1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF DELAWARE

3

4     ART+COM INNOVATIONPOOL GMBH, :   CA NO. 14-217-RGA

5                                  :   November 20, 2014

6               Plaintiff,         :

7                                  :   9:02 o'clock a.m.

8          v.                      :

9                                  :

10    GOOGLE,                      :

11                                 :

12               Defendant,        :

13    ...........................:

14

15

16               TRANSCRIPT OF DISCOVERY DISPUTE

17          BEFORE THE HONORABLE RICHARD G. ANDREWS

18               UNITED STATES DISTRICT JUDGE

19

20

21    APPEARANCES:

22

23    For Plaintiff:      FARNAN LLP

24                        BY:  BRIAN E. FARNAN, ESQ

25                        BY:  MICHAEL J. FARNAN, ESQ

```
 1                              -and-

 2                    BAKER BOTTS

 3                    BY:  SCOTT F. PARTRIDGE, ESQ

 4                    BY:  C. RYAN PINCKNEY, ESQ

 5

 6

 7   For Defendant:    MORRIS, NICHOLS, ARSHT & TUNNELL

 8                    BY:  PAUL SAINDON, ESQ

 9                              -and-

10                    AKIN & GUMP

11                    BY:  CONO A. CARRANO, ESQ

12

13

14

15

16   Court Reporter:    LEONARD A. DIBBS

17                    Official Court Reporter

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2

3              (The proceedings occurred at 9:02 o'clock a.m. as

4     follows:

5              THE COURT:  Good morning, everyone.  Please be seated.

6              This is a discovery conference in ART+COM

7     Innovationpool vs. Google, Civil Action No. 14-217.

8              Mr. Farnan, who have you got with you here?

9              MR. B. FARNAN:  Good morning, your Honor.

10             Brian Farnan on behalf of the plaintiff.  And also

11    Michael Farnan.

12             I have with me today Scott Partridge and Ryan Pinckney

13    from Baker Botts in Houston, Texas.

14             THE COURT:  Good morning to you all.

15             Mr. Saindon, who do you have with you?

16             MR. SAINDON:  Good morning, your Honor.

17             Paul Saindon from Morris Nichols.

18             And with me is Cono Carrano from Akin Gump.

19             THE COURT:  Good morning.

20             MR. CARRANO:  Good morning.

21             THE COURT:  Good morning to you all.

22             So why don't we talk about the discovery dispute first.

23             So I read the letters.  And I gather that the file that

24    the plaintiff's wants searched, which I'm going to summarize as

25    being old source code, or the source code that doesn't exactly

1    run the accused products, the -- what the plaintiff's are

2    looking for is, essentially, what it's calling copying evidence.

3    And this goes, if nothing else, to none secondary consideration

4    of nonobviousness, but maybe it goes to something else, too.

5            Am I right so far?

6            MR. PARTRIDGE:  Yes, your Honor.

7            And I do think the copying could come into play with

8    respect to other issues.  But certainly it does with respect to

9    secondary consideration issues in the case.

10            THE COURT:  And --

11            MR. PARTRIDGE:  It's an unusual patent case.

12            I suspect you haven't had a chance to look at the

13   Complaint.

14            THE COURT:  Actually, that's what I was just doing for

15   the last three minutes, so that's how much time I spent looking

16   at the complaint.

17            So, go ahead.

18            MR. PARTRIDGE:  Just briefly, the history is that our

19   client developed its system back in mid-90's at a time when PCs

20   were not powerful enough to operate a system as sophisticated as

21   theirs.

22            And the system was one that presented pictorial

23   representations of the earth.  And you do it on the fly, so you

24   could change the field of view, the direction, the distance from

25   the earth, and you would fly in over different parts of the

1    earth.  And the data that they used was data collected from a

2    plurality of different data sources.  And, in order to render

3    the view, they had to break up the representation into sections

4    with differing resolutions.  And, as you moved, you pulled data

5    that would improve the resolution and eventually all these

6    different sections that were created, would end up with the best

7    resolution that was available.

8         And to manage all that data, the client had to find

9    computers that were powerful enough.

10        The computers that used were Onyx computers that were

11   manufactured by SGI.  And the people that they worked with at

12   SGI, who are identified in the Complaint, had access to what

13   they were trying to accomplish.  And they worked with SGI to

14   modify the libraries that were used with those Onyx computers,

15   so they could work with their particular application.

16        And, indeed, SGI was so impressed with it that they

17   actually requested the client to allow them to put a demo in

18   their lobby, in their facilities out in California, so they

19   could demonstrate to people, visitors who came in, the

20   capabilities of their computers, and the client allowed them to

21   do that.

22        Well, two of the key people left SGI when it was having

23   financial difficulties.  They formed a first company, and then a

24   second company, and the second company being a company called

25   Keyhole.

1        And if you'll remember back at the time of the Iraq

2    War, CNN became famous for being able to show images of the

3    earth, as to where the bombings were occurring, and things like

4    that, and the technology that was used in connection with that

5    was the Keyhole technology, which was derived from what our

6    clients did in the '90's with their system, in using the SGI

7    computers.  The same people at Keyhole.

8        When Google decided to get into what is now the Google

9    Earth business, they bought Keyhole, and the people who were at

10   Keyhole, who had previously been at SGI, became executives at

11   Google responsible for that part of their business.

12       So, part of the reason for us seeking the information

13   that we've requested, and we've agreed on most of the ESI Order,

14   is that there's a set of terms that would allow us to search the

15   older code to determine whether or not that older code includes

16   references to Terravision, which have our client's system, and

17   some other terms that were characteristic of the system that

18   they developed in the '90's, that these people have knowledge

19   about and access to certain portions of it.

20       THE COURT:  And, so, besides for secondary

21   considerations, what other issues do you think all this is

22   relevant to?

23       MR. PARTRIDGE:  I do think it's also relevant to, you

24   know, the history of the development of Google Earth.

25       In other words, there is a story here that I think is

1    appropriate for the jury to hear, about how our client's system

2    was developed in the '90's, and when Google acquired Keyhole in

3    2004, they characterized the system that they acquired as a

4    decade ahead of its time.

5         There are press releases and the like characterizing

6    what became the Google Earth system and what they acquired from

7    Keyhole, as more or less revolutionary.  All of which is going

8    to go to the validity issues that are going to be raised in this

9    case beyond secondary considerations.

10         So, in other words, that there is praise.  There is a

11    similarity in the systems.  That information is going to be

12    relevant to arguments that they make about how, well, gee this

13    was known back in 1994 and 1995, when, in fact, Google was

14    characterizing it a decade later as more or less revolutionary.

15         THE COURT:  When was the patent issued?

16         MR. PARTRIDGE:  The original patent issued in 2000.

17         THE COURT:  When is the priority?

18         MR. PARTRIDGE:  The priority is 1996.  December 1996.

19    And the patent was reissued twice.

20         You probably hadn't had many cases of --

21         THE COURT:  Well, what is the significance of the

22    reissue?

23         MR. PARTRIDGE:  What happened in about 2005 or '6 --

24    and I can't remember the exact date -- but my client had

25    conversations with Google, after it introduced Google Earth

1    about, whether or not they could work out some sort of a deal.

2            And during the course of those conversations, a couple

3    of things happened.

4            They discovered that there was some mistakes made in

5    the translation from German to English in the specification, and

6    in some of the language in the claims.  And they also took the

7    opportunity, when they corrected those, of informing the Patent

8    Office of additional prior art that had been identified by

9    Google.

10           So they did that.  Filed this reissue application.  All

11   of the original claims were confirmed.  There was one minor

12   change in the claims.  And the first reissue issued in July of

13   2010, at which point there were some further discussions.  Much

14   shorter this time with Google about the reissued patent.

15           No deal struck.

16           And, thereafter, over the next couple of years, they

17   investigated whether or not to bring an action.

18           THE COURT:  So that doesn't seem terribly germane.

19           What is the significance of there being a reissue?

20   Does it mean there's issues as to whether the newly translated

21   claims can go back to 1996 or -- I mean I'm not sure what's the

22   significance.

23           MR. PARTRIDGE:  I was just about to get to that.

24           With respect to the first reissue, the Patent Office

25   issued the original claim, it doesn't, I don't think, has any

1    significant impact on the case.

2           What does have an impact on the case is second reissue.

3           THE COURT:  This is the one in 2010?

4           MR. PARTRIDGE:  Yes.  Well, it was filed in two

5    thousand -- a the second application for reissue was filed in

6    2013.

7           THE COURT:  Okay.

8           MR. PARTRIDGE:  And it reissued in October of 2013.

9           In the second reissue, there were new claims that were

10   included in the second reissue.

11          So, originally, there was --

12          THE COURT:  Presumably, they don't.  Well, presumably,

13   at a minimum, you can't get damages for what happened before

14   they were issued, right?

15          MR. PARTRIDGE:  Yes.

16          THE COURT:  For them.

17          MR. PARTRIDGE:  There is a difference in how damages

18   will play out for the new claims versus the old claims.

19          The ability to assert both sets of claims as to the

20   products at issue here, I think has been established under the

21   law.

22          And, particularly, there is a new product that Google

23   introduced this year.  Google Maps with Earth; that is post the

24   issuance of these new claims as to which the new claims apply.

25          And the point of all this, and how this ultimately

1    becomes relevant is that not only are there two sets of claims,

2    but the new set of claims are stacked differently than the

3    original set of claims.

4         In other words, there are dependent claims dependent on

5    each other.  That creates a different set of issues from the

6    standpoint of validity than the original claims, almost all of

7    which were directly dependent upon Independent Claim 1, which

8    was the only independent claim in the original, and is the only

9    independent claim today.

10        So you have two sets of claims that raise differing

11   issues from the standpoint of both validity and damages in the

12   case, so that complicates the analysis here over a normal case.

13        And the accused products, there are four of them,

14   basically.  Three of which existed prior to this reissue and one

15   of which came into the marketplace after the reissue.

16        So that ultimately the reissue patents do chang the set

17   of issues that we're going to have to contend with in this case.

18        It's somewhat unique in that regard.

19        THE COURT:  All right.

20        So, basically, you said, and what you're looking for in

21   this source code has to do with telling this story.

22        Is that what you said?

23        MR. PARTRIDGE:  Telling the story, and also enabling us

24   to determine if, in fact, when these engineers left SGI and

25   wrote the code that ultimately ended up as part of the Keyhole

1    product which Google bought, they used technology that was

2    derived from our client, thereby, copying what our client had

3    developed.

4           THE COURT:  All right.

5           So you have this list of terms.

6           And I was just wondering about them.  Some of them --

7    and part of reason that I was looking at the Complaint was to

8    see if, as I suspected, some of these people were inventors, and

9    I understand Terravision is the name of your product, and now I

10    understand what SGI is.

11           Are all of these terms equally likely to lead to what

12    you're looking for if that is a positive hit?

13           MR. PARTRIDGE:  I think it's pretty clear that the

14    first grouping of terms, probably the first seven or eight, are

15    directly related to that.  The last three or four are written a

16    little more broadly.  They are terms that were characteristic of

17    what our client's description of its system in the '90s, and

18    that why we selected them.

19           I would agree with you, your Honor, that those terms

20    may generate more hits.  But the problem is, we don't know how

21    many hits are being generated by any of these terms at this

22    point, which would be an easy thing to determine.

23           THE COURT:  I had gotten that far in thinking about it.

24           And I'll ask, Mr. Carrano, do you know -- and maybe the

25    answer is no -- do you know how many -- I take it you haven't

1    run this list of terms on the C++, et cetera, the code that is

2    at issue here -- to know exactly how many hits these things

3    would generate?

4         MR. CARRANO:  I'm not familiar with Google having done

5    that yet.  This is a proposal that we just heard from counsel

6    the other day or yesterday.  We haven't done that process, yet.

7         THE COURT:  Well, so, here's what -- so, is there

8    anything you want to say?

9         I gave him a opportunity to speak.

10        MR. CARRANO:  A couple of issues.

11        First the copying.

12        The only copying relevant, if their Terravision or if

13   their product embodied the patent.

14        We haven't heard from counsel or the plaintiff that

15   this source code that they are looking at, or they had, was

16   embodied by the patent.

17        If that is the case, then that somewhat makes it

18   relevant, but that's just on the relevant issue.

19        The other issue is, with respect to the ESI Agreement,

20   this is a generic provision that would apply to our source code

21   as well.

22        So, while counsel focused their source code search

23   terms, if we ran these searches, we would find our own source

24   code, which we have already given to them.  So we would have to

25   -- so, basically, in essence, running these search terms on our

1    custodians would find Google source code also, which we've

2    already given to them.

3            THE COURT:  Well, right.  I thought that was -- my

4    understanding was pretty much if you ran these things, you would

5    be running on Google's stuff, so everything you're going to

6    find, the source code is Google's source code.

7            MR. CARRANO:  Presumably, yes, right.

8            But the point I think counsel is making is, we might

9    have, in his view, some of their source code.  And if we ran --

10   if we went to a custodian and ran the search terms, we may find

11   source code from the plaintiff.  That's their theory.

12           But we would certainly find Google's source code.

13   We've already given, or made available for inspection, Google's

14   source code.

15           So the burden on us would be to not only refine our

16   source code within the custodial files, and then also review

17   them, that redundancy we think is unfair and unnecessary.

18           With respect to issues about whether or not we find

19   plaintiff's source code or derivations of that within our

20   custodial files.

21           The only thing we're asking is the following.

22           We are producing files from our custodians based on

23   these search terms.  We are not taking out from responsive files

24   -- from responsive documents -- source code, per se.

25           If the e-mail talks about source code, and it is

1    responsive, we're giving it to plaintiff.

2         All we're saying is, once we give the plaintiff those

3    responsive documents, if they think their source code files with

4    that custodians -- from that e-mail, we will work out with them

5    a process in which for us to review that source code and provide

6    it to the plaintiffs.

7         What we don't want to do is, unnecessarily refine our

8    own source code, or try it evaluate whether or not the source

9    code that is not even in the accused product is relevant to this

10   case.

11        Unless plaintiff's comes back to us after we've

12   produced the custodial files to say, yes, this source code is

13   what we want to look at, and show us cause for doing it, we

14   would do it.

15        THE COURT:  Here's what I was thinking.

16        You know, I saw some reference to last minute

17   discussions, so I'm not sure how much I might be influenced by

18   any of that.

19        It struck me that -- and I think the first thing to do

20   -- from my point of view was trying to -- I don't know --

21   balance the burden to not necessarily make Google look -- do the

22   parade of horribles that they have in their letter about having

23   to get engineers to do source code here and source code there

24   is, I think you ought to run the terms and tell me how many hits

25   you get --

1          MR. CARRANO:  Mm-hmm.

2          THE COURT:  -- in the files that are in question,

3     because I'm kind of imagining that if you get hits on

4     Terravision, or maybe even SGI, or the name of the inventors,

5     it's going to be clear that if you haven't already produced it,

6     you ought to produce it.

7          These other things where I see terms like earth demo,

8     pictorial representation, without a lot more backgrounds than I

9     have right now, they look like pretty broad terms.

10          Intrinsic Graphics?

11          I mean, obviously, I don't know what people in this

12     field talk like on a daily basis.  But those seem to be

13     something that's a lot less -- a lot less focused discovery

14     request or fishing expedition --

15          MR. PARTRIDGE:  Your Honor, may I a explain the

16     Intrinsic Graphics?

17          I agree on the first two you identified.

18          Intrinsic Graphics was the name of the first company

19     that the people who left SGI formed, that then became Keyhole,

20     when they spun Keyhole out of that company.

21          So there is a -- the reason that's in there is that

22     it's relevant to the development of the Keyhole systems that

23     Google later acquired.

24          MR. PINCKNEY:  Your Honor, if I may make a brief --

25          THE COURT:  I'm sorry.

1          Who are you?

2          MR. PINCKNEY:  I'm C. Ryan Pinckney.

3          THE COURT:  Okay.  Sorry.  I have a bad short-term

4     memory for names.

5          MR. PINCKNEY:  Okay.  I'm sorry.

6          I just wanted to make it clear the terms that are

7     listed there were actually the first set of terms that defendant

8     provided to us as the terms they were going to run on their

9     custodial ESI.

10          We pointed them out in the letter to show the irony

11     that even their terms, search and source code, will bring up

12     what are clearly responsive documents in the source code.

13          THE COURT:  All right.

14          So I guess what I'd like to have is -- I understand --

15     and tell me if I'm wrong, Mr. Carrano -- but my impression is,

16     finding out how many hits there are running these things against

17     whatever files are being run against is not a very difficult

18     task and not very expensive.

19          And, so, I think, you know, we're a step or two ahead

20     of where -- of the place where I think it would be better for me

21     to make a decision on this, if you can't make your own decision.

22          So, I guess what I'd like, because I'm not getting to,

23     you know, Mr. Saindon and the Farnans know that I don't like to

24     do things over the telephone.  But I also don't like to make

25     people come here repeatedly for particularly no good reason.

1          So I guess what I'd like is this.

2          If you could have Google run the terms by some date

3    we'll set in a second, and, basically, have for these 17 terms

4    what it, you know, what the number of hits are limited to the

5    hits that are in the disputed kinds of files.

6          I don't really care how many hits there are, and all

7    the other kinds of files you're running.  And -- and I guess

8    that would have -- I'm thinking that maybe the first ten terms

9    through Intrinsic Graphics, they probably don't show up in the

10   source code you've already produced?

11         MR. CARRANO:  Mm-hmm.

12         THE COURT:  So I don't know whether the other terms do

13   or don't.  At this point, I'm not asking you to go through

14   looking for that.  I would be inclined to say that based on what

15   I've heard, that anything that at least in the first ten terms,

16   I don't expect there is going to be that many of them.  I'm

17   expecting that you're going to just produce them.

18         The 11 through 17, you know, my initial inclination is,

19   you know, provide -- my initial inclination, but I'd like to

20   have the facts to base it on --is to not be directing that you

21   just turn that over unless either there is not a whole lot of

22   them or based -- or might be on some procedure that is closer to

23   what you suggested of plaintiffs -- some follow-up.

24         But I think I would just feel a lot better deciding

25   this with a little more factual information.

1          MR. PARTRIDGE:  And if the number of hits for that

2     second group of terms, 11 through 17 turns out to be very, very

3     high, then I would hope we could talk about whether or not

4     there's a way to modify the term.

5          THE COURT:  Well, I certainly -- I mean I think that

6     would make sense.

7          So, with that understanding, what I guess I'd like is,

8     Mr. Carrano, when do you think it's reasonable to submit a

9     letter, you know, with essentially the numbers of hits for each

10     of these?

11          MR. CARRANO:  We could do that by mid next week, I

12     think.

13          THE COURT:  Okay.

14          Mid next week.

15          So before Thanksgiving?

16          MR. CARRANO:  Yes, before Thanksgiving -- oh, I'm sorry

17     -- with Thanksgiving, Google takes off that whole -- a lot of

18     that week.

19          Could you give me until the following Monday?

20          THE COURT:  The following Monday.

21          Okay.  Well, the following Monday is fine.

22          I believe that -- is that December 1st, maybe?  I hope.

23          MR. CARRANO:  Yes.

24          MR. PARTRIDGE:  We'd be fine with the 2nd.

25          MR. CARRANO:  Okay.

1            MR. PARTRIDGE:  So your guys aren't in a situation

2     where --

3            MR. CARRANO:  I'm sure they could do it starting this

4     week.  I don't want --

5            THE COURT:  Why don't we try to avoid any problems on

6     this, even though on what I've just heard, I don't think it

7     would be a problem.

8            Why don't we say December 2nd.  You can submit a letter

9     to me and, obviously, to the plaintiff's with what the number of

10    hits are.

11           And what we'll do is, we'll set maybe a date for a

12    telephone conference about two weeks after that to give you a

13    chance to talk in between along the lines of what Mr. Partridge

14    suggested.  That based on the exchange of information you all

15    might be in a better position to come to some conclusion

16    yourself as to whether there is a better -- a way to handle it

17    that is reasonable under the circumstances.

18           But what I'm thinking is -- and I didn't bring my

19    calendar -- but maybe -- I know I don't have a trial then -- we

20    could just pick the December 16th?

21           MR. PARTRIDGE:  May I make a request?

22           THE COURT:  Yes.

23           MR. PARTRIDGE:  I'm going to be in China and Hong Kong

24    until -- through the first three weeks of December.

25           Could we do it December 22nd or 23rd?  Is that

1   possible.

2           THE COURT:  It's possible.

3           The only thing is, I'm not a hundred percent sure of my

4   movements over the holidays.

5           MR. PARTRIDGE:  I can call from China.

6           THE COURT:  That would increase the degree of

7   aggravation, because I don't think you're going to have the best

8   connection in the world.

9           But, in any event, we certainly -- so, basically, what

10  you're saying is, you're out of country until the weekend before

11  Christmas week?

12          MR. PARTRIDGE:  Yes.

13          THE COURT:  Why don't we do this.

14          Why don't we schedule it -- I'm pretty sure I'll be

15  here on December 22nd.  I'm pretty sure that I have nothing

16  scheduled.  Why don't we just schedule it for December 22nd

17  at -- and, I'm sorry, Mr. -- oh, so you're in Texas.

18          THE COURT:  And where are you?

19          MR. CARRANO:  Washington.

20          THE COURT:  Okay.  Is 9:00 a.m. all right?

21          MR. PARTRIDGE:  That's fine.

22          THE COURT:  So, December 2nd I would like to get a

23  letter, and I wouldn't be averse -- in fact I'd kind of like it

24  maybe on the Thursday before December 22nd -- if the parties

25  have made any progress in resolving the matter themselves, if

1  you would tell me -- send some joint thing and just tell me

2  where you are.

3          And, of course, if you actually resolve the matter, so

4  you don't need me, you can let me know that, too, okay?

5          MR. PARTRIDGE:  Yes, your Honor.  I would be certainly

6  happy to talk with you on the phone, and I think we could

7  probably work that out.

8          In the meantime, if I don't sign the ESI Order, can you

9  go ahead and act as though I've signed it?

10          MR. CARRANO:  Yes, your Honor.

11          THE COURT:  With the one provision to be worked out.

12          MR. PARTRIDGE:  Yes, your Honor.

13          MR. CARRANO:  Yes, your Honor.

14          THE COURT:  So that leaves the claims.

15          So let me just say what I understood about that, which

16  is the plaintiff's has one patent, and 50 or 52, I forget how

17  many asserted claims.

18          Plaintiff says that, so to speak, the initial technical

19  production is incomplete.

20          Google says, well, we produced the source code that we

21  have, and so the claim of incompleteness is really not so much

22  about what Google can do itself, but about some source code that

23  comes from somebody else?

24          MR. PARTRIDGE:  Yes.  Yes and no.

25          There is third-party source code, which I understand

1     that Google has, but they are restricted in their ability to

2     produce it, because it is owned by a third party.

3            The third party happens to be a company called

4     Activision, and the Activision code was the code developed

5     originally for the Keyhole product.  And it actually goes back

6     to the same two people who actually have patents on that

7     rendering software, in their names from the previous company.

8     And that's the code that is focused on the graphical rendering

9     that occurs when the images are displayed.

10           And I will say, your Honor, that I actually would

11    compliment Google on the code that they've produced thus far.

12    They have been very responsive to our request with respect to

13    the code that they directly control.

14           So I have no complaints about, you know, what they've

15    done in producing that code.

16           It so happens that their code has thousands of

17    references back to this outfit.  It's called Alchemy.  That is

18    its name of code that comes from the third party Activision.

19    There are thousands of references to it.

20           While there are documents that point us to how

21    functionally at a higher level that code operates, the details

22    are not there.  It's missing.  And it probably is, by our

23    expert's estimation, about half again as large as the total code

24    they've produced to us that thus far.

25           THE COURT:  You mean a 150 percent or another 50

1    percent?

2          MR. PARTRIDGE:  Another 50 percent.

3          THE COURT:  Okay.

4          MR. PARTRIDGE:  Another 50 percent.  So it's a

5    significant amount of code.

6          They have attempted to get approval from that third

7    party to produce the code to us.

8          Mr. Carrano may have an answer for us today, because I

9    know they have been working on that.  But if they are not able

10   to get an approval, we'll need to have a meet-and-confer with

11   the third party, and with Mr. Carrano, and see where we are, and

12   perhaps come back to you with respect to that issue.

13         So, the code production -- the long answer to your

14   simple is -- that the code production is not entirely complete.

15   And the patent claims have to do with how one displays the

16   representation that is displayed.  And there are multiple steps

17   that talk about how one breaks up the data into sections, and

18   then into smaller sections, and iteratively create different

19   resolutions until you get to the highest possible resolution.

20         So the graphical rendering tools that are used in

21   Google Earth, that are in the Alchemy code of Activision, are

22   important in making this assessment.

23         THE COURT:  Mr. Carrano, do you have something to add

24   to this?

25         MR. CARRANO:  I mean it's hard for me to comment on

1      their infringement theories at this point.

2           I mean I appreciate that Mr. Partridge has represented

3      the facts as far as Alchemy code pretty accurately.

4           We are -- Activation objected to producing the code.

5      We responded to a couple of their requests.  And now we're just

6      seeking their permission.

7           So we hope to have this thing resolved in a week or so,

8      but that is an outstanding issue no doubt.

9           Our point, though, is that this is a one patent case.

10     There are 85 claims in this patent.

11          Obviously, the plaintiff has been thinking about this

12     case for quite a while.  They reasonably had a Rule 11 basis.

13     They gave us preliminary sets of claims they were going to

14     assert.  They have give us infringement contentions.  So they

15     feel -- I think they know where they want to go.

16          What we're asking for at this point is that if the six

17     claims, in our view, is excessive for a one-patent case, and

18     even if you consider this a two-patent case -- because of the

19     reissued claims, it's still excessive -- for two-patent case.

20          So what we have ahead of us is infringement

21     contentions, and what we have a head of us, which is not a state

22     secret, that we'll possibly be filing inter partes review, we'd

23     like to focus the case on what is going to be the most likely,

24     or their best case for infringement, so that we can;

25          One, claim construction.  Do it efficiently here.

1          And then, two, for our contentions, inter partes

2     review, focus on, indeed, the subset of claims that they think

3     are likely to be their best case.

4          We offered 20 claims, which we think is generous for a

5     one-patent case.

6          And if the Activision code is an issue, then perhaps we

7     produce it, and they reduce their claims after the Activision

8     code is produced.

9          MR. PARTRIDGE:  Your Honor, if I may?

10          We don't I have their invalidity contentions at this

11     point.  We've done all of the work in preparing our initial set

12     of infringement contentions.

13          We reduced our claims by a third at the other side's

14     request.  We're down to fifty -- I think it's 52 claims.

15          We're not in a position to be able to assess which

16     claims we ultimately would assert without their invalidity

17     contentions.  And most of the authorities -- and I do recognize

18     there are exceptions to this -- would require claim reductions

19     after invalidity contentions or about the time of Markman.

20          So we're in favor of a process by which reduction

21     occurs, but we want it ordered and we want it informed.

22          I would just note for the Court, the original Federal

23     Circuit case that started this process of allowing the courts to

24     reduce the number of claims was the Katz case --

25          THE COURT:  Right.

1          MR. PARTRIDGE:  -- which the plaintiff cited.

2          And in the Katz case, there is a Footnote 9 that I

3     think is really instructive and right on point to where we are

4     in this case, and it reads:

5          "It is also conceivable that a claim selection order

6     could come too early in the discovery process, denying the

7     plaintiff the opportunity to determine whether particular claims

8     might raise separate issues of infringement or invalidity, in

9     light of the defendant's accused products and proposed

10    defenses."

11         And that's our position here.  That this is premature.

12    And while we could pick a number, we would be doing it

13    arbitrarily without our ability to make an informed judgment

14    about what that number ought to be based on the fact that we

15    have two sets of claims from the original, and from the reissue

16    that are going to affect damages.  Two sets of claims that are

17    going to have different implications from the standpoint of the

18    validity case.

19         And once we have their contentions, we'll be in a

20    better position to asses, of those groupings of claims, which

21    are not all asserted against the same products.  There are

22    different claims asserted against different products here.  Four

23    different Google products.  Google Earth for desktop.  The

24    Google Enterprise product.  There's a Google Mobile product.

25    And there's a Google Maps with Earth products.

1          And there are differing claims that are asserted

2     against those products that we need to be in a position to make

3     a informed judgment about the number of claims and which claims

4     they are.

5          And it seems to us that we could be in a better

6     position to advise the Court of our respective views about the

7     appropriate number of claims, after we have their invalidity

8     contentions, after we've started sharing what we think are the

9     disputed claim terms.

10          And I've gone through all claims, and because of the

11     fact that the second group of claims piggyback off the original

12     group of claims, but with different stacking arrangements, I

13     don't think the disputed claim terms here are going to be more

14     than ten or 12 unless -- and I don't think that Mr. Carrano

15     would do this, based on my experience in dealing with him so

16     far, unless one creates claim terms that are allegedly disputed

17     that can't reasonably be disputed claim terms.  I think the

18     number is going to be 10 to 15 at most.

19          So the burden on the Court is not going to change on

20     the basis of the number of asserted claims.  And the burden on

21     the plaintiff -- or on the defendant at this point -- is really

22     simply to prepare invalidity contentions to put us in an

23     informed position, just as we prepared infringement contentions

24     on all these claims to put them in a position to make an

25     informed judgment about their invalidity contentions.

1          And with all that on the table, I think both sides and

2    your Honor will be in a position to make an informed judgment as

3    to what the number ought to, be and when that number should be

4    implemented?

5          MR. CARRANO:  May I?

6          THE COURT:  Yes.

7          MR. CARRANO:  Again, this is a one-patent case.

8          Again, in my experience, I think 56 claims for one

9    patent case is excessive -- demonstratively excessive.

10          If the issue is our invalidity contentions, and if this

11    helps resolve the issue, we will defer asking for -- we won't

12    ask for a reduction before the invalidity contentions, but we

13    are -- we think it's absolutely imperative to have the

14    reductions after the invalidity contentions to the number we are

15    asking for, for 20.

16          If they need the invalidity contentions to make their

17    decision, we're okay with doing it somewhere in late December or

18    early January to reduce the claims.

19          THE COURT:  When does the claim construction process

20    start.

21          MR. PARTRIDGE:  Oh, we exchanged dispute claim terms

22    starting in-- I think we identify terms in early December.

23          We had conversations about those in late December.

24          And in January, we created our list of constructions

25    and the like.  And the hearing is, I think, in May.

1          THE COURT:  Okay.  So, here's what I think, which is,

2    however many asserted claims there are, whether it's 56, or 52,

3    or 50, whatever it is, and actually based on what Mr. Partridge

4    said, I'm not actually sure -- in fact, before I go any further.

5          Most of what you said was, it's unfair to make us do

6    this before the invalidity contentions.

7          Mr. Carrano just said, well, okay, after the invalidity

8    contentions.

9          What do you have to say about that?

10         MR. PARTRIDGE:  And our analysis of the code that they

11   are going to produce.

12         THE COURT:  No, no, no.  Okay.  Right.

13         The way the discussion was going, I thought there was a

14   reasonable chance that the Activision code was not that far off

15   in being produced.  I know we don't know that for a fact.

16         MR. CARRANO:  I believe that is the case.  I mean we're

17   waiting on Activision.

18         THE COURT:  So I'm not going to do something that

19   assumes a fact that may or may not occur, not withstanding good

20   faith representations, because you say just don't know.

21         But it does seem to me that after you get the

22   Activision code, and you get the invalidity contentions, it is

23   time to chop the case down.  I think 20 is a pretty reasonable

24   request.

25         But I guess what I'm hearing is -- I'm not sure other

1    than, you know, you said I'd like the source, the Activision

2    code.  I'd like the invalidity contentions.

3            Do you agree, after you have them, you're ready to cut

4    down the number of asserted claims?

5            MR. PARTRIDGE:  We'll ready to cut them down, but I

6    would like an opportunity to, based on our review of that, to

7    present to you what we think the number should be rather than

8    picking an arbitrary number, which is what I think we'd be doing

9    now.

10           THE COURT:  Okay.  So, part of my thinking about all

11   this is informed by the model, what is called the case

12   management committee that I'm sure you're all familiar with,

13   where, by my calculation, the target number before claim

14   construction is 12.

15           Which is the reason why I said Google's request of 20

16   is in the reasonable ballpark.

17           I hear what you're saying about, well, it's actually

18   more like two patents, we accused a bunch of products, you know,

19   four different products.

20           You know, I hear you explaining, and maybe that's the

21   -- there could be a lot of reasons why Google said 20, who

22   knows?

23           But, so, I'm very sympathetic to what Google has asked

24   for.

25           But I hear you saying, a little bit arbitrary, maybe a

1     lot arbitrary, so why don't we get these two assumed facts done.

2     And, you know, maybe you all can come to some understanding

3     yourself as to how much you're going to cut it down.

4          If you don't, I will certainly be willing to hear you

5     in January or whenever is the right time for cutting it down.  I

6     accept what you say.  It may not make that much difference in

7     the terms of the Markman.  I think it needs to be cut down

8     whether it has an impact on the Markman or not.

9          Of course, the proposed model order, you know, gives

10    you -- which follows categories in that regard -- gives you, you

11    know, the opportunity for good cause to come back and substitute

12    in.

13         And I also think, you know, because I guess the law

14    favors IPR type procedures, so putting -- and, of course, I

15    don't know when and if Google does this, whether they are going

16    to be filing Motions to Stay the case, too.  If they do, you

17    know, then I'm going to be hearing arguments about why you

18    didn't do it earlier.

19         You know, I think it actually makes a lot of sense,

20    because trying to get IPR on 56 claims is probably a lot

21    different than probably getting it on 20 plus or minus,

22    considering the amount of time and effort they have to put into

23    it, whether there is a stay or not.

24         So I'm not going to order it right now, because I think

25    Mr. Partridge makes a reasonable case that it's a little

1     premature.  But I certainly intend to do it when I don't think

2     it's premature.

3           And at the time, if you haven't worked it out between

4     yourselves as to how many claims it should be, I'll listen to

5     you and I'll come to some decision.  And I'm not saying it will

6     be 20.  Maybe it will be more.  Maybe it will be less.  But it

7     will be something based on whatever it is you tell me.

8           MR. PARTRIDGE:  Very good.  Thank you, your Honor.

9           MR. CARRANO:  Your Honor, one more point on that issue.

10           At the December 22nd status conference can we add this

11     issue to that conference also, so we can try to resolve this

12     beforehand?

13           THE COURT:  I have no problem adding it as an issue.

14           The thing that I'm mostly concerned about is -- and

15     maybe it's good to add it as an issue -- but in order to

16     actually have it added as an issue to discuss, you need to get

17     on Activision --

18           MR. CARRANO:  Yes, I know.

19           THE COURT:  -- to produce the source code.  And you

20     need to do the --

21           MR. CARRANO:  We're motivated to do that, if it comes

22     to that, and we haven't achieved that.  I'm sure we'll discuss

23     it.

24           THE COURT:  When in this letter you'll send me on

25     the --

1                     MR. PARTRIDGE:  18th.

2                     THE COURT:  The 18th.

3                     You can just tell me, you know, in a paragraph or two,

4          whether that is something that you will want to be discussing.

5                     So, put in whatever it is that you'd like me to be

6          thinking about before I actually get on the phone with you,

7          okay?

8                     MR. CARRANO:  Yes, your Honor.

9                     MR. PARTRIDGE:  Thank, your Honor.  Thank you very

10         much.

11                    THE COURT:  Thank you for coming.

12                    I'm not going to issue any written orders other than, I

13         guess, putting these dates on the calendar.

14                    But the transcript will serve as the order of the

15         Court, all right?

16                    MR. PARTRIDGE:  Thank you, your Honor.

17                    MR. CARRANO:  Thank you, your Honor.

18                    THE COURT:  Thank you.  Have a nice day.

19                    (The proceedings adjourned at 9:49 o'clock a.m.)

20                              *  *  *  *  *

21

22

23

24

25