```
 1                UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF DELAWARE

 3

 4    ART+COM Innovationpool GmbH  : CA NO. 14-217-RGA

 5                                 :

 6              Plaintiff,         :

 7                                 :

 8          v.                     : April 27, 2015

 9                                 :

10    GOOGLE INC.,                 :

11                                 :

12              Defendant.    : 11:24 o'clock a.m.

13    ............................:

14

15

16            TRANSCRIPT OF DISCOVERY DISPUTE

17        BEFORE THE HONORABLE RICHARD G. ANDREWS

18            UNITED STATES DISTRICT JUDGE

19

20

21    APPEARANCES:

22

23    For Plaintiff:    FARNAN LLP

24                      BY:  BRIAN E. FARNAN, ESQ

25                            -and-
```

```
 1                       BAKER BOTTS LLP

 2                       BY:  SCOTT F. PARTRIDGE, ESQ

 3                       BY:  M. NATALIE ALFARO, ESQ

 4

 5

 6    For Defendant:     MORRIS, NICHOLS, ARSHT & TUNNELL

 7                       BY:  JACK B. BLUMENFELD, ESQ

 8                               -and-

 9                       AKIN GUMP STRAUSS HAUER & FELD

10                       BY:  CONO A. CARRANO, ESQ

11

12

13

14

15

16    Court Reporter:     LEONARD A. DIBBS

17                        Official Court Reporter

18

19

20

21

22

23

24

25
```

1

2                        P R O C E E D I N G S

3

4              (The proceedings occurred at 11:24 o'clock a.m. as

5       follows:)

6              THE COURT:  Good morning.  Please be seated.

7              This is a discovery conference in Art+Com

8       Innovationalpool GmbH v. Google Inc., Civil Action No. 14-217.

9              Mr. Farnan, who have you got with you there?

10             MR. FARNAN:  Good morning, your Honor.  Brian Farnan.

11             With me is Scott Partridge --

12             MR. PARTRIDGE:  Good morning, your Honor.

13             MR. FARNAN:  -- and Natalie Alfaro.

14             MS. ALFARO:  Good morning, your Honor.

15             MS. FARNAN:  They are with Baker Botts.

16             THE COURT:  Good morning to you both.

17             Mr. Blumenfeld.

18             MR. BLUMENFELD:  Good morning, your Honor.

19             Jack Blumenfeld from Morris Nichols for Google, and

20       Cono Carrano from Akin Gump in Washington.

21             THE COURT:  Good morning to you all.

22             All right.

23             So, as I understand it, the letters say that Art+Com

24       has three issues.

25             Has anything that was written in the letters become

1    less of an issue since I got these?

2            MR. PARTRIDGE:  No, your Honor.

3            THE COURT:  All right.

4            So, in the first issue, these products; "Google Earth,

5    Google Earth Pro, Google Earth Enterprise, the New Google Maps,

6    and any other Google product or service that incorporates or

7    uses the same or substantially similar functionalities," is that

8    the same thing, Mr. Carrano, that your response that you

9    referred to as Google Earth?

10           MR. CARRANO:  Yes, your Honor.

11           THE COURT:  Okay.  So, in regards to the requested

12   financial information, ART+COM says we have two pages.  I

13   couldn't figure out exactly how many pages Google said it

14   produced, but it looks like it was more than just two.

15           If I'm reading these things right, what am I missing

16   here?

17           MR. PARTRIDGE:  Your Honor, they produced two

18   documents.  The documents have multiple pages.  I think that's

19   the confusion on that point.

20           THE COURT:  Well, that's a good start, yes.

21           MR. PARTRIDGE:  And if you'd like, I can -- and maybe

22   this is a good place to start -- I can showing show you the two

23   documents that somehow reflect all of the revenue information

24   they think they need to provide in connection with this case.

25           THE COURT:  Well, I thought they actually said this was

1   all the revenue information they have.

2       MR. PARTRIDGE:  Ah, well, you know, I think may be that

3   is a good place to start, your Honor.

4       Before coming over here, I pulled up from Google's

5   website their current financial tables.

6       MR. PARTRIDGE:  May I approach?

7       THE COURT:  Yes, okay.

8       (Pause)

9       MR. PARTRIDGE:  This document, which as you can see, is

10  an income statement information for previous years, as well as

11  2014.  And at the bottom of the first page, you see add revenues

12  for 2014.  For example, the total advertising revenues are $59

13  billion, 45 of which came from the website, and you see the

14  previous years there.

15      On the next several pages, you see information about

16  those ad revenues, and the acquisition of those revenues.

17  That's more information than we got in any of the documents they

18  produced.

19      THE COURT:  Weren't you asking for information about

20  Google Earth, and this is about Google?

21      MR. PARTRIDGE:  That's another good question.

22      If I May I approach again?

23      THE COURT:  All right.

24      MR. PARTRIDGE:  This is a document, page from a

25  document that was prepared by Quick Credit Suisse in 2010.

1          I can give you the whole document, but this is from

2     Page 20 of that document.

3          And it describes -- and the document, itself, in

4     exhaustive detail describes Google's way of making money,

5     especially given that they offer free products on their -- in

6     their system.

7          And if you look to the left, this is called Google's

8     network effect, and if you look to the left of that document,

9     the circle that says, strong search product, strong search

10    products are products like Google Earth, and there are others.

11         And those products drive users, which you can see at

12    the top of the document.  And the increased users drive more ad

13    revenue.  And the use of those products creates information

14    about what the users preferences are, which create data that

15    enables them to target advertisements to certain users, and

16    increase the amount of the revenue that they generate with

17    respect to those advertisements.  And that's what Google is

18    famous for.

19         So, every product that generates users, generates

20    advertising revenue.

21         And, so, a key here is whether or not Google Earth

22    drives users.  And yesterday we received a document -- we did

23    receive a few more documents -- yesterday we received a document

24    from Google that says, "The Future of Earth," a February 26,

25    2015, document that says on page -- Bates page 981 of the

1    document -- and I don't have extra copies, because I just got

2    this yesterday -- that Maps and Earth are two of their top five

3    favored brands.

4           And they go on to say that with respect to Google

5    Earth, it has massive activations, 1.9 billion, total 600,000

6    per day.

7           It drives advertising revenue.  And the reason we want

8    advertising revenue from Google is so that we can use

9    information like driving of users, driving of advertising

10   revenue per click, the relationship between downloads and the

11   generation of advertising revenue in determining what's a fair

12   apportionment of those revenues with respect to Google Earth and

13   its role.

14          And we know that there are documents, and we have seen

15   them from other public sources, that show the contribution to

16   users of Google Earth compared to all the other products of

17   Google.

18          We have none of those documents from Google.

19          What we have, your Honor, if I can approach again to

20   show you the two documents that they rely on repeatedly as

21   sufficient in this case -- I'll pull the other one out...

22          (Pause)

23          ...have scant information.

24          The first one, which is the one that has the Bates No.

25   747 in the bottom right-hand corner, talks about Google Earth

1    Enterprise.

2         Well, Google Earth Enterprise is one of the four

3    products.  It happens to be one of the products for which they

4    charge a license fee.

5         Up until recently, two of the four products accused,

6    you could only get by paying a license fee.  If you were an oil

7    company looking for geographical information in the Gulf of

8    Mexico, or if you were government looking for geographical

9    information in some part of the world, you could get a more

10   sophisticated version of Google Earth if you paid a license fee.

11        Most of this case is about free Google Earth on their

12   website, so, one of these documents has nothing to do,

13   whatsoever, with ad revenues.

14        And if you look at the second one, which is labeled

15   "Revenue, Property, Google Earth," who can tell what this is

16   about.

17        And you might say, I'll go take a deposition and find

18   out about one of those these documents.

19        That would be a complete waste of time without Google

20   first producing the documentation that they have about their

21   revenues, their ad revenues, and how those revenues relate to

22   each of the various products, and what percentage of their users

23   are generated, as a consequence of Google Earth, as compared to

24   other products.

25        And that's the problem that we're facing here.

1          THE COURT:  Okay, I get it.

2          Mr. Carrano?

3          MR. CARRANO:  Thank you, your Honor.

4          So, the documents, the two documents which Mr.

5     Partridge referred to are from our database.  It's the revenue

6     that we attribute to the Google product -- the Google Earth

7     products.

8          THE COURT:  Well, so, the one does say, revenues Google

9     Earth Enterprise, and he says that's only one of the accused

10    products.

11         Am I correct so far?

12         MR. CARRANO:  That's correct.

13         And the other ones -- I'm not sure there's another

14    document that --

15         THE COURT:  The other one says, "Revenue Property

16    Google Earth."

17         MR. CARRANO:  And that's -- that's the Google Earth

18    free version that you and I use online, and that's the ad

19    revenue for that product.

20         THE COURT:  Well, so, just looking at it, I understand

21    the column that is marked year, and I understand the column that

22    is marked month.

23         The column is the "Sum of Cost, U.S. Dollars."

24         What's that supposed to represent?

25         MR. CARRANO:  That's -- I think that's the net revenue

1    per month for Google Earth, the free version.

2              THE COURT:  Okay.  I was just kind of wondering if

3    that's what you think that is.

4              MR. CARRANO:  Well, I'm pretty surely.  I was told that

5    this was the revenue for Google Earth.  The description, "Sum of

6    Cost, U.S. Dollars," is a little misdescriptive.

7              THE COURT:  It's hard to believe -- I can't recall --

8    is Google the largest company in the world or something?

9              MR. CARRANO:  It's up there.

10             THE COURT:  It's hard to believe that this is the best

11   they can do, is to produce mislabeled columns?

12             MR. CARRANO:  I've been told that these numbers

13   represent revenue of Google Earth month-by-month since 2007.

14             THE COURT:  And, I take it, there's probably some

15   zeroes that are supposed to be added to the third column?

16             MR. CARRANO:  As far as cents?

17             THE COURT:  Right.

18             MR. CARRANO:  No.  These are the actual -- those are

19   dollars.

20             So, for example, the first 2007, month three, so March,

21   $162.

22             And then -- this is --

23             THE COURT:  Well, when we say -- so, revenue, because

24   you say sometimes Google Earth is free, and sometimes it's

25   licensed.  I guess this is the licensed revenues for Google

1    Earth, and up through the middle of 2009, that was less than I

2    make in a month?

3              MR. CARRANO:  Yes, it was rolled out -- in the early

4    days of rolling out -- so the peak -- let me clarify.

5              This document, which you're looking at, the one that is

6    Bates numbered 45750 through 752, this is Google Earth.

7              Let's say we'll call it Google Earth, the free version.

8    That's what you and I can access ourselves on the web.

9              The only revenue they make -- Google attributes revenue

10   to that product based on advertising.  This is the list on a

11   month-by-month basis of the advertising revenues they attributed

12   to Google Earth, the free version.

13             The other document you have is Google Earth Enterprise

14   product and that's a licensing paradigm.

15             THE COURT:  Okay.  And, so, you're telling me -- and,

16   presumably, more importantly the plaintiff -- that these are the

17   licensing revenues for all of the accused products?

18             MR. CARRANO:  Yes.  As counsel pointed out for ART+COM,

19   Google Earth Pro is at least now free.  It wasn't free before.

20             And I think to the extent that there's revenue from

21   that product, it's wrapped up into that second document.

22             THE COURT:  And, so, do you know how it is that Google

23   attributes advertising revenue to the free use of Google Earth?

24             MR. CARRANO:  I believe it's those ads that are

25   associated with actually using Google Earth.  I think their

1    theory is that it is broader than that.

2             THE COURT:  I think I did hear that.

3             I mean, the Credit Suisse flow chart, or whatever you

4    want to call it, certainly suggests that their theory is --

5    probably for lack of a better word is -- Google Earth

6    contributes to the overall revenue of Google.

7             And, so, therefore, it may not be the case, coming from

8    these public financial statements, that Google made 45 -- is

9    that billion?

10            MR. PARTRIDGE:  Yes, your Honor.

11            THE COURT:  Okay.  I didn't know whether it was a

12   trillion or a billion.

13            A billion dollars in 2014.  I think they have a theory

14   that Google couldn't how much of that $45 billion is a attribute

15   able to Google Earth, right?

16            MR. CARRANO:  That's what I believe their theory is,

17   yes.

18            THE COURT:  And what you're representing to me, and I

19   suppose to them, is that the only information that Google has

20   about what contribution it makes to the overall Google success,

21   that Google consider it to be -- considers it to be in its best

22   year, you know, in the neighborhood of a million-and-a-half

23   dollars?

24            MR. CARRANO:  It depends on what year.  You're taking

25   the best year.

1          THE COURT:  All right.

2          Oh, the best year.  I was picking the one that had the

3    biggest number?

4          MR. CARRANO:  Yes, yes.  Those numbers -- Enterprises

5    numbers are much bigger than that, but --

6          THE COURT:  Oh, I'm sorry.  I was just looking at the

7    free products.

8          MR. CARRANO:  Right.  So the free product is not -- is

9    not a big revenue generator for us.

10          THE COURT:  Because I'm assuming that, in fact, in

11    terms of the things you actually licensed and get fees, that

12    what they produced, Mr. Partridge has 457 to 747, that pretty

13    much is what they get as actual fees from licensing this stuff,

14    right?

15          MR. PARTRIDGE:  Well, we haven't had a chance to test

16    it, but that's what they're representing to us.

17          THE COURT:  Right.  No, I mean, that's kind of the --

18          MR. PARTRIDGE:  That's their licensing of revenue.

19          Now, of course, during the course of discovery, we'll

20    want to see the agreements that underlies it and other things.

21          THE COURT:  Right, right, right.

22          But, I mean, in terms of what we can do right now, in

23    terms of the more traditional, do you have a product and do you

24    sell it, they produced the numbers for that?

25          MR. PARTRIDGE:  Yes.  And our motion doesn't relate to

1    Enterprise.  It relates to the revenues that are related to

2    Google free.  And I would be happy to respond to the arguments

3    that --

4              THE COURT:  Revenues relating to Google what?

5              MR. PARTRIDGE:  Google free.

6              THE COURT:  Google free.

7              MR. PARTRIDGE:  Yes.

8              THE COURT:  Free, sorry.

9              MR. PARTRIDGE:  If I may, your Honor?

10             THE COURT:  Yeah, okay.

11             MR. PARTRIDGE:  The fact that counsel said, gee, they

12   didn't make any revenue off of Google Earth until 2009.  Well,

13   you know, they introduced it in 2005.

14             And, in a way, this underscores my point.

15             They used Google Earth to drive users.  And the more

16   users they get in the Google system, the greater the information

17   they generate about the users, so they can target ads to those

18   users whether they're on Google Earth or anything else.

19             THE COURT:  Okay.  But, so, isn't the problem here is

20   -- not withstanding your skepticism which I share -- Google

21   doesn't track anything besides for what Mr. Carrano has produced

22   here, until you start doing something more to find out what

23   Google actually does, what is it exactly you want me to do?

24             MR. PARTRIDGE:  Here's what I want, your Honor.

25             My point in showing you that network effect is to

1    illustrate that these different products that Google provides

2    users, and those users are then used to generate a targeted ads

3    when they find out information about the users.

4            And that what Google wants to do is confine our damages

5    theory to their attribution of advertising revenue to Google

6    Earth, as opposed to allowing us to determine what percentage of

7    their users are derived from Google Earth, including prior 2009,

8    when Google Earth was driving hundreds and hundreds of thousands

9    of users.  By 2009, they had a billion users of Google Earth.

10           Now, this was more than an altruistic enterprise on

11   their part.  They were using Google Earth to drive users to the

12   system, so they could target ads to those users.

13           What they now want to do is say, unless you're

14   specifically within Google Earth, and there's a ad within Google

15   Earth that someone clicks upon, that those are the only

16   advertising revenues that should be in play.

17           And they want to discount completely --

18           THE COURT:  Well, you would, basically, like to get the

19   information to do an audit of Google and come up with your own

20   theory as to how to attribute their reference?

21           MR. PARTRIDGE:  You got it, your Honor.  It's accepting

22   their own internal attributions since 2009, four years after

23   they introduced the product.

24           THE COURT:  I think I get your position.

25           Mr. Carrano, I guess one of the questions I have is, do

1    you think the document that ends with 45750 passes the straight

2    face test?

3            R. CARRANO:  This is what Google keeps in the ordinary

4    course of business for how they attribute revenue to Google

5    free.  That -- yes, that does.

6            As far as the broader theory which they have, we really

7    don't have much objection to them pursuing that theory, but to

8    say that we didn't produce the documents --

9            THE COURT:  So, is it you're saying, okay.  Well, fine.

10   The problem is that they really haven't asked for the right

11   papers in discovery yet?

12           MR. CARRANO:  Yes.  We suggest they never had a

13   30(b)(6) designee, a deposition notice out for documents, where

14   we have documents, and what type documents we have.

15           Take the deposition.  Explore what they want to

16   explore.  And they could follow-up more specifically.

17           For example, in their letter, they ask for an average

18   revenue per user.  We don't -- we don't -- from my minds we

19   don't calculate that.

20           We have revenue numbers which we show you on these

21   exhibits.  We have metrics about use, including activation,

22   which Mr. Partridge referred to, but our understanding is, we

23   don't calculate an average revenue per user.

24           We can give them the underlying data that they're

25   asking for, but they're presupposing that we're doing some of

1    these things that they claim we do, and, we, being the client,

2    search the analysis in our searches.

3            Now --

4            THE COURT:  And, Mr. Partridge, have you asked for the

5    underlying data yet?

6            MR. PARTRIDGE:  Yes, your Honor.

7            THE COURT:  Okay.

8            MR. PARTRIDGE:  And --

9            THE COURT:  Hold on.

10           Mr. Carrano, has he asked for the underlying data yet?

11           MR. CARRANO:  I believe so.  I think we're trying to

12   find, what we can find, and produce to them what we can find.

13           I think they're presupposing some characterization of

14   the information that we don't think exists.

15           But we are -- we're not saying no to anything here.

16   We're just saying, this is for sure the exhibit that we have for

17   the revenue.

18           Google, in the ordinary course of business, attributes

19   to these products.  That's what they asked for, these products.

20           We've given them metrics about our products, so they

21   can understand.  If they want to formulate a damages theory,

22   they can formulate it based on our metrics.

23           They have asked for the bigger numbers, which is what

24   they gave you today from the website.

25           We'll say -- we say, we'll give you those bigger

1    numbers, the SEC filings, or what have you --

2         THE COURT:  I assume giving them the SEC files, these

3    are not secret things.  If they want to do it, they can just

4    print it out themselves.

5         MR. CARRANO:  Yes.  Well, we're happy to do it.

6         THE COURT:  No, no, no.  But, I mean, saying, we'll

7    give them public documents is not much of a concession.

8         MR. CARRANO:  Fair enough.  But we're trying to get in

9    the way of their damages theory.  We just to be clear what we've

10   done so far, and be clear this is the way Google, in the

11   ordinary course of business, attributes revenue to these accused

12   products.

13        THE COURT:  Okay.  Okay.  So -- okay, Mr. Partridge --

14   Mr. Carrano, stand there.  Mr. Partridge, come on up.

15        Let's take Mr. Carrano at his word, which I'm sure is

16   good, from what he's been told.

17        So you want the underlining data, right?

18        MR. PARTRIDGE:  Yes, your Honor.

19        And I would note substantial completion of document

20   production was supposed to be last December.  We've been meeting

21   and conferring on this since January.

22        THE COURT:  What is it you want?

23        MR. PARTRIDGE:  I would like to get their total

24   advertising revenue since Google Earth was introduced on a

25   yearly, quarterly, monthly basis, or however they compile it.

1    The number of users that use Google Earth, as compared to the

2    number of users who use their other products during that period

3    of time, quarterly, monthly, annual basis, if they have it.  The

4    number of downloads for the various products.  Their information

5    that allows us to calculate revenue per click on --

6         THE COURT:  So, wait.  Revenue per click.  Information

7    in order to calculate the revenue per click.

8         Based on what he told me, you need the number of

9    clicks.

10        MR. PARTRIDGE:  We need the number of users, the number

11   of clicks, the number of downloads, and we need the revenue, ad

12   revenue, generated during the time period from the introduction

13   of Google Earth up until today.

14        THE COURT:  So there's five items.

15        MR. PARTRIDGE:  Correct.

16        THE COURT:  Is that what you need?

17        MR. PARTRIDGE:  Let me check my notes.

18        (Pause)

19        The other thing we would need here is the run rate that

20   they use for Google Earth, not just this Bates document that we

21   --

22        THE COURT:  I'm sorry.  What is the run rate?

23        MR. PARTRIDGE:  The run rate is -- they do have

24   advertisements on Google Earth that people click on, and they

25   calculate a run rate for those ads.

1                    THE COURT:  Okay.

2                    MR. PARTRIDGE:  So, the information that they have,

3          which this document they showed you is supposedly a summary.

4                    I think Mr. Carrano is telling you what he knows, but

5          the truth of the matter is, there's more information behind it.

6                    We want the Bates documentation that led to that

7          calculation in that summary.  It looks like a summary proposed

8          for litigation.  And that document relates to what is called a

9          run rate with respect to advertisements actually displayed on

10         Google Earth.

11                   So I would --

12                   THE COURT:  Wait, wait, wait, wait.  So you're talking

13         now about the free Google --

14                   MR. PARTRIDGE:  Yes.

15                   THE COURT:  -- or the free Earth?

16                   MR. PARTRIDGE:  That's correct.  Are there multiple

17         models that we could use in this case, one of which is --

18                   THE COURT:  Wait, wait, wait.  So you want the run

19         rate.

20                   Tell me, again, what is that?

21                   MR. PARTRIDGE:  There are a couple of ways to look at

22         this.

23                   One is that since 2009, as Mr. Carrano said, they have

24         done an attribution of ad revenues to Google Earth.

25                   If you are in Google Earth, and you click on a ad,

1    there's a certain amount of money that they collect from that

2    advertiser, because of that ad.

3         I think the term they use to describe that is a run

4    rate with respect to Google Earth.

5         We want the underlining documentation, so we can use

6    that to compare to the information that we get about ads

7    revenue, users, downloads, and clicks, so we can determine

8    what's the appropriate damage model here.

9         THE COURT:  Okay.  So, Mr. Carrano, he's now said about

10   six different categories of things from 2007, to the present on

11   a monthly, quarterly, or whatever basis.

12        But, basically, what you've said, have we resolved this

13   matter, can you get him those six things?

14        MR. CARRANO:  I don't know that we can get all those

15   things.  We are willing to endeavor to get back-ups for what is

16   shown here and --

17        THE COURT:  That's the run rate business that they --

18        MR. CARRANO:  They cite run rate as a term that Google

19   uses.  We're not aware of that.  There's some documents we can

20   give them, which -- we looked into this, and it's not clear to

21   us what that particularly means, but if we can get some guidance

22   on that, we will -- again, we're not saying, no, to anything.

23        THE COURT:  Well, you're right, but you are also not

24   saying, yes, to anything either.

25        The ad revenues by month for 2007, can you get him

1    that?

2            MR. CARRANO:  If we can find the back-up for this.

3            THE COURT:  No, no, no.  You're not listening real

4    well.

5            Can you get him the ad revenue for Google for the, you

6    know, the last seven years, more or less, by month?

7            MR. CARRANO:  I'm not sure.  I mean, I don't -- I'm not

8    sure.  I suspect that --

9            THE COURT:  Why not?  Do you think Google doesn't track

10   it?

11           MR. CARRANO:  Well, this is the result of tracking.

12           THE COURT:  But this is a result of tracking something

13   for Google Earth.

14           So you've produced the document maybe in what Google

15   keeps in the ordinary course of business, which strikes me as it

16   looks less sophisticated than what I keep myself with my

17   financials, but I don't know.

18           But, you know, you're telling me on the one hand, yes,

19   you want to help, if he can specify things.

20           So, basically, get him the ad revenue per month for

21   everything that Google does.  Get him the number of -- I'm

22   sorry -- Mr. Partridge, tell me another thing.

23           MR. PARTRIDGE:  The users.

24           THE COURT:  The number of users, the number of clicks.

25           MR. PARTRIDGE:  Clicks and downloads.

1      THE COURT:  And how much of that is attributed to --

2  and maybe that's what this is, I guess that's what this is --

3  but, basically, broken down to Google Earth and not Google

4  Earth.

5      MR. PARTRIDGE:  Correct.  So we can do the comparison,

6  and do our own attribution apportionment, and compare that to

7  other alternative approaches that one might take for damages in

8  this case.

9      THE COURT:  All right.

10      Well, in any event, they, you know, make the case,

11  certainly it's going to be the case that there are details that

12  may need to be worked out between the two of you.  And, in the

13  ends, probably there's going to be a 30(b)(6) deposition where

14  Mr. Partridge is going to ask some questions, to try to make

15  sure that he's got what he wants.

16      But it seems to me, that the basic parameters that he's

17  talking about are things that, I think, Google does have, and

18  they actually ought to be able to produce.

19      Is this 30(b)(6) witness scheduled for some time?

20      MR. PARTRIDGE:  The 30(b)(6) we served is a document

21  collection deposition notice that we served over a month ago.

22      We want to find out first, because the documents were

23  so --

24      THE COURT:  Okay.  So, Mr. Carrano, I'm going to order

25  you do this within three weeks, okay?

1          I understand Google takes time.  They have internal

2    stuff.  But tell them to get going and the Judge in Delaware is

3    real mad about -- you know, tell them I'm mad, all right?

4          Let's go on to the next thing.

5          Tell them that you don't want me to be mad at you.

6          MR. CARRANO:  I don't.

7          THE COURT:  So, the next thing is that Google and the

8    ESI stipulation.

9          So I have to say reading this, I thought this was one

10   resolved, because -- so, why isn't that resolved, Mr. Partridge?

11         MR. PARTRIDGE:  Ms. Alfaro will address this issue.

12         THE COURT:  Ms. Alfaro.

13         MS. ALFARO:  Good morning, Judge.

14         There's still a dispute, because it's very clear that

15   Google is not running its search terms on the non-custodial data

16   sources, which the ESI --

17         THE COURT:  They said they reviewed the non --

18   custodial data sources in their entirety.

19         MS. ALFARO:  There's a few problems with that, your

20   Honor.

21         The first problem is that we don't know what non-

22   custodial data sources they reviewed.

23         THE COURT:  I thought they said they reviewed all the

24   ones that are listed in Paragraph 3(b).

25         MS. ALFARO:  Yes, let me -- again, may I approach, your

1      Honor?

2             THE COURT:  Sure.

3             Am I right, Mr. Carrano, is that what you're saying?

4             MR. CARRANO:  Yes.  What you're going to hear is a

5      generic description.  Not specifically which repository.

6             MS. ALFARO:  That's right.  So we do not know which

7      repository have been searched.

8             THE COURT:  Well, he's saying all the ones that are in

9      3(b) have been searched, right?

10            Is that what you're saying, Mr. Carrano?

11            MR. CARRANO:  Yes, yes.  But the point is, is that 3(b)

12     is generic.  It doesn't identify specific repositories.

13            THE COURT:  Okay.  So, but I mean, so to the extent

14     that -- I take it you would be willing to tell them what the

15     actual repositories are that are -- have been searched --

16            MR. CARRANO:  Yes.

17            THE COURT:  -- that are generically identified, you

18     will specifically identify them?

19            MR. CARRANO:  That's if you want, we will.

20            MS. ALFARO:  If I may, your Honor?

21            They actually agreed to do that a couple of weeks ago,

22     and we still haven't seen any of it.  And we saw that and we

23     haven't seen it.

24            THE COURT:  But if they do that, isn't this issue

25     resolved?

1          MS. ALFARO:  So, the other issue is that ESI order, if

2     they elect to use search terms, it will allow us to run search

3     terms as well on those non-custodial data sources.

4          THE COURT:  Right.  But they said they didn't use

5     search terms.

6          MS. ALFARO:  They use -- they have used search terms,

7     your Honor, but only on the custodial set of documents, right.

8          THE COURT:  Okay.

9          MS. ALFARO:  So they have elected to use search terms.

10    That is a fact.  I don't think Mr. Carrano will -- -

11         THE COURT:  They used search terms.

12         MS. ALFARO:  I'm sorry?

13         THE COURT:  They used search terms on the custodial?

14         MS. ALFARO:  Yes.

15         THE COURT:  Is that right, Mr. Carrano?

16         MR. CARRANO:  That's correct.  That's correct.

17         THE COURT:  Okay.  All right.

18         Go ahead.

19         MS. ALFARO:  So Google has represented to us that on

20    multiple meet-and-confers, telephone calls, that their documents

21    are mostly electronic.  That makes sense.  That is not a

22    surprise to us.

23         So they elected to use search terms, pursuant to the

24    ESI order, to make it easier to search for documents they

25    believe are relevant and are responsive to our RFPs.

1          The ESI order requires them, if they elect to use those

2     search terms, to run those search terms not only on their

3     custodial documents, but also on their non-custodial data

4     sources.

5          What they are doing is, they're playing games.  They're

6     using search terms for the custodial documents, and for their

7     non-custodial data sources, they're just going picking up

8     repositories that they believe are -- you know, contain relevant

9     and responsive information, and just searching those documents.

10          And, your Honor --

11          THE COURT:  Hold on a minute.  Hold on.

12          So, where do you see in the ESI order that they have to

13     search the non-custodial data sources, the same way as the

14     custodial data sources?

15          MS. ALFARO:  Sure.  Paragraph 4(b)(i).

16          THE COURT:  Yeah, I'm looking at it.

17          MS. ALFARO:  All right.

18          So, at the beginning it says, "If the producing parity

19     elects to use search terms completely lays out what is going to

20     happen, then the other side can propose ten search terms to

21     use."

22          That last sentence says, "The producing party shall

23     search one, not non-custodial data sources as identified in

24     accordance with paragraph 3(b), and e-mails and other than those

25     maintained by the custodian."

1          THE COURT:  All right.

2          So you complaint here is that they searched the

3     non-custodial data sources one way, and they searched the

4     e-mails and ESI maintained by the custodians a different way?

5          MS. ALFARO:  That's correct, your Honor.  And because

6     --

7          THE COURT:  And --

8          MS. ALFARO:  Go ahead.

9          THE COURT:  You're saying that for the things they

10    searched by using search terms, they didn't comply with

11    something that was required?

12         MS. ALFARO:  They used search terms for custodial

13    documents and that is not at issue here.

14         What is at issue is that they do not use search terms

15    for the non-custodial data sources, although they have said they

16    have gone through those repositories reviewed every single

17    document, it's hard for us to believe that they went one-by-one

18    and reviewed --

19         THE COURT:  Okay.  So --

20         MS. ALFARO:  -- I don't know how many documents.

21         THE COURT:  -- Mr. Carrano, I'm embarrassed to ask

22    this.

23         But you've represented in your letter that you searched

24    every document in the non-custodial repositories.

25         I take it you stand behind that representation?

1          MR. CARRANO:  Just to be clear on this.

2          First, we identified those repositories that we thought

3     would remain in the case.

4          THE COURT:  Which are the 3(b) once?

5          MR. CARRANO:  Yes, yes.

6          THE COURT:  Okay.  Right.

7          MR. CARRANO:  From those, we pulled all those

8     documents, and had the team review those.  And that's what --

9          THE COURT:  So, Ms. Alfaro, I think -- I don't think

10    the ESI order requires that they necessarily take the same

11    approach to both halves.

12          And, you know, I know you find it hard to believe that

13    what Mr. Carrano says is true.  And I believe you're going to

14    have a deposition where you can ask questions and find out

15    whether or not, to your satisfaction, it's true or not.

16          But for present purposes, I'm going to accept -- it's

17    kind of the thing I normally do when Mr. Carrano says he did it,

18    that he did it.  Well, not, he, personally, but people working

19    -- people working with him would understand his direction.

20          At the direction of his partners or something, all

21    right?

22          MS. ALFARO:  With respect to the document deposition

23    that we evidenced on March 20th, we have not received a date

24    they're going to produce the witness.  And we'd like the Court

25    to order them to produce the witness in the next seven days.

1              THE COURT:  Well, I'm -- you mean name a witness?

2              MS. ALFARO:  We'd like to them to produce a witness.

3      The close of discovery is coming up in the next few months.

4              THE COURT:  All right.

5              MS. ALFARO:  But we're willing to accept whichever date

6      your Honor would propose.

7              THE COURT:  Mr. Carrano, how are you going to get this

8      witness?

9              MR. CARRANO:  Okay.  So, we can commit to there could

10     be two designees, because the topic is quite big.  We can get

11     one designee at the end of April, early May, and the second one

12     early May, mid May, depending on the availability.

13             THE COURT:  What are the names of those these two

14     people.

15             MR. CARRANO:  Peter Birch is one person --

16             THE COURT:  No.  Just --

17             MR. CARRANO:  -- and the second person -- I'm sorry --

18     I don't know her name, but she's involved with the document

19     collection.  Peter Birch was the former project manager for

20     Google Earth.

21             THE COURT:  Okay.  So one of these two people,

22     presumably, Mr. Birch, is going to be available for deposition

23     either at the end of April or beginning of May?

24             MR. CARRANO:  Yes.  And the other person is available

25     the first week in May, not the second week in May, and I think

1     the --

2            THE COURT:  Okay.  Well, we're more than halfway

3     through April.

4            So, do me a favor, find out the name of the second

5     person --

6            MR. CARRANO:  Sure.

7            THE COURT:  -- and tell them by the end of the day, and

8     offer them some actual dates, specific dates and times, you

9     know, by the end of Tuesday of next week, okay?

10           MR. CARRANO:  That's fine.

11           THE COURT:  All right?

12           MS. ALFARO:  A couple more points, your Honor.

13           Earlier we discussed the non-custodial data sources and

14    the fact that we haven't actually received a list of those.

15           THE COURT:  Yes.  He should do that by the end of

16    Tuesday.

17           MS. ALFARO:  That's great.

18           And, lastly, we have requested from the other side, but

19    we have not received it, we would like an RFP-by-RFP list of how

20    they're actually searching for these documents.  Whether they

21    are using search terms on their custodial documents, or going to

22    the non-custodial data sources to pull documents.

23           The reason we need this information, your Honor, is

24    because we need to -- we are allowed, in the ESI order, to

25    propose ten search terms for them to use on the custodial sets

1   of documents, but we don't know which RFPs they are using their

2   searched terms for.

3          So, for instance, if there is a financial RFP that we

4   have a request for production, or request for documents to

5   display the financial data, if they are not using search terms

6   for that RFP, then there is no point in us wasting a search term

7   on a financial related topic.

8          And they're --

9          THE COURT:  They're using search terms to search for

10  custodial for the identified custodians.

11         Presumably, what you get is -- and I'm saying

12  "presumably, I only read the one paragraph in the ESI order --

13  presumably, they're supposed to use some search terms, and you

14  get to produce some other search terms, right?

15         MS. ALFARO:  That's right.

16         THE COURT:  And, so, do you know which terms they used?

17         MS. ALFARO:  Use we know what terms they used.

18         THE COURT:  All right.

19         MS. ALFARO:  But we are not able to propose our without

20  knowing which RFPs they're using search terms on, because

21  they're not using RFPs for all of the they're not using search

22  terms for all of their RFPs, because they've related that

23  they're not using search terms on the non-custodial data

24  sources.

25         So, for instance, if there is a financial RFP, they

1    could just be going to non-custodial data sources, or to

2    financial repositories, and pulling up the documents that they

3    think are responsive.

4            If they're doing that, and they are not using search

5    terms on the custodial documents for a particular RFP, then it

6    would be wasteful for us to use one of our search terms.

7            THE COURT:  And, so, what you're saying is the way that

8    I would imagine it works.

9            Is that the way it works, Mr. Carrano?

10           MR. CARRANO:  I'm, frankly, a little confused.

11           So what we did is, there are nine identified custodial.

12   We used search terms for those.

13           THE COURT:  Right.  And the search terms are whatever

14   the search terms are, which you've told me.  And if they produce

15   the document responsive to RFP No. 1 -- so, RFP No. 14, it shows

16   up in the production?

17           MR. CARRANO:  That's the methodology and that's what we

18   used.

19           THE COURT:  So that's the reason.

20           I wasn't really understanding Ms. Alfaro either by

21   saying, using a search term for a particular RFP, or using their

22   pens, or however they search the terms they're using, you know

23   what they are, to produce a set of stuff.

24           And they are also searching the non-custodial databases

25   having all these RFPs in mind, right?

1          MR. CARRANO:  That's what we did.

2          THE COURT:  I don't understand what you're saying.

3          MS. ALFARO:  It's not confusing, because they're not

4    doing what ESI order requires them to use the search terms on

5    both.

6          It's gotten confusing, because they're doing the two

7    things differently, so we don't know if search terms are being

8    used for particular purposes.

9          THE COURT:  But they're saying nothing -- you

10   understand, based on what I've just heard, what they -- what Mr.

11   Carrano has said theory doing.

12         So, you know they searched nine custodians using

13   whatever ten search terms they've already told you about.

14   Bearing that in mind, you have a description of who these

15   custodians are.

16         You should propose your own search terms, right?

17   That's the way it works.

18         MS. ALFARO:  That is the way it works, your Honor.  And

19   the reason why we haven't be able to do that is because we just

20   don't know how they're using those search terms with respect to

21   the RFP.  And we discussed this in the meet-and-confer and they

22   actually agreed --

23         THE COURT:  Well, okay.  I'm going to rule against you.

24   I think you have all the information you need.

25         Make your own best own judgment with what search terms,

```
 1    and you meet-and-confer on them, or whatever, but it's up to you

 2    now to propose the search terms you'd like to have run, which I

 3    think you can make an intelligent choice basically on you know

 4    who their nine custodians are, and you know what terms they've

 5    already run.

 6         MS. ALFARO:  Yes, your Honor.  The reason I raised it,

 7    is because we had discussed this on a previous meet-and-confer,

 8    and they agreed to give us an RFP-by-RFP list, and we haven't

 9    received it.

10         And, so, Mr. --

11         THE COURT:  I still don't understand what would be on

12    an RFP-by-RFP list.

13         MS. ALFARO:  For instance, for RFP No. 1, perhaps they

14    used search terms on custodial documents and searched

15    non-custodial sources.

16         So, RFP No. 14 related to just revenue documents.

17    Perhaps, they didn't search custodial documents.  They only went

18    to non-custodial data sources.

19         THE COURT:  The ten search terms, they're not specific

20    to a particular RFP, are they?

21         MS. ALFARO:  The reason why it's a concern -- well, the

22    reason why it's a concern is, because their initial ten search

23    terms, did not have anything related to financial information.

24         THE COURT:  Okay.  Well, then under -- they did search

25    the nine custodians using financial terms, and would likely turn
```

1    up financial documents.

2         MS. ALFARO:  Exactly.  We don't exactly know that.

3    That's the whole point is that --

4         THE COURT:  Well, I think, actually, you do know that,

5    don't you, because you know --

6         MS. ALFARO:  We need some kind of --

7         THE COURT:  -- you know --

8         MS. ALFARO:  Okay.

9         THE COURT:  -- you know they have nine custodians and

10   they searched all nine using the same ten terms, and you know

11   what they are --

12        MS. ALFARO:  Okay, your Honor.

13        THE COURT:  -- don't you?

14        MS. ALFARO:  We do know their search terms, yes.

15        THE COURT:  And you know they searched the nine

16   custodians using those terms?

17        MS. ALFARO:  We do.

18        THE COURT:  Okay.  I'm not going to give you any more

19   relief.

20        MS. ALFARO:  Thank you, your Honor.

21        THE COURT:  Okay.  Thank you.

22        So Argument No. 3.  Oh, this is a -- hold on a minute.

23        (Pause)

24        The asserted prior art.

25        Okay.  I understand the dispute here, which is, while

1    in the ordinary course one might say that Google has an amount

2    of prior art that's identified that is within the range of

3    reasonableness.

4            The problem here is that five of these are systems, and

5    systems are not going to be a printed publication that says, X.

6            It's going to be -- are, in fact, systems basically

7    meaning -- what is the word -- not prototype -- but some kind of

8    thing that was in operation, and then you have a bunch of

9    documentation of bits and pieces of it?

10           MR. PARTRIDGE:  I presume that that was their intent,

11   but when you look at how they use these references in their

12   invalidity contentions, they aren't used that way.

13           They're listed as -- they're used as publications.

14           I have a short document that will illustrate the

15   problem, your Honor, if I may hand it up?

16           THE COURT:  Okay.

17           (Pause)

18           MR. PARTRIDGE:  We pulled --

19           THE COURT:  Hold a second.

20           MR. PARTRIDGE:  Please.

21           THE COURT:  All right.

22           Go on, Mr. Partridge.

23           MR. PARTRIDGE:  Let me make two major points about this

24   document.

25           The first occurs in the first paragraph where they say

1    in the second line -- this concerns the so-called SRI

2    international system, which they want to list as one piece of

3    prior art -- and they say, "as a whole or any of the individual

4    references and/or testimony below that may be further obtained

5    through discovery."

6         And in the first line leading up to that, they say,

7    that this renders it in the claims anticipated and/or obvious.

8         Then when we go to the claim chart, the second major

9    point, and you go back, for example, to Page G4 of the document,

10   they start applying it to the first element of the claim.  This

11   is illustrative of what you see in these documents.

12        And we have a reference to CEG Reference 1, and then it

13   goes on to the bottom of that page, and all of the next page.

14   And at the bottom of the next page, G5, we get to see also list,

15   and it goes all the way to the top of Page G6, where now we lump

16   in 5 through 17, 23 to 33, 39 to 40.

17        And this is prefaced by saying in the opening paragraph

18   that Claim 30 is anticipated by any, or rendered obvious, by in

19   whole, or by any of the individual references contained in that

20   list.

21        And the same is true of the other system arguments they

22   make.

23             THE COURT:  So I understand TerraVision is a system.

24             What are the other systems?

25             MR. PARTRIDGE:  There -- there are four other systems.

1    TerraVision has this particular one that's the most documents,

2    but amongst the five systems, prior art -- prior art

3    documentation that they rely upon, there's over 60 references

4    that are included in it.

5              And we have claim charts that --

6              THE COURT:  So, you've given me this thing that has 40

7    references.

8              MR. PARTRIDGE:  Right.

9              THE COURT:  Okay.  And you're saying there's over 60

10   references.  Are there other systems listed in these 40

11   references or are these 40 references all related to

12   TerraVision?

13             MR. PARTRIDGE:  This 40 is related to TerraVision.

14   They have other documents related to the other four systems

15   they're relying upon.

16             THE COURT:  Okay.  So what you're saying is, here's one

17   reference, TerraVision with 40.  Let's say some references or it

18   may be 39.  And there's four more systems like this, except that

19   there are not as big as TerraVision.

20             MR. PARTRIDGE:  Correct.

21             THE COURT:  Then there's another 22 individual

22   references.

23             MR. PARTRIDGE:  Something like that, your Honor.

24   That's correct.  And they characterize these as any one of the

25   individual references or as collection.

1         And then on top of it, when with we ask an

2    interrogatory to find out, well, what is the date of this prior

3    art system you're relying upon, so that we know which one is

4    before or after the date, we got an answer that said, look at

5    our invalidity contentions.

6         And the problem with that is, your Honor, when you look

7    at this list -- again, I think if we looked at the other list of

8    system references we'd find similar examples -- but reference

9    40, for example, is the TerraVision source code dated 1996,

10   which is exactly the date of the filing of the Patent

11   Application.

12        We're in a situation where we have these alleged five

13   systems.  We have no dates for when these alleged five systems

14   constituted prior art.  It's just a generic listing of

15   references and somehow we're supposed to figure this out from

16   the listing of references.

17        And then they attempt to apply them as a whole, and

18   anyone or more of the following, and in the claim charts that's

19   what you see, a listing of references.

20        And from our point of view, this is, essentially, still

21   at 76 total references at this stage.

22        And, as you know, we've reduced our claims.  It started

23   out at 75 -- or I can't remember the exact number -- we reduced

24   to 50.  We reduced it further after that and we're now down to

25   20 claims.

1          And they've made reduction -- I give Mr. Carrano credit

2     -- he made some reduction in the number of prior art references,

3     but we're still at a point where with a couple of months to go

4     in discovery, we have, essentially, 76 prior art references.

5          And, your Honor, we would like, at some point, to have

6     a meet-and-confer with them about the adequacy of their

7     invalidity contentions, and see if we can resolve them, and come

8     to you with a motion, if necessary.  We don't want to do it

9     until we've gotten down to a smaller number of references.

10          Maybe those problems will go away, and can more easily

11     resolved, so we are, more or less, at a standstill, given this

12     issue.

13          THE COURT:  Okay.  All right.  Thank you.

14          So, Mr. Carrano, what do you say about this?

15          MR. CARRANO:  Okay.  A number of things.

16          Just like we suspect their infringement case, they rely

17     on a number of documents.  They will not rely on one Google

18     Earth document to make their case.

19          Our systems are -- for example, TerraVision that you

20     see here, which counsel correctly points out, has the most

21     references to prove up that system.  These are numbered

22     documents that we might rely on to prove that system structure

23     function and operation.

24          So, the Model Rules that we base some of the discussion

25     on claims and prior art in this case, allows for a system art to

1     include all the references with respect to that system.

2          So, all we're saying here is, in this case, the

3     TerraVision system -- again, some systems only have two pieces

4     of -- two references that we found so far.

5          For this system, we may rely on these reference, just

6     like they will rely on a number of documents to try to prove up

7     Google Earth.

8          It's the same thing.

9          What we did in our Exhibit C, in our April 16th letter

10    is specifically outlined.  This is an e-mail --

11         THE COURT:  Hold on just a minute.

12         (Pause)

13         Exhibit C.

14         MR. CARRANO:  Exhibit C.  That is --

15         THE COURT:  Just hold on.

16         (Pause)

17         I take it that -- I take it that -- there's a thing in

18    the e-mail that says the IPR which was filed relies on eight

19    references.

20         Are some of those eight references -- I take it are the

21    ones that are pending?

22         MR. CARRANO:  Yes.

23         THE COURT:  Okay.  Because, presumably, unless and

24    until the IPR is granted, you're giving up nothing in terms of

25    the references that are alleged in their --

1          MR. CARRANO:  Just one clarification.  The IPR had one
2    additional reference that is not in our invalidity contentions.
3          THE COURT:  Okay.  I mean, I appreciate being accurate.
4    Okay.
5          So, what is it that you're trying to do in this e-mail?
6          MR. CARRANO:  Well, if you see starting at Page 2 to
7    Page 3 of that attachment, we provided ART+COM on the left-hand
8    side Nos. 1 through 28, and we've dropped one of these already.
9          And the first four are the system -- well, the first
10   five are the systems that we intend to rely on, and the
11   remaining 22 are the particular publications or patents that we
12   are relying on.
13         So they asked us to reduce it down to 24 references.
14   We proffered 27.
15         THE COURT:  Right.  A lot of it depends on what you
16   call TerraVision's 1 or 40?
17         MR. CARRANO:  Understood.
18         THE COURT:  Right.
19         MR. CARRANO:  But, I mean, from our view, it stands to
20   reason that -- again, it's my comparison to the infringement
21   case -- they're not going to prove their infringement case on
22   just source code, or just other documents at Google.  They will
23   collect documents to do that.
24         So, the system art that we have here is the same is
25   paradigm.  There isn't usually a system document that describes

1     all the claimed features, so we have to pull from another set of

2     sources about that same system to make our case.

3            Now, granted, when it comes down to the expert reports,

4     or certainly at trial, that system art will be pared down to a

5     minimal set that we need, but at this point, we can't do that.

6            And also discovery is ongoing.  We don't know if there

7     is something better out there or something that will replace

8     this stuff.

9            But the point is, we did partition this -- these --

10    this art; the system art and publication art.  The publication

11    art is clear.  Publication stands by itself.  Stands by itself

12    and that's what it is.

13           But for the system, the related information, we

14    identified for them.  It's not that -- their complaint,

15    apparently, is that we have to consider all these different

16    documents.

17           Well, that's the documents that we have to try to prove

18    the system on.

19           THE COURT:  So, I kind of recall something in the

20    letters -- and I don't have them immediately at hand -- that Mr.

21    Partridge, you said, you know, counting the system by their

22    individual references, there is 7- odd that are asserted right

23    now?

24           MR. PARTRIDGE:  Yes, your Honor.

25           THE COURT:  What was the number?

1            MR. PARTRIDGE:  76, I think.

2            THE COURT:  Okay.  So, just doing a little math here,

3     it seems to me that TerraVision, is what is the difference

4     between 27 and 76 from your count?

5            MR. PARTRIDGE:  My number -- my total may be off,

6     because there are 40 references for TerraVision, six for the

7     second system, which is T_Vision, two for the third system,

8     which is GIS, 13 for what they call NPSNet, and two for Virtual

9     Sardinia -- there seems to be one for Virtual Sardinia, so that

10    adds up to 62 additional references, actually.

11           MR. PARTRIDGE:  It's 84.

12           THE COURT:  Okay.  Let's assume, Mr. Partridge, for the

13    sake of argument that they want to keep TerraVision in the case.

14           Does that mean that your view is, they should be

15    limited to TerraVision, because that is well more than 20?

16           MR. PARTRIDGE:  No.  I'm not going to be -- I'm not

17    proposing something that is unreasonable here.

18           THE COURT:  Well, I'm kind of wondering, what is it you

19    are actually proposing?

20           MR. PARTRIDGE:  Well, I think that with any one these

21    systems there ought to be a handful or less of references they

22    rely on.  Whether it's five or six for TerraVision, and a couple

23    for one of the others, and five or six for this one reference,

24    one system they have 13.

25           And here is why I think that's appropriate.

1          Because at the moment we don't know what the date of

2     the system is, whether it's prior use and sale, public use, what

3     is it?

4          And when you know that, you have a date, you have this

5     thing that was out there that is the system as of a certain

6     point in time, and now you can judge all this other stuff that

7     they're providing with references.

8          THE COURT:  That seems like a different issue than the

9     one that you were raising.

10         MR. PARTRIDGE:  Well, except that that allows, if they

11    did that process, if they were rigorous in the analysis, and did

12    that process, they would be able to eliminate some number of the

13    40 reference, because now they'd be focused on the system at a

14    point in time that they're saying they can prove up as

15    anticipating or making obvious in the invention.

16         And if they did that --

17         THE COURT:  Well, the thing that would anticipate or

18    make obvious would be the system, not the particular reference

19    that was tried in the system, right?

20         MR. PARTRIDGE:  That's correct.  There would be a date,

21    and time, and qualification, prior public use, on sale, whatever

22    it is, and we'd know what that is.  And then there would be some

23    number of documents that represent what was in that system, as

24    opposed to what we have here.

25         THE COURT:  You know, then, for example, let's say the

1    source code.  You say the source code is year or two after a lot

2    of the other documents relating to TerraVision, and it is past

3    the priority date.

4         But that doesn't necessarily mean that it's irrelevant,

5    does it, because there are some other cases that people testify

6    that you can tell when the source code was changed, and people

7    who do the coding make little notes when they're changing

8    things.

9         Just because something, in the version that we have it,

10   dates from a date that was not prior art, and were not

11   determinative of something else, it doesn't necessarily mean

12   that it's irrelevant, right?

13       MR. PARTRIDGE:  You helped make my point, because when

14   you look at that source code, there are parts of that code that

15   when you look at the, notes and portions of the code that were

16   written in 1996, and other parts that were written earlier.

17       And, so, what we have here is a collection of code that

18   they want to assert that is part of this, that collectively

19   wasn't generated until 1996.

20       And we agree there were parts of it written earlier,

21   but which of those parts relate to which of the elements of the

22   claim?  How are they using it?  And as of what point in time was

23   that code in the system that was publicly-available, sold, or

24   otherwise qualified as prior art.

25       THE COURT:  Well, for lack of a better word, proof

1      problems of trying to connect the source code to a system.

2            But you have -- and you may not be in agreement -- but

3      you both have an idea of what the priority date is, right?

4            MR. PARTRIDGE:  We know what the priority date of the

5      patent is.

6            THE COURT:  That's what I meant.

7            MR. PARTRIDGE:  But we don't know the date -- we do not

8      know the date of this system.  We have a collection of documents

9      that --

10           THE COURT:  And it is also the case, could it not be,

11     that they may not know the exact date of the system either,

12     right?

13           MR. PARTRIDGE:  But that's their -- their burden is to

14     prove that some system existed that qualifies under the statute

15     --

16           THE COURT:  No, no, but the point is, they could say,

17     we don't know when the exact date of the system is, but we know

18     it's before the priority date, right?

19           MR. PARTRIDGE:  I don't think so, your Honor.

20           If they're contending that the system was on sale as of

21     a certain date, they then have to show the thing that they say

22     is on sale, and at that point, include all the elements of the

23     claim, and some subsequent document may or may not be relevant

24     to that, at that point in time.

25           THE COURT:  Okay.  So, let me just go back, because I

1    don't understand, Mr. Partridge.

2         It seems to me like you're -- it seems to me like, in

3    some sense, you're beef with TerraVision is not so much that

4    there are 40 references; or one system and 39 related

5    references, documents, or other things.

6         It seems like you're more saying, what is the date of

7    the system that you are relying -- you know, what -- yes, what

8    is the date of the system?

9         It seems like a different question.

10        MR. PARTRIDGE:  My problem is twofold.

11        The one is the way they use the 40 references in their

12   claim chart, which reads like 40 references, not like some

13   individual system.

14        THE COURT:  Well, would it help you, if instead they

15   just said -- instead of, you know, if 5 to 17, and 20 to 22,

16   they just said, one, one, one?

17        MR. PARTRIDGE:  It would help us if they said, here is

18   the system we're saying is prior art.  It is public use.  It's

19   on sale.  It's whatever it was as of this point in time.  And

20   here are the documents we're relying upon that establish that,

21   in fact, it was publicly used, on sale, blah, blah, blah, as of

22   that effective date for that system prior art.

23        I'm saying it's a twofold problem.

24        It's the one you pointed out first, which is the date

25   problem.  That date problem leads to not being able to evaluate

1    the list of 40 references.

2         And then the other problem is, in applying these

3    references to the claims, they applied them like individual

4    references, which gets us to the 76 to 82, or whatever the

5    number is, of total references.

6         THE COURT:  But that gets to my question.

7         Can't they just say, Reference No. 1?

8         I mean, aren't they actually -- I probably realize this

9    is the wrong logic here -- but aren't they actually being

10   helpful by saying, here are the particular things that describe

11   a particular part of the system, that is what meets this

12   limitation?

13        MR. PARTRIDGE:  They -- I guess I would not say -- they

14   might be being more helpful if they had said that the third

15   document shows what was in the system that they're claiming

16   constitutes prior art as of February of 1994.

17        You know, if that's what they were saying, as opposed

18   to listing these like they're individual publications which is

19   what they've done.

20        THE COURT:  All right.

21        Thank you, Mr. Partridge.

22        Mr. Carrano, for these systems -- and this may be an

23   irrelevant side point -- but do you have particular dates when

24   they were on sale in the format -- and when I say "on sale in

25   the format" -- that makes them prior art with respect to their

1    invalidity, do you have particular dates or --

2         MR. CARRANO:  I think -- all these five systems are

3    prior art.  We could try to come up with particular dates, or at

4    least as early as certain dates, but they are all prior art.

5         Mr. Partridge points out the source code, for example.

6         That's a source code we have.

7         These are all third-party systems, so we have to -- we

8    acquired all this stuff on our own through prior art searching,

9    and through our own discovery.  The discovery is still ongoing.

10   We have to pursue at least a number of these systems to find out

11   more information about them.

12        THE COURT:  I heard this kind of thing before.

13        I didn't mean that the way it sounded.  I meant I've

14   heard particular people talking about third-party systems.

15        MR. CARRANO:  Right.  So, this is what we could find.

16   And we'll have to go through like, for example, SRI, the

17   TerraVision system.  We'll try to go to SRI and find out more

18   about those systems.

19        But what we did here, in our invalidity contentions --

20   and just to follow-up on a point that your Honor made -- we

21   could have just said, three -- five systems and said nothing.

22   Just put them in and say, these are the prior art systems.

23        What we did is take the evidence that we had and

24   applied to those system positions, so we tried to be as specific

25   as we can.

1          Granted, it wasn't magnanimous, because we were also

2     tying publications to those claim elements themselves, because

3     it was an efficiency issue to some extent.

4          THE COURT:  And I guess part of what Mr. Partridge is

5     saying, although he didn't quite use this phrase is, you're kind

6     of double dipped here.  You've got -- you've kind of got -- to

7     the extent that there are 40 or 39 things that describe

8     TerraVision were individually counted as prior art, you're kind

9     of getting them with the system, and getting them with the

10    individuals?

11         MR. CARRANO:  Okay.  I think that's absolutely not

12    correct.

13         As I mentioned before, when we listed the references.

14         THE COURT:  Okay.

15         MR. CARRANO:  We have the first five.  This is on Page

16    2.  This is the e-mail from me, Mr. Carrano, on February 23rd to

17    Mr. Partridge.

18         THE COURT:  Right, got it.

19         MR. CARRANO:  It's a chart.  We, essentially, called

20    out the first five systems.  That's References 1 through 5.

21         THE COURT:  Got it.

22         MR. CARRANO:  And that -- just put that aside.

23         The rest of them are individual publications of

24    patents.

25         To the extent that we rely on individual publication of

1    patents, those are the only ones we intend to rely on.

2           THE COURT:  Are those the things that I'm noticing now,

3    No. 6 through No. 14, where it says, publication, and then, I

4    guess, refers to one of the five systems?

5           MR. CARRANO:  Yes.  There is some overlap to --

6           THE COURT:  So what you're saying is, other than these

7    individual ones of which there are a total of...

8           MR. CARRANO:  22.

9           THE COURT:... I was going to say about eight.

10          MR. CARRANO:  Oh, I'm sorry.

11          THE COURT:  I'm talking about the ones that also

12   support of the description of systems.

13          MR. CARRANO:  Okay.

14          THE COURT:  Right.  From No. 15 on, those are the

15   stand-alone things that are unrelated to the five systems,

16   right?

17          MR. CARRANO:  Oh, I see.  Yes, that's true.

18          I mean, there's actually more information that I can

19   remember.

20          So, yes, the first through -- 6 through 14.

21          THE COURT:  Which is at the top except for No. 11?

22          MR. CARRANO:  Correct.  Which we have, I believe,

23   dropped.

24          Those also pertain to the systems, but to be clear,

25   what we're trying to represent here is, those publications are,

1    if we're going to present them at trial, they would be presented

2    as publications.

3            THE COURT:  No.  I mean I understand what you're saying

4    which is, we're going to present the systems.  Some of these

5    things have something to do with explaining the systems.

6            We're also going to argue, hey, if you buy our system,

7    these particular things that are numbered 6 through No. 14, have

8    independent value as prior art, in terms of establishing either

9    anticipation or obviousness?

10           MR. CARRANO:  That's correct.

11           THE COURT:  And, so, the things that are cited as

12   subparts of TerraVision, that aren't also on this list, are not

13   going to be argued as individual -- on their individual merits?

14           MR. CARRANO:  I believe that's correct.  I think I lost

15   a little bit of that at the end there.

16           THE COURT:  Well, I'm sorry, I understood myself.

17           So, Mr. Partridge, that seems to take care of a lot of

18   your double dipping argument.

19           MR. PARTRIDGE:  Well, if you look at the total number

20   of references from the systems -- and I think it's 52 -- and you

21   subtract the eight that you just identified, we still have 44

22   additional references that would be, I think, fall within that

23   phrase "double dipping."

24           THE COURT:  No, I don't think actually they are,

25   because they're only going to be offered in support of only one

1    system.

2         MR. PARTRIDGE:  Well, but we're still at a point, for

3    example with TerraVision, we have this collection of, documents

4    which in their invalidity contentions are applied in whole, or

5    in any one of with respect to the claims.

6         THE COURT:  Well, right.  So they have that general

7    phrase, but Mr. Carrano just said here that it doesn't have the

8    full meaning that you are attributing to it.

9         MR. PARTRIDGE:  Then he ought to clarify their

10   contentions and --

11        THE COURT:  Well, he clarified it for my purposes.

12        So here's what I'm going to do.

13        You know, I did think about it a little bit.  This is

14   the first time this particular issue about systems and

15   supporting documents has come up for me, in terms of how many

16   prior art references are asserted.

17        And I did look at the -- you know, I probably shouldn't

18   call it the Federal Circuit Model Orders -- this is more like

19   the Federal Circuit failed model order -- but I think it still

20   represents sort of a data point from which a bunch of people

21   knowledgeable in the field thought was reasonable.

22        And I looked at the footnote about systems.  And the

23   discusses we had here today has been helpful.  You can rely on

24   that.

25        And I believe that, in fact, Google has appropriately

1    come to a reasonable number of prior art references at this

2    stage of the case.  That, in fact, when they say in this e-mail

3    they have 28, I think that actually is 27.

4         Mr. Carrano, or somebody said, yes, they dropped one to

5    27.  So, whether 28 or 27, it's a reasonable ballpark.

6         And I don't think that -- and, so, I appreciate that

7    there's possibly more -- you know, to the extent that the part

8    of goal here is to narrow the number of issues, I appreciate

9    that people are listing systems as prior art is not as efficient

10   as narrowing the issues, and listing publications of patents.

11        But I think that -- particularly, with Mr. Carrano's

12   pretty clear statement on the record here today, which is

13   entirely consistent with the chart in his e-mail -- that, in

14   fact, they are -- they have their own -- I'm not actually sure

15   what they started out at -- but they have represented that they

16   have a reasonable number of priority references.  And,

17   essentially, you know, it's mostly TerraVision that appears to

18   be a very complex thing.

19        And, so, you know, maybe it's one.  Maybe it's four.

20   If there are three independent TerraVision references.  Maybe

21   it's 40.

22        But that's, I think, something where that they have

23   actually have done a pretty good job of narrowing it down, as

24   much as they can, in terms of what are actually the prior art,

25   and they have evidence to support their statements about how it

1    works or worked.

2    So, I think it's reasonable, and not going to require

3    them to reduce the number of prior art references at this time.

4    MR. PARTRIDGE:  Your Honor, to avoid the risk of being

5    back here again on the second thing we talked about earlier, and

6    I wouldn't want to burden the Court with another one of these

7    hearings, it would be helpful, as we discussed earlier, to know

8    what the thing was as of a certain date, is it public use, is it

9    on sale, what is the date?

10    Everything else on this chart is dated except for the

11    system.

12    THE COURT:  Mr. Carrano?

13    MR. CARRANO:  Yes.  We can endeavor to provide that.

14    I'm not sure we have every date, but we will provide what we

15    have.

16    THE COURT:  Yes.  That's a reasonable thing, because I

17    do -- I believe it's possible to be somewhat vague as to when

18    something was on sale, and yet know it was on sale -- you know,

19    it's kind of like this.

20    There is a priority date.  Whatever it is in this case.

21    Let's just say for the sake of argument that it's January 1,

22    1994.

23    And maybe something was on sale, and there is an offer

24    to sell it, you know, on December 30th of 1992, and everybody

25    agrees that that would make it prior art.

1          Or maybe it was sold earlier than 1992, and people were

2     unclear about that.  You know, it was a long time ago.

3          And, so, but there may be a difficulty -- there may be

4     a piece of documentation that predates December 30th of 1992, so

5     you're going to be trying to figure out whether it relates to

6     something at an earlier time.  Maybe you can't prove exactly

7     what -- this is all -- I'm trying to think out loud, because I'm

8     not -- I'm less than a hundred percent convinced that it's

9     possible to put a precise date on these various things, so that

10    means Google loses.

11         So I would -- all I can do is encourage Mr. Carrano.  I

12    mean these things in the TerraVision system, this is being -- it

13    was obtained through a third party, or being obtained through a

14    third party.  I think that can be produced and both sides can

15    look at it.

16         MR. CARRANO:  We have produced everything that's in

17    this chart.

18         THE COURT:  All I'm going to say is, if you can, to the

19    extent you have knowledge about what the dates are of these

20    things of the five systems, it would be good to tell the

21    plaintiff what they are.

22         MR. CARRANO:  We will do that, again, with the

23    understanding that it's going to be evolving things over

24    discovery.

25         THE COURT:  And, you know, I think this is -- you know,

1    sometimes I see cases where the plaintiffs says, you know, I

2    can't tell you exactly when the conception and reduction to

3    practice occurred, and I'm somewhat dubious of this, as the

4    inventor works for them.

5         But I'm less dubious when I think the things that we're

6    talking about aren't actually a product of either party, that

7    it's not so easy to necessarily be precise, or that you could

8    say something in good faith now, and in further discovery there

9    is something else that will lead to a slightly a different date.

10        So I would prefer to avoid something where -- Mr.

11   Carrano, within the next two weeks, could you tell him what you

12   think the dates are, and perhaps indicate which ones you have

13   uncertainty about?

14        MR. CARRANO:  Sure.

15        THE COURT:  Because I'm trying to avoid the situation

16   where later on something comes up and there's a different date,

17   and something happens from time-to-time.

18        So, try.

19        MR. PARTRIDGE:  And to say whether it is a printed

20   publication, a prior sale, and whether it is public use.

21        THE COURT:  Can't you read the printed publication just

22   as well they can?

23        MR. PARTRIDGE:  If it is a printed publication.

24        If they're saying that the system was represented in a

25   printed publication, and these other documents support that,

1    then we ought to know that, too.

2         But at least to say --

3         THE COURT:  Well, all I'm going to say is, because it

4    strikes me that most of these things, there's probably no actual

5    no doubt that they have dates on them, but the systems,

6    themselves, I gather there's some dates on the five systems,

7    okay?

8         MR. CARRANO:  Yes.  And one of those systems is their

9    system and maybe they can come up with that.

10        THE COURT:  Okay.  All right.

11        So I did see reading all this that Google has filed an

12   IPR, and I see there's a Motion to Stay.

13        You know, based on experience, when is it that you

14   expect the PTAB, or whoever, decides this, is going to decide

15   whether or not to grant the IPR?

16        MR. CARRANO:  Within a window of late August or early

17   September.

18        THE COURT:  Okay.  And do I have anything else

19   scheduled in this case between now and early August and early

20   September?

21        MR. PARTRIDGE:  The Markman, I think, is May 12th.

22        MR. CARRANO:  May 12th.

23        MR. PARTRIDGE:  Your Honor, we are going to be opposing

24   those positions.  We're actually going to file papers in the

25   Patent Office, so they won't be resolved until September.

1            We have two dates in September.  I can't remember them

2    off the top of my head.  And the institution that is due at the

3    Patent Office.

4            THE COURT:  Okay.  So you're filing a response to that

5    delays that by a couple of weeks?

6            MR. PARTRIDGE:  We have a response date, and then the

7    institution date is three months later, so it moves it back

8    some, as a consequence.

9            But we're opposing them because they get up to as many

10   as four obviousness combinations, all prior art --

11           THE COURT:  I don't really care why.  I'm just

12   interested in the schedule at this point.

13           Okay.  And you said we have Markman in this in May?

14           MR. PARTRIDGE:  Correct, your Honor.

15           MR. CARRANO:  There are two IPRs.

16           MR. PARTRIDGE:  Right.

17           THE COURT:  Two IPRs, there's only one patent, right?

18           MR. CARRANO:  Yes, yes.  There was one -- one IPR is

19   directed to the TerraVision system, and those references -- I'm

20   sorry -- TerraVision publications -- and the other IPR is based

21   on their publications about their system.

22           THE COURT:  Okay.  Okay.

23           Anything else you want to talk about while you're here?

24           MR. PARTRIDGE:  Nothing, your Honor.

25           Thank you for your time.  I really appreciate it.

1          MR. CARRANO:  Thank you.

2          THE COURT:  All right.

3          We'll be in recess.  Thank you very much.

4          You know, I don't issue any written orders.  As a

5    result of this, the transcript will serve as a record of my

6    rulings.

7          If there is some reason to revisit -- or not revisit --

8    but if there's any questions as to what they are.

9          The things that you handed up, particularly, the

10   discovery, I tend to like to hand that back.

11         MR. PARTRIDGE:  I think those documents were marked

12   "Confidential" by Google, so you may not want to have them.

13         THE COURT:  I would like to actually hand them all

14   back.  I don't think I wrote too many incriminating things on

15   them.

16         Okay.  So we'll be in recess.

17         MR. CARRANO:  Thank you, your Honor.

18         MR. PARTRIDGE:  Thank you.

19         (The proceedings adjourned at 12:50 o'clock p.m.)

20                        *  *  *  *  *

21

22

23

24

25