# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ART+COM INNOVATIONPOOL GMBH,

                Plaintiff;

       v.

GOOGLE INC.,

                Defendant.

Civil Action No. 14-217-RGA

## MEMORANDUM OPINION

Brian E. Farnan, Esq., Michael J. Farnan, Esq., Farnan LLP, Wilmington, DE; Scott F. Partridge, Esq. (argued), C. Ryan Pinckney, Esq., Larry G. Spears, Esq. (argued), Lisa C. Kelly, Esq., Lisa M. Thomas, Esq., M. Natalie Alfaro, Esq., Michael A. Hawes, Esq. (argued), Baker Botts LLP, Houston, TX, attorneys for Plaintiff ART+COM Innovationpool GmbH.

Jack B. Blumenfeld, Esq., Paul Saindon, Esq., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Darin W. Snyder, Esq. (argued), Luann L. Simmons, Esq., Mark Liang, Esq., Mishima Alam, Esq., John X. Zhu, Esq., David S. Almeling, Esq. (argued), O'Melveny & Myers LLP, San Francisco, CA, attorneys for Defendant Google Inc.

April 28, 2016

*Andrew G. Andrews*

**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before the Court are Defendant's motions for summary judgment on invalidity

and non-infringement, no willful infringement, and laches; and Plaintiff's motion for summary

judgment on prior art and inequitable conduct. (D.I. 227, 234, 233, 234, 246). Also before the

Court are Plaintiff's motions to preclude certain testimony of Dr. Michael F. Goodchild and Brett

L. Reed, and Defendant's motion to preclude testimony of James J. Nawrocki. (D.I. 237, 240,

243). The issues have been fully briefed. Oral argument was held on March 24, 2016. (D.I.

336). For the reasons set forth herein, the Defendant's motion for summary judgment of

invalidity and non-infringement is **DENIED**; Defendant's motion for summary judgment of no

willful infringement is **GRANTED**; Defendant's motion for partial summary judgment on laches

is **DENIED**; Plaintiff's motion for summary judgment is **GRANTED IN PART** and **DENIED**

**IN PART**; Defendant's motion to preclude testimony of Mr. Nawrocki is **GRANTED IN PART**

and **DENIED IN PART**; Plaintiff's motion to preclude certain testimony of Dr. Goodchild is

**GRANTED IN PART** and **DENIED IN PART**; and Plaintiff's motion to preclude certain

testimony by Mr. Reed is **GRANTED IN PART** and **DENIED IN PART**.

## I.      BACKGROUND

ART+COM Innovationpool GmbH ("ACI") filed this patent infringement lawsuit against

Google Inc. on February 20, 2014. (D.I. 1). ACI alleges that Google infringes U.S. Patent No.

RE44,550 (the "'550 patent"). (*Id.*). The '550 patent describes a software-implemented method

for providing a "pictorial representation of space-related data, particularly geographical data of

flat or physical objects." '550 patent at 1:15-17; (D.I. 336 at 19). On January 15, 2016, ACI and

Google filed the motions at issue.

## II.     LEGAL STANDARDS

## A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).  The moving party has the initial burden of proving the absence of a genuinely

disputed material fact relative to the claims in question.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

330 (1986).  Material facts are those "that could affect the outcome" of the proceeding, and "a

dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury

to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir.

2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The burden on the

moving party may be discharged by pointing out to the district court that there is an absence of

evidence supporting the non-moving party's case.  *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue

for trial.  *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Williams

v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989).  A non-moving party

asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to

particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or

other materials; or (B) showing that the materials cited [by the opposing party] do not establish

the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view

the evidence in the light most favorable to the non-moving party and draw all reasonable

inferences in that party's favor.  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*,

476 F.3d 180, 184 (3d Cir. 2007).  A dispute is "genuine" only if the evidence is such that a

3

reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247-49.

If the non-moving party fails to make a sufficient showing on an essential element of its case

with respect to which it has the burden of proof, the moving party is entitled to judgment as a

matter of law. *See Celotex Corp.*, 477 U.S. at 322.

### B. *Daubert*

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and

states:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable principles and
> methods; and (d) the expert has reliably applied the principles and methods to the
> facts of the case.

Fed. R. Evid. 702. The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification,
> reliability and fit. Qualification refers to the requirement that the witness possess
> specialized expertise. We have interpreted this requirement liberally, holding that
> "a broad range of knowledge, skills, and training qualify an expert." Secondly, the
> testimony must be reliable; it "must be based on the 'methods and procedures of
> science' rather than on 'subjective belief or unsupported speculation'; the expert
> must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an
> inquiry into the reliability of scientific evidence under Rule 702 requires a
> determination as to its scientific validity." Finally, Rule 702 requires that the expert
> testimony must fit the issues in the case. In other words, the expert's testimony
> must be relevant for the purposes of the case and must assist the trier of fact. The
> Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard
> requires a valid scientific connection to the pertinent inquiry as a precondition to
> admissibility."

> By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper,
> preventing opinion testimony that does not meet the requirements of qualification,
> reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of
> expert scientific testimony, then, the trial judge must determine at the outset,
> pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is
> proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact
> to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-05 (3d Cir. 2003) (footnote and internal citations omitted).[1]

The party offering expert testimony bears the burden of proving its admissibility by a preponderance of the evidence. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993). In the context of calculating a reasonably royalty in a patent case under 35 U.S.C. § 284, the Federal Circuit has explained that "damages awarded for patent infringement must reflect the value attributable to the infringing features of the product, and no more." *CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (internal quotation marks omitted). "[G]iven the great financial incentive parties have to exploit the inherent imprecision in patent valuation, courts must be proactive to ensure that the testimony presented—using whatever methodology—is sufficiently reliable to support a damages award." *Id.* Further, the Federal Circuit has "consistently explained that proof of damages must be carefully tied to the claimed invention itself." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1324 (Fed. Cir. 2014). "While questions regarding which facts are most relevant for calculating a reasonable royalty are properly left to the jury, a critical prerequisite is that the underlying methodology be sound." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014). "[T]he essential requirement for reliability under *Daubert* is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *CSIRO*, 809 F.3d at 1301 (internal quotation marks omitted).

## III.   DISCUSSION

### A. ACI's Motion for Summary Judgment

---

[1] The Court of Appeals wrote under an earlier version of Rule 702, but later amendments to it were not intended to make any substantive change.

ACI moves for summary judgment on several pieces of prior art, arguing that they do not qualify as prior art under 35 U.S.C. § 102. ACI also moves for summary judgment of no inequitable conduct, arguing that Google has failed to advance sufficient evidence of deceptive intent.

### i. Google's Publication Prior Art

"Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' bar under 35 U.S.C. § 102(b)." *In re Hall*, 781 F.2d 897, 898-99 (Fed. Cir. 1986). To show that a reference was "publicly accessible," a party must show "that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1378 (Fed. Cir. 2006) (quoting *I.C.E. Corp. v. Armco Steel Corp.*, 250 F. Supp. 738, 743 (S.D.N.Y. 1966)). "Whether an asserted anticipatory document qualifies as a 'printed publication' under § 102(b) is a legal conclusion based on underlying factual determinations." *Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.*, 291 F.3d 1317, 1321 (Fed. Cir. 2002). "The burden is on the party asserting invalidity to prove it with facts supported by clear and convincing evidence." *Adenta GmbH v. OrthoArm, Inc.*, 501 F.3d 1364, 1371 (Fed. Cir. 2007)

ACI contends that three of Google's "printed publication" prior art references do not qualify as prior art under § 102(b). Before addressing each, the Court notes that the critical date is December 17, 1995, one year before the '550 patent's U.S. filing date. 35 U.S.C. § 102(b) (a reference is prior art if it was published or publicly used "more than one year prior to the date of the application for patent in the United States").

6

The Leclerc reference is a technical note authored by Yvan Leclerc and Stephen Lau, both of whom were employees of SRI International. (D.I. 268 at 6; D.I. 269, Ex. 1). To demonstrate publication, Google relies in part on SRI having uploaded the document to its FTP server. In response, ACI makes much of the Federal Circuit's decision in *SRI International, Inc. v. Internet Security Systems, Inc.*, 511 F.3d 1186 (Fed. Cir. 2008). There, the Federal Circuit concluded that the reference at issue was not a "printed publication," and specifically noted that the "FTP server did not contain an index or catalogue or other tools for customary and meaningful research." *Id.* at 1196. Additionally, the court stated that "[n]either the directory structure nor the README file in the PUB subdirectory identifies the location of papers or explains the mnemonic structure for files in the EMERALD subdirectory, or any subdirectory for that matter." *Id.* ACI argues that Leclerc was posted to the same FTP server, and since the FTP server "available in 1994 could not have been better than in 1997," *SRI International* is dispositive. (D.I. 247 at 16).

ACI has failed to show the absence of a genuine factual dispute.[2] The cover of Leclerc indicates that it was "Approved for Public Release" with "Distribution Unlimited." (D.I. 269, Ex. 1 at 2). Co-author Mr. Lau has testified that Leclerc was included in conference materials distributed at the MAGIC 1994 Symposium. (D.I. 269, Ex. 4 at 41-42, 45). Leclerc is listed as one of the "MAGIC Technical Papers" in the table of contents to the MAGIC 1994 Symposium. (D.I. 269, Ex 17). Further, Mr. Lau testified that Leclerc was distributed to anyone upon request, and specifically noted that Leclerc had been distributed to individuals at Mitre and Lawrence Berkeley Labs, among others. (*Id.* at 33-34, 57). A reasonable juror could credit Mr. Lau's

---

[2] The summary judgment record established by two different parties in a different case about a historical fact is not binding, or even informative, about the significance of a different record in a different case about the same historical fact.

7

testimony, along with the relevant documents, and conclude by clear and convincing evidence that the Leclerc reference was distributed to the public before the critical date.

The Fuller reference, authored by Barbara Fuller and Ira Richer, is a report which purports to provide a description of "the MAGIC project." (D.I. 269, Ex. 5 at 62). Google contends that this document was publicly accessible by virtue of its availability on the Defense Technical Information Center's ("DTIC") public STINET service. Specifically, Google relies on the testimony of Phyllis Bell, DTIC's corporate witness. Ms. Bell testified that, "[a]s evidenced by the cover page . . ., the DTIC processed [Fuller] on July 11, 1994." (D.I. 248, Ex. E ¶ 5). Further, Ms. Bell explained that in processing Fuller, DTIC would "assign metadata to the online records" of Fuller, such as "author, sponsoring organization, title, abstract, key words or subjects or topics that are covered in the report, so that [DTIC] c[ould] add it into our online system." (D.I. 269, Ex. 6 at 77-78). After this processing, the public could search for the reference on public STINET and order a printed copy. (*Id.* at 79-80). ACI insists that Ms. Bell relies on certain assumptions and speculation. The Federal Circuit has previously held, however, that "general practice[s] for indexing, cataloguing, and shelving theses" were "persuasive evidence that [a] dissertation was accessible prior to the critical date." *In re Hall*, 781 F.2d at 899; *see also Round Rock Research, LLC v. SanDisk Corp.*, 75 F. Supp. 3d 674, 687 (D. Del. 2014) (denying summary judgment where corporate witness testified "that it was Intel's 'business practice' to disseminate data sheets on the date marked on the cover page, despite the fact that the witness did not know precisely when the [specific data sheet] was provided to customers"). ACI has not shown that Google's evidence is insufficient as a matter of law. A reasonable juror could conclude by clear and convincing evidence that the Fuller reference was available on public STINET before the critical date.

The Sauter reference describes ACI's T_Vision system.  The parties vigorously dispute whether CD-ROMs containing the reference were distributed to attendees of a public conference called SIGGRAPH 95.  ACM, the organizer of SIGGRAPH 95, produced a corporate witness, Mr. Rous, who testified that the SIGGRAPH 95 CD-ROM contained the Sauter reference.  (D.I. 299, Ex. 5 at 87-89).  Further, Mr. Rous testified that the CD-ROM "was manufactured prior [to SIGGRAPH 95] and delivered so it could be handed out at the event."  (*Id.* at 89).  Mr. Rous also explained that, while he could not testify as to specific years, it was ACM's general practice to have attendees enter the event, get their registration badge, then "pick up what's being distributed to them."  (*Id.* at 90).  Mr. Rous also testified that, in the 1990's, the SIGGRAPH events were attended by "as many as 20,000" people.  (*Id.* at 73-74).  Mr. Lau, an attendee of SIGGRAPH 95, testified that he received the SIGGRAPH 95 CD-ROM "at or near the time of attending the conference."  (D.I. 229, Ex. 6 at 176-77).  Mr. Lau stated that he "believe[d]" he received the CD-ROM "right during the conference itself," but could not be certain.  (*Id.* at 177).  These facts are sufficient to create a dispute of material fact.  *See, e.g., Mass. Inst. of Tech. v. AB Fortia*, 774 F.2d 1104, 1108-09 (Fed. Cir. 1985) (finding that a paper was a "printed publication" when it was orally presented at a conference with "50 to 500" attendees and "distributed on request, without any restrictions, to as many as six persons").  ACI urges that Mr. Rous' testimony amounts to speculation and emphasizes that Mr. Lau's memory is imperfect.  This is not sufficient to show that Google has failed to meet its burden of production.  A reasonable juror could conclude by clear and convincing evidence that the Sauter reference was distributed at SIGGRAPH 95.

ACI's motion for summary judgment as to the eligibility of certain prior art printed publications is denied.

### ii. Google's Public Use Prior Art

Under 35 U.S.C § 102(b), a prior public use "may bar patentability by anticipation if the device used in public includes every limitation of the later claimed invention." *Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1321 (Fed. Cir. 2002). "Whether a patent is invalid due to public use . . . is a question of law based on underlying questions of fact." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1378 (Fed. Cir. 2005). "The burden is on the party asserting invalidity to prove it with facts supported by clear and convincing evidence." *Adenta*, 501 F.3d at 1371. Importantly, "corroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest." *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1369 (Fed. Cir. 1999).

ACI contends that four of Google's "prior public use" prior art references do not qualify as prior art under § 102(b). ACI repeatedly argues that "[s]ystems are not prior art" and that Google has failed to advance any evidence of "something that pre-AIA § 102 actually recognizes as prior art." (D.I. 247 at 18). Additionally, ACI argues that, to prove that a reference was placed in public use, Google must identify specific public uses of that reference. ACI misstates Google's burden. The functionality of a potentially anticipatory system may be shown without direct evidence of a particular demonstration, so long as there is evidence that the system was in public use. *See, e.g., Zenith Elecs. Corp. v. PDI Commc'ns Sys., Inc.*, 522 F.3d 1348, 1357-58 (Fed. Cir. 2008) (affirming summary judgment of invalidity where product designer testified that certain models of television and speakers were used together, and testimony was corroborated by documentary evidence including a "product literature sheet"); *Phoenix Sols., Inc. v. West Interactive Corp.*, 2010 WL 6032841, at *6, *8 (C.D. Cal. Aug. 25, 2010) (granting summary judgment of invalidity where professor that "used the Galaxy system" testified as to its

10

capabilities, and testimony was corroborated by a paper "presented at a conference . . . a few weeks after the critical date"). The Court next examines each reference separately.

The NPSNET system was an "open-source, large-scale virtual world that could be run on . . . Silicon Graphics workstations." (D.I. 248, Ex. M at 3). The NPSNET system is described in several documents, including two papers co-authored by Dr. Zyda (Zyda I and Zyda II), and two theses (Mackey and Corbin). (D.I. 269, Exs. 8-11). Drs. Pratt and Zyda testified that the NPSNET system was publicly demonstrated at SIGGRAPH 93. (D.I. 269, Ex. 12 at 3-4; Ex. 13 at 9). At least 10,000 people attended SIGGRAPH 93. (*See* D.I. 269, Ex. 12 at 4). The Zyda II article also confirms that the NPSNET team attended SIGGRAPH 93 "to demonstrate the latest version of [their] virtual world simulator." (D.I 269, Ex. 10 at 23-24). Dr. Pratt testified that the version of NPSNET demonstrated at SIGGRAPH 93 was "the most recent stable version." (D.I. 269, Ex. 12 at 4). Dr. Zyda testified that NPSNET system demonstrated at SIGGRAPH 93 functioned as described in the Zyda II article. (D.I. 269, Ex. 13 at 9). This evidence is more than sufficient to create a dispute of material fact regarding whether NPSNET was in public use before the critical date.

Google contends that the Virtual GIS system was publicly demonstrated at the IEEE Visualization Conference in 1995. (D.I. 268 at 11, 20). Mr. Lindstrom, the principal designer of the system, testified that Koller, an article he authored, "accurately characterized" the state of the Virtual GIS software in the fall of 1995. (D.I. 269, Ex. 15 at 26). He also confirmed that Koller was "presented to the people who attended the IEEE Visualization Conference." (*Id.*). When asked whether the Virtual GIS software was demonstrated at the IEEE Visual Conference, however, Mr. Lindstrom stated that he could not recall. (*Id.*). Google fails to identify any evidence in the record supporting its assertion that Virtual GIS was in fact demonstrated at the

IEEE Visualization Conference. Aside from speculation, a reasonable juror would have no basis to conclude that Virtual GIS was in public use. ACI's motion must be granted with respect to this reference.

ACI moves for summary judgment on the SRI TerraVision reference. TerraVision is described in Leclerc and Fuller. Mr. Lau, an engineer who worked on TerraVision and co-authored Leclerc, testified that the TerraVision system was demonstrated at SIGGRAPH 95 and MAGIC 1994. (D.I. 269, Ex. 4 at 40-41, 46; *see also* Ex. 17 at 38-42 (MAGIC 1994 Table of Contents)). Mr. Lau also testified that the system described in Leclerc and Fuller had the "same functionality" as that demonstrated at MAGIC 1994 and SIGGRAPH 95, and that Leclerc and Fuller describe the TerraVision system as of mid-1994. (D.I. 269, Ex. 4 at 36-38, 40, 47). ACI contends that Google has failed to present corroborating evidence of Mr. Lau's testimony. *See Finnigan*, 180 F.3d at 1369. I do not agree. The Leclerc and Fuller references are corroborating evidence. In *Lazare Kaplan International, Inc. v. Photoscribe Technologies, Inc.*, 628 F.3d 1359 (Fed. Cir. 2010), the Federal Circuit held that there was sufficient evidence to corroborate a prior inventor's testimony at trial where the corroboration evidence included an operation manual and a contract that described the invention's features. *Id.* at 1374 ("This documentary evidence, created around the time the machine was developed, provides strong support for [the inventor's] testimony."). Here, Google has advanced sufficient evidence to create a dispute of fact.

ACI concedes that the T_Vision system was demonstrated at SIGGRAPH 95. (D.I. 247 at 13). ACI takes issue, however, with Google's assertion that the version of T_Vision demonstrated at SIGGRAPH 95 is described in Sauter. (D.I. 268 at 12-13). ACI argues that the four ACI inventors attended the conference, "and though they were asked multiple questions about the system they demonstrated, none of that testimony is cited as support for Dr.

Goodchild's views as to what T_Vision 'embodied,'" as Dr. Goodchild instead relies on Sauter. (D.I. 247 at 13). Therefore, the parties disagree about what was displayed at SIGGRAPH 95. Although co-inventor Pavel Mayer states that the T_Vision system demonstrated at SIGGRAPH 95 "did not employ a plurality of spatially-distributed databases," Google points to numerous documents that it contends contradict this testimony. (D.I. 268 at 13-14 (citing D.I. 269, Ex. 4 at 47, Ex. 19 at 74-75)). This is a factual dispute. I cannot conclude as a matter of law that T_Vision does not qualify as prior art.

ACI's motion for summary judgment as to the eligibility of certain prior art public uses is granted with respect to Virtual GIS and denied in all other respects.

### iii. Inequitable Conduct

Google has asserted inequitable conduct as an affirmative defense. Google premises its inequitable conduct defense on a declaration submitted by co-inventor Pavel Mayer to the USPTO with the application for the second reissue of the '550 patent. (D.I. 12 ¶¶ 49-50). Google alleges that this declaration contains "false statements" as to what was demonstrated by the T_Vision system at SIGGRAPH 95. (*Id.* ¶¶ 59-63). Specifically, the statement that the system was not networked and was demonstrated in a non-networked configuration, Google contends, was false. (*Id.* ¶ 61).

To show inequitable conduct, an accused infringer must generally show (1) "that the patentee acted with the specific intent to deceive the PTO" and (2) materiality. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc). Intent may be inferred "from indirect and circumstantial evidence." *Id.* "[T]o meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Id.* (quoting *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,

537 F.3d 1357, 1366 (Fed. Cir. 2008)). In cases involving withheld prior art references, the court must assess materiality by "determin[ing] whether the PTO would have allowed the claim if it had been aware of the undisclosed reference." *Id.* at 1291. While "but-for materiality generally must be proved to satisfy the materiality prong of inequitable conduct, [the Federal Circuit has] recognize[d] an exception in cases of affirmative egregious misconduct." *Id.* at 1292. In those cases, "such as the filing of an unmistakably false affidavit, the misconduct is material." *Id.*

ACI argues that since Google has failed to advance evidence of deceptive intent, summary judgment should be granted. (D.I. 247 at 21 (citing *Eisai Co. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1360-61 (Fed. Cir. 2008))). Google contends that fact disputes exist as to whether Mr. Mayer's declaration was accurate and whether, if it was false, he made those false statements intentionally. (D.I. 268 at 23-24).

There is an underlying factual dispute as to whether Mr. Mayer's declaration is false at all. While the parties dispute whether it is false, that dispute only matters if Google has advanced some evidence of deceptive intent. *See, e.g., Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1294 (Fed. Cir. 2012) (reversing finding of inequitable conduct where there was no evidence of intent to deceive the PTO). Here, Google has advanced circumstantial evidence of deceptive intent. Specifically, Google relies on the testimony of ACI's own expert, Dr. Castleman, who testified that, in 1995, "distributed databases" were known in the art and that such databases could have been networked. (D.I. 269, Ex. 22 at 101-02). Such facts may give rise to the inference that Mr. Mayer could not have honestly believed that the "network infrastructure" and "distributed database" needed for the claimed invention did not yet exist. While the burden of proving intent is a heavy one, I cannot conclude as a matter of

14

law that Google cannot show that Mr. Mayer intended to deceive the PTO. Therefore, ACI's motion for summary judgment is denied with respect to inequitable conduct.

## B. Google's Motion for Summary Judgment on Laches

The defense of laches is defined as "the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028-29 (Fed. Cir. 1992) (en banc). The Federal Circuit has recently confirmed that, pursuant to 35 U.S.C. § 282, laches is available as a defense to patent infringement. *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 807 F.3d 1311, 1323 (Fed. Cir. 2015) (en banc), *petition for cert. filed*, No. 15-927 (Jan. 19, 2016). To succeed in a defense of laches, an accused infringer must show that (1) "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim," and (2) "the delay operated to the prejudice or injury of the defendant." *Aukerman*, 960 F.2d at 1032. A rebuttable presumption of laches arises when the plaintiff "delays bringing suit for more than six years after the date the patentee knew or should have known of the alleged infringer's activity." *Id.* at 1028. To overcome the presumption of laches, the plaintiff must advance evidence that its delay was reasonable or excusable, or that the accused infringer did not suffer prejudice or injury. *Id.* at 1038. If the presumption is rebutted, the accused infringer may still establish laches by satisfying the elements based upon "the totality of the evidence presented." *Id.* at 1038. "[A]t all times, the defendant bears the ultimate burden of persuasion of the affirmative defense of laches." *Id.* The application of laches is committed to the discretion of the district court. *Id.* at 1032.

15

ACI has raised genuine factual disputes that preclude granting summary judgment on laches. The parties vehemently dispute whether ACI's interactions with Google in 2006 demonstrate that it knew or reasonably should have known of its claim. This dispute, by itself, precludes a grant of summary judgment. For instance, while ACI was indeed aware of Google Earth's existence and looked to Google to determine whether Google Earth infringed, ACI was informed that its patent did not cover Google's system and that ACI's patent was merely a "nice-to-have patent." (D.I. 281 Ex. A ¶ 10; *id.* at 13). Google told ACI that it "had its own technology," but sought the patent in order to "help protect markets and their business, so no other potential competitors could pick up on and implement the idea in [ACI's] way." (D.I. 281, Ex. B ¶¶ 3-4). These denials of infringement, together with ACI's inability to investigate further, must be considered by the court. *See Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1554 (Fed. Cir. 1997) (affirming district court's denial of laches, relying on the defendant's "policy of secrecy for the alleged infringement and its denial of infringement upon inquiry"), *overruled on other grounds by Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) (en banc); *Joy Techs., Inc. v. Flakt, Inc.*, 954 F. Supp. 796, 802 (D. Del. 1996) (rejecting defense of laches where defendant's project proposal "could reasonably be interpreted as involving a non-infringing system," and when contacted by the plaintiff, defendant "represented it was aware of the [patent-in-suit] and, at least, implied that its process did not infringe the patent"). Google has failed to show that there is no dispute regarding whether ACI knew or should have known of its claim. In other words "there is conflicting evidence . . . as to whether [ACI] knowingly slept on its rights." *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1466-67 (Fed. Cir. 1998). Further, there are genuine disputes as to whether Google suffered prejudice. With factual issues in dispute, this matter is best resolved outside the context of summary

judgment. *See id.* at 1467; *see also Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 876 (Fed. Cir. 1991) ("Laches and estoppel are both equitable defenses, matters within the trial court's discretion; they depend on the particular factual circumstances of a case.").

I cannot conclude that Google has established laches as a matter of law. Accordingly, Google's motion for summary judgment on laches is denied.

### C. Google's Motion for Summary Judgment of No Willful Infringement

The Federal Circuit set forth a two-pronged test for establishing willfulness in *In re Seagate Technology, LLC*, 497 F.3d 1360 (Fed. Cir. 2007) (en banc). To establish willful infringement, a plaintiff must first "show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Id.* at 1371. If that objective standard is met, the plaintiff must show that "this objectively-defined risk . . . was either known or so obvious that it should have been known to the accused infringer." *Id.*; *see also Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1236 (Fed. Cir. 2011) (requiring plaintiffs "to prove the objective prong of the willful infringement inquiry by clear and convincing evidence as a predicate to the jury's consideration of the subjective prong"). The objective prong is "determined by the record developed in the infringement proceeding." *Id.* The objectiveness prong is generally not met "where an accused infringer relies on a reasonable defense to a charge of infringement." *Spine Sols., Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1319 (Fed. Cir. 2010); *see also Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 776 F.3d 837, 844 (Fed. Cir. 2015) ("Objective recklessness will not be found where the accused infringer has raised a substantial question as to the validity or noninfringement of the patent." (quotation marks omitted)). The

objective recklessness prong, "even though predicated on underlying mixed questions of law and fact, is best decided by the judge as a question of law." *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1006-07 (Fed. Cir. 2012).

Google has filed summary judgment motions on non-infringement, anticipation, and lack of patent-eligible subject matter. While "merely citing . . . motions for summary judgment does not show that those asserted defenses are reasonable," it does provide insight into Google's defenses. *See Smartflash LLC v. Apple Inc.*, 2015 WL 661276, at *5 (E.D. Tex. Feb. 13, 2015). At minimum, Google's anticipation argument is "a reasonable defense." *Spine Sols.*, 620 F.3d at 1319. The defense is premised on the Sauter reference, an inventor-authored document describing the T_Vision system. The defense is also supported by expert testimony. Regardless of whether Google may ultimately prevail on the question of anticipation, a "reasonable litigant could realistically expect" this defense to succeed. *GP Indus. v. Eran Indus.*, 500 F.3d 1369, 1374 (Fed. Cir. 2007) (quoting *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993)). Therefore, Google's motion for summary judgment of no willful infringement is granted.

### D. Google's Motion for Summary Judgment of Non-Infringement and Invalidity

A patent is infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent . . . ." 35 U.S.C. § 271(a). A two-step analysis is employed in making an infringement determination. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). First, the court must construe the asserted claims to ascertain their meaning and scope. *See id.* The trier of fact must then compare the properly construed claims with the

accused infringing product. *See id.* at 976. This second step is a question of fact. *See Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

"Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device." *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). If an accused product does not infringe an independent claim, it also does not infringe any claim depending thereon. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989). However, "[o]ne may infringe an independent claim and not infringe a claim dependent on that claim." *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007) (internal quotations omitted).

When an accused infringer moves for summary judgment of non-infringement, such relief may be granted only if at least one limitation of the claim in question does not read on an element of the accused product, either literally or under the doctrine of equivalents. *See Chimie v. PPG Indus.*, 402 F.3d 1371, 1376 (Fed. Cir. 2005); *see also TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) ("Summary judgment of noninfringement is . . . appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial."). Thus, summary judgment of non-infringement can only be granted if, after viewing the facts in the light most favorable to the non-movant, there is no genuine issue as to whether the accused product is covered by the claims (as construed by the court). *See Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999).

A patent claim is invalid as anticipated under 35 U.S.C. § 102 if "within the four corners of a single, prior art document . . . every element of the claimed invention [is described], either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009) (alterations in original). As with infringement, the court construes the claims and compares them against the prior art. *See Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010). Anticipation "may be decided on summary judgment if the record reveals no genuine dispute of material fact." *Encyclopaedia Britannica, Inc. v. Alpine Elecs. of Am., Inc.*, 609 F.3d 1345, 1349 (Fed. Cir. 2010).

### i. Invalidity

Google moves for summary judgment on invalidity, contending that the Sauter reference is a printed publication under § 102(b) and that the Sauter discloses all the elements of claim 1 of the '550 patent.

In deciding ACI's motion for summary judgment, I concluded that disputes of material fact existed regarding whether Sauter qualified as a prior art reference under § 102(b). Here, I conclude the same. In short, neither party has demonstrated the absence of a dispute as to the material fact of whether Sauter was distributed at SIGGRAPH 95. Since I cannot resolve the factual disputes underlying Sauter's status as prior art, I cannot conclude as a matter of law that Sauter anticipates the '550 patent. Google's motion for summary judgment of invalidity is denied.

### ii. Non-Infringement

Google premises its non-infringement argument on a claim construction position that was not advanced during claim construction. (D.I. 228 at 19-20). Specifically, Google argues that

"the parties did not present to the Court and the Court did not address an issue regarding step

1(a) that became critical in discovery: whether step 1(a) requires *distributing* the stored data

across the data sources . . ., or whether step 1(a) encompasses *replicating* the stored data across

the data sources." (*Id.* at 20). ACI argues that Google waived this argument by failing to timely

raise it. (D.I. 274 at 17-18 (citing *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1292

(Fed. Cir. 2005))). ACI also argues that Google's proposed construction is unsupportable.

"[T]he court's obligation is to ensure that questions of the scope of the patent claims are

not left to the jury . . . . [and] to fulfill this obligation, the court must see to it that disputes

concerning the scope of the patent claims are fully resolved." *Every Penny Counts, Inc. v. Am.

Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009); *see also O2 Micro Int'l, Ltd. v. Beyond

Innovation Tech. Co.*, 521 F.3d 1351, 1361-62 (Fed. Cir. 2008).

Since the parties dispute the scope of the term "plurality of spatially distributed data

sources," I must resolve that dispute. I do not think that Google waived this argument by failing

to raise it during claim construction. Therefore, I will consider the competing constructions of

the "plurality of spatially distributed data sources" term.

"It is a bedrock principle of patent law that the claims of a patent define the invention to

which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

(Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or

catechism for conducting claim construction.' Instead, the court is free to attach the appropriate

weight to appropriate sources 'in light of the statutes and policies that inform patent law.'"

*SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (quoting *Phillips*,

415 F.3d at 1324). When construing patent claims, a court considers the literal language of the

claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments,*

*Inc.*, 52 F.3d 967, 977-80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  Of these

sources, "the specification is always highly relevant to the claim construction analysis.  Usually,

it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d

at 1315 (internal quotation marks and citations omitted).

"[T]he words of a claim are generally given their ordinary and customary meaning. . . .

[Which is] the meaning that the term would have to a person of ordinary skill in the art in

question at the time of the invention, i.e., as of the effective filing date of the patent application."

*Id.* at 1312-13 (internal quotation marks and citations omitted).  "[T]he ordinary meaning of a

claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321

(internal quotation marks omitted).  "In some cases, the ordinary meaning of claim language as

understood by a person of skill in the art may be readily apparent even to lay judges, and claim

construction in such cases involves little more than the application of the widely accepted

meaning of commonly understood words." *Id.* at 1314 (internal citations omitted).

When a court relies solely upon the intrinsic evidence—the patent claims, the

specification, and the prosecution history—the court's construction is a matter of law.  *See Teva*

*Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).  The court may also make factual

findings based upon consideration of extrinsic evidence, which "consists of all evidence external

to the patent and prosecution history, including expert and inventor testimony, dictionaries, and

learned treatises." *Phillips*, 415 F.3d at 1317-19 (internal quotation marks and citations omitted).

Extrinsic evidence may assist the court in understanding the underlying technology, the meaning

of terms to one skilled in the art, and how the invention works.  *Id.*  Extrinsic evidence, however,

is less reliable and less useful in claim construction than the patent and its prosecution history.

*Id.*

"A claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (internal quotation marks and citation omitted).

During claim construction, the Court construed "plurality of spatially distributed data sources" to mean "a plurality of geographically separate data sources." (D.I. 148 at 13-15). Google now argues that the term should be construed as "a plurality of geographically separate data sources that each store a portion of the space-related data." (D.I. 339 at 4-5). ACI argues that the current construction of the term is correct.

Google contends that the recitation of "distributed" in step 1(a) means that space-related data must be divided across data sources, such that data is not replicated among the "geographically separate" data sources. In other words, Google argues that the patent limits "spatially distributed data sources" to instances where data is divided among the data sources, without any redundancy. In support of this interpretation of "distributed," Google cites to the specification's criticism of certain prior art—such as "[e]lectronic maps" loaded on CD-ROMs and car "navigation systems" loaded on "fixed databases"—as lacking "the capacity for representing various views of the area." '550 patent at 1:34-41. The patent purports to solve this memory limitation by distributing data sources, such that "the amount of available data . . . is . . . not limited, and can be extended at will." *Id.* at 2:55-59. Google argues that redundant data sources would "contradict[] the patent's objective of enabling storage of more data." (D.I. 339 at 7).

Google mischaracterizes the patent's concern with limited memory. The patent states that "[b]y virtue of the fact that the data are called up . . . in a spatially distributed manner, the magnitude of the available database is not limited by the size of the central data memory." '550 patent at 2:52-56. The patent seeks to overcome the limited capacity of "central data memory," i.e., CD-ROMs and fixed databases. Whether the data contained in the spatially distributed data sources is wholly or partially redundant is of no import to overcoming the constraints of the central data memory.

Further, the patent speaks of "spatially distributed data sources," not spatially distributed "space-related data." In fact, the specification says little about the data contained in those data sources. In the only preferred embodiment, the distributed data sources are "preferably located in the vicinity of the areas on the earth whose data they contain," so that the data may be "detected, stored and serviced at the point where a knowledge of the properties to be represented by the data . . . is most precise." *Id.* at 6:59-62; *see also id.* fig.1. While this embodiment contemplates some degree of localization, it does not exclude redundant storage. Google is correct that "embodiments can shed light on the intended scope of the claims." *Astrazeneca AB v. Mutual Pharm. Co.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004). This preferred embodiment does not, however, support limiting the claims as Google proposes.

Therefore, Google's claim construction argument is rejected. I conclude that the term needs no further construction, as the previous construction of the claim term provides the proper claim scope. Further, the parties are not permitted to "debate as to the meaning" of the term during trial. *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1319-20 (Fed. Cir. 2016). Specifically, Google is prohibited from presenting this claim construction argument—i.e., that space-related data must be divided, rather than duplicated across data

sources—to the jury. *See O2 Micro*, 521 F.3d at 1361-62. Beyond that, the question of

infringement is for the jury to resolve. *PPG Indus. v. Guardian Indus.*, 156 F.3d 1351, 1355

(Fed. Cir. 1998) ("[A]fter the court has defined the claim with whatever specificity and precision

is warranted by the language of the claim and the evidence bearing on the proper construction,

the task of determining whether the construed claim reads on the accused product is for the

finder of fact.").

Google moved for summary judgment of non-infringement solely on this basis of its new

claim construction theory. As I have rejected its claim construction argument, Google's motion

is denied.

### E. ACI's Motion to Strike and Exclude Certain Testimony of Dr. Goodchild

Dr. Goodchild, on behalf of Google, has rendered technical opinions on non-infringement

and invalidity. ACI now seeks to exclude certain testimony.

ACI argues that Dr. Goodchild should be precluded from opining on whether prior art

references were published or in public use. I agree. Dr. Goodchild is neither a librarian, nor an

archivist, and possesses no specialized knowledge on publication. Dr. Goodchild is, however,

permitted to opine on what prior art references disclose and how those references may or may

not anticipate or render obvious the claimed invention. ACI insists that Dr. Goodchild must

"address what is embodied . . . in . . . specific use[s] of the[] [prior art] systems at a specific time

and place." (D.I. 241 at 7 (quotation marks omitted)). This misstates the law, as experts are

routinely permitted to rely on documentary evidence which purports to describe systems that

were placed in public use. *See, e.g., Zenith Elecs. Corp. v. PDI Commc'ns Sys., Inc.*, 522 F.3d

1348, 1357-58 (Fed. Cir. 2008) (affirming summary judgment of invalidity where expert based

his anticipation opinion on "on his review of schematics and testing that he performed"); *Good*

*Tech. Corp. v. Mobileiron, Inc.*, 2015 WL 4197554, at *6 (N.D. Cal. July 20, 2015) (allowing

testimony from invalidity expert who "base[d] his conclusions on various technical documents

and marketing materials that describe[d]" the prior art references"). Though ACI disputes

whether certain references qualify as prior art and what those references disclose, that is not a

methodological objection, but a factual controversy best resolved by the jury.

ACI also objects to Dr. Goodchild's opinions on inequitable conduct, arguing that Dr.

Goodchild has no specialized expertise in whether statements are false or misleading. Dr.

Goodchild's technical testimony is helpful to the determination of whether Mr. Mayer's

declaration to the PTO was accurate when made. Further, such testimony is within his field of

expertise. Dr. Goodchild is not, however, an expert on Mr. Mayer's state of mind, and therefore

cannot opine on whether Mr. Mayer was lying or mistaken when he authored his declaration.

The inferences that may be drawn from the veracity of the affidavit are for the jury to decide.

ACI argues that the Court should exclude Dr. Goodchild's non-infringing alternative

opinion regarding a single-server implementation of Google Earth. Dr. Goodchild argues that

this alternative was described as prior art in the '550 patent. (D.I. 242, Ex. B ¶ 196). ACI argues

that this opinion is methodologically unsound because he could have tested this non-infringing

alternative, but did not. (D.I. 241 at 12-13 (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136, 158

(3d Cir. 2000))). ACI's cited cases fail to support its assertion that experts are required to

implement a non-infringing alternative in order to rely on it. In *Oddi*, a personal injury case

about car bumpers, the Third Circuit affirmed the district court's exclusion of an expert who

based his opinion on "*ipse dixit*" and "his own intuition." *Oddi*, 234 F.3d at 158. In *Izume*

*Products Co. v. Koninklijke Philips Electronics N.V.*, 315 F. Supp. 2d 589 (D. Del. 2004), the

court excluded the plaintiff's expert where he based his infringement analysis "solely on his

subjective belief," without support from literature references or his own testing. *Id.* at 602. These cases do not stand for the proposition that an expert must test all non-infringing alternatives. The use of testing is one factor to be considered when undertaking a *Daubert* analysis, but it is not required. *See, e.g.*, *Brandeis Univ. v. Keebler Co.*, 2013 WL 5911233, at *8 (N.D. Ill. Jan. 18, 2013) (finding that there were "reasonable bases" for an expert's opinion on non-infringing alternatives where "in lieu of testing," the expert "relie[d] on his knowledge about food science and the fact that Keebler ha[d] previously used the modified manufacturing process"). The absence of testing, by itself, is not a sufficient basis to exclude Dr. Goodchild's opinion pertaining to this non-infringing alternative.

ACI also argues that Dr. Goodchild impermissibly bases his non-infringing alternative opinion on inadmissible hearsay from unidentified Google engineers. Dr. Goodchild relies on conversations with Google engineer Julien Mercay, who Google expects call as a witness at trial. (D.I. 270 at 21). This reliance is permissible. *Oracle Am., Inc. v. Google Inc.*, 2011 WL 5914033, at *1 (N.D. Cal. Nov. 28, 2011) ("Expert reliance on foundational facts supplied by Google's engineers can be proper so long as they testify to the foundational facts with firsthand knowledge."). Dr. Goodchild's reliance on employee testimony is permissible.

Additionally, ACI contends that this non-infringing alternative was not timely disclosed, as Google waited until just before serving Dr. Goodchild's expert report to explicitly disclose this single-server alternative. Google argues it disclosed the alternative when it stated, in response to an interrogatory, that it "may rely on alternatives disclosed in the prior art, including as cited in Defendant's Invalidity Contentions" as non-infringing alternatives. (D.I. 242, Ex. F at 4-5). Google's invalidity contentions identified "the admitted prior art in the specification of the '550 patent" as prior art. (D.I. 271, Ex. 7 at 27). That admitted prior art included a reference to

"single data sources as opposed to the recited 'plurality of spatially distributed data sources.'"
(D.I. 242 Ex. B ¶ 196).  While I am skeptical that this trail of breadcrumbs amounts to a
sufficient disclosure, I conclude that ACI has suffered no prejudice.  Dr. Goodchild and Mr.
Reed included analyses of this alternative in their reports, and ACI's experts were afforded an
ample opportunity to respond, and did respond, in their reports.  Dr. Goodchild was deposed
about his opinions on this non-infringing alterative.  (D.I. 242, Ex. C at 10-11).  Further, ACI has
waited far too long to raise this issue.  If ACI took objection to Dr. Goodchild's opinion on this
non-infringing alternative, they could have said so in October.

ACI's motion is granted with respect to Dr. Goodchild's opinions on whether references
qualify as prior art and on issues pertaining to Mr. Mayer's state of mind, and denied in all other
respects.

### F.  ACI's Motion to Strike and Exclude Certain Opinions of Mr. Reed

ACI argues that Mr. Reed's reliance on seven license agreements as a "check" on his
reasonably royalty analysis was improper because Mr. Reed failed to establish economic
comparability.[3] *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009)
("[T]he licenses relied on . . . in proving damages [must be] sufficiently comparable to the
hypothetical license at issue in suit."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197,
1211 (Fed. Cir. 2010) (When relying on past licenses, an expert "must account for differences in
the technologies and economic circumstances of the contracting parties.").  Here, Mr. Reed relies
on seven different licenses, five of which are settlement licenses.

"The propriety of using prior settlement agreements to prove the amount of a reasonable
royalty is questionable" because such agreements "are tainted by the coercive environment of

---

[3] The parties have agreed that the licenses may be used to show Google's preference for a lump-sum
license. (Hrg. Tr. at pp. 146-47).

patent litigation [and] are unsuitable to prove a reasonable royalty . . . [under a *Georgia-Pacific* analysis], the premise of which assumes a voluntary agreement will be reached between a willing licensor and willing licensee, with validity and infringement of the patent not being disputed." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012). For the five settlement licenses, Mr. Reed fails to undertake any analysis of the underlying litigation that led to the settlement. Without such analysis, Mr. Reed's economic comparability conclusion cannot be based on "sound economic and factual predicates." *See Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002). Without adequately accounting for the differences in economic circumstances between the past settlement licenses and the hypothetical negotiation, the license agreements cannot be considered economically comparable. *See Finjan*, 626 F.3d at 1211. Mr. Reed therefore cannot rely on these licenses as a "check" against his reasonable royalty calculation.

Mr. Reed relies on two other licenses. These licenses are the product of real-world licensing negotiations, rather than litigation settlements. The experts dispute whether these licenses are technologically comparable. While the economic comparability analysis offered by Mr. Reed could be more detailed, I conclude that the analysis offered is consonant with the purpose[4] for which the licenses are offered—i.e., as a "check" against his reasonable royalty

---

[4] This is a relevant factor in determining whether an expert's testimony satisfies the comparability demands of *Lucent*. *See, e.g., GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *10 (N.D. Cal. Apr. 16, 2014). For instance, when a license is relied upon to show a preference for a lump-sum royalty, the required level of economic comparability may be lower than in instances where a license provides the core basis for the royalty. The circumstances here can be distinguished from those in *TracBeam L.L.C. v. AT & T Inc.*, 2013 WL 6175372, at *5 (E.D. Tex. Nov. 25, 2013) and *M2M Solutions LLC v. Enfora, Inc.*, 2016 WL 908790, at *9 (D. Del. Mar. 9, 2016). In *TracBeam*, the "revenue-sharing agreements" at issue "provide[d] services and products unrelated to the patent" and had no relevance to the hypothetical negotiation. *TracBeam*, 2013 WL 6175372, at *5. The court therefore concluded that "irrelevant financial information is still not admissible even when used as a 'check' for an otherwise proper reasonable royalty analysis." *Id.* In *Enfora*, the Court concluded that the licenses at issue lacked any technological or economic comparability, aside from the *ipse dixit* of the defendants' experts. *Enfora*,

calculation.  Though there are differences between these licenses and the hypothetical

negotiation, Mr. Reed acknowledges those differences.  (D.I. 245, Ex. A at 15-16).  The "jury

[is] entitled to hear the expert testimony and decide for itself what to accept or reject."  *i4i Ltd.

P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011).

ACI also moves to exclude Mr. Reed's non-infringing alternative opinion pertaining to a

single-server implementation of Google Earth.  ACI proceeds on all the same grounds as it did

with respect to its motion to exclude Dr. Goodchild's non-infringing alternative opinion.  For the

same reasons, ACI's motion to exclude Mr. Reed's non-infringing alternative opinion is denied.

Therefore, ACI's motion to exclude certain testimony of Mr. Reed is granted with respect

to the five settlement licenses, except as to their lump-sum nature, and denied in all other

respects.

### G.  Google's Motion to Exclude Testimony of Mr. Nawrocki

ACI's damages expert, Mr. Nawrocki, presents two alternative reasonable royalty

theories: a "sessions" theory and an "activations" theory.  Google moves to exclude both.

#### i. Sessions Methodology

Google takes issue with Mr. Nawrocki's starting point for calculating his royalty base.

Mr. Nawrocki begins with a 2010 Google-prepared document which outlines revenue projections

for the entire "Geo" product segment.  (D.I. 283, Ex. A ¶ 46; Hrg. Tr. at pp. 18-23).[5]  The Geo

segment includes revenue from several "inter-related product offerings," such as Google Earth,

Google Maps, StreetView, Panoramio, Local Search, and SketchUp.  (D.I. 239 Ex. 1 ¶ 150).

Google's revenue projections contain, and Mr. Nawocki incorporates, indirect revenue from

---

2016 WL 908790, at *9.  The Court then concluded that because the licenses at issue were not at all
comparable, the expert's references to those agreements must be excluded.

[5] Mr. Nawrocki also relies on a document describing Google's 2011 revenue projections for Google Geo.
(D.I. 283, Ex. A ¶ 46; Hrg. Tr. at pp. 22-23).

services such as Local Universal, IP Geo, and AdWords Local. (*Id.* at 28-29). Google argues that by beginning with the total revenue for the Google Geo segment, Mr. Nawrocki violates the entire market value rule. *See, e.g., Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226-28 (Fed. Cir. 2014).

The Federal Circuit has stated that the "essential requirement" of the entire market value rule "is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Id.* at 1226. To assist in implementing that rule, the Federal Circuit has fashioned an evidentiary principle which demands that "care . . . be taken to avoid misleading the jury by placing undue emphasis on the value of the entire product." *Id.* That principle provides that, in the context of multi-component products, "it is generally required that royalties be based not on the entire product, but instead on the smallest salable patent-practicing unit." *LaserDynamics*, 694 F.3d at 67 (quotation marks omitted). Starting with too high a royalty base "carries a considerable risk" of misleading a jury, as "disclosure to the jury of the overall product revenues 'cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue.'" *Id.* at 68 (quoting *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011)). "[T]he requirement that a patentee identify damages associated with the smallest salable patent-practicing unit is simply a step toward meeting the requirement of apportionment." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014). Therefore, "[w]here the smallest salable unit is, in fact, a multi-component product containing several non-infringing features . . ., the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology." *Id.*

Here, it is unclear whether there is a "smallest salable unit" at all. Generally speaking, aside from Google Earth Enterprise and Google Earth Pro, Google does not sell any accused products. It generates revenue through various monetization methods. Google tracks those revenue streams for its own purposes, but those do not break down nicely for purposes of proving damages in patent litigation. The various rows on the relevant revenue sheets describe intermingled and interrelated sources of revenue. Google Earth pervades these to varying degrees. With some of these monetization mechanisms, Google Earth may account for a substantial part of the revenue; with others, Google Earth may contribute very little. (Hrg. Tr. at pp. 49-50, 52-55). "Specific revenue generation [methods are] not accused," Google Earth is. (*Id.* at p. 62). To the extent that various revenue sources "rely[] upon an accused like product like Google Earth Free" in their implementation, they are properly included in a damages analysis, so long as a proper apportionment is undertaken. (Hrg. Tr. at pp. 62-64); *see VirnetX*, 767 F.3d at 1326 ("[A] patentee must take care to seek only those damages attributable to the infringing features."); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) ("[A] reasonable royalty analysis requires a court to . . . carefully tie proof of damages to the claimed invention's footprint in the market place.").

As Mr. Nawrocki received no documents that "identified both the direct and indirect revenues that were attributed to Google Earth," he began his royalty analysis with the total Google Geo revenue projections. (Hrg. Tr. at pp. 110-11). He then began a process of apportionment. "[A]n apportionment analysis needs to start somewhere, and simply starting with the total operating profit does not inherently invoke the entire market value rule." *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 2012 WL 3679564, at *4 (W.D. Pa. Aug. 24, 2012); *see also Ericsson*, 773 F.3d at 1227 ("It is not that an appropriately apportioned royalty award

could never be fashioned by starting with the entire market value of a multi-component

product—by, for instance, dramatically reducing the royalty rate to be applied in those cases."").

Google has not suggested any alternative starting point.[6]  Therefore, I conclude that this starting

point does not violate the entire market value rule, and is methodologically sound.

Google also criticizes Mr. Nawrocki's method of apportionment. To apportion out the

value of Google Earth from the entire Geo product segment, Mr. Nawrocki applies a 13%

allocation. This 13% figure is derived from a 2008 Google-prepared business plan with

projected advertising revenue for Google Earth, Google Maps, and Google Maps API. (D.I. 282

at 15; Hrg. Tr. at pp. 26-27). In selecting the 13% figure, Mr. Nawrocki "looked at the total plan,

the total Geo, and tried to . . . extract how much of that would be Google Earth related." (Hrg.

Tr. at p. 72). In other words, by looking at a breakdown of Google Earth, Google Maps, and

Google Maps API revenue data, and considering "a variety of business plans that made [similar]

assessments," Mr. Nawrocki extrapolated a value for Google Earth's total revenue contribution

to the total revenue of the Geo segment. (*Id.* at pp. 64-67). In arguing that such an approach is

flawed, Google contends that Mr. Nawrocki failed to account for "other relevant sources of

revenue," such as StreetView, Panoramio, Local Search, and SketchUp. (D.I. 238 at 13). Put

another way, Google argues that Mr. Nawrocki should have included more revenue sources in

the denominator of the ratio which produced the 13% allocation. Any inclusion of more revenue

sources in the denominator, however, would have to account for, in the numerator, the extent to

which Google Earth contributes to those revenue sources.[7]  Google has not provided the relevant

---

[6] At the summary judgment hearing, the Court asked Google whether it could advance "an alternative
suggestion as to what the starting point should be." (D.I. 336 at 151-52).

[7] Mr. Nawrocki's report makes clear that the products and services offered within the Geo segment are
interrelated. "Google Local Search powers local queries on . . . Google Earth . . . ." (D.I. 283, Ex. A ¶ 43
(quoting Google Inc., Annual Report (Form 10-K) 6 (Feb. 12, 2010))). "Panoramio enables users to
upload photos and locate them on the earth using Google Maps. These photos are then incorporated into

data that would permit Mr. Nawrocki to specify and use these values. Had Google been able to do so, there might be more force to Google's argument.

Apportionment "may involve some degree of approximation and uncertainty," particularly in cases where patentees are faced with the difficulty of "assigning value to a feature that may not have ever been individually sold." *See VirnetX*, 767 F.3d at 1328. Mr. Nawrocki testified that Google's own documents reflected a range of values for the percentage of Geo revenues attributable to Google Earth. (Hrg. Tr. at p. 114). These values "varied by document" and were generally "from 5 percent to 25 percent." (*Id.*). Mr. Nawrocki, upon consideration of the evidence, explained how 13% was a reasonable figure grounded in specific facts and "supported by the documents." (*Id.*). This is a reasonable method of estimating the proper extent to which Google Geo revenues should be attributed to Google Earth. "[W]here the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). Mr. Nawrocki's 13% figure may or may not be the most accurate apportionment for Google Earth's contributions to the Geo segment, but that goes to the weight and credibility of the evidence. I cannot conclude that the methodology is unsound or that the figures are untethered to the facts of the case.

Therefore, Google's motion is denied with respect to Mr. Nawrocki's "sessions" reasonable royalty methodology.

### ii. Activations Methodology

---

Maps, Earth, Local Search, and Place Pages." (*Id.* (quoting Google Inc., Annual Report (Form 10-K) 6 (Feb. 12, 2010))). "Google SketchUp is a free tool that enables users to model buildings in 3D. . . . SketchUp can be used as a tool for populating Google Earth with 3D building models." (*Id.* (quoting Google Inc., Annual Report (Form 10-K) 7 (Feb. 12, 2010))).

Google objects to Mr. Nawrocki's apparent equating of "users" to "activations" in his calculation. Google argues that Mr. Nawrocki unjustifiably used a per-user value, derived from Google documents, to calculate a per-activation royalty. (D.I. 238 at 10-11; *see also* D.I. 283, Ex. A ¶¶ 94 155, 157). Mr. Nawrocki testified that he relied on certain documents and testimony to support his assumption that the value of each "user," as discussed in several internal Google documents, represents the value of each "activation." (Hrg. Tr. at pp. 80-81, 111; *see also* D.I. 342, Ex. B at 5). Google has represented that "there has been testimony in the record that this is not about activations." (Hrg. Tr. at p. 90). The documents upon which Mr. Nawrocki relies do not clarify what is meant by "user." This dispute is factual, not methodological. Mr. Nawrocki's assumption, though contested, does not run afoul of *Daubert*.

After arriving at a per-user per-year royalty, Mr. Nawrocki multiplies that rate by 5.5 years, which represents the "time period of a Google Earth user." (D.I. 283, Ex. A ¶ 157). Google argues that Mr. Nawrocki's reliance on a 5.5 year period is improper. *(See id.)*. Mr. Nawrocki provides no explanation for this figure whatsoever. He simply "assume[s] a period of 5.5 years which . . . coincide[s] with the period from July 2010 through December 2015." *(Id.)*. Mr. Nawrocki used this 5.5 year multiplier "for every activation, regardless of when that activation occurred." (Hrg. Tr. at p. 110).

A "patentee must 'sufficiently [tie the expert testimony on damages] to the facts of the case.'" *Uniloc*, 632 F.3d at 1315 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993)); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Here, Mr. Nawrocki's 5.5 year period is detached from the facts of the case. There is no document that

35

supports this number, nor is there any calculation, such as some sort of weighted average. (Hrg. Tr. at p. 109). Mr. Nawrocki's statement that "the parties would have agreed to a five-and-a-half year multiplier towards a per-year value" states the result of an analysis, not the method from which that result is obtained. (*See* Hrg. Tr. at p. 102). This unsupported assumption is fatal to Mr. Nawrocki's "activations" opinion.[8]

Therefore, Google's motion is granted with respect to Mr. Nawrocki's "activations" reasonably royalty methodology.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment of invalidity and non-infringement is **DENIED**; Defendant's motion for summary judgment of no willful infringement is **GRANTED**; Defendant's motion for partial summary judgment on laches is **DENIED**; Plaintiff's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**; Defendant's motion to preclude testimony of Mr. Nawrocki is **GRANTED IN PART** and **DENIED IN PART**; Plaintiff's motion to preclude certain testimony of Dr. Goodchild is **GRANTED IN PART** and **DENIED IN PART**; and Plaintiff's motion to preclude certain testimony by Mr. Reed is **GRANTED IN PART** and **DENIED IN PART**. An appropriate order will be entered.

---

[8] Additionally, since the '550 patent expires in December 2016, Google argues that this theory awards ACI a portion of Google's revenue after the expiration of the patent. "The royalty base for reasonable royalty damages cannot include activities that do not constitute infringement." *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1343 (Fed. Cir. 2015). Through multiplying the per-year per-Google Earth user royalty rate by some number of post-expiration years, it appears that Mr. Nawrocki has impermissibly violated the Supreme Court's "bar[] [on] royalties for using an invention after it has moved into the public domain." *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2408 (2015). While ACI, if successful in its infringement case, would be entitled to the "'value of what was taken'—the value of the use of the patented technology," that value cannot flow from acts of infringement occurring after the patent's expiration. *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014) (quoting *Dowagiac Mfg. Co. v. Minn. Moline Plow Co.*, 235 U.S. 641, 648 (1915)).