```
 1               UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF DELAWARE

 3

 4    ART+COM INNOVATION POOL GmbH :   CA NO. 14-217-RGA

 5                                 :

 6              Plaintiff,         :

 7                                 :

 8         v.                      :   May 13, 2016

 9                                 :

10    GOOGLE INCORPORATED,         :

11                                 :

12              Defendant.         :   10:00 o'clock a.m.

13    .............................:

14

15

16            TRANSCRIPT OF PRETRIAL CONFERENCE

17            BEFORE THE HONORABLE TIMOTHY B. DYK

18    UNITED STATES COURT OF APPEALS JUDGE FOR THE FEDERAL CIRCUIT

19

20

21    APPEARANCES:

22

23    For Plaintiff:      FARNAN LLP

24                        BY:  BRIAN E. FARNAN, ESQ

25                              -and-
```

```
 1                        BAKER BOTTS LLP

 2                        BY:  SCOTT F. PARTRIDGE, ESQ

 3                        BY:  MICHAEL A. HAWES, ESQ

 4                        BY:  LARRY G. SPEARS, ESQ

 5                        BY:  M. NATALIE ALFARO, ESQ

 6

 7

 8   For Defendant:      MORRIS, NICHOLS, ARSHT & TUNNELL

 9                        BY:  JACK B. BLUMENFELD, ESQ

10                                -and-

11                        O'MELVENY MYERS LLP

12                        BY:  DARIN W. SNYDER, ESQ

13                        BY:  BRETT J. WILLIAMSON, ESQ

14                        BY:  DAVID S. ALMELING, ESQ

15                        BY:  LUANN L. SIMMONS, ESQ

16

17   Other Appearances:  JAMES SHERWOOD, ESQ

18                        In-house Counsel for Google

19

20

21

22

23

24   Court Reporter:        LEONARD A. DIBBS

25                          Official Court Reporter
```

```
 1                      P R O C E E D I N G S

 2

 3              (The proceedings occurred at 10:00 o'clock a.m. as

 4       follows:)

 5              THE COURT:  Thank you.  Be seated, please.

 6              We have the Pretrial Conference in ART+COM Innovation

 7       Pool GmbH v. Google Inc.

 8              I would like to begin by thanking counsel and Mr. Dibbs

 9       for coming here to Washington to have the pretrial.

10              So why don't we begin by having counsel identify

11       themselves for the record.

12              MR. PARTRIDGE:  Your Honor, Scott Partridge for ART+COM

13       Innovation Pool.

14              And I have here with me this morning, Michael Hawes,

15       who will be speaking during the hearing today.  Gene Spears, who

16       also will be speaking depending on how things go.  And Natalie

17       Alfaro, all with Baker Botts from Houston.  And Brian Farnan,

18       who's our Delaware counsel in this case.

19              THE COURT:  Welcome.

20              (Everyone collectively said, "Good morning.")

21              THE COURT:  For Google?

22              MR. SNYDER:  Good morning, your Honor.

23              Darin Snyder filed of O'Melveny Myers for defendant

24       Google.

25              Also with me is Brett Williamson of O'Melveny Myers,
```

1    Luann Simmons of O'Melveny Myers.  Behind me David Almeling also

2    of O'Melveny Myers.

3            From Google, Mr. Jim Sherwood.  And from Morris

4    Nichols, Jack Blumenfeld.

5            THE COURT:  Good morning, thank you.

6            I received the draft of the preliminary jury

7    instructions.  And I have revised them somewhat to add a little

8    bit in order for some of the things to make it more

9    understandable for the jury.

10            And I am going to ask my law clerk to distribute copies

11    of this, so you can look at it at the lunch hour and see what,

12    if anything, I've done to it that may cause any problems.

13            Unless counsel has any questions, why don't we begin

14    with the Pretrial Order.

15            I assume you all got it?

16            MR. PARTRIDGE:  We have received it, your Honor.  Thank

17    you.  That was very helpful.

18            THE COURT:  Why don't we begin by seeing if there are

19    any objections to the revisions I made.  There's one item which

20    I reserved in here, it is with respect to the stated positions

21    of the parties.  That's in Paragraph 41.

22            But, Mr. Partridge, why you don't begin.

23            Do you have any objections to the draft of the Pretrial

24    Order?

25            MR. PARTRIDGE:  Your Honor, would it be useful to sort

1    of quickly go through it in order with a few questions that I

2    have for clarification, and they may be similar to the questions

3    that Google has?

4              THE COURT:  Sure.  You can do that.

5              MR. PARTRIDGE:  And I'm looking at the red line

6    version.  And on Page 4 of it, you added that the parties will

7    stipulate to the level of ordinary skill in the art.

8              And I just wanted to inform you that we have already

9    been exchanging some proposals, and we would hope by next week,

10   I think, to work something out with respect to the level of

11   skill in the art.

12             THE COURT:  Okay.  Good.

13             MR. PARTRIDGE:  On that same page, you had decided that

14   the cross cross-examination exhibits should be included on the

15   exhibit list.

16             The exhibit lists that are attached to the Pretrial

17   Order have actually been substantially revised by the parties

18   already.

19             We've reduced the number of exhibits.  We've reduced

20   the number of objections.

21             I think that, based on today's rulings, we'll probably

22   have some further reductions to make.  And what I would suggest,

23   your Honor, is that we have a day next week in which we submit

24   revised exhibit lists to be attached to the Pretrial Order.

25             I suspect we'll probably still have some amendments

1    after that.  But if your Honor is anxious to enter the Pretrial

2    Order with the exhibits attached, as they are referenced in the

3    Pretrial Order itself, it may be best to do it early next week

4    when we can give you a revised exhibit list.

5         THE COURT:  Why don't you plan to issue the Pretrial

6    Order with the -- that exhibit with the exhibits list on it and

7    the objections to come later?

8         MR. PARTRIDGE:  That would be fine with us, your Honor.

9         THE COURT:  And I know there are quite a few objections

10   to exhibits.  I am hoping that almost all of those are going to

11   be resolved by the parties before we get to the trial.

12        MR. PARTRIDGE:  My understanding, your Honor -- and I

13   didn't participate directly in the conversations, I don't think

14   Mr. Snyder either -- but I think the parties are down to each

15   having about 90 exhibits as opposed to -- that are objected to,

16   as opposed to the larger number that you had previously.

17        And I suspect that that number is going to be reduced

18   substantially over the next several days.  And my belief is that

19   by the time we start trial, there will be relatively few

20   exhibits that you'll need to address in the morning that you set

21   aside -- and at the end of the day that you set aside for that.

22        I think those issues are going to be substantially

23   reduced.  So I don't think you need to be as concerned, as I'm

24   sure you were, in looking at those initial exhibit lists.  I

25   think it will be improved substantially.

1          THE COURT:  Okay.

2          MR. WILLIAMSON:  Your Honor, Brett Williamson from

3     O'Melveny.

4          Would you like to hear from us after each point or

5     would you rather not have a back and forth?  I just don't --

6          THE COURT:  Well, if it's on the same point --

7          MR. WILLIAMSON:  It is.

8          THE COURT:  -- I might as well as hear you at the same

9     time.

10         MR. WILLIAMSON:  It is.  Yes, your Honor.  Thank you.

11         Counsel's statement, I agree with.  The parties are

12    making progress on exhibits.

13         The fact that he raised it in connection with the

14    Court's revision to what is now Paragraph 30 of the Pretrial

15    Order, I wanted to clarify that there's not a disagreement with

16    the Court's revisions, because we think that that was a material

17    change based upon what Google had asked for.  So I'm just trying

18    to clarify it.

19         And talking about amendments to the exhibit list, of

20    course, we believe that while there should be documents removed

21    as appropriate and exhibits removed as well, and objections,

22    there shouldn't be any additions to the list.  I just wanted to

23    make sure that was certainly our view of what the amendments

24    would be.

25         MR. PARTRIDGE:  The only thing I would add to that is

1    because we were operating under the assumption that

2    cross-examination exhibits would not be on the exhibit list,

3    which was the position we took in the pretrial papers.

4         There are a relatively small number of exhibits we'll

5    need to add that are not currently on the exhibit list based on

6    your Honor's decision that cross-examination exhibits need to be

7    included on the exhibit list.

8         I doubt this is going to create a huge issue here,

9    because it isn't a large number of exhibits.  But we took the

10   position that cross-examination exhibits should not be required

11   to be identified in advance of trial on the exhibit list.  And

12   your Honor decided otherwise.

13        So I think it's appropriate for us to be able to amend

14   the exhibit list to add those exhibits that were not previously

15   put on the exhibit list.

16        THE COURT:  Well, why don't you try to work it out

17   together.  If there's a need for a ruling, I will make a ruling

18   on it.

19        MR. WILLIAMSON:  We'll do that, your Honor.  Thank you.

20        MR. PARTRIDGE:  As to the paragraph you identified that

21   deals with native files, your Honor.  We can skip that for the

22   moment and turn to Page 11 on the red line.

23        MR. SNYDER:  If we're going in order, perhaps we should

24   stop on Paragraph 41.

25        THE COURT:  Why don't we resolve Paragraph 41, because

1    I'm not sure that I understand the differences between the

2    parties here.

3              MR. PARTRIDGE:  Okay.  If I may, your Honor?

4              Ms. Alfaro will address Paragraph 41.  She knows more

5    about the natives than I do.

6              MS. ALFARO:  Yes, your Honor.

7              So the difference in positions is that Google is

8    proposing that the native documents, spreadsheets, be submitted

9    to the jury or admitted into the Court in native format, an

10   electronic version.

11             And, so, we oppose that.  And we would propose that any

12   native exhibits that are admitted in Court be actually be

13   printed out on paper in PDF version.

14             THE COURT:  The difficulty is, because of the number of

15   rows and columns, it's different to print them out on paper.

16             MS. ALFARO:  I think that is the position that Google

17   is taking.

18             However, during discovery in depositions, the parties

19   managed to print out the spreadsheets on paper and hand them to

20   witnesses.

21             So it's definitely something that can be done.  And we

22   actually provide in our proposal that if there is a specific

23   spreadsheet where this is not possible, where it cannot be

24   reasonably accomplished, the parties can work that out and we

25   can bring that up to the Court.

1          But Google have not identified the spreadsheet where

2     that is an issue.

3          THE COURT:  Well, why don't we give Mr. Snyder a turn.

4          MR. SNYDER:  The only other thing I would ask, your

5     Honor, if I may, is that we're concerned about how the jury

6     would use native files during its deliberations, because native

7     files, if you know how to work a computer and looking at native

8     files, you can actually rework what the data may look like.

9          And, so, we're uncertain both for purposes of jury

10    deliberations.  And then in terms of both trial and appeals,

11    what is it that the jury actually used from a native file?  How

12    did they search it?  What did they look at?  Did they actually

13    look at what was used by the witness or did they use something

14    else?

15         THE COURT:  I understand.

16         MR. SNYDER:  What we propose, your Honor, is that

17    unduly voluminous exhibits -- and this often primarily includes

18    financial spreadsheets -- we submit it to the Court as exhibits

19    in electronic format that cannot be changed.  It would be Read

20    Only.  And also be submitted to the jury in a Read Only format.

21         Typically, the way we've handled this in the past is

22    installing it on a computer where the files are locked.  If

23    there is any question about the ability to lock, for example, an

24    Excel file, it can also be converted to PDFs and put on the

25    computer, so they can't be manipulated or revised in I way.

1          The problem with submitting them in paper is exactly

2   the one the Court foreshadowed.

3          The numbers of rows is so large, it would often take

4   thousands of pages to print them.  And sending several boxes of

5   documents into the jury room isn't productive.

6          THE COURT:  How many exhibits are we talking about that

7   present the volume problem?

8          MR. SNYDER:  Depending on how many ultimately get

9   admitted, my guess is that we're talking about between five and

10   15.

11          THE COURT:  And how many thousands of each of those has

12   thousands of pages?

13          MR. SNYDER:  Each of those would have, if printed,

14   would be somewhere between several hundred pages and up to a few

15   thousands pages.  There is one spreadsheet -- one exhibit that

16   is a spreadsheet on the exhibit list that is tens of thousands

17   of rows.

18          THE COURT:  I'm going to allow them to be submitted in

19   native format without printing them out.

20          And, as you say, it's going to be a Read Only format.

21          Any questions about?

22          MS. ALFARO:  No, your Honor.  We would just like to

23   make sure that in Read Only format that the jury would not be

24   able to modify them.

25          I know that they -- in Read Only format you cannot save

1    it once it's modified.  But in some cases I've seen that the

2    jurors can actually -- or that somebody can actually modify the

3    Excel spreadsheet and rely on that modified data when they are

4    looking at it.  But then the Read Only file will not allow them

5    to save it.

6         THE COURT:  Well, why don't you work that out.  I think

7    it's possible that Read Only file that can't be modified, so --

8    and that's appropriate and that's what should be done.

9         Why don't you try to work it out and see if you can't

10    agree on a format so that it can't be modified?

11         MR. SNYDER:  Yes, your Honor, we will.

12         MS. ALFARO:  We will do that, your Honor.  Thank you.

13         MR. PARTRIDGE:  My next question, your Honor, is Page

14    11 of the red line, which is Paragraph 59.

15         And this is an issue -- and I wish I had thought of

16    asking Mr. Snyder about this this morning, I suspect we're

17    probably in agreement -- it has to do with how the deposition

18    designation time is allocated.

19         The way deposition video is prepared today is that

20    there are time stamps on the video.  And it's really easy for

21    both videographers for Google and our videographer to actually

22    calculate the amount of time for each side when a deposition is

23    played.

24         There isn't anything automatic with respect to counting

25    lines and then going back and doing some sort of a line

1 evaluation.

2 My preference would be to do it the way that

3 videographers normally do it, which is, they calculate the

4 amount of time that's played from the designation and the

5 counter-designation, rather than trying to get into some sort of

6 a line type calculation.

7 Do you agree with that, Mr. Snyder?

8 MR. SNYDER:  Your Honor, for depositions that are

9 presented to the jury by video, we would agree that we can use

10 the time stamps and allocate to each party the amount that they

11 designated that was played to the jury.

12 That's a slightly different situation than when the

13 depositions are read back.

14 But for video depositions, we would agree to that.

15 MR. PARTRIDGE:  And when they are read back, I think

16 the line approach would probably work.

17 THE COURT:  Why don't you get together and work out how

18 the language of Paragraph 59 should be changed to reflect that

19 agreement.

20 MR. PARTRIDGE:  We will do so, your Honor.

21 My next question actually related to the preliminary

22 jury instructions, so I'll wait until we have a chance to look

23 at that.

24 We have some questions that arise on Page 18 about the

25 bench trial, your Honor.

1            But it may be that you want to address that in

2    connection with the list of issues that the parties provided

3    you.  It arises there as well.

4            THE COURT:  Why don't we do it here.

5            Does Google have anything before Page 18?

6            MR. SNYDER:  No, your Honor.

7            THE COURT:  So what's the issue here?

8            MR. PARTRIDGE:  The issue with the bench trial, your

9    Honor, and I sent an e-mail to Mr. Snyder yesterday about this,

10   and it also was in one of the attachments to the Pretrial

11   Order -- it may have been in the issues with -- I can't

12   remember.

13           We would like to have a procedure in place, a

14   disclosure procedure in place for the bench trial, so we know

15   the witnesses, the deposition designations, the exhibits for the

16   bench trial.

17           Our assumption is that it's a subset of what's already

18   been exchanged by both sides.  I can't imagine it would be

19   outside the exchange that has already occurred.

20           But in trying to prepare for the bench trial, it's

21   very, very difficult to know from all the material that has been

22   identified thus far, both in terms of deposition designations

23   and exhibits, as well as the long list of witnesses that each

24   side has identified thus far, what the bench trial is going to

25   consist of.

1          My suggestion is that we have a disclosure procedure

2     that takes place before the jury selection on the 19th.  So that

3     at the end of that selection, after we talk about the charge

4     conference, we could talk a little bit about the structure of

5     the bench trial.  That would enable us to prepare for it.

6          So I think in the next day or two, that Google ought to

7     provide us with an identification of its witnesses, and depo

8     designations, and exhibits for the bench trial.

9          And then we respond to that with our counters, which

10    would be within that, you know, set of exhibits and designations

11    thus far, but the subset that's focused on the bench trial.

12         And then if there are any issues with each of our

13    disclosures in advance of the hearing on the 19th, we could then

14    address that with your Honor so that we know what the bench

15    trial is going to look like at the end of the following week.

16         THE COURT:  Mr. Snyder?

17         MR. SNYDER:  Thank you, your Honor.

18         My concern with Art+ counsel's proposal is that it

19    requests that Google make these disclosures, very specific

20    disclosures, even before ACI has to make these disclosure about

21    the jury trial.

22         We have a procedure for identifying witnesses and when

23    they will be disclosed.  We have a procedure for identifying

24    demonstratives and exhibits that will be used and exchanged.

25         And now plaintiff proposes that we do that for the

1    bench trial, even before it starts that process for the jury

2    trial, which doesn't seem fair or reasonable.

3         I do understand that there might be an issue with

4    asking live witnesses to stay.  We don't know yet what witnesses

5    ACI will call live.

6         I believe they are required to make that disclosure the

7    Saturday before the trial starts the following Monday, so it

8    would be 21st, I believe.

9         And I'd be happy to tell them, very shortly thereafter,

10    which of their witnesses that need to stay until Friday for the

11    bench trial, but I can't do that before then.

12         I don't see that there is any reason to disclose other

13    materials, such as demonstratives or exhibits, which have

14    already been disclosed for the general purposes of the trial, on

15    any schedule that's different than we're using for the rest of

16    the trial.

17         THE COURT:  But my understanding of the proposal was

18    that they just wanted a witness list for the bench trial, just

19    as you have a witness list for the jury trial.

20         And similarly, they want an exhibit list for the bench

21    trial, just as we have for the jury trial.

22         Am I misunderstanding?

23         MR. SNYDER:  I don't know.  All of our witnesses and

24    exhibits are a subset of what we've identified for the trial,

25    generally.

1          There is no separate list of exhibits or witnesses for

2   the equitable issue to be tried at the bench.

3          THE COURT:  Well, what is the problem with identifying

4   it with a subset somehow next week that you were going to use

5   for the bench trial?

6          MR. SNYDER:  We can create a subset.  There is going to

7   be an overlap.  And I'm afraid, your Honor, that we're just

8   creating busy work by segregating what was one set of

9   disclosures into two pieces.

10          THE COURT:  Mr. Partridge?

11          MR. PARTRIDGE:  Your Honor, I think the -- you got

12   exactly what I was requesting in your statement to Mr. Snyder.

13          This is a separate trial.  And in preparing for the

14   jury trial, the plaintiff -- ART+COM in this case -- has to go

15   first with respect to its exhibits, and depo designations, and

16   witnesses.

17          And then the defendant responded to that and that led

18   to exchanges --

19          THE COURT:  I don't think I need any more argument on

20   that.

21          I'm going to require the identification of a subset of

22   witnesses and exhibits that are going to be used for the bench

23   trial.  And I would suggest that that be done by Friday of next

24   week.

25          Does that work well enough?

1          MR. SNYDER:  We can do that, your Honor.

2          And to be clear, if I can ask for some clarification

3     from the bench.

4          Would this subset include exhibits that we contemplate

5     using for both the jury portion of the jury, and the equitable

6     portion, or only for the bench trial?

7          THE COURT:  I think what I'd like you to do is to come

8     up with a separate exhibit list and witness list for the bench

9     trial, each side, so that we know what the subset of exhibits

10    and witnesses are for the bench trial.

11         MR. SNYDER:  And I'm sorry if I'm just not -- if I'm

12    being a little dense this morning.

13         Let me give a specific example.

14         If an exhibit is going to be used in the jury trial --

15    let's take an easy one, the '550 patent.  So it's going to be an

16    exhibit.  Would we also need to list it as an exhibit for the

17    bench trial?

18         THE COURT:  Yes.

19         MR. SNYDER:  Okay.  Thank you.

20         MR. PARTRIDGE:  Thank you, your Honor.

21         My next question occurs on Page 20.

22         Your Honor, I think Paragraphs 81 and 82.  And I think

23    these paragraphs are clear, but I want to make absolutely

24    certain that I fully understand and appreciate what your Honor

25    is requesting here.

1          As I read these paragraphs, when we have our charge

2     conference next week, we'll have an informal conference and then

3     we'll have, after that, a formal conference which we state any

4     objections we might have to the instructions.

5          But then we're going to have a second formal charge

6     conference after that in which if we don't restate our

7     objections based on any changes the Court might make in the

8     instructions, then they're waived.

9          So the second time is the time that really, ultimately

10     counts, that we need to state whatever objections we have;

11     otherwise, they're waived and we shouldn't count on the first

12     formal charge conference as a basis for objections to the charge

13     for purposes of appeal?

14          THE COURT:  We're only going to have one formal charge

15     conference.

16          MR. PARTRIDGE:  Okay.

17          THE COURT:  I thought that counsel was suggesting

18     having an informal charge conference after the jury selection

19     next Thursday.

20          I said that I was willing to do that.

21          And then I was contemplating have a second informal

22     charge conference some time after the evidence is in the trial

23     to resolve any remaining things.

24          And then we would go on record for the formal charge

25     conference in which objections could be made to the final charge

1    that hadn't been worked out.

2          MR. PARTRIDGE:  Okay.  I think I understand, your

3    Honor.

4          So it's that last iteration is the one that ultimately

5    counts that we make our formal objections for purposes of the

6    record?

7          THE COURT:  Yes.

8          MR. PARTRIDGE:  Okay.  Thank you, your Honor.

9          MR. SNYDER:  Two quick points or questions, your Honor.

10         First, on the schedule.  The parties are working to

11   create and agree to the extent that they can on the revised

12   final jury instructions, which are going to be submitted.

13         We can evaluate next Thursday, at the time of jury

14   selection, to what extent it make sense to have the informal

15   charge conference then, but this schedule is somewhat different

16   than we had talked about on the telephone conference previously.

17         Secondly, I do have one question to clarify Paragraph

18   81, your Honor.

19         THE COURT:  Yes.

20         MR. SNYDER:  The first sentence says that the charge to

21   the jury will be given before closing argument, before the jury

22   begins.

23         The next sentence -- and this may be the one that

24   caused Mr. Partridge to raise it in the first place -- following

25   the delivery of the charge to the jury, counsel will be given an

1    opportunity to state any objections to the charge for the

2    record.

3            THE COURT:  Yes.  That's confusing.  I see that that

4    would cause confusion.

5            The charge conference will occur immediately before the

6    charge is given to the jury.  And you'll have the opportunity to

7    object at that point.

8            MR. SNYDER:  At the charge conference?

9            THE COURT:  At the charge conference.

10           MR. SNYDER:  So we will to the need to make objections

11   after the charge is read to the jury?

12           THE COURT:  Correct.

13           MR. PARTRIDGE:  Mr. Snyder understood my confusion

14   better than I did, your Honor.  Thank you.  That was the point.

15           If we could turn to -- my next one is on Page 22.

16           MR. SNYDER:  We have a question, your Honor, if we're

17   going in order again regarding Paragraph 85 on Page 21.

18           THE COURT:  Yes.

19           MR. SNYDER:  And we understand the Court's point that

20   the trial shall be open to the public.

21           What the Pretrial Conference Order does not currently

22   address and the Protective Order doesn't address is the handling

23   of exhibits that contain confidential information.

24           And we'd like to get clarification from the Court on

25   how it would like exhibits that contain confidential information

1       to be handled?

2               THE COURT:  Well, what I'm assuming is that exhibits

3       which contain confidential information will remain confidential.

4               You'll show them to the jury on the screen, I take it.

5       And they'll be available to the jury in paper form.

6               But those will not be available to the members of

7       public who request copies of those.

8               Does that answer your question?

9               MR. SNYDER:  That answers most of my question, your

10      Honor.

11              And for portions of confidential exhibits that might be

12      viewable to the jury, can we, if necessary, make arrangements so

13      that the public can't see those documents during trial, should

14      someone not under the Protective Order happen to be in the

15      courtroom?

16              THE COURT:  Is the courtroom set up so that the monitor

17      can be viewed by the public when the exhibits are displayed?

18              MR. SNYDER:  The screen for the jury is a very large

19      screen on the back wall of the courtroom immediately opposite

20      the jury.  They don't have individual monitors in Judge Andrews'

21      courtroom.

22              THE COURT:  So what's the proposal, that the screen be

23      tilted in such a way that only the jury can see it and not the

24      public?

25              MR. SNYDER:  If that's possible, yes.

1            THE COURT:  I'm not insisting that confidential

2      exhibits be viewable by the public on the screen.

3            So why don't you try work put a procedure whereby when

4      that's going to happen, so the screen can be moved so only the

5      jury can see it.

6            I mean, we may have a situation in which no one's

7      interested in and it may not be a problem.

8            MR. SNYDER:  Okay.  Thank you, your Honor.

9            MR. PARTRIDGE:  And my next section that I'd like to

10     address is on Page 22.  And it's Paragraph 89.  This is

11     Paragraph that deals authenticity.

12            Your Honor, we understand, I believe, what you're

13     suggesting here.

14            Our concern is primarily with respect to non-party

15     documents that are offered as exhibits in the case.  Protective.

16            And in fact there are, there's at least one document

17     that Google is relying upon that I don't think anybody knows

18     where it came from.

19            And, so, they have the ultimate burden with respect to

20     whether that's authentic or not.  And I would think that with

21     respect to any third-party documentation for which there's a

22     legitimate authenticity issue, that the burden can't shift.

23            We must first come forward with an objection.  We can't

24     prove that it's not authentic if we don't even know who the

25     third party is.

1          THE COURT:  Well, this paragraph only covers documents

2    which were produced in discovery by third parties.

3          So, if there was some document that was obtained

4    outside of discovery, there wouldn't be any presumption with

5    respect to that.

6          MR. PARTRIDGE:  There was a document produced during

7    the course of discovery by Google for which they can't

8    authentic.

9          THE COURT:  A third-party document?

10         MR. PARTRIDGE:  Yes, your Honor.

11         And we have raised the question with them as to

12   authenticity of that particular document.  It's a prior art

13   document.

14         And our view is that they can't authentic it.  It's a

15   document they want -- -

16         THE COURT:  The presumption will only apply to

17   documents that were produced by the producing party and not

18   documents that they obtained that that were in their files.

19         MR. PARTRIDGE:  So if it is a document that comes from

20   the files of the party, sort of kept in the ordinary course of

21   business of the party, then this presumption of authenticity

22   applies.  But if the document is not one that exists in the

23   files of the parties themselves, and was obtained for purposes

24   of the litigation as being offered as an exhibit, then the party

25   who's offering it has the burden, always has the burden with

1     respect to all the these?

2            THE COURT:  Correct.

3            MR. PARTRIDGE:  All we need to do at that point, I

4     would think, is to raise the issue of authenticity, make our

5     argument and then they would bear the burden with respect to the

6     document?

7            THE COURT:  Well, there is no presumption with respect

8     to that document, which didn't come from the producing party's

9     file.

10           MR. PARTRIDGE:  Okay.  That's the clarification I

11    wanted, your Honor.

12           And less you be concerned that you are going to be

13    facing a bunch of authenticity issues, it's at least for me rare

14    that I've had to raise authenticity issues in my cases.  That's

15    probably true for Mr. Snyder as well.

16           So I think this is going to be a very, very small

17    number of documents.  It may only be one, but it could a couple,

18    so it's not a big issue.

19           THE COURT:  Okay.

20           MR. PARTRIDGE:  And insofar as the rest of the Pretrial

21    Order red line that you circulated, that completes our list.

22         There are some additional issues that are part of Exhibit

23    15.  The Issue List that both Google and ART+COM have raised.

24           But insofar as to what you put in the Pretrial Order by

25    way of red lines, we've covered all of our issues, your Honor.

1          THE COURT:  Mr. Snyder, do you have anything else?

2          MR. SNYDER:  Nothing more on the Pretrial Order, your

3   Honor.

4          Thank you.

5          THE COURT:  Just for the record, does any party have

6   any objections to the Pretrial Order as it's been revised this

7   morning?

8          MR. PARTRIDGE:  Subject to the discussion we've just

9   had, no, your Honor.

10         MR. SNYDER:  The same, your Honor.

11         THE COURT:  I don't know what that means.

12         MR. PARTRIDGE:  Well, there were a couple of areas

13   where you asked us to get together and --

14         THE COURT:  Oh, yes.  That's fine.

15         MR. PARTRIDGE:  That's correct, your Honor.

16         THE COURT:  Let's talk about Exhibit 15.

17         And by the way, the Pretrial Order is going to be a

18   public document.

19         But as I understand it, some of the attachments, for

20   example, in the Motions in Limine, they'll be marked

21   "Confidential" pursuant to the Protective Order.

22         Is there a need to continue confidentiality with

23   respect to those documents?  Do you want to think about it?

24         MR. PARTRIDGE:  I don't think there is, your Honor.

25   But I would want to double check.  And for sure we could produce

1      redacted versions if there is an issue.

2              MR. SNYDER:  If we haven't provided redacted versions,

3      we can, your Honor.

4              I can't say with confidence, without going back and

5      looking at each one of them, that they could be made public.

6      They were filed under seal for a reason.

7              THE COURT:  Expert reports?

8              MR. SNYDER:  Right.  There is financial information in

9      them.  In some of them, for example, there is confidential

10     information and we'd like to keep it confidential.

11             THE COURT:  Well, why don't give me -- each side give

12     me a list of exhibits to which confidentiality should be

13     maintained.  And we'll have a public version of the Pretrial

14     Order, which doesn't include those exhibits, and then a

15     non-public version which does include them.

16             MR. PARTRIDGE:  We can do that.

17             Thank you.

18             By the way, when would you like that?

19             THE COURT:  By Monday.

20             MR. PARTRIDGE:  That's fine, your Honor.

21             THE COURT:  What issues do we have here in Exhibit 15?

22             MR. PARTRIDGE:  The first issue we raised, your Honor,

23     concerns the inter partes review proceedings being part of the

24     Pretrial Order.

25             We're going to pass on that, your Honor.

1          We wanted you to be aware of the fact that there were

2     two IPRs that were denied by the Patent Office that relate to

3     issues in the case.

4          THE COURT:  And I'm aware of that.  And I'm going to

5     grant, when we get to it -- I'm going to grant the Motion in

6     Limine to exclude mention of those before the jury.

7          So the inter partes reviews, they are not going to get

8     copies of that.

9          MR. PARTRIDGE:  Yes.  And when we get to that point,

10    your Honor, there is one thing that we would like to say about

11    that just to make sure the record is clear.

12         The No. 2 issue we raised, the specific factual

13    admissions that we thought should have been included in the

14    statement of admitted facts.

15         What we are going to do, in lieu of being able to

16    include those is -- admitted facts in the case -- is to submit

17    the admission responses as an exhibit in the case.  Unless, of

18    course, Google changes its mind with respect to the set of

19    factual admissions that we've identified.

20         So I don't know that your Honor needs to do anything

21    with that.  We'll just now make it an exhibit since we can

22    include it in the Pretrial Order.

23         Our next issue concerns evidentiary issues, your Honor.

24         And it is item No. 3 in the Issues List.

25         Use of deposition clips in ACI's case-in-chief.

1           THE COURT:  I've included that provision in the

2    Pretrial Order that Rule 32, when it's appropriate to use video

3    instead live testimony, you can do that with respect to a

4    30(b)(6) witness or corporate officer.

5           But I'm not going to permit it otherwise.  You'll have

6    to have the witness testify live.

7           MR. PARTRIDGE:  Your Honor, may I make one comment

8    about that, and it probably won't change your my mind?

9           But my concern is that we have a timed trial.  And the

10   timing is tight.  I think it can be accomplished, as we've

11   discussed previously.

12          It is -- there are only a few witnesses to which this

13   applies.  And it is going to be so much faster to play a

14   30-minute depo clip than it is going to be to put a witness live

15   on the stand to do the same thing that has already been done

16   with respect to the deposition.

17          THE COURT:  I understand.  And if the inter partes can

18   agree to do that, you can agree to do it.

19          But if you don't agree to do it, the only exception to

20   those is stated in Rule 32.

21          MR. PARTRIDGE:  Okay.  Understood, your Honor.

22          The next issue, which is the -- may I have a moment,

23   your Honor, because this may be resolved?

24          THE COURT:  Sure.

25          MR. PARTRIDGE:  I think we've already addressed issue

1       No. 4, your Honor.

2              Issue No. 5 is one that I believe both inter partes

3       have raised, which has to do with procedure for admission of

4       exhibits.  And I think we talked about this a little bit on the

5       status conference.

6              As witnesses identify exhibits, during the course of

7       their testimony, we think that the exhibits ought to be offered

8       either at the at the time the exhibit is identified with the

9       witness or at the conclusion of that particular witness's

10      testimony.

11             So that the offer is made and the Court can rule on the

12      admissibility of the exhibits.

13             THE COURT:  I think it probably should be after the

14      testimony is concluded.  Otherwise, I'm afraid sometimes I lose

15      track of exhibits and the housekeeping is not done properly.

16             MR. PARTRIDGE:  That's our preference, your Honor.  And

17      I just wanted to clarify that.  I think that it would make

18      things go more quickly as well.

19             THE COURT:  Mr. Snyder?

20             MR. SNYDER:  It is, your Honor.

21             And to clarify, after each witness finishes, you would

22      like us to move rather than doing it, for example, at the end of

23      the day?

24             THE COURT:  Yes.

25             MR. SNYDER:  Okay.  And do you want us to indicate at

1    that time whether any of those exhibits, the exhibits that are

2    moved, should be treated as confidential?

3         THE COURT:  Yes.  I think that would be a good idea.

4         MR. SNYDER:  Thank you.

5         MR. PARTRIDGE:  The only other thing I would suggest in

6    this regard is implied by Mr. Snyder's response, which is that

7    in my experience it's been good at the end of the day for both

8    sides to get together and make sure our lists are complete --

9         THE COURT:  Right.

10        MR. PARTRIDGE:  -- and that we haven't made an error.

11   And then we would notify the Court if, in fact, we discover we

12   included something that we shouldn't have been included, or we

13   left something out that was part of the testimony.

14        THE COURT:  That's fine.

15        MR. PARTRIDGE:  Very well.

16        As to our other issues, on our part of the Issue List,

17   I think they have all been addressed already, your Honor.

18        There are some joint issues at the back of this list,

19   but taking it in order, we would should probably go to Google's

20   list on Page 4, and let Google proceed before we go to the joint

21   issues.

22        MR. SNYDER:  I think most of these issues have been

23   resolved, your Honor.

24        We did raise a question, which is No. 8 on Page 6 of

25   Exhibit 15, related to the use of an interpreter.

1       And this is really just to get clarification before the

2   trial starts of your Honor's preference for how the parties will

3   use and how the witness, more importantly, will use the

4   interpreter.

5       The parties have agreed on a single interpreter.

6       THE COURT:  Have the parties identified the

7   interpreter?

8       MR. SNYDER:  I don't remember her name, but we have

9   agreed on one, your Honor.

10      MR. PARTRIDGE:  Yes, your Honor.

11      THE COURT:  Okay.

12      MR. SNYDER:  So there will only be one.  We don't know

13  yet whether the witnesses will testify English or in German.

14      And it appears that there may be a witness or witnesses

15  who will testify in both.  And I think it would be useful for

16  everyone to understand how your Honor prefers that be handled?

17      THE COURT:  I'm not sure I understand what the issue

18  is?

19      MR. SNYDER:  Well, does the interpreter for -- for

20  example, does the interpreter stand by and wait for the witness

21  to request an interpretation or translation, or do we start out

22  with the presumption that the questions are going to be

23  translated and the answers translated?

24      THE COURT:  Well, did the parties differ about how to

25  do it?

1          MR. SNYDER:  We don't know yet what language the

2    witnesses are going to testify in.

3          MR. PARTRIDGE:  I think that at least two of our

4    witnesses are going to be able to testify in English.  And

5    they'll do direct and cross in English.

6          It is possible that from time-to-time -- and this could

7    include my questions as well Google's questions -- that we use a

8    phrase that doesn't -- that's hard for a German given the

9    sentence structure to follow; verbs are at the end, the subject

10   is at the end?  It's a different sentence structure.

11         So it's possible that the witness might say, I don't

12   understand that, and have the interpreter say what some phrase

13   means within a question.

14         That could happen with those witnesses.

15         There is one witness who I don't think can testify in

16   English.  He can read English, but his conversational English is

17   not very good.

18         THE COURT:  So the direct is not going to be in English

19   either?

20         MR. PARTRIDGE:  No, no, no, no, no.  We're not going to

21   do direct in one language and cross in another.

22         If we offer a witness in English, the cross will be in

23   English.  The only thing I would note is that for anyone who's

24   second language is English, the longer the question is, the more

25   likely it is that the witness may not understand it.

1          So with second languages you're usually a little better

2     off to have shorter, more precise questions.

3          But with that, if we do address in English, they are

4     going to the cross in English as well.  That is the game plan.

5          THE COURT:  So, as I understand it, the concern is that

6     the witness might say, I don't understand what you mean by

7     such-and-such phrase in the question.

8          It seems to me that we could end up with a very

9     confusing record if the interpreter starts interpreting

10    particular phrases.

11         I think it would be better if a witness doesn't

12    understand the question, that the entire question were

13    translated and were handled that way, okay?

14         MR. PARTRIDGE:  I agree with that, your Honor.  I think

15    that's fine.

16         MR. SNYDER:  And if the witness testifies, even in

17    response to a single question in German, then the translator

18    should translate the entire answer, which is then the official

19    record?

20         THE COURT:  Then it's the entire question and the

21    entire answer, if the witness doesn't understand the question.

22         MR. SNYDER:  And perhaps -- and there is no reason to

23    be theoretical about this, this close to trial, it sounds like

24    for two witnesses the interpreter will essentially be on standby

25    at the witness's need.

1          And if for a third witness, the interpreter will

2     translate all of the questions and answers, perhaps we can find

3     out who those witnesses are, because as counsel points out --

4          THE COURT:  I'm sure Mr. Partridge will tell you.

5          MR. SNYDER:  He hasn't so far, your Honor.

6          MR. PARTRIDGE:  Well, we're going to do a reduced

7     exchange of the number of witnesses to testify at trial.  They

8     have a much longer list than we do.

9          And I would be happy to start talking sooner rather

10    than later about who's going to be called at trial, so both

11    teams can start focusing on the real witnesses.

12         THE COURT:  Well, why don't you work that out.

13         But I think on Monday I would like you to identify the

14    ones in German and the ones that are going to testify in

15    English.

16         MR. PARTRIDGE:  One modification I would request to

17    that.

18         The one who I think is going to have trouble testifying

19    in English, I won't see him until Thursday of next week.

20         So I would tell you that my -- I could tell you on

21    Monday which one I think is going to have to testify in German.

22         But, if at the end of week he says he wants to do it

23    and he's willing to try it, we might change.

24         THE COURT:  Well, why don't you identify them on

25    Monday.  If it changes on Thursday, you can tell them to change

1     it.

2           MR. PARTRIDGE:  Can we have a -- on Monday a reduction

3     of the identification of witnesses by both sides, because

4     essentially they are getting a reduction in my witness list by

5     Monday.  I think it would be fair and appropriate for both sides

6     to reduce the number of witnesses that may actually be called at

7     trial.

8           THE COURT:  What is the schedule now for witnesses?

9           MR. SNYDER:  I believe the schedule now has an exchange

10    on Saturday, not tomorrow, but a week from tomorrow.

11          I mean, I'm not sure what reduction -- plaintiff's

12    counsel thinks this actually occurred.

13          We're only asking for which witnesses are going to

14    testify in different languages.

15          THE COURT:  Yes.  I'm not going to change the date for

16    -- the Saturday date --

17          MR. PARTRIDGE:  Thank you, your Honor.

18          THE COURT:  -- except to the extent that I want you to

19    identify the three witnesses on Monday that we talked about just

20    now.

21          MR. PARTRIDGE:  Okay, your Honor.  Thank you.

22          The one other issue about the interpreter is that I

23    think we should probably have the interpreter designated by the

24    Court as the interpreter for the case under, I think it's Rule

25    43, under the specific provision with respect to interpreters.

1          THE COURT:  Why don't you give me a draft order that

2     you agree on for that one?

3          MR. PARTRIDGE:  Okay.  Thank you, your Honor.

4          THE COURT:  Okay.  Mr. Snyder, do you have anything

5     else?

6          MR. SNYDER:  There are no further issues that are on

7     the Google list.

8          So that would just take us to the Joint List, your

9     Honor, that starts on Page 7.

10         THE COURT:  Okay.

11         MR. PARTRIDGE:  For us, I think the Joint List has

12    already been addressed, your Honor.  I'm just taking a second to

13    look.

14         The Joint List has been addressed by our earlier

15    discussions today.

16         THE COURT:  Okay.  Anything else on the Pretrial Order?

17         MR. SNYDER:  Nothing further, your Honor.

18         THE COURT:  Let's turn to the jury questionnaire.

19         There are a couple of questions on there that seemed to

20    me were pretty broad.

21         One of them is asking whether anybody has ever used

22    Google Earth.

23         Is there some way that we can truncate that, so we

24    don't get a response from every juror as to that?

25         Let me say something like, does anybody use it

1    professionally or on more than an occasional basis?

2           MR. PARTRIDGE:  We could add the word "significant."

3    Professionally would be less likely.

4           But someone who just causally checked it out one time,

5    I would like to avoid that.

6           But if we added the word "significant," and let them

7    interpret it for themselves whether they've done it

8    significantly or not, that should avoid having everybody raise

9    their hand.

10          MR. SNYDER:  I agree with that revision, your Honor.

11          We could also specify Google Earth as opposed to other

12   Google Maps products, which would narrow it further.

13          Google Maps is a much more commonly used and popular

14   product than Google Earth.

15          THE COURT:  Mr. Partridge?

16          MR. PARTRIDGE:  Could we say Google Earth or Google

17   Earth for Maps?

18          MR. SNYDER:  That would be fine.

19          MR. PARTRIDGE:  That would be fine, your Honor.

20          THE COURT:  Okay.  And then there is a question there

21   about whether anybody had significant experience with law?

22          That may be the wrong question.

23          Are you really asking if they're lawyers and paralegals

24   in law firms, things of that sort?

25          MR. PARTRIDGE:  I agree, your Honor, that is pretty

1    broad.

2          This came from a more standard set that's been used in

3    other cases.

4          MR. PARTRIDGE:  Your Honor, we're okay dropping the

5    question.

6          THE COURT:  We don't ask the question about law.

7          Is that all right, Mr. Snyder?

8          MR. SNYDER:  That would be fine, your Honor.

9          Thank you.

10          What about the question that asks whether you or your

11   immediately family was ever employed by the United States

12   Government?

13          That seems like a pretty broad question.

14          What are you trying to get at there?

15          MR. PARTRIDGE:  My recollection -- which question is

16   that, your Honor?

17          THE COURT:  10.

18          MR. PARTRIDGE:  10?

19          I think that question was originally proposed by us

20   more narrowly than that.  And I thought Google broadened it and

21   we agreed, but I could be incorrect in my recollection of that.

22          MR. SNYDER:  We'd be fine with removing the question,

23   your Honor.

24          THE COURT:  We have the Patent and Trademark Office

25   applications.

1          MR. PARTRIDGE:  We do have the patent apps.

2          Let's remove it, your Honor.

3          THE COURT:  So we changed this then and add

4    "significant" having to do with the operation of Google Earth.

5          And there was a tweak at the end of that, which I'm not

6    sure.

7          MR. PARTRIDGE:  Google Earth or Google Earth for Map

8    products.

9          THE COURT:  Okay.  And then in Exhibit D we're

10   eliminating the law and we're eliminating question No. 10.

11         Is there anything else that we need to address about

12   the voir dire questions?

13         MR. PARTRIDGE:  That's it for us, your Honor.

14         MR. SNYDER:  Nothing further on that exhibit, your

15   Honor.

16         THE COURT:  Okay.  Why don't we turn to the Motions in

17   Limine?

18         Beginning first with ACI's motion.

19         The two remaining issues here seem to me to be really

20   claim construction issues.

21         And as to the second one, as to Step F, I agree that

22   each of the sections does have to be divided into subsections

23   until it is being addressed.

24         I'm going to grant the In Limine Motion with respect to

25   that.  And as a supplement claim construction, I'll issue an

1       order spelling that out.

2               However, with respect to B, I find this to be a very

3       difficult issue.  And it also seems to me to be a claim

4       construction issue.

5               Basically, whether -- when the user's device receives

6       the information and displays the material, whether the operation

7       of that device is part of a method.

8               And I've looked at the patent.  It seems to me not

9       entirely clear what was intended there.

10              So I'm not -- but I'd like each side to address that

11      question.

12              MR. PARTRIDGE:  Mr. Spears will address that for us,

13      your Honor.

14              MR. SPEARS:  Your Honor, it's our position that this --

15      it does raise an issue of claim construction.

16              But the issue has actually already been resolved by

17      Judge Andrews.

18              THE COURT:  No, I don't think so.

19              But go ahead.

20              MR. SPEARS:  I'll lay out our case for that.

21              THE COURT:  Well, you have a situation in which the

22      user has the device which has a display device, hardware, and it

23      has software which enables the graphic display.

24              What they want to argue is that the performance of the

25      software on the user's computer or device is part of the method.

1          MR. SPEARS:  That's exactly right.

2          I would like to make one point of technical

3     clarification.

4          Where you have a graphics-intensive application

5     program, whether it's Google Earth, whether it's Angry Birds,

6     whether it's whatever, those applications never interface

7     directly with the displayed hardware.

8          They always rely upon low-level software and firmware

9     to do things like to size the image for display on the device.

10          So that's the type further processing we're talking

11     about.

12          Everything that makes a Google Earth image a Google

13     Earth image, as opposed to an Angry Bird image, is output by a

14     Google Earth client.  And then the other software acts dumbly to

15     bring that image right to the display device.

16          So that's the technical background.

17          During the claim construction process, Google wanted to

18     set up the very argument that its expert is now making with

19     respect to Claim E -- to Step E.

20          And the way they did that was by advocating a claim

21     construction that requires --

22          THE COURT:  I'm not really interested in what the

23     history of this argument is.  I'm just trying to get to the

24     right result.

25          And part of the problem is that in Figure 2 of the

1    patent, it describes a device according to the invention, and

2    then that device includes the display arguments.

3          MR. SPEARS:  Okay.  The background is essential to

4    understanding what Judge Andrews did in his claim construction

5    opinion.

6          THE COURT:  I'm not -- I don't think Judge Andrews

7    resolved this.  I'm not interested in hearing arguments that he

8    did.

9          I just want you to tell me what's the right answer

10   here.

11         MR. SPEARS:  I think that the right answer -- and it's

12   -- the claims are very carefully structured.  We don't talk

13   about providing an image.

14         What we talk about is providing a pictorial

15   representation.

16         If you would like, we could provide supplemental

17   briefing on this very point.  It seems like that's what the

18   Court is interested in receiving.

19         THE COURT:  Mr. Snyder?

20         MR. SNYDER:  Mr. Williamson will address this point,

21   your Honor.

22         MR. WILLIAMSON:  Your Honor, this was exactly what

23   happened in claim construction.  There was a dispute about

24   whether representing meant something other than displaying.

25         And Judge Andrews did decide, now what we have is a

1   motion simply to preclude the expert witness to apply that

2   construction.

3          If the expert goes beyond the construction --

4          THE COURT:  Well, I don't agree with that.

5          I think this is an open question.  I think it's a

6   difficult question.

7          I think that it would probably be useful to have some

8   supplemental briefing on it.

9          It certainly is the case the data that is supplied by

10  Google Earth can only be displayed on someone's computer using

11  the screen, the hardware, and the software that is within the

12  computer, and that Google doesn't supply.

13         The question is, what was intended by the claim here?

14  What was intended to describe a method, which the data was

15  transmitted to the computer, which uses standard software and

16  hardware to display it, or is the use of the standard software

17  and hardware part of the method claims that we have here?

18         I don't know the answer to that.  I think it's a

19  difficult question.

20         And it would be, I think, helpful to have supplemental

21  briefing on that, maybe, let's say at the close of business

22  Tuesday of next week.

23         Does that work?

24         MR. SPEARS:  That works for us.

25         And just so the Court is aware, our infringement

1   theories with respect to this limitation aren't directed to a

2   literal infringement theory on Google's direct practice.

3          We also have a combined infringement theory under the

4   Federal Circuit's most recent Akamai decision.

5          The idea that Google is driving everything in that

6   client level software.  And we have in theories under the

7   Doctrine of Equivalents that if all you're doing is a post-

8   processing in accordance with standard low-level software that

9   applies to all graphical applications, that that's

10  insubstantial.

11         THE COURT:  Okay.  I understand.

12         MR. SNYDER:  Your Honor, if I may be heard then, since

13  the Court is going to invite supplemental briefing?

14         On the first issue the Court identified, we believe --

15  and it would be -- it would certainly be the fault of Google to

16  have not explained it better, because that is not a closed case.

17         That that's a plain reading of word "each" in context.

18  It can not possibly be --

19         THE COURT:  I don't want supplemental briefing on that.

20         I'm going to grant the motion with respect to that

21  aspect of it.

22         Why don't we say no more than 10 pages at the close of

23  business, 5:00 o'clock, 5:00 p.m. next Tuesday?

24         MR. PARTRIDGE:  That works for us, your Honor.

25         MR. WILLIAMSON:  Thank you, your Honor.

1                    THE COURT:  Let's turn to ACI's Motion in Limine No. 2

2     here.

3                    Who's going to address this one?

4                    MR. PARTRIDGE:  Mr. Hawes will.

5                    MR. HAWES:  Do you want me to present or do you have

6     questions?

7                    THE COURT:  Well, I have a question.

8                    You complained that you didn't get to depose Mr. Mercay

9     about this, because this came up after of the close of

10    discovery.

11                   Did you ever ask the Court to allow you to depose Mr.

12    Mercay?

13                   MR. HAWES:  No, your Honor, we didn't.

14                   We thought Rule 37 covered this situation.

15                   THE COURT:  Okay.  Well, I'm going to deny the motion

16    here.

17                   I think basically Judge Andrews has already ruled on

18    this.

19                   That brings us to ACI's Motion No. 3.

20                   To some extent, the parties agreed on this, that Google

21    is going to present evidence to support its claim that this is

22    prior art.

23                   And the question is whether I'm going to rule during

24    the course of trial whether Google's established its burden to

25    show that this is prior art.

1           And I think that you can raise that in connection with

2    the jury instructions.  You can ask me to instruct the jury that

3    this particular claimed piece of prior art is not prior art.

4           I think that's the way we'll leave it.

5           Any questions or comments about that?

6           MR. SPEARS:  I think that's an excellent way to go.

7           What I would envision is, there may or may not be some

8    references that are removed, because they haven't presented

9    clear and convincing evidence.

10          There would be some references where you think as a

11   fact issue and would have -- and that would be resolved during

12   the course of the jury verdict.  And there would be some

13   references that everyone agrees is prior art and you would

14   instruct the jury to consider them as such.

15          THE COURT:  Okay.

16          Mr. Williamson?

17          MR. WILLIAMSON:  That's the procedure we were

18   advocating.

19          THE COURT:  Okay.  So then that brings us to Google's

20   motions.

21          With respect to Google's Motion No. 1, we can agree

22   that it is ACI's belief that it is not going to argue the

23   copying in.

24          If there are questions which seem to get into that

25   area, you can object to them at the trial.

1          I just don't understand how I can deal with this as an

2    In Limine Motion.  You're asking me to bar them -- from ACI's

3    questions that imply copying.

4          I can't deal with that.

5          MR. PARTRIDGE:  Your Honor, I understand your ruling on

6    that.

7          But the clarification I seek is the exclusion was, the

8    exclusion of any evidence relating to the 1995 interactions

9    between SGI and ACI.

10          So, in addition to excluding suggestions of copying, we

11    also seek to exclude any mention of this interaction, which

12    otherwise has no relevance.

13          And they have tried to identify the three categories

14    that they have and the three identifications all fail as a

15    matter of law.

16          THE COURT:  I'm going to deny it in that respect.

17    We'll see how that plays out.

18          If they ask questions which you think enter into an

19    area that is irrelevant, you can object to them at the trial.

20          MR. PARTRIDGE:  Thank you, your Honor.

21          THE COURT:  But I think they are not trying to show

22    that it is irrelevant evidence in that area.

23          Okay.  That brings us to Google's In Limine Motion No.

24    2.

25          And I'm going to grant that.

1            As I mentioned earlier, I'm not going to allow the jury

2    to hear about the PTO's actions on these IPR requests.

3            Any questions about that?

4            MR. SPEARS:  Well, there's one point, a point of

5    clarification.

6            We have a serious concern about one of the arguments

7    that Google has advanced for the proposition that one of its

8    alleged prior art references, the Sauter reference is a printed

9    publication.

10           They made this argument in their Summary Judgment

11   Motions and they made this argument before the PTAB.

12           And their argument is that because we included that

13   reference in an IBS submitted with the second reissue

14   application, that that's an admission.  That it's actually prior

15   art.

16           THE COURT:  Admission as prior art.

17           MR. SPEARS:  That's counter to Federal Circuit law.

18   It's counter to the Federal Circuit law that was cited in the

19   IPR decision rejecting their petition for review.

20           And if we get that argument in front of the jury, I

21   would like to able to inform the jury that that argument is

22   bunk.  And that the PTAB found that it was bunk.

23           Alternatively, we might address that issue through an

24   instruction or an immediate curative instruction, if and when

25   that argument even surfaces in front of the jury.

1            THE COURT:  Mr. Williamson, are you going to argue that

2      the disclosure -- in the information disclosure statement is

3      prior art, is evidence that it's prior art?

4            MR. WILLIAMSON:  Your Honor, my colleague, Ms. Simmons

5      will address that issue.

6            MS. SIMMONS:  Good morning, your Honor.

7            We are going to argue, as part of the collective body

8      of evidence, that the disclosure in the IBS proves publication.

9            THE COURT:  I thought there was authority that that was

10     not the case?

11           MR. SPEARS:  And the PTAB cited about three Federal

12     Circuit decisions directly on point.

13           THE COURT:  Well, I think I'm not going to allow that

14     argument, that the admission of the information disclosure

15     statement is evidence of prior art.

16           That takes us to Google's In Limine Motion No. 3.

17           And the parties agree what the law is here.

18           Well, I'm going to, for the moment is, deny this.

19           But if there comes a time in the questioning when

20     there's some evidence developed, testimony that this doesn't

21     count as prior art, because it wasn't implemented, I'll sustain

22     an objection to that.

23           MR. SPEARS:  I guarantee you, you will not hear that

24     testimony, your Honor.

25           THE COURT:  All right.

1          I think that resolves all the In Limine Motions.

2          Is there anything further on that?

3          MR. WILLIAMSON:  No, your Honor.

4          THE COURT:  That brings us to Google's Request for

5   Reconsideration.

6          And as I understand it, the ACI damages' expert is

7   going to testify that some of the royalty base here ought to

8   include revenues from Google products, other than Google Earth,

9   which seems to me to be a legitimate appropriate approach.

10         I think that Judge Andrews has essentially already

11  ruled on that.

12         I'm happy to hear from Google about this for a moment,

13  if there's more to be said, but I'm inclined to deny the Motion

14  for Reconsideration.

15         MR. SNYDER:  Thank you, your Honor.

16         If I could make four quick points?

17         And I understand that Judge Andrews did look at this.

18         But additional briefing provided in the context of the

19  Motion for Reargument actually clarified the situation quite

20  dramatically and I think proved Google's point.

21         I said four points and I'll limit myself to them.

22         First, in all of the -- there is no discussion in ACI's

23  opposition.  And there is no evidence on which Judge Andrews

24  relied to show that these other categories -- to show that Mr.

25  Nawrocki, ACI's expert, connected these other categories to

1      Google Earth.

2              In fact, if you look at the opposition, they don't even

3      cite to Mr. Nawrocki's report after the fourth page of their

4      brief.  And even that citation on the fourth page of the brief

5      is for unremarkable proposition that Google's Geo Division

6      contains more products.

7              There is no dispute about that.  The question is

8      whether those other direct and indirect categories of revenues

9      should be included in this royalty pool that Mr. Nawrocki is

10     going to rely on.

11             And there isn't anything in Mr. Nawrocki's report to

12     make that connection.  He should not be allowed to testify to

13     that.  It's just not in his report.

14             That's the first point.

15             The second point, your Honor is, substantively, there

16     isn't any evidence, including in the opposition that ACI has

17     provided, that connects these other categories of revenue to

18     Google Earth.

19             What they said is -- they don't say that any of Google

20     Earth drives demand for those other categories.  They don't say

21     that they are the same functional unit.  They don't say that

22     these other categories rely on Google Earth in any way.

23             Instead, what they say is, they all generate revenues

24     through X.

25             Well, that's not surprising.  Google generates most of

1    its revenue through X.

2         But that's like saying that Saturday Night Live

3    generates revenue through X.  And, therefore, it's related to

4    the Today Show, because the Today Show generates revenue through

5    X.  It doesn't connect the Today Show and Saturday Night Live in

6    any way.

7         THE COURT:  I thought there was something in the record

8    saying that people use Google Earth are drawn to use other

9    Google products as a result of that?

10        MR. SNYDER:  They cite one document that says part of

11   the rationale for Google Earth is that they use -- they will use

12   other Google Earth -- they will use other Google products and

13   generate revenue.

14        But that's a generic statement.  It does not connect a

15   Google Earth user to any of the particular categories that Mr.

16   Nawrocki relies on.

17        In fact, their brief doesn't even mention most of

18   categories anywhere.  And if they are going rely on those

19   sources of revenue, there has to be some reliable evidence that

20   the revenue from those with categories is connected in some way

21   to Google Earth.

22        Just hand-waving and saying that everything is related

23   doesn't justify including those particular revenue streams.

24        And there isn't anything.  The one category that they

25   do specifically identify is iPGeo.

1          If you read their paragraph carefully, and look at the

2    evidence as I'm sure the Court did, all it says is that Google

3    Earth generates revenue through ads.

4          IPGeo is related to ads.  Therefore, Google Earth must

5    be related to iPGeo or iPGeo must be related to Google Earth.

6          That just logically does not fit.

7          IPGeo is related to serving ads based on geographic

8    locations that are identified through someone's IP address.

9          That's the only evidence in the record that says that,

10   the only evidence -- the only evidence in the record about

11   whether Google Earth uses that process is just from Mr. Hanke.

12         And Mr. Hanke's testimony, which is in Exhibit 4 to our

13   papers says, Google Earth does not use that.

14         There is no connection between iPGeo and Google Earth.

15   None.  And they don't provide one.

16         And yet Mr. Nawrocki wants to include literally

17   billions of dollars in revenue from iPGeo in his royalty base.

18         So there really isn't -- not really -- there isn't any

19   evidence that connects any of the challenged categories to

20   Google Earth.  Nothing.

21         The third point, your Honor.

22         They attempt to try and resolve this in a way the

23   Federal Circuit has repeatedly said is inappropriate by applying

24   an allocation.

25         And as we point out in our moving papers, the

1    allocation that they rely on is also completely unrelated to the

2    revenue sources on which -- that they are trying to include.

3            That 13 percent, by their own admission, relates to ad

4    revenue.

5            But the categories -- and it relates to a comparison of

6    ad revenue for Earth to ad revenue for Maps.

7            That is one of the categories that Mr. Nawrocki relies

8    on.  We agreed that it was appropriate to include that category.

9    We disagree with their math, but that's a different issue.

10           But for these other categories, that 13 percent

11   methodology that Mr. Nawrocki relies on, has no application

12   whatsoever.

13           Now, they go on and they say, well, there is some other

14   material in the record somewhere that creates a different

15   percentage, but none of that relates to any of these other

16   revenue categories that we've challenged.  And none of it is

17   relied on by Mr. Nawrocki.

18           We cited to the specific paragraphs in Mr. Nawrocki's

19   report where he explains where this 13 percent came from.  He

20   cites one document and one document only.

21           He says in his discussion that he's relying on one

22   document and one document only.  And that relates to the

23   division of revenue between Google Earth ads and Google Map ads.

24   It's doesn't have anything to do with any of these other

25   challenged categories.

1          The fourth point, your Honor, is that this creates

2     exactly the kind of problem that the Federal Circuit has

3     repeatedly warned us against.

4          They want to take this enormous pool of revenue, and it

5     is literally several billions of dollars with no connection

6     whatsoever to Google Earth.  They want to show that to the jury

7     and use those numbers in front of the jury.

8          And according to the Federal Circuit, you can't put

9     that category back in the bag.  It is extremely prejudicial, per

10    se.  It has no connection to Google Earth.  And to allow them to

11    do that is just inviting error.

12         THE COURT:  Okay.

13         Who's going to address this issue?

14         MR. PARTRIDGE:  Mr. Hawes.

15         MR. HAWES:  First of all, your Honor, this complaint

16    about how we didn't cite Mr. Nawrocki's report.

17         What we cited, because I thought it would be more

18    useful to the Court, was the actual exhibits discussed in Mr.

19    Nawrocki's report.  We wanted to show you the actual Google

20    documents that talk about how Google Earth, as one of the three

21    applications to draw users in, results in advertising revenue

22    for the Geo group.  And we gave you specific exhibits, and those

23    are exhibits from Mr. Nawrocki's report.

24         So, yes, we didn't say, here's the page in Mr.

25    Nawrocki's report.  We instead gave you the specific Google

1    documents that Mr. Nawrocki pointed to as supporting his

2    analysis.

3            And let me address -- they talk about how, well, iPGeo

4    just relates to ads.  That was not the testimony of their

5    expert.

6            The testimony of their expert was, all iPGeo is, is the

7    increased value of those ads that are already there.  Ads that

8    are linked to Google Earth by the exhibits.

9            THE COURT:  By locating the user?

10           MR. HAWES:  That's how you get that increased value.

11           But those ads -- those ads in the first place come

12    about by bringing in all these users through these free

13    applications, one being Maps, one being Earth.  Later in the

14    process they actually integrate the two.

15           But the Google documents make clear that Google looked

16    at these free applications, and looked at their value by looking

17    at the ads of Geo as a whole.  And we identified specific

18    examples of Google doing that internally in the time frame of

19    the hypothetical negotiation.

20           And I think the Home Depot case that we cited is a

21    great example of how -- when you've got a free application, you

22    don't have kind of that starting point of what is the revenue of

23    the application.

24           You have to look at what impact it has and what impact

25    the organization that was putting out the free application saw.

1          And here Google clearly from its internal documents saw

2     that Google Earth, this free application, not -- you know, there

3     are a few places where they license it for money -- but there

4     are millions and billions of times they give it to folks for

5     free.

6          Google internally acknowledged that that was part of

7     the way that they drew people in to get that ad revenue.

8          And iPGeo just means that that ad revenue was higher,

9     but it's ad revenues that Google's own documents say is produced

10    by these free applications, including Google Earth.

11         Now, with regard to the allocation issue that he

12    raises.

13         It's interesting -- I mean, the 13 percent is actually

14    lower than the allocation that he discussed during his

15    deposition, based on the documents their expert had put forward.

16         I mean, he looked at a range of things, and he

17    explained it to them in his deposition and actually chose

18    something on the lower end of the range.

19         So this criticism doesn't take into account exactly

20    what he explained during his deposition.  And the number of

21    different documents he looked at to come to the 13 percent.

22         And it's certainly something, if they don't think that

23    document is a good document compared to some of the others that

24    he looked at, they can raise that on cross-examination.

25         But that is not an issue where we need to Daubert it

1    out.  They can decide what they think their documents mean.  The

2    jury can decide what they think their documents mean.  That

3    ought to go in front of the jury and the jury can look at it and

4    decide.

5              THE COURT:  Okay.

6              MR. SNYDER:  Can I make two points, your Honor?

7              THE COURT:  Yes.

8              MR. SNYDER:  Thank you.

9              First, we understand that for a free product, the value

10   of the product can probably be identified by looking at other

11   categories of revenue.

12             In fact, our expert has identified not only actual

13   revenue generated from the product, but also indirect sources of

14   revenue that are connected to Google Earth.

15             That's not a controversial proposition.

16             That is not, however -- and this is my second and last

17   point -- that is not an invitation to randomly pick sources.

18   They still -- those revenue sources have to be connected to the

19   accused product, which, in this case, is Google Earth.  And

20   that's the step that they have never fulfilled.

21             They can't just generically say that Google looks at

22   other things when it looks at its value, okay?

23             It has to show that Google looks at other sources of

24   revenue when it looks at the value of Google Earth.

25             And there's not a single document that they've

1    identified that connects these other sources of revenue to

2    Google Earth.  They -- not the division, generally, but to

3    Google Earth.  Not one.

4         There's not been identified a single place in Mr.

5    Nawrocki's report where he gives an analysis of why these other

6    categories of revenue should be included that is based on use of

7    Google Earth.

8         That is completely missing.  And that's why it needs to

9    be excluded, as a matter of law.

10        THE COURT:  Okay.  Well, thank you, both.

11        I'm going to deny the motion.  I think it's a very high

12   standard for reconsidering something like this.  And I'm sure

13   that at the trial you'll have plenty of cross-examination for

14   ACI's expert as to what he based this on.

15        So that will be the context in which I think this is

16   properly addressed rather than as a Daubert Motion on which

17   Judge Andrews previous ruled.

18        I think then we ought to take a short break, so that

19   counsel can do two things.

20        One is to give me the language to go in the Pretrial

21   Order on those couple of items that we talked about earlier, and

22   also to review the draft of the preliminary jury instructions to

23   see if there's any comments, or objections, or changes that I

24   made.

25        Is there anything that we should do before we break?

1          MR. PARTRIDGE:  I think that covers it, your Honor.

2          MR. SNYDER:  Nothing further, your Honor.

3          THE COURT:  Why don't we give you a half hour.

4          Is that long enough?

5          MR. PARTRIDGE:  That should suffice, your Honor.

6          MR. SNYDER:  Yes, your Honor.

7          THE COURT:  So, we'll resume, let's say, at 10 of

8  12:00.

9          If you can give my law clerk the agreed upon language

10  for the Pretrial Order, that would be helpful, and then we'll

11  discuss in open court any objections that we have for the

12  revisions of the preliminary jury instructions, okay?

13          MR. PARTRIDGE:  One request, your Honor?

14          THE COURT:  Yes.

15          MR. PARTRIDGE:  I suspect both sides have marked up all

16  the copies of your draft of the Pretrial Order in red line form

17  so that we don't have a clean one to work from.

18          Could we ask --

19          MR. SNYDER:  I think we may have one.

20          MR. PARTRIDGE:  They have a clean copy.

21          THE COURT:  Okay.  Thank you.

22          (A recess was taken at this time.)

23          (The proceedings resumed at 11:51 o'clock a.m. as

24  follows:)

25          THE COURT:  Just so that the discussion about the

1    preliminary jury instructions is clear, I'm going to mark the

2    draft I gave the parties this morning as Exhibit 1 and attach it

3    to the transcript.

4         And I noted during the break that I had inadvertently

5    haven't in Google's defenses and description, that I gave to the

6    jury, which I gather would include the public use defense and a

7    prior inventorship defense as well?

8         MR. SNYDER:  Yes, your Honor.

9         THE COURT:  Why don't we -- we'll talk about a change

10   to accomplish that, but why don't we first hear from Mr.

11   Partridge.

12        Any objection to the suggestions with respect to the

13   revisions here?

14        MR. PARTRIDGE:  I missed the last point.  And I will

15   wait for you to discuss it with them.

16        We thought the preliminary instructions were fine as

17   you drafted them -- as you revised them, your Honor.

18        MS. SIMMONS:  Your Honor, Luann Simmons for Google.

19        We have one objection.

20        The Court has added on page -- the first sentence of

21   the first full paragraph at Page 11.  And the last sentence of

22   the second paragraph on Page 12 the Court has added the

23   statement regarding the presumption that the patent is

24   available.

25        And Google requests that both of those sentences be

1    deleted from the preliminary instructions.

2         It's our position that the instructions already

3    expressly inform the jury that it is Google's burden to

4    establish invalidity by a higher standard, the clear and

5    convincing standard.

6         And our concern is that the jury will be somehow

7    confused or misled by including additionally the statements

8    about the presumption of validity, and that the jury might think

9    that somehow there's two different burdens, or a burden on top

10   of the clear and convincing burden.

11        So we would request that both of those sentences be

12   stricken.

13        THE COURT:  Well, the sentence that you're talking

14   about, the first sentence on Page 11 -- and where is the other

15   sentence?

16        MS. SIMMONS:  It is on Page 12.  The second full

17   paragraph.  It's the last sentence.

18        It states, "The higher burden of proof exists because

19   of the presumption of validity."

20        MR. PARTRIDGE:  Where is it?

21        THE COURT:  Where is it?

22        MS. SIMMONS:  So it's about two-thirds of the way down,

23   I would say, your Honor, and it is one of the red line

24   sentences.

25        So it's immediately following a sentence that was

1    stricken and it's in blue.

2           THE COURT:  Oh, I see it.

3           What I'm going to do is, I'm going to strike the

4    sentence on the validity.

5           MS. SIMMONS:  Thank you, your Honor.

6           THE COURT:  In order to have a complete statement about

7    Google's position, you're not relying on on-sale bar or any

8    public use, is that right?

9           MR. SNYDER:  We are not relying on the on-sale bar,

10    your Honor.

11           THE COURT:  We have the following sentence at the

12    bottom of Page 12.

13           It says that "Google also contends the patent is

14    invalid because the invention was in public use before the

15    priority date and also because of prior inventorship."

16           MR. SNYDER:  That's correct, your Honor.  Thank you.

17           THE COURT:  Any objection to that?

18           MR. PARTRIDGE:  Could you read that again?  I had a

19    little trouble hearing it.

20           THE COURT:  At the bottom of Page 12 I describe the

21    Google's defenses in too limited a way and this is an effort to

22    correct it.

23           The sentence is, "Google also contends that the patent

24    is invalid, because the invention was in public use before the

25    priority date and also because of prior inventorship."

1          MR. PARTRIDGE:  Prior inventorship is --

2          THE COURT:  Is G.

3          MR. PARTRIDGE:  It's not.  But it's not an issue that's

4     been raised.

5          THE COURT:  I think it's in the stipulation, Exhibit

6     17.

7          They say it with respect to one of the items there.  If

8     you look at it.

9          (Pause)

10         MR. PARTRIDGE:  You're right, your Honor.

11         It is listed on that stipulation.  So that change is

12     fine with us.

13         MR. SNYDER:  It's fine with us.

14         THE COURT:  With those changes, I think that resolves

15     the preliminary jury instructions.

16         I just wanted to clarify one thing about Exhibit 17.

17         I don't know whether you had read the Nuance case.

18         That reminds me that we had some problems in the past

19     with the clarity of stipulations.

20         Just to be sure that I am clear about Exhibit 17, that

21     means that ACI's only going to raise Claims 1, 3, 14 and 28,

22     correct?

23         MR. PARTRIDGE:  That is correct, your Honor.

24         THE COURT:  And with respect to Google, the only

25     primary reference they are going to be relying are those listed

1    in Exhibit 17?

2             MR. WILLIAMSON:  That's correct.

3             THE COURT:  Okay.  Well, do we have the revised

4    language for the Pretrial Order?

5             MR. PARTRIDGE:  Yes, your Honor.

6             THE COURT:  If you would give that to my clerk?

7             We'll look at those over the lunch hour.  And I think

8    if we break for lunch, then we can do the text tutorial after

9    lunch.

10            Is there anything, other than the text tutorial that we

11   need to deal with here.

12            MR. PARTRIDGE:  I don't think so, your Honor.  I think

13   that covers it.

14            THE COURT:  Mr. Snyder?

15            MR. SNYDER:  Nothing further.

16            THE COURT:  Very good.

17            And the screen is set up over there.

18            Is that going to work.

19            MR. PARTRIDGE:  Yes, we tested it.

20            THE COURT:  All right.

21            Why don't we break for lunch.  We'll take an hour for

22   lunch and we'll resume at 1:00 o'clock.

23            MR. PARTRIDGE:  Thank you, your Honor.

24            MR. SNYDER:  Thank you, your Honor.

25            (The proceedings resumed after the recess as follows:)

1          (The tutorial was played.)

2          THE COURT:  We'll put it in a journal.

3          I want to thank counsel for coming today.  The tutorial

4     was very helpful.  You were helpful in many other ways, too.

5     And I look forward to seeing you next Thursday.

6          We should post the Pretrial Order on the docket today

7     without the exhibits.  We'll have to figure out which exhibits

8     are confidential.

9          We'll do the jury selection Thursday at 1:00.

10          (The proceedings adjourned at 1:42 o'clock p.m.)

11               *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25