1               UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF DELAWARE

3

4    ART+COM INNOVATIONAL POOL    :   CA NO. 14-217-RGA

5    GmbH,                        :

6                                 :

7              Plaintiff,         :

8                                 :

9         v.                      :   May 19, 2016

10                                :

11   GOOGLE INCORPORATED,         :

12                                :

13             Defendant.    :   1:00 o'clock p.m.

14   ...........................:

15

16

17        TRANSCRIPT OF JURY SELECTION AND CHARGE CONFERENCE

18            BEFORE THE HONORABLE TIMOTHY B. DYK

19               UNITED STATES DISTRICT JUDGE

20

21

22   APPEARANCES:

23

24   For Plaintiff:     FARNAN LLP

25                      BY:  BRIAN E. FARNAN, ESQ

```
 1                         BY:  MICHAEL J. FARNAN, ESQ

 2                                   -and-

 3                         BAKER & BOTTS

 4                         BY:  SCOTT F. PARTRIDGE, ESQ

 5                         BY:  MICHAEL A. HAWES, ESQ

 6                         BY:  LARRY G. SPEARS, ESQ

 7                         BY:  M. NATALIE ALFARO, ESQ

 8                         BY:  THOMAS ROONEY, ESQ

 9

10

11   For Defendant:       MORRIS, NICHOLS, ARSHT & TUNNELL

12                         BY:  JACK B. BLUMENFELD, ESQ

13                                   -and-

14                         O'MELVENY MYERS LLP

15                         BY:  DARIN W. SNYDER, ESQ

16                         BY:  LUANN L. SIMMONS, ESQ

17

18   Other Appearances:  JAMES SHERWOOD, ESQ

19                         JEN POLSE, ESQ

20                         In-house Counsel for Google

21

22

23

24   Court Reporter:       LEONARD A. DIBBS

25                              Official Court Reporter
```

```
1                    P R O C E E D I N G S

2

3              (The proceedings occurred at 1:00 o'clock p.m. as

4    follows:)

5              THE COURT:  Be seated, please.

6              Good afternoon.  Ladies and gentlemen of the jury

7    panel, welcome to the United States District Court for the

8    District of Delaware.

9              I extend a warm welcome to all of you.

10             My name is Timothy Dyk.  I'll be the judge in this

11   case.  I don't normally hear cases in Delaware.  I sit on the

12   Court of Appeals in Washington.  But chief Judge Stark and Judge

13   Andrews asked me to come here and help out, and I was glad to do

14   that.

15             My Law Clerk, David Yin, will be assisting me, as well

16   as the court staff here.

17             Mr. Dibbs is the Court Reporter.

18             Nicole Selmyer is the Courtroom Deputy, and Deborah

19   Bonselaar is going to also assist.

20             Before we begin, I'd like to tell you how much we

21   appreciate your jury service and how important jury service is.

22             Service on an American jury is really one of the

23   highest privileges and responsibilities of citizenship in this

24   country.

25             It's so important that even Federal Judges like me are
```

1    often called for jury service.  I was called about a month ago

2    myself, and I didn't make it on to the jury.  And some of you

3    won't make it on to the jury today either and I will sympathize

4    with you when that happens.

5           Jury service is something that is inconvenient to many

6    of you, but it's very important to make our system of justice

7    work.

8           So your role is not only important, it is central and

9    critical to the operation of the justice system.  And I thank

10   you and look forward to your participation in it.

11          Now, we're picking a jury here today for a trial that's

12   starting next Monday, May 23rd and I'll be the presiding judge.

13          And this is a patent case arising under the patent laws

14   of the United States.  The trial is going to last all of next

15   week; that is, Monday through Friday.  And the schedule is going

16   to go approximately 9:00 to 5:00 each day.

17          We hope to finish the trial next week, but that's not

18   guaranteed.  If necessary, we may have to ask you to return on

19   Tuesday after Memorial Day.

20          During each day, we'll have a lunch break of about an

21   hour and lunch will be provided for the jurors, so you won't

22   need to leave the building.

23          And in addition to that, there will be two fifteen

24   minute breaks.  One in the morning and one in the afternoon.

25          This is a civil case.  We will select eight jurors.

1         And, of course, we have many more than eight of you here, but

2    that's the process of jury selection.  It happens in every case.

3              The process will be done in part by my asking you

4    questions.  And once we've selected a jury, those who are not

5    selected to be part of the eight-person jury will be excused.

6              On Monday, when you come back, those of you who are

7    selected we'll begin with preliminary jury instructions and the

8    lawyers opening statements.

9              Then the plaintiff who brought this case, will present

10   evidence.  And after that the party being sued, the defendant,

11   will present its case.  The plaintiff will then have an

12   opportunity to present rebuttal as will the defendant.

13             Finally, at the end of the trial, I will give the jury

14   instructions on the law and the lawyers will make their closing

15   arguments.  Then the jurors will retire to deliberate.  And once

16   the jury has reached a verdict, it will be read to the parties

17   and the case will be complete.

18             Now, I know you've all already answered a

19   questionnaire.  And I'm going to, in addition to that, ask you a

20   series of questions to help the Court and the attorneys in the

21   jury selection process.

22             But before I ask any questions, I'm going to ask Ms.

23   Selmyer to swear the jury panel to answer the questions

24   truthfully.

25             (The jury panel was sworn.)

1              THE COURT:  I'm going to add one other point.

2              Whether you're selected or not for the jury, it doesn't

3      reflect one way or the other on you.  It's just part of the

4      process.  It doesn't mean that anybody thinks you can't be fair,

5      or they don't like you, or whatever.  It's just part of the

6      process by which jurors get selected every day in every

7      courtroom in the country.

8              I'm going to ask a series of questions.  And if the

9      answer is yes, please stand up and state your jury number --

10     juror number when I point to you.

11             And then at the end of the questioning, the Deputy

12     Clerk will randomly ask 14 of you to take a seat in the jury box

13     over there.  And the lawyers and I will then call some of you up

14     to sidebar here and may ask additional questions.

15             The first question is, do any of you have a problem

16     with the schedule that he told you about for this trial?

17             So let's start over in the first row on the left.

18             Would you state your juror number, please?

19             JURY NO. 12:  12.

20             THE COURT:  You should stand.

21             JUROR NO. 25:  I'm sorry.  25.

22             THE COURT:  Let's continue across that row.

23             JUROR NO. 39:

24             JUROR NO. 33:  33.

25             JUROR NO.  17.

1           THE COURT:  Okay.  The next row then?

2           JUROR NO. 12:  12.

3           JUROR NO. 14:  14.

4           THE COURT:  The row behind?

5           JUROR NO. 10:  10.

6           JUROR NO. 34:  34.

7           JUROR NO. 8.  33.

8           JUROR NO. 19:  19.

9           JUROR NO. 8:  8.

10          JUROR NO. 21:  21.

11          THE COURT:  How about on the other side?

12          JUROR NO. 30:  30.

13          JUROR NO. 32:  32.

14          JUROR NO. 27:  27.

15          THE COURT:  Okay.  Is there anybody who answered yes to

16     that question that we haven't identified?

17          (No response.)

18          All right.

19          The second question is -- relates to kind of cases this

20     is.  As I mentioned, it's a patent lawsuit involving the use of

21     computers, including tablets and Smartphones to access

22     geographical information from various points of view selected by

23     the engineer, and then displaying the images from those points

24     of view.

25          The plaintiff is ART+COM Innovationpool.  And we'll

1      refer to the plaintiff from here on as ACI.

2            And ACI has sued the defendant Google.  And we'll refer

3      to the defendant as Google from here on.

4            ACI claims that certain Google products, including

5      Google Earth, infringes patents.  Google denies infringement

6      when it says the patent is invalid.

7            The jury in this case will be asked to decide whether

8      Google's products infringes ACI's patent, and whether the patent

9      is valid.

10           For those of you end up being on the jury, I'll give a

11     more detailed instruction on the law later in this case.

12           So the next question, No. 2 is, have you heard or read

13     anything about this case?  Any of you heard or read anything

14     about this case?

15           (No response.)

16           THE COURT:  No response.

17           Question No. 3, based on the description of this case,

18     is there anything that makes you think that you couldn't be a

19     fair and impartial juror in this case?  Anyone?

20           (No response.)

21           THE COURT:  No response.

22           The fourth question.  Now, you have been given a list

23     of companies and organizations that is labeled Attachment A.

24           Do the jurors have that?

25           I'll give you a minute to look at Attachment A.  It's a

1    list of companies and organizations.  Then I'm going to ask you

2    a question about that.

3         The question is, have you or a member of your immediate

4    family ever worked for any of these companies or organizations?

5         (No response.)

6         THE COURT:  No response.

7         And the next question, No. 5 is, do you or a member of

8    your immediate family now own or have you or any such family

9    member every owned any stocks or bonds in any of these companies

10   or organizations?  Anyone owning stocks or bonds?

11        Yes.

12        JUROR NO. 35:  No. 35.

13        THE COURT:  Anyone else?

14        Okay.  No. 6, have you or a member of your immediate

15   family had any business dealings with, or relied financially in

16   any way any of these companies or organizations?

17        (No response.)

18        THE COURT:  No response.

19        No. 7, have you or a member of your immediate family

20   had any experience, good or bad, with the products of any these

21   companies, including Google Earth or Google Maps, that might

22   keep you from being a fair and impartial juror in the case?

23   Anybody have such an experience?

24        (No response.)

25        THE COURT:  No response.

1                8, do you possess any opinions about any of these

2      companies that might keep you from being a fair and impartial in

3      this case?  Anyone?

4                (No response.)

5                THE COURT:  No response.

6                Now, I'm going to ask one of the lawyers from each side

7      just to introduce himself and the other lawyers who are here.

8                And then we're also going to ask questions about THE

9      more detailed list of attorneys and law firms that you have in

10     your Attachment B.

11               Mr. Partridge?

12               MR. PARTRIDGE:  Yes, your Honor.  Thank you.

13               My name is Scott Partridge.  I'm an attorney with Baker

14     Botts.  I have here with me a number of attorneys from my firm.

15               I would like to start with Delaware lawyer, Brian

16     Farnan, who is local counsel in this case.  And Michael Farnan,

17     also from the same firm.  Brothers.

18               I'll begin with my partner, Michael Hawes, Gene Spears,

19     Natalie Alfaro-Gonzalez, Tom Rooney.  And we're from Baker Botts

20     in the Houston office.

21               And I would like to introduce my client, who's from

22     Berlin, Germany.  His name Detlef Andreovits, from Berlin.

23               And that's the group in the courtroom at the present

24     time.  We'll have more people for you to meet as the case

25     progresses.

```
 1              THE COURT:  Thank you.

 2              Mr. Snyder?

 3              MR. SNYDER:  Good afternoon.

 4              My name a Darin Synder.  I'm with the law firm of

 5    O'Melveny and Myers.

 6              With me here is today my partner, Luann Simmons.  Also

 7    Jack Blumenfeld from the local law firm of Morris Nichols here

 8    in Delaware.  We also brought with us our Case Manager, Shivon

 9    Meblin.

10              I would also like to introduce you to two people from

11    our client Google, Jen Polse and Jim Sherwood.

12              Thank you very much.

13              THE COURT:  Okay.  Thank you both.

14              Now you have the more detailed list, which is

15    Attachment B, and the first question is -- I believe this is

16    Question No. 9 -- are you related to, or personally acquainted

17    with, any of those attorneys, or have you ever been represented

18    by any of those attorneys or other associates or members of the

19    list listed law firms?

20              Anybody?  Anybody have any relationship with these

21    lawyers or law firms?

22              (No response.)

23              THE COURT:  No?  Okay.

24              No. 10 -- oh, I'm sorry -- yes?

25              JUROR NO. 21:  Currently or ever?
```

1          THE COURT:  Why don't we say either currently or ever.

2          JUROR NO. 21:  No. 21.

3          JUROR NO. 16:  16.

4          THE COURT:  Anyone else?

5          (No response.)

6          Okay.  No. 10 is, do any of your immediate families,

7   such as spouse, child, parent, or sibling know any of the

8   attorneys or the law firms that I've just mentioned?  In other

9   words, does anyone in your immediate family know any of the

10  attorneys and law firms?

11         (No response.)

12         THE COURT:  No?

13         11 is, have any of you or your immediate family members

14  had any business dealings with, or been employed by any of these

15  attorneys or law firms, employment?

16         Yes?

17         JUROR NO. 21:  21.

18         THE COURT:  Anyone else?

19         (No response.)

20         Okay.  Question No. 12, do you have any negative views

21  or opinions of the named attorneys or law firms that have just

22  been mentioned?  Any negative views?

23         (No response.)

24         THE COURT:  No?

25         All right.

1        Question No. 13, and this is going to require you to

2    look at Attachment C.  You've been given a list of the

3    individuals who might appear as witnesses in this case.  That's

4    Attachment C.  Take a moment to look at that.

5        (Pause)

6        And the question is, are you related to, or personally

7    acquainted with any of the individuals on that list of

8    respective witnesses?  Anyone related to or acquainted with any

9    of those witnesses?

10        (No response.)

11        THE COURT:  No?

12        All right.

13        And the next item is Question 14.  It relates to

14    Attachment D.  That is a list of subject matter areas.

15        And the question is, have you ever been educated,

16    employed, trained, or had any significant experience in the

17    subject matter areas listed in Attachment D?

18        JUROR NO. 35:  35.

19        JUROR NO. 16:  16.

20        JUROR NO. 46:  46.

21        JUROR NO. 13:  13.

22        JUROR NO. 14:  14.

23        THE COURT:  Anyone else?

24        (No response.)

25        THE COURT:  Okay.

1           Question No. 15, do you have any significant experience

2   with the operation and use of Google Earth and/or Google Earth

3   for Maps products.

4           And that's -- we're not asking about casual use here.

5   We're asking about significant experience with Google Earth

6   and/or Google Earth for Maps?

7           JUROR NO. 12:  12.

8           THE COURT:  Anyone else?

9           JUROR NO. 23:  23.

10          THE COURT:  Okay.  Anyone else?

11          (No response.)

12          THE COURT:  Okay.  Question No. 16, have you or any

13  member of your immediate family ever been employed by the United

14  States Patent and Trademark Office?  Employed by the Patent and

15  Trademark Office?  Anyone?

16          (No response.)

17          THE COURT:  Okay.  Question 17, have you or any member

18  of your immediate family ever applied for or obtained a United

19  States or a foreign patent?  Anybody ever obtain a patent?

20          JUROR NO. 42:  42.

21          JUROR NO. 37:  37.

22          THE COURT:  Anyone else?

23          (No response.)

24          THE COURT:  Okay.  Question 18, have you, your current

25  or former employers, or any member of your immediate family

1    everybody involved in the dispute about patent rights?  Involved

2    in a dispute about patent rights?

3            Anyone?

4            JUROR NO. 42:  You said "employers"?

5            THE COURT:  Yes.  With your employers.  Your current or

6    former employers?

7            JUROR NO. 42:  My current employers.

8            THE COURT:  Anyone else?

9            (No response.)

10           THE COURT:  All right.

11           All right.

12           Question 19, have you or any member of your immediate

13   family ever been involved in the licensing of patents or other

14   intellectual property rights?  Patent licensing.

15           (No response.)

16           THE COURT:  Anyone?

17           Okay.  Question 20, do you have any opinions about

18   patents, patent rights, or the United States Patent and

19   Trademark Office that might make it difficult for you to be a

20   fair and impartial juror in this case?  Anyone?

21           (No response.)

22           THE COURT:  Okay.  Question 21, do you believe it would

23   be wrong for someone to profit from or be awarded damages for

24   his or her invention or discovery?  Anyone?

25           (No response.)

1          THE COURT:  All right.

2          22, does anyone have any positive or negative feelings

3    about large corporations?  Anyone?

4          (No response.)

5          THE COURT:  No.

6          23, have you ever served on a jury in a civil case

7    within the last 15 years?  Served on a jury in civil case in the

8    last 15 years?

9          JUROR NO. 41:  41.

10         THE COURT:  Anyone else?

11         JUROR NO. 23:  23.

12         THE COURT:  Anyone else?

13         (No response.)

14         THE COURT:  Okay.  Question 24, have you, a member of

15    your family, or your employer, past or present, been involved in

16    a civil case that was a party or a witness within the last 15

17    years?  Anyone?

18         (No response.)

19         THE COURT:  Question 25, if you're selected to sit as a

20    juror in this case, are you aware of any reason why you would be

21    unable to render a verdict based solely on the evidence

22    presented at trial?  Anyone?

23         (No response.)

24         THE COURT:  All right.

25         26, if you are selected to sit as a juror in this case

1    are you aware of any reason why you would not be able to follow

2    the law as I instruct you?  Anyone?

3            (No response.)

4            THE COURT:  27, is there anything such as poor vision,

5    difficulty hearing, difficulty understanding spoken or written

6    English that would make it difficult for you to serve on this

7    jury?

8            JUROR NO. 4:  4.

9            JUROR NO. 2:  2.

10           THE COURT:  Anyone else?

11           JUROR NO. 17:  17.

12           THE COURT:  Anyone else?

13           (No response.)

14           THE COURT:  All right.

15           No. 28, and this is the last question, is there

16    anything else, including something that you remembered in

17    connection with one of the earlier questions, any questions that

18    you might have missed that you would like to tell me about in

19    connection with your service as a juror in this case?  Does

20    anybody have anything else that he or she wants to raise?

21           (No response.)

22           THE COURT:  Okay.  All right.

23           Let's seat our 14 jurors in the jury box.

24           When your number is called, come up and go into the

25    jury box.

 1              THE CLERK:  Juror No. 29, will you please come forward

 2      and take the first seat in the first row in the jury box?

 3              Juror No. 25, will you please come forward and take the

 4      second seat in the first row of the jury box?

 5              Juror No. 18, will you please come forward and take the

 6      third seat in the first row of the jury box?

 7              Juror No. 7, will you please come forward and take the

 8      fourth seat in the first row of the jury box?

 9              Juror No. 15, will you please come forward and take the

10      fifth seat in the first row of the jury box?

11              Juror No. 43, will you please come forward and take the

12      sixth seat in the first row of the jury box?

13              Juror No. 5, will you please come forward and take the

14      seventh seat in the first row of the jury box?

15              Juror No. 42, will you please come forward and take the

16      first seat in the second row of the jury box?

17              Juror No. 38, will you please come forward and take the

18      second seat in the second row of the jury box?

19              Juror No. 34, will you please come forward and take the

20      third seat in the second row of the jury box?

21              Juror No. 39, will you please come forward and take the

22      fourth seat in the second row of the jury box?

23              Juror No. 36, will you please come forward and take the

24      fifth seat in the second row of the jury box?

25              Juror No. 3, will you please come forward and take the

1    sixth seat in the second row of the jury box?

2          And Juror No. 33, will you please come forward and take

3    the seventh seat in the second row of the jury box?

4          THE COURT:  Mr. Partridge and Mr. Snyder, could you

5    come up?

6          MR. PARTRIDGE:  May I bring up Mr. Farnan?

7          THE COURT:  Sure.

8          (A sidebar discussion was held as follows:)

9          THE COURT:  With respect to Juror No. 29 is no to any

10   questions.

11         With respect to Juror 25, she's in Seat 2?

12         MR. SNYDER:  That's correct.

13         THE COURT:  Juror No. 18 is in Seat 3.  No.

14         Juror No. 7 is in Seat 4.  Again no.

15         Juror No. 15 is in Seat 5.  Again no.

16         In Seat 6 is Juror No. 43.  Again no.

17         And juror No. 5 in Seat 7 and affirmatively answered

18   Question 1.

19         And then in the second row in the first seat I have

20   Juror No. 42.  I have an affirmative response to Questions 10

21   and 11.

22         And Juror No. 38 in Seat 9 also no.

23         And in Seat 10, Juror No. 34, yes to Question 1.

24         In Seat 11, Juror No. 39, yes to Question 1.

25         And in Seat 12, Juror 36, yes to Question 7.

1          And with respect to Seat 13, I have Juror No. 3.

2          Seat 14 I have a response to Question 1.

3          Then in Seat 14, Juror No. 33, I have a no answer.

4          MR. SNYDER:  I'm sorry, which juror number?

5          THE COURT:  33.

6          MS. FARNAN:  So it's Juror 25 who answered an

7    affirmative answer to Question 14?

8          MR. SNYDER:  I did not catch that.

9          MS. FARNAN:  We may have misheard.

10         THE COURT:  25.

11         MR. SNYDER:  I thought it was to Question 14?

12         MR. PARTRIDGE:  It was with regard to one of the

13   attachments.

14         THE COURT:  Now, are there any of the jurors who

15   answered that either of you would like to question about

16   anything in the questionnaire that they filled out?

17         MR. PARTRIDGE:  Any of them that answered no to any of

18   the questions, whether or not we want to ask them follow-up

19   questions?

20         THE COURT:  Based on the questionnaire?

21         MR. PARTRIDGE:  No.

22         THE COURT:  Why don't we begin.

23         Who's doing the questioning?

24         MR. PARTRIDGE:  For us?  Mr. Farnan.

25         THE COURT:  Who?

1          MR. PARTRIDGE:  Mr. Farnan, Brian Farnan.

2          MR. SNYDER:  I will, your Honor.

3          THE COURT:  Any other questions?

4          MR. PARTRIDGE:  No, your Honor.

5          MR. SNYDER:  No, your Honor.

6          MR. PARTRIDGE:  I assume you're going to have them come

7     up to sidebar and question them with respect to the question

8     they answered affirmatively?

9          THE COURT:  Yes.

10          (End of sidebar discussion.)

11          THE CLERK:  Juror No. 5, could you please come to

12     sidebar?

13          (A sidebar discussion was held as follows:)

14          THE COURT:  Would you state your name for the record?

15          JUROR NO. 5:  Lee A. Schuldt.

16          THE COURT:  And my recollection is that you answered

17     yes to the question, whether you or any member of your family.

18          MR. SNYDER:  It was Question No. 1, your Honor.

19          THE COURT:  That you had a problem with the schedule?

20          JUROR NO. 5:  Yes.  I have severe lower back pain.  I

21     take shots to determine what was wrong.  I had one shot on my

22     right side to relieve the pain, but I still have to have it on

23     the left side, which is due to be done next Thursday.

24          THE COURT:  The problem is getting the shot or serving

25     with the back pain?

1          JUROR NO. 5:  Well, I'm scheduled to get a shot next

2     Thursday.  I would like to get the shot if I could.

3          THE COURT:  Is it possible to get that before Court or

4     after Court?

5          JUROR NO. 5:  It's scheduled for 11:00 a.m.  So I don't

6     know if that's a problem for you guys or not.

7          THE COURT:  Well, we can't -- would it be possible for

8     you to get the shot -- is the doctor you would be seeing nearby?

9          JUROR NO. 5:  He's at Christiana Hospital.

10         THE COURT:  How far away is that?

11         JUROR NO. 5:  I don't know.  It must be like 10, 12

12    miles.

13         THE COURT:  Any questions?

14         MR. SNYDER:  Mr. Schuldt, is it difficult for you to

15    sit because of your back?

16         JUROR NO. 5:  Not right now, no.  It's like a light

17    switch, it comes and goes.  I don't know when it's going to get

18    hard.  And once I get it, I don't know when it's going to go

19    away.

20         MR. FARNAN:  How long ago has this shot been scheduled

21    for?

22         JUROR NO. 5:  I believe it's three weeks now.  I have a

23    conflict with scheduling it and with the doctor's office and my

24    work.

25         THE COURT:  Any further questions?

1          MR. SNYDER:  Nothing further, your Honor.

2          THE COURT:  Thank you.

3          JUROR NO. 5:  Thank you.

4          THE COURT:  Any objection?

5          MR. SNYDER:  No objection.

6          THE COURT:  Any objection to him being excused?

7          MR. PARTRIDGE:  No.

8          MR. SNYDER:  No.

9          THE CLERK:  Now, normally, what I would do is call a

10   random number in the box to fill his seat.

11          (End of sidebar discussion.)

12          THE CLERK:  Juror No. 22, can you please come forward

13   and take the seventh seat in the first row of the jury box.

14          We have Juror No. 22 as a no.

15          MR. SNYDER:  I do not believe she answered yes to any

16   of the questions.

17          THE COURT:  Juror No. 42.

18          Juror No. 42, would you come up to sidebar?

19          (A sidebar discussion was held as follows:)

20          THE COURT:  Would you state your name for the record,

21   sir?

22          JUROR NO. 42:  Patrick Foley, F-O-L-E-Y.

23          THE COURT:  You answered affirmatively to two questions

24   whether you or a member of your immediate family applied for or

25   obtained a U.S. or foreign patent.

1          JUROR NO. 42:  Yes.

2          THE COURT:  Would you describe for us that

3    circumstance?

4          JUROR NO. 42:  Yes.  My father was a Ph.D. chemist for

5    DuPont, so he filed patents for DuPont with his name on it.

6          THE COURT:  Just one patent?

7          JUROR NO. 42:  I'm not sure.  At least one.

8          THE COURT:  At least one?

9          JUROR NO. 42:  It was a long time ago.

10         THE COURT:  Okay.  Then you also responded

11   affirmatively to the question, have you ever, or your former or

12   currently employer, or member of your immediate family ever

13   been involved in patent rights?

14         JUROR NO. 42:  Yes.  I work for DuPont as well now.

15         THE COURT:  And what are the circumstances of your

16   involvement?

17         JUROR NO. 42:  I have not been involved myself.  The

18   company has been probably involved in them all the time.

19         THE COURT:  Was your father ever involved?

20         JUROR NO. 42:  Oh, I'm sure, yes.  He was a long-term

21   DuPont employee.

22         THE COURT:  Questions?

23         MR. FARNAN:  Could you be fair and impartial to a

24   patent owner that brings a lawsuit against a company for

25   infringement?

1           JUROR NO. 42:  Yes, I think so.  Based on the facts,

2      yes.

3           MR. FARNAN:  Could you sit and listen to the facts and

4      make a decision based on the evidence given before you?

5           JUROR NO. 42:  Absolutely, yes.

6           MR. FARNAN:  And going into the process, you don't sway

7      one way or another?

8           JUROR NO. 42:  No.

9           MR. SNYDER:  Mr. Foley, do you know which side of

10     DuPont's patent disputes that DuPont is normally on?

11          JUROR NO. 42:  I think they are on both.  I don't know

12     which way is the norm.  I'm not in that area.

13          MR. SNYDER:  Okay.

14          THE COURT:  Any other questions?

15          MR. FARNAN:  Do you currently have any involvement with

16     patents at DuPont?

17          JUROR NO. 42:  Do I?

18          No, I do not have any patents.

19          MR. FARNAN:  Are you working on any patent ideas or

20     anything?

21          JUROR NO. 42:  No, I have not been in research and

22     development.

23          MR. FARNAN:  Thank you.

24          THE COURT:  Thank you.  You can sit down.

25          Any objections to that juror?

1              MR. SNYDER:  No, your Honor.

2              MR. FARNAN:  No, your Honor.

3              THE COURT:  You can take a seat back in the jury box.

4              Juror No. 34.

5              (End of sidebar discussion.)

6              THE CLERK:  Juror No. 34, can you please come to

7       sidebar?

8              (A sidebar discussion was held as follows:)

9              THE COURT:  State your name for the record, please?

10             JUROR NO. 34:  Jason Decena.

11             THE COURT:  You answered affirmatively to Question 1,

12      which was the schedule presents a problem for you?

13             JUROR NO. 34:  Yes.

14             THE COURT:  What's the problem?

15             JUROR NO. 34:  It's for -- I have a business meeting

16      next week on Wednesday.  I didn't realize I was going to go all

17      the way for multiple days.  Honestly, I anticipated that

18      question.  This was scheduled.  It's an international meeting.

19             THE COURT:  What do you mean international meeting?

20             JUROR NO. 34:  Well, it is a flight out to the

21      Philippines.

22             THE COURT:  For you to fly out?

23             JUROR NO. 34:  Yes, for the employer.

24             THE COURT:  Is there any reason that couldn't be

25      rescheduled for another time?

1          JUROR NO. 34:  It could be rescheduled, yes.

2          THE COURT:  Any questions?

3          MR. SNYDER:  If you rescheduled your meeting, would it

4    affect your ability to pay attention to the proceedings in the

5    case and serve as a juror?

6          JUROR NO. 34:  It may.  It's something that I'm very

7    deeply involved in for my company.  And right now at this

8    sensitive point in time for my business, yes.  It may possibly

9    for the fact that the duration of it, five days, there is a lot

10   of time sensitive issues that need to be addressed with bank

11   institutions, lawyers, and such will be coming up soon.

12         THE COURT:  Why would that affect your ability to

13   participate in this case?

14         JUROR NO. 34:  Just the nature of how I operate is,

15   writing business plans and everything.  It's not a strong point.

16   And it's something that I'm deeply involved in at the time at

17   the moment.  I'm trying to juggle that and also I'm hiring as

18   well.

19         THE COURT:  If you were to sit on the jury, would your

20   concerns about your business, would it affect your ability to

21   give a fair and impartial verdict?

22         JUROR NO. 34:  No, I don't think so.

23         THE COURT:  Any other questions?

24         MR. FARNAN:  No.

25         MR. SNYDER:  No.

1            THE COURT:  Thank you.

2            THE COURT:  Any objection to seating him?

3            MR. FARNAN:  No.

4            MR. PARTRIDGE:  I think he should be seated, your

5    Honor.

6            MR. SNYDER:  No objection.

7            THE COURT:  39.

8            (End of sidebar discussion.)

9            THE CLERK:  Juror No. 39, can you please come to

10   sidebar?

11           (A sidebar discussion was held as follows:)

12           THE COURT:  Could you state your name for the record?

13           JUROR NO. 39:  Katherine Hauch.

14           THE COURT:  You answered affirmatively to Question 1,

15   as to whether the schedule presented a problem for you.

16           JUROR NO. 39:  Yes.

17           THE COURT:  What is the problem?

18           JUROR NO. 39:  I work in a child care center and we

19   have under 20 employees.  I'm responsible for closing up the

20   building in the evening.  I live over two hours away.

21           THE COURT:  Can somebody else do that for you during

22   the trial?

23           JUROR NO. 39:  Well, they probably could be trained on

24   it, on how to lock up the building and such.

25           THE COURT:  Is that something that can be done between

1    now and the start of the trial on Monday?

2              JUROR NO. 39:  I believe so, yes.

3              THE COURT:  Any questions?

4              MR. SNYDER:  Ms. Hauck, you said you live more than two

5    hours away.  It takes two hours to get here and two hours to get

6    home?

7              JUROR NO. 39:  Yes.

8              THE COURT:  Any other questions?

9              (No response.)

10             THE COURT:  Thank you.

11             Any objection to seating this person?

12             MR. FARNAN:  No, your Honor.

13             MR. SNYDER:  No.

14             THE COURT:  Thank you.  You may take your seat back in

15   the box.

16             Juror No. 36.

17             (End of sidebar discussion.)

18             THE CLERK:  Juror No. 36, would you please come to

19   sidebar?

20             (A sidebar discussion was held as follows:)

21             THE COURT:  State your name for the record, please?

22             JUROR NO. 36:  Ryan Mullins.

23             THE COURT:  You answered affirmatively, I think, to

24   Question 17.  And that was in the list of subject matter areas.

25             Why did you answer yes?

1          JUROR NO. 36:  First, I'm going to school for computer

2     science.  And I'm also Adobe Photoshop certified.  And I Coded

3     Sequence Plus --

4          THE COURT:  Anything else?

5          JUROR NO. 36:  No.

6          THE COURT:  Questions?

7          MR. FARNAN:  Not from us, your Honor.

8          MR. SNYDER:  Mr. Mullins, would you be able to base

9     your verdict in this case on the evidence that was presented and

10    not on your knowledge that you might know from other sources?

11         JUROR NO. 36:  Could you give me an example?

12         THE COURT:  I think what he's asking is, whether you

13    could be a fair and impartial juror based on the evidence that

14    you heard in the courtroom as opposed to your knowledge that you

15    have outside the courtroom?

16         JUROR NO. 36:  Yes, I could.

17         MR. PARTRIDGE:  How far into your classes are you?

18         JUROR NO. 36:  I have one more semester left.

19         MR. PARTRIDGE:  So you would graduate this summer?

20         JUROR NO. 36:  Yes.

21         THE COURT:  Any other questions?

22         MR. SNYDER:  No more questions.

23         THE COURT:  Thank you.

24         Any objection to this juror?

25         MR. SNYDER:  No objection.

1              MR. PARTRIDGE:  No objection.

2              THE COURT:  Thank you.  You may take your seat back in

3       the box.

4              THE COURT:  Juror No. 20.

5              (End of sidebar discussion.)

6              THE CLERK:  Juror No. 20, would you please come to

7       sidebar?

8              (A sidebar discussion was held as follows:)

9              THE COURT:  Would state your name for the record,

10      please?

11             JUROR NO. 20:  Nicholas Nardo.

12             THE COURT:  You answered affirmatively to question No.

13      1.  You said that the schedule would present a problem?

14             JUROR NO. 20:  The schedule for me -- I work at my

15      family paid company.  I'm pretty much the project manager for

16      about 20 jobs.  It's kind of rough for me to be here.  But I

17      guess it's up to you guys.

18             THE COURT:  Well, is there somebody that can fill in

19      for you during the week?

20             JUROR NO. 20:  Not so much.  It's -- my father's the

21      owner and he's actually going to be somewhat out of town for a

22      vacation that week.  It's going to be a little rough.

23             But, I mean, I guess I can make it work.

24             THE COURT:  Okay.  It's up to you guys.

25             MR. FARNAN:  No questions, your Honor.

1          MR. SNYDER:  No questions.

2          THE COURT:  Thank you.

3          Any objections?

4          MR. FARNAN:  Just on the hardship.  Your Honor, for a

5     business owner, he's going to be distracted if he's the only one

6     left.

7          We don't have a strong view on it, but it seems like it

8     could be a true hardship for him.

9          THE COURT:  He said he could make it work.

10          MR. SNYDER:  I have no objection.

11          THE COURT:  Thank you.  You can take your seat back in

12     the box.

13          That's everybody.

14          MR. PARTRIDGE:  That is it?

15          THE COURT:  Yes.

16          Do you want to take a couple minutes?

17          MR. SNYDER:  Yes.  Thank you, your Honor.

18          MR. PARTRIDGE:  Thank you, your Honor.

19          (End of sidebar discussion.)

20          THE COURT:  Let me explain to the jury what is going

21     on.

22          We now have a group of 14 seated in the jury box.  And

23     that number will be reduced to eight.  And that will happen

24     because each side gets to remove three jurors from the panel.

25          And, so, that process will begin and then we'll

1    announce who the six are who will be removed and the eight

2    remaining.

3              It does not reflect adversity in any way if you are

4    removed from the jury.  It's just part of the process.

5              THE CLERK:  Okay.  When I call your number, it means

6    you're free to leave of jury box.

7              THE CLERK:  Juror No. 25, you're free to leave.

8              THE CLERK:  Juror No. 18, you're free to go as well.

9              THE CLERK:  Juror 22, you're free to leave.

10             THE CLERK:  Juror No. 42, you're free to leave the jury

11   box.

12             THE CLERK:  Juror No. 39, you're free to leave.

13             THE CLERK:  And juror 33, you are also free to go.

14             THE COURT:  Okay.  Now, we've selected our jurors.  The

15   rest of the potential jurors are free to go.  And as always we

16   have more people than we needed to.

17             We appreciate your participation in the process to help

18   us get a fair jury.  I thank you very much for your service and

19   coming here today.  And you're all excused, except for those in

20   the jury box.

21             Thank you very much.

22             (The jury panel exited the courtroom.

23             THE CLERK:  Okay.  Now we're going to reseat everyone

24   to get you in a more of a collective unit.

25             So Juror No. 29, you can stay where you are.

1          Juror No. 7, you're going to move down to seat No. 2.

2          Juror No. 15, you'll be in Seat No. 3 now.

3          Juror No. 43, you're going to be in Seat No. 4.

4          And Juror No. 38, if you could just shift down one.

5          34, you'll be next to 38.

6          36, you'll be in No. 3.

7          And juror No. 3, you'll be in the fourth seat.

8          THE COURT:  Now, the eight of you have now be sworn as

9    the jury in the case.

10          And at the end of the trial, it's going to be your job

11   to decide the facts based on the evidence you saw and heard.

12          I'll give you instructions on the law and procedures

13   that you should follow in making your decision.

14          But I do not decide the facts.  That's for you to do at

15   the trial, which is expected to start next Monday and last about

16   five days.

17          You will begin deliberations on Friday afternoon.  If

18   you can't reach a verdict on Friday, we'll come back the next

19   week after Memorial Day.

20          And now I'm going to ask the Deputy Clerk to swear you

21   in as jurors.

22          (The jury was sworn.)

23          THE COURT:  Be seated, please.

24          Now, next week when we resume on Monday, I'll give you

25   more detailed instructions, but for now I want to talk to you

1     about the importance of maintaining confidentiality and

2     impartiality.

3             Until this trial is over, do not discuss this case with

4     anyone.  That includes your family.  And do not allow anyone

5     else to discuss the case with you until -- and that includes

6     fellow jurors -- until you recess to deliberate.

7             And, in particular, you should hold yourselves apart

8     from the people in this case and not speak to the parties, the

9     witnesses, attorneys, or anyone associated with them.

10            If they approach you in the elevator to say "Good

11    morning," that's fine.  But apart from that, you cannot have any

12    conversation with them.

13            If anyone should try to discuss the case with you, or

14    otherwise approach you about the case, you should inform me

15    immediately about that, because that's a very serious matter.

16            Now, as I mentioned, you shouldn't even discuss the

17    case with your fellow jurors unless and until you recess and

18    deliberate.

19            Now, you're going to be passing the lawyers in the

20    hall.  They may not speak to you except to say "Hello."  They're

21    are not being rude.  They are simply following instructions.

22            And the lawyers are not allowed to speak to you after

23    the case is over either, unless I give them special permission,

24    which I would only do in exceptional circumstances.

25            If any of you use social networks, which is likely,

1     such as Facebook or Twitter, do not discuss, mention, post,

2     update of any kind on these media regarding the trial of this

3     case while it's going on.  You can tell people about your

4     experience with the case when it's over with.  While it's going

5     on, no text messages, no e-mails about the case, no discussion

6     over the telephone, no discussion in person.

7            Now, I'll allow you to have your cellphones here in the

8     Courthouse.  You should not bring them into the courtroom, but

9     you should leave them in the jury room.

10           You can use these cellphones during lunch or during the

11    breaks to call your family or your friends, say that you're

12    going to be a few minutes late or whatever.

13           But, again, you can't use them to discuss the case.

14           You're not allowed, also, to do any research into any

15    of the facts or issues related to the case.  You can't go on the

16    internet to learn more about the case.  You can't go on the

17    internet to learn more about the parties, the lawyers, or patent

18    law.  Don't watch, or listen, or read any news accounts of the

19    trial should you come across them.

20           The reason for all of this is that you got to be guided

21    solely by what you see and hear in this courtroom during the

22    trial.  And it is an important part of our civil justice system,

23    if two parties disagree, they can bring their dispute to court

24    and obtain a verdict from a fair and impartial jury.

25           Finally, I want to emphasize that violating these

1    instructions would be a very serious matter.  As you can see,

2    there's been a great deal of time, effort, and money in getting

3    this case ready for trial, and making sure that it's going to be

4    tried fairly and impartially.

5           If you were to violate the instructions that I gave

6    you, it could place all of that in jeopardy, and we might have

7    to go back and do it all over again.

8           You must follow instructions to the letter.

9           Now, as I mentioned, the trial will begin on Monday,

10   May 23rd at 9:00 a.m.  We'd like you to arrive at 8:45 a.m. to

11   give your lunch orders and some other things.  But you must

12   arrive promptly, so that we can begin the trial promptly.

13          And you're now excused.  We thank you for your service

14   and we'll see you next week.

15          (The jury exited the courtroom.)

16          THE COURT:  You can be seated, please.

17          Now, I think counsel mentioned that you wanted to

18   discuss some of the issues related to the draft of final jury

19   instructions and verdict form, which we can spend some time

20   doing this afternoon.

21          Is there anything else, besides that, that you have?

22          And I guess there is the remaining claim construction

23   issue and I would like to spend a little time addressing that as

24   well.

25          Anything else?

1        MR. PARTRIDGE:  I think that's the agenda, your Honor.

2    That works for us.

3        MR. SNYDER:  Two matters relating to the administration

4    of the trial, your Honor.

5        First, we had talked during the Pretrial Conference

6    about the presentation of confidential exhibits.  As you can

7    see, the screen that is used generally for presenting to the

8    jury is visible to, at least a portion of the gallery.

9        What counsel had talked about and agreed on was having

10   a third party vendor who could bring in a screen.  Actually, I

11   see that there is a screen -- but putting it in a place so that

12   confidential exhibits, when necessary, could be shown to the

13   jury, but not visible to the gallery.

14       THE COURT:  That's fine, as long as it's agreed on.

15       MR. SNYDER:  Okay.

16       MR. PARTRIDGE:  We have, your Honor.

17       MR. SNYDER:  Thank you, your Honor.

18       And then second, your Honor, relating to the

19   presentation of adverse witnesses, we understand -- well, there

20   are witnesses that we believe the plaintiff will call in its

21   case-in-chief for whom we will have questions that likely go

22   beyond the scope of direct.

23       And rather than serve them with trial subpoenas, so

24   they would have to return, ACI has agreed that if we give them

25   notice, that they will bring the witness back during Google's

1    case-in-chief, so that they can testify.

2            THE COURT:  That's fine.

3            MR. PARTRIDGE:  Your Honor, at this point, there is

4    only one witness that we're aware that falls into that category.

5            And I would ask, if there are going to be any others

6    that given their travel schedules, that we know about that

7    sooner rather than later.

8            But at the moment, there is one witness that has been

9    identified with whom I have agreed to this procedure.

10           MR. SNYDER:  That's correct, your Honor.

11           As soon as we know, I believe on Saturday night who

12   they are calling live, we will be able to tell them who of those

13   witnesses we would like to remain, so that they can testify in

14   Google's case-in-chief.

15           THE COURT:  Okay.  That's fine.

16           What I'd like to do is spend a few minutes talking

17   about the claim construction issue and trying to resolve that.

18   Then we'll take a recess and come back.  And we'll discuss the

19   final jury instructions and the verdict form.

20           I have read the submissions from the parties.  And let

21   me tell you tentatively where I am and it will help you address

22   the issue.

23           It seems to me that it's clear that the specifications

24   describe the embodiments of the invention in which there is, in

25   fact, a display unit, and the display unit is part of the

1    invention.

2         And, in fact, I looked back at the original claims in

3    this case and some of the device claims do have a display unit

4    included as one of the limitations.

5         However, I don't read the method claims that are

6    involved here as involving an actual display.  And they don't

7    use the word "display."  They don't use the words "display

8    unit."

9         And while Judge Andrews originally said some of the

10   claim language suggested a display, he also said that -- he

11   contemplated that there were other process steps beyond that.

12        And my tentative view is that because there is no

13   explicit reference to a "display" or "display unit" in the

14   method claims, that those claims do not require that as part of

15   the step, as part of the claim.

16        In other words, they don't require that there actually

17   be a display of the information on the display unit.  And, also,

18   that the operation of the standard software that is associated

19   with the display unit wouldn't be part of the method claim.

20        But that's my tentative view.  I'm happy to hear from

21   you.  In particular, I'm interested in, under my tentative view,

22   what would be a correct description of the software operation of

23   the individual display unit that would be outside of the method

24   claim?

25             MR. SPEARS:  I believe that we would describe the

1    operation of the software that is outside of the method claim as

2    generic, third-party graphic software and firmware, as opposed

3    to application software like Google Earth.

4            THE COURT:  Any further comments on the tentative claim

5    construction?

6            MR. SPEARS:  I believe your Honor has addressed all of

7    these issues as they relate to ACI.

8            THE COURT:  Mr. Snyder?

9            MR. SNYDER:  Thank you, your Honor.

10           Let me make a couple of points.

11           First, we do disagree with the Court's tentative

12    ruling.  You are -- and let me make two arguments.

13           First, it is true that the method claim does not

14    specifically refer to a display device, but it uses the term

15    "represent."  And I do not believe that that term is described

16    or defined anywhere in the specification.

17           The only definition we've had of "represent" so far in

18    this case is the one that Judge Andrews provided where he

19    substituted literally the word "display" for the word

20    "represent" in that element of the claim.

21           Second, every embodiment in the patent, in the

22    specification, refers to a physical display.  There aren't any

23    embodiments.  There aren't any examples where there is

24    information that is provided, particularly in the context of

25    claiming that it is representing something before it is handled

1        by third-party graphic software, or firmware, or something else.

2              In every context in which "displaying" or

3        "representing" occurs in the patent and in the specification, it

4        refers to an actual display that is visible to a person.

5              So I wouldn't know how to define "represent," if it

6        means something other than something that is perceptible to the

7        user of the device.

8              It would be -- I guess -- and related to that point, I

9        said there were only two, maybe this is three, your Honor.

10             It would be impossible to really tell, for the user to

11       tell, if the method were being performed if the Court adopts a

12       construction where there is some electrical signal that is sent.

13       And that qualifies as representing and yet nothing is visible to

14       the user.  The method requires that the user specify a field of

15       view.

16             And then, apparently, the method could go on.  And it

17       could -- the patent claim could be fulfilled, but the user would

18       never know that, which really defeats the whole point of what

19       the patent and the claim is trying to accomplish, which is a

20       display to the user.

21             THE COURT:  Well, that's the ultimate result of it.

22             But it seems to me that the references in Subsections E

23       and F to representing the data, we're talking about sending data

24       that is necessary to accomplish the display, rather than

25       referring to the actual display itself.

1        What is your view about the description of the software

2    that would be excluded under my tentative interpretation of the

3    claim?

4        In other words, accept for the moment that I am ruling

5    that this doesn't actually claim steps, don't actually require

6    the display to the user, doesn't require the use of a display

7    unit, and that the software associated with that display is not

8    part of the method.

9        How would you describe the scope of the software?

10        MR. SNYDER:  I don't know how I would draw that line,

11    your Honor.  I haven't heard a proposed definition until just

12    now from the plaintiffs.

13        And the suggestion of a third-party graphic software,

14    all that really says is it's other than the accused infringer,

15    other than the person practicing the patent.

16        I'm not -- that just -- that defines it by who owns it

17    and not by its operation, or by its function, or by its method.

18        THE COURT:  Well, I don't think that's what I would do.

19        I think what I would describe it as generic software

20    that is typically sold with the display device or used with the

21    display device.

22        In other words, it's generic software rather than

23    anything in particular adapted to Google Earth.

24        MR. SNYDER:  The difficulty there, your Honor, is that

25    generic to one person is probably not generic to another.

1          The accused software operates on a variety of different

2    platforms, different operating systems.  It works with those

3    operating systems, works with different hardware.  They're

4    supplied by a variety of different vendors.

5          So we're now engaged in a process of trying to draw a

6    line where there isn't any indication in the patent, or

7    certainly not in the specification, or the claims, of where that

8    line ought to be drawn.

9          THE COURT:  Well, if I go with my ruling, I'm going to

10   have to draw a line somewhere.  And I need to draw it in a way

11   that is comprehensible to the parties.

12         And the tentative ruling is that it wouldn't include

13   the display on the display unit.  I'm struggling for an accurate

14   description of -- a meaningful description of what software

15   associated with that display unit would be excluded from the

16   steps of the method claim.

17         MR. SNYDER:  And I apologize if I'm not being helpful

18   to the Court, your Honor.

19         It is a confounding problem, because when the claim

20   language uses the term "represent," if it doesn't mean that it's

21   showing something, displaying something to a user, we're now

22   talking about electrical signals organized in some way.

23         Does it depend on the format of those signals?  I

24   really don't know how to draw that line.

25         THE COURT:  Okay.  Is there anything further that you

1    want to address before we recess?

2              MR. SNYDER:  Nothing further, your Honor.

3              THE COURT:  Anything from the plaintiff?

4              MR. SPEARS:  I think in concept of genericness, it's a

5    perfectly decent way of describing the operations of this

6    software that go beyond the scope of the claims.

7              That software is generic in the sense that it works

8    with a variety of applications.  It's the same software that

9    would be rendering information tendered to it from Google Earth,

10   as would be rendering information tendered to it from any other

11   graphics application.

12             So generic is a perfectly good way of describing that

13   software and firmware.  This operation is outside the scope of

14   Claim 1.

15             THE COURT:  Okay.  Thank you.

16             Why don't we take a 15-minute recess and resume at

17   2:35.

18             We'll start addressing the final jury instructions.  I

19   don't think we're going to be able to resolve everything today.

20   I think we can make some progress.  And I have some questions

21   for all of you about that.

22             Thank you.

23             (A recess was held.)

24             (Court reconvened after the recess as follows:)

25             THE COURT:  Please be seated.

1          Well, this claim construction issue is difficult.  It's

2    close.  But I'm going to go with my tentative view that you need

3    to know for purposes of the trial.

4          So I will try to get an order out tomorrow.  Let me

5    give you claim construction now so you have something to work

6    with in preparing your witnesses and also the jury notebooks.

7          So I think this requires a revision in the language.

8    But I think of the meaning of Judge Andrews' original

9    construction of the number eleven representing the data for the

10   field of view and a pictorial representation having one or more

11   sections.

12         And Paragraph C under that, the Court's construction

13   would now read, "Providing the data necessary for displaying a

14   field of view in a pictorial representation having one more

15   sections.  However, the method of Claim 1 does not include the

16   final step, displaying the visual data image of the user, using

17   the hardware of the display device or using the generic graphic

18   software or firmware associated with that display device."

19         I'll read it once more to be sure you have it.

20         "Providing the data necessary for displaying the field

21   of view in a pictorial representation having one or more

22   sections.  However, the method of claim does not include the

23   final step of displaying the visual data image of user using the

24   hardware of the display device or using generic graphic software

25   or firmware associated with that displace device."

1           Are there any questions about that?

2           MR. PARTRIDGE:  No.  That's understandable, your Honor.

3   Thank you.  That's helpful.

4           THE COURT:  Mr. Snyder?

5           MR. SNYDER:  No questions, your Honor.

6           THE COURT:  Thank you very much for all your work in

7   helping me with that.

8           Let's turn now to the final jury instructions.

9           I know some of these are going to affect how you

10  present your case.  We may not get through all of them.  Let's

11  be sure that we get through those that are necessary for that

12  purpose.

13          The first one that I have is on Page 9.  And there at

14  the bottom of the page, I'll go with Google's proposal, every

15  step in the claim requires.

16          Is there going to be an agreement that some of the

17  steps of the method are performed by Google or is there a

18  dispute as to more than E and F?

19          MR. PARTRIDGE:  Your Honor, if I may?  Could you say

20  that again?  I had trouble hearing it.

21          THE COURT:  Yes.  I said is there a dispute about the

22  performance of the steps of the method other than E and F?

23          In other words, is it possible to tell the jury that

24  there's agreement that some of the steps are performed, and

25  there's an issue concerning whether E and F are performed?

1          MR. SPEARS:  I believe that would be for Google to

2     speak to it.

3          MR. SNYDER:  Your Honor, our defense will not be

4     limited to E and F.  We will need to consider the Court's new

5     claim construction.  There may be some steps that we can agree

6     are not being challenged by Google.

7          But at this point, I know it will go beyond E and F.

8          THE COURT:  Why don't we leave it this way.

9          Why don't you be prepared to include in the post-final

10    jury instructions what you do dispute so we can focus the jury

11    on what they should be deciding and not having them concern

12    themselves with other steps of the methods which aren't in

13    dispute.

14         MR. SNYDER:  Understood, your Honor, yes.

15         THE COURT:  The next one I have is 9a on Page 12.

16         There's a bracket here.

17         "(ACI Proposal; by distributing the accused Google

18    Earth products and New Google Maps)".

19         What's the matter with that?

20         MR. SPEARS:  Your Honor, I think we can short circuit

21    this.

22         At the point that you were headed with claim

23    construction, it becomes an actual order of the Court.  We're

24    going to withdraw our claims of induced infringement.  They

25    won't be in the case any more.

1          And I anticipate that we'll need to make some minor

2     changes in the preliminary instructions, but it will be

3     perfectly clear to you that they just disappeared.

4          THE COURT:  Okay.

5          MR. SPEARS:  One point I'd like to go back to, while

6     I'm up here.

7          With respect to the point at the bottom of Page 9.

8          Did I hear the Court say that it was going to go with

9     Google's proposal and instruct that every step in the claim has

10    to be in required order?

11         THE COURT:  Yes.

12         MR. SPEARS:  Our understanding is that's counter to the

13    operative presumption that generally we don't construe claims,

14    steps of the method claims to be performed in order.

15         THE COURT:  I thought that was part of Judge Andrews'

16    claim construction.

17         Am I wrong?

18         MR. SPEARS:  No.  That was not part of Judge Andrews'

19    claim construction.  Judge Andrews' claim construction was

20    directed to a very narrow issue concerning the order of

21    operation the dividing and requesting substeps of Step F.

22         Judge Andrews has never addressed that issue, because

23    the parties did not raise to him whether the main steps A, B, C,

24    D, E, F and G need to be performed in order.

25         The operative presumption under Altiris is that,

1    indeed, they did not.

2         THE COURT:  Okay.  Mr. Snyder?

3         MR. SNYDER:  My partner, Ms. Simmons, will address

4    this.

5         MS. SIMMONS:  Your Honor, actually, we do believe that

6    this was covered by Judge Andrews' Order, which was repeated, I

7    believe, in your Order from May 16th that the steps do need to

8    be performed in order.

9         And I don't know that it's been in dispute, because I

10   think everybody has worked under the assumption that the steps

11   do need to be performed in order.

12        THE COURT:  Can you point me to where that is in Judge

13   Andrews' claim construction?

14        MS. SIMMONS:  It was in your Order on Page 3, Docket

15   382.  Let me just see if I can get the cite to Judge Andrews'

16   Order.

17        Sorry.  One second.

18        (Pause)

19        I would refer the Court in Judge Andrews' memorandum

20   opinion to Section 12, which appears on Page 17.

21        And here it makes clear that with respect to this

22   particular step, there is a dispute as to whether the dividing

23   and requesting has to be performed in the same order.

24        That's the dispute that Judge Andrews resolved.

25        There was no dispute every presented as to whether the

1    main steps, A through G, need to be performed in the recited

2    order.  And Google has never taken that position in this case.

3    And Judge Andrews has never found that those steps, A through G,

4    need to be performed in order.

5             MR. SPEARS:  And the steps that he's referring to are

6    the dividing and requesting substeps of Step F.

7             THE COURT:  Well, okay.  I'm going to have to look at

8    this again.

9             MR. SPEARS:  Okay.

10            MS. SIMMONS:  Your Honor, if I could have one final

11   point on that?

12            THE COURT:  Sure.

13            MS. SIMMONS:  The claims themselves require, if you

14   read the claims, the necessary predicate.  So if you go through

15   the claims, there is no way they could be read out of order.

16            THE COURT:  Wait, wait.  I'm inclined to think that's

17   right.

18            MR. SPEARS:  This is a brand new claim construction.

19   If you refer back to the original claim construction brief

20   submitted by the parties, you will see not nary a hint of this

21   argument by Google.

22            Moreover, the experts, none of the experts have

23   addressed order of operation with respect to Claims A through G.

24   Neither their expert nor ours, for the simple reason that no

25   such construction was ever advanced to be resolved by Judge

 1    Andrews.

 2              THE COURT:  I get you.

 3              The next one I have is on Page 14.

 4              And I propose to change the language of the ACI

 5    proposal to read as follows.

 6              "Patents issued by the PTO I presume to be valid, but

 7    not all patents that are issued by the PTO are, in fact, valid.

 8    You may find the patent invalid if Google establishes necessary

 9    facts by clear and convincing evidence."

10              MR. SPEARS:  That's acceptable to ACI, your Honor.

11              MS. SIMMONS:  We also approve, your Honor.

12              THE COURT:  And then on Page 15, I'm not sure that I

13    understand the dispute that is reflected in the middle of the

14    page there.

15              MR. SPEARS:  This dispute has some history, your Honor.

16              And this basically relates to what we are going to call

17    the prior art references that the jury is going to hear about.

18              THE COURT:  Just to short circuit this, I postponed the

19    decision until whether I was going to instruct the jury that

20    some of these things didn't qualify as prior art references.

21              Is this just a marker for that?

22              MR. SPEARS:  This is a completely separate issue, your

23    Honor.

24              THE COURT:  What is it?

25              MR. SPEARS:  Throughout the proceedings in this case,

1    their expert has referred to these references as Sauter, Leclerc

2    and Fuller.

3            It's in his expert report and it's how he testified in

4    his deposition.  And now they want to come in at trial and give

5    them a completely different name.

6            So if their expert starts talking about the T_Vision

7    paper, the SRI Technical Note, and the MAGIC report, to

8    cross-examine him on his prior testimony, and his expert report

9    was executed under oath, so it is prior testimony.

10           We've got overcome to this hurdle, because the language

11   in his prior testimony is not the language that he's going to be

12   using when he testifies in response to these references.

13           THE COURT:  Okay.  I get the point.

14           Let me hear from the other side.

15           MS. SIMMONS:  Your Honor, we simply propose using the

16   names that are descriptive of what the prior art reference is to

17   assist the jury in keeping track of everything.

18           Our concern was that there would be a lot of peoples'

19   names that will be floating about and using a name that is

20   descriptive or taken from the title of the actual reference.

21           We thought would help the jury to understand better.

22   And we're certainly not going to argue that our expert can't be

23   impeached based on the switch of the names.

24           THE COURT:  Well, what you're proposing is that your

25   expert is going to be using this terminology in his direct

1    testimony?

2              MS. SIMMONS:  Yes, your Honor.

3              THE COURT:  I think they're entitled to do that.

4              So we'll use the same terminology that Google uses in

5    the testimony of its experts.  And, if necessary, we'll tell the

6    jury that the four references is the same MAGIC report or

7    vice-versa.

8              MS. SIMMONS:  Thank you, your Honor.

9              THE COURT:  Page 16.  I found the proposed instructions

10   a bit confusing insofar as public use defense is concerned.

11             If I understand correctly, there are basically three

12   invalidity defenses here.  There is anticipation, obviousness,

13   and there's public use.

14             If I understand the cases correctly, a public use can

15   also create a piece of prior art that can be used for an

16   obviousness analysis.

17             Do counsel agree with that way of saying it?

18             MR. SPEARS:  Yes, your Honor.

19             MS. SIMMONS:  Yes, your Honor.  And for anticipation as

20   well.

21             THE COURT:  I don't understand anticipation.

22             If it is public use, it's invalidating.

23             Why is it necessary to always describe it as

24   anticipation?

25             MS. SIMMONS:  Is your Honor proposing that the public

1    use would render --  would just be clarified as invalidating, as

2    opposed to obvious versus anticipation?

3           THE COURT:  Yes.  What I was proposing is that the

4    instructions be written in such a way that the jury is told that

5    there's three defenses.

6           There's anticipation, there's obviousness, and there's

7    public use.  And the public use could also be used as prior art

8    in the obviousness analysis.

9           MS. SIMMONS:  I guess I'm not understanding why it

10   would be limited to the obviousness analysis.

11          THE COURT:  The public use by itself would be

12   invalidating.

13          MS. SIMMONS:  Understood.

14          THE COURT:  I think it's just confusing to talk about

15   it as anticipation.

16          MS. SIMMONS:  Understood.  Understood.

17          THE COURT:  So if you could all get together and clear

18   that up.

19          MR. SPEARS:  I think we can do that, your Honor.

20          The other point of disagreement with ACI and Google

21   deal with what are the aspects the public use that the jury

22   needs to be instructed on.

23          I believe we can't have an intelligent conversation

24   about that until the evidence is in.

25          THE COURT:  Until?

1          MR. SPEARS:  Until the evidence is in.

2          THE COURT:  Okay.  Let's postpone that.

3          On Page 17, I'm going to adopt the Google proposal to

4    call these references instead of publications.

5          And then, again, I guess it's under Item 13, that's

6    just a question of terminology that we resolved earlier, right?

7          MR. SPEARS:  Exactly.

8          THE COURT:  Okay.  Item 16 on Page 21.

9          Is it ACI's position that the only infringement that is

10   of the second reissued patent and that there are intervening

11   rights before that?

12         MR. HAWES:  Your Honor, that is not our position.

13         But in order to keep that issue -- keep that issue out

14   of the case and simplify it, we have only asked for damages

15   since the July 13th, 2010 date.

16         THE COURT:  Well, that's the date of the second

17   reissue.

18         MR. HAWES:  It is.  And, so, we thought we could

19   simplify the case if our expert only calculated the damage model

20   based on sessions started on that date.

21         And I believe the plaintiff -- I'm sorry -- your Honor,

22   it's actually the first reissue.

23         THE COURT:  The first reissue.

24         MR. HAWES:  Then there is a second.

25         We have not asked for -- our only damage model is for

1     sessions occurring on or after that date.

2            And as plaintiff, we believe we can ask for damages for

3     the time frame that we're asking for damages.

4            THE COURT:  Why does Google want the 2008 date?  Does

5     this relate to the dispute about the hypothetical negotiation?

6            MS. SIMMONS:  It does, your Honor.

7            So we're happy for the plaintiff to limit the damages

8     period.

9            THE COURT:  I would have thought so.

10           MS. SIMMONS:  The problem is, as your Honor anticipated

11    with the hypothetical negotiation date, which by law is supposed

12    to be set at the time of the first infringement.

13            And as you'll note on Page 22, we've added an

14    instruction about that.

15           Google Earth was released in June of 2005.  That,

16    therefore, should be the date of first infringement -- I'm sorry

17    -- the date of the hypothetical negotiation.

18           THE COURT:  Well, but you certainly don't want to tell

19    the jury to start awarding damages from an earlier date, right?

20    You do want the 2010 date in here under 16?

21           MS. SIMMONS:  I suppose that that's okay, as long as

22    the jury understands that the relevant period for the

23    negotiations and damages that could have been sought could go

24    back further, because the hypothetical negotiation should have

25    been in 2005.

1              THE COURT:  Let's address that.

2              I mean, you certainly don't want an earlier date for

3      the award of damages.

4              So your theory is what, the original patent was issued

5      in 2000, and the infringement began in 2005, and that should be

6      the date of the hypothetical negotiation?

7              MS. SIMMONS:  That's correct.  That's when Google Earth

8      was released.

9              THE COURT:  Okay.  Let's hear from ACI.

10             MR. HAWES:  So, your Honor, we have only asserted and

11     only are asking for damages with regard to the claims of the

12     first reissue.  And there was a claim amendment in the first

13     reissue in order to reduce the number of issues in this case and

14     keep an appellate issue from being present.

15             We just said, we're going to ask for damages based on

16     the claims on the first reissue.  And we're not going to try to

17     -- we're not going to seek to prove whether or not we ought to

18     be able to go further back into those claim amendments were

19     insubstantial.

20             We just -- we won't even ask for that.  All we're going

21     to ask for is damages for the claims of the first reissue.

22             THE COURT:  Yes.  But I don't think that by picking a

23     particular damages date, you can fix the date of the

24     hypothetical negotiation by doing that.

25             If the claims were identical in the originally issued

1    patent, as in the first reissue, it seems to me that they have a

2    point.  The hypothetical negotiation should be, you know,

3    immediately before the first patent.

4              MR. HAWES:  So, your Honor, first of all, I would like

5    to say that we have not accused the Google Earth product that

6    was available in 2005.  It's not among the accused products.

7              But, secondly, I would point out that these claims are

8    not identical.  So if we had wanted to go before 2010, we would

9    have needed -- it was our burden to say, hey, these claims are

10   not substantially different under the Section 252 test.

11             We did not attempt to do that.  We said, we're just

12   going to live with the 2010 date.  That's the claim that we're

13   going to seek to enforce.

14             We have never raised or attempted to.  And it's not

15   that the claims are identical.  They are not.

16             THE COURT:  Has either side found any authority about

17   this situation?

18             I have never seen before or heard of where there is a

19   question as to whether the hypothetical negotiation should be

20   the date of the original patent or reissued patent.

21             MR. HAWES:  We did not, your Honor.  We did not find

22   authority on point.

23             What we did find was authority that, one, it was our

24   burden if we wanted to go forward with regard to seeking the

25   earlier date, that was our burden.

1          And, two, that the plaintiff is allowed to determine

2     how much -- you know, in making a claim, the plaintiff is

3     allowed to determine how much of the damages they are going to

4     seek.

5          And we believe, based on that law, that we ought to be

6     able to seek the damages for the claims in the first reissue and

7     that we also are able not to seek to show that they are not

8     substantially different.

9          But your Honor, I don't have a case on point right now.

10         THE COURT:  What's Google's response to the point that

11    the infringing method, accused infringing method, was different

12    in June 2005?

13         MS. SIMMONS:  Your Honor, to the extent the claims are

14    different at all, Dr. Castleman, plaintiff's technical expert,

15    testified that the differences were immaterial.

16         THE COURT:  Immaterial to what?

17         MS. SIMMONS:  To the infringement analysis.

18         THE COURT:  Any differences between the 2005 Google

19    Earth and the 2010 Google Earth?

20         MS. SIMMONS:  No.  To the different patents -- I'm

21    sorry -- to the original patent versus the later patent.

22         THE COURT:  I'm not asking about that.

23         I'm asking about whether the product, 2005 Google

24    product, is the same or materially different from the 2010

25    Google product?

1           MS. SIMMONS:  I don't know that there has been any

2     testimony as to the changes from 2005.

3           The accusations in the Complaint go back to 2008.  The

4     statutory, the six years prior to the filing date.  I believe

5     there has been testimony at least as far as back as 2008.

6           The concern that Google has about this, to be candid,

7     is that the plaintiff shouldn't be allowed to move the

8     hypothetical negotiation to avoid a laches problem, which I

9     believe is what's happening.

10           THE COURT:  I don't disagree with that.

11           It's difficult for me to resolve the question right

12     now.

13           For the moment, I'm going to assume that the original

14     claim, the claim after the first reissue, are not materially

15     different for purposes of the hypothetical negotiation.

16           But there is a question of whether the product existed,

17     which product existed at that time, which is substantially the

18     same as the 2010 product.

19           I think that I -- I think the only way to deal with

20     this is to allow the parties to put in expert testimony as to

21     what the hypothetical negotiation date is.  And based on that

22     testimony, to resolve the issue after the evidence comes in,

23     because I don't think I know enough now about the similarity

24     2005 and 2010 product.

25           I mean, I don't think you can have a hypothetical

1    negotiation in 2005, about a different product that wasn't

2    introduced until, let's say, 2010.

3           MS. SIMMONS:  Understood.

4           THE COURT:  Okay.

5           MR. HAWES:  Understood, your Honor.

6           THE COURT:  My next item here -- unless I skipped

7    something -- I'm on 23.

8           ACI says, well, whether the -- what's the point of

9    bracketed material in 4?

10          MR. HAWES:  Your Honor, I'm happy to address that.

11          There was an issue -- another issue at the bottom of

12   instruction 17.

13          THE COURT:  17?

14          MR. HAWES:  Well, I'm --

15          THE COURT:  Let's go back.

16          MR. HAWES:  Okay.

17          Well, I'm inclined to adopt ACI's proposal here rather

18   than Google's proposal.

19          So why don't you put that in the draft?

20          MR. HAWES:  Yes, your Honor.

21          Now would you like me to address that next point?

22          THE COURT:  Yes.

23          MR. HAWES:  So, your Honor, in the <u>Georgia-Pacific</u>

24   factor it gives two examples.

25          Whether they are competitors and then whether they are

1    inventor and promoter.

2         Those are two data points for the jury to use in an

3    assessing the relationship between Google and ART+COM.  Google

4    has kind of arbitrarily removing one of those points and leaving

5    the other one there.

6         All we ask is that both of the examples that the

7    Georgia-Pacific factors give for what kind of relationship there

8    may be, be included.

9         THE COURT:  Well, I don't have the Georgia-Pacific

10   factors in front of me.

11        Can you read Item 5 from the jury instructions?  Do you

12   have it there?

13        MR. HAWES:  I believe ours, except for the change of

14   plaintiff and defendant, is the language in Georgia-Pacific.

15   And it does -- Georgia-Pacific does end with, "or whether they

16   are inventor and promoter."

17        THE COURT:  I'm not sure I understand what that means.

18        What is your understanding?

19        MS. SIMMONS:  Your Honor, that was our same concern.

20   It's not even explained in a way that the jury would understand

21   what it means.

22        And, in addition, there is no evidence that there is

23   any promotion or argument that Google somehow promoted an

24   invention of ACI.

25        MR. HAWES:  Your Honor, on that, there is no evidence

1      that we are competitors in the same territory and the same line

2      of business.

3              So if that's Google standard, we should just take out

4      this entire factor.

5              THE COURT:  Well, that's a problem that I have with

6      some of this boilerplate.  And I haven't gone through this.

7              You can see from the Stragent case, I insisted that the

8      boilerplate had nothing to do with the evidence coming out.

9              So, again, I'm going to want to do that with respect to

10     these Georgia-Pacific factors when we get to the conclusion of

11     the evidence.  And if there isn't any evidence about a

12     particular factor, I'm not going to instruct the jury about it.

13             So let's wait until then and see if we have any

14     evidence.

15             MR. HAWES:  Can I make a proposal that might simplify

16     it, your Honor?

17             THE COURT:  Yes.

18             MR. HAWES:  Could we just make it the commercial

19     relationship is between ACI and Google?

20             THE COURT:  Is there a relationship?

21             MR. HAWES:  There were discussions.

22             THE COURT:  Why don't you put that in a draft and see

23     where we are.

24             MR. HAWES:  Yes, your Honor.

25             THE COURT:  We're now at Item 11 at the top of 24, is

1    that right?

2            MR. HAWES:  That's correct, your Honor.

3            THE COURT:  What's the difference between the two?

4            MR. HAWES:  Your Honor, we used the language from

5    Stragent, which says realizable profits, which we think is

6    important given our damages model.  And that it should be

7    credited.

8            And Google is using "a portion of the profit that

9    arises."

10           And we think it is an important difference in view of

11   the damages model and the extent to which Google credited

12   certain revenue to Google Earth.

13           THE COURT:  All right.

14           Why don't you put the ACI proposal in the next draft.

15           And when we get to the end of this, you'll have some

16   opportunity to object.  I'm just trying to give you some

17   guidance for preparing the next draft.

18           Why don't you use the ACI proposal.

19           MR. HAWES:  Understood, your Honor.

20           THE COURT:  What's going on at the bottom of 24 here?

21           MR. HAWES:  Your Honor, we believe this is repetitive

22   with Instruction 20, but it's Google's proposal, so I will let

23   them speak to it.

24           MS. SIMMONS:  Your Honor, the instruction at the bottom

25   of 24, it's true it does cover the same material that is covered

1    in 20, but it's relevant to the factors that are being

2    considered.  Particularly, the one we just discussed, No. 11.

3           We think it's important for the jury to understand,

4    particularly given the concerns that Mr. Nawrocki will be

5    drawing on revenue sources that aren't tied back to Google Earth

6    or any of the other accused products.

7           We want to make sure that the jury understands, as it's

8    considering this, that the award must be based on an incremental

9    value that is --

10          THE COURT:  Let's include this in the final instruction

11   in the Google proposal.

12          Now, with respect to 25, I think Google's proposal is

13   wrong in saying it's capped by an incremental profit.

14          We have a couple of recent cases that said that's not

15   the case.

16          If I leave out the capped, "Incremental Profit," is

17   there any other difference between the two proposals?

18          MR. HAWES:  And, your Honor, I believe the last

19   sentence of Google's is a significant difference, because it's

20   actually an instruction by the Court for the jury to consider

21   the single to actually set forth.

22          THE COURT:  I'm not going to include that.

23          MR. HAWES:  I think they are very close once you take

24   those two things out.

25          But I would have to double check, your Honor.  We can

1      work that out.

2           THE COURT:  If Google wants to include in this case

3      that Google contends that use of single data point as a

4      non-infringing alternative, if that is the main point that you

5      are making, we can include that.

6           MS. SIMMONS:  It is.  Just so the jury understands.

7           THE COURT:  Well, I'm not going to tell them.  You can

8      tell them that's what you contend.

9           THE COURT:  That brings us up to Page 27?

10          MR. HAWES:  I believe so, your Honor.

11          My concern with Instruction 20 now is that I think it's

12     repetitive of the language that we added in the factors list.

13          THE COURT:  Okay.  Well, I'm not going to deal with

14     repetitiveness today.

15          MR. HAWES:  Okay.  Then the only difference between the

16     proposals is that we felt for a method claim, the proposal has

17     Google has is from Stragent, but that was not a method claim,

18     your Honor.  And we tried to adopt it, so that it was

19     appropriate for a method claim, where it's more about the

20     functionality than it is components or features.

21          I think the language is similar.  It's just a question

22     of do you focus on functionality or do you focus on components

23     and features?

24          THE COURT:  What's Google response to ACI?

25          MS. SIMMONS:  The term "functionality," it's too broad.

1   It's not limited to the specific aims claimed method, so

2   functionality is displaying Earth?

3           I don't know.  Our concern is that it ends up being too

4   broad and that it reaches beyond what the actual specific

5   claimed method is, and the feature that is accused of

6   infringing.

7           THE COURT:  Why don't you change it to say, it covers

8   -- the performance of the accused method damages must be based

9   upon value of the accused method contributes to the overall

10  revenues or something like that?

11          MR. HAWES:  Your Honor, can I propose that we replace

12  "functionality" with "method," so there would be damages tied to

13  a patented method?

14          And then in --

15          THE COURT:  Well, it can't say kind of method.  I mean,

16  when the claim covers the method --

17           MR. HAWES:  I was looking at the title of the

18  instruction, your Honor, "Damages Tied to Patented Method."

19          But inside we could say, when the claimed invention

20  covers some of the methodology of the accused product, damages

21  must be based upon the value of that.

22          THE COURT:  That's confusing.  It needs to refer to the

23  claimed method.

24          In this case, the value of the product is based on

25  things other than the performance of the accused method of the

1      patented method, blah, blah, blah.

2             MR. HAWES:  I'm happy to take a shot at that and see if

3      we can agree on that.

4             We'll see if we can do something in line with what

5      you're saying, your Honor.

6             THE COURT:  Okay.  Thank you.

7             THE COURT:  Now, what is Google's proposal as to what a

8      small saleable unit is here?

9             MS. SIMMONS:  Google Earth.

10            THE COURT:  And what does that mean?

11            That you -- they can't include any revenues coming from

12     anything else?

13            MS. SIMMONS:  Well, the last paragraph is the paragraph

14     that we tried to address -- used to address that issue.  And

15     this was addressed by the Court previously in a previous

16     argument.

17            To the extent they are going to attempt to tie other

18     revenue sources back to the value of using the claimed invention

19     in Google Earth, they can only do so if they can show that those

20     drive the demands for the unaccused products.  There had to be

21     some tie back --

22            THE COURT:  No.  I don't think it has to drive demand

23     for the other products.  I think if it contributes to the demand

24     for the other products, there is an argument for getting royalty

25     on some of that revenue.

1          To the extent -- I mean, to the extent that other

2     revenue is generated by the use of this feature, then they are

3     entitled to include that in the revenue base, a portion of that

4     revenue base to apply a royalty.

5          MR. SNYDER:  And we would agree with the proposal, if

6     that's the way your Honor is leaning, that the instruction

7     specify that the other revenue sources have to specifically rely

8     upon the accused product and that there must also be a proper

9     apportionment, based on your Honor's previous Order.

10         THE COURT:  Well, I agree with the second part of that.

11    There has to be a proper apportionment.

12         I don't agree with the first part of that.

13         I think if Google Earth makes a contribution to the

14    other revenue stream, that you can apportion a part of that

15    revenue stream to Google Earth.

16         That would be my view.  It all depends on whether they

17    can prove that.

18         Does that give you some guidance as to how to redraft

19    this?

20         MS. SIMMONS:  It does.  I assume I would simply refer

21    back to your Honor's Order that they use the language to the

22    extent that the various revenue sources rely upon the accused

23    product, and that language would be acceptable to Google as

24    well.

25         THE COURT:  Well, I don't think the jury can understand

1    what rely upon means in that context.  I think the other revenue

2    sources are increased as a result of the Google Earth product or

3    something like that.

4            MS. SIMMONS:  Do you want to meet-and-confer on that as

5    well.

6            MR. HAWES:  We can.  This might be something that we

7    deal with once the evidence is in to see what happens.

8            THE COURT:  Okay.  Why don't you see if you can come up

9    with something tentatively.  Or if there is a difference, we can

10   address it later.

11           I think the drives the demand is not the right

12   formulation.

13           MS. SIMMONS:  Understood.

14           MR. HAWES:  Understood, your Honor.

15           I believe that was all of them, your Honor.

16           THE COURT:  Okay.  I think for the moment that's all I

17   have.

18           Does either side have anything more that you want to

19   discuss today?

20            THE COURT:  I guess there's the verdict form.

21           Is there anything different about the verdict form that

22   we ought to talk about?

23           MR. PARTRIDGE:  Your Honor, the verdict forms are quite

24   different.  And I would suggest that we simply wait completely

25   on that, because I think you'll be able to tell, once you hear

1    the evidence, whether or not the more complicated verdict form

2    that Google proposes compared to the simpler one we have is

3    appropriate.  And, in particular, part of the complication is

4    the separation of each of the different Google Earth products.

5           I think the evidence is going to show that the

6    technology is the same across the board and there is no need for

7    the extra complication.

8           But I think when you hear all the evidence, it's going

9    to pretty easy for you to choose as between these verdict forms.

10          MS. SIMMONS:  I agree, your Honor.  I think that's

11   fair.

12          THE COURT:  Okay.  Now, what I'd like you to do is

13   prepare a new draft of the final jury instructions and to have

14   that available Monday morning, is that feasible?

15          MR. PARTRIDGE:  Yes, your Honor, I think it is.

16          MS. SIMMONS:  Yes, your Honor.

17          THE COURT:  That would be helpful.

18          Do try to leave out the boilerplate that doesn't have

19   anything to do with this case.  I think it's very confusing to

20   the jury.

21          Anything else we should be dealing with today?

22          MR. PARTRIDGE:  Your Honor, the only thing I would add,

23   I guess we'll see you at 8:30 on Monday morning --

24          THE COURT:  Right.

25          MR. PARTRIDGE:  -- to deal with any issues that we

1   have.

2           THE COURT:  Yes.

3           MR. PARTRIDGE:  The one concern I have, and I'm sure

4   this is Mr. Snyder's experience as well, is that sometimes at

5   the first day of trial of there may be more guidance that we

6   need.  And then the next number of days it's a little easier to

7   deal with the issues, because we know how you're approaching

8   things.

9           So with respect to demonstratives for openings, and

10  demonstrative for witnesses, and the exhibits, my only concern

11  is whether or not that 30 minutes will be enough and whether we

12  should do 45 on Monday morning.  Just to be safe in case there

13  are more issues than 30 minutes will allow, because I'd really

14  like -- and I know your Honor wants to get the jury in the box

15  than and get the case started at 9:00 o'clock sharp.

16          MR. SNYDER:  We will, of course, try to reduce the

17  number of objections that the Court has to resolve Monday

18  morning.

19          But it is true that if we don't get -- we don't know

20  how many there will be and we'll be guided by the Court's

21  schedule.

22          If you want us here at 8:15, we'll be here.  If you say

23  8:30, we'll be here.

24          THE COURT:  Let's do 8:30.  If we have to keep the jury

25  waiting for a few minutes, we'll do that.

1              MR. SNYDER:  Thank you, your Honor.  We don't have

2     anything further.

3              THE COURT:  Thank you very much.

4              I will see you at 8:30 on Monday morning.  Again, I

5     think counsel are working well together and I appreciate that.

6              (The proceedings adjourned at this time.)

7                        *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25