IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


ART+COM INNOVATIONAL POOL, ) Trial Volume 2
GmbH,                      )
          Plaintiff,       )
                           ) C.A. No. 14-217-RGA
v.                         )
                           )
GOOGLE INCORPORATED,       )
                           )
          Defendant.       )


                    Monday, May 23, 2016
                    8:35 a.m.
                    Courtroom 6A


                    844 King Street
                    Wilmington, Delaware


BEFORE:  THE HONORABLE TIMOTHY B. DYK,
         United States District Court Judge




APPEARANCES:


          FARNAN LLP
          BY:  BRIAN E. FARNAN, ESQ.
          BY:  MICHAEL J. FARNAN, ESQ.

               -and-

          BAKER & BOTTS
          BY:  SCOTT F. PARTRIDGE, ESQ.
          BY:  MICHAEL A. HAWES, ESQ.
          BY:  LARRY G. SPEARS, ESQ.
          BY:  TIMOTHY ROONEY, ESQ.


               Counsel for the Plaintiff

```
1      APPEARANCES CONTINUED:

2


3


4              MORRIS, NICHOLS, ARSHT & TUNNELL
               BY:  JACK B. BLUMENFELD, ESQ.
5
                         -and-
6
               O'MELVENY MYERS, LLP
7              BY:  DARIN SNYDER, ESQ.
               BY:  LUANN L. SIMMONS, ESQ.
8              BY:  BRETT WILLIAMSON, ESQ.

9                        Counsel for the Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    THE COURT:  Good morning.  Please
 2       be seated.  Before we bring in the jury, I'm
 3       sure counsel has things they needed to address.
 4                    MR. PARTRIDGE:  I couldn't hear
 5       you, Your Honor.
 6                    THE COURT:  I said before -- why
 7       don't we try to do it.  I'm sure that you have
 8       various issues to raise so why don't we start
 9       with those before we bring the jury.
10                    MR. SNYDER:  Thank you, Your
11       Honor.  To try to take them in a little bit of
12       order, there are three minor corrections to the
13       preliminary jury instructions based on -- one is
14       I believe a correction and two that are the
15       result of intervening events.  And Ms. Simmons
16       is going to describe each of those.  These are
17       agreed.
18                    MS. SIMMONS:  Yes, Your Honor.
19       Thank you.  The first one is on page eight of
20       the version that Your Honor handed out at the
21       pretrial conference.
22                    THE COURT:  Is that the page that
23       begins -- how does the paragraph begin because
24       I'm not sure my pagination is the same as yours.
```

```
 1              MS. SIMMONS:  Understood.  It's

 2      the first paragraph under paragraph seven,

 3      patents, that section.  It starts, "Now, a

 4      little bit about patents."

 5              THE COURT:  Okay.

 6              MS. SIMMONS:  The very last

 7      sentence on that paragraph says Immersion has

 8      done that here and the parties agree that should

 9      be ACI has done that here.

10              THE COURT:  Okay.

11              MS. SIMMONS:  The next item is on

12      page 11 of the version that was handed out.

13      This is under the same section, the patent

14      section, paragraph begins ACI alleges that

15      Google has infringed certain claims.

16              THE COURT:  Yes.

17              MS. SIMMONS:  The second sentence.

18      Same issue in the next paragraph, the second to

19      last sentence begins.

20              THE COURT:  Even if.

21              MS. SIMMONS:  Correct.

22              THE COURT:  And the next sentence

23      induced infringement, also.

24              MS. SIMMONS:  Yes, Your Honor.
```

```
 1        That's all of the agreed.

 2                    MR. HAWES:  Those are agreed by

 3        ACI.

 4                    THE COURT:  Thank you.

 5                    MS. SIMMONS:  The next issue

 6        relates to Google's objections to ACI's opening

 7        slides.  Would Your Honor like to hear that

 8        issue now?

 9                    THE COURT:  Okay.

10                    MS. SIMMONS:  The first objection,

11        Your Honor, actually if I could hand up a copy I

12        could show you what the slides are that I'm

13        speaking of.

14                    THE COURT:  If you can give it to

15        her.

16                    MS. SIMMONS:  Absolutely.

17                    THE COURT:  Okay.

18                    MS. SIMMONS:  The first slide is

19        slide eight.  I'm not sure that they're numbered

20        so if I could put it up on the screen.  Google

21        objects to the final item on this slide

22        describing ACI's expert, Dr. Castleman, the

23        filed expert reports for the patent office

24        bullet.  The concern there is that it's
```

```
1    prejudicial and will confuse the jury that there

2    is some relationship between Dr. Castleman and

3    the patent office.  And that's not accurate.

4                THE COURT:  Let me ask ACI, what

5    was the basis for that statement?

6                MR. HAWES:  So Dr. Castleman is in

7    fact acting as an expert in cases for the patent

8    office is one of his experiences.  What they're

9    not owning is the technology is the video

10   processing technology.  It's very much part of

11   his experience, it's related to the case because

12   it is work in the same technical area.

13               THE COURT:  How is the patent

14   office using expert witnesses.

15               MR. HAWES:  The patent office has

16   been sued in district court by Mr. Hyatt and the

17   patent office has asked Dr. Castleman to prepare

18   expert reports in a technical area that's very

19   related.  It was gone over in his deposition and

20   there is no question about the relevance here.

21               THE COURT:  You agree that he did

22   this work for the patent office?

23               MS. SIMMONS:  Yes, Your Honor.

24   Our concern is about prejudice that it will
```

```
1     confuse the jury that somehow he is an affiliate

2     of the patent office or a spokesperson for the

3     patent office.

4                  THE COURT:  Well, I think you can

5     clear that up on cross-examination.

6                  MS. SIMMONS:  Okay.

7                  THE COURT:  That objection is

8     overruled.

9                  MS. SIMMONS:  The next objections

10    relate to slides 6, 15, 21, 27 and 33.  These

11    are all related to the same issue.  They relate

12    to the issue that Your Honor ruled on with

13    respect to Google's motion in limine number one.

14    These slides relate to issues that go to the

15    issue of the allegation that Google and

16    particularly Michael Jones copied information

17    based on a demonstration that ACI gave at SGI,

18    Michael Jones's former employer, back in 1995.

19                  And at the pretrial conference ACI

20    agreed that it would not argue copying, but the

21    slides are relevant to nothing other than

22    copying.  If I can give you an example.  Slide

23    number six.

24                  THE COURT:  This just identifies
```

```
1      the people; right?
2                  MS. SIMMONS:  But it shows the
3      people next to the SGI demonstration of ACI's
4      system, and there is no relevance of Michael
5      Jones and Mr. McClendon having seen the
6      demonstration at SGI other than to imply
7      copying.  It's not relevant to any other issue
8      in this case.
9                  THE COURT:  Well, they're going to
10     try to make it relevant.  That's overruled.  Do
11     any of these slides that you're objecting to say
12     anything about copying?
13                 MS. SIMMONS:  They don't have the
14     words on the slide, no.
15                 THE COURT:  That's overruled.
16                 MS. SIMMONS:  To be clear, Your
17     Honor, is plaintiff allowed to then imply
18     copying when it's speaking about these slides?
19                 THE COURT:  I don't know what
20     implied copying is.  Let's see what the
21     questions are and then we'll deal with them
22     then.
23                 MS. SIMMONS:  Okay.  I believe all
24     the other slides that we object to in the
```

```
 1    opening relate to the issue that what happened

 2    at SGI with the demonstration that ACI did that

 3    again it's our position relate to anything other

 4    than copying, there is no other relevance.

 5                      THE COURT:  We'll see what

 6    happens.

 7                      MR. HAWES:  Do you want me to just

 8    tell the Court what the relevance is?

 9                      THE COURT:  No, I heard that

10    before.  If you start getting close to the

11    copying issue, we're going to sustain objections

12    to that.

13                      MR. SNYDER:  We have some

14    objections, Your Honor, to a few of the

15    remaining deposition designations.  So we have a

16    few objections to deposition designations that

17    plaintiff indicated it intends to play today for

18    witnesses Michael Jones and Peter Birch.

19    Ms. Simmons will describe those in more detail.

20                      MS. SIMMONS:  We actually withdrew

21    the objections to the designations for

22    Mr. Birch.

23                      As to Mr. Jones, our objection is

24    the same as what I just mentioned regarding the
```

84

```
 1    opening slides, the designations go to

 2    communications between Mr. Jones at SGI and ACI

 3    regarding the demonstration that again it's our

 4    position has no relevance in this case other

 5    than copying.

 6              THE COURT:  Okay.  But I think I

 7    have the same problem there.  I can't rule on it

 8    in the abstract.

 9              MS. SIMMONS:  Understood.  I think

10    that addresses all of our objections to the

11    designations and the exhibits, they all go to

12    that issue.

13              THE COURT:  Okay.  Do you have the

14    juror notebooks available?

15              MR. PARTRIDGE:  Your Honor, we do

16    have the juror notebooks.

17              THE COURT:  Could I see one of

18    them, please?

19              MR. PARTRIDGE:  Yes, you may.

20              May I approach, Your Honor?

21              THE COURT:  Yes.  You're asking

22    these jurors these questions?  Okay.

23              MR. PARTRIDGE:  Well, we could

24    take that page out, Your Honor, that may cause
```

85

```
 1     us more complications if we do that.
 2               THE COURT:  It's ten questions
 3     actually.  Yes, I think it would be better just
 4     to give them a blank sheet of paper headed juror
 5     questions, make due this morning just by giving
 6     them a blank piece of paper.  Why don't you --
 7               MR. PARTRIDGE:  We will do that,
 8     Your Honor.  We will take care of that, Your
 9     Honor.  The other thing I would add is that
10     Google will be adding its witnesses pictures,
11     those pictures I think tomorrow morning.
12               MR. SNYDER:  Yes, Your Honor.
13     We'll supply and we can put them in the binder.
14     They will be collected each night, so we'll
15     supply pages for each of the witnesses that
16     we're going to call.
17               THE COURT:  Okay.  That's fine.
18     Just remind me to tell the jurors that their
19     notebooks are going to have that additional
20     feature when we get back in the morning.
21               MR. SNYDER:  Okay.  Yes.  We will.
22     Thank you.
23               THE COURT:  Is there anything else
24     we need to discuss this morning?
```

1                    MR. SNYDER:  Yes, a couple of

2       things, Your Honor.  We do have objections to a

3       few of the exhibits that Plaintiffs plan to use

4       this morning.  The first of those is Plaintiff's

5       Exhibit 267, which is a video, a video that I

6       believe came off of -- that was found on the

7       internet of the Plaintiff's T-vision system and

8       we've objected on grounds of relevance and lack

9       of foundation and authenticity.  We have no idea

10      where the video came from other than it was on

11      the internet.  We don't know when it was created

12      or who created it and we have had some testimony

13      about other videos from Plaintiff witnesses

14      indicating that these videos were compilations

15      of things that were made over time and based on

16      some of the details in them, almost certainly

17      were made in part after the invention was

18      applied for, which would make them irrelevant.

19                    So I believe that Plaintiffs

20      intend to use this exhibit with their first

21      witness, Mr. Mayer.  We don't have any

22      indication of how Mr. Mayer could authenticate

23      or lay a foundation for this exhibit or provide

24      evidence that would establish its relevance

```
1        given what little we know about the video.

2                     THE COURT:  Okay.  Well, why don't

3        we hear from Mr. Partridge?

4                     MR. PARTRIDGE:  Your Honor, it is

5        correct that Mr. Mayer is going to address this

6        video.  Actually the video that we're using was

7        one that was produced by Google in this case and

8        it so happens that during the course of the

9        development of the system that is the subject of

10       the patent application from the '94 through the

11       end of '95 and the product that followed in '96

12       that ACI made.

13                     THE COURT:  What is the video?

14                     MR. PARTRIDGE:  The video actually

15       is a video of the system in operation that they

16       use to promote what they were -- what they had

17       under development, the research work that they

18       were doing with respect to this system and they

19       produced a series of these videos.  There's a

20       voice over on it and it shows the system and the

21       system in operation.

22                     THE COURT:  When were the videos

23       produced, the date?

24                     MR. PARTRIDGE:  Oh, the videos
```

```
1    were made between '94 and '96 and the version

2    that we're using is an early '96 version that

3    shows the work that was done leading up through

4    '94, '95 and a few additional slides that were

5    added in early 1996 that don't go to anything in

6    the patent application, they are just better

7    graphics of satellite images and the like that

8    they used in the video.  And Mr. Mayer will

9    identify this as an Art+Com created video that

10   illustrated the development of the system.  It's

11   clearly -- there's no authenticity issue here.

12   It is what it is.  And in so far as its

13   relevance is concerned, it's very much directed

14   to the identification of the issues that we're

15   trying to address during the '94, '95

16   development period and how they addressed them.

17   It will be about three minutes worth of video

18   that addresses those issues, Your Honor, and the

19   part that we're playing is all about what they

20   were could go in '94 and '95.

21              THE COURT:  What is the point of

22   what they were doing in '94 and '95?

23              MR. PARTRIDGE:  It actually shows,

24   Your Honor, how this system actually looked, the
```

```
 1    visuals that they were able to create as they
 2    were developing their invention.  So for
 3    example, you will see --
 4              THE COURT:  What issue does it
 5    relate to?
 6              MR. PARTRIDGE:  It relates to the
 7    process of identification of issues that needed
 8    to be solved as part of the development process.
 9              THE COURT:  Why do we care about
10    that?
11              MR. PARTRIDGE:  Well, because it
12    distinguishes what was done before from what
13    they did.  I think it relates to at least Factor
14    8 of the Georgia Pacific factors, the utility
15    and advantages of that invention over old modes
16    and the video was clearly talking about the
17    steps forward that they were making.  It clearly
18    addresses the advantages of the patent invention
19    over what preceded.  It's relevant to that and I
20    would also argue it's relevant to how one comes
21    about addressing and how they did come about
22    addressing the issues, the problems that they
23    solved in the '94, '95 time period.  So it's
24    relevant to damages, it's relevant to the
```

1       process of development of the invention.

2                    THE COURT:  Okay.  Mr. Snyder.

3                    MR. SNYDER:  Thank you, Your

4       Honor.  Let me make just three points.  First of

5       all, this -- contrary to what ACI's counsel just

6       said, there is a question about authenticity.

7       As I pointed out and as ACI's counsel pointed

8       out, this document was produced by Google

9       because we found it on the internet and it was

10      responsive to a document request.

11                   THE COURT:  Wait one moment.  The

12      individuals who came in are not jurors, right?

13      Okay.  All right.

14                   MR. SNYDER:  So we don't know the

15      providence of this exhibit.  We don't know where

16      the video came from.  There actually is a

17      question about its authenticity.  When ACI says

18      this was a video that was created by them for

19      demonstration purposes, they didn't produce it

20      to us, because they produced it for

21      demonstration purposes.  We don't know who

22      created this thing.  So there is a real question

23      about authenticity.  Second, Your Honor, there

24      is a serious question about relevance.  They did

```
 1      not say --

 2                      THE COURT:  As to authenticity,

 3      let's let Mr. Mayer attempt to authenticate it

 4      and then we'll decide whether its been

 5      sufficiently authenticated to have a jury

 6      consider it.

 7                      MR. SNYDER:  Thank you, Your

 8      Honor.

 9                      THE COURT:  On the relevance

10      issue?

11                      MR. SNYDER:  On the relevance,

12      what you did not hear ACI say was the video is

13      an embodiment of the invention.  He says they

14      are going to talk about advances and in fact the

15      testimony has been to the contrary, that at the

16      time when he just described this video having

17      been made, the inventors claimed that they had

18      not yet reduced the invention to practice in a

19      way that they could illustrate to people in 1994

20      or 1995.  They repeatedly denied that, so there

21      is no relevance to this video showing a Georgia

22      Pacific factor of utility and advantages of the

23      invention because it's not about the invention,

24      it's about something else, some other things
```

1    that they were doing.  We don't deny that they

2    were doing work, but this case is about the

3    invention.

4              Third point, Your Honor, I believe

5    that this is another, and we're going to hear

6    many of them, back door way of talking about

7    copying.  What they can't to do is they want to

8    show the video and then they want to show Google

9    Earth and say see, they look really alike.

10             THE COURT:  I'm not going to let

11   them do that.

12             MR. SNYDER:  Thank you, Your

13   Honor.  And I do appreciate that and I'm sure

14   that you will enforce that line.

15             For the specifics of this video,

16   it does not address the issue of relevance and

17   because it is not an example of the invention,

18   it cannot satisfy the only relevance that

19   they've identified, which is Georgia Pacific

20   Factor #8.

21             THE COURT:  Okay.

22             MR. PARTRIDGE:  Mr. Mayer will

23   testify that the video was made in early '96,

24   which is after the patent application is filed,

93

1    so it's clearly about where they were at that

2    particular point in time.  It is illustrating --

3    we do not intend to use this as a side by side

4    with Google Earth, but what it does show, in an

5    effective pictorial way, is what this invention

6    accomplished, what its end result was and while

7    at various stages during development in '94 and

8    '95 they added new ideas right up until the time

9    of the filing of the patent application, the

10   video ends up being an illustration of their

11   objective, what it was they were trying to

12   accomplish, and compared to old modes of doing

13   this, the ability to actually fly over the earth

14   and move into any position relevant to the

15   earth.  That's what the video shows, and that's

16   what they accomplished in 1995 prior to the

17   filing of your application and then in '96 they

18   added some slides, added some additional

19   graphics to this video.

20            THE COURT:  I'm going to allow it.

21   But don't go on and on about it, okay?

22            MR. PARTRIDGE:  We will not.  The

23   intention, Your Honor, is to introduce it and

24   then just play it and that's it.

```
 1              THE COURT:  Okay.

 2              MR. PARTRIDGE:  Thank you.

 3              MS. SIMMONS:  Your Honor, there

 4     are two remaining exhibit issues that don't

 5     relate to the copying bucket of issues.  Exhibit

 6     PTX-85 and 295B that will be used with the

 7     deposition oh designation for Mr. Jones.  These

 8     two exhibits are e-mails that were written by a

 9     person who won't be testifying at the trial day,

10     won't have deposition testimony from.  Mr.

11     Meschkat, a former employee of Art+Com who later

12     went to Google, so they are not going to be able

13     to establish a foundation for it, but more

14     importantly, the e-mails are hearsay.

15              THE COURT:  Okay.

16              MR. HALL:  Your Honor, Mr.

17     Meschkat was actually a Google employe at the

18     time the e-mails are written.

19              THE COURT:  He wasn't an officer?

20              MR. HAWES:  He wasn't an officer,

21     but he is still within the scope of his

22     employment in discussing, he's not discussing

23     non-Google things.

24              THE COURT:  Can I see them?
```

```
 1                    MS. SIMMONS:  Yes, Your Honor.

 2                    May I approach?  There is a

 3      particular concern with 295(b) which includes

 4      hearsay within hearsay.  In the last paragraph,

 5      Mr. Meschkat is relaying a conversation --

 6                    THE COURT:  Let me read them

 7      first.

 8                    So what is it about 295(b)?

 9                    MS. SIMMONS:  In the second

10      paragraph, Mr. Meschkat is describing to

11      Mr. Mayer a conversation that Mr. Meschkat says

12      he had with Michael Jones, in which he says that

13      Michael Jones said something about his

14      inspiration for Keyhole.

15                    THE COURT:  I thought you were

16      arguing that TerraVision was prior art; right?

17                    MS. SIMMONS:  Mr. Meschkat in this

18      E-mail is referring to the T-Vision system from

19      ACI.

20                    THE COURT:  Oh, I see.

21                    MS. SIMMONS:  So essentially he's

22      implying that Mr. Jones said I was inspired by

23      ACI's system when I created Keyhole, which is

24      not correct, but more importantly is hearsay.
```

```
 1                    THE COURT:  Well --

 2                    MS. SIMMONS:  He wasn't -- he

 3       didn't send it from his Google.com E-mail either

 4       for 295(b).

 5                    THE COURT:  Okay.  Anything more

 6       about this?

 7                    MR. HAWES:  Just, Your Honor, I'll

 8       point out this exception rule we're relying on

 9       which is Rule 801(d)(2)(d), which was made by

10       the parties agent or employee on a matter within

11       the scope of that relationship and while it

12       existed.  And that was true at this time for

13       Mr. Meschkat and Mr. Jones, they were both

14       Google employees talking about a Google product.

15                    MS. SIMMONS:  That's not correct,

16       Your Honor.  This is a Google employee talking

17       about a ski trip in a conversation he had with

18       Mr. Jones on a bus.  And relaying what he

19       purports that Mr. Jones said.  So it's hearsay

20       within hearsay.

21                    THE COURT:  So at the time of

22       295(b), both the author of the E-mail, Mayer and

23       Jones were all at Google or not?

24                    MS. SIMMONS:  That's correct.
```

```
 1              MR. HAWES:  Your Honor, Mr. Mayer
 2      was the recipient, he was not at Google.
 3              MS. SIMMONS:  I'm sorry, Mr. Jones
 4      and Mr. Meschkat.
 5              THE COURT:  Where was Mr. Mayer at
 6      that point?
 7              MR. HAWES:  He was at ACI, Your
 8      Honor.
 9              THE COURT:  So this is somebody
10      from Google writing to somebody at ACI?
11              MR. HAWES:  Correct, Your Honor,
12      about what someone else at Google said.
13              THE COURT:  And then what about
14      the other one, Jones is at Google; is that
15      right, and Mayer is again, at ACI?
16              MS. SIMMONS:  Correct.  So this
17      relates to the copying issue that we discussed
18      earlier.  There is no relevance in Google's view
19      to this E-mail other than to try to imply that
20      Mr. Jones somehow used information learned about
21      Art+Com's system from the 1999 demonstration at
22      SGI in addition to it being hearsay.
23      Mr. Meschkat was not an agent of Google.
24              THE COURT:  Mr. Meschkat was not
```

```
 1      an agent?

 2                  MS. SIMMONS:  A senior executive

 3      speaking on behalf of Google.

 4                  THE COURT:  But he was an

 5      employee?

 6                  MS. SIMMONS:  That's correct.

 7                  THE COURT:  What are these going

 8      to be introduced?  This morning?

 9                  MR. PARTRIDGE:  Your Honor, the

10      one, the one from early 1995, the first one that

11      you looked at, is going to be used in

12      Mr. Mayer's testimony.  And what you will hear

13      from Mr. Mayer about it, I think this will help

14      you in resolving this, is that this was the

15      first time that he realized Michael Jones who he

16      knew from ten years earlier when he was at SGI

17      when they worked together and others at Art+Com

18      worked with him, it's the first time that he

19      knew that Michael Jones had been at Keyhole and

20      Keyhole had been acquired by Google and Google

21      now in running Google Earth was using the

22      Keyhole technology.

23                  And it was on that basis that he

24      decided to reach out to Mr. Jones approximately
```

1     a year later to try to initiate conversation

2     about doing business together, including

3     addressing the patent at issue.

4                    So this is the information he

5     relied upon in order to start communications

6     with Google in the first place towards trying to

7     license the patent.  So it's the kind of trigger

8     point to Mr. Mayer's knowledge and actions

9     following that knowledge that led to the

10    discussions themselves.

11                   Without that document, we have --

12    that's what he relies upon in order to decide to

13    write an E-mail a year later to Mr. Jones saying

14    hey, I know you're at Google, we have some

15    issues with Google Earth, maybe we should get

16    together and discuss business.

17                   Mr. Jones flies to Berlin, he

18    meets with them for a couple of days, they talk

19    about old times.  And they then pursue

20    negotiations.

21                   And the negotiations were

22    conducted in the context of a prior

23    relationship, a personal relationship that

24    existed which then led to a different level of

```
 1        competence and trust than one might ordinarily

 2        see in this kind of discussion.

 3                    So it's very important to that

 4        2006 series of interactions.  And both sides

 5        have relied upon exhibits from 2006 to support

 6        their case.  And without this chain of events,

 7        there is no way for us to explain why we acted,

 8        why ACI acted the way that it did in those

 9        discussions with Google in 2006.

10                    THE COURT:  Was Mr. Meschkat

11        deposed?  No, right?

12                    MR. PARTRIDGE:  He was not deposed

13        by either side.

14                    THE COURT:  Why is that?  He is

15        still alive?

16                    MR. PARTRIDGE:  I believe he's

17        still alive.  And I don't know -- I don't

18        remember the answer to that, Your Honor.  I

19        can't recall if it was an availability issue,

20        what the issue was back at the time of

21        discovery, but neither side deposed him.

22                    THE COURT:  I'm going to exclude

23        these.  You said you're not arguing copying and

24        these could, seems to me only be used for that
```

1      purpose.  To the extent they have any tangental

2      relationship to issues in this case, I think

3      under 403 they're prejudicial.

4                  MR. PARTRIDGE:  May I make one

5      suggestion in that regard?  What if we redacted

6      the inspired part, because I actually care more

7      about the knowledge of Mr. Jones being at

8      Keyhole and Google rather than the inspired part

9      in that document as a trigger point.

10                 THE COURT:  We're talking about

11     295(b)?

12                 MR. PARTRIDGE:  Yes, Your Honor.

13     Let me get my notebook and we can talk through

14     that.

15                 Looking at the January 2005 one,

16     and what if we took out, we put a period after

17     the parenthetical that ends ski trip and

18     redacted, "And he said that TerraVision was the

19     inspiration for Keyhole.com.  I thought you

20     might like that."

21                 And that way I have what I need as

22     sort of that trigger point for why he reached

23     out to Michael Jones for the purposes of

24     licensing negotiations and we've addressed the

```
 1        concern that Your Honor has about whether this

 2        could be used to argue copying, which is not our

 3        intent.

 4                      THE COURT:  Okay.  If you make

 5        that redaction, I'll allow you to use that

 6        exhibit.

 7                      MR. PARTRIDGE:  Thank you, Your

 8        Honor.  As to the second one, counsel, where is

 9        this used?  Is it in the Jones?

10                      MS. SIMMONS:  That's right.  It is

11        in the Jones designation.

12                      MR. PARTRIDGE:  I guess I fail to

13        see how this one raises a copying issue.  Maybe

14        I'm blind to this, but it looks fairly innocuous

15        in that regard to me.  But perhaps counsel can

16        explain it.  I just don't see it, Your Honor.

17                      MS. SIMMONS:  If I may address.

18        For both of these I will note that Mr. Mayer can

19        certainly testify that he had a personal

20        relationship with Mr. Jones without using

21        exhibits.  And Exhibit 85 does not go to so much

22        the personal relationship that Mr. Mayer and

23        Mr. Jones may have had, it goes directly to

24        Mr. Jones having seen the ACI demonstration in
```

```
 1      1995, the demonstration including of the Earth

 2      Tracker, and so this E-mail is directly related

 3      back to the demonstration.  It doesn't establish

 4      that there was a personal relationship, it

 5      establishes that there was a relationship based

 6      on Mr. Jones having seen that demonstration.

 7                  THE COURT:  Yes.  I'm going to

 8      exclude this one under 403.  I think again the

 9      idea of using the Earth Tracker in the Google

10      installations is potentially prejudicial.

11                  MS. SIMMONS:  Thank you, Your

12      Honor.

13                  MR. PARTRIDGE:  Thank you, Your

14      Honor.

15                  THE COURT:  Anything else?

16                  MR. SNYDER:  Two other issues,

17      Your Honor, related -- they have come up in the

18      context of the final jury instructions, but I do

19      think it's important to address the issues now

20      because they could relate to what occurs in the

21      openings and the evidence that is presented.

22                  The first of those relates to the

23      date of the hypothetical negotiation.  And the

24      second relates to the extent to which the patent
```

1      claims require the steps be performed in order.

2      And there is now apparently a dispute about both

3      of those things.  And we don't want there to be

4      -- we think that the evidence is clear based on

5      what has happened in the record already, that

6      the hypothetical negotiation date should be

7      2005, not 2010.

8                And we also believe based on the

9      intrinsic and extrinsic evidence that the order

10     of steps in the patent has to be in the order in

11     which they're identified in patent claim 1,

12     steps A through G.  I don't want the trial to go

13     any further if there is going to be a dispute

14     about what is essentially a claim construction

15     issue without addressing that first.

16                THE COURT:  Well, as to the date

17     of the hypothetical negotiation, I'm inclined to

18     agree that 2005 is the pertinent date, but I

19     need to hear testimony that the Google product

20     was essentially the same in 2005, which I

21     haven't heard yet.

22                And as far as the second question

23     is concerned, which -- I looked at the patent

24     carefully, and I'm not -- it seems to me that

```
 1        some of the steps need to be in order, but

 2        others not necessarily.  What is your contention

 3        about Google's noninfringement based on the

 4        order of the claims, I mean the order of the

 5        steps in the claim?

 6                   MR. SNYDER:  Based on the way the

 7        language is worded, I'll turn this over to

 8        Mr. Williamson in just a moment to be more

 9        detailed, but based on the way the steps are

10        described in the claim and the antecedents for

11        the language that is used in each of those

12        steps, they couldn't be performed any different

13        order.

14                   The part that is most important is

15        that the substeps of part F occur in order, and

16        that step G occur only after step F is

17        completed.  And step G says repeating step F.

18                   THE COURT:  Well, we have to see.

19        I think that, for example, step B could be the

20        first step.  Do you agree with that?

21                   MR. SNYDER:  I don't know how you

22        could do step B without already having the

23        plurality of data sources which is in step A.

24                   THE COURT:  My question is does
```

```
 1        that really matter to you whether step G be
 2        performed first?
 3                    MR. SNYDER:  It does not, Your
 4        Honor.
 5                    THE COURT:  So what I'm trying to
 6        avoid is a blanket statement that the steps have
 7        to be performed in order because it seems to me
 8        that some of the steps could be performed out of
 9        order.  And your focus is on F and G; right?
10                    MR. SNYDER:  That's correct.
11        Before I overstep my knowledge of the details of
12        this issue, let me turn this over to
13        Mr. Williamson if I could.
14                    MR. WILLIAMSON:  Your Honor,
15        you're correct, with the slight addition that
16        because the steps in B through E are essentially
17        mirrored in the substeps of F, there is no other
18        way to read the claim but that B, C, D, E all
19        have to be done in order.  The subsets of F need
20        to be done in order and then step G.
21                    THE COURT:  But your concern is
22        about if being completed before G is done?
23                    MR. WILLIAMSON:  That is the
24        primary concern, but within F there are also
```

```
 1        issues about those steps.

 2                    THE COURT:  Does this get back to

 3        the issue that we had earlier about whether all

 4        of the segments have to be subdivided.

 5                    MR. WILLIAMSON:  It's not, Your

 6        Honor.  It is only with respect to a separate

 7        noninfringement theory that's in the records and

 8        been part of the case from the beginning and

 9        that is with respect to a particular smaller

10        session.

11                    THE COURT:  What is the

12        noninfringement theory?

13                    MR. WILLIAMSON:  That in the

14        accused products, there is not the processing of

15        the substeps in F for each of the smaller

16        sections for a single division, the argument

17        that the Court excluded was that there was an

18        alternative noninfringement argument that all of

19        the smaller sections of the first division

20        needed to be processed before any of the next

21        level.  That is not going to be part of the case

22        anymore.

23                    THE COURT:  Let me tell you what

24        my problem is.  I think we need to bring the
```

```
 1        jury in and begin and we can spend some time

 2        addressing these issues later on as such.  I

 3        don't think they need to be resolved this

 4        morning.

 5                    MS. WILLIAMSON:  My understanding,

 6        based upon the review of the demonstratives for

 7        the opening is that's not going to be

 8        addressed --

 9                    MR. PARTRIDGE:  Your Honor, I

10        think this is a point for at the end of the day

11        because I don't believe any of the witnesses

12        today are going to be --

13                    THE COURT:  Let's do that then.

14        Is there anything else we need to do before we

15        bring the jury in?

16                    MR. WILLIAMSON:  I don't believe

17        so, Your Honor.  Thank you.

18                    THE COURT:  Thank you.  Let's

19        bring the jury in.

20                    (Jury enters.)

21                    THE COURT:  Be seated.  Good

22        morning members of the jury.  Welcome back to

23        the United States District Court for the

24        District of Delaware.  And as I mentioned last
```

```
 1        week at the end of the trial, it's going to be

 2        your job to decide the facts based on the

 3        evidence that you hear and this morning I'm

 4        going to give you some preliminary instructions

 5        and at the conclusion of the evidence I'll give

 6        you more detailed instructions that you should

 7        follow in reaching your decision.  Your job at

 8        the end of the day is to decide the facts of

 9        this case.  Now, this case, as you know,

10        involves a dispute relating to a United States

11        patent and we're going to watch a short video

12        that will help you understand the patents as has

13        been prepared by it Federal Judicial Center.

14        It's entitled introduction to the patent system.

15        And by the way, you're going to be given later a

16        notebook that has a sample patent to which

17        they're referring to in the video.

18                     MR. PARTRIDGE:  Your Honor, I

19        believe the notebooks are ready, if you'd like.

20                     THE COURT:  Well, let's do them

21        after the video.

22                     MR. PARTRIDGE:  Okay.

23                     (Video playing.)

24                     MR. FOGEL:  Hello.  I'm Jeremy
```

```
 1    Fogel.  I've been a United States District judge

 2    since 1998 and I'm now the Director of the

 3    Federal Judicial Center.  As you probably know

 4    by now, this is a patent case so you may be

 5    wondering how can I sit in judgment on a case

 6    like this when I'm not entirely sure what a

 7    patent is?  We hope to answer that concern with

 8    this brief video which will give you some of the

 9    background needed to do your job.

10            This case will involve some

11    special issues that the judge and lawyers will

12    explain to you, but all patent cases involve

13    some basics that you will learn about.  This

14    video will discuss what patents are, why we have

15    them, how people get them and why there are

16    disputes that require us to call in a jury like

17    you.  We'll also show you what patents look

18    like.  The United States constitution gives

19    Congress the power to pass laws relating to

20    patents.  Article 1, Section 8, Clause 8, allows

21    congress to promote the progress of science and

22    useful arts by issuing for limited times to

23    authors and inventors the exclusive right to

24    their respective writings and discoveries.
```

```
 1                   A patent then is an official grant

 2         by the United States Government that gives it's

 3         owner certain rights to an invention.  Those

 4         include the right to stop others from making,

 5         using, selling or offering for sale the

 6         invention that is claimed in the patent.  A

 7         patent lasts for a specific period of time,

 8         usually 20 years from the date that the

 9         applications filed by the inventor.  But because

10         it takes an average of three years for the

11         Patent and Trademark Office to act on the

12         application, the effective life of the patent is

13         closer to 17 years.

14                   A patent represents a bargain made

15         between the government and the inventor.  In

16         return for the right to prevent others from

17         using the invention, the inventor must enhance

18         the public knowledge or what we sometimes call

19         the state of the art, by adding something new

20         and useful to it.  A famous example is Thomas

21         Edison's invention of the light bulb, harnessing

22         electrical power for illumination transformed

23         society and led to many other important

24         breakthroughs.
```

1           During the lifetime of the patent,

2     it's disclosure may inspire new inventions and

3     after it expires the invention is free for

4     anyone to use.  It is this combination of

5     something new and valuable to the public that

6     justifies granting time-limited patent

7     protection to the inventor.  A patent is in many

8     ways like a deed to a piece of property.  It

9     grants the owner the right to keep people off

10    the property or to charge them a fee like rent

11    for using it.

12          And just as a deed indicates

13    boundaries defining the land owners property, a

14    patent claim defines the patentees domain.  The

15    patent system works because the inventor is

16    required to describe the invention in clear and

17    specific terms so that the public knows what the

18    boundaries of the invention are.  Once a patent

19    is issued by the government, it becomes

20    available for public inspection.  In that way

21    anyone who learns of the patent can read it and

22    understand exactly what the inventor invented

23    and the limits of the patent set forth in the

24    claims.

1          Now that we understand what a

2    patent is, let's take a closer look at the term

3    invention.  An invention is a new way of solving

4    a problem or a useful new machine, manufacture

5    or composition of matter.  The patent process

6    begins in the mind of the inventor and in

7    particular when the invention is formulated in

8    the mind of the inventor.  Patent lawyers call

9    this conception.  This is when the idea occurs

10   to the inventor clearly enough that he or she

11   can write it down and explain it to someone.

12          To qualify for a patent, the

13   invention needs to be new and useful.  Also it

14   must not be obvious to one of ordinary skill in

15   the field.  If the inventor believes these

16   requirements are met, he or she will prepare an

17   application for figure with the Patent and

18   Trademark Office whose headquarters are in

19   Alexandria, Virginia, just outside of Washington

20   D.C.

21          The Patent and Trademark Office,

22   often called the PTO, is the agency of the

23   federal government whose job it is to examine

24   patent applications to make sure they were in

1   proper form and complied with the requirements

2   of the law.  The inventor can prepare an

3   application for filing with the PTO, but usually

4   it is drafted by a patent attorney or a patent

5   agent who specializes in what is called

6   prosecuting patent applications.  That is the

7   process by which they are evaluated.  The

8   attorney or agent works with the inventor to be

9   sure the invention is described and claimed in a

10   way that complies with the law and the

11   regulations of the PTO.  98 percent of patent

12   applications are made online, using the PTO's

13   electronic filing system, although a few paper

14   applications are still made.

15                    When the PTO receives the

16   inventor's application, it is first checked to

17   see if it is complete and complies with all the

18   PTO's application requirements.  It then assigns

19   a submission to a patent examiner, a staff

20   person with a background in the field or art the

21   invention false within to evaluate the

22   application and decide whether a patent can be

23   granted.

24                    You've been given a sample patent

1    to refer to as you watch this video, so you

2    already have a sense of what a patent looks

3    like, but now let's take a closer look at the

4    three main parts of a patent.

5                    To begin with, there is some basic

6    identifying information on the first page.  This

7    material is highlighted in your handout.  On the

8    upper right side of the page is the number

9    assigned to the patent by the PTO.  And on the

10   left side is a title that describes the

11   invention and the names of the inventors and

12   sometimes the company to whom they had assigned

13   the patent.  Also on the left is the date when

14   the patent application was filed.  And back on

15   the right the date when the patent was issued.

16   There also is more detailed information on the

17   first page, including a list of numbers

18   following the caption Field of Search.  These

19   numbers identify previously issued patents the

20   examiner looked at or searched to make sure the

21   applicant's claimed invention really is

22   something new, not obvious and thus patentable.

23   Also listed on the first page is what we call

24   references, that is previous patents or articles

1       that describe the technology or prior art known

2       at the time the application was filed.

3                    It may seem strange to you that we

4       call this preexisting technology prior art, even

5       though it has nothing to do with artists.  We

6       use the word art in it's historical sense to

7       include inventions and other subject matter

8       recently related to the claimed invention.  We

9       also refer to the latest technology as state of

10      the art and we say if someone who can understand

11      and apply the technology that he or she is

12      skilled in the art.

13                   The second major part of the

14      patent is what we call the specification or

15      written description.  As is the case in your

16      sample, it is usually the longest part of the

17      patent.  It includes an abstract, which is a

18      brief summary of the invention, a background

19      section that describes the nature of the problem

20      the invention is supposed to solve, one or more

21      drawings called figures that illustrate various

22      aspects of the application and a detailed

23      description of one or more embodiments of the

24      invention.  An embodiment is a specific device

1   or method that uses the invention such as a

2   particular form of light bulb.

3               The third and most important part

4   of the patent is the claims.  These are the

5   numbered paragraphs that appear at the end.  The

6   claims are what give the public notice of the

7   boundaries of the invention.  They are similar

8   to the description of property you may have seen

9   in a deed, referring to precise measurements

10  taken on the ground.  The judge will instruct

11  you further on how any technical or ambiguous

12  terms in the patent claims should be understood.

13              Now that we've discussed the main

14  parts of a patent, let's look at how the PTO

15  processes patent applications, what we referred

16  to earlier as prosecution of the patent

17  application.  This process begins when the

18  inventor's application arrives at the PTO.

19  There it receives a filing date.  Under the

20  American Invents Act of 2011, filing dates will

21  determine who is awarded the patent if there are

22  competing valid applications.  In 2012 the PTO

23  received nearly 600,000 patent applications and

24  issued more than 270,000 patents.

1          After determining that the

2     application is complete, the receiving branch

3     also decides what field of technology an

4     application relates to and assigns it to the

5     appropriate examining group.  In order to make

6     that decision, the patent examiner usually looks

7     at patents that have been issued previously in

8     the same or closely related fields of art.  The

9     examiner has computer data bases that contain

10    information used to accomplish this task.

11    Another part of the job is to decide if the

12    inventor's description of the invention is

13    complete and clear enough to meet the

14    requirements for a patent, including the

15    requirement that the description enables someone

16    of ordinary skill in the field to actually make

17    and use it.  However, because the job of

18    examining so many applications is challenging,

19    the law requires the applicant to tell the

20    examiner whatever he or she knows about the

21    prior art that might be important to the

22    examiner's decision on whether to allow the

23    patent.  We call this the applicant's duty of

24    candor.  One way the applicant can satisfy this

1      duty is by bringing pertinent prior art to the

2      attention of the examiner either in the original

3      application or in other submissions called

4      information disclosure statements.  In this way

5      the decisions of the examiner are based on both

6      the information provided by the applicant and on

7      the information the examiner finds during his or

8      her prior art search.  Sometimes the examiner

9      concludes that the application meets all the

10     requirements we've discussed and allows the

11     patent to issue at this first stage, but more

12     frequently the examiner will reject the

13     application as deficient in some respect.  This

14     decision will be communicated by the examiner in

15     what is called an office action, which is a

16     preliminary notice to the applicant of what the

17     examiner finds insufficient or unpatentable.

18     For example, the examiner may reject certain

19     claims as being unpatentable because a journal

20     article written and published by another person

21     prior to the effective filing date of the patent

22     application disclosed what the applicant was

23     currently claiming.  At that point the applicant

24     prepares a written response either agreeing or

1    disagreeing with the examiner.  An applicant who

2    agrees with the examiner can suggest amendments

3    to the application designed to overcome the

4    examiner's rejection.

5              Alternatively, an applicant who

6    disagrees with the examiner's office action can

7    explain the reasons for the disagreement.  This

8    exchange of office actions and responses goes on

9    until the examiner issues a final office action,

10   which may reject or allow some or all of the

11   applicants claims.  The overall process is

12   referred to as the prosecution history of the

13   application.

14             The written incoming and outgoing

15   correspondence between the PTO examiner and the

16   applicant is also called the file wrapper.  In

17   the past these file wrappers were all in paper

18   form as were the submitted applications.  Now

19   they are most often electronic and may

20   occasionally be paper as well.

21             Most patent applications filed on

22   or after November 29th, 2000, are published by

23   the PTO 18 months after the inventor has filed

24   his or her application, so that the public may

1    inspect it.

2                 Once a final PTO office action has

3    occurred and one or more claims have been

4    allowed, the applicant is required to pay an

5    issuance fee and the patent is printed.  Then on

6    the date shown on the upper right-hand corner of

7    the first page of the patent it is issued by the

8    PTO and the inventor receives all the rights of

9    the patent.  That date is highlighted on your

10   sample.

11                Once a patent has issued, the

12   inventor or the person or company the inventor

13   has assigned a patent to can enforce the patent

14   against anyone who uses the invention without

15   permission.

16                We call such unlawful use

17   infringement, but the PTO and its examiners have

18   no jurisdiction over questions relating to

19   infringement of patents.  If there is a dispute

20   about infringement, it is brought to the court

21   to decide.

22                Sometimes in a court case you're

23   also asked to decide about validity; that is,

24   whether the patent should have been allowed at

1    all by the PTO.  A party accused of infringement

2    is entitled to challenge the whether the

3    asserted patent claims are sufficiently new or

4    non-obvious in light of the prior art or whether

5    other requirements of patentability have been

6    met.  On the other side a defense to

7    infringement lawsuit is that the patent in

8    question is invalid.  You may wonder why it is

9    that you would asked to consider such things

10   when the patent has already been reviewed by a

11   government examiner.  There are several reasons

12   for this.

13              First, there may be facts or

14   arguments that the examiner did not consider

15   such as prior art that was not located by the

16   PTO or provided by the applicant.  In addition,

17   there is, of course, the possibility that

18   mistakes were made or important information

19   overlooked.  Examiners have a lot of work to do

20   and no process is perfect.

21              Also, unlike a court proceeding,

22   prosecution of a patent application takes place

23   without input from people who might later be

24   accused of infringement.  So it is important

1    that we provide a chance for someone who is

2    accused of infringement to challenge the patent

3    in court.

4                In deciding issues of infringement

5    and validity, it is your job to decide the facts

6    of the case.  The judge will instruct you about

7    the law which may include the meaning of certain

8    words or phrases contained in the patent.

9                So it is your primary duty as

10   jurors to resolve any factual disputes and in

11   some cases such as infringement and validity to

12   apply the law to those facts.

13               To prove infringement, the

14   patentholder must persuade you by what is called

15   a preponderance of the evidence relating to the

16   facts of the case that the patent has been

17   infringed.

18               To prove invalidity, the alleged

19   infringer must persuade you by what is called

20   clear and convincing evidence that the patent is

21   invalid.  The judge in your case will explain

22   these and other terms and provide additional

23   specific instructions at the appropriate time.

24               Good luck with your task and thank

1          you for your service.

2                    (End of videotape. )

3                    THE COURT:  Okay.  Thank you.

4      That's a lot to digest and we're going to come

5      back to some of these issues and give you some

6      further explanation of what patents are and in

7      the issues that are going to be before you.

8                    Now, the first phase of the trial

9      after I finish giving you preliminary

10     instructions will be opening statements by the

11     lawyers.  And they'll preview the case for you

12     and prepare you for the evidence which is the

13     main phase of the trial.

14                   First, ACI, the plaintiff who

15     brought this suit will have the opportunity to

16     call witnesses and present evidence, then

17     Google, the defendant being sued, will have an

18     opportunity to do the same thing.

19                   And after Google's case, ACI will

20     present rebuttal evidence, and then finally

21     Google with present surrebuttal evidence.  When

22     all the evidence has been presented, the lawyers

23     will give you their closing statements.

24                   And as part of that process, I'll

1      give you instructions of the law and procedure

2      that will guide your decision and then you will

3      go off to deliberate on a verdict and that will

4      go on, that deliberation will go on as long as

5      it takes for you to reach a verdict.

6                     As I mentioned last week, the

7      trial is expected to take five days, that is

8      Monday through Friday.  And each day will last

9      from 9:00 to 5:00, with a lunch break of an hour

10     and two fifteen-minute breaks in the morning and

11     afternoon.  And lunch will be provided for you,

12     so you don't need to leave the building.  And

13     I'm hoping that you'll be able to begin

14     deliberations after lunch on Friday.

15                    Now, as I mentioned, the plaintiff

16     who brought this case is Art+Com Innovational

17     Pool, and I have been referring to them as ACI

18     and they'll be referred to that way throughout

19     this case.  And then we'll refer to the

20     defendant as Google for short.

21                    You know the suit is about patent

22     infringement and that means that ACI asserts

23     that Google is infringing its patent.  And

24     Google asserts two defenses, first, it asserts

1    that it is not infringing the ACI patent, and

2    second, it asserts that the ACI patent is

3    invalid.

4              And you will hear evidence about

5    both issues, infringement and invalidity.

6              Now, what do you mean by evidence?

7    The evidence in this case will consist of sworn

8    testimony from witnesses, exhibits received into

9    evidence, and stipulations made by the parties.

10             Now, some of the witness testimony

11   will be given by witnesses who appear here in

12   person, and other witness testimony will be

13   introduced in the form of depositions which are

14   basically videotape of earlier question and

15   answer sessions with the witness given under

16   oath.  And those depositions substitute for live

17   witness testimony and you should treat

18   deposition testimony the same as you would live

19   testimony.

20             And I mentioned earlier, exhibits.

21   These are simply documents or products or

22   devices used in evidence.  A stipulation is an

23   agreement among the lawyers about a fact.  If

24   the lawyers have stipulated that a fact is true,

1    you should accept that and think nothing further

2    of it.

3              One last thing about the evidence.

4    Statements and arguments by the lawyers such as

5    you will hear this morning are not evidence.

6    The lawyers may suggest to you how you should

7    interpret the evidence, and you may or may not

8    agree with them, but their statements and

9    arguments are not themselves evidence in the

10   case, and that includes the opening statements

11   and closing arguments as well as questions to

12   the witness.

13             Now, evidence has to be admitted

14   to be considered by you.  And when I refer to

15   something being admitted or admitted into

16   evidence or received into evidence, I mean that

17   you may consider a particular statement or a

18   particular exhibit in making your decisions at

19   the end of the case.

20             You're to consider only the

21   evidence that has been admitted in this case.

22   And you may draw from facts that you find to

23   have been proven any reasonable inferences or

24   conclusions that you feel are justified in the

1        light of your experience.

2                        Now, from time to time during the

3        trial, one of the other lawyers for the parties

4        may object to the introduction of evidence, and

5        I'll rule on those objections, but you should

6        not infer that I have any opinions on facts of

7        the case or that I favor one side over the

8        other.  If I overrule an objection, I'm

9        permitting that evidence to be introduced and

10       you should not think anything of the fact that

11       it was objected to.

12                        On the other hand if I sustain an

13       objection, I'm excluding from evidence that

14       particular item.  Don't worry about why, it

15       could be any number of reasons, and do not spend

16       your time wondering about what a witness or a

17       document might have said.

18                        If I tell you that evidence is

19       admitted only for a particular purpose, consider

20       it only for that purpose and not others.  And

21       finally, if inadmissible evidence is introduced

22       before I can prevent it, I may order that it be

23       stricken and then you should entirely ignore it.

24                        Now, during the trial it's going

1    to be necessary for me to confer with the

2    lawyers outside of your hearing, or even to

3    conduct part of the trial outside of your

4    presence, as we did earlier in the jury

5    selection.  And I will handle these matters as

6    briefly and conveniently for you as I can, but

7    you should remember that they are a necessary

8    part any trial.

9              It's also my duty to caution or

10   warn an attorney who does something that I

11   believe is not in keeping with the rules of

12   evidence and procedure, and don't draw any

13   inferences against the party whom I caution or

14   warn during the trial.

15             Now, keep an open mind during the

16   trial.  Do not decide any fact until you have

17   heard all the evidence, closing arguments and my

18   instructions.  And at the end of the trial,

19   you'll have to make your decision based on what

20   you recall of the evidence.

21             The exhibits that are introduced

22   in the trial will be available to you during

23   your deliberations.  And even though the court

24   reporter here is making a typewritten copy of

130

```
 1        the testimony, that copy will not be available

 2        for use by you during your deliberations,

 3        although you can request that a particular part

 4        of the witness's testimony be read back to you.

 5        It's difficult and time consuming for a reporter

 6        to read back lengthy portions of the testimony,

 7        so the opportunity to have testimony read back

 8        is limited.  And I urge you to pay close

 9        attention as the testimony is given in the first

10        place.

11                    Now, we come to the juror

12        notebooks that I mentioned earlier.  I'm going

13        to ask our courtroom deputy to distribute copies

14        of them to you.

15                    And could I have a copy also,

16        please?

17                    MR. PARTRIDGE:  Your Honor, I

18        think I still have the one we gave you from this

19        morning.

20                    THE COURT:  Yes, I do.  Thank you.

21                    Now, you're free to use these

22        notebooks to take notes at any point during the

23        trial.  Everything you write in the notebooks

24        will be kept confidential.  At the end of each
```

1      day, you're not going to take these notebooks

2      home with you, they'll be kept in the jury room

3      under lock and key.  And at the end of the trial

4      any notes that you take will be shredded.  You

5      don't have to take notes, but you may if you

6      wish.  If you do take notes, be careful not to

7      get so involved that you become distracted and

8      miss part of the testimony.

9                 Now, in addition to some blank

10     pages for notes you'll find a copy of the patent

11     that was discussed in the video.  This is a

12     sample patent.  It's not a real patent.  And

13     that's under tab A here.  It's titled A Patent

14     Process and Overview For Jurors.

15                And then in B we have the actual

16     patent that's involved here, it's RE44550E.

17     You'll see it's numbered in the upper right-hand

18     corner, and we will refer to this as the '550

19     patent in the course of the trial.

20                And then we'll come back to the

21     patent and I will explain some parts of that

22     later.

23                We also have an exhibit C here, a

24     chart of the asserted patent claims from the

```
 1        patent.  And also a glossary of patent terms,

 2        and interpretations of the patent claims

 3        provided and filed in court and we will get to

 4        an explanation of that later.

 5                    And then at the end you'll see

 6        there are pictures of the witnesses who are

 7        going to appear, space for notes, pictures of

 8        the Google witnesses that are going to be

 9        supplied to you later.  These are the ACI

10        witnesses that you have here in the notebook for

11        a moment.  And let's go back now and take a look

12        at the '550 patent.  That's tab B.  You see that

13        the patent was granted on October 22nd, 2013.

14        That's in the upper right-hand corner there of

15        the first page.  And the patent number which I

16        referred to earlier, and the names of the

17        inventors.  It says Mayer, et al., and then

18        elsewhere on this page under inventors and over

19        on the left-hand side it list all four

20        inventors.

21                    It also list the filing date of

22        the patent which is February, which is in the

23        United States, December 17th, 1996, and that

24        filing date was based on earlier filing in
```

1    Germany on December 22nd, 1995.

2                    Now, that December 22nd, 1995 date

3    is going to be important in the course of this

4    trial.  And that's referred to as the priority

5    date of the patent.  So try to remember that.

6                    Now, after the first page here we

7    have the specification, what's called the

8    specification of the patent.  It begins with a

9    summary of the patent which is under the heading

10   abstract, and that's a brief statement about the

11   subject matter of the claimed invention.  Then

12   there are various drawings here, the next few

13   pages.

14                   And then about thirteen pages in

15   after these drawings, there are figures here,

16   there is a written description of the claims and

17   you see that appears in a number of columns, two

18   columns to each page.  And then the

19   specification a few pages later with various

20   numbered claims of the patent.  You see that in

21   column ten there, it says what is claimed is,

22   and then there are numbered claims.

23                   Now, not all of these claims in

24   the patent are involved in this case.  You will

1     find the number of claims in the patent are --

2     they're claims 1, 3, 14, and 28.  1, 3, 14 and

3     28.  Those are the only claims that you need to

4     concern yourselves with.

5                    Now, normally during trials only

6     the lawyers are allowed to ask questions of the

7     witnesses, but I'm going to do something

8     different in this trial, and that is I'm going

9     to allow the jurors to ask questions.  Now,

10    you're not going to do that, be able to do that

11    orally, but it will have to be done in writing.

12    And it is a very specific process so that it's

13    done neutrally and the lawyers in the case won't

14    know which jurors are suggesting questions.

15                    So if there is something that you

16    would like to ask at the conclusion of the

17    witness's testimony after the initial

18    examination and the cross and the redirect, I'm

19    going to ask that each of you take a piece of

20    paper and if you have a question to write the

21    question on that piece of paper.

22                    Now, whether or not you have a

23    question, you should hand your piece of paper to

24    the courtroom deputy, that's so that the lawyers

1    can't tell who asked the question and everything

2    is kept confidential.  And you should not put

3    your name on the form if you do ask a question,

4    again, so the confidentiality is maintained.

5              Now, after you have written down

6    any questions that you have, and obviously we

7    don't have the opportunity to ask many

8    questions, but if there is a question, I'll

9    review the question, and I will confer with

10   lawyers whether it's an appropriate question

11   that should be asked or whether it should be

12   asked in a different format.

13             And it's possible that I won't ask

14   the question, and there may be any number of

15   reasons for that, and you shouldn't worry about

16   it if I don't allow the question to be asked.

17   But if I do decide the question should be asked,

18   I will review it like I said with the lawyers

19   and then ask the question of the witness or I

20   might ask the lawyers to ask the question of the

21   witness.  And after the witness has answered all

22   of the questions, I then may allow the attorneys

23   to ask further questions as a way to follow-up

24   any question that you had.

 1                    Now, please don't feel compelled

 2          to ask a question, but don't be afraid to ask a

 3          question if you think it would be helpful, and

 4          your questions should be limited to the

 5          questions to the particular witness that you

 6          just heard, in other words, we can't go back to

 7          earlier witnesses.

 8                    Now, let's come back to the

 9          general subject of patents.  As you heard from

10          the video, patents are granted to inventors by

11          the Patent and Trademark Office, or the PTO.

12          And a patent allows others -- it's to prevent

13          others from making, using or selling the

14          patented invention that is the invention

15          described by the claims.  When someone does one

16          of those things, that is making, using or

17          selling, without the patent owner's position,

18          that's called infringement.  And the

19          patentholder can enforce the infringer by suing

20          in federal court and that's what ACI has done

21          here.

22                    Now as you also heard from the

23          video, everyone has the right to engage in

24          activity that's not covered by a patent and to

```
1     use existing knowledge and principles.  A patent

2     can't remove from the public the ability to use

3     what is known or obvious before the invention

4     was made or protection was sought.

5                    And if a patent does that, the

6     patent is invalid.  And Google contends here

7     that the claims asserted by ACI are invalid.

8     And before giving you a little more detail about

9     the parties' contentions, I'm going to come back

10    again amd review some of the things that we saw

11    in the video.

12                   The process of obtaining a patent

13    is called patent prosecution.  To obtain a

14    patent an applicant files an application with

15    the patent and trademark office.  And the PTO of

16    course is an agency of the Federal Government

17    and it employs trained examiners who review

18    applications for patents.  If the PTO's patent

19    examiners conclude the invention is patentable,

20    they will grant a patent.  But again, as you saw

21    in the video, the PTO is not infallible and the

22    issuance of a patent is not conclusive as to the

23    patent's validity.

24                   The application includes a section
```

1    called a specification.  We just went over that

2    and that specification must include a written

3    description of the claimed invention telling

4    what the invention is, how it works and how to

5    make a use it in such full, clear, concise and

6    exact terms so that others skilled in the art,

7    including competitors will know how to make and

8    use the invention without undue experimentation.

9              Now, we've talked about the patent

10   claims.  I've shown you where in the patent

11   those claims exist.  Now, after a patent is

12   issued by the PTO, the owner of the patent can

13   request additional prosecution of the patent and

14   that request is called a reissue application and

15   if the PTO again concludes, after a back and

16   forth that the reissue application meets the

17   requirements of a patent the reissue application

18   will result in a reissue patent.  And that

19   happened here twice.  There were two reissued

20   patents.  We're concerned with the second

21   reissue patent.  That's the one that you have in

22   your juror notebooks.

23             Now, the granting of a patent by

24   the PTO carries with it a presumption that the

```
 1     patent is valid.  But the patent office doesn't

 2     determine whether the patent is infringed.  You

 3     heard that also in the video and it's the patent

 4     owner's burden to establish infringement.  And

 5     also as I mentioned, just because the PTO grants

 6     a patent does not necessarily mean that the

 7     invention claimed in the patent is, in fact,

 8     valid.  One or more claims may, in fact, not be

 9     valid and it's the job of you as the jury to

10     determine if the patent is infringed and is

11     valid.

12                   Now, to help you follow the

13     evidence here, I'll give you a summary of the

14     positions of the parties.  And as I mentioned,

15     Plaintiff is ACI and Google is the Defendant and

16     the patent we're going to refer to, as I said,

17     is the '550 Patent.

18                   ACI alleges that Google has

19     infringed certain claims of the product in the

20     patent by using within the United States methods

21     that ACI argues included all the requirements of

22     these claim.  These claims that we're dealing

23     with here are called method claims.  That's a

24     patent on a method of doing something.  Google
```

1    alleges that it does not infringe the asserted

2    claims and that the asserted claims are invalid,

3    as I said.

4              I also mentioned that there are

5    four claims.  They are claims 1, 3, 14 and 28.

6    And to fulfill your duties of jurors you must

7    decide whether any of these four claims has been

8    infringed and whether the claims are invalid.

9              Now, to make it even a little more

10   complicated, there are two ways to prove

11   infringement.  There's something called literal

12   infringement and then there's something called

13   infringement under the Doctrine of Equivalents.

14   For literal infringement ACI must show that

15   every limitation of the patent claim was met,

16   every one of the steps of the method was

17   performed by Google.  Under the Doctrine of

18   Equivalents there is infringement if there are

19   insubstantial differences between the claim,

20   what the claim requires and the accused conduct,

21   but each claim limitation has to be met either

22   literally or under the Doctrine of Equivalents.

23   And I will provide even more detailed

24   instruction on equivalents after you've heard

1    all the evidence at the conclusion of the case.

2              Now, a person accused of

3    infringement like Goggle has the right to argue

4    here in federal court that a claimed invention

5    in the patent is not entitled to patent

6    protection, that it doesn't meet the

7    requirements for the issuance of a patent.  In

8    other words, an accused infringer like Google

9    can defend a suit for patent infringement on the

10   grounds that the patent is invalid.  And Google

11   asserts that the claims that are asserted here

12   are not valid.  And it's your job to consider

13   the evidence presented by the parties and

14   determine whether Google has proven that the

15   patents are not valid by clear and convincing

16   evidence.

17             Now, in determining whether the

18   '550 Patent is invalid you will be asked to

19   consider items of prior art and I had mentioned

20   to you earlier to pay particular attention to

21   the December 22nd, 1995 date.  That's the

22   priority date of the patent.  And what

23   constitutes prior art is determined by the

24   priority date of the patent.  Only printed

1    publications made public before the priority

2    date constitute prior art.

3            Google makes three arguments about

4    validity.  First it says that prior art before

5    1995 date anticipates, anticipate the '550

6    Patent because one or more of the individual

7    prior art references previously disclosed in

8    each and every limitation of the '550 Patent,

9    that's called anticipation.  The second argument

10   is that a combination of prior art references

11   made the invention of the '550 Patent obvious to

12   someone skilled in the art at the time of the

13   1995 priority date.  And then third, Google also

14   contends that the patent is invalid because the

15   invention was in prior use before the priority

16   date and also because the prior inventor ship.

17           Now, if at the end of the trial

18   you conclude that any of the claims is infringed

19   and is not invalid, you will be asked to award

20   damages.  You will receive further instructions

21   on damages at the conclusion of the trial and by

22   instructing you as to damages, I am not

23   suggesting that damages should be awarded.  And

24   as I mentioned, the claims of the patent are the

1       main focus of the patent case, because the

2       claims are what define the owner's rights under

3       the law.  And that is the claims define what the

4       patent owner may exclude others from doing

5       during the term of the patent.

6               And the claims of the patent serve

7       two purposes.  They set the boundaries of what

8       the patent covers and second, they provide

9       notice to the public of what those boundaries

10      are.  When a process is accused of infringing a

11      patent as here, the patent claims are compared

12      to the accused product or process, here process,

13      to determine whether or not there is

14      infringement.  And as I said earlier, you're

15      going to be comparing the four claims of the

16      '550 Patent to the accused methods in this case

17      together with construction that the court has

18      given to those claims.  Claims are also at issue

19      when the validity of the patent is challenged as

20      here, so you're also going to have to compare

21      those four claims to what the prior art did or

22      described.

23              In reaching your determination

24      with respect to both infringement and

1    invalidity, you must consider each claim

2    separately.  Following the patents in your

3    notebook you'll find the list of the claims as I

4    showed you earlier.  These claims are all listed

5    in the list of patent claims described earlier

6    and after the list of patent claims you'll see

7    the glossary of patent terms.  The glossary

8    contains some simple definitions of relevant

9    terms, most of which I have just discussed.  And

10   you may find it helpful to refer to those items

11   from time to time during the trial.

12            Now, although the claims describe

13   the claimed invention, the parties may disagree

14   and they did here, as to what certain terms of

15   the claims mean.  And when that happens, they

16   ask the court to interpret the terms of the

17   claims in the light of the patent as a whole.

18   And this is to help you resolve any disagreement

19   and to give you the jury guidance in applying

20   the claims to the facts of this case.  And that

21   disagreement happened here before trial, the

22   parties came to the Court and presented

23   disagreements over what certain words in the

24   claims meant and the Court resolved those

1    disagreements by issuing what are called claim

2    constructions, which are central to your

3    deliberations.

4              The parties and the experts are

5    required to use the Court's constructions of the

6    claims when presenting evidence and you must

7    also accept and apply them when you decide the

8    issues of infringement and invalidity.

9              Now, I'm going to take a moment to

10   review the burdens of proof that each party

11   bears in this case.  You saw that mentioned at

12   the end of the video.  The burden of proof tells

13   you which side has the burden to persuade you.

14   And in this case, the burden of proof depends on

15   the issue.  First ACI as the patent holder and

16   Plaintiff bears the burden of proving that

17   Google has infringed its patent.  It has to do

18   that by a preponderance of the evidence which

19   means that it has to show that it is more

20   probable than not that Google infringes.  And if

21   you think the evidence on infringement is evenly

22   balanced then Google wins on that issue.  You

23   conclude that ACI has established infringement

24   ACI also bears the burden of proof of

1    establishing damages from Google's infringement.

2    Again, that's by a preponderance of the

3    evidence.

4              Now, on the other hand, Google is

5    the party challenging the validity of the

6    patents bears the burden of proving invalidity

7    of the claims.  And as you've heard, it has to

8    prove invalidity by clear and convincing

9    evidence.  Proof by clear and convincing

10   evidence is evidence that produces in your mind

11   a firm belief or conviction that the defense has

12   been proven.  Clear and convincing evidence is a

13   higher standard than preponderance of the

14   evidence, but it's not as high as the beyond a

15   reasonable doubt standard that a prosecution has

16   to satisfy in a criminal case.  In deciding

17   whether the parties have met their burdens of

18   proof under the appropriate standard, you should

19   consider all of the evidence regardless of which

20   party presented it.

21             Now, I spoke to you last week

22   about confidentiality and confidentiality is so

23   important that I'm going to repeat what I said

24   last week.  Until this case is over, do not

```
 1         discuss it with anyone and do not allow anyone
 2         else to discuss the case in your presence.  This
 3         includes your family and friends.  Hold yourself
 4         apart from the people involved in this case, the
 5         parties, the witnesses, the lawyers and anyone
 6         associated with them.  If anyone should try to
 7         discuss the case with you or otherwise approach
 8         you about the case, you should inform me
 9         immediately.  Do not even discuss the case with
10         your fellow jurors until you have all assembled
11         for deliberations at the end of the case on
12         Friday.  Trying lawyers in particular aren't
13         allowed to speak with you during the case and
14         when you see them at a recess or past them in
15         the halls, they may not speak to you other than
16         just to say hello.  They are not being rude,
17         they are simply following my instructions.  As I
18         said, it's fine to say good morning if you're
19         riding in the elevator together, but that's it,
20         nothing beyond that.  The lawyers will also not
21         be allowed to speak to you after the case is
22         over unless I give permission, which I will only
23         do if there's an exceptional circumstance that
24         justifies it.
```

1          If you use social networks like

2     facebook or twitter, do not discuss, mention or

3     post updates of any kind regarding the trial in

4     this case.  You can tell people about your

5     experience after the case is over.  Likewise, do

6     not send any text messages or e-mails about this

7     case or discuss it over the telephone.  I'll

8     allow you to have your cell phones in the

9     courthouse, but you must leave them in the jury

10    room during the trial and don't bring them into

11    the courtroom.  You may certainly use them

12    during the lunch break or recesses to call or

13    text your family to say for example that you're

14    going to be a few minutes late or to discuss any

15    family problem that you might have, but don't

16    use them to discuss the case.

17          You're not allowed also to do any

18    research into any fact or issue related to the

19    case.  You should not go on the internet to

20    learn more about the case, the parties, the

21    lawyers or patent law.  Do not watch or read any

22    news accounts of the trial should you come

23    across them.  The reason for all of this is that

24    you're going to be guided solely by what you see

```
1       and hear in trial in this courtroom.

2                    It's an important part of our

3       civil justice system.  If two parties disagree,

4       they can bring their dispute to court and obtain

5       a verdict from a fair and impartial jury.

6                    Finally, I need to once again

7       emphasize that violating the instructions in

8       this respect would be a very serious matter.  As

9       you can see, a great deal of time, effort and

10      money has gone into getting this case ready for

11      trial, and to trying it fairly and impartially

12      before you.  If you were to violate the Court's

13      instruction, it could place all of that in

14      jeopardy and we might have to go back and do it

15      all over again.  So please, follow my

16      instructions to the best of your ability.

17                   All right.  Now, we have arrived

18      at the time for opening statements from the

19      lawyers, and each side has thirty minutes.  And

20      plaintiff, Mr. Partridge, you may begin.

21                   MR. PARTRIDGE:  Mr. Hawes will do

22      our opening this morning, Your Honor.

23                   THE COURT:  Thank you.

24                   MR. HAWES:  Your Honor, I would
```

```
1      like to bring a flip chart up if I may.

2                     THE COURT:  Surely.

3                     MR. SNYDER:  Your Honor, may I ask

4      him to move that so I would be able to see it?

5                     MR. HAWES:  I'm sorry.

6                     THE COURT:  Yes, we all need to be

7      able to see it, but the problem is we can't have

8      it too far away from the jury.  Mr. Snyder, you

9      could move over on the other side so that you

10     can.

11                    MR. HAWES:  I'll represent for the

12     Court I'm going to write one number on it and I

13     will clearly represent what that will be before

14     I do it.

15                    THE COURT:  Okay.

16                    MR. SNYDER:  Perhaps you could

17     move it over a little bit more so I could see

18     the jury, please.

19                    MR. HAWES:  Which way would you

20     like me to move it because I don't want to block

21     their view of that?

22                    MR. SNYDER:  All right.  Thank

23     you.

24                    MR. HAWES:  Is that better?
```

```
 1                    MR. SNYDER:  Thank you.

 2                    MR. HAWES:  Is that blocking

 3      anyone's view?

 4                    Good morning.  And thank you for

 5      serving on the jury in this case.  I would guess

 6      you thought you would be doing else the week

 7      before Memorial Day, but we need your help to

 8      resolve an important issue that Art+Com tried to

 9      resolve with Google on several occasions.

10      Unfortunately this lawsuit was the only way we

11      could make Google listen.

12                    This case is about flying, or at

13      least the view you would get if you really could

14      fly around the world, the powerful visual

15      sensation of moving anywhere on the world and

16      looking down and seeing what you would see if

17      you were hovering above.

18                    Ever since the 1930s when Superman

19      debuted in the Action Comics comic book kids

20      everywhere have wanted to have that dream of

21      flying around maybe circling Mount Everest or

22      going somewhere else and seeing what it would

23      look like.

24                    You're going to learn in this
```

1    trial that the Art+Com inventors were years

2    ahead of their time in developing the patented

3    techniques that allow you or any of us to

4    experience that powerful flying viewpoint.  You

5    may have heard of Google Earth when Google Earth

6    was first introduced in 2005.  Here is picture

7    of what Google Earth looks like when you bring

8    it up.

9             In this trial and in the evidence

10   you're going to hear, you're going to learn the

11   real story.  And the real story starts ten years

12   before 2005 in Berlin, Germany, with the work of

13   the inventors of Art+Com.

14             Now, the invention that's at issue

15   in this case is really the second idea that the

16   Art+Com inventors had.  The first idea was a

17   stand-alone unit with heavy equipment and if you

18   look in the corner you can see the big ball

19   there.  You're going to get to see that with our

20   first witness.  His name is Pavel Mayer.  And

21   he's one of the Art+Com inventors.  And he'll

22   show you how what we call the Earth Tracker

23   worked back in 1994 and 1995.

24             And he'll explain the techniques

1    that allowed the Earth Tracker to show that

2    great vision of the earth.  But the Earth

3    Tracker needed a massive hard drive.  It needed

4    a lot of equipment.

5            This case is about the invention,

6    the software invention, the internal techniques

7    that allowed that powerful visual image to be

8    released from the heavy equipment and given to

9    anyone who just has a computer.  This is

10    Mr. Mayer as he was demonstrating the Earth

11    Tracker back in the mid 1990s.

12            Now, the Earth Tracker was also

13    shown at other conferences and here is a picture

14    of it being used at a conference in Japan.

15    You're going to see an actual VHS videotape of

16    Mr. Mayer using the Earth Tracker back in the

17    mid 1990s.  You'll get to see what it was all

18    about.

19            It's important to note that the

20    inventors of Art+Com were very enthusiastic

21    about their invention.  Mr. Mayer and his

22    colleagues liked to demonstrate it.

23            I want you to remember one thing,

24    Google is going to say that the demonstration

1    that inventors did make their patent no good.

2    And when they do that, I want you to remember

3    the two ideas of Art+Com, the first one is the

4    stand-alone unit with the massive hard drives

5    that was needed in order to show the viewpoint,

6    but the second idea were the special software

7    techniques that allowed you to get away from the

8    massive hard drive but still give that visual

9    flying experience to the world.  And that's

10   going to be the focus of this case, those

11   special techniques that made that possible.

12            In addition to Mr. Mayer, Mr. Axel

13   Schmidt has also come from Germany to speak to

14   you.  Mr. Schmidt will tell about the things

15   that he did to contribute to inventors and the

16   invention techniques that allowed to unshackle

17   the visual viewpoint from the equipment and the

18   massive hard drives that had been required

19   before.

20            Now, Mr. Smith and Mr. Mayer when

21   they realized what a big idea they had, what an

22   important idea they had, they did what people

23   with big ideas do, they went to the patent

24   office.  Of course for them, they went to the

1        local patent office in Germany which is why

2        their first patent application is in German.

3                Now, Mr. Schmidt and Mr. Mayer are

4        going to testify for you today in English.  Also

5        Mr. Andreas Wiek from Art+Com is also going to

6        testify for you in English.  I just want to warn

7        you, it's not their native tongue.  Each of them

8        is going to have an accent and they may have

9        problems with certain words, but they would like

10       to communicate with the Court as directly as

11       they can, so they're going to try to communicate

12       in English.

13               After the inventors had filed this

14       application in Germany, this wasn't enough, they

15       knew they had a very big idea, so they came to

16       the United States and they filed a patent

17       application here in the United States Patent

18       Office.  As you just saw from the video that the

19       judge showed you, the patent office is not

20       always a fast place.  When you file your patent

21       application, a patent examiner has to take a

22       look at it, take a look at the prior technology,

23       compare the two and decide whether you deserve a

24       patent.

1              In Art+Com's situation, they filed

2      the patent application as I said back in 1996.

3      But it took a while for it to issue.  So you had

4      to walk through over three years until in August

5      of 2000, the patent office said yes, you deserve

6      a patent, and granted that patent to Art+Com.

7              Now, during that time, those three

8      years, Art+Com inventors weren't sitting idle,

9      they wanted to go around the world and

10     demonstrate this great idea they had.  And they

11     came here to the United States.  They came to a

12     company called SGI.

13             It's important to realize first of

14     all that the Earth Tracker only shows you the

15     results of the method, the secret sauce, the

16     actual software innovations that the Art+Com

17     inventors came up with, you can't tell that from

18     just looking at the Earth Tracker.  But still it

19     is a great demonstration.

20             They came to Silicone Graphics,

21     Incorporated, or SGI in California.  They came

22     to a showroom at SGI's corporate headquarters

23     and they showed off their tracker, because SGI

24     was a big graphics company.  Their corporate

```
 1      showroom is all about showing what cool things

 2      could be done with graphic computers.  And

 3      Art+Com has used SGI computers as part of their

 4      early experiments.  And this was a great way to

 5      show off what they had done.

 6                   Well, here at SGI was the first

 7      time that Art+Com and Google Earth crossed

 8      paths.  You see at SGI they also had two

 9      employees named Mr. Michael Jones and Mr. Brian

10      McClendon.  So those two employees were there at

11      the same time.  And Mr. Jones said that he went

12      and looked at the Earth Tracker.

13                   Now, remember, as I said, just

14      looking at the Earth Tracker doesn't tell you

15      all the secret sauce, but he saw what Art+Com

16      could do.  He saw the powerful visual experience

17      that Art+Com could create.

18                   So what happened to Mr. Jones and

19      Mr. McClendon?  As I said, they were at SGI, but

20      they ended up leaving SGI, and they started a

21      new company.  And that company was called

22      Intrinsic Graphix.  Now, Intrinsic Graphix as

23      developing a software engine.  That software

24      engine was called Alchemy.  If you look at the
```

1     logo, it says powered by Alchemy.  That's

2     because they were -- it didn't work out the way

3     they wanted and Intrinsic Graphix was actually

4     purchased absorbed into another company, but

5     before that happened, Mr. Jones and

6     Mr. McClendon created a new company and moved to

7     that company and it was called Keyhole.

8                 Keyhole got some rights to that

9     Alchemy technology, but Keyhole was all about a

10    new product, a product called Earth Viewer.

11                You see, Mr. Jones and

12    Mr. McClendon wanted to create that same

13    powerful visual experience and they were going

14    to do it with this new product.  Now, did they

15    reach out to Art+Com to say hey, we both do some

16    of the similar technology, let's work together?

17    Did they talk to Art+Com about it?  Nope, they

18    didn't contact them at all.

19                So we have here in the year 2000,

20    Keyhole starting to work on Earth Viewer and

21    Art+Com already years ahead, in fact they're

22    already getting their patent in the United

23    States Patent Office in this same year.

24                Before we talk about what happened

1    at Keyhole thereafter, let's talk a little bit

2    about what it means to have a patent.  A patent

3    gives you a property right in your invention,

4    just like you can own a farm or a songwriter can

5    own a copyright in a song.  If you own a patent,

6    you have property in the invention claimed in

7    the patent.  So what does that mean?  Well,

8    anyone with property can get permission to use

9    that property.  For example, let's say the

10   Spotify music service wants to play Beatles

11   songs for its customers.  Spotify is going to

12   have to contact the Beatles and say we want to

13   play Beatles songs.  And what they will do is

14   sign a contract and this contract has a special

15   name, it's called a license agreement.

16           All that means is it's a contract

17   where one person gets permission from another

18   person to use intellectual property.  So Spotify

19   will go to the Beatles and say we want to play

20   Beatles songs, the Beatles will say hey, let's

21   sign an agreement, you can play the Beatles

22   songs, but you'll say pay us a little bit every

23   time you do it.

24           The same thing can happen with a

160

```
1    patent, you get permission in a license

2    agreement.  What happens if someone uses an

3    invention or plays a song and they didn't have a

4    license agreement?  That's what we call

5    infringement.  That's what this case is about,

6    it's the use of a patent without a license

7    agreement.

8              So what happens with Keyhole.

9    Where do Mr. Jones and Mr. McClendon end up?

10   Well, the first thing they do is they start to

11   work on this Earth Viewer product.  They hire a

12   CEO and his name is John Hanke.  The three of

13   them work on Earth Viewer and they start selling

14   the product.  In fact their deal for customers

15   is pay us a yearly fee and you can use Earth

16   Viewer for this flying visual experience.

17             But in 2004, Google learns about

18   Keyhole and Earth Viewer.  Google didn't develop

19   any of the basic technology in this case.  The

20   evidence will show that that technology was

21   developed at Keyhole.  Google bought Keyhole and

22   rebranded the Keyhole Earth Viewer as Google

23   Earth.

24             Now with Google Earth we have a
```

1    situation where it's just version 3.0.  It's

2    kind of funny, usually software the first

3    version is 1.0, with Google Earth it's 3.0

4    because there had already been two versions of

5    the Earth Viewer.

6              When Google bought Keyhole,

7    Mr. Jones, Mr. McClendon, Mr. Hanke all moved

8    over to Google as part of the deal.  In fact, by

9    the time Google Earth was released, Mr. Jones

10   had been declared the chief technologist of

11   Google Earth, Google Maps and Local Search.

12             The other thing we know about this

13   acquisition by Google is they gave a lot more

14   publicity to Google Earth.  It's no surprise

15   that Mr. Hanke admits that because of the Google

16   connection they were able to deliver this to a

17   lot more customers.  And next thing you know

18   everyone on earth heard about the Google Earth

19   and its great visual flying experience.

20             It's no mystery that at this point

21   in time, ACI learned what had been happening.

22   Now, ACI knew that Google Earth was providing

23   that powerful flying experience, but they didn't

24   know how Google Earth was doing it, they didn't

1      know the internals.

2                   But some of the ACI inventors had

3      known Michael Jones from back in the SGI days,

4      so they reached out to Mr. Jones and they said

5      hey, we're working on some of the same

6      technology, we have got this really valuable

7      patent, maybe we should work together, do a

8      business deal.

9                   They might have been a little

10     naive, because they asked Google are you using

11     our patented techniques?  And Mr. Mayer will

12     testify that Mr. Jones said no, no, we're doing

13     something different than what your patent does.

14                  Well, that's what they were told

15     and then Google called in the patent lawyers and

16     the Google patent lawyers told Art+Com, hey,

17     you've got a problem in this patent and here is

18     some documents that show you that problem.

19                  ACI didn't know one way or another

20     whether those documents were really a problem,

21     but they did know who to ask.  They asked the

22     United States Patent Office.

23                  As the Judge described, the United

24     States Patent Office has a way to do a second

1     check on your patent.  It's called reissuing

2     your patent.  And so ACI went to the patent

3     office and they filed a reissue application.

4     They said hey, we have been told there are these

5     problems.  Can you check, see if there really

6     are.  And they sent the very documents that

7     Google said were a problem to the patent office

8     to check and see.

9                 Well, again, the patent office

10    takes its time and it wasn't until the year 2010

11    that the patent office told ACI we have checked,

12    things look good, we're going to give you a new

13    reissue patent.  The problems that Google said

14    were a result of those documents, they weren't

15    really problems.

16                 So what did ACI do then?  It knew

17    it had a good patent, they had gone through two

18    different checks at the patent office.

19                 MR. HAWES:  Well, now ACI looked a

20    lot more closely at Google Earth and from what

21    they could tell of Google Earth's operations,

22    they concluded that Google Earth was using the

23    patented techniques, that Google Earth was

24    infringing that patent.

1                    Now, you're going to have to go

2          through that same analysis.  You're going to

3          have Google Earth's confidential source code

4          shown to you and you're going to have to analyze

5          whether that source code lines up with the

6          claims of the '550 Patent, but you won't have to

7          do it alone.  Doctor Ken Castleman is a

8          technical expert who has both experience with

9          regard to image processing, but also knows about

10         patents.  Doctor Castleman has worked for NASA.

11         He led the development of the image processing

12         for an automatic microscope that NASA then sent

13         to Mars and it's currently out on Mars taking

14         pictures.  He also advises the FBI, although I

15         can't really go into details about what he does

16         for them.  And he has also even filed expert

17         reports for the patent office in the area of

18         image processing.  Doctor Castleman is a PhD in

19         electrical engineering and his book on image

20         processing has been translated into many

21         different languages and used in universities

22         around the world.  He's going to work through

23         that code with you.  Luckily you're not going to

24         have to look at the code for every one of Google

```
1       Earth's products and look at it and have it be

2       new and go through it again, and the reason is

3       because Google tends to use some of that same

4       code in different products.  In fact, Google

5       Earth's technical lead, whose name is Mr. John

6       Rohlf, confirmed, as you can see there, that his

7       focus was on the core of Google Earth client and

8       when he was asked by core, do you mean code that

9       might be shared across the different platforms

10      and his answer was yes.  So you won't have to

11      look at different code each time.  Doctor

12      Castleman will identify for you where the key

13      code is and then we can show you where it is

14      each time as you go from product to product.

15               When ACI realized Google Earth was

16      using their patented invention, Mr. Meyer's sent

17      an e-mail saying hey, you need to get permission

18      and here's my deal as to how you can get

19      permission.  And I saw I think it looks like

20      it's a little hard to read, but he really gave

21      Google two options.  First he said Google, you

22      can pay $1 for each user of Google Earth.  The

23      second option he said was well, how about 10

24      cents for each use of Google Earth.  So he gave
```

1    Google a couple of options hoping to get Google

2    to negotiate.  Google could have said no, no, no

3    10 cents is too much, how about 5 cents or maybe

4    even 2 cents, only two pennies per use.  Google

5    didn't do that.  Google didn't negotiate at all.

6    Google just said we think you're patent is no

7    good and refused to talk.  The ACI inventors

8    tried very hard to engage with Google to come to

9    a deal to get Google to seek permission to use

10   the patent, but what they discovered was that

11   Google wasn't willing to share the benefits of

12   Google Earth unless a jury told them to.

13          Now, you probably have some

14   questions about Google.  You know, why didn't

15   Google go work with ArtPlus.com since they were

16   doing the same technology?  Why did Google buy

17   Keyhole and then change Earth Viewer into Google

18   Earth and why does Google provide Google Earth

19   to its customers for free, when Keyhole charged

20   a yearly fee.

21          The thing we get to do today is

22   look at Google's internal documents to answer

23   that question.  Now to do that I need to turn

24   off the big screen so that only your monitors

1     are showing the documents, because these are

2     confidential Google documents.  I think I did

3     that, so hopefully we won't see anything on the

4     big screen.  These are documents that are not

5     available to the public and I want you to keep

6     in mind that ACI didn't get to see these

7     documents.  When ACI was talking to Google in

8     2006 and 2010, they didn't get to see what

9     you're going to get to see.  So the first thing

10    I think we can all agree on is that Google is

11    not a normal company.  Google provides so many

12    of its products for free, not just Google Earth,

13    you can watch Youtube videos for free, use Gmail

14    for free, search on Google search all day long,

15    it's going to be free.  But you can be confident

16    that Google has a way to make money from all

17    those free products.

18              And we're going to look at

19    Google's strategy document from 2006, only a few

20    months after Google Earth was released, to

21    determine how Google makes money off these free

22    products.  So let's look at the detailed

23    strategy Google had in its internal documents.

24    It's a pretty big chart, but right in the middle

1    the term monetization.  That's a term you see a

2    lot in Google documents and all it really means

3    is how to make money.  How is Google going to

4    turn free products into money for Google?  And

5    if you look there, you'll see.  The biggest

6    chunk of monetization for Google is to play ads

7    for you and I.  How are they going to get us to

8    look at those ads?  Well, the very first point

9    on this strategy is the user experience of

10   Google has an integrated search across all the

11   Google products.

12              Now, what does that mean?  That

13   means that if you're searching in Google.com or

14   Google Earth or Youtube, it's all feeding into

15   that one Google search where Google can show you

16   some aps.  That's an integrated search.  If you

17   look down below the monetization and you say

18   hey, what is it that's supporting that?  Well,

19   the first thing of course is search.  Google

20   started as a search company and they've got

21   great searching.  Don't get me wrong.  We

22   certainly agree with that.

23              What's the very next thing after

24   searching?  It's what Google calls Geo

1    applications and it's led by Google Earth.  So

2    even a few months after Google Earth had been

3    released, Google was already relying on Google

4    Earth as a basis for its monetization efforts as

5    a basis for making money.

6              How does that work?  How do they

7    make money off Google Earth?  Well, we can turn

8    a couple images in this internal strategy

9    document and see how Google makes money.  They

10   use users, advertisers and publishers and

11   surround this information that Google is

12   gathering and you can see from the arrows they

13   gather the information from everyone, from us,

14   the users, from the advertisers and from the

15   publishers.  They call this the UIAP model and

16   you can just see it just stands for the

17   different parts of the framework.  And when they

18   discuss it, what they say and you'll see this in

19   the bullet point, is they talk about the dynamic

20   is that having the most users, advertisers and

21   publishers provides data that we use to increase

22   targeting irrelevance.  They call this the

23   network effect.  That's another term you're

24   going to see a lot in the Google documents.

1      Network effect, if we can bring the users in, we

2      can make more and more money off the

3      advertisers.  If we have all the users, the

4      advertisers are going to want to come to us.

5      And if we know about the users, we can target

6      the right ads to them and then we can charge

7      more per ad.

8                  So this is all part of their

9      strategy and of course given that model the

10     final bullet point is no surprise.  For Google,

11     users are the focus of everything they do.

12     These are not my words, they are Google's.  Not

13     Mr. Mayer's words, but if you remember, Mr.

14     Mayer offers for permission, he said it would

15     make sense for you to pay us for the users

16     you're bringing in through Google Earth.  Well,

17     he didn't know it, but in the internal documents

18     of Google that's exactly how they saw the value

19     as well.

20                 Now, if you remember, Google Earth

21     was part of the Geo applications, so let's look

22     at Google's internal documents that are more

23     specific to those Geo applications.  Here's a

24     Geo business discussion.  Geo business is Google

```
 1        Earth, Google Maps, the types of products that
 2        are looking at the world.  So what happens when
 3        we look in this strategy document?  Well, we see
 4        the same thing we saw in the overall Google
 5        document, which is the Geo applications are an
 6        extension of core search.  They are not
 7        independent of search.  If you remember that
 8        integrated search, Google feeds it all into the
 9        same search and of course Google Earth is one of
10        the key Geo documents.  But what I'd like you to
11        notice here, if you look down at the bottome
12        where they list the business objectives, the
13        number one business objective for Google across
14        the board was to grow users and usage.  Those
15        are Google's words, not my words, but that's
16        exactly what Mr. Meyer had offered them with his
17        license offer.  He said well, you can pay me
18        because I'm bringing in users or you can pay me
19        because I'm bringing in usage, because my
20        patented invention is part of that.  Google
21        internally knew that's where the value was.
22        They knew that was their top business objective
23        to grow the users and grow the usage.
24                  Well, how does that actually
```

```
 1        create money for them?  Well, in this slide and
 2        this is a different page of that same document
 3        from the Geo business, we see that increases
 4        their advertising in several ways.  First of
 5        all, we see that it increases the search usage
 6        in their core search.  There's incremented
 7        search usage, but it also better targets their
 8        ad.  You'll see 1, 2, 3 here under core search
 9        so it increases at increments the search usage,
10        it better targets the ads and there's new ad
11        formats.  All of those bring Google more money.
12        So what's the bottom line for the Geo business?
13        You'll see that right in the middle of the page.
14        Monetization will follow users and usage.  For
15        Google the more people those bring in and the
16        more those people are using Google products, the
17        more money they can make.  That's what it's
18        about for Google.
19                  Now, these internal confidential
20        documents, you're going to get to look through
21        them, actually get to bring them back when
22        you're deliberating on Friday into the room, but
23        you'll also get to work and hear from Doctor Jim
24        Nawrocki, who will walk through these documents
```

1       with you.  Mr. Nawrocki is an expert in the

2       financial analysis of intellectual property and

3       especially patents and he's going to help you

4       look back in 2010, 2006 and 2005 and figure out

5       if Google had been willing to seek permission,

6       what kind of deal would Google and ACI have come

7       to, what kind of license agreement would they

8       have created and he'll do that based on the

9       internal documents you've been looking at.

10              Now, in addition to these strategy

11      documents, Google keeps documents about the use

12      and usage.  That's no surprise given how

13      important it was in the strategy documents.  For

14      example, Google tracks how many times Google

15      Earth is downloaded.  And five years ago in 2011

16      they celebrated when Google Earth was downloaded

17      for the one-billionth time.  They also keep back

18      of how often we use Google Earth.  This is an

19      internal spreadsheet.  I know it's hard to see

20      because it's one of those Excel spread sheets

21      but Google is keeping track every day of how

22      often Google Earth is being used.  And this is a

23      big spread sheet, as you can see, as we move

24      through.  So that column all the way to the

```
 1        right with the 10 million, the 20 million,

 2        that's how many times Google Earth is being used

 3        every day.  And the middle column tells you the

 4        average amount of time that people use Google

 5        Earth.  Google Earth is something that people

 6        just kind of log on, get their answer and log

 7        off.  You can see in that middle column that

 8        they spend 10, 15, almost 20 minutes on average

 9        using Google Earth.  They're very involved in

10        the Google system once they start using Google

11        Earth.  That's value for Google.

12                   Now, these numbers are just the

13        numbers for Google Earth.  But something special

14        happened in 2013.  Google took Google Earth and

15        they incorporated it into Google Maps.  So when

16        Mr. Nawrocki was trying to figure out how many

17        uses, how many sessions of the Google Earth

18        technology there had been, he had to look at

19        both these numbers, the numbers you see on your

20        monitors for Google Earth, but also he had to

21        look and see how many times was the Google Earth

22        functionality used as part of Google Maps.  He

23        added all of those numbers up and he determined

24        that since July of 2010 in the United States
```

1    alone Google Earth has been used over 7 billion

2    times.

3              Now, the exact number is hard to

4    remember because it's a 7 billion number, but

5    Mr. Nawrocki uses it in his calculations.  So

6    I'm going to write it down for us.  The exact

7    number was 7,099,171,846.

8              When you're asked at the end of

9    this case to determine how much use Google made

10   of ACI's invention and what the proper royalty

11   should be, I want you to remember that this is

12   Google's use of ACI's invention, these 7 billion

13   uses.

14             Now, Mr. Nawrocki also took into

15   account what Google did for Google Earth and we

16   are in complete agreement that Google should get

17   credit for the things Google did to make Google

18   Earth a success.  And the patent was a big part

19   of it, but Google had big parts of it too, and

20   Mr. Nawrocki identifies each of those

21   contributions of Google and says hey, those are

22   Google's, Google should keep those, but he

23   calculates from that, what's the part of Google

24   Earth that's really because of the patent

```
1        because of ACI's patented techniques for
2        providing that powerful visual viewpoint as you
3        fly above the world.  And he determined that the
4        proper royalty, when you looked at that, the
5        proper royalty they would have reached would
6        have been between one and two pennies for each
7        use.  So we are asking you to award ACI one or
8        two pennies for each of these uses, which
9        calculates out to $106 million.
10                   Now, Google is going to tell you
11       they should pay next to nothing for the use of
12       this basic patent that was essential to the
13       operations of Google Earth, and essential to
14       getting this many users this many usage for
15       Google.  When you hear that, I want you to
16       remember those strategy documents, Google's
17       internal documents that time when they were
18       saying what was most important to them.  They
19       were saying it was growing users and growing
20       usage and boy did Google Earth deliver in
21       spades.
22                   Now, during this trial other
23       lawyers from my firm will also be asking
24       questions of the witnesses.  That includes Scott
```

```
 1      Partridge, Natalie Alfaro and Gene Spears.  We

 2      will also be playing for you videos of witness

 3      depositions and I would ask that you pay close

 4      attention to the videos.  It's harder to

 5      interact with the videos than it is with the

 6      live witnesses, but it's very important.  They

 7      are Google employees who are not coming here for

 8      trial and I need you to listen to those videos

 9      of what they say about the Google system.

10      Finally you'll see other graphics during the

11      trial.  The graphics you aren't able to take

12      back with you when you're deliberating.  Now,

13      the confidential Google documents, those you can

14      take back and you can look at those while you're

15      deliberating on Friday, but if there's something

16      important in the graphics, you may want to take

17      notes so you'll have it with you on Friday.

18              We appreciate your taking the time

19      to resolve this important dispute and I'm going

20      to thank you in advance for the attention I know

21      you're going to give to the evidence in this

22      case.

23              THE COURT:  Okay.  Thank you, Mr.

24      Hawes.  Mr. Snyder, who is going to do this?
```

```
 1                    MR. SNYDER:  I will, Your Honor.

 2       Thank you.  May I proceed, Your Honor.

 3                    THE COURT:  Let's just put down

 4       the thing.

 5                    MR. SNYDER:  This case is not

 6       about flying.  This case is not about showing

 7       pictures of geographies and places.  This case,

 8       as the Court told you, is a patent case and it's

 9       about the language of four very specific patent

10       claims that are in that patent that's included

11       in your notebook.

12                    ACI just talked to you for a half

13       an hour and they didn't tell you once what those

14       claims require.  They didn't tell you once what

15       their invention is.  What they claim to have

16       invented was a very, very specific way of

17       showing information, geographic information, you

18       have to follow a number of different steps.  I'm

19       going to show that language to you, because they

20       didn't.  Google does not follow those steps with

21       it's Google Earth products.  Google doesn't

22       infringe this patent because it does something

23       different.  ACI shouldn't have gotten that

24       patent in the first place, but most importantly
```

1    Google doesn't use what they claim they

2    invented, the very specific technique that

3    you're going to hear about, and that they never

4    showed you.

5              My name is Darin Snyder and along

6    with the rest of our team I'm proud to represent

7    Google.  I'm going to spend a little bit of time

8    this morning, I've got about half an hour to

9    tell you what the evidence in this case is going

10   to show.  Half an hour is kind of a long time to

11   have to sit and listen to me, so I thought it

12   would be helpful if I show you in advance a

13   little bit about what I'm going to talk about

14   and what the evidence in this case is going to

15   show.

16             First you're going to get a little

17   bit of introduction in the evidence in Google

18   and in particular in Google Earth then we're

19   going to talk about what the evidence will show

20   of Google and how Google Earth uses a different

21   approach than the one that's claimed in the

22   patent, the very thing that this case is about.

23   Then we're going to talk about Google's and

24   ACI's discussions.  And you heard a little bit

1   about the evidence from ACI, but they didn't

2   tell you all about it and everything about it

3   and they didn't importantly tell you what Google

4   said in response, how Google told ACI over and

5   over we don't use your patent, and how, in fact,

6   even ACI acknowledged that they do -- Google

7   Earth does something different.  Finally, I want

8   to talk to you a little bit about what the

9   evidence is going to show that ACI is now trying

10  to claim something that belongs to the public,

11  something that they shouldn't have a patent on,

12  and because they shouldn't have a patent and

13  because that belonged -- that idea belongs to

14  the public, their patent is invalid.

15          So Google and Google Earth, you've

16  probably heard about Google.  Google has an

17  ambitious message for a company that's less than

18  20 years old.  It has for it's entire short life

19  tried to commit itself to organizing the world's

20  information and making it useful and accessible

21  and its done that through a variety of different

22  products, products that you've heard about and

23  probably used like Google Search or Gmail.

24  Because it has so many products, Google orders

1        its products into a group of different divisions

2        and one of those divisions is the Geo group.

3        Geo just refers to geographic and there are a

4        variety of different products that relate to

5        geography and places and different things.  One

6        is Google Maps, its got very convenient turn by

7        turn directions.  Another product is Street View

8        and another product, the product that's at issue

9        in this case, is Google Earth.  Google Earth is

10       part of this Geo group, but it's only one little

11       part of that Geo group and certainly it's not

12       the most popular of the Geo group.  You're going

13       to hear from a number of engineers who work on

14       Google Earth and who helped design and build it.

15       And they are very excited about this product.

16       Google Earth is very popular for good reason.

17       It's very cool.  It allows people to virtually

18       move to any place in the world and look around

19       as if they were actually going there and that's

20       a very convenient and fun thing for people to

21       do.  The most popular use probably won't

22       surprise you, people going to look at their very

23       own home, but you can also use it to look at

24       other places like this courthouse.  And let's

```
 1       take just a few seconds to look at what going to

 2       this courthouse would look like if you started

 3       out in space and wanted to move down to that

 4       view.  You can get this nice crisp image of this

 5       courthouse and obviously this wasn't taken over

 6       the weekend when it was raining, but you had a

 7       nice day here.  This image of Google Earth is

 8       from the desktop version one you could actually

 9       use on a PC type computer, but Google Earth is

10       also available for a variety of different

11       devices like smartphones and tablets, available

12       for different types of smartphones like ones

13       that run on Android or ones that run on the

14       Apple IOS operating system.  This Google product

15       and the Google Earth in particular solves a

16       number of problems that people have always

17       wanted to solve, and that is how do you look at

18       visual information.  People have been trying to

19       look at visual information for thousands of

20       years, probably started the first time somebody

21       drew in the dirt and tried to explain where you

22       could find water.  Here's one of the earliest

23       maps of the world as people drew it before they

24       even knew that the world was round.  This dates
```

1      back to the Greeks and Ptolemy.  Here's an early

2      version of a globe dating several hundreds years

3      ago where people knew the earth was round, but

4      they wanted to visualize it.  People have also

5      been using computers to visualize the earth

6      about as long as computers have been around.

7      One of the earliest version of uses of computers

8      to visualize information was using flight

9      simulators.  Remember when ACI's lawyers told

10     you that this case was about flying?  ACI did

11     not invent flight simulators.  In fact, even in

12     their patent, the patent that's included in your

13     notebook, they note on it that flight simulators

14     already existed long before they applied for

15     their patent.  They didn't invent the idea of

16     flying around in a computer and looking at

17     things.  Instead, what they claimed to have

18     invented was a very, very specific method of

19     putting information on a screen.

20               So let's talk for a few minutes

21     about what the evidence is going to show about

22     this different approach that Google Earth uses.

23     You heard from the Court and you're going to

24     hear again at the end of the case that you

```
 1        cannot get a patent on something that is public.
 2        Everybody has a right to use techniques that are
 3        public and are not covered by the patent and
 4        that's exactly what Google has done.  It uses a
 5        technique that is different from the one that is
 6        covered by the patent.  This patent attempts to
 7        solve, just like Google Earth does, a particular
 8        problem.  It's not the idea of flying, but it's
 9        the idea of how do you represent, how do you
10        display certain information when you move from a
11        very big area to a very small area?  And let me
12        show you what I mean.  This is a map of the
13        northeastern United States.  It goes basically
14        from Washington, D.C. up to about the Boston
15        area.  And you can see we've marked on here
16        where our town Wilmington, Delaware is located.
17        Now, if you want to see where Wilmington is, how
18        do I get to that particular spot on this map?  A
19        very common way of doing that is the witnesses
20        and experts are going to describe to you is to
21        divide that map into a bunch of different areas.
22        And what I've done here on this versions, I've
23        superimposed a big rectangle.  That rectangle
24        actually comes from a different patent that
```

```
 1        you're going to hear about, a patent that was

 2        prior art to ACI's patent.  And you'll notice

 3        that inside this rectangle there are a number of

 4        other rectangles that have been drawn so this

 5        bigger rectangle has been divided into four

 6        smaller rectangles.  Two of those smaller

 7        rectangles have been divided again into four

 8        smaller rectangles.

 9                    So we go from rectangle to

10        rectangle to rectangle until we have one that is

11        just on the area of Wilmington, Delaware.

12                    Now, if you want to look at

13        Wilmington, Delaware, I can just blow up that

14        image.  If you go to a paper map and you want to

15        look at a very specific spot on a big map, you

16        get out your magnifying glass and you look in

17        there, can you see the details and the streets

18        and the individual areas?  No, because the

19        detail is not there.

20                    And the same thing happens if you

21        have a computer map.  If we take that image and

22        we blow it up, you get a very course or low

23        quality image, you can't see anything really

24        there at all.
```

```
 1                    So what you want to do if you want

 2          to get a good image is you replace that image

 3          with different pictures that have better detail

 4          to them.  And so here in our example we have

 5          replaced that low course resolution image of

 6          Wilmington with a very high or fine resolution

 7          or definition image and now you can actually,

 8          you can make out the river before but now you

 9          can see the Brandywine, you can see where some

10          of the landmarks are located.  You can actually

11          see what you were trying to look at.  This

12          solves a very particular problem.

13                    And the patent attempts to solve

14          that problem in a very particular way.  And

15          this -- and this is the first time you have had

16          to look at it.  This is the language of the

17          patent.

18                    Now, you heard from the Court and

19          you're going to hear again at the end of the

20          case that to infringe a patent, you must perform

21          every single step of that claim.  And there are

22          four claims in this case, but every one of them

23          includes all of these elements from claim one.

24                    If Google Earth does not perform
```

1    every single one of those elements, then it does

2    not infringe.

3                    Now that's a lot of words and

4    sometimes patent lawyers, they write a lot of

5    words and we're going to walk through those step

6    by step as you hear the evidence and the

7    witnesses, and they're going to explain to you

8    that Google Earth does not do, the very specific

9    process that is describe in this claim language.

10   There is two aspects of this in particular that

11   I want to focus on this morning.

12                   The first is that Google Earth

13   does not request, store and represent each of

14   the smaller sections.  And the second one is

15   that Google Earth does not repeat step F as

16   required by step G.

17                   And let me tell you, let me take

18   just a few minutes and explain a little bit

19   more, the evidence that you're going to hear

20   from the witnesses about how that works.

21                   Let's look at step F, step F says

22   that you have to request higher resolution space

23   related data, that's basically going to be

24   pictures or other things for each of the smaller

1    sections.  So for each one of these sections you

2    have to request higher resolution space related

3    data.  Then you have to store the higher

4    resolution space related data and you have to

5    represent the data for the field of view in a

6    pictorial representation.  Each time you have to

7    request each of the smaller sections.

8         Now, you're going to get to hear

9    from Mr. Peter Birch.  Mr. Birch is actually

10   going to sit with us during the trial.  He is

11   the long time product manager for Google Earth

12   and he spent almost ten years of his life

13   working on that product.

14        Mr. Birch has a bachelor of

15   engineering degree from California Polytechnic.

16   He has got an MBA.  He has worked at a number of

17   companies before he got to Google.  Now he has

18   spent a decade of his life working on that

19   product and he's going to explain to you his

20   experience of working with it, from working on

21   the code to working with the engineers.  Google

22   does not request each of those smaller

23   subsections, it just does not do it.  It uses a

24   different approach that's designed to be faster.

```
 1                    You're also going to hear from an
 2       expert named Michael Goodchild and he's here in
 3       the courtroom with us today.  Dr. Goodchild is a
 4       rock star in this field.  He has been working
 5       with the visualization of geographic information
 6       for more than forty years.  He has a gigantic
 7       two volume textbook just designed to visualizing
 8       and representing geographic information.  He has
 9       been an expert, and he has got decades of
10       experience and he teaches at a number of
11       universities and a professor emeritus.
12                    Dr. Goodchild is going to walk you
13       through Google Earth and explain to you how it
14       works just as you'll hear from Mr. Birch.  And
15       he's going to compare that to the specific
16       language of the claims and he's going to show
17       you step by step how what Google Earth does is
18       different from what they claim in that claim
19       language.
20                    Let's talk about the second one, I
21       told you that there were only two.  In step F
22       you have to go through all of those substeps,
23       and then step G says you have to repeat step F.
24                    So what does step F tell you to
```

1          do?  You have to divide a section into a

2          plurality of smaller sections, plurality just

3          means one or more.  You divide it in a plurality

4          of smaller sections, you request a higher

5          resolution data for each of the smaller

6          sections.  You store data, you represent data,

7          and when all that is done, then you repeat step

8          F.

9                    That is not the way that Google

10         works.  That is a very specific rigid way of

11         taking a course image and turning that into a

12         higher detailed fine resolution image.  Google

13         does not do that.  This is one way to do it,

14         turns out that it's kind of slow.

15                    And the evidence is going to show

16         that Google adopted a different approach from

17         the very beginning.  It uses an approach that is

18         much faster and designed to get to that fine

19         detailed image sooner than you otherwise would.

20         You are going to hear from Mr. Birch how Google

21         Earth works and how it does not use this

22         repeating step.

23                    You're going to here from

24         Dr. Goodchild confirming how Google Earth works

```
 1    and he's going to compare it claim by claim,
 2    element by element to this language and show you
 3    it does not do what the claim requires, the very
 4    specific method in this claim.  This change is
 5    not about just going around and looking at
 6    places and moving from place to place on a
 7    computer.  They don't own a patent on that.
 8    People have been doing that for decades.
 9                What they have a patent on is this
10    claim language.  And Google Earth doesn't do it.
11    ACI even knows Google Earth doesn't do it.
12                Soon after Google Earth was
13    released in 2005, Pavel Mayer, one of the
14    inventors wrote to Google and wrote to one of
15    the people who is responsible for developing
16    Google Earth to congratulate him.  And what did
17    he say in his E-mail?  He said you succeeded
18    where we failed.  Probably you saw yourself that
19    I have no bad feeling about that fact that you
20    succeeded where we failed.  Then he went on.  He
21    said you figured out most of the same things on
22    your own, and you had a lot of new ideas we
23    never thought about.  That's exactly right.
24    Google has a lot of new ideas that they never
```

```
 1     thought about.  They came up with a different

 2     way.  It doesn't matter whether it's better or

 3     worse, we're not trying to decide which one you

 4     like.  The point is it's different.  And the

 5     evidence is going to show that it was different

 6     and ACI knew it was different.  Google has been

 7     telling ACI that it's different ever since they

 8     have been first contacted.

 9               Let me tell you about a few of

10     those conversations.  Most of the conversations

11     that ACI lawyer was talking about between Google

12     and ACI occurred with this gentleman, Michael

13     Jones.  Mr. Jones has been involved with this

14     product for a very long time.  He's here in the

15     courtroom.  And you're going to hear from

16     Mr. Jones his incredible passion for this

17     project and how proud he is that it has become

18     so popular.

19               Mr. Jones and a few of his

20     colleagues started a company called Keyhole.

21     They then used Keyhole to create a product

22     called Earth Viewer.  Earth Viewer was released

23     in 2001 and gained a lot of notoriety.  It

24     become pretty famous because national news
```

 1    organizations used it to talk about world

 2    events.  But ACI never contacted Keyhole.  ACI

 3    never contacted Keyhole or Mr. Jones while he

 4    was at Keyhole to say you know, we think you

 5    might be using our patent.  No.

 6              The evidence is going to show that

 7    ACI only contacted Google.  Google purchased

 8    Keyhole in 2004, and released Google Earth based

 9    on the Earth Viewer product in 2005.  And it was

10    only after famous Google purchased the Keyhole

11    product that ACI decided to contact him.

12              During those discussions, they

13    went back and forth and, in fact, ACI asked

14    Google do you want to buy our patent.  And they

15    had a bunch of back and forth about the

16    possibility of Google buying the patent because

17    Google thought well, we might want to buy this

18    just to add to our assets, we got a portfolio of

19    patents, maybe we want to put the ACI in that

20    one.  Never once did Google say that it used the

21    claims in this patent.

22              In fact just to the contrary,

23    ACI's lawyer just told you, Google told ACI we

24    don't use your patent, and ACI even told Google

1    that ACI didn't think Google used its patent.

2    These conversations that you hear about and

3    you're going to hear more evidence about were

4    not about whether or not Google used the patent.

5              You're going to hear the video

6    testimony of Mr. Andreovits and in that

7    testimony what did Mr. Andreovits say about

8    whether Google used their patents, he was asked,

9    during this time did Art+Com communicate to

10   Google or discuss with Google the possibility of

11   Art+Com patent being infringed?

12             Answer:  As to Art+Com said to

13   Google, hey, you are infringing the patent?  No,

14   that didn't happen.

15             Those conversations weren't about

16   whether they used the technology or not, because

17   Google told them that they were not.  They had a

18   different technique, not the very specific

19   detailed one that you saw in that patent.

20   Google has been telling them that for ten years,

21   and we're still telling them that and they sued

22   us anyway and that's why we had to come here so

23   that you could listen to the evidence and you

24   could establish once and for all that Google

1        does something different, it does not practice

2        that patent.

3                    There is one more topic I need to

4        talk to you about and that is the fact that ACI

5        is trying to own something that is public.  You

6        heard from the Court and you're going to hear

7        again at the end of the case, the end of the

8        evidence, that you cannot take something that

9        belongs to the public.  You cannot take

10       something that is known or obvious and get a

11       patent on it.  If it's known or obvious, then,

12       and it was known or obvious before the date of

13       the invention or before the protection was

14       sought, you're not entitled to a patent.

15                   This idea, that specific technique

16       that's claimed in the patent, that was known,

17       that was known before they applied for a patent

18       in the United States.  And as a result of that,

19       it's not valid.

20                   You might ask yourself, I'm not a

21       patent examiner.  How am I going to make that

22       decision?  But that's what you as a group are

23       allowed to do together because you're going to

24       hear the evidence, you're going to see the

```
 1        documents, you're going to get to listen to the

 2        witnesses, and you're going to be able to hear

 3        evidence that the Patent and Trademark Office

 4        never had, and based on that evidence, you'll be

 5        able to conclude from clear and convincing

 6        evidence that this patent is not valid.

 7                    I want to talk about two aspects

 8        of that evidence now.  First, there is a system

 9        that was developed by a company called SRI

10        International.  And the name of their system is

11        TerraVision.  SRI International used to stand

12        for the Stanford Research Institute and they do

13        a variety of very interesting projects.

14                    This project in particular, the

15        TerraVision project was designed to take

16        information about visualizing geographic

17        information on computers.  This whole idea of

18        moving around and make it public, that was their

19        goal.  You're going to hear from one of the

20        leaders of that project, Mr. Stephen Lau.  He's

21        in the courtroom with us today.  Mr. Lau is

22        going to testify about how that project worked

23        and what it accomplished.  Unfortunately you

24        can't hear from the other leader of that
```

1    project, Mr. Leclerc, because he's passed way.

2    But Mr. Lau will be able to tell you what they

3    were doing, show you records of the publications

4    they had, describing their system and explain to

5    you how what they were doing was the same thing

6    that ACI claims in that patent.

7              When that occurred turns out to be

8    very important for when -- whether or not ACI's

9    patent is valid.  SRI and Mr. Lau demonstrated

10   their system at a variety of different public

11   conferences.  One of them was in 1994 at a

12   conference called Magic.  And Magic relates to

13   an information system that Mr. Lau is going to

14   describe for you.  They demonstrated again at

15   August 1995 at a conference called Siggraph.

16   There were thousands and thousands of people who

17   attended the Siggraph conference and were able

18   to hear and see about the TerraVision system.

19             What the law says as the Court

20   will tell you is that if a system is publicly

21   demonstrated, if it is known, publicly known

22   more than a year before the US application, then

23   the patent is not valid.  That year expired in

24   August 1996.  But you can see from the face of

1    the patent that's included in your notebook at

2    tab B that ACI did not file for a patent until

3    December of 1996 in the United States.  That

4    means that their application was too late.  This

5    idea was dedicated to the public, they can't get

6    a patent on it.

7             And they knew that what ACI -- I'm

8    sorry, what SRI was doing was even based on the

9    same technology as the one that they had.  This

10   is an E-mail from Mr. Pavel Mayer, one of the

11   inventors to SRI, Mr. Leclerc.  And what did

12   Mr. Mayer say to them.  He said we found your

13   home page a few days ago and were really

14   astonished about the fact that there is a

15   project with the same name, the same goals and

16   based on the same technology, the same name, the

17   same goals and based on the same technology.

18             What does he mean the same name.

19   Well, you heard ACI lawyer tell you about their

20   T-Vision project.  It wasn't always called

21   T-Vision, the project with the big ball and all

22   the other things they told you about, it wasn't

23   called T-Vision all the time.  They originally

24   called it TerraVision.  And then they discovered

1    that wait, there is somebody else out there that

2    has a project called TerraVision.  That was

3    Mr. Lau and Mr. Leclerc's project at SRI.

4              Now if you have two things that

5    have the same name, who gets to keep the name?

6    The one who came first.  And ACI acknowledged

7    that SRI Mr. Lau and Mr. Leclerc's project came

8    first.  And so ACI, the plaintiff, decided to

9    change the name, they agreed to change the name

10   of their project to TerraVision.

11             So it's sometimes a little bit

12   hard to keep straight and the documents are not

13   going to help because will there were times when

14   ACI's project was called TerraVision.  The thing

15   you need to remember is SRI's TerraVision came

16   first, it was the same name, the same goals and

17   the same technology.

18             There is one other part of the

19   evidence that I want to talk about, and that

20   relates to a system that -- and a paper that ACI

21   the plaintiff demonstrated itself.  I mentioned

22   the Siggraph 1995 conference where SRI put on a

23   demonstration in August of 1995.  The very same

24   inventors submitted a paper for that conference

1    as well.  That paper was then put on a CD-ROM

2    and it was made available to all the thousands

3    of people who attended that conference.  That

4    paper describes in great detail exactly how this

5    system works.  It describes the very steps that

6    they claim in that patent.  And that patent and

7    the date of that patent -- I'm sorry, that paper

8    and the date of that paper and this conference

9    turn out to be really important.

10                This is the same timeline that I

11   just showed you a minute ago related the SRI.

12   That same timeline turns out applies to this

13   paper that the plaintiffs submitted for the

14   Siggraph 1995 conference.  They submitted a

15   paper for a conference and it was distributed to

16   this conference in August of 1995.

17                And the law says that once you

18   make that public, you have one year to file your

19   US patent application.  That year expired in

20   August of 1996, and when they filed their US

21   application in December, it was too late.  You

22   might say to yourself, you know, that doesn't

23   seem quite fair, it's just a few months.  Why

24   does the law do that?  But it turns out that is

1      really important.

2                    You heard in the video and you

3      heard from the Court about how a property gives

4      you rights and you heard ACI's lawyer talk about

5      the boundaries of those claims.  Once something

6      belongs to the public, you're not allowed to

7      claim those boundaries anymore.  You're not

8      allowed to build a fence on that anymore.  It's

9      like somebody who walked into a national park

10     and started putting up fences and saying this is

11     mine now, the law says you don't get to do that.

12                    That's what ACI is trying to do

13     because they made this publication more than a

14     year before they filed their US application and

15     that means that their patent is invalid.

16                    There is one more subject that I

17     need to talk about.  ACI spent a lot of time

18     talking about how all this money that they think

19     they ought to get paid.  For them do that, when

20     you listen to Mr. Nawrocki, their expert explain

21     how they come up with this huge amount of money,

22     you're going to hear about him talk about a lot

23     of products that aren't Google Earth.  You're

24     going to hear him talk about a lot of things

1      that aren't the actual amounts that Google Earth

2      earned in revenue or in profit.  He's going to

3      glom together a lot of other properties and he's

4      going to use a lot of projections that don't

5      have anything to do with reality.  That's the

6      only way they can come up with a number that's

7      nearly as high as the one they're asking you

8      for.  The reality is that Google Earth is a

9      popular product, but it doesn't make a lot of

10     money.

11             You're going to hear from our

12     expert, Mr. Brett Reed.  Mr. Read has advanced

13     degrees in economics and has three years of

14     experience in these areas.  Mr. Reed is here

15     today as well.  Mr. Reed is going to explain to

16     you all of the mistakes in Mr. Nawrocki's

17     analysis and why you shouldn't listen to it.

18             You should never get to this issue

19     and I really hate to have to mention it at all,

20     it just makes me uncomfortable because Google

21     doesn't do this.  You're going to hear the

22     evidence and it's going to show you that Google

23     does not infringe this patent.  And you're going

24     to hear the evidence that that patent isn't

1     valid.

2                    This is the last chance I'm going

3     to have to talk to you until the end of the

4     trial and ACI is going to get to put on their

5     evidence first.  All I ask is that you follow

6     the Judge's instructions and keep an open mind.

7     You all have been very attentive and I know you

8     all are going to continue to be as you listen to

9     the evidence, because as you listen to the

10    evidence, I'm confident you will agree that

11    Google Earth does not practice the very specific

12    method that is claimed in this patent.  And the

13    evidence is going to be clear and convincing

14    that ACI's patent and these particular claims

15    are not valid.

16                    Thanks very much.

17                    THE COURT:  Thank you, Mr. Snyder.

18                    It's now time for our morning

19    break.  We'll take a fifteen-minute break to

20    allow the jurors to stretch their legs, and then

21    later on after that we'll come back and we'll

22    hear evidence from the plaintiff, and eventually

23    we'll get to the lunch break.

24                    I just remind you during the break

```
 1        do not discuss this case with anyone else or
 2        among yourselves.  So we'll recess for fifteen
 3        minutes and come back let's say at 11:30.
 4                     (Jury leaving the courtroom at
 5        11:12 a.m.)
 6                     THE COURT:  Is there anything else
 7        that needs --
 8                     MR. PARTRIDGE:  Two administrative
 9        matters, Your Honor.  The first is that we will
10        need to swear an interpreter when we start the
11        first witness.  It will be Pavel Mayer.  Her
12        name is Ms. Wiesner.  She is here, so we'll need
13        to swear her so that her interpretations are
14        true and to the best of her abilities.  I don't
15        think it's likely we'll need interpretation, but
16        I can't guarantee that.  We agreed on
17        Ms. Wiesner as the interpreter.  This is an
18        agreed use of an interpreter.  I don't know if
19        we can get another chair up here somewhere --
20        she'll stand back there during Mr. Mayer's
21        testimony.
22                     THE COURT:  Do you want to swear
23        the interpreter now or in the presence of the
24        jury?
```

```
 1                    MR. PARTRIDGE:  That probably
 2      makes sense to swear her now.
 3                    THE COURT:  Fine, let's do that.
 4                    THE CLERK:  Please state and spell
 5      your name for the record.
 6                    MS. WIESNER:  My name is Ulrike,
 7      and that is spelled U-L-R-I-K-E, W-I-E-S-N-E-R.
 8
 9                    ULRIKE WIESNER,
10             the interpreter herein, having first
11             been duly sworn on oath, was
12             examined and testified as follows:
13                    THE COURT:  And that's pronounce
14      Wiesner?
15                    I'm going to explain to the jury
16      what's going on when they come back from lunch.
17                    MR. PARTRIDGE:  And the second
18      administrative point, Your Honor, is at some
19      point during the testimony of Mr. Mayer, we
20      would like to move the device that's over in the
21      corner just in front of the witness box so that
22      the jury can see it.  And with your permission,
23      I would like Mr. Mayer to come down from the
24      witness stand and show the jury how that
```

```
1     operates.  It would only take like a few minutes

2     and I think given the location of our court

3     reporters, he should be I think clearly heard by

4     them from that particular position, so with your

5     permission we would like to do that as well.

6                     THE COURT:  Any objection to that?

7                     MR. SNYDER:  I don't have an

8     objection.  I don't know how heavy that is, Your

9     Honor, so I don't know how practically we move

10    it, but I do not have a legal objection.

11                    MR. PARTRIDGE:  We left it on the

12    rollers, Your Honor, so Mr. Sillman and I will

13    have to walk up and push it together and it will

14    take us about a minute to do.

15                    THE COURT:  Thank you.  Anything

16    else?

17                    We'll be in recess and be back at

18    11:30.

19                    (A brief recess was taken.)

20                    THE COURT:  Be seated.  Are you

21    ready to bring in the jury?

22                    MR. SNYDER:  Your Honor, we do

23    have an order to sequester witnesses.  I just

24    want to make sure that we take a minute and make
```

```
 1      sure there aren't any precipitant witnesses in

 2      the courtroom.

 3                   MR. PARTRIDGE:  Just experts, sir.

 4                   THE COURT:  We're all set.

 5                   MR. SNYDER:  Yes.  Thank you, Your

 6      Honor.

 7                   (Jury entering the courtroom at

 8      11:32 a.m.)

 9                   THE COURT:  You may be seated.

10      Now, the jurors have their notebooks which help

11      you track the witnesses.  And then when the

12      witness takes the stand, you'll see that there

13      is a woman standing behind the witness.  That's

14      Ms. Wiesner, and she is a translator in case we

15      need her in the course of these witnesses's

16      testimony.

17                   Mr. Partridge.

18                   MR. PARTRIDGE:  Thank you, Your

19      Honor.  For our first witness, we will call

20      Mr. Pavel Mayer, one of the inventors of the

21      patent.  Mr. Mayer, would you take the stand,

22      please.

23                   And accompanying him will be our

24      interpreter, Ms. Wiesner, who will be standing
```

```
 1     back behind the witness in the event that he
 2     requires any interpretation today.
 3                   THE WITNESS:  My name is Pavel
 4     Mayer, P-A-V-E-L, M-A-Y-E-R.
 5
 6                   PAVEL MAYER,
 7            the deponent herein, having first
 8            been duly sworn on oath, was
 9            examined and testified as follows:
10                   MR. PARTRIDGE:  Your Honor, we
11     have some witness notebooks if she may approach
12     and hand a notebook to the witness.  And we have
13     two for the Court and one for opposing counsel
14     as well.  These contain the exhibits that we'll
15     be using during Mr. Mayer's testimony.
16                   May I make a very brief
17     introduction, Your Honor?
18                   THE COURT:  Yes.
19                   MR. PARTRIDGE:  Lady and
20     gentlemen, Mr. Mayer is our first witness this
21     morning.  As you heard he is one of the
22     inventors on the patent that is at issue here.
23     His testimony is going to go a little further
24     than what you might expect to hear from an
```

```
 1        inventor on the technology.  He will talk about

 2        that and the development of the technology, but

 3        as you will also hear, he was involved in 2006

 4        in discussions with Google so he'll be

 5        testifying about that, and he was also involved

 6        in 2010 in further discussions with Google so

 7        he'll be testifying about that, so it's

 8        basically three areas of testimony that you'll

 9        hear from Mr. Mayer during his testimony today.

10                    And with that introduction.

11                    DIRECT EXAMINATION

12   BY MR. PARTRIDGE:

13              Q.   Good morning, Mr. Mayer.

14              A.   Good morning.

15              Q.   As you heard, we have an

16        interpreter here for you in the event that you

17        require interpretation of my question or if you

18        have difficulty with any answer that you might

19        give in English.  And she'll be available to you

20        for both my examination as well as Google's

21        examination.  Do you understand that?

22              A.   Yes, I understand.

23              Q.   And the one thing that we have

24        agreed upon is if you have a difficulty with
```

```
 1        some of the words that are used, that you ask

 2        for the entire question to be interpreted rather

 3        than merely a part of it.  Understood?

 4               A.   Yes, I do.

 5               Q.   How do you feel about testifying

 6        in English here today?

 7               A.   I'm a bit nervous, but I will do

 8        my best.

 9               Q.   In your deposition, I believe you

10        testified in German; is that correct?

11               A.   Yes, I did.

12               Q.   Why the change?

13               A.   I wanted to make sure that the

14        jury can understand directly what I have to say.

15               Q.   Thank you.

16                    What is your highest level of

17        education?

18               A.   I have the German apparura,

19        admission to university which is I think

20        equivalent to the bachelor in the United States.

21               Q.   Would you tell the jury how you

22        obtained your technical expertise?

23               A.   Some of itself taught, some of it

24        at school and university.  I started to get
```

```
 1    interested in electronics when I was ten years

 2    old, and when I was twelve I began to visit

 3    evening school and at the age of fifteen I

 4    started to work as a professional software

 5    developer.

 6              Q.   When you were at the age of twelve

 7    and taking evening classes were those for twelve

 8    years olds or for a different group of students?

 9              A.   They were normally for grown ups,

10    so I was the youngest participant in that.

11              Q.   How is it that you began doing

12    software development at the age of fifteen?

13              A.   It was the teacher at the evening

14    school who hired me to do work for his company.

15              Q.   What type of work did you do for

16    him?

17              A.   I did develop software for printed

18    circuit board design and for industrial

19    automation.

20              Q.   What did you do when you graduated

21    from school?

22              A.   I went to military, it is

23    mandatory in Germany, but I volunteered to

24    become a paratrooper.
```

```
 1              Q.   At some point did you take courses
 2     in computer science?
 3              A.   Yes.  I had four semesters of
 4     computer science at the University of
 5     Braunschweig.
 6              Q.   Did you complete your degree?
 7              A.   No, I did not.
 8              Q.   Why not?
 9              A.   While studying I was still
10     working, I had to work, and I felt after doing
11     seven years of professional software development
12     at that time I could make better use of my time
13     than to continue to studies.
14              Q.   Who is your current employer?
15              A.   Currently I have my own company,
16     and I am a member of the Berlin State
17     Parliament.
18              Q.   What kind of work do you do with
19     your own company?
20              A.   We are developing products related
21     to artificial intelligence and artificial neuro
22     networks like for example helping visually
23     impaired people to see their environment with
24     their phone.
```

```
 1              Q.   Is the position in the Berlin

 2       State Parliament an elected position?

 3              A.   Yes, I was elected to this

 4       parliament.

 5              Q.   What are your responsibilities

 6       there?

 7              A.   I am a member of the committee for

 8       economy.  I am a member of the committee

 9       overseeing the state owned companies like

10       hospitals, utilities, housing, and so on.

11              Q.   Prior to that particular

12       occupation, what did you do?

13              A.   I worked at Art+Com before that.

14              Q.   How long did you work at Art+Com?

15              A.   All in all, about twenty-one,

16       twenty-two years.

17              Q.   From approximately when to when?

18              A.   I came to Art+Com in 1990 and I

19       left around 2012.

20              Q.   Would you tell us a little bit

21       about what Art+Com does?

22              A.   I mean, Art+Com as the name says

23       has artists and designers and computer

24       scientists, so back in the '90s we did a lot of
```

1    real time visualization like architectural

2    walkthroughs, designing new cars and medical

3    imaging, visualization for training

4    neurosurgeons to operate on the brain or

5    analyzing back injuries.

6           Q.   Back in the early '90s, was there

7    significant architectural work being done in

8    Berlin?

9           A.   Yes, after the reunification when

10   the war came down, the government then moved to

11   Berlin, so the whole government buildings had to

12   be rebuilt, so we did the visualization of it

13   and made people able to walk through these

14   buildings that were not built yet.

15          Q.   And you did that through realtime

16   applications?

17          A.   Yes, we did mostly realtime

18   applications and some of it using virtual

19   reality technology with technology in space,

20   some of it was stereo projection.

21          Q.   What was your role at Art+Com?

22          A.   I started there as a, was hired as

23   a contractor, then I was hired permanently and

24   did software development, later project

```
 1      management and later I was responsible for the

 2      whole development and the whole technology part

 3      of Art+Com.

 4             Q.   Was there a point in time in which

 5      you became interested in satellite imagery?

 6             A.   Yes, there was a point, I think

 7      must have been end of 1993 when a Japanese guy

 8      came, Mr. Hiroyoshi Ishibashi from WeatherNews

 9      and show us this work.

10             Q.   Have you prepared some slides in

11      connection with your testimony here today?

12             A.   Yes, I have some slides.

13             Q.   And one just popped up on your

14      screen while you were talking.  Would you

15      explain this particular slide, please?

16             A.   Yes, this is Mr. Ishibashi I

17      talked about and his company WeatherNews, which

18      still exists and at that time they also did 3D

19      weather reports for TV stations.

20             Q.   And I think you said he paid a

21      visit to your offices; is that correct?

22             A.   Yes, he came to the Art+Com

23      offices in Berlin.

24             Q.   What did you discuss during that
```

```
 1    visit?

 2              A.   He did show us his work and we did

 3    show him our realtime visualization work and

 4    then talked about what we might do for each

 5    other and how we might collaborate.

 6              Q.   What did you think of what Mr.

 7    Ishibashi was doing at WeatherNews?

 8              A.   The things he was doing, his 3D

 9    weather reports, they looked really great, they

10    were very advanced for this time, but it took

11    him very long to produce them or his computers

12    took quite a long time.  It took him about 5 to

13    25 seconds just to produce a single image of it,

14    so a one-minute weather report, it would have

15    taken two to five hours to produce, which was

16    not ideal.

17              Q.   And in fact, his problem was the

18    weather would change, is that the idea?

19              A.   Yes, the weather changes, so you

20    want to be of course as current as possible.

21              Q.   Did you think at the time you

22    might be able to do it faster?

23              A.   We were quite sure, with our

24    experience in real time visualization, that we
```

```
 1        could make this process much faster.
 2                  Q.   Did you then start working on
 3        that?
 4                  A.   We decided to give it a shot to
 5        see how far we could get.
 6                  Q.   What were your first steps?
 7                  A.   We asked if he had some satellite
 8        data we could work on and did develop some
 9        research software to play around with it.
10                  Q.   Do you have a slide that shows an
11        image of the type of satellite data that you
12        received?
13                  A.   Yes, I do have a slide.
14                  Q.   Is this that slide?
15                  A.   Yes, this is one slide of an image
16        that we started to experiment on.
17                  Q.   What were the major limitations,
18        the major constraints that you ran into at the
19        start of your work?
20                  A.   The main problem was or -- yeah,
21        there were two limitations that the computers at
22        that time had.  They still have it, but it was
23        more severe at that time.  One were the memory
24        limitations, so the data wouldn't fit into
```

```
 1    memory, which is bad for realtime visualization.

 2    And also the computers were much slower, so we

 3    could not do much computation on the data when

 4    working with the machine.  It should be in

 5    realtime.

 6           Q.  Can you explain the memory

 7    problem?

 8           A.  Yes.  There were actually two

 9    types of memory.  One was the main memory and

10    the other a special, very fast so-called texture

11    memory that was even smaller.  And we had to

12    feed the data through this quite small memory to

13    get it to be displayed.

14           Q.  What is a texture memory?

15           A.   It is, as I said, it is a very

16    small, fast memory.  It's a part of a special

17    graphics hardware and it's -- it was fast and

18    small at that time and we had to use it.

19           Q.  Did you prepare some slides to

20    enable you to illustrate this problem?

21           A.  Yes, I have some slides.

22           Q.  Okay.  Let's bring up the first

23    one.

24           A.  Uh-huh.  So just as an example, if
```

1    you have an image of the whole world like this

2    one and for every kilometer of the world you

3    have one pixel, then you have an image, for

4    example, that is 20,000 by 40,000 pixels.

5            Q.   And what is a pixel?  Do you have

6    a slide for that?

7            A.   Yes.  A pixel, as some of you

8    might know, is just a small area on a screen,

9    for example, that makes up an image on the

10   screen.  So if you put out a magnifying glass

11   and look on the screen, you will see the single

12   pixels.

13           Q.   When you showed that map of the

14   world with a number of pixels on the map of the

15   world, you said, I believe, that in that map you

16   would be using one pixel for one kilometer.

17   Does that mean like the whole area of downtown

18   Delaware, at least the next two or three blocks

19   going in all directions would be just one little

20   dot on that screen?

21           A.   Yes, that's right.  So even this,

22   this would be by today's standards quite a low

23   resolution map, because, as you said, it would

24   have only one color for whole the downtown, but

```
1       still this was a huge challenge at that time to

2       deal with such a kind of information.

3               Q.  Do you have a slide that shows the

4       memory problem in more detail?

5               A.  Yes, I have a slide.

6               Q.  Could you explain this, please?

7               A.  Yes.  So you just see how data had

8       to be removed or the relevant sizes.  So this

9       one image on this would be 2,400 megabytes.  We

10      had 512 megabytes of memory at that time, and

11      this was a huge amount of memory, so a lot of

12      computers had just a fraction of that.  So when

13      we started it was only four megabytes and we had

14      to fit in the needed satellite images to paint

15      this screen, which was at that time at a

16      resolution that resided in about one million

17      pixels.

18              Q.  What were the options that you had

19      in order to be able to display the world as

20      shown at the top on a screen?

21              A.  There are basically two things you

22      could do if you have satellite image.  You can

23      scale it so have it with a lower resolutions or

24      you can cut it so you show only a part of it.
```

 1              Q.   What is a resolution?

 2              A.   Resolution is -- there, a slide

 3       popped up.

 4              Q.   Another slide popped up.  Can you

 5       explain it relative to the slide that's in front

 6       of you?

 7              A.   Yeah, I think it's fairly simple.

 8       The thing in the upper left corner, you have a

 9       fairly high resolution image that shows a lot of

10       details of my cat in this case.  And if you

11       reduce the resolution, you lose detail, but on

12       the other hand, the image with the low

13       resolution only takes a very little storage, so

14       that's to say about resolution.

15              Q.   How did you approach this problem

16       that you discovered at that point in time?

17              A.   Well, we --

18              Q.   Do you have a slide for that too?

19              A.   Yes.  I do have a slide.  And the

20       basic idea here was to think backwards.  Because

21       you have just -- when you have a screen in front

22       of you, then the number of pixels on the screen

23       it doesn't change, so no matter where you look

24       at, you're task is to fill the screens on the

```
1     pixel with your data.  So if you look at the

2     whole earth, which is a lot of data, or if you

3     look at only a small portion of the earth, the

4     number of pixels is the stencil, we have to come

5     up with a way, how to get those data in the

6     proper resolution to paint the screen, so that

7     no matter where we looked at, it would take

8     almost the same time in every case.

9          Q.   Let's see if we understand.  If

10     you look at the slide on the upper right, you're

11     showing the earth on the screen, correct?

12          A.   Yes.  This would be a view you get

13     when you're high up in space.

14          Q.   And are you changing the

15     resolution of the view of the earth in order to

16     fit it on the screen?

17          A.   Yes.  It has actually then a lower

18     resolution on the screen.

19          Q.   And with respect to the smaller

20     area that you indicate on the bottom, how does

21     the resolution compare there?

22          A.   It has a higher resolution in this

23     case.

24          Q.   But still in the same amount of
```

```
 1    space or is the same number of pixels on the

 2    screen?

 3             A.   Yeah, the number of pixels on the

 4    screen don't change.

 5             Q.   What principles did you apply in

 6    trying to solve this problem?

 7             A.   I would describe them a lot

 8    clearly as cut, align and scale, if you like.

 9             Q.   Do you have a set of slides to

10    enable you to describe the cut and align

11    problem?

12             A.   Yes, I do.

13             Q.   Let's pull up the first slide.

14    Can you describe this slide?  And I think

15    there's two or three others that immediately

16    follow that perhaps you could describe one after

17    the other?

18             A.   Yes.  So when you have the image

19    of the whole earth and first cut it in the

20    middle to get to square images and then you make

21    further and further cuts to subdivide it into

22    smaller and smaller tiles.

23             Q.   And you mentioned the third

24    principle is scaling.  Do you have a slide to
```

```
 1        illustrate that as well?

 2                A.   Yes.  We have I think a small

 3        animation of that.

 4                Q.   Can you explain this, please?

 5                A.   Yes.  So here you have a

 6        combination of cuts that were applied and now

 7        you can take, for example, if you take the area

 8        of the west coast -- the east coast, sorry.

 9                Q.   I think it's the east coast.  I

10        know you're from Germany, but that is the east

11        coast of the United States.

12                A.   Right.  And then you, you cut it

13        out and scale it to a resolution, for example,

14        of 128 by 128 and then you take a larger piece

15        of West Africa in this case and you get the same

16        resolution and you can go on with another part

17        and another part.  So in the last case, here,

18        you will have a patch of half of the world and

19        it's also scaled down then to a picture of 128

20        by 128.

21                Q.   These were the initial principles

22        that you applied as you started out; is that

23        right?

24                A.   Yes, that was how we got started
```

1    on it, so this was really the very beginning of

2    what we came up with.

3            Q.   And what happened when you applied

4    all three principles, and what was it that you

5    thought would happen when you applied all three

6    principles?

7            A.   Well, when we did the math on

8    that, how much memory we would need and how much

9    work we could get, we thought it would be much

10   faster than what Mr. Ishibashi was doing, but we

11   didn't think initially it would work in real

12   time.

13           Q.   And what did you discover?

14           A.   We found out that our math, the

15   math was wrong, but the assumptions we made were

16   too conservative.  So we found out we don't need

17   the full resolution, so we could have less

18   resolution, and we also do not need, on every

19   step, on every frame load all the tiles, but

20   only exchange a part of them.  So in the end, we

21   found out it was 50 times faster, could be 50

22   times faster than we expected.

23           Q.   I think Mr. Mayer, you said that

24   your math was wrong, did you -- is that what you

1    meant?  I think you said the math was wrong, but

2    your --

3          A.   No, the calculations we did were

4    right, but the assumptions, the numbers we put

5    in the calculations were too conservative.  So

6    the result actually -- when we saw it on screen,

7    it was -- it worked much better than we thought.

8          Q.   And what was your reaction when

9    you saw it and it exceeded your expectations?

10         A.   When we -- well, when I saw it

11   first running, I mean, this huge map, I do just

12   zoom in and zoom out and probably as nobody ever

13   has seen it before, at least I hadn't and nobody

14   in the company.  So yeah, I remember me going

15   around and dragging everyone in and to share my

16   excitement about it.

17         Q.   Did this lead you to consider

18   doing something more than what you had done up

19   to this point in time?  Did you form any

20   objective at this point?

21         A.   Well, we saw that this had some

22   potential and that we could actually make a

23   realtime visualization of the earth that we

24   could indeed then build a system where we could

1      fly around the world and get up into space and

2      then fly down again.  So yeah, like to fly like

3      a UFO or a super hero and so yeah, we thought we

4      have to try to build such a system.

5              Q.   And did you move in that direction

6      then and start developing?

7              A.   Yes, but we first had to get some

8      funding for that, so yeah, we started.  We then

9      made a project proposal and looked for people

10     who might give us money to make it work.

11             Q.   When did you progress, move far

12     enough forward in that project to where you

13     thought you had accomplished your objective;

14     that is you had solved the problems that you've

15     identified during the course of your work?

16             Q.   That may have been too long a

17     question.  Hopefully you understood it.

18             A.   Yes.  I understood.  It's

19     finally -- it took over two years.  It took much

20     longer than we thought that it would take to

21     really solve every problem to get everything

22     together to be able to build -- to start

23     building a product.  So yeah, about, about --

24     took about two years, so I think in late '95 we

```
 1      were at the point where we -- where we thought

 2      we had all the solutions for all the problems.

 3              Q.   When did you file your German

 4      patent application?

 5              A.   It was in December of '95.

 6              Q.   So this was after you made these

 7      dis -- discovered these various solutions?

 8              A.   Yes.  When we discovered all of

 9      those solutions and thought we could make it

10      work, we did put everything we knew about it in

11      the patent, so we described basically everything

12      from the start up, from the start to the last

13      solutions of the problem and then applied for

14      the patent.

15              Q.   What were the major things that

16      you learned over that two-year period?

17              A.   Well, we --

18              Q.   And do you have a slide to

19      illustrate this?

20              A.   Yes.  I have one.  And first we

21      built a demonstrator, so a system that we did

22      build as quickly as possible to see some results

23      and to play around witness.  And the

24      demonstrator did show us when we only started to
```

1    play around to fly that there were number of

2    problems that we didn't expect we would have in

3    the beginning, with --

4            Q.   What was the first problem?

5            A.   The first problem was that we ran

6    into a precision problem.  So when we started to

7    use really high resolution data, like if you

8    went down to see on street level, just to see a

9    building details, everything started to jitter

10   like it was like an earthquake, so we didn't

11   know what's wrong at first, so that was the --

12   and then we find out that it is a numerical

13   precision problem we had to solve somehow.

14           Q.   Do you have a slide that shows the

15   type of problem you were facing in this regard?

16           A.   Yes, I do.

17           Q.   Would you explain what this is,

18   please?

19           A.   Yes.  It's a little bit -- it's

20   not easy or maybe to understand that, but if

21   you're not a computer scientist at least, but

22   the problem is when you have a 3D scene, the

23   computer uses so-called floating point numbers

24   to represent where parts of the scene are.  But

```
 1      floating point numbers have one problem, that

 2      the larger the number is, the less precise it

 3      is.  So you could imagine to measure something

 4      with a floating point number is like having a

 5      tape measure and this tape measure at the

 6      beginning has a very fine scale there, so if you

 7      do not draw it out too much, you can make very

 8      precise measurements.  But the more you pull it

 9      out, the bigger the spaces become between the

10      marks on it.  So if you want to measure

11      precisely, you better don't have to pull it out

12      that much, because then you cannot tell exactly

13      where something is.

14           Q.   Did you discover a solution to

15      this problem and do you have a slide to

16      illustrate that?

17           A.   Yes.  It is on the next slide.  So

18      this is a very simplified view, but if you have

19      an observer of a scenery -- it's looking to the

20      wrong side here.  He should be looking at the

21      houses.  But if you have this whole scene, this

22      whole world, then you have to have a point zero

23      somewhere -- somewhere, where all your points

24      start at zero, like example, in Greenwich, you
```

```
 1      have point zero on the earth.  But if you move

 2      away from this point zero then your numbers

 3      start to get bigger and bigger and more

 4      imprecise and so the one thing you do is you

 5      move your point zero, which makes -- you move

 6      everything, you move the houses and you move

 7      yourself, so that in the end everything looks

 8      the same, but doesn't jitter and doesn't break

 9      down.

10              Q.   Is this -- and I think you said

11      this.  Is this an oversimplification of the

12      problem?

13              A.   This is an over -- this is a

14      simplification of the problem, but --

15              Q.   What happens if you're moving on

16      the screen, does the problem get even worse?

17              A.   Yeah, you have to do that

18      preliminarily and in a way that, yeah, that you

19      have always your origin as close to where you

20      are.

21              Q.   The second solution you identified

22      was the concern that a shear amount of data

23      problem.  Can you explain that?

24              A.   Yeah.  I already said it's this
```

1     one kilometer image was this 2,400 megabytes was

2     a big one, but that's the resolution we started

3     with.  So when we went down to like one meter

4     resolution or 10 centimeter resolution, then the

5     amount of data, the number of tiles you had,

6     they became just so big that even a catalog of

7     the data, even just listing what data exists at

8     all would be so big that it wouldn't fit into

9     memory.  And with the prototype or with the

10    demonstrator we had in the beginning, we ran

11    into this problem.  So the more data we put into

12    the system, the longer it took to start.  So in

13    the end, with the demonstrator we sometimes had

14    to wait five to 10 minutes before we could use

15    the system, which became more and more of a

16    problem.

17           Q.   And did you come up with a

18    solution to this problem?

19           A.   Yes.  The solution was to request

20    data in a way that you don't have to know all

21    the data that is there, so that you ask the data

22    sources to come up in a specific way with the

23    data you need without, but without knowing the

24    exact data in advance.

1          Q.   You mentioned a third problem, I
2     think you called it the local copy data problem.
3     Can you explain what that means?
4          A.   Yes, that was the other problem.
5     And with the demonstrator, it was -- it was
6     feasible to just carry a bunch of artists around
7     with us, wherever we demonstrated it, but if we
8     wanted to turn this into a product, we couldn't
9     give everyone like a stack of hard drives and it
10    wouldn't have fit on a CD or DVD, so we had to
11    figure out a way how this all would work over a
12    network.  And so this was basically the third
13    thing.  And we had to find a solution that
14    combines or combined solution that would solve
15    all our problems and that is what went into the
16    patent later.
17         Q.   Did the fact that you were trying
18    to do this in realtime make these problems more
19    difficult?
20         A.   It caused another problem insofar
21    as that if you would access the data over a
22    network, you could not stop moving.  So you
23    would also have to find a way how to keep moving
24    and keep the data coming in.  So it was, yeah,

```
 1      all more difficult, yes.

 2              Q.   You mentioned a couple of times

 3      something called demonstrator.  What was the

 4      demonstrator called?

 5              A.   The demonstrator was the system we

 6      explored our ideas with that we started with and

 7      didn't -- which we did show on a number of

 8      occasions then to the people.

 9              Q.   Did the demonstrator include the

10      solutions that you just described?

11              A.   No, it did not contain these

12      solutions we finally listed.  It was the

13      demonstrator that told us about the problems we

14      had to solve, so it was -- it was the system we

15      used for research and which we had to throw away

16      later.

17              Q.   Did it include some of the initial

18      concepts that you described earlier of cutting

19      the lining and scaling?

20              A.   Yes, these concepts were included

21      in the demonstrator, these basic principles.

22              Q.   What did you initially call the

23      demonstrator?

24              A.   We called it TerraVision.
```

1          Q.   You were here for the opening

2     statements of Google?

3          A.   Yes, I heard the opening.

4          Q.   What was the reason you changed

5     the name from TerraVision to another name?

6          A.   Well, we found that there were a

7     number of institutions using this term for

8     something else.  One was the SRI system, but

9     this wouldn't have been such a big problem.  But

10    there was a German trademark on the name

11    TerraVision about some slide shows and that was

12    more important reason why we changed the name.

13         Q.   When you changed the name, you

14    changed it to T-Vision; is that correct?

15         A.   Yes, we used the name T-Vision

16    when we did -- when we referred to it in the

17    public, but internally it still has the name

18    TerraVision.

19         Q.   During the course of your work in

20    developing the system as you've described it,

21    did Art+Com prepare videos illustrating the work

22    you were doing?

23         A.   Yes, we had our own video studio

24    and did a film of some of the work that we did

1    and put together some videos.  And yeah.

2            Q.   Was it just one video or was it a

3    series of videos over time?

4            A.   It was a series of videos over

5    time, so when we had a new better material, we

6    added this to the videos.

7            Q.   Are you actually part of the

8    video, are you one of the people that's in the

9    video?

10           A.   Yes, it shows me about twenty-two

11   years ago, I think.

12           Q.   We'll still recognize you, I'm

13   sure.  But there is a video that has been marked

14   as an exhibit, PTX 267.  Is that a video that

15   you have reviewed from beginning to end?

16           A.   Yes, I have reviewed it.

17           Q.   Is that a video that was prepared

18   by Art+Com?

19           A.   Yes, this video was prepared and

20   produced at Art+Com.

21           Q.   Did you see anything in that video

22   that was not generated by Art+Com and was not

23   consistent with the videos you were preparing?

24           A.   No, it was all Art+Com material I

1     was familiar with.

2               Q.   From reviewing the video, are you

3     able to give us an approximate date of that

4     particular video?

5               A.   There is I think the earliest

6     material in the video would be from '94, and the

7     latest material I think '97, maybe late '96,

8     beginning '97, but I think '96 would be, late

9     '96.

10              Q.   After you filed your patent

11    application, did you continue to do work on the

12    solutions that were described in the patent

13    application?

14              A.   Yes.  When we filed the patent,

15    most of it was not implemented yet, so we had to

16    do work over the course of I think

17    one-and-a-half years to make all the methods

18    that work, and then I think we continue to

19    develop the system further until 2001, 2002.

20              Q.   The video that I referenced, is

21    that a video that also includes some of the work

22    you did after you filed your patent application

23    work focused on some of the solutions in the

24    patent application?

```
 1              A.   Yes, there is definitely some of
 2      it has been done after the patent application,
 3      especially the parts where we enter a building,
 4      so that was not possible with demonstrator.
 5              Q.   What did you do with these videos,
 6      how did you use them?
 7              A.   We used them to show these to
 8      people when we didn't have the system running,
 9      and later we also put it up on the internet, but
10      at that time, videos were -- did not work on the
11      internet.
12              MR. PARTRIDGE:  Your Honor, I
13      would offer PTX 267, and a request to show it to
14      the jury, please.
15              MR. SNYDER:  Objection, Your
16      Honor.  Lack of foundation and relevance.
17              THE COURT:  Overruled.
18              MR. PARTRIDGE:  Mr. Lodge, would
19      you play the video that the witness has just
20      described.  This will be the first three minutes
21      of the video.  Of course if counsel wants to
22      play the rest of it, that's their choice, but
23      it's the first part of it.
24              (PTX 267 was played.)
```

```
 1                    (End of video)

 2      BY MR. PARTRIDGE:

 3              Q.   We stopped it with I think an

 4      image of you.  Is that you at the Earth Tracker?

 5              A.   Yeah, this is me.

 6              Q.   What is the Earth Tracker?

 7              A.   We used it as an input device to

 8      control the system when we presented it in trade

 9      shows or public spaces.

10              Q.   Could you also control it with a

11      mouse?

12              A.   Yes, the system did also work with

13      a mouse, but we had a problem when using a

14      mouse, people were thinking we were just playing

15      a video, nobody did believe that this was real

16      time.

17              Q.   You said you used Earth Tracker at

18      demonstrations, exhibitions; is that right?

19              A.   Yes.

20              Q.   Give us an example of that?

21              A.   Yes.  For example, here in Tokyo

22      or wherever we have been in public showing it on

23      a large screen, we preferred to use this Earth

24      Tracker device.
```

1          MR. PARTRIDGE:  With the Court's

2    permission, I would like to move the Earth

3    Tracker out so that the witness can describe to

4    the jury how this thing was used.

5          THE COURT:  You can do that.

6          MR. PARTRIDGE:  This is Physical

7    Exhibit PTX 7.

8          With the Court's permission, I

9    would like to ask Mr. Mayer to come down from

10   the stand and describe in a louder voice so that

11   the court reporters can pick it up, how you

12   would use this Earth Tracker device.

13         THE COURT:  You may do that.

14         THE WITNESS:  So, yes, you would

15   have this Earth Tracker connected to the

16   computer, and have a large screen in front of

17   you.  And then you would turn the ball here, the

18   large track ball and whatever direction you

19   would turn the ball, the earth visible on the

20   screen would turn the same way.

21         And second way to use it was this

22   space mouse, which is like steering wheel or joy

23   stick for flying.  So if you put it down, you

24   would go down on to the earth closer, or you

```
 1    could twist it to go left, right, or pull it to

 2    go up into space again.

 3              Q.   Thank you, Mr. Mayer.  I think you

 4    can resume your seat.

 5              MR. PARTRIDGE:  Your Honor, we're

 6    about to switch subject matter here.  Might this

 7    be a good time for lunch?

 8              THE COURT:  We can do that.  So

 9    it's 25 after 12:00.  Why don't we come back at

10    1:25.

11              (Jury leaving the courtroom at

12    12:25 p.m.)

13              THE COURT:  Anything we need to

14    address before we go to lunch?

15              MR. PARTRIDGE:  Nothing from the

16    plaintiff, Your Honor.

17              MR. SNYDER:  Nothing, Your Honor.

18              THE COURT:  Thank you.  We'll come

19    back at 1:25.

20              (A brief recess was taken.)

21              THE COURT:  Is there anything else

22    that we need to deal from before lunch?

23              MR. PARTRIDGE:  Nothing from the

24    Plaintiff, Your Honor.
```

```
 1                    MR. SNYDER:  Nothing from the
 2      Defendants, Your Honor.
 3                    THE COURT:  Okay.  Let's call the
 4      jury back in then.
 5                    (Jury enters.)
 6                    THE COURT:  Okay.  Welcome back.
 7      Please sit down.  Mr. Partridge.
 8      BY MR. PARTRIDGE:
 9              Q.   Good afternoon, Mr. Mayer.
10              A.   Good afternoon.
11              Q.   I'd like to start this afternoon
12      by referring you to PTX-1, which is a copy of
13      your patent.  And I'll have Mr. Lodge put it up
14      on the screen for all of us.  Is this the patent
15      as to which you're one of the inventors?
16              A.   Yes, this is the patent.
17              Q.   Are the problems that you
18      mentioned earlier today, this morning, addressed
19      in this patent?
20              A.   Yes, they are addressed.
21              Q.   What about the solutions?
22              A.   The solutions are addressed in
23      there too.
24              Q.   I don't want to go through all of
```

```
1    them, but identity like to focus on something I

2    think you called the precision problem.  Do you

3    recall discussing that this morning?

4              A.   Yes.

5              Q.   Is that discussed in your patent

6    as well?

7              A.   Yes, it is.

8              Q.   And first I want to ask you, what

9    happens to the display that the precision

10   problems now solve.  You gave us a little bit

11   this morning, but as a lead in to these

12   questions, could you tell us that again, please?

13             A.   Yes, if the precision problem is

14   not solved, when you go from one place to the

15   other and go very close, you have a lot of

16   detail, then these precision errors make the

17   geometry, the houses, for example, or the images

18   that are there, they start to jitter and start

19   to wiggle around, so it looks as if there would

20   be an earthquake.

21             Q.   I'd like for you to turn to a

22   slide that you prepared and we'll put it up.  It

23   shows a portion of the patent in Column 6, lines

24   45 to 56.  Does this portion of your patent
```

```
 1        specification talk about this precision problem

 2        that you were addressing earlier today?

 3                 A.   Yes, this is one of the places

 4        that addresses this problem.

 5                 Q.   Would you summarize what you're

 6        describing here?

 7                 A.   We describe the problem with

 8        32-bit floating point representations at that

 9        time, but it's still valid for most computers

10        today.  And so if you move, as I said, from

11        space down to high resolution areas, then you

12        have to move the coordinate system somewhere

13        closer to the place where you are, where the

14        observer is and where the objects are that

15        you're looking at.

16                 Q.   In this portion of your

17        specification, if you look at the third line

18        from the bottom, you use the word continuously.

19        Do you see that?

20                 A.   Yes.

21                 Q.   What is the meaning of the use of

22        the word continuously?

23                 A.   That you have to do it all over

24        again as you move.
```

Q. This morning we showed a video and when you were describing the video, you mentioned something about going inside of buildings. Do you recall that?

A. Yes, I do.

Q. I've asked Mr. Lodge to pull up just a small piece of that video and remove the voice over and I'd like you to describe for the jury what we're seeing relevant to this precision problem which you identified.

A. Uh-huh. Okay. So now we're getting quite close to the -- this is the memorial, a church in Berlin or satellite image of it, and now we've added 3D geometry here. And this closeness or this level of detail, it would not be possible without this solution outlined in the patent and, yeah, especially if you have details like the interior of the office here.

Q. Thank you. I'd like to go back to 1994. I apologize for jumping around a little bit. But in 1994 did you manage to get funding for your project?

A. Yes, we did.

```
 1                  Q.   And who did that funding come

 2        from?

 3                  A.   From Deutsch Telecom.

 4                  Q.   Who is Deutsch Telecom?

 5                  A.   It is a large German

 6        telecommunication company like AT&T in the

 7        United States.

 8                  Q.   I'd like to direct you to PTX-17B.

 9        There's a 17A and 17B.  A is the German language

10        version and 17B is the translation to English.

11        And for us here we're going to refer to 17B, the

12        English.  And I'm going to put it up on the

13        screen, that's the first page of the document.

14        What is this document?

15                  A.   This document is a milestone

16        report about the project that was funded.

17                  Q.   Were these reports you sent to the

18        subsidiary of Deutsch Telecom?

19                  A.   Yes, they were delivered to report

20        on the progress we made.

21                  Q.   How substantial were these

22        documents?

23                  A.   They were the basis for the

24        funding to be released.
```

247

```
 1              Q.   Were there a series of these

 2    milestone reports?

 3              A.   Yes, there were three to four

 4    typically depending on the duration of the

 5    project, so every few months we would have such

 6    a milestone report delivered.

 7              Q.   If you look at the date on the

 8    first page, and I don't know if you can see it,

 9    but what is the date of this milestone report?

10              A.   This milestone report covers the

11    time from May '94 to the end of June '94.

12              Q.   Early in your work on the project?

13              A.   Yes, this is quite early milestone

14    report.

15              Q.   Now, you mentioned this morning

16    that you did some demonstrations and you used

17    the demonstrator for that.  Do you recall that?

18              A.   Yes, I do.

19              Q.   Where do you recall doing the

20    demonstrations?  Could you give us at least a

21    few of those so we have some idea of the venues

22    for those?

23              A.   Yeah.  One was the International

24    Telecommunication Media Gathering in Kyoto,
```

```
 1      Japan.  And then there was, in Brussels, G7

 2      Meeting and there was a SIGGRAPH and a few

 3      others.

 4              Q.   During what period of time did you

 5      do these demonstrations?

 6              A.   With a demonstrator it was, the

 7      first one was in Kyoto in 1994 and then the last

 8      demonstration with the TerraVision system we

 9      gave somewhere in 2000.

10              Q.   And what was the general reaction

11      to these demonstrations that you did?

12              A.   It was always great fun to be

13      there out with the TerraVision system, because

14      nobody had seen such a thing before anywhere and

15      so we were proud and people were happy.  And

16      yeah.  So it was a very rewarding experience to

17      be out there.  So I -- yeah, I remember it very

18      well.

19              Q.   Did you attend a conference called

20      SIGGRAPH 95?

21              A.   Yes, I did attend SIGGRAPH 95.

22              Q.   Was the demonstrator used there?

23              A.   Yes, we did use the demonstrator

24      there.
```

```
 1              Q.   Do you recall whether Art+Com

 2      provided materials at the demonstration at

 3      SIGGRAPH?

 4              A.   I don't recall whether or whether

 5      or not.

 6              Q.   This morning counsel for Google

 7      used a slide that was Slide 29.  Could we pull

 8      that up?  I'm sorry, it's slide -- I must have

 9      switched them.  Maybe it's Slide 28, the

10      timeline.  No, the timeline.  Yes, this is it.

11      You were in the room in the courthouse?

12              A.   Yes.

13              Q.   In the courtroom when that was

14      displayed.  At some point in time did you come

15      across SIGGRAPH 95 materials that were related

16      to Art+Com?

17              A.   Yes, I did.

18              Q.   And approximately when was that?

19      When was the first time you saw those materials?

20              A.   I remember seeing them a couple of

21      years ago.

22              Q.   And what did you do with those

23      materials when you saw them?

24              A.   We submitted them to the US patent
```

```
 1     office.

 2              Q.   Would you, Mr. Lodge, pull up PTX

 3     1, which is the reissue patent, the '550 patent.

 4                   This is the '550 patent, the

 5     patent that's in this litigation; correct?

 6              A.   Yes, this is the one.

 7              Q.   Let's go to the first page.  And

 8     you're one of the listed inventors; correct?

 9              A.   Yes.

10              Q.   Let's go to the second page.  Do

11     you understand this to be a listing of the prior

12     art considered by the patent office?

13              A.   Yes, this is the list of

14     publications that were submitted, most of them

15     to the patent office, yes.

16              Q.   Would you, Mr. Lodge, go to the

17     second column, and the second entry that starts

18     CD-ROM.  Just the CD-ROM part.  Are these the

19     materials you submitted to the patent office?

20              A.   Yes, these are the materials.

21              Q.   Did the patent office make any

22     rejections based on these materials?

23              A.   No, they didn't make any

24     rejections.
```

1          Q.   Did the patent office issue the

2    patent after you submitted these materials?

3          A.   Yes, the patent office did.

4          Q.   I would like to go back to the

5    discussion of the development again.  At some

6    point in time, was there another project for the

7    development of an actual product?

8          A.   Can you repeat this question?

9          Q.   Yes, I'm sorry.

10              At some point was there a project

11   to develop a product?

12         A.   Yes.  After the first project

13   phase with the demonstrator, and when we figure

14   out all the problems I described earlier, we

15   wanted to make a product based on all the

16   technology and experience that we had gathered.

17         Q.   I refer to you PTX 303D, which is

18   the English translation language of the 303A.

19   We put up the first page of it, I think it's

20   back one.  I think there is a previous slide,

21   Mr. Lodge.

22              What is this document, Mr. Mayers?

23         A.   This is my report of the second

24   TerraVision project that was about developing a

```
1        product, an actual product that had different

2        users and could be sold.

3               Q.   Would you turn to page 7240

4        through 41 and I think we have a slide for that

5        as well.  Do you see on this page there is a

6        reference to a presentation system and a

7        reference to a production system.  Do you see

8        that?

9               A.   Yes, I see that.

10              Q.   What's the presentation system?

11              A.   The presentation system is the

12       product we developed that would be used in

13       showrooms, trade shows, museums and so on, and

14       that would be using a device like the Earth

15       Tracker, so it would be a real time system to

16       directly interact with and fly around.

17              Q.   What was the production system?

18              A.   The production system was not --

19       had not to be a realtime system, but it was

20       supposed to be used to do movie production for

21       TV, weather reports and so on.

22              Q.   Was the software written for both

23       of these systems?

24              A.   Yes, they shared a lot of
```

1  components, but they had differences and

2  different requirements.  And also for the

3  production system we could use cheaper hardware

4  because it didn't have to be realtime.

5       Q.  Did you use all the solutions that

6  you described earlier in writing the software

7  for the production and presentation systems?

8       A.  It had all the solutions in it,

9  but as far as I recall during the time when we

10  actually deployed these products, the networks

11  were still too slow and so we still kept using

12  it without these capabilities, but we could have

13  done that with the past network.

14       Q.  Was the software written to

15  accomplish that even though you didn't hook it

16  up to the networks?

17       A.  Yes, it was.

18       Q.  I would like to refer you to PTX

19  236, and we'll put that up on the screen as

20  well.  What is PTX 236?

21       A.  This is a list of can exhibitors

22  at ACM Conference gathering in 1997.  The ACM is

23  the Association For Computing Machinery,

24  Association of Computer Scientists, and as that

 1     was their 50th anniversary.  It was founded in

 2     1947.  And they invited for the fifty years what

 3     they called the fifty most interesting projects

 4     or milestones of computing history.  And we were

 5     very proud to be invited there.

 6            Q.   Did you use your presentation

 7     system at that conference?

 8            A.   As I remember and as the milestone

 9     report says, this was the first time we used the

10     new system.

11            Q.   What was the reaction to it?

12            A.   As always, people really liked it.

13            Q.   Was there also a demonstration

14     that you did on Wall Street?

15            A.   Yes.  In '97, actually we were

16     commissioned to show the system on Wall Street

17     on behalf of a Deutsche Telecom, they were going

18     public, they were going to be listed on the

19     stock exchange, so we were out there on Broad

20     Street in front of the stock exchange with the

21     huge LED display, and with a track ball even

22     much larger than this one.  I think it was like

23     three times the size.  And we were out there in

24     the street showing the system.

255

```
 1              Q.   What was the reaction to that?

 2              A.   As always, we had crowds and

 3    people, happy faces.

 4              Q.   I believe you said this morning

 5    that you continue to use this system until what,

 6    2001, 2002.  What was the time period?

 7              A.   Yes, I think until 2002, I guess,

 8    yeah.

 9              Q.   After that point in time, did you

10    consider using the T-Vision again?

11              A.   We did from time to time, but

12    hardware had changed at that time.  The Silicon

13    Graphics machines, they were too expensive, so

14    we would have -- and software environments

15    changed, so we would have to put it on new

16    hardware.  We considered it, but we actually

17    never did it.  We supported it to Lenox in 2002,

18    but yeah, but this was not such a popular

19    platform then.

20              Q.   Were there any other reasons that

21    it didn't continue at that time having to do

22    with yourself and others?

23              A.   Yeah, I mean, the other thing was

24    that I left Art+Com in 2000, and other
```

```
 1        developers, too.  I mean, I returned to Art+Com

 2        two years later, but during that, the time,

 3        yeah, that just was also no one left to continue

 4        the development.

 5                 Q.   What computers did you use in this

 6        system?

 7                 A.   As I said, this system we were

 8        talking about did only work on Silicon Graphics

 9        computers.

10                 Q.   Why Silicon Graphics computers?

11                 A.   They were at that time the only

12        computers that really could do fast three-three

13        computer graphics.  PC's were not up to the

14        task.

15                 Q.   Did you have communications with

16        people at ASGA, that is to say Art+Com and

17        people at SGI during the time that you were

18        developing the system?

19                 A.   Yes, so we did communicate with

20        them via E-mail.

21                 Q.   Did you describe the general

22        nature of those communications?  I'm not asking

23        you to give them in any detail?

24                 A.   Well, at some points we asked for
```

```
1    help to address some issues and problems we had,

2    and also they on the other hand after they

3    became aware of our system, they wanted to show

4    it to their customers in their presentation

5    facilities.

6         Q.   Did your team meet with any

7    specific SGI employees during that time?

8         A.   Yes, there were a number of SGI

9    employees we met both in Germany and then later

10   in the headquarters of Silicon Graphics or SGI.

11        Q.   And who were some of those people?

12        A.   Most notable was Michael T. Jones

13   who was the head of the Performer Group at

14   Silicon Graphics back then.

15        Q.   At some point did you hear about a

16   company named Keyhole?

17        A.   Yes.  I came across Keyhole

18   sometime after 2002, I guess.  I saw they had a

19   booth at the SIGGRAPH conference and I saw that

20   they were doing something with earth

21   visualization, but I didn't look closer because

22   it looked like, very much like the stuff we had

23   done six years ago, so I -- yeah, I didn't look

24   closer.
```

1          Q.   At that time did you know that

2     Michael Jones was at Keyhole?

3               A.   No, I had no idea.

4               Q.   When did you find that out?

5               A.   It must have been in 2004, I

6     think, at the beginning of 2004 or no, 2005

7     maybe.  Yeah, I think end of 2004 or 2005 a

8     former colleague told me that in an e-mail.

9               Q.   Who was that colleague?

10              A.   That was Steffen Meschkat.

11              Q.   Was he a former employee of

12    Art+Com?

13              A.   Yes, he was a former employee.  He

14    started to work as a student and then stayed

15    after he graduated and worked on the later T

16    Vision product development.

17              Q.   And at the time you exchanged

18    e-mail with him, where was he employed?  What

19    was your understanding as to where he was

20    employed?

21              A.   At this time he was working for

22    Google when he wrote me the e-mail.

23              Q.   Did you learn as part of that

24    where Michael Jones went from Keyhole?

```
 1              A.   Yes.  He told that Michael Jones
 2      was also at Google now.
 3              Q.   Would you pull up on the screen
 4      PTX-295B.  And I refer you to 295B.  This is an
 5      English language translation of the German
 6      version, which is 295A.  Is this the e-mail that
 7      you received?
 8              A.   Yes.
 9              Q.   Was this -- if you look at the
10      yellow highlighted portion it indicates that
11      Google bought Keyhole.  Do you see that?
12              A.   Yes, I see that.
13              Q.   Is this the first time you learned
14      that?
15              A.   Yes, I think so.  I hadn't heard
16      about that before.
17              Q.   Did you use the information in
18      this e-mail at some later point in time?
19              A.   Yes.  Knowing this information
20      that Michael Jones was at Google now made me to
21      reach out to him about a year later when we saw
22      an opportunity to make business with Google.
23              Q.   Why did you contact Mr. Jones?
24      What was the basic reason for making that
```

1    contact?

2              A.   At that time we were thinking what

3    to do with the TerraVision technology we had

4    developed, what we could do with the patent now

5    that PC's were fast enough, the networks were

6    fast enough, and several companies were now

7    producing mass products and so we liked what

8    Google was doing most, so we thought or yeah,

9    that Google would be the partner of choice to

10   work with on such systems.

11             Q.   Did your previous knowledge of Mr.

12   Jones play any role or not with respect to what

13   you decided about reaching out to Google?

14             A.   Well, I thought he might remember

15   me from the old times at Silicon Graphics and he

16   was an engineer and I really liked the stuff

17   that he was doing, so I thought a communication

18   from engineer to engineer might make it easier

19   to get things going.

20             Q.   I'd like to refer you to PTX-13.

21   Put it up on the screen for you.  What is --

22   just briefly, what is PTX-13?

23             A.   This is an e-mail, the e-mail I

24   was talking about when I reached out to Michael

```
 1        T. Jones about cooperation and how to make use

 2        of the patent.

 3                  Q.   In the first paragraph there's a

 4        highlighted portion that said, refers to the

 5        fact that you met about 10 years or so ago.  Do

 6        you see that?

 7                  A.   Yes.

 8                  Q.   Does that have to do with the SGI

 9        time?  Is that what you were talking about?

10                  A.   Yes, that was the SGI time.  We

11        met a couple of times at SIGGRAPH and the

12        Friends of Performers meeting and so then we

13        visited him at the headquarters in Mountain View

14        where he had his offices.

15                  Q.   And in the fourth paragraph, the

16        highlighted portion, what did you have in mind

17        there?  And again, just very briefly.

18                  A.   Yeah.  I just wanted to know if

19        they were interested in licensing this patent.

20                  Q.   Was there an attachment to this

21        e-mail?

22                  A.   Yes, there were two attachments

23        and one was the patent itself and the other was

24        the presentation about the patent.
```

```
 1              Q.   I'd like to refer you to PTX-122.

 2     We'll put it up on the screen.  It's also in

 3     your notebook.  What is PTX-122, is that the

 4     presentation?

 5              A.   That's the presentation.

 6              Q.   I'd like to turn to Page 13 of the

 7     presentation.  That's a page that's entitled

 8     Patent Exploitation.  Do you see that?

 9              A.   Yes.

10              Q.   And you use the word offer several

11     times on that page under the licensing

12     opportunities.  What were you trying to get

13     across here?

14              A.   That we were willing to discuss

15     the patent with interested parties and maybe

16     then -- yeah, to at some point, to get to a

17     license agreement.

18              Q.   Would you turn to the next page?

19     And we have a slide for that as well.  This page

20     is also entitled Patent Exploitation.  What was

21     your objective with respect to this particular

22     page in your presentation?

23              A.   Yeah.  It was that the purpose of

24     this presentation was to communicate that we
```

```
 1      were, yeah, were reasonable people and wouldn't
 2      rip off anyone.
 3              Q.   At that point in time, did you
 4      have any experience negotiating patent licenses?
 5              A.   No, I did not.
 6              Q.   Did anyone at Art+Com, to your
 7      knowledge?
 8              A.   No, not to my knowledge.
 9              Q.   Do you see where it says typical
10      licensing models?  Do you see that?
11              A.   Yes.
12              Q.   What were you attempting to get
13      across with respect to your use of the word
14      typical?
15              A.   Well, that that were examples I
16      heard about of licensing that happened in cases
17      of patent licensing.
18              Q.   Did you have a view at that time
19      as to whether Google Earth would be a typical
20      product?
21              A.   Probably not because I knew they
22      were giving away to clients for free.  So it was
23      not that typical at that time in this business.
24              Q.   Further down you referred to
```

264

```
1     patent related yearly revenue based license

2     costs.  Do you see that?

3              A.   Yes.

4              Q.   What do you mean by patent related

5     yearly revenue and how might that be applied in

6     connection with this particular presentation to

7     Google?

8              A.   I mean, for a free product it

9     would be difficult to agree on a revenue based

10    parts, so -- I mean, it would be like three

11    percent of nothing, so that probably wouldn't

12    apply in this case.

13             Q.   Did you at that time have any idea

14    how you might find what you describe in that

15    last bullet point on that page?

16             A.   No.  We hoped that during

17    discussions when knowing more about what Google

18    had in mind we would get some understanding how

19    to make that business happen.

20             Q.   Mr. Mayer, what happened next

21    after you sent that E-mail to Mr. Jones?

22             A.   Mr. Jones answered that he was

23    interested to get in touch.  And finally he came

24    to visit us in Berlin in our offices.
```

265

```
 1              Q.   Did Mr. Jones come by himself or

 2      did he come with someone else?

 3              A.   At first he came by himself.

 4              Q.   So he came to Berlin to have

 5      discussions with you and others; is that

 6      correct?

 7              A.   Yes.

 8              Q.   Approximately when did that occur?

 9              A.   That would have been in

10      March/April 2000 --

11              Q.   The E-mail is 2006.  Would it have

12      been that same year?

13              A.   Yeah, it was 2006.

14              Q.   What did you discuss during his

15      visit?  And in answering that question, I just

16      -- I want to make sure you comply with what I

17      told you about some of the orders in this case.

18              A.   We discussed our history.  He told

19      what he did after we met the last time, so his

20      career at Silicon Graphics and how he founded

21      the other companies.  And so he told us the

22      whole story.  And we did show him what we were

23      doing or had done at that time.  So we caught

24      up, yeah, long time not seeing each other.
```

1          And then also we discussed the

2     patent and the future projects, what we could do

3     together.

4          Q.   What did Mr. Jones say about his

5     interest in the patent?

6          A.   Well, at some point he expressed

7     clearly that Google is interested in the patent.

8     And I asked why he is interested in the patent.

9     And he said well, there are two ways how to do

10    such a thing.  There is the way that you

11    described in the patent, and there is the way

12    that we're doing it, and there is probably no

13    other way to do that, so if we have the patent,

14    then other companies will have -- it will be

15    harder for other companies to compete with

16    Google Earth.

17         Q.   Did you draw any conclusions from

18    that conversation?

19         A.   Well, one conclusion was that he

20    was telling me that they were not using the

21    patented technology.

22         Q.   Were you ever visit by someone

23    else from Google named John Hanke?

24         A.   Yes, John Hanke came a few weeks

```
 1    after the visit of Mr. Jones.
 2              Q.   What was your understanding of who
 3    John Hanke was?
 4              A.   I understood that he was the
 5    manager or businessman or maybe his boss at
 6    Google.
 7              Q.   How long did you meet with
 8    Mr. Hanke?
 9              A.   I remember he was there one day,
10    for one day in our -- first in our offices and
11    then we had a long dinner together.
12              Q.   Did Art+Com make any presentations
13    to Mr. Hanke at any of these meetings?
14              A.   Yes.  We also told Mr. Hanke what
15    we were doing, the projects at that time, and
16    the technology we had.
17              Q.   What was the purpose of that?
18              A.   To explore opportunities of doing
19    things together.
20                   We still -- we had to know how and
21    the system that could do more things than the
22    earth was doing.  We had a lot of designers that
23    did really good work in user interaction
24    designed, so there is stuff we could improve
```

1       other Google products.  And we had some product

2       ideas for products that Google wasn't exploring

3       in the presentation area, for example.  So we

4       thought that there were really a lot of

5       opportunities to do things together.

6              Q.   Did Mr. Hanke express any opinions

7       to you about the presentations you made?

8              A.   I think he liked what he saw.  At

9       least that's what he told us.  And when he left,

10      I think everyone was happy, we thought, yeah,

11      there are so many things we can do, just let's

12      start.

13             Q.   After Mr. Hanke's visit, did

14      discussions with Google move forward?

15             A.   First it looked like that, but

16      then lawyers got involved.

17             Q.   What happened then?

18             A.   Then the focus of the discussions

19      moved away from making business or new project

20      together, but then it was mostly all about the

21      patent, discussing with patent lawyers.

22             Q.   How did you feel about that at the

23      time?

24             A.   I didn't like it very much,

```
 1        because that was not the -- where we wanted to

 2        go in the first place.  I mean, the patent was I

 3        think a great thing in the package that we

 4        wanted to put together, but we preferred to do

 5        it with the new stuff.

 6                  Q.   Were there E-mail exchanges that

 7        followed that?

 8                  A.   Yes, there were a lot of phone

 9        conferences and E-mail exchanges about both the

10        --

11                  Q.   I would like to refer you to one.

12        I apologize for cutting you off.  I think this

13        will speed it up just a little bit.  I would

14        like to refer you to PTX 15.  And put it up on

15        the screen.  This is probably a little hard to

16        see on this page, so we'll probably break it up,

17        but in general what is this?  Is this an E-mail

18        concerning the patent and the discussions?

19                  A.   Yes, this is an E-mail that talks

20        about a phone conference between Art+Com and

21        Google we had summarizing what we had been

22        talking about, and what the results were of the

23        phone conference.

24                  Q.   Do you see two E-mails on this
```

```
 1    page?
 2              A.   Yes.
 3              Q.   I'd like to put up a slide that
 4    shows more clearly the e-mail that's at the
 5    bottom of the page.  Do you see that?
 6              A.   Yes, I do.
 7              Q.   And what -- it indicates in yellow
 8    highlighting that this is a summary of a call.
 9    Is this a summary of a call?
10              A.   Yes, this is the summary of a call
11    written by Patrick Paulish.
12              Q.   And what did you understand the
13    first bullet point to mean.  It reads Google now
14    views Patent '987, which is now the '550 Patent
15    in this case.  This is the earlier version of
16    it.  Google now views Patent '987 as a quote,
17    nice to have patent, closed quote.  What was
18    your understanding what they were saying?
19              A.   That they were having -- the way
20    we read it was that they were not using our
21    patented technology and that they didn't need
22    the patent, so it would be just nice to have it.
23              Q.   And in the second bullet point
24    which is also yellow highlighted, it says even
```

```
 1      if the patent would be a hundred percent air

 2      tight or at least meeting Google's comfort

 3      level, there's a maximum price Google would pay.

 4      What was your understanding of the first portion

 5      of that second bullet point?

 6             A.   Yeah, I mean, they were raising --

 7      Google's patent lawyers were raising a number of

 8      issues regarding the patent.

 9             Q.   And let's go to the e-mail at the

10      top of the page.  And I have a slide for you to

11      look at that makes it possible to view the

12      e-mail at the top.  Do you see that e-mail?

13             A.   Yes, I do.

14             Q.   Who is Michelle?

15             A.   Michelle Lee was a patent counsel,

16      I think, at Google.

17             Q.   And she's responding to Mr.

18      Paulish's e-mail here, is that it?

19             A.   Yes, she responded to this e-mail

20      that it was a fair summary of what we had talked

21      about in the phone conference.

22             Q.   I'd like to turn to another e-mail

23      in this series of e-mails.  I apologize for

24      having something in my throat.  It's PTX-16.
```

```
 1      And we have a slide that may make it easier to

 2      look at PTX-16.  Let's put it up.  Without going

 3      into the details of it just yet, what is PTX-16?

 4            A.    It is another e-mail I wrote to

 5      Michael Jones basically reaching out for him to,

 6      asking for his support to get talks about doing

 7      projects together back on track and one idea to

 8      do that was that we might present what we were

 9      doing at Google to a larger number of people who

10      might really make a decision on that because it

11      seemed, yeah, that we weren't talking to anybody

12      who could make decisions.

13            Q.    Here's a highlighted portion in

14      the third paragraph.  That says if it turns out

15      that we can not agree on price now, it is very

16      probable that we just wait and see and maybe let

17      perform a reexamination of the patent to gain a

18      better understanding of its potential value.  Do

19      you see that?

20            A.    Yes, I do.

21            Q.    What did you have in mind there?

22            A.    Google was raising all those

23      issues about the patent, so we were really a bit

24      unsure how the situation is.  And we asked our
```

```
 1    lawyers and they said well, probably unfounded,

 2    but you never know.  So a way -- we thought a

 3    way out of it would be to put the patent again

 4    in front of an examiner and see what's the

 5    position of the patent offices on that.

 6              Q.   And identity like to turn to

 7    another e-mail exhibit, DTX-1071.  And we'll put

 8    that up on the screen as well.

 9              A.   Yes.

10              Q.   I'd like to ask you about both of

11    the highlighted portions, but before we get into

12    the highlighted portions, could you just tell

13    me, identify this document for me?

14              A.   Yes, this is another e-mail I sent

15    to Michael Jones.

16              Q.   And this was in August of 2006?

17              A.   Yes.

18              Q.   A few weeks after the other one?

19              A.   Yes.

20              Q.   In the first highlighted part,

21    what did you have in mind there?

22              A.   Well, at that time we felt like

23    the patent seems to somehow, to be in the way of

24    making business together, so we thought okay,
```

1    under the circumstances that we're in, maybe we

2    can get just this finally off the table and

3    yeah, and we were a bit unsure really how to

4    evaluate now with all these issues and we would

5    have to put a lot of work into it, so --

6          Q.   And in that second highlighted

7    part, you refer to a kind of package deal would

8    probably -- would be probably a preferable

9    solution for both sides.  Do you see that?

10         A.   Yes, I do.

11         Q.   What did you have in mind there?

12         A.   As I already said, there were so

13   many opportunities to go forward and so probably

14   we thought and we understood that Google had

15   also proposed this, that it would be really a

16   better thing to work together and to resolve the

17   patent issue or to put the patent into the

18   packet of a larger package.

19         Q.   Did you have a view at that time

20   as to whether you would have done a deal that

21   was not inclusive of a business deal?

22         A.   It would not have been my decision

23   to do that, but I guess not.  I think not.

24         Q.   And you say that on the basis of

```
 1    what?  You said it was not your decision.

 2    That's what I'm getting at.

 3              A.   Okay.  I would have made a

 4    recommendation, but I was not the CEO of

 5    Art+Com.

 6              Q.   After this e-mail, what in general

 7    happened next?

 8              A.   Things -- yeah, we, as the

 9    discussions with Google went nowhere, we did

10    what we announced before, we put the patent

11    again in front of the patent office and yeah,

12    submitted all the documents we had and applied

13    for a reissue of the patent.

14              Q.   Did you submit all the documents

15    that Google gave you during the course of these

16    discussions to the patent office?

17              A.   Yes, we submitted everything we

18    had gathered up to that time that might be

19    remotely related to the patent.

20              Q.   I'd like to go to Slide 28 of

21    Google's opening.  This refers to SRI

22    International and SRI's TerraVision system.  Did

23    you submit to the patent office documents

24    concerning SRI's TerraVision that Google had
```

1      identified to you?

2              A.   Yes, Google brought these

3      documents to our attention and we submitted them

4      to the patent office.

5              Q.   Did the patent office reject any

6      claims over this prior art?

7              A.   No, they didn't.

8              Q.   Did the patent office issue the

9      patent?

10             A.   Yes, they issued the patent.

11             Q.   Now, I'd like to turn to another

12     slide that Google used in its opening.  It's

13     Slide 23.  You were here for the opening, I

14     think you told me that before?

15             A.   Yes.

16             Q.   So you saw this slide when it came

17     up?

18             A.   Yes, I saw it.

19             Q.   I'd like to ask you about the

20     first paragraph first.  And a portion of this

21     sentence was highlighted.  The portion that was

22     highlighted is you succeeded where we failed.

23     Do you see that?

24             A.   Yes, I see that.

1          Q.   And the rest of the sentence after

2     the colon has two portions to it.  I'll read the

3     first part and I'll ask you what you were saying

4     in this letter to Mr. Jones.  Not only have you

5     managed to create a model of the whole earth of

6     unheard size.  What were you referring to there?

7          A.   Well, they managed to acquire

8     really a lot of data at the time.  No one had

9     more satellite data put into one system before,

10    so they had the capitol to, yeah, just put a lot

11    of data in that system.

12         Q.   Was data expensive?

13         A.   It was expensive and it was

14    difficult to make the deals on the data, so it

15    was a definitely an accomplishment.

16         Q.   And the second part of that

17    sentence reads you have finally found a way how

18    to bring it to the people, and I feel very good

19    about it.  What did you mean by that statement?

20         A.   Yes, I -- I meant that now with

21    our and capitol of Google that they could afford

22    it to give it away for free, so many people

23    could use it, so I liked that.

24         Q.   So let's turn to the second

```
 1      portion of this slide, and it is also yellow
 2      highlighted in part.  Let's read that part and
 3      I'll ask you what you meant there.  First part,
 4      you figured out most of the same things on your
 5      own.  What did you mean by that?
 6              A.   What this was, this letter was
 7      written after Michael Jones had visited us in
 8      Berlin and as I already told, he said they had
 9      their way and our way, so I referred from that
10      that they figured out things so I was basically
11      referring to that I believed what he told me
12      when he visited us, so that was the thing.  And
13      also, I mean, since our patent eight, nine years
14      have passed, so it would have also been quite
15      enough time to figure these things out.
16              Q.   And the second part that was
17      yellow highlighted is, and you had a lot of new
18      ideas we never thought about.  What did you mean
19      by that?
20              A.   I really liked some parts of the
21      user interface, how to use the mouse to fly
22      around and to navigate.  And the search
23      functionality they added and some ways to add
24      the data to it, so there were, yeah, some things
```

1      I liked about the system.

2              Q.   I would like to go to Google's

3      opening slide 33.  You saw this when it was put

4      up during the openings?

5              A.   Yes, I saw that.

6              Q.   This is a reference to -- strike

7      that.

8                   In the top of the slide it says

9      that ACI knew about SRI TerraVision in 1995.  Do

10     you see that?

11             A.   Yes.

12             Q.   Is that the SRI TerraVision

13     materials that you submitted to the patent

14     office that we talked about earlier?

15             A.   Yes, it is.

16             Q.   And in this quote from the E-mail

17     where it says same name, we already talked about

18     same name; correct, same goals, and is based on

19     the same technology.  Do you see that?

20             A.   Yes.

21             Q.   Did that turn out to be true?

22             A.   Parts of it, other parts not.

23             Q.   Can you explain?

24             A.   Well, this, I have to say this --

```
 1        I wrote this E-mail I think in early '95 as a
 2        response to an E-mail from Mr. Leclerc to me.
 3        And I have never seen the SRI TerraVision in
 4        action, so I knew only a bit what was on the
 5        internet.  And the headlines sounded really
 6        interesting.  They were doing terrain
 7        visualization.  They were using SGI computers.
 8        And they I think were also funded by some
 9        telecommunication companies, so everything from
10        the outside looked a bit similar at that time.
11              Q.   What did you discover later?
12              A.   When I went to Siggraph when we
13        showed our TerraVision, T-Vision, SRI was there
14        as well.  I was excited about maybe we can get
15        some new ideas, solutions from them.  But when I
16        saw what they were showing at Siggraph, I was
17        disappointed and after that no longer interested
18        in working with them because they seemed way
19        ahead -- way -- we seemed to be way ahead of
20        what they were doing.  So from that time on,
21        yeah, I wasn't interested in seeing what they
22        were doing or talking to them.
23              Q.   I'll represent to you that your
24        first reissue patent issued on July 13th, 2010.
```

```
1      My question is, did you initiate discussions

2      with Google after you received that reissue

3      patent?

4              A.   Yes, we -- after the reissue of

5      the patent, we thought Google might like to hear

6      that other concerns about the patent history and

7      the prior art were not shared by the patent

8      examiner.

9              Q.   I would like to refer you to PTX

10     324, and we'll put it up on the screen.  Is this

11     an E-mail exchange between you and Google?

12             A.   Yes.  I wrote an E-mail to all the

13     people we had been discussing in 2006 to let

14     them know A, there are no concerns any longer,

15     maybe you're interested in the patent now.

16             Q.   I would like to break this up into

17     two slides so we can see the E-mails that are on

18     the first page.  This is I think the earliest of

19     the two E-mails.  It's at the bottom of the

20     page.  Is this an E-mail you sent?

21             A.   Yes, I sent this E-mail.

22             Q.   And it appears as though you sent

23     the reissue of the patent to them; is that

24     correct?
```

1          A.   Yes, I did, I attached the

2    reissue.

3          Q.   Is this your attempt to initiate

4    further discussions with Google?

5          A.   Yes, that was the attempt to start

6    to talk again.

7          Q.   Who were you writing to at this

8    point in time?

9          A.   As I said, the people that were

10   involved in the discussions in 2006, Michael

11   Jones, Michelle Lee, John Hanke.

12         Q.   Did Michael Jones respond to your

13   E-mail?

14         A.   No, none of the people from the

15   former discussion group responded, but Mr. Tim

16   Porter responded instead.

17         Q.   Let's look at the next slide which

18   is Mr. Porter's response.  What was your

19   understanding during the course of discussions

20   with Google in 2010 as to who Mr. Porter was?

21         A.   His signature, the patent counsel

22   lawyer working for Google.

23         Q.   Did you have discussions and

24   E-mail exchanges after this E-mail?

1          A.   Yes, we had a number of phone

2     conferences and E-mail exchanges over the course

3     of a few months.

4          Q.   Were you able to get into business

5     discussions with Google at this point?

6          A.   No, we didn't.

7          Q.   At some point did you decide to do

8     your own investigation of any of the issues that

9     were being discussed?

10          A.   I mean, the situation I was in, it

11     was that Google hasn't been right about the

12     issues the patent had, like the prosecution

13     history and the prior art, so I figured maybe

14     they aren't right about the infringement issue

15     that they were not using our patents, so I

16     started to look into that question.

17          Q.   You're not a patent lawyer.  I

18     didn't remember you saying you were a patent

19     lawyer; is that correct?

20          A.   No, I'm not a patent lawyer.

21          Q.   What did you in general do to try

22     to investigate this?

23          A.   Well, for the first time I had a

24     closer look at how Google Earth actually works,

1    so I looked at what's going on on the screen,

2    and I captured the network traffic and see how

3    it works.  I mean, as you said, I'm not a

4    lawyer, but what I saw was enough to get the

5    impression that they were, in fact, using the

6    technology.  And I remember being a bit angry

7    about that.

8            But this led me to refer the whole

9    thing then to some patent experts who could --

10   who would look deeper into it.

11           Q.   Did there come a point where you

12   decided to make a proposal to Google?  And I'm

13   just asking for a yes are no.

14           A.   Yes.

15           Q.   I would like to pull up PTX 123.

16   Is this the proposal you made to Google?

17           A.   Yes, this is the proposal.

18           Q.   And what did you propose?  I think

19   it's yellow highlighted here.  So the first

20   yellow highlighting says the fair value for the

21   patent, so this was your view of the fair value.

22   Can you tell the jury what you thought was the

23   fair value at that point in time?

24           A.   Yeah.  A fair value at that time

1    we thought would be in the order of $1 per user

2    or for every time it was used in the order of

3    ten cents.

4            Q.  Were there discussions that

5    followed this E-mail that you sent?

6            A.  No, there were only one final

7    phone conference where Google told us that they

8    were no longer interested in licensing the

9    patent or talking.

10           Q.  After these discussions, did you

11   file another reissue application?

12           A.  Yes.  We did file another reissue

13   application, yes.

14           Q.  And during the filing of this

15   reissue application, did you disclose the

16   additional prior art that Google had given to

17   you during the course of the 2010 discussion?

18               MR. SNYDER:  Objection.  Leading.

19               MR. PARTRIDGE:  I'll rephrase,

20   Your Honor.

21   BY MR. PARTRIDGE:

22           Q.  What did you submit to the patent

23   office during the course of the second reissue

24   application?

286

```
 1              A.   During -- in the course of those

 2      discussions with Tim Porter, he sent me a number

 3      of documents and said what I thought about this

 4      being prior art and I looked into these

 5      documents, but finally -- so we were made aware

 6      of the documents and when we applied for reissue

 7      we also submitted these documents to the patent

 8      office.

 9              Q.   Did the patent office make any

10      rejections over these documents?

11              A.   No, they did not make any

12      rejections, they reissued the patent again.

13              Q.   Is that the patent that is then

14      involved in this litigation?

15              A.   Yes, this is the patent.

16              MR. PARTRIDGE:  Pass the witness,

17      Your Honor.

18              THE COURT:  Does Ms. Weisner have

19      a chair?

20              MR. PARTRIDGE:  Yes, we provided

21      one for her, Your Honor.

22              THE COURT:  She looked a little

23      uncomfortable.

24              THE INTERPRETER:  I'm here, just
```

```
 1      standing.

 2                     MR. SNYDER:  We have exhibits that

 3      may be used during the cross-examination.  May I

 4      approach the witness, Your Honor?

 5                     THE COURT:  Yes.

 6                     MR. SNYDER:  Thank you.

 7                     May I proceed, Your Honor.

 8                     THE COURT:  Yes.

 9                     MR. SNYDER:  Thank you.

10      BY MR. SNYDER:

11                     Q.   Good afternoon, Mr. Mayer.

12                     A.   Good afternoon.

13                     Q.   You mentioned you were a member of

14      the Berlin State Parliament?

15                     A.   Yes.

16                     Q.   What party are you a member of?

17                     A.   The Pirate Party.

18                     Q.   The Pirate Party?

19                     A.   Yes, right.

20                     Q.   And the Pirate Party is committed

21      to protecting the public domain of intellectual

22      property; is that right?

23                     A.   Yes.

24                     Q.   And it believes in enhancing the
```

```
 1        public domain for enhancing a number of

 2        materials that are in the public domain?

 3              A.  Yes, it does.

 4              Q.  And the Pirate Party is against

 5        taking materials that are in the public domain

 6        and making them proprietary or under the control

 7        of individuals?

 8              A.  Could you repeat that question?

 9              Q.  I'm sorry.  The Pirate Party is

10        committed to making sure the information that is

11        in the public domain does not become private

12        property?

13              A.  You could say that, yes.

14        Everybody -- nobody would want that.

15              Q.  Now, Mr. Mayer, you understand

16        that this case is about claims of a patent,

17        correct?

18              A.  Yes.

19              Q.  It's a kind of intellectual

20        property?

21              A.  Yes, I do.

22              Q.  Something that is not in the

23        public domain?

24              A.  Yes.
```

```
 1              Q.   I want to ask you a little bit
 2      about what those -- what you think you invented.
 3      Your lawyer didn't show you any of the patent
 4      language during your examination, so I want to
 5      make sure that everybody understands.  The
 6      patent, the '550 Patent is in the general area
 7      of visualizing geographic information, correct?
 8              A.   I think so, yes.
 9              Q.   You didn't invent the field of
10      visualizing geographic information, did you?
11              A.   No.
12              Q.   That's existed for a long time?
13              A.   Yes.
14              Q.   People have been displaying visual
15      information even using computers for a long
16      time, haven't they?
17              A.   Yes, they have.
18              Q.   And before you filed for your
19      patent application in 1995, people had been
20      using computers to visualize geographic
21      information?
22              A.   Yes, I think I said that already
23      in my testimony, yeah.
24              Q.   One of the things, in fact, you
```

```
 1      even disclosed in the patent application, that

 2      there were different ways of using computers to

 3      visualize geographic information that were

 4      already known?

 5              A.   I think I didn't get that.

 6              Q.   Sure.  In your patent, you

 7      identify types of or ways of using computers to

 8      visualize geographic information?

 9              A.   You can say that, yes.

10              Q.   One of them is the paint box?

11              A.   There were some references to a

12      paint box, I guess, yes.

13              Q.   You did not invent the paint box?

14              A.   No.

15              Q.   But paint boxes were a way of

16      visualizing geographic information that came

17      before your patent application?

18              A.   There were systems, yeah, there

19      were of course computer graphic systems that you

20      could visualize geographic data with.

21              Q.   Another kind of computer system

22      used to visualize geographic data were flight

23      simulators, right?

24              A.   There were flight simulators at
```

```
 1        that time, they existed, yes.

 2               Q.   And they existed before you filed

 3        for your patent application?

 4               A.   Yes, there were flight simulators.

 5               Q.   You didn't invent flight

 6        simulators, did you?

 7               A.   No, we didn't claim that either.

 8               Q.   And flight simulators would allow

 9        people to fly around in space and move from one

10        place to another?

11               A.   They were a bit restricted.  I've

12        never seen a flight simulator at that time that

13        you could use to fly into space or that you

14        could fly down.  You could -- flight simulators

15        were basically for simulating flying an

16        airplane, which had several restrictions, which

17        made it much easier to do a flight simulator.

18        We had more a kind of Superman or UFO simulator,

19        if you like that.

20               Q.   But flight simulators existed

21        before your patent, correct?

22               A.   Yes, they did.

23               Q.   Another kind of computer system

24        for visualizing geographic information were
```

```
1    electronic navigation systems, right?

2             A.   There were electronic navigation

3    systems.

4             Q.   And there were electronic

5    navigation systems before you applied for your

6    patent in 1995?

7             A.   Yes, I think so.

8             Q.   You didn't invent electronic

9    navigation systems?

10            A.   No.

11            Q.   Now, electronic navigation

12   systems, they have a field of view, correct?

13            A.   There is a map, yes, and they show

14   you a part of the map, so they would have a

15   field of view, but I -- but it wouldn't be

16   typically called a field of view in 2D.

17            Q.   All computer navigation systems or

18   all computer geographic visualization systems

19   have to have some kind of field of view, don't

20   they?

21            A.   Yes, they do.

22            Q.   You didn't invent the idea of a

23   field of view?

24            A.   No.
```

```
 1                  Q.   Field of view existed as a

 2      computer concept in the context of visualizing

 3      geographic information before you applied for

 4      your patent in December of 1995?

 5                  A.   Yes, you are right.

 6                  Q.   Now, the patent claim, Claim #1 in

 7      this case requires using a computer.  Do you

 8      recall that?

 9                  A.   Yes.

10                  Q.   You did not invent a special kind

11      of computer to run the method that's described

12      in your patent, did you?

13                  A.   No.  As I already said, we were

14      using computers manufactured by Silicon Graphics

15      that we did not invent.

16                  Q.   It was Silicon Graphic's computer

17      called the Onyx?

18                  A.   Yes.

19                  Q.   And anybody, if they had the

20      resources, could buy an Onyx computer, right?

21                  A.   Yes.

22                  Q.   The patent doesn't require any

23      special kind of computer for any of its methods?

24                  A.   It needs to have some special
```

1        capabilities, but in general, I would agree.

2                Q.   And the special capabilities

3        you're referring to aren't ones that you

4        created, right?

5                A.   No, we did not create this

6        computer.

7                Q.   Now, you're familiar with the

8        concept of a kind of computer called a server?

9                A.   Yes, of course.

10               Q.   A server stores information to be

11       used by other computers?

12               A.   That is right.

13               Q.   You didn't invent the idea of a

14       server, did you?

15               A.   No.

16               Q.   Servers existed before you applied

17       for the patent in December of 1995?

18               A.   They existed, yes.

19               Q.   Now, servers share information

20       over a computer network, correct, or they can?

21               A.   Yes, it does.

22               Q.   You didn't invent the idea of a

23       computer network, did you?

24               A.   No, networks already existed at

1      that time.

2              Q.   You didn't invent the idea of

3      requesting information over a network?

4              A.   Not the general idea.

5              Q.   You didn't -- the patent doesn't

6      describe any particular or new way of requesting

7      information over a network, does it?

8              A.   I don't agree with that.  I don't

9      agree with you on that.  I think it's on the

10     opposite, it does describe a new way how to

11     access the server.

12             Q.   Okay.  Let me try and explore that

13     a little bit.  You did not invent the idea of

14     having multiple computers store information, did

15     you?

16             A.   No, of course not.

17             Q.   And there were multiple computers

18     that shared information before you applied in

19     December of 1995 for your patent?

20             A.   There were networks of computers

21     and they could share data.  One computer could

22     access data on another computer.

23             Q.   And they could do that before you

24     applied for your patent in December of '95?

```
 1              A.   Yes.

 2              Q.   Now, the idea of storing

 3    geographic information on a computer existed

 4    before December of 1995, didn't it?

 5              A.   Yes, it did.  I think I made that

 6    hopefully clear already.

 7              Q.   Now, you're familiar with -- you

 8    know what a database is, don't you, Mr. Mayer?

 9              A.   Yes, I know what a database is.

10              Q.   You didn't invent the database?

11              A.   No, we did not invent the

12    database.

13              Q.   Are you familiar with the term

14    distributed database?

15              A.   I'm familiar with the term.

16              Q.   And a distributed database means

17    that it is stored over several locations?

18              A.   A distributed database typically

19    doesn't have to be necessarily different

20    locations, but typically it's used when data is

21    distributed to several computers.

22              Q.   And distributed databases with

23    information spread over several computers

24    existed before you applied for your patent in
```

1    December of 1995?

2          A.   I think so.  There weren't

3    products I was aware of, but the idea of having

4    a distributed, or distributed databases were a

5    topic of discussion, yes.

6          MR. SNYDER:  Could you bring up

7    Plaintiff's Exhibit 1, and turn, please, to

8    claim 14.

9    BY MR. SNYDER:

10         Q.   Your lawyer, Mr. Mayer, didn't

11   show you any of the claim language, in fact, I

12   don't think that they have shown the jury any of

13   the claim language yet.  So I just want to show

14   you a couple of things that perhaps help orient

15   our question.  Claim 14 is now up on the screen.

16   Do you understand this is one of the claims

17   that's asserted in this case?

18         A.   Probably, but I don't have every

19   word of this claim in my mind.  But if you say

20   so.

21         Q.   I'll represent to you that claim

22   14 is one of the claims that's asserted.  At the

23   end -- the claim says the method of pictorial

24   representation defined in claim one, wherein the

```
 1        step F comprises dividing each of the one or

 2        more sections using a model of the quadrant

 3        tree.

 4                     MR. PARTRIDGE:  Objection, Your

 5        Honor, 602, 403.  And would you mind having a

 6        side-bar.

 7                     MR. SNYDER:  I'll withdraw the

 8        question, Your Honor.

 9     BY MR. SNYDER:

10                     Q.   Mr. Mayer, do you know what a quad

11        tree is?

12                     A.   Yes, I do.

13                     Q.   You didn't invent the quad tree,

14        did you?

15                     A.   No, I didn't, but I met the

16        inventor of the quad tree.

17                     Q.   Who is the inventor of the quad

18        tree?

19                     A.   I think his name is Hans Summitt

20        or something like that.  I met him twice.

21                     Q.   And quad tree is a pretty

22        important thing in computer science; correct?

23                     A.   It is now used for a lot of

24        purposes, yes.
```

1          Q.   The quad tree is used to organize

2     -- one way of organizing information?

3          A.   It is one -- it is a so-called

4     spacial data structure to organize data, yes.

5          Q.   Mr. Mayer, as you said, you didn't

6     invent the quad tree; right?

7          A.   No, I didn't.

8          Q.   It was invented and disclosed to

9     the world before you applied for your patent in

10    December of 1995; right?

11         A.   Yes.

12         Q.   And before December of 1995,

13    people used quad trees to store geographic

14    information; correct?

15         A.   Maybe, probably.  Quad tree was

16    used.  But there are a lot of ways how to use a

17    quad tree, so what or to make out of it.  And it

18    was not, I would say not a typical use of the

19    quad tree that we had because the inventor of

20    the quad tree when we talked about him, what we

21    had done, he was surprised, he didn't think that

22    what we were doing with the quad tree was

23    something he anticipated.

24         Q.   Mr. Mayer, my question, Mr. Mayer,

1    was whether people that used quad trees to store

2    geographic information before you applied for

3    your patent?

4         A.   Probably, yes.  But I cannot

5    confirm that definitely.

6         Q.   Trees, a quad tree is one kind of

7    data structure for storing information; right?

8         A.   Yes.

9         Q.   There are other kinds of tree

10   structures for storing information?

11        A.   There is an endless number of data

12   structures.

13        Q.   And there are potentially endless

14   number of tree related data structures; correct?

15        A.   Yes.

16        Q.   You didn't invent the idea of

17   organizing data in the form of a tree, did you?

18        A.   No.

19        Q.   That existed long before you

20   applied for your patent in December of 1995?

21        A.   Yes.

22             MR. SNYDER:  Could you show us

23   claim three of the patent.

24   BY MR. SNYDER:

1          Q.   This claim says the method of

2     pictorial representation defined in claim two

3     further including determining the data and/or

4     the coordinates of the data in terms of a new

5     coordinate system.  Do you see that, Mr. Mayer?

6          A.   I see that.

7          Q.   Mr. Mayer, I just want to use that

8     to help orient our question.  You're familiar

9     with the idea of a coordinate system; correct?

10         A.   Yes.

11         Q.   People have been using coordinate

12    systems for hundreds of years, haven't they?

13         A.   Of course.

14         Q.   You didn't invent the idea of a

15    coordinate system?

16         A.   No.

17         Q.   They existed long before you

18    applied for your patent in December of 1995?

19         A.   Yes.

20         Q.   You also didn't invent the idea of

21    converting one coordinate system into another

22    coordinate system, did you?

23         A.   No.

24         Q.   People have been doing that for

```
 1        probably about as long as there have been

 2        coordinate systems; right?

 3                A.   Yes, that's right.

 4                Q.   Something that existed long before

 5        you applied for your patent in December of 1995;

 6        right?

 7                A.   Yes.

 8                Q.   Now, Mr. Mayer, you also are

 9        familiar with something called a polygonal grid

10        model.

11                A.   I think it is not such a widely

12        used term, but in general, yes, it's -- I know

13        what it is, yeah.

14                    MR. SNYDER:  Can you bring up

15        claim 28.

16     BY MR. SNYDER:

17                Q.   Mr. Mayer, claim 28, I will read

18        it for us, the method of pictorial

19        representation defined in claim one wherein the

20        steps E and F further include representing the

21        data with a polygonal grid model?

22                A.   Yes.

23                Q.   You didn't invent the idea of a

24        polygonal grid model, did you?
```

```
 1                 A.   No.

 2                 Q.   Polygonal grid models existed long

 3      before you applied for your patent in December

 4      of 1995?

 5                 A.   Probably.  I don't know how long,

 6      but yeah, I think I have seen polygonal grid

 7      models before, yes.

 8                 Q.   Mr. Mayer, you mentioned during

 9      your direct testimony that you had done some

10      experiments, and I believe you said that math

11      was right, but your assumptions were too

12      conservative.  Do you recall that?

13                 A.   Yes.

14                 Q.   I believe your testimony was that

15      the system ran much, much faster, maybe fifty

16      times faster than you expected?

17                 A.   Yes.

18                 Q.   When was that?

19                 A.   When?

20                 Q.   Yes, when?

21                 A.   When?  That was right at the

22      beginning when we started getting the

23      TerraVision system developed.

24                 Q.   And approximately what year was
```

```
1     that?

2              A.   That would have been in '94.

3              Q.   In 1994?

4              A.   Yes.

5              Q.   You mentioned, you also mentioned

6     during your direct testimony that you applied

7     for a patent in Germany?

8              A.   Yes, we did.

9              Q.   And you put everything that you

10    knew into that patent application; correct?

11             A.   Yes.

12             Q.   And that's the patent that you

13    applied for in December of 1995?

14             A.   Yes.

15             Q.   That patent application was

16    rejected, wasn't it, Mr. Mayer?

17             A.   Yes, it was, like every patent

18    application typically.

19             Q.   So that application, the

20    application that you were referring to never

21    became a patent in Germany; correct?

22             A.   Right.

23             Q.   Mr. Mayer, you also showed us what

24    you called the Earth Tracker, the big ball.  You
```

```
 1        never got a patent on Earth Tracker, did you?

 2              A.   No.

 3              Q.   The Earth Tracker and the Earth

 4        Tracker ball isn't something that's part of the

 5        patent that's at issue in this case, is it?

 6              A.   No, it's not needed to perform

 7        what's in the patent.

 8              Q.   So you don't need to use that ball

 9        for any part of the claims that are at issue in

10        this case?

11              A.   It is an input device and you can

12        use other input devices, so, no.

13              Q.   So whether or not somebody uses

14        the Earth Tracker ball, that just doesn't matter

15        for the patent claims; correct?

16              A.   Right.

17              Q.   The plaintiff in this case is a

18        company called Art+Com Innovation Pool?

19              A.   Yes.

20              Q.   We have been calling that ACI?

21              A.   Yes.

22              Q.   And ACI is a different company

23        than Art+Com; correct?

24              A.   Yes.
```

1            Q.   Art+Com still exist?

2            A.   Yes.

3            Q.   It exist as a separate company?

4            A.   Yes.  They are separate companies.

5            Q.   ACI, the Plaintiff in this case,

6     was formed in 2002?

7            A.   Yes, it was.

8            Q.   And when it was formed, its

9     purposes was to develop software?

10           A.   Yes.

11           Q.   But about a year after ACI started

12    in 2002 it stopped trying to develop software,

13    right?

14           A.   I don't know, but probably yes.

15           Q.   The CEO of ACI is somebody who

16    would know the answer to that, right?

17           A.   Yes.

18           Q.   And if he said that ACI stopped

19    developing software about a year after it was

20    formed, you'd believe him, wouldn't you?

21           A.   Yes, I would.

22           Q.   Now, ACI never released any

23    software, did it?

24           A.   I don't know.

```
 1                    Q.   Since it was founded in 2002, ACI
 2         has never had a product, has it?
 3                    A.   I don't know.
 4                    Q.   It's never had a customer; is that
 5         right?
 6                    A.   As I said, I don't know.
 7                    Q.   ACI has never had any employees,
 8         has it?
 9                    A.   I would doubt that, but I'm not
10         the person to ask that, because yeah, I'm not
11         operationally involved in ACI.
12                    Q.   Would the CEO be the right person
13         to ask?
14                    A.   Yes.
15                    Q.   Now, ACI has never sold any
16         products that implemented the '550 Patent, the
17         patent that's at issue in this case, had it?
18                    A.   Not to my knowledge.
19                    Q.   And Art+Com, the company that you
20         worked for when you were developing the T vision
21         system, it never released any products that
22         implemented the '550 Patent either, did it?
23                    A.   I wouldn't say it like that.
24                    Q.   Well, let me ask you this, Mr.
```

1    Mayer.  Did Art+Com ever sell any products to

2    any customers that implemented the patent and

3    practiced the methods that are described in the

4    patent at issue in this case?

5              A.  Well, we -- we sold services based

6    on the product, on the patent, and we had some

7    systems that we loaned or rented out, but it was

8    not something you could download from the

9    internet or put on a CD.

10             Q.  The patents that are at issue, the

11   claims that are at issue in this case are method

12   claims.  Do you understand that?

13             A.  Yes.

14             Q.  You have to perform the steps of

15   the method to practice the claim?

16             A.  Yes.  I mean, I'm not really an

17   expert in U.S. patent law, but if you say so, it

18   might be.

19             Q.  Did Art+Com ever sell a product to

20   any customers that practiced the method, the

21   steps that are described in the asserted claims

22   of the '550 Patent?

23             A.  We developed such a system that

24   was capable of that, and we actually sold part

```
 1        of the system, for example, to German space

 2        agency, German NASA where it was used to process

 3        data for a joint German shuttle mission.

 4              Q.   And that was the only customer

 5        that Art+Com ever had, isn't it, for that

 6        system?

 7              A.   Probably there were a couple more.

 8        It was used to plan the Exploit 2000 exhibition.

 9        I can't remember how the business terms were for

10        that, but it was I remember the system was used

11        for planning purposes for two years outside of

12        Art+Com.  So I was -- I would say it was a sale.

13              Q.   If the CEO said that there weren't

14        sales of any systems, would he be wrong?

15              A.   It depends on how you see that,

16        but --

17              Q.   ACI has never received any

18        licensing revenue for the '550 Patent, has it?

19              A.   I cannot judge that, if it was the

20        case.  I don't know.

21              Q.   Well, you contacted Google for the

22        first time in 2006, correct?

23              A.   Yes.

24              Q.   That was about 10 years ago?
```

310

```
 1                    A.   Yes.

 2                    Q.   And Google hasn't paid ACI any

 3      licensing revenue for the '550 Patent, has it?

 4                    A.   No, they haven't.

 5                    Q.   And no other company has paid ACI

 6      any licensing revenue for the '550 Patent

 7      either, correct?

 8                    A.   Not that I recall.

 9                    Q.   So in those entire 10 years,

10      there's not a single company in the world that

11      has paid ACI a penny for the '550 Patent; is

12      that right?

13                    A.   Probably.

14                    Q.   Now, when ACI was first formed in

15      2002, it was completely owned by Art+Com, right?

16                    A.   Yes, it was.

17                    Q.   And then it sold shares to

18      certain, to a variety of different people?

19                    A.   I think, yes, it was -- it was

20      that as far as I remember, the Art+Com

21      shareholders could get shares of this

22      subsidiary.

23                    Q.   And you're one of the people who

24      purchased shares in ACI, correct?
```

 1                    A.   Yes.

 2                    Q.   And you're now a part owner of the

 3       Plaintiff, ACI, correct?

 4                    A.   I have a stake in ACI, yes.

 5                    Q.   Now, let's switch gears a little

 6       bit, Mr. Mayer, and talk about some of the

 7       communications that you've had with Google.  You

 8       first contacted Google and in particular Michael

 9       Jones about the '550 Patent in early 2006,

10       right?

11                    A.   Right.

12                    Q.   And you know that Google Earth

13       originated from a product called Earth Viewer,

14       correct?

15                    A.   I don't recall the name of the

16       product, but I knew that -- I knew about

17       Keyhole.  I think we talked about that.

18                    Q.   I'll use the name Keyhole, Mr.

19       Mayer.  I wasn't trying to be confusing.  You

20       know that Mr. Jones was involved with Keyhole,

21       right?

22                    A.   Yes, I learned that from the

23       e-mail we've seen.

24                    Q.   And he was one of the people who

1    was involved in creating the product that later

2    was purchased by Google and turned into Google

3    Earth, right?

4              A.   Yes.

5              Q.   You didn't contact anybody at

6    Keyhole about the '550 patent, did you?

7              A.   I didn't because I didn't know

8    that they -- I didn't know much about what they

9    were doing.  As I said, I saw them once at

10   Siggraph, they were handing out CD-ROMs.  It was

11   not a big deal, no reason for contacting them.

12             Q.   You saw them at Siggraph in 2002?

13             A.   Yes.

14             Q.   And they were demonstrating their

15   product?

16             A.   They were demonstrating a product,

17   yes.

18             Q.   This was the product that Google

19   purchased and eventually was transformed into

20   Google Earth; correct?

21             A.   That's what I learned later.

22             Q.   When you saw it in 2002, you

23   didn't think it was a big deal?

24             A.   It didn't look like much.  As I

1    said, it looked basically like it could do what

2    our demonstrator could do, and so it was not a

3    big issue.

4          Q.   You didn't contact Keyhole about

5    the '550 patent after you saw that demo at

6    Siggraph 2002, did you?

7          A.   No, I didn't think they were using

8    the patented technology, so there could have

9    been no reason for that.

10         Q.   When you first reached out to

11   Mr. Jones when at Google in 2006, you did that

12   by E-mail; right?

13         A.   Yes, I did.

14         Q.   You sent him a copy of the patent?

15         A.   Yes.

16         Q.   And you also sent him some other

17   presentation materials?

18         A.   I did.  I think we have seen them.

19         Q.   And in that document you mentioned

20   the idea of nonexclusive licensing?

21         A.   I did that as an example of what I

22   have heard could be done, yes.

23         Q.   And your suggestion, your proposal

24   was licensing one to three percent of the

```
 1        patent-related yearly revenue; is that right?

 2                 A.   That was in this document, and I

 3        think as I've already earlier explained, this

 4        would not have been something that would have

 5        applied to Google.  And the presentation, this

 6        part was not specific, not something that was a

 7        specific offer to Google, but it was a general

 8        example.

 9                 MR. SNYDER:  Could you bring up

10        PTX 13.  Blow it up a little bit so it's a

11        little bit easier for everyone to read.

12   BY MR. SNYDER:

13                 Q.   This is the E-mail that you sent

14        to Mr. Jones?

15                 A.   Yes, this is the E-mail.  I think

16        we have seen it already, too.

17                 Q.   And you want to see if Google is

18        interested in the '550 patent; correct?

19                 A.   Yes, that was the basic question.

20                 Q.   If you could blow up the fourth

21        paragraph that starts attached you find.  You

22        ended that paragraph by saying I would also

23        prefer to see the patent at Google than in the

24        hands of anyone else?
```

1          A.   Right.  You didn't say that Google

2     infringed the '550 patent?

3          A.   No.

4          Q.   Because at the time you didn't

5     think that Google infringed the '550; correct?

6          A.   That's time we had not made up our

7     minds on whether they would or would not.  We

8     thought that whoever was aware of the patent and

9     might come -- might look at it and determine

10    himself if he is using the patent or not.  If

11    he's using the patent, they better apply for a

12    license, otherwise they might get in trouble.

13    That's what we thought at that time.

14         Q.   You understood, didn't you,

15    Mr. Mayer, that Google did not infringe the

16    patent -- your understanding was that Google did

17    not infringe the patent; isn't that right?

18         A.   Not at the time that I wrote this

19    E-mail.  I made my mind up a little bit when I

20    talked to Michael T. Jones and he said that they

21    don't, I decided to believe him that he doesn't,

22    because I thought if he would not be truthful on

23    that matter, we would get into trouble and find

24    ourselves in court one day.

```
 1                   MR. SNYDER:  Mr. Inge, could you

 2      bring up Plaintiff's Exhibit 122.  And go to

 3      page 14, production 1094.  I believe this is the

 4      page that your attorney showed you, Mr. Mayer.

 5      And in particular the paragraph that refers to

 6      the nonexclusive license?

 7           A.   Yes.

 8           Q.   Now, I believe you testified

 9      earlier that Google was giving away a product

10      called Google Earth for free at the time; right?

11           A.   Yes.

12           Q.   But Google was also selling

13      different versions of Google Earth when you sent

14      this E-mail in 2006; correct?

15           A.   That's possible that they did for

16      some purposes, but I don't recall.

17           Q.   They were selling a product called

18      Google Earth Enterprise?

19           A.   Possibly.

20           Q.   And they were licensing a product

21      called Google Earth Pro?

22           A.   That's possible.

23           Q.   And the free version of Google

24      Earth had only been just released in 2005 when
```

```
 1        you sent this E-mail; isn't that right?
 2                A.   I don't know when they exactly or
 3        I can't recall when they exactly released which
 4        version.
 5                Q.   And your proposal in January of
 6        2006 was one to three percent of patent related
 7        revenue.  Isn't that right?  That's what's
 8        written here on the slide?
 9                A.   That's what is written here on the
10        slides.
11                Q.   Now, after you sent this E-mail
12        and presentation to Google, you got a response
13        from Mr. Jones; is that right?
14                A.   I got a response, yes.
15                Q.   And Mr. Jones told you that the
16        '550 patent might be useful against someone else
17        who could sue Google?
18                A.   That was -- yeah, that was also a
19        topic of the conversations.
20                Q.   He didn't tell you that Google
21        needed or was interested in the patent because
22        Google practiced any of the claims of the '550
23        patent, did he?
24                A.   No.
```

 1               Q.   He said that they're only interest

 2     was so that they could use it in case somebody

 3     else sued them; right?

 4               A.   No.  I think it would have been

 5     the opposite, that they would do something if it

 6     was incapacitated.

 7               Q.   Mr. Ang, could you please bring up

 8     Plaintiff's Exhibit 329?  And the top of this,

 9     if you could highlight it.  Mr. Mayer, this was

10     an e-mail to you from Mr. Jones at Google?

11               A.   Yes.

12               Q.   And it was sent to you on February

13     21st, 2006?

14               A.   Yes, it is.

15               Q.   That's less than a month after you

16     had contacted him?

17               A.   Yes.

18               Q.   And if you could highlight,

19     please, the second paragraph of Mr. Jones

20     e-mail.  He says please note that we are eager

21     to speak with you and do believe that your

22     patent seems useful as a defense against

23     possible future legal actions.

24               A.   Yes, I read that.

```
 1              Q.   That's what Mr. Jones said to you,

 2       right?

 3              A.   Yes, he did say that, but as I

 4       understand the patent system, you cannot defend

 5       yourself with a patent.  It gives you just the

 6       permission to use or exclusive permission to use

 7       the technology, but if someone sues you on other

 8       grounds as far as I know, the only way you can

 9       use a patent against another patent is to sue

10       someone with this patent, but --

11              Q.   And Mr. Jones told you that there

12       were two ways of visualizing information

13       generally, one that was done by Google and one

14       that was described in the patent?

15              A.   Yes, he did.

16              Q.   And you understood that to mean

17       that Google did not infringe the '550 Patent?

18              A.   I understood that that's what what

19       he was telling me.

20              Q.   And you believed that at the time?

21              A.   I decided to believe that, yes.

22              Q.   It's a little more than that,

23       isn't it Mr. Mayer.  You understood at the time

24       that Google did not infringe the '550 Patent,
```

1      isn't that right?

2              A.   As I decided not to look deeper

3      into the infringement matter because that would

4      have immediately ruled out any cooperation, any

5      future projects if we would be discussing patent

6      infringement.  And that was not the way we

7      wanted to go.

8              Q.   At no point during your

9      discussions with Google in 2006 did you tell

10     them that you believe that Google infringed the

11     '550 Patent, isn't that true?

12             A.   I relied on that was what Michael

13     Jones said and other people at Google said that

14     they weren't infringing the patent and I didn't

15     want to spend the time and effort and money to,

16     yeah, to find out because we'd like to go

17     somewhere else.

18             Q.   Mr. Mayer, I'm asking you a

19     different question.  If you could try and answer

20     my question.  In 2006, you did not at any time

21     tell Google that you believed Google and Google

22     Earth infringed the '550 Patent.  Isn't that

23     true?

24             A.   That is true.

```
 1                  Q.   Now, Mr. Jones came and visited

 2        you in Berlin, correct?

 3                  A.   Yes.

 4                  Q.   And then sometime after that

 5        meeting you had -- there was an exchange that I

 6        believe your lawyer showed us between Mr.

 7        Paulisch and Ms. Lee from Google?

 8                  A.   Yes.

 9                  Q.   Could you put Plaintiff's Exhibit

10        15 on the board, please?

11                  A.   Mr. Paulisch, in the middle e-mail

12        here from July 14th, 2006, he summarizes the

13        phone call that they had.

14                  A.   Yes.

15                  Q.   And you participated in that phone

16        call, correct?

17                  A.   I did.

18                  Q.   And I don't believe that your

19        counsel read all of it, so let's look at the

20        second bullet point.  Could you highlight that,

21        please, Mr. Ang.  Even if the patent would be a

22        hundred percent air tight or at least meeting

23        Google's comfort level, the maximum price Google

24        would be willing to pay is one million to buy
```

```
 1      the patent; is that right?

 2             A.   That is right.

 3             Q.   That's what Google communicated to

 4      you in July of 2006?

 5             A.   Google kept lowering the offers

 6      they made on every phone call that we had, so

 7      yeah, that was -- so here they were do you know

 8      to one million.

 9             Q.   Well, you responded to this

10      e-mail, correct?

11             A.   Whom do you mean?

12             Q.   Well, I'll withdraw that question,

13      Mr. Mayer.  Let me try and be more specific.

14      After this phone call, you went and talked to

15      ACI's CEO at the time, Mr. Weik; is that right?

16             A.   At sometime after that.  I don't

17      know if that's directly related to this call or

18      any other phone call that might have happened,

19      but it was after, sometime after that.

20             Q.   You and Mr. Weik agreed or Mr.

21      Weik agreed that ACI would accept three to five

22      million dollars for the '550 Patent; is that

23      right?

24             A.   Yeah, we already talked about that
```

```
 1      too and under these circumstances that Google

 2      was raising basically telling us your patent is

 3      no good --

 4              Q.  Mr. Mayer, that wasn't the reason

 5      that you told Google, was it?

 6              A.  I didn't get what you're referring

 7      to.

 8              Q.  Didn't you tell Google that the

 9      reason the price was three to five million

10      dollars was because of the limited market for

11      people interested in the patent?

12              A.  There were only a few very large

13      companies at that time who would be able to

14      compete with Google, so it was a small market,

15      but a quite exclusive one.

16              Q.  And because of that small market,

17      you told Google that you would accept three to

18      five million dollars to buy the '550 Patent,

19      correct?

20              A.  I don't think that's was the only

21      reason.  If I remember the e-mail correctly, I

22      cited a lot of other reasons, and also we wanted

23      to do something with them.  So I think we

24      also -- we still prefer to package, the package
```

1    deal that would bring us forward.  So --

2              Q.   Mr. Mayer, one of the reasons that

3    you identified to Google for the three to five

4    million dollars was the limited number of

5    potential buyers for the patent, is that right?

6              A.   One of the reasons was that there

7    were probably yeah about five to 10 companies we

8    could talk to, but yeah.

9              Q.   Now, after, after you sent --

10   after you told Google that you would accept

11   three to five million dollars, you took some

12   steps to find out the reasonable market value

13   for the patent; is that right?

14             A.   Yes.

15             Q.   And you and Mr. Weik then wrote to

16   Google to offer again to sell Google the patent?

17             A.   Yes, after, after we found out

18   that all the issues Google raised on the first

19   round, that it was, yeah, they really -- we felt

20   that they weren't really truthful with us or

21   they were at least wrong about what they were

22   telling, that the patent was bad and now,

23   this -- now it was clear after it was in front

24   of the patent office that Google was not right

1      about that.

2               Q.   Mr. Mayer, I'd like you to try and

3      focus on my question, sir.  After you talked to

4      Mr. Weik, you wrote Google and offered to sell

5      them the patent for three and a half to five

6      million euro; is that right?

7               A.   That was what the e-mail said, but

8      it was not only about the patent.

9               Q.   Mr. Mayer, I'm talking about what

10     you said to Google, sir.  If your lawyer wants

11     to ask you what was in your head, we've heard a

12     lot about that.  I'm trying to find out what you

13     told Google.

14               A.   It was a lengthy e-mail.  Everyone

15     can read what's in it and I think make up his

16     own mind what this e-mail was about.

17               Q.   Okay.  Well, let's take a look at

18     that e-mail.  Can you pull up DTX-1004, please?

19     And this is from you to Michelle Lee at Google;

20     is that right, Mr. Mayer?

21               A.   Yes.

22               Q.   And in it you say you're attaching

23     a letter regarding the sale of the 189 Virtual

24     Globe patent; is that right?

```
 1              A.   Yes.

 2              Q.   So let's take a look at that

 3     letter, which is the next page of this exhibit.

 4     And could you -- do you see where it says this

 5     is why we offer the following, down to the

 6     number -- there we go.

 7                   So this is the proposal that you

 8     sent to Google; correct?

 9              A.   Yes, that is the proposal.

10              Q.   So the first one is Art+Com sells

11     the patent to Google; right?

12              A.   Yes.  There are five points in it.

13              Q.   We'll walk through them.  The

14     section one is Google gets an exit clause that

15     allows it to exit the agreement after four years

16     and get back 50 percent of the amount paid;

17     right?

18              A.   Yeah.

19              Q.   Google gives Art+Com a

20     nonexclusive license to use the patent for its

21     own work; right?

22              A.   Yes.

23              Q.   So Art+Com -- Google will own the

24     patent, but Art+Com gets to keep using it?
```

```
 1              A.   Right.

 2              Q.   Google gets support from Art+Com

 3    in its legal dealings; right?

 4              A.   Uh-huh.

 5              Q.   And five, Art+Com gets to be

 6    listed as a partner in the Google Earth project

 7    and use that project for its own promotional

 8    purposes?

 9              A.   Yes.

10              Q.   Those were the only terms you

11    proposed; right?

12              A.   Yes.

13              Q.   As a result of the above agreement

14    Art+Com receives a one-time payment between 3.5

15    and five million euros, depending on the extent

16    of the back license and other conditions we will

17    agree on; correct?

18              A.   Yes.

19              Q.   That was your proposal to Google?

20              A.   Yes, that was our proposal.  And

21    it had five points on it, and it would have been

22    really awfully large, huge to be a partner with

23    Google in this Google Earth business.

24              Q.   The partner you're referring to is
```

328

```
 1      being listed as a partner; correct?

 2                  A.   Yes.

 3                  Q.   Now, you didn't say anywhere in

 4      this communication that you thought Google

 5      infringed the '550 patent; correct?

 6                  A.   Yes.

 7                  Q.   In fact, at no time during 2006

 8      did you ever suggest to Google that it infringed

 9      the 2006 patent?

10                  A.   No.  We accepted what Google had

11      told us at face value, so maybe we were a bit

12      naive, but we accepted what Google was telling

13      us.

14                  Q.   It seemed fair to you, didn't it,

15      that there was at least one other way of doing

16      either visualization beyond what was described

17      in the patent?

18                  A.   It might have been possible, but

19      we had no way of determining that.  And as I

20      said, we had also no intention of spending

21      precious lifetime doing that.

22                  Q.   Now, you talked about the

23      demonstrations of your T-Vision system that you

24      made over the years.  Do you recall that,
```

```
 1        Mr. Mayer, earlier today?
 2              A.   Yes.
 3              Q.   And you showed the T-Vision system
 4    at several locations?
 5              A.   Yes, we did.
 6              Q.   One of those was at Siggraph 95?
 7              A.   Yes.
 8              Q.   And you attended that conference;
 9    right?
10              A.   I was there for the whole
11    conference.
12              Q.   Siggraph is a very popular
13    conference, yes?
14              A.   It was more popular at that time
15    than today, but it is still a popular
16    conference.
17              Q.   At that time thousands of people
18    would attend Siggraph conferences; right?
19              A.   Probably 20 to 50,000.
20              Q.   Almost as popular as a football
21    game?  The Siggraph 95 conference was open to
22    the public, wasn't it?
23              A.   Well, if you were willing to pay
24    the thousand dollars attendance fee, you could
```

 1     go there.

 2              Q.   And apparently 20 to 50,000 or so

 3     people did?

 4              A.   Yes.

 5              Q.   Now, that conference occurred in

 6     August of 1995?

 7              A.   Yes.

 8              Q.   That was more than a year before

 9     you filed for your US patent application;

10     correct?

11              A.   Yes.

12              Q.   In connection with that

13     conference, Art+Com submitted a paper; is that

14     right?

15              A.   I don't know.  I personally did

16     not submit a paper, but there was some

17     information found its way on to Siggraph.  But I

18     became aware of later.  So it looked like a copy

19     of the Art+Com website reformatted, if you're

20     referring to that.

21              Q.   Let's try and break that down

22     because that's kind of a mouthful, Mr. Mayer.

23     The proceedings for the materials associated

24     with Siggraph were generally put on CD-ROMs,

 1          right?

 2                    A.   No, I don't think so.

 3                    Q.   Let me be more specific.   The

 4          materials for Siggraph 95 were put on a CD-ROM;

 5          correct?

 6                    A.   There were papers and proceedings

 7          and additional materials, so there was a bunch

 8          of material there, and I also heard that some

 9          material was distributed as CD-ROM at that time.

10                    Q.   You heard that there was material

11          distributed at Siggraph 95 on CD-ROM?

12                    A.   I have heard about that there was

13          material generally distributed on CD-ROMs during

14          that time.

15                    Q.   And you actually reviewed a CD-ROM

16          from the Siggraph 95 conference, haven't you?

17                    A.   I reviewed material that I found

18          out a couple of years ago, that was -- that was

19          at some point in time was distributed from the

20          -- by the Siggraph committee.

21                    Q.   Well, I want to be specific.   You

22          reviewed a CD-ROM from Siggraph 95; correct?

23                    A.   Yes.   We found material on the

24          internet that was entitled CD-ROM of materials,

1    so we didn't have an actual CD-ROM, but we

2    thought at some point in time it would have been

3    on a CD-ROM.  And we submitted I think this

4    material to the patent office.

5              Q.   That CD-ROM material from Siggraph

6    95 that you reviewed included a paper about your

7    T-Vision system; isn't that right?

8              A.   I wouldn't call it a paper.  To

9    get it from Siggraph was a very tedious process.

10   You have to go through a lot of peer reviews, so

11   what was on the CD from what we submitted was

12   the marketing material, it was not the paper in

13   the sense of the scientific paper.

14             Q.   I don't want to get hung up on

15   whether we call it a scientific paper or

16   marketing material, Mr. Mayer.  So let me try

17   and change the question.

18                  You reviewed CD-ROM materials from

19   Siggraph 95, and they contained marketing

20   materials about your T-Vision system; correct?

21             A.   Yes.

22             Q.   And it involved that -- those

23   marketing materials included or were a

24   description of your T-Vision system; isn't that

1     right?

2                 A.    There were some discussions, yes,

3     about the T-Vision system.

4                       THE COURT:  Mr. Snyder, are we at

5     a point where it would be convenient to take a

6     break?

7                       MR. SNYDER:  That would be fine,

8     Your Honor.

9                       THE COURT:  We'll take a

10    fifteen-minute break and come back at quarter to

11    4:00.

12                      (Jury leaving the courtroom at

13    3:30 p.m.)

14                      THE COURT:  Anything further we

15    need to discuss?

16                      MR. SNYDER:  Nothing from

17    defendants.

18                      MR. PARTRIDGE:  Nothing.

19                      THE COURT:  Anything we need to

20    address?

21                      MR. PARTRIDGE:  Yes, Your Honor.

22    I didn't object to this, but I thought Mr.

23    Snyder was getting awfully close to the line and

24    I tried to avoid having to get up and object and

334

```
1    interfere with flow and when it's borderline.
2    But we have an agreed limine that says that
3    reference to testimony of, arguments about ACI
4    or Art+Com as a non-practicing entity, patent
5    assertion entity, patentrol or any other similar
6    characterization is not permitted in this case.
7    And we're getting very close to that line and
8    going over and over again about whether they are
9    selling any products and what they've sold and
10   that they haven't sold.
11                   THE COURT:  He's probably done
12   with that, isn't he?
13                   MR. SNYDER:  I'm done with that,
14   Your Honor.  I don't have more questions on that
15   topic.
16                   MR. PARTRIDGE:  Okay.  Good.
17                   THE COURT:  Are we ready to bring
18   the jury back?
19                   MR. SNYDER:  Yes.  Thank you, Your
20   Honor.
21                   (Jury enters.)
22                   THE COURT:  Okay.  Thank you, Mr.
23   Snyder.  Be seated.  You may proceed.
24                   MR. SNYDER:  Thank you, Your
```

1    Honor.

2    BY MR. SNYDER:

3            Q.   Mr. Mayer, earlier this afternoon

4    you testified about a system from SRI that was

5    also called the TerraVision system.  Do you

6    recall that?

7            A.   Yes, I recall that.

8            Q.   You found the website for the SRI

9    TerraVision system, didn't you?

10           A.   Yes, I did found the website, yes.

11           Q.   And you found that it was in the

12   same field of geographic visualization as your T

13   vision project, correct?

14           A.   Yes, it looked very much like

15   that, yes.

16           Q.   And you actually wrote to them and

17   pointed out to them that it was based on -- had

18   the same name?

19           A.   Yes.

20           Q.   And it had the same goals?

21           A.   It looked like that, yes.

22           Q.   And that it was based on the same

23   technology?

24           A.   Yes.

1          Q.   That was the e-mail that we saw

2     earlier.  Just to remind us, Mr. Ang, could you

3     pull up DTX-1196?  This is the e-mail that you

4     wrote to Yvan Leclerc?

5          A.   Yes.  Yes, it looks like the

6     e-mail.

7          Q.   Just take perhaps that first

8     sentence, the print isn't terrific, so we'll try

9     to make hit bigger so we can see.  Says Hi Yvan,

10    I found your home page a few days ago and we're

11    really astonished about the fact that there is a

12    project with the same name, the same goals and

13    is based on the same technology.  That's what

14    you wrote to Mr. Leclerc, right?

15         A.   That was my first impression when

16    I saw the website, yes.

17         Q.   And Mr. Leclerc wrote to you and

18    he told you that SRI also used a multi

19    resolution pyramid of imagery that allows the

20    user to zoom in from high altitudes down to low

21    altitudes; is that right.

22         A.   That is what he claimed.

23         Q.   Okay.  And he also told you that

24    SRI used ATM image servers?

 1            A.   That's what he wrote in this

 2    e-mail.

 3            Q.   ATM stands for asynchronous

 4    transfer mode?

 5            A.   Yes.

 6            Q.   It's a way for computers to

 7    communicate with servers?

 8            A.   Yes, it's a low level network

 9    protocol that was very, was coming up at that

10    time.

11            Q.   After you wrote Mr. Leclerc this

12    e-mail, he wrote you back, correct?

13            A.   Yes, he did.

14            Q.   And he wrote back and told you

15    about something he called the image server

16    system?

17            A.   Yes, that was in his response

18    e-mail.

19            Q.   The image server system, he

20    pointed out was something that fell under the

21    category of a distributed data system, right?

22            A.   He was claiming, yes, that this

23    was a distributed, some kind of distributed data

24    system.

1              Q.   And this message, the one that

2      follows, your message back to Mr. Leclerc, so on

3      the next page of this exhibit, Mr. Leclerc wrote

4      back to you, let's just check the date, this is

5      in June of 1995?

6              A.   Yes.

7              Q.   I'm sorry.  June 1995?

8              A.   Yes.  I think the date is correct.

9              Q.   So by the middle of 1995 you had

10     this information from Mr. Leclerc about the SRI

11     system and you had also found the SRI web page,

12     right?

13             A.   I did, yes.

14             Q.   Now, you wrote to Mr. Le -- in

15     this exchange with Mr. Leclerc you mentioned to

16     him the database that the ACI or Art+Com system

17     used.  Do you recall that?

18             A.   I think I did make some statements

19     about that, yes.

20             Q.   You told them that your first

21     prototype can handle a database of practically

22     unlimited size?

23             A.   Yes, I wrote that and I hoped that

24     at some time we were ready to do that.

```
 1            Q.   You were referring to the

 2     prototype that you demonstrated in Kyoto, Japan?

 3            A.   No, actually at that time we hoped

 4     to get such a system at one point to use the

 5     network and the distributed database, but we

 6     hadn't figured out really how to do it all, but

 7     the idea of using a network was there.

 8            Q.   So you told Mr. Leclerc that you

 9     had already set up a permanent node in Tokyo and

10     have another in Sunnyvale this year?

11            A.   We hoped to do that too, but the

12     node -- I can't recall ever having a node in

13     Tokyo and also a node to Sunnyvale also didn't

14     manifest for a lot of reasons, mainly the

15     network wasn't there.

16            Q.   Well, Mr. Mayer, what you told Mr.

17     Leclerc was that you had already had a permanent

18     node in Tokyo, right?

19            A.   Yes, but that was a bit more hope

20     than reality.

21            Q.   Let's take a look at your exact

22     words.  I don't think it's this message.  It's

23     the one above it I believe.  Yes, it's the last

24     paragraph of the message on the second page.  It
```

```
 1       starts I returned from holidays.  Okay.  And if
 2       you start and you look at the second to the last
 3       sentence it begins in the middle of the
 4       paragraph, we already set up a permanent node in
 5       Tokyo and have planned another in Sunnyvale this
 6       year.  Do you see that?
 7               A.   Yes, I see that.
 8               Q.   You didn't tell Mr. Leclerc that
 9       this was an aspiration or goal or desire, you
10       told him we already set it up?
11               A.   Yes, I told him that and that
12       wasn't completely truthful.
13               Q.   It wasn't complete true, was it?
14               A.   No.
15               Q.   And you thought it was okay to not
16       be completely truthful because you were just
17       writing an e-mail to him, right?
18               A.   Well, he wasn't completely
19       truthful to me too.  It was -- we had to, as the
20       Deutsch Telecom, a telecommunication company
21       wanted that we had to present the project in a
22       special way that involved networking.
23               Q.   Mr. Mayer, Mr. Leclerc is not here
24       to defend himself.  You know he's passed away,
```

```
 1    right?

 2            A.   Yeah.

 3            Q.   So I'm asking you about what you

 4    said.

 5            A.   Yes, I said that.

 6            Q.   You told Mr. Leclerc, you said

 7    something in your e-mail that wasn't true?

 8            A.   Yes, I did.

 9            Q.   And you thought it was okay to

10    tell him that because it was just an e-mail?

11            A.   No, it was because we had already

12    agreed with WeatherNews to put the node in their

13    offices, so we hoped that we would have it quite

14    soon, but unfortunately it didn't workout.

15            Q.   So you just went ahead and told

16    Mr. Leclerc that you already had it?

17            A.   Because it was coming soon, so

18    yes.

19            Q.   Turns out it wasn't coming soon,

20    was it?

21            A.   No, it didn't materialize.

22            Q.   You never set up a permanent node

23    in Kyoto, Japan?

24            A.   No, we didn't.
```

1          Q.   Mr. Mayer, as one of the inventors

2     on the '550 Patent and the patents that preceded

3     it, you had to sign a declaration as part of the

4     application process.  Do you recall that?

5          A.   Yes, I recall that.

6          Q.   And are you familiar with what's

7     called the duty of candor?

8          A.   I think I understand it, but I've

9     never heard this, these words, so if you

10    could --

11         Q.   Sure.  Let me try and explain it.

12    You understood that you had a duty to disclose

13    information which is material to the examination

14    of the application?

15              MR. PARTRIDGE:  Objection, Your

16    Honor.  Not relevant to this.

17              MR. SNYDER:  It absolutely is

18    relevant, Your Honor.  It relates precisely to

19    the testimony he's given about his knowledge of

20    various systems.

21              THE COURT:  Let's see where this

22    is going.  Do you have an objection to later

23    questions?  It's overruled.

24    BY MR. SNYDER:

```
 1                      Q.   When you filed your application in

 2         the United States in December of 1996, you knew

 3         that you had a duty to disclose information

 4         which is material to the examination of the

 5         application?

 6                      A.   Yes.

 7                      Q.   And you acknowledge that duty

 8         under oath; correct?

 9                      A.   Yes.

10                      Q.   At the time that you submitted the

11         application in December of 1996, you were aware

12         of the SRI system; isn't that right?

13                      A.   I was aware.

14                      Q.   And you had been communicating

15         with Mr. Leclerc about the SRI system; correct?

16                      A.   I had been communicating about it,

17         but I think I also wrote that I didn't -- that I

18         didn't look into the details at that time.

19                      Q.   You told him that it was based --

20         it had the same goals and the same -- based on

21         the same technology; correct?

22                      A.   When I also sent that I completely

23         lost interest in what SRI was doing at the time

24         after seeing their system at Siggraph, so in
```

```
 1      talking to them I remember that I did not

 2      consider it really as relevant what they were

 3      doing.

 4              Q.   Mr. Mayer, I'm not asking whether

 5      you had interest in it or not, I'm talking about

 6      your sworn obligation to the Patent and

 7      Trademark Office.  So when you applied in

 8      December of 1996 for the US patent, you were

 9      aware of SRI's system; correct?

10              MR. PARTRIDGE:  Objection.  It's

11      been asked and answered and I think we're

12      crossing the line.

13              THE COURT:  Overruled.

14  BY MR. SNYDER:

15              Q.   Were you aware of the SRI system

16      in December of 1996?

17              A.   I was aware of the system, but I

18      didn't consider it as relevant what they did,

19      and the patent examiner later came to the same

20      conclusion.

21              MR. SNYDER:  Move to strike as

22      nonresponsive, Your Honor.

23              THE COURT:  Denied.

24  BY MR. SNYDER:
```

1          Q.   Mr. Mayer, in December of 1996

2     when you had a duty to disclose all material

3     information to the Patent and Trademark Office,

4     did you disclose anything related to SRI?

5          A.   Maybe there was something in it,

6     but I don't recall what information was

7     available to me at that time.

8          Q.   Mr. Mayer, you had seen the SRI

9     website; correct?

10         A.   Yes, I think so.

11         Q.   And you had had E-mails with

12    Mr. Leclerc about the operation of the SRI

13    TerraVision system?

14         A.   There was some E-mail exchange

15    about that.

16         Q.   And isn't it true that you did not

17    disclose anything to the Patent and Trademark

18    Office in December of 1996 about that system?

19         A.    I do not recall what we disclosed.

20         MR. SNYDER:  Mr. Inge, could you

21    bring up Plaintiff's Exhibit Number 3, please.

22    And in particular, page two.

23         Q.   This is the same format of the

24    material that your attorney showed you,

```
 1        Mr. Mayer, and over at the bottom of the first

 2        column it says references cited.  Do you see

 3        that?

 4              A.   Yes, I see that.

 5              Q.   It has US patent documents, and it

 6        identifies a patent from Shamada?

 7              A.   Yes, I see that.

 8              Q.   It goes over to the next column

 9        and it has one patent from an inventor named

10        Iwasura.  Do you see that?

11              A.   Yes.

12              Q.   And it cites two foreign patent

13        documents; correct?

14              A.   Yes.

15              Q.   It doesn't cite anything at all

16        there from SRI, does it?

17              A.   No, it doesn't.

18              Q.   Now, in December of 1996, when you

19        filed your application with the US patent office

20        and you had your duty of disclosure, you had

21        been demonstrating the ACI or Art+Com system for

22        several years, hadn't you?

23              A.   What date are you referring to?

24              Q.   December of 1996, sir.
```

1        A.   Yes.

2        Q.   You had been demonstrating that

3    system at a variety of conferences around the

4    world?

5        A.   Yes, we did.  Uh-huh.

6        Q.   And you did not disclose in

7    December of 1996 anything about the Art+Com

8    T-Vision system; isn't that right?

9        A.   First, I misspoke my last answer

10   to the question.  Because I thought you were

11   referring to the -- to the demonstrator, right.

12       Q.   I am referring to the demonstrator

13   and the Art+Com system, yes, sir.

14       A.   Yes.  But the demonstrator was --

15   the technology of the demonstrator was not what

16   we claimed in the patent.

17       Q.   But you didn't disclose to the

18   patent office anything about the T-Vision

19   system, did you?

20       A.   Yes, of course we did disclose.

21       Q.   In December of 1996 when you filed

22   your application for a US patent, you did not

23   disclose anything, there were no references

24   regarding the Art+Com T-Vision system, were

1      there?

2                 A.   It was describing, it was all

3      about the T-Vision system, the patent itself.

4                 Q.   Mr. Mayer, the two US patents that

5      are cited on the face of this patent as

6      references cited there, they're not about the

7      ACI system, are they?

8                 A.   What do you mean was the ACI

9      system, which --

10                Q.   I misspoke, the Art+Com T-Vision

11     system, what you call the demonstrator of these

12     references cited on the face of that patent are

13     about that system, are they?

14                A.   They are --

15                MR. PARTRIDGE:   I object, Your

16     Honor, this is not relevant.  This is not prior

17     art in this case.

18                THE COURT:   I think there is some

19     merit, but we weren't going too deep into this.

20     Maybe one or two more questions.

21     BY MR. SNYDER:

22                Q.   Mr. Mayer, you didn't disclose

23     anything to the Patent and Trademark Office

24     about the Art+Com system until 2013, did you?

```
 1              A.   No, I disagree.

 2              Q.   When did you first disclose

 3      anything about the T-Vision system?

 4              A.   Again, the patent business the

 5      T-Vision system, so if --

 6              Q.   This is the difficulty.

 7      Mr. Mayer --

 8                   THE COURT:  Mr. Snyder, I think

 9      you ought to ask the witness about the

10      demonstration of that system that existed before

11      the priority date.  But let's do that and then

12      move on.

13                   MR. SNYDER:  Thank you, Your

14      Honor, I will.

15      BY MR. SNYDER:

16              Q.   Mr. Mayer, before December of

17      1996, you had demonstrated the T-Vision system,

18      you had the demonstrator; correct?

19              A.   Yes.

20              Q.   And you described certain aspects

21      of it in the patent application?

22              A.   There are some aspects of this

23      system that was a precursor are also referenced

24      in the patent, yes.
```

```
 1              Q.   And you had a web page that

 2       described that system?

 3              A.   Yes, there was some marketing

 4       materials we talked already about.

 5              Q.   Those are the marketing materials

 6       that were on the Siggraph 1995 CD-ROM?

 7              A.   They are very similar to this

 8       material.

 9              Q.   When you filed for the US

10       application in December of 1996, did you provide

11       the US Patent and Trademark Office with a copy

12       of those marketing materials that were included

13       in the Siggraph 95 CD-ROM?

14              A.   No, we didn't because they were

15       not relevant.

16              MR. SNYDER:  Thank you, Your

17       Honor.  No more questions.

18              THE COURT:  Mr. Partridge,

19       redirect.

20              MR. PARTRIDGE:  Yes, Your Honor.

21              REDIRECT EXAMINATION

22       BY MR. PARTRIDGE:

23              Q.   Mr. Mayer, I would like to try to

24       clarify a few things here.  And I would like to
```

1    start kind of with the subject that counsel left

2    off with.

3              As to Siggraph 95, you attended

4    that; correct?

5         A.   Yes.

6         Q.   While you were there, did you

7    receive CD-ROM materials?

8              MR. SNYDER:  Objection.  Leading.

9              THE COURT:  Overruled.

10             THE WITNESS:  I don't recall

11   receiving any CD-ROM materials at Siggraph 95.

12        Q.   Do you know anyone at Art+Com who

13   received CD-ROM materials at Siggraph 95?

14        A.   I don't know.

15        Q.   When is the first time you heard

16   about CD-ROM materials associated with Siggraph

17   95?

18        A.   It was a couple of years ago when

19   -- before we applied for the reissue.

20        Q.   That's the first time?

21        A.   That's the first time as far as I

22   recall that I was aware of this material.

23        Q.   Would it have been possible for

24   you to submit these materials to the patent

1        office in 1995 and '96 given that?

2                A.   I don't know, but we didn't

3        consider this marketing papers as something you

4        wanted to submit to the patent office.  They

5        were badly written, full of errors and didn't

6        meet any scientific standards at all.

7                So only later we were advised to

8        do that and I think I said the patent examiner

9        didn't reject any -- the patent because they

10       existed, so we were right in the first place,

11       and they were.

12               Q.   I would like to turn to SRI

13       TerraVision.  You were asked some questions

14       about submitting SRI TerraVision to the patent

15       office.  I understand from your testimony

16       earlier you said that they have been submitted

17       since then.  But in 1995 when you knew about SRI

18       TerraVision, what was your understanding as to

19       what it did and what it didn't do with respect

20       to what you were doing?

21               A.   I mean, I already said that I lost

22       interest after seeing the system at Siggraph,

23       that I was disappointed.  So I didn't do much

24       about the technical details of the system, only

```
 1        that it didn't look very impressive to me.  And

 2        later I found out that it was also very -- that

 3        it was also limited -- they were showing on

 4        Siggraph flying around or driving around,

 5        driving around in an area of about 40 square

 6        miles around some US military base, so there was

 7        no world, no globe.  It looked just like someone

 8        driving around in a sandbox.  So that was the

 9        level of excitement I got.

10                  And also later I learned why they

11        couldn't do the whole earth because they had to

12        have an equal resolution for the whole level so

13        if they would have put the whole world in at

14        that time the system wouldn't have worked very

15        well.  So that were basically the reasons why I

16        completely stopped getting interested in the SRI

17        system.

18             Q.   Now, you were asked about

19        DTX-1196, which should be in front of you in

20        your notebook and I'll ask Mr. Lodge if he can

21        pull it up.  I'm in the wrong place.  Thank you.

22        Okay.  This is rather small.  Is it going to be

23        easy to blow this up?  You were asked a number

24        of questions about your communications back and
```

```
 1        forth with Mr. Leclerc.  I'd like to ask you

 2        about a few things that weren't discussed in

 3        reviewing it.  If you go to, let's see, it's

 4        hard to find this.  Let me do this quickly.  If

 5        you go to the e-mail in this chain on June 9th,

 6        which is the third e-mail from Leclerc.  You

 7        know what, I'm going to skip this because it's

 8        too hard and it will take too much time.  Do you

 9        have a recollection of this e-mail exchange?

10               A.   Partially, so --

11               Q.   My question is this.  Did Mr.

12        Leclerc tell you things about your system in

13        this e-mail that he had observed?

14               A.   Yes.

15               Q.   Did he talk about things that you

16        had accomplished in your system that he wondered

17        about?

18               A.   Yes, I think he was -- he liked

19        that we were able to both have the whole world

20        and high resolution areas in some places.  And

21        in fact, I remember that later SRI used a

22        similar technology than we had been using in the

23        demonstrator.

24               Q.   Did he ask you how you
```

```
 1      accomplished things?

 2              A.  Yes, I think so, but I don't

 3      recall the details.

 4              Q.  And Mr. Mayer, I'm not going to

 5      take the time to go through it.  I'd like to

 6      refer you to DTX-1004, which was a, an e-mail

 7      that you were asked about from September of 2006

 8      and I'm going to refer you to the list of terms

 9      that you discussed with Mr. Snyder.  And you

10      went through five things.  You were talking

11      about item number five, Art+Com will be listed

12      as a partner of the Google Earth and you started

13      to give an answer, but you weren't able to

14      finish the answer.  Do you recall having had a

15      discussion about that?

16              A.  Yes.

17              Q.  What is your complete answer with

18      respect to paragraph number 5?

19              A.  Yes.  I mean, I wouldn't assume

20      that Google would list someone as partner who

21      isn't a partner actually, which that was what I

22      wanted to add at this point.

23              Q.  Did this have any value to

24      Art+Com?
```

356

```
 1            A.   Well, being a partner of Google

 2       for our company, it's priceless.

 3            Q.   In the next paragraph, you'd say

 4       depending on the extent of the back-license and

 5       other conditions, do you see that?

 6            A.   Yes, I do.

 7            Q.   Had you discussed the back-license

 8       and other conditions with Google at this point?

 9            A.   No, we hadn't discussed much, but

10       it was for us we were also interested in

11       possibly continuing the work on the T vision

12       system and not completely losing the patent, so

13       we couldn't do anything in this field again.

14            Q.   And it says in the next line,

15       today's situation.  What did you mean by that?

16            A.   Well, the situation that was that

17       said Google was saying the patent is no good, so

18       that it has issues and also we expected that,

19       yeah, that the market will develop and things

20       will change over time, that there will be much

21       more users over time, so with the term at this

22       time, we really meant at this time without

23       considering.  So we definitely also wanted to

24       say, okay, in the future, everything will be
```

1    different.

2              Q.   You were asked if you had had a

3    stake in ACI.  Do you remember that?

4              A.   Yes, I remember that.

5              Q.   You weren't asked what your stake

6    is.  What is your stake in ACI?

7              A.   My stake is around two percent.

8              Q.   Do you have any idea what that

9    stake would amount to in connection with this

10   case?

11             A.   Depending -- I don't really know,

12   because if any money is awarded in this case,

13   it --

14             MR. SNYDER:  Objection, Your

15   Honor, speculation.  He's just testified he

16   doesn't know.

17             MR. PARTRIDGE:  I'll take that

18   answer, Your Honor.  We can stop at I don't

19   know.  Thank you, Mr. Mayer, I appreciate it.

20             THE COURT:  All right.

21             MR. PARTRIDGE:  I do have some

22   exhibits to offer into evidence, Your Honor.

23             THE COURT:  Yes, but let's wait.

24   Does counsel have any more questions for this

1    witness?

2                        MR. SNYDER:  Nothing further, Your

3    Honor.

4                        THE COURT:  Okay.  So before we

5    admit the exhibits into evidence, the question

6    is whether any member of the jury has a question

7    for this witness.  And as I mentioned before,

8    each of you should take a piece of paper and if

9    you have a question, write the question on the

10   piece of paper and then the courtroom deputy

11   will collect all eight pieces of paper and hand

12   them to me and I'll go tally whether there is a

13   question.  And if there is a question, whether

14   it's appropriate to ask it.  Okay.  Ready to

15   collect the questions now?  Pieces of paper.

16                        Could counsel approach the bench,

17   please?

18                        (Side bar discussion.)

19                        THE COURT:  There are three

20   questions.  One is there's a three-year wait for

21   a U.S. patent.  How long is the wait for a

22   patent in Germany?  I don't think that's

23   relevant.

24                        MR. SNYDER:  Or true.

```
 1                    THE COURT:  The second question is
 2      is how did so many people come up with the name
 3      TerraVision?  What does it mean?
 4                    MR. PARTRIDGE:  He isn't going to
 5      know the answer to that.  He won't know the
 6      answer to that.
 7                    MR. SNYDER:  No.
 8                    THE COURT:  Okay.  So we won't ask
 9      that question.  The third question is was the
10      patent ever obtained in Germany?  The witness
11      already testified it wasn't.
12                    MR. PARTRIDGE:  We'd end up
13      getting into -- there was one in Europe, the
14      EPO, but they didn't pay the fee, but you get
15      into a complications that I don't think makes a
16      difference.
17                    MR. SNYDER:  I think he already
18      answered that question.
19                    THE COURT:  Well, why don't one of
20      you tell the jury or should I tell the jury that
21      the last question was already answered.
22                    MR. SNYDER:  I think it would be
23      appropriate for Your Honor to do that.
24                    (Side bar discussion ended.)
```

```
 1              THE COURT:  The third question was

 2    was the patent ever obtained in Germany.  It was

 3    not obtained in Germany.  And don't think of

 4    anything negative about not asking the

 5    questions.  It's just in discussions with the

 6    lawyers I concluded that it wasn't appropriate

 7    to ask the other two questions.  So Mr.

 8    Partridge, you have a motion for admission of

 9    exhibits.

10              MR. PARTRIDGE:  Yes, Your Honor.

11    I would offer PTX-267, 117A and B, 303A and B,

12    236, 295A and B, 13, 122, 15, 16, DTX-1071,

13    PTX-324 and 123.  As to PTX-7, which is the

14    physical exhibit over there, I'm not sure

15    whether the Court wants that officially as a

16    physical exhibit.  And maybe we should talk

17    about that tonight as to how to handle that as

18    opposed to the Court having to struggle with

19    holding this kind of physical exhibit.

20              THE COURT:  I tend to think it

21    would be all right to admit the exhibit into

22    evidence, but perhaps if counsel agreed to allow

23    the exhibit to remain in the custody of counsel,

24    instead of in the custody of the court.
```

```
 1                    MR. PARTRIDGE:  Then I offer it,

 2       Your Honor.

 3                    THE COURT:  Is there any

 4       objection?

 5                    MR. SNYDER:  No further

 6       objections, Your Honor.

 7                    THE COURT:  Those exhibits are

 8       admitted into evidence subject to the one

 9       exhibit which will remain in custody of counsel.

10                    MR. SNYDER:  We have two exhibits

11       to offer into evidence based on the prior

12       witness's testimony, Your Honor, DTX 1004 and

13       DTX 1196.

14                    MR. PARTRIDGE:  No objection, Your

15       Honor.

16                    THE COURT:  Those exhibits were

17       also admitted into evidence.

18                    Now, the witness is excused.  Is

19       the witness going to be subject to recall?

20                    MR. SNYDER:  Yes, Your Honor,

21       although we'll communicate with counsel about

22       that.

23                    THE COURT:  Mr. Mayer, you're

24       excused for the moment, possibly subject to
```

```
 1    recall.  Thank you.

 2                    THE WITNESS:  Thank you, Your

 3    Honor.

 4                    THE COURT:  Mr. Partridge, call

 5    your next witness.

 6                    MR. PARTRIDGE:  Our next witness

 7    will be called by videotape.  His name is

 8    Michael Jones.  And the only brief introduction

 9    I would do with Michael Jones since everybody

10    has heard about it is to say the depo includes

11    both designations by the plaintiff ACI and

12    Google.  And the deposition transcript runs in

13    the order the deposition was taken so it's not

14    possible to separate who said what.  And this is

15    just a normal way to do it.  So we will play the

16    deposition videotape of Mr. Jones.

17                    THE COURT:  Okay.  Thank you.

18                    (Videotape deposition)

19            Q.   Would you please state your name

20    for the record?

21            A.   Michael T. Jones.

22            Q.   For what period of time were you

23    employed by Google?

24            A.   From 2004 until April of this
```

1    year, 2015.  October of 2004, I believe it was.

2              Q.   And what did you do at Star?

3              A.   I worked on flight simulators.

4    And I had a chance to follow my true passion,

5    which was computer graphics.  So I went there to

6    build flight simulators.

7              Star Technologies was the low

8    cost, low quality by comparison, child of

9    General Electric's flight -- high-end flight

10   simulation division in Daytona Beach, Florida.

11   They made the very sophisticated

12   multimillion-dollar simulators.  We made low

13   cost what are called part-task trainers.

14             So you could learn how to operate

15   a one heads-up display in a cockpit or you could

16   learn how to operate something simple.  Of

17   course, we had visions of taking over their --

18   their business some day because technology was

19   on our side of the small product, the

20   inexpensive product.  So I still believe that.

21             Q.   How long were you at Star?

22             A.   From 1988 until January 10th,

23   1992.  January 9, 2000.  1982.

24             Q.   What did you do on January 9th,

```
 1      1992?

 2                  A.   I left Star Technologies.

 3                  Q.   And where did you go?

 4                  A.   On January 12th, 1992, I started

 5      my first day of work at Silicon Graphics,

 6      Incorporated in Mountain View, California.

 7                  Q.   I'll use a broader term.  Was

 8      there a showroom at SGI?

 9                  A.   There was.  There was a -- there

10      was a -- there was a corporate customer briefing

11      center that was in the building where the

12      executives were where the company brought people

13      in to wow them.  And the sales force would go

14      over there.  And because the sales force and the

15      customers -- customers generally weren't allowed

16      where the engineers were.  So that was the

17      special headquarters building where the CEO and

18      those people were.  Ed McCracken and Jim Clark

19      were there.

20                  Q.   Was Art+Com's TerraVision ever in

21      one of those demonstration areas?

22                  A.   It was.

23                  Q.   And what did it -- what did that

24      demonstration look like?
```

```
 1              A.   It was -- it as -- and I told

 2     Pavel when he came it was -- P-A-V-E-L, a name

 3     that figures in this case.  I told him when he

 4     came it was one of my favorite demonstrations

 5     they had done.  Because they had made some

 6     fantastic ball.  It was maybe as -- the diameter

 7     of it was maybe as big as this table, so let's

 8     say 30 inches or maybe even 36 inches or so.  It

 9     was a big ball, and it was a little cage, and

10     somehow there were rollers or something that

11     could measure the rotation of this ball.

12              Q.   How long was that demonstration in

13     the corporate briefing center?

14              A.   I have no idea.  I -- I wasn't

15     part of putting it there or taking it away so I

16     don't know.  I wasn't -- you know, I wasn't like

17     -- you know, it was like a big company and I

18     was, like, working in another building.  And

19     somebody said I want you to come over and see --

20     see this demo.  So I went over there and saw the

21     demo.  I saw it that day and I -- you know, for

22     20 minutes or something.  I don't know how long

23     it was there after that.

24                   I've seen the boom many times, and
```

```
 1        I saw that ball there just once.  I hosted

 2    Michael Jackson when he came to SGI and took him

 3    up there and showed him things.  And the boom

 4    was there, but the ball wasn't there.  So I -- I

 5    don't know what day he came, but -- but as far

 6    as I know, that -- that company just came and

 7    showed their ball and the graphics thing and

 8    went away.  I -- I -- I don't -- I don't know of

 9    any lasting presence.

10            Q.   Did you have any communications

11    with them about installing that demonstration

12    project?

13            A.   Not -- not as far as I know.  I --

14    I was just invited to go see it.

15            Q.   So by the time you went to see it,

16    it was already set up; is that right?

17            A.   Uh-huh.

18            Q.   How long were you at SGI?

19            A.   I think I left in 1999 or else

20    late 1998.  So seven years, say.

21            Q.   And when you left SGI, what did

22    you do next?

23            A.   I did consulting.

24            Q.   And what did you do after that?
```

1          A.   I started a company.

2          Q.   And what was the name of the

3     company you started?

4          A.   Intrinsic Graphics.

5          Q.   Prior to selling Intrinsic

6     Graphics, did you spin out any companies from

7     Intrinsic Graphics?

8          A.   Yes.  We spun out Keyhole from

9     Intrinsic Graphics.

10          Q.   Did anyone work on the demo other

11     than Chris, Remi and you?

12          A.   In the creation of it?

13          Q.   Yes.

14          A.   No.

15          Q.   So after putting together the

16     demo, did you -- who -- who besides yourself

17     continued to work on that demo?

18          A.   Oh, I didn't -- I didn't continue

19     to work on it at all.  I was running the

20     company.

21          Q.   Okay.

22          A.   The demo was -- once the VC said

23     okay, we're going to fund you, that was the last

24     time I touched that demo.

1          Q.   I just wanted to make sure because

2     you had Intrinsic demo and Earth demo.  But

3     those are the same things.

4          A.   Yes, sir.

5          Q.   Could you tell me about the

6     ClipMaps?

7          A.   Sure.  ClipMapping is a patent I'm

8     a named inventor on, and it actually was a

9     complete and total invention of mine.  Complete,

10    like it came to me in a hotel room just as a --

11    the whole thing, like basically the circuit

12    diagram, the programing model, the entire thing

13    was just in my head.  And I wrote as fast as I

14    could for hours.  And I went back to SGI and I

15    said we have to change the hardware that we're

16    building.  We were -- the hardware was close to

17    tape-out.  I wanted to make substantive changes

18    to things that were very important.  And I got

19    everybody excited about it.  And then the boss

20    said you can't, it's too late.  And I started

21    buying, you know, whiskey and prizes and things

22    for people to actually do the work anyway, and I

23    made them build that.

24         Q.   Were you a director of Keyhole

```
 1          from the start of that company's existence?

 2                  A.   I was.

 3                  Q.   When was the first time that you

 4          worked on software for displaying geographic

 5          information?

 6                  A.   Probably 1990.  Maybe -- no, wait.

 7          No, no, that's wrong.  That's wrong.  I'm

 8          totally wrong.  1980, '79 or 80.  '79.

 9                  Q.   Was that with Ikonas?

10                  A.   No, it was after Ikonas for a

11          company called Lan -- what's the company's name?

12          It was a company's name I can't think of right

13          now but who sold themselves to a company called

14          Landmark Graphics.  And Landmark Graphics I

15          think is in Houston, Texas.  They're a big GIS

16          software company or something, but oil industry

17          or something or other.

18                       But this company that I worked for

19          was in Raleigh, North Carolina.  And they

20          basically -- Landmark wanted basically a

21          geographic information system that did terrain

22          processing and did hidden surface views,

23          basically line-of-sight calculations, what can

24          you see from here.  You know, like looking over
```

```
1      the skyline you can see taller buildings and

2      taller buildings.  Or if you're in the

3      mountains, you can see taller and taller

4      mountains but you couldn't see the valleys.  And

5      they wanted some calculations to be done like

6      that.

7                     And I had a contract with that

8      company.  It was call Geobased Systems,

9      G-E-O-B-A-S-E-D Systems, on Hillsborough Street

10     in Raleigh, North Carolina.  And if I keep

11     thinking, I'll probably think of the name of the

12     people there.

13                    But anyway, I built for them a 3D

14     computer graphic visual simulation, you know,

15     hidden surface rendering system.  It wasn't

16     realtime like Earth, you know, but was -- that

17     was pretty ahead of its day at the time, 1980,

18     '80 or '81.

19             Q.   Were you part of the discussion

20     for Google Earth to be freely downloadable?

21             A.    It was the plan all along.  So I

22     don't remember a specific discussion about it,

23     but it was the intention.

24             Q.   And was it discussed with Google
```

```
 1      prior to the acquisition that that was the

 2      intention?

 3             A.  Well, I mean, it -- it -- well, it

 4      was the -- it was the nature of the discussion

 5      with Google that it would be free.

 6             Q.  If you'll take a look at Exhibit

 7      4, which has document numbers ACI 10608 through

 8      10610.

 9             A.  Patrick, who is Patrick I see

10      here?  I mean, I'm -- everything's cool.  I'm

11      just trying to figure this out here.

12             Q.  Take the time you need to take a

13      look at it.

14             A.  Okay.  Well -- Patrick Ling.

15      Okay, got it.

16             Q.  Okay.  Looking at the "To" line in

17      the first e-mail, is that your e-mail address

18      from SGI?

19             A.  Absolutely.  And my machine -- my

20      machine name was called Babar, the lovable

21      elephant king.  And ASD was the Advanced Systems

22      Division.  It's the part of SGI that I worked

23      in.  I remember Axel Schmidt, I remember that

24      name.
```

```
 1              Q.   The e-mail is dated -- and here,

 2      you know, it's always difficult with the

 3      European writing here in America.  I think it's

 4      July 3rd, 1995, but I wanted to check.  Do you

 5      have a memory of when the T vision system was

 6      installed at the customer briefing center?

 7              A.   No idea whatsoever.

 8              Q.   I will ask the court reporter to

 9      mark what looks like will be Exhibit #5.  Well,

10      I wanted you to -- to read through the message

11      that's above that be seeing you.  And just see

12      if that refreshed your recollection at all about

13      communications you may have had at the time.

14              A.   Let's see.  This is me writing to

15      Axel?

16              Q.   I'm asking.

17              A.   Says your project sounds wonderful

18      and is very much a good candidate for Iris

19      Performer 2.0.  Oh, I'm sorry.  Your project

20      sounds wonderful and is very much a good

21      candidate for Iris Performer 2.0.  I will be

22      happy to add you to the beta program.  So I

23      guess he had written to me saying can I be part

24      of the beta program.  Please understand that we
```

1      are in the alpha stage now and are still adding

2      some API and function to the product so that our

3      lapses in the documentation that might be a

4      problem for you.  However, integrated

5      asynchronous database loading is in place and

6      runs well.  Do you want a digital audiotape, DAT

7      tape or quarter inch cartridge tape?  Oh yeah, I

8      remember those days.  Pre CD, could imaging if

9      it had been a few years earlier I would have

10     said do you want a punch card.  Okay.  I'm here.

11            Q.   So having read that, do you have

12     any recollection of communications with Art+Com

13     about Iris Performer 2.0?

14            A.   No.  Sounds like he wrote to me

15     said can I be on the beta list and I said yes,

16     you can.

17            Q.   Okay.

18            A.   I mean that's -- basically my plan

19     would with people was to say yes, right?  So I'm

20     not trying to get people to the beta, so I said

21     to everybody that seemed like they were

22     responsible.  So I wasn't like a difficult -- I

23     wasn't hard to date, so to speak, just looking

24     for people who looked like they were self

```
 1     starters.  These guys usually have big words,

 2     sound like they know what they're doing, so

 3     sure, they can try if they want to.

 4             Q.   The e-mail at the top starts with

 5     my name is Patrick Ling.  Do you see that?

 6             A.   Yep, I see it right there.

 7             Q.   And the second paragraph begins we

 8     are interested in demonstrating your software in

 9     our briefing center and he says we have several

10     Onyx's and run Iris Performer on all platforms.

11     Do you see that?

12             A.   I see it right there.

13             Q.   Do you understand that SGI did

14     demonstrate the T vision software at some point

15     in its briefing center?

16             A.   I don't understand that.  I

17     understand that it was in the briefing center,

18     but I don't know that it was SGI demonstrating

19     it.  I had the impression that it was SGI kind

20     of loading space to the Art+Com people.  I don't

21     know.

22             Q.   And you said that Patrick Ling was

23     in charge of the briefing center?

24             A.   Uh-huh.  So he would be the one
```

1   that would know.  I don't know.  I mean and in

2   this other e-mail you showed me there are

3   instructions about how to run the program so one

4   might imagine that that was being sent to

5   someone who would be running it on their own

6   without the Art+Com people present, but that's

7   outside of my knowledge.

8           Q.   How are you familiar with Pavel?

9           A.   We met somewhere and I don't

10  remember.  I'm sorry to say I don't know if it

11  was at the briefing center or if it was at

12  SIGGRAPH, because usually I'm at SIGGRAPH every

13  year since 1980.  Or where.  But we met.  And I

14  liked him a lot.  I mean, I liked him personally

15  and I'm a pretty good judge I think of engineer

16  talent.  He's a talented nice guy.  So certainly

17  after I discovered that ball, I love that ball.

18  That ball is awesome.  And he was showing with

19  that.  And he invited me to Germany.  And I

20  don't remember.  I mean, the Germany trip, I

21  don't know when it was.  I don't know if it was

22  an SGI days thing or a Google days thing, but at

23  some time I went to Berlin and I met with Pavel

24  and I think I met the Axel person and might have

```
 1     been SGI -- might have been at Google, but I

 2     went there anyway.  They were nice hosts.  They

 3     showed me stuff that they were building and

 4     built.  It was fantastic, things for a brewery

 5     in Scotland and things for the World's Fair that

 6     was coming up, and things for Japan.  It was

 7     just -- it was like -- it was like the

 8     headquarters of a theme park ride manufacturer.

 9     It was just fantastic.

10            Q.   So when Google first contacted

11     Keyhole, how did that occur?

12            A.   I believe it was -- I think it was

13     at lunch.

14            Q.   Who went on the trip?

15            A.   John and Brian.

16            Q.   And did they demonstrate just the

17     Earth Viewer software?

18            A.   Yes.

19            Q.   How many people were at Keyhole at

20     that point?

21            A.   29.

22            Q.   And did all 29 go across to

23     Google?

24            A.   Yep.
```

 1              Q.   When Google was in the process of

 2       acquiring Keyhole, the Earth Viewer product at

 3       that time, did it have a continuous view when

 4       you changed your viewpoint in the software?

 5              A.   What do you mean by continuous

 6       view?

 7              Q.   Well, if you had one, if you were

 8       looking at one view of the earth --

 9              A.   Uh-huh.

10              Q.   And you asked to go somewhere

11       else, did it pop over to that new spot or did it

12       move through locations on the earth in between

13       where you are and where you want to go?

14              A.   It certainly presented a smooth

15       and continuous moving view as though you were

16       flying around the earth.

17              Q.   Did you consider that to be an

18       important part of your product?

19              A.   We designed around that.

20              Q.   What assets did Keyhole have other

21       than the Earth Viewer software at the time of

22       the acquisition?

23              A.   The big assets of Keyhole was its

24       people.   These are the people that had made

```
 1        magic, so that's the first thing.  And the

 2        assets of the Beatles were like the people, not

 3        their drums, it was like the people.  So then we

 4        had contracts with the government, we had

 5        agreements that last a long time, 20-year

 6        support agreement with NGA, a lot of things.  We

 7        had the servers, which they're near irrelevant,

 8        it's Google, but we had some servers and things.

 9        We had the software as a code base.  We had

10        intellectual property around the patents, around

11        how it worked and what was going on with that.

12        That's valuable, to someone who wants to

13        continue in that line of business.  We had good

14        will, which was significant.  Well, because we

15        had many users who loved our product, so

16        there's -- there's a lot of value in that.

17               Q.   For the record I'll note the

18        exhibit number 12 has document numbers Google

19        AC-34550 through 574?

20               A.   Okay.  I see it.

21               Q.   Was this presentation or

22        presentation similar to this one used when you

23        and Mr. Hanky went to seek second round funding?

24               A.   Yes.
```

379

```
 1                    Q.   Do you know what was meant in this

 2          presentation by proprietary technology?

 3                    A.   I don't know what was meant,

 4          because I don't know what -- I mean, I didn't

 5          write the text.  I did the pictures.  But it

 6          presumably and naturally means the Keyhole, the

 7          product, which is a fluid earth viewing

 8          technology.

 9                    Q.   And did Keyhole consider that

10          product to be proprietary?

11                    A.   It still does.

12                    Q.   Okay.  And it did at the time?

13                    A.   Yeah.  It's been 10 years and no

14          one is close.

15                    Q.   So when we talked about being a

16          proprietary technology, do you believe that --

17          are there any of these sub bullet points for

18          which it is still the proprietary technology?

19                    A.   What's proprietary is how it does

20          what it does.  The bullets don't describe how it

21          does what it does.  So you know, it's not --

22          it's not -- this isn't an engineering chart,

23          this is a sales chart, right?

24                    Q.   Yes.
```

```
 1              A.   But it's not -- proprietary

 2     doesn't have unprecedented power.  It's good to

 3     have that, but it's not necessarily proprietary.

 4     What's proprietary is this notion of flying, is

 5     the way the client flies around the earth and

 6     provides this smooth, fluid -- the way it

 7     implements this smooth fluid motion around

 8     unconstrained large data sets.  There's real

 9     invention behind that.

10              Q.   For the record, I'll identify that

11     exhibit number 16 has document numbers ACI-11494

12     through 541.  And I'll identify that that

13     interview starts on page 515.  And there might

14     be a picture of someone familiar.

15              A.   Yep, there's me.  Just as bald.

16     Great.

17              Q.   So couple things in here.  Do you

18     remember doing this interview?

19              A.   It may come to me as I look at the

20     words in it.  I mean, I've done so many, I mean,

21     like it's crazy.  I speak to 100,000 people a

22     year, travel 3,000 miles a year.  It's like all

23     kind of -- like all the same, you know, after a

24     while.
```

1          Q.   Do you think the change of Keyhole

2     for $40 to Google Earth for free caused the

3     whole world to notice Google Earth?

4          A.   I think being at Google and Google

5     announcing it caused the whole world to notice

6     Google Earth.  The fact that it was free

7     certainly removed all barriers to entry, so to

8     speak, but I think it was the Google imprimatur

9     that actually made the world notice.  I mean, I

10    think -- I think the world would have paid $40

11    for it too.  Maybe not as many people, but it

12    could have done that.  But it was the Google

13    name that made it, I think made it -- made the

14    world notice.  I think it was our technology

15    that made the world keep using.  But I -- I

16    think -- I think the notice came from like

17    being, you know, a company everybody knows about

18    is doing some cool new thing, you should check

19    it out.  I think that's -- that's the biggest

20    thing, yeah.

21         Q.   So it starts, so to say that

22    Google launched Google Earth to not make any

23    money really doesn't make any sense.  Google is

24    a real business that makes profit.

```
 1              A.   Uh-huh.

 2              Q.   Do you see that?

 3              A.   I don't see -- hang on a second.

 4              Q.   So I'm starting at the bottom of

 5    the first column.

 6              A.   Oh, yeah.  I see it.  I see it.

 7              Q.   Okay. And do you agree that that

 8    was the case in May of 2006?

 9              A.   I -- I agree that's probably what

10    I was saying in 2006.  I think -- I mean, I

11    think it's a complex thing.

12              Q.   I'm going to hop back a little bit

13    because I think I did miss one piece, which is

14    texture paging.

15              A.   Uh-huh.

16              Q.   Was that a feature of the

17    Performer library?

18              A.   It was a feature of the library

19    later, like I don't know what version it was,

20    but like I said, what about 1.2 versus 2.0.  I

21    don't know that was the 2.0.  But before I left,

22    before SGI imploded, we had texture paging in

23    Performer as part of the ClipMap software

24    support.  I had this hardware patent called
```

```
 1        ClipMapping.  And it was supporting Performer
 2        for ClipMapping, because this is pretty complex.
 3        And that -- that software had a texture paging
 4        feature.  That was a crucial part of that.
 5              Q.  And so that was incorporated into
 6        SGI's Performer library to support ClipMap?
 7              A.  ClipMapping, yeah.
 8                  MR. PARTRIDGE:  Your honor, we
 9        have a few exhibits to offer in connection with
10        that deposition.  They are PTX-77, 79, 84 and
11        354.
12                  THE COURT:  Any objection?
13                  MR. SNYDER:  No objections, Your
14        Honor.
15                  THE COURT:  Okay.  Those exhibits
16        will be admitted into evidence.
17                  MR. PARTRIDGE:  Thank you, Your
18        Honor.  And given the lateness of the hour, I
19        would suggest that we were going to call a live
20        witness, but the next deposition in line is
21        exactly 11 minutes, which is exactly what we
22        have left, so I would like to go to Julien
23        Mercay and play his deposition.  There are no
24        outstanding objections to that, Your Honor, or
```

```
 1        to that deposition.

 2                    THE COURT:  Okay.  Please do that.

 3                    MR. PARTRIDGE:  So Mr. Mercay

 4        works as a software engineering manager for

 5        Google Earth testifying about the operation of

 6        Google Earth and he was a corporate

 7        representative for Google in that regard.

 8                    (Video playing.)

 9             Q.   Would you please state your name

10        for the record?

11             A.   I am Julien Mercay.

12             Q.   Okay.  Mr. Mercay, you currently

13        work for Google?

14             A.   Yes.

15             Q.   Okay.  And which facility do you

16        work at?

17             A.   In Mountain View.

18             Q.   And what's your title or position?

19             A.   I'm a software engineering

20        manager.

21             Q.   Are you familiar with the update

22        function in the Google Earth Version 7.1 source

23        code, particularly VisualContext::Update?

24             A.   VisualContext Update, yes, I'm --
```

1    at a high level, I'm familiar with it.  I

2    haven't looked closely at that code for several

3    years.

4          Q.  What is your high-level

5    understanding of what that code does?

6          A.  To the best of my recollection,

7    and again, I haven't worked on the code for

8    several years closely, is Update is the process

9    of determining what kind of data we need for a

10   given view and the process of processing that

11   data.

12         Q.  Are you familiar with the term

13   cull, C-U-L-L?

14         A.  Yes.

15         Q.  Do you have an understanding of

16   what that terms means?

17         A.  Yes.

18         Q.  What is that understanding?

19         A.  It's part of the process of

20   walking or traversing through the data

21   structure.  Culling is the word we use to decide

22   what is important and what is not.

23         Q.  And do you have an understanding

24   of whether Google Earth 7.1 client software

1    performs a cull?

2             A.   To the extent of the definition,

3    yes.

4             Q.   Okay.  And do you understand how

5    that is done in Google Earth 7.1?

6             A.   At a high level, yes.

7             Q.   And could you explain that how

8    that is done?

9             A.   So, again, we walk the data

10   structure and for each piece of data in that

11   data structure we can look at that data and

12   decide if it's important enough for that view.

13            Q.   And do you know what criteria are

14   used by Google Earth Client 7.1 software to

15   determine what is important in that process?

16            A.   I know some of the criteria, yes.

17            Q.   And what are those that you know?

18            A.   Some of them are based on what

19   each piece of data -- the location of each piece

20   of data, the location in the virtual world, and

21   we use that location to determine if the camera

22   can see that particular piece of data or not.

23   And if so, the camera can see it, we would keep

24   that piece of data, and if not we would discard

```
 1        it.
 2                   Q.   Do you know whether a frustum is
 3        used in Google Earth Client 7.1 software as a
 4        part of this culling process?
 5                   Q.   And what is your high-level
 6        understanding of LOD cull?
 7                   A.   Should we describe LOD?
 8                   Q.   Sure.
 9                   A.   Or can you describe LOD?  My -- my
10        understanding of LOD means level of detail.  And
11        it's the process of determining the right kind
12        of data to display for a given view.
13                   Q.   And when you say, "the right kind
14        of data," what are you referring to there?
15                   A.   The right resolution of data.
16                   Q.   And by "resolution," do you mean
17        image resolution?
18                   A.   Yes.
19                   Q.   And is an LOD cull performed in
20        Google Earth Client Version 7.1?
21                   A.   Yes, to the extent that I know
22        about LOD cull.
23                        And I should preface that, I don't
24        use that term directly, but I understand what
```

```
 1        you mean by it.

 2                  Q.   Okay.

 3                  A.   Yeah.

 4                  Q.   With that same understanding, is

 5        an LOD cull performed in Google Earth Version

 6        8 -- or major Version 8?

 7                  A.   Yes.

 8                  Q.   And the LOD cull that we were

 9        discussing in Google Earth Client major Version

10        8, is that done on a hierarchical data

11        structure?

12                  A.   Yes.

13                  Q.   And same question with respect to

14        7.1, is LOD cull done on a hierarchical data

15        structure?

16                  A.   Yes.

17                  Q.   Do you know what type of

18        hierarchical data structures are used in Google

19        Earth version -- or major Version 8?

20                  A.   We use several structures like

21        that.

22                  Q.   Okay.  Can you list those

23        structures?

24                  A.   For which version?
```

1          Q.   For major Version 8?

2          A.   Version 8.  Yeah, we use something

3      we called radial octree, and we use sort of a

4      Quadtree, quadrant tree, for different type of

5      data.

6          Q.   Okay.  And to your knowledge, in

7      major Version 8, both of those data structures

8      are used?

9          A.   Yes.

10         Q.   For 7.1, are there also several

11     hierarchical data structures used?

12         A.   Yes.

13         Q.   And what are those?

14         A.   The same.

15         Q.   Do you have an understanding of

16     VisualContext Update as it is in the source code

17     of Version 7.1 of the Google Earth Client?

18         A.   At a high level, yes.

19         Q.   And what is that understanding?

20         A.   I believe that's the question I

21     answered a few minutes ago.

22              So the process is walking through

23     the data structure to determine what data is

24     important for the current view.

 1             Q.   Okay.  And once that happens,

 2     what's next?

 3             A.   So once we determine which data is

 4     important for a current view, we need to

 5     retrieve those pieces of data.

 6             Q.   And when you say "we need to

 7     retrieve," you're referring to the Google Earth

 8     Client Version 7.1 needing to retrieve; is that

 9     correct?

10             A.   Correct.

11             Q.   Do you have an understanding of

12     how that retrieving is done in Google Earth

13     Client Version 7.1?

14             A.   At a high level, yes.

15             Q.   And what is that understanding?

16             A.   So we are going to -- so again, we

17     means the product and the code is going to

18     construct a set of network requests and issues

19     those requests to Google and wait for the

20     answer.

21             Q.   And once an answer is received,

22     what happens then?

23             A.   The code then decodes those pieces

24     of data and processes them and issues a command

1      to the computer to draw -- to draw that data on

2      the screen.

3              Q.   Okay.  Well, is the data that is

4      received after the network requests that you

5      mentioned earlier are sent, is that data stored

6      at all locally?

7              A.   Yes.

8              Q.   So do you recall what Mr. Tilman

9      -- or sorry, what Mr. Tilman Reinhardt told you

10     when you asked for clarification?

11             A.   I asked him three specific

12     questions.

13             Q.   And what were those questions, if

14     you don't mind me asking?

15             A.   I asked him about the location of

16     Google data center within the US.

17             Q.   Mm-hmm.

18             A.   I asked him about the storage --

19     the storage available for the -- the storage

20     that is used for Google Earth products.

21             Q.   Okay.

22             A.   And asked him about the bandwidth

23     requirements for those products.

24             Q.   Great.

```
 1                    And can you provide me with what

 2       he told you or with Google's testimony with

 3       respect to those questions, whatever you would

 4       like?

 5                    A.   Yeah, so regarding for the first

 6       question, he confirmed that Google has -- I'm

 7       not remembering the exact number, but it's

 8       between four and six data center in the United

 9       States.

10                    Q.   And is the culling in Google Earth

11       8 performed on at least one hierarchical

12       structure, to your knowledge?

13                    A.   Yes, there is a hierarchical data

14       structure.

15                    Q.   Do you know what type of

16       hierarchical data structure that would be?

17                    A.   It depends on the type of view,

18       but...

19                    Q.   For a 3D view?

20                    A.   For a 3D view it's using a radial

21       octree.

22                    Q.   Is there any use of a Quadtree or

23       a quadrant tree?

24                    A.   For a different kind of dataset,
```

```
 1      yes.

 2                Q.   The rendering in Google Earth 8,

 3      is that done using triangles and vertices?

 4                A.   It's like any computer graphics in

 5      the modern age.  Yes, we use triangle and meshes

 6      and vertices, yes.  It sounds likely based on

 7      the context.

 8                Q.   Sure.  The whole phrase, "the

 9      appropriate level of detail."  Do you have an

10      understanding?

11                A.   I can gather what "appropriate

12      level of detail" means in this context.

13                Q.   And what is that meaning that you

14      gather?

15                A.   It means displaying or rendering

16      the imaginary and data at the resolution that is

17      neither too course or too fine.

18                     (End of videotape deposition. )

19                MR. PARTRIDGE:  Your Honor, there

20      are no exhibits to offer in connection with this

21      particular deposition.  We assume that by the

22      clock we are finished for the day and we are

23      there, unless Your Honor has a differing view

24      about that.
```

```
 1                    THE COURT:  No, I think the jury
 2      -- thank you members of the jury now.  You're
 3      going to be leaving the courthouse this evening
 4      and I just remind you how important it is not to
 5      discuss this case among yourselves or with
 6      anyone else.  And how important it is not to do
 7      independent research on the facts of this case.
 8                         And we'll see you tomorrow morning
 9      again at 8:45, and we'll resume the trial at
10      that time.  And thank you again for your
11      service.
12                         (Jury leaving the courtroom at
13      5:03 p.m.)
14                    THE COURT:  Okay.  Be seated,
15      please.
16                         So what things do you both have
17      now?
18                    MR. PARTRIDGE:  I have two issues
19      I wanted to alert the Court to if I may.
20                    THE COURT:  Go ahead.
21                    MR. PARTRIDGE:  The first concerns
22      the bench trial on Friday afternoon for which we
23      are each allotted 90 minutes of time.  We did
24      get disclosures of Google on Friday evening, I
```

1        think that's when it was, Friday or Saturday,

2        whatever it was, and we're obligated to respond

3        this evening, which we will do.

4                    But I felt that in reviewing their

5        disclosures that we weren't -- they weren't

6        providing disclosures consistent with a

7        90-minute trial allocation.  We have nine

8        witnesses to be called, nine by deposition, and

9        the deposition designations are more than the 90

10       minutes by quite a lot.  The exhibit list is

11       probably in the ballpark for an exhibit list for

12       a shorter trial, although it's pretty long as

13       well.  We will respond, but it's our view that

14       we ought to have a much more precise

15       identification of the evidence that's going to

16       be offered at the bench trial on Friday than we

17       do right now.

18                    THE COURT:  Mr. Snyder.

19                    MR. SNYDER:  Your Honor, we

20       addressed precisely the situation at the

21       pretrial conference.  Your Honor instructed that

22       we provide exhibits and witness lists consistent

23       with the general disclosure obligations which we

24       understood were consistent with the pretrial

```
 1        orders specific to the bench trial.

 2                     I specifically raised the issue

 3        that we should not be required to disclose with

 4        the specificity plaintiff first requested

 5        because they were asking us to disclose a week

 6        in advance when the pretrial order requires them

 7        only to disclose the night before the jury

 8        trial, or at least two tonights before.

 9                     I provided a good faith disclosure

10        of what we anticipate will be used in the bench

11        trial.  That will, of course, depend on what

12        occurs before the jury because we have no

13        intention of repeating anything.  And we will

14        comply with the more detailed disclosure

15        requirements that are in the pretrial order for

16        the specifics of what will be provided on

17        Friday.

18                     THE COURT:  And we set that as

19        Friday?

20                     MR. SNYDER:  That's correct, Your

21        Honor, Friday after closing arguments after the

22        jury is deliberating.

23                     THE COURT:  Did we set a date for

24        more specific disclosure?
```

```
 1              MR. SNYDER:  The pretrial order
 2     has a schedule for disclosures depending on
 3     whether they are deposition designations or
 4     witnesses and exhibits.  So it varies.
 5     Deposition designations have to be disclosed two
 6     days before they might be played, and witnesses,
 7     the specific order and selection of the
 8     witnesses and their accompanying exhibits have
 9     to be disclosed the night before which is
10     exactly the schedule that we followed for today.
11              THE COURT:  Well, Mr. Partridge?
12              MR. PARTRIDGE:  Your Honor, I
13     guess I would say that it certainly wasn't clear
14     to me from the pretrial order that that
15     procedure was also going to be in place for a
16     bench trial.
17              That is an improvement over where
18     we are right now.  And if we apply that
19     procedure to the bench trial that definitely
20     helps, so that means we'll be getting further
21     disclosures from you Wednesday night and again
22     on Thursday night if I am correct?
23              MR. SNYDER:  That's correct, Your
24     Honor, that's when Mr. Partridge raised this
```

```
1       issue.

2                    THE COURT:  That sounds --

3                    MR. PARTRIDGE:  That helps.  That

4       will suffice, Your Honor.

5                    THE COURT:  Very good.  What else

6       do we have?

7                    MR. PARTRIDGE:  The other issue,

8       Your Honor, concerns where we are with respect

9       to the infringement issue.  And the other day

10      when we were I guess at our, the last hearing we

11      had before we started the trial, I can't

12      remember the day, Your Honor asked the question

13      to Google as to what remains with respect to

14      infringement given Your Honor's additional claim

15      construction rulings and you had suggested is it

16      E and F, and they said no, it's everything which

17      doesn't seem --

18                   THE COURT:  Are we talking about

19      order here now?

20                   MR. PARTRIDGE:  We're talking

21      about narrowing the scope.

22                   THE COURT:  As to which

23      limitations aren't met?

24                   MR. PARTRIDGE:  Exactly, Your
```

```
 1      Honor.  So we're still at everything is in play

 2      despite everything that has occurred.  While

 3      Your Honor can't order them to limit the number

 4      of issues they decide to raise at trial, if in

 5      fact we're going to have to go forward and

 6      present testimony on every single element of the

 7      claim, then what I would ask is that we consider

 8      whether or not Google should lose some time out

 9      of their trial time to account for the fact that

10      they're refusing to narrow the scope of the

11      issues that have to be tried at this point.

12                THE COURT:  Well, I'm not going to

13      limit their trial time, but it does seem to me

14      that it might be possible to stipulate as to the

15      fact that some of these limitations are

16      satisfied by what Google does.

17                MR. SNYDER:  Your Honor, ACI is

18      the plaintiff and they have the burden of proof.

19      It's not Google's obligation to start conceding

20      elements.  I understand if we're trying to be

21      efficient in that way, you want to us to

22      identify elements that we weren't going to

23      contest, the same should be true for your prior

24      art, they should identify for us which elements
```

1    of the claim, the asserted claims they don't

2    contest are found in the prior art, that way we

3    don't have to waste the jury's time going

4    through each of those.  The proof issue is

5    identical.

6              THE COURT:  Well, is there room

7    here for a stipulation?

8              MR. PARTRIDGE:  Well, given that,

9    Your Honor, perhaps Mr. Snyder and I and our

10   teams, who usually ends up being us a little

11   later in the process, should have a discussion

12   about this and see if we can narrow the scope of

13   the issues that we have to present to the jury.

14             THE COURT:  I think that will

15   help.

16             MR. SNYDER:  We would be happy to

17   do that, Your Honor.

18             MR. PARTRIDGE:  And these are the

19   two issues I had for you this evening, Your

20   Honor.

21             MR. SNYDER:  And then we had

22   raised two issues this morning, Your Honor,

23   which we deferred to this afternoon.  The first

24   of which is the hypothetical negotiation date.

```
1        And I believe given ACI's opening statement,

2        which is consistent with the allegations in

3        their complaint that there can't really be any

4        dispute anymore, the 2005 is the correct

5        hypothetical negotiation date.

6                  THE COURT:  Well, I said earlier

7        I'm tentatively going to adopt that date.  And I

8        don't see that the patent itself is materially

9        different.  And I haven't heard anything yet to

10       suggest that the version of Google Earth that

11       was available in 2005 is materially different

12       from what is being accused of infringement here.

13       And if there is such testimony, then we can

14       revisit it, but for the moment we're talking

15       2005 as being the hypothetical negotiation date.

16                  MR. SNYDER:  Thank you Your Honor.

17                  MR. HAWES:  Your Honor, one point

18       on that.

19                  THE COURT:  Yes.

20                  MR. HAWES:  Because we only

21       accused the versions that started in 2008, we

22       don't have discovery of the version that was

23       previous to 2008.  We have no way of showing how

24       it's different or the same because we never
```

1    sought discovery because we never accused it.

2              THE COURT:  Well, I think that's

3    your problem.  If there isn't any evidence here,

4    I think we're going to go with 2005 because

5    that's when Google Earth was introduced.  I

6    think that it's up to you to show that there is

7    some other date that's appropriate because of

8    the change in Google Earth and that you seem to

9    be telling me that you can't do that.

10             MR. HAWES:  If I had accused the

11   earlier version, then you would have said 2005

12   because you accused it, but that was the only

13   way I could get discovery to show this

14   difference you're asking us to prove.

15             THE COURT:  The burden of proof

16   here with respect to the damages is on you.  And

17   from what I see, 2005 is the right date.  And if

18   you didn't take discovery that would show some

19   other date, that's too bad.

20             MR. HAWES:  Thank you, Your Honor.

21             MR. SNYDER:  The last issue, Your

22   Honor, relates to the order, the required order

23   for the steps in claim 1.  And I don't know yet

24   to what extent a resolution of that issue is

```
1    essential.  It did not come up today,

2    fortunately, but I anticipate that

3    Dr. Castleman, ACI's expert, is going to testify

4    tomorrow.  If his opinion is going to depend on

5    flexibility in the order of those steps, then it

6    is an issue that would be ripe.

7                    THE COURT:  What is the dispute

8    here, is it whether G has to come after F, or is

9    there more to it than that?

10                   MR. WILLIAMSON:  Your Honor, based

11   upon the competing instructions it's much

12   broader than that.  Google has proposed a jury

13   instruction and it's instruction eight in the

14   proposed final instruction set that simply says

15   that --

16                   THE COURT:  That's the new

17   version.

18                   MR. WILLIAMSON:  I believe it was

19   submitted this morning, Your Honor.

20                   And Google has proposed an

21   instruction that says as to the steps of claim 1

22   that the steps of the method must be performed

23   in the order they are here.

24                   THE COURT:  That may be what they
```

```
 1      propose, but my question what's the real dispute

 2      here?  Does it relate to the order of steps F

 3      and G or is there more to it than that.

 4              MR. WILLIAMSON:  As I mentioned

 5      this morning, F and G cannot be divorced from B,

 6      C D and E.  So it's actually B before C before D

 7      before E and then E before each of the substeps

 8      of F and then G.  Those do have to be performed

 9      in order and we briefed the issue if the Court

10      would like to see it, but we have -- it's a very

11      short written brief if the Court will entertain

12      that.

13              MR. SPEARS:  I don't think the

14      Court should entertain any further claim

15      construction at this point.  It's literally been

16      whack-a-mole with Google.  We have gone through

17      rounds of claim construction --

18              THE COURT:  No, I think there is

19      an issue here as to the order of the steps and

20      I'm trying to figure out, Judge Andrews I guess

21      it was in claim construction order said the

22      steps had to be performed in order.  The cases

23      say that steps don't have to be performed in

24      order unless they explicitly, the patent
```

1      explicitly requires they be in order or

2      implicitly requires that they be in order.  So

3      it seems to me that Judge Andrews may not have

4      been addressing that question across the board

5      and I'm going to consider what to do about it.

6      And it seems to me it is a bit complicated.

7                   I suggest that we have three pages

8      from each side simultaneously submitted by 8

9      o'clock tomorrow morning to address that and let

10     me consider it.

11                  MR. SPEARS:  Okay.  We can do

12     that.

13                  MR. WILLIAMSON:  That's fine with

14     Google, Your Honor.  Thank you.

15                  THE COURT:  Is there anything

16     else?

17                  MR. SNYDER:  Nothing further from

18     defendants Your Honor.

19                  MR. PARTRIDGE:  Nothing from

20     plaintiff, Your Honor.

21                  THE COURT:  I had one question.

22     There have been some mentions of Deutsche

23     Telecom today.  I take it that Deutsche Telecom

24     is not an owner of ACI, is not an interest in

```
 1      ACI?

 2                  MR. PARTRIDGE:  That's correct,

 3      they're separate entities.  ACI does a lot of

 4      work for Deutsche Telecom.

 5                  THE COURT:  There is no ownership

 6      interest?

 7                  MR. PARTRIDGE:  No.

 8                  THE COURT:  All right.  Thank you.

 9      We'll recess and we'll resume at 8:30 tomorrow

10      morning.  Thank you.

11                  (Court adjourned at 5:15 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1    State of Delaware )
                       )
 2    New Castle County )

 3

 4

 5                 CERTIFICATE OF REPORTER

 6

 7         I, Dale C. Hawkins, Registered Merit

 8    Reporter, Certified Shorthand Reporter, and Notary

 9    Public, do hereby certify that the foregoing record,

10    Pages 75 to 407 inclusive, is a true and accurate

11    transcript of my stenographic notes taken on May 23,

12    2016, in the above-captioned matter.

13

14         IN WITNESS WHEREOF, I have hereunto set my

15    hand and seal this 23rd day of May 2016, at

16    Wilmington.

17

18

19              /s/ Dale C. Hawkins

20              Dale C. Hawkins, RMR

21

22

23

24
```

**#5** [1] - 372:9
**#8** [1] - 92:20
**$106** [1] - 176:9
**$40** [2] - 381:2, 381:10
**'550** [36] - 131:18, 132:12, 139:17, 141:18, 142:5, 142:8, 142:11, 143:16, 164:6, 250:3, 250:4, 270:14, 289:6, 307:16, 307:22, 308:22, 309:18, 310:3, 310:6, 310:11, 311:9, 312:6, 313:5, 314:18, 315:2, 315:5, 317:16, 317:22, 319:17, 319:24, 320:11, 320:22, 322:22, 323:18, 328:5, 342:2
**'79** [2] - 369:8
**'80** [1] - 370:18
**'81** [1] - 370:18
**'90s** [2] - 213:24, 214:6
**'94** [12] - 87:10, 88:1, 88:4, 88:15, 88:20, 88:22, 89:23, 93:7, 237:6, 247:11, 304:2
**'95** [11] - 87:11, 88:4, 88:15, 88:20, 88:22, 89:23, 93:8, 227:24, 228:5, 280:1, 295:24
**'96** [9] - 87:11, 88:1, 88:2, 92:23, 93:17, 237:7, 237:8, 237:9, 352:1
**'97** [3] - 237:7, 237:8, 254:15
**'987** [2] - 270:14, 270:16
**/s** [1] - 407:19
**1** [13] - 104:11, 110:20, 134:2, 140:5, 165:22, 172:8, 250:3, 285:1, 293:6, 297:7, 402:23, 403:21
**1.0** [1] - 161:3
**1.2** [1] - 382:20
**10** [11] - 165:23, 166:3, 174:1, 174:8, 232:4, 232:14, 261:5, 309:24, 310:9, 324:7, 379:13
**100,000** [1] - 380:21
**1004** [1] - 361:12
**10608** [1] - 371:7

**10610** [1] - 371:8
**1094** [1] - 316:3
**10th** [1] - 363:22
**11** [2] - 78:12, 383:21
**117A** [1] - 360:11
**1196** [1] - 361:13
**11:12** [1] - 204:5
**11:30** [2] - 204:3, 206:18
**11:32** [1] - 207:8
**12** [1] - 378:18
**122** [2] - 316:2, 360:12
**123** [2] - 284:15, 360:13
**128** [4] - 224:14, 224:19, 224:20
**12:00** [1] - 241:9
**12:25** [1] - 241:12
**12th** [1] - 364:4
**13** [3] - 262:6, 314:10, 360:12
**13th** [1] - 280:24
**14** [7] - 134:2, 140:5, 297:8, 297:15, 297:22, 316:3
**14-217-RGA** [1] - 75:4
**14th** [1] - 321:12
**15** [5] - 81:10, 174:8, 269:14, 321:10, 360:12
**16** [2] - 360:12, 380:11
**17** [1] - 111:13
**17A** [1] - 246:9
**17B** [3] - 246:9, 246:10, 246:11
**17th** [1] - 132:23
**18** [1] - 120:23
**189** [1] - 325:23
**1930s** [1] - 151:18
**1947** [1] - 254:2
**1980** [3] - 369:8, 370:17, 375:13
**1982** [1] - 363:23
**1988** [1] - 363:22
**1990** [2] - 213:18, 369:6
**1990s** [2] - 153:11, 153:17
**1992** [3] - 363:23, 364:1, 364:4
**1993** [1] - 215:7
**1994** [7] - 91:19, 152:23, 197:11, 245:21, 245:22, 248:7, 304:3
**1995** [39] - 81:18, 91:20, 93:16, 98:10, 103:1, 133:1, 133:2, 141:21, 142:5, 142:13, 15

**197:15, 199:22,**
199:23, 200:14,
200:16, 279:9,
289:19, 292:6,
293:4, 294:17,
295:19, 296:4,
297:1, 299:10,
299:12, 300:20,
301:18, 302:5,
303:4, 304:13,
330:6, 338:5, 338:7,
338:9, 350:6, 352:1,
352:17, 372:4
**1996** [18] - 88:5, 132:23, 156:2, 197:24, 198:3, 200:20, 343:2, 343:11, 344:8, 344:16, 345:1, 345:18, 346:18, 346:24, 347:7, 347:21, 349:17, 350:10
**1997** [1] - 253:22
**1998** [2] - 110:2, 366:20
**1999** [2] - 97:21, 366:19
**1:25** [2] - 241:10, 241:19
**2** [3] - 75:3, 166:4, 172:8
**2,400** [2] - 220:9, 232:1
**2.0** [5] - 372:19, 372:21, 373:13, 382:20, 382:21
**20** [7] - 111:8, 174:1, 174:8, 180:18, 329:19, 330:2, 365:22
**20,000** [1] - 219:4
**20-year** [1] - 378:5
**2000** [8] - 120:22, 156:5, 158:19, 248:9, 255:24, 265:10, 309:8, 363:23
**2001** [3] - 192:23, 237:19, 255:6
**2002** [12] - 237:19, 255:6, 255:7, 255:17, 257:18, 306:6, 306:12, 307:1, 310:15, 312:12, 312:22, 313:6
**2004** [7] - 160:17, 193:8, 258:5, 258:6, 258:7, 362:24, 363:1

**2005** [18] - 101:15, 104:7, 104:18, 104:20, 152:6, 152:12, 173:4, 191:13, 193:9, 258:6, 258:7, 316:24, 401:4, 401:11, 401:15, 402:4, 402:11, 402:17
**2006** [27] - 100:4, 100:5, 100:9, 167:8, 167:19, 173:4, 209:3, 265:11, 265:13, 273:16, 281:13, 282:10, 309:22, 311:9, 313:11, 316:14, 317:6, 318:13, 320:9, 320:20, 321:12, 322:4, 328:7, 328:9, 355:7, 382:8, 382:10
**2008** [2] - 401:21, 401:23
**2010** [9] - 104:7, 163:10, 167:8, 173:4, 174:24, 209:6, 280:24, 282:20, 285:17
**2011** [2] - 117:20, 173:15
**2012** [2] - 117:22, 213:19
**2013** [3] - 132:13, 174:14, 348:24
**2015** [1] - 363:1
**2016** [3] - 75:8, 407:12, 407:15
**21** [1] - 81:10
**21st** [1] - 318:13
**22nd** [4] - 132:13, 133:1, 133:2, 141:21
**23** [3] - 75:8, 276:13, 407:11
**236** [2] - 253:19, 253:20, 360:12
**23rd** [1] - 407:15
**25** [2] - 216:13, 241:9
**267** [4] - 86:5, 236:14, 238:13, 238:24
**27** [1] - 81:10
**270,000** [1] - 117:24
**28** [7] - 134:2, 134:3, 140:5, 249:9, 275:20, 302:15, 302:17
**29** [3] - 249:7, 376:21, 376:22
**295(b)** [4] - 95:3, 95:8,

**96:22, 101:11**
**295(b)** [1] - 96:4
**295A** [2] - 259:6, 360:12
**295B** [2] - 94:6, 259:4
**29th** [1] - 120:22
**2D** [1] - 292:16
**3** [5] - 134:2, 140:5, 172:8, 345:21
**3,000** [1] - 380:22
**3.0** [2] - 161:1, 161:3
**3.5** [1] - 327:14
**30** [1] - 365:8
**303A** [2] - 251:18, 360:11
**303D** [1] - 251:17
**32-bit** [1] - 244:8
**324** [1] - 281:10
**329** [1] - 318:8
**33** [2] - 81:10, 279:3
**354** [1] - 383:11
**36** [1] - 365:8
**3:30** [1] - 333:13
**3D** [7] - 215:18, 216:8, 229:22, 245:14, 370:13, 392:19, 392:20
**3rd** [1] - 372:4
**4** [1] - 371:7
**40** [1] - 353:5
**40,000** [1] - 219:4
**403** [3] - 101:3, 103:8, 298:5
**407** [1] - 407:10
**41** [1] - 252:4
**45** [1] - 243:24
**4:00** [1] - 333:11
**5** [3] - 166:3, 216:12, 355:18
**50** [3] - 225:21, 326:16
**50,000** [2] - 329:19, 330:2
**50th** [1] - 254:1
**512** [1] - 220:10
**515** [1] - 380:13
**541** [1] - 380:12
**56** [1] - 243:24
**574** [1] - 378:19
**5:00** [1] - 125:9
**5:03** [1] - 394:13
**5:15** [1] - 406:11
**6** [2] - 81:10, 243:23
**600,000** [1] - 117:23
**602** [1] - 298:5
**6A** [1] - 75:9
**7** [4] - 175:1, 175:4, 175:12, 240:7
**7,099,171,846** [1] - 175:7

**7.1** [11] - 384:22, 385:24, 386:5, 386:14, 387:3, 387:20, 388:14, 389:10, 389:17, 390:8, 390:13
**7240** [1] - 252:3
**75** [1] - 407:10
**79** [1] - 383:10
**8** [13] - 89:14, 110:20, 388:6, 388:10, 388:19, 389:1, 389:2, 389:7, 392:11, 393:2, 405:8
**80** [1] - 369:8
**801(d)(2)(d** [1] - 96:9
**84** [1] - 383:10
**844** [1] - 75:11
**85** [1] - 102:21
**8:30** [1] - 406:9
**8:35** [1] - 75:9
**8:45** [1] - 394:9
**9** [1] - 363:23
**90** [2] - 394:23, 395:9
**90-minute** [1] - 395:7
**95** [16] - 248:20, 248:21, 249:15, 329:6, 329:21, 331:4, 331:11, 331:16, 331:22, 332:6, 332:19, 350:13, 351:3, 351:11, 351:13, 351:17
**98** [1] - 114:11
**9:00** [1] - 125:9
**9th** [2] - 354:5, 363:24
**a.m** [3] - 75:9, 204:5, 207:8
**abilities** [1] - 204:14
**ability** [3] - 93:13, 137:2, 149:16
**able** [21] - 89:1, 94:12, 125:13, 134:10, 150:4, 150:7, 161:16, 177:11, 196:2, 196:5, 197:2, 197:17, 214:13, 216:22, 220:19, 227:22, 237:3, 283:4, 323:13, 354:19, 355:13
**above-captioned** [1] - 407:12
**absolutely** [3] - 79:16, 342:17, 371:19
**absorbed** [1] - 158:4
**abstract** [3] - 84:8, 116:17, 133:10
**AC-34550** [1] - 378:19

**accent** [1] - 155:8
**accept** [5] - 127:1, 145:7, 322:21, 323:17, 324:10
**accepted** [2] - 328:10, 328:12
**access** [3] - 233:21, 295:11, 295:22
**accessible** [1] - 180:20
**accompanying** [2] - 207:23, 397:8
**accomplish** [3] - 93:12, 118:10, 253:15
**accomplished** [6] - 93:6, 93:16, 196:23, 227:13, 354:16, 355:1
**accomplishment** [1] - 277:15
**account** [2] - 175:15, 399:9
**accounts** [1] - 148:22
**accurate** [2] - 80:3, 407:10
**accused** [15] - 107:14, 122:1, 122:24, 123:2, 140:20, 141:2, 141:8, 143:10, 143:12, 143:16, 401:12, 401:21, 402:1, 402:10, 402:12
**ACI** [113] - 78:9, 78:14, 79:3, 80:4, 81:17, 81:19, 83:2, 84:2, 87:12, 90:17, 91:12, 95:19, 97:7, 97:10, 97:15, 100:8, 102:24, 124:14, 124:19, 125:17, 125:22, 126:1, 126:2, 132:9, 136:20, 137:7, 139:15, 139:18, 139:21, 140:14, 145:15, 145:23, 145:24, 161:21, 161:22, 162:2, 162:19, 163:2, 163:11, 163:16, 163:19, 165:15, 166:7, 167:6, 167:7, 173:6, 176:7, 178:12, 178:23, 180:1, 180:4, 180:6, 180:9, 183:10, 191:11, 192:6, 192:7, 192:11,

192:12, 193:2, 193:7, 193:11, 193:13, 193:19, 193:23, 193:24, 194:1, 195:4, 197:6, 198:2, 198:7, 198:19, 199:6, 199:8, 199:20, 201:12, 201:17, 203:4, 279:9, 305:20, 305:22, 306:5, 306:11, 306:15, 306:18, 306:22, 307:1, 307:7, 307:11, 307:15, 309:17, 310:2, 310:5, 310:11, 310:14, 310:24, 311:3, 311:4, 322:21, 334:3, 338:16, 346:21, 348:7, 348:8, 357:3, 357:6, 362:11, 371:7, 399:17, 405:24, 406:1, 406:3
**ACI's** [20] - 79:6, 79:22, 82:3, 90:5, 90:7, 95:23, 175:10, 175:12, 176:1, 179:24, 183:9, 185:2, 193:23, 197:8, 199:14, 201:4, 203:14, 322:15, 401:1, 403:3
**ACI-11494** [1] - 380:11
**acknowledge** [1] - 343:7
**acknowledged** [2] - 180:6, 199:6
**ACM** [2] - 253:22
**acquire** [1] - 277:7
**acquired** [1] - 98:20
**acquiring** [1] - 377:2
**acquisition** [3] - 161:13, 371:1, 377:22
**Act** [1] - 117:20
**act** [1] - 111:11
**acted** [2] - 100:7, 100:8
**acting** [1] - 80:7
**action** [5] - 119:15, 120:6, 120:9, 121:2, 280:4
**Action** [1] - 151:19
**actions** [3] - 99:8, 120:8, 318:23
**activity** [1] - 136:24
**actual** [7] - 131:15,

153:15, 156:16, 202:1, 251:7, 252:1, 332:1
**ad** [3] - 170:7, 172:8, 172:10
**add** [5] - 85:9, 193:18, 278:23, 355:22, 372:22
**added** [8] - 88:5, 93:8, 93:18, 174:23, 236:6, 245:14, 278:23
**adding** [5] - 85:10, 111:19, 373:1
**addition** [6] - 97:22, 106:15, 122:16, 131:9, 154:12, 173:10
**additional** [8] - 85:19, 88:4, 93:18, 123:22, 138:13, 285:16, 331:7, 398:14
**address** [11] - 77:3, 87:5, 88:15, 92:16, 102:17, 103:19, 241:14, 257:1, 333:20, 371:17, 405:9
**addressed** [7] - 88:16, 101:24, 108:8, 242:18, 242:20, 242:22, 395:20
**addresses** [4] - 84:10, 88:18, 89:18, 244:4
**addressing** [7] - 89:21, 89:22, 99:3, 104:15, 108:2, 244:2, 405:4
**adjourned** [1] - 406:11
**administrative** [2] - 204:8, 205:18
**admission** [2] - 210:19, 360:8
**admit** [2] - 358:5, 360:21
**admits** [1] - 161:15
**admitted** [8] - 127:13, 127:15, 127:21, 128:19, 361:8, 361:17, 383:16
**adopt** [1] - 401:7
**adopted** [1] - 190:16
**ads** [4] - 168:6, 168:8, 170:6, 172:10
**advance** [4] - 177:20, 179:12, 232:24, 396:6
**advanced** [2] - 202:12, 216:10
**Advanced** [1] - 371:21

**advances** [1] - 91:14
**advantages** [3] - 89:15, 89:18, 91:22
**advertisers** [5] - 169:10, 169:14, 169:20, 170:3, 170:4
**advertising** [1] - 172:4
**advised** [1] - 352:7
**advises** [1] - 164:14
**affiliate** [1] - 81:1
**afford** [1] - 277:21
**afraid** [1] - 136:2
**Africa** [1] - 224:15
**afternoon** [9] - 125:11, 242:9, 242:10, 242:11, 287:11, 287:12, 335:3, 394:22, 400:23
**age** [4] - 211:3, 211:6, 211:12, 393:5
**agency** [3] - 113:22, 137:16, 309:2
**agent** [5] - 96:10, 97:23, 98:1, 114:5, 114:8
**ago** [13] - 173:15, 183:3, 198:13, 200:11, 236:11, 249:21, 257:23, 261:5, 309:24, 331:18, 336:10, 351:18, 389:21
**agree** [16] - 78:8, 80:21, 104:18, 105:20, 127:8, 167:10, 168:22, 203:10, 264:9, 272:15, 294:1, 295:8, 295:9, 327:17, 382:7, 382:9
**agreed** [13] - 77:17, 79:1, 79:2, 81:20, 199:9, 204:16, 204:18, 209:24, 322:20, 322:21, 334:2, 341:12, 360:22
**agreeing** [1] - 119:24
**agreement** [12] - 126:23, 159:15, 159:21, 160:2, 160:4, 160:7, 173:7, 175:16, 262:17, 326:15, 327:13, 378:6
**agreements** [1] - 378:5
**agrees** [1] - 120:2
**ahead** [7] - 152:2,

158:21, 280:19,
341:15, 370:17,
394:20
**air** [2] - 271:1, 321:22
**airplane** [1] - 291:16
**al** [1] - 132:17
**Alchemy** [3] - 157:24,
158:1, 158:9
**alert** [1] - 394:19
**Alexandria** [1] -
113:19
**Alfaro** [1] - 177:1
**align** [2] - 223:8,
223:10
**alike** [1] - 92:9
**alive** [2] - 100:15,
100:17
**allegation** [1] - 81:15
**allegations** [1] - 401:2
**alleged** [1] - 123:18
**alleges** [3] - 78:14,
139:18, 140:1
**allocation** [1] - 395:7
**allotted** [1] - 394:23
**allow** [13] - 93:20,
102:5, 118:22,
120:10, 134:9,
135:16, 135:22,
147:1, 148:8, 152:3,
203:20, 291:8,
360:22
**allowed** [15] - 82:17,
121:4, 121:24,
134:6, 147:13,
147:21, 148:17,
153:1, 153:7, 154:7,
154:16, 195:23,
201:6, 201:8, 364:15
**allows** [6] - 110:20,
119:10, 136:12,
181:17, 326:15,
336:19
**almost** [5] - 86:16,
174:8, 188:12,
222:8, 329:20
**alone** [4] - 152:17,
154:4, 164:7, 175:1
**alpha** [1] - 373:1
**alternative** [1] -
107:18
**alternatively** [1] -
120:5
**altitudes** [2] - 336:20,
336:21
**ambiguous** [1] -
117:11
**ambitious** [1] - 180:17
**amd** [1] - 137:10
**amendments** [1] -
120:2

**America** [1] - 372:3
**American** [1] - 117:20
**amount** [8] - 174:4,
201:21, 220:11,
222:24, 231:22,
232:5, 326:16, 357:9
**amounts** [1] - 202:1
**analysis** [3] - 164:2,
173:2, 202:17
**analyze** [1] - 164:4
**analyzing** [1] - 214:5
**Andreas** [1] - 155:5
**Andreovits** [2] -
194:6, 194:7
**Andrews** [2] - 404:20,
405:3
**Android** [1] - 182:13
**Ang** [3] - 318:7,
321:21, 336:2
**angry** [1] - 284:6
**animation** [1] - 224:3
**anniversary** [1] -
254:1
**announced** [1] -
275:10
**announcing** [1] -
381:5
**answer** [19] - 100:18,
110:7, 126:15,
165:10, 166:22,
174:6, 194:12,
209:18, 306:16,
320:19, 347:9,
355:13, 355:14,
355:17, 357:18,
359:5, 359:6,
390:20, 390:21
**answered** [6] -
135:21, 264:22,
344:11, 359:18,
359:21, 389:21
**answering** [1] -
265:15
**antecedents** [1] -
105:10
**anticipate** [3] - 142:5,
396:10, 403:2
**anticipated** [1] -
299:23
**anticipates** [1] - 142:5
**anticipation** [1] -
142:9
**anyway** [4] - 194:22,
368:22, 370:13,
376:2
**apart** [1] - 147:4
**API** [1] - 373:2
**apologize** [3] -
245:21, 269:12,
271:23

**apparura** [1] - 210:18
**appear** [3] - 117:5,
126:11, 132:7
**APPEARANCES** [2] -
75:16, 76:1
**Apple** [1] - 182:14
**applicant** [12] -
118:19, 118:24,
119:6, 119:16,
119:22, 119:23,
120:1, 120:5,
120:16, 121:4,
122:16, 137:14
**applicant's** [2] -
115:21, 118:23
**applicants** [1] -
120:11
**application** [71] -
87:10, 88:6, 92:24,
93:9, 93:17, 111:12,
113:17, 114:3,
114:16, 114:18,
114:22, 115:14,
116:2, 116:22,
117:17, 117:18,
118:2, 118:4, 119:3,
119:9, 119:13,
119:22, 120:3,
120:13, 120:24,
122:22, 137:14,
137:24, 138:14,
138:16, 138:17,
155:2, 155:14,
155:17, 155:21,
156:2, 163:3,
197:22, 198:4,
200:19, 200:21,
201:14, 228:4,
237:11, 237:13,
237:22, 237:24,
238:2, 285:11,
285:13, 285:15,
285:24, 289:19,
290:1, 290:17,
291:3, 304:10,
304:15, 304:18,
304:19, 304:20,
330:9, 342:4,
342:14, 343:1,
343:5, 343:11,
346:19, 347:22,
349:21, 350:10
**applications** [18] -
111:9, 113:24,
114:6, 114:12,
114:14, 117:15,
117:22, 117:23,
118:18, 120:18,
120:21, 137:18,
169:1, 170:21,

170:23, 171:5,
214:16, 214:18
**applied** [28] - 86:18,
183:14, 195:17,
224:6, 224:22,
225:3, 225:5,
228:13, 264:5,
275:12, 286:6,
292:5, 293:3,
294:16, 295:18,
295:24, 296:24,
299:9, 300:2,
300:20, 301:18,
302:5, 303:3, 304:6,
304:13, 314:5,
344:7, 351:19
**applies** [1] - 200:12
**apply** [7] - 116:11,
123:12, 145:7,
223:5, 264:12,
315:11, 397:18
**applying** [1] - 144:19
**appreciate** [2] - 92:13,
177:18, 357:19
**approach** [12] - 84:20,
95:2, 147:7, 179:21,
183:22, 188:24,
190:16, 190:17,
208:11, 221:15,
287:4, 358:16
**appropriate** [10] -
118:5, 123:23,
135:10, 146:18,
358:14, 359:23,
360:6, 393:9,
393:11, 402:7
**approximate** [1] -
237:3
**approximate** [1] -
237:3
**April** [1] - 362:24
**aps** [1] - 168:16
**architectural** [2] -
214:1, 214:7
**area** [14] - 80:12,
80:18, 164:17,
184:11, 184:15,
185:11, 219:8,
219:17, 222:20,
224:7, 268:3, 289:6,
353:5
**areas** [7] - 184:21,
185:18, 202:14,
209:8, 244:11,
354:20, 364:21
**argue** [4] - 81:20,
89:20, 102:2, 141:3
**argues** [1] - 139:21
**arguing** [2] - 95:16,
100:23
**argument** [3] - 107:16,
107:18, 142:9

**arguments** [8] -
122:14, 127:4,
127:9, 127:11,
129:17, 142:3,
334:3, 396:21
**arrived** [1] - 149:17
**arrives** [1] - 117:18
**arrows** [1] - 169:12
**ARSHT** [1] - 76:4
**art** [33] - 95:16,
111:19, 114:20,
116:1, 116:4, 116:6,
116:10, 116:12,
118:8, 118:21,
119:1, 119:8, 122:4,
122:15, 138:6,
141:19, 141:23,
142:2, 142:4, 142:7,
142:10, 142:12,
143:21, 185:2,
250:12, 276:6,
281:7, 283:13,
285:16, 286:4,
348:17, 399:24,
400:2
**Art+Com** [82] - 88:9,
94:11, 98:17,
125:16, 151:8,
152:1, 152:13,
152:16, 152:21,
153:20, 154:3,
155:5, 156:6, 156:8,
156:16, 157:3,
157:7, 157:15,
157:17, 158:15,
158:17, 158:21,
162:16, 194:9,
194:11, 194:12,
213:13, 213:14,
213:18, 213:21,
213:22, 214:21,
215:3, 215:22,
235:21, 236:18,
236:20, 236:22,
236:24, 249:1,
249:16, 255:24,
256:1, 256:16,
258:12, 263:6,
267:12, 269:20,
275:5, 305:18,
305:23, 306:1,
307:19, 308:1,
308:19, 309:5,
309:12, 310:15,
310:20, 326:10,
326:19, 326:23,
326:24, 327:2,
327:5, 327:14,
330:13, 330:19,
334:4, 338:16,

346:21, 347:7, 347:13, 347:24, 348:10, 348:24, 351:12, 355:11, 355:24, 373:12, 374:20, 375:6
**ART+COM** [1] - 75:3
**Art+Com's** [3] - 97:21, 156:1, 364:20
**article** [2] - 110:20, 119:20
**articles** [1] - 115:24
**artificial** [2] - 212:21
**artists** [3] - 116:5, 213:23, 233:6
**ArtPlus.com** [1] - 166:15
**arts** [1] - 110:22
**ASD** [1] - 371:21
**ASGA** [1] - 256:16
**aspects** [5] - 116:22, 187:10, 196:7, 349:20, 349:22
**aspiration** [1] - 340:9
**assembled** [1] - 147:10
**asserted** [10] - 122:3, 131:24, 137:7, 140:1, 140:2, 141:11, 297:17, 297:22, 308:21, 400:1
**assertion** [1] - 334:5
**asserts** [5] - 125:22, 125:24, 126:2, 141:11
**assets** [4] - 193:18, 377:20, 377:23, 378:2
**assigned** [3] - 115:9, 115:12, 121:13
**assigns** [2] - 114:18, 118:4
**associated** [3] - 147:6, 330:23, 351:16
**Association** [2] - 253:23, 253:24
**assume** [2] - 355:19, 393:21
**assumptions** [3] - 225:15, 226:4, 303:11
**astonished** [2] - 198:14, 336:11
**asynchronous** [2] - 337:3, 373:5
**AT&T** [1] - 246:6
**ATM** [2] - 336:24, 337:3

**attached** [2] - 282:1, 314:21
**attaching** [1] - 325:22
**attachment** [1] - 261:20
**attachments** [1] - 261:22
**attempt** [3] - 91:3, 282:3, 282:5
**attempting** [1] - 263:12
**attempts** [2] - 184:6, 186:13
**attend** [3] - 248:19, 248:21, 329:18
**attendance** [1] - 329:24
**attended** [4] - 197:17, 200:3, 329:8, 351:3
**attention** [6] - 119:2, 130:9, 141:20, 177:4, 177:20, 276:3
**attentive** [1] - 203:7
**attorney** [5] - 114:4, 114:8, 129:10, 316:4, 345:24
**attorneys** [1] - 135:22
**audiotape** [1] - 373:6
**August** [8] - 156:4, 197:15, 197:24, 199:23, 200:16, 200:20, 273:16, 330:6
**authenticate** [2] - 86:22, 91:3
**authenticated** [1] - 91:5
**authenticity** [6] - 86:9, 88:11, 90:6, 90:17, 90:23, 91:2
**author** [1] - 96:22
**authors** [1] - 110:23
**automatic** [1] - 164:12
**automation** [1] - 211:19
**availability** [1] - 100:19
**available** [12] - 84:14, 112:20, 129:22, 130:1, 167:5, 182:10, 182:11, 200:2, 209:19, 345:7, 391:19, 401:11
**average** [3] - 111:10, 174:4, 174:8
**avoid** [2] - 106:6, 333:24
**award** [2] - 142:19, 176:7

**awarded** [3] - 117:21, 142:23, 357:12
**aware** [11] - 257:3, 286:5, 297:3, 315:8, 330:18, 343:11, 343:13, 344:9, 344:15, 344:17, 351:22
**awesome** [1] - 375:18
**awfully** [2] - 327:22, 333:23
**Axel** [4] - 154:12, 371:23, 372:15, 375:24
**Babar** [1] - 371:20
**bachelor** [2] - 188:14, 210:20
**back-license** [2] - 356:4, 356:7
**background** [3] - 110:9, 114:20, 116:18
**backwards** [1] - 221:20
**bad** [4] - 191:19, 218:1, 324:22, 402:19
**badly** [1] - 352:5
**BAKER** [1] - 75:21
**balanced** [1] - 145:22
**bald** [1] - 380:15
**ball** [19] - 152:18, 198:21, 240:17, 240:18, 240:19, 254:21, 304:24, 305:4, 305:8, 305:14, 365:6, 365:9, 365:11, 366:1, 366:4, 366:7, 375:17, 375:18
**ballpark** [1] - 395:11
**bandwidth** [1] - 391:22
**bar** [3] - 298:6, 358:18, 359:24
**bargain** [1] - 111:14
**barriers** [1] - 381:7
**base** [2] - 353:6, 378:9
**based** [35] - 77:13, 81:17, 86:15, 103:5, 104:4, 104:8, 105:3, 105:6, 105:9, 108:6, 109:2, 119:5, 129:19, 132:24, 173:8, 193:8, 196:4, 198:8, 198:16, 198:17, 250:22, 251:15, 264:1, 264:9, 279:18, 308:5, 335:17,

335:22, 336:13, 343:19, 343:20, 361:11, 386:18, 393:6, 403:10
**bases** [1] - 118:9
**basic** [7] - 115:5, 160:19, 176:12, 221:20, 234:21, 259:24, 314:19
**basics** [1] - 110:13
**basis** [6] - 80:5, 98:23, 169:4, 169:5, 246:23, 274:24
**Beach** [1] - 363:10
**bears** [4] - 145:11, 145:16, 145:24, 146:6
**Beatles** [8] - 159:10, 159:12, 159:13, 159:19, 159:20, 159:21, 378:2
**became** [6] - 215:5, 232:6, 232:15, 257:3, 304:21, 330:18
**become** [6] - 131:7, 192:17, 192:24, 211:24, 230:9, 288:11
**becomes** [1] - 112:19
**BEFORE** [1] - 75:13
**began** [2] - 211:2, 211:11
**begin** [5] - 77:23, 108:1, 115:5, 125:13, 149:20
**beginning** [10] - 107:8, 190:17, 225:1, 229:3, 230:6, 232:10, 236:15, 237:8, 258:6, 303:22
**begins** [8] - 77:23, 78:14, 78:19, 113:6, 117:17, 133:8, 340:3, 374:7
**behalf** [2] - 98:3, 254:17
**behind** [3] - 207:13, 208:1, 380:9
**belief** [1] - 146:11
**believes** [2] - 113:15, 287:24
**belonged** [1] - 180:13
**belongs** [4] - 180:10, 180:13, 195:9, 201:6
**below** [1] - 168:17
**bench** [7] - 358:16, 394:22, 395:16, 396:1, 396:10, 403:12, 367:19

**benefits** [1] - 166:11
**Berlin** [14] - 99:17, 152:12, 212:16, 213:1, 214:8, 214:11, 215:23, 245:13, 264:24, 265:4, 278:8, 287:14, 321:2, 375:23
**best** [4] - 149:16, 204:14, 210:8, 385:6
**beta** [4] - 372:22, 372:24, 373:15, 373:20
**better** [14] - 85:3, 88:6, 150:24, 172:7, 172:10, 186:3, 192:2, 212:12, 226:7, 230:11, 236:5, 272:18, 274:16, 315:11
**between** [15] - 80:2, 84:2, 88:1, 111:15, 120:15, 140:19, 176:6, 192:11, 230:9, 269:20, 281:11, 321:6, 327:14, 377:12, 392:8
**beyond** [3] - 146:14, 147:20, 328:16
**big** [29] - 152:18, 154:21, 154:23, 155:15, 156:24, 166:24, 167:4, 167:24, 173:23, 175:18, 175:19, 184:11, 184:23, 185:15, 198:21, 232:2, 232:6, 232:8, 235:9, 304:24, 312:11, 312:23, 313:3, 365:7, 365:9, 365:17, 369:15, 374:1, 377:23
**bigger** [5] - 185:5, 230:9, 231:3, 336:9
**biggest** [2] - 168:5, 381:19
**billion** [3] - 175:1, 175:4, 175:12
**billionth** [1] - 173:17
**binder** [1] - 85:13
**Birch** [7] - 83:18, 83:22, 188:9, 188:14, 189:14, 190:20
**bit** [34] - 77:11, 78:4, 150:17, 159:1, 159:22, 179:7,

179:13, 179:17,
179:24, 180:8,
187:18, 199:11,
210:7, 213:20,
229:19, 243:10,
245:22, 269:13,
272:23, 274:3,
280:4, 280:10,
284:6, 289:1,
291:11, 295:13,
311:6, 314:10,
314:11, 315:19,
328:11, 339:19,
382:12, 405:6
**blank** [3] - 85:4, 85:6,
131:9
**blanket** [1] - 106:6
**blind** [1] - 102:14
**block** [1] - 150:20
**blocking** [1] - 151:2
**blocks** [1] - 219:18
**blow** [5] - 185:13,
185:22, 314:10,
314:20, 353:23
**BLUMENFELD** [1] -
76:4
**board** [4] - 171:14,
211:18, 321:10,
405:4
**book** [2] - 151:19,
164:19
**boom** [2] - 365:24,
366:3
**booth** [1] - 257:19
**borderline** [1] - 334:1
**boss** [2] - 267:5,
368:19
**Boston** [1] - 184:14
**bottom** [7] - 172:12,
222:20, 244:18,
270:5, 281:19,
346:1, 382:4
**bottome** [1] - 171:11
**BOTTS** [1] - 75:21
**bought** [3] - 160:21,
161:6, 259:11
**boundaries** [7] -
112:13, 112:18,
117:7, 143:7, 143:9,
201:5, 201:7
**box** [4] - 205:21,
290:10, 290:12,
290:13
**boxes** [1] - 290:15
**boy** [1] - 176:20
**brain** [1] - 214:4
**branch** [1] - 118:2
**Brandywine** [1] -
186:9
**Braunschweig** [1] -

212:5
**break** [12] - 125:9,
148:12, 203:19,
203:23, 203:24,
231:8, 269:16,
281:16, 330:21,
333:6, 333:10
**breaks** [1] - 125:10
**breakthroughs** [1] -
111:24
**BRETT** [1] - 76:8
**Brett** [1] - 202:12
**brewery** [1] - 376:4
**BRIAN** [1] - 75:18
**Brian** [2] - 157:9,
376:15
**brief** [8] - 110:8,
116:18, 133:10,
206:19, 208:16,
241:20, 362:8,
404:11
**briefed** [1] - 404:9
**briefing** [8] - 364:10,
365:13, 372:6,
374:9, 374:15,
374:17, 374:23,
375:11
**briefly** [3] - 129:6,
260:22, 261:17
**bring** [24] - 77:2, 77:9,
107:24, 108:15,
108:19, 148:10,
149:4, 150:1, 152:7,
170:1, 172:11,
172:15, 172:21,
206:21, 218:22,
277:18, 297:6,
302:14, 314:9,
316:2, 318:7, 324:1,
334:17, 345:21
**bringing** [4] - 119:1,
170:16, 171:18,
171:19
**Broad** [1] - 254:19
**broader** [2] - 364:7,
403:12
**brought** [5] - 121:20,
124:15, 125:16,
276:2, 364:12
**Brussels** [1] - 248:1
**bucket** [1] - 94:5
**build** [8] - 181:14,
201:8, 226:24,
227:4, 227:22,
228:22, 363:6,
368:23
**building** [9] - 125:12,
227:23, 229:9,
238:3, 364:11,
364:17, 365:18

368:16, 376:3
**buildings** [5] - 214:11,
214:14, 245:4,
370:1, 370:2
**built** [4] - 214:14,
228:21, 370:13,
376:4
**bulb** [2] - 111:21,
117:2
**bullet** [9] - 79:24,
169:19, 170:10,
264:15, 270:13,
270:23, 271:5,
321:20, 379:17
**bullets** [1] - 379:20
**bunch** [4] - 184:21,
193:15, 233:6, 331:7
**burden** [9] - 139:4,
145:12, 145:13,
145:14, 145:16,
145:24, 146:6,
399:18, 402:15
**burdens** [2] - 145:10,
146:17
**bus** [1] - 96:18
**business** [23] - 99:2,
99:16, 162:8,
170:24, 171:12,
171:13, 171:22,
172:3, 172:12,
259:22, 263:23,
264:19, 268:19,
273:24, 274:21,
283:4, 309:9,
327:23, 349:4,
363:18, 378:13,
381:24
**businessman** [1] -
267:5
**but..** [1] - 392:18
**buy** [6] - 166:16,
193:14, 193:17,
293:20, 321:24,
323:18
**buyers** [1] - 324:5
**buying** [2] - 193:16,
368:21
**BY** [25] - 75:18, 75:21,
75:22, 75:22, 75:23,
76:4, 76:7, 76:8,
209:12, 239:2,
242:8, 285:21,
287:10, 297:9,
298:9, 300:24,
302:16, 314:12,
335:2, 342:24,
344:14, 344:24,
348:21, 349:15,
350:22
**C.A** [1] - 75:4

**cage** [1] - 365:9
**calculates** [2] -
175:23, 176:9
**calculations** [5] -
175:5, 226:3, 226:5,
369:23, 370:5
**California** [3] -
156:21, 188:15,
364:6
**camera** [2] - 386:21,
386:23
**candidate** [2] -
372:18, 372:21
**candor** [2] - 118:24,
342:7
**cannot** [9] - 92:18,
184:1, 195:8, 195:9,
230:12, 300:4,
309:19, 319:4, 404:5
**capabilities** [3] -
253:12, 294:1, 294:2
**capable** [1] - 308:24
**capitol** [2] - 277:10,
277:21
**caption** [1] - 115:18
**captioned** [1] - 407:12
**captured** [1] - 284:2
**card** [1] - 373:10
**care** [3] - 85:8, 89:9,
101:6
**career** [1] - 265:20
**careful** [1] - 131:6
**carefully** [1] - 104:24
**Carolina** [2] - 369:19,
370:10
**carries** [1] - 138:24
**carry** [1] - 233:6
**cars** [1] - 214:2
**cartridge** [1] - 373:7
**case** [105] - 80:11,
82:8, 84:4, 87:7,
92:2, 100:6, 101:2,
107:8, 107:21,
109:9, 110:4, 110:5,
110:10, 116:15,
121:22, 123:6,
123:16, 123:21,
124:11, 124:19,
125:16, 125:19,
126:7, 127:10,
127:19, 127:21,
128:7, 133:24,
134:13, 141:1,
143:1, 143:16,
144:20, 145:11,
145:14, 146:16,
146:24, 147:2,
147:4, 147:7, 147:8,
147:9, 147:11,
147:21,

148:4, 148:5, 148:7,
148:16, 148:19,
148:20, 149:10,
151:5, 151:12,
152:15, 153:5,
154:10, 160:5,
160:19, 175:9,
177:22, 178:5,
178:6, 178:7, 178:8,
179:9, 179:14,
179:22, 181:9,
183:10, 183:24,
186:20, 186:22,
195:7, 204:1,
207:14, 221:10,
222:8, 222:23,
224:15, 224:17,
264:12, 265:17,
270:15, 288:16,
293:7, 297:17,
305:5, 305:10,
305:17, 306:5,
307:17, 308:4,
308:11, 309:20,
318:2, 334:6,
348:17, 357:10,
357:12, 365:3,
382:8, 394:5, 394:7
**cases** [5] - 80:7,
110:12, 123:11,
263:16, 404:22
**Castle** [1] - 407:2
**Castleman** [9] - 79:22,
80:2, 80:6, 80:17,
164:7, 164:10,
164:18, 165:12,
403:3
**cat** [1] - 221:10
**catalog** [1] - 232:6
**category** [1] - 337:21
**caught** [1] - 265:23
**caused** [3] - 233:20,
381:2, 381:5
**caution** [2] - 129:9,
129:13
**CD** [26] - 200:1,
233:10, 250:18,
308:9, 312:10,
330:24, 331:4,
331:9, 331:11,
331:13, 331:15,
331:22, 331:24,
332:1, 332:3, 332:5,
332:11, 332:18,
350:6, 350:13,
351:7, 351:11,
351:13, 351:16,
373:8
**CD-ROM** [19] - 200:1,
250:18, 331:4,

331:9, 331:11, 331:15, 331:22, 331:24, 332:1, 332:3, 332:5, 332:18, 350:6, 350:13, 351:7, 351:11, 351:13, 351:16

**CD-ROMs** [3] - 312:10, 330:24, 331:13

**celebrated** [1] - 173:16

**cell** [1] - 148:8

**center** [10] - 364:11, 365:13, 372:6, 374:9, 374:15, 374:17, 374:23, 375:11, 391:16, 392:8

**Center** [2] - 109:13, 110:3

**centimeter** [1] - 232:4

**central** [1] - 145:2

**cents** [5] - 165:24, 166:3, 166:4, 285:3

**CEO** [7] - 160:12, 275:4, 306:15, 307:12, 309:13, 322:15, 364:17

**certain** [11] - 78:15, 111:3, 119:18, 123:7, 139:19, 144:14, 144:23, 155:9, 184:10, 310:18, 349:20

**certainly** [9] - 86:16, 102:19, 148:11, 168:22, 181:11, 375:16, 377:14, 381:7, 397:13

**CERTIFICATE** [1] - 407:5

**Certified** [1] - 407:8

**certify** [1] - 407:9

**chain** [2] - 100:6, 354:5

**chair** [2] - 204:19, 286:19

**challenge** [3] - 122:2, 123:2, 220:1

**challenged** [1] - 143:19

**challenging** [2] - 118:18, 146:5

**chance** [3] - 123:1, 203:2, 363:4

**change** [13] - 166:17, 191:4, 199:9, 210:12, 216:18,

221:23, 223:4, 332:17, 356:20, 368:15, 381:1, 402:8

**changed** [7] - 235:4, 235:12, 235:13, 235:14, 255:12, 255:15, 377:4

**changes** [2] - 216:19, 368:17

**changing** [1] - 222:14

**characterization** [1] - 334:6

**charge** [3] - 112:10, 170:6, 374:23

**charged** [1] - 166:19

**chart** [5] - 131:24, 150:1, 167:24, 379:22, 379:23

**cheaper** [1] - 253:3

**check** [6] - 163:1, 163:5, 163:8, 338:4, 372:4, 381:18

**checked** [2] - 114:16, 163:11

**checks** [1] - 163:18

**chief** [1] - 161:10

**child** [1] - 363:8

**choice** [2] - 238:22, 260:9

**Chris** [1] - 367:11

**chunk** [1] - 168:6

**church** [1] - 245:13

**circling** [1] - 151:21

**circuit** [2] - 211:18, 368:11

**circumstance** [1] - 147:23

**circumstances** [2] - 274:1, 323:1

**cite** [1] - 346:15

**cited** [5] - 323:22, 346:2, 348:5, 348:6, 348:12

**cites** [1] - 346:12

**civil** [1] - 149:3

**claim** [53] - 104:11, 104:14, 105:5, 105:10, 106:18, 112:14, 139:22, 140:15, 140:19, 140:20, 140:21, 144:1, 145:1, 178:15, 179:1, 180:10, 186:21, 186:23, 187:9, 189:18, 191:1, 191:3, 191:4, 191:10, 200:6, 201:7, 291:7, 293:6, 297:8, 297:11,

297:13, 297:15, 297:19, 297:21, 297:23, 297:24, 300:23, 301:1, 301:2, 302:15, 302:17, 302:19, 308:15, 398:14, 399:7, 400:1, 402:23, 403:21, 404:14, 404:17, 404:21

**Claim** [1] - 293:6

**claimed** [18] - 91:17, 111:6, 114:9, 115:21, 116:8, 133:11, 133:21, 138:3, 139:7, 141:4, 144:13, 159:6, 179:21, 183:17, 195:16, 203:12, 336:22, 347:16

**claiming** [2] - 119:23, 337:22

**claims** [76] - 78:15, 104:1, 105:4, 112:24, 117:4, 117:6, 117:12, 119:19, 120:11, 121:3, 122:3, 131:24, 132:2, 133:16, 133:20, 133:22, 133:23, 134:1, 134:2, 134:3, 136:15, 137:7, 138:10, 138:11, 139:8, 139:19, 139:22, 139:23, 140:2, 140:5, 140:7, 140:8, 141:11, 142:18, 142:24, 143:2, 143:3, 143:6, 143:11, 143:15, 143:18, 143:21, 144:3, 144:4, 144:5, 144:6, 144:12, 144:15, 144:17, 144:20, 144:24, 145:6, 146:7, 164:6, 178:10, 178:14, 186:22, 189:16, 193:21, 197:6, 201:5, 203:14, 276:6, 288:16, 297:16, 297:22, 305:9, 305:15, 308:11, 308:12, 308:21, 317:22, 400:1

**clarification** [1] - 391:10

**clarify** [1] - 350:24

**Clark** [1] - 364:18

**classes** [1] - 211:7

**Clause** [1] - 110:20

**clause** [1] - 326:14

**clear** [16] - 81:5, 82:16, 104:4, 112:16, 118:13, 123:20, 138:5, 141:15, 146:8, 146:9, 146:12, 196:5, 203:13, 296:6, 324:23, 397:13

**clearly** [10] - 88:11, 89:16, 89:17, 93:1, 113:10, 150:13, 206:3, 223:8, 266:7, 270:4

**CLERK** [1] - 205:4

**client** [3] - 165:7, 380:5, 385:24

**Client** [7] - 386:14, 387:3, 387:20, 388:9, 389:17, 390:8, 390:13

**clients** [1] - 263:22

**ClipMap** [2] - 382:23, 383:6

**ClipMapping** [4] - 368:7, 383:1, 383:2, 383:7

**ClipMaps** [1] - 368:6

**clock** [1] - 393:22

**close** [10] - 83:10, 130:8, 177:3, 231:19, 243:15, 245:12, 333:23, 334:7, 368:16, 379:14

**closed** [1] - 270:17

**closely** [4] - 118:8, 163:20, 385:2, 385:8

**closeness** [1] - 245:15

**closer** [8] - 111:13, 113:2, 115:3, 240:24, 244:13, 257:21, 257:24, 283:24

**closing** [4] - 124:23, 127:11, 129:17, 396:21

**coast** [4] - 224:8, 224:9, 224:11

**cockpit** [1] - 363:15

**code** [17] - 164:3, 164:5, 164:23, 164:24, 165:4, 165:8, 165:11, 165:13, 168:21,

378:9, 384:23, 385:2, 385:5, 385:7, 389:16, 390:17, 390:23

**collaborate** [1] - 216:5

**colleague** [2] - 258:8, 258:9

**colleagues** [2] - 153:22, 192:20

**collect** [2] - 358:11, 358:15

**collected** [1] - 85:14

**colon** [1] - 277:2

**color** [1] - 219:24

**Column** [1] - 243:23

**column** [8] - 133:21, 173:24, 174:3, 174:7, 250:17, 346:2, 346:8, 382:5

**columns** [2] - 133:17, 133:18

**combination** [3] - 112:4, 142:10, 224:6

**combined** [1] - 233:14

**combines** [1] - 233:14

**comfort** [2] - 271:2, 321:23

**comic** [1] - 151:19

**Comics** [1] - 151:19

**coming** [6] - 177:7, 233:24, 337:9, 341:17, 341:19, 376:6

**command** [1] - 390:24

**commissioned** [1] - 254:16

**commit** [1] - 180:19

**committed** [2] - 287:20, 288:10

**committee** [3] - 213:7, 213:8, 331:20

**common** [1] - 184:19

**communicate** [7] - 155:10, 155:11, 194:9, 256:19, 262:24, 337:7, 361:21

**communicated** [2] - 119:14, 322:3

**communicating** [2] - 343:14, 343:16

**communication** [2] - 260:17, 328:4

**communications** [9] - 84:2, 99:5, 256:15, 256:22, 311:7, 353:24, 366:10, 372:13, 373:12

**companies** [11] - 188:17, 213:9,

260:6, 265:21, 266:14, 266:15, 280:9, 306:4, 323:13, 324:7, 367:6
**company** [41] - 115:12, 121:12, 156:12, 156:24, 157:21, 158:4, 158:6, 158:7, 167:11, 168:20, 180:17, 192:20, 196:9, 211:14, 212:15, 212:19, 215:17, 226:14, 246:6, 257:16, 305:18, 305:22, 306:3, 307:19, 310:5, 310:10, 340:20, 356:2, 364:12, 365:17, 366:6, 367:1, 367:3, 367:20, 369:11, 369:13, 369:16, 369:18, 370:8, 381:17
**company's** [3] - 369:1, 369:11, 369:12
**compare** [5] - 143:20, 155:23, 189:15, 191:1, 222:21
**compared** [2] - 93:12, 143:11
**comparing** [1] - 143:15
**comparison** [1] - 363:8
**compelled** [1] - 136:1
**compete** [2] - 266:15, 323:14
**competence** [1] - 100:1
**competing** [2] - 117:22, 403:11
**competitors** [1] - 138:7
**compilations** [1] - 86:14
**complaint** [1] - 401:3
**complete** [9] - 114:17, 118:2, 118:13, 175:16, 212:6, 340:13, 355:17, 368:9
**completed** [2] - 105:17, 106:22
**completely** [7] - 310:15, 340:12, 340:16, 340:18, 343:22, 353:16,

356:12
**complex** [2] - 382:11, 383:2
**complicated** [2] - 140:10, 405:6
**complications** [2] - 85:1, 359:15
**complied** [1] - 114:1
**complies** [2] - 114:10, 114:17
**comply** [2] - 265:16, 396:14
**components** [1] - 253:1
**composition** [1] - 113:5
**comprises** [1] - 298:1
**computation** [1] - 218:3
**Computer** [1] - 253:24
**computer** [36] - 118:9, 153:9, 182:9, 183:16, 185:21, 191:7, 212:2, 212:4, 213:23, 229:21, 229:23, 240:16, 256:13, 290:19, 290:21, 291:23, 292:17, 292:18, 293:2, 293:7, 293:11, 293:16, 293:20, 293:23, 294:6, 294:8, 294:20, 294:23, 295:21, 295:22, 296:3, 298:22, 363:5, 370:14, 391:1, 393:4
**computers** [28] - 157:2, 157:3, 183:5, 183:6, 183:7, 196:17, 216:11, 217:21, 218:2, 220:12, 244:9, 256:5, 256:9, 256:10, 256:12, 280:7, 289:15, 289:20, 290:2, 290:7, 293:14, 294:11, 295:14, 295:17, 295:20, 296:21, 296:23, 337:6
**Computing** [1] - 253:23
**computing** [1] - 254:4
**conceding** [1] - 399:19
**concept** [2] - 293:2, 294:8

**conception** [1] - 113:9
**concepts** [2] - 234:18, 234:20
**concern** [9] - 79:24, 80:24, 95:3, 102:1, 106:21, 106:24, 110:7, 134:4, 231:22
**concerned** [3] - 88:13, 104:23, 138:20
**concerning** [2] - 269:18, 275:24
**concerns** [4] - 281:6, 281:14, 394:21, 398:8
**concise** [1] - 138:5
**conclude** [4] - 137:19, 142:18, 145:23, 196:5
**concluded** [2] - 163:22, 360:6
**concludes** [2] - 119:9, 138:15
**conclusion** [6] - 109:5, 134:16, 141:1, 142:21, 266:19, 344:20
**conclusions** [2] - 127:24, 266:17
**conclusive** [1] - 137:22
**conditions** [3] - 327:16, 356:5, 356:8
**conduct** [2] - 129:3, 140:20
**conducted** [1] - 99:22
**confer** [2] - 129:1, 135:9
**Conference** [1] - 253:22
**conference** [29] - 77:21, 81:19, 153:14, 197:12, 197:15, 197:17, 199:22, 199:24, 200:3, 200:8, 200:14, 200:15, 200:16, 248:19, 254:7, 257:19, 269:20, 269:23, 271:21, 285:7, 329:8, 329:11, 329:13, 329:16, 329:21, 330:5, 330:13, 331:16, 395:21
**conferences** [6] - 153:13, 197:11, 269:9, 283:2, 329:18, 347:3
**confident** [2] - 167:15,

203:10
**confidential** [6] - 130:24, 135:2, 164:3, 167:2, 172:19, 177:13
**confidentiality** [3] - 135:4, 146:22
**confirm** [1] - 300:5
**confirmed** [2] - 165:6, 392:6
**confirming** [1] - 190:24
**confuse** [2] - 80:1, 81:1
**confusing** [1] - 311:19
**congratulate** [1] - 191:16
**congress** [1] - 110:21
**Congress** [1] - 110:18
**connected** [1] - 240:15
**connection** [7] - 161:16, 215:11, 264:6, 330:12, 357:9, 383:9, 393:20
**conservative** [3] - 225:16, 226:5, 303:12
**consider** [20] - 91:6, 122:9, 122:14, 127:17, 127:20, 128:19, 141:12, 141:19, 144:1, 146:19, 226:17, 255:10, 344:2, 344:18, 352:3, 377:17, 379:9, 399:7, 405:5, 405:10
**considered** [3] - 127:14, 250:12, 255:16
**considering** [1] - 356:23
**consist** [1] - 126:7
**consistent** [5] - 236:23, 395:6, 395:22, 395:24, 401:2
**constitute** [1] - 142:2
**constitutes** [1] - 141:23
**constitution** [1] - 110:18
**constraints** [1] - 217:18
**construct** [1] - 390:18
**construction** [6] - 104:14, 143:17, 398:15, 404:15, 404:17, 404:21

**constructions** [2] - 145:2, 145:5
**consulting** [1] - 366:23
**consuming** [1] - 130:5
**contact** [7] - 158:18, 159:12, 193:11, 259:23, 260:1, 312:5, 313:4
**contacted** [8] - 192:8, 193:2, 193:3, 193:7, 309:21, 311:8, 318:16, 376:10
**contacting** [1] - 312:11
**contain** [3] - 118:9, 208:14, 234:11
**contained** [2] - 123:8, 332:19
**contains** [1] - 144:8
**contends** [2] - 137:6, 142:14
**contention** [1] - 105:2
**contentions** [1] - 137:9
**contest** [2] - 399:23, 400:2
**context** [5] - 99:22, 103:18, 293:2, 393:7, 393:12
**continue** [9] - 203:8, 212:13, 237:11, 237:18, 255:5, 255:21, 256:3, 367:18, 378:13
**continued** [1] - 367:17
**CONTINUED** [1] - 76:1
**continuing** [1] - 356:11
**continuous** [3] - 377:3, 377:5, 377:15
**continuously** [2] - 244:18, 244:22
**contract** [4] - 159:14, 159:16, 370:7
**contractor** [1] - 214:23
**contracts** [1] - 378:4
**contrary** [3] - 90:5, 91:15, 193:22
**contribute** [1] - 154:15
**contributions** [1] - 175:21
**control** [3] - 239:8, 239:10, 288:6
**convenient** [3] - 181:6, 181:20, 333:5
**conveniently** [1] - 129:6

**conversation** [5] - 95:5, 95:11, 96:17, 99:1, 266:18
**conversations** [5] - 192:10, 194:2, 194:15, 317:19
**converting** [1] - 301:21
**conviction** [1] - 146:11
**convincing** [7] - 123:20, 141:15, 146:8, 146:9, 146:12, 196:5, 203:13
**cool** [4] - 157:1, 181:17, 371:10, 381:18
**cooperation** [2] - 261:1, 320:4
**coordinate** [8] - 244:12, 301:5, 301:9, 301:11, 301:15, 301:21, 301:22, 302:2
**coordinates** [1] - 301:4
**copied** [1] - 81:16
**copies** [1] - 130:13
**copy** [10] - 79:11, 129:24, 130:1, 130:15, 131:10, 233:2, 242:12, 313:14, 330:18, 350:11
**copying** [15] - 81:20, 81:22, 82:7, 82:12, 82:18, 82:20, 83:4, 83:11, 84:5, 92:7, 94:5, 97:17, 100:23, 102:2, 102:13
**copyright** [1] - 159:5
**core** [5] - 165:7, 165:8, 171:6, 172:6, 172:8
**corner** [6] - 121:6, 131:18, 132:14, 152:18, 205:21, 221:8
**corporate** [5] - 156:22, 156:24, 364:10, 365:13, 384:6
**correct** [72] - 78:21, 87:5, 95:24, 96:15, 96:24, 97:11, 97:16, 98:6, 106:10, 106:15, 210:10, 215:21, 222:11, 235:14, 250:5, 250:8, 265:6,

279:18, 281:24, 283:19, 288:17, 289:7, 291:21, 292:12, 294:20, 298:22, 299:14, 300:14, 301:9, 304:10, 304:21, 305:15, 305:23, 309:22, 310:7, 310:24, 311:3, 311:14, 312:20, 314:18, 315:5, 316:14, 321:2, 321:16, 322:10, 323:19, 326:8, 327:17, 328:1, 328:5, 330:10, 331:5, 331:22, 332:20, 335:13, 337:12, 338:8, 343:8, 343:15, 343:21, 344:9, 345:9, 346:13, 349:18, 351:4, 390:9, 390:10, 396:20, 397:22, 397:23, 401:4, 406:2
**correction** [1] - 77:14
**corrections** [1] - 77:12
**correctly** [1] - 323:21
**correspondence** [1] - 120:15
**cost** [2] - 363:8, 363:13
**costs** [1] - 264:2
**Counsel** [2] - 75:24, 76:9
**counsel** [18] - 77:3, 90:5, 90:7, 102:8, 102:15, 208:13, 238:21, 249:6, 271:15, 282:21, 321:19, 351:1, 357:24, 358:16, 360:22, 360:23, 361:9, 361:21
**County** [1] - 407:2
**couple** [12] - 86:1, 99:18, 166:1, 169:8, 234:2, 249:20, 261:11, 297:14, 309:7, 331:18, 351:18, 380:17
**course** [32] - 87:8, 122:17, 131:19, 133:3, 137:16, 154:24, 168:19, 170:9, 171:9, 185:22, 186:5, 190:11, 207:15,

216:20, 227:15, 235:19, 237:16, 238:21, 275:15, 282:19, 283:2, 285:17, 285:23, 286:1, 290:19, 294:9, 295:16, 301:13, 347:20, 363:17, 393:17, 396:11
**courses** [1] - 212:1
**COURT** [169] - 75:1, 77:1, 77:6, 77:22, 78:5, 78:10, 78:16, 78:20, 78:22, 79:4, 79:9, 79:14, 79:17, 80:4, 80:13, 80:21, 81:4, 81:7, 81:24, 82:9, 82:15, 82:19, 83:5, 83:9, 84:6, 84:13, 84:17, 84:21, 85:2, 85:17, 85:23, 87:2, 87:13, 87:22, 88:21, 89:4, 89:9, 90:2, 90:11, 91:2, 91:9, 92:10, 92:21, 93:20, 94:1, 94:15, 94:19, 94:24, 95:6, 95:15, 95:20, 96:1, 96:5, 96:21, 97:5, 97:9, 97:13, 97:24, 98:4, 98:7, 100:10, 100:14, 100:22, 101:10, 102:4, 103:7, 103:15, 104:16, 105:18, 105:24, 106:5, 106:21, 107:2, 107:11, 107:23, 108:13, 108:18, 108:21, 109:20, 124:3, 130:20, 149:23, 150:2, 150:6, 150:15, 177:23, 178:3, 203:17, 204:6, 204:22, 205:3, 205:13, 206:6, 206:15, 206:20, 207:4, 207:9, 208:18, 238:17, 240:5, 240:13, 241:8, 241:13, 241:18, 241:21, 242:3, 242:6, 286:18, 286:22, 287:5, 287:8, 333:4, 333:9, 333:14, 333:19, 334:11, 334:17, 334:22,

344:23, 348:18, 349:8, 350:18, 351:9, 357:20, 357:23, 358:4, 358:19, 359:1, 359:8, 359:19, 360:1, 360:20, 361:3, 361:7, 361:16, 361:23, 362:4, 362:17, 383:12, 383:15, 384:2, 394:1, 394:14, 394:20, 395:18, 396:18, 396:23, 397:11, 398:2, 398:5, 398:18, 398:22, 399:12, 400:6, 400:14, 401:6, 401:19, 402:2, 402:15, 403:7, 403:16, 403:24, 404:18, 405:15, 405:21, 406:5, 406:8
**court** [17] - 80:16, 121:20, 121:22, 122:21, 123:3, 129:23, 132:3, 136:20, 141:4, 143:17, 144:16, 149:4, 206:2, 240:11, 315:24, 360:24, 372:8
**Court** [22] - 75:13, 83:8, 107:17, 108:23, 144:22, 144:24, 150:12, 155:10, 178:8, 183:23, 186:18, 195:6, 197:19, 201:3, 208:13, 360:15, 360:18, 394:19, 404:9, 404:11, 404:14, 406:11
**Court's** [4] - 145:5, 149:12, 240:1, 240:8
**courthouse** [6] - 148:9, 181:24, 182:2, 182:5, 249:11, 394:3
**courtroom** [15] - 130:13, 134:24, 148:11, 149:1, 189:3, 192:15, 196:21, 204:4, 207:2, 207:7, 241:11, 249:13, 333:12, 358:10, 394:12

**Courtroom** [1] - 75:9
**covered** [3] - 136:24, 184:3, 184:6
**covers** [2] - 143:8, 247:10
**crazy** [1] - 380:21
**create** [7] - 89:1, 157:17, 158:12, 172:1, 192:21, 277:5, 294:5
**created** [9] - 86:11, 86:12, 88:9, 90:18, 90:22, 95:23, 158:6, 173:8, 294:4
**creating** [1] - 312:1
**creation** [1] - 367:12
**credit** [1] - 175:17
**criminal** [1] - 146:16
**crisp** [1] - 182:4
**criteria** [2] - 386:13, 386:16
**cross** [3] - 81:5, 134:18, 287:3
**cross-examination** [2] - 81:5, 287:3
**crossed** [1] - 157:7
**crossing** [1] - 344:12
**crowds** [1] - 255:2
**crucial** [1] - 383:4
**cull** [8] - 385:13, 386:1, 387:6, 387:19, 387:22, 388:5, 388:8, 388:14
**CULL** [1] - 385:13
**Culling** [1] - 385:21
**culling** [2] - 387:4, 392:10
**current** [4] - 212:14, 216:20, 389:24, 390:4
**custody** [3] - 360:23, 360:24, 361:9
**customer** [4] - 307:4, 309:4, 364:10, 372:6
**customers** [9] - 159:11, 160:14, 161:17, 166:19, 257:4, 308:2, 308:20, 364:15
**cut** [5] - 220:24, 223:8, 223:10, 223:19, 224:12
**cuts** [2] - 223:21, 224:6
**cutting** [2] - 234:18, 269:12
**D.C** [2] - 113:20, 184:14
**Dale** [3] - 407:7, 407:19, 407:20

**damages** [7] - 89:24, 142:20, 142:21, 142:22, 142:23, 146:1, 402:16
**Darin** [1] - 179:5
**DARIN** [1] - 76:7
**DAT** [1] - 373:6
**data** [90] - 105:23, 118:9, 169:21, 187:23, 188:3, 188:4, 188:5, 190:5, 190:6, 217:8, 217:11, 217:24, 218:3, 218:12, 220:7, 222:1, 222:2, 222:5, 229:7, 231:22, 232:5, 232:7, 232:11, 232:20, 232:21, 232:23, 232:24, 233:2, 233:21, 233:24, 277:8, 277:9, 277:11, 277:12, 277:14, 278:24, 290:20, 290:22, 295:21, 295:22, 296:20, 299:4, 300:7, 300:11, 300:14, 300:17, 301:3, 301:4, 302:21, 309:3, 337:21, 337:23, 380:8, 385:9, 385:11, 385:20, 386:9, 386:10, 386:11, 386:19, 386:20, 386:22, 386:24, 387:12, 387:14, 387:15, 388:10, 388:14, 388:18, 389:5, 389:7, 389:11, 389:23, 390:3, 390:5, 390:24, 391:1, 391:3, 391:5, 391:16, 392:8, 392:13, 392:16, 393:16
**database** [11] - 296:8, 296:9, 296:10, 296:12, 296:14, 296:16, 296:18, 338:16, 338:21, 339:5, 373:5
**databases** [2] - 296:22, 297:4
**dataset** [1] - 392:24
**date** [42] - 87:23, 103:23, 104:6,

104:16, 104:18, 111:8, 115:13, 115:15, 117:19, 119:21, 121:6, 121:9, 132:21, 132:24, 133:2, 133:5, 141:21, 141:22, 141:24, 142:2, 142:5, 142:13, 142:16, 195:12, 200:7, 200:8, 237:3, 247:7, 247:9, 338:4, 338:8, 346:23, 349:11, 373:23, 396:23, 400:24, 401:5, 401:7, 401:15, 402:7, 402:17, 402:19
**dated** [1] - 372:1
**dates** [2] - 117:20, 182:24
**dating** [1] - 183:2
**days** [9] - 99:18, 125:7, 162:3, 198:13, 336:10, 373:8, 375:22, 397:6
**Daytona** [1] - 363:10
**deal** [16] - 82:21, 149:9, 160:14, 161:8, 162:8, 165:18, 166:9, 173:6, 220:2, 241:22, 274:7, 274:20, 274:21, 312:11, 312:23, 324:1
**dealing** [1] - 139:22
**dealings** [1] - 327:3
**deals** [1] - 277:14
**debuted** [1] - 151:19
**decade** [1] - 188:18
**decades** [2] - 189:9, 191:8
**December** [32] - 132:23, 133:1, 133:2, 141:21, 198:3, 200:21, 228:5, 293:4, 294:17, 295:19, 295:24, 296:4, 297:1, 299:10, 299:12, 300:20, 301:18, 302:5, 303:3, 304:13, 343:2, 343:11, 344:8, 344:16, 345:1, 345:18, 346:18, 346:24, 347:7, 347:21,

349:16, 350:10
**decide** [19] - 91:4, 99:12, 109:2, 109:8, 114:22, 118:11, 121:21, 121:23, 123:5, 129:16, 135:17, 140:7, 145:7, 155:23, 192:3, 283:7, 385:21, 386:12, 399:4
**decided** [9] - 98:24, 193:11, 199:8, 217:4, 260:13, 284:12, 315:21, 319:21, 320:2
**decides** [1] - 118:3
**deciding** [2] - 123:4, 146:16
**decision** [10] - 109:7, 118:6, 118:22, 119:14, 125:2, 129:19, 195:22, 272:10, 274:22, 275:1
**decisions** [3] - 119:5, 127:18, 272:12
**declaration** [1] - 342:3
**declared** [1] - 161:10
**decodes** [1] - 390:23
**dedicated** [1] - 198:5
**deed** [3] - 112:8, 112:12, 117:9
**deep** [1] - 348:19
**deeper** [2] - 284:10, 320:2
**defend** [3] - 141:9, 319:4, 340:24
**Defendant** [2] - 75:7, 139:15
**defendant** [2] - 124:17, 125:20
**defendants** [2] - 333:17, 405:18
**Defendants** [2] - 76:9, 242:2
**defense** [3] - 122:6, 146:11, 318:22
**defenses** [1] - 125:24
**deferred** [1] - 400:23
**deficient** [1] - 119:13
**define** [2] - 143:2, 143:3
**defined** [3] - 297:24, 301:2, 302:19
**defines** [1] - 112:14
**defining** [1] - 112:13
**definitely** [5] - 238:1, 277:15, 300:5,

**definition** [2] - 186:7, 386:2
**definitions** [1] - 144:8
**degree** [2] - 188:15, 212:6
**degrees** [1] - 202:13
**DELAWARE** [1] - 75:1
**Delaware** [7] - 75:11, 108:24, 184:16, 185:11, 185:13, 219:18, 407:1
**deliberate** [1] - 125:3
**deliberating** [4] - 172:22, 177:12, 177:15, 396:22
**deliberation** [1] - 125:4
**deliberations** [5] - 125:14, 129:23, 130:2, 145:3, 147:11
**deliver** [2] - 161:16, 176:20
**delivered** [2] - 246:19, 247:6
**demo** [10] - 313:5, 365:20, 365:21, 367:10, 367:16, 367:17, 367:22, 367:24, 368:2
**demonstrate** [4] - 153:22, 156:10, 374:14, 376:16
**demonstrated** [7] - 197:9, 197:14, 197:21, 199:21, 233:7, 339:2, 349:17
**demonstrating** [7] - 153:10, 312:14, 312:16, 346:21, 347:2, 374:8, 374:18
**demonstration** [23] - 81:17, 82:3, 82:6, 83:2, 84:3, 90:19, 90:21, 97:21, 102:24, 103:1, 103:3, 103:6, 153:24, 156:19, 199:23, 248:8, 249:2, 254:13, 349:10, 364:21, 364:24, 365:12, 366:11
**demonstrations** [7] - 239:18, 247:16, 247:20, 248:5, 248:11, 328:23, 365:4
**demonstratives** [1] - 108:6
**demonstrator** [26] -

228:21, 228:24, 232:10, 232:13, 233:5, 234:3, 234:4, 234:5, 234:9, 234:13, 234:21, 234:23, 238:4, 247:17, 248:6, 248:22, 248:23, 251:13, 313:2, 347:11, 347:12, 347:14, 347:15, 348:11, 349:18, 354:23
**denied** [2] - 91:20, 344:23
**deny** [1] - 92:1
**deployed** [1] - 253:10
**depo** [1] - 362:10
**deponent** [1] - 208:7
**deposed** [3] - 100:11, 100:12, 100:21
**deposition** [21] - 80:19, 83:15, 83:16, 94:7, 94:10, 126:18, 210:9, 362:12, 362:13, 362:16, 362:18, 383:10, 383:20, 383:23, 384:1, 393:18, 393:21, 395:8, 395:9, 397:3, 397:5
**depositions** [3] - 126:13, 126:16, 177:3
**deputy** [3] - 130:13, 134:24, 358:10
**describe** [23] - 77:16, 83:19, 112:16, 116:1, 144:12, 184:20, 187:9, 197:14, 223:7, 223:10, 223:14, 223:16, 240:3, 240:10, 244:7, 245:8, 256:21, 264:14, 295:6, 295:10, 379:20, 387:7, 387:9
**described** [23] - 91:16, 105:10, 114:9, 136:15, 143:22, 144:5, 162:23, 228:11, 234:10, 234:18, 235:20, 237:12, 238:20, 251:14, 253:6, 266:11, 293:11, 308:3, 308:21, 319:14, 328:16, 349:20, 350:2

describes [4] - 115:10, 116:19, 200:4, 200:5
describing [6] - 79:22, 95:10, 197:4, 244:6, 245:2, 348:2
description [8] - 116:15, 116:23, 117:8, 118:12, 118:15, 133:16, 138:3, 332:24
deserve [2] - 155:23, 156:5
design [2] - 181:14, 211:18
designation [2] - 94:7, 102:11
designations [9] - 83:15, 83:16, 83:21, 84:1, 84:11, 362:11, 395:9, 397:3, 397:5
designed [7] - 120:3, 188:24, 189:7, 190:18, 196:15, 267:24, 377:19
designers [2] - 213:23, 267:22
designing [1] - 214:2
desire [1] - 340:9
desktop [1] - 182:8
despite [1] - 399:2
detail [13] - 83:19, 137:8, 185:19, 186:3, 200:4, 220:4, 221:11, 243:16, 245:15, 256:23, 387:10, 393:9, 393:12
detailed [10] - 105:9, 109:6, 115:16, 116:22, 140:23, 167:22, 190:12, 190:19, 194:19, 396:14
details [11] - 86:16, 106:11, 164:15, 185:17, 221:10, 229:9, 245:18, 272:3, 343:18, 352:24, 355:3
determination [1] - 143:23
determine [12] - 117:21, 139:2, 139:10, 141:14, 143:13, 167:21, 175:9, 315:9, 386:15, 386:21, 389:23, 390:3
determined [3] -

141:23, 174:23, 176:3
determining [6] - 118:1, 141:17, 301:3, 328:19, 385:9, 387:11
Deutsch [4] - 246:3, 246:4, 246:18, 340:20
Deutsche [4] - 254:17, 405:22, 405:23, 406:4
develop [8] - 160:18, 211:17, 217:8, 237:19, 251:11, 306:9, 306:12, 356:19
developed [6] - 160:21, 196:9, 252:12, 260:4, 303:23, 308:23
developer [1] - 211:5
developers [1] - 256:1
developing [11] - 89:2, 152:2, 157:23, 191:15, 212:20, 227:6, 235:20, 251:24, 256:18, 306:19, 307:20
development [17] - 87:9, 87:17, 88:10, 88:16, 89:8, 90:1, 93:7, 164:11, 209:2, 211:12, 212:11, 214:24, 215:2, 251:5, 251:7, 256:4, 258:16
device [7] - 116:24, 205:20, 239:7, 239:24, 240:12, 252:14, 305:11
devices [3] - 126:22, 182:11, 305:12
diagram [1] - 368:12
diameter [1] - 365:6
difference [2] - 359:16, 402:14
differences [2] - 140:19, 253:1
different [53] - 99:24, 105:12, 134:8, 135:12, 162:13, 163:18, 164:21, 165:4, 165:9, 165:11, 169:17, 172:2, 178:18, 178:23, 179:20, 180:7, 180:21, 181:1, 181:4, 181:5, 182:10, 182:12,

183:22, 184:5, 184:21, 184:24, 186:3, 188:24, 189:18, 190:16, 192:1, 192:4, 192:5, 192:6, 192:7, 194:18, 195:1, 197:10, 211:8, 252:1, 253:2, 290:2, 296:19, 305:22, 310:18, 316:13, 320:19, 357:1, 389:4, 392:24, 401:9, 401:11, 401:24
differing [1] - 393:23
difficult [7] - 130:5, 233:19, 234:1, 264:9, 277:14, 372:2, 373:22
difficulty [3] - 209:18, 209:24, 349:6
digest [1] - 124:4
digital [1] - 373:6
dinner [1] - 267:11
direct [3] - 246:8, 303:9, 304:6
DIRECT [1] - 209:11
directed [1] - 88:13
direction [2] - 227:5, 240:18
directions [2] - 181:7, 219:19
directly [7] - 102:23, 103:2, 155:10, 210:14, 252:16, 322:17, 387:24
director [1] - 368:24
Director [1] - 110:2
dirt [1] - 182:21
dis [1] - 228:7
disagree [3] - 144:13, 149:3, 349:1
disagreeing [1] - 120:1
disagreement [3] - 120:7, 144:18, 144:21
disagreements [2] - 144:23, 145:1
disagrees [1] - 120:6
disappointed [2] - 280:17, 352:23
discard [1] - 386:24
disclose [15] - 285:15, 342:12, 343:3, 345:2, 345:4, 345:17, 347:6, 347:17, 347:20, 347:23, 348:22,

349:2, 396:3, 396:5, 396:7
disclosed [7] - 119:22, 142:7, 290:1, 299:8, 345:19, 397:5, 397:9
disclosure [7] - 112:2, 119:4, 346:20, 395:23, 396:9, 396:14, 396:24
disclosures [5] - 394:24, 395:5, 395:6, 397:2, 397:21
discover [3] - 225:13, 230:14, 280:11
discovered [6] - 166:10, 198:24, 221:16, 228:7, 228:8, 375:17
discoveries [1] - 110:24
discovery [5] - 100:21, 401:22, 402:1, 402:13, 402:18
discuss [19] - 85:24, 99:16, 110:14, 147:1, 147:2, 147:7, 147:9, 148:2, 148:7, 148:14, 148:16, 169:18, 194:10, 204:1, 215:24, 262:14, 265:14, 333:15, 394:5
discussed [14] - 97:17, 117:13, 119:10, 131:11, 144:9, 243:5, 265:18, 266:1, 283:9, 354:2, 355:9, 356:7, 356:9, 370:24
discussing [7] - 94:22, 243:3, 268:21, 281:13, 320:5, 388:9
discussion [13] - 100:2, 170:24, 251:5, 282:15, 285:17, 297:5, 355:15, 358:18, 359:24, 370:19, 370:22, 371:4, 400:11
discussions [25] - 99:10, 100:9, 179:24, 193:12, 209:4, 209:6, 264:17, 265:5, 268:14, 268:18, 275:9,

275:16, 281:1, 282:4, 282:10, 282:19, 282:23, 283:5, 285:4, 285:10, 286:2, 320:9, 333:2, 360:5
display [6] - 184:10, 220:19, 243:9, 254:21, 363:15, 387:12
displayed [2] - 218:13, 249:14
displaying [1] - 289:14, 369:4, 393:15
dispute [9] - 104:2, 104:13, 109:10, 121:19, 149:4, 177:19, 401:4, 403:7, 404:1
disputes [2] - 110:16, 123:10
distinguishes [1] - 89:12
distracted [1] - 131:7
distribute [1] - 130:13
distributed [16] - 200:15, 296:14, 296:16, 296:18, 296:21, 296:22, 297:4, 331:9, 331:11, 331:13, 331:19, 337:21, 337:23, 339:5
district [1] - 80:16
DISTRICT [2] - 75:1, 75:1
District [4] - 75:13, 108:23, 108:24, 110:1
divide [3] - 184:21, 190:1, 190:3
divided [2] - 185:5, 185:7
dividing [1] - 298:1
Division [1] - 371:22
division [3] - 107:16, 107:19, 363:10
divisions [2] - 181:1, 181:2
divorced [1] - 404:5
doctor [2] - 164:7, 165:11
Doctor [3] - 164:10, 164:18, 172:23
Doctrine [3] - 140:13, 140:17, 140:22
document [20] - 90:8, 90:10, 99:11, 101:9, 128:17, 167:19,

169:9, 171:3, 171:5,
172:2, 246:13,
246:14, 246:15,
251:22, 273:13,
313:19, 314:2,
371:7, 378:18,
380:11
**documentation** [1] -
373:3
**documents** [39] -
126:21, 162:18,
162:20, 163:6,
163:14, 166:22,
167:1, 167:2, 167:4,
167:7, 167:23,
168:2, 169:24,
170:17, 170:22,
171:10, 172:20,
172:24, 173:9,
173:11, 173:13,
176:16, 176:17,
177:13, 196:1,
199:12, 246:22,
275:12, 275:14,
275:23, 276:3,
286:3, 286:5, 286:6,
286:7, 286:10,
346:5, 346:13
**dollar** [1] - 363:12
**dollars** [6] - 322:22,
323:10, 323:18,
324:4, 324:11,
329:24
**domain** [7] - 112:14,
287:21, 288:1,
288:2, 288:5,
288:11, 288:23
**done** [39] - 78:8, 78:9,
88:3, 89:12, 106:19,
106:20, 106:22,
134:11, 134:13,
136:20, 157:2,
157:5, 180:21,
184:4, 184:22,
190:7, 214:7,
226:18, 238:2,
253:13, 257:23,
265:23, 274:20,
299:21, 303:9,
313:22, 319:13,
334:11, 334:13,
365:5, 370:5,
380:20, 381:12,
386:5, 386:8,
388:10, 388:14,
390:12, 393:3
**door** [1] - 92:6
**dot** [1] - 219:20
**doubt** [2] - 146:15,
307:9

**down** [25] - 113:11,
135:5, 151:16,
168:17, 171:11,
175:6, 178:3, 182:3,
205:23, 214:10,
224:19, 227:2,
229:8, 231:9, 232:3,
240:9, 240:23,
240:24, 242:7,
244:11, 263:24,
291:14, 326:5,
330:21, 336:20
**download** [1] - 308:8
**downloadable** [1] -
370:20
**downloaded** [2] -
173:15, 173:16
**downtown** [2] -
219:17, 219:24
**Dr** [8] - 79:22, 80:2,
80:6, 80:17, 189:3,
189:12, 190:24,
403:3
**drafted** [1] - 114:4
**dragging** [1] - 226:15
**draw** [6] - 127:22,
129:12, 230:7,
266:17, 391:1
**drawings** [3] - 116:21,
133:12, 133:15
**drawn** [1] - 185:4
**dream** [1] - 151:20
**drew** [2] - 182:21,
182:23
**drive** [2] - 153:3, 154:8
**drives** [3] - 154:4,
154:18, 233:9
**driving** [3] - 353:4,
353:5, 353:8
**drums** [1] - 378:3
**DTX** [2] - 361:12,
361:13
**DTX-1004** [2] - 325:18,
355:6
**DTX-1071** [2] - 273:7,
360:12
**DTX-1196** [2] - 336:3,
353:19
**due** [1] - 85:5
**duly** [2] - 205:11,
208:8
**duration** [1] - 247:4
**during** [53] - 87:8,
88:15, 93:7, 112:1,
119:7, 128:2,
128:24, 129:14,
129:15, 129:22,
130:2, 130:22,
134:5, 143:5,
144:11, 147:13,

148:10, 148:12,
156:7, 176:22,
177:10, 188:10,
193:12, 194:9,
203:24, 204:20,
205:19, 208:15,
209:9, 215:24,
227:15, 235:19,
248:4, 253:9, 256:2,
256:17, 257:7,
264:16, 265:14,
275:15, 279:4,
282:19, 285:14,
285:17, 285:23,
286:1, 287:3, 289:4,
303:8, 304:6, 320:8,
328:7, 331:13
**duties** [1] - 140:6
**duty** [10] - 118:23,
119:1, 123:9, 129:9,
342:7, 342:12,
343:3, 343:7, 345:2,
346:20
**DVD** [1] - 233:10
**DYK** [1] - 75:13
**dynamic** [1] - 169:19
**e-mail** [49] - 165:17,
258:8, 258:18,
258:22, 259:6,
259:18, 260:23,
261:21, 270:4,
271:9, 271:12,
271:18, 271:19,
271:22, 272:4,
273:7, 273:14,
275:6, 311:23,
318:10, 318:20,
321:11, 322:10,
323:21, 325:7,
325:14, 325:16,
325:18, 336:1,
336:3, 336:6, 337:2,
337:12, 337:18,
340:17, 341:7,
341:10, 354:5,
354:6, 354:9,
354:13, 355:6,
371:17, 372:1,
374:4, 375:2
**E-mail** [35] - 95:18,
96:3, 96:22, 97:19,
99:13, 103:2,
191:17, 198:10,
256:20, 264:21,
265:11, 269:6,
269:9, 269:17,
269:19, 279:16,
280:1, 280:2,
281:11, 281:12,
281:20, 281:21,

282:13, 282:24,
283:2, 285:5,
313:12, 314:13,
314:15, 315:19,
316:14, 317:1,
317:11, 345:14
**e-mails** [5] - 94:8,
94:14, 94:18, 148:6,
271:23
**E-mails** [4] - 269:24,
281:17, 281:19,
345:11
**eager** [1] - 318:20
**earliest** [4] - 182:22,
183:7, 237:5, 281:18
**early** [11] - 88:2, 88:5,
92:23, 98:10, 157:4,
183:1, 214:6,
247:12, 247:13,
280:1, 311:9
**earned** [1] - 202:2
**Earth** [173] - 92:9,
93:4, 98:21, 99:15,
103:1, 103:9, 152:5,
152:7, 152:22,
153:1, 153:2,
153:10, 153:12,
153:16, 156:14,
156:18, 157:7,
157:12, 157:14,
158:10, 158:20,
160:11, 160:13,
160:15, 160:18,
160:22, 160:23,
160:24, 161:3,
161:5, 161:9,
161:11, 161:14,
161:18, 161:22,
161:24, 163:20,
163:22, 163:23,
165:7, 165:15,
165:22, 165:24,
166:12, 166:17,
166:18, 167:12,
167:20, 168:14,
169:1, 169:2, 169:4,
169:7, 170:16,
170:20, 171:1,
171:9, 173:15,
173:16, 173:18,
173:22, 174:2,
174:5, 174:9,
174:11, 174:13,
174:14, 174:17,
174:20, 174:21,
175:1, 175:15,
175:18, 175:24,
176:13, 176:20,
178:21, 179:18,
179:20, 180:7,

180:15, 181:9,
181:14, 181:16,
182:7, 182:9,
182:15, 183:22,
184:7, 186:24,
187:8, 187:12,
187:15, 188:11,
189:13, 189:17,
190:21, 190:24,
191:10, 191:11,
191:12, 191:16,
192:22, 193:8,
193:9, 201:23,
202:1, 202:8,
203:11, 239:4,
239:6, 239:17,
239:23, 240:2,
240:12, 240:15,
252:14, 263:19,
266:16, 283:24,
304:24, 305:1,
305:3, 305:14,
311:12, 311:13,
312:3, 312:20,
316:10, 316:13,
316:18, 316:21,
316:24, 320:22,
327:6, 327:23,
355:12, 368:2,
370:16, 370:20,
376:17, 377:2,
377:21, 381:2,
381:3, 381:6,
381:22, 384:5,
384:6, 384:22,
385:24, 386:5,
386:14, 387:3,
387:20, 388:5,
388:9, 388:19,
389:17, 390:7,
390:12, 391:20,
392:10, 393:2,
401:10, 402:5, 402:8
**earth** [24] - 93:13,
93:15, 153:2,
161:18, 183:3,
183:5, 222:2, 222:3,
222:11, 222:15,
223:19, 226:23,
231:1, 240:19,
240:24, 257:20,
267:22, 277:5,
353:11, 377:8,
377:12, 377:16,
379:7, 380:5
**Earth's** [4] - 163:21,
164:3, 165:1, 165:5
**earthquake** [2] -
229:10, 243:20
**easier** [4] - 260:18,
272:1, 291:17,

314:11

**east** [3] - 224:8, 224:9, 224:10

**easy** [2] - 229:20, 353:23

**economics** [1] - 202:13

**economy** [1] - 213:8

**Ed** [1] - 364:18

**Edison's** [1] - 111:21

**education** [1] - 210:17

**effect** [2] - 169:23, 170:1

**effective** [3] - 93:5, 111:12, 119:21

**efficient** [1] - 399:21

**effort** [2] - 149:9, 320:15

**efforts** [1] - 169:4

**eight** [5] - 77:19, 79:19, 278:13, 358:11, 403:13

**either** [9] - 96:3, 100:13, 119:2, 119:24, 140:21, 291:7, 307:22, 310:7, 328:16

**elected** [2] - 213:2, 213:3

**Electric's** [1] - 363:9

**electrical** [2] - 111:22, 164:19

**electronic** [7] - 114:13, 120:19, 292:1, 292:2, 292:4, 292:8, 292:11

**electronics** [1] - 211:1

**element** [3] - 191:2, 399:6

**elements** [5] - 186:23, 187:1, 399:20, 399:22, 399:24

**elephant** [1] - 371:21

**elevator** [1] - 147:19

**elsewhere** [1] - 132:18

**embodiment** [2] - 91:13, 116:24

**embodiments** [1] - 116:23

**emeritus** [1] - 189:11

**emphasize** [1] - 149:7

**employe** [1] - 94:17

**employed** [3] - 258:18, 258:20, 362:23

**employee** [6] - 94:11, 96:10, 96:16, 98:5, 258:11, 258:13

**employees** [7] - 96:14, 157:9, 157:10,

177:7, 257:7, 257:9, 307:7

**employer** [2] - 81:18, 212:14

**employment** [1] - 94:22

**employs** [1] - 137:17

**enable** [2] - 218:20, 223:10

**enables** [1] - 118:15

**end** [33] - 87:11, 93:6, 108:10, 109:1, 109:8, 117:5, 124:2, 127:19, 129:18, 130:24, 131:3, 132:5, 142:17, 145:12, 147:11, 160:9, 175:8, 183:24, 186:19, 195:7, 203:3, 215:7, 225:20, 231:7, 232:13, 236:15, 247:11, 258:7, 297:23, 359:12, 363:9, 393:18

**End** [1] - 239:1

**ended** [3] - 157:20, 314:22, 359:24

**endless** [2] - 300:11, 300:13

**ends** [3] - 93:10, 101:17, 400:10

**enforce** [3] - 92:14, 121:13, 136:19

**engage** [2] - 136:23, 166:8

**engine** [2] - 157:23, 157:24

**engineer** [4] - 260:16, 260:18, 375:15

**engineering** [5] - 164:19, 188:15, 379:22, 384:4, 384:19

**engineers** [3] - 181:13, 188:21, 364:19

**English** [9] - 155:4, 155:6, 155:12, 209:19, 210:6, 246:10, 246:12, 251:18, 259:5

**enhance** [1] - 111:17

**enhancing** [2] - 287:24, 288:1

**enter** [1] - 238:3

**entering** [1] - 207:7

**Enterprise** [1] - 316:18

**enters** [2] - 108:20,

242:5, 334:21

**entertain** [2] - 404:11, 404:14

**enthusiastic** [1] - 153:20

**entire** [4] - 180:18, 210:2, 310:9, 368:12

**entirely** [2] - 110:6, 128:23

**entities** [1] - 406:3

**entitled** [7] - 109:14, 122:2, 141:5, 195:14, 262:7, 262:20, 331:24

**entity** [2] - 334:4, 334:5

**entry** [2] - 250:17, 381:7

**environment** [1] - 212:23

**environments** [1] - 255:14

**EPO** [1] - 359:14

**equal** [1] - 353:12

**equipment** [4] - 152:17, 153:4, 153:8, 154:17

**equivalent** [1] - 210:20

**Equivalents** [3] - 140:13, 140:18, 140:22

**equivalents** [1] - 140:24

**errors** [2] - 243:16, 352:5

**especially** [3] - 173:3, 238:3, 245:17

**ESQ** [10] - 75:18, 75:19, 75:21, 75:22, 75:22, 75:23, 76:4, 76:7, 76:7, 76:8

**essential** [3] - 176:12, 176:13, 403:1

**essentially** [4] - 95:21, 104:14, 104:20, 106:16

**establish** [5] - 86:24, 94:13, 103:3, 139:4, 194:24

**established** [1] - 145:23

**establishes** [1] - 103:5

**establishing** [1] - 146:1

**et** [1] - 132:17

**euro** [1] - 325:6

**Europe** [1] - 359:13

euros [1] - 327:15

**evaluate** [2] - 114:21, 274:4

**evaluated** [1] - 114:7

**evening** [7] - 211:3, 211:7, 211:13, 394:3, 394:24, 395:3, 400:19

**evenly** [1] - 145:21

**event** [2] - 208:1, 209:16

**events** [3] - 77:15, 100:6, 193:2

**eventually** [2] - 203:22, 312:19

**Everest** [1] - 151:21

**everywhere** [1] - 151:20

**evidence** [88] - 86:24, 103:21, 104:4, 104:9, 109:3, 109:5, 123:15, 123:20, 124:12, 124:16, 124:20, 124:21, 124:22, 126:4, 126:6, 126:7, 126:9, 126:22, 127:3, 127:5, 127:7, 127:9, 127:13, 127:16, 127:21, 128:4, 128:9, 128:13, 128:18, 128:21, 129:12, 129:17, 129:20, 139:13, 141:1, 141:13, 141:16, 145:6, 145:18, 145:21, 146:3, 146:9, 146:10, 146:12, 146:14, 146:19, 152:9, 160:20, 177:21, 179:9, 179:14, 179:17, 179:19, 180:1, 180:9, 183:21, 187:6, 187:19, 190:15, 192:5, 193:6, 194:3, 194:23, 195:8, 195:24, 196:3, 196:4, 196:6, 196:8, 199:19, 202:22, 202:24, 203:5, 203:9, 203:10, 203:13, 203:22, 357:22, 358:5, 360:22, 361:8, 361:11, 361:17, 383:16, 395:15, 402:3

**exact** [6] - 138:6, 175:3, 175:6, 232:24, 339:21, 392:7

**exactly** [13] - 112:22, 170:18, 171:16, 184:4, 191:23, 200:4, 232:12, 317:2, 317:3, 383:21, 397:10, 398:24

**EXAMINATION** [2] - 209:11, 350:21

**examination** [8] - 81:5, 134:18, 209:20, 209:21, 287:3, 289:4, 342:13, 343:4

**examine** [1] - 113:23

**examined** [2] - 205:12, 208:9

**examiner** [25] - 114:19, 115:20, 118:6, 118:9, 118:20, 119:2, 119:5, 119:7, 119:8, 119:12, 119:14, 119:17, 119:18, 120:1, 120:2, 120:9, 120:15, 122:11, 122:14, 155:21, 195:21, 273:4, 281:8, 344:19, 352:8

**examiner's** [3] - 118:22, 120:4, 120:6

**examiners** [4] - 121:17, 122:19, 137:17, 137:19

**examining** [2] - 118:5, 118:18

**example** [24] - 81:22, 89:3, 92:17, 105:19, 111:20, 119:18, 148:13, 159:9, 173:14, 186:4, 212:22, 218:24, 219:4, 219:9, 224:7, 224:13, 230:24, 239:20, 239:21, 243:17, 268:3, 309:1, 313:21, 314:8

**examples** [1] - 263:15

**exceeded** [1] - 226:9

**Excel** [1] - 173:20

**exception** [1] - 96:8

**exceptional** [1] - 147:23

**exchange** [9] - 120:8, 225:20, 254:19, 254:20, 281:11,

321:5, 338:15,
345:14, 354:9
**exchanged** [1] -
258:17
**exchanges** [4] -
269:6, 269:9,
282:24, 283:2
**excited** [3] - 181:15,
280:14, 368:19
**excitement** [2] -
226:16, 353:9
**exclude** [3] - 100:22,
103:8, 143:4
**excluded** [1] - 107:17
**excluding** [1] - 128:13
**exclusive** [3] - 110:23,
319:6, 323:15
**excused** [2] - 361:18,
361:24
**executive** [1] - 98:2
**executives** [1] -
364:12
**exhibit** [22] - 86:20,
86:23, 90:15, 94:4,
94:5, 102:6, 127:18,
131:23, 236:14,
273:7, 326:3, 338:3,
360:14, 360:16,
360:19, 360:21,
360:23, 361:9,
378:18, 380:11,
395:10, 395:11
**Exhibit** [10] - 86:5,
102:21, 240:7,
297:7, 316:2, 318:8,
321:9, 345:21,
371:6, 372:9
**exhibition** [1] - 309:8
**exhibitions** [1] -
239:18
**exhibitors** [1] - 253:21
**exhibits** [22] - 84:11,
86:3, 94:8, 100:5,
102:21, 126:8,
126:20, 129:21,
208:14, 287:2,
357:22, 358:5,
360:9, 361:7,
361:10, 361:16,
383:9, 383:15,
393:20, 395:22,
397:4, 397:8
**exist** [3] - 138:11,
306:1, 306:3
**existed** [19] - 96:12,
99:24, 183:14,
289:12, 291:1,
291:2, 291:20,
293:1, 294:16,
294:18, 294:24,

296:3, 296:24,
300:19, 301:17,
302:4, 303:2,
349:10, 352:10
**existence** [1] - 369:1
**existing** [1] - 137:1
**exists** [2] - 215:18,
232:7
**exit** [2] - 326:14,
326:15
**expect** [2] - 208:24,
229:2
**expectations** [1] -
226:9
**expected** [4] - 125:7,
225:22, 303:16,
356:18
**expensive** [3] -
255:13, 277:12,
277:13
**experience** [19] -
80:11, 128:1, 148:5,
152:4, 154:9,
157:16, 158:13,
160:16, 161:19,
161:23, 164:8,
168:9, 188:20,
189:10, 202:14,
216:24, 248:16,
251:16, 263:4
**experiences** [1] - 80:8
**experiment** [1] -
217:16
**experimentation** [1] -
138:8
**experiments** [2] -
157:4, 303:10
**expert** [14] - 79:22,
79:23, 80:7, 80:14,
80:18, 164:8,
164:16, 173:1,
189:2, 189:9,
201:20, 202:12,
308:17, 403:3
**expertise** [1] - 210:22
**experts** [4] - 145:4,
184:20, 207:3, 284:9
**expired** [2] - 197:23,
200:19
**expires** [1] - 112:3
**explain** [28] - 100:7,
102:16, 110:12,
113:11, 120:7,
123:21, 131:21,
152:24, 182:21,
187:7, 187:18,
188:19, 189:13,
197:4, 201:20,
202:15, 205:15,
215:15, 218:6,

220:6, 221:5, 224:4,
229:17, 231:23,
233:3, 279:23,
342:11, 386:7
**explained** [1] - 314:3
**explanation** [2] -
124:6, 132:4
**explicitly** [2] - 404:24,
405:1
**Exploit** [1] - 309:8
**Exploitation** [2] -
262:8, 262:20
**explore** [2] - 267:18,
295:12
**explored** [1] - 234:6
**exploring** [1] - 268:2
**express** [1] - 268:6
**expressed** [1] - 266:6
**extension** [1] - 171:6
**extent** [7] - 101:1,
103:24, 327:15,
356:4, 386:2,
387:21, 402:24
**extrinsic** [1] - 104:9
**face** [4] - 197:24,
328:11, 348:5,
348:12
**facebook** [1] - 148:2
**faces** [1] - 255:3
**facilities** [1] - 257:5
**facility** [1] - 384:15
**facing** [1] - 229:15
**fact** [33] - 80:7, 91:14,
126:23, 126:24,
128:10, 129:16,
139:7, 139:8,
148:18, 158:21,
160:14, 161:8,
165:4, 180:5,
183:11, 191:19,
193:13, 193:22,
195:4, 198:14,
216:17, 233:17,
261:5, 284:5,
289:24, 297:11,
328:7, 336:11,
354:21, 381:6,
399:5, 399:9, 399:15
**Factor** [2] - 89:13,
92:20
**factor** [1] - 91:22
**factors** [1] - 89:14
**facts** [10] - 109:2,
109:8, 122:13,
123:5, 123:12,
123:16, 127:22,
128:6, 144:20, 394:7
**factual** [1] - 123:10
**fail** [1] - 102:12
failed [1] - 101:18

191:20, 276:22
**Fair** [1] - 376:5
**fair** [8] - 149:5,
200:23, 271:20,
284:20, 284:21,
284:23, 284:24,
328:14
**fairly** [4] - 102:14,
149:11, 221:7, 221:9
**faith** [1] - 396:9
**false** [1] - 114:21
**familiar** [13] - 237:1,
294:7, 296:7,
296:13, 296:15,
301:8, 302:9, 342:6,
375:8, 380:14,
384:21, 385:1,
385:12
**family** [3] - 147:3,
148:13, 148:15
**famous** [3] - 111:20,
192:24, 193:10
**fantastic** [3] - 365:6,
376:4, 376:9
**far** [11] - 88:12,
104:22, 150:8,
217:5, 227:11,
253:9, 310:20,
319:8, 351:21,
366:5, 366:13
**farm** [1] - 159:4
**FARNAN** [3] - 75:18,
75:18, 75:19
**fast** [8] - 155:20,
218:10, 218:16,
218:17, 256:12,
260:5, 260:6, 368:13
**faster** [9] - 188:24,
190:18, 216:22,
217:1, 225:10,
225:21, 225:22,
303:15, 303:16
**favor** [1] - 128:7
**favorite** [1] - 365:4
**FBI** [1] - 164:14
**feasible** [1] - 233:6
**feature** [4] - 85:20,
382:16, 382:18,
383:4
**February** [2] - 132:22,
318:12
**Federal** [3] - 109:13,
110:3, 137:16
**federal** [3] - 113:23,
136:20, 141:4
**fee** [6] - 112:10, 121:5,
160:15, 166:20,
329:24, 359:14
**feed** [1] - 218:12
feeding [1] - 168:14

**feeds** [1] - 171:8
**fell** [1] - 337:20
**fellow** [1] - 147:10
**felt** [4] - 212:10,
273:22, 324:19,
395:4
**fence** [1] - 201:8
**fences** [1] - 201:10
**few** [31] - 83:14, 83:16,
86:3, 88:4, 114:13,
133:12, 133:19,
148:14, 167:19,
169:2, 182:1,
183:20, 187:18,
192:9, 192:19,
198:13, 200:23,
206:1, 247:5,
247:21, 248:2,
266:24, 273:18,
283:3, 323:12,
336:10, 350:24,
354:2, 373:9, 383:9,
389:21
**field** [15] - 113:15,
114:20, 118:3,
118:16, 188:5,
189:4, 289:9,
292:12, 292:15,
292:16, 292:19,
292:23, 293:1,
335:12, 356:13
**Field** [1] - 115:18
**fields** [1] - 118:8
**fifteen** [6] - 125:10,
203:19, 204:2,
211:3, 211:12,
333:10
**fifteen-minute** [3] -
125:10, 203:19,
333:10
**fifty** [3] - 254:2, 254:3,
303:15
**figure** [8] - 113:17,
173:4, 174:16,
233:11, 251:13,
278:15, 371:11,
404:20
**figured** [5] - 191:21,
278:4, 278:10,
283:13, 339:6
**figures** [3] - 116:21,
133:15, 365:3
**file** [25] - 79:23,
92:24, 111:9,
115:14, 116:2,
120:17, 155:20,
198:2, 200:18,
228:3, 285:11,
285:12
**filed** [25] - 79:23,
92:24, 111:9,
115:14, 116:2,

120:21, 120:23,
132:3, 155:13,
155:16, 156:1,
163:3, 164:16,
200:20, 201:14,
237:10, 237:14,
237:22, 289:18,
291:2, 330:9, 343:1,
346:19, 347:21,
350:9
**files** [1] - 137:14
**filing** [11] - 93:9,
93:17, 114:3,
114:13, 117:19,
117:20, 119:21,
132:21, 132:24,
285:14
**fill** [1] - 221:24
**film** [1] - 235:24
**final** [7] - 79:21,
103:18, 120:9,
121:2, 170:10,
285:6, 403:14
**finally** [11] - 124:20,
128:21, 149:6,
177:10, 180:7,
227:19, 234:12,
264:23, 274:2,
277:17, 286:5
**financial** [1] - 173:2
**fine** [10] - 85:17,
147:18, 186:6,
190:12, 190:18,
205:3, 230:6, 333:7,
393:17, 405:13
**finish** [2] - 124:9,
355:14
**finished** [1] - 393:22
**firm** [2] - 146:11,
176:23
**first** [127] - 77:19,
78:2, 79:10, 79:18,
86:4, 86:20, 90:4,
95:7, 98:10, 98:15,
98:18, 99:6, 103:22,
104:15, 105:20,
106:2, 107:19,
114:16, 115:6,
115:17, 115:23,
119:11, 121:7,
122:13, 124:8,
124:14, 125:24,
130:9, 132:15,
133:6, 142:4,
145:15, 152:6,
152:16, 152:20,
154:3, 155:2,
156:13, 157:6,
160:10, 161:2,
165:21, 167:9,

168:8, 168:19,
172:4, 178:24,
179:16, 182:20,
186:15, 187:12,
192:8, 196:8, 196:6,
199:8, 199:16,
203:5, 204:9,
204:11, 205:10,
207:19, 208:7,
208:20, 217:6,
218:22, 223:13,
223:19, 226:11,
227:7, 228:20,
229:4, 229:5,
229:11, 238:20,
238:23, 243:8,
246:13, 247:8,
248:7, 249:19,
250:7, 251:12,
251:19, 254:9,
259:13, 261:3,
265:3, 267:10,
268:15, 269:2,
270:13, 271:4,
273:20, 276:20,
277:3, 278:3,
280:24, 281:18,
283:23, 284:19,
309:22, 310:14,
311:8, 313:10,
324:18, 326:10,
336:7, 336:15,
338:20, 346:1,
347:9, 349:2,
351:15, 351:20,
351:21, 352:10,
364:5, 369:3,
371:17, 376:10,
378:1, 382:5, 392:5,
394:21, 396:4,
400:23
**fit** [5] - 217:24, 220:14,
222:16, 232:8,
233:10
**five** [17] - 125:7,
173:15, 216:15,
232:14, 322:21,
323:9, 323:18,
324:3, 324:7,
324:11, 325:5,
326:12, 327:5,
327:15, 327:21,
355:10, 355:11
**flexibility** [1] - 403:5
**flies** [2] - 99:17, 380:5
**flight** [16] - 183:8,
183:11, 183:13,
290:22, 290:24,
291:4, 291:5, 291:8,
291:12, 291:14,

291:17, 291:20,
363:3, 363:6, 363:9
**flip** [1] - 150:1
**floating** [4] - 229:23,
230:1, 230:4, 244:8
**Florida** [1] - 363:10
**flow** [1] - 334:1
**fluid** [3] - 379:7,
380:6, 380:7
**fly** [12] - 93:13,
151:14, 176:3,
227:1, 227:2, 229:1,
252:16, 278:21,
291:9, 291:13,
291:14
**flying** [16] - 151:12,
151:21, 152:4,
154:9, 160:16,
161:19, 161:23,
178:6, 183:10,
183:16, 184:8,
240:23, 291:15,
353:4, 377:16, 380:4
**focus** [9] - 106:9,
143:1, 154:10,
165:7, 170:11,
187:11, 243:1,
268:18, 325:3
**focused** [1] - 237:23
**FOGEL** [1] - 109:24
**Fogel** [1] - 110:1
**follow** [10] - 109:7,
135:23, 139:12,
149:15, 172:14,
178:18, 178:20,
203:5, 223:16, 363:4
**follow-up** [1] - 135:23
**followed** [4] - 87:11,
269:7, 285:5, 397:10
**following** [5] - 99:9,
115:18, 144:2,
147:17, 326:5
**follows** [3] - 205:12,
208:9, 338:2
**football** [1] - 329:20
**FOR** [1] - 75:1
**force** [2] - 364:13,
364:14
**foregoing** [1] - 407:9
**foreign** [1] - 346:12
**form** [7] - 114:1,
117:2, 120:18,
126:13, 135:3,
226:19, 300:17
**format** [2] - 135:12,
345:23
**formats** [1] - 172:11
**formed** [4] - 306:6,
306:8, 306:20,
310:14

**former** [6] - 81:18,
94:11, 258:8,
258:11, 258:13,
282:15
**formulated** [1] - 113:7
**forth** [5] - 112:23,
138:16, 193:13,
193:15, 354:1
**fortunately** [1] - 403:2
**forty** [1] - 189:6
**forward** [6] - 89:17,
227:12, 268:14,
274:13, 324:1, 399:5
**foundation** [4] - 86:9,
86:23, 94:13, 238:16
**founded** [3] - 254:1,
265:20, 307:1
**four** [14] - 132:19,
140:5, 140:7,
143:15, 143:21,
178:9, 185:5, 185:7,
186:22, 212:3,
220:13, 247:3,
326:15, 392:8
**fourth** [2] - 261:15,
314:20
**fraction** [1] - 220:12
**frame** [1] - 225:19
**framework** [1] -
169:17
**free** [18] - 112:3,
130:21, 166:19,
167:12, 167:13,
167:14, 167:15,
167:17, 167:21,
168:4, 263:22,
264:8, 277:22,
316:10, 316:23,
371:5, 381:2, 381:6
**freely** [1] - 370:20
**frequently** [1] - 119:12
**Friday** [13] - 125:8,
125:14, 147:12,
172:22, 177:15,
177:17, 394:22,
394:24, 395:1,
395:16, 396:17,
396:19, 396:21
**Friends** [1] - 261:12
**friends** [1] - 147:3
**front** [9] - 205:21,
221:5, 221:21,
240:16, 254:20,
273:4, 275:11,
324:23, 353:19
**frustum** [1] - 387:2
**fulfill** [1] - 140:6
**full** [3] - 138:5, 225:17,
352:5
**fun** [2] - 181:20,

248:12
**function** [2] - 373:2,
384:22
**functionality** [2] -
174:22, 278:23
**fund** [1] - 367:23
**funded** [2] - 246:16,
280:8
**funding** [5] - 227:8,
245:22, 246:1,
246:24, 378:23
**funny** [1] - 161:2
**future** [4] - 266:2,
318:23, 320:5,
356:24
**G7** [1] - 248:1
**gain** [1] - 272:17
**gained** [1] - 192:23
**game** [1] - 329:21
**gather** [3] - 169:13,
393:11, 393:14
**gathered** [2] - 251:16,
275:18
**gathering** [2] - 169:12,
253:22
**Gathering** [1] - 247:24
**gears** [1] - 311:5
**Gene** [1] - 177:1
**general** [12] - 136:9,
248:10, 256:21,
269:17, 275:6,
283:21, 289:6,
294:1, 295:4,
302:12, 314:7,
395:23
**General** [1] - 363:9
**generally** [4] - 319:13,
330:24, 331:13,
364:15
**generated** [1] - 236:22
**gentleman** [1] -
192:12
**gentlemen** [1] -
208:20
**Geo** [14] - 168:24,
170:21, 170:23,
170:24, 171:5,
171:10, 172:3,
172:12, 181:2,
181:3, 181:10,
181:11, 181:14
**Geobased** [1] - 370:8
**GEOBASED** [1] -
370:9
**geographic** [22] -
178:17, 181:3,
189:5, 189:8,
196:16, 289:7,
289:10, 289:20,
290:3, 290:8,

290:16, 290:20, 290:22, 291:24, 292:18, 293:3, 296:3, 299:13, 300:2, 335:12, 369:4, 369:21
**geographies** [1] - 178:7
**geography** [1] - 181:5
**geometry** [2] - 243:17, 245:14
**Georgia** [3] - 89:14, 91:21, 92:19
**German** [11] - 155:2, 210:10, 210:18, 228:3, 235:10, 246:5, 246:9, 259:5, 309:1, 309:2, 309:3
**Germany** [16] - 133:1, 152:12, 154:13, 155:1, 155:14, 211:23, 224:10, 257:9, 304:7, 304:21, 358:22, 359:10, 360:2, 360:3, 375:19, 375:20
**gigantic** [1] - 189:6
**GIS** [1] - 369:15
**given** [20] - 87:1, 109:15, 114:24, 126:11, 126:15, 130:9, 143:18, 153:8, 170:9, 173:12, 206:2, 285:16, 342:19, 352:1, 383:18, 385:10, 387:12, 398:14, 400:8, 401:1
**glass** [2] - 185:16, 219:10
**Globe** [1] - 325:24
**globe** [2] - 183:2, 353:7
**glom** [1] - 202:3
**glossary** [3] - 132:1, 144:7
**Gmail** [2] - 167:13, 180:23
**GmbH** [1] - 75:3
**goal** [2] - 196:19, 340:9
**goals** [7] - 198:15, 198:17, 199:16, 279:18, 335:20, 336:12, 343:20
**Goggle** [1] - 141:3
**Goodchild** [4] - 189:2, 189:3, 189:12, 190:24

**Google** [454] - 78:15, 79:20, 81:15, 85:10, 87:7, 90:8, 92:8, 93:4, 94:12, 94:17, 94:23, 96:14, 96:16, 96:23, 97:2, 97:10, 97:12, 97:14, 97:23, 98:3, 98:20, 98:21, 99:6, 99:14, 99:15, 100:9, 101:8, 103:9, 104:19, 124:17, 124:21, 125:20, 125:23, 125:24, 132:8, 137:6, 139:15, 139:18, 139:24, 140:17, 141:8, 141:10, 141:14, 142:3, 142:13, 145:17, 145:20, 145:22, 146:4, 151:9, 151:11, 152:5, 152:7, 153:24, 157:7, 160:17, 160:18, 160:21, 160:22, 160:24, 161:3, 161:6, 161:8, 161:9, 161:11, 161:13, 161:14, 161:15, 161:18, 161:22, 161:24, 162:10, 162:15, 162:16, 163:7, 163:13, 163:20, 163:21, 163:22, 163:23, 164:3, 164:24, 165:3, 165:4, 165:7, 165:15, 165:21, 165:22, 165:24, 166:1, 166:2, 166:4, 166:5, 166:6, 166:8, 166:9, 166:11, 166:12, 166:14, 166:15, 166:16, 166:17, 166:18, 167:2, 167:7, 167:10, 167:11, 167:12, 167:14, 167:16, 167:20, 167:21, 167:23, 168:2, 168:3, 168:4, 168:6, 168:10, 168:11, 168:14, 168:15, 168:19, 168:24, 169:1, 169:2, 169:3, 169:7, 169:9, 169:11, 169:24, 170:10, 170:16, 170:18, 170:20, 17

171:1, 171:4, 171:8, 171:9, 171:13, 171:20, 172:11, 172:15, 172:16, 172:18, 173:5, 173:6, 173:11, 173:14, 173:16, 173:18, 173:21, 173:22, 174:2, 174:4, 174:5, 174:9, 174:10, 174:11, 174:13, 174:14, 174:15, 174:17, 174:20, 174:21, 174:22, 175:1, 175:9, 175:15, 175:16, 175:17, 175:19, 175:21, 175:22, 175:23, 176:10, 176:13, 176:15, 176:20, 177:7, 177:9, 177:13, 178:20, 178:21, 179:1, 179:7, 179:17, 179:18, 179:20, 180:3, 180:4, 180:6, 180:15, 180:16, 180:23, 180:24, 181:6, 181:9, 181:14, 181:16, 182:7, 182:9, 182:14, 182:15, 183:22, 184:4, 184:7, 186:24, 187:8, 187:12, 187:15, 188:11, 188:17, 188:21, 189:13, 189:17, 190:9, 190:12, 190:16, 190:20, 190:24, 191:10, 191:11, 191:12, 191:14, 191:16, 191:24, 192:6, 192:11, 193:7, 193:8, 193:10, 193:14, 193:16, 193:17, 193:20, 193:23, 193:24, 194:1, 194:4, 194:8, 194:10, 194:13, 194:17, 194:20, 194:24, 201:23, 202:1, 202:8, 202:20, 202:22, 203:11, 209:4, 209:6, 235:2, 249:6, 258:22, 259:2, 259:11, 259:20,

260:9, 260:13, 263:19, 264:7, 264:17, 266:7, 266:16, 266:23, 267:6, 268:1, 268:2, 268:14, 269:21, 270:13, 270:16, 271:3, 271:16, 272:9, 272:22, 274:14, 275:9, 275:15, 275:24, 276:2, 276:12, 277:21, 281:2, 281:5, 281:11, 282:4, 282:20, 282:22, 283:5, 283:11, 283:24, 284:12, 284:16, 285:7, 285:16, 309:21, 310:2, 311:7, 311:8, 311:12, 312:2, 312:18, 312:20, 313:11, 314:5, 314:7, 314:17, 314:23, 315:1, 315:5, 315:15, 315:16, 316:9, 316:10, 316:12, 316:13, 316:18, 316:21, 316:23, 317:12, 317:17, 317:20, 317:22, 318:10, 319:13, 319:17, 319:24, 320:9, 320:10, 320:13, 320:21, 321:7, 321:23, 322:3, 322:5, 323:1, 323:5, 323:8, 323:14, 323:17, 324:3, 324:10, 324:16, 324:18, 324:24, 325:4, 325:10, 325:13, 325:19, 326:8, 326:11, 326:14, 326:19, 326:23, 327:2, 327:6, 327:19, 327:23, 328:4, 328:8, 328:10, 328:12, 355:12, 355:20, 356:1, 356:8, 356:17, 362:12, 362:23, 370:20, 370:24, 371:5, 375:22, 376:1, 376:10, 376:23, 377:1, 378:8,

381:3, 381:4, 381:6, 381:8, 381:12, 381:22, 381:23, 384:5, 384:6, 384:7, 384:13, 384:22, 385:24, 386:5, 386:14, 387:3, 387:20, 388:5, 388:9, 388:18, 389:17, 390:7, 390:12, 390:19, 391:16, 391:20, 392:6, 392:10, 393:2, 394:24, 398:13, 399:8, 399:16, 401:10, 402:5, 402:8, 403:12, 403:20, 404:16, 405:14
**GOOGLE** [1] - 75:6
**Google's** [23] - 79:6, 81:13, 97:18, 105:3, 124:19, 146:1, 166:22, 167:19, 170:12, 170:22, 171:15, 175:12, 175:22, 176:16, 179:23, 209:20, 271:2, 271:7, 275:21, 279:2, 321:23, 392:2, 399:19
**Google.com** [2] - 96:3, 168:13
**Government** [2] - 111:2, 137:16
**government** [7] - 111:15, 112:19, 113:23, 122:11, 214:10, 214:11, 378:4
**graduated** [2] - 211:20, 258:15
**grant** [2] - 111:1, 137:20
**granted** [4] - 114:23, 132:13, 136:10, 156:6
**granting** [2] - 112:6, 138:23
**grants** [2] - 112:9, 139:5
**graphic** [3] - 157:2, 290:19, 370:14
**Graphic's** [1] - 293:16
**Graphics** [16] - 156:20, 255:13, 256:8, 256:10, 257:10, 257:14, 260:15, 265:20,

293:14, 364:5,
367:4, 367:6, 367:7,
367:9, 369:14
**graphics** [11] - 88:7,
93:19, 156:24,
177:10, 177:11,
177:16, 218:17,
256:13, 363:5,
366:7, 393:4
**Graphix** [3] - 157:22,
158:3
**great** [13] - 149:9,
153:2, 156:10,
156:19, 157:4,
161:19, 168:21,
200:4, 216:9,
248:12, 269:3,
380:16, 391:24
**Greeks** [1] - 183:1
**Greenwich** [1] -
230:24
**grid** [5] - 302:9,
302:21, 302:24,
303:2, 303:6
**ground** [1] - 117:10
**grounds** [3] - 86:8,
141:10, 319:8
**Group** [1] - 257:13
**group** [9] - 118:5,
181:1, 181:2,
181:10, 181:11,
181:12, 195:22,
211:8, 282:15
**grow** [3] - 171:14,
171:23
**growing** [2] - 176:19
**grown** [1] - 211:9
**guarantee** [1] - 204:16
**guess** [10] - 102:12,
151:5, 255:7,
257:18, 274:23,
290:12, 372:23,
397:13, 398:10,
404:20
**guidance** [1] - 144:19
**guide** [1] - 125:2
**guided** [1] - 148:24
**guy** [2] - 215:7, 375:16
**guys** [1] - 374:1
**half** [6] - 178:12,
179:8, 179:10,
224:18, 237:17,
325:5
**HALL** [1] - 94:16
**halls** [1] - 147:15
**hand** [1] - 79:11,
121:6, 128:12,
131:17, 132:14,
132:19, 134:23,
146:4, 208:12,

221:12, 257:2,
358:11, 407:15
**handed** [2] - 77:20,
78:12
**handing** [1] - 312:10
**handle** [3] - 129:5,
338:21, 360:17
**handout** [1] - 115:7
**hands** [1] - 314:24
**hang** [1] - 382:3
**Hanke** [11] - 160:12,
161:7, 161:15,
266:23, 266:24,
267:3, 267:8,
267:13, 267:14,
268:6, 282:11
**Hanke's** [1] - 268:13
**Hanky** [1] - 378:23
**Hans** [1] - 298:19
**happy** [5] - 248:15,
255:3, 268:10,
372:22, 400:16
**hard** [14] - 153:3,
154:4, 154:8,
154:18, 165:20,
166:8, 173:19,
175:3, 199:12,
233:9, 269:15,
354:4, 354:8, 373:23
**harder** [2] - 177:4,
266:15
**hardware** [7] - 218:17,
253:3, 255:12,
255:16, 368:15,
368:16, 382:24
**harnessing** [1] -
111:21
**hate** [1] - 202:19
**HAWES** [21] - 75:22,
79:2, 80:6, 80:15,
83:7, 94:20, 96:7,
97:1, 97:7, 97:11,
149:24, 150:5,
150:11, 150:19,
150:24, 151:2,
163:19, 401:17,
401:20, 402:10,
402:20
**Hawes** [2] - 149:21,
177:24
**Hawkins** [3] - 407:7,
407:19, 407:20
**head** [3] - 257:13,
325:11, 368:13
**headed** [1] - 85:4
**heading** [1] - 133:9
**headlines** [1] - 280:5
**headquarters** [6] -
113:18, 156:22,
257:10, 261:13,

364:17, 376:8
**heads** [1] - 363:15
**heads-up** [1] - 363:15
**hear** [46] - 77:4, 79:7,
87:3, 91:12, 92:5,
98:12, 104:19,
109:3, 126:4, 127:5,
149:1, 152:10,
172:23, 176:15,
179:3, 181:13,
183:24, 185:1,
186:19, 187:6,
187:19, 188:8,
189:1, 189:14,
190:20, 192:15,
194:2, 194:3, 194:5,
195:6, 195:24,
196:2, 196:19,
196:24, 197:18,
201:22, 201:24,
202:11, 202:21,
202:24, 203:22,
208:24, 209:3,
209:9, 257:15, 281:5
**heard** [36] - 83:9,
104:21, 129:17,
136:6, 136:9,
136:22, 139:3,
140:24, 146:7,
152:5, 161:18,
179:24, 180:16,
180:22, 183:23,
186:18, 195:6,
198:19, 201:2,
201:3, 201:4, 206:3,
208:21, 209:15,
235:3, 259:15,
263:16, 313:22,
325:11, 331:8,
331:10, 331:12,
342:9, 351:15,
362:10, 401:9
**hearing** [2] - 129:2,
398:10
**hearsay** [7] - 94:14,
95:4, 95:24, 96:19,
96:20, 97:22
**heavy** [2] - 152:17,
153:8, 206:8
**Hello** [1] - 109:24
**hello** [1] - 147:16
**help** [12] - 98:13,
109:12, 139:12,
144:18, 151:7,
173:3, 199:13,
207:10, 257:1,
297:14, 301:8,
400:15
**helped** [1] - 181:14
**helpful** [3] - 136:3,

144:10, 179:12
**helping** [1] - 212:22
**helps** [2] - 397:20,
398:3
**hereby** [1] - 407:9
**herein** [2] - 205:10,
208:7
**hereunto** [1] - 407:14
**hero** [1] - 227:3
**Hi** [1] - 336:9
**hidden** [2] - 369:22,
370:15
**hierarchical** [7] -
388:10, 388:14,
388:18, 389:11,
392:11, 392:13,
392:16
**high** [16] - 146:14,
186:6, 202:7, 221:9,
222:13, 229:7,
244:11, 336:20,
354:20, 363:9,
385:1, 385:4, 386:6,
387:5, 389:18,
390:14
**high-end** [1] - 363:9
**high-level** [2] - 385:4,
387:5
**higher** [7] - 146:13,
187:22, 188:2,
188:3, 190:4,
190:12, 222:22
**highest** [1] - 210:16
**highlight** [3] - 318:9,
318:18, 321:20
**highlighted** [16] -
115:7, 121:9,
259:10, 261:4,
261:16, 270:24,
272:13, 273:11,
273:12, 273:20,
274:6, 276:21,
276:22, 278:2,
278:17, 284:19
**highlighting** [2] -
270:8, 284:20
**Hillsborough** [1] -
370:9
**himself** [4] - 265:1,
265:3, 315:10,
340:24
**hire** [1] - 160:11
**hired** [3] - 211:14,
214:22, 214:23
**Hiroyoshi** [1] - 215:8
**historical** [1] - 116:6
**history** [5] - 120:12,
254:4, 265:18,
281:6, 283:13
**hit** [4] - 136:3,

**hmm** [1] - 391:17
**hold** [1] - 147:3
**holder** [1] - 145:15
**holding** [1] - 360:19
**holidays** [1] - 340:1
**home** [4] - 131:2,
181:23, 198:13,
336:10
**honor** [1] - 383:8
**Honor** [132] - 77:5,
77:11, 77:18, 77:20,
78:24, 79:7, 79:11,
80:23, 81:12, 82:17,
83:14, 84:15, 84:20,
84:24, 85:8, 85:9,
85:12, 86:2, 87:4,
88:18, 88:24, 90:4,
90:23, 91:8, 92:4,
92:13, 93:23, 94:3,
94:16, 95:1, 96:7,
96:16, 97:1, 97:8,
97:11, 98:9, 100:18,
101:12, 102:1,
102:8, 102:16,
103:12, 103:14,
103:17, 106:4,
106:14, 107:6,
108:9, 108:17,
109:18, 130:17,
149:22, 149:24,
150:3, 178:1, 178:2,
204:9, 205:18,
206:9, 206:12,
206:22, 207:6,
207:19, 208:10,
208:17, 238:12,
238:16, 241:5,
241:16, 241:17,
241:24, 242:2,
285:20, 286:17,
286:21, 287:4,
287:7, 298:5, 298:8,
333:8, 333:21,
334:14, 334:20,
335:1, 342:16,
342:18, 344:22,
348:16, 349:14,
350:17, 350:20,
357:15, 357:18,
357:22, 358:3,
359:23, 360:10,
361:2, 361:6,
361:12, 361:15,
361:20, 362:3,
383:14, 383:18,
383:24, 393:19,
393:23, 395:19,
395:21, 396:21,
397:12, 397:24,
398:4, 398:8,

398:12, 399:1,
399:3, 399:17,
400:9, 400:17,
400:20, 400:22,
401:16, 401:17,
402:20, 402:22,
403:10, 403:19,
405:14, 405:18,
405:20
**Honor's** [1] - 398:14
**HONORABLE** [1] -
75:13
**hook** [1] - 253:15
**hop** [1] - 382:12
**hope** [2] - 110:7,
339:19
**hoped** [5] - 264:16,
338:23, 339:3,
339:11, 341:13
**hopefully** [3] - 167:3,
227:17, 296:6
**hoping** [2] - 125:13,
166:1
**hospitals** [1] - 213:10
**hosted** [1] - 366:1
**hosts** [1] - 376:2
**hotel** [1] - 368:10
**hour** [5] - 125:9,
178:13, 179:8,
179:10, 383:18
**hours** [2] - 216:15,
368:14
**houses** [3] - 230:21,
231:6, 243:17
**housing** [1] - 213:10
**Houston** [1] - 369:15
**hovering** [1] - 151:17
**huge** [6] - 201:21,
220:1, 220:11,
226:11, 254:21,
327:22
**hundred** [2] - 271:1,
321:22
**hundreds** [2] - 183:2,
301:12
**hung** [1] - 332:14
**Hyatt** [1] - 80:16
**hypothetical** [6] -
103:23, 104:6,
104:17, 400:24,
401:5, 401:15
**idea** [41] - 86:9, 103:9,
113:9, 152:15,
152:16, 154:6,
154:21, 154:22,
155:15, 156:10,
180:13, 183:15,
184:8, 184:9,
195:15, 196:17,
198:5, 216:18,

221:20, 247:21,
258:3, 264:13,
272:7, 292:22,
294:13, 294:22,
295:2, 295:4,
295:13, 296:2,
297:3, 300:16,
301:9, 301:14,
301:20, 302:23,
313:20, 339:7,
357:8, 365:14, 372:7
**ideal** [1] - 216:16
**ideas** [9] - 93:8, 154:3,
154:23, 191:22,
191:24, 234:6,
268:2, 278:18,
280:15
**identical** [1] - 400:5
**identification** [3] -
88:14, 89:7, 395:15
**identified** [7] - 92:19,
104:11, 227:15,
231:21, 245:10,
276:1, 324:3
**identifies** [3] - 81:24,
175:20, 346:6
**identify** [9] - 88:9,
115:19, 165:12,
273:13, 290:7,
380:10, 380:12,
399:22, 399:24
**identifying** [1] - 115:6
**identity** [2] - 243:1,
273:6
**idle** [1] - 156:8
**ignore** [1] - 128:23
**Ikonas** [2] - 369:9,
369:10
**illumination** [1] -
111:22
**illustrate** [6] - 91:19,
116:21, 218:20,
224:1, 228:19,
230:16
**illustrated** [1] - 88:10
**illustrating** [2] - 93:2,
235:21
**illustration** [1] - 93:10
**image** [35] - 153:7,
164:9, 164:11,
164:18, 164:19,
182:4, 182:7,
185:14, 185:21,
185:23, 186:2,
186:5, 186:7,
190:11, 190:12,
190:19, 216:13,
217:11, 217:15,
219:1, 219:3, 219:9,
220:9, 220:22,

221:9, 221:12,
223:18, 232:1,
239:4, 245:13,
336:24, 337:15,
337:19, 387:17
**imagery** [2] - 215:5,
336:19
**images** [5] - 88:7,
169:8, 220:14,
223:20, 243:17
**imaginary** [1] - 393:16
**imagine** [2] - 230:3,
375:4
**imaging** [2] - 214:3,
373:8
**immediately** [3] -
147:9, 223:15, 320:4
**Immersion** [1] - 78:7
**impaired** [1] - 212:23
**impartial** [1] - 149:5
**impartially** [1] -
149:11
**implemented** [4] -
237:15, 307:16,
307:22, 308:2
**implements** [1] -
380:7
**implicitly** [1] - 405:2
**implied** [1] - 82:20
**imploded** [1] - 382:22
**imply** [3] - 82:6, 82:17,
97:19
**implying** [1] - 95:22
**important** [34] - 100:3,
103:19, 105:14,
111:23, 117:3,
118:21, 122:18,
122:24, 133:3,
146:23, 149:2,
151:8, 153:19,
154:22, 156:13,
173:13, 176:18,
177:6, 177:16,
177:19, 197:8,
200:9, 201:1,
235:12, 298:22,
368:18, 377:18,
385:22, 386:12,
386:15, 389:24,
390:4, 394:4, 394:6
**importantly** [4] -
94:14, 95:24,
178:24, 180:3
**imprecise** [1] - 231:4
**impression** [3] -
284:5, 336:15,
374:19
**impressive** [1] - 353:1
**imprimatur** [1] - 381:8
**improve** [1] - 267:24

**improvement** [1] -
397:17
**IN** [2] - 75:1, 407:14
**inadmissible** [1] -
128:21
**incapacitated** [1] -
318:6
**inch** [1] - 373:7
**inches** [2] - 365:8
**inclined** [1] - 104:17
**include** [7] - 111:4,
116:7, 123:7, 138:2,
234:9, 234:17,
302:20
**included** [8] - 139:21,
178:10, 183:12,
198:1, 234:20,
332:6, 332:23,
350:12
**includes** [9] - 95:3,
116:17, 127:10,
137:24, 147:3,
176:24, 186:23,
237:21, 362:10
**including** [6] - 99:2,
103:1, 115:17,
118:14, 138:7, 301:3
**inclusive** [2] - 274:21,
407:10
**incoming** [1] - 120:14
**Incorporated** [2] -
156:21, 364:6
**incorporated** [2] -
174:15, 383:5
**INCORPORATED** [1] -
75:6
**increase** [1] - 169:21
**increases** [3] - 172:3,
172:5, 172:9
**incredible** [1] - 192:16
**incremented** [1] -
172:6
**increments** [1] - 172:9
**indeed** [1] - 226:24
**independent** [2] -
171:7, 394:7
**indicate** [1] - 222:20
**indicated** [1] - 83:17
**indicates** [3] - 112:12,
259:10, 270:7
**indicating** [1] - 86:14
**indication** [1] - 86:22
**individual** [2] - 142:6,
185:18
**individuals** [2] -
90:12, 288:7
**induced** [1] - 78:23
**industrial** [1] - 211:18
**industry** [1] - 369:16

363:20
**infallible** [1] - 137:21
**infer** [1] - 128:6
**inferences** [2] -
127:23, 129:13
**inform** [1] - 147:8
**information** [60] -
81:16, 97:20, 99:4,
115:6, 115:16,
118:10, 119:4,
119:6, 119:7,
122:18, 169:11,
169:13, 178:17,
180:20, 182:18,
182:19, 183:8,
183:19, 184:10,
189:5, 189:8,
196:16, 196:17,
197:13, 220:2,
259:17, 259:19,
288:10, 289:7,
289:10, 289:15,
289:21, 290:3,
290:8, 290:16,
291:24, 293:3,
294:10, 294:19,
295:3, 295:7,
295:14, 295:18,
296:3, 296:23,
299:2, 299:14,
300:2, 300:7,
300:10, 319:12,
330:17, 338:10,
342:13, 343:3,
345:3, 345:6, 369:5,
369:21
**infringe** [9] - 140:1,
178:22, 186:20,
187:2, 202:23,
315:15, 315:17,
319:17, 319:24
**infringed** [15] - 78:15,
123:17, 139:2,
139:10, 139:19,
140:8, 142:18,
145:17, 194:11,
315:2, 315:5,
320:10, 320:22,
328:5, 328:8
**infringement** [35] -
78:23, 121:17,
121:19, 121:20,
122:1, 122:7,
122:24, 123:2,
123:4, 123:11,
123:13, 125:22,
126:5, 136:18,
139:4, 140:11,
140:12, 140:13,
140:14, 140:18,

141:3, 141:9,
143:14, 143:24,
145:8, 145:21,
145:23, 146:1,
160:5, 283:14,
320:3, 320:6, 398:9,
398:14, 401:12
**infringer** [3] - 123:19,
136:19, 141:8
**infringes** [1] - 145:20
**infringing** [6] -
125:23, 126:1,
143:10, 163:24,
194:13, 320:14
**Inge** [2] - 316:1,
345:20
**initial** [3] - 134:17,
224:21, 234:17
**initiate** [3] - 99:1,
281:1, 282:3
**injuries** [1] - 214:5
**innocuous** [1] -
102:14
**Innovation** [1] -
305:18
**INNOVATIONAL** [1] -
75:3
**Innovational** [1] -
125:16
**innovations** [1] -
156:16
**input** [4] - 122:23,
239:7, 305:11,
305:12
**inside** [2] - 185:3,
245:3
**insofar** [1] - 233:20
**inspect** [1] - 121:1
**inspection** [1] -
112:20
**inspiration** [2] - 95:14,
101:19
**inspire** [1] - 112:2
**inspired** [3] - 95:22,
101:6, 101:8
**installations** [1] -
103:10
**installed** [1] - 372:6
**installing** [1] - 366:11
**instead** [3] - 183:17,
282:16, 360:24
**Institute** [1] - 196:12
**institutions** [1] - 235:7
**instruct** [2] - 117:10,
123:6
**instructed** [1] - 395:21
**instructing** [1] -
142:22
**instruction** [6] -
140:24, 149:13,

403:13, 403:14,
403:21
**instructions** [15] -
77:13, 103:18,
109:4, 109:6,
123:23, 124:10,
125:1, 129:18,
142:20, 147:17,
149:7, 149:16,
203:6, 375:3, 403:11
**insubstantial** [1] -
140:19
**insufficient** [1] -
119:17
**integrated** [4] -
168:10, 168:16,
171:8, 373:4
**intellectual** [5] -
159:18, 173:2,
287:21, 288:19,
378:10
**intelligence** [1] -
212:21
**intend** [2] - 86:20,
93:3
**intends** [1] - 83:17
**intent** [1] - 102:3
**intention** [5] - 93:23,
328:20, 370:23,
371:2, 396:13
**interact** [2] - 177:5,
252:16
**interaction** [1] -
267:23
**interactions** [1] -
100:4
**interest** [7] - 266:5,
318:1, 343:23,
344:5, 352:22,
405:24, 406:6
**interested** [17] -
211:1, 215:5,
261:19, 262:15,
264:23, 266:7,
266:8, 280:17,
280:21, 281:15,
285:8, 314:18,
317:21, 323:11,
353:16, 356:10,
374:8
**interesting** [3] -
196:13, 254:3, 280:6
**interface** [1] - 278:21
**interfere** [1] - 334:1
**interior** [1] - 245:18
**internal** [10] - 153:6,
166:22, 167:23,
169:8, 170:17,
170:22, 172:19,
173:9, 173:19,

176:17
**internally** [2] - 171:21,
235:17
**internals** [1] - 162:1
**International** [4] -
196:10, 196:11,
247:23, 275:22
**internet** [9] - 86:7,
86:11, 90:9, 148:19,
238:9, 238:11,
280:5, 308:9, 331:24
**interpret** [2] - 127:7,
144:16
**interpretation** [3] -
204:15, 208:2,
209:17
**interpretations** [2] -
132:2, 204:13
**interpreted** [1] - 210:2
**INTERPRETER** [1] -
286:24
**interpreter** [7] -
204:10, 204:17,
204:18, 204:23,
205:10, 207:24,
209:16
**intervening** [1] - 77:15
**interview** [2] - 380:13,
380:18
**intrinsic** [1] - 104:9
**Intrinsic** [8] - 157:22,
158:3, 367:4, 367:5,
367:7, 367:9, 368:2
**introduce** [1] - 93:23
**introduced** [7] - 98:8,
126:13, 128:9,
128:21, 129:21,
152:6, 402:5
**introduction** [6] -
109:14, 128:4,
179:17, 208:17,
209:10, 362:8
**invalid** [13] - 122:8,
123:21, 126:3,
137:6, 137:7, 140:2,
140:8, 141:10,
141:18, 142:14,
142:19, 180:14,
201:15
**invalidity** [6] - 123:18,
126:5, 144:1, 145:8,
146:6, 146:8
**invent** [21] - 183:11,
183:15, 289:9,
290:13, 291:5,
292:8, 292:22,
293:10, 293:15,
294:13, 294:22,
295:2, 295:13,
292:16, 296:11,

298:13, 299:6,
300:16, 301:14,
301:20, 302:23
**invented** [6] - 112:22,
178:16, 179:2,
183:18, 289:2, 299:8
**invention** [64] - 86:17,
89:2, 89:15, 89:18,
90:1, 91:13, 91:18,
91:23, 92:3, 92:17,
93:5, 111:3, 111:6,
111:17, 111:21,
112:3, 112:16,
112:18, 113:3,
113:7, 113:13,
114:9, 114:21,
115:11, 115:21,
116:8, 116:18,
116:20, 116:24,
117:1, 117:7,
118:12, 121:14,
133:11, 136:14,
137:3, 137:19,
138:3, 138:4, 138:8,
139:7, 141:4,
142:11, 142:15,
144:13, 152:14,
153:5, 153:6,
153:21, 154:16,
159:3, 159:6, 160:3,
165:16, 171:20,
175:10, 175:12,
178:15, 195:13,
368:9, 380:9
**inventions** [2] - 112:2,
116:7
**inventor** [23] - 111:9,
111:15, 111:17,
112:7, 112:15,
112:22, 113:6,
113:8, 113:10,
113:15, 114:2,
114:8, 120:23,
121:8, 121:12,
142:16, 209:1,
298:16, 298:17,
299:19, 346:9, 368:8
**inventor's** [3] -
114:16, 117:18,
118:12
**inventors** [27] - 91:17,
110:23, 115:11,
132:17, 132:18,
132:20, 136:10,
152:1, 152:13,
152:16, 152:21,
153:20, 154:1,
154:15, 155:13,
156:8, 156:17,
162:22, 166:7,

191:14, 198:11,
199:24, 207:20,
208:22, 242:15,
250:8, 342:1
**Invents** [1] - 117:20
**investigate** [1] -
283:22
**investigation** [1] -
283:8
**invited** [4] - 254:2,
254:5, 366:14,
375:19
**involve** [2] - 110:10,
110:12
**involved** [16] - 131:7,
131:16, 133:24,
147:4, 174:9,
192:13, 209:3,
209:5, 268:16,
282:10, 286:14,
307:11, 311:20,
312:1, 332:22,
340:22
**involves** [1] - 109:10
**IOS** [1] - 182:14
**Iris** [4] - 372:18,
372:21, 373:13,
374:10
**irrelevance** [1] -
169:22
**irrelevant** [2] - 86:18,
378:7
**Ishibashi** [4] - 215:8,
215:16, 216:7,
225:10
**issuance** [3] - 121:5,
137:22, 141:7
**issue** [54] - 78:18,
79:5, 79:8, 81:11,
81:12, 81:15, 82:7,
83:1, 83:11, 84:12,
88:11, 89:4, 91:10,
92:16, 97:17, 99:3,
100:19, 100:20,
102:13, 104:15,
106:12, 107:3,
119:11, 143:18,
145:15, 145:22,
148:18, 151:8,
152:14, 156:3,
181:8, 202:18,
208:22, 251:1,
274:17, 276:8,
283:14, 305:5,
305:9, 307:17,
308:4, 308:10,
308:11, 313:3,
396:2, 398:1, 398:7,
398:9, 400:4,
402:21, 402:24,

403:6, 404:9, 404:19
**issued** [10] - 112:19, 115:15, 115:19, 117:24, 118:7, 121:7, 121:11, 138:12, 276:10, 280:24
**issues** [37] - 77:8, 81:14, 88:14, 88:18, 89:7, 89:22, 94:4, 94:5, 99:15, 101:2, 103:16, 103:19, 107:1, 108:2, 110:11, 120:9, 123:4, 124:5, 124:7, 126:5, 145:8, 257:1, 271:8, 272:23, 274:4, 283:8, 283:12, 324:18, 356:18, 390:18, 390:24, 394:18, 399:4, 399:11, 400:13, 400:19, 400:22
**issuing** [2] - 110:22, 145:1
**item** [4] - 78:11, 79:21, 128:14, 355:11
**items** [2] - 141:19, 144:10
**itself** [6] - 180:19, 199:21, 210:23, 261:23, 348:3, 401:8
**Iwasura** [1] - 346:10
**JACK** [1] - 76:4
**Jackson** [1] - 366:2
**January** [6] - 101:15, 317:5, 363:22, 363:23, 363:24, 364:4
**Japan** [5] - 153:14, 248:1, 339:2, 341:23, 376:6
**Japanese** [1] - 215:7
**jeopardy** [1] - 149:14
**Jeremy** [1] - 109:24
**Jim** [2] - 172:23, 364:18
**jitter** [3] - 229:9, 231:8, 243:18
**job** [9] - 109:2, 109:7, 110:9, 113:23, 118:11, 118:17, 123:5, 139:9, 141:12
**John** [7] - 160:12, 165:5, 266:23, 266:24, 267:3, 282:11, 376:15
**joint** [1] - 309:3
**Jones** [81] - 81:16,

82:5, 83:18, 83:23, 84:2, 94:7, 95:12, 95:13, 95:22, 96:13, 96:18, 96:19, 96:23, 97:3, 97:14, 97:20, 98:15, 98:19, 98:24, 99:13, 99:17, 101:7, 101:23, 102:9, 102:11, 102:20, 102:23, 102:24, 103:6, 157:9, 157:11, 157:18, 158:5, 158:11, 160:9, 161:7, 161:9, 162:3, 162:4, 162:12, 192:13, 192:16, 192:19, 193:3, 257:12, 258:2, 258:24, 259:1, 259:20, 259:23, 260:12, 261:1, 264:21, 264:22, 265:1, 266:4, 267:1, 272:5, 273:15, 277:4, 278:7, 282:11, 282:12, 311:9, 311:20, 313:11, 314:14, 315:20, 317:13, 317:15, 318:10, 318:19, 319:1, 319:11, 320:13, 321:1, 362:8, 362:9, 362:16, 362:21
**Jones's** [1] - 81:18
**journal** [1] - 119:19
**joy** [1] - 240:22
**Judge** [4] - 75:13, 162:23, 404:20, 405:3
**judge** [8] - 110:1, 110:11, 117:10, 123:6, 123:21, 155:19, 309:19, 375:15
**Judge's** [1] - 203:6
**judgment** [1] - 110:5
**Judicial** [2] - 109:13, 110:3
**Julien** [2] - 383:22, 384:11
**July** [5] - 174:24, 280:24, 321:12, 322:4, 372:4
**jumping** [1] - 245:21
**June** [4] - 247:11, 338:5, 338:7, 354:5
**jurisdiction** [1] - 121:18

**juror** [5] - 84:14, 84:16, 85:4, 130:11, 138:22
**Jurors** [1] - 131:14
**jurors** [10] - 84:22, 85:18, 90:12, 123:10, 134:9, 134:14, 140:6, 147:10, 203:20, 207:10
**jury** [51] - 77:2, 77:9, 77:13, 80:1, 81:1, 91:5, 103:18, 108:1, 108:15, 108:19, 108:22, 110:16, 129:4, 131:2, 139:9, 144:19, 148:9, 149:5, 150:8, 150:18, 151:5, 166:12, 204:4, 204:24, 205:15, 205:22, 205:24, 206:21, 207:7, 210:14, 210:21, 238:14, 240:4, 241:11, 242:4, 245:9, 284:22, 297:12, 333:12, 334:18, 358:6, 359:20, 394:1, 394:2, 394:12, 396:7, 396:12, 396:22, 400:13, 403:12
**Jury** [3] - 108:20, 242:5, 334:21
**jury's** [1] - 400:3
**justice** [1] - 149:3
**justified** [1] - 127:24
**justifies** [2] - 112:6, 147:24
**keep** [14] - 112:9, 129:15, 167:5, 173:17, 175:22, 199:5, 199:12, 203:6, 233:23, 233:24, 326:24, 370:10, 381:15, 386:23
**keeping** [2] - 129:11, 173:21
**keeps** [1] - 173:11
**Ken** [1] - 164:7
**kept** [5] - 130:24, 131:2, 135:2, 253:11, 322:5
**key** [3] - 131:3, 152:6, 171:10
**Keyhole** [46] - 95:14, 95:23, 98:19, 98:20,

98:22, 101:8, 158:7, 158:8, 158:9, 158:20, 159:1, 160:8, 160:18, 160:21, 160:22, 161:6, 166:17, 166:19, 192:20, 192:21, 193:2, 193:3, 193:4, 193:8, 193:10, 257:16, 257:17, 258:2, 258:24, 259:11, 311:17, 311:18, 311:20, 312:6, 313:4, 367:8, 368:24, 376:11, 376:19, 377:2, 377:20, 377:23, 379:6, 379:9, 381:1
**Keyhole.com** [1] - 101:19
**kids** [1] - 151:19
**kilometer** [3] - 219:2, 219:16, 232:1
**kind** [31] - 99:7, 100:2, 148:3, 161:2, 173:6, 173:7, 174:6, 179:10, 190:14, 212:18, 220:2, 274:7, 288:19, 290:21, 291:18, 291:23, 292:19, 293:10, 293:23, 294:8, 300:6, 330:22, 337:23, 351:1, 360:19, 374:19, 380:23, 385:9, 387:11, 387:13, 392:24
**kinds** [1] - 300:9
**king** [1] - 371:21
**King** [1] - 75:11
**knowing** [3] - 232:23, 259:19, 264:17
**knowledge** [14] - 99:8, 99:9, 101:7, 106:11, 111:18, 137:1, 260:11, 263:7, 263:8, 307:18, 342:19, 375:7, 389:6, 392:12
**known** [11] - 116:1, 137:3, 162:3, 195:10, 195:11, 195:12, 195:16, 195:17, 197:21, 290:4
**knows** [5] - 112:17, 118:20, 164:9, 191:11, 381:17

**Kyoto** [4] - 247:24, 248:7, 339:2, 341:23
**lack** [2] - 86:8, 238:16
**lady** [1] - 208:19
**Lan** [1] - 369:11
**land** [1] - 112:13
**Landmark** [3] - 369:14, 369:20
**landmarks** [1] - 186:10
**language** [16] - 105:7, 105:11, 178:9, 178:19, 186:16, 187:9, 189:16, 189:19, 191:2, 191:10, 246:9, 251:18, 259:5, 289:4, 297:11, 297:13
**languages** [1] - 164:21
**lapses** [1] - 373:3
**large** [7] - 239:23, 240:16, 240:18, 246:5, 323:12, 327:22, 380:8
**larger** [5] - 224:14, 230:2, 254:22, 272:9, 274:18
**LARRY** [1] - 75:22
**last** [23] - 78:6, 78:19, 95:4, 108:24, 125:6, 125:8, 127:3, 146:21, 146:24, 203:2, 224:17, 228:12, 248:7, 264:15, 265:19, 339:23, 340:2, 347:9, 359:21, 367:23, 378:5, 398:10, 402:21
**lasting** [1] - 366:9
**lasts** [1] - 111:7
**late** [8] - 148:14, 198:4, 200:21, 227:24, 237:7, 237:8, 366:20, 368:20
**lateness** [1] - 383:18
**latest** [2] - 116:9, 237:7
**Lau** [7] - 196:20, 196:21, 197:2, 197:9, 197:13, 199:3, 199:7
**launched** [1] - 381:22
**law** [13] - 114:2, 114:10, 118:19, 123:7, 123:12, 125:1, 143:3,

148:21, 197:19,
200:17, 200:24,
201:11, 308:17
**laws** [1] - 110:19
**lawsuit** [2] - 122:7,
151:10
**lawyer** [13] - 192:11,
193:23, 198:19,
201:4, 282:22,
283:17, 283:19,
283:20, 284:4,
289:3, 297:10,
321:6, 325:10
**lawyers** [31] - 110:11,
113:8, 124:11,
124:22, 126:23,
126:24, 127:4,
127:6, 128:3, 129:2,
134:6, 134:13,
134:24, 135:10,
135:18, 135:20,
147:5, 147:12,
147:20, 148:21,
149:19, 162:15,
162:16, 176:23,
183:9, 187:4,
268:16, 268:21,
271:7, 273:1, 360:6
**lay** [1] - 86:23
**Le** [1] - 338:14
**lead** [3] - 165:5,
226:17, 243:11
**leader** [1] - 196:24
**leaders** [1] - 196:20
**leading** [3] - 88:3,
285:18, 351:8
**learn** [7] - 110:13,
148:20, 151:24,
152:10, 258:23,
363:14, 363:16
**learned** [7] - 97:20,
161:21, 228:16,
259:13, 311:22,
312:21, 353:10
**learns** [2] - 112:21,
160:17
**least** [13] - 89:13,
151:13, 219:18,
226:13, 229:21,
247:20, 268:9,
271:2, 321:22,
324:21, 328:15,
392:11, 396:8
**leave** [2] - 125:12,
148:9
**leaving** [6] - 157:20,
204:4, 241:11,
333:12, 394:3,
394:12
**Leclerc** [22] - 197:1,

198:11, 280:2,
336:4, 336:14,
336:17, 337:11,
338:2, 338:3,
338:10, 338:15,
339:8, 339:17,
340:8, 340:23,
341:6, 341:16,
343:15, 345:12,
354:1, 354:6, 354:12
**Leclerc's** [2] - 199:3,
199:7
**led** [6] - 99:9, 99:24,
111:23, 164:11,
169:1, 284:8
**LED** [1] - 254:21
**Lee** [4] - 271:15,
282:11, 321:7,
325:19
**left** [16] - 115:10,
115:13, 132:19,
206:11, 213:19,
221:8, 241:1,
255:24, 256:3,
268:9, 351:1, 364:2,
366:19, 366:21,
382:21, 383:22
**left-hand** [1] - 132:19
**legal** [3] - 206:10,
318:23, 327:3
**legs** [1] - 203:20
**lengthy** [2] - 130:6,
325:14
**Lenox** [1] - 255:17
**less** [4] - 180:17,
225:17, 230:2,
318:15
**letter** [4] - 277:4,
278:6, 325:23, 326:3
**level** [19] - 99:24,
107:21, 210:16,
229:8, 245:15,
271:3, 321:23,
337:8, 353:9,
353:12, 385:1,
385:4, 386:6, 387:5,
387:10, 389:18,
390:14, 393:9,
393:12
**library** [3] - 382:17,
382:18, 383:6
**license** [15] - 99:7,
159:15, 160:1,
160:4, 160:6,
171:17, 173:7,
262:17, 264:1,
315:12, 316:6,
326:20, 327:16,
356:4, 356:7
**licenses** [1] - 263:4

**licensing** [13] -
101:24, 261:19,
262:11, 263:10,
263:16, 263:17,
285:8, 309:18,
310:3, 310:6,
313:20, 313:24,
316:20
**life** [4] - 111:12,
180:18, 188:12,
188:18
**lifetime** [2] - 112:1,
328:21
**light** [5] - 111:21,
117:2, 122:4, 128:1,
144:17
**likely** [2] - 204:15,
393:6
**likewise** [1] - 148:5
**limine** [2] - 81:13,
334:2
**limit** [2] - 399:3,
399:13
**limitation** [3] - 140:15,
140:21, 142:8
**limitations** [5] -
217:17, 217:21,
217:24, 398:23,
399:15
**limited** [7] - 110:22,
112:6, 130:8, 136:4,
323:10, 324:4, 353:3
**limits** [1] - 112:23
**line** [11] - 92:14,
172:12, 244:17,
333:23, 334:7,
344:12, 356:14,
369:23, 371:16,
378:13, 383:20
**line-of-sight** [1] -
369:23
**lines** [2] - 164:5,
243:23
**Ling** [3] - 371:14,
374:5, 374:22
**lining** [1] - 234:19
**list** [15] - 115:17,
132:19, 132:21,
144:3, 144:5, 144:6,
171:12, 250:13,
253:21, 355:8,
355:20, 373:15,
388:22, 395:10,
395:11
**listed** [8] - 115:23,
144:4, 234:12,
250:8, 254:18,
327:6, 328:1, 355:11
**listen** [9] - 151:11,
177:8, 179:11,

194:23, 196:1,
201:20, 202:17,
203:8, 203:9
**listing** [2] - 232:7,
250:11
**lists** [1] - 395:22
**literal** [2] - 140:11,
140:14
**literally** [2] - 140:22,
404:15
**litigation** [2] - 250:5,
286:14
**live** [4] - 126:16,
126:18, 177:6,
383:19
**LLP** [2] - 75:18, 76:6
**load** [1] - 225:19
**loading** [2] - 373:5,
374:20
**loaned** [1] - 308:7
**local** [2] - 155:1, 233:2
**Local** [1] - 161:11
**locally** [1] - 391:6
**located** [2] - 122:15,
184:16, 186:10
**location** [5] - 206:2,
386:19, 386:20,
386:21, 391:15
**locations** [4] - 296:17,
296:20, 329:4,
377:12
**lock** [1] - 131:3
**LOD** [9] - 387:6,
387:7, 387:9,
387:10, 387:19,
387:22, 388:5,
388:8, 388:14
**lodge** [4] - 238:18,
250:2, 250:16,
251:21
**Lodge** [3] - 242:13,
245:6, 353:20
**log** [2] - 174:6
**logo** [1] - 158:1
**longest** [1] - 116:16
**look** [73] - 92:9,
110:17, 113:2,
115:3, 117:14,
132:11, 151:23,
152:18, 155:22,
157:24, 163:12,
164:24, 165:1,
165:11, 166:22,
167:18, 167:22,
168:5, 168:8,
168:17, 170:21,
171:3, 171:11,
172:20, 173:4,
174:18, 174:21,
177:18, 179:11,

181:22, 181:23,
182:1, 182:2,
182:17, 182:19,
185:12, 185:15,
185:16, 186:11,
186:16, 187:21,
219:11, 221:23,
222:1, 222:3,
222:10, 244:17,
247:7, 257:21,
257:23, 259:9,
271:11, 272:2,
282:17, 283:16,
283:24, 284:10,
312:24, 315:9,
320:2, 321:19,
325:17, 326:2,
339:21, 340:2,
343:18, 353:1,
364:24, 371:6,
371:13, 380:19,
386:11
**looked** [23] - 88:24,
98:11, 104:23,
115:20, 157:12,
163:19, 176:4,
216:9, 222:7, 227:9,
257:22, 268:15,
280:10, 284:1,
286:4, 286:22,
313:1, 330:18,
335:14, 335:21,
353:7, 373:24, 385:2
**looking** [15] - 101:15,
151:16, 156:18,
157:14, 171:2,
173:9, 183:16,
191:5, 230:19,
230:20, 244:15,
369:24, 371:16,
373:23, 377:8
**looks** [9] - 102:14,
115:2, 118:6, 152:7,
165:19, 231:7,
243:19, 336:5, 372:9
**lose** [2] - 221:11,
399:8
**losing** [1] - 356:12
**lost** [2] - 343:23,
352:21
**louder** [1] - 240:10
**lovable** [1] - 371:20
**love** [1] - 375:17
**loved** [1] - 378:15
**low** [9] - 185:22,
186:5, 219:22,
221:12, 336:20,
337:8, 363:7, 363:8,
363:12
**lower** [2] - 220:23,

222:17
**lowering** [1] - 322:5
**LUANN** [1] - 76:7
**luck** [1] - 123:24
**luckily** [1] - 164:23
**lunch** [10] - 125:9,
125:11, 125:14,
148:12, 203:23,
205:16, 241:7,
241:14, 241:22,
376:13
**M-A-Y-E-R** [1] - 208:4
**machine** [4] - 113:4,
218:4, 371:19,
371:20
**Machinery** [1] -
253:23
**machines** [1] - 255:13
**Magic** [2] - 197:12
**magic** [1] - 378:1
**magnifying** [2] -
185:16, 219:10
**mail** [84] - 95:18, 96:3,
96:22, 97:19, 99:13,
103:2, 165:17,
191:17, 198:10,
256:20, 258:8,
258:18, 258:22,
259:6, 259:18,
260:23, 261:21,
264:21, 265:11,
269:6, 269:9,
269:17, 269:19,
270:4, 271:9,
271:12, 271:18,
271:19, 271:22,
272:4, 273:7,
273:14, 275:6,
279:16, 280:1,
280:2, 281:11,
281:12, 281:20,
281:21, 282:13,
282:24, 283:2,
285:5, 311:23,
313:12, 314:13,
314:15, 315:19,
316:14, 317:1,
317:11, 318:10,
318:20, 321:11,
322:10, 323:21,
325:7, 325:14,
325:16, 325:18,
336:1, 336:3, 336:6,
337:2, 337:12,
337:18, 340:17,
341:7, 341:10,
345:14, 354:5,
354:6, 354:9,
354:13, 355:6,
371:17, 372:1,

374:4, 375:2
**mails** [9] - 94:8, 94:14,
94:18, 148:6,
269:24, 271:23,
281:17, 281:19,
345:11
**main** [6] - 115:4,
117:13, 124:13,
143:1, 217:20, 218:9
**maintained** [1] - 135:4
**major** [9] - 116:13,
217:17, 217:18,
228:15, 388:6,
388:9, 388:19,
389:1, 389:7
**manage** [1] - 245:22
**managed** [2] - 277:5,
277:7
**management** [1] -
215:1
**manager** [4] - 188:11,
267:5, 384:4, 384:20
**mandatory** [1] -
211:23
**manifest** [1] - 339:14
**manufacture** [1] -
113:4
**manufactured** [1] -
293:14
**manufacturer** [1] -
376:8
**map** [13] - 184:12,
184:18, 184:21,
185:14, 185:15,
185:21, 219:13,
219:14, 219:15,
219:23, 226:11,
292:13, 292:14
**Maps** [5] - 161:11,
171:1, 174:15,
174:22, 181:6
**maps** [1] - 182:23
**March/April** [1] -
265:10
**mark** [1] - 372:9
**marked** [2] - 184:15,
236:13
**market** [5] - 323:10,
323:14, 323:16,
324:12, 356:19
**marketing** [8] -
332:12, 332:16,
332:19, 332:23,
350:3, 350:5,
350:12, 352:3
**marks** [1] - 230:10
**Mars** [2] - 164:13
**mass** [1] - 260:7
**massive** [4] - 153:3,
154:4, 154:9, 154:18

**material** [21] - 115:7,
236:5, 236:24,
237:6, 237:7, 331:8,
331:9, 331:10,
331:13, 331:17,
331:23, 332:4,
332:5, 332:12,
332:16, 342:13,
343:4, 345:2,
345:24, 350:8,
351:22
**materialize** [1] -
341:21
**materially** [2] - 401:8,
401:11
**materials** [27] - 249:2,
249:15, 249:19,
249:23, 250:19,
250:20, 250:22,
251:2, 279:13,
288:2, 288:5,
313:17, 330:23,
331:4, 331:7,
331:24, 332:18,
332:20, 332:23,
350:4, 350:5,
350:12, 351:7,
351:11, 351:13,
351:16, 351:24
**math** [6] - 225:7,
225:14, 225:15,
225:24, 226:1,
303:10
**matter** [14] - 96:10,
106:1, 113:5, 116:7,
133:11, 149:8,
192:2, 221:23,
222:7, 241:6,
305:14, 315:23,
320:3, 407:12
**matters** [2] - 129:5,
204:9
**maximum** [2] - 271:3,
321:23
**MAYER** [1] - 208:6
**Mayer** [88] - 86:21,
86:22, 87:5, 88:8,
91:3, 92:22, 95:11,
96:22, 97:1, 97:5,
97:15, 98:13,
102:18, 102:22,
132:17, 152:20,
153:10, 153:16,
153:21, 154:12,
154:20, 155:3,
162:11, 170:14,
191:13, 198:10,
198:12, 204:11,
205:19, 205:23,
207:20, 207:21,

208:4, 208:20,
209:9, 209:13,
225:23, 240:9,
241:3, 242:9,
264:20, 287:11,
288:15, 296:8,
297:10, 298:10,
299:5, 299:24,
301:5, 301:7, 302:8,
302:17, 303:8,
304:16, 304:23,
308:1, 311:6,
311:19, 315:15,
316:4, 318:9,
319:23, 320:18,
322:13, 323:4,
324:2, 325:2, 325:9,
325:20, 329:1,
330:22, 332:16,
339:16, 340:23,
342:1, 344:4, 345:1,
345:8, 346:1, 348:4,
348:22, 349:7,
349:16, 350:23,
355:4, 357:19,
361:23
**mayer** [1] - 335:3
**Mayer's** [5] - 98:12,
99:8, 170:13,
204:20, 208:15
**Mayers** [1] - 251:22
**MBA** [1] - 188:16
**McClendon** [7] - 82:5,
157:10, 157:19,
158:6, 158:12,
160:9, 161:7
**McCracken** [1] -
364:18
**mean** [49] - 105:4,
126:6, 127:16,
139:6, 144:15,
159:7, 165:8,
168:12, 184:12,
198:18, 213:22,
219:17, 226:11,
255:23, 256:1,
264:4, 264:8,
264:10, 269:2,
270:13, 271:6,
277:19, 278:5,
278:13, 278:18,
283:10, 284:3,
308:16, 319:16,
322:11, 348:8,
352:21, 355:19,
356:15, 359:3,
371:3, 371:10,
373:18, 375:1,
375:14, 375:20,
377:5, 379:4,

380:20, 381:9,
382:10, 387:16,
388:1
**meaning** [3] - 123:7,
244:21, 393:13
**means** [18] - 125:22,
145:19, 159:2,
159:16, 168:2,
168:13, 190:3,
198:4, 201:15,
233:3, 296:16,
379:6, 385:16,
387:10, 390:17,
393:12, 393:15,
397:20
**meant** [7] - 144:24,
226:1, 277:20,
278:3, 356:22,
379:1, 379:3
**measure** [5] - 230:3,
230:5, 230:10,
365:11
**measurements** [2] -
117:9, 230:8
**Media** [1] - 247:24
**medical** [1] - 214:2
**meet** [5] - 118:13,
141:6, 257:6, 267:7,
352:6
**meeting** [4] - 261:12,
271:2, 321:5, 321:22
**Meeting** [1] - 248:2
**meetings** [1] - 267:13
**meets** [3] - 99:18,
119:9, 138:16
**megabytes** [4] -
220:9, 220:10,
220:13, 232:1
**member** [6] - 212:16,
213:7, 213:8,
287:13, 287:16,
358:6
**members** [2] - 108:22,
394:2
**Memorial** [1] - 151:7
**memorial** [1] - 245:13
**memory** [15] - 217:23,
218:1, 218:6, 218:9,
218:11, 218:12,
218:14, 218:16,
220:4, 220:10,
220:11, 225:8,
232:9, 372:5
**mention** [2] - 148:2,
202:19
**mentioned** [28] -
83:24, 108:24,
125:6, 125:15,
126:20, 130:12,
139:5, 139:14,

140:4, 141:19, 142:24, 145:11, 199:21, 223:23, 233:1, 234:2, 242:18, 245:3, 247:15, 287:13, 303:8, 304:5, 313:19, 338:15, 358:7, 391:5, 404:4
**mentions** [1] - 405:22
**Mercay** [4] - 383:23, 384:3, 384:11, 384:12
**merely** [1] - 210:3
**merit** [1] - 348:19
**Merit** [1] - 407:7
**Meschkat** [12] - 94:11, 94:17, 95:5, 95:10, 95:11, 95:17, 96:13, 97:4, 97:23, 97:24, 100:10, 258:10
**meshes** [1] - 393:5
**message** [6] - 180:17, 338:1, 338:2, 339:22, 339:24, 372:10
**messages** [1] - 148:6
**met** [16] - 113:16, 122:6, 140:15, 140:21, 146:17, 257:9, 261:5, 261:11, 265:19, 298:15, 298:20, 375:9, 375:13, 375:23, 375:24, 398:23
**meter** [1] - 232:3
**method** [16] - 117:1, 139:23, 139:24, 140:16, 156:15, 183:18, 191:4, 203:12, 293:11, 297:23, 301:1, 302:18, 308:11, 308:15, 308:20, 403:22
**methods** [5] - 139:20, 143:16, 237:17, 293:23, 308:3
**Meyer** [1] - 171:16
**Meyer's** [1] - 165:16
**MICHAEL** [2] - 75:19, 75:22
**Michael** [31] - 81:16, 81:18, 82:4, 83:18, 95:12, 95:13, 98:15, 98:19, 101:23, 157:9, 162:3, 189:2, 192:12, 257:12, 258:2, 258:24,

259:1, 259:20, 260:24, 272:5, 273:15, 278:7, 282:10, 282:12, 311:8, 315:20, 320:12, 362:8, 362:9, 362:21, 366:2
**Michelle** [4] - 271:14, 271:15, 282:11, 325:19
**microscope** [1] - 164:12
**mid** [2] - 153:11, 153:17
**middle** [8] - 167:24, 172:13, 174:3, 174:7, 223:20, 321:11, 338:9, 340:3
**might** [44] - 100:1, 101:20, 118:21, 122:23, 128:17, 135:20, 148:15, 149:14, 162:9, 165:9, 193:5, 193:17, 195:20, 200:22, 208:24, 209:18, 216:4, 216:5, 216:22, 219:8, 227:10, 241:6, 260:14, 260:18, 264:5, 264:14, 272:8, 272:10, 275:18, 281:5, 308:18, 315:9, 315:12, 317:16, 322:18, 328:18, 373:3, 375:4, 375:24, 376:1, 380:13, 397:6, 399:14
**miles** [2] - 353:6, 380:22
**milestone** [7] - 246:15, 247:2, 247:6, 247:9, 247:10, 247:13, 254:8
**milestones** [1] - 254:4
**military** [2] - 211:22, 353:6
**million** [13] - 174:1, 176:9, 220:16, 321:24, 322:8, 322:22, 323:9, 323:18, 324:4, 324:11, 325:6, 327:15
**mind** [16] - 113:6, 113:8, 129:15, 146:10, 167:6,

203:6, 261:16, 264:18, 272:21, 273:21, 274:11, 297:19, 298:5, 315:19, 325:16, 391:14
**minds** [1] - 315:7
**mine** [2] - 201:11, 368:9
**minor** [1] - 77:12
**minute** [7] - 125:10, 200:11, 203:19, 206:14, 206:24, 216:14, 333:10
**minutes** [15] - 88:17, 148:14, 149:19, 174:8, 183:20, 187:18, 204:3, 206:1, 232:14, 238:20, 365:22, 383:21, 389:21, 394:23, 395:10
**mirrored** [1] - 106:17
**miss** [2] - 131:8, 382:13
**mission** [1] - 309:3
**misspoke** [2] - 347:9, 348:10
**mistakes** [2] - 122:18, 202:16
**mode** [1] - 337:4
**model** [8] - 169:15, 170:9, 277:5, 298:2, 302:10, 302:21, 302:24, 368:12
**models** [3] - 263:10, 303:2, 303:7
**modern** [1] - 393:5
**modes** [2] - 89:15, 93:12
**mole** [1] - 404:16
**moment** [6] - 90:11, 105:8, 132:11, 145:9, 361:24, 401:14
**Monday** [2] - 75:8, 125:8
**monetization** [5] - 168:1, 168:6, 168:17, 169:4, 172:14
**money** [19] - 149:10, 167:16, 167:21, 168:3, 168:4, 169:5, 169:7, 169:9, 170:2, 172:1, 172:11, 172:17, 201:18, 201:21, 202:10, 227:10, 320:15, 322:12, 381:23

**monitors** [2] - 166:24, 174:20
**month** [1] - 318:15
**months** [6] - 120:23, 167:20, 169:2, 200:23, 247:5, 283:3
**morning** [35] - 77:1, 85:5, 85:11, 85:20, 85:24, 86:4, 98:8, 108:4, 108:22, 109:3, 125:10, 127:5, 130:19, 147:18, 149:22, 151:4, 179:8, 187:11, 203:18, 208:21, 209:13, 209:14, 242:18, 243:3, 243:11, 245:1, 247:15, 249:6, 255:4, 394:8, 400:22, 403:19, 404:5, 405:9, 406:10
**MORRIS** [1] - 76:4
**most** [19] - 105:14, 117:3, 120:19, 120:21, 144:9, 169:20, 176:18, 178:24, 181:12, 181:21, 191:21, 192:10, 237:15, 244:9, 250:14, 254:3, 257:12, 260:8, 278:4
**mostly** [2] - 214:17, 268:20
**motion** [3] - 81:13, 360:8, 380:7
**Mount** [1] - 151:21
**Mountain** [3] - 261:13, 364:6, 384:17
**mountains** [2] - 370:3, 370:4
**mouse** [5] - 239:11, 239:13, 239:14, 240:22, 278:21
**mouthful** [1] - 330:22
**move** [27] - 93:14, 150:4, 150:9, 150:17, 150:20, 173:23, 181:18, 182:3, 184:10, 205:20, 206:9, 227:5, 227:11, 231:1, 231:5, 231:6, 240:2, 244:10, 244:12, 244:24, 268:14, 291:9, 344:21, 349:12, 377:12
**moved** [4] - 158:6,

161:7, 214:10, 268:19
**movie** [1] - 252:20
**moving** [7] - 151:15, 191:6, 196:18, 231:15, 233:22, 233:23, 377:15
**MR** [195] - 77:4, 77:10, 79:2, 80:6, 80:15, 83:7, 83:13, 84:15, 84:19, 84:23, 85:7, 85:12, 85:21, 86:1, 87:4, 87:14, 87:24, 88:23, 89:6, 89:11, 90:3, 90:14, 91:7, 91:11, 92:12, 92:22, 93:22, 94:2, 94:16, 94:20, 96:7, 97:1, 97:7, 97:11, 98:9, 100:12, 100:16, 101:4, 101:12, 102:7, 102:12, 103:13, 103:16, 105:6, 105:21, 106:3, 106:10, 106:14, 106:23, 107:5, 107:13, 108:9, 108:16, 109:18, 109:22, 109:24, 130:17, 149:21, 149:24, 150:3, 150:5, 150:11, 150:16, 150:19, 150:22, 150:24, 151:1, 151:2, 163:19, 178:1, 178:5, 204:8, 205:1, 205:17, 206:7, 206:11, 206:22, 207:3, 207:5, 207:18, 208:10, 208:19, 209:12, 238:12, 238:15, 238:18, 239:2, 240:1, 240:6, 241:5, 241:15, 241:17, 241:23, 242:1, 242:8, 285:18, 285:19, 285:21, 286:16, 286:20, 287:2, 287:6, 287:9, 287:10, 297:6, 297:9, 298:4, 298:7, 298:9, 300:22, 300:24, 302:14, 302:16, 314:9, 314:12, 316:1, 333:7, 333:16, 333:18, 333:21, 334:13, 334:16,

334:19, 334:24,
335:2, 342:15,
342:17, 342:24,
344:10, 344:14,
344:21, 344:24,
345:20, 348:15,
348:21, 349:13,
349:15, 350:16,
350:20, 350:22,
351:8, 357:14,
357:17, 357:21,
358:2, 358:24,
359:4, 359:7,
359:12, 359:17,
359:22, 360:10,
361:1, 361:5,
361:10, 361:14,
361:20, 362:6,
383:8, 383:13,
383:17, 384:3,
393:19, 394:18,
394:21, 395:19,
396:20, 397:1,
397:12, 397:23,
398:3, 398:7,
398:20, 398:24,
399:17, 400:8,
400:16, 400:18,
400:21, 401:16,
401:17, 401:20,
402:10, 402:20,
402:21, 403:10,
403:18, 404:4,
404:13, 405:11,
405:13, 405:17,
405:19, 406:2, 406:7
**MS** [37] - 77:18, 78:1,
78:6, 78:11, 78:17,
78:21, 78:24, 79:5,
79:10, 79:16, 79:18,
80:23, 81:6, 81:9,
82:2, 82:13, 82:16,
82:23, 83:20, 84:9,
94:3, 95:1, 95:9,
95:17, 95:21, 96:2,
96:15, 96:24, 97:3,
97:16, 98:2, 98:6,
102:10, 102:17,
103:11, 108:5, 205:6
**multi** [1] - 336:18
**multimillion** [1] -
363:12
**multimillion-dollar** [1]
- 363:12
**multiple** [2] - 295:14,
295:17
**museums** [1] - 252:13
**music** [1] - 159:10
**must** [15] - 111:17,
113:14, 123:14,

123:19, 138:2,
140:6, 140:14,
144:1, 145:6, 148:9,
186:20, 215:7,
249:8, 258:5, 403:22
**MYERS** [1] - 76:6
**mystery** [1] - 161:20
**naive** [2] - 162:10,
328:12
**name** [47] - 135:3,
152:20, 159:15,
160:12, 165:5,
179:5, 196:10,
198:15, 198:16,
198:18, 199:5,
199:9, 199:16,
204:12, 205:5,
205:6, 208:3,
213:22, 235:5,
235:10, 235:12,
235:13, 235:15,
235:17, 279:17,
279:18, 298:19,
311:15, 311:18,
335:18, 336:12,
359:2, 362:7,
362:19, 365:2,
367:2, 369:11,
369:12, 370:11,
371:20, 371:24,
374:5, 381:13, 384:9
**named** [6] - 157:9,
189:2, 257:16,
266:23, 346:9, 368:8
**names** [2] - 115:11,
132:16
**narrow** [2] - 399:10,
400:12
**narrowing** [1] - 398:21
**NASA** [3] - 164:10,
164:12, 309:2
**Natalie** [1] - 177:1
**national** [2] - 192:24,
201:9
**native** [1] - 155:7
**naturally** [1] - 379:6
**nature** [3] - 116:19,
256:22, 371:4
**navigate** [1] - 278:22
**navigation** [6] - 292:1,
292:2, 292:5, 292:9,
292:11, 292:17
**Nawrocki** [7] - 172:24,
173:1, 174:16,
175:5, 175:14,
175:20, 201:20
**Nawrocki's** [1] -
202:16
**near** [1] - 378:7
**nearly** [2] - 117:23,

202:7
**necessarily** [4] -
105:2, 139:6,
296:19, 380:3
**necessary** [2] - 129:1,
129:7
**need** [37] - 85:24,
101:21, 104:19,
105:1, 106:19,
107:24, 108:3,
108:14, 125:12,
134:3, 149:6, 150:6,
151:7, 165:17,
166:23, 177:8,
195:3, 199:15,
201:17, 204:10,
204:12, 204:15,
207:15, 225:8,
225:16, 225:18,
232:23, 241:13,
241:22, 270:21,
305:8, 333:15,
333:19, 371:12,
385:9, 390:4, 390:6
**needed** [10] - 77:3,
89:7, 107:20, 110:9,
153:3, 154:5,
220:14, 305:6,
317:21
**needing** [1] - 390:8
**needs** [3] - 113:13,
204:7, 293:24
**negative** [1] - 360:4
**negotiate** [2] - 166:2,
166:5
**negotiating** [1] - 263:4
**negotiation** [6] -
103:23, 104:6,
104:17, 400:24,
401:5, 401:15
**negotiations** [3] -
99:20, 99:21, 101:24
**nervous** [1] - 210:7
**network** [16] - 169:23,
170:1, 233:12,
233:22, 253:13,
284:2, 294:20,
294:23, 295:3,
295:7, 337:8, 339:5,
339:7, 339:15,
390:18, 391:4
**networking** [1] -
340:22
**networks** [7] - 148:1,
212:22, 253:10,
253:16, 260:5,
294:24, 295:20
**neuro** [1] - 212:21
**neurosurgeons** [1] -
214:4

**neutrally** [1] - 134:13
**never** [26] - 179:3,
191:23, 191:24,
193:2, 193:3,
193:20, 196:4,
202:18, 255:17,
273:2, 278:18,
280:3, 291:12,
304:20, 305:1,
306:22, 307:2,
307:4, 307:7,
307:15, 307:21,
309:17, 341:22,
342:9, 401:24, 402:1
**new** [32] - 93:8,
111:19, 112:2,
112:5, 113:3, 113:4,
113:13, 115:22,
122:3, 157:21,
158:6, 158:10,
158:14, 163:12,
165:2, 172:10,
191:22, 191:24,
214:2, 236:5,
254:10, 255:15,
268:19, 269:5,
278:17, 280:15,
295:6, 295:10,
301:4, 377:11,
381:18, 403:16
**New** [1] - 407:2
**news** [2] - 148:22,
192:24
**next** [27] - 78:11,
78:18, 78:22, 79:5,
81:9, 82:3, 107:20,
133:12, 161:17,
168:23, 176:11,
219:18, 230:17,
262:18, 264:20,
275:7, 282:17,
326:3, 338:3, 346:8,
356:3, 356:14,
362:5, 362:6,
366:22, 383:20,
390:2
**NGA** [1] - 378:6
**nice** [6] - 182:4, 182:7,
270:17, 270:22,
375:16, 376:2
**NICHOLS** [1] - 76:4
**night** [5] - 85:14,
396:7, 397:9,
397:21, 397:22
**nine** [3] - 278:13,
395:7, 395:8
**nobody** [5] - 226:12,
226:13, 239:15,
248:14, 288:14
**node** [8] - 339:9,

339:12, 339:13,
339:18, 340:4,
341:12, 341:22
**non** [3] - 94:23, 122:4,
334:4
**non-Google** [1] -
94:23
**non-obvious** [1] -
122:4
**non-practicing** [1] -
334:4
**none** [1] - 282:14
**nonexclusive** [3] -
313:20, 316:6,
326:20
**noninfringement** [4] -
105:3, 107:7,
107:12, 107:18
**nonresponsive** [1] -
344:22
**normal** [2] - 167:11,
362:15
**normally** [2] - 134:5,
211:9
**North** [2] - 369:19,
370:10
**northeastern** [1] -
184:13
**notable** [1] - 257:12
**Notary** [1] - 407:8
**note** [5] - 102:18,
153:19, 183:13,
318:20, 378:17
**notebook** [10] -
101:13, 109:16,
132:10, 144:3,
178:11, 183:13,
198:1, 208:12,
262:3, 353:20
**notebooks** [11] -
84:14, 84:16, 85:19,
109:19, 130:12,
130:22, 130:23,
131:1, 138:22,
207:10, 208:11
**notes** [8] - 130:22,
131:4, 131:5, 131:6,
131:10, 132:7,
177:17, 407:11
**Nothing** [1] - 333:18
**nothing** [14] - 81:21,
116:5, 127:1,
147:20, 176:11,
241:15, 241:17,
241:23, 242:1,
264:11, 333:16,
358:2, 405:17,
405:19
**notice** [10] - 117:6,
119:16, 143:9,

171:11, 185:2,
381:3, 381:5, 381:9,
381:14, 381:16
**notion** [1] - 380:4
**notoriety** [1] - 192:23
**November** [1] - 120:22
**nowhere** [1] - 275:9
**Number** [1] - 345:21
**number** [48] - 81:13,
81:23, 115:8,
128:15, 132:15,
133:17, 134:1,
135:14, 150:12,
171:13, 175:3,
175:4, 175:7,
178:18, 181:13,
182:16, 185:3,
188:16, 189:10,
202:6, 219:14,
221:22, 222:4,
223:1, 223:3, 229:1,
230:2, 230:4, 232:5,
234:7, 235:7, 257:8,
271:7, 272:9, 283:1,
286:2, 288:1,
300:11, 300:14,
324:4, 326:6,
353:23, 355:11,
355:18, 378:18,
380:11, 392:7, 399:3
**numbered** [5] - 79:19,
117:5, 131:17,
133:20, 133:22
**numbers** [14] -
115:17, 115:19,
174:12, 174:13,
174:19, 174:23,
226:4, 229:23,
230:1, 231:2, 371:7,
378:18, 380:11
**numerical** [1] - 229:12
**o'clock** [1] - 405:9
**O'MELVENY** [1] - 76:6
**oath** [4] - 126:16,
205:11, 208:8, 343:8
**object** [5] - 82:24,
128:4, 333:22,
333:24, 348:15
**objected** [2] - 86:8,
128:11
**objecting** [1] - 82:11
**objection** [19] - 79:10,
81:7, 83:23, 128:8,
128:13, 206:6,
206:8, 206:10,
238:15, 285:18,
298:4, 342:15,
342:22, 344:10,
351:8, 357:14,
361:4, 361:14,

383:12
**objections** [12] - 79:6,
81:9, 83:11, 83:14,
83:16, 83:21, 84:10,
86:2, 128:5, 361:6,
383:13, 383:24
**objective** [6] - 93:11,
171:13, 171:22,
226:20, 227:13,
262:21
**objectives** [1] - 171:12
**objects** [2] - 79:21,
244:14
**obligated** [1] - 395:2
**obligation** [2] - 344:6,
399:19
**obligations** [1] -
395:23
**observed** [1] - 354:13
**observer** [2] - 230:19,
244:14
**obtain** [2] - 137:13,
149:4
**obtained** [4] - 210:22,
359:10, 360:2, 360:3
**obtaining** [1] - 137:12
**obvious** [8] - 113:14,
115:22, 122:4,
137:3, 142:11,
195:10, 195:11,
195:12
**obviously** [2] - 135:6,
182:5
**occasionally** [1] -
120:20
**occasions** [2] - 151:9,
234:8
**occupation** [1] -
213:12
**occur** [4] - 105:15,
105:16, 265:8,
376:11
**occurred** [5] - 121:3,
192:12, 197:7,
330:5, 399:2
**occurs** [3] - 103:20,
113:9, 396:12
**October** [2] - 132:13,
363:1
**octree** [2] - 389:3,
392:21
**OF** [2] - 75:1, 407:5
**offer** [12] - 171:17,
238:13, 262:10,
314:7, 324:16,
326:5, 357:22,
360:11, 361:1,
361:11, 383:9,
393:20
**offered** [3] - 171:16,

325:4, 395:16
**offering** [1] - 111:5
**offers** [2] - 170:14,
322:5
**office** [51] - 79:23,
80:3, 80:8, 80:14,
80:15, 80:17, 80:22,
81:2, 81:3, 119:15,
120:6, 120:8, 120:9,
121:2, 137:15,
139:1, 154:24,
155:1, 155:19,
156:5, 163:3, 163:7,
163:9, 163:11,
163:18, 164:17,
245:18, 250:1,
250:12, 250:15,
250:19, 250:21,
251:1, 251:3,
275:11, 275:16,
275:23, 276:4,
276:5, 276:8,
279:14, 285:23,
286:8, 286:9,
324:24, 332:4,
346:19, 347:18,
352:1, 352:4, 352:15
**Office** [14] - 111:11,
113:18, 113:21,
136:11, 155:18,
158:23, 162:22,
162:24, 196:3,
344:7, 345:3,
345:18, 348:23,
350:11
**officer** [2] - 94:19,
94:20
**offices** [7] - 215:21,
215:23, 261:14,
264:24, 267:10,
273:5, 341:13
**official** [1] - 111:1
**officially** [1] - 360:15
**often** [4] - 113:22,
120:19, 173:18,
173:22
**oil** [1] - 369:16
**old** [6] - 89:15, 93:12,
99:19, 180:18,
211:2, 260:15
**olds** [1] - 211:8
**once** [17] - 112:18,
121:2, 121:11,
149:6, 174:10,
178:13, 178:14,
193:20, 194:24,
200:17, 201:5,
312:9, 366:1,
367:22, 390:1,
390:3, 390:21

**one** [182] - 77:13,
77:19, 80:8, 81:13,
84:17, 87:7, 89:20,
90:11, 97:14, 98:10,
100:1, 101:4,
101:15, 102:8,
102:13, 103:8,
113:14, 116:20,
116:23, 118:24,
121:3, 127:3, 128:3,
128:7, 130:18,
136:15, 138:21,
139:8, 140:16,
142:6, 150:12,
152:21, 153:23,
154:3, 159:17,
162:19, 164:24,
168:15, 171:9,
171:13, 173:17,
173:20, 176:6,
176:7, 179:21,
181:2, 181:5,
181:10, 182:8,
182:22, 183:7,
184:5, 185:10,
186:22, 186:23,
187:1, 187:14,
188:1, 189:20,
190:3, 190:13,
191:13, 191:14,
192:3, 193:20,
194:19, 195:3,
196:19, 197:11,
198:9, 198:10,
199:6, 199:18,
200:18, 201:16,
202:7, 207:20,
208:13, 208:21,
209:23, 213:15,
215:13, 216:14,
217:15, 217:23,
218:9, 218:23,
219:2, 219:3,
219:16, 219:19,
219:24, 220:9,
220:16, 223:16,
228:20, 230:1,
231:4, 232:1, 232:2,
232:3, 235:8, 236:2,
236:8, 237:17,
242:15, 243:14,
244:3, 247:23,
248:7, 250:6, 250:8,
251:20, 254:22,
256:3, 261:23,
266:19, 267:9,
267:10, 269:11,
272:7, 273:18,
277:8, 277:9, 285:6,
286:21, 289:24,
:9,

295:21, 297:16,
297:22, 297:24,
298:1, 299:2, 299:3,
300:6, 301:21,
302:19, 310:23,
311:24, 313:24,
315:24, 317:6,
319:13, 321:24,
322:8, 323:15,
324:2, 324:6,
326:10, 326:14,
327:14, 328:15,
329:6, 338:1, 339:4,
339:23, 342:1,
346:9, 348:20,
358:20, 359:13,
359:19, 361:8,
363:15, 364:21,
365:4, 374:24,
375:3, 377:7, 377:8,
378:22, 379:14,
382:13, 392:11,
401:17, 405:21
**one-and-a-half** [1] -
237:17
**one-billionth** [1] -
173:17
**one-minute** [1] -
216:14
**one-time** [1] - 327:14
**ones** [3] - 182:12,
182:13, 294:3
**online** [1] - 114:12
**Onyx** [2] - 293:17,
293:20
**Onyx's** [1] - 374:10
**open** [3] - 129:15,
203:6, 329:21
**opening** [15] - 79:6,
83:1, 84:1, 108:7,
124:10, 127:10,
149:18, 149:22,
235:1, 235:3,
275:21, 276:12,
276:13, 279:3, 401:1
**openings** [1] - 103:21,
279:4
**operate** [3] - 214:4,
363:14, 363:16
**operates** [1] - 206:1
**operating** [1] - 182:14
**operation** [4] - 87:15,
87:21, 345:12, 384:5
**operationally** [1] -
307:11
**operations** [2] -
163:21, 176:13
**opinion** [1] - 403:4
**opinions** [2] - 128:6,
268:6

**opportunities** [4] - 262:12, 267:18, 268:5, 274:13
**opportunity** [5] - 124:15, 124:18, 130:7, 135:7, 259:22
**opposed** [1] - 360:18
**opposing** [1] - 208:13
**opposite** [2] - 295:10, 318:5
**option** [1] - 165:23
**options** [3] - 165:21, 166:1, 220:18
**orally** [1] - 134:11
**order** [43] - 77:12, 99:5, 99:12, 104:1, 104:9, 104:10, 105:1, 105:4, 105:13, 105:15, 106:7, 106:9, 106:19, 106:20, 118:5, 128:22, 154:5, 206:23, 220:19, 222:15, 285:1, 285:2, 362:13, 396:6, 396:15, 397:1, 397:7, 397:14, 398:19, 399:3, 402:22, 403:5, 403:23, 404:2, 404:9, 404:19, 404:21, 404:22, 404:24, 405:1, 405:2
**orders** [3] - 180:24, 265:17, 396:1
**ordinarily** [1] - 100:1
**ordinary** [2] - 113:14, 118:16
**organizations** [1] - 193:1
**organize** [2] - 299:1, 299:4
**organizing** [3] - 180:19, 299:2, 300:17
**orient** [2] - 297:14, 301:8
**origin** [1] - 231:19
**original** [1] - 119:2
**originally** [1] - 198:23
**originated** [1] - 311:13
**otherwise** [3] - 147:7, 190:19, 315:12
**ought** [2] - 201:19, 349:9, 395:14
**ourselves** [1] - 315:24
**outgoing** [1] - 120:14
**outlined** [1] - 245:17
**outside** [6] - 113:19, 129:2, 129:3, 280:10, 309:11, 375:7
**outstanding** [1] - 383:24
**overall** [2] - 120:11, 171:4
**overcome** [1] - 120:3
**overlooked** [1] - 122:19
**overrule** [1] - 128:8
**overruled** [7] - 81:8, 82:10, 82:15, 238:17, 342:23, 344:13, 351:9
**overseeing** [1] - 213:9
**oversimplification** [1] - 231:11
**overstep** [1] - 106:11
**Overview** [1] - 131:14
**own** [17] - 159:4, 159:5, 181:23, 191:7, 191:22, 195:5, 212:15, 212:19, 235:23, 278:5, 283:8, 325:16, 326:21, 326:23, 327:7, 375:5
**owned** [2] - 213:9, 310:15
**owner** [6] - 111:3, 112:9, 138:12, 143:4, 311:2, 405:24
**owner's** [3] - 136:17, 139:4, 143:2
**owners** [1] - 112:13
**ownership** [1] - 406:5
**owning** [1] - 80:9
**p.m** [4] - 241:12, 333:13, 394:13, 406:11
**Pacific** [3] - 89:14, 91:22, 92:19
**package** [5] - 269:3, 274:7, 274:18, 323:24
**packet** [1] - 274:18
**Page** [1] - 262:6
**page** [45] - 77:19, 77:22, 78:12, 84:24, 115:6, 115:8, 115:17, 115:23, 121:7, 132:15, 132:18, 133:6, 133:18, 172:2, 172:13, 198:13, 246:13, 247:8, 250:7, 250:10, 251:19, 252:3, 252:5, 262:7

262:11, 262:18, 262:19, 262:22, 264:15, 269:16, 270:1, 270:5, 271:10, 281:18, 281:20, 316:3, 316:4, 326:3, 336:10, 338:3, 338:11, 339:24, 345:22, 350:1, 380:13
**Pages** [1] - 407:10
**pages** [6] - 85:15, 131:10, 133:13, 133:14, 133:19, 405:7
**pagination** [1] - 77:24
**paging** [3] - 382:14, 382:22, 383:3
**paid** [7] - 201:19, 215:20, 310:2, 310:5, 310:11, 326:16, 381:10
**paint** [6] - 220:14, 222:6, 290:10, 290:12, 290:13, 290:15
**paper** [28] - 85:4, 85:6, 114:13, 120:17, 120:20, 134:20, 134:21, 134:23, 185:14, 199:20, 199:24, 200:1, 200:4, 200:7, 200:8, 200:13, 200:15, 330:13, 330:16, 332:6, 332:8, 332:12, 332:13, 332:15, 358:8, 358:10, 358:11, 358:15
**papers** [2] - 331:6, 352:3
**paragraph** [21] - 77:23, 78:2, 78:7, 78:14, 78:18, 95:4, 95:10, 261:3, 261:15, 272:14, 276:20, 314:21, 314:22, 316:5, 318:19, 339:24, 340:4, 355:18, 356:3, 374:7
**paragraphs** [1] - 117:5
**paratrooper** [1] - 211:24
**parenthetical** [1] - 101:17
**park** [2] - 201:9, 376:8
**Parliament** [3] -

212:17, 213:2, 287:14
**parliament** [1] - 213:4
**part** [67] - 80:10, 86:17, 88:19, 89:8, 101:6, 101:8, 105:14, 105:15, 107:8, 107:21, 116:13, 116:16, 117:3, 118:11, 124:24, 129:3, 129:8, 130:3, 131:8, 149:2, 157:3, 161:8, 170:8, 170:21, 171:20, 174:22, 175:18, 175:23, 181:10, 181:11, 199:18, 210:3, 215:2, 218:16, 220:24, 224:16, 224:17, 225:20, 236:7, 238:23, 250:18, 258:23, 273:20, 274:7, 277:3, 277:16, 278:2, 278:3, 278:16, 292:14, 305:4, 305:9, 308:24, 311:2, 314:6, 342:3, 363:13, 365:15, 370:19, 371:22, 372:23, 377:18, 382:23, 383:4, 385:19, 387:4
**part-task** [1] - 363:13
**partially** [1] - 354:10
**participant** [1] - 211:10
**participated** [1] - 321:15
**particular** [34] - 93:2, 95:3, 107:9, 113:7, 117:2, 127:17, 127:18, 128:14, 128:19, 130:3, 136:5, 141:20, 147:12, 179:18, 182:15, 184:7, 184:18, 186:12, 186:14, 187:10, 196:14, 203:14, 206:4, 213:11, 215:15, 237:4, 262:21, 264:6, 295:6, 311:8, 316:5, 345:22, 386:22, 393:21
**particularly** [2] - 81:16, 384:23

**parties** [14] - 78:8, 96:10, 126:9, 128:3, 139:14, 141:13, 144:13, 144:22, 145:4, 146:17, 147:5, 148:20, 149:3, 262:15
**parties'** [1] - 137:9
**partner** [9] - 260:9, 327:6, 327:22, 327:24, 328:1, 355:12, 355:20, 355:21, 356:1
**Partridge** [6] - 87:3, 149:20, 177:1, 242:7, 360:8, 362:4
**partridge** [4] - 207:17, 350:18, 397:11, 397:24
**PARTRIDGE** [83] - 75:21, 77:4, 84:15, 84:19, 84:23, 85:7, 87:4, 87:14, 87:24, 88:23, 89:6, 89:11, 92:22, 93:22, 94:2, 98:9, 100:12, 100:16, 101:4, 101:12, 102:7, 102:12, 103:13, 108:9, 109:18, 109:22, 130:17, 149:21, 204:8, 205:1, 205:17, 206:11, 207:3, 207:18, 208:10, 208:19, 209:12, 238:12, 238:18, 239:2, 240:1, 240:6, 241:5, 241:15, 241:23, 242:8, 285:19, 285:21, 286:16, 286:20, 298:4, 333:18, 333:21, 334:16, 342:15, 344:10, 348:15, 350:20, 350:22, 357:17, 357:21, 359:4, 359:12, 360:10, 361:1, 361:14, 362:6, 383:8, 383:17, 384:3, 393:19, 394:18, 394:21, 397:12, 398:3, 398:7, 398:20, 398:24, 400:8, 400:18, 405:19, 406:2, 406:7
**parts** [11] - 115:4, 117:14, 131:21,

169:17, 175:19,
229:24, 238:3,
264:10, 278:20,
279:22
**Party** [5] - 287:17,
287:18, 287:20,
288:4, 288:9
**party** [6] - 122:1,
129:13, 145:10,
146:5, 146:20,
287:16
**pass** [2] - 110:19,
286:16
**passed** [3] - 197:1,
278:14, 340:24
**passion** [2] - 192:16,
363:4
**past** [3] - 120:17,
147:14, 253:13
**patch** [1] - 224:18
**patent** [485] - 78:13,
79:23, 80:3, 80:7,
80:13, 80:15, 80:17,
80:22, 81:2, 81:3,
87:10, 88:6, 89:18,
92:24, 93:9, 99:3,
99:7, 103:24,
104:10, 104:11,
104:23, 109:11,
109:14, 109:16,
110:4, 110:7,
110:12, 111:1,
111:6, 111:7,
111:12, 111:14,
112:1, 112:6, 112:7,
112:14, 112:15,
112:18, 112:21,
112:23, 113:2,
113:5, 113:8,
113:12, 113:24,
114:4, 114:6,
114:11, 114:19,
114:22, 114:24,
115:2, 115:4, 115:9,
115:13, 115:14,
115:15, 116:14,
116:17, 117:4,
117:12, 117:14,
117:15, 117:16,
117:21, 117:23,
118:6, 118:14,
118:23, 119:11,
119:21, 120:21,
121:5, 121:7, 121:9,
121:11, 121:13,
121:24, 122:3,
122:7, 122:10,
122:22, 123:2,
123:8, 123:16,
123:20, 125:21,

125:23, 126:1,
126:2, 131:10,
131:12, 131:16,
131:19, 131:21,
131:24, 132:1,
132:2, 132:12,
132:13, 132:15,
132:22, 133:5,
133:8, 133:9,
133:20, 133:24,
134:1, 136:12,
136:17, 136:24,
137:1, 137:5, 137:6,
137:12, 137:13,
137:14, 137:15,
137:18, 137:20,
137:22, 138:9,
138:10, 138:11,
138:12, 138:13,
138:17, 138:18,
138:21, 138:23,
139:1, 139:2, 139:3,
139:6, 139:7,
139:10, 139:16,
139:20, 139:24,
140:15, 141:5,
141:7, 141:9,
141:10, 141:22,
141:24, 142:14,
142:24, 143:1,
143:4, 143:5, 143:6,
143:8, 143:11,
143:19, 144:5,
144:6, 144:7,
144:17, 145:15,
145:17, 148:21,
154:1, 154:23,
155:1, 155:2,
155:16, 155:19,
155:20, 155:21,
155:24, 156:2,
156:5, 156:6,
158:22, 159:2,
159:5, 159:7, 160:1,
160:6, 162:7,
162:13, 162:15,
162:16, 162:17,
163:1, 163:2, 163:7,
163:9, 163:11,
163:13, 163:17,
163:18, 163:24,
164:17, 166:6,
166:10, 175:18,
175:24, 176:12,
178:8, 178:9,
178:10, 178:22,
178:24, 179:22,
180:5, 180:11,
180:12, 180:14,
183:12, 183:15,
184:1, 184

184:24, 185:1,
185:2, 186:13,
186:17, 186:20,
187:4, 191:7, 191:9,
193:5, 193:14,
193:16, 193:21,
193:24, 194:1,
194:4, 194:11,
194:13, 194:19,
195:2, 195:11,
195:14, 195:16,
195:17, 195:21,
196:6, 197:6, 197:9,
197:23, 198:1,
198:2, 198:6, 200:6,
200:7, 200:19,
201:15, 202:23,
202:24, 203:12,
203:14, 207:21,
208:22, 228:4,
228:11, 228:14,
233:16, 237:10,
237:12, 237:14,
237:22, 237:24,
238:2, 242:13,
242:14, 242:16,
242:19, 243:5,
243:23, 243:24,
245:17, 249:24,
250:3, 250:4, 250:5,
250:12, 250:15,
250:19, 250:21,
251:1, 251:2, 251:3,
260:4, 261:2,
261:19, 261:23,
261:24, 262:15,
263:4, 263:17,
264:1, 264:4, 266:2,
266:5, 266:7, 266:8,
266:11, 266:13,
268:21, 269:2,
269:18, 270:17,
270:22, 271:1,
271:7, 271:8,
271:15, 272:17,
272:23, 273:3,
273:5, 273:23,
274:17, 275:10,
275:11, 275:13,
275:16, 275:19,
275:23, 276:4,
276:5, 276:8, 276:9,
276:10, 278:13,
279:13, 280:24,
281:3, 281:5, 281:6,
281:7, 281:15,
281:23, 282:21,
283:12, 283:17,
283:18, 283:20,
284:9, 284:21,

286:7, 286:9,
286:12, 286:13,
286:15, 288:16,
289:3, 289:6,
289:19, 290:1,
290:6, 290:17,
291:3, 291:21,
292:6, 293:4, 293:6,
293:12, 293:22,
294:17, 295:5,
295:19, 295:24,
296:24, 299:9,
300:3, 300:20,
300:23, 301:18,
302:5, 303:3, 304:7,
304:10, 304:12,
304:15, 304:17,
304:21, 305:1,
305:5, 305:7,
305:15, 307:17,
308:2, 308:4, 308:6,
308:17, 312:6,
313:5, 313:14,
314:1, 314:18,
314:23, 315:2,
315:8, 315:10,
315:11, 315:16,
315:17, 317:6,
317:16, 317:21,
317:23, 318:22,
319:4, 319:5, 319:9,
319:10, 319:14,
320:5, 320:14,
321:21, 322:1,
323:2, 323:11,
324:5, 324:13,
324:16, 324:22,
324:24, 325:5,
325:8, 325:24,
326:11, 326:20,
326:24, 328:5,
328:9, 328:17,
330:9, 332:4, 334:4,
344:8, 344:19,
346:5, 346:6, 346:9,
346:12, 346:19,
347:16, 347:18,
347:22, 348:3,
348:5, 348:12,
349:4, 349:21,
349:24, 351:24,
352:4, 352:8, 352:9,
352:14, 356:12,
356:17, 358:21,
358:22, 359:10,
360:2, 368:7,
382:24, 401:8,
404:24
**Patent** [43] - 111:11,
113:17, 113:21,

139:17, 141:18,
142:6, 142:8,
142:11, 143:16,
155:17, 158:23,
162:22, 162:24,
164:6, 196:3, 262:8,
262:20, 270:14,
270:16, 289:6,
307:16, 307:22,
308:22, 309:18,
310:3, 310:6,
310:11, 311:9,
319:17, 319:24,
320:11, 320:22,
322:22, 323:18,
342:2, 344:6, 345:3,
345:17, 348:23,
350:11
**patent's** [1] - 137:23
**patent-related** [1] -
314:1
**patentability** [1] -
122:5
**patentable** [2] -
115:22, 137:19
**patented** [10] - 136:14,
152:2, 162:11,
163:23, 165:16,
171:20, 176:1,
266:21, 270:21,
313:8
**patentees** [1] - 112:14
**patentholder** [2] -
123:14, 136:19
**patentrol** [1] - 334:5
**patents** [28] - 78:3,
78:4, 109:12,
110:14, 110:17,
110:20, 115:19,
115:24, 117:24,
118:7, 121:19,
124:6, 136:9,
136:10, 137:18,
138:20, 141:15,
144:2, 146:6,
164:10, 173:3,
193:19, 194:8,
283:15, 308:10,
342:2, 348:4, 378:10
**paths** [1] - 157:8
**Patrick** [6] - 270:11,
371:9, 371:14,
374:5, 374:22
**Paulisch** [2] - 321:7,
321:11
**Paulish** [1] - 270:11
**Paulish's** [1] - 271:18
**Pavel** [9] - 152:20,
191:13, 198:10,
204:11, 207:20,

208:3, 365:2, 375:8, 375:23
**PAVEL** [3] - 208:4, 208:6, 365:2
**pay** [15] - 121:4, 130:8, 141:20, 159:22, 160:15, 165:22, 170:15, 171:17, 171:18, 176:11, 177:3, 271:3, 321:24, 329:23, 359:14
**payment** [1] - 327:14
**PC** [1] - 182:9
**PC's** [2] - 256:13, 260:5
**peer** [1] - 332:10
**pennies** [3] - 166:4, 176:6, 176:8
**penny** [1] - 310:11
**people** [76] - 82:1, 82:3, 91:19, 110:15, 112:9, 122:23, 147:4, 148:4, 154:22, 172:15, 172:16, 174:4, 174:5, 181:17, 181:20, 181:22, 182:16, 182:18, 182:23, 183:3, 183:4, 191:8, 191:15, 197:16, 200:3, 212:23, 214:13, 227:9, 234:8, 236:8, 238:8, 239:14, 248:15, 254:12, 255:3, 256:16, 256:17, 257:11, 263:1, 272:9, 277:18, 277:22, 281:13, 282:9, 282:14, 289:14, 289:19, 291:9, 299:13, 300:1, 301:11, 301:24, 310:18, 310:23, 311:24, 320:13, 323:11, 329:17, 330:3, 359:2, 364:12, 364:18, 368:22, 370:12, 373:19, 373:20, 373:24, 374:20, 375:6, 376:19, 377:24, 378:2, 378:3, 380:21, 381:11
**per** [3] - 166:4, 170:7, 285:1
**percent** [8] - 114:11,

264:11, 271:1, 313:24, 317:6, 321:22, 326:16, 357:7
**perfect** [1] - 122:20
**perform** [5] - 186:20, 186:24, 272:17, 305:6, 308:14
**performed** [13] - 104:1, 105:12, 106:2, 106:7, 106:8, 140:17, 387:19, 388:5, 392:11, 403:22, 404:8, 404:22, 404:23
**Performer** [9] - 257:13, 372:19, 372:21, 373:13, 374:10, 382:17, 382:23, 383:1, 383:6
**Performers** [1] - 261:12
**performs** [1] - 386:1
**perhaps** [7] - 102:15, 150:16, 223:16, 297:14, 336:7, 360:22, 400:9
**period** [8] - 88:16, 89:23, 101:16, 111:7, 228:16, 248:4, 255:6, 362:22
**permanent** [4] - 339:9, 339:17, 340:4, 341:22
**permanently** [1] - 214:23
**permission** [16] - 121:15, 147:22, 159:8, 159:17, 160:1, 165:17, 165:19, 166:9, 170:14, 173:5, 205:22, 206:5, 240:2, 240:8, 319:6
**permitted** [1] - 334:6
**permitting** [1] - 128:9
**person** [11] - 94:9, 114:20, 119:20, 121:12, 126:12, 141:2, 159:17, 159:18, 307:10, 307:12, 375:24
**personal** [4] - 99:23, 102:19, 102:22, 103:4
**personally** [2] - 330:15, 375:14
**persuade** [3] - 123:14, 123:19, 145:13
**pertinent** [2] - 104:18,

119:1
**Peter** [2] - 83:18, 188:9
**phase** [3] - 124:8, 124:13, 251:13
**PhD** [1] - 164:18
**phone** [12] - 212:24, 269:8, 269:20, 269:23, 271:21, 283:1, 285:7, 321:13, 321:15, 322:6, 322:14, 322:18
**phones** [1] - 148:8
**phrase** [1] - 393:8
**phrases** [1] - 123:8
**Physical** [1] - 240:6
**physical** [3] - 360:14, 360:16, 360:19
**pick** [1] - 240:11
**pictorial** [5] - 93:5, 188:6, 297:23, 301:2, 302:18
**picture** [4] - 152:6, 153:13, 224:19, 380:14
**pictures** [9] - 85:10, 85:11, 132:6, 132:7, 164:14, 178:7, 186:3, 187:24, 379:5
**piece** [15] - 85:6, 112:8, 134:19, 134:21, 134:23, 224:14, 245:7, 358:8, 358:10, 382:13, 386:10, 386:19, 386:22, 386:24
**pieces** [4] - 358:11, 358:15, 390:5, 390:23
**Pirate** [5] - 287:17, 287:18, 287:20, 288:4, 288:9
**pixel** [5] - 219:3, 219:5, 219:7, 219:16, 222:1
**pixels** [8] - 219:4, 219:12, 219:14, 220:17, 221:22, 222:4, 223:1, 223:3
**place** [17] - 99:6, 122:22, 130:10, 149:13, 155:20, 178:24, 181:18, 191:6, 243:14, 244:13, 269:2, 291:10, 302:10, 353:21, 373:5, 397:15

**places** [6] - 178:7, 181:5, 181:24, 191:6, 244:3, 354:20
**Plaintiff** [8] - 75:4, 75:24, 86:13, 139:15, 145:16, 241:24, 306:5, 311:3
**plaintiff** [14] - 82:17, 83:17, 124:14, 125:15, 149:20, 199:8, 199:21, 203:22, 241:16, 305:17, 362:11, 396:4, 399:18, 405:20
**Plaintiff's** [7] - 86:4, 86:7, 297:7, 316:2, 318:8, 321:9, 345:21
**plaintiffs** [1] - 200:13
**Plaintiffs** [1] - 86:3, 86:19
**plan** [4] - 86:3, 309:8, 370:21, 373:18
**planned** [1] - 340:5
**planning** [1] - 309:11
**platform** [1] - 255:19
**platforms** [2] - 165:9, 374:10
**play** [16] - 83:17, 93:24, 159:10, 159:13, 159:19, 159:21, 168:6, 217:9, 228:23, 229:1, 238:19, 238:22, 260:12, 362:15, 383:23, 399:1
**played** [2] - 238:24, 397:6
**playing** [5] - 88:19, 109:23, 177:2, 239:14, 384:8
**plays** [1] - 160:3
**plurality** [4] - 105:23, 190:2, 190:3
**point** [64] - 88:21, 92:4, 93:2, 96:8, 97:6, 99:8, 101:9, 101:22, 108:10, 119:23, 130:22, 161:20, 168:8, 169:19, 170:10, 192:4, 205:18, 205:19, 212:1, 215:4, 215:6, 221:16, 226:19, 226:20, 228:1, 229:23, 230:1, 230:4, 230:22, 231:1, 231:2, 231:5,

244:8, 249:14, 251:6, 251:10, 255:9, 257:15, 259:18, 262:16, 263:3, 264:15, 266:6, 270:13, 270:23, 271:5, 282:8, 283:5, 283:7, 284:11, 284:23, 320:8, 321:20, 331:19, 332:2, 333:5, 339:4, 355:22, 356:8, 374:14, 376:20, 399:11, 401:17, 404:15
**pointed** [4] - 90:7, 335:17, 337:20
**points** [6] - 90:4, 230:23, 256:24, 326:12, 327:21, 379:17
**polygonal** [5] - 302:9, 302:21, 302:24, 303:2, 303:6
**Polytechnic** [1] - 188:15
**Pool** [2] - 125:17, 305:18
**POOL** [1] - 75:3
**pop** [1] - 377:11
**popped** [3] - 215:13, 221:3, 221:4
**popular** [10] - 181:12, 181:16, 181:21, 192:18, 202:9, 255:18, 329:12, 329:14, 329:15, 329:20
**Porter** [3] - 282:16, 282:20, 286:2
**Porter's** [1] - 282:18
**portfolio** [1] - 193:18
**portion** [12] - 222:3, 243:23, 243:24, 244:16, 259:10, 261:4, 261:16, 271:4, 272:13, 276:20, 276:21, 278:1
**portions** [4] - 130:6, 273:11, 273:12, 277:2
**position** [9] - 83:3, 84:4, 93:14, 136:17, 206:4, 213:1, 213:2, 273:5, 384:18
**positions** [1] - 139:14
**possibility** [3] - 122:17, 193:16,

194:10
**possible** [14] - 135:13, 154:11, 216:20, 228:22, 238:4, 245:16, 271:11, 316:15, 316:22, 318:23, 328:18, 351:23, 362:14, 399:14
**possibly** [3] - 316:19, 356:11, 361:24
**post** [1] - 148:3
**potential** [2] - 226:22, 272:18, 324:5
**potentially** [2] - 103:10, 300:13
**power** [3] - 110:19, 111:22, 380:2
**powered** [1] - 158:1
**powerful** [7] - 151:14, 152:4, 153:7, 157:16, 158:13, 161:23, 176:2
**practically** [2] - 206:9, 338:21
**practice** [4] - 91:18, 195:1, 203:11, 308:15
**practiced** [3] - 308:3, 308:20, 317:22
**practicing** [1] - 334:4
**pre** [1] - 373:8
**preceded** [2] - 89:19, 342:2
**precious** [1] - 328:21
**precipitant** [1] - 207:1
**precise** [4] - 117:9, 230:2, 230:8, 395:14
**precisely** [3] - 230:11, 342:18, 395:20
**precision** [8] - 229:6, 229:13, 243:2, 243:9, 243:13, 243:16, 244:1, 245:10
**precursor** [1] - 349:23
**preexisting** [1] - 116:4
**preface** [1] - 387:23
**prefer** [2] - 314:23, 323:24
**preferable** [1] - 274:8
**preferred** [2] - 239:23, 269:4
**prejudice** [1] - 80:24
**prejudicial** [3] - 80:1, 101:3, 103:10
**preliminarily** [1] - 231:18
**preliminary** [4] - 77:13, 109:4,

119:16, 124:9
**prepare** [6] - 80:17, 113:16, 114:2, 124:12, 218:19, 235:21
**prepared** [5] - 109:13, 215:10, 236:17, 236:19, 243:22
**prepares** [1] - 119:24
**preparing** [1] - 236:23
**preponderance** [4] - 123:15, 145:18, 146:2, 146:13
**presence** [4] - 129:4, 147:2, 204:23, 366:9
**present** [8] - 124:16, 124:20, 124:21, 272:8, 340:21, 375:6, 399:6, 400:13
**presentation** [20] - 252:6, 252:10, 252:11, 253:7, 254:6, 257:4, 261:24, 262:4, 262:5, 262:7, 262:22, 262:24, 264:6, 268:3, 313:17, 314:5, 317:12, 378:21, 378:22, 379:2
**presentations** [2] - 267:12, 268:7
**presented** [7] - 103:21, 124:22, 141:13, 144:22, 146:20, 239:8, 377:14
**presenting** [1] - 145:6
**presumably** [1] - 379:6
**presumption** [1] - 138:24
**pretrial** [8] - 77:21, 81:19, 395:21, 395:24, 396:6, 396:15, 397:1, 397:14
**pretty** [7] - 167:24, 192:24, 298:21, 370:17, 375:15, 383:2, 395:12
**prevent** [3] - 111:16, 128:22, 136:12
**preview** [1] - 124:11
**previous** [4] - 115:24, 251:20, 260:11, 401:23
**previously** [3] - 115:19, 118:7, 142:7
**price** [4] - 271:3,

272:15, 321:23, 323:9
**priceless** [1] - 356:2
**primary** [2] - 106:24, 123:9
**principle** [1] - 223:24
**principles** [6] - 137:1, 223:5, 224:21, 225:4, 225:6, 234:21
**print** [1] - 336:8
**printed** [3] - 121:5, 141:24, 211:17
**priority** [7] - 133:4, 141:22, 141:24, 142:1, 142:13, 142:15, 349:11
**private** [1] - 288:11
**prizes** [1] - 368:21
**Pro** [1] - 316:21
**probable** [2] - 145:20, 272:16
**problem** [52] - 84:7, 107:24, 113:4, 116:19, 148:15, 150:7, 162:17, 162:18, 162:20, 163:7, 184:8, 186:12, 186:14, 216:17, 217:20, 218:7, 218:20, 220:4, 221:15, 223:6, 223:11, 227:21, 228:13, 229:4, 229:5, 229:6, 229:13, 229:15, 229:22, 230:1, 230:15, 231:12, 231:14, 231:16, 231:23, 232:11, 232:16, 232:18, 233:1, 233:2, 233:4, 233:20, 235:9, 239:13, 243:2, 243:13, 244:1, 244:4, 244:7, 245:10, 373:4, 402:3
**problems** [16] - 89:22, 155:9, 163:5, 163:13, 163:15, 182:16, 227:14, 228:2, 229:2, 233:15, 233:18, 234:13, 242:17, 243:10, 251:14, 257:1
**procedure** [4] - 125:1, 129:12, 397:15, 397:19
**proceed** [3] - 178:2, 287:7, 334:23

**proceeding** [1] - 122:21
**proceedings** [2] - 330:23, 331:6
**Process** [1] - 131:14
**process** [28] - 89:7, 89:8, 90:1, 113:5, 114:7, 117:17, 120:11, 122:20, 124:24, 134:12, 137:12, 143:10, 143:12, 187:9, 217:1, 309:2, 332:9, 342:4, 377:1, 385:8, 385:10, 385:19, 386:15, 387:4, 387:11, 389:22, 400:11
**processed** [1] - 107:20
**processes** [2] - 117:15, 390:24
**processing** [6] - 80:10, 107:14, 164:9, 164:11, 164:18, 164:20, 369:22, 385:10
**produce** [4] - 90:19, 216:11, 216:13, 216:15
**produced** [6] - 87:7, 87:19, 87:23, 90:8, 90:20, 236:20
**produces** [1] - 146:10
**producing** [1] - 260:7
**product** [58] - 87:11, 96:14, 104:19, 139:19, 143:12, 158:10, 158:14, 160:11, 160:14, 165:14, 181:7, 181:8, 181:15, 182:14, 188:11, 188:13, 188:19, 192:14, 192:21, 193:9, 193:11, 202:9, 227:23, 233:8, 251:7, 251:11, 251:15, 252:1, 252:12, 258:16, 263:20, 264:8, 268:1, 307:2, 308:6, 308:19, 311:13, 311:16, 312:1, 312:15, 312:16, 312:18, 316:9, 316:17, 316:20, 363:19, 363:20, 373:2, 377:2, 377:18,

378:15, 379:7, 379:10, 390:17
**production** [7] - 252:7, 252:17, 252:18, 252:20, 253:3, 253:7, 316:3
**products** [30] - 107:14, 126:21, 165:1, 165:4, 167:12, 167:17, 167:22, 168:4, 168:11, 171:1, 172:16, 178:21, 180:22, 180:24, 181:1, 181:4, 201:23, 212:20, 253:10, 260:7, 268:1, 268:2, 297:3, 307:16, 307:21, 308:1, 334:9, 391:20, 391:23
**professional** [2] - 211:4, 212:11
**professor** [1] - 189:11
**profit** [2] - 202:2, 381:24
**program** [3] - 372:22, 372:24, 375:3
**programing** [1] - 368:12
**progress** [3] - 110:21, 227:11, 246:20
**project** [34] - 192:17, 196:14, 196:15, 196:20, 196:22, 197:1, 198:15, 198:20, 198:21, 199:2, 199:3, 199:7, 199:10, 199:14, 214:24, 227:9, 227:12, 245:23, 246:16, 247:5, 247:12, 251:6, 251:10, 251:12, 251:24, 268:19, 327:6, 327:7, 335:13, 336:12, 340:21, 366:12, 372:17, 372:19
**projection** [1] - 214:20
**projections** [1] - 202:4
**projects** [6] - 196:13, 254:3, 266:2, 267:15, 272:7, 320:5
**promote** [2] - 87:16, 110:21
**promotional** [1] - 327:7
**pronounce** [1] - 205:13

**proof** [9] - 145:10,
145:12, 145:14,
145:24, 146:9,
146:18, 399:18,
400:4, 402:15
**proper** [5] - 114:1,
175:10, 176:4,
176:5, 222:6
**properties** [1] - 202:3
**property** [15] - 112:8,
112:10, 112:13,
117:8, 159:3, 159:6,
159:8, 159:9,
159:18, 173:2,
201:3, 287:22,
288:12, 288:20,
378:10
**proposal** [10] - 227:9,
284:12, 284:16,
284:17, 313:23,
317:5, 326:7, 326:9,
327:19, 327:20
**propose** [2] - 284:18,
404:1
**proposed** [5] - 274:15,
327:11, 403:12,
403:14, 403:20
**proprietary** [9] -
288:6, 379:2,
379:10, 379:16,
379:18, 379:19,
380:1, 380:3, 380:4
**prosecuting** [1] -
114:6
**prosecution** [7] -
117:16, 120:12,
122:22, 137:13,
138:13, 146:15,
283:12
**protecting** [1] -
287:21
**protection** [4] - 112:7,
137:4, 141:6, 195:13
**protocol** [1] - 337:9
**prototype** [3] - 232:9,
338:21, 339:2
**proud** [4] - 179:6,
192:17, 248:15,
254:5
**prove** [5] - 123:13,
123:18, 140:10,
146:8, 402:14
**proven** [3] - 127:23,
141:14, 146:12
**provide** [9] - 86:23,
123:1, 123:22,
140:23, 143:8,
166:18, 350:10,
392:1, 395:22
**provided** [8] - 119:6,

122:16, 125:11,
132:3, 249:2,
286:20, 396:9,
396:16
**providence** [1] - 90:15
**provides** [3] - 167:11,
169:21, 380:6
**providing** [3] - 161:22,
176:2, 395:6
**proving** [2] - 145:16,
146:6
**PTO** [22] - 113:22,
114:3, 114:11,
114:15, 115:9,
117:14, 117:18,
117:22, 120:15,
120:23, 121:2,
121:8, 121:17,
122:1, 122:16,
136:11, 137:15,
137:21, 138:12,
138:15, 138:24,
139:5
**PTO's** [3] - 114:12,
114:18, 137:18
**Ptolemy** [1] - 183:1
**PTX** [12] - 236:14,
238:13, 238:24,
240:7, 250:2,
251:17, 253:18,
253:20, 269:14,
281:9, 284:15,
314:10
**PTX-1** [1] - 242:12
**PTX-122** [2] - 262:1,
262:3
**PTX-13** [2] - 260:20,
260:22
**PTX-16** [3] - 271:24,
272:2, 272:3
**PTX-17B** [1] - 246:8
**PTX-267** [1] - 360:11
**PTX-295B** [1] - 259:4
**PTX-324** [1] - 360:13
**PTX-7** [1] - 360:13
**PTX-77** [1] - 383:10
**PTX-85** [1] - 94:6
**public** [32] - 111:18,
112:5, 112:17,
112:20, 117:6,
120:24, 137:2,
142:1, 143:9, 167:5,
180:10, 180:14,
184:1, 184:3, 195:5,
195:9, 196:18,
197:10, 198:5,
200:18, 201:6,
235:17, 239:9,
239:22, 254:18,
287:21, 288:1

288:2, 288:5,
288:11, 288:23,
329:22
**Public** [1] - 407:9
**publication** [1] -
201:13
**publications** [3] -
142:1, 197:3, 250:14
**publicity** [1] - 161:14
**publicly** [2] - 197:20,
197:21
**published** [2] -
119:20, 120:22
**publishers** [3] -
169:10, 169:15,
169:21
**pull** [12] - 223:13,
230:8, 230:11,
241:1, 245:6, 249:7,
250:2, 259:3,
284:15, 325:18,
336:3, 353:21
**punch** [1] - 373:10
**purchased** [6] - 158:4,
193:7, 193:10,
310:24, 312:2,
312:19
**purports** [1] - 96:19
**purpose** [5] - 101:1,
128:19, 128:20,
262:23, 267:17
**purposes** [9] - 90:19,
90:21, 101:23,
143:7, 298:24,
306:9, 309:11,
316:16, 327:8
**pursue** [1] - 99:19
**push** [1] - 206:13
**put** [44] - 79:20, 85:13,
101:16, 135:2,
178:3, 193:19,
199:22, 200:1,
203:4, 219:10,
226:4, 228:10,
232:11, 236:1,
238:9, 240:23,
242:13, 243:22,
246:12, 251:19,
253:19, 255:15,
260:21, 262:2,
269:4, 269:14,
270:3, 272:2, 273:3,
273:7, 274:5,
274:17, 275:10,
277:9, 277:10,
279:3, 281:10,
304:9, 308:9, 321:9,
330:24, 331:4,
341:12, 353:13
**putting** [4] - 183:19,

201:10, 365:15,
367:15
**pyramid** [1] - 336:19
**quad** [15] - 298:10,
298:13, 298:16,
298:17, 298:21,
299:1, 299:6,
299:13, 299:15,
299:17, 299:19,
299:20, 299:22,
300:1, 300:6
**quadrant** [3] - 298:2,
389:4, 392:23
**Quadtree** [2] - 389:4,
392:22
**qualify** [1] - 113:12
**quality** [2] - 185:23,
363:8
**quarter** [2] - 333:10,
373:7
**questions** [32] - 82:21,
84:22, 85:2, 85:5,
121:18, 127:11,
134:6, 134:9,
134:14, 135:6,
135:8, 135:22,
135:23, 136:4,
136:5, 166:14,
176:24, 243:12,
334:14, 342:23,
348:20, 350:17,
352:13, 353:24,
357:24, 358:15,
358:20, 360:5,
360:7, 391:12,
391:13, 392:3
**quickly** [2] - 228:22,
354:4
**quite** [11] - 200:23,
216:12, 216:23,
218:12, 219:22,
245:12, 247:13,
278:14, 323:15,
341:13, 395:10
**quote** [3] - 270:16,
270:17, 279:16
**radial** [2] - 389:3,
392:20
**raining** [1] - 182:6
**raise** [2] - 77:8, 399:4
**raised** [4] - 324:18,
396:2, 397:24,
400:22
**raises** [1] - 102:13
**raising** [4] - 271:6,
271:7, 272:22, 323:2
**Raleigh** [2] - 369:19,
370:10
**ran** [4] - 217:18,
229:5, 232:10,

303:15
**rather** [3] - 101:8,
210:2, 353:22
**RE44550E** [1] - 131:16
**reach** [4] - 98:24,
125:5, 158:15,
259:21
**reached** [5] - 101:22,
162:4, 176:5,
260:24, 313:10
**reaching** [4] - 109:7,
143:23, 260:13,
272:5
**reaction** [4] - 226:8,
248:10, 254:11,
255:1
**read** [19] - 95:6,
106:18, 112:21,
130:4, 130:6, 130:7,
148:21, 165:20,
202:12, 270:20,
277:2, 278:2,
302:17, 314:11,
318:24, 321:19,
325:15, 372:10,
373:11
**reads** [2] - 270:13,
277:17
**ready** [6] - 109:19,
149:10, 206:21,
334:17, 338:24,
358:14
**real** [12] - 90:22,
131:12, 152:11,
214:1, 216:24,
225:11, 239:15,
252:15, 380:8,
381:24, 404:1
**reality** [4] - 202:5,
202:8, 214:19,
339:20
**realize** [1] - 156:13
**realized** [3] - 98:15,
154:21, 165:15
**really** [45] - 92:9,
106:1, 115:21,
151:13, 152:15,
162:6, 162:20,
163:5, 163:15,
164:15, 165:20,
168:2, 175:24,
185:23, 198:13,
200:9, 201:1,
202:19, 216:9,
225:1, 227:21,
229:7, 254:12,
256:12, 260:16,
267:23, 268:4,
272:10, 272:23,
274:3, 274:15,

277:8, 278:20,
280:5, 308:16,
324:19, 324:20,
327:22, 336:11,
339:6, 344:2,
356:22, 357:11,
381:23, 401:3
**realtime** [10] - 214:15,
214:17, 216:3,
218:1, 218:5,
226:23, 233:18,
252:19, 253:4,
370:16
**reason** [11] - 148:23,
165:2, 181:16,
235:4, 235:12,
259:24, 312:11,
313:9, 323:4, 323:9,
323:21
**reasonable** [4] -
127:23, 146:15,
263:1, 324:12
**reasons** [10] - 120:7,
122:11, 128:15,
135:15, 255:20,
323:22, 324:2,
324:6, 339:14,
353:15
**rebranded** [1] - 160:22
**rebuilt** [1] - 214:12
**rebuttal** [1] - 124:20
**receive** [2] - 142:20,
351:7
**received** [10] - 117:23,
126:8, 127:16,
217:12, 259:7,
281:2, 309:17,
351:13, 390:21,
391:4
**receives** [4] - 114:15,
117:19, 121:8,
327:14
**receiving** [2] - 118:2,
351:11
**recently** [1] - 116:8
**recess** [6] - 147:14,
204:2, 206:17,
206:19, 241:20,
406:9
**recesses** [1] - 148:12
**recipient** [1] - 97:2
**recognize** [1] - 236:12
**recollection** [4] -
354:9, 372:12,
373:12, 385:6
**recommendation** [1] -
275:4
**record** [7] - 104:5,
205:5, 362:20,
378:17, 380:10,

384:10, 407:9
**records** [2] - 107:7,
197:3
**rectangle** [7] - 184:23,
185:3, 185:5, 185:9,
185:10
**rectangles** [4] - 185:4,
185:6, 185:7, 185:8
**redacted** [2] - 101:5,
101:18
**redaction** [1] - 102:5
**REDIRECT** [1] -
350:21
**redirect** [2] - 134:18,
350:19
**reduce** [1] - 221:11
**reduced** [1] - 91:18
**Reed** [3] - 202:12,
202:14, 202:15
**reexamination** [1] -
272:17
**refer** [20] - 115:1,
116:9, 125:19,
127:14, 131:18,
139:16, 144:10,
246:11, 251:17,
253:18, 259:4,
260:20, 262:1,
269:11, 269:14,
274:7, 281:9, 284:8,
355:6, 355:8
**reference** [4] - 252:6,
252:7, 279:6, 334:3
**referenced** [2] -
237:20, 349:23
**references** [8] -
115:24, 142:7,
142:10, 290:11,
346:2, 347:23,
348:6, 348:12
**referred** [8] - 117:15,
120:12, 125:18,
132:16, 133:4,
235:16, 263:24,
278:9
**referring** [18] - 95:18,
109:17, 117:9,
125:17, 242:12,
277:6, 278:11,
294:3, 304:20,
323:6, 327:24,
330:20, 339:1,
346:23, 347:11,
347:12, 387:14,
390:7
**refers** [4] - 181:3,
261:4, 275:21, 316:5
**reformatted** [1] -
330:19
**refreshed** [1] - 372:12

**refused** [1] - 166:7
**refusing** [1] - 399:10
**regard** [5] - 101:5,
102:15, 164:9,
229:15, 384:7
**regarding** [7] - 83:24,
84:3, 148:3, 271:8,
325:23, 347:24,
392:5
**regardless** [1] -
146:19
**Registered** [1] - 407:7
**regulations** [1] -
114:11
**Reinhardt** [1] - 391:9
**reissue** [20] - 138:14,
138:16, 138:17,
138:18, 138:21,
163:3, 163:13,
250:3, 275:13,
280:24, 281:2,
281:4, 281:23,
282:2, 285:11,
285:12, 285:15,
285:23, 286:6,
351:19
**reissued** [2] - 138:19,
286:12
**reissuing** [1] - 163:1
**reject** [5] - 119:12,
119:18, 120:10,
276:5, 352:9
**rejected** [1] - 304:16
**rejection** [1] - 120:4
**rejections** [4] -
250:22, 250:24,
286:10, 286:12
**relate** [10] - 81:10,
81:11, 81:14, 83:1,
83:3, 89:5, 94:5,
103:20, 181:4, 404:2
**related** [22] - 80:11,
80:19, 81:11, 103:2,
103:17, 116:8,
118:8, 148:18,
187:23, 188:2,
188:4, 200:11,
212:20, 249:15,
264:1, 264:4,
275:19, 300:14,
314:1, 317:6,
322:17, 345:4
**relates** [11] - 79:6,
89:6, 89:13, 97:17,
103:22, 103:24,
118:4, 197:12,
199:20, 342:18,
402:22
**relating** [4] - 109:10,
110:19, 121:18,

123:15
**relationship** [9] - 80:2,
96:11, 99:23, 101:2,
102:20, 102:22,
103:4, 103:5
**relative** [1] - 221:5
**relaying** [2] - 95:5,
96:18
**released** [12] - 153:8,
161:9, 167:20,
169:3, 191:13,
192:22, 193:8,
246:24, 306:22,
307:21, 316:24,
317:3
**relevance** [16] - 80:20,
82:4, 83:4, 83:8,
84:4, 86:8, 86:24,
88:13, 90:24, 91:9,
91:11, 91:21, 92:16,
92:18, 97:18, 238:16
**relevant** [18] - 81:21,
82:7, 82:10, 89:19,
89:20, 89:24, 93:14,
144:8, 220:8, 245:9,
342:16, 342:18,
344:2, 344:18,
348:16, 350:15,
358:23
**relied** [3] - 99:5,
100:5, 320:12
**relies** [1] - 99:12
**relying** [2] - 96:8,
169:3
**remain** [2] - 360:23,
361:9
**remaining** [2] - 83:15,
94:4
**remains** [1] - 398:13
**remember** [38] -
100:18, 129:7,
133:5, 153:23,
154:2, 157:13,
170:13, 170:20,
171:7, 175:4,
175:11, 176:16,
183:9, 199:15,
226:14, 248:17,
249:20, 254:8,
260:14, 267:9,
283:18, 284:6,
309:9, 309:10,
310:20, 323:21,
344:1, 354:21,
357:3, 357:4,
370:22, 371:23,
373:8, 375:10,
375:20, 380:18,
398:12
**remembering** [1] -

392:7
**Remi** [1] - 367:11
**remind** [4] - 85:18,
203:24, 336:2, 394:4
**remotely** [1] - 275:19
**remove** [2] - 137:2,
245:7
**removed** [2] - 220:8,
381:7
**rendering** [3] -
370:15, 393:2,
393:15
**rent** [1] - 112:10
**rented** [1] - 308:7
**repeat** [6] - 146:23,
187:15, 189:23,
190:7, 251:8, 288:8
**repeatedly** [1] - 91:20
**repeating** [3] - 105:17,
190:22, 396:13
**rephrase** [1] - 285:19
**replace** [1] - 186:2
**replaced** [1] - 186:5
**report** [9] - 216:14,
246:16, 246:19,
247:6, 247:9,
247:10, 247:14,
251:23, 254:9
**REPORTER** [1] -
407:5
**reporter** [3] - 129:24,
130:5, 372:8
**Reporter** [2] - 407:8
**reporters** [2] - 206:3,
240:11
**reports** [8] - 79:23,
80:18, 164:17,
215:19, 216:9,
246:17, 247:2,
252:21
**represent** [10] -
150:11, 150:13,
179:6, 184:9,
187:13, 188:5,
190:6, 229:24,
280:23, 297:21
**representation** [4] -
188:6, 297:24,
301:2, 302:19
**representations** [1] -
244:8
**representative** [1] -
384:7
**representing** [2] -
189:8, 302:20
**represents** [1] -
111:14
**request** [12] - 90:10,
130:3, 138:13,
138:14, 187:13,

187:22, 188:2, 188:7, 188:22, 190:4, 232:19, 238:13
**requested** [1] - 396:4
**requesting** [2] - 295:3, 295:6
**requests** [3] - 390:18, 390:19, 391:4
**require** [5] - 104:1, 110:16, 178:14, 209:17, 293:22
**required** [7] - 112:16, 121:4, 145:5, 154:18, 187:16, 396:3, 402:22
**requirement** [1] - 118:15
**requirements** [12] - 113:16, 114:1, 114:18, 118:14, 119:10, 122:5, 138:17, 139:21, 141:7, 253:2, 391:23, 396:15
**requires** [8] - 118:19, 140:20, 191:3, 208:2, 293:7, 396:6, 405:1, 405:2
**Research** [1] - 196:12
**research** [5] - 87:17, 148:18, 217:9, 234:15, 394:7
**resided** [1] - 220:16
**resolution** [37] - 186:5, 186:6, 187:22, 188:2, 188:4, 190:5, 190:12, 219:23, 220:16, 221:1, 221:2, 221:9, 221:11, 221:13, 221:14, 222:6, 222:15, 222:18, 222:21, 222:22, 224:13, 224:16, 225:17, 225:18, 229:7, 232:2, 232:4, 244:11, 336:19, 353:12, 354:20, 387:15, 387:16, 387:17, 393:16, 402:24
**resolutions** [1] - 220:23
**resolve** [6] - 123:10, 144:18, 151:8, 151:9, 177:19, 274:16
**resolved** [2] - 108:3,

144:24
**resolving** [1] - 98:14
**resources** [1] - 293:20
**respect** [18] - 81:13, 87:18, 107:6, 107:9, 119:13, 143:24, 149:8, 222:19, 260:12, 262:21, 263:13, 352:19, 355:18, 388:13, 392:3, 398:8, 398:13, 402:16
**respective** [1] - 110:24
**respond** [3] - 282:12, 395:2, 395:13
**responded** [4] - 271:19, 282:15, 282:16, 322:9
**responding** [1] - 271:17
**response** [7] - 119:24, 180:4, 280:2, 282:18, 317:12, 317:14, 337:17
**responses** [1] - 120:8
**responsibilities** [1] - 213:5
**responsible** [3] - 191:15, 215:1, 373:22
**responsive** [1] - 90:10
**rest** [3] - 179:6, 238:22, 277:1
**restricted** [1] - 291:11
**restrictions** [1] - 291:16
**result** [7] - 77:15, 93:6, 138:18, 163:14, 195:18, 226:6, 327:13
**results** [3] - 156:15, 228:22, 269:22
**resume** [3] - 241:4, 394:9, 406:9
**retrieve** [3] - 390:5, 390:7, 390:8
**retrieving** [1] - 390:12
**return** [1] - 111:16
**returned** [2] - 256:1, 340:1
**reunification** [1] - 214:9
**revenue** [9] - 202:2, 264:1, 264:5, 264:9, 309:18, 310:3, 310:6, 314:1, 317:7
**review** [6] - 108:6, 135:9, 135:18, 137:10, 137:17,

145:10
**reviewed** [8] - 122:10, 236:15, 236:16, 331:15, 331:17, 331:22, 332:6, 332:18
**reviewing** [3] - 237:2, 354:3, 395:4
**reviews** [1] - 332:10
**revisit** [1] - 401:14
**rewarding** [1] - 248:16
**ride** [1] - 376:8
**riding** [1] - 147:19
**right-hand** [3] - 121:6, 131:17, 132:14
**rights** [5] - 111:3, 121:8, 143:2, 158:8, 201:4
**rigid** [1] - 190:10
**rip** [1] - 263:2
**ripe** [1] - 403:6
**river** [1] - 186:8
**RMR** [1] - 407:20
**rock** [1] - 189:4
**Rohlf** [1] - 165:6
**role** [2] - 214:21, 260:12
**rollers** [2] - 206:12, 365:10
**ROM** [19] - 200:1, 250:18, 331:4, 331:9, 331:11, 331:15, 331:22, 331:24, 332:1, 332:3, 332:5, 332:18, 350:6, 350:13, 351:7, 351:11, 351:13, 351:16
**ROMs** [3] - 312:10, 330:24, 331:13
**room** [6] - 131:2, 148:10, 172:22, 249:11, 368:10, 400:6
**ROONEY** [1] - 75:23
**rotation** [1] - 365:11
**round** [4] - 182:24, 183:3, 324:19, 378:23
**rounds** [1] - 404:17
**royalty** [3] - 175:10, 176:4, 176:5
**rude** [1] - 147:16
**rule** [3] - 84:7, 96:8, 128:5
**Rule** [1] - 96:9
**ruled** [2] - 81:12, 320:4

**rulings** [1] - 398:15
**run** [5] - 182:13, 293:11, 374:10, 375:3
**running** [5] - 98:21, 226:11, 238:8, 367:19, 375:5
**runs** [2] - 362:12, 373:6
**sale** [3] - 111:5, 309:12, 325:23
**sales** [4] - 309:14, 364:13, 364:14, 379:23
**sample** [5] - 109:16, 114:24, 116:16, 121:10, 131:12
**sandbox** [1] - 353:8
**satellite** [8] - 88:7, 215:5, 217:7, 217:11, 220:14, 220:22, 245:13, 277:9
**satisfied** [1] - 399:16
**satisfy** [3] - 92:18, 118:24, 146:16
**Saturday** [1] - 395:1
**sauce** [2] - 156:15, 157:15
**saw** [36] - 137:10, 137:20, 145:11, 155:18, 157:15, 157:16, 165:19, 170:18, 171:4, 191:18, 194:19, 226:6, 226:9, 226:10, 226:21, 249:19, 249:23, 257:18, 257:19, 259:21, 268:8, 276:16, 276:18, 279:3, 279:5, 280:16, 284:4, 312:9, 312:12, 312:22, 313:5, 336:1, 336:16, 365:20, 365:21, 366:1
**scale** [4] - 220:23, 223:8, 224:13, 230:6
**scaled** [1] - 224:19
**scaling** [2] - 223:24, 234:19
**scene** [3] - 229:22, 229:24, 230:21
**scenery** [1] - 230:19
**schedule** [2] - 397:2, 397:10
**Schmidt** [4] - 154:13, 154:14, 155:3,

371:23
**school** [4] - 210:24, 211:3, 211:14, 211:21
**science** [4] - 110:21, 212:2, 212:4, 298:22
**scientific** [3] - 332:13, 332:15, 352:6
**scientist** [1] - 229:21
**scientists** [1] - 213:24
**Scientists** [1] - 253:24
**scope** [5] - 94:21, 96:11, 398:21, 399:10, 400:12
**Scotland** [1] - 376:5
**SCOTT** [1] - 75:21
**Scott** [1] - 176:24
**screen** [36] - 79:20, 166:24, 167:4, 183:19, 215:14, 219:8, 219:10, 219:11, 219:20, 220:15, 220:20, 221:21, 221:22, 222:6, 222:11, 222:16, 222:18, 223:2, 223:4, 226:6, 231:16, 239:23, 240:16, 240:20, 242:14, 246:13, 253:19, 259:3, 260:21, 262:2, 269:15, 273:8, 281:10, 284:1, 297:15, 391:2
**screens** [1] - 221:24
**seal** [1] - 407:15
**Search** [3] - 115:18, 161:11, 180:23
**search** [18] - 119:8, 167:14, 168:10, 168:15, 168:16, 168:19, 168:20, 171:6, 171:7, 171:8, 171:9, 172:5, 172:6, 172:7, 172:8, 172:9, 278:22
**searched** [1] - 115:20
**searching** [3] - 168:13, 168:21, 168:24
**seat** [1] - 241:4
**seated** [6] - 77:2, 108:21, 206:20, 207:9, 334:23, 394:14
**second** [40] - 78:17, 78:18, 90:23, 95:9, 102:8, 103:24, 104:22, 116:13,

126:2, 138:20, 142:9, 143:8, 152:15, 154:6, 162:24, 165:23, 187:14, 189:20, 205:17, 231:21, 240:21, 250:10, 250:17, 251:23, 270:23, 271:5, 274:6, 277:16, 277:24, 278:16, 285:23, 318:19, 321:20, 339:24, 340:2, 359:1, 374:7, 378:23, 382:3

**seconds** [2] - 182:1, 216:13

**secret** [2] - 156:15, 157:15

**Section** [1] - 110:20

**section** [7] - 78:3, 78:13, 78:14, 116:19, 137:24, 190:1, 326:14

**sections** [10] - 107:16, 107:19, 187:14, 188:1, 188:7, 190:2, 190:4, 190:6, 298:2

**see** [146] - 82:20, 83:5, 84:17, 89:3, 92:9, 94:24, 95:20, 100:2, 102:13, 102:16, 105:18, 114:17, 131:17, 132:5, 132:12, 133:17, 133:20, 144:6, 147:14, 148:24, 149:9, 150:4, 150:7, 150:17, 151:16, 152:18, 152:19, 153:15, 153:17, 157:8, 158:11, 163:5, 163:8, 165:6, 167:3, 167:6, 167:8, 167:9, 168:1, 168:5, 169:9, 169:12, 169:16, 169:18, 169:24, 171:3, 172:3, 172:5, 172:8, 172:13, 173:19, 173:23, 174:7, 174:19, 174:21, 177:10, 184:15, 184:17, 185:17, 185:23, 186:9, 186:11, 195:24, 197:18, 197:24, 205:22, 207:12, 212:23, 217:5, 219:11, 220:7,

222:9, 228:22, 229:8, 236:21, 244:19, 247:8, 252:5, 252:7, 252:9, 259:11, 259:12, 261:6, 262:8, 263:9, 263:10, 264:2, 269:16, 269:24, 270:5, 271:12, 272:16, 272:19, 273:4, 274:9, 276:23, 276:24, 279:10, 279:19, 281:17, 284:2, 301:5, 301:6, 309:15, 314:17, 314:23, 326:4, 336:9, 340:6, 340:7, 342:21, 346:2, 346:4, 346:7, 346:10, 354:3, 356:5, 365:19, 365:20, 366:14, 366:15, 369:24, 370:1, 370:3, 370:4, 371:9, 372:11, 372:14, 374:5, 374:6, 374:11, 374:12, 378:20, 382:2, 382:3, 382:6, 386:22, 386:23, 394:8, 400:12, 401:8, 402:17, 404:10

**seeing** [9] - 151:16, 151:22, 245:9, 249:20, 265:24, 280:21, 343:24, 352:22, 372:11

**seek** [5] - 166:9, 173:5, 378:23

**seem** [5] - 116:3, 200:23, 398:17, 399:13, 402:8

**segments** [1] - 107:4

**selection** [2] - 129:5, 397:7

**self** [1] - 373:24

**sell** [4] - 308:1, 308:19, 324:16, 325:4

**selling** [8] - 111:5, 136:13, 136:17, 160:13, 316:12, 316:17, 334:9, 367:5

**sells** [1] - 326:10

**semesters** [1] - 212:3

**send** [2] - 96:3, 148:6

**senior** [1] - 98:2

**sensation** [1] - 151:15

**sense** [6] - 115:2, 116:6, 170:15, 205:2, 332:13, 381:23

**sent** [23] - 163:6, 164:12, 165:16, 246:17, 264:21, 273:14, 281:20, 281:21, 281:22, 285:5, 286:2, 313:14, 313:16, 314:13, 316:13, 317:1, 317:11, 318:12, 324:9, 326:8, 343:22, 375:4, 391:5

**sentence** [9] - 78:7, 78:17, 78:19, 78:22, 276:21, 277:1, 277:17, 336:8, 340:3

**separate** [5] - 107:6, 306:3, 306:4, 362:14, 406:3

**separately** [1] - 144:2

**September** [1] - 355:7

**sequester** [1] - 206:23

**series** [6] - 87:19, 100:4, 236:3, 236:4, 247:1, 271:23

**serious** [2] - 90:24, 149:8

**serve** [1] - 143:6

**server** [6] - 294:8, 294:10, 294:14, 295:11, 337:15, 337:19

**servers** [6] - 294:16, 294:19, 336:24, 337:7, 378:7, 378:8

**service** [3] - 124:1, 159:10, 394:11

**services** [1] - 308:5

**serving** [1] - 151:5

**session** [1] - 107:10

**sessions** [2] - 126:15, 174:17

**set** [14] - 112:23, 143:7, 207:4, 223:9, 339:9, 340:4, 340:10, 341:22, 366:16, 390:18, 396:18, 396:23, 403:14, 407:14

**sets** [1] - 380:8

**seven** [3] - 78:2, 212:11, 366:20

**several** [17] - 122:11, 151:9, 172:4, 183:2, 260:6, 262:10, 291:16, 296:17,

296:21, 296:23, 329:4, 346:22, 374:9, 385:2, 385:8, 388:20, 389:10

**severe** [1] - 217:23

**SGI** [36] - 81:17, 82:3, 82:6, 83:2, 84:2, 97:22, 98:16, 156:12, 156:21, 156:23, 157:3, 157:6, 157:8, 157:19, 157:20, 162:3, 256:17, 257:7, 257:8, 257:10, 261:8, 261:10, 280:7, 364:8, 366:2, 366:18, 366:21, 368:14, 371:18, 371:22, 374:13, 374:18, 374:19, 375:22, 376:1, 382:22

**SGI's** [2] - 156:22, 383:6

**Shamada** [1] - 346:6

**share** [4] - 166:11, 226:15, 294:19, 295:21

**shared** [4] - 165:9, 252:24, 281:7, 295:18

**shareholders** [1] - 310:21

**shares** [3] - 310:17, 310:21, 310:24

**shear** [1] - 231:22

**sheet** [2] - 85:4, 173:23

**sheets** [1] - 173:20

**ship** [1] - 142:16

**short** [4] - 109:11, 125:20, 180:18, 404:11

**shorter** [1] - 395:12

**Shorthand** [1] - 407:8

**shot** [1] - 217:4

**show** [50] - 79:12, 92:8, 93:4, 110:17, 140:14, 145:19, 152:22, 153:1, 154:5, 157:5, 160:20, 162:18, 165:13, 168:15, 178:19, 179:10, 179:12, 179:15, 179:19, 180:9, 183:21, 184:12, 189:16, 190:15, 191:2, 192:5, 193:6,

197:3, 202:22, 205:24, 215:9, 216:2, 216:3, 220:24, 228:24, 234:7, 238:7, 238:13, 254:16, 257:3, 265:22, 289:3, 292:13, 297:11, 297:13, 300:22, 402:6, 402:13, 402:18

**showed** [17] - 144:4, 155:19, 156:23, 179:4, 200:11, 219:13, 245:1, 280:13, 304:23, 316:4, 321:6, 329:3, 345:24, 366:3, 366:7, 375:2, 376:3

**showing** [12] - 91:21, 157:1, 167:1, 178:6, 178:17, 222:11, 239:22, 254:24, 280:16, 353:3, 375:18, 401:23

**shown** [6] - 121:6, 138:10, 153:13, 164:4, 220:20, 297:12

**showroom** [3] - 156:22, 157:1, 364:8

**showrooms** [1] - 252:13

**shows** [16] - 82:2, 87:20, 88:3, 88:23, 93:15, 156:14, 217:10, 220:3, 221:9, 229:14, 235:11, 236:10, 239:9, 243:23, 252:13, 270:4

**shredded** [1] - 131:4

**shuttle** [1] - 309:3

**side** [16] - 93:3, 100:13, 100:21, 115:8, 115:10, 122:6, 128:7, 132:19, 145:13, 149:19, 150:9, 230:20, 298:6, 363:19, 405:8

**Side** [2] - 358:18, 359:24

**side-bar** [1] - 298:6

**sides** [2] - 100:4, 274:9

**Siggraph** [32] - 197:15, 197:17, 199:22, 200:14, 280:12, 280:16,

312:10, 312:12, 313:6, 329:6, 329:12, 329:18, 329:21, 330:17, 330:24, 331:4, 331:11, 331:16, 331:20, 331:22, 332:5, 332:9, 332:19, 343:24, 350:6, 350:13, 351:3, 351:11, 351:13, 351:16, 352:22, 353:4

**SIGGRAPH** [9] - 248:2, 248:20, 248:21, 249:3, 249:15, 257:19, 261:11, 375:12

**sight** [1] - 369:23

**sign** [3] - 159:14, 159:21, 342:3

**signature** [1] - 282:21

**significant** [2] - 214:7, 378:14

**Silicon** [10] - 255:12, 256:8, 256:10, 257:10, 257:14, 260:15, 265:20, 293:14, 293:16, 364:5

**Silicone** [1] - 156:20

**sillman** [1] - 206:12

**similar** [7] - 117:7, 158:16, 280:10, 334:5, 350:7, 354:22, 378:22

**SIMMONS** [36] - 76:7, 77:18, 78:1, 78:6, 78:11, 78:17, 78:21, 78:24, 79:5, 79:10, 79:16, 79:18, 80:23, 81:6, 81:9, 82:2, 82:13, 82:16, 82:23, 83:20, 84:9, 94:3, 95:1, 95:9, 95:17, 95:21, 96:2, 96:15, 96:24, 97:3, 97:16, 98:2, 98:6, 102:10, 102:17, 103:11

**Simmons** [2] - 77:15, 83:19

**simple** [3] - 144:8, 221:7, 363:16

**simplification** [1] - 231:14

**simplified** [1] - 230:18

**simply** [3] - 126:21, 147:17, 403:14

**simulating** [1] - 291:15

**simulation** [2] - 363:10, 370:14

**simulator** [3] - 291:12, 291:17, 291:18

**simulators** [13] - 183:9, 183:11, 183:13, 290:23, 290:24, 291:4, 291:6, 291:8, 291:14, 291:20, 363:3, 363:6, 363:12

**simultaneously** [1] - 405:8

**single** [7] - 107:16, 186:21, 187:1, 216:13, 219:11, 310:10, 399:6

**sit** [4] - 110:5, 179:11, 188:10, 242:7

**sitting** [1] - 156:8

**situation** [5] - 156:1, 161:1, 272:24, 283:10, 356:15, 356:16, 395:20

**six** [3] - 81:23, 257:23, 392:8

**size** [3] - 254:23, 277:6, 338:22

**sizes** [1] - 220:8

**ski** [2] - 96:17, 101:17

**skill** [2] - 113:14, 118:16

**skilled** [3] - 116:12, 138:6, 142:12

**skip** [1] - 354:7

**skyline** [1] - 370:1

**Slide** [4] - 249:7, 249:9, 275:20, 276:13

**slide** [44] - 79:18, 79:19, 79:21, 81:22, 82:14, 172:1, 215:15, 217:10, 217:13, 217:14, 217:15, 219:6, 220:3, 220:5, 221:2, 221:4, 221:5, 221:18, 221:19, 222:10, 223:13, 223:14, 223:24, 228:18, 229:14, 230:15, 230:17, 235:11, 243:22, 249:7, 249:8, 251:20, 252:4, 262:19, 270:3, 271:10, 272:1, 276:12, 276:16, 278:1, 279:3, 279:8, 282:17, 317:8

**slides** [18] - 79:7, 79:12, 81:10, 81:14, 81:21, 82:11, 82:18, 82:24, 84:1, 88:4, 93:18, 215:10, 215:12, 218:19, 218:21, 223:9, 281:17, 317:10

**slight** [1] - 106:15

**slow** [2] - 190:14, 253:11

**slower** [1] - 218:2

**small** [12] - 184:11, 218:12, 218:16, 218:18, 219:8, 222:3, 224:2, 245:7, 323:14, 323:16, 353:22, 363:19

**smaller** [17] - 107:9, 107:15, 107:19, 185:6, 185:8, 187:14, 187:24, 188:7, 188:22, 190:2, 190:4, 190:5, 218:11, 222:19, 223:22

**smartphones** [2] - 182:11, 182:12

**Smith** [1] - 154:20

**smooth** [3] - 377:14, 380:6, 380:7

**SNYDER** [81] - 76:7, 77:10, 83:13, 85:12, 85:21, 86:1, 90:3, 90:14, 91:7, 91:11, 92:12, 103:16, 105:6, 105:21, 106:3, 106:10, 150:3, 150:16, 150:22, 151:1, 178:1, 178:5, 206:7, 206:22, 207:5, 238:15, 241:17, 242:1, 285:18, 287:2, 287:6, 287:9, 287:10, 297:6, 297:9, 298:7, 298:9, 300:22, 300:24, 302:14, 302:16, 314:9, 314:12, 316:1, 333:7, 333:16, 334:13, 334:19, 334:24, 335:2, 342:17, 342:24, 344:14, 344:21, 344:24, 345:20, 348:21, 349:13, 349:15, 350:16, 351:8, 357:14, 358:2,

358:24, 359:7, 359:17, 359:22, 361:5, 361:10, 361:20, 383:13, 395:19, 396:20, 397:1, 397:23, 399:17, 400:16, 400:21, 401:16, 402:21, 405:17

**Snyder** [12] - 90:2, 150:8, 177:24, 179:5, 203:17, 333:4, 333:23, 334:23, 349:8, 355:9, 395:18, 400:9

**so-called** [3] - 218:10, 229:23, 299:3

**social** [1] - 148:1

**society** [1] - 111:23

**software** [35] - 153:6, 154:6, 156:16, 157:23, 161:2, 211:4, 211:12, 211:17, 212:11, 214:24, 217:9, 252:22, 253:6, 253:14, 255:14, 306:9, 306:12, 306:19, 306:23, 369:4, 369:16, 374:8, 374:14, 376:17, 377:4, 377:21, 378:9, 382:23, 383:3, 384:4, 384:19, 385:24, 386:14, 387:3

**sold** [8] - 252:2, 307:15, 308:5, 308:24, 310:17, 334:9, 334:10, 369:13

**solely** [1] - 148:24

**solution** [8] - 230:14, 231:21, 232:18, 232:19, 233:13, 233:14, 245:16, 274:9

**solutions** [13] - 228:2, 228:7, 228:9, 228:13, 234:10, 234:12, 237:12, 237:23, 242:21, 242:22, 253:5, 253:8, 280:15

**solve** [10] - 116:20, 182:17, 184:7, 186:13, 223:6, 227:21, 229:13, 233:14, 234:14,

243:10

**solved** [4] - 89:8, 89:23, 227:14, 243:14

**solves** [2] - 182:15, 186:12

**solving** [1] - 113:3

**someone** [18] - 97:12, 113:11, 116:10, 118:15, 123:1, 136:15, 142:12, 160:2, 265:2, 266:22, 317:16, 319:7, 319:10, 353:7, 355:20, 375:5, 378:12, 380:14

**sometime** [4] - 257:18, 321:4, 322:16, 322:19

**sometimes** [7] - 111:18, 115:12, 119:8, 121:22, 187:4, 199:11, 232:13

**somewhere** [9] - 151:22, 204:19, 230:23, 244:12, 248:9, 320:17, 375:9, 377:10

**song** [2] - 159:5, 160:3

**songs** [4] - 159:11, 159:13, 159:20, 159:22

**songwriter** [1] - 159:4

**soon** [4] - 191:12, 341:14, 341:17, 341:19

**sooner** [1] - 190:19

**sophisticated** [1] - 363:11

**sorry** [12] - 97:3, 150:5, 198:8, 200:7, 224:8, 249:8, 251:9, 288:9, 338:7, 372:19, 375:10, 391:9

**sort** [2] - 101:22, 389:3

**sought** [3] - 137:4, 195:14, 402:1

**sound** [1] - 374:2

**sounded** [1] - 280:5

**sounds** [5] - 372:17, 372:20, 373:14, 393:6, 398:2

**source** [4] - 164:3, 164:5, 384:22, 389:16

**sources** [2] - 105:23, 232:22
**space** [16] - 132:7, 182:3, 187:22, 188:2, 188:4, 214:19, 222:13, 223:1, 227:1, 240:22, 241:2, 244:11, 291:9, 291:13, 309:1, 374:20
**spaces** [2] - 230:9, 239:9
**spacial** [1] - 299:4
**spades** [1] - 176:21
**speaking** [3] - 79:13, 82:18, 98:3
**SPEARS** [3] - 75:22, 404:13, 405:11
**Spears** [1] - 177:1
**special** [13] - 110:11, 154:6, 154:11, 159:14, 174:13, 218:10, 218:16, 293:10, 293:23, 293:24, 294:2, 340:22, 364:17
**specializes** [1] - 114:5
**specific** [30] - 111:7, 112:17, 116:24, 123:23, 134:12, 170:23, 178:9, 178:16, 179:2, 183:18, 185:15, 187:8, 189:15, 190:10, 191:4, 194:18, 195:15, 203:11, 232:22, 257:7, 314:6, 314:7, 322:13, 331:3, 331:21, 370:22, 391:11, 396:1, 396:24, 397:7
**specifically** [1] - 396:2
**specification** [8] - 116:14, 133:7, 133:8, 133:19, 138:1, 138:2, 244:1, 244:17
**specificity** [1] - 396:4
**specifics** [2] - 92:15, 396:16
**speculation** [1] - 357:15
**speed** [1] - 269:13
**spell** [1] - 205:4
**spelled** [1] - 205:7
**spend** [5] - 108:1, 128:15, 174:8, 179:7, 320:15

**spending** [1] - 328:20
**spent** [3] - 188:12, 188:18, 201:17
**spin** [1] - 367:6
**spokesperson** [1] - 81:2
**spot** [3] - 184:18, 185:15, 377:11
**Spotify** [3] - 159:10, 159:11, 159:18
**spread** [3] - 173:20, 173:23, 296:23
**spreadsheet** [1] - 173:19
**spun** [1] - 367:8
**square** [2] - 223:20, 353:5
**SRI** [34] - 196:9, 196:11, 197:9, 198:8, 198:11, 199:3, 199:7, 199:22, 200:11, 235:8, 275:21, 279:9, 279:12, 280:3, 280:13, 335:4, 335:8, 336:18, 336:24, 338:10, 338:11, 343:12, 343:15, 343:23, 344:15, 345:4, 345:8, 345:12, 346:16, 352:12, 352:14, 352:17, 353:16, 354:21
**SRI's** [4] - 199:15, 275:22, 275:24, 344:9
**stack** [1] - 233:9
**staff** [1] - 114:19
**stage** [2] - 119:11, 373:1
**stages** [1] - 93:7
**stake** [6] - 311:4, 357:3, 357:5, 357:6, 357:7, 357:9
**stand** [8] - 152:17, 154:4, 196:11, 204:20, 205:24, 207:12, 207:21, 240:10
**stand-alone** [2] - 152:17, 154:4
**standard** [3] - 146:13, 146:15, 146:18
**standards** [2] - 219:22, 352:6
**standing** [3] - 207:13, 207:24, 287:1
**stands** [2] - 169:16,

337:3
**Stanford** [1] - 196:12
**Star** [3] - 363:2, 363:21, 364:2
**star** [2] - 189:4, 363:7
**start** [25] - 77:8, 83:10, 99:5, 160:10, 160:13, 174:10, 204:10, 217:2, 217:19, 227:6, 227:22, 228:12, 230:24, 231:3, 232:12, 242:11, 243:18, 268:12, 282:5, 340:2, 351:1, 369:1, 399:19
**started** [30] - 157:20, 168:20, 182:2, 182:20, 192:20, 201:10, 210:24, 211:4, 214:22, 217:16, 220:13, 224:22, 224:24, 227:8, 228:24, 229:6, 229:9, 232:2, 234:6, 258:14, 283:16, 303:22, 306:11, 355:12, 364:4, 367:1, 367:3, 368:20, 398:11, 401:21
**starters** [1] - 374:1
**starting** [2] - 158:20, 382:4
**starts** [8] - 78:3, 152:11, 250:17, 314:21, 340:1, 374:4, 380:13, 381:21
**state** [6] - 111:19, 116:9, 205:4, 213:9, 362:19, 384:9
**State** [4] - 212:16, 213:2, 287:14, 407:1
**statement** [6] - 80:5, 106:6, 127:17, 133:10, 277:19, 401:1
**statements** [9] - 119:4, 124:10, 124:23, 127:4, 127:8, 127:10, 149:18, 235:2, 338:18
**STATES** [1] - 75:1
**States** [23] - 75:13, 108:23, 109:10, 110:1, 110:18, 111:2, 132:23, 139:20, 155:16,

155:17, 156:11, 158:23, 162:22, 162:24, 174:24, 184:13, 195:18, 198:3, 210:20, 224:11, 246:7, 343:2, 392:9
**stations** [1] - 215:19
**stayed** [1] - 258:14
**steering** [1] - 240:22
**Steffen** [1] - 258:10
**stencil** [1] - 222:4
**stenographic** [1] - 407:11
**step** [27] - 105:16, 105:17, 105:19, 105:20, 105:22, 105:23, 106:1, 106:20, 186:21, 187:5, 187:6, 187:15, 187:16, 187:21, 189:17, 189:21, 189:23, 189:24, 190:7, 190:22, 225:19, 298:1
**Stephen** [1] - 196:20
**steps** [29] - 89:17, 104:1, 104:10, 104:12, 105:1, 105:5, 105:9, 105:12, 106:6, 106:8, 106:16, 107:1, 140:16, 178:18, 178:20, 200:5, 217:6, 302:20, 308:14, 308:21, 324:12, 402:23, 403:5, 403:21, 403:22, 404:2, 404:19, 404:22, 404:23
**stereo** [1] - 214:20
**stick** [1] - 240:23
**still** [27] - 94:21, 100:15, 100:17, 114:14, 130:18, 154:8, 156:18, 194:21, 212:9, 215:18, 217:22, 220:1, 222:24, 235:17, 236:12, 244:9, 253:11, 267:20, 306:1, 323:24, 329:15, 363:20, 373:1, 379:11, 379:18, 399:1
**stipulate** [1] - 399:14
**stipulated** [1] - 126:24

**stipulation** [2] - 126:22, 400:7
**stipulations** [1] - 126:9
**stock** [2] - 254:19, 254:20
**stop** [3] - 111:4, 233:22, 357:18
**stopped** [4] - 239:3, 306:12, 306:18, 353:16
**storage** [4] - 221:13, 391:18, 391:19
**store** [6] - 187:13, 188:3, 190:6, 295:14, 299:13, 300:1
**stored** [2] - 296:17, 391:5
**stores** [1] - 294:10
**storing** [3] - 296:2, 300:7, 300:10
**story** [3] - 152:11, 265:22
**straight** [1] - 199:12
**strange** [1] - 116:3
**strategy** [9] - 167:19, 167:23, 168:9, 169:8, 170:9, 171:3, 173:10, 173:13, 176:16
**Street** [6] - 75:11, 181:7, 254:14, 254:16, 254:20, 370:9
**street** [2] - 229:8, 254:24
**streets** [1] - 185:17
**stretch** [1] - 203:20
**stricken** [1] - 128:23
**strike** [2] - 279:6, 344:21
**structure** [11] - 299:4, 300:7, 385:21, 386:10, 386:11, 388:11, 388:15, 389:23, 392:12, 392:14, 392:16
**structures** [8] - 300:10, 300:12, 300:14, 388:18, 388:20, 388:23, 389:7, 389:11
**struggle** [1] - 360:18
**student** [1] - 258:14
**students** [1] - 211:8
**studies** [1] - 212:13
**studio** [1] - 235:23
**studying** [1] - 212:9
**stuff** [5] - 257:22,

260:16, 267:24, 269:5, 376:3
**sub** [1] - 379:17
**subdivide** [1] - 223:21
**subdivided** [1] - 107:4
**subject** [10] - 87:9, 116:7, 133:11, 136:9, 201:16, 241:6, 351:1, 361:8, 361:19, 361:24
**submission** [1] - 114:19
**submissions** [1] - 119:3
**submit** [6] - 275:14, 275:23, 285:22, 330:16, 351:24, 352:4
**submitted** [20] - 120:18, 199:24, 200:13, 200:14, 249:24, 250:14, 250:19, 251:2, 275:12, 275:17, 276:3, 279:13, 286:7, 330:13, 332:3, 332:11, 343:10, 352:16, 403:19, 405:8
**submitting** [1] - 352:14
**subsections** [1] - 188:23
**subsets** [1] - 106:19
**subsidiary** [2] - 246:18, 310:22
**substantial** [1] - 246:21
**substantive** [1] - 368:17
**substeps** [5] - 105:15, 106:17, 107:15, 189:22, 404:7
**substitute** [1] - 126:16
**succeeded** [2] - 191:17, 191:20, 276:22
**success** [1] - 175:18
**sue** [2] - 317:17, 319:9
**sued** [4] - 80:16, 124:17, 194:21, 318:3
**sues** [1] - 319:7
**suffice** [1] - 398:4
**sufficiently** [2] - 91:5, 122:3
**suggest** [6] - 120:2, 127:6, 328:8, 383:19, 401:10, 405:7

**suggested** [1] - 398:15
**suggesting** [2] - 134:14, 142:23
**suggestion** [2] - 101:5, 313:23
**suing** [1] - 136:19
**suit** [3] - 124:15, 125:21, 141:9
**summarize** [1] - 244:5
**summarizes** [1] - 321:12
**summarizing** [1] - 269:21
**summary** [7] - 116:18, 133:9, 139:13, 270:8, 270:9, 270:10, 271:20
**Summitt** [1] - 298:19
**Sunnyvale** [3] - 339:10, 339:13, 340:5
**super** [1] - 227:3
**superimposed** [1] - 184:23
**Superman** [2] - 151:18, 291:18
**supplied** [1] - 132:9
**supply** [2] - 85:13, 85:15
**support** [6] - 100:5, 272:6, 327:2, 378:6, 382:24, 383:6
**supported** [1] - 255:17
**supporting** [2] - 168:18, 383:1
**supposed** [2] - 116:20, 252:20
**surely** [1] - 150:2
**surface** [2] - 369:22, 370:15
**surprise** [4] - 161:14, 170:10, 173:12, 181:22
**surprised** [1] - 299:21
**surrebuttal** [1] - 124:21
**surround** [1] - 169:11
**sustain** [2] - 83:11, 128:12
**swear** [4] - 204:10, 204:13, 204:22, 205:2
**switch** [2] - 241:6, 311:5
**switched** [1] - 249:9
**sworn** [4] - 126:7, 205:11, 208:8, 344:6
**system** [134] -

86:7, 87:9, 87:15, 87:18, 87:20, 87:21, 88:10, 88:24, 95:18, 95:23, 97:21, 109:14, 112:15, 114:13, 149:3, 174:10, 177:9, 182:14, 196:8, 196:10, 197:4, 197:10, 197:13, 197:18, 197:20, 199:20, 200:5, 226:24, 227:4, 228:21, 232:12, 232:15, 234:5, 234:14, 235:8, 235:20, 237:19, 238:8, 239:8, 239:12, 244:12, 248:8, 248:13, 252:6, 252:7, 252:10, 252:11, 252:15, 252:17, 252:18, 252:19, 253:3, 254:7, 254:10, 254:16, 254:24, 255:5, 256:6, 256:7, 256:18, 257:3, 267:21, 275:22, 277:9, 277:11, 279:1, 290:21, 291:23, 301:5, 301:9, 301:15, 301:21, 301:22, 303:15, 303:23, 307:21, 308:23, 309:1, 309:6, 309:10, 319:4, 328:23, 329:3, 332:7, 332:20, 332:24, 333:3, 335:4, 335:5, 335:9, 337:16, 337:19, 337:21, 337:24, 338:11, 338:16, 339:4, 343:12, 343:15, 343:24, 344:9, 344:15, 344:17, 345:13, 345:18, 346:21, 347:3, 347:8, 347:13, 347:19, 347:24, 348:3, 348:7, 348:9, 348:11, 348:13, 348:24, 349:3, 349:5, 349:10, 349:17, 349:23, 350:2, 352:22,

353:17, 354:12, 354:16, 356:12, 369:21, 370:15, 372:5
**systems** [17] - 252:23, 253:7, 260:10, 290:18, 290:19, 292:1, 292:3, 292:5, 292:9, 292:12, 292:17, 292:18, 301:12, 302:2, 308:7, 309:14, 342:20
**Systems** [3] - 370:8, 370:9, 371:21
**T-vision** [23] - 86:7, 95:18, 198:20, 198:21, 198:23, 235:14, 235:15, 255:10, 280:13, 328:23, 329:3, 332:7, 332:20, 332:24, 333:3, 347:8, 347:18, 347:24, 348:3, 348:10, 349:3, 349:5, 349:17
**tab** [3] - 131:13, 132:12, 198:2
**table** [2] - 274:2, 365:7
**tablets** [1] - 182:11
**talent** [1] - 375:16
**talented** [1] - 375:16
**talks** [2] - 269:19, 272:6
**taller** [4] - 370:1, 370:2, 370:3
**tally** [1] - 358:12
**tangental** [1] - 101:1
**tape** [5] - 230:5, 368:17, 373:7
**tape-out** [1] - 368:17
**target** [1] - 170:5
**targeting** [1] - 169:22
**targets** [2] - 172:7, 172:10
**task** [5] - 118:10, 123:24, 221:24, 256:14, 363:13
**taught** [1] - 210:23
**teacher** [1] - 211:13
**teaches** [1] - 189:10
**team** [2] - 179:6, 257:6
**teams** [1] - 400:10
**technical** [7] - 80:12, 80:18, 117:11, 164:8, 165:5, 210:22, 352:24
**technique** [4] - 179:2, 184:5, 194:18,

195:15
**techniques** [10] - 152:3, 152:24, 153:6, 154:7, 154:11, 154:16, 162:11, 163:23, 176:1, 184:2
**Technologies** [2] - 363:7, 364:2
**technologist** [1] - 161:10
**technology** [46] - 80:9, 80:10, 98:22, 116:1, 116:4, 116:9, 116:11, 118:3, 155:22, 158:9, 158:16, 160:19, 160:20, 162:6, 166:16, 174:18, 194:16, 198:9, 198:16, 198:17, 199:17, 209:1, 209:2, 214:19, 215:2, 251:16, 260:3, 266:21, 267:16, 270:21, 279:19, 284:6, 313:8, 319:7, 335:23, 336:13, 343:21, 347:15, 354:22, 363:18, 379:2, 379:8, 379:16, 379:18, 381:14
**tedious** [1] - 332:9
**Telecom** [8] - 246:3, 246:4, 246:18, 254:17, 340:20, 405:23, 406:4
**telecommunication** [3] - 246:6, 280:9, 340:20
**Telecommunication** [1] - 247:24
**telephone** [1] - 148:7
**ten** [8] - 85:2, 98:16, 133:21, 152:11, 188:12, 194:20, 211:1, 285:3
**tend** [1] - 360:20
**tends** [1] - 165:3
**tentatively** [1] - 401:7
**term** [13] - 113:2, 143:5, 168:1, 169:23, 235:7, 296:13, 296:15, 302:12, 356:21, 364:7, 385:12, 387:24
**terms** [14] - 112:17,

117:12, 123:22,
132:1, 138:6, 144:7,
144:9, 144:14,
144:16, 301:4,
309:9, 327:10,
355:8, 385:16
**terrain** [2] - 280:6,
369:21
**TerraVision** [33] -
95:16, 101:18,
196:11, 196:15,
197:18, 198:24,
199:2, 199:10,
199:14, 199:15,
234:24, 235:5,
235:11, 235:18,
248:8, 248:13,
251:24, 260:3,
275:22, 275:24,
279:9, 279:12,
280:3, 280:13,
303:23, 335:5,
335:9, 345:13,
352:13, 352:14,
352:18, 359:3,
364:20
**terrific** [1] - 336:8
**testified** [7] - 205:12,
208:9, 210:10,
316:8, 335:4,
357:15, 359:11
**testify** [7] - 92:23,
102:19, 155:4,
155:6, 162:12,
196:22, 403:3
**testifying** [5] - 94:9,
209:5, 209:7, 210:5,
384:5
**testimony** [39] - 86:12,
91:15, 94:10, 98:12,
104:19, 126:8,
126:10, 126:12,
126:17, 126:18,
126:19, 130:1,
130:4, 130:6, 130:7,
130:9, 131:8,
134:17, 194:6,
194:7, 204:21,
205:19, 207:16,
208:15, 208:23,
209:8, 209:9,
215:11, 289:23,
303:9, 303:14,
304:6, 334:3,
342:19, 352:15,
361:12, 392:2,
399:6, 401:13
**Texas** [1] - 369:15
**text** [3] - 148:6,
148:13, 379:5

**textbook** [1] - 189:7
**texture** [5] - 218:10,
218:14, 382:14,
382:22, 383:3
**THE** [177] - 75:1, 75:1,
75:13, 77:1, 77:6,
77:22, 78:5, 78:10,
78:16, 78:20, 78:22,
79:4, 79:9, 79:14,
79:17, 80:4, 80:13,
80:21, 81:4, 81:7,
81:24, 82:9, 82:15,
82:19, 83:5, 83:9,
84:6, 84:13, 84:17,
84:21, 85:2, 85:17,
85:23, 87:2, 87:13,
87:22, 88:21, 89:4,
89:9, 90:2, 90:11,
91:2, 91:9, 92:10,
92:21, 93:20, 94:1,
94:15, 94:19, 94:24,
95:6, 95:15, 95:20,
96:1, 96:5, 96:21,
97:5, 97:9, 97:13,
97:24, 98:4, 98:7,
100:10, 100:14,
100:22, 101:10,
102:4, 103:7,
103:15, 104:16,
105:18, 105:24,
106:5, 106:21,
107:2, 107:11,
107:23, 108:13,
108:18, 108:21,
109:20, 124:3,
130:20, 149:23,
150:2, 150:6,
150:15, 177:23,
178:3, 203:17,
204:6, 204:22,
205:3, 205:4,
205:13, 206:6,
206:15, 206:20,
207:4, 207:9, 208:3,
208:18, 238:17,
240:5, 240:13,
240:14, 241:8,
241:13, 241:18,
241:21, 242:3,
242:6, 286:18,
286:22, 286:24,
287:5, 287:8, 333:4,
333:9, 333:14,
333:19, 334:11,
334:17, 334:22,
342:21, 344:13,
344:23, 348:18,
349:8, 350:18,
351:9, 351:10,
357:20, 357:23,
358:4, 358

359:1, 359:8,
359:19, 360:1,
360:20, 361:3,
361:7, 361:16,
361:23, 362:2,
362:4, 362:17,
383:12, 383:15,
384:2, 394:1,
394:14, 394:20,
395:18, 396:18,
396:23, 397:11,
398:2, 398:5,
398:18, 398:22,
399:12, 400:6,
400:14, 401:6,
401:19, 402:2,
402:15, 403:7,
403:16, 403:24,
404:18, 405:15,
405:21, 406:5, 406:8
**theme** [1] - 376:8
**themselves** [3] -
99:10, 127:9, 369:13
**theory** [2] - 107:7,
107:12
**thereafter** [1] - 159:1
**they've** [3] - 92:19,
168:20, 334:9
**thinking** [3] - 239:14,
260:2, 370:11
**third** [11] - 92:4, 117:3,
142:13, 223:23,
233:1, 233:12,
244:17, 272:14,
354:6, 359:9, 360:1
**thirteen** [1] - 133:14
**thirty** [1] - 149:19
**Thomas** [1] - 111:20
**thousand** [1] - 329:24
**thousands** [5] -
182:19, 197:16,
200:2, 329:17
**three** [34] - 77:12,
88:17, 90:4, 111:10,
115:4, 142:3, 156:4,
156:7, 160:12,
202:13, 209:8,
219:18, 223:15,
225:4, 225:5,
238:20, 247:3,
254:23, 256:12,
264:10, 300:23,
313:24, 317:6,
322:21, 323:9,
323:17, 324:3,
324:11, 325:5,
358:19, 358:20,
391:11, 405:7
**three-three** [1] -
256:12

**three-year** [1] - 358:20
**throat** [1] - 271:24
**throughout** [1] -
125:18
**throw** [1] - 234:15
**Thursday** [1] - 397:22
**tight** [2] - 271:2,
321:22
**tiles** [3] - 223:22,
225:19, 232:5
**Tilman** [2] - 391:8,
391:9
**Tim** [2] - 282:15, 286:2
**time-limited** [1] -
112:6
**timeline** [4] - 200:10,
200:12, 249:10
**TIMOTHY** [2] - 75:13,
75:23
**title** [2] - 115:10,
384:18
**titled** [1] - 131:13
**today** [19] - 83:17,
108:12, 155:4,
166:21, 189:3,
196:21, 202:15,
208:2, 209:9, 210:6,
215:11, 242:18,
244:2, 244:10,
329:1, 329:15,
397:10, 403:1,
405:23
**today's** [2] - 219:22,
356:15
**together** [22] - 98:17,
99:2, 99:16, 143:17,
147:19, 158:16,
162:7, 195:23,
202:3, 206:13,
227:22, 236:1,
266:3, 267:11,
267:19, 268:5,
268:20, 269:4,
272:7, 273:24,
274:16, 367:15
**Tokyo** [5] - 239:21,
339:9, 339:13,
339:18, 340:5
**tomorrow** [5] - 85:11,
394:8, 403:4, 405:9,
406:9
**tongue** [1] - 155:7
**tonight** [1] - 360:17
**tonights** [1] - 396:8
**took** [13] - 101:16,
156:3, 174:14,
175:14, 216:10,
216:12, 227:19,
227:24, 232:12,
334:11, 366:2

**top** [7] - 171:22,
220:20, 271:10,
271:12, 279:8,
318:8, 374:4
**topic** [4] - 195:3,
297:5, 317:19,
334:15
**total** [1] - 368:9
**totally** [1] - 369:8
**touch** [1] - 264:23
**touched** [1] - 367:24
**towards** [1] - 99:6
**town** [1] - 184:16
**track** [5] - 173:21,
207:11, 240:18,
254:21, 272:7
**Tracker** [25] - 103:2,
103:9, 152:22,
153:1, 153:3,
153:11, 153:12,
153:16, 156:14,
156:18, 157:12,
157:14, 239:4,
239:6, 239:17,
239:24, 240:3,
240:12, 240:15,
252:15, 304:24,
305:1, 305:3, 305:4,
305:14
**tracker** [1] - 156:23
**tracks** [1] - 173:14
**trade** [2] - 239:8,
252:13
**trademark** [2] -
137:15, 235:10
**Trademark** [10] -
111:11, 113:18,
113:21, 136:11,
196:3, 344:7, 345:3,
345:17, 348:23,
350:11
**traffic** [1] - 284:2
**trained** [1] - 137:17
**trainers** [1] - 363:13
**training** [1] - 214:3
**transcript** [2] - 362:12,
407:11
**transfer** [1] - 337:4
**transformed** [2] -
111:22, 312:19
**translated** [1] - 164:20
**translation** [3] -
246:10, 251:18,
259:5
**translator** [1] - 207:14
**travel** [1] - 380:22
**traversing** [1] - 385:20
**treat** [1] - 126:17
**tree** [19] - 298:3,
298:11, 298:13,

298:16, 298:18, 298:21, 299:1, 299:6, 299:15, 299:17, 299:19, 299:20, 299:22, 300:6, 300:9, 300:14, 300:17, 389:4, 392:23
**trees** [3] - 299:13, 300:1, 300:6
**Trial** [1] - 75:3
**trial** [49] - 94:9, 104:12, 109:1, 124:8, 124:13, 125:7, 128:3, 128:24, 129:3, 129:8, 129:14, 129:16, 129:18, 129:22, 130:23, 131:3, 131:19, 133:4, 134:8, 142:17, 142:21, 144:11, 144:21, 148:3, 148:10, 148:22, 149:1, 149:11, 152:1, 152:9, 176:22, 177:8, 177:11, 188:10, 203:4, 394:9, 394:22, 395:7, 395:12, 395:16, 396:1, 396:8, 396:11, 397:16, 397:19, 398:11, 399:4, 399:9, 399:13
**trials** [1] - 134:5
**triangle** [1] - 393:5
**triangles** [1] - 393:3
**tried** [6] - 151:8, 166:8, 180:19, 182:21, 333:24, 399:11
**trigger** [3] - 99:7, 101:9, 101:22
**trip** [4] - 96:17, 101:17, 375:20, 376:14
**trouble** [2] - 315:12, 315:23
**true** [14] - 96:12, 126:24, 204:14, 279:21, 320:11, 320:23, 320:24, 340:13, 341:7, 345:16, 358:24, 363:4, 399:23, 407:10
**trust** [1] - 100:1
**truthful** [5] - 315:22,

324:20, 340:12, 340:16, 340:19
**try** [20] - 77:7, 77:11, 82:10, 97:19, 99:1, 133:5, 147:6, 155:11, 227:4, 283:21, 295:12, 320:19, 322:13, 325:2, 330:21, 332:16, 336:8, 342:11, 350:23, 374:3
**trying** [23] - 88:15, 93:11, 99:6, 106:5, 147:12, 149:11, 174:16, 180:9, 182:18, 186:11, 192:3, 195:5, 201:12, 223:6, 233:17, 262:12, 306:12, 311:19, 325:12, 371:11, 373:20, 399:20, 404:20
**TUNNELL** [1] - 76:4
**turn** [23] - 105:7, 106:12, 166:23, 168:4, 169:7, 181:6, 181:7, 200:9, 233:8, 240:17, 240:19, 240:20, 243:21, 252:3, 262:6, 262:18, 271:22, 273:6, 276:11, 277:24, 279:21, 297:7, 352:12
**turned** [1] - 312:2
**turning** [1] - 190:11
**turns** [6] - 190:14, 197:7, 200:12, 200:24, 272:14, 341:19
**TV** [2] - 215:19, 252:21
**twelve** [3] - 211:2, 211:6, 211:7
**twenty** [3] - 213:15, 213:16, 236:10
**twenty-one** [1] - 213:15
**twenty-two** [2] - 213:16, 236:10
**twice** [2] - 138:19, 298:20
**twist** [1] - 241:1
**twitter** [1] - 148:2
**two** [62] - 77:14, 94:4, 94:8, 103:16, 125:10, 125:24, 133:17, 138:19, 140:10, 143:7,

149:3, 154:3, 155:23, 157:8, 157:10, 161:4, 163:17, 165:21, 166:4, 176:6, 176:8, 185:6, 187:10, 189:7, 189:21, 196:7, 199:4, 204:8, 208:13, 213:16, 216:15, 217:21, 218:8, 219:18, 220:21, 223:15, 227:19, 227:24, 228:16, 236:10, 256:2, 261:22, 266:9, 269:24, 277:2, 281:17, 281:19, 301:2, 309:11, 319:12, 345:22, 346:12, 348:4, 348:20, 357:7, 360:7, 361:10, 394:18, 396:8, 397:5, 400:19, 400:22
**two-year** [1] - 228:16
**type** [8] - 182:9, 211:15, 217:11, 229:15, 388:17, 389:4, 392:15, 392:17
**types** [4] - 171:1, 182:12, 218:9, 290:7
**typewritten** [1] - 129:24
**typical** [5] - 263:9, 263:14, 263:19, 263:23, 299:18
**typically** [5] - 247:4, 292:16, 296:18, 296:20, 304:18
**U.S** [2] - 308:17, 358:21
**UFO** [2] - 227:3, 291:18
**UIAP** [1] - 169:15
**Ulrike** [1] - 205:6
**ULRIKE** [2] - 205:7, 205:9
**uncomfortable** [2] - 202:20, 286:23
**unconstrained** [1] - 380:8
**under** [23] - 78:2, 78:13, 87:17, 101:3, 103:8, 117:19, 126:15, 131:3, 131:13, 132:18, 133:9, 140:13, 140:17, 140:22,

143:2, 146:18, 172:8, 262:11, 274:1, 288:6, 323:1, 337:20, 343:8
**understood** [13] - 84:9, 117:12, 210:3, 227:17, 227:18, 267:4, 274:14, 315:14, 319:16, 319:18, 319:23, 342:12, 395:24
**Understood** [1] - 78:1
**undue** [1] - 138:8
**unfortunately** [3] - 151:10, 196:23, 341:14
**unfounded** [1] - 273:1
**unheard** [1] - 277:6
**unit** [2] - 152:17, 154:4
**UNITED** [1] - 75:1
**United** [23] - 75:13, 108:23, 109:10, 110:1, 110:18, 111:2, 132:23, 139:20, 155:16, 155:17, 156:11, 158:22, 162:22, 162:23, 174:24, 184:13, 195:18, 198:3, 210:20, 224:11, 246:7, 343:2, 392:8
**universities** [2] - 164:21, 189:11
**university** [2] - 210:19, 210:24
**University** [1] - 212:4
**unlawful** [1] - 121:16
**unless** [4] - 147:22, 166:12, 393:23, 404:24
**unlike** [1] - 122:21
**unlimited** [1] - 338:22
**unpatentable** [2] - 119:17, 119:19
**unprecedented** [1] - 380:2
**unshackle** [1] - 154:16
**unsure** [2] - 272:24, 274:3
**up** [99] - 79:11, 79:20, 81:5, 88:3, 93:8, 93:10, 103:17, 135:23, 150:1, 152:8, 156:17, 157:20, 160:9, 164:5, 174:23, 184:14, 185:13,

185:22, 192:1, 201:10, 201:21, 202:6, 204:19, 206:13, 215:13, 218:22, 219:9, 221:3, 221:4, 222:5, 222:13, 223:13, 225:2, 226:18, 227:1, 228:12, 232:17, 232:22, 238:9, 240:11, 241:2, 242:13, 243:22, 245:6, 246:12, 249:8, 250:2, 251:19, 253:16, 253:19, 256:13, 259:3, 260:21, 262:2, 265:24, 269:13, 269:14, 269:16, 270:3, 272:2, 273:8, 275:18, 276:17, 279:4, 281:10, 281:16, 284:15, 297:6, 297:15, 302:14, 314:9, 314:10, 314:20, 315:6, 315:19, 316:2, 318:7, 325:15, 325:18, 332:14, 333:24, 336:3, 337:9, 339:9, 340:4, 340:10, 341:22, 345:21, 353:21, 353:23, 359:2, 359:12, 363:15, 366:3, 366:16, 376:6, 400:10, 402:6, 403:1
**update** [1] - 384:21
**Update** [3] - 384:24, 385:8, 389:16
**updates** [1] - 148:3
**upper** [6] - 115:8, 121:6, 131:17, 132:14, 221:8, 222:10
**ups** [1] - 211:9
**urge** [1] - 130:8
**US** [15] - 197:22, 200:19, 200:20, 201:14, 249:24, 330:9, 344:8, 346:5, 346:19, 347:22, 348:4, 350:9, 350:11, 353:6, 391:16
**usage** [10] - 171:14, 171:19, 171:23, 172:5, 172:7, 172:9,

172:14, 173:12,
176:14, 176:20
**useful** [7] - 110:22,
111:20, 113:4,
113:13, 180:20,
317:16, 318:22
**user** [6] - 165:22,
168:9, 267:23,
278:21, 285:1,
336:20
**users** [17] - 169:10,
169:14, 169:20,
170:1, 170:3, 170:5,
170:11, 170:15,
171:14, 171:18,
171:23, 172:14,
176:14, 176:19,
252:2, 356:21,
378:15
**uses** [15] - 117:1,
121:14, 160:2,
174:17, 175:5,
175:13, 176:8,
179:20, 183:7,
183:22, 184:4,
188:23, 190:17,
229:23, 305:13
**utilities** [1] - 213:10
**utility** [2] - 89:14,
91:22

**V**

**valid** [14] - 117:22,
139:1, 139:8, 139:9,
139:11, 141:12,
141:15, 195:19,
196:6, 197:9,
197:23, 203:1,
203:15, 244:9
**validity** [7] - 121:23,
123:5, 123:11,
137:23, 142:4,
143:19, 146:5
**valleys** [1] - 370:4
**valuable** [3] - 112:5,
162:6, 378:12
**value** [12] - 170:18,
171:21, 174:11,
272:18, 284:20,
284:21, 284:23,
284:24, 324:12,
328:11, 355:23,
378:16
**varies** [1] - 397:4
**variety** [7] - 180:21,
181:4, 182:10,
196:13, 197:10,
310:18, 347:3
**various** [7] - 77:8,
93:7, 116:21,
133:12, 133:19,
228:7, 342:20

**VC** [1] - 367:22
**venues** [1] - 247:21
**verdict** [3] - 125:3,
125:5, 149:5
**version** [21] - 77:20,
78:12, 88:1, 88:2,
161:1, 161:3, 182:8,
183:2, 183:7,
246:10, 259:6,
270:15, 316:23,
317:4, 382:19,
388:19, 388:24,
401:10, 401:22,
402:11, 403:17
**Version** [12] - 384:22,
387:20, 388:5,
388:6, 388:9,
388:19, 389:1,
389:2, 389:7,
389:17, 390:8,
390:13
**versions** [4] - 161:4,
184:22, 316:13,
401:21
**versus** [1] - 382:20
**vertices** [2] - 393:3,
393:6
**VHS** [1] - 153:15
**via** [1] - 256:20
**video** [62] - 80:9, 86:5,
86:10, 87:1, 87:6,
87:13, 87:14, 87:15,
88:8, 88:9, 88:17,
89:16, 90:16, 90:18,
91:12, 91:16, 91:21,
92:8, 92:15, 92:23,
93:10, 93:15, 93:19,
109:11, 109:17,
109:21, 110:8,
110:14, 115:1,
131:11, 136:10,
136:23, 137:11,
137:21, 139:3,
145:12, 155:18,
194:5, 201:2,
235:23, 236:2,
236:8, 236:9,
236:13, 236:14,
236:17, 236:19,
236:21, 237:2,
237:4, 237:6,
237:20, 237:21,
238:19, 238:21,
239:1, 239:15,
245:1, 245:2, 245:7
**Video** [2] - 109:23,
384:8
**videos** [18] - 86:13,
86:14, 87:19, 87:22,
87:24, 167:13,

177:2, 177:4, 177:5,
177:8, 235:21,
236:1, 236:3, 236:4,
236:6, 236:23,
238:5, 238:10
**videotape** [7] - 124:2,
126:14, 153:15,
362:7, 362:16,
362:18, 393:18
**View** [4] - 181:7,
261:13, 364:6,
384:17
**view** [33] - 97:18,
150:21, 151:3,
151:13, 182:4,
188:5, 222:12,
222:15, 230:18,
263:18, 271:11,
274:19, 284:21,
292:12, 292:15,
292:16, 292:19,
292:23, 293:1,
377:3, 377:6, 377:8,
377:15, 385:10,
386:12, 387:12,
389:24, 390:4,
392:17, 392:19,
392:20, 393:23,
395:13
**Viewer** [16] - 158:10,
158:20, 160:11,
160:13, 160:16,
160:18, 160:22,
161:5, 166:17,
192:22, 193:9,
311:13, 376:17,
377:2, 377:21
**viewing** [1] - 379:7
**viewpoint** [5] - 152:4,
154:5, 154:17,
176:2, 377:4
**views** [3] - 270:14,
270:16, 369:22
**violate** [1] - 149:12
**violating** [1] - 149:7
**Virginia** [1] - 113:19
**virtual** [2] - 214:18,
386:20
**Virtual** [1] - 325:23
**virtually** [1] - 181:17
**visible** [1] - 240:19
**Vision** [23] - 95:18,
198:20, 198:21,
198:23, 235:14,
235:15, 255:10,
258:16, 280:13,
328:23, 329:3,
332:7, 332:20,
332:24, 333:3,
347:8, 347:18,

347:24, 348:3,
348:10, 349:3,
349:5, 349:17
**vision** [7] - 86:7,
153:2, 307:20,
335:13, 356:11,
372:5, 374:14
**visions** [1] - 363:17
**visit** [8] - 211:2,
215:21, 216:1,
264:24, 265:15,
266:22, 267:1,
268:13
**visited** [4] - 261:13,
278:7, 278:12, 321:1
**visual** [13] - 151:14,
153:7, 154:8,
154:17, 157:16,
158:13, 160:16,
161:19, 176:2,
182:18, 182:19,
289:14, 370:14
**visualContext** [1] -
384:24
**VisualContext** [1] -
389:16
**VisualContext::
Update** [1] - 384:23
**visualization** [13] -
189:5, 214:1, 214:3,
214:12, 216:3,
216:24, 218:1,
226:23, 257:21,
280:7, 292:18,
328:16, 335:12
**visualize** [8] - 183:4,
183:5, 183:8,
289:20, 290:3,
290:8, 290:20,
290:22
**visualizing** [8] - 189:7,
196:16, 289:7,
289:10, 290:16,
291:24, 293:2,
319:12
**visually** [1] - 212:22
**visuals** [1] - 89:1
**voice** [3] - 87:20,
240:10, 245:8
**volume** [1] - 189:7
**Volume** [1] - 75:3
**volunteered** [1] -
211:23
**W-I-E-S-N-E-R** [1] -
205:7
**wait** [9] - 90:11, 199:1,
232:14, 272:16,
357:23, 358:20,
358:21, 369:6,
390:19

**walk** [8] - 156:4,
172:24, 187:5,
189:12, 206:13,
214:13, 326:13,
386:9
**walked** [1] - 201:9
**walking** [2] - 385:20,
389:22
**walkthroughs** [1] -
214:2
**Wall** [2] - 254:14,
254:16
**wants** [5] - 159:10,
238:21, 325:10,
360:15, 378:12
**war** [1] - 214:10
**warn** [3] - 129:10,
129:14, 155:6
**Washington** [2] -
113:19, 184:14
**waste** [1] - 400:3
**watch** [4] - 109:11,
115:1, 148:21,
167:13
**water** [1] - 182:22
**ways** [9] - 112:8,
140:10, 172:4,
266:9, 278:23,
290:2, 290:7,
299:16, 319:12
**weather** [6] - 215:19,
216:9, 216:14,
216:18, 216:19,
252:21
**WeatherNews** [4] -
215:8, 215:17,
216:7, 341:12
**web** [2] - 338:11,
350:1
**website** [5] - 330:19,
335:8, 335:10,
336:16, 345:9
**Wednesday** [1] -
397:21
**week** [6] - 109:1,
125:6, 146:21,
146:24, 151:6, 396:5
**weekend** [1] - 182:6
**weeks** [2] - 266:24,
273:18
**Weik** [5] - 322:15,
322:20, 322:21,
324:15, 325:4
**Weisner** [1] - 286:18
**welcome** [2] - 108:22,
242:6
**west** [1] - 224:8
**West** [1] - 224:15
**whack** [1] - 404:16
**whack-a-mole** [1] -

404:16
**whatsoever** [1] - 372:7
**wheel** [1] - 240:22
**wherein** [2] - 297:24, 302:19
**WHEREOF** [1] - 407:14
**whiskey** [1] - 368:21
**whole** [24] - 144:17, 196:17, 214:11, 215:2, 219:1, 219:17, 219:24, 222:2, 223:19, 230:21, 230:22, 265:22, 277:5, 284:8, 329:10, 353:11, 353:12, 353:13, 354:19, 368:11, 381:3, 381:5, 393:8
**widely** [1] - 302:11
**Wiek** [1] - 155:5
**Wiesner** [5] - 204:12, 204:17, 205:14, 207:14, 207:24
**WIESNER** [2] - 205:6, 205:9
**wiggle** [1] - 243:19
**WILLIAMSON** [11] - 76:8, 106:14, 106:23, 107:5, 107:13, 108:5, 108:16, 403:10, 403:18, 404:4, 405:13
**Williamson** [2] - 105:8, 106:13
**willing** [5] - 166:11, 173:5, 262:14, 321:24, 329:23
**Wilmington** [7] - 75:11, 184:16, 184:17, 185:11, 185:13, 186:6, 407:16
**wins** [1] - 145:22
**wish** [1] - 131:6
**withdraw** [2] - 298:7, 322:12
**withdrew** [1] - 83:20
**witness** [38] - 86:21, 126:10, 126:12, 126:15, 126:17, 127:12, 128:16, 135:19, 135:21, 136:5, 152:20, 177:2, 204:11, 205:21, 205:24, 207:12, 207:13,

207:19, 208:1, 208:11, 208:12, 208:20, 228:23, 238:19, 240:3, 286:16, 287:4, 349:9, 358:1, 358:7, 359:10, 361:18, 361:19, 362:5, 362:6, 383:20, 395:22
**WITNESS** [5] - 208:3, 240:14, 351:10, 362:2, 407:14
**witness's** [3] - 130:4, 134:17, 361:12
**witnesses** [28] - 80:14, 83:18, 85:10, 85:15, 86:13, 108:11, 124:16, 126:8, 126:11, 132:6, 132:8, 132:10, 134:7, 136:7, 147:5, 176:24, 177:6, 184:19, 187:7, 187:20, 196:2, 206:23, 207:1, 207:11, 395:8, 397:4, 397:6, 397:8
**witnesses's** [1] - 207:15
**woman** [1] - 207:13
**wonder** [1] - 122:8
**wondered** [1] - 354:16
**wonderful** [2] - 372:17, 372:20
**wondering** [2] - 110:5, 128:16
**word** [7] - 116:6, 244:18, 244:22, 262:10, 263:13, 297:19, 385:21
**worded** [1] - 105:7
**words** [17] - 82:14, 123:8, 136:6, 141:8, 144:23, 155:9, 170:12, 170:13, 171:15, 187:3, 187:5, 210:1, 339:22, 342:9, 374:1, 380:20
**workout** [1] - 341:14
**works** [12] - 112:15, 114:8, 138:4, 187:20, 189:14, 190:10, 190:21, 190:24, 200:5, 283:24, 284:3, 384:4
**world** [32] - 151:14, 151:15, 154:9,

156:9, 164:22, 171:2, 176:3, 181:18, 182:23, 182:24, 193:1, 219:1, 219:2, 219:14, 219:15, 220:19, 224:18, 227:1, 230:22, 299:9, 310:10, 347:4, 353:7, 353:13, 354:19, 381:3, 381:5, 381:9, 381:10, 381:14, 381:15, 386:20
**world's** [1] - 180:19
**World's** [1] - 376:5
**worry** [2] - 128:14, 135:15
**worse** [2] - 192:3, 231:16
**worth** [1] - 88:17
**wow** [1] - 364:13
**wrapper** [1] - 120:16
**wrappers** [1] - 120:17
**write** [9] - 99:13, 113:11, 130:23, 134:20, 150:12, 175:6, 187:4, 358:9, 379:5
**writing** [7] - 97:10, 134:11, 253:6, 282:7, 340:17, 372:3, 372:14
**writings** [1] - 110:24
**written** [18] - 94:8, 94:18, 116:15, 119:20, 119:24, 120:14, 133:16, 135:5, 138:2, 252:22, 253:14, 270:11, 278:7, 317:8, 317:9, 352:5, 372:23, 404:11
**wrote** [23] - 191:14, 258:22, 272:4, 280:1, 281:12, 315:18, 324:15, 325:4, 335:16, 336:4, 336:14, 336:17, 337:1, 337:11, 337:12, 337:14, 338:3, 338:14, 338:23, 343:17, 368:13, 373:14
**year** [24] - 99:1, 99:13, 158:19, 158:23, 163:10, 197:22, 197:23, 200:18, 200:19, 201:14,

228:16, 259:21, 265:12, 303:24, 306:11, 306:19, 330:8, 339:10, 340:6, 358:20, 363:1, 375:13, 380:22
**yearly** [6] - 160:15, 166:20, 264:1, 264:5, 314:1
**years** [45] - 98:16, 111:8, 111:10, 111:13, 152:1, 152:11, 156:4, 156:8, 158:21, 173:15, 180:18, 182:20, 183:2, 188:12, 189:6, 194:20, 202:13, 211:1, 211:8, 212:11, 213:16, 227:19, 227:24, 236:11, 237:17, 249:21, 254:2, 256:2, 257:23, 261:5, 278:13, 301:12, 309:11, 309:24, 310:9, 326:15, 328:24, 331:18, 346:22, 351:18, 366:20, 373:9, 379:13, 385:3, 385:8
**yellow** [7] - 259:10, 270:7, 270:24, 278:1, 278:17, 284:19, 284:20
**youngest** [1] - 211:10
**yourself** [8] - 147:3, 191:18, 195:20, 200:22, 231:7, 255:22, 319:5, 367:16
**yourselves** [3] - 134:4, 204:2, 394:5
**Youtube** [2] - 167:13, 168:14
**Yvan** [2] - 336:4, 336:9
**zero** [5] - 230:22, 230:24, 231:1, 231:2, 231:5
**zoom** [3] - 226:12, 336:20