IN THE UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF DELAWARE


ART+COM INNOVATIONAL POOL, ) Trial Volume 4
GmbH,                       )
         Plaintiff,         )
                            ) C.A. No. 14-217-RGA
v.                          )
                            )
GOOGLE INCORPORATED,        )
                            )
         Defendant.         )


              Wednesday, May 25, 2016
              8:32 a.m.
              Courtroom 6A


              844 King Street
              Wilmington, Delaware


BEFORE:  THE HONORABLE TIMOTHY B. DYK,
         United States District Court Judge



APPEARANCES:


         FARNAN LLP
         BY:  BRIAN E. FARNAN, ESQ.
         BY:  MICHAEL J. FARNAN, ESQ.

              -and-

         BAKER & BOTTS
         BY:  SCOTT F. PARTRIDGE, ESQ.
         BY:  MICHAEL A. HAWES, ESQ.
         BY:  LARRY G. SPEARS, ESQ.
         BY:  TIMOTHY ROONEY, ESQ.


              Counsel for the Plaintiff

```
 1    APPEARANCES CONTINUED:

 2


 3


 4            MORRIS, NICHOLS, ARSHT & TUNNELL
              BY:  JACK B. BLUMENFELD, ESQ.
 5
                      -and-
 6
          O'MELVENY MYERS, LLP
 7        BY:  DARIN SNYDER, ESQ.
          BY:  LUANN L. SIMMONS, ESQ.
 8        BY:  BRETT WILLIAMSON, ESQ.

 9                  Counsel for the Defendants

10


11


12


13


14


15


16


17


18


19


20


21


22


23


24
```

```
 1              THE COURT:  Is there anything we
 2    need to discuss before we address the
 3    hypothetical negotiation date?
 4              MR. PARTRIDGE:  Your Honor, the
 5    only thing I would raise is that there are some
 6    objections with respect to testimony that the
 7    Defendant has proffered, but I think we can deal
 8    with those briefly at lunchtime, so I think we
 9    should probably deal with the damage issue first
10    this morning.
11              THE COURT:  All right.
12              MR. SNYDER:  I'm not aware of
13    anything other than the objections to deposition
14    testimony.
15              THE COURT:  Okay.  I read the
16    briefs that both sides have submitted on the
17    hypothetical negotiation date which were quite
18    helpful.  I've concluded first of all that
19    contrary to Plaintiff's argument, there's been
20    no waiver with respect to the issue by Google
21    and no impropriety in raising the issue when
22    they raised the issue.
23              So let's move onto the merits.
24    With respect to the merits, it seems to me that
```

```
 1     there's been no showing that the patent was not

 2     substantially identical in its later iterations

 3     after the two reissues compared to the original

 4     patent and there's been no showing in my view

 5     that the Google product was materially different

 6     in 2005 than in 2010.  So my ruling is that the

 7     hypothetical negotiation date, as I suggested

 8     earlier, is 2005.

 9              The question is whether there can

10     be any reference to a 2010 date in the testimony

11     of the experts on the subject.  And my view is

12     that referring to a 2010 hypothetical

13     negotiation date would be extremely confusing to

14     the jury, but I'll hear argument on that

15     question briefly.

16              MR. HAWES:  So Your Honor, we

17     agree and would not tell the jury that the

18     hypothetical negotiation would have been in

19     2010.  That is not our plan.  However, I think

20     that there are facts in 2010 that are relevant

21     to what would have happened in 2005 and that we

22     ought to be able to present those.  And I would

23     note for Your Honor that the tenth factor of the

24     parties' agreed final jury instruction with
```

```
 1      regard to the reasonable royalty rate is the

 2      extent to which Google has made use of the

 3      invention and any evidence that shows the value

 4      of that use.  And kind of by definition that all

 5      has to happen after the hypothetical negotiation

 6      because that use is the alleged infringement.

 7      So all the evidence concerning that use and the

 8      value of that use is going to be up in 2008,

 9      2009, 2010.

10                  THE COURT:  You're talking about a

11      book of wisdom theory here?

12                  MR. HAWES:  No, Your Honor.  I

13      think the factor specifically talks about the

14      value of the use, and that use occurs after the

15      hypothetical negotiation date.  There is no use

16      of the invention before the hypothetical --

17                  THE COURT:  Are you familiar with

18      the book of wisdom?

19                  MR. HAWES:  I am, Your Honor, yes.

20                  THE COURT:  Well, why isn't that

21      what this is?

22                  MR. HAWES:  I think there's an

23      overlap there.  The book of wisdom talks about

24      using what's afterwards to get inside the head
```

```
 1    at the time and I think the book of wisdom has
 2    more often be used to say when you get to factor
 3    13, the hypothetical negotiation factor, you can
 4    look at future events to decide how they would
 5    have negotiated.  That's kind of the book of
 6    wisdom.  All I'm saying, Your Honor, is there's
 7    an independent factor, factor 10 that also makes
 8    that information relevant.
 9                  THE COURT:  Okay.  Mr. Snyder.
10                  MR. SNYDER:  Couple of things,
11    Your Honor.  First, I agree with Plaintiff that
12    a reference to a 2010 hypothetical negotiation
13    date would be extremely prejudicial.  Doesn't
14    seem to be a dispute.
15                  THE COURT:  I think it's been
16    agreed that that's not going to happen and it
17    would be confusing to the jury.  I wouldn't
18    permit it under Rule 403.
19                  MR. SNYDER:  Then the question is
20    what period of time and what events during that
21    period of time can reasonably be referenced and
22    for what purpose given a 2005 hypothetical
23    negotiation?  The book of wisdom is often
24    applied in the context of actual revenues, so
```

1           that you can apply a rate to those actual

2           revenues and move forward and make a damages

3           determination.  What Mr. Nawrocki tried to do is

4           take some projections regarding revenues, not

5           related to Earth, but related to a bunch of

6           other products, and not use them for the royalty

7           base.  He uses them as part of an extended

8           calculation to determine a royalty rate, which

9           is completely different.  So at the time of the

10          hypothetical negotiation in 2005, what would the

11          parties have considered?  And there's certainly

12          a fair range of dates around that, but the

13          product has just been issued in 2005, and Mr.

14          Nawrocki is going to want to go into 2010, 2011

15          to try and take those dates, take projections

16          based on at the times of those dates for

17          different products, not Earth, and apply those

18          to something in 2005.  And that can't be

19          permitted and would be extremely prejudicial.

20                    THE COURT:  I think the difficulty

21          is that it's hard for me to understand what's

22          going on here and what the two of you are

23          talking about and until I see what Mr. Nawrocki

24          is planning to do.  At the same time, I don't

```
 1     want to put evidence in front of the jury that

 2     I'm eventually going to have to strike because

 3     it's irrelevant or should be excluded under Rule

 4     403.  Can the two of you help me understand

 5     better what we're arguing about here?

 6                   MR. SNYDER:  I'll defer to the

 7     Plaintiffs for description of what they plan for

 8     Mr. Nawrocki to do, because frankly I don't

 9     know, Your Honor.

10                   MR. HAWES:  Your Honor, they've

11     objected to the very -- they have our

12     demonstratives, they've got the charts, they

13     know what the information is.

14                   THE COURT:  They may have it.  I

15     don't.  I don't know what's going on.

16                   MR. HAWES:  Fair enough, Your

17     Honor.

18                   THE COURT:  It's very hard for me

19     to make a ruling unless I do understand what's

20     going on.

21                   MR. HAWES:  So Google has business

22     plans in 2008, 2010 that talk about the various

23     ways in which their monetizing.  This was the

24     issue that Your Honor addressed in the motion
```

```
 1      for the argument.  But there were various items

 2      that we believe are linked to Google Earth and

 3      that yes, you have to apportion, because it's

 4      not, it's not that Google Earth has a one to one

 5      direct consumer driving revenue relationship,

 6      but that there are those items and that in view

 7      of what eventually occurred, the parties in 2005

 8      could have understood that look, Google Earth in

 9      view of Google strategy is going to be

10      developing advertising.  The 2010 and 2008

11      business plans just tell us the particular ways

12      in which that actually happened, the value of

13      the invention that Google actually got.

14                MR. HAWES:  He should be allowed

15      to discuss that as part of discussing what the

16      parties would have understood and agreed to in

17      2005.  Not as this is the money we're going to

18      get, but this is the rate we should pay to see

19      if we can achieve that.

20                And if the parties with have

21      agreed to a certain rate for the use of the

22      invention so they could try to achieve the goals

23      that Google had for Google Earth.  But it is

24      specifically in terms of evidence, Your Honor, a
```

```
 1    business plan in 2008 and a business plan in

 2    2010.

 3                    THE COURT:  They couldn't have

 4    known about a 2008 or a 2010 business plan in

 5    2005.  What's the relevance of that?

 6                    MR. HAWES:  The relevance of that

 7    is to Factor 10 of the agreed factors that the

 8    parties have agreed to which is the value of the

 9    use of the invention to Google.  That is a

10    factor that we have agreed to as part of the

11    jury instructions.

12                    THE COURT:  I don't see that that

13    factor suggest that you can use later

14    information in determining what the parties

15    would have done in 2005.  And the Book of Wisdom

16    may allow some limited use of later data, it's a

17    confusing doctrine, I don't know how far it

18    goes, but I don't understand the Book of Wisdom

19    would allow you to use projections from later

20    years to determine what people would have done

21    in 2005.

22                    MR. HAWES:  Well, these business

23    plans, Your Honor, do include data and

24    projections, so the table that was presented to
```

777

```
1      you showed the data for a particular years and

2      then projections for other years.

3                        THE COURT:  What is

4      Mr. Nawraocki's theory going to be about what

5      the reasonable royalty rate would have been,

6      what reasonable royalty rate would have been

7      agreed to in 2005?  What is he going to say

8      about that?

9                        MR. HAWES:  He's going to say

10     there would have than at least one-and-a-half

11     pennies per use.

12                       THE COURT:  What's the basis for

13     that?

14                       MR. HAWES:  A basis for that is

15     the analysis of the expected revenue that Google

16     was expecting to receive from the advertising

17     that we showed in the strategy documents that we

18     showed to the jury as well as the Google

19     documents that showed an increase in the ad

20     revenue for Google.com and the identified

21     amounts of I believe it's eight categories of

22     such ad revenue.  And that ad revenue is showing

23     2008 and 2010, so those are the Book of Wisdom.

24                       THE COURT:  What is the relevance
```

778

```
 1      of projections from 2008 and 2010 as to what the

 2      parties would have agreed to in 2005?

 3                      MR. HAWES:  Both experts used --

 4      if you looked at --

 5                      THE COURT:  I don't care what both

 6      experts did.  Tell me what the experts did --

 7                      MR. SNYDER:  Your Honor,

 8      Mr. Nawraocki is here.  I'm very sorry to

 9      interrupt the Court.

10                      THE COURT:  Yes.  Mr. Nawraocki

11      should not be here.

12                      MR. HAWES:  Your Honor, I didn't

13      realize he was here.

14                      THE COURT:  That is unfortunate.

15                      Go ahead.

16                      MR. HAWES:  So Mr. Nawraocki --

17      Your Honor, there are specific categories of

18      advertising revenue.  So Google categorizes the

19      way it receives the advertising revenue.  One

20      example I think Your Honor referenced in the

21      order was IPGO, which we have actually heard a

22      witness testify is the marginal increase in

23      revenue that occurs because there is knowledge

24      about the location of the person who is --
```

```
 1              THE COURT:  I understand that

 2      theory.  I do not understand what projections

 3      from 2008 and 2010 have to do with what the

 4      reasonable royalty rate would have been agreed

 5      on in 2005.

 6              MR. HAWES:  We believe they're the

 7      best evidence of the value of the use of the

 8      invention that Google anticipated when it bought

 9      Google Earth.  It's the reason they put Google

10      Earth into their system was because they

11      anticipated they could grow advertising.

12              We did have and presented to the

13      jury the documents that show Google's

14      anticipation from as early as January 2006 which

15      is only a few months after the hypothetical

16      negotiation date in 2005 that they were going to

17      have an increase in advertising revenue as a

18      result of growing the users of the Google system

19      including Google Earth.  Google Earth is named

20      in that document.

21              THE COURT:  I'm not going to allow

22      you to use 2008 and 2010 revenue projections to

23      determine what the hypothetical negotiation

24      would have yielded in 2005.  I'm not at this
```

```
 1    moment ruling about something from 2006 which

 2    may be close enough in time to 2005 to be

 3    relevant, if that clarifies it for you.

 4                 MR. HAWES:  It does.  Can we

 5    consult with the team and see how this affects

 6    the trial, Your Honor?

 7                 THE COURT:  Of course.

 8                 MR. PARTRIDGE:  We would like

 9    maybe five minutes to confer, Your Honor.  We

10    may have a request to make to you as a

11    consequence of this.

12                 THE COURT:  Why don't we recess

13    until ten of.

14                 (A brief recess was taken.)

15                 THE COURT:  Be seated, please.

16                 MR. PARTRIDGE:  Your Honor, this

17    is obviously a rather difficult issue and one

18    that has surprised us.

19                 THE COURT:  I don't see how it

20    could have surprised you.  We have been talking

21    about the 2005 date for some time.

22                 MR. PARTRIDGE:  I understand what

23    you're saying, Your Honor, but in terms of

24    preparing for this particular trial up until the
```

```
 1      last few weeks, this was not something we

 2      contemplated as a possibility.  That's from our

 3      standpoint.  I understand you may disagree with

 4      that, but that's the way we saw it coming into

 5      this.

 6                  The issue that has been raised by

 7      this morning's discussion is one that I think

 8      requires us to spend with your permission a few

 9      minutes discussing with Mr. Nawrocki the changes

10      that we would have to make to his testimony.

11                  I understand that's unusual, but

12      given this particular circumstance, I think we

13      need a little time to discuss that with him so

14      that when we go forward, he has some

15      understanding as to the things we're now

16      skipping that we had contemplated including in

17      his testimony.

18                  So I would ask permission to

19      discuss this with Mr. Nawrocki before we

20      proceed.  It probably would take ten or fifteen

21      minutes to do so.

22                  We are contemplating going forward

23      following your order without making a request at

24      this moment for any other type of relief, but I
```

```
 1      would request the Court's permission to have

 2      fifteen or twenty minutes to discuss this issue

 3      with Mr. Nawraocki so that we can formulate a

 4      plan for going forward that is different than

 5      what has been contemplated by us up to this

 6      point in time.

 7                   THE COURT:  Well, even though I

 8      think you should have anticipated this, I'm

 9      inclined to allow you to do that.  Is there any

10      objection, Mr. Snyder?

11                   MR. SNYDER:  Your Honor, I do

12      object for two reasons.  First, Mr. Nawraocki

13      has started his testimony, so communication with

14      him is improper.  But second and most

15      importantly, his opinions that he could offer at

16      this trial are disclosed in his report.  He's

17      not allowed to go beyond that.  So if they're

18      going to go and plot some new testimony by

19      Mr. Nawraocki, then it is by definition going to

20      go beyond what is in his report and it shouldn't

21      be allowed.

22                   They can ask him questions, he can

23      answer the questions.  They don't need to go

24      over with him in advance what questions are
```

```
 1        going to be excised or how they're going to

 2        change them.

 3                    THE COURT:  I'm going to overrule

 4        that objection.  I'm going to allow fifteen

 5        minutes for plaintiff to discuss with

 6        Mr. Nawraocki.  Now, obviously I'm not saying he

 7        can go beyond his expert report in this respect,

 8        that's a different issue.

 9                    I would say, also, Mr. Partridge

10        and Mr. Hawes, I do take very seriously

11        excluding the witnesses from the courtroom and

12        it is your job to make sure the witnesses other

13        than courtroom representatives are not present

14        when you're having discussions with the Court

15        outside of the presence of the jury.

16                    MR. PARTRIDGE:  And I apologize

17        for that, Your Honor.  None of us realized he

18        was there and I accept responsibility for

19        looking to see whether he was in the courtroom

20        or not.  And we did not do that.  I apologize

21        that that happened.

22                    THE COURT:  All right.

23        Mr. Snyder.

24                    MR. SNYDER:  I would like if I
```

```
1     can, Your Honor, some guidance from the Court on

2     your preferred way for how I frame objections to

3     Mr. Nawraocki's testimony.  I don't know what

4     he's going to say and what they're going to

5     decide to have him say in the next fifteen

6     minutes, but I am certain I'm going to have

7     objections about material that is beyond the

8     scope of his report or objections that he is

9     making statements that have no foundation.

10                 THE COURT:  We'll just have to see

11    when it comes up how best to handle it.  In

12    allowing you to speak to Mr. Nawraocki, let's be

13    clear about it.  I am only allowing you to speak

14    to him about the hypothetical negotiation date

15    and the consequences of that and nothing else.

16                 MR. PARTRIDGE:  We understand

17    that, Your Honor.

18                 THE COURT:  Now, is there any

19    possible way that we could continue with the

20    jury while those discussions are going on?

21                 MR. PARTRIDGE:  I don't think so,

22    Your Honor, because this is our last witness.

23    It would be pretty awkward to start the

24    defendant's case.
```

 1              THE COURT:  We'll recess until

 2      9:15.  Let's be back promptly at 9:15 so we can

 3      move forward with the jury.

 4              MR. SNYDER:  Your Honor, I know we

 5      got very strict time budgets and the Court is

 6      keeping track of time.  I assume this time is

 7      not going to be charged against the defendants.

 8              THE COURT:  No, it's not going to

 9      be charged against anybody.

10              MR. PARTRIDGE:  Thank you.

11              (A brief recess was taken.)

12              THE COURT:  Be seated, please.  Do

13      we have anything we need to discuss before we

14      resume?

15              MR. PARTRIDGE:  Your Honor, we're

16      prepared to go forward.  We understand that

17      counsel for Google intends to make objections to

18      documents as we introduce them.  That's what I

19      read from this.  But we'll go forward.  We do

20      think that -- and just for making my record,

21      that this has been prejudice to us given the way

22      all of this has developed up to this point in

23      time.  We respect that Your Honor has made a

24      decision in this regard to which we disagree,

```
 1    but we will go forward and we'll do the best
 2    with where we are at the moment and hopefully
 3    we'll be able to get through the testimony
 4    without having objection after objection, but
 5    we'll see how it goes and so we're ready to
 6    proceed, Your Honor.
 7                THE COURT:  Okay.  I just want to
 8    put on the record that I don't think there's any
 9    possibility of prejudice here.  The 2005 date
10    has been in discussion for some period of time
11    and I've even given you tentative rulings in
12    advance that that was the date that I considered
13    to be appropriate so that you could work with
14    Mr. Nawrocki before he took the stand and now
15    you've had the opportunity to talk to him
16    additionally.  And my ruling as to the 2008,
17    2010 projections is that they are not relevant.
18    Even if they were relevant, I'd exclude them in
19    computing the royalty rate under Rule 403.  So
20    why don't we begin and we'll probably truncate
21    the lunch hour a bit and some of these breaks a
22    little bit to make up time this morning.
23                MR. PARTRIDGE:  Your Honor, may I
24    preserve my record just for one minute?
```

```
 1                    THE COURT:  Yes.

 2                    MR. PARTRIDGE:  The expert report

 3        was served last October.  It had both

 4        hypothetical dates in it.  They responded with

 5        their own report that addressed both dates.  We

 6        ended up with Daubert proceedings and this issue

 7        wasn't raised.  We ended up with a second

 8        Daubert proceeding and this wasn't raised.  We

 9        had a pre-trial order and this wasn't raised.

10        And the first time we act actually got from the

11        other side an issue of this point was the Monday

12        following the pre-trial order and the order had

13        already issued without this being an issue

14        identified in the pre-trial order.  I just need

15        to make my record and I'm sure you appreciate

16        that.

17                    THE COURT:  I understand.

18                    MR. PARTRIDGE:  Thank you.

19                    THE COURT:  Let's bring in the

20        jury.

21                    (Jury enters.)

22                    THE COURT:  Good morning, members

23        of the jury.  Sorry to keep you waiting.  The

24        lawyers and I had something we had to resolve
```

```
 1        before we could resume.  And we may truncate the

 2        lunch hour a little bit to try and make up the

 3        time.  So why don't we bring Mr. Nawrocki back

 4        to the stand.

 5                    THE COURT:  Mr. Nawrocki, you

 6        understand you're still under oath.

 7                    THE WITNESS:  Yes, I do, Your

 8        Honor.

 9                    THE COURT:  Okay.  Mr. Hawes, you

10        may proceed.

11                    MR. HAWES:  Thank you, Your Honor.

12     BY MR. HAWES:

13                    Q.  Mr. Nawrocki since we've all had a

14        night to perhaps have memories fade, could you

15        summarize for the jury what was important to you

16        about the Google internal documents that we

17        looked at yesterday afternoon?

18                    A.  So what we went through yesterday

19        was we talked about the strategic plan or the

20        strategic framework for Google and how that was

21        implemented by attracting users, how users were

22        monetized by advertisers and how Google Earth

23        was a product, as an example, was used as part

24        of that whole plan.  One thing I might mention
```

```
1    as well, there was that Geo business that was

2    eventually developed to do some of the

3    monetization.

4              Q.   And I believe this was the final

5    slide.

6              MR. SNYDER:  Objection, Your

7    Honor.  Can we have that taken down, please?

8    This is precisely an example of what we were

9    discussing earlier.

10             THE COURT:  Well, let me see how

11   it's going to be used before I rule on the

12   objection.

13             MR. SNYDER:  May I approach for

14   just a moment, Your Honor.

15             (Side bar discussion.)

16             MR. SNYDER:  This is a 2008

17   document, July of 2008.  And they're putting up

18   information about revenues.  I intentionally did

19   not object to the description about the general

20   approach of monetizing Google Earth through ads,

21   but now they want to put up information from '08

22   with specific revenue data.

23             THE COURT:  What's the point of

24   this?
```

```
 1                    MR. HAWES:  Your Honor, I put it

 2        up for him to be able to say this is what we

 3        were looking at last time, then we were going to

 4        move to the next slide.

 5                    THE COURT:  Let's just move to the

 6        next slide.

 7                    MR. HAWES:  Okay.

 8                    MR. HAWES:  Sorry, Your Honor.

 9        BY MR. HAWES:

10             Q.   So if you could turn with me to

11        Plaintiff's Trial Exhibit Number 45 in your

12        notebook, please, Mr. Nawrocki.

13             A.   Yes.

14             Q.   And are you familiar with this

15        document?

16             A.   Yes, I am.

17             Q.   What was the date of this

18        document?

19             A.   December 2010.  December 17th,

20        2010.

21             Q.   This is Plaintiff's Trial Exhibit

22        45?

23                    MR. SNYDER:  Objection.

24        Irrelevant, Your Honor.
```

```
 1                    THE COURT:  Let's see where he's

 2          going with it.

 3                    Q.   And this is Plaintiff's Trial

 4          Exhibit 45; is that correct?

 5                    A.   Yes, that's correct.

 6                    Q.   Did you consider this document?

 7                    A.   Yes, I did.

 8                    Q.   We discussed yesterday about how

 9          Google wanted to grow users and usage.  Do you

10          remember that?

11                    A.   Yes.

12                    Q.   And having looked at what happened

13          at Google, did you find that Google succeeded in

14          growing users and usage?

15                    A.   Yes, I did.

16                    Q.   And did you look at any Google

17          documents in reaching that conclusion?

18                    A.   Yes.

19                    Q.   Could you describe for us the

20          documents shown which is Plaintiff's Trial

21          Exhibit 3150?

22                    MR. SNYDER:  Objection.

23          Irrelevant Your Honor.

24                    MR. HAWES:  This does not have any
```

```
 1      projections in it, Your Honor.  This is not

 2      going to the issue they've raised, it just goes

 3      to what actually happened.

 4                  THE COURT:  For the moment that's

 5      overruled.

 6  BY MR. HAWES:

 7            Q.  So what did you find in this

 8      document?

 9            A.  So this document which is called

10      the future of Earth, it's called By the Numbers.

11      There is one page that goes By the Numbers, and

12      it's looking back at what's happened so far.

13      They identify what their activations were.  See

14      that it's 1.9 billion total activations through

15      2014, approximately.  There was strong

16      engagement, the average session length was one

17      thing they looked at.  Mobile devices, six to

18      seven minutes.  Desktop twenty plus minutes.  So

19      there is a difference there.  You'll spend more

20      time on your desktop than you will on your

21      mobile device, still a significant amount of

22      engagement time.

23                  And they recognized they had a

24      significant user base.  25 million seven day
```

```
 1    active, 70 million third day active uses

 2    overall.  So those are people using Google Earth

 3    on an active basis.

 4            Q.   And Mr. Nawrocki, are these

 5    projections?

 6            A.   No, these -- this is by the

 7    numbers what's happened so far.

 8            Q.   So once you looked at Google's

 9    strategy, how did you calculate the proper

10    damages?

11            A.   I took a look at the base and

12    determined what the amount of infringing use

13    was.

14                 What's at issue here is a method

15    claim, or a method patent.  And so what I looked

16    at is how was this method used.  I looked at

17    several things.  I looked at the number of

18    users, number of activations, number of

19    sessions, amount of time spent, all those things

20    as a consideration for what would measure the

21    use.

22                 And the reason for that is not

23    everybody uses Google Earth.  Some people use it

24    once.  Well, then it would be one session and
```

794

```
 1        the royalty would be paid on that one session.
 2        I use it, I probably use it a couple hundred
 3        times, then my sessions would be 200 sessions in
 4        there.
 5                  So based upon all that
 6        information, I think sessions would be a
 7        reasonable basis to take a look at to measure
 8        the extent of use.
 9              Q.   Did you consider a paid up or lump
10        sum license?
11              A.   Yes, I considered it.
12              Q.   And what was your conclusion?
13              A.   My conclusion was at the time I
14        think the parties' expectations were
15        diametrically opposed for a lump sum.  There was
16        some testimony here in the trial you heard where
17        ACI or Art+Com ACI was looking for a package
18        deal.  And that didn't seem to be necessarily
19        what Google was interested in.
20                  ACI wanted to kind of increase
21        their overall platform.  They considered certain
22        similar amounts as part of a package deal which
23        was discussed.  They also considered certain
24        running considerations as well or extent of use
```

```
 1      type of licenses, so I considered that.
 2                Q.  And what was your conclusion as
 3      to --
 4                     THE COURT:  Mr. Hawes and
 5      Mr. Snyder, can you approach the bench.
 6                (Side-bar discussion:)
 7                     THE COURT:  I want you to
 8      establish with the witness that you're talking
 9      about a hypothetical negotiation in 2005 so
10      there isn't any confusion in it because I don't
11      want to intervene and tell them that's what it
12      is in my jury charge.  I want you to make clear
13      that's the period you're talking about.
14                     MR. HAWES:  May I do it after
15      we're done with the royalty base which is --
16      because --
17                     THE COURT:  Yes.  I don't want the
18      jury to be confused about the time period.
19                     MR. HAWES:  I will do it, but I
20      would like to get in royalty base first.
21                     MR. SNYDER:  I also, Your Honor,
22      think it's essential that he identify a
23      foundation for an opinion before he blurts out
24      what it is on the royalty rate.
```

```
 1                    THE COURT:  We will see where it

 2        goes.

 3                    (End of side-bar.)

 4        BY MR. HAWES:

 5             Q.   So Mr. Nawrocki, I think it's the

 6        same question I just asked.  What was your

 7        conclusion concerning your analysis of the lump

 8        sum royalty and the running royalty?

 9             A.   That a running royalty rate would

10        be the appropriate royalty for this matter.

11             Q.   And what was the first thing you

12        needed to do in order to apply a running

13        royalty?

14             A.   To determine what the royalty base

15        would be.

16             Q.   And how did you determine the

17        royalty base?

18             A.   So after considering the various

19        options, I determined it based upon looking at

20        the amount of sessions that Google had for

21        Google Earth.  They actually record the amount

22        of sessions.

23             Q.   And what kinds of Google documents

24        did you use for that analysis?
```

797

1          A.   So as part of this case, Google

2     produced numerous spreadsheets.  This was one

3     such spreadsheet.  It was much longer than this

4     and wider than this, it's a voluminous

5     spreadsheet.  This is an extraction of that.

6                You see day by day it shows the

7     amount of Google Earth sessions.  On the left

8     column, you see iPhone, iPad, Android, PC, there

9     are various other devices there identified as

10     well.  The next column shows the amount of

11     minutes on average.  You see that varies from

12     seventeen to twenty minutes on average.

13                And then the very right column is

14     the total amount of sessions.  It's not showing

15     up totally on the screen here.  I don't know if

16     it can be moved over.  But that number looks

17     like it's 1.7 million, it's actually

18     approximately 17 million.  So 17 million, so

19     between 15 and 20 million sessions per day, 15

20     to 20 million sessions per day people using it

21     based on their own records.

22          Q.   And this is Plaintiff's Trial

23     Exhibit 55?

24          A.   Yes, it is.

```
 1              Q.   And that was a spreadsheet you
 2      considered; is that correct?
 3              A.   Yes.
 4              Q.   Please turn in your notebook to
 5      Plaintiff's Trial Exhibit 72C.  And can you tell
 6      the jury what that document is?
 7              A.   Yes.  This is another Google
 8      document that I looked at to make an adjustment
 9      to the data here.
10              Q.   What is the document?
11              A.   The document is a spreadsheet from
12      Google that identifies certain price levels.
13              Q.   And could you turn to Plaintiff's
14      Trial Exhibit 73 and tell the jury what that
15      document is?
16              A.   73.  So this is another
17      spreadsheet and it's sales by customer.
18              Q.   Could you turn to Plaintiff's
19      Trial Exhibit Number 198 and tell the jury what
20      that document is?
21                   I believe you have two notebooks,
22      Mr. Nawrocki.
23              A.   Yes.  Sorry.
24                   So 198 is a Google document that
```

```
 1    identified the average user size for different

 2    aspects including government.

 3            Q.   And could you explain to the jury

 4    how those three documents were important to your

 5    analysis of the royalty base?

 6            A.   So the spreadsheet has total

 7    sessions on a worldwide basis.  I had to adjust

 8    this database for this US proceeding by a couple

 9    of things, or several things.

10              First of all, these documents were

11    used that I just mentioned to adjust for federal

12    government use.  Federal government use is not

13    at issue in this proceeding, so I had to make a

14    calculation of what that usage or what those

15    sessions would be.

16            Q.   So having done that, could you

17    please turn on your notebook to Plaintiff's

18    trial exhibit 66 and tell the jury what that

19    document is?

20            A.   Okay.  So this is another Google

21    spread sheet that shows the worldwide

22    activations.

23            Q.   And then could you turn to exhibit

24    number 190 and tell the jury what that is?
```

```
 1              A.   That's another Google spread sheet

 2       that shows the number of activations by country.

 3              Q.   And how were those two exhibits

 4       important to your analysis?

 5              A.   I use those to estimate what the

 6       U.S. sessions would be.  The information on the

 7       spread sheet that we talked about previously,

 8       PTX-055 has worldwide sessions.  I had to

 9       estimate what the U.S. sessions would be and

10       then I had to exclude the government use as

11       well.

12              Q.   So could you explain to the jury

13       how after taking those steps you reached a

14       conclusion as to the royalty base in this case?

15              A.   So then I summarized the

16       information by year.  I believe it's not showing

17       up.  I'm sorry, it is.  I didn't see it on the

18       screen.

19              Q.   This again is confidential

20       information, it will not show up on the screen.

21              A.   I understand.  So I summarized

22       their sessions for the U.S., excluding

23       government sessions on the schedule.  And so

24       you'll see starting in 2010, the amount starts
```

 1    in the middle of 2010.  There were sessions

 2    before this, but for damages purposes I've

 3    started in the middle of 2010, all the way

 4    through April of 2016.  And you'll see there's

 5    several billion per year for a total of

 6    7,099,171,846.

 7              Q.   And what steps did you take other

 8    than the federal government adjustment and U.S.

 9    adjustment that you previously described in

10    reaching this conclusion?

11              A.   So the other adjustment that was

12    made was for after 2013 Google Earth was

13    combined with Google Maps.  And so the data that

14    Microsoft -- not Microsoft, that Google had for

15    the sessions didn't include Google Earth or

16    Google Maps for those years.  It did include

17    some of the sessions but not all the sessions,

18    so I had to estimate the sessions for '14, '15

19    and '16 by looking at the prior years.

20              Q.   And did you reach a conclusion as

21    to the property royalty base in this case?

22              A.   Yes.  And so my conclusion based

23    upon my analysis was that the royalty base would

24    be again the 7 billion, 99 million that we

```
 1      talked about.

 2             Q.   And how did you go about

 3      considering potential royalty rates?

 4             A.   So I looked at a set of reasonable

 5      royalty factors.  This chart shows the factors

 6      that I've proved off.  For purposes of

 7      calculating a rate, there's a case called

 8      Georgia Pacific and it identifies 15 factors

 9      that I considered as part of my analysis.  I'm

10      not going to go through all 15 factors, so what

11      I've done is I've grouped them into three

12      groups.  Certain factors deals with licensing

13      considerations, some of them dealing with

14      technical and then there's a variety of

15      financial and business factors, like commercial

16      success, extent of use, things such as that, all

17      leading to what's on the bottom is a

18      hypothetical negotiation; in other words, what

19      the parties would have agreed to when they would

20      have sat down at this table and applied what

21      rate should be applied to it.

22             Q.   Mr. Nawrocki, going forward in our

23      discussion, can you please assume with me that

24      that hypothetical negotiation would have been
```

803

 1     when Google Earth 3.0 was released in 2005?

 2            A.   Okay.

 3            Q.   Thank you.  At the time of the

 4     acquisition of Keyhole by Google in 2004, did

 5     you hear about that in earlier testimony?

 6            A.   Yes, I did.

 7            Q.   What kind of an investment was

 8     Google planning to make in the Keyhole

 9     technology?

10            A.   So there was some discussion from

11     a Mr. Jones about when the Keyhole was

12     purchased.  And at the time as I understand it,

13     they were looking for Google to invest a billion

14     dollars to continue to develop the network in

15     Google Earth as part of that arrangement.

16            Q.   Mr. Lodge, could you please put up

17     Plaintiff's trial exhibit 200.  And could you

18     describe for us what this document is, Mr.

19     Nawrocki?

20            THE COURT:  We're again dealing

21     with non-confidential documents.  May they be

22     shown on the screen?

23            MR. HAWES:  Yes, Your Honor.

24     BY MR. HAWES:

1          Q.   Could you please describe for the

2     jury what this document is, Mr. Nawrocki?

3          A.   So what this document is, is this

4     is a press release from Google dated June 28th,

5     2005, from Mountain View and it says Google has

6     announced the launch of Google Earth and it goes

7     on and describes it.  Later on in that sentence

8     it says Google Earth enables users to fly from

9     space to street level views to find geographic

10    information and explore places around the world.

11    If you look further down in the document as an

12    example, the next section talks about key

13    features of Google Earth.  For example, first

14    bullet point says that it's free software that's

15    download available.  They also mention, a couple

16    bullet points down, the fourth one, integrated

17    Google Local Search to find local information

18    such as hotels, restaurants, et cetera.  So as

19    soon as it was released they recognized that

20    they would be selling it for free, even though

21    Keyhole had been selling it for $69 a user, they

22    were going to introduce it as a free product in

23    addition to having those paid subscriptions as

24    well.  And that it would be integrated into

805

```
 1    their Google Local Search platform.
 2              Q.   Was there any other information in
 3    this document you found useful to your analysis?
 4              A.   I believe if you page down a
 5    little bit further, I can't see the whole
 6    document.  What's the exhibit number?
 7              Q.   This is exhibit number 200, Mr.
 8    Nawrocki?
 9              A.   Uh-huh.  Yes, on the next page as
10    an example, the top of the next page.  Second
11    paragraph, says for users interested in a more
12    advanced mapping capabilities, there would be
13    Google Earth plus for $20 per year which had
14    features such as GPS, data import and then
15    Google Earth Pro was $400 per year.  So a unique
16    situation here, some subscriptions were paying
17    $20 a year, $400 a year per user and then it was
18    available to consumers on a free basis as well,
19    or users I should say.  So there's obviously
20    more capabilities some of these things had, but
21    they were looking at both the paid model as well
22    as the free model.
23              Q.   Mr. Lodge, could we pull up
24    Plaintiff's trial exhibit 31, please?  Could you
```

```
 1        identify this document for the jury?

 2               A.   Let me --

 3               Q.   Help us zoom so that we can see

 4        what's important in it to you.

 5               A.   Yeah, so this is a Google

 6        document.  If you go to the date, actually

 7        there's a revision date on the top.  The very

 8        bottom of the document, pull that up.  I believe

 9        it's approximately 2005.  The very last page.  I

10        don't know if you have it.  Yeah, the very last

11        page.  Yeah.  So the original document or the

12        original version was dated August 9th, 2005.  So

13        this was a couple months after they released it.

14        So August 9th, 2005, this was the initial

15        generation of the document.  Let's go to the

16        front date.  I just wanted to establish what the

17        timing was.  So couple months hypothetical.  So

18        this is the front end.  Maybe zoom back, if you

19        don't mind.  So at the bottom portion they talk

20        about several things.  Within the vision, they

21        talk about that first section says as Google

22        rolls out more location dependent applications

23        like Local and Earth, it is important that we

24        develop a monetization solution and levers that
```

```
1      information.  So that was important to me as if

2      you recall from that strategic framework we

3      talked about, talked about getting users,

4      getting information and monetizing it.  So that

5      goes back to that network effect that we talked

6      about, and this is an example of that.  You can

7      close that one.

8             If you go down below that second,

9      that's called background and motivation, they

10     identified here several things.  And again, this

11     is a month or two after they've introduced their

12     product.  The middle paragraph says currently

13     the combined local maps, properties generating

14     five million searches a day, Google Earth is

15     generating about one million local search per

16     day and seven million Geo codes.  Geo codes are

17     geographic codes of where that information is

18     generated.  So where you are or where you are

19     looking for, those codes would be important.

20     And again they're recognizing that at that

21     point.  The next thing there's comment on is

22     they mention several things, they mention RPM

23     there in the next sentence.

24            Q.   What does RPM stand for?
```

```
 1              A.   Talking about how they can

 2    generate revenue here and they're saying if we

 3    make some assumptions on growth we can get

 4    certain RPM's of conservative $10 per RPM.

 5    That's revenue per thousand.  So it's kind of

 6    confusing, what's $10 had per dozen.  That's a

 7    penny a unit or penny a search, if you will.  So

 8    conservatively a penny a search is what they

 9    were thinking about at that point in time and

10    they put in some assumptions on growth.

11              I call your attention to 25

12    percent per month and 10 percent after that.

13    That's a fairly aggressive growth rate, 25

14    percent a month, would be several hundred

15    percent within a year.  That's a fairly

16    aggressive growth rate they were looking for.

17    If I may just continuing on, the other aspects I

18    saw relevant to this document -- if you could

19    close that.  There's a table on the bottom which

20    we don't have to blow up, that relates to the

21    maps.  They make some assumptions there.  Go to

22    the top of the next page.  And it has an

23    anticipation for Earth.  It's a little bit

24    grainy there, so I'll try to read through it.
```

809

1      You can blow it up perhaps.  So it has what the

2      revenue impact for Google Earth is and this is

3      as of the time of August 2005, so the current

4      volume is 1.5 million searches per day.  The

5      assumed traffic growth in this box, is 25

6      percent per month.  So that's several hundred

7      percent per year basically.

8                The next item is the assumed RPM,

9      that's the 10,000 or $10 per thousand searches,

10     so that's a penny a search at that level.  And

11     then they go ahead and anticipate at that point

12     in time what their annual run rate is.  I'll

13     explain what that is, but the amounts are as of

14     January 2006, so forth next year they were

15     anticipating a 7.3 million run rate for that

16     year, at that point in time.  And then if you go

17     ahead to the next January, it would say well,

18     there's going to be 25 million a year later.  So

19     that's more than a 300 percent increase in

20     that -- those first couple years they were

21     looking at and it would continue on if they

22     would be successful.

23               Q.   Based on your review of the Google

24     documents, what was your conclusion as to the

```
 1    perception of the growth of -- growth rate of

 2    Google Earth in the 2005 time frame?

 3              A.   They expected high growth for that

 4    ad application.

 5              Q.   And based on your review of the

 6    Google documents, what portion of Google's Geo

 7    business was Google Earth in the 2005 time

 8    frame?

 9              A.   So in 2005 they didn't really

10    identify it in the next year.  I believe it was

11    2006, so first full year after that, they began

12    identifying it.  And in fact, we had a document

13    we referred to earlier that had what their

14    revenue was.  I believe it was a 2006 direct

15    revenue.

16              Q.   Could we move to slide #9, Mr.

17    Lodge.  Is this the one you're referring to?

18              A.   Yeah, this is an example.  So they

19    refer to 2005 at the top saying revenues had

20    increased a hundred percent for Earth Pro and

21    200 percent for Enterprise compared to 2005, but

22    what they show is is the 2006 results, this is

23    the first full year afterwards.  And what you'll

24    notice that I mentioned yesterday, I believe is
```

1    that Earth, the Earth products plus the Pro, the

2    Enterprises and then Earth ads down at the

3    bottom, add all those together would represent

4    more than 50 percent of their direct revenues at

5    this point in time, so more than 50 percent of

6    the 53 million.  I might add, and this is a

7    focal point, is that the Google Earth ads at the

8    bottom at this point were 1.2 million.  Remember

9    the prior slide we talked about as being 7

10   million as they would go forward and then 25

11   annual run rate, so they were anticipating

12   significant growth over this 1.2 million, even

13   in that '05 time period.  This summarized what

14   they received at this point, but at that 2005,

15   ads were where they were expecting to grow.  But

16   even at this point Earth represented

17   approximately 50 percent, a little bit more than

18   50 percent of their total revenues.

19        Q.   Have you prepared a slide to

20   illustrate for the jury what the hypothetical

21   negotiation would have looked like?

22        A.   I didn't misspeak, but I want to

23   be clear.  I said approximately 50 percent of

24   their total revenues, their total Geo direct

```
 1    revenues, to be more precise.  I don't want to

 2    say it's 50 percent of Google's revenues.  50

 3    percent of the Geo direct revenues to be

 4    precise.

 5              Q.   Thank you, Mr. Nawrocki.  You

 6    presented a slide for the jury to illustrate

 7    what the hypothetical negotiation would look

 8    like?

 9              A.   Yes.

10              Q.   Mr. Lodge, could we move to --

11              THE COURT:  It's not a

12    confidential slide.

13              MR. HAWES:  It is not, Your Honor.

14  BY MR. HAWES:

15              Q.   Could you explain for the jury

16    what you've shown here?

17              A.   Yes, so this would be the

18    hypothetical negotiation or depiction of a

19    hypothetical negotiation with Art+Com sitting on

20    one side, Google sitting on the other side to

21    negotiate a license agreement that didn't happen

22    in this case.  But what we have a construct of

23    is if the parties got together, they would get

24    together and have to have a discussion.
```

1          Q.   And what assumptions would you

2     make about that discussion?

3          A.   There are several assumptions.

4     First of all the assumptions would be that the

5     parties would be willing and able to license,

6     come to a license agreement.  They would be

7     willing licensors.

8               There is an assumption that the

9     patents would be valid and infringed.  So there

10    wouldn't be a challenge of that.  The parties

11    would agree that they were valid and infringed

12    and now we're going to have to try to work out a

13    license agreement.

14              The other thing that's important

15    it's sometimes referred to as all information is

16    available for both parties.  The cards are

17    referred to as face up.  The information for

18    both parties would be available for them to

19    consider.

20         Q.   So we talked about these factors

21    before.  What aspects of the licensing factors

22    in your opinion affected the royalty rate?

23         A.   I would say I considered all of

24    these factors.  The ones that had the most

814

```
 1    impact I would suggest would be the

 2    interrelationship with the technical with the

 3    financial and business factors.  The licensing

 4    had an impact, but not directly on the rates

 5    specifically.

 6              So the reason for the technical

 7    and financial factors is the financial is where

 8    you can take a look to determine what some of

 9    the numbers would be.  The technical side, what

10    that refers to is how superior is this

11    technology compared to what was out there and

12    what's the real benefits of this technology.

13              Dr. Castleman talked about what he

14    saw as the benefits of that.  I saw Mr. Pavel

15    Mayer talk about how excited he was when he saw

16    certain information.  I think I leaned on my

17    discussions with Dr. Castleman about the

18    importance of this technology, so that does

19    impact when you take a look at what portion

20    relates to the patents.

21              Q.   What license agreements did you

22    look at?

23              A.   So there was several

24    considerations from a licensing standpoint.
```

```
1      There has been some discussion about what the

2      offers were, considerations were of the ten

3      cents a user, dollar per user, ten cents a use

4      that ACI had been looking for.  I also

5      considered a couple of agreements that Google

6      had produced that their expert regards as

7      relevant, and I considered those as well.

8              Q.   And how would financial and

9      business factors affect the royalty rate?

10             A.   There are several factors on the

11     financial and business side.  Those deal with

12     things such as extent of use, what's the value

13     from that use, and we were talking a little bit

14     about the value of that use, things such as

15     Google Toolbars that you add, the search

16     revenues that you could see, the ad revenues

17     from the searches.

18                  What amount relates to the patent

19     at issue versus the other considerations, so

20     those are the financial and business type

21     factors that I considered.

22             Q.   What impact did you consider for

23     Google with regard to Google Earth's brand?

24             A.   I think the importance of their
```

816

```
 1      brand can't be minimized.  They have certain

 2      documents they produced that showed how they

 3      looked at how Google Earth had helped their

 4      brand or was one of the more important aspects

 5      of their branding.

 6            Q.   Let's pull up Plaintiff's Trial

 7      Exhibit 3150.  Is this one of the documents

 8      you're referring to?  I think we have seen it

 9      before?

10            A.   Yes.  So it's identified as good

11      for the brand, and it says that Maps and Earth

12      have two of the five most favored Google brands.

13      You'll see G-mail and Chrome and uTube.  Maps

14      and Earth are above those in the higher bars.

15            Q.   Now, in looking at the impact of

16      the technology, did you also look at the credit

17      that Google ought to receive for some of

18      Google's contributions?

19            A.   Yes.

20            Q.   And in apportioning or separating

21      out the value of the '550 patent, what did you

22      need to do in order to separate the Geo business

23      from Google Earth?

24            A.   So we talked about this Geo
```

```
1    business platform which included several things.
2    I had to take a look at Google's own documents
3    and identify what portion of that was related to
4    Google Earth because not all of it was Google
5    Earth.  There were several things talked about.
6    There were things that were directly or
7    indirectly related to Google Earth and I needed
8    to take a portion of that.
9              Q.  So looking back to 2005 and 2006,
10   what document in 2005 or 2006 did you use to get
11   an estimate of the value of Google Earth inside
12   of Geo?
13             A.  So for one aspect of that, I
14   looked at that direct source of revenue that you
15   referred to earlier.
16             Q.  Have you jumped to slide nine?
17             A.  Just to reference that.  This
18   document where we talked about the Earth --
19             THE COURT:  That should be
20   confidential, shouldn't it?
21             MR. HAWES:  Sorry, Your Honor.
22             A.  So the Earth Plus Pro Enterprise
23   and ads, again here shows this approximately 51
24   percent, 50 to 51 percent of the total revenues
```

```
 1        at that point in time.
 2               Q.   And did you also need to make an
 3        apportionment with respect to the United States?
 4               A.   Yes, I did.  I'm just pausing a
 5        little bit.  This was the direct revenues.
 6        There were some indirect revenues they looked at
 7        as well.  Those related to Google Earth Toolbar
 8        which we won't have to identify here, but there
 9        were Toolbar which were additional things which
10        would put a higher percentage on Google Earth.
11        The direct is about 50 percent, the indirect was
12        higher at this time.  I'm sorry I interrupted
13        your question.
14               Q.   Can we pull up Plaintiff's Trial
15        Exhibit 160.  I believe this one is not
16        confidential.  Can you explain to the jury what
17        this document is?
18               A.   This is a Google financial
19        statement.  It's called a 10-K report at the
20        top.  It's filed with the Securities and
21        Exchange Commission by Google.
22               Q.   How did this document play into
23        your analysis?
24               A.   This document has their sales, not
```

819

```
 1        for Google Earth but in total and it shows what

 2        their sales were to US as a portion of total.

 3        That percent is approximately 48 percent.

 4                    MR. SNYDER:  Objection, Your

 5        Honor.

 6                    THE COURT:  Overruled.

 7                    MR. SNYDER:  I'm trying to find a

 8        date of this document.  2011.  This is for 2011,

 9        Your Honor.

10                    THE COURT:  Overruled.

11    BY MR. HAWES:

12              Q.   After apportioning out the United

13        States portion of the benefits of Google Earth,

14        could you please turn with me to Plaintiff's

15        Trial Exhibit 219 in your notebook?

16              A.   Yes, I have it.

17              Q.   Can we bring up Plaintiff's Trial

18        Exhibit 219, please.  I think this one is

19        public.  We can leave that up.

20                    Can you explain to the jury what

21        we're looking at here?

22              A.   This is a document that --

23                    MR. SNYDER:  Objection, Your

24        Honor.
```

820

```
 1                    MR. HAWES:  Please stop for a

 2     moment.

 3                    MR. SNYDER:  This is a document

 4     from five years after the hypothetical

 5     negotiation, Your Honor.  It's going to be used

 6     for an improper purpose.

 7                    THE COURT:  For the moment that's

 8     overruled.  Let's see how it's used.

 9     BY MR. HAWES:

10          Q.   Can you explain to the jury what

11     this document is, Mr. Nawrocki?

12          A.   This document summarizes how

13     Google shares revenues with partners they have,

14     someone uses a Google search engine, they share

15     their revenues.  Without getting into details,

16     AdSense is a program where people can use Google

17     search results for activities and if you view

18     that on the website, then Google will share that

19     revenue with you.

20                    If you look later on in the

21     document, they talk at the top end about where

22     sharing the revenue, the page I'm looking for is

23     the second page, the first full paragraph.

24          Q.   So the one that begins we pay?
```

1       A.   Yes.  So we pay our AdSense for

2   search partners a 51 percent revenue share.  So

3   that means if you do those activities, its

4   partner would receive 51 percent, Google would

5   have 49 percent, so roughly a split.

6       Q.   Is that a projection Mr. Nawrocki?

7       A.   That's how they actually operate.

8   What I call your attention to at the very bottom

9   sentence, it says the AdSense for search revenue

10  share has remained the same since 2005 when we

11  increased it.

12      Q.   Thank you, Mr. Nawrocki.  How did

13  you use the information you learned from this

14  document?

15      A.   So one other aspect is to show how

16  it came into.  I considered this, but the next,

17  second sentence, sorry about that, second

18  sentence within that paragraph, you can leave

19  that paragraph alone, it says as with AdSense

20  for content the proportion of revenue that we

21  keep reflects our costs, including the

22  significant expense, research and development

23  involved in building and enhancing our core

24  search and AdWords technologies.  I recognize

```
 1      when we're talking about this monetization

 2      effort by Google, they need to be given credit

 3      for that.  We're in a patent infringement case

 4      here about the patent at issue and I need to

 5      give credit to Google for what they've

 6      contributed.  And there are several ways I did

 7      that.  This is one consideration I made.

 8              Q.   Just to make sure we pack up the

 9      list, the first thing you did was with respect

10      to splitting out the US portion, what was the

11      percentage there?

12              A.   That was 48 percent.

13              Q.   And the second thing you did was

14      to give credit with regard to I guess you said

15      Google's research and development and building

16      and enhancing core search and AdWord?

17              A.   For the search platform, what they

18      bring to the platform.

19              Q.   What percentage of credit did you

20      give that?

21              A.   49 percent to Google, 51 percent

22      would remain.

23              Q.   So what was the next apportionment

24      step that you conducted when trying to determine
```

```
 1        how much of the credit should go to Google?

 2             A.   Well, we talked about taking a

 3        look at what amount relates to the patent as an

 4        example, how much apportion should relate to the

 5        patent.  If we make all these considerations,

 6        what amount would relate to the patent at issue.

 7        And based upon my discussions with

 8        Dr. Castleman, there was several aspects of

 9        things that were regarded as critical to the

10        functionality.

11             I believe in his testimony he had

12        a three-legged stool there which had the data,

13        the volume of data here that's used by Google.

14        They talked earlier about the billion dollar

15        investments, so that was one consideration.

16             There were certain documents that

17        had what those costs were per content

18        acquisition it's called.

19             Additionally I looked at the

20        hardware infrastructure cost that he considered

21        as the other leg of the stool.  And the third

22        leg of the stool is the patent at issue.

23             So I assigned 30 percent to the

24        patent at issue, considering all these other
```

824

```
 1      deductions that were made, what the Google Earth
 2      would be as a portion, what the US portion would
 3      be, giving credit to Google for their search
 4      platform, the upper half, or half I should say,
 5      approximately half, and then 30 percent to the
 6      patent at issue.
 7                Q.   Can being back to slide 22,
 8      Mr. Lodge, so we discussed.  We went through the
 9      royalty base and we just discussed a number of
10      the factors that go to the royalty rate.  I
11      think yesterday we actually discussed what was
12      the guidance you received legally with respect
13      to that.  And what was that, could you repeat
14      that for the jury?
15                A.   That was referring to a statute
16      that said damages should be adequate to
17      compensate for a reasonable royalty for the use
18      made of the invention.
19                Q.   And if royalty, if a reasonable
20      royalty for the use were determined, how would
21      one use that rate to determine the royalty
22      damages?
23                A.   So the rate that would be
24      applicable here, you would be applied the
```

```
 1      royalty base to arrive at what the royalty

 2      damage would be.

 3               Q.   And you were here in the courtroom

 4      when there was a discussion of a rate that was

 5      offered by ACI with respect to the per use, do

 6      you remember that?

 7               A.   Yes.

 8               MR. SNYDER:  Objection, Your

 9      Honor.  It's irrelevant.  The rate he's about to

10      ask was from 2010, the per use rate.

11               MR. HAWES:  Your Honor, the e-mail

12      was 2010, but it described it as a typical rate.

13      It did refer to it as something -- it was just a

14      rate that was out there.  It was not specific to

15      2010.

16               THE COURT:  Overruled.

17               MR. SNYDER:  There is no

18      foundation that was a typical rate.

19               THE COURT:  You can cover it on

20      cross-examination.  It's overruled.

21   MR. HAWES:

22               Q.   What was that typical rate,

23      Mr. Nawrocki?

24               MR. SNYDER:  Your Honor, this is
```

```
 1      beyond the scope.  There was nothing disclosed

 2      about Mr. Nawrocki relying on --

 3                  MR. HAWES:  I'm not asking if he

 4      relied on it.  It is in the report that he

 5      discussed that rate.

 6                  THE COURT:  Overruled.

 7   BY MR. HAWES:

 8           Q.   Mr. Nawrocki, what was the typical

 9      rate for the per user rate expressed in that

10      e-mail?

11           A.    That e-mail referred to a ten

12      cents per user rate, or I'm sorry, ten cent per

13      use rate, I should say, a dollar per user, ten

14      cent per use.

15           Q.   Could you reiterate for us how

16      many uses there were in this case?

17           A.   7,099,000,000.

18                  MR. HAWES:  No further questions,

19      Your Honor.

20                  THE COURT:  Mr. Snyder.

21                  MR. SNYDER:  May I approach the

22      witness, Your Honor?

23                  THE COURT:  Yes.

24                  MR. SNYDER:  Thank you.
```

```
 1                   CROSS-EXAMINATION
 2    BY MR. SNYDER:
 3              Q.   Good morning, Mr. Nawrocki.
 4              A.   Good morning.
 5              Q.   You're being paid for your time to
 6    testify in this case; correct?
 7              A.   Yes.  Our firm is being paid on an
 8    hourly basis.
 9              Q.   What is your rate?
10              A.   My rate is 550 an hour.  My firm's
11    rate is 550 an hour for my time.
12              Q.   Approximately how many hours of
13    your time have you spent on this case?
14              A.   I don't recall a specific number,
15    but more than 200 hours.
16              Q.   How many hours has your team spent
17    on this case?
18              A.   My team has spent hundreds of
19    hours on this case.  There was numerous,
20    thousands of spreadsheets, documents, hundreds
21    of hours.
22              Q.   Mr. Nawrocki, you understand that
23    the hypothetical negotiation date for your
24    opinion is in 2005?
```

```
 1              A.   That's my understanding.
 2              Q.   You don't have an opinion, do you,
 3       on whether or not the '550 patent is infringed
 4       by Google Earth?
 5              A.   I don't have an opinion on that.
 6       That was an analysis of Dr. Castleman.
 7              Q.   That's just an assumption that you
 8       make for purposes of your analysis?
 9              A.   That's correct.
10              Q.   And you understand that if there
11       is no infringement, then there would be no
12       damages; correct?
13              A.   That's correct.
14              Q.   You also have no opinion on the
15       validity of the '550 patent?
16              A.   That's correct, that's being
17       debated by other experts in the case.
18              Q.   And you understand that if the
19       patent is invalid, then there is no damages;
20       correct?
21              A.   Yes, that's my understanding.
22              Q.   Part of your analysis is the -- is
23       based on what you called a hypothetical
24       negotiation?
```

```
 1                    A.    Yes.   We had that slide with the

 2         factors on it leading to a hypothetical.

 3                    Q.    And the purpose of the

 4         hypothetical negotiation is to determine what

 5         ACI and Google actually would have agreed to in

 6         2005; is that right?

 7                    A.    Yes, under certain assumptions.

 8                    Q.    Under certain assumptions.

 9                          During the parties' negotiations

10         in -- withdrawn.

11                          You understand that the parties

12         actually had some negotiations in 2006; correct?

13                    A.    That's my understanding.

14                    Q.    And that was very close to the

15         hypothetical negotiation date that we're using

16         for purposes of this analysis?

17                    A.    Yes.   2005, middle of 2005 was

18         when the press release was out and they released

19         Google Earth, so 2006 would be within the year

20         or so afterwards.

21                    Q.    During the parties' negotiations

22         in 2006, there was not any mention of a royalty

23         based on a per session amount or a per use

24         amount, was there?
```

```
 1              A.   Not to my knowledge.  Well, I

 2       shouldn't say that.  There was a percentage

 3       applied or discussed, but not a dollar amount

 4       per unit.

 5              Q.   And that percentage, we'll get to

 6       that in just a moment.  That percentage was not

 7       a per use amount, was it?

 8              A.   It wasn't a per unit amount, it

 9       would have been a -- I just want to make clear.

10       I view it as still running, but not a per unit

11       amount.

12              Q.   Mr. Nawrocki, I didn't ask you if

13       it was running or not, I asked you if it was an

14       amount per use?

15              A.   Not per use, it's percentage.

16              Q.   Just to be clear, in the parties'

17       discussions in 2006, nobody, either Google nor

18       ACI, mentioned a per session or per use royalty;

19       correct?

20              A.   Not to my knowledge on a per unit

21       basis.

22              Q.   Now, would you agree with me that

23       strong evidence of what the parties would have

24       actually negotiated is evidence of what they
```

1    actually talked about?

2            A.   I didn't follow your question.

3            Q.   That's a poor question.  I'll try

4    and reword it.

5                 Would you agree that what the

6    parties actually did is strong evidence of what

7    they would have done in your hypothetical

8    negotiation?

9            A.   I'm not going to weigh the

10   evidence.  I would say it's a consideration.

11   What the strength of it is I would say is

12   something I considered.

13           Q.   We'll let the jury make that

14   factual decision.

15           A.   That's fair.

16           Q.   Would you agree, Mr. Nawrocki,

17   that what the parties did in -- at the time of

18   the hypothetical negotiation would be at least

19   some evidence and relevant to what they would

20   have done in your hypothetical negotiation?

21           A.   I would say it's a fair

22   consideration.

23           Q.   Now, could you please bring up,

24   Mr. Ang, Plaintiff's 122.

832

```
 1              I don't think that's the right
 2      document.  Let's try Plaintiff's 13, please.
 3              A.   Is it in my binder as well, I
 4      assume?  Just so I'm clear, do I have that in my
 5      binder as well just so I can see it?
 6              Q.   Why don't you turn in your binder,
 7      please, to Plaintiff's -- PTX 13 in your binder.
 8              A.   PTX 13?
 9              Q.   PTX 13, yes.  They're not quite in
10      order.
11              A.   Okay.  I have 213 and 214.  I have
12      the PTXs, but I didn't see the PTX 13.  213,
13      214.  Oh, you know what, you're right, they're
14      not in order.  I have 13.  Okay.
15              Q.   This is the first e-mail that
16      Mr. Mayer sent to Google to contact them about
17      Google Earth; correct -- I'm sorry, about the
18      '550 patent?
19              A.   I don't know if it was the first
20      one.  I know there were various correspondence
21      in or around 2006.
22              Q.   You're not aware of any that came
23      before this one, are you?
24              A.   I don't recall.  There are several
```

833

```
 1        I have seen.
 2               Q.   And you were in the courtroom when
 3        Mr. Mayer testified?
 4               A.   Yes.
 5               Q.   And did you hear him testify that
 6        this was the first e-mail that he sent to
 7        Mr. Jones?
 8               A.   I don't remember if he said it was
 9        the first, but I remember there being a
10        discussion about his e-mails to Mr. Jones.
11               Q.   And in this e-mail, he attached a
12        proposal; correct?
13               A.   I remember seeing a proposal.  It
14        says down below there is a copy of a short
15        presentation, so I believe I have seen that
16        before.
17               Q.   And that was about the -- it was
18        about their licensing proposal?
19               A.   I believe so, but do you have the
20        document?
21               Q.   I think we might have to come back
22        to that one, Mr. Nawrocki.  I'm sorry, I got the
23        wrong number here.  So we're going to have to
24        find that.
```

```
 1                    A.   Okay.

 2                    Q.   All right.  Now in August of --

 3      that message was in January of 2006; right?

 4                    A.   Yes.

 5                    Q.   Now in August 2006, ACI suggested

 6      a price for Google to purchase the '550 patent?

 7                    A.   There was some discussion that I

 8      have seen in the documents as well as here at

 9      trial about different proposals, so I don't know

10      which one you're talking about in August.  If I

11      could see that.

12                    Q.   Sure.  If you could look at

13      Defendant's Exhibit 1071.  And if we go, please,

14      to --

15                    A.   I would be happy to look at the

16      screen, I just don't seem to have that one

17      either, unless they're not in order.

18                    Q.   I'm pretty confident that it is in

19      there.  It would have been right near the 13.

20      Why don't we take a look at the screen.

21                    A.   Okay.  Sure.  Again, the number

22      you said was PTX 1071?

23                    Q.   1071.

24                    A.   Okay.  I don't seem to have it
```

```
 1    here.
 2                  THE COURT:  It is in your book.
 3    It's right before, a couple of pages.
 4    BY MR. SNYDER:
 5          Q.  It's before the deposition
 6    transcripts, sir.
 7          A.  I got it.
 8          Q.  And we can look at this screen and
 9    we can make this a little larger so the jurors
10    can see.  This is an e-mail from Mr. Mayer to
11    Mr. Jones in August of '06; correct?
12          A.  Yes.
13          Q.  Q.  And he says they want to keep
14    Mr. Jones up-to-date about a recent discussion
15    he had with the CEO, Andreas, regarding the
16    patent licensing?
17          A.  Yes, I see that.
18          Q.  And he says, "I convinced him that
19    a price on the order of 3 to 5 million would be
20    acceptable at this time."
21          A.  Yes, I see that.
22          Q.  "And that was given that the
23    number of potential buyers is limited to a
24    handful and it would require substantial time
```

```
 1        and effort to get a better deal."
 2                    Do you see that?
 3             A.   Yes.
 4             Q.   Now, this was a proposal to
 5        purchase the '550 patent, right?
 6             A.   They talk about patent licensing
 7        here either for purchase, or I believe they were
 8        talking about investments and other options.
 9             Q.   This proposal, though, you read
10        this wording and you understand that that's a
11        proposal to purchase the patent for 3 to $5
12        million?
13             A.   I don't have a conclusion on that
14        based upon my read of the collection of
15        documents, and my discussions where they had
16        looked for a variety of options.
17                    So this talks about 3 to 5
18        million.  As I talked with them numerous times,
19        and heard the testimony, and saw the documents,
20        they were always considering a package where
21        they would have a joint relationship with them.
22                    But this would be one piece of
23        that that was discussed.
24             Q.   Mr. Nawrocki, your company does IP
```

837

```
 1    evaluation?

 2              A.   Yes.

 3              Q.   And would you agree with me that a

 4    purchase of a patent is more valuable than a

 5    license to a patent?

 6              A.   It depends on the patent

 7    certainly, but all else being equal, if you buy

 8    the patent, then you have the full right to it.

 9    That generally would be more valuable.  I can't

10    think of a situation where it wouldn't.

11              Q.   So you would assume --

12              A.   Some purchases have other terms

13    during the purchase.  There are sometimes a

14    license back, sometimes there are other clauses.

15         Generally, a purchase to license could be

16    more valuable, it could be more valuable.

17              Q.   It was a pretty simple question.

18              You agree that a purchase of a

19    license would be more valuable -- I'm sorry -- a

20    purchase of a patent would be more valuable than

21    a license to the patent?

22              A.   I've been doing this for a lot of

23    years and that could be the case.  It's just

24    that sometimes a license, by owning the patent,
```

838

```
1        you sometimes have duties to defend, you have to

2        litigate things.  You might have other costs

3        that potentially with licenses you would be

4        required to do.

5                     Sometimes with a purchase, you

6        might say, you know what?

7                     I'd rather just take a license,

8        for example, for a pharmaceutical maybe than own

9        a patent and do other things with the patent.

10                     So it depends.  But, in general,

11        for simple purposes  owning the patent is better

12        than just getting a license.

13                     But there's sometimes

14        complications that you have as a result of a

15        patent that might have other rights due to other

16        licenses.  It's not all that simple.  In

17        general, a purchase would be better than a

18        license.

19                     Q.   Mr. Nawrocki, you never saw

20        anything related to the '550 patent to indicate

21        that a license to the patent would be more

22        valuable than purchasing the patent, did you?

23                     A.   Well, it depends on the license, I

24        guess.
```

839

```
 1              Q.  You never saw anything, in the

 2      terms of license, that ACI suggested to Google

 3      to indicate that that license would be more

 4      valuable than purchasing the patent, did you?

 5              A.  I didn't see anything that was

 6      down to a License Agreement with clauses.  There

 7      were discussions and e-mails, but I didn't see

 8      it in terms of clauses such as that that were

 9      identified.

10              Q.  Mr. Nawrocki, you're familiar with

11      the difference between an exclusive license and

12      a non-exclusive license?

13              A.  Yes, an exclusive means that you

14      are the only person that get the license.

15                  Non-exclusive would mean that

16      other people would get the license as well.

17              Q.  And for purposes of the

18      hypothetical negotiation, you assume that the

19      license would be non-exclusive, isn't that

20      right?

21              A.  Yes, for purposes of the

22      negotiation -- and I'm pausing a little bit --

23      because I believe the prior e-mail talked about

24      an exclusive offer.
```

840

```
 1                 But for purposes of negotiation,
 2       would be assumption of a non-exclusive, though
 3       there had been some discussion points about
 4       exclusivity within these discussions.
 5                 Q.   I was just asking about the
 6       hypothetical negotiation, Mr. Nawrocki.
 7                 You assume, for purpose of the
 8       hypothetical negotiation, that it would be a
 9       non-exclusive license?
10                 A.   That would be the assumption.
11                 Q.   And that means that ACI would
12       still be free to license that patent to other
13       people?
14                 A.   If there was other people using
15       it, they would have that ability, or potentially
16       they would use it themselves.
17       But, yes, with a non-exclusive, they would have
18       additional rights.
19                 Q.   And, generally speaking, a
20       non-exclusive license is less valuable than an
21       exclusive license?
22                 A.   I couldn't say a hundred percent,
23       but generally that's the case, depending upon
24       the specific materials.  All else being the
```

 1      same, an exclusive would be more valuable.

 2              Q.   Now, in this proposal in August of

 3      2006, this was for a -- this was a lump-sum

 4      payment, correct?

 5              A.   It would appear to be that.  It

 6      doesn't give the timing of it.  It talks about

 7      in the order of 3 to $5 million.  It doesn't say

 8      lump sum or up front, but it says 3 to 5

 9      million.

10              Q.   In this e-mail, ACI does not

11      suggest any kind of running royalty, do they?

12              A.   I don't believe they do.

13              Q.   And they don't suggest in this

14      e-mail any kind of per-use or per-session rate,

15      do they?

16              A.   I'm just looking down below in the

17      e-mail.  It says that we would -- if you go down

18      below at the last paragraph -- it says, "We

19      would also like to start a discussion about

20      possible terms.  We would use Google Earth

21      content and location-based installations.  We

22      have some unsolicited offers and requests from

23      customers."

24                   So what --

842

```
 1              Q.   Mr. Nawrocki --

 2              A.   -- would all that be is, I don't

 3      know what aspect -- how that would relate to

 4      their negotiations.

 5              Q.   Mr. Nawrocki, there is nothing in

 6      this paragraph that you just read for us that

 7      says anything about a per-session rate,  does

 8      it?

 9              A.   Not a per-session rate.  That's

10      correct.

11              Q.   There's nothing in this paragraph

12      that you just read for us that related to a

13      running royalty?

14              A.   That's correct.  It shows other

15      aspects they were considering as well.

16              Q.   The possible term they are talking

17      about here is, ACI using Google Earth content in

18      locatio-based installations, correct?

19              A.   Yes.  So there are a couple

20      aspects that I was just going to explain.

21              Q.   Mr. Nawrocki, if ACI -- we'll,

22      I'll withdraw that question.  I'm sure if you

23      want to explain further, I'm sure your lawyer

24      can ask about it.
```

```
1              A.   Okay.

2              Q.   In July of 2006, Google

3    communicated its feelings about the '550 patent

4    to ACI, correct?

5              A.   I don't remember the time period,

6    but there was some discussion from Google as

7    well.

8              Q.   Google told ACI that the most that

9    it would be willing to pay was if it was a

10   million dollars, isn't that right?

11             A.   In some period of time there was a

12   million.  There were various numbers talked

13   about.  There was another e-mail we saw that

14   talked about other amounts.

15             MR. SNYDER:  Could you -- could

16   you bring up, please, Plaintiff's Exhibit 15?

17   BY MR. SNYDER:

18             Q.   This is a message from Google's

19   Michelle Lee to Patrick Paulisch at ACI?

20             A.   Yes.

21             Q.   Okay.  If we can go down to the

22   next e-mail, this is an e-mail from Mr. Paulisch

23   to Ms. Lee?

24             A.   Yes.
```

844

```
1              Q.   And she is -- he is summarizing

2      the conversation that they had in a telephone

3      call in July?

4              A.   Yes, I see that.

5              Q.   And you heard Mr. Mayer testify on

6      Monday about that phone call, didn't you?

7              A.   Yes.

8              Q.   You heard him testify that he

9      participated in that phone call?

10             A.   That's my recollection.

11             Q.   In this e-mail, Plaintiff's 15,

12     Mr. Paulisch reports that Google tell them that

13     the most Google would be willing to pay was $1

14     million to buy the patent?

15             A.   There's a couple of things there.

16             Q.   Mr. Nawrocki, is it the e-mail or

17     not?

18             A.   It is.

19                  If you look at the next point it

20     says, "Instead of buying" -- and this is

21     reflecting what Google said was a fair summary

22     -- "instead of buying, Google views licensing on

23     an exclusive or non-exclusive basis as a valid

24     alternative, maybe even combining with
```

845

```
 1        contracted work."
 2                    That was discussed in addition to
 3        the one million.
 4            Q.   I'm asking you what this says was
 5        the maximum that they were willing to pay.
 6                    Mr. Nawrocki, it says the maximum
 7        they were willing to pay was a million dollars,
 8        right?
 9            A.   I see that.
10            Q.   It identifies these licensings as
11        valid alternatives?
12            A.   Yes.
13            Q.   It doesn't identify any rates for
14        those?
15            A.   No, but it says Google views
16        licensing as an alternative.
17            Q.   It does not indicate any
18        willingness to enter into a license on a
19        per-session basis, does it?
20            A.   It doesn't say that.
21            Q.   It doesn't indicate any
22        willingness to enter into a running royalty
23        agreement, does it?
24            A.   It doesn't say that, right.
```

846

```
 1              Q.   Now, if we look at the bullet up

 2    above or the first line of that bullet, it says

 3    "Even if the patent would be a hundred percent

 4    air tight, or at least meeting Google's comfort

 5    level."

 6              Do you see that?

 7              A.   Yes.

 8              Q.   And you heard Mr. Mayer testify

 9    that that was related to the validity of the

10    patent?

11              A.   I was here for his testimony.  I

12    don't recall specifically the validity.  But

13    there was some discussion about it.

14              Q.   Do you recall Mr. Mayer saying

15    that he understood this to mean that if the

16    patent were a hundred percent defensible?

17              A.   I don't remember exactly what he

18    said.  Air tight would mean that there would

19    be -- I don't know what he meant by "air tight."

20              But that's the discussion between

21    Google and ACI,  meaning there might not be

22    issues.  At least that's what they are trying to

23    assume there.

24              Q.   Now, and that their -- let me go
```

```
 1        back a moment -- one of your assumptions, as we

 2        talked about a few minutes ago, was that the

 3        patent is valid?

 4               A.   Yes.

 5               Q.   And that's very similar to Google

 6        telling ACI that it would only pay a million

 7        dollars if it were a hundred percent air tight,

 8        isn't that right?

 9               A.   I couldn't say if it was similar

10        or not.  That's their terms, not mine.

11                    But I would say valid and

12        infringed would be the assumption that we had.

13        What they meant by that, I agree with the

14        statement.

15               Q.   Now, this $1 million is to

16        purchase the patent, correct?

17               A.   It says, the maximum price they

18        would be willing to pay is 1 million to buy the

19        patent.  One million to buy the patent.

20               Q.   Which is more valuable than a

21        license?

22               A.   With the exceptions that we talked

23        about.

24               Q.   Now, if you have also been in the
```

848

```
 1     courtroom and we've seen evidence regarding

 2     ACI's response to this e-mail, right?

 3               A.   Yes.  Again, I believe there was a

 4     back and forth between the parties.

 5                    MR. SNYDER:  Could you bring up,

 6     please, Defendant's Exhibits 1004.

 7     BY MR. SNYDER:

 8               Q.   Now, this is another exhibit that

 9     we've seen before, you seen you've seen this in

10     the courtroom right, Mr. Mayer -- I'm sorry --

11     Mr. Nawrocki?

12               A.   Let me just read this.  There are

13     several...yes, I recall seeing this.

14               Q.   And in this -- this is from

15     September of 2006?

16               A.   September, yes.

17               Q.   Which is near the time of the

18     hypothetical negotiation?

19               A.   About a year afterwards.

20               Q.   And in this message, Mr. Mayer

21     says that it is -- he's attaching a letter

22     regarding the sale of the patent?  The first

23     line.

24               A.   Oh, regarding sale of the '189,
```

849

```
 1        the virtual globe patent.

 2              Q.   And that's the patent that

 3        preceded, the original patent that preceded the

 4        '550 patent, correct?

 5              A.   I don't know if that was the

 6        number that directly preceded it.

 7              Q.   No.  It was the original patent?

 8              A.   I'll take your word for it.

 9              Q.   You didn't understand this to be

10        about some other patents not involved in this

11        case, did you?

12              A.   Not that I recall.  I just know

13        that the patent issued in this case is the '550.

14              Q.   This e-mail is about purchasing

15        the patent, correct?

16              A.   Yes, or regarding the sale of the

17        virtual globe patent, the '189.

18              Q.   And that would be a purchase by

19        Google of the -- of ACI's patent?

20              A.   Of the '189 they refer to, yes.

21              Q.   And this is the amount -- they

22        were proposing an amount after taking steps to

23        find out a reasonable market value based on a

24        potential return from other options and then
```

```
 1          selling it to you, is that right?
 2                  A.   Yes, and the next paragraph is
 3          informative as well in terms of what it doesn't
 4          take into account.
 5                  Q.   Right.  It does include their
 6          steps to find out a reasonable market value
 7          based on potential return?
 8                  A.   Yes, but it says in the next
 9          sentence, it does take into account our
10          expectations of a much higher value in the
11          future due to the development of the market.
12                  Q.   And they did include, didn't they,
13          a proposal to purchase the patent, to have
14          Google purchase the patent?
15                  A.   Again, I believe there were
16          different options that were considered with the
17          overall tactical options that they were
18          considering.
19                  Q.   Let's take a look at the next page
20          so we can look at those options?
21                  A.   Okay.
22                  Q.   At the bottom of this page --
23          we're on the second page of Defendant's Exhibit
24          1004 -- there is a list of five different terms.
```

```
 1                    A.   If you might just go back to that
 2       prior document.  The other one.  Let me make
 3       sure I understand from the prior document.
 4              No.  The e-mail that we had previously?
 5                    Because this was -- I guess this
 6       was the Michelle Lee.  I see.  There was a copy
 7       to Mr. Jones.
 8                    Okay.  So the next document you
 9       had was to Michelle.  I see.
10                    Okay.  I'm with you.
11                    Q.   You reviewed these documents
12       before today, haven't you, Mr. Nawrocki?
13                    A.   I saw Michelle on there and I was
14       looking at it in terms of Michael Jones, so --
15                    Q.   You reviewed these documents as
16       part of your preparation in the case?
17                    A.   As part of my analysis.
18                    Q.   So it's not like you're seeing
19       these for the first time?
20                    A.   That's correct.
21                    Q.   And you've been in court all week,
22       haven't you?
23                    A.   Yes.
24                    Q.   And you've heard all testimony
```

```
 1      about all these documents?

 2              A.   Yes, I have.

 3              Q.   So these aren't new to you, are

 4      they?

 5              A.   They are not.

 6              Q.   Now, in this proposal, ACI says,

 7      "We offer the following."          And one of the

 8      terms is that ART+COM" -- which is after No. 5

 9      -- "ART+COM receives a one-time payment between

10      3-1/2 to 5 millin euros."

11              A.   Down at the bottom?

12              Yes.

13              Q.   Mm-hmm.  And that was a lump sum

14      amount?

15              A.   Yes, a one-time payment would be a

16      lump sum.

17              Q.   There is no indication of a

18      running royalty?

19              A.   Let me just see.

20              The next sentence says, "Depending

21      on the extent of back license and other

22      conditions, we agree on it."

23              So I don't know if the back

24      license was referring to past use there, or what
```

853

```
 1      specifically they had in mind.
 2              Q.   Mr. Nawrocki, there is no
 3      indication in here of a running royalty, is
 4      there?
 5              A.   Not a going forward running
 6      royalty, that is correct.
 7              Q.   There is no indication here of a
 8      per-session royalty, is there?
 9              A.   That's correct.
10              Q.   Now, ACI and Google didn't reach a
11      deal regarding the '550 patent, did they?
12              A.   That's correct.  That's why we're
13      here.
14              Q.   And ACI explored other options for
15      the two to sell or license the patent, correct?
16              A.   There was some other discussions
17      back and forth between the parties.
18              Q.   Well, one of the companies that
19      they contacted was Nokia?
20              A.   Yes.
21              Q.   And one of the companies that he
22      they contacted was Microsoft?
23              A.   Yes.
24              Q.   And Nokia responded to them and
```

854

```
1    said that they weren't interested, isn't that

2    right?

3              A.   Is that a question?

4              Okay.   I believe that neither

5    Nokia nor Microsoft took a license with them.

6    Their specific response, I don't recall.

7              Q.   In your report, Mr. Nawrocki,

8    didn't you say that you understood that Nokia

9    said that it stated that it was not interested

10   in a license at the time?

11             A.   That sounds familiar.

12             Q.   And isn't it also true that

13   Microsoft didn't even bother to respond?

14             A.   Yes, some companies don't respond.

15             Q.   And, in this instance, Microsoft

16   didn't respond to ACI's offer to license the

17   '550 patent?

18             A.   That's my understanding.

19             Q.   Now, Mr. Nawrocki, in determining

20   what kind of terms the parties would actually

21   come to, do you agree that it would be relevant

22   to consider the kinds of agreements that they've

23   negotiated?

24             A.   Yes, that's a consideration.
```

```
 1              Q.   Did you look at any License

 2    Agreements from ACI for the '550 patent?

 3              A.   ACI was not able to license the

 4    '550 patent.

 5              Q.   So of all of the companies and

 6    people in the world, ACI has never succeeded in

 7    licensing the '550 patent to anybody?

 8              A.   To my knowledge, Google is the

 9    only company -- I shouldn't say that -- to my

10    knowledge Google is the only company that has

11    been accused at this point.

12              Q.   Mr. Nawrocki, I really would

13    appreciate it if you would answer my question.

14              A.   I'm not aware of any of other

15    licenses or any licenses that ACI has on the

16    '550 patent.

17              Q.   ACI has never succeeded in

18    licensing the patent on a per-session basis,

19    have they?

20              A.   That's correct.

21              Q.   ACI has never succeeded in getting

22    someone to pay them a running royalty for the

23    '550 patent?

24              A.   That's correct.
```

1          Q.   And ACI has certainly never gotten

2     somebody to pay them a cent or a cent-and-a-half

3     for the '550 patent, did they?

4          A.   That's my understanding.

5          Q.   In fact, ACI has never received

6     any revenue for the '550 patent?

7          A.   Unfortunately, that's correct.

8               MR. SNYDER:  Could we turn to 115,

9     please.

10              Turn, please, to Page 4.

11    BY MR. SNYDER:

12         Q.   This is a slide that you talked

13    about during your direct, Mr. Nawrocki?

14         A.   Yes, this is that summary of

15    direct revenue that we talked about earlier.

16         Q.   In this document, Mr. Nawrocki,

17    you pointed out that Earth Pro revenues had

18    increased substantially in 2006 compared to

19    2005?

20         A.   Yes, by the top bullet point

21    there, a hundred percent -- Earth Pro revenues

22    increased by a hundred percent compared to 2005.

23         Q.   Now, there's nothing in this

24    document indicating what they expect to make

857

```
1     over the next several years from Earth Pro, is

2     there?

3               A.   Yes, there is.

4                    Not on this page, but on other

5     pages within the document there is.  If you look

6     at Page 9, it talks about growing at 38 percent.

7               Q.   And that's Pro revenue?

8               A.   That's the Pro revenue expected to

9     grow by 38 percent per year.

10              Q.   And then you also pointed out that

11    on this Page 4 of the slide that there was a

12    reference to Earth Enterprise revenue increasing

13    by 200 percent compared to 2005, right?

14              A.   Earth Enterprise revenue increased

15    by 200 over 2005.

16              Q.   So that's 2006 compared to 2005?

17              A.   Yes, that's true.

18              Q.   Now, the revenues from Pro in

19    2005, were pretty small, weren't they?

20              A.   Relatively speaking to other

21    products within Google.

22                   But in Pro, they are the second

23    largest -- if you look at 2006 -- it's 11

24    million compared to the second highest one, 14
```

```
 1    million for Maps.
 2              Q.   In the Geo group, correct.
 3              A.   Within the Geo direct group or
 4    direct revenue.
 5              Q.   Now, this was -- in 2005 Earth Pro
 6    was sold for a licensing fee, as you pointed
 7    out, correct?
 8              A.   Yes.
 9              Q.   And Earth Enterprise was sold for
10    a licensing fee also?
11              A.   Yes, Pro was for $400.  On the few
12    pages before it,  enterprise varied from
13    approximately 100 to 400.
14              Q.   And Google had introduced Google
15    Free?
16              A.   Yes.
17              Q.   And before 2005, had there been
18    any version of Earth or the Earth viewer product
19    that was free?
20              A.   Not to my knowledge.  I couldn't
21    say affirmatively, but not to my knowledge.
22              Q.   Now, you pointed out that the
23    number of uses of Earth is about 7.1 billion,
24    the number of sessions?
```

1          A.   Yes, from the period of 2000 --

2     the middle of 2010, through April of this year

3     in the U.S with those adjustments.

4          Q.   Did you determine what portion of

5     those are from a free version of Google Earth

6     versus a licensed version of Google Earth like

7     Pro or Enterprise?

8          A.   There was some information that

9     Google introduced involving  applications that

10    showed how many were iPad, iPod, things such

11    that.

12          Why I'm hesitating is, there was

13    some information on Free.  I don't remember

14    having the Free identified by session.

15          Q.   Mr. Nawrocki, in your opinion

16    today --

17          A.   Yes.

18          Q.   -- what you've described for the

19    jury, did you identify the proportion of those

20    7.1 billion uses that are free versus ones that

21    the user had to pay for?

22          A.   I understand your question now.

23          And, so, the seven billion are the

24    total uses.  That would include all the uses by

1    the different platforms.

2           Q.   Would you agree with me that it's

3    more likely that people are going to use a free

4    version of a product than one that they have to

5    pay for?

6           A.   It depends on what we are they're

7    using it for.  So a business user who is trying

8    to use it in an oil and gas application where

9    they need to make all sorts of measurements,

10   he's more inclined to probably use the paid

11   because it has more features.  Consumers would

12   probably use the free application on their phone

13   or I use the free version on my desktop at home,

14   so it depends on the use.  So again, a business

15   user in a real estate or oil and gas would

16   probably use the paid version.

17          Q.   Have you identified for the jury

18   what proportion of Google users are these oil

19   and gas people that might use it more often?

20          A.   That the data that they produced

21   doesn't show that, it shows certain information

22   by customer.

23          Q.   That was your example,

24   Mr. Nawrocki, I'm asking what you told the jury

1    today?

2              A.   The data that Google produced

3    doesn't break it down in terms of sessions by

4    customer, they'll break it down by platform, but

5    either for privacy or other reasons, they don't

6    provide the session information for a specific

7    customer.

8              Q.   Now, in -- you pointed out looking

9    at this document that Earth's was about 50

10   percent of the revenue for the Geo group in

11   2006?

12             A.   And that's why I paused.  For the

13   50 percent of the direct revenues.  There was

14   another slide that had indirect which was I

15   think more identified for, for the direct

16   revenues it was more than 50 percent.

17             Q.   It was just in the previous year

18   that Google had introduced a free version of

19   Earth?

20             A.   Yes, so this was 2006.  It was

21   2005 when they introduced the free version.

22             Q.   You didn't identify for the jury

23   any documents indicating whether Google expected

24   Earth Pro or Earth Enterprise to continue to be

862

```
 1    about 50 percent of Geo revenues in subsequent

 2    years, did you?

 3          A.   Well, I'm pausing because there is

 4    information I have, but I'm -- I'm pausing on

 5    the stuff I have after 2005.

 6          Q.   Mr. Nawrocki, I'm asking for what

 7    you presented to the jury.

 8          A.   So there is information that I

 9    have, but I haven't presented that to the jury,

10    but there has been some discussion with the

11    courts.

12          Q.   My question, Mr. Nawrocki, was

13    very specific.

14          A.   Go ahead.

15          Q.   Did you present to the jury any

16    information regarding Google's expectations

17    about the amount, the percentage of Google Earth

18    revenue for the Geo segment?

19          A.   I know that information, but that

20    information hasn't been disclosed.

21          Q.   Currently all of the versions of

22    Google Earth are free; correct?

23          A.   When you say currently, you mean

24    as of today?
```

```
 1              Q.   I mean today.

 2              A.   Why I am pausing is because there

 3    was a bit of testimony that the Enterprise

 4    product that was sold for hundreds of dollars

 5    per user has I believe no longer been supported

 6    or minimal support, but I don't believe it's

 7    available today currently, so as of today I

 8    believe it's just -- I believe it's just free.

 9              Q.   That's a question I'm asking,

10    Mr. Nawrocki.  And if you could answer my

11    question, that would be helpful.

12              A.   The only reason I'm pausing, when

13    you're saying today, I want to make sure they

14    don't do it as of whenever.  To my knowledge

15    currently only available free, I don't think

16    there is a charge if you download that app on

17    your phone.

18              Q.   So Google does not receive any

19    money when people use the Google Earth product;

20    correct?

21              A.   Well, I would disagree with that.

22    Google receives plenty of money in ads when they

23    use that free product.

24              Q.   Mr. Nawrocki, currently Google
```

```
 1        does not include any ads in the Google Earth

 2        product, does it?

 3               A.   There is a variety of ads or

 4        advertisements or information that they receive

 5        from this network effect that we talked about.

 6        When you go on Google --

 7               Q.   Mr. Nawrocki, can you answer my

 8        question, please?

 9               A.   I am.

10               Q.   I don't think you are.

11               A.   Go ahead.

12               Q.   Does Google include in Google

13        Earth any ads?

14               A.   If you're referring to banner ads,

15        not to my knowledge.  Is there other advertising

16        means that Google can monetize?  My

17        understanding is yes.

18               Q.   I didn't ask you about monetizing,

19        Mr. Nawrocki.  Perhaps I'm not communicating

20        very well.  Ads that are in Google Earth, are

21        there any ads in Google Earth today?

22               A.   When you're saying ads --

23               MR. HAWES:  Your Honor, your order

24        concerns how far out we can get into
```

```
 1      information.  I think this is going beyond what

 2      your order limits.

 3                  THE COURT:  Overruled.

 4            A.   So when you're saying ads, if you

 5      mean advertisements, there is advertisements and

 6      advertising revenues that Google receives from

 7      that.  Is there an ad that shows up like a

 8      commercial on Google Earth?  That doesn't

 9      happen.

10            Q.   That doesn't happen?

11            A.   Doesn't happen on Maps where an ad

12      would necessarily show up.

13            Q.   There are three different types of

14      accused products; correct?  There is Google

15      Earth 7 and its predecessors; right?

16            A.   Well, I believe it's Google Earth

17      8, I think, and predecessors.

18            Q.   Is that your understanding?

19            A.   There is a group 2 that was talked

20      about in Dr. Castleman, and there were several

21      groups, he identified the accused products.

22            Q.   So let's -- his group 1 was --

23      I'll represent to you was Google 7 and previous

24      versions?
```

```
1              A.   That was group 1.

2              Q.   And that version does not contain

3    ads; correct?

4              A.   I didn't look at it by version in

5    terms of whether the ads were there.

6              Q.   Mr. Nawrocki, you're the one that

7    just brought up the category.  I'm trying to get

8    some answers here.

9              A.   I understand.  I don't know by

10   version which one had advertisements on it.

11             Q.   Google 8 for Android does not

12   include any ads, does it?

13             A.   And again by ads, do you mean

14   commercials showing or banner ads?

15             Q.   That's correct.

16             A.   To my knowledge, no, but that's

17   not how they obtain advertisements.

18             Q.   And Google Pro does not contain

19   any advertising, does it?

20             A.   To my knowledge there is

21   advertising and advertising revenues they

22   receive based upon Google Pro and all the usage

23   by the users of these products.  Again, there

24   might not be an ad showing on the product, but
```

1    that's not to say in the back they don't receive

2    money from those ads from the advertisers.

3              Q.   Mr. Nawrocki, can you answer my

4    question, does Google Pro contain ads?

5              A.   Let me tell you why I can't.

6    Because you're using the term ads as a broad

7    representation.  We might all know what ads are,

8    like an advertisement that shows up on TV or a

9    banner ad, and to my knowledge there are none of

10   those done on those products.  However, that's

11   not to say Google is not receiving revenues from

12   advertisements or Google is not receiving

13   revenue from their advertising model for those

14   products.  That's my hesitation.

15             Q.   My question was, does Google Pro

16   contain ads, can you answer that question?

17             A.   Not banner ads to my knowledge.

18             Q.   Does Google Pro contain any kind

19   of ads?

20             A.   Well, if it's any kind of ad, I

21   would say there are advertising revenues they

22   receive.

23             Q.   I didn't ask you whether it

24   contained advertising revenues, Mr. Nawrocki.

```
1      I'm trying to ask you a simple question.  Does

2      Google Pro contain ads?

3              A.   I don't know for sure.

4              Q.   Has Google Pro ever contained ads?

5              A.   I don't know for sure.

6              Q.   Google Enterprise does not contain

7      ads, does it?

8              A.   Not to my knowledge.

9              Q.   Google Enterprise has never

10     contained ads; isn't that true?

11             A.   That's the business application

12     where they're receiving the 300.  To my

13     knowledge they don't receive ads or ad revenue

14     on that.  They might, but not to my knowledge.

15             Q.   And the free versions of Google

16     Earth, they currently do not contain ads,

17     either; correct?

18             A.   What the current state is in terms

19     of what ads they show, I know when you go on

20     Google Earth there is a variety of pop ups,

21     balloons, et cetera, within that overall Google

22     Earth experience.  What their monetization of

23     that is, if you want to call that an ad.  I know

24     when I go on Google Earth, I'm looking for
```

869

```
 1     Walgreens, the Walgreens popped up, several

 2     other Walgreens popped up.  Whether or not

 3     Google Earth is monetizing that, I couldn't say

 4     for certain.  But those ads are showing up.  I

 5     will get Walgreens banners and everything else

 6     showing up all over the Google Earth platform.

 7              Q.  So to the best of your knowledge

 8     the free versions of Google Earth do not contain

 9     any ads, do they?

10              A.  How Google is specifically

11     monetizing all of that information that shows

12     up, I couldn't say.

13              MR. SNYDER:  Thank you,

14     Mr. Nawrocki.  No more questions.

15              REDIRECT EXAMINATION

16     BY MR. PARTRIDGE:

17              Q.  Mr. Nawrocki, there were several

18     discussions of what was happening in 2006.  Do

19     you remember?

20              A.  Yes.

21              Q.  Could we pull up Plaintiff's Trial

22     Exhibit 15.  And if you could -- if we could

23     scroll down to -- there we are.  This is that

24     summary of the call, do you remember the summary
```

1    being discussed?

2              A.   Yes.

3              Q.   And I remember counsel for Google

4    discussed the second bullet point and the third

5    bullet point.  Look at the first bullet point

6    because that wasn't ever discussed.  Do you see

7    that?

8              A.   Yes.

9              Q.   Google viewed and told ACI viewed

10   this patent as a nice to have patent.  Do you

11   see that?

12             A.   Yes, I do.

13             Q.   Is the assumption in the

14   hypothetical negotiation that the patent is nice

15   to have?

16             A.   No, I haven't heard that within

17   the hypothetical construct.  It's supposed to be

18   a valid and infringed patent and you're supposed

19   to work out a deal for this valid and infringed

20   patent.

21             Q.   So the assumption is the patent is

22   infringed; right?

23             A.   Yes.

24             Q.   Not that it's nice to have?

```
 1              A.   That's correct.

 2              Q.   Now, were you here when Mr. Mayer

 3    testified on Monday?

 4              A.   Yes, I was.

 5              Q.   And did Mr. Mayer testify about a

 6    discussion that he had with Mr. Michael Jones?

 7              A.   Yes, several discussions, I think.

 8              Q.   And what did Mr. Mayer testify

 9    with regard to, what Mr. Jones told him about

10    whether Google was using the patent?

11              A.   My recollection was there was some

12    discussion about them not using it or not

13    thinking they were using that patent.  There was

14    other means they were doing.  I can't recall the

15    exact testimony, but basically suggesting they

16    weren't using the patent is what I recall.

17              Q.   So you for all this 2006 stuff we

18    saw, at that point Mr. Mayer told us that he had

19    been told they weren't using the patent?

20              A.   That's my recollection.

21              MR. HAWES:  No further questions,

22    Your Honor.

23              THE COURT:  Any recross?

24              MR. SNYDER:  No further questions,
```

1       Your Honor.

2                       THE COURT:  Now comes the time for

3       the jury to ask questions.  If any members of

4       the jury have questions.

5                       JUROR:  Your Honor, may I use the

6       restroom really quick?

7                       THE COURT:  Why don't we take our

8       ten-minute morning break.  We're going to

9       truncate it a little bit.  We'll recess for ten

10      minutes.

11                      (Jury leaving the courtroom at

12      10:48 a.m.)

13                      THE COURT:  Sit down.  Is there

14      anything further before we break?

15                      MR. HAWES:  Not from plaintiff,

16      Your Honor.

17                      MR. SNYDER:  No, Your Honor,

18      although we are going to have a motion.  I don't

19      know what question the jury may come up with,

20      but we are going to have a motion at the close

21      of plaintiff's case, and under 50(a).  And I'm

22      also going to have a motion specific to

23      Mr. Nawrocki's testimony.

24                      THE COURT:  We'll deal with that

1    at the appropriate time.  Let's recess for ten

2    minutes.

3                     (A brief recess was taken.)

4                     THE COURT:  Be seated, please.

5    Why don't we bring the jury back in.

6                     MR. SNYDER:  Your Honor, before

7    the jury returns, may I be heard on an issue

8    with Mr. Nawrocki's testimony or would you

9    prefer that we take the jury's questions?

10                    THE COURT:  I prefer that we do

11   the jury questions and then we'll have your Rule

12   50 motions.  We'll have to have the jury out.

13   Is it something that needs to be resolved before

14   the Rule 50 motion?

15                    MR. SNYDER:  Depending on the

16   questions we get from the jury, it may be.

17                    THE COURT:  Why don't you tell me

18   what it is.

19                    MR. SNYDER:  The issue, Your

20   Honor, relates to Mr. Nawrocki's testimony about

21   a ten cent per user proposal.  And at the time

22   that Mr. Nawrocki mentioned that proposal, I

23   objected that it was related to 2010.

24                    ACI's counsel represented that it

1    was in his report.  And it is referenced in his

2    report, but that is incredibly misleading and

3    contrary to Your Honor's order regarding the

4    parameters of Mr. Nawrocki's testimony.

5                    Mr. Nawrocki -- it is from -- that

6    reference to a ten cent per user proposal is

7    from 2010.  It's Plaintiff's Exhibit 123.

8                    THE COURT:  This is not something

9    we have to deal with now.  I want to bring the

10   jury back in, get the question and then we'll

11   let them take a break and then we'll come back

12   and have all your motions.

13                   MR. SNYDER:  Thank you, Your

14   Honor.  I will renew this if the questions

15   relate to that per user amount.

16                   THE COURT:  We'll see what

17   happens.

18                   MR. HAWES:  Your Honor, can we

19   bring Mr. Nawrocki back?

20                   THE COURT:  Yes.  He should come

21   up and sit in the stand.

22                   (Jury entering the courtroom at

23   11:01 a.m.)

24                   THE COURT:  And now do we have any

```
 1         questions from the jury for Mr. Nawrocki?
 2                   The jury has no questions.
 3                   So Mr. Haase, that concludes the
 4         plaintiff's direct case; is that correct?
 5                   MR. HAWES:  Actually I need to
 6         enter the exhibits into the record, Your Honor,
 7         and then I can sit down.
 8                   THE COURT:  Yes.
 9                   MR. HAWES:  Your Honor, the
10         plaintiff offers Plaintiff's Trial 158, 115,
11         167, 271, 45, 350, 55, 72, 73, 198, 66, 190,
12         200, 31, 160 and 219.
13                   THE COURT:  Any objection?
14                   MR. SNYDER:  I object to 219, Your
15         Honor.  That is a 2010 document.
16                   THE COURT:  That's overruled.
17         They're admitted into evidence.
18                   MR. HAWES:  Thank you, Your Honor.
19         Plaintiff rest.
20                   MR. SNYDER:  And Defendants move
21         into evidence Defendant's exhibit 1071.
22                   THE COURT:  Any objection?
23                   MR. HAWES:  No, Your Honor, no
24         objection.
```

```
1                    THE COURT:  That's admitted into

2       evidence.

3                    THE COURT:  Members of the jury,

4       we're going to recess for a little while now.

5       We have some housekeeping matters before the

6       Defendant begins its case and so we ask you to

7       leave the courtroom.  Please again, don't

8       discuss the case while you're waiting for us to

9       conclude.  We'll try to make this as quick as we

10      can.

11                   (Jury exits)

12                   THE COURT:  Okay.  Mr. Snyder.

13                   MR. SNYDER:  Should Mr. Nawrocki

14      be excused, Your Honor.

15                   THE COURT:  Yes.  Now, he's

16      excused.  Is he subject to recall?

17                   MR. SNYDER:  Not by us, Your

18      Honor.

19                   MR. PARTRIDGE:  Your Honor,

20      there's a possibility we'll be calling him in

21      our rebuttal case.

22                   THE COURT:  Okay.  So thank you.

23      For the moment, Mr. Nawrocki, you're excused.

24                   THE WITNESS:  Thank you, Your
```

1      Honor.

2                  MR. SNYDER:  I don't have a menu

3      up here.  Your Honor, Defendants move under Rule

4      50A for a directed verdict.  We also move to

5      strike Mr. Nawrocki's testimony.  There are

6      several grounds for the 50A motion, but let me

7      start with the issue of damages in Mr.

8      Nawrocki's testimony.

9                  Mr. Nawrocki did not offer an

10     opinion on damages.  He identified a number of

11     factors, but did not at the conclusion of his

12     testimony identify any rate that he believed

13     would be appropriate.  In fact, they studiously

14     avoided including any specific rate and

15     presented their slide number 7, which has a

16     royalty rate, a base of 7.1 billion sessions and

17     leaves open the issue of a royalty rate and the

18     total amount.  Without having offered an

19     opinion, there's nothing for the Plaintiff to

20     rely on.  It would be improper for the jury to

21     rely on it.  And Mr. Nawrocki's testimony should

22     be struck.

23                  A separate and independent reason

24     related to or reason why Mr. Nawrocki's opinion

```
 1          should be struck relates to his improper
 2          reference to a 10 cents per use communication.
 3          The only evidence of that is from a 2010 e-mail,
 4          which has been marked as Plaintiff's exhibit
 5          123.  When I objected to that e-mail,
 6          Plaintiff's response was that it was in his
 7          report, but it is in his report only in the
 8          context of a 2010 hypothetical negotiation and
 9          their use of that e-mail and introduction to
10          that, that evidence before the jury was in
11          direct violation of Your Honor's order and
12          extraordinarily prejudicial.  And what I fear
13          they're planning to do, because it is directly
14          in Mr. Nawrocki's report, is use that
15          information to suggest to the jury that a
16          royalty of as much or a payment of as much as
17          $700 million would be appropriate given the 7.1
18          billion sessions that they've identified.  This
19          isn't speculation on my part.  This is from Mr.
20          Nawrocki's report.  He specifically refers to a
21          November 2010 e-mail from Pavel Mayer of ACI to
22          Tim Porter of Google.  And that's in that e-mail
23          he says ACI stated that a typical user based
24          licensing model would be on the order of $1 per
```

```
 1      usage, a usage based model in the order of 10

 2      cents per usage.  This is the e-mail that he was

 3      referring to and the testimony we objected to.

 4      Mr. Nawrocki then applies that to his sessions

 5      of 7.1 billion and comes up with a total of $710

 6      million.  Having that in front of the jury is

 7      enormously prejudicial.  It's also very clear,

 8      Your Honor, that Mr. Nawrocki only used that

 9      e-mail in the context of a 2010 hypothetical

10      negotiation date.  This is from paragraph 7 of

11      his report as discussed throughout this report

12      in order to determine the appropriate royalty

13      that's applicable in this case, says I

14      considered the rates ACI sought for licensing

15      the patent at issue at the time of a

16      hypothetical negotiation in 2010.

17              He then goes on to talk about the

18      number of activations and continues in that

19      paragraph to refer to that same 10 cents per

20      user rate and the possible $710 million.  And I

21      fear what they're going to do, Your Honor, is

22      take Mr. Nawrocki's testimony and that 10 cents

23      per use rate that was entered into over

24      objection and suggest that there could be an
```

```
 1    award of as much as $700 million and that they

 2    would be, only be conservative by asking for a

 3    cent and a half and therefore order a hundred

 4    and plus million dollars.  That is exactly the

 5    kind of prejudice that the Federal Circuit has

 6    repeatedly recognized.  If you anchor by using

 7    some gigantic number and then pretend you're

 8    being conservative or restrained by using a

 9    smaller number, it's completely inappropriate

10    and prejudicial and it's directly contrary to

11    Your Honor's instructions about the 2005 date,

12    not the 2010 date.

13              So Mr. Nawrocki's opinions and

14    testimony should be struck and I believe it

15    would be appropriate to issue a curative

16    instruction to the jury that that 10 cents per

17    use amount cannot be used because of the date of

18    the hypothetical negotiation.

19              THE COURT:  As I understand that

20    document, it's referring to a general concept of

21    royalty rates, not tied in any way to a

22    particular time and I think that's the purpose

23    for which he was using it.  So I'm going to deny

24    your motion to strike.  Is there more you would
```

1    like to say about your Rule 50 motion?

2              MR. SNYDER:  There is, Your Honor.

3    Defendant Google is entitled to a directed

4    verdict on the issue of infringement for several

5    reasons.  First, there is no evidence that

6    several steps of the only independent claim,

7    Claim 1, are performed.  In particular, there is

8    no evidence that the two subparts of Step F,

9    storing and representing, are ever performed.

10   The only evidence that's been presented was from

11   Mr. Castleman and all he testified to, all he

12   said was yes, they are performed, in response to

13   a leading question.  He presented no testimony,

14   he presented no explanation.  That's all there

15   was.

16              Second, related to that same

17   subsection F, there is no evidence, and in fact,

18   Mr. Castleman agreed that you do not have a

19   representation of or a request for each of the

20   subsections.  And let me try and be a little bit

21   clearer.  The second subpart of Step F of Claim

22   1 requires that you request each of the

23   subsections.  Mr. Castleman was asked on direct,

24   do you have to request each of the children in

1    order to have infringement?  And he said yes,

2    which is consistent with Your Honor's ruling on

3    claim construction.  He was then asked, in the

4    Google product, do you request each of the

5    subsections?  And he specifically testified that

6    he did not do that analysis.  So there is no

7    evidence in the record on which the jury could

8    find that that step has been met.

9              Third, Your Honor, related to Step

10   G, there is no evidence that Step G is ever

11   performed.  Mr. Castleman testified consistent

12   with the Court's claim construction, that you

13   have to go through each of the four parts of

14   Step F before you perform Step G.  You can't do

15   G until you finish F.  Because Step F is never

16   performed or there is at least insufficient

17   evidence for the jury to find that Step F is

18   performed, you can't perform Step G.  There is

19   no evidence on which the jury could find that

20   there is.

21             There are two other separate

22   issues related to infringement, Your Honor.

23   First, one part of Mr. Castleman's categories

24   relates to the Enterprise products and to the

1    Audi products.  Mr. Castleman did not testify

2    that the use of those products by Google

3    infringes.  In fact, he admitted that he has no

4    evidence of it.  All of the claims at issue in

5    this case are method claims, 1, 3, 14 and 28.

6    You have to of course perform the method in

7    order to infringe.  And Mr. Castleman agreed

8    that merely providing the software does not

9    infringe those methods.  That software is then

10   provided to other users, like the users of the

11   Enterprise product, it is then provided to Audi,

12   and he does not have any evidence and had no

13   opinion on whether the users of those, whether

14   Google uses those products.  That is somebody

15   else.  Google can't be held responsible for

16   that.

17              Finally Your Honor, and this will

18   relate specifically to the jury instructions,

19   should we get that far, but this should be taken

20   out of the case.  There is no evidence of

21   Doctrine of Equivalence.  Mr. Castleman did not

22   provide an opinion on Doctrine of Equivalence

23   and there should be no further reference to that

24   in the case whatsoever.

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | The last issue, Your Honor,                                  |
| 2  | relates to whether the '550 Patent claims patent             |
| 3  | eligible subject matter and it does not.  We                 |
| 4  | previously brought a motion under Section 101                |
| 5  | and Judge Andrew denied it.  In part he denied               |
| 6  | it because there was an ordered combination of               |
| 7  | steps.  But Mr. Mayer and Mr. Schmidt both                   |
| 8  | confirmed that there is nothing about their,                 |
| 9  | their claims that includes any specific                      |
| 10 | hardware.  There's no invention for the                      |
| 11 | performance of those ordered steps.  And as the              |
| 12 | Federal Circuit recently identified in TLI, if               |
| 13 | you're going to pass step number two and have                |
| 14 | that inventive element, you have to actually                 |
| 15 | have invented something.  And one way you can do             |
| 16 | that is with specialized hardware.  That is not              |
| 17 | present here.  The only reference is using a                 |
| 18 | computer and both Mr. Mayer and Mr. Schmidt                  |
| 19 | testified that they used a commercially                      |
| 20 | publically available computer for the                        |
| 21 | performance of those tests.  The thing that's                |
| 22 | left then is this algorithm that describes the               |
| 23 | steps and that should not be eligible for patent            |
| 24 | protection in the United States under current                |

1          law.

2                    I would like your -- I've tried to

3          describe these as best I can, Your Honor.  I

4          would like the permission to file in writing on

5          your motion under 50A, but I do believe this

6          identifies all the relevant grounds that would

7          justify finding a verdict in Defendant's favor.

8                    THE COURT:  All right.  You may

9          file a written motion.  I am going to deny the

10         motion with respect to everything, except I have

11         one concern, and that is I did not hear any

12         evidence about the Doctrine of Equivalence.

13                   MR. SPEARS:  The Court is correct,

14         and to that extent, ACI's motion should be

15         granted.  It should not appear in the jury

16         instructions or the verdict form.

17                   THE COURT:  All right.  Thank you.

18         The Defendant's motion for judgment on the

19         Doctrine of Equivalence is granted and that will

20         be removed from the final jury instructions.  In

21         other respects, the Rule 50 motion is denied.

22                   MR. SNYDER:  Thank you, Your

23         Honor.

24                   MR. HAWES:  Your Honor, will you

```
 1      want us to respond to the written submission?

 2                   THE COURT:  Yes, I think you

 3      should respond to the written submission.  What

 4      is the written submission --

 5                   MR. HAWES:  Can we have a page

 6      limit?

 7                   THE COURT:  Page limit.  10 pages

 8      each.  Double spaced.

 9                   MR. SNYDER:  Could we have 15,

10      Your Honor?

11                   THE COURT:  No, I think 10 is

12      enough.

13                   MR. HAWES:  Thank you, Your Honor.

14                   THE COURT:  And why don't you file

15      that 5 o'clock tomorrow and response to that, I

16      guess noontime on Friday, is that doable?  Do

17      you need more time than that?

18                   MR. HAWES:  Can we have one day,

19      Your Honor?  Can we at least have 5 o'clock.

20                   THE COURT:  5 o'clock.  Anything

21      further we need to address before Google begins

22      its case?

23                   MR. HAWES:  Not from Plaintiff,

24      Your Honor.
```

1              MR. SNYDER:  Nothing further, Your

2      Honor.

3              THE COURT:  Okay.  Thank you.  Why

4      don't we bring the jury back in.

5              (Jury entering the courtroom at

6      11:20 a.m.)

7              THE COURT:  Be seated.  Please.

8      Welcome back members of the jury.  We'll now

9      proceed with Google's case.

10             Mr. Snyder.

11             MR. SNYDER:  Thank you, Your

12     Honor.  As Google's first witness, we call the

13     corporate representative, Mr. Peter Birch.

14     Peter Birch is an engineer and senior project

15     manager at Google.  He's going to testify about

16     the background of the Google Earth product and

17     how it operates and presents images on a user's

18     device.  He's also going to provide information

19     about the financial aspect of the Google Earth

20     products.

21             May I approach the witness, Your

22     Honor.

23             THE COURT:  Let him be sworn

24     first.

```
 1                    THE CLERK:  Please state and spell
 2      your name for the record.
 3                    THE WITNESS:  P-E-T-E-R,
 4      B-I-R-C-H.
 5                         PETER BIRCH,
 6                the deponent herein, having first
 7                been duly sworn on oath, was
 8                examined and testified as follows:
 9                    DIRECT EXAMINATION
10      BY MR. SNYDER:
11              Q.   Good morning, Mr. Birch.
12              A.   Good morning.
13              Q.   Could you please introduce
14      yourself to the jury?
15              A.   Certainly.  My name is Peter
16      Birch.
17              Q.   Who do you work for?
18              A.   I work for Google.
19              Q.   How long have you worked for
20      Google?
21              A.   As of the -- coming Monday it will
22      be ten years.
23              Q.   What is your current position with
24      Google?
```

1          A.   My current position is senior

2     product manager for Google Earth Engine.

3          Q.   And what other positions have you

4     held at Google?

5          A.   I also work on basically as a role

6     of PM Emeritus for the Google Earth products.

7     And then in the past I have been the sole

8     product manager for the Google Earth product

9     family.

10         Q.   How long were you the sole product

11    manager for the Google Earth family?

12         A.   I started in 2006 until

13    approximately 2012.

14         Q.   Mr. Birch, what is Google?

15         A.   So Google is a company.  Our

16    mission is to organize the world's information

17    and make it universally useful and successful.

18    We make products like Google Search and G-mail

19    and various other products to really help people

20    get access to information.

21         Q.   What is Google Earth?

22         A.   So Google Earth is an application

23    that you can download on to your computer or

24    phone or tablet, and it allows you to fly around

 1     the world.  So you can type in your home

 2     address, you can -- maybe you want to go back to

 3     where your parents came from and you want to

 4     learn about when they grew up.  Maybe you're

 5     thinking of planning a virtual vacation.  So

 6     it's really a portal or a way to teleport

 7     yourself to anywhere in the world.

 8              Q.   Have you brought an example to

 9     show the jury to help illustrate your testimony,

10     Mr. Birch?

11              A.   Yes, I have.

12                   So here you can see this is a

13     screen shot from Google Earth.  And as you can

14     see on the right-hand side is a picture of the

15     globe out in space.  And we have actually shown

16     that we're drawing the country boarders as well.

17     On the left-hand side there is a search box and

18     some other features.  This is showing the

19     desktop version of Google Earth.

20              Q.   How does Google Earth relate to

21     Google's mission?

22              A.   I talked about this idea of

23     organizing the world's information.  It turns

24     out that a lot of information about the world

1      and the planet we live on.  And a lot of that

2      information has typically been satellite

3      imagery, has only been accessible to scientist

4      and researchers and people in the industry.  But

5      bringing in data into Google Earth we have made

6      that available to millions of people around the

7      world.

8              Q.   What are some of the ways that

9      Google Earth is used?

10             A.   So Google Earth is used in a lot

11     of different ways.  In fact, I have a couple of

12     example videos if we can bring those up.

13                  So this, if you go ahead and click

14     start.  Here is an example of learning a little

15     bit about history.  So what we're going to do is

16     we're going to fly in Philadelphia and here you

17     can see the stadiums in Philadelphia.

18                  But what we can do is go back in

19     time so you can actually see the old stadiums.

20     You can see the Spectrum.  And it's getting torn

21     down and replaced.  So now where the 76ers play.

22                  And then over here on the left you

23     can start to see the Eagle's stadium being

24     built.  Now, the new Phillies stadium is being

1    constructed.  And then finally the upper

2    right-hand side you can see the old stadium

3    being demolished.  This is a really great way to

4    learn something about your community.

5            Q.  Did you bring another video to

6    illustrate how Google Earth can be used?

7            A.  Yes, I did.  This is something

8    many of us may have experienced, flying to your

9    house or flying somewhere that you're interested

10   in.  Again, we're flying into Philadelphia and

11   in this case we're looking at a very significant

12   building in American history which is

13   Independence Hall.  So we're going to fly down

14   and you can see we have 3D models of all the

15   buildings, all the trees in the area and then

16   right here in the center you can see

17   Independence Hall.  We do this nice cinematic

18   fly around.  It really gives you a sense of what

19   this place is like and encourage you to come out

20   and visit.

21           Q.  Mr. Birch, how did you get

22   involved with Google Earth?

23           A.  So I started on Google Earth

24   immediately while joining Google.  And my

1    involvement with that was really based on my

2    past experience working in things like computer

3    graphics.

4              Q.   What was your responsibilities as

5    the sole product manager for Google Earth?

6              A.   So I was responsible for all

7    aspects of the product.  So that included things

8    like product strategy, coming up with feature

9    definition, timelines, kind of managing

10   schedules, working very closely with the

11   engineers; also dealing with marketing,

12   financials, projections, working with press.

13   There is -- obviously this is a very well-known

14   public product, so I did a lot of press

15   interviews and other types of outreach

16   activities working with the legal team and all

17   the things that are related to running a

18   product.

19             Q.   Mr. Birch, you mentioned earlier

20   you're now the PM Emeritus of Google Earth?

21             A.   That's correct.

22             Q.   What roles does that entail?

23             A.   That's kind of a title I use to

24   describe my role on the current Earth

```
 1        development.  There is a new team working on
 2        some future version of Earth and they're pretty
 3        new to the product.  Most of the older team has
 4        moved on, but I have a lot of the history and
 5        the knowledge and experience with that product,
 6        and so I regularly advise that team.  Of course,
 7        I sit just a few feet away from them and meet
 8        with them regularly to talk about some of the
 9        aspects of the product and history.
10             Q.   Mr. Birch, why have you come to
11        court to testify?
12             A.   I'm here as Google's
13        representative, so I'm here to be the face of
14        the company, to talk about what Google is about,
15        what Google Earth is about, and to help the jury
16        and others here in the court to better
17        understand Google.
18             Q.   What did you do immediately before
19        working at Google?
20             A.   So immediately prior to Google I
21        worked at Microsoft.  And I was the graphics
22        hardware lead for the xBox 360 gaming system.
23        And that entailed basically managing all of the
24        architecture and silicon development for the
```

```
 1    graphics processing unit for the xBox 360

 2    system.

 3              Q.   Before Microsoft where did you

 4    work?

 5              A.   Before Microsoft I worked at a

 6    company called Silicon Graphics, or SGI, which

 7    you may have heard of earlier this week, which

 8    is a company that built high performance 3D

 9    graphics visualization workstations.

10              Q.   What did you do at SGI?

11              A.   So at SGI for the first seven

12    years or so, I worked as an architect for

13    basically designing 3D graphics, workstations.

14    So there is this mention of a graphics

15    processing unit that's been mentioned earlier.

16    I designed and built those.

17                   And then in the later years I

18    worked in software development in graphics,

19    library software dealing with various graphs,

20    scene graphs and tree structures for

21    representing 3D graphics.

22              Q.   Mr. Birch, have you received any

23    educational degrees?

24              A.   Yes, I have.  I have a bachelors
```

```
 1        of science in electronic engineering from Cal

 2        Poly State University and I have a masters of

 3        business administration from the University of

 4        California and Berkley.

 5                    Q.   Are you the named inventor on any

 6        patents?

 7                    A.   Yes, I am.

 8                    Q.   How many patents?

 9                    A.   Five.

10                    Q.   Do any of your patents relate to

11        Google Earth?

12                    A.   Two of them do, yes.

13                    Q.   Generally speaking, what do those

14        cover?

15                    A.   Those particular patents are

16        related to basically hand gestures for

17        controlling Google Earth on a phone or tablet

18        device, how you might navigate and move the

19        globe, or the ways we control the camera in that

20        application.

21                    Q.   Mr. Birch, is Google Earth part of

22        any product area at Google?

23                    A.   Yes, it's part of what we call the

24        Geo product area.
```

1          Q.   What does Geo refer to?

2          A.   Geo is short for geographic.  And

3     it basically means all the mapping products that

4     Google makes.

5          Q.   What products are in the Geo

6     product area?

7          A.   So the most dominant and most

8     important one is obviously Google Maps.  We also

9     have other products like StreetView which is

10    kind of a sub-brand if you will of Google Maps.

11    We have a division that we call Terrabella which

12    specializes in satellite analytics which is more

13    of an Enterprise focused product, and, of

14    course, Google Earth.

15         Q.   What is the difference between

16    Google Earth and Google Maps?

17         A.   So Google Maps, the way I like to

18    describe it, Google Maps is a tool to help you

19    find your way in the world.  It's really focused

20    on daily use and helping people answer

21    questions, like how do I get to this courtroom

22    and get directions, where is a good restaurant

23    or is this store open today, very day-to-day

24    utility functions.  Google Earth is really

```
 1      intended to be kind of a fun entertainment

 2      product for just browsing and exploring the

 3      world.

 4                 Q.   How many people work in the Geo

 5      product area?

 6                 A.   There is about 2000 people.

 7                 Q.   Of those, how many work on Google

 8      Maps?

 9                 A.   The vast majority of them work on

10      Google Maps.

11                 Q.   How many of them work on Google

12      Earth?

13                 A.   There is about fifteen people.

14                 Q.   Why does Google Maps have so many

15      more people working on it than Earth?

16                 A.   Well, Google Maps is the flagship

17      product for the division.  Again, this is the

18      product that everybody uses.  Not everyone uses,

19      but we intend for people to use on a daily

20      basis.  If possible it has far more traffic than

21      a product like Google Earth.  It's ten times the

22      number of users.  It's really the main product

23      that we produce.

24                 Q.   When did Google first release
```

```
 1      Google Earth?

 2              A.   It was released in I believe June

 3      of 2005.

 4              Q.   Why did Google release Google

 5      Earth?

 6              A.   Well, we released it because we

 7      wanted to make a product that we thought was,

 8      you know, exciting and interesting for users.

 9      And, you know, it has a really -- you know, the

10      first time people have used Google Earth they

11      get a feeling of wow.  And we wanted to create

12      that kind of excitement for our users.

13              Q.   Did Google acquire any of the

14      material for Google Earth from another company?

15              A.   Absolutely.  So we acquired a

16      company called Keyhole in 2004 which I believe

17      was mentioned earlier.  And Keyhole was a

18      company that developed a lot of the technology

19      that became Google Earth.

20              Q.   Since introducing Google Earth in

21      2005, has Google offered other Google Earth

22      products?

23              A.   Yes, we have.  So the very first

24      version was for Windows computers.  We then
```

 1        introduced a version for MacIntosh computers, or

 2        Lennox workstations, and then later mobile

 3        devices like the Apple iPhone, iPad and Android

 4        phones and tablets.

 5                    Q.   What is Google Earth for Android

 6        8?

 7                    A.   Google Earth for Android is the

 8        version of Google Earth for Android phone and

 9        tablets, Version 8 is the most recent version

10        that we released.

11                    Q.   When did Google release Google

12        Earth for Android 8?

13                    A.   That was released in I believe

14        2013.

15                    Q.   Mr. Birch, we have had some

16        testimony --

17                    A.   I'm sorry, that was 2014.

18                    Q.   We have had some testimony about

19        another Google product called Globe.  Could you

20        tell the jury what Globe is?

21                    A.   Sure.  So Globe is an internal

22        code name that we use for the Earth like

23        features in Google Maps, what we call either

24        view.

1            Q.   When did Google integrate from

2     Globe into Google Maps?

3            A.   That was 2013.

4            Q.   Mr. Birch, have you been involved

5     in all of the different versions of the accused

6     Google Earth products?

7            A.   Yes, I have.

8            Q.   We heard a little testimony

9     earlier about a company called Audi.  Has Google

10    provided any of the Google Earth functionality

11    to Audi?

12           A.   Yes, we have.

13           Q.   Is it different from the other

14    Google Earth products?

15           A.   Yes, it is.  So the other Google

16    products are standalone applications.  The

17    technology with Audi was a software component

18    that could be used as part of an application.

19    In this case Audi developed the application that

20    would run on what's called the head unit, the

21    components in the dash in the car, they would

22    develop the application and they would use the

23    software component that we provided to them.

24           Q.   Mr. Birch, has Google Earth won

1      any awards or industry recognition?

2              A.   Yes, we won many.  We won a United

3      Nation's Environmental Program Award.  We won a

4      MAC World Magazine Award.  We also won a couple

5      of Webbys.

6              Q.   What are Webbys?

7              A.   So Webbys are an industry award.

8      They're kind of like the academy awards, but for

9      people in the web industry.

10             Q.   Does Google have any patents

11     related to Google Earth?

12             A.   Yes, we do.

13             Q.   About how many?

14             A.   We have about fifty.

15             Q.   What do they cover?

16             A.   They cover a wide range of

17     components of Google Earth, everything from how

18     do we do the rendering, and the core

19     implementation to user interface, to you know,

20     many different aspects.  For example, I

21     mentioned a couple of ones that I did that were

22     related to the user interface on mobile devices.

23             Q.   I want to switch gears a little

24     bit, Mr. Birch, and talk about how Google Earth

1    operates.  What kinds of information does Google

2    use to present images of Google Earth or in

3    Google Earth?

4            A.   Uh-huh.  So we use a lot of

5    different imaginary data that primarily comes

6    from satellites and aerial acquisition, so

7    planes.

8            Q.   How large is the total amount of

9    information that Google has collected for use in

10   Google Earth?

11           A.   So it's -- it's massive.  It's in

12   the order of petabytes.  And just to put that in

13   perspective, you might have heard of megabytes

14   and then there's some discussion of gigabytes

15   which is a thousand times that, and then there's

16   terabytes, which is a thousand times that and

17   petabyte is a thousand times that.  So it's a

18   really, really big number.

19           Q.   How does Google organize all that

20   information that's used to present images in

21   Google Earth?

22           A.   So what we do is we actually store

23   that, we kind of divide that up into a bunch of

24   images and then we store those images on our

904

1    servers.

2            Q.   And how does Google know which or

3    how does Google Earth know which images to find?

4            A.   So we actually create an index or

5    what we call a metadata tree.  And that metadata

6    tree serves as sort of like a table of contents,

7    if you will, for where we can go and find all

8    these different images.

9            Q.   Why is it called a tree?

10           A.   It's called a tree because it's a

11   data structure type, so in computer engineering

12   there's this notion of a tree.  You've heard

13   some of that earlier, so it's called a tree

14   because it has a root and it has branches and

15   then it has leaves, so it looks kind of like an

16   upside down tree.

17           Q.   What kind of information is stored

18   in this metadata tree?

19           A.   So the term meta means it's not

20   about data, it's information about the data not

21   the data itself.  So we don't store the data or

22   the images in the metadata tree, we store

23   information, for example, where the image is

24   located.

905

```
 1              Q.   Have you prepared a graphic to

 2      help explain the idea of the metadata tree to

 3      the jury?

 4              A.   Yes, I have.  So this is an

 5      example of a tree and in this case it's what's

 6      called a binary tree, where at the top we have a

 7      node and then below that there are two children

 8      and each of those have two children as you

 9      continue down.

10              Q.   What do the small circles in the

11      tree represent?

12              A.   So the small circles, as I

13      mentioned, are nodes.  And in the case of the

14      Google Earth metadata tree, as I mentioned those

15      nodes include information about images, so for

16      example, where those images are located in the

17      world and their existence.

18              Q.   Now, there are lines drawn between

19      the different circles in this tree.  How do you

20      describe the relationship between the different

21      circles?

22              A.   Sure.  So there's really a kind of

23      a family relationship.  You know, we've made

24      some references to family trees before and in
```

1       computer engineering and in software engineering
2       we use that analogy, so if you go to the next
3       slide I can talk a little bit about that.  This
4       pink node is one of the nodes and then go ahead
5       and go to the next slide.  The purple nodes here
6       are the children of that node.  The one above it
7       is the parent and you can image the light blue
8       ones are the grandchildren, so we use that
9       terminology to kind of reference the
10      relationship.
11              Q.   In Google Earth, what is the
12      difference between the different levels in the
13      metadata tree?
14              A.   So the different levels represent
15      different resolution imagery.  So let's go back
16      to our pink node for a second.  So the node --
17      the image referenced by the pink node is half of
18      the resolution of the two nodes that are purple.
19      And in addition, the area covered by the pink
20      node is equal to the area of both of the purple
21      nodes, so you can think of one purple node is
22      half of the area and the other purple node is
23      the other half.  I mean, total area equals the
24      area covered by the pink node.

1          Q.   And how does the, in this example,

2     how would the area of the light blue nodes at

3     the bottom, the four light blue nodes at the

4     bottom compare to the pink node?

5          A.   So again, they would also

6     represent the same area, but would represent

7     quarters of that area instead of halves of that

8     area.

9          Q.   Which version of the accused

10    Google Earth products use a metadata tree?

11         A.   All of them.

12         Q.   How do the -- how does the

13    metadata tree used in the accused Google Earth

14    products compare to the illustration of a tree

15    that you've shown to the jury today?

16         A.   So this is a binary tree.  And I

17    had really just done that for simplicity, but

18    it's a lot easier to look at.  The Google Earth

19    products use quadtrees and octrees.  So that

20    would be four- and eight-noded children.

21         Q.   And have you brought an example of

22    an illustration of a quad tree?

23         A.   Yeah, so if you go to the next

24    slide.  So this is a quadtree, so it's similar,

```
 1      but you can see it very quickly gets very

 2      complicated because of the vast number of nodes,

 3      because each level you now get four more

 4      children and four more children after that.  And

 5      you can image what an octree would look like.

 6      It would be impossible to see.  That's the

 7      reason I'm kind of simplifying it with a binary

 8      tree.

 9                Q.   And how is an octree different

10      from your illustration of a quadtree?

11                A.   As I mentioned, oct means eight,

12      so instead of four nodes there would be eight

13      children for any given node.

14                Q.   Mr. Birch, in this example it

15      looks like you have four different levels of

16      nodes?

17                A.   That is correct.

18                Q.   How many different levels are

19      there in the metadata tree in the accused Google

20      Earth products?

21                A.   We have up to about 25 different

22      levels.

23                Q.   And in the accused Google Earth

24      products, what does the top most node in the
```

```
 1       metadata tree represent?

 2                A.   So the top node is the whole

 3       world.

 4                Q.   And what geographic area is

 5       covered by the nodes at the very bottom of the

 6       metadata tree in the accused Google Earth

 7       products?

 8                A.   So in the areas with the highest

 9       resolution imagery, the bottom nodes are quite

10       small.  There may be only, you know, five or 10

11       feet on a side.  So they're actually, you know,

12       quite small.

13                Q.   In the accused Google Earth

14       products, where is the metadata tree stored?

15                A.   So the metadata tree is actually

16       stored on our servers.  And the reason is even

17       though it's just a metadata tree and doesn't

18       have much information stored in it, it's also

19       incredibly large.  You can image if you tried to

20       extend eight nodes of this down 25 levels, it's

21       quite a big index, so we store all of that on

22       the server as well.

23                Q.   If it's stored on the servers, how

24       do devices that have the accused Google Earth
```

```
 1        products use the metadata tree?

 2                 A.   So devices will actually request

 3        the metadata tree in portions as needed.  It

 4        will basically request the portions of that

 5        tree.

 6                 Q.   Now, does the -- you mentioned

 7        earlier that the metadata tree just contains

 8        metadata?

 9                 A.   That's correct.

10                 Q.   And that's separate from the

11        images?

12                 A.   Yes, that's correct.

13                 Q.   Where are the images that are used

14        by the Google Earth products stored?

15                 A.   So the images are stored on Google

16        servers.

17                 Q.   And what are those servers?

18                 A.   Those servers, you know, so

19        servers are computers that Google uses to offer

20        our services and there's a service that runs on

21        them that we call Keyhole, which is, you know,

22        named after the original company, and that

23        service is the one that actually provides this

24        data back to Earth clients.
```

1          Q.   How does Google Earth use the

2    metadata tree to request information from the

3    servers?

4          A.   So what we do is we do something

5    called traverse or we basically kind of walk our

6    way down the tree to, you know, we basically

7    visit each of these nodes to find out is this

8    relevant, right, and relevant is primarily

9    driven by whether it's in the view or not.

10   Right.  So if we're here at, you know, the east

11   coast, we're not going to want data from Asia,

12   for example.  So we use this tree to understand

13   what of this vast amount of imagery is actually

14   relevant for the current view.

15         Q.   And what happens after traversing

16   or walking through the metadata tree?

17         A.   So what happens after that is we,

18   we build a list of nodes that we're interested

19   in.  So in the process of this traversal we're

20   making a list, almost like a shopping list.

21   Right.  We want to make something which in this

22   case is a final image and we need the pieces to

23   make that and so traversing this tree is kind of

24   our way of building up the shopping list of

1     images that we will need.

2              Q.   Have you brought an illustration

3     to help explain this process to the jury?

4              A.   Yes, I have.

5              Q.   Let's turn to that, please.

6              A.   Great.  So what we have here on

7     the left there is again an example of one of

8     these metadata trees and again it's a binary

9     tree for illustration, but in the actual

10    application it's a quad or an octree.  And then

11    on the right we have an example of a user's

12    computer and you can kind of see the screen

13    there, and that's where we're going to be

14    drawing or rendering this final picture.  And

15    then just a little bit of guidance here on the

16    colors.  As I go through this animation, blue

17    will mean that we've traversed or, you know,

18    looked at one of these metadata nodes.  Yellow

19    is that we've requested that node and then the

20    orange is that we have stored and rendered it.

21    And just to be clear, this is not the whole

22    tree, this is a portion of the tree.  In this

23    case it's the portion of the tree that is in the

24    view.  So you can image that outside of this is

1    a very vast amount of data that isn't relevant,

2    it would just be kind of confusing for this

3    diagram.

4            Q.   So in the Google Earth products,

5    what is the first step?

6            A.   Yeah, so let me start.  I talked

7    about this notion of traversing, so if you can

8    go ahead and flip.  You see this blue arrows and

9    this is the process of traversing.  We go, we

10   follow this tree structure and we are visiting

11   each of the nodes that are in the view and for

12   each of those nodes, because they are in the

13   view, we add them to this list.  But again, you

14   kind of think of it as a shopping list, okay?

15   These are the nodes that may be relevant for us

16   for this, at least the ones that are in this

17   current view.

18           Q.   Does the list contain only nodes

19   that are in the field of view?

20           A.   That's correct.

21           Q.   And what happens after traversing

22   the metadata tree?

23           A.   Yeah.  So I'm going to mention

24   this before you start it.  So keep your eye on

1      that list.  So this list is in a particular

2      order.  And it's what we call traversal order.

3      Just happens to be the order that we've gone

4      through and visited them.  It's not the order

5      that we actually care about.  Some of these

6      nodes are more important than other nodes, so

7      what we're going to do is we're going to shuffle

8      them around and re-prioritize them.  Get the

9      next animation.  Okay.

10              Q.  Mr. Birch, why are some nodes more

11     important than other nodes?

12              A.  That's a great question.  So the

13     reality is that what we really want to do is we

14     have a task to do here, right, which is we're

15     trying to make an image for the users.  And what

16     we want to do is we want to get to that answer

17     as quickly as possible.  And what we want to do

18     is, you know, there's this notion of what is the

19     appropriate resolution, right, because this tree

20     could potentially extend much further down, but

21     we don't want all that data because it's not

22     really relevant.  There's an appropriate

23     resolution for the given view, and so what we're

24     going to want to do is we want to get those

1        nodes first.  So in this illustration you'll see

2        that the D level represent nodes that are at the

3        resolution that we care about or the appropriate

4        resolution for this particular view.  And what

5        we do is we put those at the front of the list,

6        because those are most important and then we

7        start to add in some of these other lower ones

8        and kind of put them back towards the end of the

9        list.

10                Q.   And what happens after the list

11       has been prioritized?

12                A.   So then what we do, we finished

13       this whole traversal process, so we're done with

14       that.  And we have our list.  So now what we

15       have to do is we have to start fetching some of

16       this data or requesting this data.  So go ahead

17       and get the next animation.  And what we're

18       going to do is we do that by requesting over the

19       network.  And I should describe a little bit of

20       how we do this.

21                So the traversing time here is

22       really, really fast, like less than a blink of

23       an eye.  It's in milliseconds.  The retrieving

24       of this data takes a long time.  It might even

```
 1        take several seconds.  And in drawing of a
 2        frame, that's a really long time, right, because
 3        we have to go out and go onto the network and
 4        there's a network request and it has to go to
 5        the data center and all this stuff that happened
 6        and maybe you're on a slow cell network, so that
 7        can take a really long time relative to this
 8        other process.  So what we do is we have a bunch
 9        of what we call workers, which are little
10        computers tasks that can go off and fetch data.
11        So it's kind of like if you have your shopping
12        list and you have a bunch of friends or so and
13        you give each of them one item and say hey, go
14        get butter and go get me some milk and whatever
15        else, right, and each one of those people or
16        those workers now go off and go fetch this data.
17        And there's only so many of those, but they can
18        be done in parallel with everything else.  So
19        that's important thing to keep in mind.  It
20        takes a long time, so we're going to get that
21        going.  And now that happens, that just keeps
22        going while we continue with other things.  So
23        in this illustration here we've gone in and we
24        fetched, you know, we have I think it looks like
```

```
 1        about nine different workers in this case.
 2        We've gone and fetched or requested those
 3        different nodes.
 4             Q.   I'm sorry.  I'll let you finish.
 5             A.   Okay.  Great.  And so then the
 6        next thing that will happen is let's go ahead
 7        and hit the next animation.  So you notice that
 8        B1 came back, right?  Now, we didn't request B1
 9        first.  How could that have happened?  And
10        again, because these tasks are all done in
11        parallel, we don't really have control of what
12        order they might come back in.  So B1 might not
13        always come back first, but there's a question
14        of traffic, right, how much network traffic is
15        there, you know, some tasks may take longer than
16        others.  So there's not necessarily a lot of
17        control about what order they may or may not
18        come back in.  So in this case B1 comes back and
19        so we go ahead and take that and we draw that
20        and it's a little hard to see in this animation,
21        but the left-hand side of that screen is now a
22        little bit sharper than on the right, because
23        we've gotten some higher resolution data, but
24        only for half of the screen.
```

```
 1                So what's going to happen next,

 2      this is going to be a little confusing, so I'll

 3      walk through it ahead of time, is that now a

 4      bunch of of these other ones are going to start

 5      coming back.  When they come back we can

 6      actually start requesting more because those

 7      workers are now available like okay, here's your

 8      data, great, I have something else for you to go

 9      get.  Get me this other piece of data.  So go

10      ahead and hit the next animation.  And what

11      you'll see is now we're requested some more

12      nodes and more nodes are starting to come back

13      and at the end now what we have is we've gotten

14      all of these D level nodes have returned back,

15      right?  And if you look at the image on the

16      right, that is now the final image, right,

17      because that's the resolution that's appropriate

18      for this particular view.  So now we're done.

19      And we actually have all of the data that we

20      need in order to create that image.

21                Q.   Mr. Birch, in the approach that's

22      used by the accused Google Earth products, are

23      all of the nodes traversed before the first

24      images of the nodes are requested?
```

```
 1              A.   That's correct, so we actually do
 2      the complete traversal first, and then we start
 3      to do requests.
 4              Q.   And in the approach used by the
 5      Google Earth products, are all of the traversed
 6      nodes requested before drawing the final scene?
 7              A.   Are all the traversed nodes
 8      requested?  No.  In fact, as you can see in this
 9      example, we haven't requested all of the nodes
10      on this list, we've only requested a portion of
11      them.
12              Q.   And Mr. Birch, in the approach
13      that's used by the accused Google Earth
14      products, are all of the traversed nodes fetched
15      before drawing the final scene?
16              A.   Again, not necessarily.  And in
17      fact, in this case, we haven't fetched all of
18      the nodes.  We've only actually fetched a
19      portion of those nodes.
20              Q.   Why does Google Earth not request
21      the image for each node that is traversed?
22              A.   So as I mentioned earlier, what
23      we're really trying to do is what's important is
24      getting the final image to the user as quickly
```

1     as possible, right?  And we want it to feel

2     fast.  And so we don't want to mess around doing

3     things that don't help us achieve that goal.

4     And so to do that we're going to prioritize, you

5     know, by re-prioritizing the nodes we get to

6     that answer sooner.

7                 Q.   In the approach that's used by the

8     accused Google Earth products, can some child

9     nodes be requested before the parent node is

10    requested?

11                A.   Yes, they can.

12                Q.   And in the approach used by the

13    accused Google Earth products, can some child

14    nodes be displayed before it's parent is

15    requested?

16                A.   Yes, absolutely.  You can base --

17    again, because of this process where we're

18    potentially or we're fetching the child nodes

19    ahead of other nodes, then they can potentially

20    be displayed before they are fetched -- before

21    the parent would be fetched.

22                Q.   And in the approach used by the

23    accused Google Earth products, are all of the

24    requested nodes, do they have to be returned

```
1    before drawing the final scene?
2              A.   No, they do not.
3              Q.   So are all of the requested nodes
4    drawn in the final scene?
5              A.   No.  They are not.  And one of the
6    ways to think about that is if we have all of
7    the children nodes for the view, there's no
8    reason to draw the parent, because the parent is
9    blurrier, right?  So we don't want to create a
10   blurry image for people because that's not as
11   nice as a sharp image.  And if we've already
12   gotten back these higher resolution children,
13   then we're just going to go ahead and draw those
14   and we don't even bother drawing the courser
15   parent.
16             Q.   Is the approach that you described
17   used in all versions of the accused Google Earth
18   products?
19             A.   Yes, it is.
20             Q.   And have all versions of Google
21   Earth used this approach since it was released
22   in 2005?
23             A.   Yes, they have.
24                  And actually, I would just like to
```

```
 1        make one more point on this before we move to.

 2        I talk about this idea of the importance of

 3        getting to an image as quick as possible.  You

 4        know, that's really important to us.  And we

 5        actually have a metric we use, we call it scene

 6        resolution time.  It's something that we measure

 7        and keep track of and monitor over time because

 8        we want to be fast, and we want to get an image

 9        as quickly as possible.

10              And there is many different ways

11        that we might do this, but the reason we do it

12        this way is because this notion of scene

13        resolution time or getting to the final image as

14        quickly as possible is so important to us.

15              Q.  Mr. Birch, are there tradeoffs to

16        using this approach?

17              A.  There are.  So the benefits you

18        have are you can get to this final image sooner.

19        One of the tradeoffs is that you are loading

20        potentially high resolution data ahead of lower

21        resolution data and there can be some

22        discontinuities in the data, you can have some

23        low resolution, for example we saw half of the

24        screen sharp and the other half blurry.  It's
```

```
 1    visually pleasant to have the whole imaging from

 2    blurry to fine, but that's also slow.  So we

 3    kind of made a choice how we implemented it,

 4    it's more important for us to get to the final

 5    image sooner rather than creating this kind of

 6    smooth blurry or coarse to fine transition

 7    across the whole image.

 8              Q.   Mr. Birch, I'm going to have to

 9    switch gears a little bit and talk about

10    financial information related to Google Earth.

11              A.   Okay.

12              Q.   Are you familiar with the finances

13    and financial records related to Google Earth?

14              A.   Yes, I am.

15              Q.   And how did you become familiar

16    with those records?

17              A.   Well, as product manager for

18    Google Earth that was my responsibility.  I was

19    responsible for all the aspects of the Google

20    Earth product family.

21              Q.   What fees did Google charge in the

22    past for Google Earth?

23              A.   So in the past we have had a few

24    different licensing fees for Google Earth.  So
```

```
 1      one would be we mentioned Google Earth Pro as

 2      one product.  So that was one way we would, you

 3      know, charge for the product.  We have another

 4      product called Google Earth Plus which was

 5      available for a short period of time which is

 6      much less expensive version and we also had

 7      Google Earth Enterprise which was part of a

 8      package of different products and services we

 9      sold.

10           Q.   Does Google currently collect any

11      revenue related to Google Earth?

12           A.   Currently we don't.  I think there

13      may be some residual revenue from some older

14      deals that we have done, but we aren't selling

15      any of the products today.

16           Q.   When you first joined Google, what

17      was the plan for making money from Google Earth?

18           A.   Well, I think when we first joined

19      the plan was -- you know, it's kind of

20      interesting, actually, because my first question

21      to my boss, who is John Hanke who you saw on

22      video testimony earlier, my first question when

23      I joined was, you know, who owns the business

24      model and the P&L in this product because I was
```

```
 1    interested in understanding that.  His answer

 2    was well, just go get users, really focus on

 3    getting users.

 4              I think there was really a lot of

 5    drive towards making happy users and delighting

 6    them.  We obviously had the Enterprise revenue

 7    plan and that was something that we already had

 8    some history with.  And we also had some plans

 9    for doing advertising revenue in the product.

10         Q.   Does Google currently include ads

11    in any of the accused Google Earth products?

12         A.   No, we do not.

13         Q.   How successful was the effort to

14    monetize Google Earth by using ads?

15         A.   It was not successful.

16         Q.   Was that related to the decision

17    not to include ads?

18         A.   Yeah, exactly.  I mean, the amount

19    of revenue that we got from putting ads in the

20    product just really didn't justify the effort,

21    and, you know, there is always issues around

22    user experience.  If you're going to show ads in

23    the product, you want to make sure it didn't

24    detract from the experience.  The revenue didn't
```

```
 1      justify doing that so they were just pulled out.
 2             Q.   Why wasn't Google successful in
 3      monetizing Earth through advertising?
 4             A.   Well, it's important to think
 5      about, you know, there is this idea that you get
 6      users and with a lot of users you can generate
 7      revenues through ads.  That's what we did with
 8      Google Search.  The problem is that Google Earth
 9      users are not the same as Google Search users.
10      You may go to Google Search because you're
11      interesting in buying a television.  Maybe
12      you're trying to plan a wedding.  There are all
13      sorts of thing that we learn about a user's
14      intent and it's a really great place to show
15      ads.
16             People in Google Earth you don't
17      go to Google Earth to buy a new TV.  You go
18      there to kind of browse around the world and
19      explore, even though we have a tremendous amount
20      of usage, and these incredibly long session
21      lengths, the number of minutes people spend on
22      the product was just massive, but nobody clicks
23      on ads in Earth because they're really not
24      relevant.  And the user doesn't have some intent
```

```
 1        where they're looking for something, it's just a

 2        browse experience.

 3                 Q.   Is one of the metrics that Google

 4        tracks session time?

 5                 A.   Yes, it is.

 6                 Q.   What does the session time reflect

 7        about users of Google Earth?

 8                 A.   Yes.  So the session time is how

 9        long does a particular session last.  You know,

10        if you start using Earth and use it for a minute

11        or do you use it for five minutes or do you use

12        it for an hour.  And the numbers that we had,

13        for example, the desktop products were close to

14        twenty minutes, the mobile products were around

15        seven minutes.  It really shows a level of, you

16        know, engagement with the product, because

17        people would stay in the product for quite a

18        long time.

19                 Q.   How does that relate to Google's

20        ability to monetize Google Earth through ads?

21                 A.   As I mentioned earlier, you know,

22        we had a lot of user time in this product.  But

23        the problem was it wasn't a situation where

24        people really had an intent to do something or
```

1      to buy a product or do some other thing where an

2      ad was really going to be an effective thing to

3      show the users.

4              Q.   During the time that Google Earth

5      included ads, did Google keep track of how much

6      it charged for those ads?

7              A.   Yes, we did.

8              Q.   What does the amount that Google

9      was able to charge for ads in Google Earth

10     reflect about Google Earth users?

11             A.   Again, the amount of money we got

12     from Google Earth users was very low relative to

13     other products.

14                 And one way to think of this is

15     that anyone can go and create a web page and put

16     Google ads on it, but not all web pages are

17     created equal.  If you have a web page about

18     selling shoes, then maybe you're going to be

19     able to sell ads related to shoes on that page.

20     If you have one about your pet cat, probably not

21     a great opportunity.  So those have different

22     monetization opportunities.

23                 There is an notion called RPM

24     which is how much money per thousand

```
 1        impressions.  I think you heard that earlier.
 2        The RPM numbers in Earth were really low, and
 3        you know, probably twenty times or more less
 4        than on the property like Google.com.
 5                 Q.   In what group is Google Earth now?
 6                 A.   So Google Earth -- so what
 7        happened was, you know, in addition to turning
 8        off advertising and stop selling the product,
 9        there really wasn't any active development on
10        Google Earth.  More recently we decided to move
11        it into a group called Geo For Good, which is
12        our philanthropic arm of Geo.  There is a lot of
13        good things that that group does and Earth meet
14        the needs of having a positive impact on the
15        world and now it's part of that organization.
16                 Q.   What does Geo For Good do?
17                 A.   Geo For Good is really an
18        organization, as I mentioned, to help do good in
19        the world.  We have initiatives.  Something
20        called Global Fishing Watch, for example, which
21        is a project we did in collaboration with some
22        nonprofits to monitor fishing activity and to
23        look for illegal fishing so that we could really
24        start to address when there was illegal
```

```
 1    depletion of fishing stocks because that's a big

 2    global problem that we all have.

 3                   There is an outreach team that

 4    works on working with nonprofits and other

 5    organizations.  And then there is my current

 6    product which is Google Earth Engine which is a

 7    tool for scientists and researchers to monitor

 8    things like deforestation, drought, public

 9    health and other really big important issues.

10         Q.   Historically how did Google obtain

11    revenue from Google Earth?

12         A.   Historically there were these two

13    different methods.  There was licensing revenue

14    and advertising revenue.

15         Q.   Let's take them one at a time.

16    How did Google keep track of its licensing

17    revenue from Google Earth?

18         A.   So licensing revenue was kept,

19    recorded in a system called Hyperion, which is

20    our finance system.

21         Q.   Mr. Ang, could you please put up

22    on the screen Defendant's Exhibit 1114.  This is

23    very, very tiny type on it, so we're going to

24    try to below it up.
```

1              What is Defendant's Exhibit 1114?

2              A.   So this is an output from this

3     Hyperion system that I mentioned earlier.

4              Q.   Let's talk, make sure we

5     understand what some of these columns are.   The

6     first two have pretty recognizable name, year

7     and month.   The next two say D08 Earth on

8     Premise and D08 Keyhole?

9              A.   That's correct.

10             Q.   What does D08 refer to?

11             A.   This is just an internal code that

12    the finance team uses to represent Earth

13    licensing revenue.

14             Q.   What is the difference between

15    these two columns?

16             A.   It's really just a renaming, for

17    whatever reasons the finance team changed it

18    from Keyhole to Earth on premise at some point,

19    there is no overlap between them, it's just a

20    renaming.

21             Q.   The first row, 2005, month of 7.

22    That's July.   Why does this start in July of

23    2007?

24             A.   That's the first time that we

```
 1    received or booked revenue for the Earth, you

 2    know, the first time we got Earth licensing

 3    revenue.

 4           Q.  If we could move over to the right

 5    on the document and look at the remaining

 6    columns, there is three of them there.  They all

 7    start with the code D53, and they all have the

 8    same Earth Builder, Googling Maps Engine and 14B

 9    Maps Engine.  What do those columns refer to?

10           A.  All of those columns refer to a

11    different product that we called Maps Engine.

12           Q.  What is the code D53?

13           A.  So, again, D53 is really just an

14    internal finance team code that references this

15    Maps Engine product.

16           Q.  Do any of those columns relate to

17    Google Earth?

18           A.  No, they do not, they relate to

19    this Maps Engine product.

20           Q.  Mr. Birch, have you created a

21    summary of Google's licensing revenue from

22    Google Earth?

23           A.  Yes, I have.

24           Q.  Is this a copy, is this that
```

```
 1    summary?

 2              A.   Yes, this is a summary.

 3              Q.   What is the total amount of

 4    licensing revenue that Google has received from

 5    licensing Google Earth from July of 2005 through

 6    the end of 2014?

 7              A.   So, the amount total is

 8    $226,167,748.

 9              Q.   How did you create this summary?

10              A.   This summary is basically just a

11    spreadsheet of the data that we saw in the

12    earlier exhibit.  And I just summed up the total

13    numbers from each year, and in the right-hand

14    column and I totaled those at the bottom just so

15    it's easier to understand.

16              Q.   Let's talk about the second

17    category of revenue that you mentioned,

18    advertising.  How did Google obtain revenue from

19    advertising in Google Earth?

20              A.   So what we did we would show

21    different ads within the Earth product.  For

22    example, maybe if you did a search, or sometime

23    there are photos that will show up in the view,

24    you can click on that photo, you get a nice
```

934

1      photo of that location, we might show an ad

2      alongside that photo.

3            Q.   How did Google keep track of the

4      revenue in Google Earth?

5            A.   We kept track of that in system

6      called AdsNav.

7            Q.   Can you put up Exhibit 1011.  This

8      is really, really tiny type.  So maybe we can

9      blow up the top left-hand corner.

10            What is this exhibit, Mr. Birch?

11            A.   So, this is an output from this

12      AdsNav system that I mentioned earlier.

13            Q.   This begins in April or month four

14      of 2007.  Why does it begin at that time?

15            A.   Because this is when we formally

16      launched ads in the Google Earth products.

17            Q.   And I know they're very small, so

18      maybe we can go through them.  You reviewed this

19      exhibit before today, haven't you, Mr. Birch?

20            A.   Yes, I have.

21            Q.   What do the different columns

22      represent?

23            A.   So the different columns represent

24      different type of ad placement, so for each

935

```
1        placement you give it a different code or name

2        so you can track the performance of each.

3                    So these different columns, you

4        see one here, Google Earth Panaramio.  Panaramio

5        are these users photos that I mentioned earlier.

6        We have partner Google Earth Geo codes.  A Geo

7        code is if you search for a place, maybe a city

8        name or a park name, that would be when we

9        showed an ad with those kind of results.  There

10       is also some related to what we call local

11       search or for showing business information.

12                   Q.   Is each of the columns in this

13       exhibit, Defendant's 1011 related to advertising

14       at Google Earth?

15                   A.   Yes.

16                   Q.   Are these all of the different

17       categories of advertising in Google Earth?

18                   A.   Yes, these are all the Google

19       Earth advertising.

20                   Q.   Mr. Birch, have you created a

21       summary of the revenue that Google has received

22       from ads in Google Earth?

23                   A.   Yes, I have.

24                   Q.   Is this that summary?
```

936

1          A.   Yes, it is.

2          Q.   How did you create this?

3          A.   Unfortunately the right-hand side

4     is getting a little cut off, but I'll help to

5     describe this.  Again, I took that same

6     spreadsheet of the data or that output of the

7     AdsNav and put it in a spreadsheet and those

8     rows are added up for each year.  At the very

9     bottom, you can't quite see it, but the bottom

10    number there is about $5.6 million.

11         Q.   Is that a little more than $5.6

12    million the total amount of revenue that Google

13    got from advertising in Google Earth from the

14    beginning in April 2007 through the end of 2014?

15         A.   Yes, it is.  For the United

16    States.

17         Q.   Is this the total amount of

18    advertising revenue that Google has gotten from

19    Google Earth?

20         A.   Yes.

21         Q.   Now, we heard some testimony

22    earlier about something called a prep cookie.

23    Do you recall that?

24         A.   I do.

```
 1              Q.   What is a prep cookie?

 2              A.   So, maybe I should start with what

 3       is a cookie.  And unfortunately it's not one

 4       that you can eat.  A browser, a web browser has

 5       a notion of putting a little file in your

 6       computer and that little file will persist so

 7       it's used to keep track of user activity over

 8       time.  So if you return to a web page, you can

 9       learn something, keep information about a user.

10              The prep cookie is a cookie that

11       Google uses to keep track of Google users so

12       that we know when they return to a site or which

13       Google properties they may visit.

14              Q.   Can you bring up Plaintiff's

15       Exhibit 40.  Maybe you can blow up the top part,

16       the title, so it's a little bit easier to see.

17       This was used as an exhibit earlier in the

18       trial, Mr. Birch.

19              What is this exhibit?

20              A.   So this exhibit is a proposal from

21       an engineer on the Earth team or related to the

22       Earth team named Olivia Bailey.  And what this

23       is is a proposal for the use of, basically

24       allowing Google Earth to write to this prep
```

```
 1      cookie so that we would know about users of

 2      Google Earth in other products.

 3                Q.   Was this proposal ever

 4      implemented?

 5                A.   No, it was not.

 6                Q.   Mr. Birch, one last topic.  Are

 7      you familiar with the concept of derived or

 8      imputed revenues?

 9                A.   Yes, I am.

10                Q.   What does derived imputed revenues

11      mean?

12                A.   So an imputed revenue is basically

13      revenue received for -- usually for your own

14      services that you might have purchased outside

15      elsewhere, but you're using internally.  So it's

16      really just an accounting term for sort of this

17      additional revenue.  In the context of the Geo

18      organization it meant revenues that might come

19      into Google, but not directly to the Geo

20      organization.

21                Q.   Has Google ever identify any

22      categories of derived or imputed revenues

23      associated with Google Earth?

24                A.   Yes.
```

```
 1              Q.   Which ones?

 2              A.   There is one.  And what this is,

 3    it's called a client referral fee.  So it's

 4    basically if someone installs Google Earth on

 5    your desktop, you'll notice that you are

 6    basically downloading a program.  At that time

 7    we offer another Google product called Google

 8    Chrome.  And if the user chooses to install

 9    that, they might get both Google Earth and

10    Google Chrome.

11              This referral fee is an imaginary

12    payment from the Chrome team to pay for the

13    installation of Chrome, because they're

14    basically paying for more users and so this sort

15    of additional payment is to the Geo group for

16    doing that.

17              Q.   Does Google receive, actually

18    receive any revenue from this referral fee?

19              A.   No, we do not.

20              Q.   So how does it benefit the Geo

21    group or Google?

22              A.   So the way it benefits the Geo

23    group is it's a way of showing value that the

24    Geo group and the Geo products, specifically in
```

940

```
 1      this case, Google Earth.

 2              Q.   Did Google ever identify any other

 3      categories of derived or imputed revenue

 4      connected to Google Earth?

 5              A.   No, with the exception of I

 6      mentioned Chrome, there was also a product

 7      called Toolbar where it was a simple idea where

 8      it would be an installation for a product.

 9      Those two products were the only imputed revenue

10      related to Google Earth.

11                   MR. SNYDER:  Pass the witness.

12                       CROSS-EXAMINATION.

13      BY MS. ALFARO:

14              Q.   Good morning, Mr. Birch.

15              A.   Good afternoon.

16              Q.   You went through some slide

17      animations with your counsel this morning to

18      explain how Google Earth works; is that correct?

19              A.   That is correct.

20              Q.   And you referred to them as

21      metadata trees, I believe?

22              A.   A metadata tree, that was part of

23      the demonstration, yes.

24              Q.   You never used these particular
```

941

```
1    animations to explain Google Earth to others at

2    Google, have you?

3              A.   No, I have not.

4              Q.   You have never used them with

5    Google business partners?

6              A.   No, I have not.

7              Q.   Or with Google customers?

8              A.   No, I have not.

9              Q.   In fact, nobody at Google has ever

10   used those particular animations for that

11   purpose?

12             A.   That's correct, these animations

13   were made for this specific presentation.

14             Q.   They were made for this trial,

15   that's right?

16             A.   That's correct.

17             Q.   And these animations are not

18   Google documents, are they?

19             A.   I mean, I helped make them.   I

20   don't know why that wouldn't be considered a

21   Google document.

22             Q.   There are plenty of Google

23   documents that were in this case that describe

24   how Google Earth operates; is that right?
```

```
 1              A.   Yes.

 2              Q.   For instance, the source code?

 3              A.   That's correct.

 4              Q.   Mr. Birch, you joined Google in

 5     May of 2006; is that right?

 6              A.   That's correct.

 7              Q.   And you testified that Google

 8     Earth was released in 2005?

 9              A.   That's correct.

10              Q.   Which is before you joined the

11     company?

12              A.   Yes.

13              Q.   You would agree with me that the

14     operation of Google Earth is described in the

15     Google Earth source code; right?

16              A.   The source code is the

17     implementation.  I wouldn't say it describes it.

18     It's basically the embodiment of it.

19              Q.   If someone wanted to know how

20     Google Earth works, the source code would

21     probably be a good place to look; is that right?

22              A.   Obviously challenging, but it

23     would be the authoritative source.

24              Q.   You have been in the courtroom
```

```
 1        throughout this whole trial as Google's

 2        corporate rep?

 3                 A.   Yes, I was.

 4                 Q.   You were here when Dr. Castleman

 5        testified?

 6                 A.   Yes, I was.

 7                 Q.   You heard Dr. Castleman yesterday

 8        discuss the source code for Google Earth; right?

 9                 A.   Yes I did.

10                 Q.   And you didn't write any of the

11        source code for Google Earth, did you?

12                 A.   No, I didn't.  I've already

13        checked in a couple configure files, but I

14        didn't write any of the source code.

15                 Q.   And Google did not designate you

16        as an expert in this case, did they?

17                 A.   No.

18                 Q.   You didn't submit an expert

19        report?

20                 A.   No, I did not.

21                 Q.   And you're not an expert witness?

22                 A.   That is correct.

23                 Q.   Mr. Birch, Google tracks an

24        activation metric for Google Earth, correct?
```

```
1              A.   That is correct.

2              Q.   And they track a daily upgrade

3    metric?

4              A.   Yes.

5              Q.   And a daily session metric?

6              A.   Yes.

7              Q.   And tracks session length?

8              A.   Yes.

9              Q.   For Google Earth.  And I believe

10   you mentioned earlier in your testimony that the

11   session length is incredibly long for most of

12   these?

13             A.   Yes, it's a long number relative

14   to other products.

15             Q.   Right.  And you'd agree with me

16   that Google is interested in how often Google

17   Earth is used; is that right?

18             A.   Yes, that's correct.

19             Q.   And you'd also agree that Google

20   is interested in how many people use Google

21   Earth, right?

22             A.   Yes.

23             Q.   And Google uses all of these

24   metrics that we've talked about as a measure of
```

```
 1       Google Earth's success; is that right?

 2              A.   You could say that, yes, by people

 3       using our product, that is success to us.

 4              Q.   And as early as 2006, you already

 5       considered Google Earth to be a successful

 6       product; is that right?

 7              A.   That's correct.

 8              Q.   Mr. Birch, you'd agree with me

 9       that there is overall value in people liking

10       Google as a company; is that right?

11              A.   Yes.

12              Q.   And that's the case even for

13       products that don't have immediate revenue

14       goals; is that right?

15              A.   Yeah, every product wants to make

16       products that delight users and make people

17       think good about Google.

18              MS. ALFARO:  No further questions.

19       BY MR. SNYDER:

20              Q.    Mr. Birch, why aren't you the

21       author of any of the Google Earth source code?

22              A.   Well, I'm an engineer, but I'm

23       also -- we have some of the brightest engineers

24       in the industry and they are the people whose
```

1    job it is to really write the code.

2              Q.   Are you familiar with the Google

3    Earth source code?

4              A.   Oh, absolutely.

5              Q.   Is the illustration that you gave

6    to the jury of how Google Earth works consistent

7    with the source code for the products?

8              A.   Absolutely.

9              Q.   And why did you help prepare that

10   presentation?

11             A.   Well, I think all the stuff is

12   pretty complicated.  And I think my main goal is

13   to really is how can I distill down the essence

14   of how this product works in a way that is easy

15   to understand.  I mean obviously it's a

16   simplification and there's a lot of other detail

17   and I mean the source code for this product is

18   probably hundreds, if not thousands of files and

19   thousands, tens of thousands of lines of code.

20   Right?  It would be a huge volume to try to go

21   through that.  No one can go through all that,

22   so my real goal is how to distill that down into

23   something that's easy to understand.

24             Q.   And is your illustration

```
 1    consistent with the way that the Google Earth

 2    products actually operate?

 3              A.   Yes, it is.

 4                   MR. SNYDER:  No more question.

 5                   MS. ALFARO:  No more questions,

 6    Your Honor.

 7                   THE COURT:  Okay.  Thank you.  So

 8    now let's see if the jury has any questions,

 9    please.

10                   THE COURT:  The jury has two

11    questions, so if counsel could approach the

12    bench for me.

13                   (Side bar discussion.)

14                   THE COURT:  One question is when

15    did you or your team come up with the metadata

16    tree system to show it the way you currently do?

17    And the other question is what years did Mr.

18    Birch work at SGI and in Microsoft.  Any

19    objection to that?

20                   MR. SNYDER:  No objections.

21                   MR. PARTRIDGE:  No objections,

22    Your Honor.

23                   THE COURT:  Okay.

24                   (End side bar discussion.)
```

```
 1              THE COURT:  Mr. Birch, have a

 2      little bit of unusual procedure here in that we

 3      let the jury ask questions and the jury has a

 4      couple of questions.  The first is when did you

 5      or your team come up with the metadata tree

 6      system to show data the way you currently do?

 7              THE WITNESS:  Sure.  So the idea

 8      of the metadata tree really existed even prior

 9      to the acquisition.  So this is something that

10      was part of the Keyhole EarthViewer was the name

11      of it, product.  In fact, the idea of a metadata

12      tree to store information like this is a very

13      old idea in programming and computer graphics,

14      so that the idea existed from the very beginning

15      of Google Earth and prior.

16              THE COURT:  Okay.  And two other

17      questions.  What years did you work at SGI?

18              THE WITNESS:  So I was at SGI from

19      19 89 to 1999, so also 10 years.

20              THE COURT:  And when did you work

21      at Microsoft?

22              THE WITNESS:  I was at Microsoft

23      from 2002 or 3 until 2006.

24              THE COURT:  Okay.  Thank you.  And
```

949

```
1     Mr. Birch is excused at that point.  Is he

2     subject to recall?

3                    MR. HAWES:  No, Your Honor, he's

4     not.

5                    THE COURT:  No.  Okay.  Thank you,

6     Mr. Birch.

7                    MR. SNYDER:  Your Honor,

8     Defendants move into evidence Defendant's

9     exhibit 1114.

10                   MS. ALFARO:  No objection, Your

11    Honor.

12                   THE COURT:  That's admitted.

13                   MR. SNYDER:  Your Honor, Defendant

14    Google calls as it's next witness, Mr. Michael

15    Jones.  He was the CTO and chief technologist

16    for Google Earth at Google.  He's going to

17    testify about the history and development of

18    Google Earth and he's also going to testify

19    about his interactions with ACI.  And his

20    examination will be presented by Ms. Simmons.

21                        MICHAEL T. JONES,

22            the deponent herein, having first

23            been duly sworn on oath, was

24            examined and testified as follows:
```

1    BY MS. SIMMONS:

2              Q.   Good afternoon, Mr. Jones.

3              A.   Good afternoon.

4              Q.   Again, you know who I am and I

5    think I've already introduced myself, but I'm

6    Luann Simmons and I'm with the Google team.  Mr.

7    Jones, what do you currently do for a living?

8              A.   I'm the Chief Executive Officer of

9    Wearality Corporation.

10             Q.   What does Wearality Corporation

11   do?

12             A.   It's a spinoff from Lockheed

13   Martin, we make the world's most advanced lenses

14   for virtual reality and augmented reality.

15             Q.   What would lenses like that be

16   used for?

17             A.   They're used to make headsets that

18   sort of cleverly fill your entire vision with

19   computer-generated pictures, so that wherever

20   you look, everything you can see is real.  It

21   helps people understand to do surgeries and

22   flight simulation and games, but also to

23   understand the world around them.

24             Q.   How long have you been with

```
 1      Wearality?

 2              A.   A little over a year, about a year

 3      and a month.

 4              Q.   Where did you work before

 5      Wearality?

 6              A.   I worked at Google.

 7              Q.   What did you do at Google?

 8              A.   I was the Chief Technology

 9      Advocate of Google.

10              Q.   What does that mean?

11              A.   Well, I worked for Eric Schmidt.

12      I was basically the technical ambassador of

13      Google.  I was the person that went around the

14      world to explain to heads of state or

15      legislators how Google worked, how technologies

16      at Google worked and worked with them to find

17      ways to solve problems.

18              Q.   What other roles did you have at

19      Google during your time there?

20              A.   Well, I was the Chief Technologist

21      or CTO basically of the Google Earth Maps and

22      Local Search efforts.

23              Q.   When did you first join Google?

24              A.   2004.
```

1          Q.    Under what circumstances?

2          A.    A merger, an acquisition.

3          Q.    Acquisition of what?

4          A.    Oh, a company called Keyhole.

5          Q.    What was Keyhole?

6          A.    Keyhole was a service company, it

7    provided both software and services to let

8    people fly around the earth and explore it

9    fluidly.

10          Q.    Did Keyhole make any products?

11          A.    Yes.  We had several products.

12    One was called the Keyhole EarthViewer.  It's a

13    program you run on a PC.  And we had a Keyhole

14    server, which was the server that sent the

15    pictures to the EarthViewer.  And there was a

16    third product called Keyhole Fusion that

17    essentially kind of processed the picture so the

18    server could distribute them to the clients.

19          Q.    So the EarthViewer was the client

20    product.  What happened to Keyhole's EarthViewer

21    after the acquisition?

22          A.    Oh, it was refined a little bit

23    and then shipped as Google Earth.

24          Q.    And we're going to talk more about

```
 1        Keyhole and Google Earth.  But first, Mr. Jones
 2        are you being compensated by Google or anyone
 3        associated with Google for your testimony here
 4        today?
 5                 A.   No.
 6                 Q.   And since you left Google last
 7        year in 2015.  Have you worked for Google as a
 8        consultant or a contractor or otherwise received
 9        any salary from Google?
10                 A.   No.
11                 Q.   Do you currently own any stock in
12        Google?
13                 A.   No.
14                 Q.   So why are you here testifying
15        today?
16                 A.   Well, this is a -- basically I
17        feel like Google Earth is my baby and I want to
18        make sure the truth about everything about this
19        case comes out.
20                 Q.   What do you mean by that?
21                 A.   Well, I've been in this field for
22        35 years and I don't like the idea of redefining
23        the start of it as 10 or 15 years ago.  That
24        concerns me greatly.
```

1          Q.   Let's talk about your background a

2     little bit more.  How long have you been

3     working -- 35 years, is that right?  How long

4     have you been working with earth visualization?

5          A.   I started in 1981 with a company

6     called Geo Based Systems building software to

7     render the earth and buildings on it so people

8     could make movies and explore things, see

9     construction projects before they were finished

10    and present that to planning commissions and

11    board of directors and things, so that was 1981.

12         Q.   And you said that was Geo-based

13    Systems?

14         A.   Geo-based Systems, yes.

15         Q.   What did you do after working with

16    Geo-based Systems?

17         A.   Well, I went to a company called

18    Star Technologies, Graphicon, it's a division of

19    -- a spinoff from General Electric.  It was a

20    flight simulation company.

21         Q.   Does flight simulation have

22    anything to do with earth visualization?

23         A.   Certainly does.  That's why they

24    hired me.

```
 1              Q.   How so?

 2              A.   Well, when you -- if you learn to

 3     fly an airplane, part of it is taking off and

 4     part of it is landing, but the bulk of the time

 5     is between one airport and the next airport

 6     flying over the earth, so you look out the

 7     window of the simulator and you see rivers and

 8     streams and mountains and things, so that's --

 9     being able to constantly stream that to pilots

10     so it looks real is a fundamental requirement of

11     flight simulation.

12              Q.   What did you do after your work

13     with Star Technologies?

14              A.   Well, I was recruited by a company

15     called Silicon Graphics to come help them build

16     flight simulators that are their hardware.

17              Q.   And Silicon Graphics is sometimes

18     also referred to, I thing we've heard testimony

19     about it as SGI; is that right?

20              A.   That's right, SGI.

21              Q.   And so what did you specifically

22     do at SGI?

23              A.   Well, I was an engineer on a

24     product called Performer that was basically take
```

956

```
1    the standard workstation and make it a flight

2    simulator.  Then I became the manager of that

3    team, then I became the engineering director of

4    all the advanced graphic software at SGI,

5    everything else that was advanced graphic

6    software.

7              Q.  Are you the named inventor on any

8    patents related to your work at SGI?

9              A.  Yes, approximately 11 patents.

10             Q.  Any of those stand out?

11             A.  Well, there's one that's called

12   ClipMapping that I think is relevant to this and

13   I'm most proud of.

14             Q.  Tell us about ClipMapping.  What

15   is that?

16             A.  Well, ClipMapping was a real

17   breakthrough in the way that computers could

18   represent imagery for flying over the earth so

19   that it was exactly perfect when you looked at

20   it in a simulator, every pixel was just perfect.

21   And before that it was very hard.  ClipMapping

22   made it perfect.  So that was a lot of work.

23   And it pretty much transformed the whole

24   industry of terrain visualization and flight
```

1    simulation and all kinds of military simulations

2    as well as allied industries of mission

3    rehearsal, mission training, sort of government

4    type work, military work.

5           Q.   When did you come up with the idea

6    for ClipMapping?

7           A.   Late 1993, early 1994.  Took a

8    long time.  It was a hardware, so it took a long

9    time to get it perfected.

10          Q.   When you were at SGI, were you

11   aware of any other systems that existed so this

12   is in the time frame of the 1990's, any other

13   systems that existed for earth visualization?

14          A.   Certainly.  It was my job to know.

15          Q.   What do you mean by that?

16          A.   Well, as an engineering manager

17   and director, I was responsible not just

18   internally for making the products, but working

19   with customers to understand what didn't work or

20   maybe what should work better, what their goals

21   were and our customers, we had tens of thousands

22   of customers, but maybe the thousand I was

23   concerned about were the ones that built flight

24   simulators and systems for looking at the earth.

```
 1        So the marines used it, Boeing used it, the

 2        Coast Guard, the Navy, all these people as well

 3        as, you know, non military applications, but I

 4        worked with them to help solve those problems.

 5        So I knew about companies like, well, like

 6        Hughes Training, Boeing, Cambridge Research I

 7        knew really, really intimately.  Just many, many

 8        companies.

 9                Q.   What about research projects

10        during this time frame.  Were you aware of any

11        research projects in the 1990's relating to

12        earth visualization?

13                A.   Oh, yes, there were academic

14        projects as well.  And our company was the

15        center of computer graphics related, so

16        everybody used our products, so I knew about a

17        project at the Stanford Research Institute

18        called TerraVision.

19                Q.   And Stanford Research Institute,

20        is that sometimes referred to as SRI?

21                A.   Yes.

22                Q.   What did you know about SRI's

23        research project?

24                A.   Well, they had a system that --
```

```
 1      well, they had a big program called Magic that

 2      was going to show ways to use high speed

 3      networking, but they had a product called

 4      TerraVision that was a way of -- basically they

 5      had this idea of not using like a normal URL or

 6      web addresses for computers to say like ford.com

 7      and they wanted instead to have latitude and

 8      longitude markers, so that different companies

 9      or countries or NGO's could publish little

10      tiles, little squares of imagery and have people

11      fly through all of that.  And so it would be a

12      geographic world, basically a geographic web

13      that people could fly through.  And that system

14      was prototyped at a trade show that I went to,

15      15,000 person show called SIGGRAPH.

16              Q.   When was that?

17              A.   That was 1995.

18              Q.   Did the SRI system, to your

19      knowledge, where did that store the image data

20      for visualizing this earth image?

21              A.   Oh, it stored on it remote servers

22      that cities and governments would publish.

23              Q.   Were you aware of other earth

24      visualization systems in this time frame, the
```

1        '90s that stored image data on remote servers?

2              A.   Certainly.  Almost all of the

3        military ones did.  It's just -- flight

4        simulation, usually we build a simulator and the

5        data would be on disk drives in the computer,

6        but for military mission applications at sea

7        like that aircraft carrier pilot training, what

8        they call mission rehearsal like we're going to

9        fly from the carrier, we're going to go to this

10       place, Kosovo, going to do this interdiction,

11       the data came from the National Geo Spacial

12       Agency through it's called national technical

13       means, satellites and airplanes.  And they would

14       put that together at the NGA, the National Geo

15       Spacial Agency in D.C., but they have to get

16       that to the aircraft carrier, so they used

17       networking to get the data there and they flew

18       around data that was basically produced at the

19       NGA.

20             Q.   What about increasing the

21       resolution of the displayed image so that you

22       could get to finer and finer details, how was

23       that handled, to your knowledge, by systems in

24       the 1990's?

1          A.   I think it was handled in the '90s

2     the way it was handled in the '80s, '70s, ever

3     since.  Basically you have an area of regard,

4     like a big wall, a ceiling, you dice it in

5     little squares and then the squares have

6     subsquares and little tiny squares there inside

7     the big squares and basically what happens is as

8     you moved around, the next big squares are broad

9     and then closer, the next little squares are

10    broad.  This happens on a computer so it can

11    happen more finely then divided it in powers of

12    two instead of powers of a hundred.  That's

13    called a quadtree and data stream as you fly

14    around.

15          Q.   What about the user's experience

16    during this time frame.  How did users

17    experience this image data that was provided by

18    these earth visualization systems in that time?

19          A.   Well, it was just like you would

20    experience flying an airplane.  You fly to the

21    mountain and got sharper and sharper the closer

22    you got to it.  You look down 20,000 feet, you

23    see the sea you're going to land the airplane

24    in.  The closer you got to it, you zoomed in and

```
 1        finally you could see the runway and the stripes

 2        and runway edge illumination system, reels,

 3        everything that would be, you know, on a runway

 4        or in an aircraft carrier.  You'd see the

 5        meatball, which is the optical landing system.

 6        So it was just -- it's axiomatic, the flight

 7        simulation is just smoothly zooming in to see

 8        the world.

 9                Q.   When did you leave SGI?

10                A.   1999.

11                Q.   What did you do after leaving SGI?

12                A.   Well, I ambitiously started a

13        little company.

14                Q.   What was that company?

15                A.   It ended up being called Intrinsic

16        Graphics.

17                Q.   What did you work on at Intrinsic

18        Graphics?

19                A.   Our vision was to build software

20        for game, for Game Cube, xBox and PlayStation

21        II, but -- which we did, but we needed to get a

22        demo to get funding.  We got a contract with a

23        company called Cambridge Research that I worked

24        with at SGI.  And they wanted us to build a
```

1    personal computer version of some software that

2    did what their big computer software could do.

3    And we thought since we had built all this

4    software at SGI we would be the perfect people

5    to figure that out.

6         Q.   Did you create a demonstration?

7         A.   We did.

8         Q.   What was that called?

9         A.   It was called Earth after the

10   Earth application in Neil Stephenson's science

11   fiction novel.

12        Q.   Can you describe for the jury what

13   your Earth demonstration did?

14        A.   It kind of took over the screen

15   like a video game and let you use a joystick or

16   a mouse or whatever to fly an airplane.  You

17   pull back, zoom up, you could look around, but

18   you could inspect the data.  It wasn't just

19   flying, you could kind of stop like a UFO and

20   you could look down because an airplane would

21   crash.  A UFO you could stop, zoom in, zoom out,

22   move down, you could look around.

23             It didn't have any advanced

24   measuring tools, but it showed the complete

1    smooth imagery on a PC as opposed to a big

2    workstation because we used kind of a special PC

3    to do that.

4           Q.   You mentioned that you had some

5    colleagues working with you.  Where did you and

6    your colleagues work on this demonstration?

7           A.   That was, three friends of mine

8    and I, we built that in the dining room of my

9    house.

10          Q.   Why were you in the dining room of

11   your house?

12          A.   Because my garage was filled with

13   boxes, so we couldn't really do the garage type

14   startup because my garage was too messy.  But we

15   built that in my house.

16          Q.   And why personally were you

17   interested in working on this Earth

18   demonstration?

19          A.   Well, for me, I have been doing

20   this since 1981.  Right?  But it started when I

21   was a little boy.  I was adopted and I didn't

22   know where I was from.  And I got a present one

23   time for Christmas.  It was a globe.  And I

24   looked at that globe every night forever.  And I

1    imaged maybe I was from here, maybe I was from

2    there.  I studied the rivers, the borders,

3    country names, and I dreamed when I grew up, I

4    would be able -- I would go to those places when

5    I was big.  I could go to those places and I

6    could see them.

7              And it turns out I grew up, I

8    couldn't fly around.  It was a child's dream,

9    but I was a computer programmer, I can write a

10   program to fly around.  That's always been a

11   fascination.

12             Q.   How long did it take you and your

13   colleagues to create the Earth demonstration

14   program?

15             A.   About three months.

16             Q.   What computer did you use?

17             A.   We used an Intergraph machine.  It

18   was the only one -- in those days it was rare

19   for computers, personal computers to have

20   multiple like Intel processors inside them, so

21   they usually had one, but we needed multiple

22   PC's because we needed to write a parallel

23   program.

24             Q.   Did you need multiple PCs?

```
 1              A.   No.   It's a single PC, but inside

 2      there is two computers.   In my laptop now I have

 3      got four computers, back then you had to get two

 4      chips.   Intergraph made machines that could do

 5      that.   And we did that because we needed to do

 6      the data management and disc reading and the

 7      texture image fetching and all that in parallel

 8      with the drawing because we did it for flight

 9      simulation, you had to have one processor

10      dedicated to drawing while other processors

11      could do data fetching and things like that.

12              Q.   Is that how your Earth

13      demonstration program worked, it did two

14      different things at the same time?

15              A.   It did.   Cambridge was very

16      satisfied and so was the navy and so was the

17      three star general who approved it, it's how we

18      got paid.

19              Q.   How did the Earth demonstration

20      program relate back to your work at SGI?

21              A.   It was a natural continuation.   At

22      SGI we built hardware and software.   Here we

23      were just building software.   We couldn't do it

24      the same way we did it at SGI.   But we learned a
```

1    lot and we learned how to, like what the

2    problems were so we really could focus on how to

3    build that.  So it was a continuation of that

4    years at SGI.

5            Q.   How did your Earth demonstration

6    program organize the image data?

7            A.   It used a data structure, a

8    computer system called Quadtree.  I kind of

9    referred before taking a big thing dicing it

10   into pieces, parent, four children and each of

11   those has four children and four children and

12   four children.

13           Q.   What did you do after developing

14   the Earth demonstration program?

15           A.   Well, we started -- we took the

16   demo once we got paid by Cambridge, technically

17   by the navy, we used our money to give us three

18   or four months run way.  We started going to

19   Silicon Valley venture capitalists starting with

20   the demo and saying look how smart we are, we

21   wrote this demo, you should give us money to

22   write this.  It didn't really make sense because

23   it was a different thing.  We found a CV who

24   funded us and we built a company.

1          Q.   When you say funded us, who is us?

2          A.   Well the four, the four guys.

3          Q.   And what was the company that you

4     built with that funding?

5          A.   It was called Intrinsic Graphix.

6          Q.   What happened after you got the

7     funding and founded Intrinsic Graphics?

8          A.   I had a little problem with that.

9     What happened was I had the money and I started

10    hiring people.  I started hiring people to run

11    the company.  I was CEO and we were building all

12    the software team we needed to build Intrinsic

13    Graphics software to work with Sony and

14    Microsoft and Nintendo.  But the demo we built

15    to get funding from Cambridge, I kept working on

16    that.

17              At one point I had four or five

18    people working for me working on that demo.  And

19    basically we had a pretty angry board meeting

20    one time where the board of directors, which was

21    new to me, have a board of directors, look

22    you're like a maniac.  You have this little

23    company, only so much money, so much time and

24    you have all these people working on this demo

```
 1     that has nothing to do with your company.  Like
 2     what is wrong with you?  And they said you have
 3     to shut that down.
 4               And I basically, you know, I love
 5     it, you know.  And they said look, you have to
 6     stop.  And so I said well, what if I spin it
 7     out?  What if I take that, send it outside the
 8     company, hire somebody to run it, and send it
 9     away.  They said okay.  As long as you're not
10     part of it, that's fine, we don't want anything
11     to do with it, just get it out of the company.
12     I said okay.  So that's what I did.
13          Q.   So you spin out a new company?
14          A.   Yes.
15          Q.   What was that company called?
16          A.   It's called Keyhole.
17          Q.   What happened with the Earth demo?
18          A.   That was -- that went with Keyhole
19     and all the technology went the Keyhole.
20          Q.   Where are we up to now in the
21     timeline, when did you found Keyhole?
22          A.   2001.
23          Q.   Why was it called Keyhole?
24          A.   I was younger then, we were kind
```

```
1      of playful kids.  And the -- since 1970's, you

2      know, the government has had a top secret

3      programs to do satellite recon over the former

4      Soviet Union, and those programs all fell under

5      the code word Keyhole.  So we knew that, because

6      it had passed -- the people that were part of

7      that program couldn't say that word in public so

8      it seemed fun to us if we built spy technology

9      for regular people, instead of seeing where the

10     bombers are, you can see is the hotel really got

11     a beach view or not.  It would be like a

12     people's keyhole, so we called it Keyhole.

13                  It was pretty fun watching Colin

14     Powell and other people squirm when they

15     couldn't say the name of our company.  It was

16     good to give them a business card and watch them

17     vibrate.

18          Q.   What was your purpose in creating

19     Keyhole?

20          A.   Just the same as building that

21     demo, just to find a way to get information

22     moving it forward, put it in the hands of other

23     people.  It's great that it trains pilots, it's

24     great that it's been used to train astronauts of
```

971

1    NASA.

2                   But really seven billion people

3    and as far as I'm concerned, the only thing

4    people have in common is they live on the same

5    planet.  It doesn't matter where you're from,

6    your culture, we're all brothers and sisters in

7    that we live on the earth.  It's our home.

8                   I thought if we could see that,

9    people would understand, like those people over

10   there in this country we're going to bomb, they

11   have kids, too, and their kids play soccer like

12   our kids play soccer.  There is a brotherhood of

13   man that maybe I could help the world if people

14   can embrace that and see for themselves.  People

15   that travel have a broader world view.  I

16   thought virtual travel people could be a little

17   kinder and nicer and really embrace each other.

18              Q.   You testified earlier that Keyhole

19   offered a product called Earth Viewer; right?

20              A.   That's true, yes.

21              Q.   Was there a relationship between

22   Earth Viewer and Earth demo that you created a

23   little bit before?

24              A.   It was just logical continuation.

1    It had more user interface features, more

2    buttons to push and things, but it was the same

3    technology.

4         Q.   When did you first or when did

5    Keyhole first launch Earth Viewer?

6         A.   That same year that was created

7    2001.  I made sure they were -- I didn't spin

8    until I hired a CEO that I really, really,

9    really trusted until the product was ready to

10   go.  When I spun them out they were ready to go

11   to market, but I ran out of money.

12        Q.   How many Keyhole Earth Viewer

13   users did you have let's say at around the time

14   of the acquisition by Google in 2004?

15        A.   About 50,000.

16        Q.   Where were those users located?

17        A.   They were all over the world.

18   Everybody is interested in seeing the earth.

19        Q.   Where did Keyhole store the image

20   data that was used by those users?

21        A.   We had the Keyhole server product

22   and we had that in Pala Alto, we had a server in

23   Pala Alto in the basement of a building near the

24   expressway, that's where all the data was

1      stored.

2            Q.   Tell us about Keyhole customers

3      for Earth Viewer, who were your customers?

4            A.   Well, mostly they were commercial

5      real estate people, so a big one was people that

6      looked for places to build Wal-Marts.  People at

7      Wal-Mart they make a decision, big bosses there,

8      somewhere there and somebody is going to build a

9      Wal-Mart in Idaho, they look for good places

10     next to roads, the right kind of people and

11     population.  They used to take pictures and send

12     boards back and now they can make markers on the

13     earth and people in Wal-Mart can fly around and

14     see where the choices were.  Quality Homes was a

15     big customer.  CBRE, Coldwell Banker, Richard

16     Ellis, they lease office space they would use to

17     that to take clients on virtual tours.

18            We had military customers, the

19     marine expedition units used it all the time.

20     Before we run up the shore and get shot at,

21     what's it looked like.  We also had customers in

22     academia, intelligence community agency was a

23     customer, but the National Geospacial Agency.

24     But we had customers that were in the broadcast

974

1      industry.

2               Q.   How did customers in the broadcast

3      industry use Earth Viewer?

4               A.   Well, they were like the poster

5      child for what we were doing.  CNN used it, and

6      they used it when they go to do the news.  They

7      would show like they say now we are going to fly

8      into Tahrir Square.  They would fly into Tahrir

9      Square.  If you're not from Egypt you don't know

10     that it's right on the edge of the banks of the

11     Nile in Cairo.  You wouldn't know that.  It's

12     just a name.  They would take you to places,

13     Central Park, wherever the place would be.

14               Q.   Mr. Jones, do you have a video

15     that illustrates how CNN used Keyhole Earth

16     Viewer?

17               A.   I do.

18               MS. SIMMONS:  This is Defendant's

19     Exhibit 1095 and, Your Honor, there are no

20     objections pending to this exhibit.  May we

21     publish it to the jury?

22               THE COURT:  Yes.

23               MS. SIMMONS:  We're going to put

24     the video up.  Let's not start it yet.

1    BY MS. SIMMONS:

2              Q.   Mr. Jones, we're going mute the

3    volume so that you can describe for the jury

4    what they're seeing as this video plays.

5              A.   Okay.  So somebody is going to

6    tell you about the palaces in Iraq on CNN.  And

7    most of us aren't from Iraq, so we don't know.

8    We see Iraq up high, and the palaces are in

9    Baghdad.  So they're flying to Bagdad so you can

10   know where Bagdad is.  And then they say here

11   are the palaces right on the base of the river.

12   They go from palace to palace talking through

13   here is the palace, here is the dome, here is

14   the garden, here is the pools.

15              In this particular case I think

16   there was a military action and they were

17   showing the places where command and control

18   centers were bombed and where there were

19   targeted strikes.  They were just discussing

20   what does it mean to understand where these

21   palaces are.

22              Q.   I'm going to ask Mr. Ang if you

23   could stop it right before it ends.  Maybe this

24   is a good point we could stop it right here.

1          There is text up in that upper

2     right-hand corner and it's kind of impossible to

3     see from here.  Do you know what that text said?

4          A.   I do.

5          Q.   What does that say?

6          A.   It says Earth Viewer.com.

7          Q.   Why does it say that?

8          A.   Well, that was the name of our

9     website, and it was part of the license we had

10    with CNN that they could use our product but

11    they had to put our website address up there.

12    We were a small company, we wanted to make sure

13    we got credit from the world for what we were

14    doing so people could contact us if they wanted

15    to do business with us.

16          Q.   How long were you with Keyhole?

17          A.   Well, I just joined -- I sold the

18    parent company and I joined Keyhole maybe for

19    six months, nine months, something like that.

20          Q.   You were with Keyhole at the time

21    of the acquisition by Google in 2004?

22          A.   Yes.

23          Q.   What was your role with Keyhole at

24    that time?

1          A.    I was the CTO.

2          Q.    Were you involved in the Google

3     acquisition?

4          A.    Yes.

5          Q.    How did that acquisition arise?

6          A.    Well, we were just closing what we

7     called series B financing.  So this was series

8     A, which is the first funding and series B is

9     the second funding.  If you're good you don't

10    need series C, it's how much runway you need to

11    takeoff.  We haven't signed the papers yet.  We

12    were a week away.

13              We got a call from a friend of

14    ours named Jeff Huber who works at Google who

15    said that later, the founders of Google are

16    customers of yours.  We didn't know it, they fly

17    around all the time.  In fact, they cause

18    problems at board meetings because they show it

19    all the time asking people what their addresses

20    are.

21              Apparently they were told if you

22    like it that much, you should buy it, this

23    person was calling us, Jeff was calling us to

24    say could you come over and meet with us.  We

```
1       want to talk about buying your company.  It was

2       kind of bad timing because we were right in the

3       last week of signing, all the paperwork was

4       done, all the legal expenses was done.

5               Q.   Why did you decide to sell your

6       company to Google?

7               A.   Several reasons.  I mean Google

8       was -- but for me, personally I was on the board

9       and I had -- I had told them, you can't buy it,

10      actually, unless you make some promises.  And

11      the promise I cared about was we're going to

12      need a lot of money to buy the data to make this

13      be something for the world.  It seemed to me

14      like that was the way to fulfill my dream from

15      child.

16              Q.   Did you think you could fulfill

17      that dream with Google?

18              A.   Yes, I did.

19              Q.   Did you become a Google employee

20      as part of the acquisition?

21              A.   I did, every single Keyhole

22      employee became a Google employee.  That was the

23      other condition, you can't buy the company

24      unless you take all the people.  We built it,
```

1    you want it, take us, take the whole family.

2          Q.   What happened with the Keyhole

3    Earth Viewer after Google acquired Keyhole?

4          A.   We worked on it a little bit.  It

5    was going to be at Google, and they had some

6    looking field style guidelines, we did some user

7    interface changes and a couple of substantive

8    changes and we launched that as a product called

9    Google Earth.

10         Q.   Do you remember about when that

11   was that Google Earth launched?

12         A.   That was 2005.

13         Q.   When you joined Google in 2004,

14   did Google already have a search product?

15         A.   Yes.  In fact, it was known for

16   its search product.

17         Q.   How did Google Earth fit in with

18   Google's other products such as its search

19   product?

20         A.   Well, it didn't really fit in.  I

21   mean, it fit in the company mission to organize

22   the world's information and make it universally

23   successful and useful, but it was the only thing

24   at Google that wasn't a web application.  It was

1    a standalone.  You had to download something to

2    install it.  That was a problem.

3              Like sometimes you had a computer

4    like in a school, you can't install software,

5    it's managed by somebody.  Google was concerned

6    about buying us.  It wasn't a web software.  But

7    we ran understood Google for a year-and-a-half

8    independently and we made it work and people

9    were willing to download an application.  It was

10   separate, but at least it was philosophically

11   friendly to Google.

12             Q.   After you started with Google, did

13   you hear from a company called Art+Com at some

14   point?

15             A.   I did.

16             Q.   When was that?

17             A.   2006.

18             Q.   And was that the first time that

19   you had heard from Art+Com?

20             A.   No, actually I had heard from them

21   once before.

22             Q.   When was that?

23             A.   When I was at Silicon Graphics,

24   that was 1995.

 1          Q.   What did you hear about or from

 2   Art+Com back in your Silicon Graphics days?

 3          A.   They were customers of ours.   Like

 4   I said, we were the center of graphics hardware

 5   at that time, there wasn't video and ATI, it was

 6   just us.   And they wrote to us and said they

 7   were customers, they used the product that my

 8   team built, it was called Iris Performer.   They

 9   had a demo they were going to be in California

10   showing it off and they wanted to come to

11   corporate headquarters and show it to their

12   customers and show it to us and would the

13   performer team come over and look at it.

14          Q.   Where was this demo?   This was at

15   the corporate headquarters, is that what you

16   said?

17          A.   Our campus in Mountain View, but

18   it was actually in a particular place called the

19   corporate briefing center.

20          Q.   What was the corporate briefing

21   center?

22          A.   It was sort of like the test drive

23   facility, it was like the trial facility, it had

24   a big room, maybe twice the size of the

```
 1    courtroom, and it had computers on the walls and

 2    little pods out in the middle, kind of like

 3    this, actually with tables here and there,

 4    computers there.  It was pretty big computers.

 5    It wasn't like modern computers.  And little

 6    refrigerators everywhere.  And they were going

 7    to show their software, or computer there.

 8         Q.   Who could attend demonstrations in

 9    SGI's corporate briefing center?

10         A.   Pretty much anybody.  We had

11    celebrities.  We had President Clinton,

12    Vice-president Gore.  We had Michael Jackson,

13    all kinds of people came there.  It was anybody.

14    We had two or 300 people sometimes at one time

15    in the corporate center.  It was kind of

16    crowded.  School kids came sometimes in buses.

17    It was a public venue.

18         Q.   Did you attend Art+Com's

19    demonstration at SGI?

20         A.   We did.  We went in the afternoon.

21    I got the whole team together.  They were kind

22    of finishing things.  I got them all together

23    and we marched across the parking lot.

24         Q.   Why?
```

1            A.   Well, we wanted to see what they

2       had done.  They were our customers and they were

3       proud to show us their work.  And it's always

4       exciting -- if you haven't worked in a factory,

5       you wouldn't know this, but you work in a

6       factory, you make things.  But when you meet

7       customers, they use things.  It's like you work

8       at a music factory, you make trumpets.  Someone

9       comes and wants to play the trumpet for you, you

10      want to hear it because you're like I might have

11      hammered on that trumpet and hear good music, so

12      we were excited to see what they had done.

13           Q.   What was your involvement in

14      settling up the Art+Com demonstration?

15           A.   None.  The corporate business

16      center machines were controlled by the briefing

17      center staff.  There was a man I knew there

18      named Pat Lank.  He was responsible for all the

19      machines and installations and setup and tear

20      down, cleaning.  It was his thing.

21           Q.   What did you see when you went to

22      see Art+Com demonstration?

23           A.   Well, it was -- we came in the

24      door, so imagine walking the length of the

```
 1      courtroom and this was at the far end in a
 2      little cul-de-sac area.  And from across the
 3      room, I could see the ball, which in fact, it
 4      looked just like that, maybe that's it, like
 5      this, there is the ball.  And I want to go touch
 6      it now, actually, to be honest.  It was
 7      fantastic then and it is fantastic now.
 8                There was a big ball and a
 9      computer screen set up.  And the idea was if you
10      move the ball, the picture would move.  The
11      picture was like a globe.  It was Universal
12      Studios, a picture up on the screen, but you
13      could move the ball and there was a cable
14      between the computer and the ball so you made
15      the picture move.  And I thought that was really
16      clever.
17                It turns out that that's the
18      business they're in.  They make like trade show
19      exhibits for worlds fairs and companies so
20      they're really good with mechanical devices.  I
21      told them, that is fantastic.
22                Q.  What documentation did you receive
23      at the demonstration about Art+Com demo?
24                A.  Nothing.
```

1          Q.   What about source code, did you

2     see any of the source code that related to the

3     software?

4          A.   No.  It was just a demo, it was

5     just watching it go.

6          Q.   What did you think about the

7     demonstration?

8          A.   Well, I liked the ball.  And I

9     like the ball a lot, actually.  But as far as

10    the actual computer part, I was not particularly

11    impressed with that part.

12         Q.   Did you have any follow-up

13    communications with Art+Com after the demo at

14    SGI?

15         A.   Not much.  I mean, maybe like --

16    probably, you know, I like customers, I would

17    have said it's nice to see your demo.  I really

18    like the ball and thanks for coming.  Good luck.

19              Actually they wrote to me, they

20    wrote to me and they asked me, could we -- we

21    were about to do a new version of our software

22    Performer, and they said could we be on the beta

23    program for the new version of Performer.  I

24    said sure.

```
 1            Q.   Anything else about their Earth

 2    Visualization software, did you have any more

 3    communications or any communications with

 4    Art+Com about that?

 5            A.   No.

 6            Q.   What about then after SGI, you

 7    went to Intrinsic Graphics.  While you were at

 8    Intrinsic Graphics, did you have any

 9    communications with Art+Com?

10            A.   No.

11            Q.   I think Keyhole was next.  Did you

12    have any communications with Art+Com while you

13    were at Keyhole?

14            A.   No.

15            Q.   You weren't ever contacted by

16    Art+Com during the time you were at Keyhole?

17            A.   No.

18            Q.   You were associated with Keyhole

19    during its existence; correct?

20            A.   I was on the board of directors

21    the entire time.  Even when I wasn't employed

22    there, I went there every day and talked to the

23    employees.  I recommended employees that got

24    hired.  I was part of the management team.
```

987

```
1              Q.   So you didn't have communications
2       with Art+Com again until we're fast forwarding
3       to Google, so it wasn't until your time at
4       Google that you heard from Art+Com; right?
5              A.   That's right, I remember those
6       people from way back when.
7              Q.   And you may have already said
8       this, but when was that when you heard from them
9       while you were at Google?
10             A.   2006.
11             Q.   What happened with respect to
12      Art+Com in 2006?
13             A.   I received an e-mail.
14             Q.   An e-mail from whom, do you
15      remember?
16             A.   Pavel Mayer.
17             Q.   What did Mr. Mayer say?
18             A.   He wrote to me, congratulated me
19      on Google Earth and says looks like you're
20      making a good success there.  People are
21      enjoying that here in Germany, too.  He said you
22      may not know this, but we have a patent in that
23      space, we're not using it, probably not going to
24      use it, but maybe Google would like to buy it.
```

```
 1              Q.   Did he attach the patent to his

 2    e-mail?

 3              A.   He did.  He attached the full

 4    patent specification to the e-mail.

 5              Q.   Before you got that e-mail from

 6    Mr. Mayer in 2006, were you aware of Art+Com

 7    having a patent?

 8              A.   No.

 9              Q.   Were aware of anyone at Google who

10    knew that Art+Com had a patent?

11              A.   No.  I can't imagine, no,

12    certainly not.

13              Q.   Did you take a look at the patent?

14              A.   I did.

15              Q.   And what did you think about it?

16              A.   Well, my job as a technical

17    engineer on the Geo team is to do that exact

18    thing, to look at technologies that come across

19    the thresholds and see if they make sense for

20    us.

21              I studied it.  I'm not a patent

22    examiner or patent court.  I just looked at it

23    as an engineer, but with a lot of experience.

24    And I figured out what is that patent trying to
```

```
 1      tell me to do.  How would that system work.  And

 2      I felt it would be sufficiently inferior to what

 3      we already did that I couldn't imagine

 4      downgrading Google Earth to that.

 5                   But we also had a -- the patent

 6      team at Google had a program where they

 7      sometimes would buy or license patents that help

 8      in a protective way in case of future actions.

 9      What I told -- by e-mail, I didn't tell, I wrote

10      an e-mail telling Mr. Mayer, I'm not interested

11      in this for us.  Maybe it's good for the patent

12      team.  I'll ask if they're interested in this.

13      I'll forward it to them.

14              Q.   If we could pull up, Mr. Ang,

15      Plaintiff's Exhibit 329.  This exhibit has

16      already been admitted.  Before we blow it up, I

17      want to make sure we put this in context.

18                   Mr. Jones, can you see Exhibit

19      329?

20              A.   It's here on my screen.  I

21      couldn't see that one up there, but I can see

22      this one.

23              Q.   Do you know what that is?

24              A.   It's an e-mail from me to Pavel.
```

```
 1                    Q.   Mr. Ang, maybe we could blow up

 2         the top e-mail, the one from Mr. Jones to

 3         Mr. Mayer.

 4                         THE COURT:  Are we going to be

 5         coming to a convenient time for a lunch break?

 6                         MS. SIMMONS:  Any time is

 7         convenient, Your Honor.

 8                         THE COURT:  Why don't you finish

 9         what you're doing.

10    BY MS. SIMMONS:

11                    Q.   Mr. Jones, what were you

12         explaining to Mr. Mayer in this E-mail from

13         February of 2006?

14                    A.   He wrote to me and he said well

15         really, you can't understand what we're doing

16         unless you come to Berlin to our office and see

17         what we've done because we have kind of a museum

18         of previously built things or a showroom I guess

19         like or Silicon Graphics showroom would have

20         been, can you come and see that, please, please

21         come and see that.  I said I'm busy.  Berlin is

22         not here, I'm here, I'm in California.  I said

23         I'll come.  I wrote him, I said I will come, I

24         will come see and I'm looking forward to that.
```

```
 1              Q.   And did you go to Berlin to visit

 2    with Art+Com?

 3              A.   I did.

 4              Q.   Maybe this would be a good spot,

 5    I'm going to ask him a bit about those

 6    communications.  Do you want to stop before

 7    that?

 8                   THE COURT:  It's up to you.

 9                   MS. SIMMONS:  I don't want to cut

10    into lunch time.

11                   THE COURT:  Why won't we take our

12    lunch break now and we'll come back at 2

13    o'clock.  The jury, remember not to discuss the

14    case.

15                   (Jury exits.)

16                   THE COURT:  Is there anything we

17    need to do before lunch?

18                   MR. PARTRIDGE:  Your Honor, we do

19    have some objections to a deposition transcript

20    that Google wants to play this afternoon.  There

21    could be two ways to do this.  I could give you

22    a markup that I identifies the objections and

23    then we could look at it as soon as we come back

24    from lunch or we can talk about it first.
```

992

```
 1                    THE COURT:  Why don't you give me
 2       a markup and I'll look at it during lunch.
 3                    MR. PARTRIDGE:  Okay.  And for
 4       your reference, when you look at the markup,
 5       I'll give you two copies, there really are just
 6       a couple of fundamental issues one of which
 7       concerns the motion in limine that was agreed
 8       that has to do with characterizations like troll
 9       and PD and the like.  And there's a set of
10       questions and answers about whether or not the
11       invention is practiced and how big the company
12       is, et cetera, et cetera, et cetera, which could
13       only be a set up, we think, for arguing NPE
14       status for Art+Com Innovation Pool --
15                    MR. SNYDER:  Your Honor, should we
16       excuse, Mr. Jones?
17                    THE COURT:  Yes, we should.  But I
18       don't think we should be discussing this now.
19       Why don't we come back, let's say at 10 of 2, so
20       we don't delay the jury and we can resolve this
21       and then we'll bring in Mr. Jones and the jury
22       and continue with this.
23                    MR. PARTRIDGE:  Very well, Your
24       Honor.  Thank you.
```

```
 1                    THE COURT:  Thank you.

 2                    (Luncheon recess.)

 3                    THE COURT:  Be seated please.

 4       Okay.  Mr. Partridge.

 5                    MR. PARTRIDGE:  Yes, Your Honor.

 6       I started to say before we took our lunch break,

 7       Your Honor, that there are -- I wanted to sort

 8       of summarize what these objections are about.

 9       First, many of the questions go to the

10       equivalent of whether we were practicing,

11       whether ACI was a practicing entity which of

12       course it's not relevant at all to the issues in

13       this case and the second issue is that --

14                    MR. SNYDER:  Your Honor, it

15       appears we have an expert witness in the room.

16       Could we excuse him?

17                    MR. PARTRIDGE:  Please.  And the

18       second is that there is a series of these that

19       also I think relate to the copying issue which

20       is not in the case, and that in terms of whether

21       or not source code was given and that series of

22       questions, the only possible explanation for the

23       inclusion of those is whether or not they relate

24       to copying, which isn't in the case.  And the
```

```
 1    problem with the set of questions is that it
 2    creates an additional problem that I think is
 3    confusing and prejudicial, which is the notion
 4    that independent development is relevant to an
 5    infringement case.  And of course it's a strict
 6    liability cause of action and so whether or not
 7    somebody did it independently is not material
 8    and not relevant to the issues of infringement.
 9    I do need, since we don't have this document in
10    the record, to at least identify before we
11    finish here the page and line numbers that we
12    find objectionable.  But those are essentially
13    the issues that we're raising with respect to
14    these sets of Q and A's.
15                  THE COURT:  Do you want to attach
16    this to the transcript as to what has been
17    objected to.
18                  MR. PARTRIDGE:  We can do it that
19    way too.
20                  THE COURT:  Why don't we do it
21    that way.  We'll call this Court Exhibit A.
22                  MR. PARTRIDGE:  And all of my
23    copies have been distributed other than one that
24    I've marked up by hand, but if you have one that
```

```
 1        the court reporter can use.

 2                    THE COURT:  You can take my

 3        clerk's copy there.

 4                    MR. PARTRIDGE:  Okay.  But those

 5        are the objections.

 6                    THE COURT:  I'll hear from Mr.

 7        Snyder.  My view as to the first one, that is

 8        about the non-activity of ACI is that that

 9        doesn't fall under the stipulation which refers

10        to pejorative characterizations of ACI or

11        Art+Com as a non-practicing entity in, in

12        quotes, patent assertion entity, quote, patent

13        troll, quote, or any other similar pejorative

14        characterizations.  And I didn't see a

15        pejorative characterization like that in the

16        testimony that you marked.  So as to that one,

17        I'm going to deny the motion.

18                    On the other question of the copy,

19        it seems to me that it's difficult for me to see

20        why that testimony shouldn't be admitted that

21        you marked there, so why don't we hear from Mr.

22        Snyder about that.

23                    MR. SNYDER:  On the first

24        category, Your Honor, we completely agree with
```

```
 1          you that the issues about pejorative references
 2          and this does not make them on the second
 3          category what they are calling evidence of
 4          non-copying, this is an issue that they opened.
 5          Their narrative and chronology in the opening
 6          was about how these employees moved from Silicon
 7          Graphics to Intrinsic Graphics to Keyhole to
 8          Google and then created Earth and we saw them
 9          put up their pictures time and time again.  Then
10          they played the video testimony of Mr. Jones
11          about him seeing the ball at SGI and we need to
12          combat any inference that there was some kind of
13          copying.  Now, it is true --
14                    THE COURT:  How about a way of
15          handling this of putting something in the final
16          jury instructions that there is no contention
17          that Google copied the ACI invention.  Would
18          that be satisfactory?
19                    MR. PARTRIDGE:  It would be
20          satisfactory to us, Your Honor.  As a matter of
21          fact, we are planning on sending you tonight a
22          few additional instructions we were going to
23          propose and that's included in them, so it is
24          acceptable to us to do that as a fix.  We'll
```

1    probably propose something with respect to

2    characterizing this evidence of lack of activity

3    by ACI as opposed to Art+Com as NPE type stuff

4    as well.  But that -- that is acceptable to us.

5            THE COURT:  How about that, Mr.

6    Snyder?

7            MR. SNYDER:  That would be

8    acceptable, your honor.  And I believe that that

9    would apply to the designations.

10           THE COURT:  167.8 to --

11           MR. SNYDER:  Through 171.18.

12           THE COURT:  Yes.

13           MR. PARTRIDGE:  I think it goes

14    over into the next page because the answer isn't

15    completed at 18.

16           MR. SNYDER:  So it would go to

17    172.2.  Those are not consecutive but they are

18    consecutive extracts from what we've marked as

19    Court Exhibit A.

20           MR. PARTRIDGE:  That's correct.  I

21    agree with that identification.

22           THE COURT:  That material will be

23    left out of the video that was just identified

24    in this, but the other material I think that's

```
 1        not covered by the stipulation and can be

 2        included in the video.

 3                    MR. SNYDER:  And just so there

 4        isn't any surprise, Your Honor, because this

 5        deposition was given in German, we're going to

 6        have somebody play the role of the witness and

 7        read it into the record.

 8                    MR. PARTRIDGE:  Mr. Snyder, it was

 9        done in English.

10                    MR. SNYDER:  Oh.

11                    MR. PARTRIDGE:  This one was done

12        in English.  You don't have that copy.

13                    MR. SNYDER:  My mistake.

14                    THE COURT:  I have been working on

15        the final jury instructions and late this

16        afternoon after court I'm going to have a

17        revised version of those, which I will post on

18        the docket and you will be able to see.  I would

19        suggest that you hold up for the moment in

20        suggesting changes to that until you've been

21        over the new version and make the suggested

22        changes based on the new version.  And what I

23        think I'd like to do is to have a conference

24        after you recess tomorrow at around 5:15 or so,
```

```
 1        an informal conference to discharge the charge

 2        to try to work out as many of these issues as

 3        can be worked out and then when we have the

 4        formal charge conference on Friday morning

 5        you'll be able to make any objections to things

 6        you still object to, but this is an effort to

 7        resolve as many of them as possible informally.

 8        And I'd like to limit the number of attendees at

 9        that conference, which we'll have in the

10        conference room here, to two lawyers for each

11        side.

12                    MR. PARTRIDGE:  That's acceptable

13        to us, Your Honor, that's fine.

14                    MR. SNYDER:  That's fine, Your

15        Honor.

16                    THE COURT:  Anything else we need

17        to do before we bring the jury back in?

18                    MR. PARTRIDGE:  Nothing from the

19        Plaintiff's, Your Honor.

20                    MR. SNYDER:  Nothing from the

21        Defendant.

22                    THE COURT:  Okay.  Let's bring the

23        jury back in.

24                    (Jury enters.)
```

```
 1                    THE COURT:  Be seated, please.

 2       And Ms. Simmons.

 3                    MS. SIMMONS:  Thank you, Your

 4       Honor.

 5  BY MS. SIMMONS:

 6            Q.   Mr. Jones, I think before the

 7       break we were looking at Plaintiff's exhibit

 8       329.  And Mr. Jones, let's focus in I think you

 9       had explained what this was and I just want to

10       focus you in on that last sentence.  What does

11       it say?

12            A.   Says from me to Pavel, says please

13       know that we are eager to speak with you and do

14       believe that your patent seems useful as a

15       defense against possible future legal actions.

16            Q.   Why were you eager to speak with

17       Mr. Mayer?

18            A.   I was looking forward to seeing

19       his hardware, but also even though I couldn't

20       use the patent in the engineering part of

21       Google, I thought that maybe the patent team

22       could use it and they seemed willing to

23       entertain that conversation.

24            Q.   And when you say the patent team
```

```
 1     could use it, use it in what way?
 2              A.   They have kind of like a program
 3     to buy or license patents that they thought that
 4     maybe if there was ever a lawsuit with Microsoft
 5     or something, that they could say we have this
 6     army of patents and you have an army of patents
 7     and maybe we should just have peace.  I don't
 8     know the word for that, but there's sort of a
 9     mutual standoff.  And we're a young company.  We
10     had only been in business a few years at that
11     point, so we didn't have any of these patents,
12     so we thought maybe this could be one of those.
13              Q.   Did Google want the patent to go
14     sue other companies?
15              A.   No, we have never asserted, as far
16     as I know, any patent against anybody, and Larry
17     was not wanting to do that.  We thought once you
18     have money basically you start getting sued and
19     Google was making money ans we knew we were
20     going to get sued left and right by people at
21     random, so we thought we could build up a little
22     barricade of patents around things even though
23     we didn't do them to deter people.
24              Q.   Did you go see the Art+Com people
```

```
 1           in Germany?

 2                     A.   I did.

 3                     Q.   What did you talk about?

 4                     A.   Several things.  We talked about

 5           licensing the patent of buying the patent,

 6           briefly, and we talked about most of the time

 7           was spent touring their facility, and they

 8           showed me really, you know, kind of like the

 9           ball, but different.  Rooms with projectors when

10           you walk on the floor it made ripples also in

11           the floor with pictures, these kind of nice

12           trade show exhibit things.

13                     They showed me the nice demo out

14           on the balcony that I liked a lot.  They showed

15           me what they do, and we talked about patents as

16           well.

17                     Q.   What happened next?

18                     A.   Well, I went away.

19                     Q.   Did you have any further

20           communications with Art+Com after your visit to

21           Germany?

22                     A.   I remember them sending mail to

23           Google asking about negotiation and things like

24           that.
```

```
 1              Q.   Let's, if we could, Mr. Ang, put

 2      up Defendant's Exhibit 1109.  And there are no

 3      objections to this exhibit.

 4              Before we blow it up, do you

 5      recognize this exhibit, Mr. Jones?

 6              A.   Yes, I do.

 7              Q.   What is this?

 8              A.   This is a mail from Art+Com to

 9      Michelle Lee at Google, nut it includes me on

10      the list of people who are being notified of the

11      mail.  It's a -- it's mail about basically

12      Art+Com and Google had had a conference call and

13      they talked about things and Art+Com was telling

14      Google basically here Google, here is what I

15      heard from the call.  Please let me know if you

16      agree with this or if you disagree with this so

17      we can agree together what we agreed in the

18      call, what topics were in the call.

19              Q.   What did it mean that in the first

20      bullet point that Google viewed the patent as a

21      quote, nice to have patent?

22              A.   Well, it basically confirmed the

23      opinion I had going in which was that it wasn't

24      going to be a need to have patent, that it was
```

```
 1        going to be a nice to have patent.  So we had

 2        the, you know, a couple of categories of patents

 3        and the ones that describe something that we

 4        might want to start doing, you know, like we

 5        make cakes, this is a good kind of icing, we

 6        want to put that icing on our cakes, we license

 7        the patent.  While if it describes something we

 8        already did, which would be like terrifying, was

 9        like a necessary thing, wasn't like that.  It

10        was a nice to have.  It might be good in the

11        patent team's defensive arsenal in case we were

12        attacked, but nothing more than that.

13              Q.   What about the second bullet, what

14        is that referring to?

15              A.   This is -- want me to read it?

16              Q.   Sure.

17              A.   Says even if the patent would be a

18        hundred percent airtight or at least meeting

19        Google's comfort level, the maximum price Google

20        would be willing to pay is $1 million to buy the

21        patent. So that means a couple of things.  One

22        it meant that it wasn't air tight.  And air

23        tight is not a -- I don't think it's a technical

24        lawyer phrase.  I think it's just the meaning is
```

```
 1     if it was really a good patent, you know, if it
 2     was prepared right and disclosed right and filed
 3     right and all that kind of stuff is just right,
 4     then in that world, even that world we would not
 5     be willing to pay more than a million, but it
 6     doesn't quite say it here, but the even if was
 7     because it was perceived that it was none of
 8     those things, that it was actually flawed in
 9     some technical way and that it wouldn't be
10     trustworthy for Google who's only interest of it
11     was to have a defensive posture.  They were
12     afraid -- I remember being told in the hallway
13     by somebody, this doesn't seem like a good
14     patent.  So I think they were trying to say
15     look, even if it was good, it would only be this
16     much, but it's not good.
17          Q.   What happened next?
18          A.   That's kind of interesting what
19     happened.  I got another e-mail from Art+Com not
20     saying the patent was good, but saying that we
21     should pay more.
22          Q.   Let's put that one up.  Mr. Ang,
23     that's Defendant's exhibit 1071.  Is this the
24     e-mail that you're referring to, Mr. Jones?
```

```
 1              A.   Yes, yes.  And so that's from
 2     Pavel again and he's basically saying look, I
 3     talked to Andreas, our CEO, and I convinced him
 4     that we think a price of 3 to 5 million would be
 5     acceptable at this time.  And so they thought --
 6     you know, we had said look, we wouldn't even do
 7     more than a million even if it was perfect,
 8     which is isn't, and they said well, why don't
 9     you pay 3 million now or 5 million.  I guess
10     usually when somebody says 3 to 5, they mean 5
11     and you mean 3.  But whatever it is, it was more
12     than 1, which we already told them we wouldn't
13     pay more than that.  And at this time was a
14     non-starter because it was already -- we had
15     already said, look, it's not worth money at all
16     because of its problems.
17              Q.   How did Google respond to this
18     e-mail?
19              A.   I don't know that we ever
20     responded to it.  It just was like a
21     nonresponsive answer.  Tell somebody look, if
22     you fix the car, it might play.  And they say
23     no, why don't you buy it now for this big number
24     and just say well, keep your car.
```

1        Q.   What happened with the discussions

2   in 2006 between Google and Art+Com?

3        A.   They ended.  As far as I know,

4   they ended.

5        Q.   At any point during the

6   discussions in 2006 did Art+Com tell you that it

7   thought that Google infringed its patent?

8        A.   No.

9        Q.   What about what Google was saying

10  to Art+Com, did anybody at Google, yourself

11  including, that you know of tell Art+Com that

12  Google would buy the patent at any point?

13        A.   No.

14        Q.   At any point during those

15  conversations did you tell Art+Com that you

16  thought Google didn't practice the patent?

17        A.   Every single time I spoke to them.

18        Q.   Do you know whether there were any

19  communications between Google and Art+Com after

20  2006?

21        A.   I do know of one subsequent

22  conversation, yes.

23        Q.   When was that?

24        A.   I got an e-mail in 2010 from

1      Art+Com.  I had kind of forgotten about it.

2      They wrote to me again in 2010.

3              Q.   What did you do in response to

4      that e-mail?

5              A.   I forwarded it to the patent

6      people.

7              Q.   Go ahead?

8              A.   I forwarded it, I thought here it

9      is again, so I forwarded it to the patent

10     people.

11             Q.   Did you have any further

12     communications with Art+Com after that?

13             A.   Never.

14             Q.   When was the next time you heard

15     of or about Art+Com?

16             A.   That was last year or yeah, last

17     year.  I, you know, I was in my office and I was

18     descended upon basically or visited by two

19     Google attorneys and they said do you remember

20     Art+Com?  And I said yeah.  And they said they

21     just sued us, and, you know, we may be, you

22     know, talking to you in the future about the

23     trial things.  So they were right.  And here I

24     am.

```
 1              Q.   Okay.  Thank you, Mr. Jones.  I

 2      have no further questions.

 3                   MR. HAWES:  May I approach the

 4      witness, Your Honor?

 5                       CROSS-EXAMINATION

 6    BY MR. HAWES:

 7              Q.   Good afternoon, Mr. Jones.

 8              A.   Good afternoon, sir.

 9              Q.   So let's kind of start with SGI.

10      You talked a bit about your ClipMapping patent.

11      Do you remember that?

12              A.   I do remember that.

13              Q.   Were you the only inventor on that

14      patent?

15              A.   There were four named inventors on

16      that patent.

17              Q.   Did you work together with the

18      other inventors to prepare a patent application?

19              A.   We did, in a sense, yes, we did.

20      We all worked together on the work.  SGI used

21      outside patent firm to produce those, a company

22      called Stern Kessler Goldstein & Fox in

23      Washington D.C.  We each interviewed with the

24      patent examiner, the patent attorney and they
```

```
 1    videotaped us and they went away for a long time

 2    and produced the patent and they came back to us

 3    and review the drawings and review the words.

 4              Q.   When you say patent, you mean

 5    patent application?

 6              A.   Patent application, yes.

 7              Q.   That was submitted to the patent

 8    office?

 9              A.   It did submit.  It was issued.

10              Q.   And then a patent examiner took a

11    look at it; right?

12              A.   I imagine so.  That's what they

13    do, yes.

14              Q.   And you said that you were not a

15    patent examiner earlier in your testimony.  Do

16    you remember that?

17              A.   I did.

18              Q.   So do you have an understanding of

19    what a patent examiner is?

20              A.   I did.  I saw the video at the

21    opening of the trial as well.  It was very nice.

22              Q.   Is it your understanding the

23    patent examiner looks at the prior technology

24    and compares it to the application?
```

1      A.   It's my understanding that the

2  patent examiner looks at existing patents and

3  some subset of technology and publications, yes.

4      Q.   Does the patent examiner look at

5  other materials that are submitted by the

6  applicant?

7      A.   Yes, those are the references,

8  just before the description.

9      Q.   And do you remember if you

10  submitted any of those types of materials with

11  your ClipMaps patent application?

12      A.   I'm sure they would be, yes.

13      Q.   Now, you talked a lot about your

14  Earth demo that you created for Cambridge

15  Consulting?

16      A.   A company called Cambridge

17  Research Associates in Virginia.

18      Q.   And you talked about a creating

19  that in your living room; right?

20      A.   Yeah.

21      Q.   What year was it that you did

22  that?

23      A.   1999.

24      Q.   And so that was after your time at

```
 1      SGI; right?

 2              A.   After I left, yes.

 3              Q.   Now, you told your counsel that

 4      you weren't contacted by Art+Com while you were

 5      at Keyhole.  Do you remember that?

 6              A.   Excuse me, sir, I told you that I

 7      agreed with you it was my living room.  Actually

 8      it was my dining room.

 9              Q.   But it was still in 1999?

10              A.   Yes, sir.

11              Q.   And you testified that you weren't

12      contacted by Art+Com while you were at Keyhole;

13      correct?

14              A.   Yes.

15              Q.   And is it also true that you

16      didn't reach out to Art+Com during that time?

17              A.   Certainly.

18              Q.   Now, when Google purchased

19      Keyhole, you said that part of the deal was that

20      they take all the employees.  Do you remember

21      that?

22              A.   I do.

23              Q.   And you said Keyhole was spun out

24      by Intrinsic Graphics.  Do you remember that?
```

```
 1                    A.   I do.
 2                    Q.   And prior to that happening or
 3         perhaps right after that happened, did Intrinsic
 4         Graphics create a license agreement so that
 5         Keyhole could use that Alchemy technology?
 6                    A.   We did, I signed that document.
 7                    Q.   And that included any patent
 8         rights to the Alchemy technology; correct?
 9                    A.   For the use in the -- in their
10         field, yes.
11                    Q.   And that field included Earth
12         Viewer; correct?
13                    A.   A geographic visualization.
14                    Q.   And when Google bought Keyhole, I
15         believe you testified that Google got all
16         Keyhole's assets; correct?
17                    A.   I don't know if I testified to
18         that at all.  I don't remember discussing
19         assets.  But certainly as far as I know, I
20         wasn't a lawyer involved in it.  But everything
21         that was Keyhole became Google if that's the
22         meaning that.
23                    Q.   And that included contracts
24         Keyhole had; correct?
```

```
 1              A.   Yes.

 2              Q.   And those included contracts with

 3     the government?

 4              A.   Yes.

 5              Q.   You spoke about how Google took on

 6     obligations when they purchased Keyhole.  Do you

 7     remember that discussion, specifically with

 8     regard to buying geographic data?

 9              A.   You mean my conversations with

10     executives and we're going to sell this to you,

11     but only if you let us get data for the

12     application?

13              Q.   Yes.

14              A.   Yes, I remember that conversation.

15     It wasn't a contract, it was a discussion in the

16     purchase.

17              Q.   Did Google also take on

18     obligations in the form of long-term contracts

19     with the government?

20              A.   It did.

21              Q.   How long were the support

22     obligations in those contracts?

23              MS. SIMMONS:  Objection.  Calls

24     for legal conclusion.
```

```
 1                    THE COURT:  Overruled.

 2            A.   Varying lengths.  I'm sure there

 3    are many contracts, so I don't know.

 4            Q.   Do you remember if Google took on

 5    a twenty-year obligation to support the use of

 6    Earth Viewer at the government?

 7            A.   I remember a lengthy, I think it

 8    was twenty years with the National Geospacial

 9    Agency.  They were one of the investors in

10    Keyhole.  And they had the right to use it for

11    free, but we had the right to charge them for

12    support.  And in exchange they wanted it to be

13    supported.  It's a government requirement that

14    they use supported software and not unsupported

15    software.

16            Q.   Was there, in fact, a twenty year

17    obligation to support?

18            A.   I believe there was.  To my

19    knowledge I don't have -- I haven't seen the

20    actual contract, but I have been told it was

21    twenty years, yes.

22            Q.   Did Google, in fact, support that

23    for twenty years?

24            A.   The twenty years is not up yet.
```

          1                    Q.   Has Google stopped supporting

          2        that?

          3                    A.   Well, they said they would, and

          4        they postured to do so.  And I have heard that

          5        actually that support continued after I left.

          6        So I'm not quite sure of the current status of

          7        that.

          8                         MR. HAWES:  Your Honor, may I

          9        approach?

         10                         THE COURT:  Yes.

         11                         MR. HAWES:  And may I approach the

         12        witness?

         13                         THE COURT:  Yes.

         14        BY MR. HAWES:

         15                    Q.   And do you see that this is a copy

         16        of a portion of your deposition.  Your notebook

         17        has the first page of your deposition together

         18        with the time it was taken.  It's the first part

         19        of your notebook.

         20                    A.   I see it.

         21                    Q.   And at that deposition, do you

         22        remember giving the deposition last summer in

         23        this case?

         24                    A.   I remember it vividly.  I had

```
 1    fallen the day before and broken bones in my
 2    hands.  And I was kind of crippled going into
 3    that room that day.  I could barely move, so I
 4    remember it vividly.
 5              Q.   Were you sworn in under oath like
 6    you were today?
 7              A.   I was.
 8              Q.   So what I would like you to do is
 9    turn with me in the document that I've handed
10    you, and if you could turn with me, I would like
11    you to look at if you could page 321 of your
12    deposition.  Do you see that?
13              A.   I do.
14              Q.   Actually, I'm sorry, can you turn
15    to 260, not 300?
16              A.   I can do that, too.
17              Q.   Thank you.
18                   And do you see my question
19    stating, "As far as you know, I know you have
20    left Google now, but as far as you know those
21    support contracts have been honored?"
22              MS. SIMMONS:  Objection, Your
23    Honor.  This is improper impeachment.
24              THE COURT:  Let's let the witness
```

```
 1        look at it.  It's overruled.  Let's give the
 2        witness a moment to look at the question and
 3        answer.
 4   BY MR. HAWES:
 5            Q.   The question and answer is in the
 6        middle of that page.
 7            A.   I see it.  Yes.  I see the
 8        question and answer.
 9            Q.   And am I reading the question
10        correctly:  "As far as you know, I know you have
11        left Google now, but as far as you know those
12        support contracts have been honored?"
13            A.   I see that.
14            Q.   And your answer, and you can tell
15        me if I read it correctly.  "I left within a few
16        months of them being reneged on.  That lie
17        happened in January and I walked out the door
18        very soon after that, after helping ESRI build a
19        bridge to Google Earth users who were being
20        stranded."
21                 Do you see that?
22            A.   Yes.
23            Q.   Was that your testimony?
24            A.   It was.
```

1          MR. HAWES:  No further questions,

2     Your Honor.

3               REDIRECT EXAMINATION

4     BY MS. SIMMONS:

5          Q.   Mr. Jones, going back to the

6     testimony that you just spoke about, did you

7     come to learn that, in fact, Google Earth --

8     Google was continuing to support its Enterprise

9     contract?

10          A.   I did to my great relief.  And I

11     spoke to Allen Hustus and Eric Smith about I

12     though we had made a mistake here.  And I was

13     glad to see just when I leaving, and I was glad

14     to see that something was done about that.

15          MR. SIMMONS:  Thank you.  No

16     further questions.

17          MR. HAWES:  Nothing further, Your

18     Honor.

19          THE COURT:  Let's see if the jury

20     has any questions.

21          Counsel approach.

22          (Side-bar discussion:).

23          THE COURT:  The question is why

24     did you leave Google.

```
 1              MS. SIMMONS:  I don't see how
 2     that's relevant to the issue in this case.
 3              MR. PARTRIDGE:  The question is
 4     fine with us, Your Honor.
 5              THE COURT:  I don't think it's
 6     relevant.  I'm not going to ask it.  Thank the
 7     jury.  There was one question, I've decided that
 8     it should not be asked because it's not relevant
 9     to the case, but I thank you for your attention.
10     I guess now the witness is excused subject to
11     recall?
12              MR. PARTRIDGE:  No need to recall,
13     Your Honor.
14              THE COURT:  All right.  Thank you,
15     Mr. Jones.
16              THE WITNESS:  Thank you, sir.
17              MR. SNYDER:  Your Honor, Defendant
18     Google next calls by deposition Mr. Rous.  Mr.
19     Rous is the director of publications at the
20     Association for Computing Machinery and he's
21     going to testify about their practices related
22     to publications at industry conferences,
23     including in a conference called SIGGRAPH.  The
24     video is about seven and a half minutes long.
```

```
 1                    (Video playing.)
 2            Q.   Mr. Rous, could you please state
 3      your name for the record?
 4            A.   Bernard Rous.
 5            Q.   Who is your current employer?
 6            A.   Association for Computing
 7      Machinery.
 8            Q.   Would it be okay if I called
 9      Association For Computing Machinery ACM?
10            A.   Yes.
11            Q.   Okay.  And how long have you
12      worked at ACM?
13            A.   Since 1980.
14            Q.   What is your current position at
15      ACM?
16            A.   I'm the director of publications.
17            Q.   At ACM were you always involved in
18      the publications department?
19            A.   Yes.
20            Q.   And as the director of
21      publications, could you briefly outline your
22      duties and responsibilities?
23            A.   Yes.  I'm responsible for the
24      direction of the publications program,
```

1    development of new titles, the operations, the

2    production, the strategic direction for

3    delivery, which is now through our digital

4    library.  Let me just ask some general

5    background about ACM.  What does ACM do, just

6    generally.

7            A.   It's a not for profit scientific

8    and educational society for professional

9    computer scientists, researchers, educators and

10   practitioners in the field.  We produce a number

11   of programs for that community, and for a

12   broader community that's outside -- it's a

13   membership organization, so both for our members

14   and outside the -- that.  The largest programs

15   are conferences and publications.

16           Q.   Can you generally describe what

17   the SIGGRAPH convention is?

18           A.   So within the ACM organizations

19   there are a number of special interest groups

20   called SIG, special interest groups.  And

21   SIGGRAPH is the special interest group on

22   graphics.  And most of the SIGs run conferences.

23   And SIGGRAPH has its annual SIGGRAPH conference

24   event, which consists of a number of tracks or

```
 1      programs.  In 1995 it had an exhibit, a big

 2      exhibit hall for industry.  And it has a

 3      technical program, it has electronic theater, an

 4      animation festival, there are a whole bunch of

 5      different tracks.

 6              Q.   Okay.  And what was ACM's

 7      relationship to SIGGRAPH?

 8              A.   SIGGRAPH is one of ACM's special

 9      interest groups.

10              Q.   Okay.  And do you -- in terms of

11      the SIGGRAPH convention, do you know -- can you

12      describe who generally attends those

13      conventions?

14              A.   Yes.  The -- the SIGGRAPH event is

15      attended by both computer scientists and people

16      who are in industries related to computer

17      graphics.

18              Q.   Is attendance open to the public,

19      or is it by invitation?

20              A.   It's open to the public.

21              Q.   Okay.  And so SIGGRAPH '95, do you

22      know where that one was held?

23              A.   Los Angeles.

24              Q.   And do you know -- well, we
```

```
 1    mentioned August '95, but can you tell me what
 2    dates the conference was held?
 3              A.   August 2 to 11.
 4              Q.   And how about the exhibition for
 5    SIGGRAPH '95?
 6              A.   It ran alongside those -- within
 7    those dates.
 8              Q.   Were any materials given to
 9    attendees of SIGGRAPH '95?
10              A.   Yes.  Generally speaking, the
11    attendees are given -- the CD-ROMs that are
12    produced as hard copy of the proceedings are
13    also distributed to attendees, and in this case
14    and also the -- this program and buyers guide
15    was also distributed.
16              Q.   Was this CD made around the time
17    of SIGGRAPH '95?
18              A.   Yes.
19              Q.   Was it made prior to SIGGRAPH '95?
20              A.   Yeah, it was manufactured prior
21    and delivered so it could be handed out at the
22    event, yes.
23              Q.   Do you know if there -- if these
24    CD's were given out during SIGGRAPH '95?
```

1       A.   Yes.

2            Q.   Okay.  Do you know if they were

3       given out only at the beginning, during the

4       admission period?

5            A.   Well I -- I -- normally

6       speaking -- I can't talk to the specific year,

7       but normally speaking when people enter, they

8       have their registration badge, or whatever they

9       get to acknowledge that they paid their

10      registration fees, and as they come in, they

11      pick up what's being distributed to them.

12           Q.   Do you know about how many CD's

13      were created for SIGGRAPH '95?

14           A.   No, I don't.

15           Q.   Okay.  Or similar question, but do

16      you know how many CD's were distributed?

17           A.   No, I don't.

18           Q.   Did you personally supervise the

19      creation of the multimedia or proceeding CD's

20      for SIGGRAPH '95?

21           A.   No.

22           Q.   Do you know if anyone in your

23      publication office did that?

24           A.   Certainly nobody who is there now,

1    and doubtfully that it was actually somebody on

2    staff at headquarters for ACM that supervised

3    that vendor.

4             Q.   And just so that we're clear, the

5    multimedia and proceeding CD's for SIGGRAPH '95

6    would not have been created by your office of

7    publication but by a vendor that was hired for

8    that purpose?

9             A.   Yes.

10            Q.   And sitting here today, you can't

11   recall who that vendor was?

12            A.   No.

13            Q.   Now, I take it that this was your

14   offices general practice that these CD would be

15   furnished by vendors separate from your office?

16            A.   Yes.

17            Q.   Now, when these CD's were shipped

18   to the conference site, was that done by the

19   vendor or would the vendor send the CD to your

20   office and your office would be the one to

21   arrange for the shipment?

22            A.   To the best of my knowledge, it --

23   it is shipped directly from the vendor to the

24   sites that are specified in the order.

```
 1              Q.  Do you have any clear recall of

 2     anyone having confirmed personally to you that

 3     those CD's had been shipped to the conference

 4     site in Los Angeles?

 5              A.  No.

 6              Q.  Have you ever attended a SIGGRAPH

 7     conference?

 8              A.  Yes.  I think I did go to one of

 9     them.

10              Q.  Okay.  Did you go to the one in

11     Los Angeles in 1995?

12              A.  No.

13              Q.  When you say that the CD-ROMs were

14     distributed at SIGGRAPH '95 in Los Angeles, are

15     you basing that testimony primarily on your

16     understanding of the general practice of how ACM

17     goes about putting these conferences together?

18              A.  Yes.

19                  (Video end.)

20              MR. SNYDER:  That is the end of

21     the video, Your Honor.  Defendants move into

22     evidence Defendant's exhibits 1001, 1001A and

23     1001B.

24              MR. SPEARS:  No objection.
```

```
 1                    THE COURT:  They are admitted.

 2                    MR. SNYDER:  Thank you, Your

 3      Honor.  And also for Mr. Jones testimony

 4      Defendant's move the admission of 1095 and 1109.

 5                    MR. HAWES:  No objection, Your

 6      Honor.

 7                    THE COURT:  They are admitted.

 8                    MR. SNYDER:  Thank you, Your

 9      Honor.  Defendant Google calls its next witness

10      Mr. Stephen Lau.  Mr. Lau previously worked for

11      SRI International and Mr. Lau is going to

12      testify about his work in the early and mid '90s

13      on the SRI TerraVision system and the

14      questioning will be done by Mr. Almeling.

15                              STEPHEN LAU, JR.,

16                    the deponent herein, having first

17                    been duly sworn on oath, was

18                    examined and testified as follows:

19                    MR. ALMELING:  Your Honor, may I

20      proceed?

21                    THE COURT:  Yes.  And why don't

22      you introduce yourself.

23                    MR. ALMELING:  Thank you, Your

24      Honor.  My name IS David Almeling and I'm also
```

```
 1        one of the counsels for Google.  It's good to

 2        see you again.

 3   BY MR. ALMELING:

 4              Q.   Good afternoon.

 5              A.   Good afternoon.

 6              Q.   So you're here today to talk about

 7        SRI TerraVision.  Let's take those in turn.

 8        What is SRI and what is TerraVision?

 9              A.   SRI is a not-for-profit company,

10        formally known as Stanford Research Institute,

11        and we performed research for commercial and

12        also government entities.

13              Q.   TerraVision, what is that?

14              A.   TerraVision was an earth

15        visualization application that I developed that

16        used a course defined algorithm to retrieve

17        images data across the network from multiple

18        servers.

19              Q.   Before you worked at SRI, where

20        did you work?

21              A.   I worked at a company named

22        ExpertSoft down in San Diego, California.

23              Q.   And what are they and what did you

24        do?
```

1           A.   ExpertSoft was a consultant

2    company, we did consultant work for working on

3    contracts with the federal government and also

4    commercial entities also.  And my job there was

5    develop visualization including terrain

6    visualizations.

7           Q.   And is it correct that then you

8    went to SRI?

9           A.   Yes, I was hired directly by SRI

10   to work on the Magic project to develop the

11   terrain visualization application, which had

12   be -- came to be known as TerraVision.

13          Q.   For how long did you work as SRI?

14          A.   I worked at SRI from 1992 to May

15   of 1996.

16          Q.   How about now, where do you work?

17          A.   I work at North Berkley National

18   Labs in Berkley, California.

19          Q.   Do you work for Google?

20          A.   No, I do not.

21          Q.   Have you been retained as a

22   consultant in this litigation?

23          A.   Yes, I have.

24          Q.   How are you being compensated for

```
 1        your work in this litigation?
 2                   A.   I make 450 an hour.
 3                   Q.   Does your compensation depend in
 4        any way on the testimony you give or the outcome
 5        of this case?
 6                   A.   No, it does not.
 7                   Q.   And now let's return to
 8        TerraVision.  Can you give a little more detail
 9        about what specifically you did as part of
10        TerraVision?
11                   A.   I was hired to develop the
12        application that became known as TerraVision.  I
13        wrote about 89 percent of the source code.
14                   Q.   The name TerraVision, at SRI who
15        came up with that name?
16                   A.   I did.
17                   Q.   How did you do that?
18                   A.   When I worked at ExpertSoft, I
19        worked on a project known as Exterra, and when I
20        went to SRI it was being called terrain
21        visualization application, which is a mouthful.
22        We needed a new name, so I took the old name
23        Exterra, Terra, vision, visualization and put
24        the two together and people liked it.  It stuck.
```

1    Q.   What did your colleagues think

2    when you told them about the name TerraVision?

3    A.   They liked it much better than

4    terrain visualization application.  It was a

5    mouthful.

6    Q.   TerraVision was a government

7    project.  What were the goals of TerraVision?

8    A.   One of the goals of TerraVision

9    was to do research and visualization for the

10   public domain for the general public.  We were

11   funded by the federal government to do that.

12   Our research was open to be publish.

13   Q.   This is a patent case.  Did SRI

14   ever get any patents on TerraVision?

15   A.   No, we did not.

16   Q.   Why not?

17   A.   Yvan Leclerc who was my manager

18   and colleague discussed it, however, the project

19   that we were working on, TerraVision, was meant

20   for the public domain.  It was funded by the

21   federal government.  And we also were looking at

22   the algorithms we were developing and we believe

23   it was not innovative enough to be a patent.

24   Q.   Why did you think that?

```
 1              A.   Because one thing, I was already

 2    working on algorithm such as coarse to fine.

 3              Q.   You mentioned a name, Yvan

 4    Leclerc.  Who was that?

 5              A.   Yvan Leclerc was my manager and

 6    also my colleague.

 7              Q.   Where is he now?

 8              A.   Unfortunately Mr. Leclerc has

 9    passed away.

10              Q.   So let's dive into TerraVision a

11    little bit.  Can you show and tell the jury how

12    it worked.

13              A.   Yes.  It's a visual application so

14    what I have is a video from 1994 that can be

15    shown.

16              Q.   I would like to direct you in your

17    binder to exhibit DTX 1088.

18              MR. ALMELING:  Your Honor, neither

19    this exhibit or any of the others that will be

20    used in this direct examination have been

21    objected to.  May I publish it to the jury?

22              THE COURT:  Yes.

23    BY MR. ALMELING:

24              Q.   Before we play Exhibit 1088, can
```

```
 1        you explain what it is?

 2                 A.   The video that you're about to

 3        see, that was a video that Yvan Leclerc and I

 4        developed and published so that people will be

 5        able to see how TerraVision worked.  If I was

 6        not able to demonstrate it or we were unable to

 7        demonstrate it, it was meant to be shown at

 8        conferences and symposiums.

 9                 Q.   When did you guys create it?

10                 A.   Early 1994.

11                 Q.   How long is the video and how long

12        is the bit that we're going to watch?

13                 A.    The video itself, entirety is

14        about eleven minutes long and what you're going

15        to see is a four-minute excerpt.

16                      MR. ALMELING:  Mr. Ang, can you

17        play the video.

18                      (Exhibit DTX 1088 is played for

19        the jury.)

20                      (End of videotape)

21   BY MR. ALMELING:

22                 Q.   The video looked really, really

23        grainy.  Why?

24                 A.   Well, it was -- we made it in
```

```
1     1994, and this was a copy taken off of VHS tape

2     so it degraded over time.  One of the other

3     things in terms of the terrain being fuzzy, we

4     wanted to show it working across the network and

5     pulling images from across the network.

6              Q.   Did that look, video look better

7     when it was played in 1994?

8              A.   Yes, a lot better in 1994.

9              Q.   Let's talk about some of the

10    things that the video said.  One is something

11    called ISS.  What's that?

12             A.   The ISS was the image server

13    system which was developed by Lawrence National

14    Labs and it would store the image data that was

15    provided to TerraVision.

16             Q.   And where were the ISS servers for

17    the demonstration shown in the video?

18             A.    In the video itself, the ISS we

19    had ISS located at the National Lab in Berkley.

20    We also had a ISS at the University of Kansas,

21    KU, who was also a partner in the project.  Also

22    a server in Kansas City, and at U.S. Geological

23    Survey up in Sioux Falls, Minnesota, and

24    Minnesota Super Computer Center.
```

1    Q.   The video mentioned that in some

2    instances you couldn't predict where the user

3    was going to go such as if a user clicked in an

4    unexpected place.  What happened then?

5          A.   It used a course to fine algorithm

6    as you saw in the video to try to come up with

7    the best display it could.  We also would send

8    out on the request to the ISS to try to retrieve

9    the information to be able to display it.

10         Q.   For those instances that you just

11   described, how would the TerraVision system

12   determine which tiles to then fetch?

13         A.   So we used what's called a

14   frustum, a field of view.  So it would project

15   out where you're looking in the terrain and

16   where you're at, figure out how far away each of

17   the tiles should be, what the best tile there,

18   so as you moved around the field of view, like a

19   flashlight would move over terrain and you would

20   be able to figure out which tiles are the best

21   tiles for that view.

22         Q.   The video also mentioned a group

23   of four tiles.  What's that?

24         A.   The group of four tiles utilized

1   what's called a Quadtree which was an internal

2   representation of the coarse to fine, coarse to

3   fine resolution pyramid.

4          Q.   And one more vocabulary, the video

5   mentioned a resolution pyramid.  What's that?

6          A.   The resolution pyramid as you saw

7   in the video there, because you didn't want to

8   have all of the tiles, you couldn't have all the

9   tiles on the screen at one time when you were

10  looking at a large area, we would take a large

11  sample of one tile, subdivide that into four

12  down to the next lower level resolution, sub

13  those four down into the next lower resolution

14  until you got to the fine resolution, the

15  highest resolution that you had.

16         Q.   At the beginning of the video is

17  2D and toward the end it was 3D or

18  three-dimensional.  How did that work?

19         A.   So in TerraVision you could

20  display the information either as a 2D, it's

21  flat like you saw on the screen, or else in 3D,

22  like a flight simulator like you're looking out

23  the window.

24         Q.   In those cases of a

1    three-dimensional view, how did TerraVision

2    create that view?

3              A.   From the US Geological Survey, we

4    received what's called a digital elevation

5    model, as you saw the mountains and all the

6    elevation there.  We take that information from

7    the ISS, we would tessellate it, break it down

8    in polygonal triangles, take the images

9    corresponding from that, from the ISS, and then

10   drape that over the terrain so that then you see

11   a three-dimensional view like it's out the

12   window.

13             Q.   I'm not sure I heard you.  Did you

14   say polygonal triangles?

15             A.   Yes.

16             Q.   What's that?

17             A.   The polygonal triangle, it's

18   called tesselation.

19             Q.   Thank you.

20             Did you prepare any materials as

21   part of preparing the video?

22             A.   Yes.  We, Yvan and I created a

23   script.

24             Q.   When did you create that script?

        1            A.   Early 1994, the same time as the

        2     video.

        3            Q.   Did you ever show it to anyone?

        4            A.   Yes, it was published at the Magic

        5     Technical Symposium in August of 1994.

        6            Q.   Mr. Lau, I'm going to show you an

        7     exhibit which has been marked DTX 1087.

        8     Mr. Ang, if you could pull that up, please.

        9                 What is this?

       10            A.   What you're seeing on the screen

       11     there is the cover of the 1994 Magic Technical

       12     Symposium proceedings that occurred at the

       13     University of Kansas in August of 1994.

       14            Q.   We'll talk more about the

       15     symposium in a little bit.  First I want to show

       16     you a page of this.

       17                 And Mr. Ang, if you could please

       18     turn to the slide that ends 367.

       19                 What's this?

       20            A.   This is a script for the

       21     TerraVision video that you just saw.

       22            Q.   And does this script accurately

       23     represent the entirety of what is TerraVision?

       24            A.   Unfortunately not.  As you saw,

```
1    TerraVision is a very visual application so one

2    would really need to see the video with the

3    script itself.  If you scroll down a little bit,

4    please.  You see in square brackets there near

5    the bottom, it says fly through 37 seconds, that

6    is what you would be seeing on the screen while

7    the script was being read.

8              Q.   Other than the script and the

9    videos, did you create any other materials in

10   the early 1990s about TerraVision?

11             A.   Yes.  We wrote technical

12   publications that were published.

13             Q.   I would like to show you Exhibit

14   1023, and that is DTX 1023.  Thank you.

15                  What's this one?

16             A.   This is a SRI technical paper that

17   Yvan Leclerc and I wrote and published.  It

18   described TerraVision and how TerraVision

19   operates.

20             Q.   You mentioned that you published

21   it.  When did you publish this?

22             A.   April of 1994.

23             Q.   How do you know that?

24             A.   I remember crafting this document
```

1    and submitting it to SRI international

2    publication system and they issued a number to

3    it, and the number issued was number 540.

4         Q.   I want to show you a couple of

5    pages in this document.  Let's start with the

6    one that ends 159.  And I want to show you the

7    figure at the top.  Figure 1.  Do you see that?

8         A.   Yes, I do.

9         Q.   What is that?

10        A.   That's a representation of the

11   Quadtree.

12        Q.   And then the TerraVision system

13   use a Quadtree?

14        A.   Yes, it did.

15        Q.   I also want to show you a little

16   bit further down this same page if I could, the

17   second paragraph under the heading 2.4.  Can you

18   please read that first sentence aloud and then

19   explain to the jury what that means?

20        A.   Our approach is to use a coarse to

21   fine search on a Quadtree representation of the

22   terrain.

23             And that is how TerraVision was

24   able to use -- be able to do the search from

1    coarse to fine, low resolution to high

2    resolution, fine resolution, to display it,

3    retrieve information from across the network.

4         Q.   Was TerraVision the first time

5    that you ever used a coarse to fine process for

6    an earth visualization program?

7         A.   No, it was not.

8         Q.   When was it?

9         A.   When I was working at ExpertSoft

10   back in the early '90s.

11        Q.   And in what context did you use a

12   coarse to fine earth visualization process?

13        A.   At ExpertSoft my job there was to

14   develop this terrain visualization, so when the

15   common technique to do is to use coarse to fine

16   in order to be able to display a nice view of

17   like an out the window.

18        Q.   I would like to show you another

19   exhibit.  This one is DTX 1193.  Mr. Ang, if you

20   could pull that one up.

21             What's this one?

22        A.   This is a publication of the

23   overview of the magic project.  It was created

24   by all the members of the magic project,

1043

```
1    contributed to it, and it was Barbara Fuller and

2    Ira Richer were the ones that took all our

3    materials and condensed it down into one

4    document.

5              Q.   You said the word magic a lot.

6    What is magic?

7              A.   Magic was the federal, umbrella

8    federally funded research project that terrain

9    visualization was a trained visualization

10   application part of that project.

11             Q.   Who authored this article?

12             A.   All the members of the magic

13   consortium created portions of this document,

14   and Barbara Fuller and Ira Richer did the

15   editing down into one cohesive document.

16             Q.   You mentioned it was published in

17   December of '93.  How do you know that?

18             A.   I remember crafting it and

19   drafting it back in December of 1993, submitting

20   it into the other members of the magic

21   consortium, submitting it into Barbara Fuller

22   and Ira Richer who edited down and shipped it

23   back for us to review.

24             Q.   I want to get your thoughts on two
```

1   more documents.  First is DTX 1036.  And again,

2   what is this exhibit?

3           A.   This exhibit is the proceedings

4   that were handed to attendees from the 1995

5   Magic Technical Symposium that was held in

6   August of 1995 in Minneapolis, Minnesota.

7           Q.   Were you there.

8           A.   Yes, I was.

9           Q.   What was your role regarding the

10  materials that are in Exhibit 1036?

11          A.   Yvan Leclerc and I crafted the

12  terrain visualization materials that went into

13  the proceedings that was published in the

14  proceedings?

15          Q.   I want to show you a figure in

16  this document.  It's at page NO65.  The top

17  figure I want to talk about.  Can you please

18  explain what's shown here?

19          A.   So this is a graphical

20  representation of the magic testbed.  Magic was

21  a high speed network and this is a testbed.  All

22  the boxes around there is a how -- was showing

23  how you could have multiple ISS servers located

24  anywhere on the network and also you could have

```
 1    terrain visualization running at multiple

 2    locations simultaneously.

 3              Q.   Can you point out where the

 4    various ISS servers are?

 5              A.   Starting from the top, you see the

 6    USGS Data Center and you see the ISS server,

 7    there is three of them.  And going over to the

 8    three o'clock position, you see the US West

 9    Compass Lab in Minnesota had another ISS lab

10    there.  You have another ISS distributor in

11    Kansas City, the Sprint headquarters, and then

12    at the 7 o'clock position, you have another ISS

13    distributor at the University of Kansas in

14    Lawrence, Kansas.  And then finally you have a

15    ISS in Fort Leavenworth in Fort Leavenworth,

16    Kansas.  Those are all the participants of the

17    magic project.

18              Q.   Were all these ISS servers at

19    their geographical locations used as part of the

20    terrain visualization system?

21              A.   Yes, that was the purpose of the

22    terrain visualization system to be able to pull

23    data from multiple locations.

24              Q.   Next is DTX 1037.  I want to get
```

```
 1     your thoughts on this one, too.  Can you please
 2     pull that up, Mr. Ang.
 3                 Same thing, what is this document?
 4     Let's start there.
 5                 A.   This document is another
 6     publication that Yvan Leclerc and I created.
 7     This was one that described the tile sets which
 8     is what terrain visualization used in order to
 9     be able to display the pages.
10                 Q.   When was this document published?
11                 A.   This was also published in April
12     of 1994.
13                 Q.   I want to show you one page on
14     this.  DTX 1037, page 176, those are the last
15     three digits, section 1.1.4 is about coordinate
16     systems.  What's this section about?
17                 A.   This is about the various
18     coordinate systems that was in use within
19     TerraVision.
20                 Q.   And can you describe some of those
21     coordinate systems?
22                 A.   Yeah.  We used various coordinate
23     transformers within TerraVision.  We used
24     transformers from a three-dimensional, that is
```

1    where the terrain is, to the two-dimensional

2    screen, that is here on the screen.  Another one

3    we used was coordinate transformation was from

4    latitude longitude to a number of -- so you are

5    point of view back to the origin, like zero zero

6    zero zero zero instead of that long.

7              Q.   That last one, can you explain why

8    you did that?

9              A.   Yeah, because you were able to

10   teleport and move from various locations very

11   quickly like say from Wilmington, Delaware here,

12   which had one set of latitude and longitude

13   coordinates to say Seattle, Washington, which

14   had a completely different set of latitude

15   longitude coordinates, those are very big

16   numbers.  The earth is very big.  And at the

17   time you could get precision errors in doing

18   those calculations.  So what we did is we

19   normalized that down, brought those down,

20   translated you back to zero zero zero, wherever

21   your point of view was, in Wilmington or Seattle

22   and used a coordinate system based upon that.

23             Q.   You've talked about your video,

24   we've talked about some of your documents.  Now

```
 1        I want to move on and talk about demonstrations.

 2   Did you ever use TerraVision in public?

 3             A.   Yes.  We demonstrated TerraVision

 4   in multiple locations, including the 1994 Magic

 5   Technical Symposium and also at SIGGRAPH '95 in

 6   Los Angeles, California.

 7             Q.   Let's start with the latter and of

 8   course everyone in this room knows what that is

 9   because we've been talking about it for days.

10   Did you attend that conference in 1995?

11             A.   Which conference?

12             Q.   SIGGRAPH '95?

13             A.   Yes, I was in attendance at

14   SIGGRAPH 1995.

15             Q.   And did you present anything as

16   part of that conference?

17             A.   Yes, I did live demonstrations of

18   TerraVision in operation on the exhibit floor

19   retrieving data from the, across the network

20   across the magic network and also showed the

21   video that you saw in a loop on a TV screen.

22             Q.   How did the video that you showed

23   compare to the one that we all watched?

24             A.   A lot better quality.  So no, it's
```

1      the same video, but it was a clearer quality,

2      but it was from back then.

3              Q.   How about the demonstrations, how

4      did you demonstrate how TerraVision worked at

5      that time?

6              A.   So had a workstation there that

7      actually could run TerraVision.  And once again

8      we had ISS's scattered throughout the magic

9      network as you saw.  So TerraVision in operation

10     would actually pull that information across the

11     internet from the magic network and display that

12     in real time on the show floor.

13             Q.   How many people saw that

14     demonstration?

15             A.   Approximately about at least 500.

16             Q.   And how did that demonstration of

17     the TerraVision system compare to the features

18     that were shown in the video?

19             A.   They are the same features that

20     were shown on the video with TerraVision.

21             Q.   And how do the features of the

22     version of TerraVision that you've demonstrated

23     compare to the features described in the

24     documents that we walked through?

1          A.   The features of TerraVision that

2    was demonstrated at SIGGRAPH 1995 were the same

3    that was, that was in the papers that had been

4    published to date, including the ones that we

5    have talked about.

6          Q.   And from where did the -- which

7    ISS servers throughout the country did the

8    TerraVision system that you demonstrated at

9    SIGGRAPH '95 request data?

10         A.   We requested data from ISS server

11   at Multiple International Laboratory.  And we

12   also pulled data from ISS servers across the

13   Magic network in Lawrence, Kansas, Sioux Falls,

14   South Dakota, so we were demonstrating not only

15   TerraVision, but Magic network.

16         Q.   Art+Com, did you see them at

17   SIGGRAPH '95?

18         A.   Yes, I did.

19         Q.   Did you talk with any of them?

20         A.   Yes, I did.

21         Q.   Did you exchange any materials?

22         A.   Yes.  They actually were literally

23   across the hall, not hall, across the aisle from

24   me.  And we thought it was kind of funny that

```
 1        they were across -- so I talked a lot with them

 2        and I also gave them the source code to

 3        TerraVision.

 4                 Q.   I'm sorry, you gave the

 5        TerraVision source code, you gave that to

 6        Art+Com?

 7                 A.   Yes.

 8                 Q.   Why can you do that?

 9                 A.   So once again, Magic was a --

10        TerraVision was a federally funded project that

11        was meant to be put in the public domain so

12        people could use those algorithms in the spirit

13        of collaboration.  They were very interested in

14        how we were able to retrieve information from

15        across the network and to be able to do that in

16        real time.  They were interested in the high

17        resolution of our data, so in the spirit of

18        collaboration provided them with the source

19        code, walked them through it and talked to them

20        about it.

21                 Q.   How did you show them the source

22        code?

23                 A.   I had the source code there that

24        was compiled to run on the workstation to get
```

1      the demo running, so during the time we were

2      setting up I could show them, walk them through

3      the source code.

4                Q.   Was SIGGRAPH '95 the first time

5      that you ever heard of Art+Com?

6                A.   No, it wasn't actually.

7                Q.   When was it?

8                A.   Late 1994.

9                Q.   How did you hear of Art+Com in

10     '94?

11               A.   So I live in San Francisco and one

12     day I was driving and there was a plant store or

13     flower shop called TerraVision.  I thought that

14     was kind of funny that somebody was using the

15     exact same name for something completely

16     different.  When I got to my office I decided to

17     type it into a very rudimentary search engine

18     back then and I was expecting the flower shop,

19     the plant shop, but Art+Com showed up instead.

20               Q.   What did you do when you learned

21     about that?

22               A.   I showed the website, Art+Com

23     website to my manager.

24               Q.   And then what?

```
 1              A.   We thought it was very interesting

 2      the fact that there was another research --

 3      application out there with the same name doing a

 4      similar type of thing so we contacted them.

 5              Q.   I'm going to show you another

 6      document.  This is DTX-1196.  Mr. Ang, if you

 7      could please pull that up.  Now, this is

 8      difficult to read, so I want to take it in

 9      parts.  Let's start with the two in the front.

10      Thank you.  And if you could blow that up even

11      more.  I'm having a hard time seeing that.

12      Thank you very much.  The to line is to Pavel at

13      artcom.de.  Who is that?

14              A.   That was Pavel from Art+Com.

15              Q.   And the cc line, do you see

16      lau@ai.sri.com?

17              A.   Yes, I do.

18              Q.   And is that your e-mail address?

19              A.   That was e-mail address while I

20      was at SRI International.

21              Q.   I want to show you a little bit

22      about this document and particularly what I want

23      to do is I want to show you the third paragraph

24      of the top e-mail, which is an e-mail from Yvan
```

```
 1        to Pavel and we'll make this as big as we

 2        possibly can and it reads, just so we're on the

 3        same page, quote, what is remarkable is not only

 4        the similar names, but that TerraVision also

 5        uses a multi-resolution pyramid of imagery that

 6        allows the user to zoom in from high altitude

 7        down to low altitudes and also uses ATM image

 8        servers, end quote.  I want to focus on the bit

 9        about the similar names.  What does that refer

10        to?

11                A.   That refers to the fact that both

12        of us was using the name TerraVision.

13                Q.   So what happened next?  How did

14        you address these similar names issue?

15                A.   So we wanted to stop having name

16        collision, so we talked with Art+Com, we talked

17        to them about what TerraVision, our TerraVision

18        was doing, they talked to us about what their

19        TerraVision was doing and we both jointly

20        determined that SRI International TerraVision

21        was first, so they decided, they determined --

22        they changed their name to T underscore Vision.

23                Q.   What do you mean that SRI

24        TerraVision was first?
```

```
 1              A.   We were first and as we discussed

 2      with Art+Com that we were also at least one to

 3      two years ahead of them.

 4              Q.   Did SRI TerraVision change it's

 5      name after that conversation?

 6              A.   No, we did not.

 7              Q.   And did Art+Com change the name of

 8      its system?

 9              A.   Yes, they changed it.  They

10      changed it to T_Vision.

11              Q.   Were you given any materials as

12      part of your attendance at that conference?

13              A.   Yes, all the attendees received a

14      printed proceedings from the conference itself

15      and also a CD-ROM containing electronic versions

16      from the conference itself.

17              Q.   So I have in my hand a copy of a

18      CD that was produced by ACM in this case and

19      just discussed in the previous video.  I'm now

20      going to give this to Mr. Ang.  And Mr. Ang, if

21      you could put the CD 1 into the CD-ROM drive of

22      your computer and pull that up.  Do you

23      recognize this?

24              A.   Yes, I recognize it as the front
```

1    of the CD that was provided to us to all the

2    attendees at SIGGRAPH '95.

3              Q.   I want to show you the community

4    folder and Mr. Ang, if you could click on that.

5    Do you recognize this?

6              A.   Yes, I do.

7              Q.   What is it?

8              A.   It is one of the directories on

9    the CD-ROM that was provided to the attendees.

10             Q.   Now, I want to scroll all the way

11   down at the bottom, the index.htm, if you could

12   click on that.  And do you recognize this?

13             A.   Yes, I do.

14             Q.   What is it?

15             A.   It is a table of contents for the

16   various research projects that was what was

17   called interactive communities which was the

18   research part of the exhibit hall.  And --

19             Q.   Was your research project on this?

20             A.   Yes, you see about midway down,

21   very tiny, tiny font there, it says Magic

22   Gigabit Testbed.

23             Q.   Before we go there, do you see at

24   the bottom where it says T_Vision is another

1        link you can click on?

2                 A.   Yes.  I see T_Vision down the

3        bottom there.

4                 Q.   Let's go to Magic first.  Click on

5        that, Mr. Ang.  What's this?

6                 A.   This is a description that we

7        submitted into SIGGRAPH '95 that describes the

8        Magic Gigabit Testbed and TerraVision.

9                 Q.   And based on what you've seen, do

10       you believe that this is a copy of the CD that

11       you got at SIGGRAPH '95?

12                A.   Yes.

13                Q.   And why, what makes you believe

14       that?

15                A.   I recognize the materials that are

16       submitted in, also on the previous page there

17       was a SIGGRAPH '95 logo.  And I also recall some

18       of the research exhibitors that attended there,

19       including T_Vision.

20                Q.   And just so that the, the record

21       is clear here, I want to go to a different

22       exhibit that has some printouts from this.  I

23       want to go to DTX-1101B.  I'm sorry, 1001B.  And

24       if you could click through these documents

```
1    briefly, Mr. Ang, just click through the pages

2    from one to the next.  What did we just click

3    through?

4            A.   We just clicked through the

5    various folders that were on the CD-ROM to see

6    some of the, some of the material that was

7    provided, including Magic Gigabit Testbed.

8            Q.   We talked about SIGGRAPH '95 and

9    the last thing I want to talk about is the one

10   other conference that you mentioned being at and

11   showing TerraVision and you called it Magic '94.

12   What was that?

13           A.   Magic '94 was the Magic Technical

14   Symposium that we put on in 1994 in Lawrence,

15   Kansas, at the campus of the University of

16   Kansas.

17           Q.   Were you there?

18           A.   Yes, I was.

19           Q.   Did you present anything?

20           A.   Yes.  I gave a demonstration, a

21   live demonstration of TerraVision to the

22   attendees.  And we also showed, Yvan and I

23   showed the video that you saw a few minutes ago

24   and we also gave a talk about TerraVision at the
```

1    symposium.

2              Q.    You said you demonstrated it.   How

3    did you demonstrate TerraVision at Magic '94?

4              A.    We had a live demonstration that

5    we worked on a workstation and -- on a

6    workstation, and we had ISS's located at various

7    locations on the magic network and we did a live

8    demonstration of TerraVision being able to

9    retrieve the data from across the network in

10   real time as you fly.

11             Q.    And about how many people attended

12   that demonstration?

13             A.    Approximately about a hundred

14   people.

15             Q.    How did the features of the

16   TerraVision system that you have demonstrated at

17   Magic '94 compare to the features that we saw in

18   the video?

19             A.    The same features that was

20   demonstrated live was on the video.

21             Q.    And how do the features of the

22   version of TerraVision that you demonstrated at

23   Magic '94 compare to the documents that we

24   walked through?

1        A.   The features of TerraVision then

2   was all -- was equivalent to all the papers

3   thanked been published to date.

4        Q.   The last question I have for you

5   is from where did the TerraVision system that

6   you demonstrated at Magic '94, where did it get

7   its images from?

8        A.   We had multiple ISS servers in

9   Sioux Falls, South Dakota, Lawrence, Kansas --

10  Sioux Falls, South Dakota and Minneapolis

11  Supercomputing Center at Lawrence Kansas.

12           MR. ALMELING:  Pass the witness,

13  Your Honor.

14           MR. SPEARS:  Before we proceed to

15  cross, might be good for afternoon break.

16           THE COURT:  Why don't we take 15

17  minute break and we'll come back.  Of course the

18  jury should not discuss the case.

19           (Jury exits.)

20           THE COURT:  Thank you.  Sit down.

21  Anything before we break.

22           MR. PARTRIDGE:  Nothing from the

23  Plaintiff, Your Honor.

24           MR. SNYDER:  Nothing from

```
 1    Defendant, Your Honor.

 2                    (Short recess.)

 3                    THE COURT:  Ready to bring the

 4    jury back?

 5                    MR. SNYDER:  Yes, Your Honor.

 6                    MR. SPEARS:  Yes, Your Honor.

 7                    THE COURT:  Someone bringing the

 8    jury back?

 9                    (Jury enters.)

10                    MR. SPEARS:  Ready?

11                    THE COURT:  Yep, we're ready.

12    BY MR. SPEARS:

13            Q.   Good afternoon, Mr. Lau?

14            A.   Good afternoon.

15            Q.   This isn't the first time we've

16    met, is it.

17            A.   I'm sorry.

18            Q.   This isn't the first time we've

19    met, is it?

20            A.   No, it is not.

21            Q.   In fact, I took your deposition in

22    September of last year?

23            A.   Correct.

24            Q.   And at that time you were aware
```

```
1    that Google was being sued for patent

2    infringement, correct?

3              A.   Yes, I was.

4              Q.   But at that time you were not

5    aware of whose patent was being asserted against

6    Google?

7              A.   Can you -- I'm sorry, say that

8    again.

9              Q.   But at that time in September of

10   last year, you were not aware of who owned the

11   patent that was being asserted against Google?

12             A.   No, I did not.

13             Q.   But you know that now?

14             A.   I believe so, yes.

15             Q.   Okay.  Have you ever read the

16   patent in this case at a high level of detail,

17   if you'll excuse the pun?

18             A.   Yes.

19             Q.   Okay.  You've been hired as a

20   consultant by Google's lawyers to assist them in

21   connection with this lawsuit?

22             A.   Yes.

23             Q.   And they are paying you $400 an

24   hour for these services?
```

```
 1              A.   $450 an hour.

 2              Q.   Okay.  I'd like to ask you some

 3    questions about SRI International.

 4              A.   Okay.

 5              Q.   SRI International was formed out

 6    of Stanford University, correct?

 7              A.   Yes, it was formerly known as

 8    Stanford Research Institute.

 9              Q.   And if you go to SRI's facilities

10    in Menlo Park, California, you will find

11    placards touting SRI's role in incubating the

12    entire tech industry in Silicon Valley, correct?

13              A.   Actually I haven't been back to

14    SRI International since I left.

15              Q.   But that's a claim that you have

16    heard made by SRI International?

17              A.   Actually no, I haven't actually

18    heard that claim.

19              Q.   In any event, SRI International is

20    a fairly sophisticated organization, correct?

21              A.   Yes.

22              Q.   They do cutting edge research?

23              A.   Yes.

24              Q.   Some of that research is done
```

1    under government contracts, correct?

2              A.   Yes.

3              Q.   In fact, much of that research is

4    done under government contracts?

5              A.   That I don't know any more.

6              Q.   The fact that research is done

7    under government contracts doesn't forbid SRI

8    from obtaining patents on that research?

9              A.   That's correct.

10             Q.   Now, so we have SRI International,

11   this very sophisticated research organization in

12   1995, I take it that if there was a graphic

13   application that SRI had developed and that they

14   were very proud of and that they wanted to

15   record for posterity, that they would have had

16   the technology to do that in 1995?

17             A.   I'm sorry, repeat the question

18   again.

19             Q.   Okay.  If SRI International had

20   this graphic application that they developed

21   that they -- and that they were really, really

22   proud of and that they wanted to preserve for

23   posterity, then they would have had the

24   technology to make a record of what that

 1    application can do even back in 1995, correct?

 2         A.    That I'm not a hundred percent

 3    sure of, I'm sorry.

 4         Q.    Okay.  So in any event what you

 5    describe is the grainy video that was shown to

 6    the jury, SRI could have done a lot better than

 7    that in 1995 if they'd really wanted to?

 8         A.    Actually we created the video in

 9    1994 and it was not grainy.

10         Q.    Okay.  So what you're saying then

11    is that SRI International has not preserved a

12    copy of the non-grainy video that was created in

13    1995?

14         A.    That I don't know.

15         Q.    Okay.  If SRI believed that what

16    was depicted in that video was a significant

17    innovation, a significant advance, then wouldn't

18    it seem reasonable that SRI would have made

19    steps to hold on to that decent video?

20         A.    That I don't know.

21         Q.    In any event, once you and

22    Mr. Leclerc got around to discussing the

23    possibility of filing a patent application on

24    your work, you concluded it wasn't innovative

1      enough to do that?

2                A.   We determined that we were

3      building on existing algorithms and techniques.

4                Q.   And if you wanted to do that,

5      there were patent lawyers on SRI's staff that

6      would have assisted you in that enterprise;

7      correct?

8                A.   Yes.

9                Q.   Now, you spoke some of a magic

10     symposium that was held in Lawrence, Kansas in

11     August of 1994; correct?

12               A.   Yes.

13               Q.   In April of 1994, you went on

14     extended leave from SRI for personal reasons?

15               A.   Yes.

16               Q.   And I believe you indicated in

17     response to Mr. Almeling that you personally

18     attended that conference in Lawrence, Kansas in

19     August of 1994?

20               A.   I'm sorry, I don't remember the

21     names.

22               Q.   You indicated in response to

23     Mr. Almeling's question that you attended the

24     Magic 1994 symposium in August of 1994?

1        A.   Yes.  Sorry.

2        Q.   And that was in Lawrence, Kansas?

3        A.   Yes, it's in Lawrence, Kansas.

4        Q.   That's not true, is it, Mr. Lau?

5        A.   That the technical symposium was

6   in Lawrence, Kansas?

7        Q.   No, that you attended that

8   symposium?

9        A.   It is true, I did.

10        Q.   Do you recall giving deposition

11   testimony in connection with a lawsuit styled

12   Skyline Software versus Keyhole?

13        A.   Yes.

14        Q.   That testimony was given over a

15   multi-day period in June of 2006?

16        A.   Yes.

17        Q.   You were under oath at that time

18   and swore to tell the truth?

19        A.   Yes.

20        Q.   I would like to hand out a

21   transcript from that deposition and the

22   pagination is a little wonky which is why we put

23   a tab to direct you to the portion of the

24   transcript that I would like you to look at.

1068

```
 1     And that portion of the transcript appears at
 2     page 141.  Are you with me?
 3                A.   Sorry, 141, yes.
 4                Q.   At line five.
 5                THE COURT:  Give the witness a
 6     moment to look at it.
 7                MR. SPEARS:  Okay.
 8                Q.   Can I proceed?
 9                A.   Yes.
10                Q.   At line five of that page you were
11     asked, "At the bottom of that page there is a
12     reference to a TerraVision videotape made by
13     Dr. Leclerc for the Magic Technical Symposium in
14     August.  Do you have recall a videotape being
15     made of the TerraVision project?"
16                Can you read aloud your answer?
17                A.   "Yeah, the reasons yes, Yvan and I
18     made the tape because at the time I had just
19     come back from medical leave and I was unable to
20     travel during that time period, so in order to
21     have a demonstration in order to talk about it,
22     there was a videotape that was created and was
23     presented at the conference."
24                Q.   I am going to hand out the second
```

```
1     volume of that deposition.  And once again for
2     convenience, we have flagged the page that I am
3     interested in which we are addressing your
4     attendance at that conference in Lawrence,
5     Kansas.  Could you turn to page 168, line 24.
6     Are you there?
7              A.   Yes, I am.
8              Q.   And you were asked:  "When
9     approximately was this video prepared?"
10             What was your answer?
11             A.   "In 1994, summer of 1994."
12             Q.   And the very next question at line
13     one of page 169, "What was the purpose of this
14     video?"
15             What was your answer?
16             A.   "The purpose of the Magic video
17     was to demonstrate TerraVision at the Magic
18     Technical Symposium because they had -- I was
19     partially on medical leave at that time.  I was
20     unable to attend the symposium and so the
21     videotape was created in order to be able to
22     demonstrate the TerraVision system in my
23     absence."
24             Q.   And your testimony in 2006 was
```

1    that did you not attend that symposium in

2    Lawrence, Kansas?

3              A.   Yes, in 2006.

4              Q.   And 2006 was nine years closer to

5    the events in question that the testimony that

6    you have just given today?

7              A.   Yes.

8              Q.   All right.  Now, let's talk some

9    about the Siggraph 95 conference in Los Angeles.

10   That's a conference that's attended by people

11   who are interested in computer graphics and

12   visualization?

13             A.   The Siggraph conference?

14             Q.   Yes.  If you're interested in

15   networking there are other conferences that you

16   go you can go to; correct?

17             A.   Yes, I attend Siggraph.

18             Q.   During the course of that

19   conference, you would from time to time

20   demonstrate TerraVision to folks who are walking

21   around the conference hall; correct?

22             A.   Yes.

23             Q.   And if I were one of the folks

24   walking around the conference hall, one of the

```
 1      things that I would see would have been a less

 2      grainy version of the video that you just showed

 3      the jury; correct?

 4              A.  Yes.

 5              Q.  And if I followed, if I asked you

 6      questions about can I see some source code, can

 7      I see this or that, you would have responded to

 8      those questions?

 9              A.  Yes.

10              Q.  But if those types of questions

11      were not asked, the only other things that you

12      would demonstrate would be the variability of

13      this viewing frustum that you talk about and

14      something of the network performance; correct?

15              A.  No, that was not the only thing

16      that I would demonstrate.

17              Q.  I would like to show -- let's go

18      to the deposition that you gave in connection

19      with this.  And I would direct your attention to

20      page 177.  No, I'm sorry, I want to take you to

21      page 223.

22              A.  I'm sorry, I don't see the page

23      numbers on here.

24              THE COURT:  The page number is not
```

```
 1        on it.
 2                    A.   It starts at 337.
 3                    Q.   At 337?
 4                    A.   Or actually at 336.
 5                    Q.   I handed you the wrong document.
 6        Sorry.  I'll move on, Mr. Lau.
 7                         Now, you spoke some about some
 8        CD-ROMs and you were shown a CD-ROM during the
 9        course of your examination.  Do you recall that?
10                    A.   Yes.
11                    Q.   Now, do you recall that, in fact,
12        there were three CD-ROMs prepared for Siggraph
13        95?
14                    A.   That I don't recall the exact
15        number.
16                    Q.   You don't know how many were
17        prepared -- you don't recall that there was a
18        preceding CD-ROM and two media CD-ROMs?
19                    A.   I believe there was a preceding
20        CD-ROM.
21                    Q.   And at some point you believe that
22        you were given a CD-ROM at the conference?
23                    A.   Yes.
24                    Q.   Just one CD-ROM?
```

1        A.    That I don't remember.

2        Q.    The CD-ROM that you were shown by

3   Google's lawyers, that was not a CD-ROM that you

4   personally can say came from your records?

5        A.    I'm sorry?

6        Q.    The CD-ROM that Google's lawyers

7   showed you, that was not a CD-ROM that came from

8   your own personal records?

9        A.    I do not believe so.

10        Q.    In fact, you had no idea where

11   Google's lawyers obtained that CD-ROM from?

12        A.    No.

13        Q.    Now, the one thing that we do know

14   about the CD-ROM that you were given in Siggraph

15   1995 is that you don't recall if there was any

16   information about ACI TerraVision on that

17   CD-ROM?

18        A.    You mean Siggraph 95?

19        Q.    Siggraph 95.

20        A.    Can you repeat the question?

21        Q.    Whatever you received at Siggraph

22   '95, you do not recall seeing a CD-ROM with any

23   information about ACI TerraVision?

24        A.    I do recall seeing a CD-ROM.

```
 1              Q.  All right.  I am going to hand you
 2      a copy of your deposition transcript from this
 3      case, and I would like to direct your attention
 4      to page 177, lines 19 through 25.
 5                   MR. ALMELING:  Your Honor, this is
 6      being displayed to the jury, and the witness has
 7      not had an opportunity to review the transcript.
 8                   THE COURT:  Give the witness some
 9      time to review it.  Do you have copies of this
10      for the rest of us?
11                   MR. SPEARS:  I don't seem to have
12      copies of this.
13                   THE COURT:  Before you question
14      the witness about it, I would like to see it,
15      please.
16                   MR. SPEARS:  Okay.
17                   THE COURT:  Let him look at it
18      first.
19                   MR. SPEARS:  Understood.
20                   Permission to approach.
21                   THE COURT:  Yes.
22                   Okay.  Does Google have copies of
23      this?
24                   MR. ALMELING:  We do not, Your
```

```
 1        Honor.
 2                     THE COURT:  They're going to need
 3        copies of it.
 4                     MR. SPEARS:  Can we put it up on
 5        the screen?
 6                     THE COURT:  Yes.
 7                     MR. SPEARS:  Okay.
 8     BY MR. SPEARS:
 9             Q.  So you were asked at line 19, do
10        you recall if there was information about
11        Art+Com's T-Vision or about Art+Com on that
12        CD-ROM?  What was your answer?
13             A.  I responded, "That I do not
14        remember."
15                     At the time of when I took this
16        deposition.
17                     MR. SPEARS:  Pass the witness.
18                     REDIRECT EXAMINATION
19     BY MR. ALMELING:
20             Q.  A question about Magic 1994.
21        Counsel showed you a deposition that you gave in
22        2006 about whether you were in attendance and
23        you answered the question today, so let me ask
24        it simply.  Were you in attendance at Magic 1994
```

```
 1      in Lawrence, Kansas?

 2                A.   Yes, I was.

 3                Q.   How do you know that for sure?

 4                A.   Because subsequent to the 2006

 5      deposition, I actually have used Quicken, which

 6      is a financial piece of software.  I have been

 7      recording my credit card and bank transactions

 8      all the way back to 1989.  So since 2006 to

 9      today, I went back to 1994, August of 1994 and I

10      saw the credit card transactions for a hotel in

11      Lawrence, Kansas, a hotel in Kansas City, and

12      also a rent-a-car in Kansas and also for entries

13      for restaurants in that area.

14                Q.   And what do those receipts and

15      entries suggest to you?

16                A.   That I actually was at Magic 94.

17                MR. ALMELING:  No further

18      questions, Your Honor.

19                THE COURT:  So if there are no

20      further questions, we'll see if the jury has any

21      questions for this witness.

22                (Side-bar discussion:)

23                THE COURT:  The question is who

24      did you speak with from Art+Com at Siggraph 95?
```

1077

```
 1                    MR. SPEARS:  That's fine.

 2                    MR. ALMELING:  Likewise.

 3                    (End of side-bar.)

 4                    THE COURT:  Mr. Lau, one of the

 5      jurors has a question which I'm going to ask

 6      you.

 7                    Who did you speak with from

 8      Art+Com at Siggraph 95?

 9                    THE WITNESS:  I spoke with -- I

10      don't remember all their names, but there was at

11      least three of them that were there at Art+Com

12      -- I mean at Siggraph 95.

13                    THE COURT:  Do you remember the

14      names?

15                    THE WITNESS:  No, I do not.

16                    THE COURT:  Thank you.  Any

17      further questions?

18                    Thank you, Mr. Lau.  You're

19      excused.

20                    MR. ALMELING:  Your Honor, we

21      would like to move in several exhibits.

22                    DTX 1023, DTX 1037.  DTX 1087.

23      DTX 1088.  DTX 1193.  And DTX 1036.

24                    MR. SPEARS:  No objection.
```

```
 1              THE COURT:  Without objection,
 2      these exhibits are admitted.
 3              MR. SNYDER:  Defendant Google
 4      calls as its next witness Dr. Michael Goodchild.
 5      Dr. Goodchild is an expert in the field of
 6      geographic information systems with more than
 7      forty years of experience.  He's going to
 8      testify to his opinion that Google Earth does
 9      not infringe the '550 patent and that the patent
10      is invalid.
11              Mr. Williamson will question
12      Dr. Goodchild.
13              THE CLERK:  Please state and spell
14      your full name for the record.
15              THE WITNESS:  Michael Frank
16      Goodchild, M-I-C-H-A-E-L, F-R-A-N-K,
17      G-O-O-D-C-H-I-L-D.
18
19              MICHAEL FRANK GOODCHILD, PH.D.,
20               the deponent herein, having first
21               been duly sworn on oath, was
22               examined and testified as follows:
23              MR. WILLIAMSON:  May I proceed,
24      Your Honor?
```

```
 1                    THE COURT:  Yes.

 2                    DIRECT EXAMINATION

 3   BY MR. WILLIAMSON:

 4            Q.   Good afternoon, Dr. Goodchild.

 5   You and I know each other, but for the benefit

 6   of the jury, I'm Brett Williamson and I'm one of

 7   the attorneys here for Google in the case

 8   defending it against the allegations by ACI.

 9                    Dr. Goodchild, could you please

10   introduce yourself to the jury?

11            A.   Good afternoon.  I'm Dr. Michael

12   Goodchild.

13            Q.   Dr. Goodchild, what do you do for

14   a living?

15            A.   I retired in 2012 from the

16   University of California Santa Barbara where I

17   was a professor of geography.

18            Q.   Do you continue to hold academic

19   appointment?

20            A.   I do.  I'm a Emeritus Professor at

21   UC Santa Barbara.  I'm also an affiliate

22   professor at the University of Washington.  Both

23   of those are honorary and unpaid positions.

24            Q.   Dr. Goodchild, did you assist in
```

1    preparing a slide of some of your academic and

2    educational background?

3            A.   I did.

4            Q.   And Mr. Ang, why don't we put up

5    the first slide.

6            Dr. Goodchild, at the top of this

7    slide it list your position as Professor of

8    Geography at UC Santa Barbara.  You began

9    teaching there in 1989?

10           A.   Yes.

11           Q.   What positions or appointments at

12   UC Santa Barbara did you hold?

13           A.   Professor of Geography.  I was

14   also director of various research centers from

15   time to time.

16           Q.   And you were the director of the

17   Center for Spatially Integrated Social Science;

18   is that correct?

19           A.   Yes.

20           Q.   Have you held any other teaching

21   positions before UC Santa Barbara?

22           A.   Yes.  For twenty years before that

23   I was a professor at the University of Western

24   Ontario.

1        Q.   Can you describe for the jury your

2   personal educational background?

3        A.   I have a BA in physics from

4   Cambridge University 1965.  And then a Ph.D. in

5   geography from McMaster University in Canada in

6   1969.

7        Q.   In what particular field have you

8   focused your research and teaching activities

9   since you began professionally?

10       A.   For over forty years my focus has

11   been on geographic information systems.

12       Q.   Is that field sometimes referred

13   to as GIS?

14       A.   Yes.

15       Q.   Have you published any books or

16   papers in the GIS field?

17       A.   I have published something over

18   550 papers, and something over fifteen books on

19   the topic.

20       Q.   I'm holding up a very heavy

21   two-volume treatise titled Geographical

22   Information System.  Is this one of your books,

23   these two volumes?

24       A.   Yes.

1    Q.   How is that volume used in the

2    field?

3         A.   It was published in 1991.  It has

4    about 800,000 words.  It was published as a

5    state of the art review of GIS at that time.

6         Q.   Have you received any honors for

7    the work you have done in the GIS field?

8         A.   Yes.  In the US I have been

9    elected to the National Academy of Sciences and

10   the American Academy of Arts and Sciences.  In

11   Canada I have been elected to the Royal Society

12   of Canada.  In the UK I have been elected to the

13   Royal Society.  I have also received a gold

14   medal from the World Geographical Society.  And

15   in France I received the Prix Vautrin Lud, which

16   is in some people's view the equivalent of the

17   Nobel Prize in geography.

18        Q.   Have you taught any courses in the

19   area of geographical information systems?

20        A.   Yes.  My teaching since the early

21   '70s has been in this field.

22        Q.   As part of your work on the

23   faculty of these institutions, did you also do

24   independent research?

1    A.   Yes.

2         Q.   And have you worked on any

3    research projects that involved the use of

4    digital imaging in connection with the display

5    of geographical information?

6         A.   Yes.  That really is what my

7    research has all been about from the early

8    1970's.

9         Q.   So let's go to the next slide.

10   And I'm going to direct you, Dr. Goodchild, to

11   what's been marked as DTX 1198.  Do you

12   recognize the title of this paper on the slide

13   that's being displayed?

14        A.   Yes, I do.

15        Q.   And what is this paper?

16        A.   This is a paper published in April

17   '91, and it describes some work that my lab was

18   doing in 1990, 1991.  And we were very excited

19   at that time by the emergence of some 3D

20   capabilities in workstations.

21             You have heard a lot about Silicon

22   Graphics at this trial.  We were actually

23   working with an IBM machine which had many of

24   the same characteristics and we were interested

```
 1    in developing the ability to place a globe on

 2    the screen and allow the user to spin the globe

 3    and zoom in to finer resolution.

 4         Q.   I want to proceed now to the

 5    opinions that you have developed based upon the

 6    work you have done in the case.

 7              First of all, what subjects will

 8    you be testifying about today?  Have you

 9    prepared a slide to summarize those?

10         A.   Yes.  So essentially two sets of

11    opinions.  The first set having to do with

12    infringement and the question of whether Google

13    Earth infringes the '550 patent.  And the

14    question of whether the '550 patent is invalid.

15         Q.   And I'm going to get into the

16    details of your opinions, of course, this

17    afternoon.  But just so the jury understands

18    what you'll be talking about, have you reached

19    an opinion as to whether Google Earth infringes

20    the '550 patent?

21         A.   Yes, I have.  My conclusion is

22    that it does not.

23         Q.   Have you reached an opinion based

24    on your work in the case as to whether or not
```

```
 1      the '550 patent is invalid?

 2              A.   Yes.

 3              Q.   What's that conclusion?

 4              A.   It is invalid.

 5              Q.   In doing your work to form your

 6      opinions that you're going to talk about this

 7      afternoon, can you tell the jury generally the

 8      source of information that you reviewed?

 9              A.   We can start with the '550 patent

10      itself and it precursors.  It was the third

11      issue of essentially the same patent.  And also

12      the file history which is the documentation that

13      the patent office maintains on its decisions in

14      the case.

15                   I have also reviewed a large

16      amount of published material dating from the

17      date of application of the patent.  And I have

18      consulted the source code of Google Earth and

19      also had conversations with Google's engineers.

20      I've also considered the testimony given in

21      various depositions and at this trial.

22              Q.   Have you reviewed Dr. Castleman's

23      reports that he prepared in connection with the

24      opinions that he presented at trial yesterday?
```

1    A.   Yes, I have reviewed the various

2    reports and I also of course heard

3    Dr. Castleman's testimony.

4    Q.   It's a good time to ask you, have

5    you been here in Court since the beginning of

6    the trial to listen to the testimony of the

7    witnesses?

8    A.   Yes, I have.

9    Q.   Including Dr. Castleman's

10   examination?

11   A.   Yes.

12   Q.   And did you also review some of

13   the Court's decisions relating to, for instance,

14   the interpretation or construction of some of

15   the claim terms?

16   A.   Yes.  There are some very

17   important additions by the Court as to what

18   various terms in the claims mean, in the claims

19   of the '550 patent.

20   Q.   Did you use those claim

21   constructions in developing your opinions?

22   A.   Yes.

23   Q.   I'm going to show you what's been

24   marked as PTX 4.  And I believe it's on the next

1    slide.  You mentioned having reviewed the file

2    history.  Is this the first page of the file

3    history of the '550 patent?

4              A.   Yes, it is.

5              Q.   Did you rely on your review of the

6    file history of the '550 patent in reaching your

7    opinions that you're presenting today?

8              A.   Yes, it was one of the many

9    sources of information.

10             Q.   Dr. Goodchild, have you ever used

11   Google Earth?

12             A.   Yes, I have.

13             Q.   When was the first time you did

14   that?

15             A.   I first encountered it in the form

16   of Earth Viewer, the precursor, that if I

17   remember correctly was in very early 2002.  I

18   was very excited by it.  I immediately purchased

19   a copy.  And I began using it in my teaching and

20   making presentations, and in my research.

21             Q.   Have you again reviewed the Google

22   Earth product in connection with developing the

23   opinions that you're presenting to the jury

24   today?

```
 1              A.   Yes.

 2              Q.   About how many hours have you

 3    spent on your investigation that led to you

 4    presenting the opinions today?

 5              A.   Until the end of April I had spent

 6    215 hours.

 7              Q.   Are you being compensated for the

 8    work that you've done in this case?

 9              A.   Yes, I am.  Google is being billed

10    $500 an hour for my time.  There is a referral

11    agency involved which takes a hundred dollars,

12    so I receive 400.

13              Q.   Does the compensation agreement

14    that you have depend in any way on the outcome

15    of this case?

16              A.   No, not in any way.

17              Q.   Doctor Goodchild, you've talked

18    about GIS.  What specific technologies within

19    the GIS field do you believe are relevant to

20    your opinion about the '550 Patent and whether

21    or not it relates to the Google Earth product?

22              A.   Well, there are a number of

23    technologies.  There's, as you've heard many

24    times, the technology of the quadtree.  There's
```

```
 1     the technology of remote access to data bases.

 2     So there are numerous technologies, including

 3     the technologies of computer graphics which

 4     determine how the images are actually displayed

 5     on the computer screen.

 6              Q.   With regard to this idea of how

 7     these images are displayed to the computer

 8     screen, have you prepared an initial

 9     demonstration to explain to the jury this

10     general field?

11              A.   Yes, I have.

12              Q.   Can we go to the next slide.  Can

13     you explain your demonstration for the jury,

14     Doctor Goodchild?

15              A.   So inevitably some of what I'm

16     going to show you you've seen before, so I hope

17     you will excuse that.  So we're looking at the

18     part of the northeastern United States,

19     including all of Delaware, all of New Jersey,

20     part of the Atlantic Ocean, part of Lake Erie.

21     And let's suppose our interest is in Wilmington,

22     but if we were to bring a magnifying glass to

23     that image we would see something very blurry

24     and you might recognize the Delaware River, but
```

1090

```
 1    not much else.

 2              Q.   Before the time of the '550

 3    Patent, were there ways to adjust the image

 4    resolution to match the user's desire to have a

 5    finer viewpoint of the image?

 6              A.   Oh, yes.  And this idea of going

 7    to finer resolution dates way back in the

 8    history of GIS.

 9              Q.   Let's go to the next slide.  And

10    I'm going to ask you to refer to what we've

11    marked as DTX-1076.  I believe it's in evidence.

12    And this is a patent from 1987.  Do you

13    recognize this exhibit?

14              A.   Yes.

15              Q.   And have you reviewed it as part

16    of your work in this case?

17              A.   Yes.

18              Q.   And September 25th, 1987 is the

19    year this patent was filed.  Did you review the

20    various disclosures and information in this

21    patent as part of your opinion?

22              A.   I did.

23              Q.   Let me direct you to Page 6 of

24    Exhibit 1076.  What does this part of the patent
```

1       explain?

2               A.   So this part of the patent

3       illustrates the concept of, as you've heard many

4       times, the quadtree.  And this Figure 11A, which

5       comes from the patent, shows an initially course

6       image over a large area being subdivided first

7       into four sections and then subdivided again

8       into four more sections and then again into

9       four.  So that if we had carried out that

10      subdivision over the entire square area, we

11      would have 64 subdivisions at our finest level

12      of resolution.

13              Q.   How would this subdividing process

14      that you described from this global mapping

15      patent apply to the image that you showed in

16      your earlier demonstration?

17              A.   So let's put it on top of that

18      image.  And we can now, if we superimpose the

19      quadtree and we've arranged it so that one of

20      those 64 smaller sections lies exactly on

21      Wilmington, and if we now look at the finer

22      resolution data which is available for that

23      smaller section, there's the original magnifying

24      glass, if you like, and the lower image shows

```
 1        the much finer resolution.  And now you can

 2        clearly see the Delaware River, you can see the

 3        Christina River, you can see Brandywine Creek,

 4        you can see downtown Wilmington.

 5               Q.   Let me move now to the '550

 6        Patent.  And you've reviewed the '550 Patent, I

 7        take it, in detail as part of your opinion?

 8               A.   Yes, I have.

 9               Q.   On this slide it's Claim 1 of the

10        '550 Patent and can you generally describe for

11        the jury's benefit your understanding of what

12        Claim 1 talks about?

13               A.   Yeah, it's about creating a

14        pictorial representation of space-related data,

15        which essentially means geographic information

16        of a selectable object, in this case the earth,

17        and this pictorial representation will present a

18        field of view of the object by an observer and

19        in this case, in this two figures, Figure 9 and

20        Figure 11 from the patent, you can see the earth

21        as it would be seen from space.  So what we're

22        trying to do essentially is simulate how the

23        earth looks from space.

24               Q.   Is that process then described in
```

 1          these various steps?

 2                    A.   Yes, those are the six steps of

 3          the '550 Patent, sorry, seven steps of the '550

 4          Patent that describe exactly how this is done.

 5                    Q.   If we turn to the first step, Step

 6          A, what is that explaining?

 7                    A.   So this is the principle of the

 8          distributed data sources and so in my

 9          illustration here I've taken Figure 1 from the

10          patent and I've put three servers on it and also

11          the user's workstation in the bottom right.  And

12          what the user is going to do is request data

13          from that plurality of spatially distributed

14          servers.

15                    Q.   Did the Court issue any

16          constructions of claims that relate to Step A

17          that you used in your opinions?

18                    A.   Yes, it did.  Here are the two

19          constructions that the Court issued.

20                    Q.   I won't ask you to read those, but

21          you considered those in your opinion?

22                    A.   Yes.

23                    Q.   Let's move onto Step B.  What is

24          Step B talking about?

1    A.   So Step B says that you first

2    determine the field of view from the imagined

3    user's position, the virtual camera, then Step C

4    says you request data for that field of view.

5    Those are the red arrows going out to the

6    servers.  Step D says the servers provide data

7    which is now centrally stored that relates to

8    the field of view and then finally you represent

9    the data on the screen in Step E.

10    Q.   And did the Court construe any

11    terms that relate to Steps B through E that you

12    relied on?

13    A.   Yes.  So here are two

14    constructions by the Court of the specific

15    meaning of two of those claims.

16    Q.   And then turning to Steps F and G.

17    I know the jury has heard a little bit of

18    testimony about those during the course of the

19    trial.  What do Steps F and G talk about in the

20    '550 Patent?

21    A.   So Step F describes how we do this

22    process of course-defined zoom.  And it begins

23    by dividing the area into these subsections, in

24    this case into four, then requesting high

```
 1       resolution data for each of the smaller

 2       sections, then storing the high resolution data

 3       and then representing the data in a pictorial

 4       representation.  So there's four substeps of

 5       Step F.

 6              Q.  Now, in your opinion, does the

 7       global mapping patent that we saw earlier in

 8       1997 describe one of the ways to do this

 9       dividing process?

10              A.  Yes.

11              Q.  Did the Court issue any

12       construction is on claim terms F and G that

13       you've considered in your opinion?

14              A.  Yes.  Here they are.  So the Court

15       construed the term image resolution and also the

16       longer section that you see there.

17              Q.  Now, you've discussed Claim 1.

18       And do you understand in developing your opinion

19       that ACI is asserting at this trial three

20       additional dependent claims of the '550 Patent?

21              A.  Yes.

22              Q.  And those are claims 3, 14 and 28.

23       Have you reviewed those claims as well?

24              A.  Yes.
```

1        Q.   Okay.  And in forming your

2    opinions, did you consider the Court's

3    construction of terms in those dependent claims?

4        A.   Yes.

5        Q.   Now, let's go to the next slide

6    and remind the jury of the opinions we're going

7    to move to.  I want to first ask you about the

8    first of your two, I think you described them as

9    sets of opinions, and that is that Google Earth

10   does not infringe, that Earth uses a

11   fundamentally different method than the '550

12   Patent.  What Google Earth products did you

13   consider in reaching that opinion?

14       A.   Well, I think for the purposes of

15   this trial we've already seen that the Google

16   Earth products can be grouped into three

17   categories, and I followed that suggestion in

18   this work.

19       Q.   And have you listed them in a

20   slide?

21       A.   Yes.  You'll notice the order is a

22   little different here.  So what I've called 1, 2

23   and 3, I think that Doctor Castleman called 2, 1

24   and 3, but this order here is to me a little

1    more convenient because it's essentially

2    chronological.  So Group I was developed first,

3    then Group II and then Group III.

4           Q.   What types of evidence relating to

5    these Google Earth products and the way that

6    they work did you consider in reaching your

7    opinion?

8           A.   As I said before, I examined the

9    source code, I talked with Google engineers to

10   confirm my interpretation of the source code and

11   gathered other information and I also reviewed

12   various documents that Google has published from

13   time to time about Google Earth.

14          Q.   Why is source code relevant to

15   your opinion regarding non-infringement?

16          A.   Because source code essentially

17   defines what the computer does.  It's the set of

18   instructions to the computer, and so it's the

19   ultimate authority on what the computer is

20   actually doing.

21          Q.   Did you also review Doctor

22   Castleman's opinion regarding how Google Earth

23   works?

24          A.   Yes, I did.

1        Q.    Are there parts of Doctor

2    Castleman's opinion that you disagree with?

3        A.    Yes.

4        Q.    So let's turn back to the global

5    mapping patent we looked at before, and it's use

6    of quadtrees and subdivisions here.  Does Google

7    Earth use the concept of a tree or a quadtree in

8    its product?

9        A.    Yes, it does.

10       Q.    Do you have a demonstration of how

11    this use of quadtrees and subdivisions would

12    work in the Earth product?

13       A.    Yes, I do.

14       Q.    So what are we seeing here on the

15    left-hand side of this next slide?

16       A.    So what we're seeing on the left

17    here is a tree.  At the top, the A level is the

18    courses image and then as we move down the tree

19    to the B level, the C level, the D level, the

20    pieces of the tree are smaller but they get more

21    refined, they get more detailed.  And you've

22    heard these images talked about in several ways.

23    You can talk about them as the nodes in the tree

24    or we can talk about them as tiles, because

    1    essentially they form a mosaic which covers the

    2    area.

    3            Q.   Now, when one uses the Google

    4    Earth product, are all these tiles or images

    5    actually placed onto the user's computer or cell

    6    phone?

    7            A.   No.  And this of course is one of

    8    the big problems here.  One of the big

    9    challenges is that there isn't room on the

   10    user's computer or cell phone and so we store

   11    them in the Keyhole server and access them as

   12    needed and as appropriate.

   13            Q.   So if a person who decides to use

   14    Google Earth wants to see a particular image,

   15    how does the computer or the cell phone decide

   16    which image to request from the Keyhole server?

   17            A.   So this is a little bit like a

   18    menu at a restaurant, because with a menu what

   19    you have is a description of the food items, you

   20    don't actually have the food items.  And what we

   21    have here in the metadata tree is a description

   22    of what each element of the metadata tree might

   23    give you.  We don't actually get the data until

   24    we need to.  So this is all about delaying

```
 1      requesting the data until we are reasonably sure
 2      what data we need, just as in a restaurant, you
 3      delay getting the food until you know what you
 4      want from the menu.
 5              Q.   I'm sorry, what information about
 6      an image is described in this metadata or in
 7      these items in the menu?
 8              A.   There are quite a few items, but
 9      there are two really that are relevant here.
10      One is the resolution of each of those elements
11      in a metadata tree and as we go down the tree
12      the resolution gets higher and higher.  And then
13      the second is the area covered or in other words
14      the viewpoint of that tile in the metadata tree.
15              Q.   How did the Google Earth products
16      use this metadata tree to display images at the
17      level of detail that the user wants?
18              A.   So Google Earth uses this process
19      of traversal where we start with a root node and
20      work through the tree, examining the metadata to
21      decide which of the tiles in the metadata tree
22      we're going to request from the server.
23              Q.   Did you review Google documents
24      that the company uses in its business to help
```

```
 1          confirm that Google Earth uses a metadata tree?

 2                    A.   Yes, I did.

 3                    Q.   Let's move on to the next slide.

 4          It's a page from PTX-0075, which is in evidence.

 5          Is this one of the documents that describe

 6          Google Earth's use of metadata trees?

 7                    A.   Yes.

 8                    Q.   That Google keeps in its files?

 9                    A.   Yes.  You can see the relevant

10          terms here.  You can see the term traverse, this

11          is how Google traverses a metadata tree.  You

12          can see the term metadata and the distinction

13          between metadata, the menu, and node data, the

14          food items.  And you can also see that for the

15          purposes of convenience, that diagram uses a

16          binary split into two instead of a split into

17          four.  It makes it simply easier to see.

18                    Q.   And will you be using that same

19          binary tree for some of your demonstrations?

20                    A.   Yes, I will.

21                    Q.   Did you confirm that traversal of

22          a metadata tree is the method used in all

23          versions of Google Earth that you reviewed?

24                    A.   Yes, I did.
```

1        Q.   So let me turn now to your

2    non-infringement positions and we'll go here

3    first.  And first, as a general matter, Doctor

4    Goodchild, what is your understanding of the

5    requirements of infringement, that is at a high

6    level, about the performance of the element of a

7    claim?

8        A.   So at a high level, the law

9    establishes that in order to infringe it's

10   necessary that the offending products follow

11   each and every step of the claim.

12       Q.   And you've listed two reasons why

13   in your opinion Google Earth does not perform

14   every step of Claim 1 of the '550 Patent; is

15   that correct?

16       A.   Yes.

17       Q.   Okay.  What is the first reason?

18       A.   This focuses on Step F and the

19   problem here is that Google Earth does not, as

20   required by the '550 Patent, does not request or

21   display each of the smaller sections after the

22   division step.

23       Q.   What's the second reason?

24       A.   And the second refers to Step G

```
 1    and Google Earth does not repeat Step F as

 2    required by Step G.

 3              Q.   So on this slide in your

 4    testimony, you're right now just talking about

 5    Claim 1.  In your opinion, does Google Earth

 6    infringe any of these dependent claims, 3, 14 or

 7    28?

 8              A.   Each of the dependent claims of

 9    course depends on Claim 1, and so if Google

10    Earth does not infringe Claim 1, it

11    automatically does not infringe the dependent

12    claims.

13              Q.   So Doctor Goodchild, for the first

14    reason that you have concluded Google Earth does

15    not infringe, what do you mean by Google Earth

16    does not request, store and represent each of

17    the smaller sections?

18              A.   So in executing Step F we first

19    divide.  And that's this idea with the quadtree

20    of dividing a larger section into its children,

21    into its four children and then Step F requires

22    that the requesting substep go to each of the

23    smaller sections.  So each of the smaller

24    sections must be requested.  Each of the smaller
```

```
 1    sections must be stored and represented in the
 2    pictorial representation.
 3              Q.   Have you helped prepare an
 4    animation to illustrate how this requirement of
 5    each of the smaller sections works under the
 6    '550 Patent?
 7              A.   I have.
 8              Q.   Can you tell us what happens in
 9    this animation?
10              A.   And of course the point here is
11    that what I'm going to demonstrate is how
12    different the '550 requirements are from the way
13    Google Earth operates.  So we're going to look
14    at how the '550 Patent would operate and here is
15    the root node A1 and we begin by deciding that
16    it is not a sufficient resolution, we don't
17    think it's a good enough image to display, the
18    user wants something more detailed and so we
19    begin Step F by dividing.  And those red arrows
20    denote dividing into B1 and B2.
21              Q.   And what happens next in the '550
22    Patent?
23              A.   Then Step F requires us to move to
24    the next step, which is requesting higher
```

     1      resolution spatially related data for each of

     2      those smaller sections, so B1 and B2 must be

     3      requested, they must be stored centrally and

     4      then represented.

     5               Q.   And just so we're clear, because I

     6      know you have a couple of other animations

     7      similar, you describe the red arrows as in your

     8      demonstration depicting the dividing step; is

     9      that correct?

    10               A.   Yes.

    11               Q.   And then we saw the nodes where

    12      tiles B1 and B2, they were empty and then

    13      surrounded by yellow and what does that refer

    14      to?

    15               A.   That refers to the requesting of

    16      the contents of that tile in the metadata.

    17               Q.   And then when they turn orange,

    18      what did that refer to?

    19               A.   That referred to the fact that the

    20      data for B1, the actual image data has now been

    21      retrieved back at the user's computer and is now

    22      being represented on the screen.

    23               Q.   And then what happens in Step G?

    24               A.   So Step G then says well,

1   depending on two conditions, if you still don't

2   have good enough resolution and if there's a

3   better resolution available, in other words

4   there's layers below this in the tree, then you

5   repeat Step F.  So let's repeat Step F with

6   respect to B1, we divide B1, we request data for

7   C1 and C2, we wait for that data to come back to

8   the user's computer, we then store it locally

9   and then we represent it.

10          Q.   What happens under the '550 Patent

11   if the C1 and C2 smaller sections aren't at a

12   sufficient level of detail?

13          A.   Then we repeat again.  And so

14   let's divide C1 into D1 and D2, request, store

15   and represent and then go perhaps to C2, divide,

16   request, store and represent and so on.

17          Q.   Now, what happens if D1 and D2 are

18   at a sufficient level of detail at least

19   according to the operation of the '550 Patent?

20          A.   Then G says we now have the best

21   data available for D1 and D2, but we don't yet

22   have the best data available for C1 so we go

23   back and repeat -- I'm sorry, for C2.  Go back

24   and repeat for C2 and that gives us D3 and D4

```
 1     and so on until we've completed the entire tree.

 2              Q.   Now, you explained how the process

 3     worked for the B1 parent node to its C1 and C2

 4     parent nodes and the C1 parent node to its D1

 5     and D2 parent nodes, correct?

 6              A.   Yes.

 7              Q.   Does the '550 Patent require that

 8     that process wait until its done at the same

 9     level on the other side of the tree?

10              A.   Not necessarily.  Depends on the

11     ending condition there.  So we might have run of

12     good enough data as we went do you know another

13     branch of the tree.

14              Q.   Now, have you prepared a similar

15     animation that shows how the operation of the

16     '550 Patent's method would look if we were

17     actually operating this with a computer screen?

18              A.   Yes.

19              Q.   And can you take us through this

20     demonstration as it depicts each of the smaller

21     sections requirement of Claim 1 of the '550

22     Patent?

23              A.   So here's A1 on the screen.  It's

24     not very -- A 1.  /S grainy, so let's /TKEUFPD
```

```
 1       it, execute Step F, divide, request, store and

 2       represent.  And so both halves of the screen now

 3       have better resolution.  But that's not good

 4       enough, so we go to B1, divide it again,

 5       request, store and represent and now the two

 6       quarters corresponding to C1 and C2 have gotten

 7       better, but that's still not good enough, so we

 8       do the same --

 9              A.   So we do the same, we repeat for

10       C1 to get D1 and D2, and we get now better

11       resolution.  And eventually when we finish the

12       whole process, we will have the desired

13       resolution for the entire screen.

14              Q.   Based on your investigation, is it

15       your view that Google Earth, or whether or not

16       Google Earth requests each of the image sections

17       within the field of view as set forth in the

18       '550 patent, step F?

19              A.   No, the process used by Google

20       Earth is very different.

21              Q.   Have you reviewed and assisted in

22       preparing an animation that describes how

23       Google's method works?

24              A.   Yes, I have.
```

1        Q.   The jury earlier heard from one of

2    the engineer product managers from Google, Peter

3    Birch.  Were you in the courtroom at the time?

4        A.   I was.

5        Q.   Is this a similar demonstration to

6    the one Mr. Birch used?

7        A.   It is.  Essentially he was making

8    the same point.  He was describing how Google

9    Earth works.  My purpose here is to compare how

10   Google Earth works to the '550 patent.

11       Q.   Did you confirm that it depicted

12   the operation of the Google Earth products as

13   you understood it based on your review of the

14   various documents and source code?

15       A.   Yes, all three groupings of the

16   Google Earth products.

17       Q.   And did you do some additional

18   material in this animation other than what we

19   saw from Mr. Birch?

20       A.   I don't think so.

21       Q.   What does -- well, why don't you

22   just take us through the process, your

23   understanding having done the investigation to

24   review the Google process how it works?

```
 1              A.   Just to remind the jury, so we

 2      first begin traversing the metadata tree.  And

 3      that if you remember was the set of blue arrows.

 4      And every tile or node that we visit gets put

 5      into a list.

 6              So we are dividing, but we're not

 7      requesting and storing and representing anything

 8      at this stage.  We traverse the entire metadata

 9      tree and Mr. Birch talked about the importance

10      of speed and doing that and how quickly that can

11      be done.

12              Q.   Somehow it started over again.

13      Let's stop the demonstration there.  There has

14      been a number of the nodes that have been

15      outlined in blue.  Is that the result of the

16      traversal process?

17              A.   Yes.

18              Q.   So what happens after traversing?

19              A.   Well, you'll notice that to this

20      point nothing has been requested, nothing has

21      been stored, nothing has been represented.  We

22      divided as step F requires, but we have not done

23      the rest of step F.  So the next step is to

24      prioritize the list.  And to do this on the
```

1    basis of the desirability of retrieving

2    particular tiles from the server.

3            Q.   Why does the Google Earth system

4    prioritize this list after the traversal?

5            A.   Because at this point we basically

6    know what we want.  We know we want D1 through

7    D8 because those are the fine resolution data

8    that are going to satisfy the user.  So we put

9    them first in the list and start retrieving them

10   first.

11           Q.   Which versions of Earth use a

12   prioritization process?

13           A.   All of them.  Although there are

14   differences between the criteria used.

15           Q.   What happens next after the

16   prioritization of the list?

17           A.   So now it's finally the requesting

18   can begin.  So if you'll remember this is still

19   part of step F in the patent.  And so D1 through

20   D8 have been requested, B1 has been requested.

21   But as Mr. Birch described this morning, we've

22   also ended up with B1.  And this is in part a

23   quirk of the internet that it's not all that

24   predictable.  And in part it's because Mr. Birch

1    referred to various actors I think he called

2    them, which go out and retrieve data and it's

3    entirely possible that they will retrieve data

4    out of sequence.

5            Q.   Based upon your review of the

6    source code, did you agree with Mr. Birch's

7    description of the way that the parallel

8    processes worked to have people go out, I think

9    he used an analogy of several people at the

10   supermarket getting different things?

11           A.   Yes.

12           Q.   What happens next in the Google

13   Earth product?

14           A.   So far we have requested, you can

15   see now the various tiles are starting to show

16   up back at the user's computer, we have got D1,

17   we have stored it and represented it, and if we

18   allow this process to continue, essentially we

19   will eventually end up with all of the D titles

20   and we'll end up with the image we want.

21           Q.   Now, some of these tiles are

22   showing based upon your description as not

23   having data requested and, therefore, there is

24   no image data on the tree.  Is that the

1    conclusion that you reached about Google Earth

2    not requesting storing representing each of the

3    smaller sections?

4         A.   Yes.

5         Q.   And how would you display or how

6    would you explain why in this process say, for

7    instance, C3 and C4 never had data even

8    requested?

9         A.   Because with this process, which

10   began with traversal, we have been smart enough

11   to identify the ones we really want.  And not

12   have to retrieve all of the intermediate ones,

13   so we have been able to skip certain nodes or

14   tiles.

15             A key issue here is that remember

16   that in this demonstration, I'm just showing a

17   binary split instead off a four-way split and

18   I'm only showing three levels or four levels in

19   the tree.  And you heard this morning that the

20   number of levels in the tree can be as many as

21   twenty-five.

22             So what that means is the

23   proportion of tiles that are skipped will be

24   much higher in reality than it is in this very

1   simple demonstration.

2              Q.   So to use the demonstration, if we

3   had the entire tree in the actual system, there

4   would be a lot more red Xs; is that correct?

5              A.   Yes.

6              Q.   If, Dr. Goodchild, you were to

7   redraw this tree to only show the images that

8   actually were requested, stored and represented,

9   what would that look like?

10             A.   So it might look something like

11  this, where dashed lines are indicating that

12  there are intermediate nodes between, for

13  example, A1 and D5 which have been skipped.

14             Q.   I'm going to ask you now about

15  some of the confidential source codes we talked

16  about at length yesterday.  Do you have an

17  example of source code for one group of the

18  accused products that executes this

19  prioritization process that leads out or skips

20  some of the nodes?

21             A.   Yeah.  And let me say that in my

22  report I've gone into detail on each of the

23  product sets and have a great deal of detail on

24  the source code.

```
 1              But here I have outlined a

 2    particular comment in lod-manager.js which is

 3    one of the files of software that Dr. Castleman

 4    analyzed.

 5              And you can see here if the node

 6    meets the threshold, or is a leaf, in other

 7    words, it's at the bottom of the tree, then

 8    request it normally since we want to show it as

 9    quickly as possible.

10              In other words, the purpose of the

11    prioritization is to get the nodes we most want

12    as quickly as possible.

13         Q.  Have you reviewed other software

14    as well as part of your review of the Google

15    Earth product?

16         A.  Yes.

17         Q.  Dr. Goodchild, what was your

18    conclusion in comparing your investigation

19    relating to the '550 patent with the performance

20    of Google Earth as it relates to step F of claim

21    1?

22         A.  That Google Earth skips some of

23    the smaller sections.  It does not as the '550

24    patent requires request, store and represent
```

```
 1     data for each of the smaller sections after

 2     every step.

 3              Q.   Let's go to the next slide.  Are

 4     these the source code file names that you

 5     reviewed for purposes of your opinion as to the

 6     operation of the Google Earth products as they

 7     relate to step F?

 8              A.   Yes.  These are a very small

 9     selection of all of the files of source code,

10     but together with Google engineers I was able to

11     narrow it down to the ones that were really

12     critical in understanding this process.  These

13     are the three groupings for the three sets of

14     the accused products.

15              Q.   So our record is clear, these are

16     exhibit numbers DTX 1178, 1179, 1180, 1184,

17     1186, 1185, 1187 and 1176?

18              A.   Yes.

19              Q.   And the last one at the bottom,

20     the lod-manager, that's the file that we looked

21     at the excerpt from before?

22              A.   Yes.

23              Q.   Based on these differences that

24     you've explained to the jury, what have you
```

```
 1      concluded?

 2              A.    That Google Earth does not request

 3      or represent each of the smaller sections and,

 4      therefore, it does not infringe claim 1, step F.

 5              Q.    And to recap, can you kind of put

 6      this into maybe some general language along the

 7      lines that you used before when you were giving

 8      the example of how the Google Earth process

 9      works in comparison to the '550 patent?

10              A.    Yes.  It's simply a very different

11      process.  And it uses a process which is

12      guaranteed to be more efficient to produce what

13      the user wants more rapidly.  The user does not

14      have to wait as long for all the data to be

15      retrieved as it would under the '550 patent.

16              Q.    Let's go to the second of your two

17      reasons for why the Google Earth products do not

18      perform every step of claim 1.  The second is

19      Google Earth does not repeat step F as required

20      by step G.  Can you explain based on the claim

21      language what you mean by that?

22              A.    So what the claim language says is

23      that after you guide you must request, store and

24      represent each of the smaller sections.  And
```

1118

1    then, and only then can you go to step G.  And

2    under the conditions expressed in step G, if

3    those conditions apply, go back and repeat step

4    F.

5         Q.   And have you prepared an animation

6    to show how this repeating requirement works in

7    terms of how the image data is divided,

8    requested, stored and represented?

9         A.   Yes.

10        Q.   Can you explain to the jury in the

11   demonstration as it relates to the operation of

12   step G after step F?

13        A.   Yes.  So here is a one, we're

14   starting again with a root node, we divide, we

15   request and we store.  So that's executed step

16   F.

17             Now we go to step G and ask have

18   we reached the desired resolution.  It's no.

19   Have we exhausted the higher resolution imagery.

20   No.  So step G requires us to repeat step F.

21        Q.   If we show that next, what's

22   happening now?

23        A.   Here is step F being repeated by

24   dividing B1 into the two sections C1, C2,

1    requesting, storing and representing those two

2    sections.

3              Q.   Under the '550 patent, can you

4    divide B1 into C1 and C2 before B1 is

5    represented?

6              A.   No.

7              Q.   Now, what about lower levels of

8    the tree in the smaller sections, does the same

9    rule apply as you apply step G to step F?

10             A.   The same rule applies, we execute

11   step F and step G again, on C1, execute again on

12   C2, execute again on B2, execute it again on C3,

13   execute it again on C4.

14             Q.   And is that same repeating process

15   done in each element of the tree?

16             A.   Yes.

17             Q.   How does step F and step G, or I

18   should say step G's repeating process that

19   relates to step F affect what's represented on

20   the user's screen?

21             A.   So it's essentially what I showed

22   before, that as we work down the tree, we see

23   the process of division, retrieval and

24   representation, and we see that repeated as

1    often as necessary to get all the way to the

2    ideal image.

3         Q.   Based on the analysis you have

4    done, does Google Earth perform the repeating

5    step in section G of claim 1 of the '550 patent?

6         A.   No, it does not.

7         Q.   And can you demonstrate how Google

8    Earth works instead as it relates to step G?

9         A.   Yes.  So we first traverse the

10   tree and place items into the list.  But there

11   is no question here of repeating because the

12   dividing does not lead to retrieving, storing

13   and representing, and we can proceed to further

14   divisions without executed all of step F.

15        Q.   So if I stop this after the

16   traversing, C1, I'll let it stop, C1 has been

17   divided into D1 and D2 before data has been

18   requested, stored or represented in C1; correct?

19        A.   Correct.

20        Q.   Is that the way that Google Earth

21   process works?

22        A.   Yes.

23        Q.   So continuing the animation, what

24   do we see next?

1       A.   Then we see the prioritization,

2  and then we see the step of requesting

3  beginning.  But this is completely out of sync

4  with the dividing process that '550 requires.

5       Q.   So based on the image, why don't

6  we finish the process.  And again, is this the

7  same process that goes until the image at the

8  requested level of detail is displayed?

9       A.   Yes.

10       Q.   So from the image that we see at

11  the end of the animation, how is Google Earth

12  different than the '550 patent's step G?

13       A.   It simply does not repeat step F

14  at the integration of step G.

15       Q.   And do you have a slide that

16  compares these processes side-by-side?

17       A.   Yes.

18       Q.   And why don't we run through this

19  and you can tell the jury what we're seeing?

20       A.   So the left we're seeing on the

21  '550 patent animation as I've shown it before.

22  On the right we're seeing the Google Earth

23  animation.  And one thing to notice about Google

24  Earth process is that it operates in parallel.

```
 1        There are things going on here at the same time

 2        and independently.  And we'll talk about that a

 3        little bit more in a moment.

 4                  Q.   Let me ask you about that now.

 5                       The demonstration you showed

 6        demonstrated that Google Earth had processes

 7        going on in parallel and independently.  Is that

 8        something that you identified and confirmed from

 9        your review of the source code of Google Earth

10        products?

11                  A.   Yes.

12                  Q.   Let me go on to the next file

13        here.  Are these the source code files that you

14        reviewed in support of your opinion that the

15        Google Earth products did not practice the

16        repeating step G of claim 1 of the '550 patent?

17                  A.   Yes, they are.

18                       MR. WILLIAMSON:  For the record

19        those are exhibit numbers DTX 1179, DTX 1183,

20        PTX 0371, PTX 0372, PTX 376, PTX 377, PTX 380,

21        and PTX 381.

22                       And then for Android 8, DTX 1184

23        and DTX 1187.  And for Globe, PTX 0387 and PTX

24        0395.
```

1    BY MR. WILLIAMSON:

2            Q.   Based on the differences in

3    processing order as you showed between steps F

4    and G, what conclusions have you drawn?

5            A.   That Google Earth does not repeat

6    step F and step G.

7            Q.   And do you have a conclusion that

8    based upon the operation of the Google Earth

9    products whether or not Google Earth infringes

10   the claim 1 of the '550 patent?

11           A.   Yes.  The claim 1 requires these

12   four substeps of step F to be executed before

13   being repeated and that is simply not true of

14   the Google Earth product.

15           Q.   So it's your opinion that the

16   Google Earth product does not infringe on that

17   basis?

18           A.   It is.

19           Q.   Now, with respect to the Google

20   image on the right, again, can you just sort of

21   summarize the showing the absence of the

22   repeating steps for the benefit of the jury?

23           A.   Yes.  The repeating step is

24   initiated by division.  So every time something

1    is divided, the '550 patent requires the four

2    steps, the remaining three steps of step F to be

3    executed.  But that simply hasn't happened in

4    the Google example.

5             Q.   Let me go back then to somewhat

6    where we started and ask you to summarize your

7    opinions on noninfringement for the jury

8    relating to both of your reasons.

9             A.   So there are two reasons here.

10   And essentially Google Earth does not perform

11   every step of step F and step G.  And,

12   therefore, it does not infringe claim 1.  And,

13   therefore, it does not infringe any of the

14   accused, any of the relevant -- the claims at

15   this trial.

16            Q.   And that would include not just

17   claim 1, but in your opinion, claim 3, claim 14

18   and claim 28 for the same reason?

19            A.   Yes.

20            Q.   That is because those claims all

21   include the steps of claim 1?

22            A.   Yes.

23            Q.   So let me move back to the second

24   general topic that you've developed opinions on

```
 1        and that is the invalidity of the '550 patent.

 2        Do you have a summary of your opinion in that

 3        regard?

 4               A.   Yes.  The '550 patent is invalid.

 5        The patent's technology was known and the '550

 6        patent in my opinion should not have been

 7        issued.

 8               Q.   If we go to the next slide.  What

 9        are these two primary references that you list

10        here?  I am sure that the names will be familiar

11        to the jury, but maybe you can remind the jury

12        what you're relying on as the primary basis of

13        your opinion for invalidity?

14               A.   There is an important distinction

15        here.  On the left is SRI TerraVision which we

16        already heard a lot about from Mr. Lau and

17        others.  And the primary reference there is a

18        system, it's the TerraVision system.

19                    On the right is another primary

20        reference, this is the T-Vision reference.  And

21        this is a publication.  This is a primary

22        reference in the form of a publication.

23               Q.   And so to place your opinions on

24        some testimony that we've already heard today
```

1    which I think is helpful to tie this together,

2    is the primary reference number one, the

3    TerraVision system, is that the system that was

4    described by Mr. Lau when he was here in person

5    in the courtroom?

6         A.   Yes.

7         Q.   And the primary reference number

8    two which is this T-Vision publication, is that

9    the paper that was on this CD that was talked

10   about by Mr. Rous on that video that we saw

11   earlier today?

12        A.   Yes.

13        Q.   These names are very similar.

14   We'll try to keep them apart as best we can.

15   First I want to go into a little bit of the

16   background of the GIS field because as I

17   understand it, you reviewed the background

18   technology as part of forming your opinions as

19   to whether the patent is valid?

20        A.   Yes.

21        Q.   You earlier testified that you

22   yourself have worked in the GIS field, that is

23   visualizing geographic data, for forty years?

24        A.   Yes.

```
 1            Q.   Let's go to the first slide.  Can

 2     you give the jury a little bit of background

 3     about the history of the geographical

 4     information system field?

 5            A.   This gentleman here is Dr. Roger

 6     Tomlinson.  And he's widely acknowledge to be

 7     the father of GIS, although other people might

 8     disagree.  He in the mid 1960s persuaded the

 9     Canadian federal government to invest in the

10     development of the world's first geographic

11     information system.  It was called the Canada

12     Geographic Information System and it was built

13     to handle the kind of data that you see on the

14     right which was data about land use, areas of

15     Canadian land that was being used.

16            Q.   Did you personally work with

17     Mr. Tomlinson?

18            A.   Yes.  I first met him in 1974 or

19     '75.  I got to know him very well.  I became a

20     member of his team which he called Tomlinson

21     Associates.  And we worked all over the world

22     consulting with government agencies and

23     corporations with GIS.

24            Q.   The bottom figure it looks like at
```

1    least part of some computer machinery, I think

2    we all know that things have changed over time.

3    Were there particular problems that arose as the

4    ability of computers and computer networks to be

5    part of this process?

6              A.   Yes.  Several problems that became

7    really critical problems in the history of GIS.

8    One of them was the volume of data.  As you have

9    heard many times, the earth's surface is

10   enormous.  It's 500 million square kilometers.

11   Representing that at a fine level of resolution

12   creates a gigantic amount of information.  This

13   was one of the major issues.  It was an early

14   version of the big data problem that we're

15   hearing about so much today.

16             Q.   Let me direct your attention to

17   exhibit number DTX-1079, which is an article by

18   William Hibbard and David Santek.  Are you

19   familiar with that article?

20             A.   Yes, I am.

21             Q.   And did you review this article as

22   part of the process you went through in

23   developing your opinions in this case?

24             A.   Yes.

1    Q.   What did Mr. Hibbard and Mr.

2    Santek come up with that related to the problem

3    you described?

4         A.   So this is a paper published in

5    1991 about work that was going on at University

6    of Wisconsin-Madison and the problem they were

7    looking at was the problem that existed for

8    atmospheric science and many other fields where

9    there is again a vast amount of data.  And what

10   they were arguing in this paper was that the

11   solution to this problem could well be to

12   remotely access databases over a high speed

13   network and leave the data on those remote

14   databases except when they were needed and at

15   the time this was before the internet became so

16   popular, but they talked about various high

17   speed networks that were appearing at that time.

18   And this is one of, in fact, several

19   publications which appeared about that time

20   pointing out the potential uses of high speed

21   networks to solve this problem.

22        Q.   So were these concepts that were

23   published as a solution to this problem around

24   1991 actually utilized for later systems,

1      including the Google Earth system that we use

2      today?

3           A.   Oh, yes.  It was a very rapid

4      process of adoption because the advantages as a

5      way to solve the problem were so obvious.

6           Q.   So let's go to Slide 48 and turn

7      now to that first of the primary references that

8      you listed and that's the SRI TerraVision

9      system.  And the jury just a little while ago

10     this afternoon heard in detail from Mr. Lau so

11     I'm going to try not to repeat a lot of that

12     testimony, but the first thing I want to ask you

13     about whether you actually were aware of SRI's

14     TerraVision system back in the early 1990's?

15          A.   Yes, I was.  I was well aware of

16     the work going on at SRI in this area.

17          Q.   And so you knew that SRI in the

18     1994 time frame was working on an earth

19     visualization system?

20          A.   Yes.

21          Q.   Have you, for the purposes of this

22     case, looked now very closely at the various

23     parts of the SRI system such as those that Mr.

24     Lau described in his testimony?

1    A.   Yes, I have.

2    Q.   So you're not relying on your

3  memory of what you may have known about the SRI

4  system in 1994, correct?

5    A.   No.

6    Q.   Now, I understand you're not a

7  lawyer.  That's one of the questions I think

8  every witness has been asked in this trial.  But

9  have you been informed as to the patent law

10  rules generally that you have used to apply the

11  work you've done to reach your conclusions?

12    A.   Yes, I have.

13    Q.   And let me show the first of

14  those.  This is something called 35 U.S.C. 102,

15  conditions of patentability.  And what do you

16  understand that to be?

17    A.   So this is what we call the

18  anticipation condition and it says that you

19  should not be entitled to a patent if the

20  invention that you're thinking about was already

21  described in a printed publication in this or a

22  foreign country or in public use or on sale more

23  than one year prior to the date of application

24  for the patent.

1    Q.   And is this one of the rules that

2    you considered in making your final opinions

3    after having done your investigation?

4    A.   Yes, it is.

5    Q.   And then I'll show you a second

6    one.  This is 35 U.S.C. 103, conditions for

7    patentability.  And what do you understand the

8    section 103 rule to be?

9    A.   This is what's generally known as

10   the obviousness condition and that says again,

11   you cannot have a patent if the differences

12   between the subject matter you want to patent

13   and the existing prior art, in other words,

14   public knowledge, would have been obvious to a

15   person at the time of the invention to a person

16   having what we term ordinary skill in the art.

17   And I'll explain what that means.

18   Q.   Why don't you do that now.  What

19   is meant, as you understand, of a person having

20   ordinary skill in the art?

21   A.   So this is a hypothetical person

22   at the time of the invention, so here in

23   mid-1995, and the parties in this case have

24   agreed or they agreed early on in the case that

```
 1      a reasonable description of such a person would

 2      be a person having a bachelor of science degree

 3      or its equivalent and three years of experience

 4      in research or development in computer graphics

 5      and/or digital image processing.

 6             Q.   And in your work in the

 7      geographical information systems field, did you

 8      have more than three years experience in

 9      computer graphics or digital image processing as

10      of 1995?

11             A.   Yes.

12             Q.   How are you applying these three

13      legal bases with respect to the asserted claims

14      in the prior art references?

15             A.   By looking at the two references

16      and so TerraVision and the T-Vision publication,

17      and looking at all of the claims now, Claims 1,

18      3, 14 and 28 and applying the two criteria of

19      anticipation or obviousness.

20             Q.   And the first says SRI's

21      TerraVision anticipates or renders obvious

22      Claims 1, 3, 14 and 28.  Is that your

23      conclusion?

24             A.   Yes.
```

1    Q.   And the second says ACI's T-Vision

2    publication anticipates or renders obvious

3    Claims 1, 14 and 28.  And then ACI's T-Vision

4    paper, in view of the global mapping patent,

5    renders obvious Claim 3.  Is that your opinion?

6    A.   Yes.

7    Q.   And the global mapping patent, is

8    that the same patent we saw at the very

9    beginning of your testimony?

10   A.   Right, the 1987 patent

11   application.

12   Q.   Do you understand that you need to

13   establish that both SRI's TerraVision system and

14   the ACI T-Vision publication have to either

15   anticipate or invalidate the '550 Patent?

16   A.   No.  I understand that either of

17   those primary references could invalidate the

18   patent.

19   Q.   So let's turn now to the first

20   one, the SRI TerraVision system.  And again,

21   this is the system that Mr. Lau described in

22   detail earlier this afternoon.  What sources of

23   evidence did you analyze that address what is

24   described or disclosed in the TerraVision system

1    that Mr. Lau testified was on public display?

2         A.   So I had access to the TerraVision

3    video which we've seen in Mr. Lau's testimony.

4    I had access to various publications from the

5    SRI project at the time, 1994, '95.  And I also

6    had access to various reports of the Magic

7    project which as you heard earlier was the

8    overarching project of which TerraVision was a

9    part.

10        Q.   And do you understand the

11   materials you reviewed to be the same ones that

12   Mr. Lau testified described the operations of

13   the TerraVision system that was on public

14   display in 1994?

15        A.   Yes.

16        Q.   I'm sorry, the TerraVision system

17   that was on public display in 1994?

18        A.   Yes.

19        Q.   As part of your work on this case,

20   did you review the records at the patent office

21   including that file history of the '550 Patent

22   that we looked at earlier?

23        A.   Right.  Right.  Because it's

24   important to know what information the patent

1    office had access to.

2              Q.   Now, I think there's been

3    testimony earlier today that the patent office

4    had access to some of this information, but

5    based on your review of that '550 Patent, did

6    the patent office consider all of the

7    information that you relied on and that Mr. Lau

8    talked about?

9              A.   No, it's my understanding that the

10   patent office did not have access to the video

11   and it's also -- well, of course they didn't

12   have access to Stephen Lau's testimony today.

13             Q.   Have you put together a timeline

14   based on Mr. Lau's testimony and your review of

15   the '550 Patent?

16             A.   Yes.

17             Q.   Okay.  What's shown on your

18   timeline here?

19             A.   So here are the relevant events.

20   If we start from the right, we have the filing

21   of the patent application for the '550 Patent in

22   December of '96.  We have a one-year grace

23   period prior to that, specified in the law.  And

24   then we have the demonstration of TerraVision at

1137

```
 1    SIGGRAPH '95 which occurred in August of '95,

 2    several months before the beginning of that

 3    grace period.  And then we have the even earlier

 4    demonstration in August of '94 of the

 5    TerraVision system.

 6         Q.   Did you apply your understanding

 7    of these dates to the legal rules that we looked

 8    at to reach your conclusions regarding

 9    invalidity of the '550 Patent?

10         A.   Yes, I did.

11         Q.   So let's look specifically at how

12    the SRI system, the TerraVision system that Mr.

13    Lau was talking about compares to the '550

14    Patent.  And let's go to the next slide.  What

15    have you prepared for us here for purposes of

16    describing to the jury your opinion regarding

17    invalidity?

18         A.   So my analysis essentially goes

19    through each element of Claim 1 and each element

20    of the cited claims and asks whether that claim

21    is disclosed in the TerraVision system.

22         Q.   So let's begin then with the first

23    element, which is described as the preamble.

24    That's the part that doesn't have a letter
```

```
 1      denoting a specific step.  In your opinion does

 2      SRI's TerraVision system disclose the preamble

 3      of the '550 Patent Claim 1?

 4            A.   Yes.  The preamble in the patent

 5      is pretty general.  It talks about a pictorial

 6      representation of space related data of a

 7      selectable object and then I've highlighted from

 8      one of the TerraVision publications essentially

 9      equivalent statement that it's a system of

10      visualizing terrain, allows the user to view in

11      realtime a synthetic recreation of the

12      landscape.

13            Q.   And if we move to Step A, what, in

14      your opinion, does SRI's TerraVision system

15      disclose regarding Step A of the '550 Patent?

16            A.   So the key thing here is this idea

17      of a spatially distributed set of data sources.

18      And as you heard in Mr. Lau's testimony, he

19      talked about the image server system, which was

20      just that, a set of spatially distributed data

21      sources.  And SRI -- as I've highlighted, the

22      second and third highlights will point you

23      directly to the equivalent language in the

24      TerraVision publication.
```

1139

1       Q.   Is there an additional disclosure

2    in the TerraVision publications that explains

3    more graphically what's meant by this image

4    server system, ISS?

5       A.   Yes.  So here is a, an image

6    you've seen already, a diagram of the ISS system

7    as it existed then identifying the locations of

8    the servers, showing the network that connected

9    them and this is the network of distributed,

10   spatially distributed data sources that

11   TerraVision is connected to.

12      Q.   And those are the same servers

13   that Mr. Lau was describing today, correct?

14      A.   Yes.

15      Q.   So if we then move forward -- I

16   guess I should go back just to make sure, is it

17   your opinion then that Claim 1 element of the

18   '550 Patent is disclosed in the TerraVision

19   system?

20      A.   Yes, it is.

21      Q.   Let's move onto Steps B and C.  In

22   your opinion, does SRI's TerraVision system

23   disclose Steps B and C of the '550 Patent?

24      A.   So Steps B and C are about

```
 1      determining a field of view and then requesting
 2      data for the field of view.  And here's an
 3      extract from the TerraVision document,
 4      TerraVision basically using an incremental
 5      retrieval of the data base as required by the
 6      user.  That's 1C.  And he or she has seen it
 7      from just the right point of view is essentially
 8      1B.
 9              Q.  In your opinion this disclosure of
10      the TerraVision system itself discloses the
11      subject matter of claim elements B and C?
12              A.  Yes.
13              Q.  Is there additional evidence that
14      you looked at in support of your opinion that
15      claim element B through E are all together
16      disclosed in the prior art of the SRI
17      TerraVision system?
18              A.  Yes.
19              Q.  And what does that include, is
20      that a part of the video that Mr. Lau showed the
21      jury?
22              A.  Yes.
23              Q.  Okay.  So if we do this right
24      technically, let's go to the next slide.  And
```

1    we've broken this video up based upon your

2    review; is that correct?

3              A.   Yes, this is just a short element

4    of the video that addresses directly those two

5    claims.

6                   (Video of Exhibit DTX-1088

7    played.)

8    BY MR. WILLIAMSON:

9              Q.   Does that video excerpt further

10   support your opinion that the SRI TerraVision

11   system discloses the features of Steps B through

12   E of Claim 1?

13             A.   Yes, it does.

14             Q.   Let's go to the next slide in our

15   checklist then.  And now we're talking about

16   Steps F and G.  Based on your analysis, Doctor

17   Goodchild, does SRI's TerraVision system

18   disclose these steps of the '550 Patent?

19             A.   Yes, these are the steps that talk

20   about of course dividing the sections into

21   smaller sections, requesting and storing and

22   representing and then repeating.  And on the

23   left is a figure from a TerraVision document

24   which shows the quadtree and how the quadtree

```
 1        allows you to successively divide and request.
 2        And on the right-hand side is the equivalent
 3        diagram from the '550 Patent.  And you can see
 4        in both cases there's a reference to a quadtree
 5        in the caption of the figure.
 6                  Q.  Were there any other --
 7                  THE COURT:  I'm a little concerned
 8        that the record is not going to reflect in some
 9        cases which document he's referring to unless
10        you identify the document for the record.
11                  MS. WILLIAMSON:  Thank you, Your
12        Honor.  That's helpful.
13        BY MR. WILLIAMSON:
14                  Q.  When you said down on the left,
15        when you said the TerraVision document, was that
16        referring to the SRI technical document 540,
17        exhibit DTX-1023?
18                  A.  Yes.
19                  Q.  And you're referring to PTX-1, the
20        '550 Patent?
21                  A.  Yes.
22                  MS. WILLIAMSON:  Thank you, Your
23        Honor, for that clarification.
24        BY MR. WILLIAMSON:
```

```
 1              Q.   Was there any other disclosures in

 2      the specific TerraVision documents that you

 3      relied on to support your conclusion that the

 4      TerraVision system disclosed Steps F and G of

 5      Claim 1?

 6              A.   Yes.  Here's a couple of quotes.

 7      The second highlighted section there, our

 8      approach is to use a course defined search on

 9      the quadtree, and then below it, representing

10      this until we found a portion of the terrain

11      that was of interest, both of those are

12      supporting this conclusion.

13              Q.   And for the record you're

14      referring this to a portion of DTX-1023?

15              A.   Yes.

16              Q.   Did anything in the SRI

17      TerraVision video that was played and has been

18      admitted support your opinion that the SRI

19      TerraVision system disclosed the subject matter

20      of Steps F and G?

21              A.   Yes, there's another clip I'd like

22      to show.  It's again a very brief clip.

23                   (Video of Exhibit DTX-1088

24      played.)
```

BY MR. WILLIAMSON:

         Q.   And did that portion of the SRI

TerraVision video support your conclusion that

that TerraVision system disclosed claim element

F and G of Claim 1?

         A.   Yes.

         Q.   So if we go to the next slide,

based on your analysis of Claim 1's elements as

they relate to the SRI TerraVision system, what

have you concluded?

         A.   That based on this analysis,

TerraVision, the TerraVision system discloses

each and every element of Claim 1.

         Q.   Now, let's move on to the other of

the asserted claims and the next asserted claim

in numerical order is dependent Claim 3.  You've

listed on the screen Claims 2 and 3.  Can you

explain to the jury why that is?

         A.   Yeah, so Claim 3 depends on Claim

2.  And so I've had to examine Claim 2 and Claim

2 also depends of course on Claim 1.  So it's

first necessary to look at Claim 2 and the

important thing in Claim 2 is the ability to

alter the location of the camera, in other words

```
 1        to allow the user to move.  And so that's
 2        something that is widely found in the relevant
 3        documentation and something that the video
 4        demonstrated that TerraVision could certainly
 5        do.
 6                  Q.   Let me ask you specifically about
 7        that subject matter of Claim 2 that's
 8        incorporated in Claim 3.  What specifically did
 9        you rely on regarding this SRI TerraVision
10        system for the disclosure of that subject matter
11        in Claim 2?
12                  A.   So here's a, a suitable quotation,
13        this is from DTX-1023 again, SRI technical
14        document number 540.  And I've highlighted,
15        underlined the words, allow a user to roam
16        around the terrain, which is essentially what
17        Claim 2 is about.
18                  Q.   So let's move then to the
19        additional subject matter independent claim --
20        let's stay on Claim 2.  Is there additional
21        disclosures in any of the SRI TerraVision
22        documents that you relied on in reaching your
23        opinion that the system disclosed the subject
24        matter of Claim 2?
```

1    A.   Sure.  Here's a highlighted

2    section from DTX-1087, which is a presentation

3    made at the 1994 Magic symposium.

4         Q.   And this talks about the ability

5    to pan and zoom over the terrain imagery in 2D

6    or fly or drive over the terrain in 3D in the

7    SRI TerraVision system?

8         A.   Yes.

9         Q.   Now, I want to bring you to Claim

10   3, Doctor Goodchild, my apologies.  And again,

11   this additional subject matter in dependent

12   Claim 3, in your opinion does SRI's TerraVision

13   system disclose this additional limitation in

14   Claim 3?

15        A.   Yes, Claim 3 is a very broad

16   claim.  It talks in general about changing the

17   coordinates of the data for a new coordinate

18   system.  And we've heard testimony at various

19   times during the trial about what that might

20   mean in practice.  Here is one quotation, this

21   time from DTX 1037 where it talks about the

22   transformation that's necessary as it is in any

23   computer graphic system from the 3D coordinate

24   to the 2D coordinate system of the screen.

1    That's one.  We also heard today in Mr. Lau's

2    testimony about another kind of coordinate

3    transformation.

4         Q.   And what was it in Mr. Lau's

5    testimony in trial and in the previous

6    deposition that you reviewed that was another

7    coordinate system that was in the TerraVision

8    system?

9         A.   It was this idea that's been

10   referred to many times, we heard it in the sense

11   of this shaking that you get when you zoom down

12   to very fine resolution, because the

13   coordinates, if you use global coordinates don't

14   have sufficient precision and he talked directly

15   about the solution that TerraVision used for

16   that problem.

17        Q.   With respect to the, the technical

18   document, just for the record that you're

19   relying on for disclosure in the TerraVision

20   system of the additional subject matter of Claim

21   3, that's DTX-1037?

22        A.   Yes.

23        Q.   So let's move then to Claim 14?

24        A.   And Claim 14 is about the use of a

1    quadtree or quadrant tree and here I've shown

2    again the figure from DTX-1023 which shows a

3    quadtree being divided first into four sections

4    and then into 16 sections.

5              Q.   So you're referring on the left

6    side to a document relating to the SRI

7    TerraVision system, correct?

8              A.   Yes.

9              Q.   And that's DTX-1023?

10             A.   Yes.

11             Q.   And what have you displayed on the

12   right-hand side of the screen?

13             A.   This is very much an equivalent

14   figure from the '550 Patent.  This is Figure 4

15   from PTX-001 and it shows the division of an

16   image into four and then into 16 and then into

17   64.  And going, down in fact, five levels in the

18   quadtree.

19             Q.   And then finally let's move to the

20   fourth of the four asserted claims, Claim 28

21   relating to the -- representing the data with

22   the polygonal grid model.  In your opinion does

23   the SRI TerraVision system disclose this

24   additional subject matter in Claim 28?

```
 1              A.   Yes.  Again I consider this to be
 2       a very broad claim.  Here is one possible way in
 3       which TerraVision addresses this claim and that
 4       is to compose the image that's on the user
 5       screen as a mosaic of tiles.  So in this case a
 6       set of square tiles have been knitted together
 7       to form the display on the screen.
 8              But we also today heard in
 9       Mr. Lau's testimony about how the TerraVision
10       system used a triangular mesh, a mesh of
11       three-sided polygons to represent terrain.
12              Q.   And is that also supported by the
13       video that we saw before?
14              A.   Yes.
15              Q.   DTX 1088?
16              A.   Yes.
17              Q.   Based upon your review and the
18       analysis of the '550 patent, what have you
19       concluded with respect to whether or not the SRI
20       TerraVision system anticipates the claims of
21       the -- the asserted claims of the '550 patent
22       under Section 102 that we looked at?
23              A.   I have concluded that in my
24       opinion the TerraVision system anticipates the
```

1    asserted claims.  But I also have allowed the

2    differences are perceived between the asserted

3    claims and the TerraVision system that those

4    differences would have been obvious to one of

5    ordinary skill in the art at the time.  And so

6    in effect, there is a combination of an

7    anticipation case and an obviousness case.

8              MR. WILLIAMSON:  Your Honor, we're

9    at a natural stopping point.  I realize it's a

10   few minutes after 5:00.

11             THE COURT:  Thank you.  We'll

12   recess for the evening and we'll resume tomorrow

13   morning.  And again, I remind the jury not to

14   discuss the case or do any research.  And we'll

15   see you tomorrow morning at 8:45.

16             Have a nice night.  Thank you.

17             (Jury leaving the courtroom at

18   5:03 p.m.)

19             THE COURT:  Thank you.  Sit down.

20   So as I mentioned, I don't think we're going to

21   be able to post, because the clerk's office is

22   closed, on the docket the suggested revised

23   final jury instructions, but what we will do is

24   we'll e-mail them to each side at six o'clock

1      and post them in the morning.

2                      And then if you have the time to

3      get together and come up with a revised draft by

4      the end of the day tomorrow, that would be

5      helpful.  If you don't, I understand it's a lot

6      of other things that both sides need to do.  If

7      you don't have to time to do that, we'll deal

8      with suggested changes at the conference.

9                      Anything else we need to deal with

10     this evening?

11                     MR. SPEARS:  Just one issue

12     because it's extremely fresh.  And I need

13     Dr. Goodchild out of the room when I raise it.

14                     THE COURT:  Okay.

15                     MR. SPEARS:  My issue concerns the

16     last minute of testimony that the Court heard.

17     That is going to be the entire sum and substance

18     of Dr. Goodchild's opinion on obviousness.  The

19     Court can immediately appreciate it that this is

20     in no way, shape and form a competent opinion on

21     obviousness.

22                     THE COURT:  How do you know that's

23     all he's going to do?

24                     MR. SPEARS:  I know that's all

1        he's going to do.

2                    THE COURT:  Mr. Williamson.

3                    MR. WILLIAMSON:  Dr. Goodchild

4        isn't finished his testimony, Your Honor.

5                    MR. SPEARS:  All right.

6                    THE COURT:  Let's see what he

7        does.

8                    MR. SPEARS:  Fair enough.

9                    THE COURT:  Okay.  We'll see you

10       at 8:30 tomorrow morning and we'll recess.

11       Thank you.

12                    (Court recessed at 5:05 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

1  State of Delaware )
                    )
2  New Castle County )

3

4

5              CERTIFICATE OF REPORTER

6

7        I, Dale C. Hawkins, Registered Merit

8  Reporter, Certified Shorthand Reporter, and Notary

9  Public, do hereby certify that the foregoing record,

10  Pages 767 to 1,153 inclusive, is a true and accurate

11  transcript of my stenographic notes taken on May 25,

12  2016, in the above-captioned matter.

13

14        IN WITNESS WHEREOF, I have hereunto set my

15  hand and seal this 25th day of May 2016, at

16  Wilmington.

17

18

19              /s/ Dale C. Hawkins

20            Dale C. Hawkins, RMR

21

22

23

24

**$10** [3] - 808:4, 808:6, 809:9
**$20** [2] - 805:13, 805:17
**$226,167,748** [1] - 933:8
**$400** [4] - 805:15, 805:17, 858:11, 1062:23
**$450** [1] - 1063:1
**$500** [1] - 1088:10
**$69** [1] - 804:21
**$700** [2] - 878:17, 880:1
**$710** [2] - 879:5, 879:20
**'05** [1] - 811:13
**'06** [1] - 835:11
**'08** [1] - 789:21
**'14** [1] - 801:18
**'15** [1] - 801:18
**'16** [1] - 801:19
**'189** [3] - 848:24, 849:17, 849:20
**'550** [84] - 816:21, 828:3, 828:15, 832:18, 834:6, 836:5, 838:20, 843:3, 849:4, 849:13, 853:11, 854:17, 855:2, 855:4, 855:7, 855:16, 855:23, 856:3, 856:6, 884:2, 1078:9, 1084:13, 1084:14, 1084:20, 1085:1, 1085:9, 1086:19, 1087:3, 1087:6, 1088:20, 1090:2, 1092:5, 1092:6, 1092:10, 1093:3, 1094:20, 1095:20, 1096:11, 1102:14, 1102:20, 1104:6, 1104:12, 1104:14, 1104:21, 1106:10, 1106:19, 1107:7, 1107:16, 1107:21, 1108:18, 1109:10, 1115:19, 1115:23, 1117:9, 1117:15, 1119:3, 1120:5, 1121:4, 1121:12, 1121:21, 1122:16, 1123:10, 1124:1, 1125:1, 1125:4, 1125:5, 1134:15, 1135:21, 1136:5, 1136:15, 1136:21, 1137:9,

1137:13, 1138:3, 1138:15, 1139:18, 1139:23, 1141:18, 1142:3, 1142:20, 1148:14, 1149:18, 1149:21
**'70s** [2] - 961:2, 1082:21
**'75** [1] - 1127:19
**'80s** [1] - 961:2
**'90s** [4] - 960:1, 961:1, 1028:12, 1042:10
**'91** [1] - 1083:17
**'93** [1] - 1043:17
**'94** [8] - 1052:10, 1058:11, 1058:13, 1059:3, 1059:17, 1059:23, 1060:6, 1137:4
**'95** [25] - 1023:21, 1024:1, 1024:5, 1024:9, 1024:17, 1024:19, 1024:24, 1025:13, 1025:20, 1026:5, 1027:14, 1048:5, 1048:12, 1050:9, 1050:17, 1052:4, 1056:2, 1057:7, 1057:11, 1057:17, 1058:8, 1073:22, 1135:5, 1137:1
**'96** [1] - 1136:22
**/S** [1] - 1107:24
**/s** [1] - 1153:19
**/TKEUFPD** [1] - 1107:24
**0371** [1] - 1122:20
**0372** [1] - 1122:20
**0387** [1] - 1122:23
**0395** [1] - 1122:24
**1** [46] - 844:13, 847:15, 847:18, 865:22, 866:1, 878:24, 881:7, 881:22, 883:5, 1004:20, 1006:12, 1041:7, 1055:21, 1092:9, 1092:12, 1093:9, 1095:17, 1096:22, 1096:23, 1102:14, 1103:5, 1103:9, 1103:10, 1107:21, 1107:24, 1115:21, 1117:4, 1117:18, 1120:5, 1122:16, 1123:10, 1123:11, 1124:12, 1124:17, 1124:21, 1133:17, 1133:22, 1134:3,

1137:19, 1138:3, 1139:17, 1141:12, 1143:5, 1144:5, 1144:13, 1144:21
**1's** [1] - 1144:8
**1,153** [1] - 1153:10
**1.1.4** [1] - 1046:15
**1.2** [2] - 811:8, 811:12
**1.5** [1] - 809:4
**1.7** [1] - 797:17
**1.9** [1] - 792:14
**10** [14] - 772:7, 776:7, 808:12, 878:2, 879:1, 879:19, 879:22, 880:16, 886:7, 886:11, 909:10, 948:19, 953:23, 992:19
**10,000** [1] - 809:9
**10-K** [1] - 818:19
**100** [1] - 858:13
**1001** [1] - 1027:22
**1001A** [1] - 1027:22
**1001B** [2] - 1027:23, 1057:23
**1004** [2] - 848:6, 850:24
**101** [1] - 884:4
**1011** [2] - 934:7, 935:13
**102** [2] - 1131:14, 1149:22
**1023** [1] - 1040:14, 1077:22
**103** [2] - 1132:6, 1132:8
**1036** [1] - 1044:1, 1044:10, 1077:23
**1037** [4] - 1045:24, 1046:14, 1077:22, 1146:21
**1071** [5] - 834:13, 834:22, 834:23, 875:21, 1005:23
**1076** [1] - 1090:24
**1087** [2] - 1039:7, 1077:22
**1088** [5] - 1033:17, 1033:24, 1034:18, 1077:23, 1149:15
**1095** [2] - 974:19, 1028:4
**10:48** [1] - 872:12
**11** [4] - 857:23, 956:9, 1024:3, 1092:20
**1109** [2] - 1003:2, 1028:4
**1114** [3] - 930:22, 931:1, 949:9

**1176** [1] - 1116:17
**1178** [1] - 1116:16
**1179** [2] - 1116:16, 1122:19
**1180** [1] - 1116:16
**1183** [1] - 1122:19
**1184** [2] - 1116:16, 1122:22
**1185** [1] - 1116:17
**1186** [1] - 1116:17
**1187** [2] - 1116:17, 1122:23
**1193** [2] - 1042:19, 1077:23
**1198** [1] - 1083:11
**11:01** [1] - 874:23
**11:20** [1] - 887:6
**11A** [1] - 1091:4
**122** [1] - 831:24
**123** [2] - 874:7, 878:5
**13** [8] - 772:3, 832:2, 832:7, 832:8, 832:9, 832:12, 832:14, 834:19
**14** [10] - 857:24, 883:5, 1095:22, 1103:6, 1124:17, 1133:18, 1133:22, 1134:3, 1147:23, 1147:24
**14-217-RGA** [1] - 767:5
**141** [2] - 1068:2, 1068:3
**14B** [1] - 932:8
**15** [10] - 797:19, 802:8, 802:10, 843:16, 844:11, 869:22, 886:9, 953:23, 1060:16
**15,000** [1] - 959:15
**158** [1] - 875:10
**159** [1] - 1041:6
**16** [2] - 1148:4, 1148:16
**160** [2] - 818:15, 875:12
**167** [1] - 875:11
**167.8** [1] - 997:10
**168** [1] - 1069:5
**169** [1] - 1069:13
**17** [2] - 797:18
**171.18** [1] - 997:11
**172.2** [1] - 997:17
**176** [1] - 1046:14
**177** [2] - 1071:20, 1074:4
**17th** [1] - 790:19
**18** [1] - 997:15
**19** [3] - 948:19, 1075:9

**190** [2] - 799:24, 875:11
**1960s** [1] - 1127:8
**1965** [1] - 1081:4
**1969** [1] - 1081:6
**1970's** [2] - 970:1, 1083:8
**1974** [1] - 1127:18
**198** [3] - 798:19, 798:24, 875:11
**1980** [1] - 1021:13
**1981** [3] - 954:5, 954:11, 964:20
**1987** [3] - 1090:12, 1090:18, 1134:10
**1989** [2] - 1076:8, 1080:9
**1990** [1] - 1083:18
**1990's** [4] - 957:12, 958:11, 960:24, 1130:14
**1990s** [1] - 1040:10
**1991** [4] - 1082:3, 1083:18, 1129:5, 1129:24
**1992** [1] - 1030:14
**1993** [2] - 957:7, 1043:19
**1994** [33] - 957:7, 1033:14, 1034:10, 1035:1, 1035:7, 1035:8, 1039:1, 1039:5, 1039:11, 1039:13, 1040:22, 1046:12, 1048:4, 1052:8, 1058:14, 1065:9, 1066:11, 1066:13, 1066:19, 1066:24, 1069:11, 1075:20, 1075:24, 1076:9, 1130:18, 1131:4, 1135:5, 1135:14, 1135:17, 1146:3
**1995** [16] - 959:17, 980:24, 1023:1, 1027:11, 1044:4, 1044:6, 1048:10, 1048:14, 1050:2, 1064:12, 1064:16, 1065:1, 1065:7, 1065:13, 1073:15, 1133:10
**1996** [1] - 1030:15
**1997** [1] - 1095:8
**1999** [4] - 948:19, 962:10, 1011:23, 1012:9
**1B** [1] - 1140:8
**1C** [1] - 1140:6

**2** [17] - 865:19, 991:12, 992:19, 1024:3, 1096:22, 1096:23, 1144:17, 1144:20, 1144:21, 1144:22, 1144:23, 1145:7, 1145:11, 1145:17, 1145:20, 1145:24
**2.4** [1] - 1041:17
**20** [2] - 797:19, 797:20
**20,000** [1] - 961:22
**200** [8] - 794:3, 803:17, 805:7, 810:21, 827:15, 857:13, 857:15, 875:12
**2000** [2] - 859:1, 898:6
**2001** [2] - 969:22, 972:7
**2002** [2] - 948:23, 1087:17
**2004** [6] - 803:4, 899:16, 951:24, 972:14, 976:21, 979:13
**2005** [58] - 770:6, 770:8, 770:21, 772:22, 773:10, 773:13, 773:18, 775:7, 775:17, 776:5, 776:15, 776:21, 777:7, 778:2, 779:5, 779:16, 779:24, 780:2, 780:21, 786:9, 795:9, 803:1, 804:5, 806:9, 806:12, 806:14, 809:3, 810:2, 810:7, 810:9, 810:19, 810:21, 811:14, 817:9, 817:10, 821:10, 827:24, 829:6, 829:17, 856:19, 856:22, 857:13, 857:15, 857:16, 857:19, 858:5, 858:17, 861:21, 862:5, 880:11, 899:3, 899:21, 921:22, 931:21, 933:5, 942:8, 979:12
**2006** [44] - 779:14, 780:1, 809:14, 810:11, 810:14, 810:22, 817:9, 817:10, 829:12, 829:19, 829:22, 830:17, 832:21,

834:3, 834:5, 841:3, 843:2, 848:15, 856:18, 857:16, 857:23, 861:11, 861:20, 869:18, 871:17, 889:12, 942:5, 945:4, 948:23, 980:17, 987:10, 987:12, 988:6, 990:13, 1007:2, 1007:6, 1007:20, 1067:15, 1069:24, 1070:3, 1070:4, 1075:22, 1076:4, 1076:8
**2007** [3] - 931:23, 934:14, 936:14
**2008** [12] - 771:8, 774:22, 775:10, 776:1, 776:4, 777:23, 778:1, 779:3, 779:22, 786:16, 789:16, 789:17
**2009** [1] - 771:9
**2010** [37] - 770:6, 770:10, 770:12, 770:19, 770:20, 771:9, 772:12, 773:14, 774:22, 775:10, 776:2, 776:4, 777:23, 778:1, 779:3, 779:22, 786:17, 790:19, 790:20, 800:24, 801:1, 801:3, 825:10, 825:12, 825:15, 859:2, 873:23, 874:7, 875:15, 878:3, 878:8, 878:21, 879:9, 879:16, 880:12, 1007:24, 1008:2
**2011** [3] - 773:14, 819:8
**2012** [2] - 889:13, 1079:15
**2013** [3] - 801:12, 900:14, 901:3
**2014** [4] - 792:15, 900:17, 933:6, 936:14
**2015** [1] - 953:7
**2016** [4] - 767:9, 801:4, 1153:12, 1153:15
**213** [2] - 832:11, 832:12
**214** [2] - 832:11,

832:13
**215** [1] - 1088:6
**219** [4] - 819:15, 819:18, 875:12, 875:14
**22** [1] - 824:7
**223** [1] - 1071:21
**24** [1] - 1069:5
**25** [11] - 767:9, 792:24, 808:11, 808:13, 809:5, 809:18, 811:10, 908:21, 909:20, 1074:4, 1153:11
**25th** [2] - 1090:18, 1153:15
**260** [1] - 1017:15
**271** [1] - 875:11
**28** [9] - 883:5, 1095:22, 1103:7, 1124:18, 1133:18, 1133:22, 1134:3, 1148:20, 1148:24
**28th** [1] - 804:4
**2D** [4] - 1037:17, 1037:20, 1146:5, 1146:24
**3** [28] - 835:19, 836:11, 836:17, 841:7, 841:8, 883:5, 948:23, 1006:4, 1006:9, 1006:10, 1006:11, 1095:22, 1096:23, 1096:24, 1103:6, 1124:17, 1133:18, 1133:22, 1134:5, 1144:16, 1144:17, 1144:19, 1145:8, 1146:10, 1146:12, 1146:14, 1146:15, 1147:21
**3-1/2** [1] - 852:10
**3.0** [1] - 803:1
**30** [2] - 823:23, 824:5
**300** [4] - 809:19, 868:12, 982:14, 1017:15
**31** [2] - 805:24, 875:12
**3150** [2] - 791:21, 816:7
**321** [1] - 1017:11
**329** [3] - 989:15, 989:19, 1000:8
**336** [1] - 1072:4
**337** [2] - 1072:2, 1072:3
**35** [4] - 953:22, 954:3, 1131:14, 1132:6
**350** [1] - 875:11

**367** [1] - 1039:18
**37** [1] - 1040:5
**376** [1] - 1122:20
**377** [1] - 1122:20
**38** [2] - 857:6, 857:9
**380** [1] - 1122:20
**381** [1] - 1122:21
**3D** [9] - 892:14, 895:8, 895:13, 895:21, 1037:17, 1037:21, 1083:19, 1146:6, 1146:23
**4** [5] - 767:3, 856:10, 857:11, 1086:24, 1148:14
**40** [1] - 937:15
**400** [2] - 858:13, 1088:12
**403** [3] - 772:18, 774:4, 786:19
**45** [4] - 790:11, 790:22, 791:4, 875:11
**450** [1] - 1031:2
**48** [3] - 819:3, 822:12, 1130:6
**49** [2] - 821:5, 822:21
**5** [14] - 835:19, 836:11, 836:17, 841:7, 841:8, 852:8, 852:10, 886:15, 886:19, 886:20, 1006:4, 1006:9, 1006:10
**5.6** [2] - 936:10, 936:11
**50** [17] - 811:4, 811:5, 811:17, 811:18, 811:23, 812:2, 817:24, 818:11, 861:9, 861:13, 861:16, 862:1, 873:12, 873:14, 881:1, 885:21
**50(a)** [1] - 872:21
**50,000** [1] - 972:15
**500** [2] - 1049:15, 1128:10
**50A** [3] - 877:4, 877:6, 885:5
**51** [5] - 817:23, 817:24, 821:2, 821:4, 822:21
**53** [1] - 811:6
**540** [3] - 1041:3, 1142:16, 1145:14
**55** [2] - 797:23, 875:11
**550** [3] - 827:10, 827:11, 1081:18

**5:03** [1] - 1150:18
**5:05** [1] - 1152:12
**5:15** [1] - 998:24
**6** [1] - 1090:23
**64** [3] - 1091:11, 1091:20, 1148:17
**66** [2] - 799:18, 875:11
**6A** [1] - 767:10
**7** [8] - 801:24, 811:9, 865:15, 865:23, 877:15, 879:10, 931:21, 1045:12
**7,099,000,000** [1] - 826:17
**7,099,171,846** [1] - 801:6
**7.1** [5] - 858:23, 859:20, 877:16, 878:17, 879:5
**7.3** [1] - 809:15
**70** [1] - 793:1
**72** [1] - 875:11
**72C** [1] - 798:5
**73** [3] - 798:14, 798:16, 875:11
**767** [1] - 1153:10
**76ers** [1] - 891:21
**8** [6] - 865:17, 866:11, 900:6, 900:9, 900:12, 1122:22
**800,000** [1] - 1082:4
**844** [1] - 767:11
**89** [2] - 948:19, 1031:13
**8:30** [1] - 1152:10
**8:32** [1] - 767:9
**8:45** [1] - 1150:15
**9** [3] - 810:16, 857:6, 1092:19
**94** [1] - 1076:16
**95** [7] - 1070:9, 1072:13, 1073:18, 1073:19, 1076:24, 1077:8, 1077:12
**99** [1] - 801:24
**9:15** [2] - 785:2
**9th** [2] - 806:12, 806:14
**A's** [1] - 994:14
**a.m** [4] - 767:9, 872:12, 874:23, 887:6
**A1** [3] - 1104:15, 1107:23, 1114:13
**ability** [6] - 840:15, 927:20, 1084:1, 1128:4, 1144:23, 1146:4
**able** [28] - 770:22, 786:3, 790:2, 813:5,

855:3, 928:9, 928:19, 955:9, 965:4, 998:18, 999:5, 1034:5, 1034:6, 1036:9, 1036:20, 1041:24, 1042:16, 1045:22, 1046:9, 1047:9, 1051:14, 1051:15, 1059:8, 1069:21, 1113:13, 1116:10, 1150:21

**above-captioned** [1] - 1153:12

**absence** [2] - 1069:23, 1123:21

**absolutely** [4] - 899:15, 920:16, 946:4, 946:8

**academia** [1] - 973:22

**academic** [3] - 958:13, 1079:18, 1080:1

**academy** [1] - 902:8

**Academy** [2] - 1082:9, 1082:10

**accept** [1] - 783:18

**acceptable** [6] - 835:20, 996:24, 997:4, 997:8, 999:12, 1006:5

**access** [11] - 889:20, 1089:1, 1099:11, 1129:12, 1135:2, 1135:4, 1135:6, 1136:1, 1136:4, 1136:10, 1136:12

**accessible** [1] - 891:3

**according** [1] - 1106:19

**account** [2] - 850:4, 850:9

**accounting** [1] - 938:16

**accurate** [1] - 1153:10

**accurately** [1] - 1039:22

**accused** [21] - 855:11, 865:14, 865:21, 901:5, 907:9, 907:13, 908:19, 908:23, 909:6, 909:13, 909:24, 918:22, 919:13, 920:8, 920:13, 920:23, 921:17, 925:11, 1114:18, 1116:14, 1124:14

**achieve** [3] - 783:3, 775:22, 920:3

**ACI** [44] - 794:17,

794:20, 815:4, 825:5, 829:5, 830:18, 834:5, 839:2, 840:11, 841:10, 842:17, 842:21, 843:4, 843:8, 843:19, 846:21, 847:6, 852:6, 853:10, 853:14, 855:2, 855:3, 855:6, 855:15, 855:17, 855:21, 856:1, 856:5, 870:9, 878:21, 878:23, 879:14, 949:19, 993:11, 995:8, 995:10, 996:17, 997:3, 1073:16, 1073:23, 1079:8, 1095:19, 1134:14

**ACI's** [7] - 848:2, 849:19, 854:16, 873:24, 885:14, 1134:1, 1134:3

**acknowledge** [2] - 1025:9, 1127:6

**ACM** [10] - 1021:9, 1021:12, 1021:15, 1021:17, 1022:5, 1022:18, 1026:2, 1027:16, 1055:18

**ACM's** [2] - 1023:6, 1023:8

**acquire** [1] - 899:13

**acquired** [2] - 899:15, 979:3

**acquisition** [12] - 803:4, 823:18, 903:6, 948:9, 952:2, 952:3, 952:21, 972:14, 976:21, 977:3, 977:5, 978:20

**act** [1] - 787:10

**action** [2] - 975:16, 994:6

**actions** [2] - 989:8, 1000:15

**activation** [1] - 943:24

**activations** [6] - 792:13, 792:14, 793:18, 799:22, 800:2, 879:18

**active** [4] - 793:1, 793:3, 929:9

**activities** [4] - 820:17, 821:3, 893:16, 1081:8

**activity** [4] - 929:22, 937:7, 995:8, 997:2

**actors** [1] - 1112:1

**actual** [7] - 772:24, 773:1, 912:9, 985:10, 1015:20, 1105:20, 1114:3

**ad** [16] - 777:19, 777:22, 810:4, 815:16, 865:7, 865:11, 866:24, 867:9, 867:20, 868:13, 868:23, 928:2, 934:1, 934:24, 935:9

**add** [5] - 811:3, 811:6, 815:15, 913:13, 915:7

**added** [1] - 936:8

**addition** [4] - 804:23, 845:2, 906:19, 929:7

**additional** [16] - 818:9, 840:18, 938:17, 939:15, 994:2, 996:22, 1095:20, 1109:17, 1139:1, 1140:13, 1145:19, 1145:20, 1146:11, 1146:13, 1147:20, 1148:24

**additionally** [2] - 786:16, 823:19

**additions** [1] - 1086:17

**address** [9] - 769:2, 886:21, 890:2, 929:24, 976:11, 1053:18, 1053:19, 1054:14, 1134:23

**addressed** [2] - 774:24, 787:5

**addresses** [4] - 959:6, 977:19, 1141:4, 1149:3

**addressing** [1] - 1069:3

**adequate** [1] - 824:16

**adjust** [3] - 799:7, 799:11, 1090:3

**adjustment** [4] - 798:8, 801:8, 801:9, 801:11

**adjustments** [1] - 859:3

**administration** [1] - 896:3

**admission** [2] - 1025:4, 1028:4

**admitted** [10] - 875:17, 876:1, 883:3, 949:12, 989:16, 995:20, 1028:1,

1028:7, 1078:2, 1143:18

**adopted** [1] - 964:21

**adoption** [1] - 1130:4

**ads** [52] - 789:20, 811:2, 811:7, 811:15, 817:23, 863:22, 864:1, 864:3, 864:13, 864:14, 864:20, 864:21, 864:22, 865:4, 866:3, 866:5, 866:12, 866:13, 866:14, 867:2, 867:4, 867:6, 867:7, 867:16, 867:17, 867:19, 868:2, 868:4, 868:7, 868:10, 868:13, 868:16, 868:19, 869:4, 869:9, 925:10, 925:14, 925:17, 925:19, 925:22, 926:7, 926:15, 926:23, 927:20, 928:5, 928:6, 928:9, 928:16, 928:19, 933:21, 934:16, 935:22

**AdSense** [4] - 820:16, 821:1, 821:9, 821:19

**AdsNav** [3] - 934:6, 934:12, 936:7

**advance** [3] - 782:24, 786:12, 1065:17

**advanced** [5] - 805:12, 950:13, 956:4, 956:5, 963:23

**advantages** [1] - 1130:4

**advertisement** [1] - 867:8

**advertisements** [6] - 864:4, 865:5, 866:10, 866:17, 867:12

**advertisers** [2] - 788:22, 867:2

**advertising** [25] - 775:10, 777:16, 778:18, 778:19, 779:11, 779:17, 864:15, 865:6, 866:19, 866:21, 867:13, 867:21, 867:24, 925:9, 926:3, 929:8, 930:14, 933:18, 933:19, 935:13,

935:17, 935:19, 936:13, 936:18

**advise** [1] - 894:6

**Advocate** [1] - 951:9

**AdWord** [1] - 822:16

**AdWords** [1] - 821:24

**aerial** [1] - 903:6

**affect** [2] - 815:9, 1119:19

**affected** [1] - 813:22

**affects** [1] - 780:5

**affiliate** [1] - 1079:21

**affirmatively** [1] - 858:21

**afraid** [1] - 1005:12

**afternoon** [20] - 788:17, 940:15, 950:2, 950:3, 982:20, 991:20, 998:16, 1009:7, 1009:8, 1029:4, 1029:5, 1060:15, 1061:13, 1061:14, 1079:4, 1079:11, 1084:17, 1085:7, 1130:10, 1134:22

**afterwards** [4] - 771:24, 810:23, 829:20, 848:19

**agencies** [1] - 1127:22

**agency** [2] - 973:22, 1088:11

**Agency** [4] - 960:12, 960:15, 973:23, 1015:9

**aggressive** [2] - 808:13, 808:16

**ago** [4] - 847:2, 953:23, 1058:23, 1130:9

**agree** [21] - 770:17, 772:11, 813:11, 830:22, 831:5, 831:16, 837:3, 837:18, 847:13, 852:22, 854:21, 860:2, 942:13, 944:15, 944:19, 945:8, 995:24, 997:21, 1003:16, 1003:17, 1112:6

**agreed** [19] - 770:24, 772:16, 775:16, 775:21, 776:7, 776:8, 776:10, 777:7, 778:2, 779:4, 802:19, 829:5, 881:18, 883:7, 992:7, 1003:17, 1012:7, 1132:24

Agreement [1] - 839:6
agreement [6] -
812:21, 813:6,
813:13, 845:23,
1013:4, 1088:13
Agreements [1] -
855:2
agreements [3] -
814:21, 815:5,
854:22
ahead [18] - 778:15,
809:11, 809:17,
862:14, 864:11,
891:13, 906:4,
913:8, 915:16,
917:6, 917:19,
918:3, 918:10,
920:19, 921:13,
922:20, 1008:7,
1055:3
air [6] - 846:4, 846:18,
846:19, 847:7,
1004:22
aircraft [3] - 960:7,
960:16, 962:4
airplane [5] - 955:3,
961:20, 961:23,
963:16, 963:20
airplanes [1] - 960:13
airport [2] - 955:5
airtight [1] - 1004:18
aisle [1] - 1050:23
Alchemy [1] - 1013:5,
1013:8
ALFARO [4] - 940:13,
945:18, 947:5,
949:10
algorithm [4] - 884:22,
1029:16, 1033:2,
1036:5
algorithms [3] -
1032:22, 1051:12,
1066:3
allegations [1] -
1079:8
alleged [1] - 771:6
Allen [1] - 1019:11
allied [1] - 957:2
allow [9] - 776:16,
776:19, 779:21,
782:9, 783:4,
1084:2, 1112:18,
1145:1, 1145:15
allowed [4] - 775:14,
782:17, 782:21,
1150:1
allowing [3] - 784:12,
784:13, 937:24
allows [4] - 889:24,
1054:6, 1138:10,

1142:1
Almeling [3] -
1028:14, 1028:24,
1066:17
ALMELING [14] -
1028:19, 1028:23,
1029:3, 1033:18,
1033:23, 1034:16,
1034:21, 1060:12,
1074:5, 1074:24,
1075:19, 1076:17,
1077:2, 1077:20
Almeling's [1] -
1066:23
almost [2] - 911:20,
960:2
alone [1] - 821:19
alongside [2] - 934:2,
1024:6
aloud [1] - 1041:18,
1068:16
alter [1] - 1144:24
alternative [2] -
844:24, 845:16
alternatives [1] -
845:11
altitude [1] - 1054:6
altitudes [1] - 1054:7
Alto [2] - 972:22,
972:23
ambassador [1] -
951:12
ambitiously [1] -
962:12
American [2] - 892:12,
1082:10
amount [40] - 792:21,
793:12, 793:19,
796:20, 796:21,
797:7, 797:10,
797:14, 800:24,
815:18, 823:3,
823:6, 829:23,
829:24, 830:3,
830:7, 830:8,
830:11, 830:14,
849:21, 849:22,
852:14, 862:17,
874:15, 877:18,
880:17, 903:8,
911:13, 913:1,
925:18, 926:19,
928:8, 928:11,
933:3, 933:7,
936:12, 936:17,
1085:16, 1128:12,
1129:9
amounts [4] - 777:21,
794:22, 809:13,
843:14

analogy [2] - 906:2,
1112:9
analysis [21] - 777:15,
796:7, 796:24,
799:5, 800:4,
801:23, 802:9,
805:3, 818:23,
828:6, 828:8,
828:22, 829:16,
851:17, 882:6,
1120:3, 1137:18,
1141:16, 1144:8,
1144:11, 1149:18
analytics [1] - 897:12
analyze [1] - 1134:23
analyzed [1] - 1115:4
anchor [1] - 880:6
Andreas [2] - 835:15,
1006:3
Andrew [1] - 884:5
Android [8] - 797:8,
866:11, 900:3,
900:5, 900:7, 900:8,
900:12, 1122:22
Ang [17] - 831:24,
930:21, 975:22,
989:14, 990:1,
1003:1, 1005:22,
1039:8, 1039:17,
1042:19, 1046:2,
1053:6, 1055:20,
1056:4, 1057:5,
1058:1
ang [2] - 1034:16,
1080:4
Angeles [6] - 1023:23,
1027:4, 1027:11,
1027:14, 1048:6,
1070:9
angry [1] - 968:19
animation [17] -
912:16, 914:9,
915:17, 917:7,
917:20, 918:10,
1023:4, 1104:4,
1104:9, 1107:15,
1108:22, 1109:18,
1118:5, 1120:23,
1121:11, 1121:21,
1121:23
animations [6] -
940:17, 941:1,
941:10, 941:12,
941:17, 1105:6
announced [1] - 804:6
annual [3] - 809:12,
811:11, 1022:23
ans [1] - 1001:19
answer [20] - 782:23,
855:13, 863:10,

864:7, 867:3,
867:16, 897:20,
914:16, 920:6,
925:1, 997:14,
1006:21, 1018:3,
1018:5, 1018:8,
1018:14, 1068:16,
1069:10, 1069:15,
1075:12
answered [1] -
1075:23
answers [2] - 866:8,
992:10
anticipate [2] -
809:11, 1134:15
anticipated [3] -
779:8, 779:11, 782:8
anticipates [4] -
1133:21, 1134:2,
1149:20, 1149:24
anticipating [2] -
809:15, 811:11
anticipation [5] -
779:14, 808:23,
1131:18, 1133:19,
1150:7
apart [1] - 1126:14
apologies [1] -
1146:10
apologize [2] -
783:16, 783:20
app [1] - 863:16
appear [2] - 841:5,
885:15
APPEARANCES [2] -
767:16, 768:1
appeared [1] -
1129:19
appearing [1] -
1129:17
Apple [1] - 900:3
applicable [2] -
824:24, 879:13
applicant [1] - 1011:6
application [36] -
810:4, 860:8,
860:12, 868:11,
889:22, 896:20,
901:18, 901:19,
901:22, 912:10,
963:10, 979:24,
980:9, 1009:18,
1010:5, 1010:6,
1010:24, 1011:11,
1014:12, 1029:15,
1030:11, 1031:12,
1031:21, 1032:4,
1033:13, 1040:1,
1043:10, 1053:3,
1063:14, 1064:20,

1065:1, 1065:23,
1085:17, 1131:23,
1134:11, 1136:21
applications [5] -
806:22, 859:9,
901:16, 958:3, 960:6
applied [5] - 772:24,
802:20, 802:21,
824:24, 830:3
applies [2] - 879:4,
1119:10
apply [10] - 773:1,
773:17, 796:12,
997:9, 1091:15,
1118:3, 1119:9,
1131:10, 1137:6
applying [2] -
1133:12, 1133:18
appointment [1] -
1079:19
appointments [1] -
1080:11
apportion [2] - 775:3,
823:4
apportioning [2] -
816:20, 819:12
apportionment [2] -
818:3, 822:23
appreciate [3] -
787:15, 855:13,
1151:19
approach [22] -
789:13, 789:20,
795:5, 826:21,
887:21, 918:21,
919:4, 919:12,
920:7, 920:12,
920:22, 921:16,
921:21, 922:16,
947:11, 1009:3,
1016:9, 1016:11,
1019:21, 1041:20,
1074:20, 1143:8
appropriate [12] -
786:13, 796:10,
873:1, 877:13,
878:17, 879:12,
880:15, 914:19,
914:22, 915:3,
918:17, 1099:12
approved [1] - 966:17
April [9] - 801:4,
859:2, 934:13,
936:14, 1040:22,
1046:11, 1066:13,
1083:16, 1088:5
architect [1] - 895:12
architecture [1] -
894:24
area [26] - 892:15,

896:22, 896:24,
897:6, 898:5,
906:19, 906:20,
906:22, 906:23,
906:24, 907:2,
907:6, 907:7, 907:8,
909:4, 961:3, 984:2,
1037:10, 1076:13,
1082:19, 1091:6,
1091:10, 1094:23,
1099:2, 1100:13,
1130:16
**areas** [2] - 909:8,
1127:14
**arguing** [3] - 774:5,
992:13, 1129:10
**argument** [3] - 769:19,
770:14, 775:1
**arise** [1] - 977:5
**arm** [1] - 929:12
**army** [2] - 1001:6
**arose** [1] - 1128:3
**arrange** [1] - 1026:21
**arranged** [1] - 1091:19
**arrangement** [1] -
803:15
**arrive** [1] - 825:1
**arrows** [5] - 913:8,
1094:5, 1104:19,
1105:7, 1110:3
**arsenal** [1] - 1004:11
**ARSHT** [1] - 768:4
**art** [7] - 1082:5,
1132:13, 1132:16,
1132:20, 1133:14,
1140:16, 1150:5
**Art+Com** [55] -
794:17, 812:19,
980:13, 980:19,
981:2, 983:14,
983:22, 984:23,
985:13, 986:4,
986:9, 986:12,
986:16, 987:2,
987:4, 987:12,
988:6, 988:10,
991:2, 992:14,
995:11, 997:3,
1001:24, 1002:20,
1003:8, 1003:12,
1003:13, 1005:19,
1007:2, 1007:6,
1007:10, 1007:11,
1007:15, 1007:19,
1008:1, 1008:12,
1008:15, 1008:20,
1012:4, 1012:12,
1012:16, 1050:16,
1051:6, 1052:5,
1052:9, 1052:19,

1052:22, 1053:14,
1054:16, 1055:2,
1055:7, 1075:11,
1076:24, 1077:8,
1077:11
**ART+COM** [3] - 767:3,
852:8, 852:9
**Art+Com's** [2] -
982:18, 1075:11
**artcom.de** [1] -
1053:13
**article** [4] - 1043:11,
1128:17, 1128:19,
1128:21
**Arts** [1] - 1082:10
**Asia** [1] - 911:11
**aspect** [4] - 817:13,
821:15, 842:3,
887:19
**aspects** [11] - 799:2,
808:17, 813:21,
816:4, 823:8,
842:15, 842:20,
893:7, 894:9,
902:20, 923:19
**asserted** [10] -
1001:15, 1062:5,
1062:11, 1133:13,
1144:15, 1148:20,
1149:21, 1150:1,
1150:2
**asserting** [1] -
1095:19
**assertion** [1] - 995:12
**assets** [2] - 1013:16,
1013:19
**assigned** [1] - 823:23
**assist** [2] - 1062:20,
1079:24
**assisted** [2] - 1066:6,
1108:21
**associated** [3] -
938:23, 953:3,
986:18
**Associates** [2] -
1011:17, 1127:21
**association** [1] -
1021:6
**Association** [2] -
1020:20, 1021:9
**assume** [7] - 785:6,
802:23, 832:4,
837:11, 839:18,
840:7, 846:23
**assumed** [2] - 809:5,
809:8
**assumption** [7] -
813:8, 828:7, 840:2,
840:10, 847:12,
870:13, 870:21

**assumptions** [9] -
808:3, 808:10,
808:21, 813:1,
813:3, 813:4, 829:7,
829:8, 847:1
**astronauts** [1] -
970:24
**ATI** [1] - 981:5
**Atlantic** [1] - 1089:20
**ATM** [1] - 1054:7
**atmospheric** [1] -
1129:8
**attach** [2] - 988:1,
994:15
**attached** [2] - 833:11,
988:3
**attaching** [1] - 848:21
**attacked** [1] - 1004:12
**attend** [6] - 982:8,
982:18, 1048:10,
1069:20, 1070:1,
1070:17
**attendance** [6] -
1023:18, 1048:13,
1055:12, 1069:4,
1075:22, 1075:24
**attended** [8] -
1023:15, 1027:6,
1057:18, 1059:11,
1066:18, 1066:23,
1067:7, 1070:10
**attendees** [9] - 999:8,
1024:9, 1024:11,
1024:13, 1044:4,
1055:13, 1056:2,
1056:9, 1058:22
**attends** [1] - 1023:12
**attention** [6] - 808:11,
821:8, 1020:9,
1071:19, 1074:3,
1128:16
**attorney** [1] - 1009:24
**attorneys** [2] -
1008:19, 1079:7
**attracting** [1] - 788:21
**Audi** [6] - 883:1,
883:11, 901:9,
901:11, 901:17,
901:19
**augmented** [1] -
950:14
**August** [20] - 806:12,
806:14, 809:3,
834:2, 834:5,
834:10, 835:11,
841:2, 1024:1,
1024:3, 1039:5,
1039:13, 1044:6,
1066:11, 1066:19,
1066:24, 1068:14

1076:9, 1137:1,
1137:4
**author** [1] - 945:21
**authored** [1] - 1043:11
**authoritative** [1] -
942:23
**authority** [1] - 1097:19
**automatically** [1] -
1103:11
**available** [14] -
804:15, 805:18,
813:16, 813:18,
863:7, 863:15,
884:20, 891:6,
918:7, 924:5,
1091:22, 1106:3,
1106:21, 1106:22
**average** [4] - 792:16,
797:11, 797:12,
799:1
**avoided** [1] - 877:14
**Award** [2] - 902:3,
902:4
**award** [2] - 880:1,
902:7
**awards** [2] - 902:1,
902:8
**aware** [13] - 769:12,
832:22, 855:14,
957:11, 958:10,
959:23, 988:6,
988:9, 1061:24,
1062:5, 1062:10,
1130:13, 1130:15
**awkward** [1] - 784:23
**axiomatic** [1] - 962:6
**B-I-R-C-H** [1] - 888:4
**B1** [17] - 917:8,
917:12, 917:18,
1104:20, 1105:2,
1105:12, 1105:20,
1106:6, 1107:3,
1108:4, 1111:20,
1111:22, 1118:24,
1119:4
**B2** [4] - 1104:20,
1105:2, 1105:12,
1119:12
**BA** [1] - 1081:3
**baby** [1] - 953:17
**bachelor** [1] - 1133:2
**bachelors** [1] - 895:24
**background** [9] -
807:9, 887:16,
954:1, 1022:5,
1080:2, 1081:2,
1126:16, 1126:17,
1127:2
**bad** [1] - 978:2
**badge** [1] - 1025:8

**Bagdad** [2] - 975:9,
975:10
**Baghdad** [1] - 975:9
**Bailey** [1] - 937:22
**BAKER** [1] - 767:21
**balcony** [1] - 1002:14
**ball** [11] - 984:3,
984:5, 984:8,
984:10, 984:13,
984:14, 985:8,
985:9, 985:18,
996:11, 1002:9
**balloons** [1] - 868:21
**bank** [1] - 1076:7
**Banker** [1] - 973:15
**banks** [1] - 974:10
**banner** [4] - 864:14,
866:14, 867:9,
867:17
**banners** [1] - 869:5
**bar** [8] - 789:15,
795:6, 796:3,
947:13, 947:24,
1019:22, 1076:22,
1077:3
**Barbara** [8] - 1043:1,
1043:14, 1043:21,
1079:16, 1079:21,
1080:8, 1080:12,
1080:21
**barely** [1] - 1017:3
**barricade** [1] -
1001:22
**bars** [1] - 816:14
**base** [17] - 773:7,
792:24, 793:11,
795:15, 795:20,
796:14, 796:17,
799:5, 800:14,
801:21, 801:23,
824:9, 825:1,
877:16, 920:16,
975:11, 1140:5
**Based** [1] - 954:6
**based** [44] - 773:16,
794:5, 796:19,
797:21, 801:22,
809:23, 810:5,
823:7, 828:23,
829:23, 836:14,
841:21, 842:18,
849:23, 850:7,
866:22, 878:23,
879:1, 893:1,
954:12, 954:14,
954:16, 998:22,
1047:22, 1057:9,
1084:5, 1084:23,
1108:14, 1109:13,
1112:5, 1112:22,

1116:23, 1117:20,
1120:3, 1121:5,
1123:2, 1123:8,
1136:5, 1136:14,
1141:1, 1141:16,
1144:8, 1144:11,
1149:17
**basement** [1] - 972:23
**bases** [2] - 1089:1,
1133:13
**basing** [1] - 1027:15
**basis** [15] - 777:12,
777:14, 793:3,
794:7, 799:7,
805:18, 827:8,
830:21, 844:23,
845:19, 855:18,
898:20, 1111:1,
1123:17, 1125:12
**beach** [1] - 970:11
**became** [9] - 899:19,
956:2, 956:3,
978:22, 1013:21,
1031:12, 1127:19,
1128:6, 1129:15
**become** [2] - 923:15,
978:19
**BEFORE** [1] - 767:13
**began** [5] - 810:11,
1080:8, 1081:9,
1087:19, 1113:10
**begin** [7] - 786:20,
934:14, 1104:15,
1104:19, 1110:2,
1111:18, 1137:22
**beginning** [8] -
936:14, 948:14,
1025:3, 1037:16,
1086:5, 1121:3,
1134:9, 1137:2
**begins** [5] - 820:24,
876:6, 886:21,
934:13, 1094:22
**below** [8] - 807:8,
833:14, 841:16,
841:18, 905:7,
930:24, 1106:4,
1143:9
**bench** [2] - 795:5,
947:12
**benefit** [4] - 939:20,
1079:5, 1092:11,
1123:22
**benefits** [5] - 814:12,
814:14, 819:13,
922:17, 939:22
**Berkley** [4] - 896:4,
1030:17, 1030:18,
1035:19
**Berlin** [3] - 990:16,

990:21, 991:1
**Bernard** [1] - 1021:4
**best** [2] - 779:7,
784:11, 786:1,
869:7, 885:3,
1026:22, 1036:7,
1036:17, 1036:20,
1106:20, 1106:22,
1126:14
**beta** [1] - 985:22
**better** [15] - 774:5,
836:1, 838:11,
838:17, 894:16,
957:20, 1032:3,
1035:6, 1035:8,
1048:24, 1065:6,
1106:3, 1108:3,
1108:7, 1108:10
**between** [23] - 797:19,
839:11, 846:20,
848:4, 852:9,
853:17, 897:15,
905:18, 905:20,
906:12, 931:14,
931:19, 955:5,
971:21, 984:14,
1007:2, 1007:19,
1101:13, 1111:14,
1114:12, 1123:3,
1132:12, 1150:2
**beyond** [6] - 782:17,
782:20, 783:7,
784:7, 826:1, 865:1
**big** [27] - 903:18,
909:21, 930:1,
930:9, 959:1, 961:4,
961:7, 961:8, 963:2,
964:1, 965:5, 967:9,
973:5, 973:7,
973:15, 981:24,
982:4, 984:8,
992:11, 1006:23,
1023:1, 1047:15,
1047:16, 1054:1,
1099:8, 1128:14
**billed** [1] - 1088:9
**billion** [12] - 792:14,
801:5, 801:24,
803:13, 823:14,
858:23, 859:20,
859:23, 877:16,
878:18, 879:5, 971:2
**binary** [7] - 905:6,
907:16, 908:7,
912:8, 1101:16,
1101:19, 1113:17
**binder** [5] - 832:3,
832:5, 832:6, 832:7,
1033:17
**birch** [1] - 943:23

**Birch** [41] - 887:13,
887:14, 888:11,
888:16, 889:14,
890:10, 892:21,
893:19, 894:10,
895:22, 896:21,
900:15, 901:4,
901:24, 902:24,
908:14, 914:10,
918:21, 919:12,
922:15, 923:8,
932:20, 934:10,
934:19, 935:20,
937:18, 938:6,
940:14, 942:4,
945:8, 945:20,
947:18, 948:1,
949:1, 949:6,
1109:3, 1109:6,
1109:19, 1110:9,
1111:21, 1111:24
**BIRCH** [1] - 888:5
**Birch's** [1] - 1112:6
**bit** [39] - 786:21,
786:22, 788:2,
805:5, 808:23,
811:17, 815:13,
818:5, 839:22,
863:3, 872:9,
881:20, 891:15,
902:24, 906:3,
912:15, 915:19,
917:22, 923:9,
937:16, 948:2,
952:22, 954:2,
971:23, 979:4,
991:5, 1009:10,
1033:11, 1034:12,
1039:15, 1040:3,
1041:16, 1053:21,
1054:8, 1094:17,
1099:17, 1122:3,
1126:15, 1127:2
**blink** [1] - 915:22
**blow** [8] - 808:20,
809:1, 934:9,
937:15, 989:16,
990:1, 1003:4,
1053:10
**blue** [7] - 906:7, 907:2,
907:3, 912:16,
913:8, 1110:3,
1110:15
**BLUMENFELD** [1] -
768:4
**blurrier** [1] - 921:9
**blurry** [5] - 921:10,
922:24, 923:2,
923:6, 1089:23
**blurts** [1] - 795:23

**board** [7] - 954:11,
968:19, 968:20,
968:21, 977:18,
978:8, 986:20
**boarders** [1] - 890:16
**boards** [1] - 973:12
**Boeing** [2] - 958:1,
958:6
**bomb** [1] - 971:10
**bombed** [1] - 975:18
**bombers** [1] - 970:10
**bones** [1] - 1017:1
**Book** [3] - 776:15,
776:18, 777:23
**book** [7] - 771:11,
771:18, 771:23,
772:1, 772:5,
772:23, 835:2
**booked** [1] - 932:1
**books** [3] - 1081:15,
1081:18, 1081:22
**borders** [1] - 965:2
**boss** [1] - 924:21
**bosses** [1] - 973:7
**bother** [2] - 854:13,
921:14
**bottom** [25] - 802:17,
806:8, 806:19,
808:19, 811:3,
811:8, 821:8,
850:22, 852:11,
907:3, 907:4, 909:5,
909:9, 933:14,
936:9, 1040:5,
1056:11, 1056:24,
1057:3, 1068:11,
1093:11, 1115:7,
1116:19, 1127:24
**BOTTS** [1] - 767:21
**bought** [2] - 779:8,
1013:14
**box** [2] - 809:5, 890:17
**boxes** [2] - 964:13,
1044:22
**boy** [1] - 964:21
**brackets** [1] - 1040:4
**branch** [1] - 1107:13
**branches** [1] - 904:14
**brand** [5] - 815:23,
816:1, 816:4,
816:11, 897:10
**branding** [1] - 816:5
**brands** [1] - 816:12
**Brandywine** [1] -
1092:3
**break** [13] - 861:3,
861:4, 872:8,
872:14, 874:11,
990:5, 991:12,
993:6, 1000:7,

1038:7, 1060:15,
1060:17, 1060:21
**breaks** [1] - 786:21
**breakthrough** [1] -
956:17
**BRETT** [1] - 768:8
**Brett** [1] - 1079:6
**BRIAN** [1] - 767:18
**bridge** [1] - 1018:19
**brief** [4] - 780:14,
785:11, 873:3,
1143:22
**briefing** [4] - 981:19,
981:20, 982:9,
983:16
**briefly** [5] - 769:8,
770:15, 1002:6,
1021:21, 1058:1
**briefs** [1] - 769:16
**brightest** [1] - 945:23
**bring** [20] - 787:19,
788:3, 819:17,
822:18, 831:23,
843:16, 848:5,
873:5, 874:9,
874:19, 887:4,
891:12, 892:5,
937:14, 992:21,
999:17, 999:22,
1061:3, 1089:22,
1146:9
**bringing** [2] - 891:5,
1061:7
**broad** [5] - 867:6,
961:8, 961:10,
1146:15, 1149:2
**broadcast** [2] -
973:24, 974:2
**broader** [2] - 971:15,
1022:12
**broken** [2] - 1017:1,
1141:1
**brotherhood** [1] -
971:12
**brothers** [1] - 971:6
**brought** [6] - 866:7,
884:4, 890:8,
907:21, 912:2,
1047:19
**browse** [2] - 926:18,
927:2
**browser** [2] - 937:4
**browsing** [1] - 898:2
**budgets** [1] - 785:5
**build** [11] - 911:18,
955:15, 960:4,
962:19, 962:24,
967:3, 968:12,
973:6, 973:8,
1001:21, 1018:18

**Builder** [1] - 932:8
**building** [10] - 821:23, 822:15, 892:12, 911:24, 954:6, 966:23, 968:11, 970:20, 972:23, 1066:3
**buildings** [2] - 892:15, 954:7
**built** [16] - 891:24, 895:8, 895:16, 957:23, 963:3, 964:8, 964:15, 966:22, 967:24, 968:4, 968:14, 970:8, 978:24, 981:8, 990:18, 1127:12
**bulk** [1] - 955:4
**bullet** [10] - 804:14, 804:16, 846:1, 846:2, 856:20, 870:4, 870:5, 1003:20, 1004:13
**bunch** [6] - 773:5, 903:23, 916:8, 916:12, 918:4, 1023:4
**buses** [1] - 982:16
**business** [28] - 774:21, 775:11, 776:1, 776:4, 776:22, 789:1, 802:15, 810:7, 814:3, 815:9, 815:11, 815:20, 816:22, 817:1, 860:7, 860:14, 868:11, 896:3, 924:23, 935:11, 941:5, 970:16, 976:15, 983:15, 984:18, 1001:10, 1100:24
**busy** [1] - 990:21
**butter** [1] - 916:14
**buttons** [1] - 972:2
**buy** [16] - 837:7, 844:14, 847:18, 847:19, 926:17, 928:1, 977:22, 978:9, 978:12, 978:23, 987:24, 989:7, 1001:3, 1004:20, 1006:23, 1007:12
**buyers** [2] - 835:23, 1024:14
**buying** [7] - 844:20, 844:22, 926:11,

978:1, 980:6, 1002:5, 1014:8
**BY** [46] - 767:18, 767:21, 767:22, 767:22, 767:23, 768:4, 768:7, 768:8, 788:12, 790:9, 792:6, 796:4, 803:24, 812:14, 819:11, 820:9, 826:7, 827:2, 835:4, 843:17, 848:7, 856:11, 869:16, 888:10, 940:13, 945:19, 950:1, 975:1, 990:10, 1000:5, 1009:6, 1016:14, 1018:4, 1019:4, 1029:3, 1033:23, 1034:21, 1061:12, 1075:8, 1075:19, 1079:3, 1123:1, 1141:8, 1142:13, 1142:24, 1144:1
**C.A** [1] - 767:5
**C1** [14] - 1106:7, 1106:11, 1106:14, 1106:22, 1107:3, 1107:4, 1108:6, 1108:10, 1118:24, 1119:4, 1119:11, 1120:16, 1120:18
**C2** [10] - 1106:7, 1106:11, 1106:15, 1106:23, 1106:24, 1107:3, 1108:6, 1118:24, 1119:4, 1119:12
**C3** [2] - 1113:7, 1119:12
**C4** [2] - 1113:7, 1119:13
**cable** [1] - 984:13
**Cairo** [1] - 974:11
**cakes** [2] - 1004:5, 1004:6
**Cal** [1] - 896:1
**calculate** [1] - 793:9
**calculating** [1] - 802:7
**calculation** [2] - 773:8, 799:14
**calculations** [1] - 1047:18
**California** [2] - 896:4, 981:9, 990:22, 1029:22, 1030:18, 1048:6, 1063:10, 1079:16
**cambridge** [1] -

966:15
**Cambridge** [7] - 958:6, 962:23, 967:16, 968:15, 1011:14, 1011:16, 1081:4
**camera** [3] - 896:19, 1094:3, 1144:24
**campus** [2] - 981:17, 1058:15
**Canada** [4] - 1081:5, 1082:11, 1082:12, 1127:11
**Canadian** [2] - 1127:9, 1127:15
**cannot** [2] - 880:17, 1132:11
**capabilities** [3] - 805:12, 805:20, 1083:20
**capitalists** [1] - 967:19
**caption** [1] - 1142:5
**captioned** [1] - 1153:12
**car** [4] - 901:21, 1006:22, 1006:24, 1076:12
**card** [3] - 970:16, 1076:7, 1076:10
**cards** [1] - 813:16
**care** [3] - 778:5, 914:5, 915:3
**cared** [1] - 978:11
**carried** [1] - 1091:9
**carrier** [4] - 960:7, 960:9, 960:16, 962:4
**case** [80] - 784:24, 797:1, 800:14, 801:21, 802:7, 812:22, 822:3, 826:16, 827:6, 827:13, 827:17, 827:19, 828:17, 837:23, 840:23, 849:11, 849:13, 851:16, 872:21, 875:4, 876:6, 876:8, 876:21, 879:13, 883:5, 883:20, 883:24, 886:22, 887:9, 892:11, 901:19, 905:5, 905:13, 911:22, 912:23, 917:1, 917:18, 919:17, 940:1, 941:23, 943:16, 945:12, 953:19, 975:15, 989:8, 991:14,

993:13, 993:20, 993:24, 994:5, 1004:11, 1016:23, 1020:2, 1020:9, 1024:13, 1031:5, 1032:13, 1055:18, 1060:18, 1062:16, 1074:3, 1079:7, 1084:6, 1084:24, 1085:14, 1088:8, 1088:15, 1090:16, 1092:16, 1092:19, 1094:24, 1128:23, 1130:22, 1132:23, 1132:24, 1135:19, 1149:5, 1150:7, 1150:14
**cases** [3] - 1037:24, 1142:4, 1142:9
**Castle** [1] - 1153:2
**Castleman** [16] - 814:13, 814:17, 823:8, 828:6, 865:20, 881:11, 881:18, 881:23, 882:11, 883:1, 883:7, 883:21, 943:4, 943:7, 1096:23, 1115:3
**Castleman's** [6] - 882:23, 1085:22, 1086:3, 1086:9, 1097:22, 1098:2
**cat** [1] - 928:20
**categories** [8] - 777:21, 778:17, 882:23, 935:17, 938:22, 940:3, 1004:2, 1096:17
**categorizes** [1] - 778:18
**category** [4] - 866:7, 933:17, 995:24, 996:3
**CBRE** [1] - 973:15
**cc** [1] - 1053:15
**CD** [32] - 1024:11, 1024:16, 1026:14, 1026:19, 1027:13, 1055:15, 1055:18, 1055:21, 1056:1, 1056:9, 1057:10, 1058:5, 1072:8, 1072:12, 1072:18, 1072:20, 1072:22, 1072:24, 1073:2, 1073:3, 1073:6, 1073:7, 1073:11, 1073:14, 1073:17, 1073:22, 1073:24,

1075:12, 1126:9
**CD's** [7] - 1024:24, 1025:12, 1025:16, 1025:19, 1026:5, 1026:17, 1027:3
**CD-ROM** [19] - 1055:15, 1055:21, 1056:9, 1058:5, 1072:8, 1072:18, 1072:20, 1072:22, 1072:24, 1073:2, 1073:3, 1073:6, 1073:7, 1073:11, 1073:14, 1073:17, 1073:22, 1073:24, 1075:12
**CD-ROMs** [5] - 1024:11, 1027:13, 1072:8, 1072:12, 1072:18
**ceiling** [1] - 961:4
**celebrities** [1] - 982:11
**cell** [4] - 916:6, 1099:5, 1099:10, 1099:15
**cent** [7] - 826:12, 826:14, 856:2, 873:21, 874:6, 880:3
**cent-and-a-half** [1] - 856:2
**Center** [4] - 1035:24, 1045:6, 1060:11, 1080:17
**center** [10] - 892:16, 916:5, 958:15, 981:4, 981:19, 981:21, 982:9, 982:15, 983:16, 983:17
**centers** [2] - 975:18, 1080:14
**Central** [1] - 974:13
**centrally** [2] - 1094:7, 1105:3
**cents** [8] - 815:3, 826:12, 878:2, 879:2, 879:19, 879:22, 880:16
**CEO** [4] - 835:15, 968:11, 972:8, 1006:3
**certain** [15] - 775:21, 784:6, 794:21, 794:23, 798:12, 802:12, 808:4, 814:16, 816:1, 823:16, 829:7, 829:8, 860:21, 869:4, 1113:13

certainly [12] - 773:11, 837:7, 856:1, 888:15, 954:23, 957:14, 960:2, 988:12, 1012:17, 1013:19, 1025:24, 1145:4
CERTIFICATE [1] - 1153:5
Certified [1] - 1153:8
certify [1] - 1153:9
cetera [5] - 804:18, 868:21, 992:12
challenge [1] - 813:10
challenges [1] - 1099:9
challenging [1] - 942:22
change [3] - 783:2, 1055:4, 1055:7
changed [5] - 931:17, 1054:22, 1055:9, 1055:10, 1128:2
changes [6] - 781:9, 979:7, 979:8, 998:20, 998:22, 1151:8
changing [1] - 1146:16
characteristics [1] - 1083:24
characterization [1] - 995:15
characterizations [3] - 992:8, 995:10, 995:14
characterizing [1] - 997:2
charge [8] - 795:12, 863:16, 923:21, 924:3, 928:9, 999:1, 999:4, 1015:11
charged [3] - 785:7, 785:9, 928:6
chart [1] - 802:5
charts [1] - 774:12
checked [1] - 943:13
checklist [1] - 1141:15
chief [1] - 949:15
Chief [3] - 950:8, 951:8, 951:20
child [5] - 920:8, 920:13, 920:18, 974:5, 978:15
child's [1] - 965:8
children [16] - 881:24, 905:7, 905:8, 906:6, 907:20, 908:4, 908:13, 921:7, 921:12, 967:10,

967:11, 967:12, 1103:20, 1103:21
chips [1] - 966:4
choice [1] - 923:3
choices [1] - 973:14
chooses [1] - 939:8
Christina [1] - 1092:3
Christmas [1] - 964:23
Chrome [6] - 816:13, 939:8, 939:10, 939:12, 939:13, 940:6
chronological [1] - 1097:2
chronology [1] - 996:5
cinematic [1] - 892:17
circles [4] - 905:10, 905:12, 905:19, 905:21
Circuit [2] - 880:5, 884:12
circumstance [1] - 781:12
circumstances [1] - 952:1
cited [1] - 1137:20
cities [1] - 959:22
city [1] - 935:7
City [3] - 1035:22, 1045:11, 1076:11
claim [35] - 793:15, 881:6, 882:3, 882:12, 1063:15, 1063:18, 1086:15, 1086:20, 1095:12, 1102:7, 1102:11, 1115:20, 1117:4, 1117:18, 1117:20, 1117:22, 1120:5, 1122:16, 1123:10, 1123:11, 1124:12, 1124:17, 1124:18, 1124:21, 1137:20, 1140:11, 1140:15, 1144:4, 1144:15, 1145:19, 1146:16, 1149:2, 1149:3
Claim [42] - 881:7, 881:21, 1092:9, 1092:12, 1095:17, 1102:14, 1103:5, 1103:9, 1103:10, 1107:21, 1134:5, 1137:19, 1138:3, 1139:17, 1141:12, 1143:5, 1144:5, 1144:8, 1144:13, 1144:16, 1144:19, 1144:20, 1144:21

1144:22, 1144:23, 1145:7, 1145:8, 1145:11, 1145:17, 1145:20, 1145:24, 1146:9, 1146:12, 1146:14, 1146:15, 1147:20, 1147:23, 1147:24, 1148:20, 1148:24
Claims [4] - 1133:17, 1133:22, 1134:3, 1144:17
claims [27] - 883:4, 883:5, 884:2, 884:9, 1086:18, 1093:16, 1094:15, 1095:20, 1095:22, 1095:23, 1096:3, 1103:6, 1103:8, 1103:12, 1124:14, 1124:20, 1133:13, 1133:17, 1137:20, 1141:5, 1144:15, 1148:20, 1149:20, 1149:21, 1150:1, 1150:3
clarification [1] - 1142:23
clarifies [1] - 780:3
clauses [3] - 837:14, 839:6, 839:8
cleaning [1] - 983:20
clear [13] - 784:13, 795:12, 811:23, 830:9, 830:16, 832:4, 879:7, 912:21, 1026:4, 1027:1, 1057:21, 1105:5, 1116:15
clearer [2] - 881:21, 1049:1
clearly [1] - 1092:2
CLERK [2] - 888:1, 1078:13
clerk's [2] - 995:3, 1150:21
clever [1] - 984:16
cleverly [1] - 950:18
click [9] - 891:13, 933:24, 1056:4, 1056:12, 1057:1, 1057:4, 1057:24, 1058:1, 1058:2
clicked [2] - 1036:3, 1058:4
clicks [1] - 926:22
client [2] - 939:3, 952:19
clients [3] - 910:24, 952:18, 973:17
Clinton [1] - 982:11

clip [2] - 1143:21, 1143:22
ClipMapping [6] - 956:12, 956:14, 956:16, 956:21, 957:6, 1009:10
ClipMaps [1] - 1011:11
close [6] - 780:2, 807:7, 808:19, 829:14, 872:20, 927:13
closed [1] - 1150:22
closely [2] - 893:10, 1130:22
closer [4] - 961:9, 961:21, 961:24, 1070:4
closing [1] - 977:6
CNN [4] - 974:5, 974:15, 975:6, 976:10
coarse [9] - 923:6, 1033:2, 1037:2, 1041:20, 1042:1, 1042:5, 1042:12, 1042:15
Coast [1] - 958:2
coast [1] - 911:11
code [45] - 900:22, 931:11, 932:7, 932:12, 932:14, 935:1, 935:7, 942:2, 942:15, 942:16, 942:20, 943:8, 943:11, 943:14, 945:21, 946:1, 946:3, 946:7, 946:17, 946:19, 970:5, 985:1, 985:2, 993:21, 1031:13, 1051:2, 1051:5, 1051:19, 1051:22, 1051:23, 1052:3, 1071:6, 1085:18, 1097:9, 1097:10, 1097:14, 1097:16, 1109:14, 1112:6, 1114:17, 1114:24, 1116:4, 1116:9, 1122:9, 1122:13
codes [6] - 807:16, 807:17, 807:19, 935:6, 1114:15
cohesive [1] - 1043:15
Coldwell [1] - 973:15
Colin [1] - 970:13
collaboration [3] - 929:21, 1051:13, 1051:18

colleague [2] - 1032:18, 1033:6
colleagues [4] - 964:5, 964:6, 965:13, 1032:1
collect [1] - 924:10
collected [1] - 903:9
collection [1] - 836:14
collision [1] - 1054:16
colors [1] - 912:16
column [4] - 797:8, 797:10, 797:13, 933:14
columns [10] - 931:5, 931:15, 932:6, 932:9, 932:10, 932:16, 934:21, 934:23, 935:3, 935:12
combat [1] - 996:12
combination [2] - 884:6, 1150:6
combined [2] - 801:13, 807:13
combining [1] - 844:24
comfort [2] - 846:4, 1004:19
coming [6] - 781:4, 888:21, 893:8, 918:5, 985:18, 990:5
command [1] - 975:17
comment [2] - 807:21, 1115:2
commercial [5] - 802:15, 865:8, 973:4, 1029:11, 1030:4
commercially [1] - 884:19
commercials [1] - 866:14
Commission [1] - 818:21
commissions [1] - 954:10
common [2] - 971:4, 1042:15
communicated [1] - 843:3
communicating [1] - 864:19
communication [2] - 782:13, 878:2
communications [10] - 985:13, 986:3, 986:9, 986:12, 987:1, 991:6, 1002:20, 1007:19, 1008:12

**communities** [1] -
1056:17
**community** [5] -
892:4, 973:22,
1022:11, 1022:12,
1056:3
**companies** [9] -
853:18, 853:21,
854:14, 855:5,
958:5, 958:8, 959:8,
984:19, 1001:14
**company** [49] -
836:24, 855:9,
855:10, 889:15,
894:14, 895:6,
895:8, 899:14,
899:16, 899:18,
901:9, 910:22,
942:11, 945:10,
952:4, 952:6, 954:5,
954:17, 954:20,
955:14, 958:14,
962:13, 962:14,
962:23, 967:24,
968:3, 968:11,
968:23, 969:1,
969:8, 969:11,
969:13, 969:15,
970:15, 976:12,
976:18, 978:1,
978:6, 978:23,
979:21, 980:13,
992:11, 1001:9,
1009:21, 1011:16,
1029:9, 1029:21,
1030:2, 1100:24
**compare** [8] - 907:4,
907:14, 1048:23,
1049:17, 1049:23,
1059:17, 1059:23,
1109:9
**compared** [8] - 770:3,
810:21, 814:11,
856:18, 856:22,
857:13, 857:16,
857:24
**compares** [3] -
1010:24, 1121:16,
1137:13
**comparing** [1] -
1115:18
**comparison** [1] -
1117:9
**Compass** [1] - 1045:9
**compensate** [1] -
824:17
**compensated** [3] -
953:2, 1030:24,
1088:7
**compensation** [2] -

1031:3, 1088:13
**competent** [1] -
1151:20
**compiled** [1] -
1051:24
**complete** [2] - 919:2,
963:24
**completed** [2] -
997:15, 1107:1
**completely** [6] -
773:9, 880:9,
995:24, 1047:14,
1052:15, 1121:3
**complicated** [2] -
908:2, 946:12
**complications** [1] -
838:14
**component** [2] -
901:17, 901:23
**components** [2] -
901:21, 902:17
**compose** [1] - 1149:4
**Computer** [1] -
1035:24
**computer** [46] -
884:18, 884:20,
889:23, 893:2,
904:11, 906:1,
912:12, 937:6,
948:13, 950:19,
958:15, 960:5,
961:10, 963:1,
963:2, 965:9,
965:16, 967:8,
980:3, 982:7, 984:9,
984:14, 985:10,
1022:9, 1023:15,
1023:16, 1055:22,
1070:11, 1089:3,
1089:5, 1089:7,
1097:17, 1097:18,
1097:19, 1099:5,
1099:10, 1099:15,
1105:21, 1106:8,
1107:17, 1112:16,
1128:1, 1128:4,
1133:4, 1133:9,
1146:23
**computer-generated**
[1] - 950:19
**computers** [15] -
899:24, 900:1,
910:19, 916:10,
956:17, 959:6,
965:19, 966:2,
966:3, 982:1, 982:4,
982:5, 1128:4
**computing** [1] -
786:19
**Computing** [3] -

1020:20, 1021:6,
1021:9
**concept** [4] - 880:20,
938:7, 1091:3,
1098:7
**concepts** [1] -
1129:22
**concern** [1] - 885:11
**concerned** [4] -
957:23, 971:3,
980:5, 1142:7
**concerning** [2] -
771:7, 796:7
**concerns** [4] - 864:24,
953:24, 992:7,
1151:15
**conclude** [1] - 876:9
**concluded** [7] -
769:18, 1065:24,
1103:14, 1117:1,
1144:10, 1149:19,
1149:23
**concludes** [1] - 875:3
**conclusion** [22] -
791:17, 794:12,
794:13, 795:2,
796:7, 800:14,
801:10, 801:20,
801:22, 809:24,
836:13, 877:11,
1014:24, 1084:21,
1085:3, 1113:1,
1115:18, 1123:7,
1133:23, 1143:3,
1143:12, 1144:3
**conclusions** [3] -
1123:4, 1131:11,
1137:8
**condensed** [1] -
1043:3
**condition** [4] - 978:23,
1107:11, 1131:18,
1132:10
**conditions** [6] -
852:22, 1106:1,
1118:2, 1118:3,
1131:15, 1132:6
**conducted** [1] -
822:24
**confer** [1] - 780:9
**conference** [30] -
998:23, 999:1,
999:4, 999:9,
999:10, 1003:12,
1020:23, 1022:23,
1024:2, 1026:18,
1027:3, 1027:7,
1048:10, 1048:11,
1048:16, 1055:12,
1055:14, 1055:16,

1058:10, 1066:18,
1068:23, 1069:4,
1070:9, 1070:10,
1070:13, 1070:19,
1070:21, 1070:24,
1072:22, 1151:8
**conferences** [6] -
1020:22, 1022:15,
1022:22, 1027:17,
1034:8, 1070:15
**confident** [1] - 834:18
**confidential** [6] -
800:19, 803:21,
812:12, 817:20,
818:16, 1114:15
**configure** [1] - 943:13
**confirm** [4] - 1097:10,
1101:1, 1101:21,
1109:11
**confirmed** [4] - 884:8,
1003:22, 1027:2,
1122:8
**confused** [1] - 795:18
**confusing** [7] -
770:13, 772:17,
776:17, 808:6,
913:2, 918:2, 994:3
**confusion** [1] - 795:10
**congratulated** [1] -
987:18
**connected** [3] - 940:4,
1139:8, 1139:11
**connection** [6] -
1062:21, 1067:11,
1071:18, 1083:4,
1085:23, 1087:22
**consecutive** [2] -
997:17, 997:18
**consequence** [1] -
780:11
**consequences** [1] -
784:15
**conservative** [3] -
808:4, 880:2, 880:8
**conservatively** [1] -
808:8
**consider** [10] - 791:6,
794:9, 813:19,
815:22, 854:22,
1096:2, 1096:13,
1097:6, 1136:6,
1149:1
**consideration** [6] -
793:20, 822:7,
823:15, 831:10,
831:22, 854:24
**considerations** [6] -
794:24, 802:13,
814:24, 815:2,
815:19, 823:5

**considered** [23] -
773:11, 786:12,
794:11, 794:21,
794:23, 795:1,
798:2, 802:9,
813:23, 815:5,
815:7, 815:21,
821:16, 823:20,
831:12, 850:16,
879:14, 941:20,
945:5, 1085:20,
1093:21, 1095:13,
1132:2
**considering** [6] -
796:18, 802:3,
823:24, 836:20,
842:15, 850:18
**consistent** [4] - 882:2,
882:11, 946:6, 947:1
**consists** [1] - 1022:24
**consortium** [2] -
1043:13, 1043:21
**constantly** [1] - 955:9
**construct** [2] - 812:22,
870:17
**constructed** [1] -
892:1
**construction** [6] -
882:3, 882:12,
954:9, 1086:14,
1095:12, 1096:3
**constructions** [4] -
1086:21, 1093:16,
1093:19, 1094:14
**construe** [1] - 1094:10
**construed** [1] -
1095:15
**consult** [1] - 780:5
**consultant** [5] - 953:8,
1030:1, 1030:2,
1030:22, 1062:20
**consulted** [1] -
1085:18
**consulting** [1] -
1127:22
**Consulting** [1] -
1011:15
**consumer** [1] - 775:5
**consumers** [2] -
805:18, 860:11
**contact** [2] - 832:16,
976:14
**contacted** [6] -
853:19, 853:22,
986:15, 1012:4,
1012:12, 1053:4
**contain** [10] - 866:2,
866:18, 867:4,
867:16, 867:18,
868:2, 868:6,

868:16, 869:8,
913:18
**contained** [3] -
867:24, 868:4,
868:10
**containing** [1] -
1055:15
**contains** [1] - 910:7
**contemplated** [3] -
781:2, 781:16, 782:5
**contemplating** [1] -
781:22
**content** [4] - 821:20,
823:17, 841:21,
842:17
**contention** [1] -
996:16
**contents** [3] - 904:6,
1056:15, 1105:16
**context** [6] - 772:24,
878:8, 879:9,
938:17, 989:17,
1042:11
**continuation** [3] -
966:21, 967:3,
971:24
**continue** [9] - 784:19,
803:14, 809:21,
861:24, 905:9,
916:22, 992:22,
1079:18, 1112:18
**continued** [1] - 1016:5
**CONTINUED** [1] -
768:1
**continues** [1] - 879:18
**continuing** [3] -
808:17, 1019:8,
1120:23
**contract** [4] - 962:22,
1014:15, 1015:20,
1019:9
**contracted** [1] - 845:1
**contractor** [1] - 953:8
**contracts** [11] -
1013:23, 1014:2,
1014:18, 1014:22,
1015:3, 1017:21,
1018:12, 1030:3,
1064:1, 1064:4,
1064:7
**contrary** [3] - 769:19,
874:3, 880:10
**contributed** [2] -
822:6, 1043:1
**contributions** [1] -
816:18
**control** [4] - 896:19,
917:11, 917:17,
975:17
**controlled** [1] - 983:16

**controlling** [1] -
896:17
**convenience** [2] -
1069:2, 1101:15
**convenient** [3] -
990:5, 990:7, 1097:1
**convention** [2] -
1022:17, 1023:11
**conventions** [1] -
1023:13
**conversation** [5] -
844:2, 1000:23,
1007:22, 1014:14,
1055:5
**conversations** [3] -
1007:15, 1014:9,
1085:19
**convinced** [2] -
835:18, 1006:3
**cookie** [6] - 936:22,
937:1, 937:3,
937:10, 938:1
**coordinate** [11] -
1046:15, 1046:18,
1046:21, 1046:22,
1047:3, 1047:22,
1146:17, 1146:23,
1146:24, 1147:2,
1147:7
**coordinates** [5] -
1047:13, 1047:15,
1146:17, 1147:13
**copied** [1] - 996:17
**copies** [6] - 992:5,
994:23, 1074:9,
1074:12, 1074:22,
1075:3
**copy** [14] - 833:14,
851:6, 932:24,
995:3, 995:18,
998:12, 1016:15,
1024:12, 1035:1,
1055:17, 1057:10,
1065:12, 1074:2,
1087:19
**copying** [4] - 993:19,
993:24, 996:4,
996:13
**core** [3] - 821:23,
822:16, 902:18
**corner** [2] - 934:9,
976:2
**corporate** [9] - 887:13,
943:2, 981:11,
981:15, 981:19,
981:20, 982:9,
982:15, 983:15
**Corporation** [2] -
950:9, 950:10
**corporations** [1] -

1127:23
**correct** [93] - 791:4,
791:5, 798:2, 827:6,
828:9, 828:12,
828:13, 828:16,
828:20, 829:12,
830:19, 832:17,
833:12, 835:11,
841:4, 842:10,
842:14, 842:18,
843:4, 847:16,
849:4, 849:15,
851:20, 853:6,
853:9, 853:12,
853:15, 855:20,
855:24, 856:7,
858:2, 858:7,
862:22, 863:20,
865:14, 866:3,
866:15, 868:17,
871:1, 875:4,
885:13, 893:21,
908:17, 910:9,
910:12, 913:20,
919:1, 931:9,
940:18, 940:19,
941:12, 941:16,
942:3, 942:6, 942:9,
943:22, 943:24,
944:1, 944:18,
945:7, 986:19,
997:20, 1012:13,
1013:8, 1013:12,
1013:16, 1013:24,
1030:7, 1061:23,
1062:2, 1063:6,
1063:12, 1063:20,
1064:1, 1064:9,
1065:1, 1066:7,
1066:11, 1070:16,
1070:21, 1071:3,
1071:14, 1080:18,
1102:15, 1105:9,
1107:5, 1114:4,
1120:18, 1120:19,
1131:4, 1139:13,
1141:2, 1148:7
**correctly** [3] -
1018:10, 1018:15,
1087:17
**correspondence** [1] -
832:20
**corresponding** [2] -
1038:9, 1108:6
**cost** [1] - 823:20
**costs** [3] - 821:21,
823:17, 838:2
**counsel** [8] - 785:17,
870:3, 873:24,
940:17, 947:11,

1012:3, 1019:21,
1075:21
**Counsel** [2] - 767:24,
768:9
**counsels** [1] - 1029:1
**countries** [1] - 959:9
**country** [6] - 800:2,
890:16, 965:3,
971:10, 1050:7,
1131:22
**County** [1] - 1153:2
**couple** [23] - 772:10,
794:2, 799:8,
804:15, 806:13,
806:17, 809:20,
815:5, 835:3,
842:19, 844:15,
891:11, 902:4,
902:21, 943:13,
948:4, 979:7, 992:6,
1004:2, 1004:21,
1041:4, 1105:6,
1143:6
**course** [24] - 780:7,
883:6, 894:6,
897:14, 993:12,
994:5, 1029:16,
1036:5, 1048:8,
1060:17, 1070:18,
1072:9, 1084:16,
1086:2, 1091:5,
1094:18, 1094:22,
1099:7, 1103:9,
1104:10, 1136:11,
1141:20, 1143:8,
1144:21
**course-defined** [1] -
1094:22
**courser** [1] - 921:14
**courses** [2] - 1082:18,
1098:18
**COURT** [168] - 767:1,
769:1, 769:11,
769:15, 771:10,
771:17, 771:20,
772:9, 772:15,
773:20, 774:14,
774:18, 776:3,
776:12, 777:3,
777:12, 777:24,
778:5, 778:10,
778:14, 779:1,
779:21, 780:7,
780:12, 780:15,
780:19, 782:7,
783:3, 783:22,
784:10, 784:18,
785:1, 785:8,
785:12, 786:7,
787:1, 787:17,

787:19, 787:22,
788:5, 788:9,
789:10, 789:23,
790:5, 791:1, 792:4,
795:4, 795:7,
795:17, 796:1,
803:20, 812:11,
817:19, 819:6,
819:10, 820:7,
825:16, 825:19,
826:6, 826:20,
826:23, 835:2,
865:3, 871:23,
872:2, 872:7,
872:13, 872:24,
873:4, 873:10,
873:17, 874:8,
874:16, 874:20,
874:24, 875:8,
875:13, 875:16,
875:22, 876:1,
876:3, 876:12,
876:15, 876:22,
880:19, 885:8,
885:17, 886:2,
886:7, 886:11,
886:14, 886:20,
887:3, 887:7,
887:23, 947:7,
947:10, 947:14,
947:23, 948:1,
948:16, 948:20,
948:24, 949:5,
949:12, 974:22,
990:4, 990:8, 991:8,
991:11, 991:16,
992:1, 992:17,
993:1, 993:3,
994:15, 994:20,
995:2, 995:6,
996:14, 997:5,
997:10, 997:12,
997:22, 998:14,
999:16, 999:22,
1000:1, 1015:1,
1016:10, 1016:13,
1017:24, 1019:19,
1019:23, 1020:5,
1020:14, 1028:1,
1028:7, 1028:21,
1033:22, 1060:16,
1060:20, 1061:3,
1061:7, 1061:11,
1068:5, 1071:24,
1074:8, 1074:13,
1074:17, 1074:21,
1075:2, 1075:6,
1076:19, 1076:23,
1077:4, 1077:13,
1077:16, 1078:1,
1079:1, 1142:7,

1150:11, 1150:19, 1151:14, 1151:22, 1152:2, 1152:6, 1152:9
**court** [6] - 851:21, 894:11, 894:16, 988:22, 995:1, 998:16
**Court** [19] - 767:14, 778:9, 783:14, 784:1, 785:5, 885:13, 994:21, 997:19, 1086:5, 1086:17, 1093:15, 1093:19, 1094:10, 1094:14, 1095:11, 1095:14, 1151:16, 1151:19, 1152:12
**Court's** [4] - 782:1, 882:12, 1086:13, 1096:2
**courtroom** [18] - 783:11, 783:13, 783:19, 825:3, 833:2, 848:1, 848:10, 872:11, 874:22, 876:7, 887:5, 897:21, 942:24, 982:1, 984:1, 1109:3, 1126:5, 1150:17
**Courtroom** [1] - 767:10
**courts** [1] - 862:11
**cover** [5] - 825:19, 896:14, 902:15, 902:16, 1039:11
**covered** [5] - 906:19, 906:24, 909:5, 998:1, 1100:13
**covers** [1] - 1099:1
**crafted** [1] - 1044:11
**crafting** [2] - 1040:24, 1043:18
**crash** [1] - 963:21
**create** [14] - 899:11, 904:4, 918:20, 921:9, 928:15, 933:9, 936:2, 963:6, 965:13, 1013:4, 1034:9, 1038:2, 1038:24, 1040:9
**created** [17] - 928:17, 932:20, 935:20, 971:22, 972:6, 996:8, 1011:14, 1025:13, 1026:6, 1038:22, 1042:23, 1043:13, 1046:6, 1065:8, 1065:12,

1068:22, 1069:21
**creates** [2] - 994:2, 1128:12
**creating** [4] - 923:5, 970:18, 1011:18, 1092:13
**creation** [1] - 1025:19
**credit** [10] - 816:16, 822:2, 822:5, 822:14, 822:19, 823:1, 824:3, 976:13, 1076:7, 1076:10
**Creek** [1] - 1092:3
**crippled** [1] - 1017:2
**criteria** [2] - 1111:14, 1133:18
**critical** [3] - 823:9, 1116:12, 1128:7
**cross** [2] - 825:20, 1060:15
**CROSS** [3] - 827:1, 940:12, 1009:5
**cross-examination** [1] - 825:20
**CROSS-EXAMINATION** [3] - 827:1, 940:12, 1009:5
**crowded** [1] - 982:16
**CTO** [3] - 949:15, 951:21, 977:1
**Cube** [1] - 962:20
**cul** [1] - 984:2
**cul-de-sac** [1] - 984:2
**culture** [1] - 971:6
**curative** [1] - 880:15
**current** [12] - 809:3, 868:18, 884:24, 888:23, 889:1, 893:24, 911:14, 913:17, 930:5, 1016:6, 1021:5, 1021:14
**customer** [6] - 798:17, 860:22, 861:4, 861:7, 973:15, 973:23
**customers** [18] - 841:23, 941:7, 957:19, 957:21, 957:22, 973:2, 973:3, 973:18, 973:21, 973:24, 974:2, 977:16, 981:3, 981:7, 981:12, 983:2, 983:7, 985:16
**cut** [2] - 936:4, 991:9
**cutting** [1] - 932:22

**CV** [1] - 967:23
**D.C** [2] - 960:15, 1009:23
**D08** [3] - 931:7, 931:8, 931:10
**D1** [9] - 1106:14, 1106:17, 1106:21, 1107:4, 1108:10, 1111:6, 1111:19, 1112:16, 1120:17
**D2** [6] - 1106:14, 1106:17, 1106:21, 1107:5, 1108:10, 1120:17
**D3** [1] - 1106:24
**D4** [1] - 1106:24
**D5** [1] - 1114:13
**D53** [3] - 932:7, 932:12, 932:13
**D8** [2] - 1111:7, 1111:20
**daily** [4] - 897:20, 898:19, 944:2, 944:5
**Dakota** [3] - 1050:14, 1060:9, 1060:10
**Dale** [3] - 1153:7, 1153:19, 1153:20
**damage** [2] - 769:9, 825:2
**damages** [9] - 773:2, 793:10, 801:2, 824:16, 824:22, 828:12, 828:19, 877:7, 877:10
**DARIN** [1] - 768:7
**dash** [1] - 901:21
**dashed** [1] - 1114:11
**Data** [1] - 1045:6
**data** [113] - 776:16, 776:23, 777:1, 789:22, 798:9, 801:13, 805:14, 823:12, 823:13, 860:20, 861:2, 891:5, 903:5, 904:11, 904:20, 904:21, 910:24, 911:11, 913:1, 914:21, 915:16, 915:24, 916:5, 916:10, 916:16, 917:23, 918:8, 918:9, 918:19, 922:20, 922:21, 922:22, 933:11, 936:6, 948:6, 959:19, 960:1, 960:5, 960:11, 960:17, 960:18, 961:13, 961:17

963:18, 966:6, 966:11, 967:6, 967:7, 972:20, 972:24, 978:12, 1014:8, 1014:11, 1029:17, 1035:14, 1045:23, 1048:19, 1050:9, 1050:10, 1050:12, 1051:17, 1059:9, 1089:1, 1091:22, 1092:14, 1093:8, 1093:12, 1094:4, 1094:6, 1094:9, 1095:1, 1095:2, 1095:3, 1099:23, 1100:1, 1100:2, 1101:13, 1105:1, 1105:20, 1106:6, 1106:7, 1106:21, 1106:22, 1107:12, 1111:7, 1112:2, 1112:3, 1112:23, 1112:24, 1113:7, 1116:1, 1117:14, 1118:7, 1120:17, 1126:23, 1127:13, 1127:14, 1128:8, 1128:14, 1129:9, 1129:13, 1138:6, 1138:17, 1138:20, 1139:10, 1140:2, 1140:5, 1146:17, 1148:21
**database** [1] - 799:8
**databases** [2] - 1129:12, 1129:14
**date** [28] - 769:3, 769:17, 770:7, 770:10, 770:13, 771:15, 772:13, 779:16, 780:21, 784:14, 786:9, 786:12, 790:17, 806:6, 806:7, 806:16, 819:8, 827:23, 829:15, 835:14, 879:10, 880:11, 880:12, 880:17, 1050:4, 1060:3, 1085:17, 1131:23
**dated** [2] - 804:4, 806:12
**dates** [9] - 773:12, 773:15, 773:16, 787:4, 787:5, 1024:2, 1024:7, 1090:7, 1137:7
**dating** [1] - 1085:16
**Daubert** [2] - 787:6,

787:8
**David** [2] - 1028:24, 1128:18
**day-to-day** [1] - 897:23
**days** [3] - 965:18, 981:2, 1048:9
**de** [1] - 984:2
**deal** [14] - 769:7, 769:9, 794:18, 794:22, 815:11, 836:1, 853:11, 870:19, 872:24, 874:9, 1012:19, 1114:23, 1151:7, 1151:9
**dealing** [4] - 802:13, 803:20, 893:11, 895:19
**deals** [2] - 802:12, 924:14
**debated** [1] - 828:17
**December** [5] - 790:19, 1043:17, 1043:19, 1136:22
**decent** [1] - 1065:19
**decide** [5] - 772:4, 784:5, 978:5, 1099:15, 1100:21
**decided** [4] - 929:10, 1020:7, 1052:16, 1054:21
**decides** [1] - 1099:13
**deciding** [1] - 1104:15
**decision** [4] - 785:24, 831:14, 925:16, 973:7
**decisions** [2] - 1085:13, 1086:13
**dedicated** [1] - 966:10
**deductions** [2] - 824:1
**defend** [1] - 838:1
**defendant** [3] - 881:3, 1028:9, 1078:3
**Defendant** [7] - 767:7, 769:7, 876:6, 949:13, 999:21, 1020:17, 1061:1
**defendant's** [1] - 784:24
**Defendant's** [15] - 834:13, 848:6, 850:23, 875:21, 885:7, 885:18, 930:22, 931:1, 935:13, 949:8, 974:18, 1003:2, 1005:23, 1027:22, 1028:4
**Defendants** [4] -

768:9, 875:20,
877:3, 949:8
**defendants** [2] -
785:7, 1027:21
**defending** [1] - 1079:8
**defense** [1] - 1000:15
**defensible** [1] -
846:16
**defensive** [2] -
1004:11, 1005:11
**defer** [1] - 774:6
**defined** [3] - 1029:16,
1094:22, 1143:8
**defines** [1] - 1097:17
**definition** [3] - 771:4,
782:19, 893:9
**deforestation** [1] -
930:8
**degraded** [1] - 1035:2
**degree** [1] - 1133:2
**degrees** [1] - 895:23
**DELAWARE** [1] -
767:2
**Delaware** [6] - 767:12,
1047:11, 1089:19,
1089:24, 1092:2,
1153:1
**delay** [2] - 992:20,
1100:3
**delaying** [1] - 1099:24
**delight** [1] - 945:16
**delighting** [1] - 925:5
**delivered** [1] -
1024:21
**delivery** [1] - 1022:3
**demo** [19] - 962:22,
967:16, 967:20,
967:21, 968:14,
968:18, 968:24,
969:17, 970:21,
971:22, 981:9,
981:14, 984:23,
985:4, 985:13,
985:17, 1002:13,
1011:14, 1052:1
**demolished** [1] -
892:3
**demonstrate** [11] -
1034:6, 1034:7,
1049:4, 1059:3,
1069:17, 1069:22,
1070:20, 1071:12,
1071:16, 1104:11,
1120:7
**demonstrated** [11] -
1048:3, 1049:22,
1050:2, 1050:8,
1059:2, 1059:16,
1059:20, 1059:22,
1060:6, 1122:6,

1145:4
**demonstrating** [1] -
1050:14
**demonstration** [39] -
940:23, 963:6,
963:13, 964:6,
964:18, 965:13,
966:13, 966:19,
967:5, 967:14,
982:19, 983:14,
983:22, 984:23,
985:7, 1035:17,
1049:14, 1049:16,
1058:20, 1058:21,
1059:4, 1059:8,
1059:12, 1068:21,
1089:9, 1089:13,
1091:16, 1098:10,
1105:8, 1107:20,
1109:5, 1110:13,
1113:16, 1114:1,
1114:2, 1118:11,
1122:5, 1136:24,
1137:4
**demonstrations** [5] -
982:8, 1048:1,
1048:17, 1049:3,
1101:19
**demonstratives** [1] -
774:12
**denied** [3] - 884:5,
885:21
**denote** [1] - 1104:20
**denoting** [1] - 1138:1
**deny** [3] - 880:23,
885:9, 995:17
**department** [1] -
1021:18
**dependent** [8] -
806:22, 1095:20,
1096:3, 1103:6,
1103:8, 1103:11,
1144:16, 1146:11
**depicted** [2] -
1065:16, 1109:11
**depicting** [1] - 1105:8
**depiction** [1] - 812:18
**depicts** [1] - 1107:20
**depletion** [1] - 930:1
**deponent** [4] - 888:6,
949:22, 1028:16,
1078:20
**deposition** [20] -
769:13, 835:5,
991:19, 998:5,
1016:16, 1016:17,
1016:21, 1016:22,
1017:12, 1020:18,
1061:21, 1067:10,
1067:21, 1069:1,

1071:18, 1074:2,
1075:16, 1075:21,
1076:5, 1147:6
**depositions** [1] -
1085:21
**derived** [4] - 938:7,
938:10, 938:22,
940:3
**descended** [1] -
1008:18
**describe** [23] - 791:19,
803:18, 804:1,
885:3, 893:24,
897:18, 905:20,
915:19, 936:5,
941:23, 963:12,
975:3, 1004:3,
1022:16, 1023:12,
1046:20, 1065:5,
1081:1, 1092:10,
1093:4, 1095:8,
1101:5, 1105:7
**described** [22] - 801:9,
825:12, 859:18,
921:16, 942:14,
1036:11, 1040:18,
1046:7, 1049:23,
1091:14, 1092:24,
1096:8, 1100:6,
1111:21, 1126:4,
1129:3, 1130:24,
1131:21, 1134:21,
1134:24, 1135:12,
1137:23
**describes** [8] - 804:7,
884:22, 942:17,
1004:7, 1057:7,
1083:17, 1094:21,
1108:22
**describing** [3] -
1109:8, 1137:16,
1139:13
**description** [9] -
774:7, 789:19,
1011:8, 1057:6,
1099:19, 1099:21,
1112:7, 1112:22,
1133:1
**designate** [1] - 943:15
**designations** [1] -
997:9
**designed** [1] - 895:16
**designing** [1] - 895:13
**desirability** [1] -
1111:1
**desire** [1] - 1090:4
**desired** [2] - 1108:12,
1118:18
**desktop** [6] - 792:18,
792:20, 860:13,

890:19, 927:13,
939:5
**detail** [12] - 946:16,
1031:8, 1062:16,
1092:7, 1100:17,
1106:12, 1106:18,
1114:22, 1114:23,
1121:8, 1130:10,
1134:22
**detailed** [2] - 1098:21,
1104:18
**details** [3] - 820:15,
960:22, 1084:16
**deter** [1] - 1001:23
**determination** [1] -
773:3
**determine** [14] -
773:8, 776:20,
779:23, 796:14,
796:16, 814:8,
822:24, 824:21,
829:4, 859:4,
879:12, 1036:12,
1089:4, 1094:2
**determined** [6] -
793:12, 796:19,
824:20, 1054:20,
1054:21, 1066:2
**determining** [3] -
776:14, 854:19,
1140:1
**detract** [1] - 925:24
**develop** [7] - 803:14,
806:24, 901:22,
1030:5, 1030:10,
1031:11, 1042:14
**developed** [12] -
785:22, 789:2,
899:18, 901:19,
1029:15, 1034:4,
1035:13, 1064:13,
1064:20, 1084:5,
1097:2, 1124:24
**developing** [8] -
775:10, 967:13,
1032:22, 1084:1,
1086:21, 1087:22,
1095:18, 1128:23
**development** [12] -
821:22, 822:15,
850:11, 894:1,
894:24, 895:18,
929:9, 949:17,
994:4, 1022:1,
1127:10, 1133:4
**device** [3] - 792:21,
887:18, 896:18
**devices** [7] - 792:17,
797:9, 900:3,
902:22, 909:24,

910:2, 984:20
**diagram** [4] - 913:3,
1101:15, 1139:6,
1142:3
**diametrically** [1] -
794:15
**dice** [1] - 961:4
**dicing** [1] - 967:9
**Diego** [1] - 1029:22
**difference** [5] -
792:19, 839:11,
897:15, 906:12,
931:14
**differences** [6] -
1111:14, 1116:23,
1123:2, 1132:11,
1150:2, 1150:4
**different** [56] - 770:5,
773:9, 773:17,
782:4, 783:8, 799:1,
834:9, 850:16,
850:24, 860:1,
865:13, 891:11,
901:5, 901:13,
902:20, 903:5,
904:8, 905:19,
905:20, 906:12,
906:14, 906:15,
908:9, 908:15,
908:18, 908:21,
917:1, 917:3,
922:10, 923:24,
924:8, 928:21,
930:13, 932:11,
933:21, 934:21,
934:23, 934:24,
935:1, 935:3,
935:16, 959:8,
966:14, 967:23,
1002:9, 1023:5,
1047:14, 1052:16,
1057:21, 1096:11,
1096:22, 1104:12,
1108:20, 1112:10,
1117:10, 1121:12
**difficult** [3] - 780:17,
995:19, 1053:8
**difficulty** [1] - 773:20
**digital** [5] - 1022:3,
1038:4, 1083:4,
1133:5, 1133:9
**digits** [1] - 1046:15
**dimensional** [1] -
1037:18, 1038:1,
1038:11, 1046:24,
1047:1
**dining** [3] - 964:8,
964:10, 1012:8
**DIRECT** [2] - 888:9,
1079:2

**direct** [25] - 775:5, 810:14, 811:4, 811:24, 812:3, 817:14, 818:5, 818:11, 856:13, 856:15, 858:3, 858:4, 861:13, 861:15, 875:4, 878:11, 881:23, 1033:16, 1033:20, 1067:23, 1071:19, 1074:3, 1083:10, 1090:23, 1128:16
**directed** [2] - 877:4, 881:3
**direction** [2] - 1021:24, 1022:2
**directions** [1] - 897:22
**directly** [11] - 814:4, 817:6, 849:6, 878:13, 880:10, 938:19, 1026:23, 1030:9, 1138:23, 1141:4, 1147:14
**director** [7] - 956:3, 957:17, 1020:19, 1021:16, 1021:20, 1080:14, 1080:16
**directories** [1] - 1056:8
**directors** [4] - 954:11, 968:20, 968:21, 986:20
**disagree** [6] - 781:3, 785:24, 863:21, 1003:16, 1098:2, 1127:8
**disc** [1] - 966:6
**discharge** [1] - 999:1
**disclose** [6] - 1138:2, 1138:15, 1139:23, 1141:18, 1146:13, 1148:23
**disclosed** [12] - 782:16, 826:1, 862:20, 1005:2, 1134:24, 1137:21, 1139:18, 1140:16, 1143:4, 1143:19, 1144:4, 1145:23
**discloses** [3] - 1140:10, 1141:11, 1144:12
**disclosure** [4] - 1139:1, 1140:9, 1145:10, 1147:19
**disclosures** [3] - 1090:20, 1143:1, 1145:21
**discontinuities** [1] -

922:22
**discuss** [12] - 769:2, 775:15, 781:13, 781:19, 782:2, 783:5, 785:13, 876:8, 943:8, 991:13, 1060:18, 1150:14
**discussed** [17] - 791:8, 794:23, 824:8, 824:9, 824:11, 826:5, 830:3, 836:23, 845:2, 870:1, 870:4, 870:6, 879:11, 1032:18, 1055:1, 1055:19, 1095:17
**discussing** [7] - 775:15, 781:9, 789:9, 975:19, 992:18, 1013:18, 1065:22
**discussion** [27] - 781:7, 786:10, 789:15, 795:6, 802:23, 803:10, 812:24, 813:2, 815:1, 825:4, 833:10, 834:7, 835:14, 840:3, 841:19, 843:6, 846:13, 846:20, 862:10, 871:6, 871:12, 903:14, 947:13, 947:24, 1014:7, 1014:15, 1076:22
**discussion:)** [1] - 1019:22
**discussions** [13] - 783:14, 784:20, 814:17, 823:7, 830:17, 836:15, 839:7, 840:4, 853:16, 869:18, 871:7, 1007:1, 1007:6
**disk** [1] - 960:5
**display** [16] - 1036:7, 1036:9, 1037:20, 1042:2, 1042:16, 1046:9, 1049:11, 1083:4, 1100:16, 1102:21, 1104:17, 1113:5, 1135:1, 1135:14, 1135:17, 1149:7
**displayed** [9] - 920:14, 920:20, 960:21, 1074:6, 1083:13,

1089:4, 1089:7, 1121:8, 1148:11
**dispute** [1] - 772:14
**distill** [2] - 946:13, 946:22
**distinction** [2] - 1101:12, 1125:14
**distribute** [1] - 952:18
**distributed** [12] - 994:23, 1024:13, 1024:15, 1025:11, 1025:16, 1027:14, 1093:8, 1093:13, 1138:17, 1138:20, 1139:9, 1139:10
**distributor** [2] - 1045:10, 1045:13
**DISTRICT** [2] - 767:1, 767:2
**District** [1] - 767:14
**dive** [1] - 1033:10
**divide** [10] - 903:23, 1103:19, 1106:6, 1106:14, 1106:15, 1108:1, 1108:4, 1118:14, 1119:4, 1142:1
**divided** [6] - 961:11, 1110:22, 1118:7, 1120:17, 1124:1, 1148:3
**dividing** [11] - 1094:23, 1095:9, 1103:20, 1104:19, 1104:20, 1105:8, 1110:6, 1118:24, 1120:12, 1121:4, 1141:20
**division** [7] - 897:11, 898:17, 954:18, 1102:22, 1119:23, 1123:24, 1148:15
**divisions** [1] - 1120:14
**doable** [1] - 886:16
**docket** [2] - 998:18, 1150:22
**doctor** [1] - 1088:17
**Doctor** [8] - 1089:14, 1096:23, 1097:21, 1098:1, 1102:3, 1103:13, 1141:16, 1146:10
**doctrine** [1] - 776:17
**Doctrine** [4] - 883:21, 883:22, 885:12, 885:19
**document** [77] - 779:20, 789:17, 790:15, 790:18,

791:6, 792:8, 792:9, 798:6, 798:8, 798:10, 798:11, 798:15, 798:20, 798:24, 799:19, 803:18, 804:2, 804:3, 804:11, 805:3, 805:6, 806:1, 806:6, 806:8, 806:11, 806:15, 808:18, 810:12, 817:10, 817:18, 818:17, 818:22, 818:24, 819:8, 819:22, 820:3, 820:11, 820:12, 820:21, 821:14, 832:2, 833:20, 851:2, 851:3, 851:8, 856:16, 856:24, 857:5, 861:9, 875:15, 880:20, 932:5, 941:21, 994:9, 1013:6, 1017:9, 1040:24, 1041:5, 1043:4, 1043:13, 1043:15, 1044:16, 1046:3, 1046:5, 1046:10, 1053:6, 1053:22, 1072:5, 1140:3, 1141:23, 1142:9, 1142:10, 1142:15, 1142:16, 1145:14, 1147:18, 1148:6
**documentation** [3] - 984:22, 1085:12, 1145:3
**documents** [38] - 777:17, 777:19, 779:13, 785:18, 788:16, 791:17, 791:20, 796:23, 799:4, 799:10, 803:21, 809:24, 810:6, 816:2, 816:7, 817:2, 823:16, 827:20, 834:8, 836:15, 836:19, 851:11, 851:15, 852:1, 861:23, 941:18, 941:23, 1044:1, 1047:24, 1049:24, 1057:24, 1059:23, 1097:12, 1100:23, 1101:5, 1109:14, 1143:2, 1145:22
**dollar** [4] - 815:3, 823:14, 826:13,

**dollars** [7] - 803:14, 843:10, 845:7, 847:7, 863:4, 880:4, 1088:11
**domain** [3] - 1032:10, 1032:20, 1051:11
**dome** [1] - 975:13
**dominant** [1] - 897:7
**done** [40] - 776:15, 776:20, 795:15, 799:16, 802:11, 831:7, 831:20, 867:10, 907:17, 915:13, 916:18, 917:10, 918:18, 924:14, 978:4, 983:2, 983:12, 990:17, 998:9, 998:11, 1019:14, 1026:18, 1028:14, 1063:24, 1064:4, 1064:6, 1065:6, 1082:7, 1084:6, 1088:8, 1093:4, 1107:8, 1109:23, 1110:11, 1110:22, 1119:15, 1120:4, 1131:11, 1132:3
**door** [2] - 983:24, 1018:17
**double** [1] - 886:8
**doubtfully** [1] - 1026:1
**down** [56] - 789:7, 802:20, 804:11, 804:16, 805:4, 807:8, 811:2, 833:14, 839:6, 841:16, 841:17, 843:21, 852:11, 861:3, 861:4, 869:23, 872:13, 875:7, 891:21, 892:13, 904:16, 905:9, 909:20, 911:6, 914:20, 946:13, 946:22, 961:22, 963:20, 963:22, 969:3, 983:20, 1029:22, 1037:12, 1037:13, 1038:7, 1040:3, 1041:16, 1043:3, 1043:15, 1043:22, 1047:19, 1054:7, 1056:11, 1056:20, 1057:2, 1060:20, 1098:18, 1100:11, 1116:11, 1119:22, 1142:14, 1147:11, 1148:17, 1150:19

**downgrading** [1] -
  989:4
**download** [5] -
  804:15, 863:16,
  889:23, 980:1, 980:9
**downloading** [1] -
  939:6
**downtown** [1] -
  1092:4
**dozen** [1] - 808:6
**Dr** [29] - 814:13,
  814:17, 823:8,
  828:6, 865:20,
  943:4, 943:7,
  1068:13, 1078:4,
  1078:5, 1078:12,
  1079:4, 1079:9,
  1079:11, 1079:13,
  1079:24, 1080:6,
  1083:10, 1085:22,
  1086:3, 1086:9,
  1087:10, 1114:6,
  1115:3, 1115:17,
  1127:5, 1151:13,
  1151:18, 1152:3
**draft** [1] - 1151:3
**drafting** [1] - 1043:19
**drape** [1] - 1038:10
**draw** [3] - 917:19,
  921:8, 921:13
**drawing** [9] - 890:16,
  912:14, 916:1,
  919:6, 919:15,
  921:1, 921:14,
  966:8, 966:10
**drawings** [1] - 1010:3
**drawn** [3] - 905:18,
  921:4, 1123:4
**dream** [3] - 965:8,
  978:14, 978:17
**dreamed** [1] - 965:3
**drive** [4] - 925:5,
  981:22, 1055:21,
  1146:6
**driven** [1] - 911:9
**drives** [1] - 960:5
**driving** [2] - 775:5,
  1052:12
**drought** [1] - 930:8
**DTX** [22] - 1033:17,
  1034:18, 1039:7,
  1040:14, 1042:19,
  1044:1, 1045:24,
  1046:14, 1077:22,
  1077:23, 1083:11,
  1116:16, 1122:19,
  1122:22, 1122:23,
  1146:21, 1149:15
**DTX-1023** [5] -
  1142:17, 1143:14,

  1145:13, 1148:2,
  1148:9
**DTX-1037** [1] -
  1147:21
**DTX-1076** [1] -
  1090:11
**DTX-1079** [1] -
  1128:17
**DTX-1087** [1] - 1146:2
**DTX-1088** [2] - 1141:6,
  1143:23
**DTX-1101b** [1] -
  1057:23
**DTX-1196** [1] - 1053:6
**due** [2] - 838:15,
  850:11
**duly** [4] - 888:7,
  949:23, 1028:17,
  1078:21
**during** [23] - 772:20,
  829:9, 829:21,
  837:13, 856:13,
  928:4, 951:19,
  958:10, 961:16,
  986:16, 986:19,
  992:2, 1007:5,
  1007:14, 1012:16,
  1024:24, 1025:3,
  1052:1, 1068:20,
  1070:18, 1072:8,
  1094:18, 1146:19
**duties** [2] - 838:1,
  1021:22
**DYK** [1] - 767:13
**E-mail** [1] - 990:12
**e-mail** [25] - 825:11,
  826:10, 826:11,
  832:15, 833:6,
  833:11, 835:10,
  839:23, 841:10,
  841:14, 841:17,
  843:13, 843:22,
  844:11, 844:16,
  848:2, 849:14,
  851:4, 878:3, 878:5,
  878:9, 878:21,
  878:22, 879:2,
  879:9, 987:13,
  987:14, 988:2,
  988:4, 988:5, 989:9,
  989:10, 989:24,
  990:2, 1005:19,
  1005:24, 1006:18,
  1007:24, 1008:4,
  1053:18, 1053:19,
  1053:24, 1150:24
**e-mails** [2] - 833:10,
  839:7
**eager** [2] - 1000:13,
  1000:16

**Eagle's** [1] - 891:23
**early** [14] - 779:14,
  945:4, 957:7,
  1028:12, 1034:10,
  1039:1, 1040:10,
  1042:10, 1082:20,
  1083:7, 1087:17,
  1128:13, 1130:14,
  1132:24
**Earth** [355] - 773:5,
  773:17, 775:2,
  775:4, 775:8,
  775:23, 779:9,
  779:10, 779:19,
  788:22, 789:20,
  792:10, 793:2,
  793:23, 796:21,
  797:7, 801:12,
  801:15, 803:1,
  803:15, 804:6,
  804:8, 804:13,
  805:13, 805:15,
  806:23, 807:14,
  808:23, 809:2,
  810:2, 810:7,
  810:20, 811:1,
  811:2, 811:7,
  811:16, 816:3,
  816:11, 816:14,
  816:23, 817:4,
  817:5, 817:7,
  817:11, 817:18,
  817:22, 818:7,
  818:10, 819:1,
  819:13, 824:1,
  828:4, 829:19,
  832:17, 841:20,
  842:17, 856:17,
  856:21, 857:1,
  857:12, 857:14,
  858:5, 858:9,
  858:18, 858:23,
  859:5, 859:6,
  861:19, 861:24,
  862:17, 862:22,
  863:19, 864:1,
  864:13, 864:20,
  864:21, 865:8,
  865:15, 865:16,
  868:16, 868:20,
  868:22, 868:24,
  869:3, 869:6, 869:8,
  887:16, 887:19,
  889:2, 889:6, 889:8,
  889:11, 889:21,
  889:22, 890:13,
  890:19, 890:20,
  891:5, 891:9,
  891:10, 892:6,
  892:22, 892:23,

  893:24, 894:2,
  894:15, 896:11,
  896:17, 896:21,
  897:14, 897:16,
  897:24, 898:12,
  898:15, 898:21,
  899:1, 899:5,
  899:10, 899:14,
  899:19, 899:20,
  899:21, 900:5,
  900:7, 900:8,
  900:12, 900:22,
  901:6, 901:10,
  901:14, 901:24,
  902:11, 902:17,
  902:24, 903:2,
  903:3, 903:10,
  903:21, 904:3,
  905:14, 906:11,
  907:10, 907:13,
  907:18, 908:20,
  908:23, 909:6,
  909:13, 909:24,
  910:14, 910:24,
  911:1, 913:4,
  918:22, 919:5,
  919:13, 919:20,
  920:8, 920:13,
  920:23, 921:17,
  921:21, 923:10,
  923:13, 923:18,
  923:20, 923:22,
  923:24, 924:1,
  924:4, 924:7,
  924:11, 924:17,
  925:11, 925:14,
  926:3, 926:8,
  926:16, 926:17,
  926:23, 927:7,
  927:10, 927:20,
  928:4, 928:9,
  928:10, 928:12,
  929:2, 929:5, 929:6,
  929:10, 929:13,
  930:6, 930:11,
  930:17, 931:7,
  931:12, 931:18,
  932:1, 932:2, 932:8,
  932:17, 932:22,
  933:5, 933:19,
  933:21, 934:4,
  934:16, 935:4,
  935:6, 935:14,
  935:17, 935:19,
  935:22, 936:13,
  936:19, 937:21,
  937:22, 937:24,
  938:2, 938:23,
  939:4, 939:9, 940:1,
  940:4, 940:10,
  941:1,

  941:24, 942:8,
  942:14, 942:15,
  942:20, 943:8,
  943:11, 943:24,
  944:9, 944:17,
  944:21, 945:5,
  945:21, 946:3,
  946:6, 947:1,
  948:15, 949:16,
  949:18, 951:21,
  952:23, 953:1,
  953:17, 963:9,
  963:10, 963:13,
  964:17, 965:13,
  966:12, 966:19,
  967:5, 967:14,
  969:17, 971:19,
  971:22, 972:5,
  972:12, 973:3,
  974:3, 974:15,
  976:6, 979:3, 979:9,
  979:11, 979:17,
  986:1, 987:19,
  989:4, 996:8,
  1011:14, 1013:11,
  1015:6, 1018:19,
  1019:7, 1078:8,
  1084:13, 1084:19,
  1085:18, 1087:11,
  1087:16, 1087:22,
  1088:21, 1096:9,
  1096:10, 1096:12,
  1096:16, 1097:5,
  1097:13, 1097:22,
  1098:7, 1098:12,
  1099:4, 1099:14,
  1100:15, 1100:18,
  1101:1, 1101:23,
  1102:13, 1102:19,
  1103:1, 1103:5,
  1103:10, 1103:14,
  1103:15, 1104:13,
  1108:15, 1108:16,
  1108:20, 1109:9,
  1109:10, 1109:12,
  1109:16, 1111:3,
  1111:11, 1112:13,
  1113:1, 1115:15,
  1115:20, 1115:22,
  1116:6, 1117:2,
  1117:8, 1117:17,
  1117:19, 1120:4,
  1120:8, 1120:20,
  1121:11, 1121:22,
  1121:24, 1122:6,
  1122:9, 1122:15,
  1123:5, 1123:8,
  1123:9, 1123:14,
  1123:16, 1124:10,
  1130:1
**earth** [23] - 952:8,

954:4, 954:7,
954:22, 955:6,
956:18, 957:13,
957:24, 958:12,
959:20, 959:23,
961:18, 971:7,
972:18, 973:13,
1029:14, 1042:6,
1042:12, 1047:16,
1092:16, 1092:20,
1092:23, 1130:18
**Earth's** [4] - 815:23,
861:9, 945:1, 1101:6
**earth's** [1] - 1128:9
**EarthViewer** [5] -
948:10, 952:12,
952:15, 952:19,
952:20
**easier** [4] - 907:18,
933:15, 937:16,
1101:17
**east** [1] - 911:10
**easy** [2] - 946:14,
946:23
**eat** [1] - 937:4
**edge** [3] - 962:2,
974:10, 1063:22
**edited** [1] - 1043:22
**editing** [1] - 1043:15
**educational** [4] -
895:23, 1022:8,
1080:2, 1081:2
**educators** [1] - 1022:9
**effect** [3] - 807:5,
864:5, 1150:6
**effective** [1] - 928:2
**efficient** [1] - 1117:12
**effort** [5] - 822:2,
836:1, 925:13,
925:20, 999:6
**efforts** [1] - 951:22
**Egypt** [1] - 974:9
**eight** [5] - 777:21,
907:20, 908:11,
908:12, 909:20
**eight-noded** [1] -
907:20
**either** [9] - 830:17,
834:17, 836:7,
861:5, 868:17,
900:23, 1037:20,
1134:14, 1134:16
**elected** [3] - 1082:9,
1082:11, 1082:12
**Electric** [1] - 954:19
**electronic** [3] - 896:1,
1023:3, 1055:15
**element** [12] - 884:14,
1099:22, 1102:6,
1119:15, 1137:19,

1137:23, 1139:17,
1140:15, 1141:3,
1144:4, 1144:13
**elements** [3] -
1100:10, 1140:11,
1144:8
**elevation** [2] - 1038:4,
1038:6
**eleven** [1] - 1034:14
**eligible** [2] - 884:3,
884:23
**Ellis** [1] - 973:16
**elsewhere** [1] - 938:15
**embodiment** [1] -
942:18
**embrace** [2] - 971:14,
971:17
**emergence** [1] -
1083:19
**Emeritus** [3] - 889:6,
893:20, 1079:20
**employed** [1] - 986:21
**employee** [2] - 978:19,
978:22
**employees** [4] -
986:23, 996:6,
1012:20
**employer** [1] - 1021:5
**empty** [1] - 1105:12
**enables** [1] - 804:8
**encountered** [1] -
1087:15
**encourage** [1] -
892:19
**End** [3] - 796:3,
947:24, 1077:3
**end** [17] - 806:18,
820:21, 915:8,
918:13, 933:6,
936:14, 984:1,
1027:19, 1027:20,
1034:20, 1037:17,
1054:8, 1088:5,
1112:19, 1112:20,
1121:11, 1151:4
**ended** [6] - 787:6,
787:7, 962:15,
1007:3, 1007:4,
1111:22
**ending** [1] - 1107:11
**ends** [3] - 975:23,
1039:18, 1041:6
**engagement** [3] -
792:16, 792:22,
927:16
**engine** [2] - 820:14,
1052:17
**Engine** [7] - 889:2,
930:6, 932:8, 932:9,
932:11, 932:15,

932:19
**engineer** [7] - 887:14,
937:21, 945:22,
955:23, 988:17,
988:23, 1109:2
**engineering** [7] -
896:1, 904:11,
906:1, 956:3,
957:16, 1000:20
**engineers** [5] -
893:11, 945:23,
1085:19, 1097:9,
1116:10
**English** [2] - 998:9,
998:12
**enhancing** [2] -
821:23, 822:16
**enjoying** [1] - 987:21
**enormous** [1] -
1128:10
**enormously** [1] -
879:7
**entail** [1] - 893:22
**entailed** [1] - 894:23
**enter** [4] - 845:18,
845:22, 875:6,
1025:7
**entered** [1] - 879:23
**entering** [2] - 874:22,
887:5
**enterprise** [2] -
858:12, 1066:6
**Enterprise** [16] -
810:21, 817:22,
857:12, 857:14,
858:9, 859:7,
861:24, 863:3,
868:6, 868:9,
882:24, 883:11,
897:13, 924:7,
925:6, 1019:8
**Enterprises** [1] -
811:2
**enters** [3] - 787:21,
999:24, 1061:9
**entertain** [1] - 1000:23
**entertainment** [1] -
898:1
**entire** [9] - 950:18,
986:21, 1063:12,
1091:10, 1107:1,
1108:13, 1110:8,
1114:3, 1151:17
**entirely** [1] - 1112:3
**entirety** [2] - 1034:13,
1039:23
**entities** [2] - 1029:12,
1030:4
**entitled** [2] - 881:3,
1131:19

**entity** [3] - 993:11,
995:11, 995:12
**entries** [2] - 1076:12,
1076:15
**Environmental** [1] -
902:3
**equal** [3] - 837:7,
906:20, 928:17
**equals** [1] - 906:23
**Equivalence** [4] -
883:21, 883:22,
885:12, 885:19
**equivalent** [8] -
993:10, 1060:2,
1082:16, 1133:3,
1138:9, 1138:23,
1142:2, 1148:13
**Eric** [2] - 951:11,
1019:11
**Erie** [1] - 1089:20
**errors** [1] - 1047:17
**ESQ** [10] - 767:18,
767:19, 767:21,
767:22, 767:22,
767:23, 768:4,
768:7, 768:7, 768:8
**ESRI** [1] - 1018:18
**essence** [1] - 946:13
**essential** [1] - 795:22
**essentially** [17] -
952:17, 994:12,
1084:10, 1085:11,
1092:15, 1092:22,
1097:1, 1097:16,
1099:1, 1109:7,
1112:18, 1119:21,
1124:10, 1137:18,
1138:8, 1140:7,
1145:16
**establish** [3] - 795:8,
806:16, 1134:13
**establishes** [1] -
1102:9
**estate** [2] - 860:15,
973:5
**estimate** [4] - 800:5,
800:9, 801:18,
817:11
**et** [5] - 804:18, 868:21,
992:12
**euros** [1] - 852:10
**evaluation** [1] - 837:1
**evening** [2] - 1150:12,
1151:10
**event** [6] - 1022:24,
1023:14, 1024:22,
1063:19, 1065:4,
1065:21
**events** [4] - 772:4,
772:20, 1070:5,

1136:19
**eventually** [5] - 774:2,
775:7, 789:2,
1108:11, 1112:19
**everywhere** [1] -
982:6
**evidence** [37] - 771:3,
771:7, 774:1,
775:24, 779:7,
830:23, 830:24,
831:6, 831:10,
831:19, 848:1,
875:17, 875:21,
876:2, 878:3,
878:10, 881:5,
881:8, 881:10,
881:17, 882:7,
882:10, 882:17,
882:19, 883:4,
883:12, 883:20,
885:12, 949:8,
996:3, 997:2,
1027:22, 1090:11,
1097:4, 1101:4,
1134:23, 1140:13
**exact** [4] - 871:15,
988:17, 1052:15,
1072:14
**exactly** [6] - 846:17,
880:4, 925:18,
956:19, 1091:20,
1093:4
**examination** [5] -
825:20, 949:20,
1033:20, 1072:9,
1086:10
**EXAMINATION** [8] -
827:1, 869:15,
888:9, 940:12,
1009:5, 1019:3,
1075:18, 1079:2
**examine** [1] - 1144:20
**examined** [5] - 888:8,
949:24, 1028:18,
1078:22, 1097:8
**examiner** [8] - 988:22,
1009:24, 1010:10,
1010:15, 1010:19,
1010:23, 1011:2,
1011:4
**examining** [1] -
1100:20
**example** [33] - 778:20,
788:23, 789:8,
804:12, 804:13,
805:10, 807:6,
810:18, 823:4,
838:8, 860:23,
890:8, 891:12,
891:14, 902:20,

904:23, 905:5,
905:16, 907:1,
907:21, 908:14,
911:12, 912:7,
912:11, 919:9,
922:23, 927:13,
929:20, 933:22,
1114:13, 1114:17,
1117:8, 1124:4
**except** [2] - 885:10,
1129:14
**exception** [1] - 940:5
**exceptions** [1] -
847:22
**excerpt** [3] - 1034:15,
1116:21, 1141:9
**exchange** [2] -
1015:12, 1050:21
**Exchange** [1] - 818:21
**excised** [1] - 783:1
**excited** [4] - 814:15,
983:12, 1083:18,
1087:18
**excitement** [1] -
899:12
**exciting** [2] - 899:8,
983:4
**exclude** [2] - 786:18,
800:10
**excluded** [1] - 774:3
**excluding** [2] -
783:11, 800:22
**exclusive** [14] -
839:11, 839:12,
839:13, 839:15,
839:19, 839:24,
840:2, 840:9,
840:17, 840:20,
840:21, 841:1,
844:23
**exclusivity** [1] - 840:4
**excuse** [5] - 992:16,
993:16, 1012:6,
1062:17, 1089:17
**excused** [6] - 876:14,
876:16, 876:23,
949:1, 1020:10,
1077:19
**execute** [6] - 1108:1,
1119:10, 1119:11,
1119:12, 1119:13
**executed** [4] -
1118:15, 1120:14,
1123:12, 1124:3
**executes** [1] - 1114:18
**executing** [1] -
1103:18
**Executive** [1] - 950:8
**executives** [1] -
1014:10

**exhausted** [1] -
1118:19
**exhibit** [40] - 799:18,
799:23, 803:17,
805:6, 805:7,
805:24, 848:8,
875:21, 878:4,
933:12, 934:10,
934:19, 935:13,
937:17, 937:19,
937:20, 949:9,
974:20, 989:15,
1000:7, 1002:12,
1003:3, 1005:5,
1005:23, 1023:1,
1023:2, 1033:17,
1033:19, 1039:7,
1042:19, 1044:2,
1044:3, 1048:18,
1056:18, 1057:22,
1090:13, 1116:16,
1122:19, 1128:17,
1142:17
**Exhibit** [34] - 790:11,
790:21, 791:4,
791:21, 797:23,
798:5, 798:14,
798:19, 816:7,
818:15, 819:15,
819:18, 834:13,
843:16, 850:23,
869:22, 874:7,
930:22, 931:1,
934:7, 937:15,
974:19, 989:15,
989:18, 994:21,
997:19, 1003:2,
1033:24, 1034:18,
1040:13, 1044:10,
1090:24, 1141:6,
1143:23
**exhibition** [1] - 1024:4
**exhibitors** [1] -
1057:18
**Exhibits** [1] - 848:6
**exhibits** [6] - 800:3,
875:6, 984:19,
1027:22, 1077:21,
1078:2
**existed** [6] - 948:8,
948:14, 957:11,
957:13, 1129:7,
1139:7
**existence** [2] - 905:17,
986:19
**existing** [3] - 1011:2,
1066:3, 1132:13
**exits** [1] - 876:11,
991:15, 1060:19
**expect** [1] - 856:24

**expectations** [3] -
794:14, 850:10,
862:16
**expected** [4] - 777:15,
810:3, 857:8, 861:23
**expecting** [3] -
777:16, 811:15,
1052:18
**expedition** [1] -
973:19
**expense** [1] - 821:22
**expenses** [1] - 978:4
**expensive** [1] - 924:6
**experience** [13] -
868:22, 893:2,
894:5, 925:22,
925:24, 927:2,
961:15, 961:17,
961:20, 988:23,
1078:7, 1133:3,
1133:8
**experienced** [1] -
892:8
**expert** [8] - 783:7,
787:2, 815:6,
943:16, 943:18,
943:21, 993:15,
1078:5
**experts** [5] - 770:11,
778:3, 778:6, 828:17
**ExpertSoft** [4] -
1029:22, 1031:18,
1042:9, 1042:13
**expertSoft** [1] -
1030:1
**explain** [26] - 799:3,
800:12, 809:13,
812:15, 818:16,
819:20, 820:10,
842:20, 842:23,
905:2, 912:3,
940:18, 941:1,
951:14, 1034:1,
1041:19, 1044:18,
1047:7, 1089:9,
1089:13, 1091:1,
1113:6, 1117:20,
1118:10, 1132:17,
1144:18
**explained** [6] - 948:8,
1000:9, 1107:2,
1116:24
**explaining** [2] -
990:12, 1093:6
**explains** [1] - 1139:2
**explanation** [2] -
881:14, 993:22
**explore** [1] - 804:10,
926:19, 952:8, 954:8
**explored** [1] - 853:14

**exploring** [1] - 898:2
**expressed** [2] - 826:9,
1118:2
**expressway** [1] -
972:24
**extend** [2] - 909:20,
914:20
**extended** [2] - 773:7,
1066:14
**extent** [7] - 771:2,
794:8, 794:24,
802:16, 815:12,
852:21, 885:14
**Exterra** [2] - 1031:19,
1031:23
**extract** [1] - 1140:3
**extraction** [1] - 797:5
**extracts** [1] - 997:18
**extraordinarily** [1] -
878:12
**extremely** [4] -
770:13, 772:13,
773:19, 1151:12
**eye** [2] - 913:24,
915:23
**face** [2] - 813:17,
894:13
**facilities** [1] - 1063:9
**facility** [3] - 981:23,
1002:7
**fact** [27] - 810:12,
856:5, 877:13,
881:17, 883:3,
891:11, 919:8,
919:17, 941:9,
948:11, 977:17,
979:15, 984:3,
996:21, 1015:16,
1015:22, 1019:7,
1053:2, 1054:11,
1061:21, 1064:3,
1064:6, 1072:11,
1073:10, 1105:19,
1129:18, 1148:17
**factor** [8] - 770:23,
771:13, 772:2,
772:3, 772:7,
776:10, 776:13
**Factor** [1] - 776:7
**factors** [18] - 776:7,
802:5, 802:8,
802:10, 802:12,
802:15, 813:20,
813:21, 813:24,
814:3, 814:7, 815:9,
815:10, 815:21,
824:10, 829:2,
877:11
**factory** [3] - 983:4,
983:6, 983:8

**facts** [1] - 770:20
**factual** [1] - 831:14
**faculty** [1] - 1082:23
**fade** [1] - 788:14
**fair** [6] - 773:12,
774:16, 831:15,
831:21, 844:21,
1152:8
**fairly** [3] - 808:13,
808:15, 1063:20
**fairs** [1] - 984:19
**fall** [1] - 995:9
**fallen** [1] - 1017:1
**Falls** [4] - 1035:23,
1050:13, 1060:9,
1060:10
**familiar** [10] - 771:17,
790:14, 839:10,
854:11, 923:12,
923:15, 938:7,
946:2, 1125:10,
1128:19
**family** [6] - 889:9,
889:11, 905:23,
905:24, 923:20,
979:1
**fantastic** [3] - 984:7,
984:21
**far** [18] - 776:17,
792:12, 793:7,
864:24, 883:19,
898:20, 971:3,
984:1, 985:9,
1001:15, 1007:3,
1013:19, 1017:19,
1017:20, 1018:10,
1018:11, 1036:16,
1112:14
**FARNAN** [3] - 767:18,
767:18, 767:19
**fascination** [1] -
965:11
**fast** [4] - 915:22,
920:2, 922:8, 987:2
**father** [1] - 1127:7
**favor** [1] - 885:7
**favored** [1] - 816:12
**fear** [2] - 878:12,
879:21
**feature** [1] - 893:8
**features** [17] - 804:13,
805:14, 860:11,
890:18, 900:23,
972:1, 1049:17,
1049:19, 1049:21,
1049:23, 1050:1,
1059:15, 1059:17,
1059:19, 1059:21,
1060:1, 1141:11
**February** [1] - 990:13

**federal** [8] - 799:11, 799:12, 801:8, 1030:3, 1032:11, 1032:21, 1043:7, 1127:9
**Federal** [2] - 880:5, 884:12
**federally** [2] - 1043:8, 1051:10
**fee** [5] - 858:6, 858:10, 939:3, 939:11, 939:18
**feelings** [1] - 843:3
**fees** [3] - 923:21, 923:24, 1025:10
**feet** [3] - 894:7, 909:11, 961:22
**fell** [1] - 970:4
**felt** [1] - 989:2
**festival** [1] - 1023:4
**fetch** [3] - 916:10, 916:16, 1036:12
**fetched** [7] - 916:24, 917:2, 919:14, 919:17, 919:18, 920:20, 920:21
**fetching** [4] - 915:15, 920:18, 966:7, 966:11
**few** [13] - 779:15, 781:1, 781:8, 847:2, 858:11, 894:7, 923:23, 996:22, 1001:10, 1018:15, 1058:23, 1100:8, 1150:10
**fiction** [1] - 963:11
**field** [28] - 913:19, 953:21, 979:6, 1013:10, 1013:11, 1022:10, 1036:14, 1036:18, 1078:5, 1081:7, 1081:12, 1081:16, 1082:2, 1082:7, 1082:21, 1088:19, 1089:10, 1092:18, 1094:2, 1094:4, 1094:8, 1108:17, 1126:16, 1126:22, 1127:4, 1133:7, 1140:1, 1140:2
**fields** [1] - 1129:8
**fifteen** [6] - 781:20, 782:2, 783:4, 784:5, 898:13, 1081:18
**fifty** [1] - 902:14
**Figure** [5] - 1091:4, 1092:19, 1092:20, 1093:9, 1148:14

**figure** [12] - 963:5, 1036:16, 1036:20, 1041:7, 1044:15, 1044:17, 1127:24, 1141:23, 1142:5, 1148:2, 1148:14
**figured** [1] - 988:24
**figures** [1] - 1092:19
**file** [13] - 885:4, 885:9, 886:14, 937:5, 937:6, 1085:12, 1087:1, 1087:2, 1087:6, 1116:4, 1116:20, 1122:12, 1135:21
**filed** [3] - 818:20, 1005:2, 1090:19
**files** [6] - 943:13, 946:18, 1101:8, 1115:3, 1116:9, 1122:13
**filing** [2] - 1065:23, 1136:20
**fill** [1] - 950:18
**filled** [1] - 964:12
**final** [18] - 770:24, 789:4, 885:20, 911:22, 912:14, 918:16, 919:6, 919:15, 919:24, 921:1, 921:4, 922:13, 922:18, 923:4, 996:15, 998:15, 1132:2, 1150:23
**finally** [7] - 883:17, 892:1, 962:1, 1045:14, 1094:8, 1111:17, 1148:19
**finance** [4] - 930:20, 931:12, 931:17, 932:14
**finances** [1] - 923:12
**financial** [12] - 802:15, 814:3, 814:7, 815:8, 815:11, 815:20, 818:18, 887:19, 923:10, 923:13, 1076:6
**financials** [1] - 893:12
**financing** [1] - 977:7
**fine** [21] - 923:2, 923:6, 969:10, 999:13, 999:14, 1020:4, 1033:2, 1036:5, 1037:2, 1037:3, 1037:14, 1041:21, 1042:1, 1042:2, 1042:5, 1042:12, 1042:15,

1077:1, 1111:7, 1128:11, 1147:12
**finely** [1] - 961:11
**finer** [7] - 960:22, 1084:3, 1090:5, 1090:7, 1091:21, 1092:1
**finest** [1] - 1091:11
**finish** [6] - 882:15, 917:4, 990:8, 994:11, 1108:11, 1121:6
**finished** [3] - 915:12, 954:9, 1152:4
**finishing** [1] - 982:22
**firm** [2] - 827:7, 1009:21
**firm's** [1] - 827:10
**first** [109] - 769:9, 769:18, 772:11, 782:12, 787:10, 795:20, 796:11, 799:10, 804:13, 806:21, 809:20, 810:11, 810:23, 813:4, 820:23, 822:9, 832:15, 832:19, 833:6, 833:9, 846:2, 848:22, 851:19, 870:5, 881:5, 882:23, 887:12, 887:24, 888:6, 895:11, 898:24, 899:10, 899:23, 913:5, 915:1, 917:9, 917:13, 918:23, 919:2, 924:16, 924:18, 924:20, 924:22, 931:4, 931:21, 931:24, 932:2, 948:4, 949:22, 951:23, 953:1, 972:4, 972:5, 977:8, 980:18, 991:24, 993:9, 995:7, 995:23, 1003:19, 1016:17, 1016:18, 1028:16, 1039:15, 1041:18, 1042:4, 1044:1, 1052:4, 1054:21, 1054:24, 1055:1, 1057:4, 1061:15, 1061:18, 1074:18, 1078:20, 1080:5, 1084:7, 1084:11, 1087:2, 1087:13, 1087:15, 1091:6, 1093:5, 1094:1,

1096:7, 1096:8, 1097:2, 1102:3, 1102:17, 1103:13, 1103:18, 1110:2, 1111:9, 1111:10, 1120:9, 1126:15, 1127:1, 1127:10, 1127:18, 1130:7, 1130:12, 1131:13, 1133:20, 1134:19, 1137:22, 1144:22, 1148:3
**Fishing** [1] - 929:20
**fishing** [3] - 929:22, 929:23, 930:1
**fit** [3] - 979:17, 979:20, 979:21
**five** [13] - 780:9, 807:14, 816:12, 820:4, 850:24, 896:9, 909:10, 927:11, 968:17, 1068:4, 1068:10, 1113:21, 1148:17
**fix** [2] - 996:24, 1006:22
**flagged** [1] - 1069:2
**flagship** [1] - 898:16
**flashlight** [1] - 1036:19
**flat** [1] - 1037:21
**flawed** [1] - 1005:8
**flew** [1] - 960:17
**flight** [12] - 950:22, 954:20, 954:21, 955:11, 955:16, 956:1, 956:24, 957:23, 960:3, 962:6, 966:8, 1037:22
**flip** [1] - 913:8
**floor** [4] - 1002:10, 1002:11, 1048:18, 1049:12
**flower** [2] - 1052:13, 1052:18
**fluidly** [1] - 952:9
**fly** [22] - 804:8, 889:24, 891:16, 892:13, 892:18, 952:8, 955:3, 959:11, 959:13, 960:9, 961:13, 961:20, 963:16, 965:8, 965:10, 973:13, 974:7, 974:8, 977:16, 1040:5, 1059:10, 1146:6
**flying** [8] - 892:8,

892:9, 892:10, 955:6, 956:18, 961:20, 963:19, 975:9
**focal** [1] - 811:7
**focus** [6] - 925:2, 967:2, 1000:8, 1000:10, 1054:8, 1081:10
**focused** [3] - 897:13, 897:19, 1081:8
**focuses** [1] - 1102:18
**folder** [1] - 1056:4
**folders** [1] - 1058:5
**folks** [2] - 1070:20, 1070:23
**follow** [4] - 831:2, 913:10, 985:12, 1102:10
**follow-up** [1] - 985:12
**followed** [2] - 1071:5, 1096:17
**following** [3] - 781:23, 787:12, 852:7
**follows** [4] - 888:8, 949:24, 1028:18, 1078:22
**font** [1] - 1056:21
**food** [4] - 1099:19, 1099:20, 1100:3, 1101:14
**FOR** [1] - 767:2
**forbid** [1] - 1064:7
**ford.com** [1] - 959:6
**foregoing** [1] - 1153:9
**foreign** [1] - 1131:22
**forever** [1] - 964:24
**forgotten** [1] - 1008:1
**form** [8] - 885:16, 1014:18, 1085:5, 1087:15, 1099:1, 1125:22, 1149:7, 1151:20
**formal** [1] - 999:4
**formally** [2] - 934:15, 1029:10
**formed** [1] - 1063:5
**former** [1] - 970:3
**formerly** [1] - 1063:7
**forming** [2] - 1096:1, 1126:18
**formulate** [1] - 782:3
**Fort** [2] - 1045:15
**forth** [4] - 809:14, 848:4, 853:17, 1108:17
**forty** [3] - 1078:7, 1081:10, 1126:23
**forward** [16] - 773:2, 781:14, 781:22,

782:4, 785:3,
785:16, 785:19,
786:1, 802:22,
811:10, 853:5,
970:22, 989:13,
990:24, 1000:18,
1139:15
**forwarded** [3] -
1008:5, 1008:8,
1008:9
**forwarding** [1] - 987:2
**foundation** [3] -
784:9, 795:23,
825:18
**founded** [1] - 968:7
**founders** [1] - 977:15
**four** [37] - 882:13,
907:3, 907:20,
908:3, 908:4,
908:12, 908:15,
934:13, 966:3,
967:10, 967:11,
967:12, 967:18,
968:2, 968:17,
1009:15, 1034:15,
1036:23, 1036:24,
1037:11, 1037:13,
1091:7, 1091:8,
1091:9, 1094:24,
1095:4, 1101:17,
1103:21, 1113:17,
1113:18, 1123:12,
1124:1, 1148:3,
1148:16, 1148:20
**four-minute** [1] -
1034:15
**four-way** [1] - 1113:17
**fourth** [2] - 804:16,
1148:20
**Fox** [1] - 1009:22
**frame** [9] - 784:2,
810:2, 810:8, 916:2,
957:12, 958:10,
959:24, 961:16,
1130:18
**framework** [2] -
788:20, 807:2
**France** [1] - 1082:15
**Francisco** [1] -
1052:11
**Frank** [1] - 1078:15
**FRANK** [2] - 1078:16,
1078:19
**frankly** [1] - 774:8
**free** [21] - 804:14,
804:20, 804:22,
805:18, 805:22,
840:12, 858:19,
859:5, 859:20,
860:3, 860:12,

860:13, 861:18,
861:21, 862:22,
863:8, 863:15,
863:23, 868:15,
869:8, 1015:11
**Free** [3] - 858:15,
859:13, 859:14
**fresh** [1] - 1151:12
**Friday** [2] - 886:16,
999:4
**friend** [1] - 977:13
**friendly** [1] - 980:11
**friends** [2] - 916:12,
964:7
**front** [8] - 774:1,
806:16, 806:18,
841:8, 879:6, 915:5,
1053:9, 1055:24
**frustum** [2] - 1036:14,
1071:13
**fulfill** [2] - 978:14,
978:16
**full** [6] - 810:11,
810:23, 820:23,
837:8, 988:3,
1078:14
**Fuller** [3] - 1043:1,
1043:14, 1043:21
**fun** [3] - 898:1, 970:8,
970:13
**functionality** [2] -
823:10, 901:10
**functions** [1] - 897:24
**fundamental** [2] -
955:10, 992:6
**fundamentally** [1] -
1096:11
**funded** [6] - 967:24,
968:1, 1032:11,
1032:20, 1043:8,
1051:10
**funding** [6] - 962:22,
968:4, 968:7,
968:15, 977:8, 977:9
**funny** [1] - 1050:24,
1052:14
**furnished** [1] -
1026:15
**Fusion** [1] - 952:16
**future** [7] - 772:4,
792:10, 850:11,
894:2, 989:8,
1000:15, 1008:22
**fuzzy** [1] - 1035:3
**G's** [1] - 1119:18
**G-mail** [2] - 816:13,
889:18
**G-O-O-D-C-H-I-L-D** [1]
- 1078:17
**game** [2] - 962:20,

963:15
**Game** [1] - 962:20
**games** [1] - 950:22
**gaming** [1] - 894:22
**garage** [3] - 964:12,
964:13, 964:14
**garden** [1] - 975:14
**gas** [3] - 860:8,
860:15, 860:19
**gathered** [1] - 1097:11
**gears** [2] - 902:23,
923:9
**General** [1] - 954:19
**general** [15] - 789:19,
838:10, 838:17,
880:20, 966:17,
1022:4, 1026:14,
1027:16, 1032:10,
1089:10, 1102:3,
1117:6, 1124:24,
1138:5, 1146:16
**generally** [13] - 837:9,
837:15, 840:19,
840:23, 896:13,
1022:6, 1022:16,
1023:12, 1024:10,
1085:7, 1092:10,
1131:10, 1132:9
**generate** [2] - 808:2,
926:6
**generated** [2] -
807:18, 950:19
**generating** [2] -
807:13, 807:15
**generation** [1] -
806:15
**gentleman** [1] -
1127:5
**Geo** [39] - 789:1,
807:16, 810:6,
811:24, 812:3,
816:22, 816:24,
817:12, 858:2,
858:3, 861:10,
862:1, 862:18,
896:24, 897:1,
897:2, 897:5, 898:4,
929:11, 929:12,
929:16, 929:17,
935:6, 938:17,
938:19, 939:15,
939:20, 939:22,
939:24, 954:6,
954:12, 954:14,
954:16, 960:11,
960:14, 988:17
**Geo-based** [3] -
954:12, 954:14,
954:16
**geographic** [13] -

804:9, 807:17,
897:2, 909:4,
959:12, 1013:13,
1014:8, 1078:6,
1081:11, 1092:15,
1126:23, 1127:10
**Geographic** [1] -
1127:12
**Geographical** [2] -
1081:21, 1082:14
**geographical** [5] -
1045:19, 1082:19,
1083:5, 1127:3,
1133:7
**geography** [3] -
1079:17, 1081:5,
1082:17
**Geography** [2] -
1080:8, 1080:13
**Geological** [2] -
1035:22, 1038:3
**Georgia** [1] - 802:8
**Geospacial** [2] -
973:23, 1015:8
**German** [1] - 998:5
**Germany** [3] - 987:21,
1002:1, 1002:21
**gestures** [1] - 896:16
**Gigabit** [3] - 1056:22,
1057:8, 1058:7
**gigabytes** [1] - 903:14
**gigantic** [2] - 880:7,
1128:12
**GIS** [12] - 1081:13,
1081:16, 1082:5,
1082:7, 1088:18,
1088:19, 1090:8,
1126:16, 1126:22,
1127:7, 1127:23,
1128:7
**given** [21] - 772:22,
781:12, 785:21,
786:11, 822:2,
835:22, 878:17,
908:13, 914:23,
993:21, 998:5,
1024:8, 1024:11,
1024:24, 1025:3,
1055:11, 1067:14,
1070:6, 1072:22,
1073:14, 1085:20
**glad** [2] - 1019:13
**glass** [2] - 1089:22,
1091:24
**Global** [1] - 929:20
**global** [7] - 930:2,
1091:14, 1095:7,
1098:4, 1134:4,
1134:7, 1147:13
**globe** [9] - 849:1,

849:17, 890:15,
896:19, 964:23,
964:24, 984:11,
1084:1, 1084:2
**Globe** [5] - 900:19,
900:20, 900:21,
901:2, 1122:23
**GmbH** [1] - 767:4
**goal** [3] - 920:3,
946:12, 946:22
**goals** [5] - 775:22,
945:14, 957:20,
1032:7, 1032:8
**gold** [1] - 1082:13
**Goldstein** [1] -
1009:22
**Goodchild** [19] -
1078:4, 1078:12,
1078:16, 1079:9,
1079:12, 1079:13,
1080:6, 1083:10,
1087:10, 1088:17,
1089:14, 1102:4,
1103:13, 1114:6,
1115:17, 1141:17,
1146:10, 1151:13,
1152:3
**goodchild** [3] -
1078:5, 1079:4,
1079:24
**GOODCHILD** [1] -
1078:19
**Goodchild's** [1] -
1151:18
**GOOGLE** [1] - 767:6
**Google** [591] - 769:20,
770:5, 771:2,
774:21, 775:2,
775:4, 775:8, 775:9,
775:13, 775:23,
776:9, 777:15,
777:18, 778:18,
779:8, 779:9,
779:18, 779:19,
785:17, 788:16,
788:20, 788:22,
789:20, 791:9,
791:13, 791:16,
793:2, 793:23,
794:19, 796:20,
796:21, 796:23,
797:1, 797:7, 798:7,
798:12, 798:24,
799:20, 800:1,
801:12, 801:13,
801:14, 801:15,
801:16, 803:1,
803:4, 803:8,
803:13, 803:15,
804:4, 804:5, 804:6,

804:8, 804:13,
804:17, 805:1,
805:13, 805:15,
806:5, 806:21,
807:14, 809:2,
809:23, 810:2,
810:6, 810:7, 811:7,
812:20, 815:5,
815:15, 815:23,
816:3, 816:12,
816:17, 816:23,
817:4, 817:7,
817:11, 818:7,
818:10, 818:18,
818:21, 819:1,
819:13, 820:13,
820:14, 820:16,
820:18, 821:4,
822:2, 822:5,
822:21, 823:1,
823:13, 824:1,
824:3, 828:4, 829:5,
829:19, 830:17,
832:16, 832:17,
834:6, 839:2,
841:20, 842:17,
843:2, 843:6, 843:8,
844:12, 844:13,
844:21, 844:22,
845:15, 846:21,
847:5, 849:19,
850:14, 853:10,
855:8, 855:10,
857:21, 858:14,
859:5, 859:6, 859:9,
860:18, 861:2,
861:18, 861:23,
862:17, 862:22,
863:18, 863:19,
863:22, 863:24,
864:1, 864:6,
864:12, 864:16,
864:20, 864:21,
865:6, 865:8,
865:14, 865:16,
865:23, 866:11,
866:18, 866:22,
867:4, 867:11,
867:12, 867:15,
867:18, 868:2,
868:4, 868:6, 868:9,
868:15, 868:20,
868:21, 868:24,
869:3, 869:6, 869:8,
869:10, 870:3,
870:9, 871:10,
878:22, 881:3,
882:4, 883:2,
883:14, 883:15,
886:21, 887:15,
887:16, 887:19,

888:18, 888:20,
888:24, 889:2,
889:4, 889:6, 889:8,
889:11, 889:14,
889:15, 889:18,
889:21, 889:22,
890:13, 890:19,
890:20, 891:5,
891:9, 891:10,
892:6, 892:22,
892:23, 892:24,
893:5, 893:20,
894:14, 894:15,
894:17, 894:19,
894:20, 896:11,
896:17, 896:21,
896:22, 897:4,
897:8, 897:10,
897:14, 897:16,
897:17, 897:18,
897:24, 898:7,
898:10, 898:11,
898:14, 898:16,
898:21, 898:24,
899:1, 899:4,
899:10, 899:13,
899:14, 899:19,
899:20, 899:21,
900:5, 900:7, 900:8,
900:11, 900:19,
900:23, 901:1,
901:2, 901:6, 901:9,
901:10, 901:14,
901:15, 901:24,
902:10, 902:11,
902:17, 902:24,
903:1, 903:2, 903:3,
903:9, 903:10,
903:19, 903:21,
904:2, 904:3,
905:14, 906:11,
907:10, 907:13,
907:18, 908:19,
908:23, 909:6,
909:13, 909:24,
910:14, 910:15,
910:19, 911:1,
913:4, 918:22,
919:5, 919:13,
919:20, 920:8,
920:13, 920:23,
921:17, 921:20,
923:10, 923:13,
923:18, 923:19,
923:21, 923:22,
923:24, 924:1,
924:4, 924:7,
924:10, 924:11,
924:16, 924:17,
925:10, 925:11,
925:14, 926:2,

926:8, 926:9,
926:10, 926:16,
926:17, 927:3,
927:7, 927:20,
928:4, 928:5, 928:8,
928:9, 928:10,
928:12, 928:16,
929:5, 929:6,
929:10, 930:6,
930:10, 930:11,
930:16, 930:17,
932:17, 932:22,
933:4, 933:5,
933:18, 933:19,
934:3, 934:4,
934:16, 935:4,
935:6, 935:14,
935:17, 935:18,
935:21, 935:22,
936:12, 936:13,
936:18, 936:19,
937:11, 937:13,
937:24, 938:2,
938:19, 938:21,
938:23, 939:4,
939:7, 939:9,
939:10, 939:17,
939:21, 940:1,
940:2, 940:4,
940:10, 940:18,
941:1, 941:2, 941:5,
941:7, 941:9,
941:18, 941:21,
941:22, 941:24,
942:4, 942:7,
942:14, 942:15,
942:20, 943:8,
943:11, 943:15,
943:23, 943:24,
944:9, 944:16,
944:19, 944:20,
944:23, 945:1,
945:5, 945:10,
945:17, 945:21,
946:2, 946:6, 947:1,
948:15, 949:14,
949:16, 949:18,
950:6, 951:6, 951:7,
951:9, 951:13,
951:15, 951:16,
951:19, 951:21,
951:23, 952:23,
953:1, 953:2, 953:3,
953:6, 953:7, 953:9,
953:12, 953:17,
972:14, 976:21,
977:2, 977:14,
977:15, 978:6,
978:7, 978:17,
978:19, 978:22,

979:11, 979:13,
979:14, 979:17,
979:24, 980:5,
980:7, 980:11,
980:12, 987:3,
987:4, 987:9,
987:19, 987:24,
988:9, 989:4, 989:6,
991:20, 996:8,
996:17, 1000:21,
1001:13, 1001:19,
1002:23, 1003:9,
1003:12, 1003:14,
1003:20, 1004:19,
1005:10, 1006:17,
1007:2, 1007:7,
1007:9, 1007:10,
1007:12, 1007:16,
1007:19, 1008:19,
1012:18, 1013:14,
1013:15, 1013:21,
1014:5, 1014:17,
1015:4, 1015:22,
1016:1, 1017:20,
1018:11, 1018:19,
1019:7, 1019:8,
1019:24, 1020:18,
1028:9, 1029:1,
1030:19, 1062:1,
1062:6, 1062:11,
1074:22, 1078:3,
1078:8, 1079:7,
1084:12, 1084:19,
1085:18, 1087:11,
1087:21, 1088:9,
1088:21, 1096:9,
1096:12, 1096:15,
1097:5, 1097:9,
1097:12, 1097:13,
1097:22, 1098:6,
1099:3, 1099:14,
1100:15, 1100:18,
1100:23, 1101:1,
1101:6, 1101:8,
1101:11, 1101:23,
1102:13, 1102:19,
1103:1, 1103:5,
1103:9, 1103:14,
1103:15, 1104:13,
1108:15, 1108:16,
1108:19, 1109:2,
1109:8, 1109:10,
1109:12, 1109:16,
1109:24, 1111:3,
1112:12, 1113:1,
1115:14, 1115:20,
1115:22, 1116:6,
1116:10, 1117:2,
1117:8, 1117:17,
1117:19, 1120:4,
1117:17, 1120:20,

1121:11, 1121:22,
1121:23, 1122:6,
1122:9, 1122:15,
1123:5, 1123:8,
1123:9, 1123:14,
1123:16, 1123:19,
1124:4, 1124:10,
1130:1

**Google's** [25] -
779:13, 793:8,
810:6, 812:2,
816:18, 817:2,
822:15, 843:18,
846:4, 862:16,
887:9, 887:12,
890:21, 894:12,
927:19, 932:21,
943:1, 979:18,
1004:19, 1062:20,
1073:3, 1073:6,
1073:11, 1085:19,
1108:23

**Google.com** [2] -
777:20, 929:4

**Googling** [1] - 932:8

**Gore** [1] - 982:12

**government** [22] -
799:2, 799:12,
800:10, 800:23,
801:8, 957:3, 970:2,
1014:3, 1014:19,
1015:6, 1015:13,
1029:12, 1030:3,
1032:6, 1032:11,
1032:21, 1064:1,
1064:4, 1064:7,
1127:9, 1127:22

**governments** [1] -
959:22

**GPS** [1] - 805:14

**grace** [2] - 1136:22,
1137:3

**grainy** [7] - 808:24,
1034:23, 1065:5,
1065:9, 1065:12,
1071:2, 1107:24

**grandchildren** [1] -
906:8

**granted** [2] - 885:15,
885:19

**graphic** [6] - 905:1,
956:4, 956:5,
1064:12, 1064:20,
1146:23

**graphical** [1] -
1044:19

**graphically** [1] -
1139:3

**Graphicon** [1] -
954:18

Graphics [17] - 895:6, 955:15, 955:17, 962:16, 962:18, 968:7, 968:13, 980:23, 981:2, 986:7, 986:8, 990:19, 996:7, 1012:24, 1013:4, 1083:22

graphics [17] - 893:3, 894:21, 895:1, 895:9, 895:13, 895:14, 895:18, 895:21, 948:13, 958:15, 981:4, 1022:22, 1023:17, 1070:11, 1089:3, 1133:4, 1133:9

Graphix [1] - 968:5

graphs [2] - 895:19, 895:20

great [11] - 892:3, 912:6, 914:12, 917:5, 918:8, 926:14, 928:21, 970:23, 970:24, 1019:10, 1114:23

greatly [1] - 953:24

grew [3] - 890:4, 965:3, 965:7

grid [1] - 1148:22

grounds [2] - 877:6, 885:6

Group [3] - 1097:2, 1097:3

group [17] - 858:2, 858:3, 861:10, 865:19, 865:22, 866:1, 929:5, 929:11, 929:13, 939:15, 939:21, 939:23, 939:24, 1022:21, 1036:22, 1036:24, 1114:17

grouped [2] - 802:11, 1096:16

groupings [2] - 1109:15, 1116:13

groups [5] - 802:12, 865:21, 1022:19, 1022:20, 1023:9

grow [4] - 779:11, 791:9, 811:15, 857:9

growing [3] - 779:18, 791:14, 857:6

growth [9] - 808:3, 808:10, 808:13, 808:16, 809:5, 810:1, 810:3, 811:12

guaranteed [1] -

1117:12

Guard [1] - 958:2

guess [8] - 822:14, 838:24, 851:5, 886:16, 990:18, 1006:9, 1020:10, 1139:16

guidance [3] - 784:1, 824:12, 912:15

guide [2] - 1024:14, 1117:23

guidelines [1] - 979:6

guys [2] - 968:2, 1034:9

Haase [1] - 875:3

half [14] - 777:10, 824:4, 824:5, 856:2, 880:3, 906:17, 906:22, 906:23, 917:24, 922:23, 922:24, 980:7, 1020:24

Hall [2] - 892:13, 892:17

hall [6] - 1023:2, 1050:23, 1056:18, 1070:21, 1070:24

hallway [1] - 1005:12

halves [2] - 907:7, 1108:2

hammered [1] - 983:11

hand [18] - 890:14, 890:17, 892:2, 896:16, 917:21, 933:13, 934:9, 936:3, 976:2, 994:24, 1055:17, 1067:20, 1068:24, 1074:1, 1098:15, 1142:2, 1148:12, 1153:15

handed [4] - 1017:9, 1024:21, 1044:4, 1072:5

handful [1] - 835:24

handle [2] - 784:11, 1127:13

handled [3] - 960:23, 961:1, 961:2

handling [1] - 996:15

hands [2] - 970:22, 1017:2

Hanke [1] - 924:21

happy [2] - 834:15, 925:5

hard [6] - 773:21, 774:18, 917:20, 956:21, 1024:12, 1053:11

hardware [9] - 823:20, 884:10, 884:16, 894:22, 955:16, 957:8, 966:22, 981:4, 1000:19

HAWES [65] - 767:22, 770:16, 771:12, 771:19, 771:22, 774:10, 774:16, 774:21, 775:14, 776:6, 776:22, 777:9, 777:14, 778:3, 778:12, 778:16, 779:6, 780:4, 788:11, 788:12, 790:1, 790:7, 790:8, 790:9, 791:24, 792:6, 795:14, 795:19, 796:4, 803:23, 803:24, 812:13, 812:14, 817:21, 819:11, 820:1, 820:9, 825:11, 825:21, 826:3, 826:7, 826:18, 864:23, 871:21, 872:15, 874:18, 875:5, 875:9, 875:18, 875:23, 885:24, 886:5, 886:13, 886:18, 886:23, 949:3, 1009:3, 1009:6, 1016:8, 1016:11, 1016:14, 1018:4, 1019:1, 1019:17, 1028:5

Hawes [3] - 783:10, 788:9, 795:4

Hawkins [3] - 1153:7, 1153:19, 1153:20

head [2] - 771:24, 901:20

heading [1] - 1041:17

headquarters [4] - 981:11, 981:15, 1026:2, 1045:11

heads [1] - 951:14

headsets [1] - 950:17

health [1] - 930:9

hear [11] - 770:14, 803:5, 833:5, 885:11, 980:13, 981:1, 983:10, 983:11, 995:6, 995:21, 1052:9

heard [47] - 778:21, 794:16, 836:19, 844:5, 844:8, 846:8,

851:24, 870:16, 873:7, 895:7, 901:8, 903:13, 904:12, 929:1, 936:21, 943:7, 955:18, 980:19, 980:20, 987:4, 987:8, 1003:15, 1008:14, 1016:4, 1038:13, 1052:5, 1063:16, 1063:18, 1083:21, 1086:2, 1088:23, 1091:3, 1094:17, 1098:22, 1109:1, 1113:19, 1125:16, 1125:24, 1128:9, 1130:10, 1135:7, 1138:18, 1146:18, 1147:1, 1147:10, 1149:8, 1151:16

hearing [1] - 1128:15

heavy [1] - 1081:20

held [7] - 883:15, 889:4, 1023:22, 1024:2, 1044:5, 1066:10, 1080:20

help [17] - 774:4, 806:3, 889:19, 890:9, 894:15, 897:18, 905:2, 912:3, 920:3, 929:18, 936:4, 946:9, 955:15, 958:4, 971:13, 989:7, 1100:24

helped [3] - 816:3, 941:19, 1104:3

helpful [5] - 769:18, 863:11, 1126:1, 1142:12, 1151:5

helping [2] - 897:20, 1018:18

helps [1] - 950:21

hereby [1] - 1153:9

herein [4] - 888:6, 949:22, 1028:16, 1078:20

hereunto [1] - 1153:14

hesitating [1] - 859:12

hesitation [1] - 867:14

Hibbard [2] - 1128:18, 1129:1

high [17] - 810:3, 895:8, 922:20, 959:2, 975:8, 1042:1, 1044:21, 1051:16, 1054:6, 1062:16, 1094:24, 1095:2, 1102:5, 1102:8, 1129:12,

1129:16, 1129:20

higher [11] - 816:14, 818:10, 818:12, 850:10, 917:23, 921:12, 1100:12, 1104:24, 1113:24, 1118:19

highest [1] - 857:24, 909:8, 1037:15

highlighted [5] - 1138:7, 1138:21, 1143:7, 1145:14, 1146:1

highlights [1] - 1138:22

hire [1] - 969:8

hired [7] - 954:24, 972:8, 986:24, 1026:7, 1030:9, 1031:11, 1062:19

hiring [2] - 968:10

historically [2] - 930:10, 930:12

history [14] - 891:15, 892:12, 894:4, 894:9, 925:8, 949:17, 1085:12, 1087:2, 1087:3, 1087:6, 1090:8, 1127:3, 1128:7, 1135:21

hit [2] - 917:7, 918:10

hmm [1] - 852:13

hold [4] - 998:19, 1065:19, 1079:18, 1080:12

holding [1] - 1081:20

home [3] - 860:13, 890:1, 971:7

Homes [1] - 973:14

honest [1] - 984:6

Honor [140] - 769:4, 770:16, 770:23, 771:12, 771:19, 772:6, 772:11, 774:9, 774:10, 774:17, 774:24, 775:24, 776:23, 778:7, 778:12, 778:17, 778:20, 780:6, 780:9, 780:16, 780:23, 782:11, 783:17, 784:1, 784:17, 784:22, 785:4, 785:15, 785:23, 786:6, 786:23, 788:8, 788:11, 789:7, 789:14, 790:1, 790:8,

790:24, 791:23,
792:1, 795:21,
803:23, 812:13,
817:21, 819:5,
819:9, 819:24,
820:5, 825:9,
825:11, 825:24,
826:19, 826:22,
864:23, 871:22,
872:1, 872:5,
872:16, 872:17,
873:6, 873:20,
874:14, 874:18,
875:6, 875:9,
875:15, 875:18,
875:23, 876:14,
876:18, 876:19,
877:1, 877:3, 879:8,
879:21, 881:2,
882:9, 882:22,
883:17, 884:1,
885:3, 885:23,
885:24, 886:10,
886:13, 886:19,
886:24, 887:2,
887:12, 887:22,
947:6, 947:22,
949:3, 949:7,
949:11, 949:13,
974:19, 990:7,
991:18, 992:15,
992:24, 993:5,
993:7, 993:14,
995:24, 996:20,
998:4, 999:13,
999:15, 999:19,
1000:4, 1009:4,
1016:8, 1017:23,
1019:2, 1019:18,
1020:4, 1020:13,
1020:17, 1027:21,
1028:3, 1028:6,
1028:9, 1028:19,
1028:24, 1033:18,
1060:13, 1060:23,
1061:1, 1061:5,
1061:6, 1074:5,
1075:1, 1076:18,
1077:20, 1078:24,
1142:12, 1142:23,
1150:8, 1152:4
**honor** [1] - 997:8
**Honor's** [4] - 874:3,
878:11, 880:11,
882:2
**HONORABLE** [1] -
767:13
**honorary** [1] - 1079:23
**honored** [2] - 1017:21,
1018:12

**honors** [1] - 1082:6
**hope** [1] - 1089:16
**hopefully** [1] - 786:2
**hotel** [3] - 970:10,
1076:10, 1076:11
**hotels** [1] - 804:18
**hour** [9] - 786:21,
788:2, 827:10,
827:11, 927:12,
1031:2, 1062:24,
1063:1, 1088:10
**hourly** [1] - 827:8
**hours** [7] - 827:12,
827:15, 827:16,
827:19, 827:21,
1088:2, 1088:6
**house** [4] - 892:9,
964:9, 964:11,
964:15
**housekeeping** [1] -
876:5
**Huber** [1] - 977:14
**huge** [1] - 946:20
**Hughes** [1] - 958:6
**hundred** [16] - 794:2,
808:14, 809:6,
810:20, 840:22,
846:3, 846:16,
847:7, 856:21,
856:22, 880:3,
961:12, 1004:18,
1059:13, 1065:2,
1088:11
**hundreds** [4] - 827:18,
827:20, 863:4,
946:18
**Hustus** [1] - 1019:11
**Hyperion** [2] - 930:19,
931:3
**hypothetical** [44] -
769:3, 769:17,
770:7, 770:12,
770:18, 771:5,
771:15, 771:16,
772:3, 772:12,
772:22, 773:10,
779:15, 779:23,
784:14, 787:4,
795:9, 802:18,
802:24, 806:17,
811:20, 812:7,
812:18, 812:19,
820:4, 827:23,
828:23, 829:2,
829:4, 829:15,
831:7, 831:18,
831:20, 839:18,
840:6, 840:8,
848:18, 870:14,
870:17, 878:8,

879:9, 879:16,
880:18, 1132:21
**IBM** [1] - 1083:23
**icing** [2] - 1004:5,
1004:6
**Idaho** [1] - 973:9
**idea** [19] - 890:22,
905:2, 922:2, 926:5,
940:7, 948:7,
948:11, 948:13,
948:14, 953:22,
957:5, 959:5, 984:9,
1073:10, 1089:6,
1090:6, 1103:19,
1138:16, 1147:9
**ideal** [1] - 1120:2
**identical** [1] - 770:2
**identification** [1] -
997:21
**identified** [16] -
777:20, 787:14,
797:9, 799:1,
807:10, 816:10,
839:9, 859:14,
860:17, 861:15,
865:21, 877:10,
878:18, 884:12,
997:23, 1122:8
**identifies** [5] - 798:12,
802:8, 845:10,
885:6, 991:22
**identify** [15] - 792:13,
795:22, 806:1,
810:10, 817:3,
818:8, 845:13,
859:19, 861:22,
877:12, 938:21,
940:2, 994:10,
1113:11, 1142:10
**identifying** [2] -
810:12, 1139:7
**II** [2] - 962:21, 1097:3
**III** [1] - 1097:3
**illegal** [2] - 929:23,
929:24
**illumination** [1] -
962:2
**illustrate** [5] - 811:20,
812:6, 890:9, 892:6,
1104:4
**illustrates** [2] -
974:15, 1091:3
**illustration** [10] -
907:14, 907:22,
908:10, 912:2,
912:9, 915:1,
916:23, 946:5,
946:24, 1093:9
**image** [62] - 904:23,
906:7, 906:17,

908:5, 909:19,
911:22, 912:24,
914:15, 918:15,
918:16, 918:20,
919:21, 919:24,
921:10, 921:11,
922:3, 922:8,
922:13, 922:18,
923:5, 923:7,
959:19, 959:20,
960:1, 960:21,
961:17, 966:7,
967:6, 972:19,
1035:12, 1035:14,
1054:7, 1089:23,
1090:3, 1090:5,
1091:6, 1091:15,
1091:18, 1091:24,
1095:15, 1098:18,
1099:14, 1099:16,
1100:6, 1104:17,
1105:20, 1108:16,
1112:20, 1112:24,
1118:7, 1120:2,
1121:5, 1121:7,
1121:10, 1123:20,
1133:5, 1133:9,
1138:19, 1139:3,
1139:5, 1148:16,
1149:4
**imaged** [1] - 965:1
**imagery** [10] - 891:3,
906:15, 909:9,
911:13, 956:18,
959:10, 964:1,
1054:5, 1118:19,
1146:5
**images** [25] - 887:17,
903:2, 903:20,
903:24, 904:3,
904:8, 904:22,
905:15, 905:16,
910:11, 910:13,
910:15, 912:1,
918:24, 1029:17,
1035:5, 1038:8,
1060:7, 1089:4,
1089:7, 1098:22,
1099:4, 1100:16,
1114:7
**imaginary** [2] - 903:5,
939:11
**imagine** [4] - 983:24,
988:11, 989:3,
1010:12
**imagined** [1] - 1094:2
**imaging** [2] - 923:1,
1083:4
**immediate** [1] -
945:13

**immediately** [5] -
892:24, 894:18,
894:20, 1087:18,
1151:19
**impact** [7] - 809:2,
814:1, 814:4,
814:19, 815:22,
816:15, 929:14
**impeachment** [1] -
1017:23
**implementation** [2] -
902:19, 942:17
**implemented** [3] -
788:21, 923:3, 938:4
**import** [1] - 805:14
**importance** [4] -
814:18, 815:24,
922:2, 1110:9
**important** [24] -
788:15, 799:4,
800:4, 806:4,
806:23, 807:1,
807:19, 813:14,
816:4, 897:8, 914:6,
914:11, 915:6,
916:19, 919:23,
922:4, 922:14,
923:4, 926:4, 930:9,
1086:17, 1125:14,
1135:24, 1144:23
**importantly** [1] -
782:15
**impossible** [2] -
908:6, 976:2
**impressed** [1] -
985:11
**impressions** [1] -
929:1
**improper** [5] - 782:14,
820:6, 877:20,
878:1, 1017:23
**impropriety** [1] -
769:21
**imputed** [6] - 938:8,
938:10, 938:12,
938:22, 940:3, 940:9
**IN** [2] - 767:1, 1153:14
**inappropriate** [1] -
880:9
**inclined** [2] - 782:9,
860:10
**include** [15] - 776:23,
801:15, 801:16,
850:5, 850:12,
859:24, 864:1,
864:12, 866:12,
905:15, 925:10,
925:17, 1124:16,
1124:21, 1140:19
**included** [9] - 817:1,

893:7, 928:5, 996:23, 998:2, 1013:7, 1013:11, 1013:23, 1014:2
**includes** [2] - 884:9, 1003:9
**including** [17] - 779:19, 781:16, 799:2, 821:21, 877:14, 1007:11, 1020:23, 1030:5, 1048:4, 1050:4, 1057:19, 1058:7, 1086:9, 1089:2, 1089:19, 1130:1, 1135:21
**inclusion** [1] - 993:23
**inclusive** [1] - 1153:10
**incorporated** [1] - 1145:8
**INCORPORATED** [1] - 767:6
**increase** [5] - 777:19, 778:22, 779:17, 794:20, 809:19
**increased** [5] - 810:20, 821:11, 856:18, 856:22, 857:14
**increasing** [2] - 857:12, 960:20
**incredibly** [4] - 874:2, 909:19, 926:20, 944:11
**incremental** [1] - 1140:4
**incubating** [1] - 1063:11
**Independence** [2] - 892:13, 892:17
**independent** [6] - 772:7, 877:23, 881:6, 994:4, 1082:24, 1145:19
**independently** [4] - 980:8, 994:7, 1122:2, 1122:7
**index** [2] - 904:4, 909:21
**index.htm** [1] - 1056:11
**indicate** [4] - 838:20, 839:3, 845:17, 845:21
**indicated** [2] - 1066:16, 1066:22
**indicating** [3] - 856:24, 861:23, 1114:11
**indication** [3] -

852:17, 853:3, 853:7
**indirect** [3] - 818:6, 818:11, 861:14
**indirectly** [1] - 817:7
**industries** [2] - 957:2, 1023:16
**industry** [11] - 891:4, 902:1, 902:7, 902:9, 945:24, 956:24, 974:1, 974:3, 1020:22, 1023:2, 1063:12
**inevitably** [1] - 1089:15
**inference** [1] - 996:12
**inferior** [1] - 989:2
**informal** [1] - 999:1
**informally** [1] - 999:7
**Information** [2] - 1081:22, 1127:12
**information** [79] - 772:8, 774:13, 776:14, 789:18, 789:21, 794:6, 800:6, 800:16, 800:20, 804:10, 804:17, 805:2, 807:1, 807:4, 807:17, 813:15, 813:17, 814:16, 821:13, 859:8, 859:13, 860:21, 861:6, 862:4, 862:8, 862:16, 862:19, 862:20, 864:4, 865:1, 869:11, 878:15, 887:18, 889:16, 889:20, 890:23, 890:24, 891:2, 903:1, 903:9, 903:20, 904:17, 904:20, 904:23, 905:15, 909:18, 911:2, 923:10, 935:11, 937:9, 948:12, 970:21, 979:22, 1036:9, 1037:20, 1038:6, 1042:3, 1049:10, 1051:14, 1073:16, 1073:23, 1075:10, 1078:6, 1081:11, 1082:19, 1083:5, 1085:8, 1087:9, 1090:20, 1092:15, 1097:11, 1100:5, 1127:4, 1127:11, 1128:12, 1133:7, 1135:24, 1136:4, 1136:7

**informative** [1] - 850:3
**informed** [1] - 1131:9
**infrastructure** [1] - 823:20
**infringe** [13] - 883:7, 883:9, 1078:9, 1096:10, 1102:9, 1103:6, 1103:10, 1103:11, 1103:15, 1117:4, 1123:16, 1124:12, 1124:13
**infringed** [8] - 813:9, 813:11, 828:3, 847:12, 870:18, 870:19, 870:22, 1007:7
**infringement** [13] - 771:6, 822:3, 828:11, 881:4, 882:1, 882:22, 994:5, 994:8, 1062:2, 1084:12, 1097:15, 1102:2, 1102:5
**infringes** [4] - 883:3, 1084:13, 1084:19, 1123:9
**infringing** [1] - 793:12
**initial** [2] - 806:14, 1089:8
**initiated** [1] - 1123:24
**initiatives** [1] - 929:19
**innovation** [1] - 1065:17
**Innovation** [1] - 992:14
**INNOVATIONAL** [1] - 767:3
**innovative** [2] - 1032:23, 1065:24
**inside** [5] - 771:24, 817:11, 961:6, 965:20, 966:1
**inspect** [1] - 963:18
**install** [3] - 939:8, 980:2, 980:4
**installation** [2] - 939:13, 940:8
**installations** [3] - 841:21, 842:18, 983:19
**installs** [1] - 939:4
**instance** [4] - 854:15, 942:2, 1086:13, 1113:7
**instances** [2] - 1036:2, 1036:10
**Instead** [1] - 844:20
**instead** [11] - 844:22, 907:7, 908:12,

959:7, 961:12, 970:9, 1047:6, 1052:19, 1101:16, 1113:17, 1120:8
**Institute** [4] - 958:17, 958:19, 1029:10, 1063:8
**institutions** [1] - 1082:23
**instruction** [2] - 770:24, 880:16
**instructions** [10] - 776:11, 880:11, 883:18, 885:16, 885:20, 996:16, 996:22, 998:15, 1097:18, 1150:23
**insufficient** [1] - 882:16
**integrate** [1] - 901:1
**integrated** [2] - 804:16, 804:24
**Integrated** [1] - 1080:17
**integration** [1] - 1121:14
**Intel** [1] - 965:20
**intelligence** [1] - 973:22
**intend** [1] - 898:19
**intended** [1] - 898:1
**intends** [1] - 785:17
**intent** [3] - 926:14, 926:24, 927:24
**intentionally** [1] - 789:18
**interactions** [1] - 949:19
**interactive** [1] - 1056:17
**interdiction** [1] - 960:10
**interest** [7] - 1005:10, 1022:19, 1022:20, 1022:21, 1023:9, 1089:21, 1143:11
**interested** [19] - 794:19, 805:11, 854:1, 854:9, 892:9, 911:18, 925:1, 944:16, 944:20, 964:17, 972:18, 989:10, 989:12, 1051:13, 1051:16, 1069:3, 1070:11, 1070:14, 1083:24
**interesting** [5] - 899:8, 924:20, 926:11, 1005:18, 1053:1
**interface** [4] - 902:19,

902:22, 972:1, 979:7
**Intergraph** [2] - 965:17, 966:4
**intermediate** [2] - 1113:12, 1114:12
**internal** [5] - 788:16, 900:21, 931:11, 932:14, 1037:1
**internally** [2] - 938:15, 957:18
**International** [12] - 1028:11, 1050:11, 1053:20, 1054:20, 1063:3, 1063:5, 1063:14, 1063:16, 1063:19, 1064:10, 1064:19, 1065:11
**international** [1] - 1041:1
**internet** [3] - 1049:11, 1111:23, 1129:15
**interpretation** [2] - 1086:14, 1097:10
**interrelationship** [1] - 814:2
**interrupt** [1] - 778:9
**interrupted** [1] - 818:12
**intervene** [1] - 795:11
**interviewed** [1] - 1009:23
**interviews** [1] - 893:15
**intimately** [1] - 958:7
**Intrinsic** [10] - 962:15, 962:17, 968:5, 968:7, 968:12, 986:7, 986:8, 996:7, 1012:24, 1013:3
**introduce** [5] - 785:18, 804:22, 888:13, 1028:22, 1079:10
**introduced** [7] - 807:11, 858:14, 859:9, 861:18, 861:21, 900:1, 950:5
**introducing** [1] - 899:20
**introduction** [1] - 878:9
**invalid** [6] - 828:19, 1078:10, 1084:14, 1085:1, 1085:4, 1125:4
**invalidate** [2] - 1134:15, 1134:17
**invalidity** [4] - 1125:1, 1125:13, 1137:9, 1137:17
**invented** [1] - 884:15
**invention** [13] - 771:3,

771:16, 775:13, 775:22, 776:9, 779:8, 824:18, 884:10, 992:11, 996:17, 1131:20, 1132:15, 1132:22

**inventive** [1] - 884:14

**inventor** [3] - 896:5, 956:7, 1009:13

**inventors** [2] - 1009:15, 1009:18

**invest** [2] - 803:13, 1127:9

**investigation** [5] - 1088:3, 1108:14, 1109:23, 1115:18, 1132:3

**investment** [1] - 803:7

**investments** [2] - 823:15, 836:8

**investors** [1] - 1015:9

**invitation** [1] - 1023:19

**involved** [9] - 821:23, 849:10, 892:22, 901:4, 977:2, 1013:20, 1021:17, 1083:3, 1088:11

**involvement** [2] - 893:1, 983:13

**involving** [1] - 859:9

**IP** [1] - 836:24

**iPad** [3] - 797:8, 859:10, 900:3

**IPGO** [1] - 778:21

**iPhone** [2] - 797:8, 900:3

**iPod** [1] - 859:10

**Ira** [3] - 1043:2, 1043:14, 1043:22

**Iraq** [3] - 975:6, 975:7, 975:8

**Iris** [1] - 981:8

**irrelevant** [4] - 774:3, 790:24, 791:23, 825:9

**IS** [1] - 1028:24

**ISS** [23] - 1035:11, 1035:12, 1035:16, 1035:18, 1035:19, 1035:20, 1036:8, 1038:7, 1038:9, 1044:23, 1045:4, 1045:6, 1045:9, 1045:10, 1045:12, 1045:15, 1045:18, 1050:7, 1050:10, 1050:12, 1060:8, 1139:4, 1139:6

**ISS's** [2] - 1049:8,

1059:6

**issue** [41] - 769:9, 769:20, 769:21, 769:22, 774:24, 780:17, 781:6, 782:2, 783:8, 787:6, 787:11, 787:13, 792:2, 793:14, 799:13, 815:19, 822:4, 823:6, 823:22, 823:24, 824:6, 873:7, 873:19, 877:7, 877:17, 879:15, 880:15, 881:4, 883:4, 884:1, 993:13, 993:19, 996:4, 1020:2, 1054:14, 1085:11, 1093:15, 1095:11, 1113:15, 1151:11, 1151:15

**issued** [8] - 773:13, 787:13, 849:13, 1010:9, 1041:2, 1041:3, 1093:19, 1125:7

**issues** [11] - 846:22, 882:22, 925:21, 930:9, 992:6, 993:12, 994:8, 994:13, 996:1, 999:2, 1128:13

**item** [2] - 809:8, 916:13

**items** [8] - 775:1, 775:6, 1099:19, 1099:20, 1100:7, 1100:8, 1101:14, 1120:10

**iterations** [1] - 770:2

**itself** [8] - 904:21, 1034:13, 1035:18, 1040:3, 1055:14, 1055:16, 1085:10, 1140:10

**JACK** [1] - 768:4

**Jackson** [1] - 982:12

**January** [5] - 779:14, 809:14, 809:17, 834:3, 1018:17

**Jeff** [2] - 977:14, 977:23

**Jersey** [1] - 1089:19

**job** [6] - 783:12, 946:1, 957:14, 988:16, 1030:4, 1042:13

**John** [1] - 924:21

**join** [1] - 951:23

**joined** [8] - 924:16.

924:18, 924:23, 942:4, 942:10, 976:17, 976:18, 979:13

**joining** [1] - 892:24

**joint** [1] - 836:21

**jointly** [1] - 1054:19

**JONES** [1] - 949:21

**Jones** [30] - 803:11, 833:7, 833:10, 835:11, 835:14, 851:7, 851:14, 871:6, 871:9, 949:15, 950:2, 950:7, 953:1, 974:14, 975:2, 989:18, 990:2, 990:11, 992:16, 992:21, 996:10, 1000:6, 1000:8, 1003:5, 1005:24, 1009:1, 1009:7, 1019:5, 1020:15, 1028:3

**joystick** [1] - 963:15

**JR** [1] - 1028:15

**Judge** [2] - 767:14, 884:5

**judgment** [1] - 885:18

**July** [6] - 789:17, 843:2, 844:3, 931:22, 933:5

**jumped** [1] - 817:16

**June** [3] - 804:4, 899:2, 1067:15

**JUROR** [1] - 872:5

**jurors** [2] - 835:9, 1077:5

**jury** [131] - 770:14, 770:17, 770:24, 772:17, 774:1, 776:11, 777:18, 779:13, 783:15, 784:20, 785:3, 787:20, 787:23, 788:15, 795:12, 795:18, 798:6, 798:14, 798:19, 799:3, 799:18, 799:24, 800:12, 804:2, 806:1, 811:20, 812:6, 812:15, 818:16, 819:20, 820:10, 824:14, 831:13, 859:19, 860:17, 860:24, 861:22, 862:7, 862:9, 862:15, 872:3, 872:4, 872:11,

872:19, 873:5, 873:7, 873:11, 873:12, 873:16, 874:10, 874:22, 875:1, 875:2, 876:3, 877:20, 878:10, 878:15, 879:6, 880:16, 882:7, 882:17, 882:19, 883:18, 885:15, 885:20, 887:4, 887:5, 887:8, 888:14, 890:9, 894:15, 900:20, 905:3, 907:15, 912:3, 946:6, 947:8, 947:10, 948:3, 963:12, 974:21, 975:3, 991:13, 991:15, 992:20, 992:21, 996:16, 998:15, 999:17, 999:23, 1019:19, 1020:7, 1033:11, 1033:21, 1034:19, 1041:19, 1060:18, 1061:4, 1061:8, 1065:6, 1071:3, 1074:6, 1076:20, 1079:6, 1079:10, 1081:1, 1084:17, 1085:7, 1087:23, 1089:9, 1089:13, 1094:17, 1096:6, 1109:1, 1110:1, 1116:24, 1118:10, 1121:19, 1123:22, 1124:7, 1125:11, 1127:2, 1130:9, 1137:16, 1140:21, 1144:18, 1150:13, 1150:17, 1150:23

**Jury** [5] - 787:21, 876:11, 999:24, 1060:19, 1061:9

**jury's** [2] - 873:9, 1092:11

**justify** [3] - 885:7, 925:20, 926:1

**Kansas** [23] - 1035:20, 1035:22, 1039:13, 1045:11, 1045:13, 1045:14, 1045:16, 1050:13, 1058:15, 1058:16, 1060:9, 1060:11, 1066:10, 1066:18, 1067:2, 1067:3, 1067:6, 1069:5, 1070:2, 1076:1, 1076:11,

**keep** [14] - 787:23, 821:21, 835:13, 913:24, 916:19, 922:7, 928:5, 930:16, 934:3, 937:7, 937:9, 937:11, 1006:24, 1126:14

**keeping** [1] - 785:6

**keeps** [2] - 916:21, 1101:8

**kept** [3] - 930:18, 934:5, 968:15

**Kessler** [1] - 1009:22

**key** [3] - 804:12, 1113:15, 1138:16

**keyhole** [1] - 970:12

**Keyhole** [58] - 803:4, 803:8, 803:11, 804:21, 899:16, 899:17, 910:21, 931:8, 931:18, 948:10, 952:4, 952:5, 952:6, 952:10, 952:12, 952:13, 952:16, 953:1, 969:16, 969:18, 969:19, 969:21, 969:23, 970:5, 970:12, 970:19, 971:18, 972:5, 972:12, 972:19, 972:21, 973:2, 974:15, 976:16, 976:18, 976:20, 976:23, 978:21, 979:2, 979:3, 986:11, 986:13, 986:16, 986:18, 996:7, 1012:5, 1012:12, 1012:19, 1012:23, 1013:5, 1013:14, 1013:21, 1013:24, 1014:6, 1015:10, 1067:12, 1099:11, 1099:16

**Keyhole's** [2] - 952:20, 1013:16

**kids** [5] - 970:1, 971:11, 971:12, 982:16

**kilometers** [1] - 1128:10

**kind** [63] - 771:4, 772:5, 794:20, 803:7, 808:5, 841:11, 841:14, 854:20, 867:18, 867:20, 880:5,

893:9, 893:23,
897:10, 898:1,
899:12, 902:8,
903:23, 904:15,
904:17, 905:22,
906:9, 908:7, 911:5,
911:23, 912:12,
913:2, 913:14,
915:8, 916:11,
923:3, 923:5,
924:19, 926:18,
935:9, 952:17,
963:14, 963:19,
964:2, 967:8,
969:24, 973:10,
976:2, 978:2, 982:2,
982:15, 982:21,
990:17, 996:12,
1001:2, 1002:8,
1002:11, 1004:5,
1005:3, 1005:18,
1008:1, 1009:9,
1017:2, 1050:24,
1052:14, 1117:5,
1127:13, 1147:2
**kinder** [1] - 971:17
**kinds** [5] - 796:23,
854:22, 903:1,
957:1, 982:13
**King** [1] - 767:11
**knitted** [1] - 1149:6
**knowledge** [23] -
778:23, 830:1,
830:20, 855:8,
855:10, 858:20,
858:21, 863:14,
864:15, 866:16,
866:20, 867:9,
867:17, 868:8,
868:13, 868:14,
869:7, 894:5,
959:19, 960:23,
1015:19, 1026:22,
1132:14
**known** [11] - 776:4,
893:13, 979:15,
1029:10, 1030:12,
1031:12, 1031:19,
1063:7, 1125:5,
1131:3, 1132:9
**knows** [1] - 1048:8
**Kosovo** [1] - 960:10
**KU** [1] - 1035:21
**lab** [2] - 1045:9,
1083:17
**Lab** [2] - 1035:19,
1045:9
**Laboratory** [1] -
1050:11
**Labs** [2] - 1030:18,

1035:14
**lack** [1] - 997:2
**Lake** [1] - 1089:20
**land** [3] - 961:23,
1127:14, 1127:15
**landing** [2] - 955:4,
962:5
**landscape** [1] -
1138:12
**language** [4] - 1117:6,
1117:21, 1117:22,
1138:23
**Lank** [1] - 983:18
**laptop** [1] - 966:2
**large** [6] - 903:8,
909:19, 1037:10,
1085:15, 1091:6
**larger** [2] - 835:9,
1103:20
**largest** [2] - 857:23,
1022:14
**Larry** [1] - 1001:16
**LARRY** [1] - 767:22
**last** [24] - 781:1,
784:22, 787:3,
790:3, 806:9,
806:10, 841:18,
884:1, 927:9, 938:6,
953:6, 978:3,
1000:10, 1008:16,
1016:22, 1046:14,
1047:7, 1058:9,
1060:4, 1061:22,
1062:10, 1116:19,
1151:16
**late** [3] - 957:7,
998:15, 1052:8
**latitude** [4] - 959:7,
1047:4, 1047:12,
1047:14
**latter** [1] - 1048:7
**Lau** [20] - 1028:10,
1028:11, 1039:6,
1061:13, 1067:4,
1072:6, 1077:4,
1077:18, 1125:16,
1126:4, 1130:10,
1130:24, 1134:21,
1135:1, 1135:12,
1136:7, 1137:13,
1139:13, 1140:20
**LAU** [1] - 1028:15
**Lau's** [7] - 1135:3,
1136:12, 1136:14,
1138:18, 1147:1,
1147:4, 1149:9
**lau@ai.sri.com** [1] -
1053:16
**launch** [2] - 804:6,
972:5

**launched** [3] - 934:16,
979:8, 979:11
**law** [4] - 885:1,
1102:8, 1131:9,
1136:23
**Lawrence** [15] -
1035:13, 1045:14,
1050:13, 1058:14,
1060:9, 1060:11,
1066:10, 1066:18,
1067:2, 1067:3,
1067:6, 1069:4,
1070:2, 1076:1,
1076:11
**lawsuit** [3] - 1001:4,
1062:21, 1067:11
**lawyer** [4] - 842:23,
1004:24, 1013:20,
1131:7
**lawyers** [7] - 787:24,
999:10, 1062:20,
1066:5, 1073:3,
1073:6, 1073:11
**layers** [1] - 1106:4
**lead** [2] - 894:22,
1120:12
**leading** [3] - 802:17,
829:2, 881:13
**leads** [1] - 1114:19
**leaf** [1] - 1115:6
**leaned** [1] - 814:16
**learn** [6] - 890:4,
892:4, 926:13,
937:9, 955:2, 1019:7
**learned** [4] - 821:13,
966:24, 967:1,
1052:20
**learning** [1] - 891:14
**lease** [1] - 973:16
**least** [15] - 777:10,
831:18, 846:4,
846:22, 882:16,
886:19, 913:16,
980:10, 994:10,
1004:18, 1049:15,
1055:2, 1077:11,
1106:18, 1128:1
**leave** [9] - 819:19,
821:18, 876:7,
962:9, 1019:24,
1066:14, 1068:19,
1069:19, 1129:13
**Leavenworth** [2] -
1045:15
**leaves** [2] - 877:17,
904:15
**leaving** [4] - 872:11,
962:11, 1019:13,
1150:17
**Leclerc** [10] - 1032:17,

1033:4, 1033:5,
1033:8, 1034:3,
1040:17, 1044:11,
1046:6, 1065:22,
1068:13
**led** [1] - 1088:3
**Lee** [4] - 843:19,
843:23, 851:6,
1003:9
**left** [23] - 797:7,
884:22, 890:17,
891:22, 912:7,
917:21, 934:9,
953:6, 997:23,
1001:20, 1012:2,
1016:5, 1017:20,
1018:11, 1018:15,
1063:14, 1098:15,
1098:16, 1121:20,
1125:15, 1141:23,
1142:14, 1148:5
**left-hand** [4] - 890:17,
917:21, 934:9,
1098:15
**leg** [2] - 823:21,
823:22
**legal** [6] - 893:16,
978:4, 1000:15,
1014:24, 1133:13,
1137:7
**legally** [1] - 824:12
**legged** [1] - 823:12
**legislators** [1] -
951:15
**length** [5] - 792:16,
944:7, 944:11,
983:24, 1114:16
**lengths** [2] - 926:21,
1015:2
**lengthy** [1] - 1015:7
**Lennox** [1] - 900:2
**lenses** [2] - 950:13,
950:15
**less** [5] - 840:20,
915:22, 924:6,
929:3, 1071:1
**letter** [2] - 848:21,
1137:24
**level** [23] - 804:9,
809:10, 846:5,
908:3, 915:2,
918:14, 927:15,
1004:19, 1037:12,
1062:16, 1091:11,
1098:17, 1098:19,
1100:17, 1102:6,
1102:8, 1106:12,
1106:18, 1107:9,
1121:8, 1128:11
**levels** [12] - 798:12,

906:12, 906:14,
908:15, 908:18,
908:22, 909:20,
1113:18, 1113:20,
1119:7, 1148:17
**levers** [1] - 806:24
**liability** [1] - 994:6
**library** [2] - 895:19,
1022:4
**license** [42] - 794:10,
812:21, 813:5,
813:6, 813:13,
814:21, 837:5,
837:14, 837:15,
837:19, 837:21,
837:24, 838:7,
838:12, 838:18,
838:21, 838:23,
839:2, 839:3,
839:11, 839:12,
839:14, 839:16,
839:19, 840:9,
840:12, 840:20,
840:21, 845:18,
847:21, 852:21,
852:24, 853:15,
854:5, 854:10,
854:16, 855:3,
976:9, 989:7,
1001:3, 1004:6,
1013:4
**License** [2] - 839:6,
855:1
**licensed** [1] - 859:6
**licenses** [5] - 795:1,
838:3, 838:16,
855:15
**licensing** [25] -
802:12, 813:21,
814:3, 814:24,
833:18, 835:16,
836:6, 844:22,
845:16, 855:7,
855:18, 858:6,
858:10, 878:24,
879:14, 923:24,
930:13, 930:16,
930:18, 931:13,
932:2, 932:21,
933:4, 933:5, 1002:5
**licensings** [1] -
845:10
**licensors** [1] - 813:7
**lie** [1] - 1018:16
**lies** [1] - 1091:20
**light** [3] - 906:7,
907:2, 907:3
**likely** [1] - 860:3
**likewise** [1] - 1077:2
**limine** [1] - 992:7

**limit** [3] - 886:6, 886:7, 999:8
**limitation** [1] - 1146:13
**limited** [2] - 776:16, 835:23
**limits** [1] - 865:2
**line** [10] - 846:2, 848:23, 994:11, 1053:12, 1053:15, 1068:4, 1068:10, 1069:5, 1069:12, 1075:9
**lines** [5] - 905:18, 946:19, 1074:4, 1114:11, 1117:7
**link** [1] - 1057:1
**linked** [1] - 775:2
**list** [26] - 822:9, 850:24, 911:18, 911:20, 911:24, 913:13, 913:14, 913:18, 914:1, 915:5, 915:9, 915:10, 915:14, 916:12, 919:10, 1003:10, 1080:7, 1110:5, 1110:24, 1111:4, 1111:9, 1111:16, 1120:10, 1125:9
**listed** [4] - 1096:19, 1102:12, 1130:8, 1144:17
**listen** [1] - 1086:6
**literally** [1] - 1050:22
**litigate** [1] - 838:2
**litigation** [2] - 1030:22, 1031:1
**live** [9] - 891:1, 971:4, 971:7, 1048:17, 1052:11, 1058:21, 1059:4, 1059:7, 1059:20
**living** [4] - 950:7, 1011:19, 1012:7, 1079:14
**LLP** [2] - 767:18, 768:6
**loading** [1] - 922:19
**local** [4] - 804:17, 807:13, 807:15, 935:10
**Local** [4] - 804:17, 805:1, 806:23, 951:22
**locally** [1] - 1106:8
**located** [6] - 904:24, 905:16, 972:16, 1035:19, 1044:23,

1059:6
**locatio** [1] - 842:18
**locatio-based** [1] - 842:18
**location** [5] - 778:24, 806:22, 841:21, 934:1, 1144:24
**location-based** [1] - 841:21
**locations** [7] - 1045:2, 1045:19, 1045:23, 1047:10, 1048:4, 1059:7, 1139:7
**Lockheed** [1] - 950:12
**lod** [2] - 1115:2, 1116:20
**lod-manager** [1] - 1116:20
**lod-manager.js** [1] - 1115:2
**Lodge** [4] - 803:16, 805:23, 810:17, 812:10
**lodge** [1] - 824:8
**logical** [1] - 971:24
**logo** [1] - 1057:17
**long-term** [1] - 1014:18
**longitude** [4] - 959:8, 1047:4, 1047:12, 1047:15
**look** [71] - 772:4, 775:8, 791:16, 793:11, 794:7, 804:11, 812:7, 814:8, 814:19, 814:22, 816:16, 817:2, 820:20, 823:3, 834:12, 834:15, 834:20, 835:8, 844:19, 846:1, 850:19, 850:20, 855:1, 857:5, 857:23, 866:4, 870:5, 907:18, 908:5, 918:15, 929:23, 932:5, 942:21, 950:20, 955:6, 961:22, 963:17, 963:20, 963:22, 967:20, 968:21, 969:5, 973:9, 981:13, 988:13, 988:18, 991:23, 992:2, 992:4, 1005:15, 1006:2, 1006:6, 1006:15, 1006:21, 1010:11, 1011:4, 1017:11,

1018:1, 1018:2, 1035:6, 1067:24, 1068:6, 1074:17, 1091:21, 1104:13, 1107:16, 1114:9, 1114:10, 1137:11, 1144:22
**looked** [31] - 778:4, 788:17, 791:12, 792:17, 793:8, 793:15, 793:16, 793:17, 798:8, 802:4, 811:21, 816:3, 817:14, 818:6, 823:19, 836:16, 912:18, 956:19, 964:24, 973:6, 973:21, 984:4, 988:22, 1034:22, 1098:5, 1116:20, 1130:22, 1135:22, 1137:7, 1140:14, 1149:22
**looking** [35] - 783:19, 790:3, 792:12, 794:17, 796:19, 801:19, 803:13, 805:21, 807:19, 808:16, 809:21, 815:4, 816:15, 817:9, 819:21, 820:22, 841:16, 851:14, 861:8, 868:24, 892:11, 927:1, 957:24, 979:6, 990:24, 1000:7, 1000:18, 1032:21, 1036:15, 1037:10, 1037:22, 1089:17, 1129:7, 1133:15, 1133:17
**looks** [10] - 797:16, 904:15, 908:15, 916:24, 955:10, 987:19, 1010:23, 1011:2, 1092:23, 1127:24
**loop** [1] - 1048:21
**Los** [6] - 1023:23, 1027:4, 1027:11, 1027:14, 1048:6, 1070:9
**love** [1] - 969:4
**low** [5] - 922:23, 928:12, 929:2, 1042:1, 1054:7
**lower** [6] - 915:7, 922:20, 1037:12, 1037:13, 1091:24, 1119:7

**LUANN** [1] - 768:7
**Luann** [1] - 950:6
**luck** [1] - 985:18
**Lud** [1] - 1082:15
**lump** [7] - 794:9, 794:15, 796:7, 841:3, 841:8, 852:13, 852:16
**lump-sum** [1] - 841:3
**lunch** [9] - 786:21, 788:2, 990:5, 991:10, 991:12, 991:17, 991:24, 992:2, 993:6
**Luncheon** [1] - 993:2
**lunchtime** [1] - 769:8
**MAC** [1] - 902:4
**machine** [2] - 965:17, 1083:23
**Machinery** [3] - 1020:20, 1021:7, 1021:9
**machinery** [1] - 1128:1
**machines** [3] - 966:4, 983:16, 983:19
**MacIntosh** [1] - 900:1
**Madison** [1] - 1129:6
**Magazine** [1] - 902:4
**magic** [16] - 1042:23, 1042:24, 1043:5, 1043:6, 1043:7, 1043:12, 1043:20, 1044:20, 1045:17, 1048:20, 1049:8, 1049:11, 1058:13, 1059:7, 1066:9
**Magic** [28] - 959:1, 1030:10, 1039:4, 1039:11, 1044:5, 1048:4, 1050:13, 1050:15, 1051:9, 1056:21, 1057:4, 1057:8, 1058:7, 1058:11, 1058:13, 1059:3, 1059:17, 1059:23, 1060:6, 1066:24, 1068:13, 1069:16, 1069:17, 1075:20, 1075:24, 1076:16, 1135:6, 1146:3
**magnifying** [2] - 1089:22, 1091:23
**mail** [52] - 816:13, 825:11, 826:10, 826:11, 832:15, 833:6, 833:11, 835:10, 839:23, 841:10, 841:14,

841:17, 843:13, 843:22, 844:11, 844:16, 848:2, 849:14, 851:4, 878:3, 878:5, 878:9, 878:21, 878:22, 879:2, 879:9, 889:18, 987:13, 987:14, 988:2, 988:4, 988:5, 989:9, 989:10, 989:24, 990:2, 990:12, 1002:22, 1003:8, 1003:11, 1005:19, 1005:24, 1006:18, 1007:24, 1008:4, 1053:18, 1053:19, 1053:24, 1150:24
**mails** [2] - 833:10, 839:7
**main** [2] - 898:22, 946:12
**maintains** [1] - 1085:13
**major** [1] - 1128:13
**majority** [1] - 898:9
**man** [2] - 971:13, 983:17
**managed** [1] - 980:5
**management** [2] - 966:6, 986:24
**manager** [12] - 887:15, 889:2, 889:8, 889:11, 893:5, 923:17, 956:2, 957:16, 1032:17, 1033:5, 1052:23, 1116:20
**manager.js** [1] - 1115:2
**managers** [1] - 1109:2
**managing** [2] - 893:9, 894:23
**maniac** [1] - 968:22
**manufactured** [1] - 1024:20
**mapping** [7] - 805:12, 897:3, 1091:14, 1095:7, 1098:5, 1134:4, 1134:7
**Maps** [23] - 801:13, 801:16, 816:11, 816:13, 858:1, 865:11, 897:8, 897:10, 897:16, 897:17, 897:18, 898:8, 898:10, 898:14, 898:16, 900:23, 901:2, 932:8, 932:9,

932:11, 932:15, 932:19, 951:21
**maps** [2] - 807:13, 808:21
**marched** [1] - 982:23
**marginal** [1] - 778:22
**marine** [1] - 973:19
**marines** [1] - 958:1
**marked** [9] - 878:4, 994:24, 995:16, 995:21, 997:18, 1039:7, 1083:11, 1086:24, 1090:11
**markers** [2] - 959:8, 973:12
**market** [4] - 849:23, 850:6, 850:11, 972:11
**marketing** [1] - 893:11
**markup** [3] - 991:22, 992:2, 992:4
**Mart** [3] - 973:7, 973:9, 973:13
**Martin** [1] - 950:13
**Marts** [1] - 973:6
**massive** [2] - 903:11, 926:22
**masters** [1] - 896:2
**match** [1] - 1090:4
**material** [8] - 784:7, 899:14, 994:7, 997:22, 997:24, 1058:6, 1085:16, 1109:18
**materially** [1] - 770:5
**materials** [13] - 840:24, 1011:5, 1011:10, 1024:8, 1038:20, 1040:9, 1043:3, 1044:10, 1044:12, 1050:21, 1055:11, 1057:15, 1135:11
**matter** [16] - 796:10, 884:3, 971:5, 996:20, 1102:3, 1132:12, 1140:11, 1143:19, 1145:7, 1145:10, 1145:19, 1145:24, 1146:11, 1147:20, 1148:24, 1153:12
**matters** [1] - 876:5
**maximum** [4] - 845:5, 845:6, 847:17, 1004:19
**Mayer** [23] - 814:15, 832:16, 833:3, 835:10, 844:5, 846:8, 846:14,

848:10, 848:20, 871:2, 871:5, 871:8, 871:18, 878:21, 884:7, 884:18, 987:16, 987:17, 988:6, 989:10, 990:3, 990:12, 1000:17
**McMaster** [1] - 1081:5
**mean** [33] - 839:15, 846:15, 846:18, 862:23, 863:1, 865:5, 866:13, 906:23, 912:17, 925:18, 938:11, 941:19, 946:15, 946:17, 951:10, 953:20, 957:15, 975:20, 978:7, 979:21, 985:15, 1003:19, 1006:10, 1006:11, 1010:4, 1014:9, 1054:23, 1073:18, 1077:12, 1086:18, 1103:15, 1117:21, 1146:20
**meaning** [4] - 846:21, 1004:24, 1013:22, 1094:15
**means** [14] - 821:3, 839:13, 840:11, 864:16, 871:14, 897:3, 904:19, 908:11, 960:13, 1004:21, 1041:19, 1092:15, 1113:22, 1132:17
**meant** [9] - 846:19, 847:13, 938:18, 1004:22, 1032:19, 1034:7, 1051:11, 1132:19, 1139:3
**measure** [4] - 793:20, 794:7, 922:6, 944:24
**measurements** [1] - 860:9
**measuring** [1] - 963:24
**meatball** [1] - 962:5
**mechanical** [1] - 984:20
**medal** [1] - 1082:14
**media** [1] - 1072:18
**medical** [2] - 1068:19, 1069:19
**meet** [4] - 894:7, 929:13, 977:24, 983:6
**meeting** [3] - 846:4, 968:19, 1004:18

**meetings** [1] - 977:18
**meets** [1] - 1115:6
**megabytes** [1] - 903:13
**member** [1] - 1127:20
**members** [8] - 787:22, 872:3, 876:3, 887:8, 1022:13, 1042:24, 1043:12, 1043:20
**membership** [1] - 1022:13
**memories** [1] - 788:14
**memory** [1] - 1131:3
**Menlo** [1] - 1063:10
**mention** [7] - 788:24, 804:15, 807:22, 829:22, 895:14, 913:23
**mentioned** [33] - 799:11, 810:24, 830:18, 873:22, 893:19, 895:15, 899:17, 902:21, 905:13, 905:14, 908:11, 910:6, 919:22, 924:1, 927:21, 929:18, 931:3, 933:17, 934:12, 935:5, 940:6, 944:10, 964:4, 1024:1, 1033:3, 1036:1, 1036:22, 1037:5, 1040:20, 1043:16, 1058:10, 1087:1, 1150:20
**menu** [6] - 877:2, 1099:18, 1100:4, 1100:7, 1101:13
**merely** [1] - 883:8
**merger** [1] - 952:2
**Merit** [1] - 1153:7
**merits** [2] - 769:23, 769:24
**mesh** [2] - 1149:10
**mess** [1] - 920:2
**message** [3] - 834:3, 843:18, 848:20
**messy** [1] - 964:14
**met** [4] - 882:8, 1061:16, 1061:19, 1127:18
**meta** [1] - 904:19
**metadata** [47] - 904:5, 904:18, 904:22, 905:2, 905:14, 906:13, 907:10, 907:13, 908:19, 909:1, 909:6,
909:14, 909:15,

909:17, 910:1, 910:3, 910:7, 910:8, 911:2, 911:16, 912:8, 912:18, 913:22, 940:21, 940:22, 947:15, 948:5, 948:8, 948:11, 1099:21, 1099:22, 1100:6, 1100:11, 1100:14, 1100:16, 1100:20, 1100:21, 1101:1, 1101:6, 1101:11, 1101:12, 1101:13, 1101:22, 1105:16, 1110:2, 1110:8
**method** [9] - 793:14, 793:15, 793:16, 883:5, 883:6, 1096:11, 1101:22, 1107:16, 1108:23
**methods** [2] - 883:9, 930:13
**metric** [4] - 922:5, 943:24, 944:3, 944:5
**metrics** [2] - 927:3, 944:24
**MICHAEL** [5] - 767:19, 767:22, 949:21, 1078:16, 1078:19
**Michael** [7] - 851:14, 871:6, 949:14, 982:12, 1078:4, 1078:15, 1079:11
**Michelle** [5] - 843:19, 851:6, 851:9, 851:13, 1003:9
**Microsoft** [14] - 801:14, 853:22, 854:5, 854:13, 854:15, 894:21, 895:3, 895:5, 947:18, 948:21, 948:22, 968:14, 1001:4
**mid** [2] - 1028:12, 1127:8
**mid-1995** [1] - 1132:23
**middle** [7] - 801:1, 801:3, 807:12, 829:17, 859:2, 982:2, 1018:6
**midway** [1] - 1056:20
**might** [33] - 788:24, 811:6, 833:21, 838:2, 838:6, 838:15, 846:21, 851:1, 860:19, 866:24, 867:7, 868:14, 896:18,

903:13, 915:24, 917:12, 922:11, 934:1, 938:14, 938:18, 939:9, 983:10, 1004:4, 1004:10, 1006:22, 1060:15, 1089:24, 1099:22, 1107:11, 1114:10, 1127:7, 1146:19
**military** [7] - 957:1, 957:4, 958:3, 960:3, 960:6, 973:18, 975:16
**milk** [1] - 916:14
**millin** [1] - 852:10
**million** [48] - 792:24, 793:1, 797:17, 797:18, 797:19, 797:20, 801:24, 807:14, 807:15, 807:16, 809:4, 809:15, 809:18, 811:6, 811:8, 811:10, 811:12, 835:19, 836:12, 836:18, 841:7, 841:9, 843:10, 843:12, 844:14, 845:3, 845:7, 847:6, 847:15, 847:18, 847:19, 857:24, 858:1, 878:17, 879:6, 879:20, 880:1, 880:4, 936:10, 936:12, 1004:20, 1005:5, 1006:4, 1006:7, 1006:9, 1128:10
**millions** [1] - 891:6
**milliseconds** [1] - 915:23
**mind** [3] - 806:19, 853:1, 916:19
**mine** [2] - 847:10, 964:7
**minimal** [1] - 863:6
**minimized** [1] - 816:1
**Minneapolis** [2] - 1044:6, 1060:10
**Minnesota** [4] - 1035:23, 1035:24, 1044:6, 1045:9
**minute** [6] - 786:24, 872:8, 927:10, 1034:15, 1060:17, 1151:16
**minutes** [21] - 780:9, 781:9, 781:21, 782:2, 783:5, 784:6,

792:18, 797:11,
797:12, 847:2,
872:10, 873:2,
926:21, 927:11,
927:14, 927:15,
1020:24, 1034:14,
1058:23, 1150:10
**misleading** [1] - 874:2
**mission** [7] - 889:16,
890:21, 957:2,
957:3, 960:6, 960:8,
979:21
**misspeak** [1] - 811:22
**mistake** [2] - 998:13,
1019:12
**mobile** [5] - 792:17,
792:21, 900:2,
902:22, 927:14
**model** [8] - 805:21,
805:22, 867:13,
878:24, 879:1,
924:24, 1038:5,
1148:22
**models** [1] - 892:14
**modern** [1] - 982:5
**moment** [14] - 780:1,
781:24, 786:2,
789:14, 792:4,
820:2, 820:7, 830:6,
847:1, 876:23,
998:19, 1018:2,
1068:6, 1122:3
**Monday** [4] - 787:11,
844:6, 871:3, 888:21
**monetization** [5] -
789:3, 806:24,
822:1, 868:22,
928:22
**monetize** [3] - 864:16,
925:14, 927:20
**monetized** [1] -
788:22
**monetizing** [7] -
774:23, 789:20,
807:4, 864:18,
869:3, 869:11, 926:3
**money** [16] - 775:17,
863:19, 863:22,
867:2, 924:17,
928:11, 928:24,
967:17, 967:21,
968:9, 968:23,
972:11, 978:12,
1001:18, 1001:19,
1006:15
**monitor** [3] - 922:7,
929:22, 930:7
**month** [8] - 807:11,
808:12, 808:14,
809:6, 931:7,

931:21, 934:13,
951:3
**months** [9] - 779:15,
806:13, 806:17,
965:15, 967:18,
976:19, 1018:16,
1137:2
**morning** [17] - 769:10,
786:22, 787:22,
827:3, 827:4, 872:8,
888:11, 888:12,
940:14, 940:17,
999:4, 1111:21,
1113:19, 1150:13,
1150:15, 1151:1,
1152:10
**morning's** [1] - 781:7
**MORRIS** [1] - 768:4
**mosaic** [2] - 1099:1,
1149:5
**most** [18] - 782:14,
813:24, 816:12,
843:8, 844:13,
894:3, 897:7, 900:9,
908:24, 915:6,
944:11, 950:13,
956:13, 975:7,
1002:6, 1022:22,
1115:11
**mostly** [1] - 973:4
**motion** [17] - 774:24,
872:18, 872:20,
872:22, 873:14,
877:6, 880:24,
881:1, 884:4, 885:5,
885:9, 885:10,
885:14, 885:18,
885:21, 992:7,
995:17
**motions** [2] - 873:12,
874:12
**motivation** [1] - 807:9
**Mountain** [2] - 804:5,
981:17
**mountain** [1] - 961:21
**mountains** [2] - 955:8,
1038:5
**mouse** [1] - 963:16
**mouthful** [2] -
1031:21, 1032:5
**move** [43] - 769:23,
773:2, 785:3, 790:4,
790:5, 810:16,
812:10, 875:20,
877:3, 877:4,
896:18, 922:1,
929:10, 932:4,
949:8, 963:22,
984:10, 984:13,
984:15, 1017:3,

1027:21, 1028:4,
1036:19, 1047:10,
1048:1, 1072:6,
1077:21, 1092:5,
1093:23, 1096:7,
1098:18, 1101:3,
1104:23, 1124:23,
1138:13, 1139:15,
1139:21, 1144:14,
1145:1, 1145:18,
1147:23, 1148:19
**moved** [5] - 797:16,
894:4, 961:8, 996:6,
1036:18
**movies** [1] - 954:8
**moving** [1] - 970:22
**MR** [216] - 769:4,
769:12, 770:16,
771:12, 771:19,
771:22, 772:10,
772:19, 774:6,
774:10, 774:16,
774:21, 775:14,
776:6, 776:22,
777:9, 777:14,
778:3, 778:7,
778:12, 778:16,
779:6, 780:4, 780:8,
780:16, 780:22,
782:11, 783:16,
783:24, 784:16,
784:21, 785:4,
785:10, 785:15,
786:23, 787:2,
787:18, 788:11,
788:12, 789:6,
789:13, 789:16,
790:1, 790:7, 790:8,
790:9, 790:23,
791:22, 791:24,
792:6, 795:14,
795:19, 795:21,
796:4, 803:23,
803:24, 812:13,
812:14, 817:21,
819:4, 819:7,
819:11, 819:23,
820:1, 820:3, 820:9,
825:8, 825:11,
825:17, 825:21,
825:24, 826:3,
826:7, 826:18,
826:21, 826:24,
827:2, 835:4,
843:15, 843:17,
848:5, 848:7, 856:8,
856:11, 864:23,
869:13, 869:16,
871:21, 871:24,
872:15, 872:17,

873:19, 874:13,
874:18, 875:5,
875:9, 875:14,
875:18, 875:20,
875:23, 876:13,
876:17, 876:19,
877:2, 881:2,
885:13, 885:22,
885:24, 886:5,
886:9, 886:13,
886:18, 886:23,
887:1, 887:11,
888:10, 940:11,
945:19, 947:4,
947:20, 947:21,
949:3, 949:7,
949:13, 991:18,
992:3, 992:15,
992:23, 993:5,
993:14, 993:17,
994:18, 994:22,
995:4, 995:23,
996:19, 997:7,
997:11, 997:13,
997:16, 997:20,
998:3, 998:8,
998:10, 998:11,
998:13, 999:12,
999:14, 999:18,
999:20, 1009:3,
1009:6, 1016:8,
1016:11, 1016:14,
1018:4, 1019:1,
1019:15, 1019:17,
1020:3, 1020:12,
1020:17, 1027:20,
1027:24, 1028:2,
1028:5, 1028:8,
1028:19, 1028:23,
1029:3, 1033:18,
1033:23, 1034:16,
1034:21, 1060:12,
1060:14, 1060:22,
1060:24, 1061:5,
1061:6, 1061:10,
1061:12, 1068:7,
1074:5, 1074:11,
1074:16, 1074:19,
1074:24, 1075:4,
1075:7, 1075:8,
1075:17, 1075:19,
1076:17, 1077:1,
1077:2, 1077:20,
1077:24, 1078:3,
1078:23, 1079:3,
1122:18, 1123:1,
1141:8, 1142:13,
1142:24, 1144:1,
1150:8, 1151:11,
1151:15, 1151:24,
1152:3, 1152:5,

1152:8
**MS** [19] - 940:13,
945:18, 947:5,
949:10, 950:1,
974:18, 974:23,
975:1, 990:6,
990:10, 991:9,
1000:3, 1000:5,
1014:23, 1017:22,
1019:4, 1020:1,
1142:11, 1142:22
**multi** [2] - 1054:5,
1067:15
**multi-day** [1] -
1067:15
**multi-resolution** [1] -
1054:5
**multimedia** [2] -
1025:19, 1026:5
**multiple** [9] - 965:20,
965:21, 965:24,
1029:17, 1044:23,
1045:1, 1045:23,
1048:4, 1060:8
**Multiple** [1] - 1050:11
**museum** [1] - 990:17
**music** [2] - 983:8,
983:11
**must** [5] - 1103:24,
1104:1, 1105:2,
1105:3, 1117:23
**mute** [1] - 975:2
**mutual** [1] - 1001:9
**MYERS** [1] - 768:6
**name** [27] - 888:2,
888:15, 900:22,
931:6, 935:1, 935:8,
948:10, 970:15,
974:12, 976:8,
1021:3, 1028:24,
1031:14, 1031:15,
1031:22, 1032:2,
1033:3, 1052:15,
1053:3, 1054:12,
1054:15, 1054:22,
1055:5, 1055:7,
1078:14
**named** [9] - 779:19,
896:5, 910:22,
937:22, 956:7,
977:14, 983:18,
1009:15, 1029:21
**names** [10] - 965:3,
1054:4, 1054:9,
1054:14, 1066:21,
1077:10, 1077:14,
1116:4, 1125:10,
1126:13
**narrative** [1] - 996:5
**narrow** [1] - 1116:11

**NASA** [1] - 971:1
**Nation's** [1] - 902:3
**National** [8] - 960:11, 960:14, 973:23, 1015:8, 1030:17, 1035:13, 1035:19, 1082:9
**national** [1] - 960:12
**natural** [2] - 966:21, 1150:9
**navigate** [1] - 896:18
**navy** [2] - 966:16, 967:17
**Navy** [1] - 958:2
**Nawraocki** [8] - 778:8, 778:10, 778:16, 782:3, 782:12, 782:19, 783:6, 784:12
**Nawraocki's** [2] - 777:4, 784:3
**Nawrocki** [69] - 773:3, 773:14, 773:23, 774:8, 781:9, 781:19, 786:14, 788:3, 788:5, 788:13, 790:12, 793:4, 796:5, 798:22, 802:22, 803:19, 804:2, 805:8, 812:5, 820:11, 821:6, 821:12, 825:23, 826:2, 826:8, 827:3, 827:22, 830:12, 831:16, 833:22, 836:24, 838:19, 839:10, 840:6, 842:1, 842:5, 842:21, 844:16, 845:6, 848:11, 851:12, 853:2, 854:7, 854:19, 855:12, 856:13, 856:16, 859:15, 860:24, 862:6, 862:12, 863:10, 863:24, 864:7, 864:19, 866:6, 867:3, 867:24, 869:14, 869:17, 873:22, 874:5, 874:19, 875:1, 876:13, 876:23, 877:9, 879:4, 879:8
**Nawrocki's** [12] - 872:23, 873:8, 873:20, 874:4, 877:5, 877:8, 877:21, 877:24,

878:14, 878:20, 879:22, 880:13
**near** [4] - 834:19, 848:17, 972:23, 1040:4
**necessarily** [5] - 794:18, 865:12, 917:16, 919:16, 1107:10
**necessary** [5] - 1004:9, 1102:10, 1120:1, 1144:22, 1146:22
**need** [34] - 769:2, 781:13, 782:23, 785:13, 787:14, 816:22, 818:2, 822:2, 822:4, 860:9, 875:5, 886:17, 886:21, 911:22, 912:1, 918:20, 965:24, 977:10, 978:12, 991:17, 994:9, 996:11, 999:16, 1003:24, 1020:12, 1040:2, 1075:2, 1099:24, 1100:2, 1134:12, 1151:6, 1151:9, 1151:12
**needed** [11] - 796:12, 817:7, 910:3, 962:21, 965:21, 965:22, 966:5, 968:12, 1031:22, 1099:12, 1129:14
**needs** [2] - 873:13, 929:14
**negotiate** [1] - 812:21
**negotiated** [3] - 772:5, 830:24, 854:23
**negotiation** [41] - 769:3, 769:17, 770:7, 770:13, 770:18, 771:5, 771:15, 772:3, 772:12, 772:23, 773:10, 779:16, 779:23, 784:14, 795:9, 802:18, 802:24, 811:21, 812:7, 812:18, 812:19, 820:5, 827:23, 828:24, 829:4, 829:15, 831:8, 831:18, 831:20, 839:18, 839:22, 840:1, 840:6, 840:8, 848:18, 870:14,

878:8, 879:10, 879:16, 880:18, 1002:23
**negotiations** [4] - 829:9, 829:12, 829:21, 842:4
**Neil** [1] - 963:10
**network** [27] - 803:14, 807:5, 864:5, 915:19, 916:3, 916:4, 916:6, 917:14, 1029:17, 1035:4, 1035:5, 1042:3, 1044:21, 1044:24, 1048:19, 1048:20, 1049:9, 1049:11, 1050:13, 1050:15, 1051:15, 1059:7, 1059:9, 1071:14, 1129:13, 1139:8, 1139:9
**networking** [3] - 959:3, 960:17, 1070:15
**networks** [3] - 1128:4, 1129:17, 1129:21
**never** [14] - 838:19, 839:1, 855:6, 855:17, 855:21, 856:1, 856:5, 868:9, 882:15, 940:24, 941:4, 1001:15, 1008:13, 1113:7
**new** [15] - 782:18, 852:3, 891:24, 894:1, 894:3, 926:17, 968:21, 969:13, 985:21, 985:23, 998:21, 998:22, 1022:1, 1031:22, 1146:17
**New** [2] - 1089:19, 1153:2
**news** [1] - 974:6
**next** [75] - 784:5, 790:4, 790:6, 797:10, 804:12, 805:9, 805:10, 807:21, 807:23, 808:22, 809:8, 809:14, 809:17, 810:10, 821:16, 822:23, 843:22, 844:19, 850:2, 850:8, 850:19, 851:8, 852:20, 857:1, 906:2, 906:5, 907:23, 914:9, 915:17, 917:6, 917:7, 918:1,

918:10, 931:7, 949:14, 955:5, 961:8, 961:9, 973:10, 986:11, 997:14, 1002:17, 1005:17, 1008:14, 1020:18, 1028:9, 1037:12, 1037:13, 1045:24, 1054:13, 1058:2, 1069:12, 1078:4, 1083:9, 1086:24, 1089:12, 1090:9, 1096:5, 1098:15, 1101:3, 1104:21, 1104:24, 1110:23, 1111:15, 1112:12, 1116:3, 1118:21, 1120:24, 1122:12, 1125:8, 1137:14, 1140:24, 1141:14, 1144:7, 1144:15
**NGA** [2] - 960:14, 960:19
**NGO's** [1] - 959:9
**nice** [15] - 870:10, 870:14, 870:24, 892:17, 921:11, 933:24, 985:17, 1002:11, 1002:13, 1003:21, 1004:1, 1004:10, 1010:21, 1042:16, 1150:16
**nicer** [1] - 971:17
**NICHOLS** [1] - 768:4
**night** [3] - 788:14, 964:24, 1150:16
**Nile** [1] - 974:11
**nine** [4] - 817:16, 917:1, 976:19, 1070:4
**Nintendo** [1] - 968:14
**NO65** [1] - 1044:16
**Nobel** [1] - 1082:17
**nobody** [4] - 830:17, 926:22, 941:9, 1025:24
**node** [25] - 905:7, 906:4, 906:6, 906:16, 906:17, 906:20, 906:21, 906:22, 906:24, 907:4, 908:13, 908:24, 909:2, 912:19, 919:21, 920:9, 1100:19, 1101:13, 1104:15, 1107:3, 1107:4, 1110:4, 1115:5, 1118:14

**noded** [1] - 907:20
**nodes** [56] - 905:13, 905:15, 906:4, 906:5, 906:18, 906:21, 907:2, 907:3, 908:2, 908:12, 908:16, 909:5, 909:9, 909:20, 911:7, 911:18, 912:18, 913:11, 913:12, 913:15, 913:18, 914:6, 914:10, 914:11, 915:1, 915:2, 917:3, 918:12, 918:14, 918:23, 918:24, 919:6, 919:7, 919:9, 919:14, 919:18, 919:19, 920:5, 920:9, 920:14, 920:18, 920:19, 920:24, 921:3, 921:7, 1098:23, 1105:11, 1107:4, 1107:5, 1110:14, 1113:13, 1114:12, 1114:20, 1115:11
**Nokia** [4] - 853:19, 853:24, 854:5, 854:8
**non** [17] - 803:21, 839:12, 839:15, 839:19, 840:2, 840:9, 840:17, 840:20, 844:23, 958:3, 995:8, 995:11, 996:4, 1006:14, 1065:12, 1097:15, 1102:2
**non-activity** [1] - 995:8
**non-confidential** [1] - 803:21
**non-copying** [1] - 996:4
**non-exclusive** [8] - 839:12, 839:15, 839:19, 840:2, 840:9, 840:17, 840:20, 844:23
**non-grainy** [1] - 1065:12
**non-infringement** [2] - 1097:15, 1102:2
**non-practicing** [1] - 995:11
**non-starter** [1] - 1006:14
**none** [4] - 783:17, 867:9, 983:15,

1005:7
**noninfringement** [1] - 1124:7
**nonprofits** [2] - 929:22, 930:4
**nonresponsive** [1] - 1006:21
**noontime** [1] - 886:16
**normal** [1] - 959:5
**normalized** [1] - 1047:19
**normally** [3] - 1025:5, 1025:7, 1115:8
**North** [1] - 1030:17
**northeastern** [1] - 1089:18
**not-for-profit** [1] - 1029:9
**Notary** [1] - 1153:6
**note** [1] - 770:23
**notebook** [6] - 790:12, 798:4, 799:17, 819:15, 1016:16, 1016:19
**notebooks** [1] - 798:21
**notes** [1] - 1153:11
**nothing** [19] - 784:15, 826:1, 842:5, 842:11, 856:23, 877:19, 884:8, 887:1, 969:1, 984:24, 999:18, 999:20, 1004:12, 1019:17, 1060:22, 1060:24, 1110:20, 1110:21
**notice** [6] - 810:24, 917:7, 939:5, 1096:21, 1110:19, 1121:23
**notified** [1] - 1003:10
**notion** [7] - 904:12, 913:7, 914:18, 922:12, 928:23, 937:5, 994:3
**novel** [1] - 963:11
**November** [1] - 878:21
**NPE** [2] - 992:13, 997:3
**Number** [2] - 790:11, 798:19
**number** [46] - 793:17, 793:18, 797:16, 799:24, 800:2, 805:6, 805:7, 824:9, 827:14, 833:23, 834:21, 835:23, 849:6, 858:23, 858:24, 877:10,

877:15, 879:18, 880:7, 880:9, 884:13, 898:22, 903:18, 908:2, 926:21, 936:10, 944:13, 999:8, 1006:23, 1022:10, 1022:19, 1022:24, 1041:2, 1041:3, 1047:4, 1071:24, 1072:15, 1088:22, 1110:14, 1113:20, 1126:2, 1126:7, 1128:17, 1145:14
**Numbers** [2] - 792:10, 792:11
**numbers** [11] - 793:7, 814:9, 843:12, 927:12, 929:2, 933:13, 994:11, 1047:16, 1071:23, 1116:16, 1122:19
**numerical** [1] - 1144:16
**numerous** [4] - 797:2, 827:19, 836:18, 1089:2
**nut** [1] - 1003:9
**o'clock** [7] - 886:15, 886:19, 886:20, 991:13, 1045:8, 1045:12, 1150:24
**O'MELVENY** [1] - 768:6
**oath** [7] - 788:6, 888:7, 949:23, 1017:5, 1028:17, 1067:17, 1078:21
**object** [7] - 782:12, 789:19, 875:14, 999:6, 1092:16, 1092:18, 1138:7
**objected** [6] - 774:11, 873:23, 878:5, 879:3, 994:17, 1033:21
**objection** [23] - 782:10, 783:4, 786:4, 789:6, 789:12, 790:23, 791:22, 819:4, 819:23, 825:8, 875:13, 875:22, 875:24, 879:24, 947:19, 949:10, 1014:23, 1017:22, 1027:24, 1028:5, 1077:24, 1078:1
**objectionable** [1] - 994:12

**objections** [15] - 769:6, 769:13, 784:2, 784:7, 784:8, 785:17, 947:20, 947:21, 974:20, 991:19, 991:22, 993:8, 995:5, 999:5, 1003:3
**obligation** [2] - 1015:5, 1015:17
**obligations** [3] - 1014:6, 1014:18, 1014:22
**observer** [1] - 1092:18
**obtain** [3] - 866:17, 930:10, 933:18
**obtained** [1] - 1073:11
**obtaining** [1] - 1064:8
**obvious** [6] - 1130:5, 1132:14, 1133:21, 1134:2, 1134:5, 1150:4
**obviously** [8] - 780:17, 783:6, 805:19, 893:13, 897:8, 925:6, 942:22, 946:15
**obviousness** [5] - 1132:10, 1133:19, 1150:7, 1151:18, 1151:21
**occurred** [3] - 775:7, 1039:12, 1137:1
**occurs** [2] - 771:14, 778:23
**Ocean** [1] - 1089:20
**oct** [1] - 908:11
**October** [1] - 787:3
**octree** [3] - 908:5, 908:9, 912:10
**octrees** [1] - 907:19
**OF** [2] - 767:2, 1153:5
**offending** [1] - 1102:10
**offer** [7] - 782:15, 839:24, 852:7, 854:16, 877:9, 910:19, 939:7
**offered** [4] - 825:5, 877:18, 899:21, 971:19
**offers** [3] - 815:2, 841:22, 875:10
**office** [17] - 973:16, 990:16, 1008:17, 1010:8, 1025:23, 1026:6, 1026:15, 1026:20, 1052:16, 1085:13, 1135:20, 1136:1, 1136:3,

1136:6, 1136:10, 1150:21
**Officer** [1] - 950:8
**offices** [1] - 1026:14
**often** [5] - 772:2, 772:23, 860:19, 944:16, 1120:1
**oil** [3] - 860:8, 860:15, 860:18
**old** [4] - 891:19, 892:2, 948:13, 1031:22
**older** [2] - 894:3, 924:13
**Olivia** [1] - 937:22
**once** [9] - 793:8, 793:24, 967:16, 980:21, 1001:17, 1049:7, 1051:9, 1065:21, 1069:1
**one** [173] - 775:4, 777:10, 778:19, 780:17, 781:7, 786:24, 788:24, 792:11, 792:16, 793:24, 794:1, 797:2, 804:16, 807:7, 807:15, 810:17, 812:20, 816:4, 816:7, 817:13, 818:15, 819:18, 820:24, 821:15, 822:7, 823:15, 824:21, 832:20, 832:23, 833:22, 834:10, 834:16, 836:22, 845:3, 847:1, 847:19, 851:2, 852:7, 852:9, 852:15, 853:18, 853:21, 857:24, 860:4, 866:6, 866:10, 882:23, 884:15, 885:11, 886:18, 897:8, 906:4, 906:6, 906:21, 910:23, 912:7, 912:18, 916:13, 916:15, 921:5, 922:1, 922:19, 924:1, 924:2, 927:3, 928:14, 928:20, 930:15, 935:4, 937:3, 938:6, 939:2, 946:21, 947:14, 952:12, 955:5, 956:11, 964:22, 965:18, 965:21, 966:9, 968:17,

968:20, 973:5, 982:14, 989:21, 989:22, 990:2, 992:6, 994:23, 994:24, 995:7, 995:16, 998:11, 1001:12, 1005:22, 1007:21, 1015:9, 1020:7, 1023:8, 1023:22, 1026:20, 1027:8, 1027:10, 1029:1, 1032:8, 1033:1, 1035:2, 1035:10, 1037:4, 1037:9, 1037:11, 1040:1, 1040:15, 1041:6, 1042:19, 1042:20, 1042:21, 1043:3, 1043:15, 1046:1, 1046:7, 1046:13, 1047:2, 1047:7, 1047:12, 1048:23, 1052:11, 1055:2, 1056:8, 1058:2, 1058:9, 1069:13, 1070:23, 1070:24, 1072:24, 1073:13, 1077:4, 1079:6, 1081:22, 1087:8, 1091:19, 1095:8, 1099:3, 1099:7, 1099:8, 1100:10, 1101:5, 1109:1, 1109:6, 1114:17, 1115:3, 1116:19, 1118:13, 1121:23, 1126:2, 1128:8, 1128:13, 1129:18, 1131:7, 1131:23, 1132:1, 1132:6, 1134:20, 1136:22, 1138:8, 1146:20, 1147:1, 1149:2, 1150:4, 1151:11
**One** [1] - 1004:21
**one-and-a-half** [1] - 777:10
**one-time** [2] - 852:9, 852:15
**one-year** [1] - 1136:22
**ones** [17] - 813:24, 859:20, 902:21, 906:8, 913:16, 915:7, 918:4, 939:1, 957:23, 960:3, 1004:3, 1043:2, 1050:4, 1113:11, 1113:12, 1116:11, 1135:11

**Ontario** [1] - 1080:24
**open** [5] - 877:17, 897:23, 1023:18, 1023:20, 1032:12
**opened** [1] - 996:4
**opening** [2] - 996:5, 1010:21
**operate** [3] - 821:7, 947:2, 1104:14
**operates** [6] - 887:17, 903:1, 941:24, 1040:19, 1104:13, 1121:24
**operating** [1] - 1107:17
**operation** [9] - 942:14, 1048:18, 1049:9, 1106:19, 1107:15, 1109:12, 1116:6, 1118:11, 1123:8
**operations** [2] - 1022:1, 1135:12
**opinion** [53] - 795:23, 813:22, 827:24, 828:2, 828:5, 828:14, 859:15, 877:10, 877:19, 877:24, 883:13, 883:22, 1003:23, 1078:8, 1084:19, 1084:23, 1088:20, 1090:21, 1092:7, 1093:21, 1095:6, 1095:13, 1095:18, 1096:13, 1097:7, 1097:15, 1097:22, 1098:2, 1102:13, 1103:5, 1116:5, 1122:14, 1123:15, 1124:17, 1125:2, 1125:6, 1125:13, 1134:5, 1137:16, 1138:1, 1138:14, 1139:17, 1139:22, 1140:9, 1140:14, 1141:10, 1143:18, 1145:23, 1146:12, 1148:22, 1149:24, 1151:18, 1151:20
**opinions** [21] - 782:15, 880:13, 1084:5, 1084:11, 1084:16, 1085:6, 1085:24, 1086:21, 1087:7, 1087:23, 1088:4, 1093:17, 1096:2, 1096:6, 1096:9, 1124:7, 1124:24, 1125:23, 1126:18, 1128:23,

1132:2
**opportunities** [1] - 928:22
**opportunity** [3] - 786:15, 928:21, 1074:7
**opposed** [3] - 794:15, 964:1, 997:3
**optical** [1] - 962:5
**options** [8] - 796:19, 836:8, 836:16, 849:24, 850:16, 850:17, 850:20, 853:14
**orange** [2] - 912:20, 1105:17
**order** [42] - 778:21, 781:23, 787:9, 787:12, 787:14, 796:12, 816:22, 832:10, 832:14, 834:17, 835:19, 841:7, 864:23, 865:2, 874:3, 878:11, 878:24, 879:1, 879:12, 880:3, 882:1, 883:7, 903:12, 914:2, 914:3, 914:4, 917:12, 917:17, 918:20, 1026:24, 1042:16, 1046:8, 1068:20, 1068:21, 1069:21, 1096:21, 1096:24, 1102:9, 1123:3, 1144:16
**ordered** [2] - 884:6, 884:11
**ordinary** [3] - 1132:16, 1132:20, 1150:5
**organization** [7] - 929:15, 929:18, 938:18, 938:20, 1022:13, 1063:20, 1064:11
**organizations** [2] - 930:5, 1022:18
**organize** [4] - 889:16, 903:19, 967:6, 979:21
**organizing** [1] - 890:23
**origin** [1] - 1047:5
**original** [7] - 770:3, 806:11, 806:12, 849:3, 849:7, 910:22, 1091:23
**otherwise** [1] - 953:8
**ought** [2] - 770:22, 816:17

**outcome** [2] - 1031:4, 1088:14
**outline** [1] - 1021:21
**outlined** [2] - 1110:15, 1115:1
**output** [3] - 931:2, 934:11, 936:6
**outreach** [2] - 893:15, 930:3
**outside** [7] - 783:15, 912:24, 938:14, 969:7, 1009:21, 1022:12, 1022:14
**overall** [5] - 793:2, 794:21, 850:17, 868:21, 945:9
**overarching** [1] - 1135:8
**overlap** [2] - 771:23, 931:19
**overrule** [1] - 783:3
**overruled** [11] - 792:5, 819:6, 819:10, 820:8, 825:16, 825:20, 826:6, 865:3, 875:16, 1015:1, 1018:1
**overview** [1] - 1042:23
**own** [7] - 787:5, 797:21, 817:2, 838:8, 938:13, 953:11, 1073:8
**owned** [1] - 1062:10
**owning** [2] - 837:24, 838:11
**owns** [1] - 924:23
**P&L** [1] - 924:24
**p.m** [2] - 1150:18, 1152:12
**Pacific** [1] - 802:8
**pack** [1] - 822:8
**package** [4] - 794:17, 794:22, 836:20, 924:8
**Page** [4] - 856:10, 857:6, 857:11, 1090:23
**page** [44] - 792:11, 805:4, 805:9, 805:10, 806:9, 806:11, 808:22, 820:22, 820:23, 850:19, 850:22, 850:23, 857:4, 886:5, 886:7, 928:15, 928:17, 928:19, 937:8, 994:11, 997:14, 1016:17, 1017:11, 1018:6, 1039:16,

1041:16, 1044:16, 1046:13, 1046:14, 1054:3, 1057:16, 1068:2, 1068:10, 1068:11, 1069:2, 1069:5, 1069:13, 1071:20, 1071:21, 1071:22, 1071:24, 1074:4, 1087:2, 1101:4
**pages** [8] - 835:3, 857:5, 858:12, 886:7, 928:16, 1041:5, 1046:9, 1058:1
**Pages** [1] - 1153:10
**pagination** [1] - 1067:22
**paid** [11] - 794:1, 794:9, 804:23, 805:21, 827:5, 827:7, 860:10, 860:16, 966:18, 967:16, 1025:9
**Pala** [2] - 972:22, 972:23
**palace** [3] - 975:12, 975:13
**palaces** [4] - 975:6, 975:8, 975:11, 975:21
**pan** [1] - 1146:5
**Panaramio** [2] - 935:4
**paper** [8] - 1040:16, 1083:12, 1083:15, 1083:16, 1126:9, 1129:4, 1129:10, 1134:4
**papers** [5] - 977:11, 1050:3, 1060:2, 1081:16, 1081:18
**paperwork** [1] - 978:3
**paragraph** [13] - 805:11, 807:12, 820:23, 821:18, 821:19, 841:18, 842:6, 842:11, 850:2, 879:10, 879:19, 1041:17, 1053:23
**parallel** [7] - 916:18, 917:11, 965:22, 966:7, 1112:7, 1121:24, 1122:7
**parameters** [1] - 874:4
**parent** [13] - 906:7, 920:9, 920:14, 920:21, 921:8, 921:15, 967:10, 1078:18, 1107:3,

1107:4, 1107:5
**parents** [1] - 890:3
**Park** [2] - 974:13, 1063:10
**park** [1] - 935:8
**parking** [1] - 982:23
**part** [62] - 773:7, 775:15, 776:10, 788:23, 794:22, 797:1, 802:9, 803:15, 828:22, 851:16, 851:17, 878:19, 882:23, 884:5, 896:21, 896:23, 901:18, 924:7, 929:15, 937:15, 940:22, 948:10, 953:3, 955:4, 969:10, 970:6, 976:9, 978:20, 985:10, 985:11, 986:24, 1000:20, 1012:19, 1016:18, 1031:9, 1038:21, 1043:10, 1045:19, 1048:16, 1055:12, 1056:18, 1082:22, 1089:18, 1089:20, 1090:15, 1090:21, 1090:24, 1091:2, 1092:7, 1111:19, 1111:22, 1111:24, 1115:14, 1126:18, 1128:1, 1128:5, 1128:22, 1135:9, 1135:19, 1137:24, 1140:20
**partially** [1] - 1069:19
**participants** [1] - 1045:16
**participated** [1] - 844:9
**particular** [20] - 775:11, 777:1, 780:24, 781:12, 880:22, 881:7, 896:15, 914:1, 915:4, 918:18, 927:9, 940:24, 941:10, 975:15, 981:18, 1081:7, 1099:14, 1111:2, 1115:2, 1128:3
**particularly** [2] - 985:10, 1053:22
**parties** [21] - 773:11, 775:7, 775:16, 775:20, 776:8, 776:14, 778:2, 802:19, 812:23,

813:5, 813:10,
813:16, 813:18,
829:11, 830:23,
831:6, 831:17,
848:4, 853:17,
854:20, 1132:23
**parties'** [5] - 770:24,
794:14, 829:9,
829:21, 830:16
**partner** [3] - 821:4,
935:6, 1035:21
**partners** [3] - 820:13,
821:2, 941:5
**Partridge** [2] - 783:9,
993:4
**PARTRIDGE** [34] -
767:21, 769:4,
780:8, 780:16,
780:22, 783:16,
784:16, 784:21,
785:10, 785:15,
786:23, 787:2,
787:18, 869:16,
876:19, 947:21,
991:18, 992:3,
992:23, 993:5,
993:17, 994:18,
994:22, 995:4,
996:19, 997:13,
997:20, 998:8,
998:11, 999:12,
999:18, 1020:3,
1020:12, 1060:22
**parts** [4] - 882:13,
1053:9, 1098:1,
1130:23
**pass** [4] - 884:13,
940:11, 1060:12,
1075:17
**passed** [2] - 970:6,
1033:9
**past** [5] - 852:24,
889:7, 893:2,
923:22, 923:23
**Pat** [1] - 983:18
**Patent** [35] - 884:2,
1088:20, 1090:3,
1092:6, 1092:10,
1093:3, 1093:4,
1094:20, 1095:20,
1096:12, 1102:14,
1102:20, 1104:6,
1104:14, 1104:22,
1106:10, 1106:19,
1107:7, 1107:22,
1134:15, 1135:21,
1136:5, 1136:15,
1136:21, 1137:9,
1137:14, 1138:3,
1138:15, 1139:18,

1139:23, 1141:18,
1142:3, 1142:20,
1148:14
**patent** [208] - 770:1,
770:4, 793:15,
815:18, 816:21,
822:3, 822:4, 823:3,
823:5, 823:6,
823:22, 823:24,
824:6, 828:3,
828:15, 828:19,
832:18, 834:6,
835:16, 836:5,
836:6, 836:11,
837:4, 837:5, 837:6,
837:8, 837:20,
837:21, 837:24,
838:9, 838:11,
838:15, 838:20,
838:21, 838:22,
839:4, 840:12,
843:3, 844:14,
846:3, 846:10,
846:16, 847:3,
847:16, 847:19,
848:22, 849:1,
849:2, 849:3, 849:4,
849:7, 849:13,
849:15, 849:17,
849:19, 850:13,
850:14, 853:11,
853:15, 854:17,
855:2, 855:4, 855:7,
855:16, 855:18,
855:23, 856:3,
856:6, 870:10,
870:14, 870:18,
870:20, 870:21,
871:10, 871:13,
871:16, 871:19,
879:15, 884:2,
884:23, 987:22,
988:1, 988:4, 988:7,
988:10, 988:13,
988:21, 988:22,
988:24, 989:5,
989:11, 995:12,
1000:14, 1000:20,
1000:21, 1000:24,
1001:13, 1001:16,
1002:5, 1003:20,
1003:21, 1003:24,
1004:1, 1004:7,
1004:11, 1004:17,
1004:21, 1005:1,
1005:14, 1005:20,
1007:7, 1007:12,
1007:16, 1008:5,
1008:9, 1009:10,
1009:14, 1009:16,
1009:18, 1009:2,

1009:24, 1010:2,
1010:4, 1010:5,
1010:6, 1010:7,
1010:10, 1010:15,
1010:19, 1010:23,
1011:2, 1011:4,
1011:11, 1013:7,
1032:13, 1032:23,
1062:1, 1062:5,
1062:11, 1062:16,
1065:23, 1066:5,
1078:9, 1084:13,
1084:14, 1084:20,
1085:1, 1085:9,
1085:11, 1085:13,
1085:17, 1086:19,
1087:3, 1087:6,
1090:12, 1090:19,
1090:21, 1090:24,
1091:2, 1091:5,
1091:15, 1092:20,
1093:10, 1095:7,
1098:5, 1108:18,
1109:10, 1111:19,
1115:19, 1115:24,
1117:9, 1117:15,
1119:3, 1120:5,
1121:21, 1122:16,
1123:10, 1124:1,
1125:1, 1125:4,
1125:6, 1126:19,
1131:9, 1131:19,
1131:24, 1132:11,
1132:12, 1134:4,
1134:7, 1134:8,
1134:10, 1134:18,
1135:20, 1135:24,
1136:3, 1136:6,
1136:10, 1136:21,
1138:4, 1149:18,
1149:21
**patent's** [2] - 1121:12,
1125:5
**Patent's** [1] - 1107:16
**patentability** [2] -
1131:15, 1132:7
**patents** [21] - 813:9,
814:20, 849:10,
896:6, 896:8,
896:10, 896:15,
902:10, 956:8,
956:9, 989:7,
1001:3, 1001:6,
1001:11, 1001:22,
1002:15, 1004:2,
1011:2, 1032:14,
1064:8
**Patrick** [1] - 843:19
**Paulisch** [3] - 843:19,
843:22, 844:12

**paused** [1] - 861:12
**pausing** [6] - 818:4,
839:22, 862:3,
862:4, 863:2, 863:12
**pavel** [1] - 987:16
**Pavel** [8] - 814:14,
878:21, 989:24,
1000:12, 1006:2,
1053:12, 1053:14,
1054:1
**pay** [19] - 775:18,
820:24, 821:1,
843:9, 844:13,
845:5, 845:7, 847:6,
847:18, 855:22,
856:2, 859:21,
860:5, 939:12,
1004:20, 1005:5,
1005:21, 1006:9,
1006:13
**paying** [3] - 805:16,
939:14, 1062:23
**payment** [6] - 841:4,
852:9, 852:15,
878:16, 939:12,
939:15
**PC** [5] - 797:8, 952:13,
964:1, 964:2, 966:1
**PC's** [1] - 965:22
**PCs** [1] - 965:24
**PD** [1] - 992:9
**peace** [1] - 1001:7
**pejorative** [4] -
995:10, 995:13,
995:15, 996:1
**pending** [1] - 974:20
**pennies** [1] - 777:11
**penny** [4] - 808:7,
808:8, 809:10
**people** [87] - 776:20,
793:2, 793:23,
797:20, 820:16,
839:16, 840:13,
840:14, 855:6,
860:3, 860:19,
863:19, 889:19,
891:4, 891:6,
897:20, 898:4,
898:6, 898:13,
898:15, 898:19,
899:10, 902:9,
916:15, 921:10,
926:16, 926:21,
927:17, 927:24,
944:20, 945:2,
945:9, 945:16,
945:24, 950:21,
952:8, 954:7, 958:2,
959:10, 959:13,
963:4, 968:10,

968:18, 968:24,
970:6, 970:9,
970:14, 970:23,
971:2, 971:4, 971:9,
971:13, 971:14,
971:16, 973:5,
973:6, 973:10,
973:13, 976:14,
977:19, 978:24,
980:8, 982:13,
982:14, 987:6,
987:20, 1001:20,
1001:23, 1001:24,
1003:10, 1008:6,
1008:10, 1023:15,
1025:7, 1031:24,
1034:4, 1049:13,
1051:12, 1059:11,
1059:14, 1070:10,
1112:8, 1112:9,
1127:7
**people's** [2] - 970:12,
1082:16
**per** [55] - 777:11,
797:19, 797:20,
801:5, 805:13,
805:15, 805:17,
807:15, 808:4,
808:5, 808:6,
808:12, 809:4,
809:6, 809:7, 809:9,
815:3, 823:17,
825:5, 825:10,
826:9, 826:12,
826:13, 826:14,
829:23, 830:4,
830:7, 830:8,
830:10, 830:14,
830:15, 830:18,
830:20, 841:14,
842:7, 842:9,
845:19, 853:8,
855:18, 857:9,
863:5, 873:21,
874:6, 874:15,
878:2, 878:24,
879:2, 879:19,
879:23, 880:16,
928:24
**per-session** [6] -
841:14, 842:7,
842:9, 845:19,
853:8, 855:18
**per-use** [1] - 841:14
**perceived** [2] -
1005:7, 1150:2
**percent** [45] - 808:12,
808:14, 808:15,
809:6, 809:7,
809:19, 810:20,

810:21, 811:4, 811:5, 811:17, 811:18, 811:23, 812:2, 812:3, 817:24, 818:11, 819:3, 821:2, 821:4, 821:5, 822:12, 822:21, 823:23, 824:5, 840:22, 846:3, 846:16, 847:7, 856:21, 856:22, 857:6, 857:9, 857:13, 861:10, 861:13, 861:16, 862:1, 1004:18, 1031:13, 1065:2
**percentage** [8] - 818:10, 822:11, 822:19, 830:2, 830:5, 830:6, 830:15, 862:17
**perception** [1] - 810:1
**perfect** [5] - 956:19, 956:20, 956:22, 963:4, 1006:7
**perfected** [1] - 957:9
**perform** [7] - 882:14, 882:18, 883:6, 1102:13, 1117:18, 1120:4, 1124:10
**performance** [7] - 884:11, 884:21, 895:8, 935:2, 1071:14, 1102:6, 1115:19
**performed** [7] - 881:7, 881:9, 881:12, 882:11, 882:16, 882:18, 1029:11
**Performer** [4] - 955:24, 981:8, 985:22, 985:23
**performer** [1] - 981:13
**perhaps** [5] - 788:14, 809:1, 864:19, 1013:3, 1106:15
**period** [15] - 772:20, 772:21, 786:10, 795:13, 795:18, 811:13, 843:5, 843:11, 859:1, 924:5, 1025:4, 1067:15, 1068:20, 1136:23, 1137:3
**permission** [5] - 781:8, 781:18, 782:1, 885:4, 1074:20
**permit** [1] - 772:18

**permitted** [1] - 773:19
**persist** [1] - 937:6
**person** [13] - 778:24, 839:14, 951:13, 959:15, 977:23, 1099:13, 1126:4, 1132:15, 1132:19, 1132:21, 1133:1, 1133:2
**personal** [5] - 963:1, 965:19, 1066:14, 1073:8, 1081:2
**personally** [7] - 964:16, 978:8, 1025:18, 1027:2, 1066:17, 1073:4, 1127:16
**perspective** [1] - 903:13
**persuaded** [1] - 1127:8
**pet** [1] - 928:20
**petabyte** [1] - 903:17
**petabytes** [1] - 903:12
**Peter** [4] - 887:13, 887:14, 888:15, 1109:2
**PETER** [2] - 888:3, 888:5
**PH.D** [1] - 1078:19
**Ph.D** [1] - 1081:4
**pharmaceutical** [1] - 838:8
**Philadelphia** [3] - 891:16, 891:17, 892:10
**philanthropic** [1] - 929:12
**Phillies** [1] - 891:24
**philosophically** [1] - 980:10
**phone** [10] - 844:6, 844:9, 860:12, 863:17, 889:24, 896:17, 900:8, 1099:6, 1099:10, 1099:15
**phones** [1] - 900:4
**photo** [3] - 933:24, 934:1, 934:2
**photos** [2] - 933:23, 935:5
**phrase** [1] - 1004:24
**physics** [1] - 1081:3
**pick** [1] - 1025:11
**pictorial** [5] - 1092:14, 1092:17, 1095:3, 1104:2, 1138:5
**picture** [7] - 890:14, 912:14, 952:17,

984:10, 984:11, 984:12, 984:15
**pictures** [5] - 950:19, 952:15, 973:11, 996:9, 1002:11
**piece** [3] - 836:22, 918:9, 1076:6
**pieces** [3] - 911:22, 967:10, 1098:20
**pilot** [1] - 960:7
**pilots** [2] - 955:9, 970:23
**pink** [6] - 906:4, 906:16, 906:17, 906:19, 906:24, 907:4
**pixel** [1] - 956:20
**placards** [1] - 1063:11
**place** [11] - 892:19, 926:14, 935:7, 942:21, 960:10, 974:13, 981:18, 1036:4, 1084:1, 1120:10, 1125:23
**placed** [1] - 1099:5
**placement** [2] - 934:24, 935:1
**places** [7] - 804:10, 965:4, 965:5, 973:6, 973:9, 974:12, 975:17
**plaintiff** [4] - 783:5, 872:15, 875:10, 875:19
**Plaintiff** [6] - 767:4, 767:24, 772:11, 877:19, 886:23, 1060:23
**plaintiff's** [2] - 872:21, 875:4
**Plaintiff's** [30] - 769:19, 790:11, 790:21, 791:3, 791:20, 797:22, 798:5, 798:13, 798:18, 799:17, 803:17, 805:24, 816:6, 818:14, 819:14, 819:17, 831:24, 832:2, 832:7, 843:16, 844:11, 869:21, 874:7, 875:10, 878:4, 878:6, 937:14, 989:15, 999:19, 1000:7
**Plaintiffs** [1] - 774:7
**plan** [12] - 770:19, 774:7, 776:1, 776:4, 782:4, 788:19,

788:24, 924:17, 924:19, 925:7, 926:12
**planes** [1] - 903:7
**planet** [2] - 891:1, 971:5
**planning** [6] - 773:24, 803:8, 878:13, 890:5, 954:10, 996:21
**plans** [4] - 774:22, 775:11, 776:23, 925:8
**plant** [2] - 1052:12, 1052:19
**platform** [8] - 794:21, 805:1, 817:1, 822:17, 822:18, 824:4, 861:4, 869:6
**platforms** [1] - 860:1
**play** [10] - 818:22, 891:21, 971:11, 971:12, 983:9, 991:20, 998:6, 1006:22, 1033:24, 1034:17
**played** [6] - 996:10, 1034:18, 1035:7, 1141:7, 1143:17, 1143:24
**playful** [1] - 970:1
**playing** [1] - 1021:1
**plays** [1] - 975:4
**PlayStation** [1] - 962:20
**pleasant** [1] - 923:1
**plenty** [2] - 863:22, 941:22
**plot** [1] - 782:18
**plurality** [1] - 1093:13
**plus** [4] - 792:18, 805:13, 811:1, 880:4
**Plus** [2] - 817:22, 924:4
**PM** [2] - 889:6, 893:20
**pods** [1] - 982:2
**point** [44] - 782:6, 785:22, 787:11, 789:23, 804:14, 807:21, 808:9, 809:11, 809:16, 811:5, 811:7, 811:8, 811:14, 811:16, 818:1, 844:19, 855:11, 856:20, 870:4, 870:5, 871:18, 922:1, 931:18, 949:1, 968:17, 975:24, 980:14, 1001:11,

1003:20, 1007:5, 1007:12, 1007:14, 1045:3, 1047:5, 1047:21, 1072:21, 1104:10, 1109:8, 1110:20, 1111:5, 1138:22, 1140:7, 1150:9
**pointed** [5] - 856:17, 857:10, 858:6, 858:22, 861:8
**pointing** [1] - 1129:20
**points** [2] - 804:16, 840:3
**Poly** [1] - 896:2
**polygonal** [4] - 1038:8, 1038:14, 1038:17, 1148:22
**polygons** [1] - 1149:11
**POOL** [1] - 767:3
**Pool** [1] - 992:14
**pools** [1] - 975:14
**poor** [1] - 831:3
**pop** [1] - 868:20
**popped** [2] - 869:1, 869:2
**popular** [1] - 1129:16
**population** [1] - 973:11
**portal** [1] - 890:6
**Porter** [1] - 878:22
**portion** [21] - 806:19, 810:6, 814:19, 817:3, 817:8, 819:2, 819:13, 822:10, 824:2, 859:4, 912:22, 912:23, 919:10, 919:19, 1016:16, 1067:23, 1068:1, 1143:10, 1143:14, 1144:2
**portions** [3] - 910:3, 910:4, 1043:13
**position** [7] - 888:23, 889:1, 1021:14, 1045:8, 1045:12, 1080:7, 1094:3
**positions** [5] - 889:3, 1079:23, 1080:11, 1080:21, 1102:2
**positive** [1] - 929:14
**possibility** [4] - 781:2, 786:9, 876:20, 1065:23
**possible** [17] - 784:19, 841:20, 842:16, 879:20, 898:20, 914:17, 920:1, 922:3, 922:9,

922:14, 993:22, 999:7, 1000:15, 1112:3, 1115:9, 1115:12, 1149:2
**possibly** [1] - 1054:2
**post** [3] - 998:17, 1150:21, 1151:1
**poster** [1] - 974:4
**posterity** [2] - 1064:15, 1064:23
**posture** [1] - 1005:11
**postured** [1] - 1016:4
**potential** [5] - 802:3, 835:23, 849:24, 850:7, 1129:20
**potentially** [6] - 838:3, 840:15, 914:20, 920:18, 920:19, 922:20
**Powell** [1] - 970:14
**powers** [2] - 961:11, 961:12
**practice** [5] - 1007:16, 1026:14, 1027:16, 1122:15, 1146:20
**practiced** [1] - 992:11
**practices** [1] - 1020:21
**practicing** [3] - 993:10, 993:11, 995:11
**practitioners** [1] - 1022:10
**pre** [3] - 787:9, 787:12, 787:14
**pre-trial** [3] - 787:9, 787:12, 787:14
**preamble** [3] - 1137:23, 1138:2, 1138:4
**preceded** [3] - 849:3, 849:6
**preceding** [2] - 1072:18, 1072:19
**precise** [2] - 812:1, 812:4
**precisely** [1] - 789:8
**precision** [2] - 1047:17, 1147:14
**precursor** [1] - 1087:16
**precursors** [1] - 1085:10
**predecessors** [2] - 865:15, 865:17
**predict** [1] - 1036:2
**predictable** [1] - 1111:24
**prefer** [2] - 873:9, 873:10

**preferred** [1] - 784:2
**prejudice** [3] - 785:21, 786:9, 880:5
**prejudicial** [6] - 772:13, 773:19, 878:12, 879:7, 880:10, 994:3
**Premise** [1] - 931:8
**premise** [1] - 931:18
**prep** [4] - 936:22, 937:1, 937:10, 937:24
**preparation** [1] - 851:16
**prepare** [4] - 946:9, 1009:18, 1038:20, 1104:3
**prepared** [13] - 785:16, 811:19, 905:1, 1005:2, 1069:9, 1072:12, 1072:17, 1084:9, 1085:23, 1089:8, 1107:14, 1118:5, 1137:15
**preparing** [4] - 780:24, 1038:21, 1080:1, 1108:22
**presence** [1] - 783:15
**present** [11] - 770:22, 783:13, 862:15, 884:17, 903:2, 903:20, 954:10, 964:22, 1048:15, 1058:19, 1092:17
**presentation** [4] - 833:15, 941:13, 946:10, 1146:2
**presentations** [1] - 1087:20
**presented** [12] - 776:24, 779:12, 812:6, 862:7, 862:9, 877:15, 881:10, 881:13, 881:14, 949:20, 1068:23, 1085:24
**presenting** [3] - 1087:7, 1087:23, 1088:4
**presents** [1] - 887:17
**preserve** [2] - 786:24, 1064:22
**preserved** [1] - 1065:11
**President** [1] - 982:11
**president** [1] - 982:12
**press** [4] - 804:4, 829:18, 893:12, 893:14

**pretend** [1] - 880:7
**pretty** [13] - 784:23, 834:18, 837:17, 857:19, 894:2, 931:6, 946:12, 956:23, 968:19, 970:13, 982:4, 982:10, 1138:5
**previous** [5] - 861:17, 865:23, 1055:19, 1057:16, 1147:5
**previously** [6] - 800:7, 801:9, 851:4, 884:4, 990:18, 1028:10
**price** [6] - 798:12, 834:6, 835:19, 847:17, 1004:19, 1006:4
**primarily** [3] - 903:5, 911:8, 1027:15
**primary** [9] - 1125:9, 1125:12, 1125:17, 1125:19, 1125:21, 1126:2, 1126:7, 1130:7, 1134:17
**principle** [1] - 1093:7
**printed** [2] - 1055:14, 1131:21
**printouts** [1] - 1057:22
**prioritization** [5] - 1111:12, 1111:16, 1114:19, 1115:11, 1121:1
**prioritize** [4] - 914:8, 920:4, 1110:24, 1111:4
**prioritized** [1] - 915:11
**prioritizing** [1] - 920:5
**privacy** [1] - 861:5
**Prix** [1] - 1082:15
**Prize** [1] - 1082:17
**Pro** [23] - 805:15, 810:20, 811:1, 817:22, 856:17, 856:21, 857:1, 857:7, 857:8, 857:18, 857:22, 858:5, 858:11, 859:7, 861:24, 866:18, 866:22, 867:4, 867:15, 867:18, 868:2, 868:4, 924:1
**problem** [17] - 926:8, 927:23, 930:2, 968:8, 980:2, 994:1, 994:2, 1102:19, 1128:14, 1129:2, 1129:6, 1129:7,

1129:11, 1129:21, 1129:23, 1130:5, 1147:16
**problems** [9] - 951:17, 958:4, 967:2, 977:18, 1006:16, 1099:8, 1128:3, 1128:6, 1128:7
**procedure** [1] - 948:2
**proceed** [10] - 781:20, 786:6, 788:10, 887:9, 1028:20, 1060:14, 1068:8, 1078:23, 1084:4, 1120:13
**proceeding** [5] - 787:8, 799:8, 799:13, 1025:19, 1026:5
**proceedings** [7] - 787:6, 1024:12, 1039:12, 1044:3, 1044:13, 1044:14, 1055:14
**process** [40] - 911:19, 912:3, 913:9, 915:13, 916:8, 920:17, 1042:5, 1042:12, 1091:13, 1092:24, 1094:22, 1095:9, 1100:18, 1107:2, 1107:8, 1108:12, 1108:19, 1109:22, 1109:24, 1110:16, 1111:12, 1112:18, 1113:6, 1113:9, 1114:19, 1116:12, 1117:8, 1117:11, 1119:14, 1119:18, 1119:23, 1120:21, 1121:4, 1121:6, 1121:7, 1121:24, 1128:5, 1128:22, 1130:4
**processed** [1] - 952:17
**processes** [3] - 1112:8, 1121:16, 1122:6
**processing** [5] - 895:1, 895:15, 1123:3, 1133:5, 1133:9
**processor** [1] - 966:9
**processors** [2] - 965:20, 966:10
**produce** [4] - 898:23, 1009:21, 1022:10, 1117:12
**produced** [9] - 797:2,

815:6, 816:2, 860:20, 861:2, 960:18, 1010:2, 1024:12, 1055:18
**product** [92] - 770:5, 773:13, 788:23, 804:22, 807:12, 858:18, 860:4, 863:4, 863:19, 863:23, 864:2, 866:24, 882:4, 883:11, 887:16, 889:2, 889:8, 889:10, 893:5, 893:7, 893:8, 893:14, 893:18, 894:3, 894:5, 894:9, 896:22, 896:24, 897:6, 897:13, 898:2, 898:5, 898:17, 898:18, 898:21, 898:22, 899:7, 900:19, 923:17, 923:20, 924:2, 924:3, 924:4, 924:24, 925:9, 925:20, 925:23, 926:22, 927:16, 927:17, 927:22, 928:1, 929:8, 930:6, 932:11, 932:15, 932:19, 933:21, 939:7, 940:6, 940:8, 945:3, 945:6, 945:15, 946:14, 946:17, 948:11, 952:16, 952:20, 955:24, 959:3, 971:19, 972:9, 972:21, 976:10, 979:8, 979:14, 979:16, 979:19, 981:7, 1087:22, 1088:21, 1098:8, 1098:12, 1099:4, 1109:2, 1112:13, 1114:23, 1115:15, 1123:14, 1123:16
**production** [1] - 1022:2
**products** [75] - 773:6, 773:17, 811:1, 857:21, 865:14, 865:21, 866:23, 867:10, 867:14, 882:24, 883:1, 883:2, 883:14, 887:20, 889:6, 889:18, 889:19, 897:3, 897:5, 897:9, 899:22, 901:6,

901:14, 901:16,
907:10, 907:14,
907:19, 908:20,
908:24, 909:7,
909:14, 910:1,
910:14, 913:4,
918:22, 919:5,
919:14, 920:8,
920:13, 920:23,
921:18, 924:8,
924:15, 925:11,
927:13, 927:14,
928:13, 934:16,
938:2, 939:24,
940:9, 944:14,
945:13, 945:16,
946:7, 947:2,
952:10, 952:11,
957:18, 958:16,
979:18, 1096:12,
1096:16, 1097:5,
1100:15, 1102:10,
1109:12, 1109:16,
1114:18, 1116:6,
1116:14, 1117:17,
1122:10, 1122:15,
1123:9
**professional** [1] -
1022:8
**professionally** [1] -
1081:9
**professor** [4] -
1079:17, 1079:22,
1080:13, 1080:23
**Professor** [2] -
1079:20, 1080:7
**proffered** [1] - 769:7
**profit** [2] - 1022:7,
1029:9
**program** [19] - 820:16,
939:6, 952:13,
959:1, 965:10,
965:14, 965:23,
966:13, 966:20,
967:6, 967:14,
970:7, 985:23,
989:6, 1001:2,
1021:24, 1023:3,
1024:14, 1042:6
**Program** [1] - 902:3
**programmer** [1] -
965:9
**programming** [1] -
948:13
**programs** [5] - 970:3,
970:4, 1022:11,
1022:14, 1023:1
**project** [21] - 887:14,
929:21, 958:17,
958:23, 1030:10,

1031:19, 1032:7,
1032:18, 1035:21,
1036:14, 1042:23,
1042:24, 1043:8,
1043:10, 1045:17,
1051:10, 1056:19,
1068:15, 1135:5,
1135:7, 1135:8
**projection** [1] - 821:6
**projections** [12] -
773:4, 773:15,
776:19, 776:24,
777:2, 778:1, 779:2,
779:22, 786:17,
792:1, 793:5, 893:12
**projectors** [1] - 1002:9
**projects** [6] - 954:9,
958:9, 958:11,
958:14, 1056:16,
1083:3
**promise** [1] - 978:11
**promises** [1] - 978:10
**promptly** [1] - 785:2
**proper** [1] - 793:9
**properties** [2] -
807:13, 937:13
**property** [2] - 801:21,
929:4
**proportion** [4] -
821:20, 859:19,
860:18, 1113:23
**proposal** [15] -
833:12, 833:13,
833:18, 836:4,
836:9, 836:11,
841:2, 850:13,
852:6, 873:21,
873:22, 874:6,
937:20, 937:23,
938:3
**proposals** [1] - 834:9
**propose** [2] - 996:23,
997:1
**proposing** [1] -
849:22
**protection** [1] -
884:24
**protective** [1] - 989:8
**prototyped** [1] -
959:14
**proud** [4] - 956:13,
983:3, 1064:14,
1064:22
**proved** [1] - 802:6
**provide** [4] - 861:6,
883:22, 887:18,
1094:6
**provided** [11] -
883:10, 883:11,
901:10, 901:23,

952:7, 961:17,
1035:15, 1051:18,
1056:1, 1056:9,
1058:7
**provides** [1] - 910:23
**providing** [1] - 883:8
**PTX** [14] - 832:7,
832:8, 832:9,
832:12, 834:22,
1086:24, 1122:20,
1122:21, 1122:23
**PTX-001** [1] - 1148:15
**PTX-0075** [1] - 1101:4
**PTX-055** [1] - 800:8
**PTX-1** [1] - 1142:19
**PTXs** [1] - 832:12
**Public** [1] - 1153:9
**public** [17] - 819:19,
893:14, 930:8,
970:7, 982:17,
1023:18, 1023:20,
1032:10, 1032:20,
1048:2, 1051:11,
1131:22, 1132:14,
1135:1, 1135:13,
1135:17
**publically** [1] - 884:20
**publication** [13] -
1025:23, 1026:7,
1041:2, 1042:22,
1046:6, 1125:21,
1125:22, 1126:8,
1131:21, 1133:16,
1134:2, 1134:14,
1138:24
**publications** [13] -
1011:3, 1020:19,
1020:22, 1021:16,
1021:18, 1021:21,
1021:24, 1022:15,
1040:12, 1129:19,
1135:4, 1138:8,
1139:2
**publish** [6] - 959:9,
959:22, 974:21,
1032:12, 1033:21,
1040:21
**published** [20] -
1034:4, 1039:4,
1040:12, 1040:17,
1040:20, 1043:16,
1044:13, 1046:10,
1046:11, 1050:4,
1060:3, 1081:15,
1081:17, 1082:3,
1082:4, 1083:16,
1085:16, 1097:12,
1129:4, 1129:23
**pull** [14] - 805:23,
806:8, 816:6,

818:14, 869:21,
963:17, 989:14,
1039:8, 1042:20,
1045:22, 1046:2,
1049:10, 1053:7,
1055:22
**pulled** [2] - 926:1,
1050:12
**pulling** [1] - 1035:5
**pun** [1] - 1062:17
**purchase** [16] - 834:6,
836:5, 836:7,
836:11, 837:4,
837:13, 837:15,
837:18, 837:20,
838:5, 838:17,
847:16, 849:18,
850:13, 850:14,
1014:16
**purchased** [5] -
803:12, 938:14,
1012:18, 1014:6,
1087:18
**purchases** [1] -
837:12
**purchasing** [3] -
838:22, 839:4,
849:14
**purple** [5] - 906:5,
906:18, 906:20,
906:21, 906:22
**purpose** [13] - 772:22,
820:6, 829:3, 840:7,
880:22, 941:11,
970:18, 1026:8,
1045:21, 1069:13,
1069:16, 1109:9,
1115:10
**purposes** [13] - 801:2,
802:6, 828:8,
829:16, 838:11,
839:17, 839:21,
840:1, 1096:14,
1101:15, 1116:5,
1130:21, 1137:15
**push** [1] - 972:2
**put** [37] - 774:1, 779:9,
786:8, 789:21,
790:1, 803:16,
808:10, 818:10,
903:12, 915:5,
915:8, 928:15,
930:21, 934:7,
936:7, 960:14,
970:22, 974:23,
976:11, 989:17,
996:9, 1003:1,
1004:6, 1005:22,
1031:23, 1051:11,
1055:21, 1058:14,

1067:22, 1075:4,
1080:4, 1091:17,
1093:10, 1110:4,
1111:8, 1117:5,
1136:13
**putting** [5] - 789:17,
925:19, 937:5,
996:15, 1027:17
**pyramid** [4] - 1037:3,
1037:5, 1037:6,
1054:5
**quad** [2] - 907:22,
912:10
**quadrant** [1] - 1148:1
**Quadtree** [5] - 967:8,
1037:1, 1041:11,
1041:13, 1041:21
**quadtree** [15] -
907:24, 908:10,
961:13, 1088:24,
1091:4, 1091:19,
1098:7, 1103:19,
1141:24, 1142:4,
1143:9, 1148:1,
1148:3, 1148:18
**quadtrees** [3] -
907:19, 1098:6,
1098:11
**quality** [3] - 973:14,
1048:24, 1049:1
**quarters** [2] - 907:7,
1108:6
**questioning** [1] -
1028:14
**questions** [40] -
782:22, 782:23,
782:24, 826:18,
869:14, 871:21,
871:24, 872:3,
872:4, 873:9,
873:11, 873:16,
874:14, 875:1,
875:2, 897:21,
945:18, 947:5,
947:8, 947:11,
948:3, 948:4,
948:17, 992:10,
993:9, 993:22,
994:1, 1009:2,
1019:1, 1019:16,
1019:20, 1063:3,
1071:6, 1071:8,
1071:10, 1076:18,
1076:20, 1076:21,
1077:17, 1131:7
**quick** [3] - 872:6,
876:9, 922:3
**Quicken** [1] - 1076:5
**quickly** [9] - 908:1,
914:17, 919:24,

922:9, 922:14, 1047:11, 1110:10, 1115:9, 1115:12
**quirk** [1] - 1111:23
**quite** [10] - 769:17, 832:9, 909:9, 909:12, 909:21, 927:17, 936:9, 1005:6, 1016:6, 1100:8
**quotation** [2] - 1145:12, 1146:20
**quote** [5] - 995:12, 995:13, 1003:21, 1054:3, 1054:8
**quotes** [2] - 995:12, 1143:6
**raise** [2] - 769:5, 1151:13
**raised** [6] - 769:22, 781:6, 787:7, 787:8, 787:9, 792:2
**raising** [2] - 769:21, 994:13
**ran** [3] - 972:11, 980:7, 1024:6
**random** [1] - 1001:21
**range** [2] - 773:12, 902:16
**rapid** [1] - 1130:3
**rapidly** [1] - 1117:13
**rare** [1] - 965:18
**rate** [48] - 771:1, 773:1, 773:8, 775:18, 775:21, 777:5, 777:6, 779:4, 786:19, 795:24, 796:9, 802:7, 802:21, 808:13, 808:16, 809:12, 809:15, 810:1, 811:11, 813:22, 815:9, 824:10, 824:21, 824:23, 825:4, 825:9, 825:10, 825:12, 825:14, 825:18, 825:22, 826:5, 826:9, 826:12, 826:13, 827:9, 827:10, 827:11, 841:14, 842:7, 842:9, 877:12, 877:14, 877:16, 877:17, 879:20, 879:23
**rates** [5] - 802:3, 814:4, 845:13, 879:14, 880:21
**rather** [3] - 780:17,

838:7, 923:5
**re** [2] - 914:8, 920:5
**re-prioritize** [1] - 914:8
**re-prioritizing** [1] - 920:5
**reach** [5] - 801:20, 853:10, 1012:16, 1131:11, 1137:8
**reached** [5] - 800:13, 1084:18, 1084:23, 1113:1, 1118:18
**reaching** [6] - 791:17, 801:10, 1087:6, 1096:13, 1097:6, 1145:22
**read** [17] - 769:15, 785:19, 808:24, 836:9, 836:14, 842:6, 842:12, 848:12, 998:7, 1004:15, 1018:15, 1040:7, 1041:18, 1053:8, 1062:15, 1068:16, 1093:20
**reading** [2] - 966:6, 1018:9
**reads** [1] - 1054:2
**ready** [6] - 786:5, 972:9, 972:10, 1061:3, 1061:10, 1061:11
**real** [10] - 814:12, 860:15, 946:22, 950:20, 955:10, 956:16, 973:5, 1049:12, 1051:16, 1059:10
**reality** [4] - 914:13, 950:14, 1113:24
**realize** [2] - 778:13, 1150:9
**realized** [1] - 783:17
**really** [76] - 810:9, 855:12, 872:6, 889:19, 890:6, 892:3, 892:18, 893:1, 897:19, 897:24, 898:22, 899:9, 903:18, 905:22, 907:17, 914:13, 914:22, 915:22, 916:2, 916:7, 917:11, 919:23, 922:4, 925:2, 925:4, 925:20, 926:14, 926:23, 927:15, 927:24, 928:2, 929:2, 929:9,

929:17, 929:23, 930:9, 931:16, 932:13, 934:8, 938:16, 946:1, 946:13, 948:8, 958:7, 964:13, 967:2, 967:22, 970:10, 971:2, 971:17, 972:8, 972:9, 979:20, 984:15, 984:20, 985:17, 990:15, 992:5, 1002:8, 1005:1, 1034:22, 1040:2, 1064:21, 1065:7, 1083:6, 1100:9, 1113:11, 1116:11, 1128:7
**realtime** [1] - 1138:11
**reason** [14] - 779:9, 793:22, 814:6, 863:12, 877:23, 877:24, 908:7, 909:16, 921:8, 922:11, 1102:17, 1102:23, 1103:14, 1124:18
**reasonable** [12] - 771:1, 777:5, 777:6, 779:4, 794:7, 802:4, 824:17, 824:19, 849:23, 850:6, 1065:18, 1133:1
**reasonably** [2] - 772:21, 1100:1
**reasons** [11] - 782:12, 861:5, 881:5, 931:17, 978:7, 1066:14, 1068:17, 1102:12, 1117:17, 1124:8, 1124:9
**rebuttal** [1] - 876:21
**recap** [1] - 1117:5
**receipts** [1] - 1076:14
**receive** [13] - 777:16, 816:17, 821:4, 863:18, 864:4, 866:22, 867:1, 867:22, 868:13, 939:17, 939:18, 984:22, 1088:12
**received** [16] - 811:14, 824:12, 856:5, 895:22, 932:1, 933:4, 935:21, 938:13, 953:8, 987:13, 1038:4, 1055:13, 1073:21, 1082:6, 1082:13, 1082:15

**receives** [4] - 778:19, 852:9, 863:22, 865:6
**receiving** [3] - 867:11, 867:12, 868:12
**recent** [2] - 835:14, 900:9
**recently** [2] - 884:12, 929:10
**recess** [13] - 780:12, 780:14, 785:1, 785:11, 872:9, 873:1, 873:3, 876:4, 993:2, 998:24, 1061:2, 1150:12, 1152:10
**recessed** [1] - 1152:12
**recognition** [1] - 902:1
**recognizable** [1] - 931:6
**recognize** [10] - 821:24, 1003:5, 1055:23, 1055:24, 1056:5, 1056:12, 1057:15, 1083:12, 1089:24, 1090:13
**recognized** [5] - 792:23, 804:19, 880:6
**recognizing** [1] - 807:20
**recollection** [3] - 844:10, 871:11, 871:20
**recommended** [1] - 986:23
**recon** [1] - 970:3
**record** [22] - 785:20, 786:8, 786:24, 787:15, 796:21, 875:6, 882:7, 888:2, 994:10, 998:7, 1021:3, 1057:20, 1064:15, 1064:24, 1078:14, 1116:15, 1122:18, 1142:8, 1142:10, 1143:13, 1147:18, 1153:9
**recorded** [1] - 930:19
**recording** [1] - 1076:7
**records** [6] - 797:21, 923:13, 923:16, 1073:4, 1073:8, 1135:20
**recreation** [1] - 1138:11
**recross** [1] - 871:23
**recruited** [1] - 955:14
**red** [4] - 1094:5, 1104:19, 1105:7,

1114:4
**redefining** [1] - 953:22
**REDIRECT** [3] - 869:15, 1019:3, 1075:18
**redraw** [1] - 1114:7
**reels** [1] - 962:2
**refer** [12] - 810:19, 825:13, 849:20, 879:19, 897:1, 931:10, 932:9, 932:10, 1054:9, 1090:10, 1105:13, 1105:18
**reference** [18] - 770:10, 772:12, 817:17, 857:12, 874:6, 878:2, 883:23, 884:17, 906:9, 992:4, 1068:12, 1125:17, 1125:20, 1125:22, 1126:2, 1126:7, 1142:4
**referenced** [4] - 772:21, 778:20, 874:1, 906:17
**references** [9] - 905:24, 932:14, 996:1, 1011:7, 1125:9, 1130:7, 1133:14, 1133:15, 1134:17
**referral** [4] - 939:3, 939:11, 939:18, 1088:10
**referred** [13] - 810:13, 813:15, 813:17, 817:15, 826:11, 940:20, 955:18, 958:20, 967:9, 1081:12, 1105:19, 1112:1, 1147:10
**referring** [15] - 770:12, 810:17, 816:8, 824:15, 852:24, 864:14, 879:3, 880:20, 1004:14, 1005:24, 1142:9, 1142:16, 1142:19, 1143:14, 1148:5
**refers** [6] - 814:10, 878:20, 995:9, 1054:11, 1102:24, 1105:15
**refined** [2] - 952:22, 1098:21
**reflect** [3] - 927:6, 928:10, 1142:8
**reflecting** [1] - 844:21

reflects [1] - 821:21
refrigerators [1] - 982:6
regard [9] - 771:1, 785:24, 815:23, 822:14, 871:9, 961:3, 1014:8, 1089:6, 1125:3
regarded [1] - 823:9
regarding [16] - 773:4, 835:15, 848:1, 848:22, 848:24, 849:16, 853:11, 862:16, 874:3, 1044:9, 1097:15, 1097:22, 1137:8, 1137:16, 1138:15, 1145:9
regards [1] - 815:6
Registered [1] - 1153:7
registration [2] - 1025:8, 1025:10
regular [1] - 970:9
regularly [2] - 894:6, 894:8
rehearsal [2] - 957:3, 960:8
reissues [1] - 770:3
reiterate [1] - 826:15
relate [17] - 823:4, 823:6, 842:3, 874:15, 883:18, 890:20, 896:10, 927:19, 932:16, 932:18, 966:20, 993:19, 993:23, 1093:16, 1094:11, 1116:7, 1144:9
related [35] - 773:5, 817:3, 817:7, 818:7, 838:20, 842:12, 846:9, 873:23, 877:24, 881:16, 882:9, 882:22, 893:17, 896:16, 902:11, 902:22, 923:10, 923:13, 924:11, 925:16, 928:19, 935:10, 935:13, 937:21, 940:10, 956:8, 958:15, 985:2, 1020:21, 1023:16, 1092:14, 1105:1, 1129:2, 1138:6
relates [14] - 808:20, 814:20, 815:18, 823:3, 873:20, 878:1, 882:24,

884:2, 1088:21, 1094:7, 1115:20, 1118:11, 1119:19, 1120:8
relating [7] - 958:11, 1086:13, 1097:4, 1115:19, 1124:8, 1148:6, 1148:21
relationship [7] - 775:5, 836:21, 905:20, 905:23, 906:10, 971:21, 1023:7
relative [3] - 916:7, 928:12, 944:13
relatively [1] - 857:20
release [5] - 804:4, 829:18, 898:24, 899:4, 900:11
released [10] - 803:1, 804:19, 806:13, 829:18, 899:2, 899:6, 900:10, 900:13, 921:21, 942:8
relevance [3] - 776:5, 776:6, 777:24
relevant [31] - 770:20, 772:8, 780:3, 786:17, 786:18, 808:18, 815:7, 831:19, 854:21, 885:6, 911:8, 911:14, 913:1, 913:15, 914:22, 926:24, 956:12, 993:12, 994:4, 994:8, 1020:2, 1020:6, 1020:8, 1088:19, 1097:14, 1100:9, 1101:9, 1124:14, 1136:19, 1145:2
relied [5] - 826:4, 1094:12, 1136:7, 1143:3, 1145:22
relief [2] - 781:24, 1019:10
rely [4] - 877:20, 877:21, 1087:5, 1145:9
relying [4] - 826:2, 1125:12, 1131:2, 1147:19
remain [1] - 822:22
remained [1] - 821:10
remaining [2] - 932:5, 1124:2
remarkable [1] - 1054:3

remember [45] - 791:10, 811:18, 825:6, 833:8, 833:9, 833:13, 843:5, 846:17, 859:13, 869:19, 869:24, 870:3, 979:10, 987:5, 987:15, 991:13, 1002:22, 1005:12, 1008:19, 1009:11, 1009:12, 1010:16, 1011:9, 1012:5, 1012:20, 1012:24, 1013:18, 1014:7, 1014:14, 1015:4, 1015:7, 1016:22, 1016:24, 1017:4, 1040:24, 1043:18, 1066:20, 1073:1, 1075:14, 1077:10, 1077:13, 1087:17, 1110:3, 1111:18, 1113:15
remind [4] - 1096:6, 1110:1, 1125:11, 1150:13
remote [4] - 959:21, 960:1, 1089:1, 1129:13
remotely [1] - 1129:12
removed [1] - 885:20
renaming [2] - 931:16, 931:20
render [1] - 954:7
rendered [1] - 912:20
rendering [2] - 902:18, 912:14
renders [3] - 1133:21, 1134:2, 1134:5
reneged [1] - 1018:16
renew [1] - 874:14
rent [1] - 1076:12
rent-a-car [1] - 1076:12
rep [1] - 943:2
repeat [16] - 824:13, 1064:17, 1073:20, 1103:1, 1106:5, 1106:13, 1106:23, 1106:24, 1108:9, 1117:19, 1118:3, 1118:20, 1121:13, 1123:5, 1130:11
repeated [3] - 1118:23, 1119:24, 1123:13
repeatedly [1] - 880:6
repeating [9] - 1118:6, 1119:14, 1119:18, 1120:4, 1120:11,

1122:16, 1123:22, 1123:23, 1141:22
replaced [1] - 891:21
report [19] - 782:16, 782:20, 783:7, 784:8, 787:2, 787:5, 818:19, 826:4, 854:7, 874:1, 874:2, 878:7, 878:14, 878:20, 879:11, 943:19, 1114:22
reporter [1] - 995:1
REPORTER [1] - 1153:5
Reporter [1] - 1153:8
reports [4] - 844:12, 1085:23, 1086:2, 1135:6
represent [24] - 811:3, 865:23, 905:11, 906:14, 907:6, 909:1, 915:2, 931:12, 934:22, 934:23, 956:18, 1039:23, 1094:8, 1103:16, 1106:9, 1106:15, 1106:16, 1108:2, 1108:5, 1115:24, 1117:3, 1117:24, 1149:11
representation [12] - 867:7, 881:19, 1037:2, 1041:10, 1041:21, 1044:20, 1092:14, 1092:17, 1095:4, 1104:2, 1119:24, 1138:6
representative [2] - 887:13, 894:13
representatives [1] - 783:13
represented [12] - 811:16, 873:24, 1104:1, 1105:4, 1105:22, 1110:21, 1112:17, 1114:8, 1118:8, 1119:5, 1119:19, 1120:18
representing [11] - 881:9, 895:21, 1095:3, 1110:7, 1113:2, 1119:1, 1120:13, 1128:11, 1141:22, 1143:9, 1148:21
request [32] - 780:10, 781:23, 782:1, 881:19, 881:22, 881:24, 882:4, 910:2, 910:4, 911:2,

916:4, 917:8, 919:20, 1036:8, 1050:9, 1093:12, 1094:4, 1099:16, 1100:22, 1102:20, 1103:16, 1106:6, 1106:14, 1106:16, 1108:1, 1108:5, 1115:8, 1115:24, 1117:2, 1117:23, 1118:15, 1142:1
requested [26] - 912:19, 917:2, 918:11, 918:24, 919:6, 919:8, 919:9, 919:10, 920:9, 920:10, 920:15, 920:24, 921:3, 1050:10, 1103:24, 1105:3, 1110:20, 1111:20, 1112:14, 1112:23, 1113:8, 1114:8, 1118:8, 1120:18, 1121:8
requesting [15] - 915:16, 915:18, 918:6, 1094:24, 1100:1, 1103:22, 1104:24, 1105:15, 1110:7, 1111:17, 1113:2, 1119:1, 1121:2, 1140:1, 1141:21
requests [3] - 841:22, 919:3, 1108:16
require [1] - 835:24, 1107:7
required [5] - 838:4, 1102:20, 1103:2, 1117:19, 1140:5
requirement [5] - 955:10, 1015:13, 1104:4, 1107:21, 1118:6
requirements [2] - 1102:5, 1104:12
requires [10] - 781:8, 881:22, 1103:21, 1104:23, 1110:22, 1115:24, 1118:20, 1121:4, 1123:11, 1124:1
Research [7] - 958:6, 958:17, 958:19, 962:23, 1011:17, 1029:10, 1063:8
research [28] - 821:22, 822:15, 958:9, 958:11, 958:23, 1029:11, 1032:9,

1032:12, 1043:8,
1053:2, 1056:16,
1056:18, 1056:19,
1057:18, 1063:22,
1063:24, 1064:3,
1064:6, 1064:8,
1064:11, 1080:14,
1081:8, 1082:24,
1083:3, 1083:7,
1087:20, 1133:4,
1150:14
**researchers** [3] -
891:4, 930:7, 1022:9
**residual** [1] - 924:13
**resolution** [51] -
906:15, 906:18,
909:9, 914:19,
914:23, 915:3,
915:4, 917:23,
918:17, 921:12,
922:6, 922:13,
922:20, 922:21,
922:23, 960:21,
1037:3, 1037:5,
1037:6, 1037:12,
1037:13, 1037:14,
1037:15, 1042:1,
1042:2, 1051:17,
1054:5, 1084:3,
1090:4, 1090:7,
1091:12, 1091:22,
1092:1, 1095:1,
1095:2, 1095:15,
1100:10, 1100:12,
1104:16, 1105:1,
1106:2, 1106:3,
1108:3, 1108:11,
1108:13, 1111:7,
1118:18, 1118:19,
1128:11, 1147:12
**resolve** [3] - 787:24,
992:20, 999:7
**resolved** [1] - 873:13
**respect** [18] - 769:6,
769:20, 769:24,
783:7, 785:23,
818:3, 822:9,
824:12, 825:5,
885:10, 987:11,
994:13, 997:1,
1106:6, 1123:19,
1133:13, 1147:17,
1149:19
**respects** [1] - 885:21
**respond** [6] - 854:13,
854:14, 854:16,
886:1, 886:3,
1006:17
**responded** [5] - 787:4,
853:24, 1006:20,

1071:7, 1075:13
**response** [8] - 848:2,
854:6, 878:6,
881:12, 886:15,
1008:3, 1066:17,
1066:22
**responsibilities** [2] -
893:4, 1021:22
**responsibility** [2] -
783:18, 923:18
**responsible** [6] -
883:15, 893:6,
923:19, 957:17,
983:18, 1021:23
**rest** [3] - 875:19,
1074:10, 1110:23
**restaurant** [3] -
897:22, 1099:18,
1100:2
**restaurants** [2] -
804:18, 1076:13
**restrained** [1] - 880:8
**restroom** [1] - 872:6
**result** [3] - 779:18,
838:14, 1110:15
**results** [3] - 810:22,
820:17, 935:9
**resume** [3] - 785:14,
788:1, 1150:12
**retained** [1] - 1030:21
**retired** [1] - 1079:15
**retrieval** [2] - 1119:23,
1140:5
**retrieve** [8] - 1029:16,
1036:8, 1042:3,
1051:14, 1059:9,
1112:2, 1112:3,
1113:12
**retrieved** [2] -
1105:21, 1117:15
**retrieving** [5] - 915:23,
1048:19, 1111:1,
1111:9, 1120:12
**return** [5] - 849:24,
850:7, 937:8,
937:12, 1031:7
**returned** [2] - 918:14,
920:24
**returns** [1] - 873:7
**revenue** [62] - 775:5,
777:15, 777:20,
777:22, 778:18,
778:19, 778:23,
779:17, 779:22,
789:22, 808:2,
808:5, 809:2,
810:14, 810:15,
817:14, 820:19,
820:22, 821:2,
821:9, 821:20,

856:6, 856:15,
857:7, 857:8,
857:12, 857:14,
858:4, 861:10,
862:18, 867:13,
868:13, 924:11,
924:13, 925:6,
925:9, 925:19,
925:24, 930:11,
930:13, 930:14,
930:17, 930:18,
931:13, 932:1,
932:3, 932:21,
933:4, 933:17,
933:18, 934:4,
935:21, 936:12,
936:18, 938:12,
938:13, 938:17,
939:18, 940:3,
940:9, 945:13
**revenues** [34] -
772:24, 773:2,
773:4, 789:18,
810:19, 811:4,
811:18, 811:24,
812:1, 812:2, 812:3,
815:16, 817:24,
818:5, 818:6,
820:13, 820:15,
856:17, 856:21,
857:18, 861:13,
861:16, 862:1,
865:6, 866:21,
867:11, 867:21,
867:24, 926:7,
938:8, 938:10,
938:18, 938:22
**review** [24] - 809:23,
810:5, 1010:3,
1043:23, 1074:7,
1074:9, 1082:5,
1086:12, 1087:5,
1090:19, 1097:21,
1100:23, 1109:13,
1109:24, 1112:5,
1115:14, 1122:9,
1128:21, 1135:20,
1136:5, 1136:14,
1141:2, 1149:17
**reviewed** [21] -
851:11, 851:15,
934:18, 1085:8,
1085:15, 1085:22,
1086:1, 1087:1,
1087:21, 1090:15,
1092:6, 1095:23,
1097:11, 1101:23,
1108:21, 1115:13,
1116:5, 1122:14,
1126:17, 1135:11,

**revised** [3] - 998:17,
1150:22, 1151:3
**revision** [1] - 806:7
**reword** [1] - 831:4
**Richard** [1] - 973:15
**Richer** [3] - 1043:2,
1043:14, 1043:22
**right-hand** [7] -
890:14, 892:2,
933:13, 936:3,
976:2, 1142:2,
1148:12
**rights** [3] - 838:15,
840:18, 1013:8
**ripples** [1] - 1002:10
**River** [3] - 1089:24,
1092:2, 1092:3
**river** [1] - 975:11
**rivers** [2] - 955:7,
965:2
**RMR** [1] - 1153:20
**roads** [1] - 973:10
**roam** [1] - 1145:15
**Roger** [1] - 1127:5
**role** [6] - 889:5,
893:24, 976:23,
998:6, 1044:9,
1063:11
**roles** [2] - 893:22,
951:18
**rolls** [1] - 806:22
**ROM** [19] - 1055:15,
1055:21, 1056:9,
1058:5, 1072:8,
1072:18, 1072:20,
1072:22, 1072:24,
1073:2, 1073:3,
1073:6, 1073:7,
1073:11, 1073:14,
1073:17, 1073:22,
1073:24, 1075:12
**ROMs** [5] - 1024:11,
1027:13, 1072:8,
1072:12, 1072:18
**room** [13] - 964:8,
964:10, 981:24,
984:3, 993:15,
999:10, 1011:19,
1012:7, 1012:8,
1017:3, 1048:8,
1099:9, 1151:13
**Rooms** [1] - 1002:9
**ROONEY** [1] - 767:23
**root** [4] - 904:14,
1100:19, 1104:15,
1118:14
**roughly** [1] - 821:5
**Rous** [5] - 1020:18,
1020:19, 1021:2,
1021:4, 1126:10

**row** [1] - 931:21
**rows** [1] - 936:8
**Royal** [2] - 1082:11,
1082:13
**royalty** [49] - 771:1,
773:6, 773:8, 777:5,
777:6, 779:4,
786:19, 794:1,
795:15, 795:20,
795:24, 796:8,
796:9, 796:10,
796:13, 796:14,
796:17, 799:5,
800:14, 801:21,
801:23, 802:3,
802:5, 813:22,
815:9, 824:9,
824:10, 824:17,
824:19, 824:20,
824:21, 825:1,
829:22, 830:18,
841:11, 842:13,
845:22, 852:18,
853:3, 853:6, 853:8,
855:22, 877:16,
877:17, 878:16,
879:12, 880:21
**RPM** [6] - 807:22,
807:24, 808:4,
809:8, 928:23, 929:2
**RPM's** [1] - 808:4
**rudimentary** [1] -
1052:17
**Rule** [8] - 772:18,
774:3, 786:19,
873:11, 873:14,
877:3, 881:1, 885:21
**rule** [4] - 789:11,
1119:9, 1119:10,
1132:8
**rules** [3] - 1131:10,
1132:1, 1137:7
**ruling** [5] - 770:6,
774:19, 780:1,
786:16, 882:2
**rulings** [1] - 786:11
**run** [14] - 809:12,
809:15, 811:11,
901:20, 952:13,
967:18, 968:10,
969:8, 973:20,
1022:22, 1049:7,
1051:24, 1107:11,
1121:18
**running** [16] - 794:24,
796:8, 796:9,
796:12, 830:10,
830:13, 841:11,
842:13, 845:22,
852:18, 853:3,

853:5, 855:22, 893:17, 1045:1, 1052:1
**runs** [1] - 910:20
**runway** [4] - 962:1, 962:2, 962:3, 977:10
**sac** [1] - 984:2
**salary** [1] - 953:9
**sale** [4] - 848:22, 848:24, 849:16, 1131:22
**sales** [3] - 798:17, 818:24, 819:2
**sample** [1] - 1037:11
**San** [2] - 1029:22, 1052:11
**Santa** [5] - 1079:16, 1079:21, 1080:8, 1080:12, 1080:21
**Santek** [2] - 1128:18, 1129:2
**sat** [1] - 802:20
**satellite** [3] - 891:2, 897:12, 970:3
**satellites** [2] - 903:6, 960:13
**satisfactory** [2] - 996:18, 996:20
**satisfied** [1] - 966:16
**satisfy** [1] - 1111:8
**saw** [34] - 781:4, 808:18, 814:14, 814:15, 836:19, 838:19, 839:1, 843:13, 851:13, 871:18, 922:23, 924:21, 933:11, 996:8, 1010:20, 1036:6, 1037:6, 1037:21, 1038:5, 1039:21, 1039:24, 1048:21, 1049:9, 1049:13, 1058:23, 1059:17, 1076:10, 1095:7, 1105:11, 1109:19, 1126:10, 1134:8, 1149:13
**scattered** [1] - 1049:8
**scene** [7] - 895:20, 919:6, 919:15, 921:1, 921:4, 922:5, 922:12
**schedule** [1] - 800:23
**schedules** [1] - 893:10
**Schmidt** [3] - 884:7, 884:18, 951:11
**school** [2] - 980:4, 982:16
**Science** [1] - 1080:17

**science** [4] - 896:1, 963:10, 1129:8, 1133:2
**Sciences** [2] - 1082:9, 1082:10
**scientific** [1] - 1022:7
**scientist** [1] - 891:3
**scientists** [3] - 930:7, 1022:9, 1023:15
**scope** [2] - 784:8, 826:1
**SCOTT** [1] - 767:21
**screen** [40] - 797:15, 800:18, 800:20, 803:22, 834:16, 834:20, 835:8, 890:13, 912:12, 917:21, 917:24, 922:24, 930:22, 963:14, 984:9, 984:12, 989:20, 1037:9, 1037:21, 1039:10, 1040:6, 1047:2, 1048:21, 1075:5, 1084:2, 1089:5, 1089:8, 1094:9, 1105:22, 1107:17, 1107:23, 1108:2, 1108:13, 1119:20, 1144:17, 1146:24, 1148:12, 1149:5, 1149:7
**script** [7] - 1038:23, 1038:24, 1039:20, 1039:22, 1040:3, 1040:7, 1040:8
**scroll** [3] - 869:23, 1040:3, 1056:10
**sea** [2] - 960:6, 961:23
**seal** [1] - 1153:15
**Search** [7] - 804:17, 805:1, 889:18, 926:8, 926:9, 926:10, 951:22
**search** [24] - 807:15, 808:7, 808:8, 809:10, 815:15, 820:14, 820:17, 821:2, 821:9, 821:24, 822:16, 822:17, 824:3, 890:17, 933:22, 935:7, 935:11, 979:14, 979:16, 979:18, 1041:21, 1041:24, 1052:17, 1143:8
**searches** [4] - 807:14, 809:4, 809:9, 815:17
**seated** [2] - 780:15,

785:12, 873:4, 887:7, 993:3, 1000:1
**Seattle** [1] - 1047:13, 1047:21
**second** [33] - 782:14, 787:7, 805:10, 807:8, 820:23, 821:17, 822:13, 850:23, 857:22, 857:24, 870:4, 881:16, 881:21, 906:16, 933:16, 977:9, 993:13, 993:18, 996:2, 1004:13, 1041:17, 1068:24, 1100:13, 1102:23, 1102:24, 1117:16, 1117:18, 1124:23, 1132:5, 1134:1, 1138:22, 1143:7
**seconds** [2] - 916:1, 1040:5
**secret** [1] - 970:2
**section** [11] - 804:12, 806:21, 1046:15, 1046:16, 1091:23, 1095:16, 1103:20, 1120:5, 1132:8, 1143:7, 1146:2
**Section** [2] - 884:4, 1149:22
**sections** [26] - 1091:7, 1091:8, 1091:20, 1095:2, 1102:21, 1103:17, 1103:23, 1103:24, 1104:1, 1104:5, 1105:2, 1106:11, 1107:21, 1108:16, 1113:3, 1115:23, 1116:1, 1117:3, 1117:24, 1118:24, 1119:2, 1119:8, 1141:20, 1141:21, 1148:3, 1148:4
**Securities** [1] - 818:20
**see** [156] - 773:23, 775:18, 776:12, 780:5, 780:19, 783:19, 784:10, 786:5, 789:10, 791:1, 792:13, 796:1, 797:6, 797:8, 797:11, 800:17, 800:24, 801:4, 805:5, 806:3, 815:16, 816:13, 820:8, 832:5, 832:12, 834:11,

835:10, 835:17, 835:21, 836:2, 839:5, 839:7, 844:4, 845:9, 846:6, 851:6, 851:9, 852:19, 870:6, 870:11, 874:16, 890:12, 890:14, 891:17, 891:19, 891:20, 891:23, 892:2, 892:14, 892:16, 908:1, 908:6, 912:12, 913:8, 915:1, 917:20, 918:11, 919:8, 935:4, 936:9, 937:16, 947:8, 950:20, 954:8, 955:7, 961:23, 962:1, 962:4, 962:7, 965:6, 970:10, 971:8, 971:14, 973:14, 975:8, 976:3, 983:1, 983:12, 983:21, 983:22, 984:3, 985:2, 985:17, 988:19, 989:18, 989:21, 990:16, 990:20, 990:21, 990:24, 995:14, 995:19, 998:18, 1001:24, 1016:15, 1016:20, 1017:12, 1017:18, 1018:7, 1018:13, 1018:21, 1019:13, 1019:14, 1019:19, 1020:1, 1029:2, 1034:3, 1034:5, 1034:15, 1038:10, 1040:2, 1040:4, 1041:7, 1045:5, 1045:6, 1045:8, 1050:16, 1053:15, 1056:20, 1056:23, 1057:2, 1058:5, 1071:1, 1071:6, 1071:7, 1071:22, 1074:14, 1076:20, 1089:23, 1092:2, 1092:3, 1092:4, 1092:20, 1095:16, 1099:14, 1101:9, 1101:10, 1101:12, 1101:14, 1101:17, 1112:15, 1115:5, 1119:22, 1119:24, 1120:24, 1121:1, 1121:2, 1121:10, 1127:13, 1150:15,

1152:6, 1152:9
**seeing** [18] - 833:13, 848:13, 851:18, 970:9, 972:18, 975:4, 996:11, 1000:18, 1039:10, 1040:6, 1053:11, 1073:22, 1073:24, 1098:14, 1098:16, 1121:19, 1121:20, 1121:22
**seem** [7] - 772:14, 794:18, 834:16, 834:24, 1005:13, 1065:18, 1074:11
**segment** [1] - 862:18
**selectable** [2] - 1092:16, 1138:7
**selection** [1] - 1116:9
**sell** [4] - 853:15, 928:19, 978:5, 1014:10
**selling** [6] - 804:20, 804:21, 850:1, 924:14, 928:18, 929:8
**send** [5] - 969:7, 969:8, 973:11, 1026:19, 1036:7
**sending** [2] - 996:21, 1002:22
**senior** [2] - 887:14, 889:1
**sense** [5] - 892:18, 967:22, 988:19, 1009:19, 1147:10
**sent** [3] - 832:16, 833:6, 952:14
**sentence** [9] - 804:7, 807:23, 821:9, 821:17, 821:18, 850:9, 852:20, 1000:10, 1041:18
**separate** [6] - 816:22, 877:23, 882:21, 910:10, 980:10, 1026:15
**separating** [1] - 816:20
**September** [5] - 848:15, 848:16, 1061:22, 1062:9, 1090:18
**sequence** [1] - 1112:4
**series** [6] - 977:7, 977:8, 977:10, 993:18, 993:21
**seriously** [1] - 783:10
**served** [1] - 787:3
**server** [16] - 909:22,

952:14, 952:18, 972:21, 972:22, 1035:12, 1035:22, 1045:6, 1050:10, 1099:11, 1099:16, 1100:22, 1111:2, 1138:19, 1139:4

**servers** [25] - 904:1, 909:16, 909:23, 910:16, 910:17, 910:18, 910:19, 911:3, 959:21, 960:1, 1029:18, 1035:16, 1044:23, 1045:4, 1045:18, 1050:7, 1050:12, 1054:8, 1060:8, 1093:10, 1093:14, 1094:6, 1139:8, 1139:12

**serves** [1] - 904:6

**service** [3] - 910:20, 910:23, 952:6

**services** [5] - 910:20, 924:8, 938:14, 952:7, 1062:24

**session** [21] - 792:16, 793:24, 794:1, 829:23, 830:18, 841:14, 842:7, 842:9, 845:19, 853:8, 855:18, 859:14, 861:6, 926:20, 927:4, 927:6, 927:8, 927:9, 944:5, 944:7, 944:11

**sessions** [27] - 793:19, 794:3, 794:6, 796:20, 796:22, 797:7, 797:14, 797:19, 797:20, 799:7, 799:15, 800:6, 800:8, 800:9, 800:22, 800:23, 801:1, 801:15, 801:17, 801:18, 858:24, 861:3, 877:16, 878:18, 879:4

**set** [15] - 802:4, 984:9, 992:9, 992:13, 994:1, 1047:12, 1047:14, 1084:11, 1097:17, 1108:17, 1110:3, 1138:17, 1138:20, 1149:6, 1153:14

**sets** [6] - 994:14, 1046:7, 1084:10,

1096:9, 1114:23, 1116:13

**setting** [1] - 1052:2

**settling** [1] - 983:14

**setup** [1] - 983:19

**seven** [9] - 792:18, 794:24, 807:16, 859:23, 895:11, 927:15, 971:2, 1020:24, 1093:3

**seventeen** [1] - 797:12

**several** [34] - 793:17, 799:9, 801:5, 806:20, 807:10, 807:22, 808:14, 809:6, 813:3, 814:23, 815:10, 817:1, 817:5, 822:6, 823:8, 832:24, 857:1, 865:20, 869:1, 869:17, 871:7, 877:6, 881:4, 881:6, 916:1, 952:11, 978:7, 1002:4, 1077:21, 1098:22, 1112:9, 1128:6, 1129:18, 1137:2

**several...yes** [1] - 848:13

**SGI** [27] - 895:6, 895:10, 895:11, 947:18, 948:17, 948:18, 955:19, 955:20, 955:22, 956:4, 956:8, 957:10, 962:9, 962:11, 962:24, 963:4, 966:20, 966:22, 966:24, 967:4, 982:19, 985:14, 986:6, 996:11, 1009:9, 1009:20, 1012:1

**SGI's** [1] - 982:9

**shaking** [1] - 1147:11

**shape** [1] - 1151:20

**share** [4] - 820:14, 820:18, 821:2, 821:10

**shares** [1] - 820:13

**sharing** [1] - 820:22

**sharp** [2] - 921:11, 922:24

**sharper** [3] - 917:22, 961:21

**sheet** [3] - 799:21, 800:1, 800:7

**shipment** [1] - 1026:21

**shipped** [5] - 952:23, 1026:17, 1026:23, 1027:3, 1043:22

**shoes** [2] - 928:18, 928:19

**shop** [3] - 1052:13, 1052:18, 1052:19

**shopping** [4] - 911:20, 911:24, 913:14, 916:11

**shore** [1] - 973:20

**short** [4] - 833:14, 897:2, 924:5, 1141:3

**Short** [1] - 1061:2

**Shorthand** [1] - 1153:8

**shot** [2] - 890:13, 973:20

**show** [57] - 779:13, 800:20, 810:22, 821:15, 860:21, 865:12, 868:19, 890:9, 925:22, 926:14, 928:3, 933:20, 933:23, 934:1, 947:16, 948:6, 959:2, 959:14, 959:15, 974:7, 977:18, 981:11, 981:12, 982:7, 983:3, 984:18, 1002:12, 1033:11, 1035:4, 1039:3, 1039:6, 1039:15, 1040:13, 1041:4, 1041:6, 1041:15, 1042:18, 1044:15, 1046:13, 1049:12, 1051:21, 1052:2, 1053:5, 1053:21, 1053:23, 1056:3, 1071:17, 1086:23, 1089:16, 1112:15, 1114:7, 1115:8, 1118:6, 1118:21, 1131:13, 1132:5, 1143:22

**showed** [25] - 777:1, 777:17, 777:18, 777:19, 816:2, 859:10, 935:9, 963:24, 1002:8, 1002:13, 1002:14, 1048:20, 1048:22, 1052:19, 1052:22, 1058:22, 1058:23, 1071:2, 1073:7, 1075:21, 1091:15, 1119:21, 1122:5, 1123:3, 1140:20

**showing** [21] - 770:1, 770:4, 777:22, 797:14, 800:16, 866:14, 866:24, 869:4, 869:6, 890:18, 935:11, 939:23, 975:17, 981:10, 1044:22, 1058:11, 1112:22, 1113:16, 1113:18, 1123:21, 1139:8

**shown** [17] - 791:20, 803:22, 812:16, 890:15, 907:15, 1033:15, 1034:7, 1035:17, 1044:18, 1049:18, 1049:20, 1065:5, 1072:8, 1073:2, 1121:21, 1136:17, 1148:1

**showroom** [2] - 990:18, 990:19

**shows** [20] - 771:3, 797:6, 797:10, 799:21, 800:2, 802:5, 817:23, 819:1, 842:14, 860:21, 865:7, 867:8, 869:11, 927:15, 1091:5, 1091:24, 1107:15, 1141:24, 1148:2, 1148:15

**shuffle** [1] - 914:7

**shut** [1] - 969:3

**side** [26] - 787:11, 795:6, 796:3, 812:20, 814:9, 815:11, 890:14, 890:17, 892:2, 909:11, 917:21, 936:3, 947:24, 999:11, 1019:22, 1076:22, 1077:3, 1098:15, 1107:9, 1121:16, 1142:2, 1148:6, 1148:12, 1150:24

**Side** [2] - 789:15, 947:13

**side-bar** [5] - 795:6, 796:3, 1019:22, 1076:22, 1077:3

**side-by-side** [1] - 1121:16

**sided** [1] - 1149:11

**sides** [2] - 769:16, 1151:6

**SIG** [1] - 1022:20

**SIGGRAPH** [34] -

959:15, 1020:23, 1022:17, 1022:21, 1022:23, 1023:7, 1023:8, 1023:11, 1023:14, 1023:21, 1024:5, 1024:9, 1024:17, 1024:19, 1024:24, 1025:13, 1025:20, 1026:5, 1027:6, 1027:14, 1048:5, 1048:12, 1048:14, 1050:2, 1050:9, 1050:17, 1052:4, 1056:2, 1057:7, 1057:11, 1057:17, 1058:8, 1137:1

**Siggraph** [11] - 1070:9, 1070:13, 1070:17, 1072:12, 1073:14, 1073:18, 1073:19, 1073:21, 1076:24, 1077:8, 1077:12

**signed** [2] - 977:11, 1013:6

**significant** [7] - 792:21, 792:24, 811:12, 821:22, 892:11, 1065:16, 1065:17

**signing** [1] - 978:3

**SIGs** [1] - 1022:22

**silicon** [1] - 894:24

**Silicon** [10] - 895:6, 955:15, 955:17, 967:19, 980:23, 981:2, 990:19, 996:6, 1063:12, 1083:21

**similar** [14] - 794:22, 847:5, 847:9, 907:24, 995:13, 1025:15, 1053:4, 1054:4, 1054:9, 1054:14, 1105:7, 1107:14, 1109:5, 1126:13

**SIMMONS** [15] - 768:7, 950:1, 974:18, 974:23, 975:1, 990:6, 990:10, 991:9, 1000:3, 1000:5, 1014:23, 1017:22, 1019:4, 1019:15, 1020:1

**Simmons** [3] - 949:20, 950:6, 1000:2

**simple** [6] - 837:17,

838:11, 838:16,
868:1, 940:7, 1114:1
**simplicity** [1] - 907:17
**simplification** [1] -
946:16
**simplifying** [1] - 908:7
**simply** [6] - 1075:24,
1101:17, 1117:10,
1121:13, 1123:13,
1124:3
**simulate** [1] - 1092:22
**simulation** [8] -
950:22, 954:20,
954:21, 955:11,
957:1, 960:4, 962:7,
966:9
**simulations** [1] -
957:1
**simulator** [5] - 955:7,
956:2, 956:20,
960:4, 1037:22
**simulators** [2] -
955:16, 957:24
**simultaneously** [1] -
1045:2
**single** [3] - 966:1,
978:21, 1007:17
**Sioux** [4] - 1035:23,
1050:13, 1060:9,
1060:10
**sisters** [1] - 971:6
**sit** [6] - 872:13,
874:21, 875:7,
894:7, 1060:20,
1150:19
**site** [3] - 937:12,
1026:18, 1027:4
**sites** [1] - 1026:24
**sitting** [3] - 812:19,
812:20, 1026:10
**situation** [3] - 805:16,
837:10, 927:23
**six** [4] - 792:17,
976:19, 1093:2,
1150:24
**size** [2] - 799:1,
981:24
**skill** [3] - 1132:16,
1132:20, 1150:5
**skip** [1] - 1113:13
**skipped** [2] - 1113:23,
1114:13
**skipping** [1] - 781:16
**skips** [2] - 1114:19,
1115:22
**Skyline** [1] - 1067:12
**slide** [43] - 789:5,
790:4, 790:6,
810:16, 811:9,
811:19, 812:6,

812:12, 817:16,
824:7, 829:1,
856:12, 857:11,
861:14, 877:15,
906:3, 906:5,
907:24, 940:16,
1039:18, 1080:1,
1080:5, 1080:7,
1083:9, 1083:12,
1084:9, 1087:1,
1089:12, 1090:9,
1092:9, 1096:5,
1096:20, 1098:15,
1101:3, 1103:3,
1116:3, 1121:15,
1125:8, 1127:1,
1137:14, 1140:24,
1141:14, 1144:7
**Slide** [1] - 1130:6
**slow** [2] - 916:6, 923:2
**small** [8] - 857:19,
905:10, 905:12,
909:10, 909:12,
934:17, 976:12,
1116:8
**smaller** [21] - 880:9,
1091:20, 1091:23,
1095:1, 1098:20,
1102:21, 1103:17,
1103:23, 1103:24,
1104:5, 1105:2,
1106:11, 1107:20,
1113:3, 1115:23,
1116:1, 1117:3,
1117:24, 1119:8,
1141:21
**smart** [2] - 967:20,
1113:10
**Smith** [1] - 1019:11
**smooth** [2] - 923:6,
964:1
**smoothly** [1] - 962:7
**Snyder** [11] - 772:9,
782:10, 783:23,
795:5, 826:20,
876:12, 887:10,
995:7, 995:22,
997:6, 998:8
**SNYDER** [74] - 768:7,
769:12, 772:10,
772:19, 774:6,
778:7, 782:11,
783:24, 785:4,
789:6, 789:13,
786:16, 790:23,
791:22, 795:21,
819:4, 819:7,
819:23, 820:3,
825:8, 825:17,
825:24, 826:21,

826:24, 827:2,
835:4, 843:15,
843:17, 848:5,
848:7, 856:8,
856:11, 869:13,
871:24, 872:17,
873:6, 873:15,
873:19, 874:13,
875:14, 875:20,
876:13, 876:17,
877:2, 881:2,
885:22, 886:9,
887:1, 887:11,
888:10, 940:11,
945:19, 947:4,
947:20, 949:7,
949:13, 992:15,
993:14, 995:23,
997:7, 997:11,
997:16, 998:3,
998:10, 998:13,
999:14, 999:20,
1020:17, 1027:20,
1028:2, 1028:8,
1060:24, 1061:5,
1078:3
**soccer** [2] - 971:11,
971:12
**Social** [1] - 1080:17
**Society** [3] - 1082:11,
1082:13, 1082:14
**society** [1] - 1022:8
**software** [31] - 804:14,
883:8, 883:9,
895:18, 895:19,
901:17, 901:23,
906:1, 952:7, 954:6,
956:4, 956:6,
962:19, 963:1,
963:2, 963:4,
966:22, 966:23,
968:12, 968:13,
980:4, 980:6, 982:7,
985:3, 985:21,
986:2, 1015:14,
1015:15, 1076:6,
1115:3, 1115:13
**Software** [1] - 1067:12
**sold** [5] - 858:6, 858:9,
863:4, 924:9, 976:17
**sole** [3] - 889:7,
889:10, 893:5
**solution** [4] - 806:24,
1129:11, 1129:23,
1147:15
**solve** [4] - 951:17,
958:4, 1129:21,
1130:5
**someone** [6] - 820:14,
855:22, 939:4,

942:19, 983:8,
1061:7
**sometime** [1] - 933:22
**sometimes** [14] -
813:15, 837:13,
837:14, 837:24,
838:1, 838:5,
838:13, 955:17,
958:20, 980:3,
982:14, 982:16,
989:7, 1081:12
**somewhat** [1] -
1124:5
**somewhere** [2] -
892:9, 973:8
**Sony** [1] - 968:13
**soon** [3] - 804:19,
991:23, 1018:18
**sooner** [3] - 920:6,
922:18, 923:5
**sophisticated** [2] -
1063:20, 1064:11
**sorry** [33] - 778:8,
787:23, 790:8,
798:23, 800:17,
817:21, 818:12,
821:17, 826:12,
832:17, 833:22,
837:19, 848:10,
900:17, 917:4,
1017:14, 1051:4,
1057:23, 1061:17,
1062:7, 1064:17,
1065:3, 1066:20,
1067:1, 1068:3,
1071:20, 1071:22,
1072:6, 1073:5,
1093:3, 1100:5,
1106:23, 1135:16
**sort** [9] - 904:6,
938:16, 939:14,
950:18, 957:3,
981:22, 993:7,
1001:8, 1123:20
**sorts** [2] - 860:9,
926:13
**sought** [1] - 879:14
**sounds** [1] - 854:11
**source** [39] - 817:14,
942:2, 942:15,
942:16, 942:20,
942:23, 943:8,
943:11, 943:14,
945:21, 946:3,
946:7, 946:17,
985:1, 985:2,
993:21, 1031:13,
1051:2, 1051:5,
1051:18, 1051:21,
1051:23, 1052:3,

1071:6, 1085:8,
1085:18, 1097:9,
1097:10, 1097:14,
1097:16, 1109:14,
1112:6, 1114:15,
1114:17, 1114:24,
1116:4, 1116:9,
1122:9, 1122:13
**sources** [6] - 1087:9,
1093:8, 1134:22,
1138:17, 1138:21,
1139:10
**South** [3] - 1050:14,
1060:9, 1060:10
**Soviet** [1] - 970:4
**space** [8] - 804:9,
890:15, 973:16,
987:23, 1092:14,
1092:21, 1092:23,
1138:6
**space-related** [1] -
1092:14
**spaced** [1] - 886:8
**Spacial** [2] - 960:11,
960:15
**Spatially** [1] - 1080:17
**spatially** [5] - 1093:13,
1105:1, 1138:17,
1138:20, 1139:10
**speaking** [6] - 840:19,
857:20, 896:13,
1024:10, 1025:6,
1025:7
**SPEARS** [22] - 767:22,
885:13, 1027:24,
1060:14, 1061:6,
1061:10, 1061:12,
1068:7, 1074:11,
1074:16, 1074:19,
1075:4, 1075:7,
1075:8, 1075:17,
1077:1, 1077:24,
1151:11, 1151:15,
1151:24, 1152:5,
1152:8
**special** [5] - 964:2,
1022:19, 1022:20,
1022:21, 1023:8
**specialized** [1] -
884:16
**specializes** [1] -
897:12
**specific** [17] - 778:17,
789:22, 825:14,
827:14, 840:24,
854:6, 861:6,
862:13, 872:22,
877:14, 884:9,
941:13, 1025:6,
1088:18, 1094:14,

1138:1, 1143:2
**specifically** [16] -
771:13, 775:24,
814:5, 846:12,
853:1, 869:10,
878:20, 882:5,
883:18, 939:24,
955:21, 1014:7,
1031:9, 1137:11,
1145:6, 1145:8
**specification** [1] -
988:4
**specified** [2] -
1026:24, 1136:23
**Spectrum** [1] - 891:20
**speculation** [1] -
878:19
**speed** [6] - 959:2,
1044:21, 1110:10,
1129:12, 1129:17,
1129:20
**spell** [2] - 888:1,
1078:13
**spend** [3] - 781:8,
792:19, 926:21
**spent** [7] - 793:19,
827:13, 827:16,
827:18, 1002:7,
1088:3, 1088:5
**spin** [4] - 969:6,
969:13, 972:7,
1084:2
**spinoff** [2] - 950:12,
954:19
**spirit** [2] - 1051:12,
1051:17
**split** [5] - 821:5,
1101:16, 1113:17
**splitting** [1] - 822:10
**spot** [1] - 991:4
**spread** [3] - 799:21,
800:1, 800:7
**spreadsheet** [9] -
797:3, 797:5, 798:1,
798:11, 798:17,
799:6, 933:11,
936:6, 936:7
**spreadsheets** [2] -
797:2, 827:20
**Sprint** [1] - 1045:11
**spun** [2] - 972:10,
1012:23
**spy** [1] - 970:8
**square** [4] - 1040:4,
1091:10, 1128:10,
1149:6
**Square** [2] - 974:8,
974:9
**squares** [7] - 959:10,
961:5, 961:6, 961:7,

961:8, 961:9
**squirm** [1] - 970:14
**SRI** [59] - 958:20,
959:18, 1028:11,
1028:13, 1029:7,
1029:8, 1029:9,
1029:19, 1030:8,
1030:9, 1030:13,
1030:14, 1031:14,
1031:20, 1032:13,
1040:16, 1041:1,
1053:20, 1054:20,
1054:23, 1055:4,
1063:3, 1063:5,
1063:14, 1063:16,
1063:19, 1064:7,
1064:10, 1064:13,
1064:19, 1065:6,
1065:11, 1065:15,
1065:18, 1066:14,
1125:15, 1130:8,
1130:16, 1130:17,
1130:23, 1131:3,
1134:20, 1135:5,
1137:12, 1138:21,
1140:16, 1141:10,
1142:16, 1143:16,
1143:18, 1144:2,
1144:9, 1145:9,
1145:13, 1145:21,
1146:7, 1148:6,
1148:23, 1149:19
**SRI's** [12] - 958:22,
1063:9, 1063:11,
1066:5, 1130:13,
1133:20, 1134:13,
1138:2, 1138:14,
1139:22, 1141:17,
1146:12
**stadium** [3] - 891:23,
891:24, 892:2
**stadiums** [2] - 891:17,
891:19
**staff** [3] - 983:17,
1026:2, 1066:5
**stage** [1] - 1110:8
**stand** [5] - 786:14,
788:4, 807:24,
874:21, 956:10
**standalone** [2] -
901:16, 980:1
**standard** [1] - 956:1
**standoff** [1] - 1001:9
**standpoint** [2] - 781:3,
814:24
**Stanford** [5] - 958:17,
958:19, 1029:10,
1063:6, 1063:8
**star** [1] - 966:17
**Star** [2] - 954:18,

955:13
**start** [30] - 784:23,
841:19, 877:7,
891:14, 891:23,
913:6, 913:24,
915:7, 915:15,
918:4, 918:6, 919:2,
927:10, 929:24,
931:22, 932:7,
937:2, 953:23,
974:24, 1001:18,
1004:4, 1009:9,
1041:5, 1046:4,
1048:7, 1053:9,
1085:9, 1100:19,
1111:9, 1136:20
**started** [15] - 782:13,
801:3, 889:12,
892:23, 954:5,
962:12, 964:20,
967:15, 967:18,
968:9, 968:10,
980:12, 993:6,
1110:12, 1124:6
**starter** [1] - 1006:14
**starting** [6] - 800:24,
918:12, 967:19,
1045:5, 1112:15,
1118:14
**starts** [2] - 800:24,
1072:2
**startup** [1] - 964:14
**state** [6] - 868:18,
888:1, 951:14,
1021:2, 1078:13,
1082:5
**State** [2] - 896:2,
1153:1
**statement** [3] -
818:19, 847:14,
1138:9
**statements** [1] - 784:9
**STATES** [1] - 767:1
**States** [6] - 767:14,
818:3, 819:13,
884:24, 936:16,
1089:18
**stating** [1] - 1017:19
**status** [2] - 992:14,
1016:6
**statute** [1] - 824:15
**stay** [2] - 927:17,
1145:20
**stenographic** [1] -
1153:11
**Step** [34] - 881:8,
881:21, 882:9,
882:10, 882:14,
882:15, 882:17,
882:18, 1093:5,

1093:16, 1093:23,
1093:24, 1094:1,
1094:3, 1094:6,
1094:9, 1094:21,
1095:5, 1102:18,
1102:24, 1103:1,
1103:2, 1103:18,
1103:21, 1104:19,
1104:23, 1105:23,
1105:24, 1106:5,
1108:1, 1138:13,
1138:15
**step** [57] - 822:24,
882:8, 884:13,
913:5, 1093:5,
1102:11, 1102:14,
1102:22, 1104:24,
1105:8, 1108:18,
1110:22, 1110:23,
1111:19, 1115:20,
1116:2, 1116:7,
1117:4, 1117:18,
1117:19, 1117:20,
1118:1, 1118:2,
1118:3, 1118:12,
1118:15, 1118:17,
1118:20, 1118:23,
1119:9, 1119:11,
1119:17, 1119:18,
1119:19, 1120:5,
1120:8, 1120:14,
1121:2, 1121:12,
1121:13, 1121:14,
1122:16, 1123:6,
1123:12, 1123:23,
1124:2, 1124:11,
1138:1
**Stephen** [2] - 1028:10,
1136:12
**STEPHEN** [1] -
1028:15
**Stephenson's** [1] -
963:10
**Steps** [10] - 1094:11,
1094:16, 1094:19,
1139:21, 1139:23,
1139:24, 1141:11,
1141:16, 1143:4,
1143:20
**steps** [19] - 800:13,
801:7, 849:22,
850:6, 881:6, 884:7,
884:11, 884:23,
1065:19, 1093:1,
1093:2, 1093:3,
1123:3, 1123:22,
1124:2, 1124:21,
1141:18, 1141:19
**Stern** [1] - 1009:22
**still** [9] - 788:6,

792:21, 830:10,
840:12, 999:6,
1012:9, 1106:1,
1108:7, 1111:18
**stipulation** [2] - 995:9,
998:1
**stock** [1] - 953:11
**stocks** [1] - 930:1
**stool** [3] - 823:12,
823:21, 823:22
**stop** [12] - 820:1,
929:8, 963:19,
963:21, 969:6,
975:23, 975:24,
991:6, 1054:15,
1110:13, 1120:15,
1120:16
**stopped** [1] - 1016:1
**stopping** [1] - 1150:9
**store** [21] - 897:23,
903:22, 903:24,
904:21, 904:22,
909:21, 948:12,
959:19, 972:19,
1035:14, 1052:12,
1099:10, 1103:16,
1106:8, 1106:14,
1106:16, 1108:1,
1108:5, 1115:24,
1117:23, 1118:15
**stored** [19] - 904:17,
909:14, 909:16,
909:18, 909:23,
910:14, 910:15,
912:20, 959:21,
960:1, 973:1,
1094:7, 1104:1,
1105:3, 1110:21,
1112:17, 1114:8,
1118:8, 1120:18
**storing** [7] - 881:9,
1095:2, 1110:7,
1113:2, 1119:1,
1120:12, 1141:21
**stranded** [1] - 1018:20
**strategic** [4] - 788:19,
788:20, 807:2,
1022:2
**strategy** [4] - 775:9,
777:17, 793:9, 893:8
**stream** [2] - 955:9,
961:13
**streams** [1] - 955:8
**street** [1] - 804:9
**Street** [1] - 767:11
**StreetView** [1] - 897:9
**strength** [1] - 831:11
**strict** [2] - 785:5,
994:5
**strike** [3] - 774:2,

877:5, 880:24
**strikes** [1] - 975:19
**stripes** [1] - 962:1
**strong** [3] - 792:15, 830:23, 831:6
**struck** [3] - 877:22, 878:1, 880:14
**structure** [3] - 904:11, 913:10, 967:7
**structures** [1] - 895:20
**stuck** [1] - 1031:24
**studied** [2] - 965:2, 988:21
**Studios** [1] - 984:12
**studiously** [1] - 877:13
**stuff** [6] - 862:5, 871:17, 916:5, 946:11, 997:3, 1005:3
**style** [1] - 979:6
**styled** [1] - 1067:11
**sub** [2] - 897:10, 1037:12
**sub-brand** [1] - 897:10
**subdivide** [1] - 1037:11
**subdivided** [2] - 1091:6, 1091:7
**subdividing** [1] - 1091:13
**subdivision** [1] - 1091:10
**subdivisions** [3] - 1091:11, 1098:6, 1098:11
**subject** [15] - 770:11, 876:16, 884:3, 949:2, 1020:10, 1132:12, 1140:11, 1143:19, 1145:7, 1145:10, 1145:19, 1145:23, 1146:11, 1147:20, 1148:24
**subjects** [1] - 1084:7
**submission** [3] - 886:1, 886:3, 886:4
**submit** [2] - 943:18, 1010:9
**submitted** [6] - 769:16, 1010:7, 1011:5, 1011:10, 1057:7, 1057:16
**submitting** [3] - 1041:1, 1043:19, 1043:21
**subpart** [1] - 881:21
**subparts** [1] - 881:8
**subscriptions** [2] -

1151:17
**summarize** [5] - 788:15, 993:8, 1084:9, 1123:21, 1124:6
**summarized** [3] - 800:15, 800:21, 811:13
**summarizes** [1] - 820:12
**summarizing** [1] - 844:1
**summary** [12] - 844:21, 856:14, 869:24, 932:21, 933:1, 933:2, 933:9, 933:10, 935:21, 935:24, 1125:2
**summed** [1] - 933:12
**summer** [2] - 1016:22, 1069:11
**Super** [1] - 1035:24
**Supercomputing** [1] - 1060:11
**superimpose** [1] - 1091:18
**superior** [1] - 814:10
**supermarket** [1] - 1112:10
**supervise** [1] - 1025:18
**supervised** [1] - 1026:2
**support** [16] - 863:6, 1014:21, 1015:5, 1015:12, 1015:17, 1015:22, 1016:5, 1017:21, 1018:12, 1019:8, 1122:14, 1140:14, 1141:10, 1143:3, 1143:18, 1144:3
**supported** [4] - 863:5, 1015:13, 1015:14, 1149:12
**supporting** [2] - 1016:1, 1143:12
**suppose** [1] - 1089:21
**supposed** [2] - 870:17, 870:18
**surface** [1] - 1128:9
**surgeries** [1] - 950:21
**surprise** [1] - 998:4
**surprised** [2] - 780:18, 780:20
**surrounded** [1] - 1105:13
**Survey** [2] - 1035:23, 1038:3

923:9
**swore** [1] - 1067:18
**sworn** [6] - 887:23, 888:7, 949:23, 1017:5, 1028:17, 1078:21
**Symposium** [7] - 1039:5, 1039:12, 1044:5, 1048:5, 1058:14, 1068:13, 1069:18
**symposium** [9] - 1039:15, 1059:1, 1066:10, 1066:24, 1067:5, 1067:8, 1069:20, 1070:1, 1146:3
**symposiums** [1] - 1034:8
**sync** [1] - 1121:3
**synthetic** [1] - 1138:11
**System** [2] - 1081:22, 1127:12
**system** [89] - 779:10, 779:18, 894:22, 895:2, 930:19, 930:20, 931:3, 934:5, 934:12, 947:16, 948:6, 958:24, 959:13, 959:18, 962:2, 962:5, 967:8, 989:1, 1028:13, 1035:13, 1036:11, 1041:2, 1041:12, 1045:20, 1045:22, 1047:22, 1049:17, 1050:8, 1055:8, 1059:16, 1060:5, 1069:22, 1111:3, 1114:3, 1125:18, 1126:3, 1127:4, 1127:11, 1130:1, 1130:9, 1130:14, 1130:19, 1130:23, 1131:4, 1134:13, 1134:20, 1134:21, 1134:24, 1135:13, 1135:16, 1137:5, 1137:12, 1137:21, 1138:2, 1138:9, 1138:14, 1138:19, 1139:4, 1139:6, 1139:19, 1139:22, 1140:10, 1140:17, 1141:11, 1141:17, 1143:4, 1143:19, 1144:4, 1144:9, 1144:12, 1145:10, 1145:23,

1146:7, 1146:13, 1146:18, 1146:23, 1146:24, 1147:7, 1147:8, 1147:20, 1148:7, 1148:23, 1149:10, 1149:20, 1149:24, 1150:3
**systems** [14] - 957:11, 957:13, 957:24, 959:24, 960:23, 961:18, 1046:16, 1046:18, 1046:21, 1078:6, 1081:11, 1082:19, 1129:24, 1133:7
**Systems** [4] - 954:6, 954:13, 954:14, 954:16
**T-Vision** [7] - 1075:11, 1125:20, 1126:8, 1133:16, 1134:1, 1134:3, 1134:14
**T_Vision** [4] - 1055:10, 1056:24, 1057:2, 1057:19
**tab** [1] - 1067:23
**table** [5] - 776:24, 802:20, 808:19, 904:6, 1056:15
**tables** [1] - 982:3
**tablet** [2] - 889:24, 896:17
**tablets** [2] - 900:4, 900:9
**tactical** [1] - 850:17
**Tahrir** [1] - 974:8
**takeoff** [1] - 977:11
**talks** [11] - 771:13, 771:23, 804:12, 836:17, 841:6, 857:6, 1092:12, 1138:5, 1146:4, 1146:16, 1146:21
**tape** [2] - 1035:1, 1068:18
**targeted** [1] - 975:19
**task** [1] - 914:14
**tasks** [3] - 916:10, 917:10, 917:15
**taught** [1] - 1082:18
**teaching** [5] - 1080:9, 1080:20, 1081:8, 1082:20, 1087:19
**team** [29] - 780:5, 827:16, 827:18, 893:16, 894:1, 894:3, 894:6, 930:3, 931:12, 931:17, 932:14, 937:21, 937:22, 939:12,

947:15, 948:5,
950:6, 956:3,
968:12, 981:8,
981:13, 982:21,
986:24, 988:17,
989:6, 989:12,
1000:21, 1000:24,
1127:20
**team's** [1] - 1004:11
**tear** [1] - 983:19
**tech** [1] - 1063:12
**technical** [16] -
802:14, 814:2,
814:6, 814:9,
951:12, 960:12,
988:16, 1004:23,
1005:9, 1023:3,
1040:11, 1040:16,
1067:5, 1142:16,
1145:13, 1147:17
**Technical** [7] - 1039:5,
1039:11, 1044:5,
1048:5, 1058:13,
1068:13, 1069:18
**technically** [2] -
967:16, 1140:24
**technique** [1] -
1042:15
**techniques** [1] -
1066:3
**technologies** [7] -
821:24, 951:15,
988:18, 1088:18,
1088:23, 1089:2,
1089:3
**Technologies** [2] -
954:18, 955:13
**technologist** [1] -
949:15
**Technologist** [1] -
951:20
**technology** [20] -
803:9, 814:11,
814:12, 814:18,
816:16, 899:18,
901:17, 969:19,
970:8, 972:3,
1010:23, 1011:3,
1013:5, 1013:8,
1064:16, 1064:24,
1088:24, 1089:1,
1125:5, 1126:18
**Technology** [1] -
951:8
**telephone** [1] - 844:2
**teleport** [2] - 890:6,
1047:10
**television** [1] - 926:11
**ten** [14] - 780:13,
781:20, 815:2,

815:3, 826:11,
826:12, 826:13,
872:8, 872:9, 873:1,
873:21, 874:6,
888:22, 898:21
**ten-minute** [1] - 872:8
**tens** [2] - 946:19,
957:21
**tentative** [1] - 786:11
**tenth** [1] - 770:23
**terabytes** [1] - 903:16
**term** [9] - 842:16,
867:6, 904:19,
938:16, 1014:18,
1095:15, 1101:10,
1101:12, 1132:16
**terminology** [1] -
906:9
**terms** [25] - 775:24,
780:23, 837:12,
839:2, 839:8,
841:20, 847:10,
850:3, 850:24,
851:14, 852:8,
854:20, 861:3,
866:5, 868:18,
993:20, 1023:10,
1035:3, 1086:15,
1086:18, 1094:11,
1095:12, 1096:3,
1101:10, 1118:7
**Terra** [1] - 1031:23
**Terrabella** [1] - 897:11
**terrain** [24] - 956:24,
1030:5, 1030:11,
1031:20, 1032:4,
1035:3, 1036:15,
1036:19, 1038:10,
1041:22, 1042:14,
1043:8, 1044:12,
1045:1, 1045:20,
1045:22, 1046:8,
1047:1, 1138:10,
1143:10, 1145:16,
1146:5, 1146:6,
1149:11
**TerraVision** [134] -
958:18, 959:4,
1028:13, 1029:7,
1029:8, 1029:13,
1029:14, 1030:12,
1031:8, 1031:10,
1031:12, 1031:14,
1032:2, 1032:6,
1032:7, 1032:8,
1032:14, 1032:19,
1033:10, 1034:5,
1035:15, 1036:11,
1037:19, 1038:1,
1039:21, 1039:23,

1040:1, 1040:10,
1040:18, 1041:12,
1041:23, 1042:4,
1046:19, 1046:23,
1048:2, 1048:3,
1048:18, 1049:4,
1049:7, 1049:9,
1049:17, 1049:20,
1049:22, 1050:1,
1050:8, 1050:15,
1051:3, 1051:5,
1051:10, 1052:13,
1054:4, 1054:12,
1054:17, 1054:19,
1054:20, 1054:24,
1055:4, 1057:8,
1058:11, 1058:21,
1058:24, 1059:3,
1059:8, 1059:16,
1059:22, 1060:1,
1060:5, 1068:12,
1068:15, 1069:17,
1069:22, 1070:20,
1073:16, 1073:23,
1125:15, 1125:18,
1126:3, 1130:8,
1130:14, 1133:16,
1133:21, 1134:13,
1134:20, 1134:24,
1135:2, 1135:8,
1135:13, 1135:16,
1136:24, 1137:5,
1137:12, 1137:21,
1138:2, 1138:8,
1138:14, 1138:24,
1139:2, 1139:11,
1139:18, 1139:22,
1140:3, 1140:4,
1140:10, 1140:17,
1141:10, 1141:17,
1141:23, 1142:15,
1143:2, 1143:4,
1143:17, 1143:19,
1144:3, 1144:4,
1144:9, 1144:12,
1145:4, 1145:9,
1145:21, 1146:7,
1146:12, 1147:7,
1147:15, 1147:19,
1148:7, 1148:23,
1149:3, 1149:9,
1149:20, 1149:24,
1150:3
**terrifying** [1] - 1004:8
**tesselation** [1] -
1038:18
**tessellate** [1] - 1038:7
**test** [1] - 981:22
**Testbed** [3] - 1056:22,
1057:8, 1058:7

**testbed** [2] - 1044:20,
1044:21
**testified** [19] - 833:3,
871:3, 881:11,
882:5, 882:11,
884:19, 888:8,
942:7, 943:5,
949:24, 971:18,
1012:11, 1013:15,
1013:17, 1028:18,
1078:22, 1126:21,
1135:1, 1135:12
**testify** [16] - 778:22,
827:6, 833:5, 844:5,
844:8, 846:8, 871:5,
871:8, 883:1,
887:15, 894:11,
949:17, 949:18,
1020:21, 1028:12,
1078:8
**testifying** [2] - 953:14,
1084:8
**testimony** [71] - 769:6,
769:14, 770:10,
781:10, 781:17,
782:13, 782:18,
784:3, 786:3,
794:16, 803:5,
823:11, 836:19,
846:11, 851:24,
863:3, 871:15,
872:23, 873:8,
873:20, 874:4,
877:5, 877:8,
877:12, 877:21,
879:3, 879:22,
880:14, 881:13,
890:9, 900:16,
900:18, 901:8,
924:22, 936:21,
944:10, 953:3,
955:18, 995:16,
995:20, 996:10,
1010:15, 1018:23,
1019:6, 1027:15,
1028:3, 1031:4,
1067:11, 1067:14,
1069:24, 1070:5,
1085:20, 1086:3,
1086:6, 1094:18,
1103:4, 1125:24,
1130:12, 1130:24,
1134:9, 1135:3,
1136:3, 1136:12,
1136:14, 1138:18,
1146:18, 1147:2,
1147:5, 1149:9,
1151:16, 1152:4
**tests** [1] - 884:21
**text** [2] - 976:1, 976:3

**texture** [1] - 966:7
**thanked** [1] - 1060:3
**THE** [182] - 767:1,
767:2, 767:13,
769:1, 769:11,
769:15, 771:10,
771:17, 771:20,
772:9, 772:15,
773:20, 774:14,
774:18, 776:3,
776:12, 777:3,
777:12, 777:24,
778:5, 778:10,
778:14, 779:1,
779:21, 780:7,
780:12, 780:15,
780:19, 782:7,
783:3, 783:22,
784:10, 784:18,
785:1, 785:8,
785:12, 786:7,
787:1, 787:17,
787:19, 787:22,
788:5, 788:7, 788:9,
789:10, 789:23,
790:5, 791:1, 792:4,
795:4, 795:7,
795:17, 796:1,
803:20, 812:11,
817:19, 819:6,
819:10, 820:7,
825:16, 825:19,
826:6, 826:20,
826:23, 835:2,
865:3, 871:23,
872:2, 872:7,
872:13, 872:24,
873:4, 873:10,
873:17, 874:8,
874:16, 874:20,
874:24, 875:8,
875:13, 875:16,
875:22, 876:1,
876:3, 876:12,
876:15, 876:22,
876:24, 880:19,
885:8, 885:17,
886:2, 886:7,
886:11, 886:14,
886:20, 887:3,
887:7, 887:23,
888:1, 888:3, 947:7,
947:10, 947:14,
947:23, 948:1,
948:7, 948:16,
948:18, 948:20,
948:22, 948:24,
949:5, 949:12,
974:22, 990:4,
990:8, 991:8,
991:11, 991:16,

992:1, 992:17, 993:1, 993:3, 994:15, 994:20, 995:2, 995:6, 996:14, 997:5, 997:10, 997:12, 997:22, 998:14, 999:16, 999:22, 1000:1, 1015:1, 1016:10, 1016:13, 1017:24, 1019:19, 1019:23, 1020:5, 1020:14, 1020:16, 1028:1, 1028:7, 1028:21, 1033:22, 1060:16, 1060:20, 1061:3, 1061:7, 1061:11, 1068:5, 1071:24, 1074:8, 1074:13, 1074:17, 1074:21, 1075:2, 1075:6, 1076:19, 1076:23, 1077:4, 1077:9, 1077:13, 1077:15, 1077:16, 1078:1, 1078:13, 1078:15, 1079:1, 1142:7, 1150:11, 1150:19, 1151:14, 1151:22, 1152:2, 1152:6, 1152:9

**theater** [1] - 1023:3
**themselves** [2] - 840:16, 971:14
**theory** [3] - 771:11, 777:4, 779:2
**therefore** [5] - 880:3, 1112:23, 1117:4, 1124:12, 1124:13
**they've** [7] - 774:10, 774:12, 792:2, 807:11, 822:5, 854:22, 878:18
**thinking** [4] - 808:9, 871:13, 890:5, 1131:20
**third** [8] - 793:1, 823:21, 870:4, 882:9, 952:16, 1053:23, 1085:10, 1138:22
**thoughts** [2] - 1043:24, 1046:1
**thousand** [7] - 808:5, 809:9, 903:15, 903:16, 903:17, 928:24, 957:22
**thousands** [5] - 827:20, 946:18, 946:19, 957:21

**three** [30] - 799:4, 802:11, 823:12, 865:13, 932:6, 964:7, 965:15, 966:17, 967:17, 1037:18, 1038:1, 1038:11, 1045:7, 1045:8, 1046:15, 1046:24, 1072:12, 1077:11, 1093:10, 1095:19, 1096:16, 1109:15, 1113:18, 1116:13, 1124:2, 1133:3, 1133:8, 1133:12, 1149:11
**three-dimensional** [4] - 1037:18, 1038:1, 1038:11, 1046:24
**three-legged** [1] - 823:12
**three-sided** [1] - 1149:11
**threshold** [1] - 1115:6
**thresholds** [1] - 988:19
**throughout** [4] - 879:11, 943:1, 1049:8, 1050:7
**tie** [1] - 1126:1
**tied** [1] - 880:21
**tight** [6] - 846:4, 846:18, 846:19, 847:7, 1004:22, 1004:23
**tile** [6] - 1036:17, 1037:11, 1046:7, 1100:14, 1105:16, 1110:4
**tiles** [20] - 959:10, 1036:12, 1036:17, 1036:20, 1036:21, 1036:23, 1036:24, 1037:8, 1037:9, 1098:24, 1099:4, 1100:21, 1105:12, 1111:2, 1112:15, 1112:21, 1113:14, 1113:23, 1149:5, 1149:6
**Tim** [1] - 878:22
**timeline** [3] - 969:21, 1136:13, 1136:18
**timelines** [1] - 893:9
**timing** [3] - 806:17, 841:6, 978:2
**TIMOTHY** [2] - 767:13, 767:23
**tiny** [5] - 930:23, 934:8, 961:6, 1056:21

**title** [3] - 893:23, 937:16, 1083:12
**titled** [1] - 1081:21
**titles** [2] - 1022:1, 1112:19
**TLI** [1] - 884:12
**today** [34] - 851:12, 859:16, 861:1, 862:24, 863:1, 863:7, 863:13, 864:21, 897:23, 907:15, 924:15, 934:19, 953:4, 953:15, 1017:6, 1026:10, 1029:6, 1070:6, 1075:23, 1076:9, 1084:8, 1087:7, 1087:24, 1088:4, 1125:24, 1126:11, 1128:15, 1130:2, 1136:3, 1136:12, 1139:13, 1147:1, 1149:8
**together** [18] - 811:3, 812:23, 812:24, 960:14, 982:21, 982:22, 1003:17, 1009:17, 1009:20, 1016:17, 1027:17, 1031:24, 1116:10, 1126:1, 1136:13, 1140:15, 1149:6, 1151:3
**Tomlinson** [3] - 1127:6, 1127:17, 1127:20
**tomorrow** [6] - 886:15, 998:24, 1150:12, 1150:15, 1151:4, 1152:10
**tonight** [1] - 996:21
**took** [16] - 786:14, 793:11, 854:5, 936:5, 957:7, 957:8, 963:14, 967:15, 993:6, 1010:10, 1014:5, 1015:4, 1031:22, 1043:2, 1061:21, 1075:15
**tool** [2] - 897:18, 930:7
**Toolbar** [3] - 818:7, 818:9, 940:7
**Toolbars** [1] - 815:15
**tools** [1] - 963:24
**top** [21] - 805:10, 806:7, 808:22, 810:19, 818:20, 820:21, 856:20, 905:6, 908:24,

909:2, 934:9, 937:15, 970:2, 990:2, 1041:7, 1044:16, 1045:5, 1053:24, 1080:6, 1091:17, 1098:17
**topic** [3] - 938:6, 1081:19, 1124:24
**topics** [1] - 1003:18
**torn** [1] - 891:20
**total** [20] - 792:14, 797:14, 799:6, 801:5, 811:18, 811:24, 817:24, 819:1, 819:2, 859:24, 877:18, 879:5, 903:8, 906:23, 933:3, 933:7, 933:12, 936:12, 936:17
**totaled** [1] - 933:14
**totally** [1] - 797:15
**touch** [1] - 984:5
**touring** [1] - 1002:7
**tours** [1] - 973:17
**touting** [1] - 1063:11
**toward** [1] - 1037:17
**towards** [2] - 915:8, 925:5
**track** [10] - 785:6, 922:7, 928:5, 930:16, 934:3, 934:5, 935:2, 937:7, 937:11, 944:2
**tracks** [5] - 927:4, 943:23, 944:7, 1022:24, 1023:5
**trade** [3] - 959:14, 984:18, 1002:12
**tradeoffs** [2] - 922:15, 922:19
**traffic** [4] - 809:5, 898:20, 917:14
**train** [1] - 970:24
**trained** [1] - 1043:9
**training** [2] - 957:3, 960:7
**Training** [1] - 958:6
**trains** [1] - 970:23
**transactions** [2] - 1076:7, 1076:10
**transcript** [8] - 991:19, 994:16, 1067:21, 1067:24, 1068:1, 1074:2, 1074:7, 1153:11
**transcripts** [1] - 835:6
**transformation** [3] - 1047:3, 1146:22, 1147:3

**transformed** [1] - 956:23
**transformers** [2] - 1046:23, 1046:24
**transition** [1] - 923:6
**translated** [1] - 1047:20
**travel** [3] - 971:15, 971:16, 1068:20
**traversal** [9] - 911:19, 914:2, 915:13, 919:2, 1100:19, 1101:21, 1110:16, 1111:4, 1113:10
**traverse** [4] - 911:5, 1101:10, 1110:8, 1120:9
**traversed** [6] - 912:17, 918:23, 919:5, 919:7, 919:14, 919:21
**traverses** [1] - 1101:11
**traversing** [9] - 911:15, 911:23, 913:7, 913:9, 913:21, 915:21, 1110:2, 1110:18, 1120:16
**treatise** [1] - 1081:21
**tree** [84] - 895:20, 904:5, 904:6, 904:9, 904:10, 904:12, 904:13, 904:16, 904:18, 904:22, 905:2, 905:5, 905:6, 905:11, 905:14, 905:19, 906:13, 907:10, 907:13, 907:14, 907:16, 907:22, 908:8, 908:19, 909:1, 909:6, 909:14, 909:15, 909:17, 910:1, 910:3, 910:5, 910:7, 911:2, 911:6, 911:12, 911:16, 911:23, 912:9, 912:22, 912:23, 913:10, 913:22, 914:19, 940:22, 947:16, 948:5, 948:8, 948:12, 1098:7, 1098:17, 1098:18, 1098:20, 1098:23, 1099:21, 1099:22, 1100:11, 1100:14, 1100:16, 1100:20, 1100:21, 1101:1, 1101:11,

1101:19, 1101:22, 1106:4, 1107:1, 1107:9, 1107:13, 1110:2, 1110:9, 1112:24, 1113:19, 1113:20, 1114:3, 1114:7, 1115:7, 1119:8, 1119:15, 1119:22, 1120:10, 1148:1

**trees** [5] - 892:15, 905:24, 912:8, 940:21, 1101:6

**tremendous** [1] - 926:19

**trial** [28] - 780:6, 780:24, 782:16, 787:9, 787:12, 787:14, 794:16, 799:18, 803:17, 805:24, 834:9, 937:18, 941:14, 943:1, 981:23, 1008:23, 1010:21, 1083:22, 1085:21, 1085:24, 1086:6, 1094:19, 1095:19, 1096:15, 1124:15, 1131:8, 1146:19, 1147:5

**Trial** [15] - 767:3, 790:11, 790:21, 791:3, 791:20, 797:22, 798:5, 798:14, 798:19, 816:6, 818:14, 819:15, 819:17, 869:21, 875:10

**triangle** [1] - 1038:17

**triangles** [2] - 1038:8, 1038:14

**triangular** [1] - 1149:10

**tried** [3] - 773:3, 885:2, 909:19

**troll** [2] - 992:8, 995:13

**true** [10] - 854:12, 857:17, 868:10, 971:20, 996:13, 1012:15, 1067:4, 1067:9, 1123:13, 1153:10

**trumpet** [2] - 983:9, 983:11

**trumpets** [1] - 983:8

**truncate** [3] - 786:20, 788:1, 872:9

**trusted** [1] - 972:9

**trustworthy** [1] -

1005:10

**truth** [2] - 953:18, 1067:18

**try** [16] - 773:15, 775:22, 788:2, 808:24, 813:12, 831:3, 832:2, 876:9, 881:20, 930:24, 946:20, 999:2, 1036:6, 1036:8, 1126:14, 1130:11

**trying** [12] - 819:7, 822:24, 846:22, 860:7, 866:7, 868:1, 914:15, 919:23, 926:12, 988:24, 1005:14, 1092:22

**TUNNELL** [1] - 768:4

**turn** [23] - 790:10, 798:4, 798:13, 798:18, 799:17, 799:23, 819:14, 832:6, 856:8, 856:10, 912:5, 1017:9, 1017:10, 1017:14, 1029:7, 1039:18, 1069:5, 1093:5, 1098:4, 1102:1, 1105:17, 1130:6, 1134:19

**turning** [2] - 929:7, 1046:19

**turns** [3] - 890:23, 965:7, 984:17

**TV** [3] - 867:8, 926:17, 1048:21

**twenty** [13] - 782:2, 792:18, 797:12, 927:14, 929:3, 1015:5, 1015:8, 1015:16, 1015:21, 1015:23, 1015:24, 1080:22, 1113:21

**twenty-five** [1] - 1113:21

**twenty-year** [1] - 1015:5

**twice** [1] - 981:24

**two** [60] - 770:3, 773:22, 774:4, 782:12, 798:21, 800:3, 807:11, 816:12, 853:15, 881:8, 882:21, 884:13, 896:12, 905:7, 905:8, 906:18, 930:12, 931:6, 931:7, 931:15, 940:9, 947:10, 948:16,

961:12, 966:2, 966:3, 966:13, 982:14, 991:21, 992:5, 999:10, 1008:18, 1031:24, 1043:24, 1047:1, 1053:9, 1055:3, 1072:18, 1081:21, 1081:23, 1084:10, 1092:19, 1093:18, 1094:13, 1094:15, 1096:8, 1100:9, 1101:16, 1102:12, 1106:1, 1108:5, 1117:16, 1118:24, 1119:1, 1124:9, 1125:9, 1126:8, 1133:15, 1133:18, 1141:4

**two-dimensional** [1] - 1047:1

**two-volume** [1] - 1081:21

**type** [13] - 781:24, 795:1, 815:20, 890:1, 904:11, 930:23, 934:8, 934:24, 957:4, 964:13, 997:3, 1052:17, 1053:4

**types** [5] - 865:13, 893:15, 1011:10, 1071:10, 1097:4

**typical** [5] - 825:12, 825:18, 825:22, 826:8, 878:23

**typically** [1] - 891:2

**U.S** [6] - 800:6, 800:9, 800:22, 801:8, 859:3, 1035:22

**U.S.C** [2] - 1131:14, 1132:6

**UC** [4] - 1079:21, 1080:8, 1080:12, 1080:21

**UFO** [2] - 963:19, 963:21

**UK** [1] - 1082:12

**ultimate** [1] - 1097:19

**umbrella** [1] - 1043:7

**unable** [3] - 1034:6, 1068:19, 1069:20

**under** [26] - 772:18, 774:3, 786:19, 788:6, 829:7, 829:8, 872:21, 877:3, 884:4, 884:24, 885:5, 952:1, 970:4, 995:9, 1017:5, 1041:17, 1064:1,

1064:4, 1064:7, 1067:17, 1104:5, 1106:10, 1117:15, 1118:2, 1119:3, 1149:22

**underlined** [1] - 1145:15

**underscore** [1] - 1054:22

**understood** [7] - 775:8, 775:16, 846:15, 854:8, 980:7, 1074:19, 1109:13

**unexpected** [1] - 1036:4

**unfortunate** [1] - 778:14

**unfortunately** [5] - 856:7, 936:3, 937:3, 1033:8, 1039:24

**Union** [1] - 970:4

**unique** [1] - 805:15

**unit** [8] - 808:7, 830:4, 830:8, 830:10, 830:20, 895:1, 895:15, 901:20

**UNITED** [1] - 767:1

**United** [7] - 767:14, 818:3, 819:12, 884:24, 902:2, 936:15, 1089:18

**units** [1] - 973:19

**Universal** [1] - 984:11

**universally** [2] - 889:17, 979:22

**University** [13] - 896:2, 896:3, 1035:20, 1039:13, 1045:13, 1058:15, 1063:6, 1079:16, 1079:22, 1080:23, 1081:4, 1081:5, 1129:5

**unless** [6] - 774:19, 834:17, 978:10, 978:24, 990:16, 1142:9

**unpaid** [1] - 1079:23

**unsolicited** [1] - 841:22

**unsupported** [1] - 1015:14

**unusual** [2] - 781:11, 948:2

**up** [115] - 771:8, 780:24, 782:5, 784:11, 785:22, 786:22, 787:6, 787:7, 788:2,

789:17, 789:21, 790:2, 794:9, 797:15, 800:17, 800:20, 803:16, 805:23, 806:8, 808:20, 809:1, 813:17, 816:6, 818:14, 819:17, 819:19, 822:8, 831:23, 835:14, 841:8, 843:16, 846:1, 848:5, 865:7, 865:12, 866:7, 867:8, 869:1, 869:2, 869:4, 869:6, 869:12, 869:21, 872:19, 874:21, 877:3, 879:5, 890:4, 891:12, 893:8, 903:23, 908:21, 911:24, 930:21, 930:24, 933:12, 933:23, 934:7, 934:9, 936:8, 937:14, 937:15, 947:15, 948:5, 957:5, 962:15, 963:17, 965:3, 965:7, 969:20, 973:20, 974:24, 975:8, 976:1, 976:11, 983:14, 984:9, 984:12, 985:12, 989:14, 989:16, 989:21, 990:1, 991:8, 992:13, 994:24, 996:9, 998:19, 1001:21, 1003:2, 1003:4, 1005:22, 1015:24, 1025:11, 1031:15, 1035:23, 1036:6, 1039:8, 1042:20, 1046:2, 1052:2, 1052:19, 1053:7, 1053:10, 1055:22, 1075:4, 1080:4, 1081:20, 1111:22, 1112:16, 1112:19, 1112:20, 1129:2, 1141:1, 1151:3

**up-to-date** [1] - 835:14

**upgrade** [1] - 944:2

**upper** [3] - 824:4, 892:1, 976:1

**ups** [1] - 868:20

**upside** [1] - 904:16

**URL** [1] - 959:5

**US** [7] - 799:8, 819:2,
822:10, 824:2,
1038:3, 1045:8,
1082:8
**usage** [8] - 791:9,
791:14, 799:14,
866:22, 879:1,
879:2, 926:20
**useful** [4] - 805:3,
889:17, 979:23,
1000:14
**user** [44] - 792:24,
799:1, 804:21,
805:17, 815:3,
826:9, 826:12,
826:13, 859:21,
860:7, 860:15,
863:5, 873:21,
874:6, 874:15,
878:23, 879:20,
902:19, 902:22,
919:24, 925:22,
926:24, 927:22,
937:7, 937:9, 939:8,
972:1, 979:6,
1036:2, 1036:3,
1054:6, 1084:2,
1093:12, 1100:17,
1104:18, 1111:8,
1117:13, 1138:10,
1140:6, 1145:1,
1145:15, 1149:4
**user's** [13] - 887:17,
912:11, 926:13,
961:15, 1090:4,
1093:11, 1094:3,
1099:5, 1099:10,
1105:21, 1106:8,
1112:16, 1119:20
**users** [40] - 779:18,
788:21, 791:9,
791:14, 793:18,
804:8, 805:11,
805:19, 807:3,
860:18, 866:23,
883:10, 883:13,
898:22, 899:8,
899:12, 914:15,
925:2, 925:3, 925:5,
926:6, 926:9, 927:7,
928:3, 928:10,
928:12, 935:5,
937:11, 938:1,
939:14, 945:16,
961:16, 972:13,
972:16, 972:20,
1018:19
**uses** [26] - 773:7,
793:1, 793:23,
820:14, 826:16,

858:23, 859:20,
859:24, 883:14,
898:18, 910:19,
931:12, 937:11,
944:23, 1054:5,
1054:7, 1096:10,
1099:3, 1100:18,
1100:24, 1101:1,
1101:15, 1117:11,
1129:20
**USGS** [1] - 1045:6
**utility** [1] - 897:24
**utilized** [2] - 1036:24,
1129:24
**uTube** [1] - 816:13
**vacation** [1] - 890:5
**valid** [9] - 813:9,
813:11, 844:23,
845:11, 847:3,
847:11, 870:18,
870:19, 1126:19
**validity** [3] - 828:15,
846:9, 846:12
**Valley** [2] - 967:19,
1063:12
**valuable** [11] - 837:4,
837:9, 837:16,
837:19, 837:20,
838:22, 839:4,
840:20, 841:1,
847:20
**value** [15] - 771:3,
771:8, 771:14,
775:12, 776:8,
779:7, 815:12,
815:14, 816:21,
817:11, 849:23,
850:6, 850:10,
939:23, 945:9
**variability** [1] -
1071:12
**varied** [1] - 858:12
**varies** [1] - 797:11
**variety** [4] - 802:14,
836:16, 864:3,
868:20
**various** [30] - 774:22,
775:1, 796:18,
797:9, 832:20,
843:12, 889:19,
895:19, 1045:4,
1046:17, 1046:22,
1047:10, 1056:16,
1058:5, 1059:6,
1080:14, 1085:21,
1086:1, 1086:18,
1090:20, 1093:1,
1097:12, 1109:14,
1112:1, 1112:15,
1129:16, 1130:22,

1135:4, 1135:6,
1146:18
**varying** [1] - 1015:2
**vast** [5] - 898:9, 908:2,
911:13, 913:1,
1129:9
**Vautrin** [1] - 1082:15
**vendor** [6] - 1026:3,
1026:7, 1026:11,
1026:19, 1026:23
**vendors** [1] - 1026:15
**venture** [1] - 967:19
**venue** [1] - 982:17
**verdict** [4] - 877:4,
881:4, 885:7, 885:16
**version** [30] - 806:12,
858:18, 859:5,
859:6, 860:4,
860:13, 860:16,
861:18, 861:21,
866:2, 866:4,
866:10, 890:19,
894:2, 899:24,
900:1, 900:8, 900:9,
907:9, 924:6, 963:1,
985:21, 985:23,
998:17, 998:21,
998:22, 1049:22,
1059:22, 1071:2,
1128:14
**Version** [1] - 900:9
**versions** [10] - 862:21,
865:24, 868:15,
869:8, 901:5,
921:17, 921:20,
1055:15, 1101:23,
1111:11
**versus** [4] - 815:19,
859:6, 859:20,
1067:12
**VHS** [1] - 1035:1
**vibrate** [1] - 970:17
**Vice** [1] - 982:12
**Vice-president** [1] -
982:12
**Video** [4] - 1021:1,
1027:19, 1141:6,
1143:23
**video** [64] - 892:5,
924:22, 963:15,
974:14, 974:24,
975:4, 981:5,
996:10, 997:23,
998:2, 1010:20,
1020:24, 1027:21,
1033:14, 1034:2,
1034:3, 1034:11,
1034:13, 1034:17,
1034:22, 1035:6,
1035:10, 1035:17,

1035:18, 1036:1,
1036:6, 1036:22,
1037:4, 1037:7,
1037:16, 1038:21,
1039:2, 1039:21,
1040:2, 1047:23,
1048:21, 1048:22,
1049:1, 1049:18,
1049:20, 1055:19,
1058:23, 1059:18,
1059:20, 1065:5,
1065:8, 1065:12,
1065:16, 1065:19,
1069:9, 1069:14,
1069:16, 1071:2,
1126:10, 1135:3,
1136:10, 1140:20,
1141:1, 1141:4,
1141:9, 1143:17,
1144:3, 1145:3,
1149:13
**videos** [2] - 891:12,
1040:9
**videotape** [5] -
1034:20, 1068:12,
1068:14, 1068:22,
1069:21
**videotaped** [1] -
1010:1
**View** [2] - 804:5,
981:17
**view** [43] - 770:4,
770:11, 775:6,
775:9, 820:17,
830:10, 900:24,
911:9, 911:14,
912:24, 913:11,
913:13, 913:17,
913:19, 914:23,
915:4, 918:18,
921:7, 933:23,
970:11, 971:15,
995:7, 1036:14,
1036:18, 1036:21,
1038:1, 1038:2,
1038:11, 1042:16,
1047:5, 1047:21,
1082:16, 1092:18,
1094:2, 1094:4,
1094:8, 1108:15,
1108:17, 1134:4,
1138:10, 1140:1,
1140:2, 1140:7
**viewed** [3] - 870:9,
1003:20
**Viewer** [11] - 971:19,
971:22, 972:5,
972:12, 973:3,
974:3, 974:16,
979:3, 1013:12,

1015:6, 1087:16
**viewer** [1] - 858:18
**Viewer.com** [1] -
976:6
**viewing** [1] - 1071:13
**viewpoint** [2] -
1090:5, 1100:14
**views** [3] - 804:9,
844:22, 845:15
**violation** [1] - 878:11
**Virginia** [1] - 1011:17
**virtual** [7] - 849:1,
849:17, 890:5,
950:14, 971:16,
973:17, 1094:3
**Vision** [8] - 1054:22,
1075:11, 1125:20,
1126:8, 1133:16,
1134:1, 1134:3,
1134:14
**vision** [4] - 806:20,
950:18, 962:19,
1031:23
**visit** [6] - 892:20,
911:7, 937:13,
991:1, 1002:20,
1110:4
**visited** [2] - 914:4,
1008:18
**visiting** [1] - 913:10
**visual** [2] - 1033:13,
1040:1
**Visualization** [1] -
986:2
**visualization** [28] -
895:9, 954:4,
954:22, 956:24,
957:13, 958:12,
959:24, 961:18,
1013:13, 1029:15,
1030:5, 1030:11,
1031:21, 1031:23,
1032:4, 1032:9,
1042:6, 1042:12,
1042:14, 1043:9,
1044:12, 1045:1,
1045:20, 1045:22,
1046:8, 1070:12,
1130:19
**visualizations** [1] -
1030:6
**visualizing** [3] -
959:20, 1126:23,
1138:10
**visually** [1] - 923:1
**vividly** [2] - 1016:24,
1017:4
**vocabulary** [1] -
1037:4
**volume** [8] - 809:4,

823:13, 946:20, 975:3, 1069:1, 1081:21, 1082:1, 1128:8

**Volume** [1] - 767:3

**volumes** [1] - 1081:23

**voluminous** [1] - 797:4

**wait** [3] - 1106:7, 1107:8, 1117:14

**waiting** [2] - 787:23, 876:8

**waiver** [1] - 769:20

**Wal** [4] - 973:6, 973:7, 973:9, 973:13

**Wal-Mart** [3] - 973:7, 973:9, 973:13

**Wal-Marts** [1] - 973:6

**Walgreens** [4] - 869:1, 869:2, 869:5

**walk** [4] - 911:5, 918:3, 1002:10, 1052:2

**walked** [4] - 1018:17, 1049:24, 1051:19, 1059:24

**walking** [4] - 911:16, 983:24, 1070:20, 1070:24

**wall** [1] - 961:4

**walls** [1] - 982:1

**wants** [7] - 945:15, 983:9, 991:20, 1099:14, 1100:17, 1104:18, 1117:13

**Washington** [3] - 1009:23, 1047:13, 1079:22

**Watch** [1] - 929:20

**watch** [2] - 970:16, 1034:12

**watched** [1] - 1048:23

**watching** [2] - 970:13, 985:5

**ways** [14] - 774:23, 775:11, 822:6, 891:8, 891:11, 896:19, 921:6, 922:10, 951:17, 959:2, 991:21, 1090:3, 1095:8, 1098:22

**Wearality** [4] - 950:9, 950:10, 951:1, 951:5

**web** [10] - 902:9, 928:15, 928:16, 928:17, 937:4, 937:8, 959:6, 959:12, 979:24, 980:6

**Webbys** [3] - 902:5, 902:6, 902:7

**website** [5] - 820:18, 976:9, 976:11, 1052:22, 1052:23

**wedding** [1] - 926:12

**Wednesday** [1] - 767:9

**week** [4] - 851:21, 895:7, 977:12, 978:3

**weeks** [1] - 781:1

**weigh** [1] - 831:9

**welcome** [1] - 887:8

**well-known** [1] - 893:13

**West** [1] - 1045:8

**Western** [1] - 1080:23

**whatsoever** [1] - 883:24

**WHEREOF** [1] - 1153:14

**whole** [13] - 788:24, 805:5, 909:2, 912:21, 915:13, 923:1, 923:7, 943:1, 956:23, 979:1, 982:21, 1023:4, 1108:12

**wide** [1] - 902:16

**widely** [2] - 1127:6, 1145:2

**wider** [1] - 797:4

**William** [1] - 1128:18

**WILLIAMSON** [13] - 768:8, 1078:23, 1079:3, 1122:18, 1123:1, 1141:8, 1142:11, 1142:13, 1142:22, 1142:24, 1144:1, 1150:8, 1152:3

**Williamson** [3] - 1078:11, 1079:6, 1152:2

**willing** [11] - 813:5, 813:7, 843:9, 844:13, 845:5, 845:7, 847:18, 980:9, 1000:22, 1004:20, 1005:5

**willingness** [2] - 845:18, 845:22

**Wilmington** [7] - 767:12, 1047:11, 1047:21, 1089:21, 1091:21, 1092:4, 1153:16

**window** [4] - 955:7, 1037:23, 1038:12, 1042:17

**Windows** [1] - 899:24

**Wisconsin** [1] - 1129:6

**Wisconsin-Madison** [1] - 1129:6

**Wisdom** [3] - 776:15, 776:18, 777:23

**wisdom** [6] - 771:11, 771:18, 771:23, 772:1, 772:6, 772:23

**withdraw** [1] - 842:22

**withdrawn** [1] - 829:10

**WITNESS** [11] - 788:7, 876:24, 888:3, 948:7, 948:18, 948:22, 1020:16, 1077:9, 1077:15, 1078:15, 1153:14

**witness** [26] - 778:22, 784:22, 795:8, 826:22, 887:12, 887:21, 940:11, 943:21, 949:14, 993:15, 998:6, 1009:4, 1016:12, 1017:24, 1018:2, 1020:10, 1028:9, 1060:12, 1068:5, 1074:6, 1074:8, 1074:14, 1075:17, 1076:21, 1078:4, 1131:8

**witnesses** [3] - 783:11, 783:12, 1086:7

**won** [5] - 901:24, 902:2, 902:3, 902:4

**wonky** [1] - 1067:22

**word** [5] - 849:8, 970:5, 970:7, 1001:8, 1043:5

**wording** [1] - 836:10

**words** [10] - 802:18, 1010:3, 1082:4, 1100:13, 1106:3, 1115:7, 1115:10, 1132:13, 1144:24, 1145:15

**workers** [4] - 916:9, 916:16, 917:1, 918:7

**works** [16] - 930:4, 940:18, 942:20, 946:6, 946:14, 977:14, 1097:23, 1104:5, 1108:23, 1109:9, 1109:10, 1109:24, 1117:9, 1118:6, 1120:8, 1120:21

**workstation** [7] - 956:1, 964:2, 1049:6, 1051:24, 1059:5, 1059:6, 1093:11

**workstations** [4] - 895:9, 895:13, 900:2, 1083:20

**World** [2] - 902:4, 1082:14

**world** [25] - 804:10, 855:6, 890:1, 890:7, 890:24, 891:7, 897:19, 898:3, 905:17, 909:3, 926:18, 929:15, 929:19, 950:23, 951:14, 959:12, 962:8, 971:13, 971:15, 972:17, 976:13, 978:13, 1005:4, 1127:21

**world's** [5] - 889:16, 890:23, 950:13, 979:22, 1127:10

**worlds** [1] - 984:19

**worldwide** [3] - 799:7, 799:21, 800:8

**worth** [1] - 1006:15

**wow** [1] - 899:11

**write** [7] - 937:24, 943:10, 943:14, 946:1, 965:9, 965:22, 967:22

**writing** [1] - 885:4

**written** [4] - 885:9, 886:1, 886:3, 886:4

**wrote** [12] - 967:21, 981:6, 985:19, 985:20, 987:18, 989:9, 990:14, 990:23, 1008:2, 1031:13, 1040:11, 1040:17

**xBox** [3] - 894:22, 895:1, 962:20

**Xs** [1] - 1114:4

**year** [38] - 800:16, 801:5, 805:13, 805:15, 805:17, 808:15, 809:7, 809:14, 809:16, 809:18, 810:10, 810:11, 810:23, 829:19, 848:19, 857:9, 859:2, 861:17, 931:6, 933:13, 936:8, 951:2, 953:7, 972:6, 980:7, 1008:16,

1008:17, 1011:21, 1015:5, 1015:16, 1025:6, 1061:22, 1062:10, 1090:19, 1131:23, 1136:22

**year-and-a-half** [1] - 980:7

**years** [33] - 776:20, 777:1, 777:2, 801:16, 801:19, 809:20, 820:4, 837:23, 857:1, 862:2, 888:22, 895:12, 895:17, 947:17, 948:17, 948:19, 953:22, 953:23, 954:3, 967:4, 1001:10, 1015:8, 1015:21, 1015:23, 1015:24, 1055:3, 1070:4, 1078:7, 1080:22, 1081:10, 1126:23, 1133:3, 1133:8

**yellow** [2] - 912:18, 1105:13

**yesterday** [8] - 788:17, 788:18, 791:8, 810:24, 824:11, 943:7, 1085:24, 1114:16

**yielded** [1] - 779:24

**young** [1] - 1001:9

**younger** [1] - 969:24

**yourself** [6] - 888:14, 890:7, 1007:10, 1028:22, 1079:10, 1126:22

**Yvan** [11] - 1032:17, 1033:3, 1033:5, 1034:3, 1038:22, 1040:17, 1044:11, 1046:6, 1053:24, 1058:22, 1068:17

**zero** [2] - 1047:5, 1047:6, 1047:20

**zoom** [10] - 806:3, 806:18, 963:17, 963:21, 1054:6, 1084:3, 1094:22, 1146:5, 1147:11

**zoomed** [1] - 961:24

**zooming** [1] - 962:7