IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


ART+COM INNOVATIONAL POOL,  ) Trial Volume 6
GmbH,                       )
            Plaintiff,      )
                            ) C.A. No. 14-217-RGA
v.                          )
                            )
GOOGLE INCORPORATED,        )
                            )
            Defendant.      )


                    Friday, May 27, 2016
                    8:35 a.m.
                    Courtroom 6A


                    844 King Street
                    Wilmington, Delaware


BEFORE:  THE HONORABLE TIMOTHY B. DYK,
         United States District Court Judge



APPEARANCES:


         FARNAN LLP
         BY:  BRIAN E. FARNAN, ESQ.
         BY:  MICHAEL J. FARNAN, ESQ.

              -and-

         BAKER & BOTTS
         BY:  SCOTT F. PARTRIDGE, ESQ.
         BY:  MICHAEL A. HAWES, ESQ.
         BY:  LARRY G. SPEARS, ESQ.
         BY:  TIMOTHY ROONEY, ESQ.


                    Counsel for the Plaintiff

APPEARANCES CONTINUED:


        MORRIS, NICHOLS, ARSHT & TUNNELL
        BY:  JACK B. BLUMENFELD, ESQ.

                -and-

        O'MELVENY MYERS, LLP
        BY:  DARIN SNYDER, ESQ.
        BY:  LUANN L. SIMMONS, ESQ.
        BY:  BRETT WILLIAMSON, ESQ.

                Counsel for the Defendants

1375

```
 1              THE COURT:  Be seated, please.
 2   For the record, counsel and the Court met for an
 3   informal charge conference yesterday afternoon
 4   which was very productive.  And the parties sent
 5   me this morning a joint proposed draft of final
 6   jury instructions with the three remaining
 7   issues to be resolved and this is your
 8   opportunity to make formal objections as
 9   required by Rule 51 as to the jury instructions.
10              Now, two objections don't need to
11   be made.  To the extent that you reserve
12   objections to the Court's claim constructions,
13   those don't need to be raised here this morning.
14   Those are preserved.  And I understand that ACI
15   has objected to the 2005 hypothetical
16   negotiation date arguing instead for a 2010 date
17   it.  That objection is preserved and need not be
18   repeated this morning.
19              And turning to the proposed write
20   up the parties sent me last night, of the final
21   jury instructions, I think there are two things
22   which I need to rule on here.  One of them is on
23   Page 25 and we'll make a copy of this and attach
24   it to the transcript as Court's Exhibit B.
```

```
 1    There was a Google proposal and an ACI proposal
 2    on this page and here's what I propose to do, is
 3    to have two sentences which would be, the
 4    evidence concerning Google's revenues or
 5    financial projections from after 2006 is not
 6    material to and cannot be considered for the
 7    purpose of determining the royalty rate.  ACI's
 8    financial proposals after 2006 may be given less
 9    weight for determining a reasonable royalty
10    period.
11                Now, is there any objection to
12    that resolution?
13                MR. PARTRIDGE:  Yes, Your Honor.
14    Our objection is to the inclusion of the -- of
15    these sentences at all, which I think was
16    discussed previously.  We think that the
17    inclusion here of a suggestion of less weight is
18    not appropriate.  We also don't agree that the
19    date should be after 2006.  Your Honor's already
20    ruled the hypothetical negotiation date is in
21    July of 2005.  I don't think we should be making
22    distinctions between 2006 versus any other
23    years.  If we're going to have an instruction
24    like this, it ought to be pegged to the
```

```
 1    hypothetical negotiation date as we've
 2    suggested.  So those are the two remaining
 3    problems we have.  Well, I guess three, we don't
 4    think it's required at all.  Two, we don't think
 5    that the date should be July of 2006 and we
 6    think that less weight is not an appropriate
 7    instruction.  That's our view of this, Your
 8    Honor.
 9              THE COURT:  Okay.  Google.
10              MS. SIMMONS:  Good morning, Your
11    Honor.  Google does not object to the first
12    sentence that Your Honor proposed to the
13    instruction.  As to the second sentence
14    regarding the ACI financial proposals, Google
15    objects to that instruction on the basis that
16    the ACI financial proposals after 2006 should be
17    given no weight as opposed to less weight.  The
18    hypothetical negotiation has been set by Your
19    Honor as 2005.  Information concerning in
20    particular an e-mail from November of 2010 is
21    five years after the date, and therefore should
22    not be considered for the purpose of determining
23    a royalty rate.  In addition the 2010 e-mail was
24    offered by Mr. Mayer, who testified at the trial
```

```
 1    that he has no experience with licensing and

 2    that the e-mail related to a typical licensing

 3    model and Mr. Mayer admitted that Google Earth

 4    was not a typical product.  Therefore Google

 5    objects on the basis that admitting the e-mail

 6    for any purpose and determining a royalty rate

 7    would be highly prejudicial and is not relevant

 8    to the proper determination of damages.

 9              THE COURT:  Okay.  Well, seems as

10    though I've made both parties unhappy, so maybe

11    I'm about right.  I'm going to overrule both of

12    those objections.

13              And then the one remaining issue

14    is on Page 30 here and you've given me competing

15    proposals.  I'm going to adopt the Google

16    proposal, so the first sentence would read -- I

17    mean, I'm sorry, not the Google proposal, the

18    ACI proposal.  So that the first sentence would

19    read, ACI seeks to recover damages reflecting

20    the alleged value that Google Earth contributes

21    to Google's profitability.

22              Does Google object to that?

23              MS. SIMMONS:  Yes, Your Honor.

24    Google objects to that proposal or that
```

```
 1    instruction on the basis that there's been no

 2    evidence or expert testimony that Google Earth

 3    contributes to Google's profitability.  In fact,

 4    there's been no evidence regarding what Google's

 5    profitability actually is.  The jurors will be

 6    left to speculate as to that profitability based

 7    on general knowledge about Google as a company.

 8    Therefore we believe it's an improper

 9    instruction regarding the proper determination

10    of damages and would be highly prejudicial to

11    Google.

12                   THE COURT:  Okay.  That objection

13    is overruled.

14                   MR. PARTRIDGE:  Your Honor, if I

15    may with respect to this?

16                   THE COURT:  Yeah.

17                   MR. PARTRIDGE:  To preserve our

18    record as discussed previously.  We object to

19    the repeated references to revenue in this

20    instruction given that the products that are at

21    issue are free, largely free products.  So we

22    have an overall objection to this instruction on

23    that basis.  We appreciate Your Honor's, I

24    think, from our standpoint, improvement of the
```

```
 1    instruction with the decision this morning.  And

 2    we do have one other objection that didn't get

 3    into the red line late last night at midnight.

 4                    THE COURT:  Well, hold on a

 5    moment.  I thought that the proposal that you

 6    were -- the joint proposal I had from the

 7    parties was a proposal that everything was

 8    agreed with the exception of these items which

 9    you listed as the disagreements.  You're now

10    telling me that this agreement goes beyond

11    things that were noted in the draft?

12                    MR. PARTRIDGE:  I'm just saying,

13    Your Honor, with respect to this instruction, I

14    think as we've discussed previously the repeated

15    references to revenue in this situation we're

16    objecting to.  We accept the Court's decision to

17    go with this instruction and so we made a

18    proposal to fix one part of it, but we do have

19    an objection to the instruction overall.

20                    THE COURT:  I think if you had an

21      objection to the rest of the instruction you

22    should have noted it in this draft if that was

23    the purpose of the draft.  But to the extent

24    that you're making objection that goes beyond
```

1   the draft, then in this respect it's overruled.

2              MR. PARTRIDGE:  Understood, Your

3   Honor.  And the one error that was made, if I

4   may, concerns instruction 13.  And as

5   previously -- I'll wait until you get there,

6   Your Honor.  This concerns whether or not a

7   public use must be informed and we had requested

8   the insertion of a sentence along the lines of

9   if members of the public are not informed of and

10  cannot readily discern the plain features of the

11  invention in the alleged system, the public use

12  has not been put in possession of those features

13  and we cite to Day versus Synovium and other

14  Federal Circuit cases to support that additional

15  sentence being added to that instruction.

16             THE COURT:  I agreed that that

17  objection was preserved and I think that's not

18  consistent with the Supreme Courts decision in

19  Egbert and the way its been construed in later

20  Federal Circuit cases, so I'm going to overrule

21  that objection and I'll probably, at some later

22  time, have a written order about that.

23             MR. PARTRIDGE:  Very well, Your

24  Honor.  Thank you.

```
 1              THE COURT:  So I understand that

 2    now with the exception of the things that have

 3    been formally raised here today and the claim

 4    construction objections that were preserved and

 5    the objections of the 2005 hypothetical

 6    negotiation date, there is no other objection to

 7    these instructions; is that correct?

 8              MR. PARTRIDGE:  That is correct

 9    from plaintiff's standpoint, Your Honor.

10              MS. SIMMONS:  Your Honor, no

11    further objections from Google.

12              One small point of clarification

13    stemming from Your Honor's instruction that all

14    parties preserve their claim construction

15    positions, that extends to the instruction that

16    indicates that Google does not dispute that

17    certain claim limitations are met, that is based

18    on the current claim constructions.

19              THE COURT:  Right.  You're

20    preserving your objections to the claim

21    constructions, and by agreeing in the final jury

22    instructions that Google satisfies particular

23    limitations, you are not giving up your

24    objection to the claim construction.
```

1    MS. SIMMONS:  Yes, Your Honor.

2    Thank you for that clarification.

3    THE COURT:  Now, that brings us to

4    the verdict form.  And I propose to work from

5    the ACI verdict form which you sent me this

6    morning.  And again, for clarity, I suggest I'll

7    mark this as Court Exhibit C.

8    Obviously ACI proposed these.  I'm

9    inclined to accept ACI's proposal to have

10   separate questions on anticipation and

11   obviousness.  It does make the verdict form a

12   bit confusing, but nonetheless I understand why

13   they would want to do that.

14   I do think a couple of changes

15   need to be made in the ACI proposed form.  If

16   you look at question three, I think that

17   referring to the TerraVision system anticipates

18   without more could be confusing to the jury, so

19   I think there should be a parenthetical there

20   that it constitutes a prior public use of.  Is

21   there any objection to that change?

22   MR. PARTRIDGE:  No, Your Honor.

23   MS. SIMMONS:  Not to that change,

24   Your Honor.

```
 1                    THE COURT:  And then in question

 2        four, I don't think the jury should be asked to

 3        answer the obviousness question if it's already

 4        found anticipation because I think that will be

 5        confusing to them.  So I propose to modify the

 6        introduction to question four to say if you have

 7        answered yes to question two and no to question

 8        three, you find that Google has proven.

 9                    Is there any objection to that

10        change?

11                    MR. PARTRIDGE:  My only concern

12        about -- my concern, Your Honor, is not having a

13        resolution of that issue for potential appeal

14        purposes.  I'm just thinking through -- I mean,

15        if they answer that it anticipates, I see your

16        problem, I think I understand what you're

17        saying, if they say it anticipates, under the

18        law it is not necessarily obvious.

19                    THE COURT:  It's very confusing to

20        them if you tell them to go on and decide the

21        obviousness question.

22                    MR. PARTRIDGE:  I see your point.

23        I think that is an appropriate addition to that

24        question.
```

```
 1                   THE COURT:  Does Google have any

 2      objection to that?

 3                   MS. SIMMONS:  No, Your Honor.

 4                   THE COURT:  And then in question

 5      seven, same change, if you answered yes to

 6      question five and no to question six, so again,

 7      they're not asked to go on and decide the

 8      obviousness question with respect to claims 1,

 9      14 and 28 if they have already found them

10      anticipated.  Is there any objection to that

11      change?

12                   MR. PARTRIDGE:  No, Your Honor.

13                   MS. SIMMONS:  No, Your Honor.

14                   THE COURT:  And with those

15      changes, is there any objection to the verdict

16      form?

17                   MR. HAWES:  Your Honor, you might

18      want to do the same with question number eight

19      as you did with question number seven.

20                   THE COURT:  No, I don't think so,

21      because with respect to question eight there is

22      no anticipation -- with respect to claim 3 there

23      is no anticipation question.

24                   MR. HAWES:  I'm sorry, Your Honor.
```

1    You're correct.  Yes.

2              MR. PARTRIDGE:  To answer your

3    question, Your Honor, no objection to the

4    changes made.

5              MS. SIMMONS:  Your Honor, just for

6    purposes of preserving the record, Google

7    objects to splitting the question out into two

8    as we believe it will be prejudicial to Google

9    and confusing to the jury.

10             THE COURT:  Why prejudicial?

11             MS. SIMMONS:  Because it ends up

12   with one question for infringement and I believe

13   it ends up being eight questions for invalidity.

14   And the concern is that the jury will have more

15   work to do on the invalidity case and that could

16   negatively impact their resolution of the issues

17   for Google.

18             THE COURT:  That's overruled.

19             MS. SIMMONS:  Thank you.

20             THE COURT:  When I gave you the

21   draft last night, I put it in large type so I

22   could read it.  You have shrunk the type.  What

23   I'm going to ask my clerk to do is to make the

24   changes that I made this morning and print out a

     1     large type version which would be the one that I

     2     would read to the jury.  And also it would be

     3     the same one that the jury would take back with

     4     it for its deliberations.  And I'll ask them to

     5     make the changes that we talked about this

     6     morning to the verdict form, also.

     7                    Do you need time to make those

     8     changes or have those been done already?

     9                    What I'm going to do is I'm going

    10     to give each of you a copy of the new verdict

    11     form with the changes that we just talked about,

    12     and the final jury instructions with the changes

    13     we talked about at recess for ten minutes or

    14     something, give you a chance to make sure that

    15     there isn't some glitch in here.  And then we'll

    16     call the jury back and I'll give the jury

    17     instructions.

    18                    MR. PARTRIDGE:  One point of

    19     information for you, Your Honor.  There have

    20     been I believe some outstanding objections to

    21     closing slides, demonstratives that we need to

    22     discuss with you at some point before the jury

    23     comes in as well.

    24                    THE COURT:  How long is that going

1388

 1        to take?

 2                    MR. ALMELING:  Not very long at

 3        all.  Less than five minutes.

 4                    THE COURT:  Can we sort of double

 5        track this?  Can someone check the verdict form

 6        and final jury instructions while we're

 7        considering the objections?

 8                    MR. PARTRIDGE:  Yes, Your Honor.

 9                    MR. ALMELING:  Yes, Your Honor.

10                    THE COURT:  So hold on for a

11        moment on the objections.  I'm going to ask my

12        clerk to pass out the revised verdict form and

13        the jury instructions and let's call the verdict

14        form Court Exhibit D and the final revised jury

15        instructions as Exhibit E.  And I think we have

16        two copies for each side.  And come back and let

17        us know if there is any glitch in here that

18        needs to be corrected.  Okay.

19                    MR. ALMELING:  Thank you, Your

20        Honor.  Google has two concerns with plaintiff's

21        opening.  Instead of discussing this in

22        abstract, it would be useful to show the slides

23        if that would be helpful to Your Honor.

24                    THE COURT:  Please.

1389

```
 1              MR. ALMELING:  The first issue

 2      relates to a series of slides beginning at slide

 3      five.  This is the issue of ACI's improper

 4      suggestion of copying which has been addressed

 5      partly by this trial so far, but I wanted to lay

 6      this out in the closing as it's being done.

 7              Slide five itself is not

 8      objectionable, it refers to who was at SGI in

 9      1995.

10              Next slide.

11              Then there's a plan

12   to show this, which shows Mr. Mayer giving a

13   demonstration of the T_VisionVision system.

14   This was not given to SGI in 1995 and during the

15   meet and confer process ACI has agreed to remove

16   the title to avoid that suggestion, but it's

17   still in the slide and in that order.

18              Next slide.  Then ACI plans to

19   suggest that these people that were at ACI and

20   presumably saw a demonstration or at least part

21   of a demonstration, next slide, moved to

22   Intrinsic Graphic and ostensibly took with them

23   whatever they learned at SGI including their

24   knowledge of the demonstration, next slide, then
```

```
 1    to Keyhole.  Next slide, and that cumulative

 2    information is now funneled into Google.

 3                   During opening presentation, a

 4    similar series of slides was presented

 5    purportedly to suggest the context of the

 6    parties' negotiations to aid the jury.  That

 7    context is no longer necessary, because the jury

 8    understands the connections between the parties

 9    and the only use of this is therefore for the

10    improper suggestion that they learned of the

11    demonstration, took what they learned through a

12    series of companies and then brought into

13    Google, i.e., the copying issue.

14                   THE COURT:  Could you go back one

15    slide?

16                   MR. ALMELING:  Yes, Your Honor.

17                   THE COURT:  Or maybe one other

18    one.  That's one that has an X on it.  What's

19    that at the bottom?

20                   MR. ALMELING:  I believe that is

21    an X through the Intrinsic.  I'm not sure why

22    the X is there.

23                   MR. HAWES:  May I comment, Your

24    Honor.
```

```
 1              THE COURT:  Yeah.

 2              MR. HAWES:  We actually agreed to

 3   get rid of these slides because Mr. Birch was

 4   not in our opening slides, so we've gotten rid

 5   of the slides.  All we plan to do is use the

 6   slides we used in our opening so the jury knows

 7   we're talking about the same things we talked

 8   about before.  We now have an instruction

 9   specifically on the copying issue and not going

10   to show anything we didn't show in opening on

11   this issue.

12              MR. ALMELING:  The objection is

13   the even though the word copying is not used,

14   this is meant to portray copying which is no

15   longer necessary for context.

16              THE COURT:  I'm going to overrule

17   that and if they start suggesting copying, you

18   can rebut it and I may emphasize to the jury

19   that there is no issue of copying, so do stay

20   away from that, please.

21              MR. ALMELING:  Thank you, Your

22   Honor.  The second issue Google would like to

23   raise relates to Slide 54.

24              MS. SIMMONS:  Your Honor, this
```

1392

1    slide we understand from the meet and confer is

2    based on PTX-219, which is a document that talks

3    about AdSense revenue, that was admitted during

4    Mr. Nawrocki's direct.  Google object and the

5    Court overruled.  At that time we object to this

6    slide as being based on a document dated from

7    2010 and related to revenues from AdSense.

8    First of all, it's five years after the

9    hypothetical negotiation date and there's no

10   expert opinion or testimony that would link

11   AdSense revenue back to Google Earth or somehow

12   evidence that Google Earth contributed to any

13   AdSense revenues.  And the figures obviously are

14   large and our concern is that this is

15   prejudicial and is being used for an improper

16   purpose.

17              THE COURT:  Okay.

18              MR. HAWES:  Your Honor, may I

19   actually pass up that document?

20              THE COURT:  Yes.

21              MR. HAWES:  So I'd start, Your

22   Honor, by just pointing out that as you can see

23   from the slide, there are no revenues numbers or

24   projection numbers here.  This is an

1393

```
 1    apportionment issue.  More importantly, if Your
 2    Honor could turn to Page 2, it's a double-sided
 3    document, if you look at the second full
 4    paragraph there, Your Honor, and look at the
 5    last sentence, you'll see this document is
 6    specifically talking about an apportionment
 7    breakdown that was effective in 2005.
 8              THE COURT:  Well, what's the
 9    Google comment on that?
10              MS. SIMMONS:  The main concern,
11    Your Honor, that as to any date, 2010 or 2005,
12    there is nothing in this document, nor is there
13    any expert testimony that links any AdSense
14    revenue to Google Earth.  That's not in this
15    document, not in the paragraph that counsel just
16    pointed out.
17              THE COURT:  Well, help me
18    understand what AdSense revenue is.
19              MS. SIMMONS:  Revenue from the ad
20    program for Google Earth that's used as we heard
21    from testimony, not in Google Earth.  It's used
22    in other Google products, and there's been no
23    expert testimony that says Google Earth
24    generates any of the AdSense revenue.
```

1394

1    THE COURT:  The AdSense revenue is

2    all of Google's advertising revenue for all

3    platforms?

4    MS. SIMMONS:  I'm not sure it's

5    all platforms, but I am certain it's not for

6    Google Earth.

7    THE COURT:  What is it, Mr. Hawes

8    MR. HAWES:  Your Honor, we are not

9    using this at all for revenue.  This is a

10   program that Google has where it splits the

11   value that Google adds and the value that the

12   customer receives and the expert testified that

13   this was the basis for determining an

14   apportionment to give Google credit for it's ad

15   program.  We are not going to talk about any

16   revenue numbers.

17   THE COURT:  I'm sorry, I'm not

18   following what's going on here.  And it's hard

19   for me to rule on it if I don't understand

20   what's going on.

21   MR. HAWES:  Fair enough, Your

22   Honor.  So the AdSense program is a partnership

23   program where third parties can work with Google

24   to have ads on their website.  So if I had my

1395

```
 1    own web --

 2                    THE COURT:  On Google website?

 3                    MR. HAWES:  No, actually on mine.

 4    So I'm a third party and Google provides me with

 5    software that allows me to show ads on my

 6    website, but through Google's system.  So it's

 7    on my website but it goes through Google's

 8    advertising them.

 9                    THE COURT:  Okay.

10                    MR. HAWES:  And there's a share,

11    I'm not going to talk about the revenue numbers,

12    but there's a share that has been effective

13    since 2005 for how Google says here's your

14    portion of that, and here's our portion because

15    of our advertising platform.

16                    THE COURT:  What does that have to

17    do with the issues in this case?

18                    MR. HAWES:  It has to do with the

19    share that Google itself attributes to the value

20    its advertising platform provides.  And that's

21    what Mr. Nawrocki testified as an expert, that

22    this helps him apportion because it shows what

23    Google believes its advertising platform is

24    worth as a share of revenue its providing.  So
```

1   it's an important apportionment point that was

2   testified to by the expert and as the document

3   indicates was dated back to 2005.

4                   THE COURT:  What is the 49/51

5   percent share going to be attributed to?

6                   MR. HAWES:  It's going to be

7   attributed to the various numbers we've seen

8   that the jury may use in calculating its

9   royalty.  We're going to say Google should get

10  credit for the percentage that Google itself has

11  determined is appropriate when you're using the

12  Google.

13                  THE COURT:  Are you suggesting

14  that Google Earth is responsible for 51 percent

15  of Google's total revenue?

16                  MR. HAWES:  No, Your Honor.  This

17  is one step in I believe four steps of

18  apportionment that Mr. Nawrocki used.  I mean,

19  this is certainly not a single step.  And again,

20  we're not going to talk about their total

21  revenue or any revenues numbers, but there are

22  four steps of apportionment that are important

23  for the jury to hear because apportionment is

24  required by the jury instructions.

```
 1                THE COURT:  Why is this 49/51
 2    percent apportionment from AdSense, what are you
 3    arguing it can be used for?
 4                MR. HAWES:  It can be used by the
 5    jury to adjust the rate to take into account the
 6    apportionment that Google's advertising platform
 7    deserves by Google's own program that shows how
 8    much Google attributes to its advertising
 9    platform as a percentage.
10                THE COURT:  Ms. Simmons.
11                MS. SIMMONS:  Your Honor, first of
12    all, Mr. Nawrocki talked about this document but
13    gave no opinion -- or not this document, I'm
14    sorry, the underlying document, but gave no
15    opinion as to how it should be used and second
16    and more important, as Your Honor, has
17    indicated, if you read PTX-219, and we can pull
18    it up if that's helpful, I believe counsel gave
19    you a copy.  If you read through this documents
20    it relates to ads that publishers can put on
21    their own site and generate revenues from those
22    ads.  It has absolutely nothing to do with
23    Google Earth and there has been no testimony or
24    evidence that it does.
```

```
 1                    THE COURT:  Is there any testimony
 2      Mr. Hawes?
 3                    MR. HAWES:  Yes, Your Honor, there
 4      is.  Mr. Nawrocki testified that this was an
 5      apportionment step that the jury could use to
 6      determine a reasonable royalty.  Your Honor --
 7                    THE COURT:  Did he say something
 8      about the AdSense document?
 9                    MR. HAWES:  Yes, he did, Your
10        Honor.
11                    THE COURT:  Did he say something
12        about the AdSense document?
13                    MR. HAWES:  Yes, he did.  He said
14        yes, our AdSense so we paid our AdSense for
15        search partners at 50 percent revenue per share,
16        that means if you do those activities its
17        partners would receive 51 percent, Google would
18        have a 49 percent, so roughly a split.  That's
19        how he described his apportioning step based on
20        how he analyzed the underlying document.  That's
21        all we're asking to show the jury exactly what
22        he testified.  I'm not going to show them the
23        document, I'm not going to show them anything in
24        the document other than what he testified about.
```

1399

```
1              THE COURT:  I'm going to sustain

2      the objection.  I think the way you're using

3      this could well confuse the jury and suggest

4      that this apportionment that's made in an

5      entirely different context somehow is between

6      Google and its third-party partners is somehow a

7      proper apportionment with respect to Google

8      Earth and other Google products, and it seems to

9      me it's quite remote from that.

10              MR. HAWES:  I understand your

11      ruling, Your Honor.

12              MS. SIMMONS:  Thank you, Your

13      Honor.

14              MR. SNYDER:  Your Honor, there are

15      two other issues that are closely related to

16      what we have just discussed.  The first relates

17      to an exhibit that is admitted.  This is

18      Plaintiff's Exhibit 160.  It is an SEC filing

19      from 2011, I believe, and it was admitted

20      without any redaction.

21              Now, like any SEC filing it

22      includes an enormous amount of information about

23      Google, the entire Google company including all

24      of its revenues and profits.  It was referenced
```

1   by Mr. Nawrocki for one purpose, and that was to

2   identify generically the difference, the amount

3   of Google worldwide revenues that he attributes

4   to the United States.

5                But it would be enormously

6   prejudicial for plaintiff's counsel or for one

7   of the jurors to look at that document and

8   identify the very kind of information that is

9   prohibited to show the jury about the company's

10  total revenues when there is no connection to

11  any of the issues in this case.

12               THE COURT:  Is there any reason,

13  Mr. Hawes that the document can't be redacted?

14               MR. HAWES:  I thought we had

15  agreed to a redaction.  I'm not sure what the

16  issue was.

17               MR. SNYDER:  I wasn't aware there

18  was a response.

19               MR. HAWES:  I'm sorry, we talked

20  yesterday.  We had agreed to a redaction based

21  on a document they had submitted.

22               MR. SNYDER:  That resolves the

23  issue and we'll submit the redacted version.

24               There is a related issue to that,

```
 1        Your Honor.  I am very concerned and I am more
 2        concerned after this morning's conversation that
 3        what plaintiff intends to do is to take their
 4        $7.1 billion session number and put some
 5        gigantic proposed damages in front of the jury
 6        when there is nothing to support that.
 7                  Mr. Nawrocki did not give a
 8        damages opinion.  He identified the number of
 9        sessions and never gave an opinion about the
10        rate.  He never gave an opinion about a proposed
11        reasonable royalty in his view.  If they want to
12        identify a number of sessions, that's one thing,
13        but now what I fear they are going to do is take
14        that 2010 document that we objected to and some
15        suggestion of a ten cent per use rate, and put a
16        number of $700 million in front of the jury.
17        And there is no basis for doing that given the
18        Court's rulings and given the evidence that's
19        been put forth in this case.
20                  MR. HAWES:  Your Honor, I am not
21        going to ask the jury for a $700 million damage
22        award.
23                  THE COURT:  What are you going to
24        do with the ten cent figure?
```

1402

```
 1              MR. HAWES:  All right.  So you're

 2    asking me for my closing, Your Honor?

 3              THE COURT:  Well, that's the issue

 4    that's raised here.

 5              MR. HAWES:  And I answered the

 6    issue, I'm not going to ask for $700 million.

 7    Yes, we're going to say that there is a typical

 8    royalty rate that was put in that e-mail that

 9    was admitted into evidence, we are going to

10    discuss various of the credit factors that

11    Mr. Nawrocki set forward, one less now, but

12    various of the factors that Mr. Nawrocki set

13    forward for giving credit to Google and we are

14    going to ask the jury to consider the evidence

15    in view of the royalty instructions that they

16    have received and let them know that there are

17    various options that they have for reaching a

18    reasonable royalty in this case in accordance

19    with the instructions.

20              I do not intend to put a $700

21    million number or any number higher than the

22    number we originally had in this case as a

23    result of the ten cent in front of the jury.

24              THE COURT:  I'm going to let you
```

1       -- this does seem to raise potential Rule 50

2       motion if you're successful here as to whether

3       there is sufficient evidence to support some of

4       these calculations, but I think I can't rule on

5       that in connection with to the closing argument.

6                   MR. HAWES:  Thank you, Your Honor.

7                   MR. SNYDER:  May I make one more

8       comment to try to put this in context?

9                        Your Honor just ruled that a

10      portion of the apportionment scheme that they

11      wanted to use, the 49 to 51 percent, they cannot

12      use.  I agree with that ruling and we all

13      understand that.

14                  THE COURT:  No, I didn't say they

15      couldn't argue for a 49 and 51 percent division,

16      I just said that they can't rely on this

17      document, the AdSense document because it's too

18      far afield and it's not relevant to making that

19      calculation.

20                  MR. SNYDER:  Thank you, for the

21      clarification, Your Honor.  There is no evidence

22      for an apportionment of the -- that is the only

23      evidence that Mr. Nawrocki relied on.  And there

24      is no other evidence on that issue.  If we

1  pulled -- we know how this works.  And if they

2  pull that piece out of the formula, one for

3  which there is no support, then the net effect

4  of that mathematically is it's going to double

5  the amount of damages that they're going to ask

6  for.

7              By taking a piece out, the net

8  effect is they're going to ask for more money

9  which is more prejudicial, not less prejudicial,

10  when the reason for removing it is that it is

11  irrelevant.

12              THE COURT:  You're going to argue

13  there is no support for it.  At the end of the

14  day if there is a Rule 50 motion necessitated

15  here, we can have briefing on whether there is

16  any support in the record for this.  Mr. Hawes

17  runs the risk of that happening.  But I'm going

18  to let the argument be made within the confines

19  of what we just discussed.

20              MR. SNYDER:  Thank you, Your

21  Honor.

22              MR. HAWES:  Thank you, Your Honor.

23              THE COURT:  Is there anything

24  else?

```
 1              MR. PARTRIDGE:  Nothing from the

 2     plaintiff, Your Honor.

 3              MR. SNYDER:  Nothing further, Your

 4     Honor.

 5              THE COURT:  All right.  Are we

 6     ready to bring the jury back in for the closing

 7     argument?

 8              MR. PARTRIDGE:  One --

 9              THE COURT:  Yes, we need to

10     determine whether your review of the verdict

11     form and final jury instructions showed any need

12     for a change.

13              MR. PARTRIDGE:  It's okay with us,

14     Your Honor.  I would request you would give us a

15     couple of minutes to adjust the slides in light

16     of Your Honor's ruling.

17              THE COURT:  We'll do that.

18              MR. WILLIAMSON:  I apologize, Your

19     Honor.  I realized there is a housekeeping

20     issue.  I have already addressed it with

21     plaintiff's counsel.  Some of the exhibits and

22     there is one we have identified so far that were

23     not objected to in the pretrial order and that

24     were used with witnesses were not listed in some
```

```
 1    of those post witness rollcall and the only one

 2    we have identified now is the file history from

 3    plaintiff's exhibit, it's PTX 5.  There may be

 4    others, we agreed if plaintiff identified those,

 5    we won't object.  I just move that into

 6    evidence.

 7                    MR. PARTRIDGE:  No objection, Your

 8    Honor.

 9                    THE COURT:  It's admitted.

10                    And now Mr. Snyder, you have had a

11    chance to review the final jury instructions and

12    verdict form?

13                    MR. SNYDER:  We have, Your Honor.

14    And you conformed to the Court's rulings.  We

15    have no further issues for them.

16                    THE COURT:  We'll wait a couple of

17    minutes to let you get set.

18                    MR. HAWES:  Can I ask for a

19    clarification, Your Honor?

20                    THE COURT:  Yes.

21                    MR. HAWES:  On your ruling with

22    regard to the AdSense, are you excluding the

23    demonstrative slide?  We're trying to fix

24    closing right now, Your Honor.  Are you
```

1407

```
 1      excluding the demonstrative slide or are you

 2      excluding the article that was previously

 3      admitted into evidence?

 4                  THE COURT:  The article being PTX

 5      0219?

 6                  MR. HAWES:  Yes, 0219, that's

 7      right, Your Honor.

 8                  THE COURT:  Yes, I think this

 9      document should be not only excluded as a

10      demonstrative, but based on further argument

11      stricken to the extent that it was admitted

12      earlier.  I think it's too speculative, too

13      confusing.  It raises a very serious 402

14      problem, very marginal reference and

15      significantly prejudicial.

16                  MR. HAWES:  Your Honor, are you

17      also striking the witness's testimony with

18      regard to Exhibit 219, the expert witness?

19                  THE COURT:  Yes.

20                  MR. HAWES:  I understand your

21      ruling.  Thank you, Your Honor.  And just for

22      the record, we do object to those being

23      stricken, but I understand your ruling.

24                  THE COURT:  Thank you.
```

```
 1                Just one other matter before you

 2      bring in the jury.  Now that I've stricken PTX

 3      0219 and the testimony with respect to that, is

 4      there a need to inform the jury of that?

 5                MR. SNYDER:  I think it would be

 6      appropriate to inform them, Your Honor, that

 7      they have been taking notes.  We have no idea

 8      what portion of it is going to be relevant to

 9      their determinations or not.  And I don't know

10      how that issue is going to be handled at

11      closing.

12                THE COURT:  It's not going to be

13      handled at closing, but is there a need to

14      inform the jury about that?

15                MR. HAWES:  Your Honor, we don't

16      believe so.  It shouldn't go back, obviously,

17      because you have excluded it so it wouldn't be

18      something the jury would have access to or

19      consider.  We believe it would be prejudicial to

20      have the jury come in during closing and tell

21      them we're striking some of the plaintiff's

22      witness's testimony.  This decision was

23      potentially made while the witness was on the

24      stand, but instead now we're here in closing and
```

```
 1        the question is whether to tell the jury as

 2        closing starts or even right after closing, I'm

 3        striking a plaintiff's witness's testimony.

 4                    THE COURT:  I'm inclined to agree.

 5        It gives it too much emphasis.  The exhibit

 6        won't be available to the jury.  There is not

 7        going to be any reference to the testimony about

 8        it.  So I think to avoid further jury confusion

 9        about that, I'm not going to mention it.

10                    MR. SNYDER:  I understand, Your

11        Honor.

12                    MR. HAWES:  I understand, Your

13        Honor.

14                    THE COURT:  All right.  Are we

15        ready to bring the jury back?

16                    MR. HAWES:  The plaintiff is

17        ready, Your Honor.

18                    MR. SNYDER:  Yes, Your Honor.

19                    (Jury entering the courtroom at

20        9:14 a.m.)

21                    THE COURT:  Good morning, members

22        of the jury.  Thank you for your patience here.

23        Sorry to keep you waiting.  Now comes the time

24        for the final stages of this case.  I'm going to
```

1410

1    give you final jury instructions and I'm going

2    to give you a verdict form which you should fill

3    out in your deliberations and then there will be

4    closing argument by each side and then you will

5    recess to deliberate.  Unfortunately the final

6    jury instructions are somewhat lengthy, probably

7    going to take on the order of 45 minutes or

8    maybe even longer than that, so I ask you to

9    bear with me and to pay attention carefully

10   because these instructions must govern your

11   deliberations.

12            Now, members of the jury, you have

13   heard the evidence in this case and I'm going to

14   instruct you now on the law you must apply.  And

15   a copy of these instructions will be available

16   to you during your deliberations.  It's your

17   duty to follow the law as I describe it to you.

18   On the other hand, you, members of the jury, are

19   the judges of the fact or the facts and don't

20   consider any statement that I have made during

21   the trial or in these instructions as an

22   indication that I have a view about the facts of

23   the case.

24            After I instruct you on the law,

```
 1    the attorneys will have an opportunity to make

 2    their closing arguments.  Statements and

 3    arguments of the attorneys are not evidence and

 4    are not instructions on the law.  They are

 5    intended only to assist you in understanding the

 6    evidence and the parties' contentions.

 7                 As I mentioned, a verdict form has

 8    be prepared for you.  You will take this form

 9    into the jury room and when you have reached a

10    unanimous agreement as to your verdict, you will

11    have your foreperson fill it in, date it and

12    sign it.  Answer each question on the verdict

13    form in order based on the facts as you find

14    them.  Your answers and your verdict must be

15    unanimous.

16                 In determining whether any fact as

17    be proven in this case, you may, unless

18    otherwise instructed, consider the testimony of

19    all witnesses, regardless of who may have called

20    them, and all exhibits received into evidence,

21    regardless of who may have produced them.  You

22    may also consider the parties' factual

23    stipulations.  You have heard testimony and

24    viewed exhibits about some very technological
```

1412

1   issues.  The evidence at times may have been

2   difficult for non-experts such as yourself to

3   comprehend.  In deliberating on a verdict, do

4   not be discouraged and do your best to

5   understand the testimony and exhibits that have

6   been presented to you.  I think these

7   instructions and the closing arguments will help

8   you to understand the relevant issues and I have

9   great faith in your ability to reach a fair and

10  impartial verdict.

11              While you should consider only the

12  evidence in this case, you are permitted to draw

13  such reasonable inferences from the testimony

14  and exhibits as you feel is justified in the

15  light of common experience.  In other words, you

16  may make deductions and reach conclusions that

17  reason and common sense lead you to draw from

18  the facts that have been establish by the

19  testimony and evidence in this case.  The

20  testimony of a single witness may be sufficient

21  to prove any fact, even if a greater number of

22  witnesses may have testified to the contrary, if

23  after considering all other evidence you believe

24  that single witness.

1           Now, certain testimony as you

2    recall, has be presented through a deposition.

3    As I mentioned at the outset of the trial, a

4    deposition is the sworn, recorded answers to

5    questions asked of a witness before trial.

6    Under some circumstances, if a witness cannot be

7    present to testify from the witness stand, the

8    witness testimony may be presented, under oath,

9    in the form of a deposition.  The deposition

10   testimony is entitled to the same consideration

11   as live witness testimony, and it is to be

12   judged by you as to credibility and weight and

13   otherwise considered by you insofar as possible

14   and treated the same as if the witness has been

15   present and had testified from the witness stand

16   in court.

17           You have heard comments and

18   questions from both sides concerning potential

19   witnesses who were not called to testify in this

20   trial.  You should be aware that I have strictly

21   limited the amount of time available to each

22   side to present testimony, so that we could

23   conclude within the week and it was not possible

24   for the parties to call all witnesses who may

     1    have relevant knowledge.

     2              In determining the weight to give

     3    to the testimony of a witness, you should ask

     4    yourself whether there was evidence tending to

     5    prove that the witness testified falsely

     6    concerning some important fact, or whether there

     7    was evidence that at some other time the witness

     8    did or said something or failed to say or do

     9    something, that was different from the testimony

    10    the witness gave before you during the trial.

    11              You should keep in mind of course

    12    that a simple mistake by a witness does not

    13    necessarily mean the witness was not telling the

    14    truth as he remembers it, because people forget

    15    some things and remember other things

    16    inaccurately.  So if a witness has made a

    17    misstatement, you need to consider whether the

    18    misstatement was an intentional falsehood or

    19    simply an innocent lapse of memory and the

    20    significance of that may depend on whether it

    21    has to do with an important factor an

    22    unimportant detail.  Now, a witness may also be

    23    discredited or impeached by contradictory

    24    evidence such as testimony of other witnesses or

1   written documents received in evidence or

2   evidence that at some other time the witness

3   said or did something, or failed to say or do

4   something that was different from the testimony

5   he or she gave at trial.  If you believe any

6   witness has been impeached and thus discredited,

7   you may give the testimony of that witness such

8   credibility, if any, as you think it deserves.

9            If a witness is shown knowingly to

10   have testified falsely about any material

11   matter, you have a right to distrust such

12   witness' other testimony, and you may reject all

13   the testimony of that witness or give it such

14   credibility as you may think it deserves.

15            Certain exhibits shown to you are

16   illustrations.  We call these types of exhibits

17   demonstrative exhibits.  Demonstrative exhibits

18   are a party's description, picture or model to

19   describe something involved from in this trial.

20   If your recollection of the evidence differs

21   from the demonstrative exhibit, rely on your

22   recollection.  Both parties have presented

23   testimony of expert witnesses.  When /-PBL of

24   technical subject matter may be helpful to the

1    jury, a person who has special training or

2    experience in that technical field, called an

3    expert witness, is permitted to state his or her

4    opinion on those technical matters.  However,

5    you're not required to accept that opinion of

6    the expert.  As with other witnesses, it is up

7    to you to decide whether to rely upon it.  In

8    deciding whether to accept or rely upon the

9    opinion of an expert, you may consider any bias

10   of the witness, including any bias you may infer

11   from evidence that the expert witness has been

12   will be paid for reviewing the case and

13   testifying, and whether the expert supported his

14   opinion with sufficient evidence.

15            Now, by allowing testimony or

16   other evidence to be introduced over the

17   objection of an attorney, I will not indicate

18   any opinion as to the weight or effect of such

19   evidence.  You are the sole judges of the

20   credibility of all witnesses and the weight and

21   effect of such evidence.  When I sustained an

22   objection to a question addressed to a witness,

23   you must disregard the question entirely and may

24   draw no inference from the wording of it or

1  speculate as to what the witness who have

2  testified to, if he or she had been permitted to

3  answer the question.

4           As you've seen at times during the

5  trial, it was necessary for me to talk to the

6  lawyers here at the bench out of your hearing or

7  by calling a recess.  We met because often

8  during a trial something comes up that doesn't

9  involve the jury.  You should not speculate on

10  what was discussed during such times.

11           Now, I will first give you a

12  summary of each side's contentions in this case

13  and I will then tell you what each side must

14  prove to win on the issues.  In this case ACI

15  contends that Google infringes claims 1, 3, 14

16  and 28 of the '550 Patent by using within the

17  United States certain Google Earth products and

18  the Google Maps with Earth feature.  ACI asks

19  you to award damages for the infringement.

20  Google contends that the accused Google Earth

21  products do not infringe Claims 1, 3, 14 and 28

22  of the '550 Patent.  Google contends that

23  certain steps of the claimed method are not

24  performed by Google or its software in the

```
 1    accused Google Earth product.  Google's contends

 2    that claims 1, 3, 14 and 28 are invalid.  Google

 3    contends that at the time of the alleged

 4    invention, there was already prior art that

 5    performed or described every element of each

 6    asserted claim, rendering the claims invalid.

 7    As such, Google contends that ACI is not

 8    entitled to any damages.

 9              Your job is to decide which, if

10    any, of the accused claims have been infringed

11    and which, if any, of the asserted claims are

12    invalid.  If you decide that any asserted claim

13    of the '550 Patent has been infringed and is not

14    invalid, you will then need to decide any money

15    damages to be awarded to ACI as compensation for

16    that infringement.

17              Now, in any legal action, facts

18    must be proved by a required amount of evidence.

19    The burden of proof in this case is on ACI for

20    some issues and on Google for others.  ACI has

21    the burden of proving infringement and damages

22    by a preponderance of the evidence.  Google has

23    the burden of proving invalidity by clear and

24    convincing evidence.  As I told you, when a
```

1    party such as ACI has the burden to prove any

2    claim by a preponderance of the evidence, that

3    means that the evidence must persuade you that

4    the claim is more probable than not.  When a

5    party such as Google has the burden of proving a

6    defense by clear and convincing evidence, it

7    means the evidence must produce in your mind a

8    firm belief or conviction that the claim or

9    defense has been proven.  Although the clear and

10   convincing evidence standard is more rigorous

11   than preponderance of the evidence, it does not

12   require proof beyond a reasonable doubt as in

13   criminal cases.  You may think of clear and

14   convincing evidence as being between the

15   preponderance and beyond a reasonable doubt

16   standards of proof.

17            As I told you at the beginning of

18     trial, the claims of a patent are the numbered

19     sentences at the end of the patent.  The patent

20     claims describe the claimed invention made by

21     the inventor and describe what the patent owner

22     owns and what the patent owner may prevent

23     others from doing.  Four claims are involved

24     here.  These are set forth in your list of

1    claims and Court's construction of claim

2    terminology.  They are claims 1, 3, 14 and 28,

3    which are claims to methods.  These claims are

4    divided into parts called steps, requirements,

5    or limitations.

6              For example, a claim that covers

7    the invention of a method of building a table

8    may recite cutting a tabletop, carving four

9    legs, and gluing the legs to the tabletop.

10   Cutting the tabletop, carving the legs and

11   gluing the legs to the tabletop are each a

12   separate step of the claim.  To find

13   infringement, you must find that each step was

14   performed by the accused infringer.

15             You will first need to understand

16   what each claim covers in order to decide

17   whether or not there is infringement of the

18   claim and to decide whether or not the claim is

19   invalid based on the prior art.

20             It is the Court's role to define

21   the terms of the claims, and it is your role to

22   apply those definitions to the issues that are

23   asked to decide in this case.  Therefore, as I

24   explained to you at the start of the case, the

1    Court has determined the meaning and scope of

2    the claims, and you have been provided the

3    definitions of certain claim terms in your list

4    of claims and Court's construction of claim

5    terminology.  You must accept the definitions of

6    those words in the claims as being correct.  It

7    is your job to take those definitions and apply

8    them to the issues that you are deciding,

9    including the issues of infringement and

10   validity.  Let me remind you of those

11   definitions:

12              In each claim, space-related data,

13   means data related to a geographical location.

14              In each claim, plurality of

15   spatially distributed data sources means a

16   plurality after geographically separate data

17   sources.

18              In each claim, centrally storing

19   the data for the field of view, means storing

20   requested data for the field of view in memory

21   at the location of the request.

22              In each claim, image resolution

23   means the level of detail or spatial precision

24   contained in an image.  In addition, image

1    resolutions means the plurality of the level of

2    detail or spatial precision contained in an

3    image.

4              In each claim, representing the

5    data for the field of view in a pictorial

6    representation having one or more sections,

7    means providing and organizing the data

8    necessary for displaying the field of view in a

9    pictorial representation having one or more

10   sections.  However, the method of claim does not

11   include a final step of displaying the visual

12   image to the user, using the hardware of a

13   display device or using generic graphics

14   software or firmware associated with that

15   display device.

16             In each claim, dividing each of

17   the one or more sections having image

18   resolutions below a desired image resolution

19   into a plurality of smaller sections, requesting

20   higher resolution space-related data for each of

21   the smaller sections means dividing each of the

22   one or more sections having image resolutions

23   below a desired image resolution into a

24   plurality of smaller sections, prior to

```
 1    requesting higher resolution space-related data

 2    for each of the smaller sections.  While

 3    dividing any given section into smaller sections

 4    must occur prior to requesting higher resolution

 5    space-related data for each of those smaller

 6    sections, it is not necessary that all sections

 7    must be divided before higher resolution

 8    space-related data can be requested for any of

 9    the smaller sections.

10              In each claim, repeating step F,

11    dividing the sections into smaller sections,

12    until every section has the desired image

13    resolution or no higher image resolution data is

14    available means repeating step F, dividing the

15    sections into smaller sections, until every

16    section has the desired image resolution or no

17    higher image resolution data is available.

18              In claim 3, the coordinates of the

19    data means a distinct position in a given space.

20              In claim 14, quadrant tree means a

21    data structure where each node has four equally

22    sized children.

23              In claim 28, polygonal grid model

24    means a model of an object that represents the
```

1 objects surface using a measure of polygons to

2 form a grid.

3              The beginning, or preamble of each

4 asserted claim uses the word comprising.

5 Comprising means including or containing but not

6 limited to.

7              In claim 1, step F, the substep of

8 sub-dividing must be performed before the

9 substep of requesting, and step F must be

10 performed before step G.

11              Claim terms not specifically

12 defined by me should be interpreted by you based

13 on their plain and ordinary meaning to one of

14 ordinary skill in the relevant technology.  The

15 meaning of words in the patent claims is the

16 same for both infringement and invalidity.

17              You must pay careful attention to

18 the language of the claims.  It is the claims,

19 and not the rest of the patent, that define the

20 invention that ACI has a right to exclude others

21 from using.  Only if you decide that an accused

22 Google Earth product performs each and every one

23 of the steps in a claim is that claim infringed

24 by that product.

1    This case involves two types of

2    patent claims:  Independent claims and dependent

3    claims.

4        An independent claim sets forth

5    all of the steps that must be performed in order

6    to be covered by that claim.  Thus, it is not

7    necessary to look at any other claim to

8    determine what an independent claim covers.  In

9    this case, claim 1 of the '550 patent is an

10   independent claim.

11       The remainder of the claims in the

12   '550 patent are dependent claims.  A dependent

13   claim does not itself recite all of the steps of

14   the claim, but refers to another claim for some

15   of its steps.  In this way, the claim depends on

16   another claim.

17       A dependent claim incorporates all

18   of the steps of the claim(s) to which it refers.

19   The dependent claim then adds its own additional

20   steps.  To determine what a dependent claim

21   covers, it is necessary to look at both the

22   dependent claim and any other claims to which it

23   refers.  A product that performs all of the

24   steps of both of the dependent claim and the

1    claim(s) to which it refers is covered by that

2    dependent claim.

3              An accused product is only covered

4    by, and therefore, only infringes a dependent

5    claim if the accused product performs all of the

6    steps of both of the dependent claim and the

7    claim, and to which dependent claim refers.

8    Because a dependent claim incorporates all of

9    the features of the independent claim it refers

10   to, if you find that an independent claim is not

11   infringed, then the claims that depend on that

12   independent claim cannot be infringed.

13             I will now instruct you on the

14   specific rules you must follow to determine

15   whether ACI has proven that Google has infringed

16   one or more of the patent claims involved in

17   this case.

18             To prove infringement, ACI must

19   prove by a preponderance of the evidence that

20   one or more of Google's products performs

21   methods that infringe one or more of the

22   asserted claims.  An asserted method claim such

23   as claims 1, 3, 14 and 28 is infringed if Google

24   has used the method in the United States, i.e.,

1    if Google has done something in the United

2    States that performs every step in that asserted

3    claim.   Performance of the method outside the

4    United States is not covered by the claims.

5                    Evidence of independent

6    development of the patented invention may not be

7    considered in determining patent infringement,

8    though it may be relevant to obviousness.

9                    Infringements of a patent is

10   assessed on a claim by claim basis.  When a

11   thing (such as use of a method) meets all of the

12   requirements of a claim, the claim is said to

13   cover that thing, and that thing is said to fall

14   within the scope of that claim.  In other words,

15   a claim covers a method where each of the claim

16   steps is performed in that method.

17                    The infringement of each of the

18   four claims must be considered separately.

19   Thus, you must compare each claim to each

20   accused Google Earth product to determine

21   whether each product's use includes every

22   requirement of the claim.  If the use of any

23   accused Google Earth product does not perform

24   one or more of the steps recited in a claim,

1    then that product does not infringe that claim.

2              ACI is not required to prove that

3    Google intended to infringe or knew of the

4    patent to prove infringement.  ACI does not

5    contend that Google copied the invention claimed

6    in the patent.

7              Google does not dispute that steps

8    A through E of claim 1 are met.  Google also

9    does not dispute that the additional limitations

10   of claims 3, 14 and 28 are met if the

11   limitations of steps F and G of claim 1 are met.

12             ACI and Google dispute whether the

13   accused Google Earth products meets steps F and

14   G of claim 1.  In order to find infringement,

15   you must consider whether each of Google's

16   accused products infringes each of the four

17   asserted claims - claims 1, 3, 14 and 28, and

18   conclude that at least one Google Earth product

19   meets every step of at least one claim.

20             Invalidity generally.

21             I will now instruct you on the

22   rules you must follow in deciding whether or not

23   Google has proven that claims 1, 3, 14 and 28 of

24   the '550 patent are invalid.

1    Patents issued by the Patent and

2    Trademark Office (PTO) are presumed to be valid,

3    but not all patents that are issued by the PTO

4    are, in fact, valid.  You may find that the

5    patent claims invalid if Google establishes the

6    necessary facts by clear and convincing

7    evidence, i.e., you must be left with a clear

8    conviction that the claim is invalid.  Evidence

9    concerning the inventor's duty of candor before

10   the PTO may not be considered for purposes of

11   determining validity.

12        What qualifies as prior art.

13        Before you can determine whether

14   the patent claims are valid in light of the

15   prior art, you must determine what qualifies as

16   prior art.

17        Prior art may include items that

18   were publicly known or that have been used or

19   offered for sale, or references, such as

20   publications or patents, that disclose the

21   claimed invention or elements of the claimed

22   invention.  To be prior art, the item or

23   reference must have been made, known, used,

24   published, or patented before December 17, 1995.

1430

```
 1              In the preliminary instructions I
 2      told you the priority date was December 22,
 3      1995.  The parties have now agreed to a December
 4      17, 1995 priority date.
 5              Google contends that certain
 6      references are prior art because they were
 7      printed publications before December 17, 1995,
 8      and that certain systems are prior art because
 9      they were used publicly before that date.
10      Google contends that the following references
11      constitute prior art:
12              The SRI TerraVision system; and
13      paragraph two, the T_Vision paper.
14              ACI and Google dispute whether the
15      SRI TerraVision system qualifies as prior art
16      based on prior public use, which I will explain
17      shortly.  ACI and Google also dispute whether
18      the T_Vision paper qualifies as prior art.  The
19      T_Vision paper is a printed publication, only if
20      it is was accessible to the public prior to
21      December 17, 1995.  To qualify the T_Vision
22      paper as prior art, Google must prove to you by
23      clear and convincing evidence that this
24      reference was disseminated or otherwise made
```

1    available to the extent that persons interested

2    in ordinary skilled in the subject matter

3    exercising reasonable diligence could locate it

4    prior to the December 17, 1995.  It is not

5    necessary for the printed publications to have

6    been available to every member of the public.

7              ACI and Google do not dispute that

8    global mapping patent reference is a printed

9    publication.  You should therefore consider it

10   as prior art to the '550 patent.

11              Anticipation.

12              Google contends the T_Vision paper

13   anticipates claims 1, 14, and 28, but not claim

14   3.  You may find a claim is anticipated only if

15   all of its steps were present in a single prior

16   art reference in the arrangement claimed to.  To

17   anticipate a prior art reference does not have

18   to use the same words as the claim, but all of

19   the requirements of the claim must have been

20   present so that a person having ordinary skill

21   in the art could make and use the claimed

22   invention based on that knowledge.

23              To anticipate the claimed

24   invention, the disclosures of a prior art

1   reference do not need to have been made, used or

2   performed.  Google must prove anticipation by

3   clear and convincing evidence.

4           Google contends that the public

5   use of the SRI TerraVision system invalidates

6   claims 1, 3, 14 and 28 of the patent.  This is

7   sometimes referred to as anticipation.  You may

8   find a claim is invalid based on prior public

9   use if there is clear and convincing evidence of

10  each claim step was publically used.  ACI and

11  Google dispute whether SRI's TerraVision system

12  was publically used.  SRI's TerraVision system

13  was in public use if it was accessible to the

14  public.  Factors relevant to determining whether

15  a use was public include the nature of the

16  activity that occurred in public; public access

17  to the use; confidential obligations imposed

18  upon observers and the circumstances surrounding

19  testing and experimentation.  An invention is

20  publically used if it is used by the inventor or

21  by a person who is not under any limitation,

22  restriction, understanding or obligation of

23  secrecy to the inventor.

24          The absence of affirmative steps

1   to conceal the use of the invention is evidence

2   of a public use.  However, non-commercial secret

3   use by a third party is not public, unless

4   members of the public or employees of the third

5   party have access to the invention.  To

6   establish a public use of a prior art system,

7   Google must prove the system was complete and

8   could be used for its intended purpose.  To

9   prove that SRI's TerraVision system was used

10   publically, Google must show by clear and

11   convincing evidence that it was accessible to

12   the public prior to December 17, 1995.  If the

13   SRI TerraVision system satisfied those

14   requirements, it qualifies as prior art.

15          Google contends that the patent

16   claims are obvious over various prior art

17   references.  Even if you find that the T_Vision

18   paper and the SRI TerraVision system references

19   do not, by themselves, invalidate the claims,

20   you must consider those references in connection

21   with the issue of obviousness if you conclude

22   that those references constitute prior art.

23          Google contends that claims, 1, 3

24   14 and 28 are obvious in view of the public use

1434

1    of the SRI TerraVision system and the knowledge

2    and skill of a person of ordinary skill in the

3    art at the time of the alleged invention.

4    Google's contends that claims 1, 14 and 28 would

5    have been obvious in view of the T_Vision paper

6    and the knowledge and skill of a person of

7    ordinary skill in the art at the time of the

8    alleged invention.

9            Google contends that Claim 3 would

10   have been obvious in view of the combination of

11   the T_Vision paper, the Global Mapping patent

12   and the knowledge and skill of a person of

13   ordinary in the art at the time of the alleged

14   invention.

15           I will now instruct you on the law

16   of obviousness.  Even if a claimed invention was

17   not fully anticipated because it was not exactly

18   described or disclosed in a single prior art

19   reference, a patent claim may still be invalid

20   if the asserted claim would have been obvious to

21   a person of ordinary skill in the art at the

22   time of the alleged invention.

23           In determining whether a claimed

24   invention was obvious, you must consider A, the

```
 1    level of ordinary skill in the art that someone
 2    would have had at the time of the claimed
 3    invention; B, the scope and content of the prior
 4    art and C, any differences between the prior art
 5    and the claimed invention.
 6             The parties agree that a person of
 7    ordinary skill in the art at the time of the
 8    claimed invention would have had a Bachelor of
 9    Science degree (or its equivalent) and three
10    years experience with research or development,
11    engineering product development requirements
12    analysis, in computer graphics and/or digital
13    image processing.  With more education, for
14    example, post graduate degrees and/or study,
15    less industry experience is needed to attain
16    that ordinary level of skill.
17             I have already instructed you
18    about how to determine what references qualified
19    as prior art.  It will be up to you to evaluate
20    what those prior art references taught or
21    disclosed and the scope of any differences
22    between the prior art and the claimed invention.
23    A claim can be obvious over the prior art based
24    on a combination of references or considering
```

1  the single reference.  To tender obvious the

2  claimed invention, the disclosures of a printed

3  publication do not need to have been made, used

4  or performed.  In assessing obviousness or

5  non-obviousness, keep in mind that an invention

6  is not obvious simply because each of its

7  elements appeared in the prior art.  Many

8  inventions rely on building blocks of prior art,

9  and you should not judge obviousness in

10  hindsight.  You should consider whether there

11  was a reason that would have prompted a person

12  of ordinary skill at the time of the claimed

13  invention and combine the known element in a way

14  that the claimed invention did.

15           Factors you may consider in this

16  regard include whether the claimed invention was

17  merely the predictable consult of using prior

18  art elements according to their known functions,

19  whether the claimed invention provided an

20  obvious solution to a known problem, whether the

21  prior art taught or suggested the desirability

22  of combining elements or claimed in the

23  invention, whether it would have been obvious to

24  try to create the invention, for example, if

1    there was a design need or market pressure to

2    solve a problem and there were a finite number

3    of identified predictable solutions, and whether

4    the claimed combination would have occurred in

5    any way due to design incentives or other market

6    forces.  You should also take into account any

7    objective evidence (sometimes called secondary

8    assertions) that may shed light on the

9    obviousness or non obviousness of the claimed

10   invention.  In particular, if products

11   incorporating the invention were commercially

12   successful as a result of the claimed invention,

13   then that may suggest that the invention was

14   non-obvious.  But you should disregard any

15   commercial success that was due to factors other

16   than the claimed invention, such as other

17   product features or sales and marketing

18   evidence.  If you find that the claimed

19   invention satisfied a long felt but previously

20   unsolved need or that persons other than the

21   inventors had tried and failed to achieve the

22   invention, that may also suggest that the

23   invention was non-obvious.

24                On the other hand, if you find

1   that someone else came up with the claimed

2   invention before or at about the same time that

3   ACI's inventors thought of it, that may suggest

4   that the claimed invention was obvious.

5   Finally, acceptance of the claim invention by

6   others shown by praise for or licensing of the

7   claimed invention may suggest that the claimed

8   invention was not obvious.  In this connection,

9   you should give less weight to a license entered

10  into for the purpose of avoiding the cost of

11  litigation, all things being equal.  These

12  factors are relevant only if there is a

13  connection or nexus between the factor and the

14  invention covered by the patent claims.

15          Even if you conclude that some of

16  the above indicators have been established,

17  those factors should be considered along with

18  all the other evidence in the case in

19  determining whether Google has proven that the

20  claimed invention would have been obvious.  Keep

21  in mind that all these factors relate to

22  obviousness only.  Not to anticipate or to

23  publish use.  Google must prove obviousness by

24  clear and convincing evidence.  I will now

```
1    instruct you on damages.  If you find that
2    Google has infringed any of claims 1, 3, 14 and
3    28 of the '550 Patent and you find that claim is
4    not invalid, you must determine the amount of
5    money damages to which ACI is entitled.  By
6    instructing you on damages, I do not suggest
7    that one or the other party should prevail on
8    infringement or invalidity.  These instructions
9    are provided to guide you on the calculation of
10   damages in the event you find infringement of a
11   valid patent claim and thus must address the
12   damages issues.  The amount of damages must be
13   adequate to compensate ACI for the infringement.
14   Here ACI seeks to recover the reasonable royalty
15   for use of the invention by Google.  At the same
16   time, the object of damages is to compensate,
17   not to punish.  You should not award additional
18   damages if you find that the patent or patents
19   were used without permits.  You also may not add
20   anything to the amount of damages for interest.
21            You may award damages only for the
22   amount that ACI proves by a preponderance of the
23   evidence constitute a reasonable royalty.
24            Where the parties dispute a matter
```

1 concerning damages, it is ACI's burden to prove

2 by a preponderance of the evidence that ACI's

3 version is correct.  ACI must prove the amount

4 of damages with reasonable certainty, but it

5 need not prove the amount of damages with

6 mathematical precision.  On the other hand, ACI

7 is not entitled to damages that are remote or

8 speculative.

9          Any damages you assess in this

10 case should be calculated starting on July 13,

11 2010.  A royalty is a payment made to a patent

12 holder in exchange for the right to make, use,

13 sell, offer to sell, or import the claimed

14 invention.  A reasonable royalty is the amount

15 of royalty payment that a patent holder and the

16 infringer would have agreed to in a hypothetical

17 negotiation taking place at a time just before

18 when the infringement first began.  In this

19 case, the hypothetical negotiation would have

20 occurred in June 2005, when Google Earth was

21 introduced.

22          In considering this hypothetical

23 negotiation, you should focus on what the

24 expectations of the patent holder and the

```
 1    infringer would have had they entered into an

 2    agreement at that time, and had they acted

 3    reasonably in their negotiations.

 4              In determining this, you must

 5    assume that both parties believed the patent was

 6    valid and infringed and that the patent holder

 7    and infringer were willing to enter into an

 8    agreement.  The reasonable royalty you determine

 9    must be a royalty that would have resulted from

10    the hypothetical negotiation, and not simply a

11    royalty either party would have preferred.

12    Evidence of things that happened after the

13    infringement first began can be considered in

14    evaluating the reasonable royalty only to the extent

15    that the evidence aids in assessing what royalty

16    would have resulted from a hypothetical negotiation.

17    Although evidence of the actual profits an alleged

18    infringer made may be used to determine the

19    anticipated profits at the time of the hypothetical

20    negotiation, the royalty may not be based on the

21    actual profits the alleged infringer made.  Evidence

22    concerning Google's revenues or financial projections

23    from after 2006 is not material to and cannot be

24    considered for the purpose of determining the royalty
```

1    rate.  ACI's financial proposals after 2006 may be

2    given less weight for the purposes of determining a

3    reasonable royalty.

4    In determining the reasonable royalty, you should

5    consider all the facts known and available to the

6    parties at the time the infringement began.  Some of

7    the kinds of factors that you may consider in making

8    your determination are:

9    1.  The Stanford license agreement, which I will

10   discuss in more detail later.

11   2.  The nature and scope of the license, as exclusive

12   or nonexclusive, or as restricted or nonrestricted in

13   terms of its territory or with respect to whom the

14   manufactured product may be sold.

15   3.  The commercial relationship, if any, between ACI

16   and Google.

17   4.  The effect of selling the patented product in

18   promoting sales of other products of the licensee.

19   5.  The duration of the '550 patent and the term of

20   the license.

21   6.  The established profitability of any product made

22   under the '550 patent; its commercial success; and

23   its current popularity.

24   7.  The utility and advantages of the patented

1    invention over the old modes or devices, if any, that

2    had been used for achieving similar results.

3    8.   The nature of the patented invention; whether

4    there is any commercial embodiment of it as owned and

5    produced by ACI; and the benefits to those who have

6    used the invention.

7    9.   The extent to which Google has made use of the

8    invention; and any evidence that shows the value of

9    that use.

10   10.   The portion of the profit that arises from the

11   patented invention itself as opposed to profit

12   arising from unpatented features, such as the

13   manufacturing process, business risks, or significant

14   features or improvements added by Google.

15   11.   The opinion testimony of qualified experts.

16   No one factor is dispositive, and you can and should

17   consider the evidence that has been presented to you

18   in this case on each of these factors.  You may also

19   consider any other factors which in your mind would

20   have increased or decreased the royalty the infringer

21   would have been willing to pay and the patentholder

22   would have been willing to accept, acting as normally

23   prudent business people.  You should determine the

24   amount that a licensor (such as ACI) and a licensee

```
 1    (such as Google) would have agreed upon in 2005 if
 2    both sides had been reasonably and voluntarily trying
 3    to reach an agreement.  That is, the amount which a
 4    prudent licensee - who desired, as a business
 5    proposition, to obtain a license - would have been
 6    willing to pay as a royalty.  You may also consider
 7    whether Google could have made a reasonable profit.
 8    This is the framework which you should use in
 9    determining a reasonable royalty, that is, the
10    payment that would have resulted from negotiation
11    between the patentholder and the infringer taking
12    place at a time just prior to when the infringement
13    began.
14    The reasonable royalty award must be based on the
15    incremental value that the patented invention adds to
16    the end product.  When the infringing products have
17    both patented and unpatented features, measuring this
18    value requires a determination of the value added by
19    the patented features.  The ultimate combination of
20    royalty base and royalty rate must reflect the value
21    attributable to the infringing features of the
22    product, and no more.
23    Use of the Stanford agreement.
24    In estimating the reasonable royalty for any
```

1   infringement, Google has relied on a license

2   agreement with Stanford University.  You will need to

3   decide whether that agreement is comparable to the

4   agreement that would have been reached in the

5   hypothetical negotiation I mentioned earlier.  Google

6   bears the burden of proving that the situations are

7   comparable.  In deciding whether a license agreement

8   is comparable, you may consider, among others, the

9   following factors:

10  1.  Whether the negotiating circumstances were

11  similar - for example, whether the agreement

12  reflected an arms-length transaction between willing

13  parties;

14  2.  Whether the structure of the license agreement

15  was similar to the structure of the license that

16  would have resulted from the hypothetical

17  negotiation;

18  3.  Whether the patents and products covered by the

19  license agreement were similar to the patents and

20  products involved in the hypothetical negotiation;

21  4.  Whether other product functionality not covered

22  by the patent-in-suit affects the comparability of

23  the two negotiations;

24  5.  Whether the relationship between the licensing

1    parties was similar to the relationship between the

2    patent owner and Google at the time of the

3    hypothetical negotiation;

4    6.  The time when the license agreement was entered

5    into relative to the timing of the hypothetical

6    negotiation.

7    A license agreement needs not be perfectly comparable

8    to a hypothetical license that would have been

9    negotiated between ACI and Google in order for you to

10   consider it.  However, if you choose to rely upon

11   evidence from any other license agreements, you must

12   account for any differences between those licenses

13   and the hypothetically negotiated license again ACI

14   and Google.

15   Damages tied to a patented method.

16   When the claimed invention is part of the

17   functionality or success of the accused product,

18   damages must be based upon the value of the claimed

19   invention.  In this case, Google argues that the

20   value of the accused product is based on many

21   features and the performance of many methods,

22   including other technical features and methods and

23   patented technologies unrelated to the performance of

24   the method claimed in the patent.  You may award

1   damages only based on the value of the claimed

2   method.

3   ACI has the burden of establishing any damages award.

4   ACI, therefore, must prove by a preponderance of the

5   evidence that the damages it seeks are attributable

6   to the claimed method, and not to the other

7   technologies, features, methods, or aspects of the

8   accused products.  ACI's evidence must be reliable

9   and tangible; it cannot be conjectural or

10  speculative.  Any evidence of a reasonable royalty

11  must explicitly tie proof of damages to the claimed

12  method's role in the marketplace.

13  Again, you only reach the damages question if you

14  find that Google's products infringe at least one

15  claim that has not been proven invalid.

16  Damages tied to other Google products.

17  ACI seeks to recover damages reflecting the alleged

18  value that Google Earth contributes to Google's

19  profitability.  ACI does not accuse additional Google

20  products of infringing the patent, and damages cannot

21  be awarded on any theory that they do infringe.  ACI

22  is not entitled to damages based upon the value of

23  other Google products unless ACI establishes that it

24  is more likely than not that revenues from those

```
 1    products were generated by the use of the patented

 2    method in Google Earth.  To show that it is entitled

 3    to damages based on these other products, ACI must

 4    establish a proper apportionment of the revenues

 5    Google generated from those products - that is, ACI

 6    must show what portion of the revenues generated by

 7    those products results from the infringement.

 8    In short, to recover damages tied to additional

 9    Google products, which are not themselves accused of

10    infringement, ACI must prove, first, that Google

11    Earth infringes at least one valid claim of the

12    patent, and, second, that Google Earth increases the

13    revenues Google collects from those other products.

14    If you conclude that ACI has proved both of these

15    things, then you must first determine what fraction

16    of the revenues from the other products is

17    attributable to the patented technology and then

18    determine what a reasonable royalty on those revenues

19    would be.

20    Any reasonable royalty rate you determine for

21    revenues from the other Google products not accused

22    of infringement should be no more than the reasonable

23    royalty rate for revenues from Google Earth itself.

24    That's quite a mouthful.  That took forty-five
```

```
 1   minutes.  And as I said, you will have copies of

 2   these instructions to take back with you during the

 3   deliberations.  And I will also give you some final

 4   instructions after the parties' closing arguments,

 5   which I think will take about two hours.

 6   You will find in each case that the lawyer delivering

 7   the closing argument may reserve some of the time

 8   from the opening to use in rebuttal.

 9   I think before we get to the closing arguments, this

10   might be a good time to take our morning break and

11   then come back and have the closing arguments.

12   All right.  Thank you members of the jury.  We'll

13   take a fifteen-minute break.

14   (Jury leaving the courtroom at 10:05 a.m.)

15                   THE COURT:  Anything before we

16     recess?

17                   MR. HAWES:  No, Your Honor.

18                   MR. SNYDER:  Nothing further, Your

19     Honor.

20                   THE COURT:  We'll resume at about

21     10:15, 10:20, we'll do the closing arguments at

22     that point.

23                   (A brief recess was taken.)

24                   THE COURT:  Be seated please.  All
```

```
 1    right.  Unless there's anything else, why don't
 2    we bring the jury back.
 3                    MR. PARTRIDGE:  Nothing from
 4    Plaintiff, Your Honor.
 5                    THE COURT:  Who is going to
 6    deliver the closing argument?
 7                    MR. PARTRIDGE:  Mr. Hawes will for
 8    ACI.
 9                    MR. SNYDER:  I will for Google,
10    Your Honor.
11                    THE COURT:  Okay.  Thank you.
12                  (Jury enters.)
13                    THE COURT:  Welcome back, members
14    of the jury.  We're ready for closing arguments
15    beginning with Mr. Hawes for ACI.
16                    MR. HAWES:  Thank you, Your Honor.
17    Are you ready, Your Honor?
18                    THE COURT:  Please.
19                    MR. HAWES:  Good morning once
20    again.  I'm sure it feels like its been a long
21    week.  Four days of testimony, source code,
22    financial documents, patents, claims, videos,
23    but it all wraps together now.  And as the judge
24    has told you, the dispute of the parties today
```

1    is in your hands.  Google and Google alone

2    decided to offer Google Earth for free.  And

3    with that free offering of the flying invention,

4    you can image how licensing of that to companies

5    who might want to offer that and make money

6    would turn out.  As you know, millions, millions

7    and millions of people have used Google Earth

8    and did so in just the first year of its

9    release.  It was a free product and it was cool.

10   And it did very, very well.  Google and Google

11   alone decided not to seek permission from ACI,

12   decided not to seek permission to use the '550

13   Patent.  And that's why we're here today.

14   That's why this lawsuit has occurred.

15              Now, you heard yesterday, just

16   yesterday from Mr. Reed that even today it's

17   Google's position that when they use someone

18   else's invention for free, they don't have to

19   pay a royalty.  You remember when I questioned

20   Mr. Reed and I said if I use Google Earth and I

21   don't clock on an ad and I don't download,

22   whatever it was, Chrome, is there any part that

23   you say Google ought to pay to ACI?  He said no.

24   He said Google ought to be able to do that for

```
1    free, ought to be able to infringe ACI's patent

2    for free.  So that's what this is about, your

3    decision of whether that makes sense, in view of

4    the law you've seen that if you infringe a valid

5    patent, you are due, at minimum, a reasonable

6    royalty for the use of that invention.

7                Today you'll determine what credit

8    is due for the '550 reissue patent.  So let's

9    talk about what it means to be a reissue patent.

10   Most patent cases are about patents.  Why is

11   this a reissue patent?  Well, it's because after

12   the first patent was approved by the Patent

13   Office, ACI went back to the Patent Office and

14   pointed out some additional information they had

15   received and the Patent Office came along and

16   again approved the patent.  And finally, some

17   more information came in and ACI put their

18   patent at risk again and said look at this, is

19   it, is it still good?  Is it a valid patent?

20   And what happened?  The Patent Office said yes.

21   This patent has been triple checked and that's

22   going to be very important when you consider

23   some of the issues in this case, whether this

24   triple-checked patent and what the Patent Office
```

1453

```
 1    has done ought to be second guessed.
 2               The other thing that's in this
 3    patent is a list of the information that was
 4    considered by the examiner during this triple
 5    check process.  First of all, and I know this is
 6    hard to read, and I hope -- I don't know if it
 7    is on your monitors or not, but here we have
 8    several references all having to do with that
 9    TerraVision you've heard so much about.  I want
10    you to remember that during the triple check
11    process, that was in front of the Patent Office.
12    What else was in front of the Patent Office?
13    Well, you heard about all these events at
14    SIGGRAPH '95.  That was in front of the Patent
15    Office too.  You can see all the SIGGRAPH '95
16    CD's, articles, all that given to the patent
17    office.  And finally what else was in front of
18    the Patent Office is the deposition testimony of
19    Mr. Lau.  So Mr. Lau has actually spoken to the
20    Patent Office, he's had depositions on these
21    issues before and ACI gave that to the Patent
22    Office, so the Patent Office could do its triple
23    check.  That's the reissue patent that you're
24    looking at today.
```

1        Now, of course we've talked about

2    how this all started, how every boy wants to fly

3    through the air and be Superman and look over

4    the earth.  You can see a man here doing the

5    same thing, looking over the earth, using the

6    earth tracker.  Still sitting there in the

7    corner.  I'm sure they want it out of the court

8    room, but we like it.  ACI and Art+Com are proud

9    of what they built and proud of giving this kind

10   of experience back to people back in 1994 and

11   1995.  And we also talked about how they brought

12   EarthTracker over here to the United States to

13   SGI and California and showed it in the

14   corporate showroom of SGI in order to impress

15   SGI's other customers.  And we talked about how

16   future Google employees Michael Jones and Brian

17   McClenden were at SGI.  And you got to hear Mr.

18   Jones himself talking about going over and using

19   the EarthTracker while he was there.

20        And then they left SGI and we

21   heard a little bit about how they moved first to

22   make their own company, Intrinsic Graphics.

23   Didn't quite work out and so what did they do?

24   They decided to move and create a company called

1    Keyhole.  And I'm not going to take the time I

2    did in opening when I told you this story the

3    first time, but it's the story of this case,

4    it's still important.  Because at Keyhole they

5    developed EarthViewer and they developed a

6    product and they start selling that product.

7    They charged $69 a year to their customers.

8    There was real money involved in this product.

9    It was a product that they cared about, that

10   they charged money for and that customers

11   bought.

12              But then what happens?  They hire

13   John Hanke.  Great addition.  We got to hear

14   from him on video.  They take this product that

15   they are charging $69 for and when Google buys

16   them, what happens?  Google rebrands the product

17   as Google Earth and it reprices the product at

18   zero dollars.  Think about that.  Is the

19   invention any less used because Google chose to

20   price the product as zero dollars as it was used

21   when Keyhole was pricing the product at $69?

22   Should the payment, the royalty to the patent

23   owner be any less because Google makes that

24   decision?  That's in your hands today, whether

1      that's the case.

2              Now, we talked early on about

3      Google's strategy and remember when Google made

4      that zero dollar decision, Google had a strategy

5      behind it.  We talked about this on Monday and

6      Mr. Nawrocki talked about that strategy when he

7      was on the stand and we'll talk again, why does

8      Google do the zero dollars?  How does that work

9      for Google to make money?  And we'll go through

10     that in detail this afternoon.  Now, the first

11     communication is about the patent.  Again, you

12     got to hear from Mr. Jones and what Mr. Jones

13     did right away was he told ACI it's a nice to

14     have patent.  It's not one we need, it's not

15     even something, as he puts it, I think it was a

16     different type of icing on the cake.  It was not

17     even something we want to use, it's just nice to

18     have, maybe if there's a lawsuit we'll use it

19     for defense.  That's what he told ACI.

20             And you've heard from Google about

21     those communications in 2006.  There were a lot

22     of them.  Those e-mails are hard to read, they

23     are old.  I know it's tough to read those, and

24     frankly they are all not that important, because

1    they all were based on Google telling ACI it's a

2    nice to have patent.  ACI didn't know whether

3    Google was truly saying it's a nice to have

4    patent, but you heard Pavel Mayer.  He believed

5    Mr. Jones.  He believed this wasn't a patent

6    they were using, that they had a different way

7    and that this was just something that well, we

8    might take it, we might not.  It's nice to have.0

9                 All of these negotiations in 2006

10    were based on that premise, on that

11    communication through Mr. Jones and Mr. Mayer

12    that it was a nice-to-have patent.  Keep that in

13    mind because I'm sure you're going to get to see

14    all these E-mails in detail again today.  Keep

15    that in mind.

16                 Now, at the end of that process,

17    as you remember, Google's lawyers said your

18    patent has problems and here is some documents

19    showing you the problems your patents have.  ACI

20    not knowing if Google was right or wrong knew

21    who to ask and went to the patent office.  They

22    said here are those documents.  Is it really a

23    problem?  Is our patent still good?  They risked

24    their patent, because you go to the patent

1458

```
1    office and you ask if your patent is still good,

2    they may say no.  But Mr. Mayer was willing to

3    put his patent at risk, to take those documents

4    to the patent office and ask do I still have a

5    good patent.  And as we all know, the patent

6    office said yes.

7                 What was happening while the

8    patent office was analyzing those patents?

9    Frankly, Google Earth was going gangbusters.  We

10   have seen big charts, lots of numbers.  The

11   bottom line really are the sessions.  Mr. Birch

12   testified for you and he told you what a session

13   was of Google Earth.  He said a session is when

14   somebody opens and begins using Google Earth.

15   So that's what a session is.

16                 When you see those big

17   spreadsheets with all those numbers, every one

18   of those numbers, and I know it's millions and

19   millions up to billions, but each time, that's

20   someone opening and beginning to use Google

21   Earth.

22                 And you'll remember Dr. Castleman,

23   what does it mean when they're using Google

24   Earth?  It means they're using the '550 patent.
```

1    And here is that spreadsheet.  We

2    don't have to go through it line by line.  I'll

3    actually let you know, you'll have it back --

4    you'll have a computer back in your deliberation

5    room, and if you want to, this is PTX 55, you

6    can look at every day that Google kept these

7    session numbers for Google Earth.  It actually

8    breaks it down by all the different types of

9    Google Earth.  There is Google Earth for your

10   computer, there is Google Earth for your iPad,

11   there is Google Earth for your Android phone.

12   Of course, those come a little bit later.  Here

13   in 2005 it was just Google Earth for the

14   desktop.  All those numbers are there.  They're

15   all on that Plaintiff's Trial Exhibit 55.  If

16   you want you can certainly take a look.

17              But Mr. Nawrocki, he looked at it

18   for you, took all those numbers.  First thing he

19   did was which one of these are in the United

20   States, because ladies and gentlemen, this is a

21   United States patent.  We're not asking you, ACI

22   is not asking you to give credit to ACI for

23   Google Earth's success outside the United

24   States.  This is about Google Earth in the

 1      United States, the use of it in the United

 2      States, because it's a United States patent.

 3      That's what it comes.

 4                    He looked at it year to year and

 5      determined that since July 2010, and you have

 6      just heard the Judge tell you that's when you

 7      start the damages calculation is July 2010, that

 8      there had been over seven billion uses of Google

 9      Earth in the United States.

10                    So that's the extent of

11      infringement that we believe has occurred of the

12      '550 patent.

13                    So the first question you're going

14      to find on that jury form is a question that ask

15      whether Google Earth infringes.  And you know

16      what the real question is?  The real question

17      is, did Google infringe over seven billion

18      times?  Because that's what you heard about is

19      whether the use of Google Earth by Google to

20      provide this great interface, this flying,

21      zooming entertaining interface that keeps its

22      customers involved for ten, twenty, thirty

23      minutes, whether that infringes.  And you got to

24      hear a lot of information about whether that

 1    infringed.

 2              The first thing we should talk

 3    about is what's the most important information

 4    you heard.  And Google's witnesses will confirm,

 5    the most important information you heard about

 6    whether it infringes was about source code.

 7    Mr. Birch referred to it as the authoritative

 8    source.  And Dr. Goodchild agreed, it's the

 9    ultimate authority.

10              So when it comes to weighing the

11    evidence, even Google agrees it's the source

12    code that really weighs.  Let's talk about that.

13    Who showed you that source code?  Who walked

14    through the source code with you element by

15    element for these claims?

16              Now, you remember on Monday, I

17    wasn't the only one who stood up.  Google's

18    attorney stood up as well.  And what he told you

19    is this case is about, it's about a patent case

20    and there are four very specific patent claims.

21    And he's right.  This case is about those patent

22    claims.

23              But it was Dr. Castleman who went

24    through those patent claims with you element by

```
 1    element and kept pointing out for you the files,

 2    the modules and the comments of Google's

 3    engineers that showed how each step of each of

 4    those claims was being used by Google Earth.

 5    That was the source code analysis you heard.

 6              Dr. Castleman is the only one who

 7    went through every step of every claim with you.

 8    I know it took a while, I know that it was not a

 9    quick and easy process, but frankly

10    Dr. Castleman didn't want quick and easy, he

11    wanted right.  He wanted correct.  And that's

12    why he went through that source code with you

13    step by step, comment by comment, module by

14    module.

15              And he went through claim 1, and

16    even because there was different source code,

17    and remember, it's the source code that counts,

18    he went through different products of Google in

19    order to do a full analysis for you of every

20    element, every step of the '550 claim.

21              That's what Dr. Castleman did.

22    Now, Google, they don't disagree.  The Judge

23    just told you, Google doesn't disagree that they

24    do the first two-thirds of that patent claim.
```

1    No dispute.  Dr. Castleman got up there, go

2    through all that source code, no dispute, we all

3    found that out.

4              We did find out that they do

5    dispute steps F and G.  And frankly when you

6    look at step G, that means they were disputing

7    step F, because step G says do step F again.

8    And we can all see looking at Google Earth it

9    does it again and again and again.  You get

10   frames as you move through.  It's those smooth

11   frames that allow you to see the earth moving as

12   though you were flying.

13             Let's focus on that step F and

14   figure out what the real evidence was.

15             Now, Mr. Birch testified about

16   what Google Earth did, but one thing Mr. Birch

17   told you was that he was not the author in any

18   of the Google Earth source code.  He told you

19   there were some brilliant engineers at Google,

20   brilliant engineers and they're the best in the

21   industry, and they are the ones who really write

22   the code.  So that's interesting.  Mr. Birch,

23   who is not evidently one of these engineers, he

24   may well be brilliant, but he's not one of the

1    ones who wrote the source code.  He came here to

2    talk to you.  But the brilliant engineers, we

3    don't know where the brilliant engineers were.

4    We know they weren't here in Wilmington,

5    Delaware.  I hope they're enjoying themselves.

6    You saw video, if you remember, we saw video of

7    two of their engineers, we saw video of Julian

8    Merce who was one of them, and John Rosh, two

9    software engineers, the Google project lead

10   engineers, we took their deposition, but they

11   didn't come here from California.

12              No one from Google who wrote the

13   source code came here to get in that witness box

14   and tell you about how the source code works,

15   didn't come.

16              Dr. Goodchild, their expert

17   witness, he came.  He came and he got in that

18   witness box and he told you why he thought

19   Google Earth did not infringe.  One of the

20   things he told you was that in describing step

21   F, he described it, these are his words, he says

22   yes, that phrase has been used many times in the

23   trial.  The phrase in question, coarse to fine.

24   That's what he used and agreed described step F

1       of the '550 patent, the step that's being

2       contested here, the step that you need to decide

3       about.

4                       Then he said, and that's why

5       Google doesn't infringe because it doesn't do

6       coarse to fine.  That's what he said.  That was

7       the reason.  The reason that he gave.

8                       But then he was presented with

9       some source code, some source code he didn't

10      tell you about when he was talking with his

11      attorney on the stand.  The source code he was

12      presented with when ACI's attorney started

13      talking to him.  He goes down to a particular

14      line in the source code and the source code says

15      the default is zero, which means coarse to fine.

16      And he agrees.  And then he agrees that coarse

17      to fine is the shorthand for referring to the

18      process in step F of the claim.  So the source

19      code had the very thing that he agrees describes

20      step F of the '550 patent claim.  He agreed to

21      it.

22                      So then what happens?  He's agreed

23      that the source code does this.  Then what

24      happens?  Well, all of a sudden, he's not in a

1466

```
 1      position to analyze the source code anymore,

 2      having agreed the source code says default, do

 3      it the way the patent does it, he decides he has

 4      no basis to answer the question, he would have

 5      to consider great detail, it's a very complex

 6      source code.  He sat in that witness stand and

 7      told you he understood this product enough to

 8      tell you that Google Earth didn't infringe.

 9                But when he realized that there

10      was source code that said it did, all of a

11      sudden it was too complex.  He couldn't figure

12      it out.  He was not in a position to do that

13      today.  Well, maybe he's in a position to do it

14      next week, but it's not going to help any of us,

15      because it's not evidence in this case.  He

16      needed to be in a position to do that today if

17      he wanted you to assess his evidence in favor of

18      Google.

19                And then there is his argument

20      about step G.  Now, all step G says is do step F

21      until you reach one of two different resolution

22      points and just do F over and over.  And we have

23      already seen, Google does step F.  If you look

24      at some of the things he said, he said well, it
```

1    doesn't repeat.  Maybe that's because he doesn't

2    think Google does step F.

3              Then he says claim 1 requires

4    these four substeps and that is simply not true.

5    He never tells you why it's not true.  He never

6    tells you what it is Google is doing.  All he's

7    really saying is Google doesn't do step F,

8    therefore, it doesn't repeat, but we all seen

9    that he did admit that Google does step F, but

10   the source code showed it.  Now, all we will get

11   is it just doesn't, it just doesn't, it's simply

12   not true.

13             That's not an argument against

14   infringement.  That's not evidence that weighs.

15   The evidence was what Dr. Castleman showed you,

16   the modules, the file names, the specific

17   reasons why it doesn't do -- why it does each

18   step.

19             And, for example, in step G,

20   remember there are two parts, it's still you get

21   the right resolution or you run out of data, and

22   you can see both of those things in here.  You

23   can see the target image quality module is in

24   there.  You can see the max level module is in

1468

```
 1        there.  Target quality, that's resolution,

 2        maximum level, that's when you run out of

 3        levels, it's the exact stuff and it was

 4        explained to you by Dr. Castleman with no

 5        response from Dr. Goodchild.

 6                    What Doctor Goodchild and Mr.

 7   Birch did use were made for trial animations.

 8   So Doctor Castleman comes to you, works through

 9   the source code, file by file, module by module.

10   Mr. Birch and Doctor Goodchild come to you with

11   an animation that was made for this trial, not

12   for Google customers, not for Google's internal

13   engineers.  This isn't a Google document that

14   was around before this case.  This is a Google

15   document created by the lawyers to show you.

16                    Now, Mr. Birch worked with the

17   lawyers, Doctor Goodchild worked with the

18   lawyers, but these were not Google's original

19   documents, they were something that was created

20   for you.  Doctor Goodchild said the same thing,

21   the entire slide set was jointly prepared

22   between him and the attorneys.

23                    He also said, and it's

24   interesting, he said that the animation that I
```

1    prepared was the basis for Peter Birch's

2    testimony.  So if you think of Doctor Goodchild

3    and Peter Birch as kind of separate independent

4    evidence on the part of Google, that's not what

5    Doctor Goodchild said.  He said that he created

6    this animation and that was the basis for Mr.

7    Birch's testimony.  So think about that.

8    There's a link.  Doctor Goodchild and Mr. Birch,

9    same animation, same document, never used with

10   Google's customers, never used by Google's

11   engineers.  That's the evidence that was shown

12   to you.  And then it wasn't actually clear what

13   Doctor Goodchild had done because on one side he

14   said the animation I prepared was the basis for

15   Peter Birch's testimony, but then he said I have

16   no particular knowledge about the relationship

17   between the slides that Peter Birch showed and

18   the slides that I showed.  How could you

19   reconcile those two things, especially when you

20   look at the slides?  And we've got examples

21   right down there.  I don't think those slides

22   were independently developed, they sure look

23   about the same to me.

24              So in the end on infringement you

```
 1    need to make a judgment about whether we, ACI,
 2    have shown you by a preponderance of the
 3    evidence that these claims are infringed by
 4    Google Earth.  On one side you have the evidence
 5    Doctor Castleman presented you with, the source
 6    code of three different types of Google Earth,
 7    capturing all of the accused products.  On the
 8    other side you have a made for trial diagram
 9    that was created just to show you in this trial
10    with no brilliant engineers coming here from
11    California who wrote the source code to tell you
12    about what the source code really does about
13    what the product really does.  It's your job,
14    not my job, to weigh those.  And you can weigh
15    the source code more heavily, but you consider
16    all the facts and make your own judgment.  I
17    would remind you that both Mr. Birch and Doctor
18    Goodchild agreed the source code is the ultimate
19    authority on what the software does, not a made
20    for trial animation.
21            So when you look at the first
22    question on your verdict form, the very first
23    thing you need to decide is whether Google Earth
24    infringes Claim 1.  And if you decide that based
```

1    on Doctor Goodchild saying that the source code

2    shown to him showed the course define, which is

3    how he defined the operation of Step F, you'll

4    see that indeed all of the elements are used by

5    Google Earth and Google Earth infringes Claim 1

6    of the '550 Patent.

7              Now, the nice thing is that once

8    you get to that point, actually gets pretty easy

9    in question 1, the verdict form.  And that's

10   because Google has not in any way contested that

11   if it's infringing Claim 1, it infringes Claim

12   3, it infringes Claim 14, and it infringes claim

13   28.  They haven't contested it.  They haven't

14   contested that the additional requirements of

15   those claims are met by Google Earth.  Doctor

16   Castleman walked through all of those with you

17   and the source code, but you don't even need to

18   worry about it, because it's not even contested.

19   So with regard to that first question, you can

20   go ahead and check off Claim 1, Claim 3, Claim

21   14 and Claim 28.

22             So after the first question on

23   infringement in your verdict form, you'll see

24   several questions, numbers 2 through 8 are all

1472

```
 1    about all this prior art stuff, the TerraVision,

 2    the T_Vision patent that he showed for just a

 3    little bit.  Remember he talked about

 4    obviousness.  All of that information, the same

 5    things the Patent Office has already triple

 6    checked and they are asking you to question that

 7    to decide that the Patent Office got it wrong.

 8              Now, what are they basing -- what

 9    evidence are they basing that request on?  How

10    are they trying to tell you they have clear and

11    convincing evidence of invalidity?  Well, they

12    certainly have Doctor Goodchild.  He claimed the

13    patents were invalid, but what I want you to

14    keep in mind is Doctor Goodchild likes to

15    simplify things and he told us that, he told us

16    he's interested in simplifying the case and when

17    we asked him about, you know, going into the

18    files, he said it's my belief that taking them

19    in detail through source code and talking about

20    the meanings of variability would not have been

21    particularly helpful.  And the people he's

22    talking about are you.  That's the jury that

23    he's saying he's not going to provide detail to

24    because that wouldn't be particularly helpful.
```

 1     And maybe it wouldn't have been helpful to

 2     Doctor Goodchild, but it would have been helpful

 3     to you.  You deserved to get the detail, not the

 4     simplification, because you're making a

 5     difficulty decision.  You're making a decision

 6     about a technology that the Patent Office has

 7     looked at, very technical references, very

 8     technical demonstrations, you deserve the

 9     detail.

10             What other simplifications did we

11     encounter with Doctor Goodchild?  We already

12     heard one of them, which was in the infringement

13     analysis when, you know, the animation, the

14     simple explanation was my animation shows

15     there's no course define, so no infringement.

16     What's the simple explanation?  What was the

17     detailed explanation?  And you saw it.  He said

18     it the detailed explanation was the source code

19     shows there is course define.  The source code

20     shows that the Step F, substeps are all down

21     here, he was the one that said Step F is course

22     define.  He was the one that said the source

23     code showed it.

24             What other simplifications did we

1474

```
1    see?  You'll remember his simple approach was

2    just to highlight the text he liked and you

3    remember it was pointed out to him that that

4    text follows the words rather than.  In fact,

5    the opposite was true.  If you simplify too much

6    you run into some problems and Doctor Goodchild

7    certainly did in the way he considered the

8    evidence in this case.

9                   Well, who else do you have to look

10   to?  Well, you have Mr. Lau.  Now Mr. Lau said,

11   you know, I myself could not attend this

12   symposium.  That's what he said at one point in

13   the transcript.  But in another point in the

14   transcript I said were you there?  He says yes,

15   I was.  So at one point I'm not there, at a

16   different point, I am there.  Now, he comes back

17   and he says well, there were some receipts and

18   those show that I'm there.  Now, if you had made

19   a mistake testifying under oath and you knew you

20   were going to have to explain it, and your

21   explanation was going to involve some paperwork,

22   would you bring the paperwork with you?  Would

23   you show the jury I made an honest mistake, here

24   are the receipts?  We didn't see any receipts,
```

1    we didn't see any paperwork.  There was no

2    explanation other than just believe me now,

3    don't believe me then.  That was about what you

4    got.

5              Now, here we get to the real

6    contribution of this.  We've got the over

7    simplification, we've got the believe me now,

8    believe me then, but what's really important

9    when you look at the prior art is they never

10   showed you a single line of source code.  They

11   want you to believe what TerraVision was doing

12   at SIGGRAPH '95 based on a whole bunch of

13   documents and grainy video and some of those

14   documents don't even work with each other, but

15   you know, they have the source code.

16             Doctor Goodchild admitted he

17   reviewed the source code.  Doctor Lau said he

18   wrote most of the source code.  So if they had

19   the source code to TerraVision and they could

20   have shown you exactly how it works, exactly how

21   it was being displayed at SIGGRAPH '95, why

22   didn't they?  Why did they come here with a

23   whole bunch of different papers over a couple of

24   years and say it's all kind of in there and

1    here's a grainy video?  Why did they take that

2    approach when the Judge has instructed you that

3    invalidity requires clear and convincing

4    evidence?  They had the source code and they

5    didn't bring it to you.  They didn't show it to

6    you.  If they wanted clear and convincing

7    evidence by their own admissions, they should

8    have gone to the authority.  They should have

9    gone to the ultimate authority according to

10   Doctor Goodchild, the source code.  They had it

11   and they didn't bring it with them.  You can

12   take that into consideration when you decide

13   whether the Patent Office should be second

14   guessed.

15           So that's my ultimate question on

16   all of this prior art.  Where is the source

17   code?  They have it.  Why haven't we seen it?

18           So if you find infringement in

19   Question 1 and you don't find that this prior

20   art was source code we don't even know from

21   Questions 2 to 8 causes the Patent Office to be

22   second guessed after the triple check, then you

23   move into what is probably the toughest part of

24   this case.  And that's the damages part of this

1    case.

2              Now, the statute we've all seen is

3    not too tough.  It says that upon finding for

4    the Claimant, the Court shall award the Claimant

5    damages adequate to compensate for infringement,

6    but in no event less than a reasonable royalty

7    for the use made of the invention by the

8    infringer.  Now, it doesn't say the non free

9    use.  It doesn't say the use that has direct

10   revenue.  It says the use.  When Google Earth

11   Free is used by Google, they are using the

12   invention and ACI is entitled to a royalty.  I

13   know Mr. Reed doesn't agree, but that's what the

14   statute says.

15             Now, on the damages side of the

16   case, you heard the Judge discuss there are a

17   large number of factors.  And every one of those

18   factors if you read through it, I'm not sure

19   it's every one, but perhaps it's 90 percent of

20   them say may, you may consider.  You may

21   consider X, you may consider Y.  There's like 25

22   factors you may consider.  And that makes it

23   difficult.  Right?  You're not -- infringement

24   you look at each step, you decide if it's there.

1    Damages it's like well, we can look at this, we

2    can look at this, we can look at that.  I'm

3    going to tell you the ones I think are

4    important, but you need to assess the record and

5    that's why damages are difficult.  You need to

6    look at all those potential factors and decide

7    what you think is right, what you think is a

8    reasonable royalty for the use made of the

9    invention.  And I'm going to start with that

10   Google strategy document and I'm going to turn

11   the page in a moment once we get inside it,

12   because this is one of those confidential

13   documents we talked about on Monday.

14            I kind of think of this document

15   almost as financial source code, because like

16   source code, it's confidential and I always have

17   to play with the paper when I put it up.  Like

18   source code it tells us what Google really does.

19   There is their internal strategy, so we're

20   finding out what they really do and also like

21   source code you hardly ever hear the Google

22   witnesses talk about it.  Mr. Reed never talked

23   about this strategy document.  No other Google

24   witness ever discussed Google's strategy at the

1  time that Google Earth was being released.  Why

2  doesn't Google want to talk about their own

3  strategy?  Doesn't make much sense.

4           I'll flip the page so we can get

5  into the document.  So we talked about the

6  strategy last time and the strategy is complex.

7  It's kind of hard to read, but the bottom line

8  is the strategy is about monetization.  And you

9  remember that term we've seen it in lots of

10  Google documents, that's making money, and even

11  now a few months after Google Earth's release,

12  Google Earth is the number one Geo application

13  there supporting monetization for Google.  So

14  there's no question that there was not Geo for

15  good, this was good for monetization.  That was

16  their strategy.

17           So what's their strategic

18  framework?  We talked about this a bit and Mr.

19  Nawrocki went into it in more detail than I can.

20  I'm not an expert on this.  What he told you was

21  that what their strategic framework showed was

22  their top priority back in 2006 was just getting

23  more users.  It wasn't necessarily about

24  immediately getting revenue from those users

1480

```
 1    right away, it was about getting the users into

 2    their framework so they can learn information

 3    about those users.  By using Google Earth they

 4    got to see where you might want to go on

 5    vacation, where you lived, what you were

 6    interested in.  All of that information comes

 7    back into Google and you can see it in their

 8    UIAP model.  And they use that information, you

 9    can see they use that information for

10    advertisers, for publishes, they use that

11    information to be more profitable.  And what do

12    they call that?  They call that the network

13    effect.  Having the most users, advertisers and

14    publishers provides data that we use to increase

15    targeting relevance.  That targeting relevance,

16    that's all about that big category of

17    advertising right there in the middle of

18    monetization.  What they are targeting are

19    advertising.  What's relevant is the

20    advertisements you and I see when we do anything

21    on Google, because Google has information about

22    us from all these free applications.  And that

23    increases the amount of money they make from

24    advertisers.  And it's explained right here in
```

          1    2006 in their strategy document.  So Google's

          2    concern at the time was to bring users in, not

          3    necessarily immediately make money off them, but

          4    bring them in.  And guess what, Google Earth did

          5    that really well.  It was really effective in

          6    bringing those users in.  And Google itself

          7    understood in 2006 that that would create a

          8    network effect that would allow them to make

          9    more money off advertising.  And it's in their

         10    internal strategy documents, the document that

         11    was never discussed by a single Google witness.

         12              Let's turn to the Geo business.

         13    So the Geo business, as we know, has Maps, it

         14    has Earth, it has I think Local Search was the

         15    third one.  How did the Geo business see their

         16    development?  And Mr. Lodge, could you move

         17    three slides ahead, please.  The Geo business

         18    saw their development as focused on, as they put

         19    it, the overarching investment focus on growing

         20    users and usage.

         21              That's important language.  It's

         22     their overarching investment focus.  So remember

         23     what both Mr. Nawrocki and Mr. Reed told you.

         24     The process when you're trying to figure out

1    damages, the process is if Google had been

2    willing, if they had been willing to license the

3    patent, that's something they had been willing

4    to do, and they had come to the table saying we

5    want permission to use your patent, we're

6    willing to pay you a royalty for that.  What

7    would have been important to Google in making

8    that investment?  Because getting intellectual

9    property that you can use for your product,

10   that's an investment.  Getting a patented method

11   that makes your product do the critical things

12   it's supposed to do, it's an investment.

13              And how did Google say they

14   invested?  They said their overarching

15   investment focus was in growing users and usage.

16   Mr. Reed didn't talk about users or usage.  You

17   have heard about the users and usage.  You have

18   heard about the billions of downloads and seven

19   billion uses of Google Earth.  Each of those

20   uses is an infringement of the '550 patent.

21              So when you go back to talk and

22   you think about the instructions on damages, I

23   want you to take into account Google's internal

24   strategy of growing the users and investing in

```
 1      users and usage, because that's what Google's

 2      documents tell us Google wanted to do.

 3                  The other thing you need to take

 4      into account is the view of the '550 patent.  If

 5      you remember, the '550 patent, Google said it's

 6      nice to have, no big deal.  That's not how you

 7      treat the hypothetical negotiation.  Mr. Reed

 8      agreed, when you're in the hypothetical

 9      negotiation, that patent is valid and it's

10      infringed.

11                  And you know how Mr. Jones

12      characterized the patent that's valid and

13      infringed, he characterized as terrifying.  He

14      said if it describes something we already did

15      which would be like terrifying.  For a business,

16      you can kind of understand that.  They made this

17      investment in Keyhole.  They want to reach

18      hundreds of millions of people with Google Earth

19      and what makes Google Earth special the ability

20      to fly and zoom and have the graphics come at

21      you in a smooth way that makes it feel natural,

22      that makes it feel fun, and that's what they

23      were going to have to negotiate over, because

24      that's what the patent allowed them to do, the
```

```
 1        '550 patent.

 2                    So they're coming to that

 3        negotiation table and they're kind of nervous.

 4        It's an essential patent for their product.

 5        What are they going to think about?  Are they

 6        going to think about the kind of licenses that

 7        they do with technical incomparable patents like

 8        the one you heard about from Stanford?  You

 9        remember that Stanford license you heard about,

10        Dr. Castleman told you it wasn't technically

11        comparable.  The '550 patent was essential, and

12        the Stanford patent applications which was in

13        that agreement, they weren't essential.  They

14        were kind of nice to have little things.  We

15        know what Google does with nice to have, Google

16        told us, they make a lump sum payment.  They say

17        if we ever use it, great.

18                    But that's not what this case

19        business.  This case isn't about a nice to have

20        patent, it isn't about the kind of things you

21        saw in that Stanford agreement.  It's about a

22        patent that was terrifying in the words of

23        Mr. Jones, a patent that they were infringing

24        and valid.  That's how you have to consider it
```

```
 1        when you look at damages.  Terrifying.

 2                    Now, we also heard from Mr. Reed

 3        that he talked to Dr. Goodchild about the

 4        Stanford agreement.  Do you remember that?

 5        Dr. Goodchild never said a thing about it.  He

 6        never said it was technically comparable.  He

 7        didn't get on that witness stand and tell you

 8        anything about that.  Instead he got off the

 9        witness stand and then Mr. Reed just kind of

10        said, well, I had this conversation.  I asked

11        Mr. Reed, well, what about that.  He said it's

12        not my expertise.  Remember, he said I'm not a

13        technical expert.  I don't know if it's

14        technically comparable.  He couldn't answer

15        questions about it.

16                    So you got Dr. Castleman who was

17        willing to get up there and say, I'm an expert,

18        these Stanford agreement, nothing like Art+Com's

19        patent.  Then you got Dr. Goodchild who wasn't

20        willing to even get on the stand and say that.

21                    In the damages instructions you

22        will be told you may consider the Stanford

23        agreement.  Based on the evidence, the technical

24        comparability, you also may not.
```

1        Now, we were in the situation

2   where the terrifying patent, and we have got to

3   figure out with seven billion uses, what kind of

4   license deal would they have come to.  Well, we

5   do have one point of reference.  There were

6   typical license rates that were discussed in

7   2010.  And that 2010 is a ways after 2006, and

8   the Judge has instructed you that you can take

9   that into account.  You can give less weight to

10  something that's farther in the future, but

11  again, you may.

12        You may also think that this user

13  rate is the only one that really reflects the

14  use of Google Earth because Google Earth is

15  offered for free, so a rate based on revenue or

16  profit, is that a rate which under the statute

17  reflects the use of the invention, or is the ten

18  cents per usage rate the one that reflects the

19  use of the invention.  You get to decide that.

20  The Judge has instructed you, you may consider

21  it, you may not.  It's your call.

22        So another data point for you to

23  consider in what is the challenging

24  consideration of damages.

          1          What else can you consider with

          2     regard to damages?  Well, Mr. Mr. Nawrocki told

          3     you that he determined a 30 percent assignment

          4     of value to the patent.  Now, you remember that

          5     was based on Dr. Castleman, he talked about the

          6     different things that go into Google Earth.  He

          7     talked about how well Google has some amazing

          8     infrastructure.  And they do, they got huge

          9     server farms, not just Google Earth, of course,

         10     G-mail, Google Earth, Google.com, big server

         11     farms, lots of software and they also put a lot

         12     of software into the world, StreetView, a lot of

         13     other things.  That's an essential part of

         14     Google Earth.  Dr. Castleman agreed, it's

         15     essential.

         16          They also have to get all the data

         17     for Google Earth.  I mean, maybe Google owns

         18     satellite.  I don't know, but somehow you got to

         19     get the data from the satellite that are taking

         20     pictures of the earth at all these different

         21     resolutions from Wilmington as a whole to a

         22     picture that can pick out you or I as we walk

         23     out of this building.  All geographic data all

         24     coming from these satellites.  And we give

1  credit to them, they did, Google Earth is

2  amazing with the amount of data it has, the

3  amount of things you can see in it.  That's to

4  Google's credit and Google Earth wouldn't be

5  what it is without that.  That's essential to

6  Google Earth.

7       But you know what the third thing

8  that's essential to Google Earth is the '550

9  patent.  It's the method that allows Google

10  Earth to zoom and cleanly bring you with the

11  view you want to go from place to place.

12       You can have all the servers in

13  the world, you can have a bunch of geographic

14  data, but if it's chunky and moving like this,

15  that's not what Google Earth is about.  That's

16  not what makes Google Earth the successful

17  product with seven billion uses that Google has

18  received from the use of that.

19       So with all these data points and

20  all the instructions the Judge has given you,

21  you'll need to think about what's the right

22  reasonable royalty.  What's reasonable for the

23  use that Google has made of Google Earth, the

24  seven billion uses Google has made of Google

1   Earth.  You get to decide that.  You're the

2   jury.  It's not Mr. Reed.  It's not

3   Mr. Nawrocki.  It's not me.  It's you, that's

4   your role.

5           I ask you to look carefully at the

6   instructions, think about the evidence.  You're

7   going to have with you binders and if you have

8   taken any notes on the trial exhibits, you'll be

9   able to pull the binder out, they'll be numbered

10  and all in order.  If you want to look at one of

11  these specialty strategy documents, you can do

12  that.  It's all going to be there for you.  And

13  I encourage you to look at the evidence

14  carefully and decide what the right rate is

15  given the use made by Google of Google Earth.

16          We know what the use is, it was

17  uncontradicted.  Mr. Nawrocki testified over

18  seven billion sessions.  And Mr. Reed never

19  challenged that.  No Google witness ever

20  challenged that.  So that's the only number

21  you'll hear in the evidence of how many sessions

22  there were of Google Earth that were infringing

23  the '550 patent.  Over seven billion.

24          But you will a need to take all

1      the facts into account in trying to decide what

2      that means in terms of giving full credit to ACI

3      for the contribution to this success which was

4      the '550 patent.

5                  Google should not be able to say I

6      get to use your intellectual property because I

7      give it away for free.  That's not their model,

8      there is no free lunch.  We have seen their

9      strategy framework.  That should not be the

10     outcome here.  I ask you to determine a

11     reasonable royalty and apply it to the use of

12     Google's invention and award ACI the appropriate

13     damages.

14                  Thank you in advance for all the

15     hard work you're going to do on deliberations.

16     And thank you right now for all the work and

17     attention you have given this jury trial this

18     week.  We appreciate it at ACI and we look

19     forward to your verdict.

20                  THE COURT:  Thank you, Mr. Hawes.

21                  Mr. Snyder.

22                  MR. SNYDER:  Thank you, Your

23     Honor.

24                  May I proceed, Your Honor?

```
 1                THE COURT:  Yes, please.

 2                MR. SNYDER:  Google has been

 3      telling ACI for ten years that it does not

 4      infringe this patent.  For ten years we have

 5      been trying to make them understand that what

 6      Google Earth does is different than what this

 7      patent describes.

 8                We wanted to come here and we

 9      wanted to explain to you what Google Earth does

10      and how it is different.  We didn't think it was

11      going to be helpful to wheel in stacks of

12      printouts of source code and tell you to look at

13      little bits and pieces of something that most of

14      you couldn't understand because it's written in

15      a language that you don't read.  And there are

16      so much of it.  It would take hundreds of hours

17      as you heard from Dr. Castleman.

18                Instead, we brought the senior

19      product manager who has been working with this

20      product for ten years to explain how it works.

21      We brought an expert witness who came in and

22      explained how it works.  And once we had done

23      that, what did you hear in response?  What did

24      ACI come and ask you to believe?  What evidence
```

1   did they put on to say nope, that's not a

2   description of how it works, it's different?

3   What was that evidence?  There wasn't any.

4               You have all been very patient and

5   attentive and we really appreciate the time that

6   you have given us to give us our day in court so

7   that we can explain to you and you can decide

8   that what Google Earth does in accomplishing

9   this very specific process of going from coarse

10  to fine is different from the way it's claimed

11  in the ACI patent.

12              My job today is to try to review

13  that evidence with you and show you piece by

14  piece how you should reach that verdict that

15  Google does not infringe once you've considered

16  all evidence.  We're putting it in your hands

17  and trying to give you the tools to do that with

18  the explanations that we have provided.

19              Just as I did in the opening, I'm

20  going to be here for a little while, so I want

21  to give you a quick roadmap into what I'm going

22  to say.

23              First, I want to talk about how

24  Google Earth uses a different approach, and I'm

1    going to spend most of my time talking on that,

2    because it's very important.

3              Second, I'm going to talk about

4    how ACI is still trying to claim for itself

5    public methods, things that were known.  This

6    very special technique was already out there.

7              And finally, I'm going to have to

8    spend a little bit of time talking about a

9    reasonable royalty, because ACI has spent so

10   much time talking about that issue.

11             Let me start with the first issue

12   of how Google uses a different approach.  From

13   the very beginning of this trial, we have tried

14   to help you understand that it is about the

15   claim language.  And you have heard directly

16   from the Court that that's what it's about.

17   This case isn't about some generic descriptions,

18   it's the about the claim language.

19             What did the Court tell you?  You

20   must pay careful attention to the language of

21   the claims.  It is the claims and not the rest

22   of the patent that define the invention that ACI

23   has the right to exclude others from using.

24   Only if you decide that an accused Google Earth

1       product performs each and every one of the steps

2       in a claim is that claim infringed by that

3       product.

4                    When did ACI show you the language

5       of those claims?  It wasn't in their opening.

6       It wasn't when they had the inventors on the

7       stand.  ACI didn't even show you the language of

8       the claims until Dr. Castleman came and

9       testified.

10                   And I was kind of watching today.

11      When is ACI going to show the jury the language

12      of the claims that define this invention?  He

13      had talked for fifteen minutes before he even

14      showed it.  And you know what, he still hasn't

15      told you what the invention really is about.

16      Instead they just want to use some vague

17      descriptions and hope that you'll agree with

18      them.

19                   That's not what we want to do.  We

20      wanted to help you to understand what is the

21      invention really about.  They opened this trial

22      by telling you that this invention was about

23      flying.  In fact, he told you about that again,

24      it's the flying invention.  This invention isn't

```
1      about flying.  Flying has been known for a long

2      time.  You saw this patent in evidence.  This is

3      known as the global mapping patent.  This is

4      almost ten years before their patent and talks

5      about how you use a computer to fly to that

6      location in a step zoom mode.

7                    They even admitted, Mr. Mayer on

8      the stand, that flight simulators, the ability

9      to fly around, that isn't something he invented.

10     He was asked:

11                   "Question:  Another kind of

12     computer system used to visualize geographic

13     data were flight simulators; right?

14                   "Answer:  There were Flight

15     simulators at that time, they existed, yes."

16                   And then at the end:

17                   "Question:  You didn't invent

18     flight simulators, did you?

19                   "Answer:  No, we didn't claim that

20     either. "

21                   They brought in two of the

22     inventors to testify for you.  And did they ask

23     the inventors what is this invention, what is it

24     about?  No.  They told you about a ball.  They
```

1    brought the ball in.  The ball is kind of cool.

2    But the ball isn't the invention, and that's

3    what they told you.  You can look through that

4    claim language and it doesn't mention the ball

5    even once.  In fact, he said it's just any

6    pointing device.

7              They told you about a couple of

8    technical things that they had solved.  They

9    talked about texturizing.  Okay, maybe that is a

10   technical problem that they had to solve with

11   their demonstration.  But if you go through the

12   patent language, do you see the word texturizing

13   in there?  Do you see anything that describes

14   this patent and these claims related to

15   texturizing?  No.

16             There was one other technical

17   problem they told you they solved.  They talked

18   about this floating point precision problem,

19   that is you have this much data, you only have

20   so many numbers to keep track of it.  So as you

21   get closer to something, you literally run out

22   of space and it gets too fuzzy.  He said that's

23   a problem we solve.

24             Okay.  That's fair.  I want to

1    give them credit where credit is due.  They do

2    at least mention that in the patent.  It's not

3    in claim 1, though, it's in claim 3 where it

4    talks about converting one coordinate system

5    into another coordinate system.  I asked the

6    inventor, "Mr. Mayer, did you invent that idea?"

7    And he said no.

8              "Question:  You also didn't invent

9    the idea of converting one coordinate system

10   into another coordinate system, did you?

11             "Answer:  No.

12             "Question:  People have been doing

13   that for probably about as long as there have

14   been coordinate systems; right?

15             "Answer:  Yes, that's right.

16             "Question:  Something that existed

17   long before you applied for your patent in

18   December of 1995; right?

19             "Answer:  Yes."

20             They didn't invent this thing that

21   they added on to claim 3.  That might have been

22   a problem that they solved for their

23   demonstration, but it's not what this patent is

24   about.

1        Well, then they said this patent

2    is about going from coarse to fine.  And you

3    heard him again today, well, it's about coarse

4    to fine.  Mr. Goodchild admitted that what

5    Google does is go from coarse to fine, and

6    therefore, tad ah, they infringe.

7        This patent isn't about just going

8    from coarse to fine.  It's about a very specific

9    method of going from coarse to fine.

10       I asked their inventor,

11   Mr. Schmidt, whether they invented coarse to

12   fine.  I asked him, "Aren't there other ways to

13   do it?"  And he said, "Yes."

14       This is Mr. Schmidt's testimony:

15       "Question:  There are various ways

16   of doing coarse to fine images, there is not

17   just one; correct?

18       "Answer:  Sure, there are

19   different -- yeah.

20       "Question:  My question was did

21   you invent every possible way of going from a

22   coarse image to a fine image?

23       "Answer:  Every possible way?

24   No."

```
 1              They didn't invent coarse to fine.
 2    So when ACI stands up and they say, Google Earth
 3    does coarse to fine, just look at it, therefore
 4    they infringe.  That's not evidence.  That
 5    doesn't meet the claim language.  That doesn't
 6    satisfy the instructions that the court has
 7    given you to apply the words of the claim.  What
 8    do the words of the claim look like?
 9              Well, there is a whole lot of
10    them.  And it takes a long time to read them.
11    And it's kind of complicated and it's kind of
12    hard to put it into context, but we wanted you
13    to understand what the claim is really about.
14              So we asked Dr. Goodchild to come
15    in and explain what that claim means in the
16    context of what you would see on a computer.
17    And he said if you go through steps A through E,
18    you'll get an image on a computer, and we don't
19    dispute for this trial that Google Earth does
20    step G.
21              What happens in step F according
22    to patent claim.  According to the language of
23    the patent, you have to divide that image, then
24    you have to request it, then you have to store
```

     1        and represent it on the computer.

     2                    You have to go through all of

     3        those four steps before you get to the repeating

     4        step, step G.  Then what do you do?  You take

     5        one of those smaller images and you divide it,

     6        and it gets stored, and it gets represented.  It

     7        gets shown on to your computer.

     8                    Then what you have to repeat it

     9        again.  And you take another one.  And you keep

    10        doing that process over and over until the

    11        entire image gets down to the level of detail

    12        that you want.  That you have that level of

    13        precision that you want.  And Dr. Goodchild

    14        said, this is my analysis of how this would

    15        really work in practice, this is what these

    16        claims mean.

    17                    And after Dr. Goodchild testified,

    18        what is the evidence that ACI put on to say

    19        nope, Dr. Goodchild got it wrong, that's not the

    20        way it works.

    21              There wasn't any.  And it wasn't

    22     because they didn't have the opportunity.

    23     Doctor Castleman came back and they asked him

    24     one question and I'm going to get to that in a

1    minute.  But did they ask him, was Doctor

2    Goodchild's description of the patent wrong?

3    No.  They didn't ask him that.  Did they put on

4    one of the inventors to say that's not how it

5    works?  No.  What was the evidence to say this

6    isn't the accurate description?  There wasn't

7    any.

8               So now let's talk about how Google

9    Earth got developed.  But before that, one quick

10   point.  And there's something the Judge said and

11   I want to make sure we all understand so we're

12   on the same page here.  We can test, Google can

13   test that Google Earth practices Step F and Step

14   G of Claim 1.  Now, there are three other

15   dependent claims, Claims 3, 14 and 28, but if

16   Google doesn't infringe Claim 1, then it can't

17   infringe those other three claims and that's

18   what the Court told you, because a dependent

19   claim incorporates all of the features of the

20   independent claim it refers to.  If you find

21   that an independent claim is not infringed, then

22   the claims that depend on that independent claim

23   cannot be infringed.  Well 3, 14 and 28, all

24   dependent claims on Claim 1.  So if Google Earth

1   and Google do in the infringe Claim 1, they

2   cannot infringe those other three claims.

3           Now, let's talk about Google Earth

4   and where Google Earth came from.  You've heard

5   all this, so I want to summarize it for you, but

6   you heard from Mr. Michael Jones.  And he's here

7   in the courtroom today.  Mr. Jones came and

8   shared with you his description in history of

9   his passion for this area and his passion for

10  this product.  He described for you his history

11  in the global visualization, this general area

12  going back to the early 1980's and how when he

13  had an opportunity after he left Silicon

14  Graphics he wanted to start, and built a demo

15  that would do this process of allowing people to

16  zoom around and get in detail images of anywhere

17  in the world.  He and three of his colleagues

18  designed and built that demo in his dining room.

19          They then took that to another

20  company called Intrinsic Graphics and you heard

21  him describe how it was not part of the general

22  business plan at Intrinsic Graphics, because

23  what they were doing there was making software

24  for games.  But this was his passion.  He still

1   wanted to pursue this product so they spun it

2   off and they created Keyhole.  And they

3   introduced a product called EarthViewer and you

4   heard Mr. Jones describe how EarthViewer became

5   a popular system for visualizing the earth.  It

6   actually attracted national attention.  CNN used

7   it to visualize world events.

8           When ACI contacted Google about

9   Google Earth after Google purchased Keyhole and

10  after they released it as Google Earth, what did

11  ACI say?  Did they say you've copied our patent?

12  Did they say, you're doing what we do?  No.

13  What Mr. Mayer said then in January of 2006 is

14  that you succeeded where we failed.  And what

15  did he say back then when he first contacted

16  him?  He said you figured out most of the same

17  things on your own and you had a lot of new

18  ideas we never thought about.  A lot of new

19  ideas.  And you know what, one of those new

20  ideas was this way from going from course define

21  that is different than the way they describe in

22  the patent.  Mr. Jones knew immediately that

23  there was a different.

24          When Mr. Mayer sent that note to

1  him in January of 2006, he sent the patent with

2  it.  Said so right in the e-mail that you all

3  saw.  And Mr. Jones was able to read it and he

4  was asked, what did you think about that patent?

5  And he said I felt it would be sufficiently

6  inferior to what we already did that I couldn't

7  imaging downgrading Google Earth to that.  They

8  didn't want to do it the way they describe it in

9  Claim 1.  They didn't want to infringe on the

10  patent, because they were doing something

11  different.

12              They've told you this story of the

13  development several times.  They told you in

14  opening, they told you again in closing, but

15  let's be very clear.  The Court has instructed

16  you that ACI does not contend that Google copied

17  the invention claimed in the patent.  That's not

18  what this case is about.  This case is about

19  comparing how does Google Earth work to the

20  claims of the patent.  And when you do that, how

21  does it actually work?  It's very clear that it

22  does not infringe.  And there are two reasons

23  for that.  One is it does not do Step F.  Step F

24  requires in one particular subsection that you

 1    have to request the higher resolution

 2    space-related data for each, each of the smaller

 3    sections.  So first you divide it, then you have

 4    to request that data for each of the smaller

 5    sections.  You have to do it for each one of

 6    them.  Not some of them, but it has to be every

 7    one of them.  Now, Doctor Castleman and Mr.

 8    Birch came and explained to you how Google Earth

 9    works and apparently ACI thinks we should have

10    brought somebody else.  Well, we thought that if

11    we brought the person who knows more about this

12    product than probably anyone in the world, that

13    would be the right person.  Peter Birch is the

14    Senior Product Manager for Google Earth.  It's

15    true.  He didn't write all the code.  He didn't

16    write the code.  He was the manager for the

17    product for 10 years.  And he testified to you

18    he knows the code.  They didn't try and test him

19    by showing him any code, but what did he do for

20    you?  The amount of code is enormous for a

21    product like this, and what did he do?  He tried

22    to explain to you how the product works.  That

23    sounds like the right kind of person to testify

24    to me.

```
 1              Doctor Goodchild came as well.
 2     And he said I've looked at the code, it took me
 3     hundreds of hours.  I've looked at the code and
 4     this is the way it works.  And he described it
 5     for you and what did he say?  He said well, you
 6     start with an image, and then you divide it.
 7     I'm sorry, yes, this is the '550 Patent, so let
 8     me go forward.  I want to show you what this
 9     each means in the context of the '550 Patent.  I
10     appreciate my partner over here, Mr. Williamson,
11     making sure I don't go off track.
12              You have to start out by dividing
13     each one of the sections, so you divide it in
14     onto two, then you have to request the data for
15     each of those smaller sections, you have to
16     store them, you have to represent them.  Okay.
17     You have to do it for every one of those
18     children nodes every time, divide and then you
19     request each of those.  And then you repeat that
20     step each time.  Now, what does that mean
21     compared to Google Earth?  This is the
22     information -- I'm making noises.  This is what
23     Doctor Goodchild showed you.  It's very similar
24     to the one that Mr. Birch showed you.  You start
```

```
 1    with an image on your computer and then it
 2    starts going through what they called the
 3    metadata tree, traversing this tree and it goes
 4    all the way down to the desired level of image.
 5    It follows that entire tree within the field of
 6    view.  And it creates a list of all the
 7    different possible nodes, all of the images that
 8    you might need that fit within that field of
 9    view.  After its done all of that process, after
10    its done what the patent describes as the
11    dividing step, traversing this tree, then it
12    does something else.  It prioritizes all of
13    those nodes.  It moves them around and says
14    which ones are more important and it puts those
15    at the front.  And then and only then does it
16    start requesting them.  And it requests several
17    of them at a time.  You heard Mr. Birch explain
18    how they are like workers, and they all go out,
19    we don't know how fast they are going to get
20    back but we send them out and when they come
21    back, then we display them if we still want
22    them.
23              So in this example B1 came back
24    first even though it's not at the level of
```

1508

```
1    detail we want, so we display it, but then we
2    start seeing images for the level of detail that
3    we desire and we display those, and they come
4    back -- once we get all of those, the process of
5    the claim, Claim 1 stops.  But that happens in
6    Google Earth before all of the images are
7    requested.  And remember, you have to request
8    each of the subsections.  But in Google Earth we
9    don't do that.  So if you change that metadata
10   tree to compare what you start with to just what
11   you end up requesting, it's far, far less than
12   all of those images.
13             Now, you heard testimony from Mr.
14   Birch that this process does not request each of
15   the subsections.  He was asked, in the approach
16   used by Google Earth products, are all of the
17   traversed nodes requested before drawing the
18   final scene?  Answer, are all of the traversed
19   nodes requested?  No.  In fact, as you can see
20   in this example we haven't requested all the
21   nodes on this list, we've only requested a
22   portion of them.  And he was asked why?  And he
23   explained it.  And it turns out that this
24   explanation is very helpful.  Question, why does
```

```
 1    Google Earth not request the image for each node
 2    that is traversed?  Answer, so as I mentioned
 3    earlier, what we're really trying to do is
 4    what's important is getting the final image to
 5    the users as quickly as possible, right?  And we
 6    want it to feel fast and so we don't want to
 7    mess around doing things that don't help us
 8    achieve that goal.  And so to do that, we're
 9    going to prioritize -- you know, by
10    reprioritizing nodes we get to that answer
11    sooner.  Doctor Goodchild told you the same
12    thing.  And he explained to you that within this
13    process they've been smart enough to skip the
14    nodes that they don't need.  Now, they
15    criticized Doctor Goodchild for not showing you
16    a bunch of source code that we really didn't
17    think was going to be helpful.  I mean, it's
18    like somebody saying if you want to understand
19    an airplane, let's pick 15 or 20 different
20    random pieces and show somebody and tell them
21    they're supposed to understand how an airplane
22    works.  No.  Isn't it much better to get
23    somebody who actually helped the product manager
24    for the airplane, somebody who studied all the
```

1510

parts of the airplane and then have them explain

what the airplane does?  That's what we tried to

do.  And we hope that that was more helpful to

you.  They showed Doctor Goodchile one line of

code and they said ta da, it has course define

in it, so doesn't that mean we infringe?  They

took one line of code, they didn't give him any

context at all.  He said I need to study this

and now somehow they think that means you

shouldn't believe Doctor Goodchile.  He studied

all the code and he was the one who explained to

you that this is how it works.

Then they showed him another

document about Google Earth.  And they said

well, doesn't this document say course define?

But they didn't show him the rest of that

document.  If you actually look at the rest of

that document and this is Plaintiff's exhibit

75, it actually says, explicitly avoid rendering

nodes less than quarter quality.  Avoid

rendering nodes.  Skip them.  That's the -- that

was their aha moment with Doctor Goodchild.

Doctor Castleman was actually asked on direct

about this process and he admitted that Google

```
 1    Earth does not go through this process of
 2    requesting and representing and displaying every
 3    node.  And this was on direct testimony from his
 4    own attorney.  Question, what are these
 5    comments, testimony about what call children is
 6    doing?  Answer, it says there is no need to call
 7    the children if we don't compare Lod metrics and
 8    that was level of detail.  That means -- what
 9    that means is there is no need to download the
10    images in those child nodes if they don't meet
11    the level of detail criteria.  There's no need
12    to download those child nodes if they don't meet
13    the level of detail criteria.  That's the
14    difference.
15              In Google Earth they use a smarter
16    system that picks and chooses and it does not
17    request each of the subsections and that's why
18    it does not infringe.  Doctor Goodchild put them
19    side by side and said if you look at these two,
20    they are very different.  Here's what the patent
21    describes, here's what Google Earth does and
22    those are two different things.  And when Doctor
23    Goodchild was done testifying, what evidence did
24    ACI put on to tell you that he was wrong?  Did
```

```
 1      they bring Doctor Castleman back and say nope,

 2      Doctor Goodchild made a mistake.  That is not

 3      how Google Earth works.  Mr. Birch is wrong,

 4      that is not how Google Earth works.  Let me show

 5      you some more source code fragments.  No, there

 6      wasn't any evidence.

 7                  Now, let me turn to the next

 8      reason why Google Earth doesn't infringe.  And

 9      that's because it does not do Step F.  In other

10      words, it doesn't repeat -- it doesn't do Step

11      G, it doesn't repeat Step F.  The Court has

12      actually told you, given you some constructions

13      that are important to this that help understand

14      the requirements and the relationship between

15      Step F and Step G.  In Claim 1, Step F, the

16      substep of dividing must be performed before the

17      substep of requesting.  So you have to divide

18      and then you can send the request out.  And Step

19      F must be performed before Step G.  And so Step

20      F has four subparts.  You have the dividing

21      step, where the image is broken into pieces,

22      whether it's two or four or eight or something

23      else.  And then it has to be requested and then

24      it has to be stored and represented.  Step G
```

1513

1    says, now you have to repeat that.  And you can

2    do that over and over until the image is at the

3    desired level of resolution.  And because this

4    is a pretty complicated image, it actually takes

5    a little while to get to the end of it.  But at

6    the very end what you've done is traversed

7    through each one of those nodes and you have to

8    divide, then you have to request, then you have

9    to store and display and then you have to do

10   that again, you have to repeat it.

11              But what does Google Earth do?  It

12   doesn't do that.  It uses that process that I

13   just described of traversing the tree first,

14   then picking some to request, then picking some

15   to store and display.  It's a completely

16   different process.  It doesn't go through that

17   four step process that's in Step F and then

18   repeat it over and over again.  It's doing it

19   completely differently.  Now, after that was

20   done, and after that was demonstrated, Doctor

21   Goodchild explained that that means that it does

22   not perform Step G.  He was asked the question,

23   can you demonstrate how Google Earth works

24   instead of as it relates to Step G?  Yes.  So we

```
 1    traverse the tree and place items into the list,

 2    but there's no question here of repeating

 3    because the dividing does not lead to

 4    retrieving, storing and representing and we can

 5    proceed to further divisions without executing

 6    all of Step F.  Mr. Birch explained the same

 7    thing.  And he says particularly in the context

 8    of the illustration that he had given you about

 9    child nodes and parent nodes, he said can you

10    request a child node before you've displayed the

11    parent node, because in the claim you couldn't

12    do that.  You'd have to request it, store it and

13    display it before you would repeat that process.

14    And so he was asked, can you do that?  And his

15    answer was yes, absolutely, because of this

16    process, where we're potentially or we're

17    fetching the child nodes ahead of other nodes,

18    then they can potentially be displayed before

19    they are fetched, before the parent would be

20    fetched.  That is the difference.  And that's a

21    difference that Doctor Castleman didn't even

22    consider.  It's not like he showed you source

23    code about how this works.  He was asked, did

24    you consider this issue and here is his answer.
```

1    Question, I'm just asking whether you did any

2    analysis that would address the question of

3    whether any nodes get ignored after the data has

4    been requested for them?  Answer, I don't recall

5    specifically looking at that question.  Then he

6    was asked about the specific question of

7    infringement related to Step G.  Wouldn't you

8    agree with me that if Google didn't perform all

9    the steps, the substeps of Step F of Claim 1, it

10   could not infringe Step G, correct?  Answer, I

11   don't recall specifically looking at that

12   question, but as we sit here today it strikes me

13   that the answer to your question is yes.

14            Now, Doctor Goodchild and Mr.

15   Birch came and explained how Google Earth works.

16   And they explained how it doesn't do this

17   repeating step in Step G.  And they brought

18   Doctor Castleman back.  And they asked him one

19   question.  They didn't ask him about Step G,

20   they didn't ask him whether the description of

21   Google Earth was wrong.  They didn't ask him

22   about whether the description of the patent was

23   wrong.  They didn't ask him.  They didn't put on

24   any evidence at all related to this issue once

1516

```
 1    we heard the descriptions of how the claim
 2    really works and how the patent and how Google
 3    Earth really works.  They brought him back to
 4    answer one question.  It was actually a really
 5    good question.  It came from one of you.
 6    Somebody asked, how can Google Earth present a
 7    smooth image if you don't perform all the
 8    substeps of F?  And Doctor Goodchild was asked
 9    that question.  And you know what his answer
10    was?  Well, sometimes it's not smooth.  If your
11    internet connection is fast, it will be smooth,
12    because it's going to go to the level of detail
13    as quickly as possible.  But if your internet
14    connection is slow, you might see some
15    jerkiness, you might see some broken images in
16    the middle.  And ACI brought Doctor Castleman
17    back and they asked him one question and they
18    asked him that question.  And I listened to his
19    answer and he said almost the same thing as
20    Doctor Goodchild.  He said, you know, you don't,
21    because you would see this jerkiness as you're
22    waiting for the images to come back.  That's
23    exactly what Doctor Goodchild said.
24               Now, Doctor Castleman apparently
```

```
 1    comes to a different conclusion.  He says that

 2    we infringe, but he didn't bother to explain

 3    that.  He didn't say that Doctor Goodchild was

 4    wrong in his explanation of the product.  He

 5    just answered that question and then he left.

 6    They didn't recall any of the inventors to tell

 7    you that the description of the patent was

 8    wrong.  What was the evidence that they put on

 9    once we had tried to explain to you, the jury,

10    what the patent requires and how Google Earth

11    works and how it's different?  What was that

12    evidence?  There wasn't any.

13              Now, you're going to get a verdict

14    form at the end of this process and it's going

15    to have some questions on it.  And this is the

16    first question.  Do you find that ACI has proven

17    by a preponderance of the evidence that Google's

18    use of the accused Google Earth products

19    infringes the following claims of U.S. Patent

20    No. RE44550?  You should answer that no.  And

21    Claim 1, Google Earth does not infringe Claim 1

22    because it does not do all the steps of Step F

23    and it does not repeat as required by Step G.

24    And because Google Earth does not infringe Claim
```

1     1, you should find that it does not infringe the

2     others either.

3               Now, let me turn to the next topic

4     and that is that ACI is trying to own public

5     methods -- ACI is trying to claim for their own

6     something that should belong to the public.

7     They made a big issue this morning about the PTO

8     having looked at this patent and having looked

9     at it three times, but you heard from the Court,

10    patents issued by the Patent and Trademark

11    Office are presumed to be valid, but not all

12    patents that are issued by the PTO are, in fact,

13    valid.  That's the job for you to decide based

14    on the evidence that's in front of you.

15              They've also made a big deal of

16    telling you, well, ACI has gone back to the

17    Patent Office and they've told the Patent Office

18    that we're coming to you because we have this

19    extra art.  This is what they said in their

20    opening.  They said hey, we've been told there

21    are these problems.  Can you check to see if

22    there really are?  Now, I want to be fair.  They

23    did submit some more prior art.  But they didn't

24    submit everything that you've heard about during

1   this trial.  And more importantly, or at least

2   something you should consider, when they

3   submitted it to the Patent Office the first

4   time, they didn't tell the Patent Office hey,

5   we've got this prior art, you want to look at

6   it?  Let's look at what they actually told the

7   Patent Office was the reason they wanted to

8   submit it.

9              This is from the declaration from

10  their CEO Andreas Wiek and he says I believe the

11  original patent to be wholly or partially

12  inoperative or invalid for the reasons described

13  below.  Claims 1 contain errors with antecedent

14  basis, specifically the first occurrence of

15  several claim terms such as the term selection

16  in subparagraph B are preceded with the rather

17  than A.  And the second occurrence concerning

18  pictorial representation in the body of the

19  claim in subparagraph F is preceded by the A

20  rather than the.  Rather the specification

21  contains several translation errors from the

22  priority German application.  He didn't say

23  we've got a bunch of other art we want you to

24  look at.  This is what he told the Patent

1    Office.  Now, they looked at it and they

2    reissued the patent.  But when they reissued it,

3    when they looked at it, they did not have all of

4    the evidence that you have seen.  And in

5    particular, they did not have the testimony of

6    Stephen Lau that you heard from that witness

7    box.  They also did not have other information

8    about the TerraVision system.  They did not have

9    the TerraVision video.  They did not have some

10   of the documentation about the demonstrations in

11   the Magic system.  All of that was available

12   only to you.

13            But of all the people that they've

14   been unfair to in ACI, Mr. Lau has got the top

15   of the list.  What ACI's lawyer just told you is

16   well, they talked to Mr. Lau.  They had his

17   testimony.  And well, they had some testimony,

18   but the PTO did not talk to Mr. Lau.  You never

19   heard that.  They had testimony that he gave in

20   another litigation 10 years ago in 2006.  Mr.

21   Lau came here and he talked to you directly and

22   he answered all of their questions and he

23   explained to you what their system was, where he

24   demonstrated it and how it was used.  And we

```
 1    went through all of the documents showing that.

 2              Now, the Court -- they've raised

 3    an issue about whether the TerraVision system

 4    that Mr. Lau and Mr. Leclerc developed was

 5    actually in public use.  And the Court has given

 6    you instructions on what it means to be in

 7    public use.  It says SRI's TerraVision was in

 8    public use if it was accessible to the public.

 9    To prove that SRI's TerraVision system was used

10    publically, Google must show by clear and

11    convincing evidence that it was accessible to

12    the public prior to December 17th, 1995.  If the

13    SRI's TerraVision system satisfied those

14    requirements, it qualifies as prior art.

15              Well, the evidence is pretty clear

16    and convincing that it does.  In fact, the only

17    evidence you've heard is that Mr. Lau

18    demonstrated the TerraVision system at least

19    twice before that critical date in December of

20    1995.  He was asked about the demonstration, the

21    public demonstrations that he did.  And he

22    mentioned that they demonstrated it in multiple

23    locations, including the 1994 Magic Technical

24    Symposium and also at SIGGRAPH '95.  And during
```

1    those he described how they had live

2    demonstrations, retrieving data from across the

3    network, across the magic network and also

4    showing the video.  Showing how that system

5    worked and making it publically available.  And

6    when you look at those dates in August of 1994

7    when the Magic Symposium was shown and in August

8    of 1995 at SIGGRAPH, that is more than one year

9    before the date that they filed for their U.S.

10   application.  And as a result, their application

11   is too late.  That information belongs to the

12   public.  We know that we should believe, you

13   should believe what Mr. Lau tells us.  He was

14   very firm in his recollection that he had met

15   with at least three of the inventors while he

16   was there.  And described for you how ACI

17   actually had their demonstration just on the

18   other aisle.  He actually told you about how he

19   gave them the source code for his project, which

20   most of the time you would think is a somewhat

21   unusual thing.  People are supposed to protect

22   their source code and keep it confidential.

23               But Mr. Lau described for you how

24    he and Mr. Leclerc and the entire TerraVision

1      project were designed to make this public, to

2      take this information, and this knowledge about

3      global visualization and make it public for

4      everybody.

5                    TerraVision was a federally funded

6      product that was meant to be put in the public

7      domain so people could use these algorithms in a

8      spirit of corroboration.  So they provided their

9      source code to the people at ACI.  But ACI has

10     an unfortunate history when it comes to dealing

11     with TerraVision and SRI.  And, in fact, you

12     heard Mr. Mayer admit that he was describing his

13     system to Mr. Leclerc in E-mails, he was less

14     than truthful.  I asked him:

15                    "You didn't tell Mr. Leclerc that

16     there was an aspiration or a goal or a desire,

17     you told him we already set it up?

18                    "Answer:  Yes, I told him that and

19     that wasn't completely truthful.

20                    "Question:  It wasn't completely

21     true, was it?

22                    "Answer:  No."

23                    So when you look at the evidence

24     that's available to you and you're asked the

1     question on the verdict form, did you find that

2     Google has proven by clear and convincing

3     evidence that SRI's TerraVision system was

4     publicly used before December 17, 1995, you

5     should answer that yes.

6           Now, then you heard Dr. Goodchild,

7     and he compared the disclosures about the

8     TerraVision system, what about Lau said and the

9     information that's been made available to you

10    about that system.  He said let's compare them

11    and see, does that disclose what is in claim 1.

12          There is an instruction here

13    that's particularly important and that relates

14    to how you understand those references.  To

15    anticipate a prior art reference does not have

16    to use the same words as the claim, but all the

17    of the requirements of the claim must have been

18    present so that a person having ordinary skill

19    in the art could make and use the claimed

20    invention based on that knowledge.

21          Well, Dr. Goodchild went through

22    and he showed you how each one of those claims

23    is described.  And what did they do on

24    cross-examination?  They came up and they wanted

1    to fight and spar with Dr. Goodchild whether

2    this word was exactly the same as the word that

3    was in the patent or whether the patent word was

4    exactly the same as the word that was in the

5    documents that they had about the TerraVision

6    system.

7              But the instruction says the words

8    don't have to be exactly the same.  And after

9    Dr. Goodchild was done and he had explained to

10   you how all of these requirements are met, what

11   was the evidence that ACI put on to say that

12   Dr. Goodchild was wrong, to say that nope, he

13   has misinterpreted TerraVision.  SRI TerraVision

14   does not anticipate.  What was that evidence?

15   There wasn't any.

16             Dr. Goodchild explained the same

17   thing for you for the other three dependent

18   claims and showed how they're disclosing

19   TerraVision and as a result you should find that

20   those are disclosed and anticipated as well.

21             This is going to be question

22   number three on your verdict form.  If you

23   answered yes to question number two, do you find

24   that Google has proven by clear and convincing

1    evidence that SRI's TerraVision system

2    anticipates, that is constitutes a public use of

3    any of the following claims of the US patent

4    number RE 44550.

5              And the answer to that should be

6    yes, because in every one of those instances,

7    the system that Mr. Lau demonstrated in 1994 at

8    the MAGIC conference and in 1995 at Siggraph, it

9    is a public use of every one of those claims.

10             Now there is a further question

11   related to this because this has to be broken in

12   subparts.  His Honor described for you when

13   you're dealing with invalidity, you got

14   anticipation or public use, and you also have

15   obviousness.

16             If you answer no to question

17   three, if you don't think that it's anticipated,

18   then you get another question.  And this

19   question is going to ask you about obviousness.

20   Do you find that Google has proven by clear and

21   convincing evidence that any of the following

22   claims of US patent number RE44550 are invalid

23   as obvious based on SRI's TerraVision system and

24   the knowledge of a person of ordinary skill in

1     the art at the time of the alleged invention?

2                You should answer those questions

3     yes, if you get to this question.  If you think

4     for some reason the differences in the words are

5     important enough that it's still not the same

6     concept as described by Dr. Goodchild, it's

7     still rendered obvious and you should answer yes

8     for Google.

9                Let me turn to the other piece of

10    prior art.  And that's the T_Vision System.

11               Did you hear ACI's lawyer talk

12    about this publication at all?  You heard

13    Dr. Goodchild, you heard Dr. Goodchild on the

14    stand, and he explained how this system and you

15    -- I'm sorry, how this paper renders invalid

16    their claim.  But you didn't hear any evidence

17    at all from ACI, you didn't even hear any

18    argument from ACI about how that's not true.

19    Just like the TerraVision system, they got a

20    number of disputes about this T_Vision paper.

21    First they say it wasn't demonstrated, it wasn't

22    distributed to anybody.  We went through with

23    Mr. Lau on the stand to show that it was on the

24    CD-ROM.  We actually put the CD-ROM into the

1    computer.  It was read into the computer.  He

2    looked at the screen and clicked on the location

3    for the T_Vision paper and up it came, looking I

4    think pretty much identical to this.  That

5    CD-ROM was distributed at Siggraph 95 in August,

6    and that was more than a year, several months

7    more than a year before ACI filed its US

8    application.  Under the law that the Court has

9    given you, that means that their patent is

10   invalid.  It was simply too late.

11               You're going to get a couple of

12   different questions related to this T_Vision

13   paper.  The first of those questions is whether

14   it's a printed publication.  And the Court has

15   instructed you that it's a printed publication

16   only if it was accessible to the public prior to

17   December 17, 1995.

18               Well, we know that it was.  The

19   evidence, the only evidence that's available to

20   you is that it was.  You heard from Bernard

21   Rous, he's the director of publications for the

22   Association of Computing Machinery.  They're the

23   organization that runs Siggraph 95.  And he came

24   by videotape, but you did get to hear his

1        testimony.  And he explained to you the whole

2        process of how these CD-ROMs work.  He was

3        asked:

4                    "Were any materials given to

5        attendees of Siggraph 95?

6                    "Answer:  Yes.  Generally speaking

7        the attendees are given the CD-ROMs that are

8        produced as hard copy."

9                    Mr. Rous told you he didn't know

10       specifically whether that happened at Siggraph

11       95, but this is the way it normally works.  You

12       also got some evidence about whether it actually

13       happened at Siggraph 95.  Mr. Lau was asked that

14       question, because he was there, and there is no

15       doubt that he was at Siggraph 95.

16                   "Question:  Were you given any

17       materials as part of your attendance at that

18       conference?

19                   "Answer:  Yes, all the attendees

20       received a printed proceeding from the

21       conference itself and also a CD-ROM containing

22       electronic versions from the conference itself."

23                   What was ACI's evidence that those

24       CD-ROMs were not distributed?  Did they come in,

1    did they have anybody testify that that didn't

2    happen, that they didn't show up?  What was that

3    evidence?

4              There wasn't any.  So you're going

5    to get this question number five on your verdict

6    form.  Do you find that Google has proven by

7    clear and convincing evidence that the T_Vision

8    paper was a printed publication before December

9    17th, 1995?  And you should answer that yes.

10             And you're going to get a similar

11   question about the contents of that T_Vision

12   paper.  Dr. Goodchild looked at that paper and

13   went through each one of these elements and he

14   showed you in the paper where each one of these

15   elements is found and he checked them off one at

16   a time.

17             And when he was done, he had

18   finished testifying, what was the evidence that

19   ACI put on to say nope, that's wrong.  You have

20   read that paper incorrectly, that's not what it

21   said.

22             Did they have Dr. Castleman come

23   and tell you that Dr. Goodchild was mistaken?

24   No.

1          Did they have one of the inventors

2     and authors of this paper come in and tell you

3     that Dr. Goodchild was mistaken?  No.

4          What was that evidence that ACI

5     wants you to believe shows that somehow

6     Dr. Goodchild was wrong and that the T_Vision

7     paper does not anticipate or render obvious

8     these claims?  There wasn't any.

9          Dr. Goodchild went through the

10    same process for claims 14 and 28, and because

11    of that, because of that evidence, you should

12    find that the T_Vision paper anticipates these

13    three claims, 1, 14 and 28 of the patent.  This

14    is question number six on your verdict form.  If

15    you answered yes to question number five which

16    is the one about whether it's a printed

17    publication, do you find that Google has proven

18    by clear and convincing evidence that the

19    T_Vision paper system anticipates any of the

20    following claims?  And you should answer yes for

21    each of those.

22         Dr. Goodchild admitted that when

23    it came to claim 3, that changing of the

24    coordinate system, he had the T_Vision paper

1    does not explicitly disclose that.  So what did

2    he do?  He said you have to look at what someone

3    of ordinary skill in the art would understand,

4    and you have to look at what other information

5    was available.  And he said there is another

6    paper that describes that very process.  And

7    that's that global mapping patent that I showed

8    you that describes flying at the beginning of my

9    presentation this morning.

10                   This is that.  He pointed out to

11    you that it includes and describes presenting

12    mapping data in a collected or compensated

13    projection format departing from said Mercado

14    projection.  In other words, if you started with

15    the Mercado projection, then you present it in a

16    different, a corrected or compensated

17    projection.  If you put those two together like

18    a person of ordinary skill in the art would,

19    that renders obvious this claim.

20                   So you're going to get a specific

21    question on your verdict form related to claim

22    number 3 with the T_Vision paper in combination

23    with the global mapping patent and someone of

24    ordinary skill in the art, and based on that,

```
 1    based on all the evidence that you have, you
 2    should answer that question yes.
 3                Now, I need to turn for a few
 4    minutes and talk about determining a reasonable
 5    royalty.  I really don't like to talk about this
 6    subject.  This is the last question that you're
 7    going to get on your verdict form.  And the
 8    reason I don't like to talk about this subject
 9    is I don't believe that you need to consider
10    this issue.
11                What the Court told you is that
12    you only need to -- you only reach the damages
13    question if you find that Google's products
14    infringe at least one claim that has not been
15    proven invalid.
16                And I believe that the evidence is
17    very, very strong.  It exceeds the burden of
18    proof, the preponderance of the evidence that
19    the patent does not infringe by Google Earth.
20    And I believe that the evidence is more than
21    clear and convincing that those claims are
22    invalid.  But if you disagree, then we had
23    Mr. Reed come and explain to you the process
24    that you ought to go through in the context of
```

```
 1          the instructions that the Court has provided.

 2                       And what did the Court tell you?

 3          That you have to put this in the context of what

 4          these parties would have agreed to in June of

 5          2005.  A reasonable royalty is the amount of

 6          royalty payment that a patentholder and the

 7          infringer would have agreed to in a hypothetical

 8          negotiation taking place at a time just before

 9          when the infringement first began.  In this

10          case, the hypothetical negotiation would have

11          occurred in June 2005, when Google Earth was

12          introduced.

13                       Well, what is the best evidence of

14          what the parties would have agreed to in a

15          hypothetical negotiation in June of 2005.  Maybe

16          it's what they were actually talking to each

17          other.  ACI's lawyer put up a list of those

18          communications, he didn't show you the detail,

19          he said you seen them enough, they're hard to

20          read, we don't want to talk about it.

21                       Instead, he said what you ought to

22          pay attention to an e-mail that Mr. Mayer sent

23          four years later in 2010.  He said that's a

24          better description of what the parties would
```

1    have agreed to in June 2005.  That doesn't make

2    any sense.  If you want to understand what the

3    parties thought at the time, look at what the

4    parties said to each other at the time.

5              And that's what the Court has told

6    you you should do.  In considering this

7    hypothetical negotiation, you should focus on

8    what the expectations of the patentholder and

9    the infringer would have been had they entered

10   into an agreement at that time, and had they

11   acted reasonably in their negotiations.

12             Well, Mr. Reed went through the

13   process of all of the Georgia-Pacific factors he

14   called them, the list of 13 or 14 or 15 factors,

15   and he explained to you what all of that would

16   mean in the context of a hypothetical

17   negotiation in June 2005.  He looked at all of

18   those factors and he summarized it this way.

19   What was the evidence that he showed you about

20   the lump sum payment that he said these parties

21   would have agreed to in June 2005?

22             One of the things he looked at was

23   comparable licenses.  He said I found a license

24   that I believe is economically comparable,

1    Dr. Goodchild found that it was technologically

2    comparable.  It actually licenses more patents.

3    But Google only paid $600,000 for it.  $600,000.

4            Now, he said it probably would

5    have been moved up a little bit, therefore he

6    thought it was consistent with his opinion of no

7    more than $3 million.  There was another aspect

8    of Google's licenses that he found particularly

9    important, and that is that Google always enters

10   into lump sum agreements.  He reviewed evidence

11   about more than 100 agreements, every single one

12   of them was a lump sum agreement.

13           And there was a very good reason

14   for that.  And it relates specifically to the

15   kinds of things ACI wants you to believe now.

16   He had a big part of the reason for that, is

17   because it gives them the freedom to operate.

18   Google can decide what it wants to do with that

19   technology.  It can use it a little bit.  It can

20   use it a lot.  If it uses it a little bit or a

21   lot, it doesn't have to keep track of every time

22   it uses it.  It can make those decisions in the

23   future because it doesn't know what it's going

24   to do with it them.  Google always enters into

1  these lump sum agreements.  And that's very

2  different from the kind of agreement that they

3  want you to agree to.  They want to suggest that

4  in 2005 the parties would have agreed to some

5  kind of running royalty that was paid for each

6  session of somebody using Google Earth.

7           What were the other things that he

8  looked at?  He said well, look at the

9  contributions that Google makes to these

10  products, the millions and millions of dollars

11  that Google spends to buy data centers and all

12  of the information that stores them, all of the

13  money that is spent on the engineers who have

14  spent years and years of their lives working on

15  this product.

16           He also said look at the

17  difficulties in monetizing Google Earth.  And

18  this was a very important factor.  You heard

19  from Mr. Birch about the issues that Google has

20  had with Google Earth.  It is an enormously

21  popular product, and it's really cool, but it

22  doesn't make a ton of money.  The revenue has

23  been flat.

24           ACI kind of wants to mislead you a

```
 1        little bit here, because they said look, when it

 2        was introduced, there was Google Free so all of

 3        a sudden it as zero dollars.  That's not what

 4        Mr. Birch said and that's not what Mr. Reed

 5        said.  They looked at the Google financial

 6        records and they said there are these versions

 7        that Google charged for, Pro and Enterprise.

 8        Before Google started making those free, how

 9        much did Google get?  It was just a little under

10        $250 million over the course of all those years.

11        That's real revenue.  That's real money.  That's

12        not profit, but that was real money.  But it was

13        flat during the entire time, despite all of

14        their effort they couldn't grow it.

15                    You also heard evidence about

16        their efforts to try to make ads through Google

17        Earth.  And even though the licensing revenue

18        sounds kind of big, $250 million is a lot of

19        revenue, but the ad revenue was much, much

20        smaller, $5.6 million is what Mr. Birch said is

21        the total amount that they have spent.

22                    Put it in the relevant period,

23        it's even less than that, so they stopped

24        including ads.
```

1        Now Google has taken the entire

2   product and moved it into Geo for good so all of

3   the versions are free.  You have to consider

4   that factor of difficulty in monetizing it

5   before they would distribute it.

6        We also looked at whether ACI had

7   any licensing revenue.  We found that they

8   didn't.  ACI has not licensed the product.  They

9   have never gotten any money for that patent.

10  They said let's look at whether they have any

11  competitive products.  And the answer is they

12  don't.  You saw the testimony of Mr. Andreovits

13  by video, they don't have and never had a

14  competitive product.

15       Let's look at the negotiating

16  history between the companies.  And we used this

17  timeline to show you what were the parties

18  actually saying to each other.  The very first

19  communication before Google had told ACI that

20  they didn't infringe, ACI said well, we'll take

21  a one to three percent royalty on patent related

22  revenues, and it's the midpoint of that, two

23  percent that Mr. Reed actually uses, two percent

24  of patent related revenues.

1           But then the parties continue to

2   negotiation and it turns out they were willing

3   to take even less.  And importantly, Google,

4   because remember, you have to consider what both

5   of the parties would have done, Google said it

6   would not have paid more than a million dollars

7   for that patent even if it was ironclad.

8           What was the response to

9   Mr. Reed's analysis of the lump sum royalty of

10  $3 million?  Mr. Nawrocki came and he put up

11  this slide and he showed you this royalty base

12  of 7.1 billion sessions, but he didn't give you

13  a royalty rate, and he didn't give you an

14  opinion on royalty damages.

15          All of this evidence about a rate

16  and this discussion about a rate and the damages

17  is something that their lawyers are making up.

18  You never heard a witness come and tell you what

19  would be a fair amount.  You never heard an

20  expert telling you what would be a fair amount.

21  You never heard ACI tell you they were going to

22  get some money for 7.1 billion sessions.

23          ACI told you you should get paid

24  for every use of Google Earth.  That's not true,

1541

1    ACI doesn't get paid for every use of Google

2    Earth.  They get paid for every use of the

3    invention.  And there wasn't any use of the

4    invention.

5            Once you look at all the evidence,

6    you should find that Google Earth does not

7    infringe claim 1, and that claim 1 and the other

8    asserted claims are invalid.

9            Now, I'm going to get a chance to

10    come back and talk to you in just a few minutes

11    but I'm only going to be able to talk to you

12    about invalidity.  I want you to understand when

13    I don't mention it, that doesn't mean that

14    infringement is important.  The evidence that

15    you have shows that Google Earth operates

16    differently.  When you look at that evidence, I

17    think you'll agree.

18            Thank you.

19            THE COURT:  Thank you, Mr. Snyder.

20            Mr. Hawes.

21            MR. HAWES:  Thank you, Your Honor.

22            So I got to see the trial made

23    graphics again.  They did a good job with those

24    graphics.  Little lines going here and there.

1   When you look at the graphics, it reflects

2   exactly what the lawyer says.  The lines go to

3   the places the lawyers say the lines ought to

4   go.  Is that a surprise?  They made the

5   graphics.  Of course they're going to reflect

6   what the lawyers say.

7             Can I have slide 23.

8             But what their witnesses say was

9   important for you in making your decision.  Did

10  they say the authoritative source was trial made

11  graphics by the attorneys?  Did they say look at

12  all the little boxes and how they fill in when a

13  graphics artist puts them together?  That's not

14  what they had.

15            Both Mr. Birch and Dr. Goodchild

16  said the ultimate authority for you to make a

17  decision on what Google Earth does is the source

18  code.  And that's an admission.  They knew they

19  didn't have the source code.  So when they said

20  that, they had to say that, because they know

21  it's the source code that makes it work.

22            So we have Dr. Castleman get up

23  and walk through the source code with you.  You

24  remember that?  Google's attorney might tell you

```
 1    he really didn't do it.  You were here for

 2    Dr. Castleman walking through that source code

 3    with you, I'm sure you remember it.  He went

 4    through every step.  He showed you the files,

 5    the modules and the comments of engineers of

 6    Google, the engineers who didn't come here to

 7    speak with you, the comments of those engineers

 8    talking about how every step was done.

 9               When you weigh the infringement

10    decision in the case, there shouldn't be a

11    question of whether the authoritative source

12    that witnesses agree outweighs trial made

13    graphics.  You should go with the source code.

14               Now, we also heard a little bit

15    about how well, Stephen Lau was there, there was

16    TerraVision.  Stephen Lau was there, you heard

17    everyone say, he was at Siggraph 95.  No

18    problem, he was there.

19               TerraVision had a booth.  That's

20    true.  But the issue is what was the TerraVision

21    that was on display.  And we know that if they

22    had actually brought, shown us the source code

23    or at least talked about the source code and

24    what it showed.  And they both had it, and they
```

1   didn't show it to you.  They didn't even explain

2   it or talk about what it showed.  Instead they

3   take these papers over a year-and-a-half, and

4   they say, well, it's kind of all these papers.

5   We showed when we questioned Dr. Goodchild and

6   Mr. Lau that the papers didn't agree, so how do

7   you know what was at this booth at Siggraph 95

8   when the papers don't agree, when Mr. Lau and

9   Dr. Goodchild had the code and didn't bring it

10  here for you, how do we know.  How do we know

11  that's clear and convincing evidence that allows

12  us to second guess a patent that was triple

13  checked.

14          We heard that the patent office

15  didn't get to hear Mr. Lau on the stand.  That's

16  true.  That just happened yesterday, obviously

17  the patent office didn't get to see that.  But

18  when I put up the patent, and I think it's slide

19  number five, let's see if I am close on that.

20  No, back one.  There we go.

21          That last one, that's a deposition

22  of Stephen Lau talking about TerraVision.  Now,

23  maybe his story has changed, I can't say.  But

24  the patent office certainly can did get to see

1545

1     what Stephen Lau had to say about TerraVision

2     when they granted this patent.  They saw it

3     right there, right below where they got to see

4     what the CD-ROM for Siggraph 95, when they got

5     to see the article about the TerraVision product

6     and all the SRI stuff, they got to see that,

7     that's what was checked by the patent office

8     when they were doing their checks.

9               Keep that in mind when you're

10    deciding whether there was clear and convincing

11    evidence with what Mr. Lau says now compared to

12    what he said then.

13              We still haven't heard about the

14    2006 strategy document.  Can we get the front

15    page of the 2006 strategy document.  I think

16    it's about four or five ahead.  Couple more.

17    Got to get past the zero dollars.  Three or four

18    more.

19              You know the 2006 strategy

20    document, I have talked to you about it before.

21    We still at this point in the case, at the end

22    of the case, even with our closing argument out

23    of the way, they won't discuss their internal

24    strategy.  They won't tell you about what Google

```
 1      really thought about the value of Google Earth.

 2      They just won't talk about it.

 3                  I know it's confidential, and I'm

 4      not going to turn the page so I have to go flip

 5      the paper.  But you have seen it.  You have seen

 6      how they use users and how that was in their

 7      words their overarching investment focus, that

 8      was the reason they invest was for users and

 9      usage.

10                  Mr. Reed wants you to ignore that.

11      He wants you to do something else on reasonable

12      royalty.  Why won't they talk about their

13      internal strategy documents, their financial

14      support code.  Because it supports a royalty on

15      the use.  That's way.  It says they would invest

16      based on usage, so they don't want to talk about

17      it, they just ignore.

18                  You don't have to ignore it.  The

19      Judge has told you, but will give you the

20      instructions again with how to determine damages

21      and you can take it into account in deciding

22      what the proper reasonable royalty is for the

23      use made of the invention.

24                  Could we get slide 62, please.
```

1547

1     There it is.  That's the investment focus.  It

2     has not been discussed once by Google.  That

3     doesn't mean that you can ignore it, because

4     it's the only Google internal document in the

5     case that tells you how Google would have

6     decided this, if they had been a willing

7     licensor.

8                    You heard him say in 2006, Google

9     wasn't offering anything.  Google was saying

10    it's nice to have patent.  Remember, both

11    experts agreed, you have to assume the patent is

12    valid.  You have to assume it's infringed.  You

13    have to assume it's that terrifying situation

14    Mr. Jones described for you, when you realized

15    you're using someone else's patent for this

16    product that you expect to sell millions and

17    billions.

18                    In fact, I used the word sell, not

19    correct, Google Earth for free, but that's

20    Google's choice, not ACI's choice.  ACI didn't

21    say go use our invention and give it away for

22    free.  They didn't have that option, that was

23    Google's choice.  Because of the way the Google

24    model works, Google knew they would be more

1    profitable by bringing in their users, it's in

2    their own documents and Google refuses, refuses

3    to talk about it.

4                Let's talk a little bit about the

5    T_Vision paper.  Now, you saw Mr. Lau hold up a

6    CD-ROM.  He did, he pulled up the CD-ROM, that's

7    true.  Their testimony from the inventors is

8    they don't remember that being distributed at

9    the conference, that was given to the patent

10   office.  There is not evidence sufficient for

11   you to find by clear and convincing evidence

12   that the patent office got it wrong.  There is a

13   disagreement about that and there is no clear

14   and convincing evidence, you saw the witness, he

15   put up there, and Google's lawyer had to admit,

16   the witness said generally speaking, he was

17   talking about twenty years, he said well, most

18   of the time, you also heard other witnesses say

19   some years they didn't get it out to attendees,

20   and no witness, except Mr. Lau who is being paid

21   by Google at $450 an hour said I got the

22   materials.

23                You know what he actually

24   testified.  It was kind of interesting.  He said

1   all attendees got the materials, as though

2   Mr. Lau hung out at the registration desk and

3   watched and made sure.  It was kind of odd.  He

4   didn't say I got them, he claimed that all

5   attendees got them, something he couldn't

6   possibly have known.  That's his testimony, and

7   obviously you can consider it.

8            You can also consider the

9   testimony of the other witnesses who didn't

10  remember getting it and the fact that Mr. Lau is

11  being paid $450 an hour when he said it.

12           What about the T_Vision papers.

13  Can we go to the rebuttal slide, please.  The

14  big issue here is that Dr. Goodchild wants to

15  simplify things.  Do you remember that?  He

16  wants to say well, I'm going to read things in.

17  If you read the instructions carefully, that you

18  cannot do -- you can't read things into the

19  publication.  You can't say well, I think people

20  would understand.  You've got to show where it

21  is.

22           And if you remember, if we go

23  forward a slide, he said -- actually let's go

24  forward three to his chapter book, maybe one

1    more, we'll get there.  There it is.

2              You'll remember years after what

3    he now says was this disclosing paper that said

4    the whole thing, he said that previous

5    generations of developers have seen insuperable

6    challenges, and he included the very challenges

7    in the '550 patent, feeding vast amounts of data

8    through comparatively limited internet pipes.

9    Remember the discussion in the patent, that's

10   why you subdivide, that's why you have the

11   repetitive step because you can't get enough

12   data to go through and do the whole thing at

13   once.

14             These challenges are still there

15   years later.  He's now telling you these were

16   all solved by the paper on the Siggraph

17   conference CD.  It doesn't make any sense.  It's

18   not clear and convincing evidence for you to

19   second guess the patent office to say no, this

20   patent is still good, we have looked at that,

21   still good patent.

22             They have to show by clear and

23   convincing evidence if they want to you second

24   guess the patent office and they haven't shown

1       that.

2                    I ask you to be careful with your

3       verdict.  Look at the instructions carefully and

4       make a good decision for this dispute which is

5       in your hands at this point.

6                    Thank you.

7                    THE COURT:  Thank you, Mr. Hawes.

8                    Mr. Snyder.

9                    MR. SNYDER:  Thank you, Your

10      Honor.

11                   ACI wants you to just defer to the

12      Patent and Trademark Office.  The Patent and

13      Trademark Office looked at it, they issued this

14      patent and so you shouldn't pay any more

15      attention to it, you should just go along.  But

16      the Judge has instructed you -- the Court has

17      instructed you and the law is that the patent is

18      presumed valid, but not all patents are valid.

19      That's why you're here.  And that's why we

20      presented evidence.  That's why we showed you

21      the documents and that is why we brought the

22      witnesses so that you could hear them.

23                   And after Doctor Goodchild explained how

24      the T_Vision system and that paper shows each and

```
 1    every one of those elements, what
 2    was the evidence that ACI put on?  Did they
 3    bring back Doctor Castleman and say, Doctor
 4    Goodchild is mistaken, that is not what the
 5    patent says or the paper says?  No.  Did they
 6    bring back one of the inventors?  Two of them
 7    had testified.  Did they bring one of or both of
 8    them back and have them say -- and remember
 9    their authors of the paper.  Did they say nope,
10    he misunderstands the paper, that is not how it
11    works, that's not what we meant, that is not
12    what it says?  No.  What was the evidence that
13    they asked you to rely on to contradict Doctor
14    Goodchild's conclusions?  There isn't any.
15              It's even thinner when we get to
16    the TerraVision system.  Mr. Lau came and
17    explained to you his project.  He came to you
18    and explained his and Mr. Leclerc's work and
19    said this is how it works and it's accurately
20    described in these various papers.  This was the
21    system that we put on public display in 1994 and
22    1995.  If they wanted to ask him about the
23    source code, they could have done it.  He was
24    right there.  He said he wrote 80 or 90 percent
```

1    of it.  Doctor Goodchild came and he said if you

2    look at what they did and how it's described, it

3    invalidates these claims.  And after Mr. Lau

4    testified and after Doctor Goodchild testified,

5    what is the evidence that ACI wants you to rely

6    on to contradict them?  There isn't any.  They

7    didn't have Doctor Castleman come back and say

8    that Mr. Lau's mistaken.  They didn't have

9    Doctor Castleman come back and say Doctor

10   Goodchild's got it wrong.  They just want to

11   argue to you and they want to tell you just

12   trust the Patent and Trademark Office.  Don't do

13   your job.

14            Your job is to look at the

15   evidence independently.  I have great confidence

16   that you're going to do your job and look at the

17   evidence.  And when you look at all of the

18   evidence, you will come to the conclusion that

19   Google Earth does something different than is

20   described by the patent.  It does not infringe.

21   And when you look at the evidence, you will

22   conclude that the claim 1, 3, 14 and 28 are

23   invalid as anticipated or obvious.  We've been

24   telling ACI for 10 years that Google does not

1    infringe this patent and that it has problems.

2    And now we've given you that evidence and we

3    hope that you will agree with us based on your

4    review of that evidence.  Thank you very much.

5                    THE COURT:  Thank you, Mr. Snyder.

6    Now, I'm going to give you some final

7    instructions, members of the jury and you will

8    go back to the jury room and select your foreman

9    and deliberate on a verdict.  And when you get

10   back there, you will find there was a verdict

11   form and there's a copy of the instructions for

12   each one of you.

13                   You must perform your duties as

14   jurors without bias or prejudice as to any

15   party.  The law does not permit you to be

16   controlled by sympathy, prejudice or public

17   opinion.  All parties expect that you will

18   carefully and impartially consider all the

19   evidence, follow the law as I have given it to

20   you and reach a just verdict regardless of the

21   consequences.

22                   It is your sworn duty as jurors to

23   discuss the case with one another in an effort

24   to reach agreement if you can do so.  Each of

```
 1      you must decide the case for yourself, but only
 2      after full consideration of the evidence with
 3      the other members of the jury.  While you are
 4      discussing the case do not hesitate to
 5      re-examine your own opinion and change your mind
 6      if you become convinced that you are wrong.
 7      However, do not give up your honest beliefs
 8      solely because the others think differently, or
 9      merely to finish the case.
10                  Remember that in a very real way
11      you are the judges of the facts.  Your only
12      interest is to seek the truth from the evidence
13      in the case.  You should consider and decide
14      this case as a dispute between persons of equal
15      standing in the community, of equal worth, and
16      holding the same or similar stations in life.  A
17      corporation is entitled to the same fair trial
18      as a private individual.  All persons, including
19      corporations and other organizations stand equal
20      before the law and are to be treated as equals.
21                  When you retire to the jury room
22      to deliberate on your verdict, you may take this
23      charge with you as well as exhibits which the
24      Court has admitted into evidence.
```

1    Select your foreperson and conduct

2  your deliberations.  If you recess during your

3  deliberations, follow all of the instructions

4  that the Court has given you regarding your

5  conduct during the trial.  After you have

6  reached your unanimous verdict, your foreperson

7  is to fill in on the verdict form your answers

8  to the questions.  Do not reveal your answers

9  until such time as you are discharged unless

10  otherwise directed by me.  You must never

11  disclose to anyone, not even to me, your

12  numerical division on any questions.

13    Any notes that you have taken

14  during this trial are only aids to memory.  If

15  your memory should differ from your notes, then

16  you should rely on your memory and not on your

17  notes.  The notes are not evidence.  A juror who

18  has not taken notes should rely on his or her

19  independent recollection of the evidence and

20  should not be unduly influenced by notes of

21  other jurors.  Notes are not entitled to any

22  greater weight than the recollection or

23  impression of each juror about the testimony.

24    During your deliberations, you

```
 1    must not communicate with or provide any
 2    information to anyone by any means about this
 3    case.  Except to the extent I instruct you that
 4    you may review certain exhibits on a computer
 5    provided to you, you may not use any electronic
 6    device, or media, such as the telephone, a cell
 7    phone, smart phone, iPhone, Blackberry, or
 8    computer, the internet, any internet service,
 9    any text or instant messages service, any
10    internet chatroom, blog or website such as
11    Facebook, MySpace, LinkedIn, YouTube or Twitter,
12    to communicate to anyone any information about
13    this case or to conduct any research about this
14    case until I accept your verdict.  In other
15    words, you cannot talk to anyone on the phone,
16    correspond with anyone or electronically
17    communicate with anyone about this case.  You
18    can only discuss the case in the jury room with
19    your fellow jurors during deliberations.
20              If you want to communicate with me
21    at any time, please give a written message or
22    question to the bailiff, who will bring it to
23    me.  I will then respond as promptly as possible
24    either in writing or by having you brought into
```

1   the courtroom so that I can address you orally.

2   I will always first disclose to the attorneys

3   your question and my response before I answer

4   your question.

5                Any exhibits used in the trial

6   will be available to you during your

7   deliberations.  A typewritten copy of the

8   testimony will not be available for your use

9   during the deliberations, although you can

10  request a particular portion of a witness's

11  testimony to be read back to you.  It is

12  difficult and time consuming for the reporter to

13  read back lengthy portions of the testimony, so

14  the opportunity to have testimony read back is

15  quite limited.  After you have reached a

16  verdict, you are not required to talk with

17  anyone about the case unless the Court orders

18  otherwise.  You may now retire to the jury room

19  to deliberate.

20                THE COURT:  Be seated please.  We

21  have to swear the security officer.

22                (Court officer sworn.)

23                THE COURT:  Thank you.  All right.

24  Now, I suggest that we recess for lunch for one

1    hour and then again -- begin the bench trial at

2    1:30.  Is there anything else that counsel has?

3                    MR. PARTRIDGE:  Yes, Your Honor.

4    We had a conversation about the bench trial and

5    we've agreed we'll avoid repetitive testimony

6    from the jury trial this week and therefore we

7    think the bench trial should take an hour and a

8    half or so.  It's hard to predict it exactly.

9    And our preference would be to start at 2, if

10   that would be acceptable to Your Honor.

11                   THE COURT:  That would be fine.

12                   MS. WILLIAMSON:  And as part of

13   that process, Your Honor, even though there is

14   some new evidence that has been designated from

15   depositions, we don't intend to play or read

16   that, we simply will submit it to the Court for

17   its consideration.

18                   THE COURT:  That's fine.

19                   MR. PARTRIDGE:  Thank you.

20                   THE COURT:  We'll resume at 2

21   o'clock.  Hold on just one moment.  I want to

22   talk to my clerk hear.  I just want to say one

23   other thing before we break, and that is that I

24   think this case has been very professionally

```
 1   tried on both sides and I think it's an

 2   admirable example of lawyering and whatever way

 3   the verdict comes out, I appreciate what all of

 4   you have done and you should feel as though

 5   you've performed admirably for the profession

 6   and I appreciate it.

 7                   MR. HAWES:  Thank you.

 8                   MR. SNYDER:  Thank you, Your

 9   Honor.

10                   THE COURT:  All right.  We'll

11   recess until 2 o'clock then.

12              (Luncheon recess.)

13                   THE COURT:  Be seated please.  As

14   you know the jury has reached a /SRERT /EUBGT.

15   Is there anything we need to discuss before we

16   bring the jury back.

17                   MR. PARTRIDGE:  Nothing from the

18     Plaintiff, Your Honor.

19                   MR. SNYDER:  Nothing from Google,

20   Your Honor.

21                   THE COURT:  Thank you.

22              (Jury enters.)

23                   THE COURT:  And who is the

24   foreperson for the jury?
```

1561

1     FOREPERSON:  I am.

2          THE COURT:  Has the jury reached a

3     verdict in this case?

4          FOREPERSON:  We have, Your Honor.

5          THE COURT:  Would you please hand

6     the verdict to the court deputy.  I will now

7     read the verdict.  The first question is do you

8     find that ACI has proven by a preponderance of

9     the evidence that Google's use of the accused

10    Google Earth products infringes the following

11    claims of U.S. Patent No. RE44550?  Claim 1, no.

12    Claim 3, no.  Claim 14, no.  Claim 28, no.

13         Question 2.  Do you find that

14    Google has proven by clear and convincing

15    evidence that SRI's TerraVision system was

16    publically used before December 17, 1995?

17    Answer, yes.

18         Question #3.  If you answered yes

19    to Question #2, do you find that Google has

20    proven by clear and convincing evidence that SRI

21    TerraVision anticipates, that is constitutes the

22    public use of any of the following claims of

23    U.S. Patent No. RE44550?  Claim 1, yes.  Claim

24    3, yes.  Claim 14, yes.  Claim 28, yes.

1   Question #4.  If you answered yes

2   to Question #2 and no to Question #3 -- and

3   since the jury answered yes to both questions,

4   it did not answer Question #4.

5   Question #5.  Do you find that

6   Google has proven by clear and convincing

7   evidence that the T_Vision paper was a printed

8   publication before December 17th, 1995?  Answer,

9   yes.

10   Question #6.  If you answered yes

11   to Question #5, do you find that Google has

12   proven by clear and convincing evidence that the

13   T_Vision paper anticipates any of the following

14   claims of U.S. Patent No. RE44550:  Claim 1,

15   yes.  Claim 14, yes.  Claim 28, yes.

16   And then Question #7 is not

17   answered.

18   Question #8, if you answered yes

19   to Question #5, do you find that Google has

20   proven by clear and convincing evidence that

21   Claim 3 of U.S. Patent No. RE44550 is invalid as

22   obvious in view of the combination of the

23   T_Vision paper, the Global Mapping patent and

24   the knowledge of a person of ordinary skill in

```
 1    the art at the time of the alleged invention?

 2    Answer, yes.

 3                And Question 9 is not answered as

 4    being inapplicable.

 5                Signed May 27th, 2016.  Foreperson

 6    Michael Brothers.

 7                Is there any request to poll the

 8    jury?

 9                MR. PARTRIDGE:  No, Your Honor.

10                THE COURT:  Now, members of the

11    jury, by general practice of the Court and the

12    rules of the Court, I'm not permitted to comment

13    on your verdict, but I am allowed to comment on

14    your service.  And I want to congratulate you on

15    having worked very hard and attentively and

16    having put in great effort and serious

17    mindedness into this project.  The parties thank

18    you.  The Court thanks you and I congratulate

19    you for your service.  It's another

20    demonstration that the founding fathers had a

21    good idea when they put their trust in the

22    common sense of the American jury and I thank

23    you for participating in this with us.  Now I'm

24    going to allow you to go back to the jury room.
```

1    If you wait just a few minutes, I will come in

2    and eventually discharge you and then you'll be

3    free to go.  Thank you again for your service.

4    I'll see you in a few minutes.

5                    (Jury exits.)

6                    THE COURT:  Be seated, please.

7    Thank you all again.  Eventually I will enter

8    judgment on the verdict.  I'm not sure, in light

9    of the bench trial, whether that's appropriate

10   to do now.  The parties may or may not have a

11   view about that.  And then of course once I do

12   enter a judgment, there will be a 28-day period

13   for post trial motions and I'd be willing to

14   extend that, but the time won't begin to run

15   until I enter a judgment.

16                   So now I'm going to go and meet

17   with the jury for a few minutes and then we have

18   the bench trial.  Mr. Snyder?

19                   MR. SNYDER:  Your Honor, the

20   subject matter of the bench trial are

21   affirmative defenses only, and I believe that

22   they are moot in light of the jury's verdict.

23                   MR. PARTRIDGE:  That's correct,

24   Your Honor.

```
 1            THE COURT:  Okay.  So we will,
 2   what, dismiss the claims of laches and
 3   inequitable conduct on the grounds of mootness,
 4   is that what you'd like me to do?
 5            MR. SNYDER:  They are not claims,
 6   they are affirmative defenses.
 7            THE COURT:  Affirmative defenses,
 8   so we don't have to dismiss any claims.  We'll
 9   treat those as moot and that will put me in a
10   position, then, to enter judgment on the
11   verdict, which I will do.
12            Is there anything else that we
13   need to accomplish today?
14            MR. PARTRIDGE:  Nothing from the
15    Plaintiff, Your Honor.  Thank you for your work
16   on this case.  We appreciate it.
17            THE COURT:  Thank you.
18            MR. SNYDER:  Nothing from Google,
19   Your Honor.
20            THE COURT:  And again, I thank all
21    counsel.  I thank our court reporters and the
22   court staff.  You've been enormously helpful and
23   I very much appreciate it.  And it's been a
24   pleasure for me to be able to participate in
```

1566

1    this.  So with that, I think we're adjourned.

2                    Thank you.

3                    (Court recessed at 2:35 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
1    State of Delaware )
                      )
2    New Castle County )

3

4

5                    CERTIFICATE OF REPORTER

6

7         I, Dale C. Hawkins, Registered Merit

8    Reporter, Certified Shorthand Reporter, and Notary

9    Public, do hereby certify that the foregoing record,

10   Pages 1373 to 1567 inclusive, is a true and accurate

11   transcript of my stenographic notes taken on May 27,

12   2016, in the above-captioned matter.

13

14        IN WITNESS WHEREOF, I have hereunto set my

15   hand and seal this 27th day of May 2016, at

16   Wilmington.

17

18

19             /s/ Dale C. Hawkins

20             Dale C. Hawkins, RMR

21

22

23

24
```



**#3** [1] - 1561:18
**#4** [2] - 1562:1, 1562:4
**#5** [1] - 1562:5
**#6** [1] - 1562:10
**$250** [2] - 1538:10, 1538:18
**$450** [2] - 1548:21, 1549:11
**$600,000** [2] - 1536:3
**$69** [3] - 1455:7, 1455:15, 1455:21
**$700** [4] - 1401:16, 1401:21, 1402:6, 1402:20
**'550** [29] - 1417:16, 1417:22, 1418:13, 1425:9, 1425:12, 1428:24, 1431:10, 1439:3, 1442:19, 1442:22, 1451:12, 1452:8, 1458:24, 1460:12, 1462:20, 1465:1, 1465:20, 1471:6, 1482:20, 1483:4, 1483:5, 1484:1, 1484:11, 1488:8, 1489:23, 1490:4, 1506:7, 1506:9, 1550:7
**'95** [5] - 1453:14, 1453:15, 1475:12, 1475:21, 1521:24
**/-PBL** [1] - 1415:23
**/EUBGT** [1] - 1560:14
**/s** [1] - 1567:19
**/SRERT** [1] - 1560:14
**0219** [3] - 1407:5, 1407:6, 1408:3
**1** [49] - 1385:8, 1417:15, 1417:21, 1418:2, 1420:2, 1424:7, 1425:9, 1426:23, 1428:8, 1428:11, 1428:14, 1428:17, 1428:23, 1431:13, 1432:6, 1433:23, 1434:4, 1439:2, 1445:10, 1462:15, 1467:3, 1470:24, 1471:5, 1471:9, 1471:11, 1471:20, 1476:19, 1497:3, 1501:14, 1501:16, 1501:24, 1502:1, 1504:9, 1508:5, 1512:15, 1515:9, 1517:21, 1518:1, 1519:13, 1524:11, 1531:13, 1541:7,

1553:22, 1561:11, 1561:23, 1562:14
**10** [4] - 1443:10, 1505:17, 1520:20, 1553:24
**100** [1] - 1536:11
**10:05** [1] - 1449:14
**10:15** [1] - 1449:21
**10:20** [1] - 1449:21
**11** [1] - 1443:15
**13** [3] - 1381:4, 1440:10, 1535:14
**1373** [1] - 1567:10
**14** [26] - 1385:9, 1417:15, 1417:21, 1418:2, 1420:2, 1423:20, 1426:23, 1428:10, 1428:17, 1428:23, 1431:13, 1432:6, 1433:24, 1434:4, 1439:2, 1471:12, 1471:21, 1501:15, 1501:23, 1531:10, 1531:13, 1535:14, 1553:22, 1561:12, 1561:24, 1562:15
**14-217-RGA** [1] - 1373:5
**15** [2] - 1509:19, 1535:14
**1567** [1] - 1567:10
**160** [1] - 1399:18
**17** [9] - 1429:24, 1430:4, 1430:7, 1430:21, 1431:4, 1433:12, 1524:4, 1528:17, 1561:16
**17th** [3] - 1521:12, 1530:9, 1562:8
**1980's** [1] - 1502:12
**1994** [5] - 1454:10, 1521:23, 1522:6, 1526:7, 1552:21
**1995** [21] - 1389:9, 1389:14, 1429:24, 1430:3, 1430:4, 1430:7, 1430:21, 1431:4, 1433:12, 1454:11, 1497:18, 1521:12, 1521:20, 1522:8, 1524:4, 1526:8, 1528:17, 1530:9, 1552:22, 1561:16, 1562:8
**1:30** [1] - 1559:2
**2** [11] - 1393:2, 1442:11, 1445:14, 1471:24, 1476:21, 1559:9, 1559:20

1560:11, 1561:13, 1561:19, 1562:2
**20** [1] - 1509:19
**2005** [18] - 1375:15, 1376:21, 1377:19, 1382:5, 1393:7, 1393:11, 1395:13, 1396:3, 1440:20, 1444:1, 1459:13, 1534:5, 1534:11, 1534:15, 1535:1, 1535:17, 1535:21, 1537:4
**2006** [21] - 1376:5, 1376:8, 1376:19, 1376:22, 1377:5, 1377:16, 1441:23, 1442:1, 1456:21, 1457:9, 1479:22, 1481:1, 1481:7, 1486:7, 1503:13, 1504:1, 1520:20, 1545:14, 1545:15, 1545:19, 1547:8
**2010** [12] - 1375:16, 1377:20, 1377:23, 1392:7, 1393:11, 1401:14, 1440:11, 1460:5, 1460:7, 1486:7, 1534:23
**2011** [1] - 1399:19
**2016** [4] - 1373:9, 1563:5, 1567:12, 1567:15
**219** [1] - 1407:18
**22** [1] - 1430:2
**23** [1] - 1542:7
**25** [2] - 1375:23, 1477:21
**27** [2] - 1373:9, 1567:11
**27th** [2] - 1563:5, 1567:15
**28** [25] - 1385:9, 1417:16, 1417:21, 1418:2, 1420:2, 1423:23, 1426:23, 1428:10, 1428:17, 1428:23, 1431:13, 1432:6, 1433:24, 1434:4, 1439:3, 1471:13, 1471:21, 1501:15, 1501:23, 1531:10, 1531:13, 1553:22, 1561:12, 1561:24, 1562:15
**28-day** [1] - 1564:12
**2:35** [1] - 1566:3
**3** [32] - 1385:22, 1415:17, 1417:21,

1418:2, 1420:2, 1423:18, 1426:23, 1428:10, 1428:17, 1428:23, 1431:14, 1432:6, 1433:23, 1434:9, 1439:2, 1442:15, 1445:18, 1471:12, 1471:20, 1497:3, 1497:21, 1501:15, 1501:23, 1531:23, 1532:22, 1536:7, 1540:10, 1553:22, 1561:12, 1561:24, 1562:2, 1562:21
**30** [2] - 1378:14, 1487:3
**4** [2] - 1442:17, 1445:21
**402** [1] - 1407:13
**44550** [1] - 1526:4
**45** [1] - 1410:7
**49** [3] - 1398:18, 1403:11, 1403:15
**49/51** [2] - 1396:4, 1397:1
**5** [5] - 1406:3, 1442:19, 1445:24, 1562:11, 1562:19
**5.6** [1] - 1538:20
**50** [3] - 1398:15, 1403:1, 1404:14
**51** [5] - 1375:9, 1396:14, 1398:17, 1403:11, 1403:15
**54** [1] - 1391:23
**55** [2] - 1459:5, 1459:15
**6** [3] - 1373:3, 1442:21, 1446:4
**62** [1] - 1546:24
**6A** [1] - 1373:10
**7** [2] - 1442:24, 1562:16
**7.1** [3] - 1401:4, 1540:12, 1540:22
**75** [1] - 1510:19
**8** [4] - 1443:3, 1471:24, 1476:21, 1562:18
**80** [1] - 1552:24
**844** [1] - 1373:11
**8:35** [1] - 1373:9
**9** [2] - 1443:7, 1563:3
**90** [2] - 1477:19, 1552:24
**95** [9] - 1528:5, 1528:23, 1529:5, 1529:11, 1529:13, 1530:15, 1543:17,

1544:7, 1545:4
**9:14** [1] - 1409:20
**a.m** [3] - 1373:9, 1409:20, 1449:14
**ability** [3] - 1412:9, 1483:19, 1495:8
**able** [7] - 1451:24, 1452:1, 1489:9, 1490:5, 1504:3, 1541:11, 1565:24
**above-captioned** [1] - 1567:12
**absence** [1] - 1432:24
**absolutely** [2] - 1397:22, 1514:15
**abstract** [1] - 1388:22
**accept** [7] - 1380:16, 1383:9, 1416:5, 1416:8, 1421:5, 1443:22, 1557:14
**acceptable** [1] - 1559:10
**acceptance** [1] - 1438:5
**access** [3] - 1408:18, 1432:16, 1433:5
**accessible** [6] - 1430:20, 1432:13, 1433:11, 1521:8, 1521:11, 1528:16
**accomplish** [1] - 1565:13
**accomplishing** [1] - 1492:8
**accordance** [1] - 1402:18
**according** [4] - 1436:18, 1476:9, 1499:21, 1499:22
**account** [8] - 1397:5, 1437:6, 1446:12, 1482:23, 1483:4, 1486:9, 1490:1, 1546:21
**accurate** [2] - 1501:6, 1567:10
**accurately** [1] - 1552:19
**accuse** [1] - 1447:19
**accused** [20] - 1417:20, 1418:1, 1418:10, 1420:14, 1424:21, 1426:3, 1426:5, 1427:20, 1427:23, 1428:13, 1428:16, 1446:17, 1446:20, 1447:8, 1448:9, 1448:21, 1470:7, 1493:24, 1517:18, 1561:9

**achieve** [2] - 1437:21, 1509:8
**achieving** [1] - 1443:2
**ACI** [116] - 1375:24, 1376:1, 1377:14, 1377:16, 1378:18, 1378:19, 1383:5, 1383:8, 1383:15, 1389:15, 1389:18, 1389:19, 1417:14, 1417:18, 1418:7, 1418:15, 1418:19, 1418:20, 1419:1, 1424:20, 1426:15, 1426:18, 1428:2, 1428:4, 1428:12, 1430:14, 1430:17, 1431:7, 1432:10, 1439:5, 1439:13, 1439:14, 1439:22, 1440:3, 1440:6, 1442:15, 1443:5, 1443:24, 1446:9, 1446:13, 1447:3, 1447:4, 1447:17, 1447:19, 1447:21, 1447:23, 1448:3, 1448:5, 1448:10, 1448:14, 1450:8, 1450:15, 1451:11, 1451:23, 1452:13, 1452:17, 1453:21, 1454:8, 1456:13, 1456:19, 1457:1, 1457:2, 1457:19, 1459:21, 1459:22, 1470:1, 1477:12, 1490:2, 1490:12, 1490:18, 1491:3, 1491:24, 1492:11, 1493:4, 1493:9, 1493:22, 1494:4, 1494:7, 1494:11, 1499:2, 1500:18, 1503:8, 1503:11, 1504:16, 1505:9, 1511:24, 1516:16, 1517:16, 1518:4, 1518:5, 1518:16, 1520:14, 1522:16, 1523:9, 1525:11, 1527:17, 1527:18, 1528:7, 1530:19, 1531:4, 1536:15, 1537:24, 1539:6, 1539:8, 1539:19, 1539:20, 1540:21, 1540:23, 1541:1, 1547:20, 1551:11, 1552:2, 1553:5, 1553:24, 1561:8

**ACI's** [15] - 1376:7, 1383:9, 1389:3, 1438:3, 1440:1, 1440:2, 1442:1, 1447:8, 1452:1, 1465:12, 1520:15, 1527:11, 1529:23, 1534:17, 1547:20
**acted** [2] - 1441:2, 1535:11
**acting** [1] - 1443:22
**action** [1] - 1418:17
**activities** [1] - 1398:16
**activity** [1] - 1432:16
**actual** [2] - 1441:17, 1441:21
**ad** [4] - 1393:19, 1394:14, 1451:21, 1538:19
**add** [1] - 1439:19
**added** [4] - 1381:15, 1443:14, 1444:18, 1497:21
**addition** [4] - 1377:23, 1384:23, 1421:24, 1455:13
**additional** [8] - 1381:14, 1425:19, 1428:9, 1439:17, 1447:19, 1448:8, 1452:14, 1471:14
**address** [3] - 1439:11, 1515:2, 1558:1
**addressed** [3] - 1389:4, 1405:20, 1416:22
**adds** [3] - 1394:11, 1425:19, 1444:15
**adequate** [2] - 1439:13, 1477:5
**adjourned** [1] - 1566:1
**adjust** [2] - 1397:5, 1405:15
**admirable** [1] - 1560:2
**admirably** [1] - 1560:5
**admission** [1] - 1542:18
**admissions** [1] - 1476:7
**admit** [3] - 1467:9, 1523:12, 1548:15
**admitted** [14] - 1378:3, 1392:3, 1399:17, 1399:19, 1402:9, 1406:9, 1407:3, 1407:11, 1475:16, 1495:7, 1498:4, 1510:24, 1531:22, 1555:24
**admitting** [1] - 1378:5

**adopt** [1] - 1378:15
**ads** [6] - 1394:24, 1395:5, 1397:20, 1397:22, 1538:16, 1538:24
**AdSense** [16] - 1392:3, 1392:7, 1392:11, 1392:13, 1393:13, 1393:18, 1393:24, 1394:1, 1394:22, 1397:2, 1398:8, 1398:12, 1398:14, 1403:17, 1406:22
**advance** [1] - 1490:14
**advantages** [1] - 1442:24
**advertisements** [1] - 1480:20
**advertisers** [3] - 1480:10, 1480:13, 1480:24
**advertising** [10] - 1394:2, 1395:8, 1395:15, 1395:20, 1395:23, 1397:6, 1397:8, 1480:17, 1480:19, 1481:9
**affects** [1] - 1445:22
**afield** [1] - 1403:18
**afternoon** [2] - 1375:3, 1456:10
**ago** [1] - 1520:20
**agree** [13] - 1376:18, 1403:12, 1409:4, 1435:6, 1477:13, 1494:17, 1515:8, 1537:3, 1541:17, 1543:12, 1544:6, 1544:8, 1554:3
**agreed** [26] - 1380:8, 1381:16, 1389:15, 1391:2, 1400:15, 1400:20, 1406:4, 1430:3, 1440:16, 1444:1, 1461:8, 1464:24, 1465:20, 1465:22, 1466:2, 1470:18, 1483:8, 1487:14, 1534:4, 1534:7, 1534:14, 1535:1, 1535:21, 1537:4, 1547:11, 1559:5
**agreeing** [1] - 1382:21
**agreement** [25] - 1380:10, 1411:10, 1441:2, 1441:8, 1442:9, 1444:3, 1444:23, 1445:2,

1445:3, 1445:4, 1445:7, 1445:11, 1445:14, 1445:19, 1446:4, 1446:7, 1484:13, 1484:21, 1485:4, 1485:18, 1485:23, 1535:10, 1536:12, 1537:2, 1554:24
**agreements** [4] - 1446:11, 1536:10, 1536:11, 1537:1
**agrees** [4] - 1461:11, 1465:16, 1465:19
**aha** [1] - 1510:22
**ahead** [4] - 1471:20, 1481:17, 1514:17, 1545:16
**aid** [1] - 1390:6
**aids** [2] - 1441:15, 1556:14
**air** [1] - 1454:3
**airplane** [5] - 1509:19, 1509:21, 1509:24, 1510:1, 1510:2
**aisle** [1] - 1522:18
**algorithms** [1] - 1523:7
**alleged** [12] - 1378:20, 1381:11, 1418:3, 1434:3, 1434:8, 1434:13, 1434:22, 1441:17, 1441:21, 1447:17, 1527:1, 1563:1
**allow** [3] - 1463:11, 1481:8, 1563:24
**allowed** [2] - 1483:24, 1563:13
**allowing** [2] - 1416:15, 1502:15
**allows** [3] - 1395:5, 1488:9, 1544:11
**ALMELING** [8] - 1388:2, 1388:9, 1388:19, 1389:1, 1390:16, 1390:20, 1391:12, 1391:21
**almost** [3] - 1478:15, 1495:4, 1516:19
**alone** [2] - 1451:1, 1451:11
**amazing** [2] - 1487:7, 1488:2
**American** [1] - 1563:22
**amount** [22] - 1399:22, 1400:2, 1404:5, 1413:21, 1418:18, 1443:24, 1439:12,

1439:20, 1439:22, 1440:3, 1440:5, 1440:14, 1443:24, 1444:3, 1480:23, 1488:2, 1488:3, 1505:20, 1534:5, 1538:21, 1540:19, 1540:20
**amounts** [1] - 1550:7
**analysis** [7] - 1435:12, 1462:5, 1462:19, 1473:13, 1500:14, 1515:2, 1540:9
**analyze** [1] - 1466:1
**analyzed** [1] - 1398:20
**analyzing** [1] - 1458:8
**Andreas** [1] - 1519:10
**Andreovits** [1] - 1539:12
**Android** [1] - 1459:11
**animation** [8] - 1468:11, 1468:24, 1469:6, 1469:9, 1469:14, 1470:20, 1473:13, 1473:14
**animations** [1] - 1468:7
**Answer** [19] - 1411:12, 1495:14, 1495:19, 1497:11, 1497:15, 1497:19, 1498:18, 1498:23, 1508:18, 1509:2, 1511:6, 1515:4, 1515:10, 1523:18, 1523:22, 1529:19, 1561:17, 1562:8, 1563:2
**answer** [26] - 1384:3, 1384:15, 1386:2, 1417:3, 1466:4, 1485:14, 1509:10, 1514:15, 1514:24, 1515:13, 1516:4, 1516:9, 1516:19, 1517:20, 1524:5, 1526:5, 1526:16, 1527:2, 1527:7, 1529:6, 1530:9, 1531:20, 1533:2, 1539:11, 1558:3, 1562:4
**answered** [14] - 1384:7, 1385:5, 1402:5, 1517:5, 1520:22, 1525:23, 1531:15, 1561:18, 1562:1, 1562:3, 1562:10, 1562:17, 1562:18, 1563:3
**answers** [4] - 1411:14,

1413:4, 1556:7,
1556:8
**antecedent** [1] -
1519:13
**anticipate** [6] -
1431:17, 1431:23,
1438:22, 1524:15,
1525:14, 1531:7
**anticipated** [7] -
1385:10, 1431:14,
1434:17, 1441:19,
1525:20, 1526:17,
1553:23
**anticipates** [9] -
1383:17, 1384:15,
1384:17, 1431:13,
1526:2, 1531:12,
1531:19, 1561:21,
1562:13
**anticipation** [8] -
1383:10, 1384:4,
1385:22, 1385:23,
1431:11, 1432:2,
1432:7, 1526:14
**apologize** [1] -
1405:18
**appeal** [1] - 1384:13
**APPEARANCES** [2] -
1373:16, 1374:1
**appeared** [1] - 1436:7
**application** [5] -
1479:12, 1519:22,
1522:10, 1528:8
**applications** [2] -
1480:22, 1484:12
**applied** [1] - 1497:17
**apply** [5] - 1410:14,
1420:22, 1421:7,
1490:11, 1499:7
**apportion** [1] -
1395:22
**apportioning** [1] -
1398:19
**apportionment** [15] -
1393:1, 1393:6,
1394:14, 1396:1,
1396:18, 1396:22,
1396:23, 1397:2,
1397:6, 1398:5,
1399:4, 1399:7,
1403:10, 1403:22,
1448:4
**appreciate** [8] -
1379:23, 1490:18,
1492:5, 1506:10,
1560:3, 1560:6,
1565:16, 1565:23
**approach** [5] - 1474:1,
1476:2, 1492:24,
1493:12, 1508:15

**appropriate** [7] -
1376:18, 1377:6,
1384:23, 1396:11,
1408:6, 1490:12,
1564:9
**approved** [2] -
1452:12, 1452:16
**area** [2] - 1502:9,
1502:11
**argue** [3] - 1403:15,
1404:12, 1553:11
**argues** [1] - 1446:19
**arguing** [2] - 1375:16,
1397:3
**argument** [11] -
1403:5, 1404:18,
1405:7, 1407:10,
1410:4, 1449:7,
1450:6, 1466:19,
1467:13, 1527:18,
1545:22
**arguments** [8] -
1411:2, 1411:3,
1412:7, 1449:4,
1449:9, 1449:11,
1449:21, 1450:14
**arises** [1] - 1443:10
**arising** [1] - 1443:12
**arms** [1] - 1445:12
**arms-length** [1] -
1445:12
**arrangement** [1] -
1431:16
**ARSHT** [1] - 1374:4
**art** [56] - 1418:4,
1420:19, 1429:12,
1429:15, 1429:16,
1429:17, 1429:22,
1430:6, 1430:8,
1430:11, 1430:15,
1430:18, 1430:22,
1431:10, 1431:16,
1431:17, 1431:21,
1431:24, 1433:6,
1433:14, 1433:16,
1433:22, 1434:3,
1434:7, 1434:13,
1434:18, 1434:21,
1435:1, 1435:4,
1435:7, 1435:19,
1435:20, 1435:22,
1435:23, 1436:7,
1436:8, 1436:18,
1436:21, 1472:1,
1475:9, 1476:16,
1476:20, 1518:19,
1518:23, 1519:5,
1519:23, 1521:14,
1524:15, 1524:19,
1527:1, 1527:10,

1532:3, 1532:18,
1532:24, 1563:1
**ART+COM** [1] -
1373:3
**Art+Com** [1] - 1454:8
**Art+Com's** [1] -
1485:18
**article** [3] - 1407:2,
1407:4, 1545:5
**articles** [1] - 1453:16
**artist** [1] - 1542:13
**aspect** [1] - 1536:7
**aspects** [1] - 1447:7
**aspiration** [1] -
1523:16
**asserted** [10] - 1418:6,
1418:11, 1418:12,
1424:4, 1426:22,
1427:2, 1428:17,
1434:20, 1541:8
**assertions** [1] -
1437:8
**assess** [3] - 1440:9,
1466:17, 1478:4
**assessed** [1] -
1427:10
**assessing** [2] -
1436:4, 1441:15
**assignment** [1] -
1487:3
**assist** [1] - 1411:5
**associated** [1] -
1422:14
**Association** [1] -
1528:22
**assume** [4] - 1441:5,
1547:11, 1547:12,
1547:13
**attach** [1] - 1375:23
**attain** [1] - 1435:15
**attend** [1] - 1474:11
**attendance** [1] -
1529:17
**attendees** [6] -
1529:5, 1529:7,
1529:19, 1548:19,
1549:1, 1549:5
**attention** [7] - 1410:9,
1424:17, 1490:17,
1493:20, 1503:6,
1534:22, 1551:15
**attentive** [1] - 1492:5
**attentively** [1] -
1563:15
**attorney** [6] - 1416:17,
1461:18, 1465:11,
1465:12, 1511:4,
1542:24
**attorneys** [5] - 1411:1,

1542:11, 1558:2
**attracted** [1] - 1503:6
**attributable** [3] -
1444:21, 1447:5,
1448:17
**attributed** [2] -
1396:5, 1396:7
**attributes** [3] -
1395:19, 1397:8,
1400:3
**August** [3] - 1522:6,
1522:7, 1528:5
**author** [1] - 1463:17
**authoritative** [3] -
1461:7, 1542:10,
1543:11
**authority** [5] - 1461:9,
1470:19, 1476:8,
1476:9, 1542:16
**authors** [2] - 1531:2,
1552:9
**available** [16] -
1409:6, 1410:15,
1413:21, 1423:14,
1423:17, 1431:1,
1431:6, 1442:5,
1520:11, 1522:5,
1523:24, 1524:9,
1528:19, 1532:5,
1558:6, 1558:8
**Avoid** [1] - 1510:20
**avoid** [4] - 1389:16,
1409:8, 1510:19,
1559:5
**avoiding** [1] - 1438:10
**award** [9] - 1401:22,
1417:19, 1439:17,
1439:21, 1444:14,
1446:24, 1447:3,
1477:4, 1490:12
**awarded** [2] -
1418:15, 1447:21
**aware** [2] - 1400:17,
1413:20
**B1** [1] - 1507:23
**Bachelor** [1] - 1435:8
**bailiff** [1] - 1557:22
**BAKER** [1] - 1373:21
**ball** [5] - 1495:24,
1496:1, 1496:2,
1496:4
**base** [2] - 1444:20,
1540:11
**based** [35] - 1379:6,
1382:17, 1392:2,
1392:6, 1398:19,
1400:20, 1407:10,
1411:13, 1420:19,
1424:12, 1430:16,
1437:22, 1432:8,

1435:23, 1441:20,
1444:14, 1446:18,
1446:20, 1447:1,
1447:22, 1448:3,
1457:1, 1457:10,
1470:24, 1475:12,
1485:23, 1486:15,
1487:5, 1518:13,
1524:20, 1526:23,
1532:24, 1533:1,
1546:16, 1554:13
**basing** [2] - 1472:8,
1472:9
**basis** [12] - 1377:15,
1378:5, 1379:1,
1379:23, 1394:13,
1401:17, 1427:10,
1466:4, 1469:1,
1469:6, 1469:14,
1519:14
**bear** [1] - 1410:9
**bears** [1] - 1445:6
**became** [1] - 1503:4
**become** [1] - 1555:6
**BEFORE** [1] - 1373:13
**began** [5] - 1440:18,
1441:13, 1442:6,
1444:13, 1534:9
**begin** [2] - 1559:1,
1564:14
**beginning** [7] -
1389:2, 1419:17,
1424:3, 1450:15,
1458:20, 1493:13,
1532:8
**begins** [1] - 1458:14
**behind** [1] - 1456:5
**belief** [2] - 1419:8,
1472:18
**beliefs** [1] - 1555:7
**believes** [1] - 1395:23
**belong** [1] - 1518:6
**belongs** [1] - 1522:11
**below** [4] - 1422:18,
1422:23, 1519:13,
1545:3
**bench** [7] - 1417:6,
1559:1, 1559:4,
1559:7, 1564:9,
1564:18, 1564:20
**benefits** [1] - 1443:5
**Bernard** [1] - 1528:20
**best** [3] - 1412:4,
1463:20, 1534:13
**better** [2] - 1509:22,
1534:24
**between** [19] -
1376:22, 1390:8,
1399:5, 1419:14,
1435:4, 1435:22,

1438:13, 1442:15, 1444:11, 1445:12, 1445:24, 1446:1, 1446:9, 1446:12, 1468:22, 1469:17, 1512:14, 1539:16, 1555:14

**beyond** [4] - 1380:10, 1380:24, 1419:12, 1419:15

**bias** [3] - 1416:9, 1416:10, 1554:14

**big** [10] - 1458:10, 1458:16, 1480:16, 1483:6, 1487:10, 1518:7, 1518:15, 1536:16, 1538:18, 1549:14

**billion** [11] - 1401:4, 1460:8, 1460:17, 1482:19, 1486:3, 1488:17, 1488:24, 1489:18, 1489:23, 1540:12, 1540:22

**billions** [3] - 1458:19, 1482:18, 1547:17

**binder** [1] - 1489:9

**binders** [1] - 1489:7

**Birch** [25] - 1391:3, 1458:11, 1461:7, 1463:15, 1463:16, 1463:22, 1468:7, 1468:10, 1468:16, 1469:3, 1469:8, 1469:17, 1470:17, 1505:8, 1505:13, 1506:24, 1507:17, 1508:14, 1512:3, 1514:6, 1515:15, 1537:19, 1538:4, 1538:20, 1542:15

**Birch's** [3] - 1469:1, 1469:7, 1469:15

**bit** [12] - 1383:12, 1454:21, 1459:12, 1472:3, 1479:18, 1493:8, 1536:5, 1536:19, 1536:20, 1538:1, 1543:14, 1548:4

**bits** [1] - 1491:13

**Blackberry** [1] - 1557:7

**blocks** [1] - 1436:8

**blog** [1] - 1557:10

**BLUMENFELD** [1] - 1374:4

**body** [1] - 1519:18

**book** [1] - 1549:24

**booth** [2] - 1543:19,

---

1544:7

**bother** [1] - 1517:2

**bottom** [3] - 1390:19, 1458:11, 1479:7

**BOTTS** [1] - 1373:21

**bought** [1] - 1455:11

**box** [3] - 1464:13, 1464:18, 1520:7

**boxes** [1] - 1542:12

**boy** [1] - 1454:2

**break** [3] - 1449:10, 1449:13, 1559:23

**breakdown** [1] - 1393:7

**breaks** [1] - 1459:8

**BRETT** [1] - 1374:8

**BRIAN** [1] - 1373:18

**Brian** [1] - 1454:16

**brief** [1] - 1449:23

**briefing** [1] - 1404:15

**brilliant** [6] - 1463:19, 1463:20, 1463:24, 1464:2, 1464:3, 1470:10

**bring** [17] - 1405:6, 1408:2, 1409:15, 1450:2, 1474:22, 1476:5, 1476:11, 1481:2, 1481:4, 1488:10, 1512:1, 1544:9, 1552:3, 1552:6, 1552:7, 1557:22, 1560:16

**bringing** [2] - 1481:6, 1548:1

**brings** [1] - 1383:3

**broken** [3] - 1512:21, 1516:15, 1526:11

**Brothers** [1] - 1563:6

**brought** [14] - 1390:12, 1454:11, 1491:18, 1491:21, 1495:21, 1496:1, 1505:10, 1505:11, 1515:17, 1516:3, 1516:16, 1543:22, 1551:21, 1557:24

**building** [3] - 1420:7, 1436:8, 1487:23

**built** [3] - 1454:9, 1502:14, 1502:18

**bunch** [5] - 1475:12, 1475:23, 1488:13, 1509:16, 1519:23

**burden** [9] - 1418:19, 1418:21, 1418:23, 1419:1, 1419:5, 1440:1, 1445:6, 1447:3, 1533:17

**business** [1]...

---

1443:13, 1443:23, 1444:4, 1481:12, 1481:13, 1481:15, 1481:17, 1483:15, 1484:19, 1502:22

**buy** [1] - 1537:11

**buys** [1] - 1455:15

**BY** [8] - 1373:18, 1373:21, 1373:22, 1373:22, 1373:23, 1374:4, 1374:7, 1374:8

**C.A** [1] - 1373:5

**cake** [1] - 1456:16

**calculated** [1] - 1440:10

**calculating** [1] - 1396:8

**calculation** [3] - 1403:19, 1439:9, 1460:7

**calculations** [1] - 1403:4

**California** [3] - 1454:13, 1464:11, 1470:11

**candor** [1] - 1429:9

**cannot** [12] - 1376:6, 1381:10, 1403:11, 1413:6, 1426:12, 1441:23, 1447:9, 1447:20, 1501:23, 1502:2, 1549:18, 1557:15

**captioned** [1] - 1567:12

**capturing** [1] - 1470:7

**cared** [1] - 1455:9

**careful** [3] - 1424:17, 1493:20, 1551:2

**carefully** [6] - 1410:9, 1489:5, 1489:14, 1549:17, 1551:3, 1554:18

**carving** [2] - 1420:8, 1420:10

**case** [65] - 1386:15, 1395:17, 1400:11, 1401:19, 1402:18, 1402:22, 1409:24, 1410:13, 1410:23, 1411:17, 1412:12, 1412:19, 1416:12, 1417:12, 1417:14, 1418:19, 1420:23, 1420:24, 1425:1, 1425:9, 1426:17, 1438:18, 1440:10, 1440:19, 1443:18, 1446:19, 1449:6,

---

1452:23, 1455:3, 1456:1, 1461:19, 1461:21, 1466:15, 1468:14, 1472:16, 1474:8, 1476:24, 1477:1, 1477:16, 1484:18, 1484:19, 1493:17, 1504:18, 1534:10, 1543:10, 1545:21, 1545:22, 1547:5, 1554:23, 1555:1, 1555:4, 1555:9, 1555:13, 1555:14, 1557:3, 1557:13, 1557:14, 1557:17, 1557:18, 1558:17, 1559:24, 1561:3, 1565:16

**cases** [4] - 1381:14, 1381:20, 1419:13, 1452:10

**Castle** [1] - 1567:2

**Castleman** [31] - 1458:22, 1461:23, 1462:6, 1462:10, 1462:21, 1463:1, 1467:15, 1468:4, 1468:8, 1470:5, 1471:16, 1484:10, 1485:16, 1487:5, 1487:14, 1491:17, 1494:8, 1500:23, 1505:7, 1510:23, 1512:1, 1514:21, 1515:18, 1516:16, 1516:24, 1530:22, 1542:22, 1543:2, 1552:3, 1553:7, 1553:9

**category** [1] - 1480:16

**causes** [1] - 1476:21

**CD** [11] - 1527:24, 1528:5, 1529:2, 1529:7, 1529:21, 1529:24, 1545:4, 1548:6, 1550:17

**CD's** [1] - 1453:16

**CD-ROM** [7] - 1527:24, 1528:5, 1529:21, 1545:4, 1548:6

**CD-ROMs** [5] - 1529:2, 1529:7, 1529:24

**cell** [1] - 1557:6

**cent** [3] - 1401:15, 1401:24, 1402:23

**centers** [1] - 1537:11

**centrally** [1] - 1421:18

**cents** [1] - 1486:18

---

**CEO** [1] - 1519:10

**Certain** [1] - 1415:15

**certain** [9] - 1382:17, 1394:5, 1413:1, 1417:17, 1417:23, 1421:3, 1430:5, 1430:8, 1557:4

**certainly** [5] - 1396:19, 1459:16, 1472:12, 1474:7, 1544:24

**certainty** [1] - 1440:4

**CERTIFICATE** [1] - 1567:5

**Certified** [1] - 1567:8

**certify** [1] - 1567:9

**challenged** [2] - 1489:19, 1489:20

**challenges** [3] - 1550:6, 1550:14

**challenging** [1] - 1486:23

**chance** [3] - 1387:14, 1406:11, 1541:9

**change** [8] - 1383:21, 1383:23, 1384:10, 1385:5, 1385:11, 1405:12, 1508:9, 1555:5

**changed** [1] - 1544:23

**changes** [8] - 1383:14, 1385:15, 1386:4, 1386:24, 1387:5, 1387:8, 1387:11, 1387:12

**changing** [1] - 1531:23

**chapter** [1] - 1549:24

**characterized** [2] - 1483:12, 1483:13

**charge** [2] - 1375:3, 1555:23

**charged** [3] - 1455:7, 1455:10, 1538:7

**charging** [1] - 1455:15

**charts** [1] - 1458:10

**chatroom** [1] - 1557:10

**check** [7] - 1388:5, 1453:5, 1453:10, 1453:23, 1471:20, 1476:22, 1518:21

**checked** [6] - 1452:21, 1452:24, 1472:6, 1530:15, 1544:13, 1545:7

**checks** [1] - 1545:8

**child** [5] - 1511:10, 1511:12, 1514:9, 1514:10, 1514:17

**children** [4] - 1423:22, 1506:18, 1511:5, 1511:7
**choice** [3] - 1547:20, 1547:23
**choose** [1] - 1446:10
**chooses** [1] - 1511:16
**chose** [1] - 1455:19
**Chrome** [1] - 1451:22
**chunky** [1] - 1488:14
**Circuit** [2] - 1381:14, 1381:20
**circumstances** [3] - 1413:6, 1432:18, 1445:10
**cite** [1] - 1381:13
**Claim** [33] - 1434:9, 1470:24, 1471:5, 1471:11, 1471:12, 1471:20, 1471:21, 1501:14, 1501:16, 1501:24, 1502:1, 1504:9, 1508:5, 1512:15, 1515:9, 1517:21, 1517:24, 1561:11, 1561:12, 1561:23, 1561:24, 1562:14, 1562:15, 1562:21
**claim** [139] - 1375:12, 1382:3, 1382:14, 1382:17, 1382:18, 1382:20, 1382:24, 1385:22, 1418:6, 1418:12, 1419:2, 1419:4, 1419:8, 1420:1, 1420:6, 1420:12, 1420:16, 1420:18, 1421:3, 1421:4, 1421:12, 1421:14, 1421:18, 1421:22, 1422:4, 1422:10, 1422:16, 1423:10, 1423:18, 1423:20, 1423:23, 1424:4, 1424:7, 1424:11, 1424:23, 1425:4, 1425:6, 1425:7, 1425:8, 1425:9, 1425:10, 1425:13, 1425:14, 1425:15, 1425:16, 1425:17, 1425:19, 1425:20, 1425:22, 1425:24, 1426:2, 1426:5, 1426:6, 1426:7, 1426:8, 1426:9, 1426:10, 1426:12, 1426:22, 1427:3, 1427:10,
1427:12, 1427:14, 1427:15, 1427:19, 1427:22, 1427:24, 1428:1, 1428:8, 1428:11, 1428:14, 1428:19, 1429:8, 1431:13, 1431:14, 1431:18, 1431:19, 1432:8, 1432:10, 1434:19, 1434:20, 1435:23, 1438:5, 1439:3, 1439:11, 1447:15, 1448:11, 1462:7, 1462:15, 1462:20, 1462:24, 1465:18, 1465:20, 1467:3, 1471:12, 1493:4, 1493:15, 1493:18, 1494:2, 1495:19, 1496:4, 1497:3, 1497:21, 1499:5, 1499:7, 1499:8, 1499:13, 1499:15, 1499:22, 1501:19, 1501:20, 1501:21, 1501:22, 1508:5, 1514:11, 1516:1, 1518:5, 1519:15, 1519:19, 1524:11, 1524:16, 1524:17, 1527:16, 1531:23, 1532:19, 1532:21, 1533:14, 1541:7, 1553:22
**claim(s** [2] - 1425:18, 1426:1
**Claimant** [2] - 1477:4
**claimed** [42] - 1417:23, 1419:20, 1428:5, 1429:21, 1431:16, 1431:21, 1431:23, 1434:16, 1434:23, 1435:2, 1435:5, 1435:8, 1435:22, 1436:2, 1436:12, 1436:14, 1436:16, 1436:19, 1436:22, 1437:4, 1437:9, 1437:12, 1437:16, 1437:18, 1438:1, 1438:4, 1438:7, 1438:20, 1440:13, 1446:16, 1446:18, 1446:24, 1447:1, 1447:6, 1447:11, 1472:12, 1492:10, 1504:17, 1524:19, 1549:4
**claims** [86] - 1385:8, 1417:15, 1418:2, 1418:6, 14
1418:11, 1419:18, 1419:20, 1419:23, 1420:1, 1420:2, 1420:3, 1420:21, 1421:2, 1421:4, 1421:6, 1424:15, 1424:18, 1425:2, 1425:3, 1425:11, 1425:12, 1425:22, 1426:11, 1426:16, 1426:22, 1426:23, 1427:4, 1427:18, 1428:10, 1428:17, 1428:23, 1429:5, 1429:14, 1431:13, 1432:6, 1433:16, 1433:19, 1433:23, 1434:4, 1438:14, 1439:2, 1450:22, 1461:15, 1461:20, 1461:22, 1461:24, 1462:4, 1470:3, 1471:15, 1493:21, 1494:5, 1494:8, 1494:12, 1496:14, 1500:16, 1501:15, 1501:17, 1501:22, 1501:24, 1502:2, 1504:20, 1517:19, 1524:22, 1525:18, 1526:3, 1526:9, 1526:22, 1531:8, 1531:10, 1531:13, 1531:20, 1533:21, 1541:8, 1553:3, 1561:11, 1561:22, 1562:14, 1565:2, 1565:5, 1565:8
**Claims** [3] - 1417:21, 1501:15, 1519:13
**clarification** [4] - 1382:12, 1383:2, 1403:21, 1406:19
**clarity** [1] - 1383:6
**cleanly** [1] - 1488:10
**clear** [36] - 1418:23, 1419:6, 1419:9, 1419:13, 1429:6, 1429:7, 1430:23, 1432:3, 1432:9, 1433:10, 1438:24, 1469:12, 1472:10, 1476:3, 1476:6, 1504:15, 1504:21, 1521:10, 1521:15, 1524:2, 1525:24, 1526:20, 1530:7, 1531:18, 1533:21, 1544:11, 1545:10, 1548:11, 1548:13,
1550:18, 1550:22, 1561:14, 1561:20, 1562:6, 1562:12, 1562:20
**clerk** [3] - 1386:23, 1388:12, 1559:22
**clicked** [1] - 1528:2
**clock** [1] - 1451:21
**close** [1] - 1544:19
**closely** [1] - 1399:15
**closer** [1] - 1496:21
**closing** [24] - 1387:21, 1389:6, 1402:2, 1403:5, 1405:6, 1406:24, 1408:11, 1408:13, 1408:20, 1408:24, 1409:2, 1410:4, 1411:2, 1412:7, 1449:4, 1449:7, 1449:9, 1449:11, 1449:21, 1450:6, 1450:14, 1504:14, 1545:22
**CNN** [1] - 1503:6
**coarse** [15] - 1464:23, 1465:6, 1465:15, 1465:16, 1492:9, 1498:2, 1498:3, 1498:5, 1498:8, 1498:9, 1498:11, 1498:16, 1498:22, 1499:1, 1499:3
**code** [80] - 1450:21, 1461:6, 1461:12, 1461:13, 1461:14, 1462:5, 1462:12, 1462:16, 1462:17, 1463:2, 1463:18, 1463:22, 1464:1, 1464:13, 1464:14, 1465:9, 1465:11, 1465:14, 1465:19, 1465:23, 1466:1, 1466:2, 1466:6, 1466:10, 1467:10, 1468:9, 1470:6, 1470:11, 1470:12, 1470:15, 1470:18, 1471:1, 1471:17, 1472:19, 1473:18, 1473:19, 1473:23, 1475:10, 1475:15, 1475:17, 1475:18, 1475:19, 1476:4, 1476:10, 1476:17, 1476:20, 1478:15, 1478:16, 1478:18, 1478:21, 1491:12, 1505:15, 1505:16, 1505:18, 1505:19,
1505:20, 1506:2, 1506:3, 1509:16, 1510:5, 1510:7, 1510:11, 1512:5, 1514:23, 1522:19, 1522:22, 1523:9, 1542:18, 1542:19, 1542:21, 1542:23, 1543:2, 1543:13, 1543:22, 1543:23, 1549:4, 1546:14, 1552:23
**colleagues** [1] - 1502:17
**collected** [1] - 1532:12
**collects** [1] - 1448:13
**combination** [6] - 1434:10, 1435:24, 1437:4, 1444:19, 1532:22, 1562:22
**combine** [1] - 1436:13
**combining** [1] - 1436:22
**coming** [4] - 1470:10, 1484:2, 1487:24, 1518:18
**comment** [7] - 1390:23, 1393:9, 1403:8, 1462:13, 1563:12, 1563:13
**comments** [5] - 1413:17, 1462:2, 1511:5, 1543:5, 1543:7
**commercial** [5] - 1433:2, 1437:15, 1442:15, 1442:22, 1443:4
**commercially** [1] - 1437:11
**common** [3] - 1412:15, 1412:17, 1563:22
**communicate** [4] - 1557:1, 1557:12, 1557:17, 1557:20
**communication** [3] - 1456:11, 1457:11, 1539:19
**communications** [2] - 1456:21, 1534:18
**community** [1] - 1555:15
**companies** [3] - 1390:12, 1451:4, 1539:16
**company** [5] - 1379:7, 1399:23, 1454:22, 1454:24, 1502:20

**company's** [1] - 1400:9
**comparability** [2] - 1445:22, 1485:24
**comparable** [10] - 1445:3, 1445:7, 1445:8, 1446:7, 1484:11, 1485:6, 1485:14, 1535:23, 1535:24, 1536:2
**comparatively** [1] - 1550:8
**compare** [4] - 1427:19, 1508:10, 1511:7, 1524:10
**compared** [3] - 1506:21, 1524:7, 1545:11
**comparing** [1] - 1504:19
**compensate** [3] - 1439:13, 1439:16, 1477:5
**compensated** [2] - 1532:12, 1532:16
**compensation** [1] - 1418:15
**competing** [1] - 1378:14
**competitive** [2] - 1539:11, 1539:14
**complete** [1] - 1433:7
**completely** [4] - 1513:15, 1513:19, 1523:19, 1523:20
**complex** [3] - 1466:5, 1466:11, 1479:6
**complicated** [2] - 1499:11, 1513:4
**comprehend** [1] - 1412:3
**comprising** [2] - 1424:4, 1424:5
**computer** [14] - 1435:12, 1459:4, 1459:10, 1495:5, 1495:12, 1499:16, 1499:18, 1500:1, 1500:7, 1507:1, 1528:1, 1557:4, 1557:8
**Computing** [1] - 1528:22
**conceal** [1] - 1433:14
**concept** [1] - 1527:6
**concern** [6] - 1384:11, 1384:12, 1386:14, 1392:14, 1393:10, 1481:2
**concerned** [2] -

1401:1, 1401:2
**concerning** [8] - 1376:4, 1377:19, 1413:18, 1414:6, 1429:9, 1440:1, 1441:22, 1519:17
**concerns** [3] - 1381:4, 1381:6, 1388:20
**conclude** [6] - 1413:23, 1428:18, 1433:21, 1438:15, 1448:14, 1553:22
**conclusion** [2] - 1517:1, 1553:18
**conclusions** [2] - 1412:16, 1552:14
**conduct** [4] - 1556:1, 1556:5, 1557:13, 1565:3
**confer** [2] - 1389:15, 1392:1
**conference** [7] - 1375:3, 1526:8, 1529:18, 1529:21, 1529:22, 1548:9, 1550:17
**confidence** [1] - 1553:15
**confidential** [5] - 1432:17, 1478:12, 1478:16, 1522:22, 1546:3
**confines** [1] - 1404:18
**confirm** [1] - 1461:4
**conformed** [1] - 1406:14
**confuse** [1] - 1399:3
**confusing** [6] - 1383:12, 1383:18, 1384:5, 1384:19, 1386:9, 1407:13
**confusion** [1] - 1409:8
**congratulate** [2] - 1563:14, 1563:18
**conjectural** [1] - 1447:9
**connection** [7] - 1400:10, 1403:5, 1433:20, 1438:8, 1438:13, 1516:11, 1516:14
**connections** [1] - 1390:8
**consequences** [1] - 1554:21
**consider** [43] - 1402:14, 1408:19, 1410:20, 1411:18, 1411:22, 1412:11, 1414:17, 1416:19

1428:15, 1431:9, 1433:20, 1434:24, 1436:10, 1436:15, 1442:5, 1442:7, 1443:17, 1443:19, 1444:6, 1445:8, 1446:10, 1452:22, 1466:5, 1470:15, 1477:20, 1477:21, 1477:22, 1484:24, 1485:22, 1486:20, 1486:23, 1487:1, 1514:22, 1514:24, 1519:2, 1533:9, 1539:3, 1540:4, 1549:7, 1549:8, 1554:18, 1555:13
**consideration** [5] - 1413:10, 1476:12, 1486:24, 1555:2, 1559:17
**considered** [12] - 1376:6, 1377:22, 1413:13, 1427:7, 1427:18, 1429:10, 1438:17, 1441:13, 1441:24, 1453:4, 1474:7, 1492:15
**considering** [5] - 1388:7, 1412:23, 1435:24, 1440:22, 1535:6
**consistent** [2] - 1381:18, 1536:6
**constitute** [3] - 1430:11, 1433:22, 1439:23
**constitutes** [3] - 1383:20, 1526:2, 1561:21
**construction** [5] - 1382:4, 1382:14, 1382:24, 1420:1, 1421:4
**constructions** [4] - 1375:12, 1382:18, 1382:21, 1512:12
**construed** [1] - 1381:19
**consult** [1] - 1436:17
**consuming** [1] - 1558:12
**contacted** [2] - 1503:8, 1503:15
**contain** [1] - 1519:13
**contained** [2] - 1421:24, 1422:2
**containing** [2] - 1424:5, 1529:21
**contains** [1] - 1519:21

**contend** [2] - 1428:5, 1504:16
**contends** [14] - 1417:15, 1417:20, 1417:22, 1418:1, 1418:3, 1418:7, 1430:5, 1430:10, 1431:12, 1432:4, 1433:15, 1433:23, 1434:4, 1434:9
**content** [1] - 1435:3
**contentions** [2] - 1411:6, 1417:12
**contents** [1] - 1530:11
**contested** [5] - 1465:2, 1471:10, 1471:13, 1471:14, 1471:18
**context** [13] - 1390:5, 1390:7, 1391:15, 1399:5, 1403:8, 1499:12, 1499:16, 1506:9, 1510:8, 1514:7, 1533:24, 1534:3, 1535:16
**continue** [1] - 1540:1
**CONTINUED** [1] - 1374:1
**contradict** [2] - 1552:13, 1553:6
**contradictory** [1] - 1414:23
**contrary** [1] - 1412:22
**contributed** [1] - 1392:12
**contributes** [3] - 1378:20, 1379:3, 1447:18
**contribution** [2] - 1475:6, 1490:3
**contributions** [1] - 1537:9
**controlled** [1] - 1554:16
**conversation** [3] - 1401:2, 1485:10, 1559:4
**converting** [2] - 1497:4, 1497:9
**conviction** [2] - 1419:8, 1429:8
**convinced** [1] - 1555:6
**convincing** [32] - 1418:24, 1419:6, 1419:10, 1419:14, 1429:6, 1430:23, 1432:3, 1432:9, 1433:11, 1438:24, 1472:11 1476:3,

1476:6, 1521:11, 1521:16, 1524:2, 1525:24, 1526:21, 1530:7, 1531:18, 1533:21, 1544:11, 1545:10, 1548:11, 1548:14, 1550:18, 1550:23, 1561:14, 1561:20, 1562:6, 1562:12, 1562:20
**cool** [3] - 1451:9, 1496:1, 1537:21
**coordinate** [6] - 1497:4, 1497:5, 1497:9, 1497:10, 1497:14, 1531:24
**coordinates** [1] - 1423:18
**copied** [3] - 1428:5, 1503:11, 1504:16
**copies** [2] - 1388:16, 1449:1
**copy** [7] - 1375:23, 1387:10, 1397:19, 1410:15, 1529:8, 1554:11, 1558:7
**copying** [7] - 1389:4, 1390:13, 1391:9, 1391:13, 1391:14, 1391:17, 1391:19
**corner** [1] - 1454:7
**corporate** [1] - 1454:14
**corporation** [1] - 1555:17
**corporations** [1] - 1555:19
**correct** [10] - 1382:7, 1382:8, 1386:1, 1421:6, 1440:3, 1462:11, 1498:17, 1515:10, 1547:19, 1564:23
**corrected** [2] - 1388:18, 1532:16
**correspond** [1] - 1557:16
**corroboration** [1] - 1523:8
**cost** [1] - 1438:10
**counsel** [7] - 1375:2, 1393:15, 1397:18, 1400:6, 1405:21, 1559:2, 1565:21
**Counsel** [2] - 1373:24, 1374:9
**counts** [1] - 1462:17
**County** [1] - 1567:2
**couple** [7] - 1383:14, 1405:15, 1406:16,

1475:23, 1496:7,
1528:11, 1545:16
**course** [14] - 1414:11,
1454:1, 1459:12,
1471:2, 1473:15,
1473:19, 1473:21,
1487:9, 1503:20,
1510:5, 1510:15,
1538:10, 1542:5,
1564:11
**COURT** [97] - 1373:1,
1375:1, 1377:9,
1378:9, 1379:12,
1379:16, 1380:4,
1380:20, 1381:16,
1382:1, 1382:19,
1383:3, 1384:1,
1384:19, 1385:1,
1385:4, 1385:14,
1385:20, 1386:10,
1386:18, 1386:20,
1387:24, 1388:4,
1388:10, 1388:24,
1390:14, 1390:17,
1391:1, 1391:16,
1392:17, 1392:20,
1393:8, 1393:17,
1394:1, 1394:7,
1394:17, 1395:2,
1395:9, 1395:16,
1396:4, 1396:13,
1397:1, 1397:10,
1398:1, 1398:7,
1398:11, 1399:1,
1400:12, 1401:23,
1402:3, 1402:24,
1403:14, 1404:12,
1404:23, 1405:5,
1405:9, 1405:17,
1406:9, 1406:16,
1406:20, 1407:4,
1407:8, 1407:19,
1407:24, 1408:12,
1409:4, 1409:14,
1409:21, 1449:15,
1449:20, 1449:24,
1450:5, 1450:11,
1450:13, 1450:18,
1490:20, 1491:1,
1541:19, 1551:7,
1554:5, 1558:20,
1558:23, 1559:11,
1559:18, 1559:20,
1560:10, 1560:13,
1560:21, 1560:23,
1561:2, 1561:5,
1563:10, 1564:6,
1565:1, 1565:7,
1565:17, 1565:20
**court** [7] - 1413:16,
1454:7, 1492:6,

1499:6, 1561:6,
1565:21, 1565:22
**Court** [31] - 1373:14,
1375:2, 1383:7,
1388:14, 1392:5,
1421:1, 1477:4,
1493:16, 1493:19,
1501:18, 1504:15,
1512:11, 1518:9,
1521:2, 1521:5,
1528:8, 1528:14,
1533:11, 1534:1,
1534:2, 1535:5,
1551:16, 1555:24,
1556:4, 1558:17,
1558:22, 1559:16,
1563:11, 1563:12,
1563:18, 1566:3
**Court's** [8] - 1375:12,
1375:24, 1380:16,
1401:18, 1406:14,
1420:1, 1420:20,
1421:4
**courtroom** [4] -
1409:19, 1449:14,
1502:7, 1558:1
**Courtroom** [1] -
1373:10
**Courts** [1] - 1381:18
**cover** [1] - 1427:13
**covered** [7] - 1425:6,
1426:1, 1426:3,
1427:4, 1438:14,
1445:18, 1445:21
**covers** [5] - 1420:6,
1420:16, 1425:8,
1425:21, 1427:15
**create** [3] - 1436:24,
1454:24, 1481:7
**created** [5] - 1468:15,
1468:19, 1469:5,
1470:9, 1503:2
**creates** [1] - 1507:6
**credibility** [4] -
1413:12, 1415:8,
1415:14, 1416:20
**credit** [11] - 1394:14,
1396:10, 1402:10,
1402:13, 1452:7,
1459:22, 1488:1,
1488:4, 1490:2,
1497:1
**criminal** [1] - 1419:13
**criteria** [2] - 1511:11,
1511:13
**critical** [2] - 1482:11,
1521:19
**criticized** [1] -
1509:15
**cross** [1] - 1524:24

**cross-examination** [1]
- 1524:24
**cumulative** [1] -
1390:1
**current** [2] - 1382:18,
1442:23
**customer** [1] -
1394:12
**customers** [6] -
1454:15, 1455:7,
1455:10, 1460:22,
1468:12, 1469:10
**cutting** [2] - 1420:8,
1420:10
**Dale** [3] - 1567:7,
1567:19, 1567:20
**damage** [1] - 1401:21
**damages** [54] -
1378:8, 1378:19,
1379:10, 1401:5,
1401:8, 1404:5,
1417:19, 1418:8,
1418:15, 1418:21,
1439:1, 1439:5,
1439:6, 1439:10,
1439:12, 1439:16,
1439:18, 1439:20,
1439:21, 1440:1,
1440:4, 1440:5,
1440:7, 1440:9,
1446:15, 1446:18,
1447:1, 1447:3,
1447:5, 1447:11,
1447:13, 1447:16,
1447:17, 1447:20,
1447:22, 1448:3,
1448:8, 1460:7,
1476:24, 1477:5,
1477:15, 1478:5,
1482:1, 1482:22,
1485:1, 1485:21,
1486:24, 1487:2,
1490:13, 1533:12,
1540:14, 1540:16,
1546:20
**Damages** [1] - 1478:1
**DARIN** [1] - 1374:7
**data** [36] - 1421:12,
1421:13, 1421:15,
1421:16, 1421:19,
1421:20, 1422:5,
1422:7, 1422:20,
1423:1, 1423:5,
1423:8, 1423:13,
1423:17, 1423:19,
1423:21, 1467:21,
1480:14, 1486:22,
1487:16, 1487:19,
1487:23, 1488:2,
1488:4, 1488:19,

1495:13, 1496:19,
1505:2, 1505:4,
1506:14, 1515:3,
1522:2, 1532:12,
1537:11, 1550:7,
1550:12
**date** [16] - 1375:16,
1376:19, 1376:20,
1377:1, 1377:5,
1377:21, 1382:6,
1392:9, 1393:11,
1411:11, 1430:2,
1430:4, 1430:9,
1521:19, 1522:9
**dated** [2] - 1392:6,
1396:3
**dates** [1] - 1522:6
**days** [1] - 1450:21
**deal** [3] - 1483:6,
1486:4, 1518:15
**dealing** [2] - 1523:10,
1526:13
**December** [15] -
1429:24, 1430:2,
1430:3, 1430:7,
1430:21, 1431:4,
1433:12, 1497:18,
1521:12, 1521:19,
1524:4, 1528:17,
1530:8, 1561:16,
1562:8
**decide** [28] - 1384:20,
1385:7, 1416:7,
1418:9, 1418:12,
1418:14, 1420:16,
1420:18, 1420:23,
1424:21, 1445:3,
1465:2, 1470:23,
1470:24, 1472:7,
1476:12, 1477:24,
1478:6, 1486:19,
1489:1, 1489:14,
1490:1, 1492:7,
1493:24, 1518:13,
1536:18, 1555:1,
1555:13
**decided** [5] - 1451:2,
1451:11, 1451:12,
1454:24, 1547:6
**decides** [1] - 1466:3
**deciding** [6] - 1416:8,
1421:8, 1428:22,
1445:7, 1545:10,
1546:21
**decision** [13] - 1380:1,
1380:16, 1381:18,
1408:22, 1452:3,
1455:24, 1456:4,
1473:5, 1542:9,
1542:17, 1543:10,

1551:4
**decisions** [1] -
1536:22
**declaration** [1] -
1519:9
**decreased** [1] -
1443:20
**deductions** [1] -
1412:16
**default** [2] - 1465:15,
1466:2
**Defendant** [1] -
1373:7
**Defendants** [1] -
1374:9
**defense** [3] - 1419:6,
1419:9, 1456:19
**defenses** [3] -
1564:21, 1565:6,
1565:7
**defer** [1] - 1551:11
**define** [11] - 1420:20,
1424:19, 1471:2,
1473:15, 1473:19,
1473:22, 1493:22,
1494:12, 1503:20,
1510:5, 1510:15
**defined** [2] - 1424:12,
1471:3
**definitions** [5] -
1420:22, 1421:3,
1421:5, 1421:7,
1421:11
**degree** [1] - 1435:9
**degrees** [1] - 1435:14
**DELAWARE** [1] -
1373:2
**Delaware** [3] -
1373:12, 1464:5,
1567:1
**deliberate** [4] -
1410:5, 1554:9,
1555:22, 1558:19
**deliberating** [1] -
1412:3
**deliberation** [1] -
1459:4
**deliberations** [12] -
1387:4, 1410:3,
1410:11, 1410:16,
1449:3, 1490:15,
1556:2, 1556:3,
1556:24, 1557:19,
1558:7, 1558:9
**deliver** [1] - 1450:6
**delivering** [1] - 1449:6
**demo** [2] - 1502:14,
1502:18
**demonstrate** [1] -
1513:23

**demonstrated** [6] - 1513:20, 1520:24, 1521:18, 1521:22, 1526:7, 1527:21

**demonstration** [10] - 1389:13, 1389:20, 1389:21, 1389:24, 1390:11, 1496:11, 1497:23, 1521:20, 1522:17, 1563:20

**demonstrations** [4] - 1473:8, 1520:10, 1521:21, 1522:2

**Demonstrative** [1] - 1415:17

**demonstrative** [5] - 1406:23, 1407:1, 1407:10, 1415:17, 1415:21

**demonstratives** [1] - 1387:21

**departing** [1] - 1532:13

**dependent** [17] - 1425:2, 1425:12, 1425:17, 1425:19, 1425:20, 1425:22, 1425:24, 1426:2, 1426:4, 1426:6, 1426:7, 1426:8, 1501:15, 1501:18, 1501:24, 1525:17

**deposition** [7] - 1413:2, 1413:4, 1413:9, 1453:18, 1464:10, 1544:21

**depositions** [2] - 1453:20, 1559:15

**deputy** [1] - 1561:6

**describe** [8] - 1410:17, 1415:19, 1419:20, 1419:21, 1502:21, 1503:4, 1503:21, 1504:8

**described** [19] - 1398:19, 1418:5, 1434:18, 1464:21, 1464:24, 1502:10, 1506:4, 1513:13, 1519:12, 1522:1, 1522:16, 1522:23, 1524:23, 1526:12, 1527:6, 1547:14, 1552:20, 1553:2, 1553:20

**describes** [9] - 1465:19, 1483:14, 1491:7, 1496:13, 1507:10, 1511:21, 1532:6, 1532:8,

1532:11

**describing** [2] - 1464:20, 1523:12

**description** [9] - 1415:18, 1492:2, 1501:2, 1501:6, 1502:8, 1515:20, 1515:22, 1517:7, 1534:24

**descriptions** [3] - 1493:17, 1494:17, 1516:1

**deserve** [1] - 1473:8

**deserved** [1] - 1473:3

**deserves** [3] - 1397:7, 1415:8, 1415:14

**design** [2] - 1437:1, 1437:5

**designated** [1] - 1559:14

**designed** [2] - 1502:18, 1523:1

**desirability** [1] - 1436:21

**desire** [2] - 1508:3, 1523:16

**desired** [7] - 1422:18, 1422:23, 1423:12, 1423:16, 1444:4, 1507:4, 1513:3

**desk** [1] - 1549:2

**desktop** [1] - 1459:14

**despite** [1] - 1538:13

**detail** [21] - 1414:22, 1421:23, 1422:2, 1442:10, 1456:10, 1457:14, 1466:5, 1472:19, 1472:23, 1473:3, 1473:9, 1479:19, 1500:11, 1502:16, 1508:1, 1508:2, 1511:8, 1511:11, 1511:13, 1516:12, 1534:18

**detailed** [2] - 1473:17, 1473:18

**determination** [4] - 1378:8, 1379:9, 1442:8, 1444:18

**determinations** [1] - 1408:9

**determine** [19] - 1398:6, 1405:10, 1425:8, 1425:20, 1426:14, 1427:20, 1429:13, 1429:15, 1435:18, 1439:4, 1441:8, 1441:18, 1443:23, 1448:15, 1448:18, 1448:20

1452:7, 1490:10, 1546:20

**determined** [4] - 1396:11, 1421:1, 1460:5, 1487:3

**determining** [18] - 1376:7, 1376:9, 1377:22, 1378:6, 1394:13, 1411:16, 1414:2, 1427:7, 1429:11, 1432:14, 1434:23, 1438:19, 1441:4, 1441:24, 1442:2, 1442:4, 1444:9, 1533:4

**developed** [5] - 1455:5, 1469:22, 1501:9, 1521:4

**developers** [1] - 1550:5

**development** [6] - 1427:6, 1435:10, 1435:11, 1481:16, 1481:18, 1504:13

**device** [4] - 1422:13, 1422:15, 1496:6, 1557:6

**devices** [1] - 1443:1

**diagram** [1] - 1470:8

**differ** [1] - 1556:15

**difference** [4] - 1400:2, 1511:14, 1514:20, 1514:21

**differences** [4] - 1435:4, 1435:21, 1446:12, 1527:4

**different** [35] - 1399:5, 1414:9, 1415:4, 1456:16, 1457:6, 1459:8, 1462:16, 1462:18, 1466:21, 1470:6, 1474:16, 1475:23, 1487:6, 1487:20, 1491:6, 1491:10, 1492:2, 1492:10, 1492:24, 1493:12, 1498:19, 1503:21, 1503:23, 1504:11, 1507:7, 1509:19, 1511:20, 1511:22, 1513:16, 1517:1, 1517:11, 1528:12, 1532:16, 1537:2, 1553:19

**differently** [3] - 1513:19, 1541:16, 1555:8

**differs** [1] - 1415:20

**difficult** [4] - 1412:2, 1477:23, 1478:5,

1558:12

**difficulties** [1] - 1537:17

**difficulty** [2] - 1473:5, 1539:4

**digital** [1] - 1435:12

**diligence** [1] - 1431:3

**dining** [1] - 1502:18

**direct** [4] - 1392:4, 1477:9, 1510:23, 1511:3

**directed** [1] - 1556:10

**directly** [2] - 1493:15, 1520:21

**director** [1] - 1528:21

**disagree** [3] - 1462:22, 1462:23, 1533:22

**disagreement** [1] - 1548:13

**disagreements** [1] - 1380:9

**discern** [1] - 1381:10

**discharge** [1] - 1564:2

**discharged** [1] - 1556:9

**disclose** [5] - 1429:20, 1524:11, 1532:1, 1556:11, 1558:2

**disclosed** [3] - 1434:18, 1435:21, 1525:20

**disclosing** [2] - 1525:18, 1550:3

**disclosures** [3] - 1431:24, 1436:2, 1524:7

**discouraged** [1] - 1412:4

**discredited** [2] - 1414:23, 1415:6

**discuss** [8] - 1387:22, 1402:10, 1442:10, 1477:16, 1545:23, 1554:23, 1557:18, 1560:15

**discussed** [10] - 1376:16, 1379:18, 1380:14, 1399:16, 1404:19, 1417:10, 1478:24, 1481:11, 1486:6, 1547:2

**discussing** [2] - 1388:21, 1555:4

**discussion** [2] - 1540:16, 1550:9

**dismiss** [2] - 1565:2, 1565:8

**display** [10] - 1422:13, 1422:15, 1507:21,

1508:1, 1508:3, 1513:9, 1513:15, 1514:13, 1543:21, 1552:21

**displayed** [3] - 1475:21, 1514:10, 1514:18

**displaying** [3] - 1422:8, 1422:11, 1511:2

**dispositive** [1] - 1443:16

**dispute** [16] - 1382:16, 1428:7, 1428:9, 1428:12, 1430:14, 1430:17, 1431:7, 1432:11, 1439:24, 1450:24, 1463:1, 1463:2, 1463:5, 1499:19, 1551:4, 1555:14

**disputes** [1] - 1527:20

**disputing** [1] - 1463:6

**disregard** [2] - 1416:23, 1437:14

**disseminated** [1] - 1430:24

**distinct** [1] - 1423:19

**distinctions** [1] - 1376:22

**distribute** [1] - 1539:5

**distributed** [5] - 1421:15, 1527:22, 1528:5, 1529:24, 1548:8

**DISTRICT** [2] - 1373:1, 1373:2

**District** [1] - 1373:14

**distrust** [1] - 1415:11

**divide** [8] - 1499:23, 1500:5, 1505:3, 1506:6, 1506:13, 1506:18, 1512:17, 1513:8

**divided** [2] - 1420:4, 1423:7

**dividing** [11] - 1422:16, 1422:21, 1423:3, 1423:11, 1423:14, 1424:8, 1506:12, 1507:11, 1512:16, 1512:20, 1514:3

**division** [2] - 1403:15, 1556:12

**divisions** [1] - 1514:5

**Doctor** [55] - 1468:6, 1468:8, 1468:10, 1468:17, 1468:20, 1469:2, 1469:5,

1469:8, 1469:13, 1470:5, 1470:17, 1471:1, 1471:15, 1472:12, 1472:14, 1473:2, 1473:11, 1474:6, 1475:16, 1475:17, 1476:10, 1500:23, 1501:1, 1505:7, 1506:1, 1506:23, 1509:11, 1509:15, 1510:4, 1510:10, 1510:22, 1510:23, 1511:18, 1511:22, 1512:1, 1512:2, 1513:20, 1514:21, 1515:14, 1515:18, 1516:8, 1516:16, 1516:20, 1516:23, 1516:24, 1517:3, 1551:23, 1552:3, 1552:13, 1553:1, 1553:4, 1553:7, 1553:9

**document** [40] - 1392:2, 1392:6, 1392:19, 1393:3, 1393:5, 1393:12, 1393:15, 1396:2, 1397:12, 1397:13, 1397:14, 1398:8, 1398:12, 1398:20, 1398:23, 1398:24, 1400:7, 1400:13, 1400:21, 1401:14, 1403:17, 1407:9, 1468:13, 1468:15, 1469:9, 1478:10, 1478:14, 1478:23, 1479:5, 1481:1, 1481:10, 1510:14, 1510:15, 1510:17, 1510:18, 1545:14, 1545:15, 1545:20, 1547:4

**documentation** [1] - 1520:10

**documents** [19] - 1397:19, 1415:1, 1450:22, 1457:18, 1457:22, 1458:3, 1468:19, 1475:13, 1475:14, 1478:13, 1479:10, 1481:10, 1483:2, 1489:11, 1521:1, 1525:5, 1546:13, 1548:2, 1551:21

**dollar** [1] - 1456:4

**dollars** [7] - 1455:18, 1455:20, 1456:8,

1537:10, 1538:3, 1540:6, 1545:17

**domain** [1] - 1523:7

**done** [17] - 1387:8, 1389:6, 1427:1, 1453:1, 1469:13, 1491:22, 1507:9, 1507:10, 1511:23, 1513:6, 1513:20, 1525:9, 1530:17, 1540:5, 1543:8, 1552:23, 1560:4

**double** [3] - 1388:4, 1393:2, 1404:4

**double-sided** [1] - 1393:2

**doubt** [3] - 1419:12, 1419:15, 1529:15

**down** [6] - 1459:8, 1465:13, 1469:21, 1473:20, 1500:11, 1507:4

**downgrading** [1] - 1504:7

**download** [3] - 1451:21, 1511:9, 1511:12

**downloads** [1] - 1482:18

**Dr** [47] - 1458:22, 1461:8, 1461:23, 1462:6, 1462:10, 1462:21, 1463:1, 1464:16, 1467:15, 1468:4, 1468:5, 1484:10, 1485:3, 1485:5, 1485:16, 1485:19, 1487:5, 1487:14, 1491:17, 1494:8, 1499:14, 1500:13, 1500:17, 1500:19, 1524:6, 1524:21, 1525:1, 1525:9, 1525:12, 1525:16, 1527:6, 1527:13, 1530:12, 1530:22, 1530:23, 1531:3, 1531:6, 1531:9, 1531:22, 1536:1, 1542:15, 1542:22, 1543:2, 1544:5, 1544:9, 1549:14

**draft** [6] - 1375:5, 1380:11, 1380:22, 1380:23, 1381:1, 1386:21

**draw** [3] - 1412:12, 1412:17, 1416:24

**drawing** [1] - 1508:17

**due** [5] - 1437:5, 1437:15, 1452:5, 1452:8, 1497:1

**duration** [1] - 1442:19

**during** [21] - 1389:14, 1392:3, 1408:20, 1410:16, 1410:20, 1414:10, 1417:4, 1417:8, 1417:10, 1449:2, 1453:4, 1453:10, 1518:24, 1521:24, 1538:13, 1556:2, 1556:5, 1556:14, 1557:19, 1558:6, 1558:9

**During** [2] - 1390:3, 1556:24

**duties** [1] - 1554:13

**duty** [3] - 1410:17, 1429:9, 1554:22

**DYK** [1] - 1373:13

**e-mail** [7] - 1377:20, 1377:23, 1378:2, 1378:5, 1402:8, 1504:2, 1534:22

**e-mails** [1] - 1456:22

**E-mails** [2] - 1457:14, 1523:13

**early** [2] - 1456:2, 1502:12

**earth** [6] - 1454:4, 1454:5, 1454:6, 1463:11, 1487:20, 1503:5

**Earth** [141] - 1378:3, 1378:20, 1379:2, 1392:11, 1392:12, 1393:14, 1393:20, 1393:21, 1393:23, 1394:6, 1396:14, 1397:23, 1399:8, 1417:17, 1417:18, 1417:20, 1418:1, 1424:22, 1427:20, 1427:23, 1428:13, 1428:18, 1440:20, 1447:18, 1448:2, 1448:11, 1448:12, 1448:23, 1451:2, 1451:7, 1451:20, 1455:17, 1458:9, 1458:13, 1458:14, 1458:21, 1458:24, 1459:7, 1459:9, 1459:10, 1459:11, 1459:13, 1459:24, 1460:9, 1460:15, 1460:19, 1462:4, 1463:8, 1463:16, 1463:18, 1464:19,

**Earth's** [2] - 1459:23, 1479:11

**EarthTracker** [2] - 1454:12, 1454:19

**EarthViewer** [3] - 1455:5, 1503:3, 1503:4

**easy** [3] - 1462:9, 1462:10, 1471:8

**economically** [1] - 1535:24

**education** [1] - 1435:13

**effect** [7] - 1404:3, 1404:8, 1416:18, 1416:21, 1442:17,

1466:8, 1470:4, 1470:6, 1470:23, 1471:5, 1471:15, 1477:10, 1479:1, 1479:12, 1480:3, 1481:4, 1481:14, 1482:19, 1483:18, 1483:19, 1486:14, 1487:6, 1487:9, 1487:10, 1487:14, 1487:17, 1488:1, 1488:4, 1488:6, 1488:8, 1488:10, 1488:15, 1488:16, 1488:23, 1489:1, 1489:15, 1489:22, 1491:6, 1491:9, 1492:8, 1492:24, 1493:24, 1499:2, 1499:19, 1501:9, 1501:13, 1501:24, 1502:3, 1502:4, 1503:9, 1503:10, 1504:7, 1504:19, 1505:8, 1505:14, 1506:21, 1508:6, 1508:8, 1508:16, 1509:1, 1510:14, 1511:1, 1511:15, 1511:21, 1512:3, 1512:4, 1512:8, 1513:11, 1513:23, 1515:15, 1515:21, 1516:3, 1516:6, 1517:10, 1517:18, 1517:21, 1517:24, 1533:19, 1534:11, 1537:6, 1537:17, 1537:20, 1538:17, 1540:24, 1541:2, 1541:6, 1541:15, 1542:17, 1546:1, 1547:19, 1553:19, 1561:10

**effective** [3] - 1393:7, 1395:12, 1481:5

**effort** [3] - 1538:14, 1554:23, 1563:16

**efforts** [1] - 1538:16

**Egbert** [1] - 1381:19

**eight** [4] - 1385:18, 1385:21, 1386:13, 1512:22

**either** [4] - 1441:11, 1495:20, 1518:2, 1557:24

**electronic** [2] - 1529:22, 1557:5

**electronically** [1] - 1557:16

**element** [7] - 1418:5, 1436:13, 1461:14, 1461:15, 1461:24, 1462:1, 1462:20

**elements** [8] - 1429:21, 1436:7, 1436:18, 1436:22, 1471:4, 1530:13, 1530:15, 1552:1

**embodiment** [1] - 1443:4

**emphasis** [1] - 1409:5

**emphasize** [1] - 1391:18

**employees** [2] - 1433:4, 1454:16

**encounter** [1] - 1473:11

**encourage** [1] - 1489:13

**end** [11] - 1404:13, 1419:19, 1444:16, 1457:16, 1469:24, 1495:16, 1508:11, 1513:5, 1513:6, 1517:14, 1545:21

**ends** [2] - 1386:11, 1386:13

**engineering** [1] - 1435:11

**engineers** [16] - 1462:3, 1463:19, 1463:20, 1463:23, 1464:2, 1464:3, 1464:7, 1464:9, 1464:10, 1468:13, 1469:11, 1470:10, 1537:13, 1543:5, 1543:6, 1543:7

**enjoying** [1] - 1464:5

**enormous** [2] - 1399:22, 1505:20

**enormously** [3] -

1480:13, 1481:8

1400:5, 1537:20, 1565:22

**enter** [5] - 1441:7, 1564:7, 1564:12, 1564:15, 1565:10

**entered** [4] - 1438:9, 1441:1, 1446:4, 1535:9

**entering** [1] - 1409:19

**Enterprise** [1] - 1538:7

**enters** [4] - 1450:12, 1536:9, 1536:24, 1560:22

**entertaining** [1] - 1460:21

**entire** [7] - 1399:23, 1468:21, 1500:11, 1507:5, 1522:24, 1538:13, 1539:1

**entirely** [2] - 1399:5, 1416:23

**entitled** [9] - 1413:10, 1418:8, 1439:5, 1440:7, 1447:22, 1448:2, 1477:12, 1555:17, 1556:21

**equal** [4] - 1438:11, 1555:14, 1555:15, 1555:19

**equally** [1] - 1423:21

**equals** [1] - 1555:20

**equivalent** [1] - 1435:9

**error** [1] - 1381:3

**errors** [2] - 1519:13, 1519:21

**especially** [1] - 1469:19

**ESQ** [10] - 1373:18, 1373:19, 1373:21, 1373:22, 1373:22, 1373:23, 1374:4, 1374:7, 1374:7, 1374:8

**essential** [7] - 1484:4, 1484:11, 1484:13, 1487:13, 1487:15, 1488:5, 1488:8

**establish** [3] - 1412:18, 1433:6, 1448:4

**established** [2] - 1438:16, 1442:21

**establishes** [2] - 1429:5, 1447:23

**establishing** [1] - 1447:3

**estimating** [1] - 1444:24

**evaluate** [1] - 1435:19

**evaluating** [1] - 1441:14

**event** [2] - 1439:10, 1477:6

**events** [2] - 1453:13, 1503:7

**Eventually** [1] - 1564:7

**eventually** [1] - 1564:2

**evidence** [164] - 1376:4, 1379:2, 1379:4, 1392:12, 1397:24, 1401:18, 1402:9, 1402:14, 1403:3, 1403:21, 1403:23, 1403:24, 1406:6, 1407:3, 1410:13, 1411:3, 1411:6, 1411:20, 1412:1, 1412:12, 1412:19, 1412:23, 1414:4, 1414:7, 1414:24, 1415:1, 1415:2, 1415:20, 1416:11, 1416:14, 1416:16, 1416:19, 1416:21, 1418:18, 1418:22, 1418:24, 1419:2, 1419:3, 1419:6, 1419:7, 1419:10, 1419:11, 1419:14, 1426:19, 1427:5, 1429:7, 1429:8, 1430:23, 1432:3, 1432:9, 1433:1, 1433:11, 1437:7, 1437:18, 1438:18, 1438:24, 1439:23, 1440:2, 1441:15, 1441:17, 1441:21, 1443:8, 1443:17, 1446:11, 1447:5, 1447:8, 1447:10, 1461:11, 1463:14, 1466:15, 1466:17, 1467:14, 1467:15, 1469:4, 1469:11, 1470:3, 1470:9, 1472:9, 1472:11, 1474:8, 1476:4, 1476:7, 1485:23, 1489:6, 1489:13, 1489:21, 1491:24, 1492:3, 1492:13, 1492:16, 1495:2, 1499:4, 1500:18, 1501:5, 1511:23, 1512:6, 1515:24, 1517:8,

1517:12, 1517:17, 1518:14, 1520:4, 1521:11, 1521:15, 1521:17, 1523:23, 1524:3, 1525:11, 1525:14, 1526:1, 1526:21, 1527:16, 1528:19, 1529:12, 1529:23, 1530:3, 1530:7, 1530:18, 1531:4, 1531:11, 1531:18, 1533:1, 1533:16, 1533:18, 1533:20, 1534:13, 1535:19, 1536:10, 1538:15, 1540:15, 1541:5, 1541:14, 1541:16, 1544:11, 1545:11, 1548:10, 1548:11, 1548:14, 1550:18, 1550:23, 1551:20, 1552:2, 1552:12, 1553:5, 1553:15, 1553:17, 1553:18, 1553:21, 1554:2, 1554:4, 1554:19, 1555:2, 1555:12, 1555:24, 1556:17, 1556:19, 1559:14, 1561:9, 1561:15, 1561:20, 1562:7, 1562:12, 1562:13, 1562:14

**Evidence** [1] - 1441:12

**evidently** [1] - 1463:23

**exact** [1] - 1468:3

**exactly** [10] - 1398:21, 1434:17, 1475:20, 1516:23, 1525:2, 1525:4, 1525:8, 1542:2, 1559:8

**examination** [1] - 1524:24

**examine** [1] - 1555:5

**examiner** [1] - 1453:4

**example** [8] - 1420:6, 1435:14, 1436:24, 1445:11, 1467:19, 1507:23, 1508:20, 1560:2

**examples** [1] - 1469:20

**exceeds** [1] - 1533:17

**except** [1] - 1548:20

**Except** [1] - 1557:3

**exception** [2] - 1380:8, 1382:2

**exchange** [1] - 1440:12

**exclude** [2] - 1424:20, 1493:23

**excluded** [2] - 1407:9, 1408:17

**excluding** [3] - 1406:22, 1407:1, 1407:2

**exclusive** [1] - 1442:11

**executing** [1] - 1514:5

**exercising** [1] - 1431:3

**Exhibit** [7] - 1375:24, 1383:7, 1388:14, 1388:15, 1399:18, 1407:18, 1459:15

**exhibit** [5] - 1399:17, 1406:3, 1469:5, 1415:21, 1510:18

**exhibits** [13] - 1405:21, 1411:20, 1411:24, 1412:5, 1412:14, 1415:15, 1415:16, 1415:17, 1489:8, 1555:23, 1557:4, 1558:5

**existed** [2] - 1495:15, 1497:16

**exits** [1] - 1564:5

**expect** [2] - 1547:16, 1554:17

**expectations** [2] - 1440:24, 1535:8

**experience** [6] - 1378:1, 1412:15, 1416:2, 1435:10, 1435:15, 1454:10

**experimentation** [1] - 1432:19

**expert** [20] - 1379:2, 1392:10, 1393:13, 1393:23, 1394:12, 1395:21, 1396:2, 1407:18, 1415:23, 1416:3, 1416:6, 1416:9, 1416:11, 1416:13, 1464:16, 1479:20, 1485:13, 1485:17, 1491:21, 1540:20

**expertise** [1] - 1485:12

**experts** [3] - 1412:2, 1443:15, 1547:11

**explain** [13] - 1430:16, 1474:20, 1491:9, 1491:20, 1492:7, 1499:15, 1505:22, 1507:17, 1510:1, 1517:2, 1517:9,

1533:23, 1544:1

**explained** [21] - 1420:24, 1468:4, 1480:24, 1491:22, 1505:8, 1508:23, 1509:12, 1510:11, 1513:21, 1514:6, 1515:15, 1515:16, 1520:23, 1525:9, 1525:16, 1527:14, 1529:1, 1535:15, 1551:23, 1552:17, 1552:18

**explanation** [8] - 1473:14, 1473:16, 1473:17, 1473:18, 1474:21, 1475:2, 1508:24, 1517:4

**explanations** [1] - 1492:18

**explicitly** [3] - 1447:11, 1510:19, 1532:1

**extend** [1] - 1564:14

**extends** [1] - 1382:15

**extent** [8] - 1375:11, 1380:23, 1407:11, 1431:1, 1441:14, 1443:7, 1460:10, 1557:3

**extra** [1] - 1518:19

**Facebook** [1] - 1557:11

**fact** [15] - 1379:3, 1410:19, 1411:16, 1412:21, 1414:6, 1429:4, 1474:4, 1494:23, 1496:5, 1508:19, 1518:12, 1521:16, 1523:11, 1547:18, 1549:10

**factor** [5] - 1414:21, 1438:13, 1443:16, 1537:18, 1539:4

**factors** [17] - 1402:10, 1402:12, 1437:15, 1438:12, 1438:17, 1438:21, 1442:7, 1443:18, 1443:19, 1445:9, 1477:17, 1477:18, 1477:22, 1478:6, 1535:13, 1535:14, 1535:18

**Factors** [2] - 1432:14, 1436:15

**facts** [10] - 1410:19, 1410:22, 1411:13, 1412:18, 1418:17, 1429:6, 1442:5, 1470:16, 1490:1,

1555:11
**factual** [1] - 1411:22
**failed** [4] - 1414:8, 1415:3, 1437:21, 1503:14
**Fair** [1] - 1394:21
**fair** [6] - 1412:9, 1496:24, 1518:22, 1540:19, 1540:20, 1555:17
**faith** [1] - 1412:9
**fall** [1] - 1427:13
**falsehood** [1] - 1414:18
**falsely** [2] - 1414:5, 1415:10
**far** [5] - 1389:5, 1403:18, 1405:22, 1508:11
**farms** [2] - 1487:9, 1487:11
**FARNAN** [3] - 1373:18, 1373:18, 1373:19
**fast** [3] - 1507:19, 1509:6, 1516:11
**fathers** [1] - 1563:20
**favor** [1] - 1466:17
**fear** [1] - 1401:13
**feature** [1] - 1417:18
**features** [13] - 1381:10, 1381:12, 1426:9, 1437:17, 1443:12, 1443:14, 1444:17, 1444:19, 1444:21, 1446:21, 1446:22, 1447:7, 1501:19
**Federal** [2] - 1381:14, 1381:20
**federally** [1] - 1523:5
**feeding** [1] - 1550:7
**fellow** [1] - 1557:19
**felt** [2] - 1437:19, 1504:5
**fetched** [2] - 1514:19, 1514:20
**fetching** [1] - 1514:17
**few** [6] - 1479:11, 1533:3, 1541:10, 1564:1, 1564:4, 1564:17
**field** [7] - 1416:2, 1421:19, 1421:20, 1422:5, 1422:8, 1507:5, 1507:8
**fifteen** [2] - 1449:13, 1494:13
**fifteen-minute** [1] - 1449:13

**fight** [1] - 1525:1
**figure** [5] - 1401:24, 1463:14, 1466:11, 1481:24, 1486:3
**figured** [1] - 1503:16
**figures** [1] - 1392:13
**file** [4] - 1406:2, 1467:16, 1468:9
**filed** [2] - 1522:9, 1528:7
**files** [3] - 1462:1, 1472:18, 1543:4
**filing** [2] - 1399:18, 1399:21
**fill** [4] - 1410:2, 1411:11, 1542:12, 1556:7
**final** [6] - 1375:5, 1375:20, 1382:21, 1387:12, 1388:6, 1388:14, 1405:11, 1406:11, 1409:24, 1410:1, 1410:5, 1422:11, 1449:3, 1508:18, 1509:4, 1554:6
**finally** [3] - 1452:16, 1453:17, 1493:7
**Finally** [1] - 1438:5
**financial** [10] - 1376:5, 1376:8, 1377:14, 1377:16, 1441:22, 1442:1, 1450:22, 1478:15, 1538:5, 1546:13
**fine** [17] - 1464:23, 1465:6, 1465:15, 1465:17, 1492:10, 1498:2, 1498:4, 1498:5, 1498:8, 1498:9, 1498:12, 1498:16, 1498:22, 1499:1, 1499:3, 1559:11, 1559:18
**finish** [1] - 1555:9
**finished** [1] - 1530:18
**finite** [1] - 1437:2
**firm** [2] - 1419:8, 1522:14
**firmware** [1] - 1422:14
**First** [2] - 1392:8, 1453:5
**first** [40] - 1377:11, 1378:16, 1378:18, 1389:1, 1397:11, 1399:16, 1417:11, 1420:15, 1440:18, 1441:13, 1448:10, 1448:15, 1451:8, 1452:12, 1454:21

1455:3, 1456:10, 1459:18, 1460:13, 1461:2, 1462:24, 1470:21, 1470:22, 1471:19, 1471:22, 1492:23, 1493:11, 1503:15, 1505:3, 1507:24, 1513:13, 1517:16, 1519:3, 1519:14, 1527:21, 1528:13, 1534:9, 1539:18, 1558:2, 1561:7
**fit** [1] - 1507:8
**five** [11] - 1377:21, 1385:6, 1388:3, 1389:3, 1389:7, 1392:8, 1448:24, 1530:5, 1531:15, 1544:19, 1545:16
**fix** [2] - 1380:18, 1406:23
**flat** [2] - 1537:23, 1538:13
**flight** [3] - 1495:8, 1495:13, 1495:18
**Flight** [1] - 1495:14
**flip** [2] - 1479:4, 1546:4
**floating** [1] - 1496:18
**fly** [4] - 1454:2, 1483:20, 1495:5, 1495:9
**flying** [8] - 1451:3, 1460:20, 1463:12, 1494:23, 1494:24, 1495:1, 1532:8
**focus** [8] - 1440:23, 1463:13, 1481:19, 1481:22, 1482:15, 1535:7, 1546:7, 1547:1
**focused** [1] - 1481:18
**follow** [5] - 1410:17, 1426:14, 1428:22, 1554:19, 1556:3
**following** [10] - 1394:18, 1430:10, 1445:9, 1517:19, 1526:3, 1526:21, 1531:20, 1561:10, 1561:22, 1562:13
**follows** [2] - 1474:4, 1507:5
**FOR** [1] - 1373:2
**forces** [1] - 1437:6
**foregoing** [1] - 1567:9
**foreman** [1] - 1554:8
**FOREPERSON** [2] - 1561:1, 1561:4

**foreperson** [4] - 1411:11, 1556:1, 1556:6, 1560:24
**Foreperson** [1] - 1563:5
**forget** [1] - 1414:14
**form** [31] - 1383:4, 1383:5, 1383:11, 1383:15, 1385:16, 1387:6, 1387:11, 1388:5, 1388:12, 1388:14, 1405:11, 1406:12, 1410:2, 1411:7, 1411:8, 1411:13, 1413:9, 1424:2, 1460:14, 1470:22, 1471:9, 1471:23, 1517:14, 1524:1, 1525:22, 1530:6, 1531:14, 1532:21, 1533:7, 1554:11, 1556:7
**formal** [1] - 1375:8
**formally** [1] - 1382:3
**format** [1] - 1532:13
**formula** [1] - 1404:2
**forth** [3] - 1401:19, 1419:24, 1425:4
**forty** [1] - 1448:24
**forty-five** [1] - 1448:24
**forward** [6] - 1402:11, 1402:13, 1490:19, 1506:8, 1549:23, 1549:24
**founding** [1] - 1563:20
**Four** [1] - 1450:21
**four** [18] - 1384:2, 1384:6, 1396:17, 1396:22, 1419:23, 1420:8, 1423:21, 1427:18, 1428:16, 1461:20, 1467:4, 1500:3, 1512:20, 1512:22, 1513:17, 1534:23, 1545:16, 1545:17
**fraction** [1] - 1448:15
**fragments** [1] - 1512:5
**frames** [2] - 1463:10, 1463:11
**framework** [5] - 1444:8, 1479:18, 1479:21, 1480:2, 1490:9
**frankly** [4] - 1456:24, 1458:9, 1462:9, 1463:5
**free** [18] - 1379:21, 1451:2, 1451:3, 1451:18,

**foreperson** [4] - 1452:1, 1452:2, 1477:8, 1480:22, 1486:15, 1490:7, 1490:8, 1538:8, 1539:3, 1547:19, 1547:22, 1564:3
**Free** [2] - 1477:11, 1538:2
**freedom** [1] - 1536:17
**Friday** [1] - 1373:9
**front** [10] - 1401:5, 1401:16, 1402:23, 1453:11, 1453:12, 1453:14, 1453:17, 1507:15, 1518:14, 1545:14
**full** [4] - 1393:3, 1462:19, 1490:2, 1555:2
**fully** [1] - 1434:17
**fun** [1] - 1483:22
**functionality** [2] - 1445:21, 1446:17
**functions** [1] - 1436:18
**funded** [1] - 1523:5
**funneled** [1] - 1390:2
**future** [3] - 1454:16, 1486:10, 1536:23
**fuzzy** [1] - 1496:22
**G-mail** [1] - 1487:10
**games** [1] - 1502:24
**gangbusters** [1] - 1458:9
**general** [4] - 1379:7, 1502:11, 1502:21, 1563:11
**generally** [3] - 1428:20, 1529:6, 1548:16
**generate** [1] - 1397:21
**generated** [3] - 1448:1, 1448:5, 1448:6
**generates** [1] - 1393:24
**generations** [1] - 1550:5
**generic** [2] - 1422:13, 1493:17
**generically** [1] - 1400:2
**gentlemen** [1] - 1459:20
**Geo** [7] - 1479:12, 1479:14, 1481:12, 1481:13, 1481:15, 1481:17, 1539:2
**geographic** [3] - 1487:23, 1488:13,

1495:12
**geographical** [1] - 1421:13
**geographically** [1] - 1421:16
**Georgia** [1] - 1535:13
**Georgia-Pacific** [1] - 1535:13
**German** [1] - 1519:22
**gigantic** [1] - 1401:5
**given** [27] - 1376:8, 1377:17, 1378:14, 1379:20, 1389:14, 1401:17, 1401:18, 1423:3, 1423:19, 1442:2, 1453:16, 1488:20, 1489:15, 1490:17, 1492:6, 1499:7, 1512:12, 1514:8, 1521:5, 1528:9, 1529:4, 1529:7, 1529:16, 1548:9, 1554:2, 1554:19, 1556:4
**glitch** [2] - 1387:15, 1388:17
**global** [6] - 1431:8, 1495:3, 1502:11, 1523:3, 1532:7, 1532:23
**Global** [2] - 1434:11, 1562:23
**gluing** [2] - 1420:9, 1420:11
**GmbH** [1] - 1373:4
**goal** [2] - 1509:8, 1523:16
**Goodchild** [66] - 1461:8, 1464:16, 1468:5, 1468:6, 1468:10, 1468:17, 1468:20, 1469:2, 1469:5, 1469:8, 1469:13, 1470:18, 1471:1, 1472:12, 1472:14, 1473:2, 1473:11, 1474:6, 1475:16, 1476:10, 1485:3, 1485:5, 1485:19, 1498:4, 1499:14, 1500:13, 1500:17, 1500:19, 1506:1, 1506:23, 1509:11, 1509:15, 1510:22, 1511:18, 1511:23, 1512:2, 1513:21, 1515:14, 1516:8, 1516:20, 1516:23, 1517:3, 1524:6, 1524:21, 1525:1, 1525:9, 1525:12, 1525:16, 1527:6, 1527:13, 1530:12, 1530:23, 1531:3, 1531:6, 1531:9, 1531:22, 1536:1, 1542:15, 1544:5, 1544:9, 1549:14, 1551:23, 1552:4, 1553:1, 1553:4
**Goodchild's** [3] - 1501:2, 1552:14, 1553:10
**Goodchile** [2] - 1510:4, 1510:10
**Google** [367] - 1376:1, 1377:9, 1377:11, 1377:14, 1378:3, 1378:4, 1378:15, 1378:17, 1378:20, 1378:22, 1378:24, 1379:2, 1379:7, 1379:11, 1382:11, 1382:16, 1382:22, 1384:8, 1385:1, 1386:6, 1386:8, 1386:17, 1388:20, 1390:2, 1390:13, 1391:22, 1392:4, 1392:11, 1392:12, 1393:9, 1393:14, 1393:20, 1393:21, 1393:22, 1393:23, 1394:6, 1394:10, 1394:11, 1394:14, 1394:23, 1395:2, 1395:4, 1395:13, 1395:19, 1395:23, 1396:9, 1396:10, 1396:12, 1396:14, 1397:8, 1397:23, 1398:17, 1399:6, 1399:7, 1399:8, 1399:23, 1400:3, 1402:13, 1417:15, 1417:17, 1417:18, 1417:20, 1417:22, 1417:24, 1418:1, 1418:2, 1418:7, 1418:20, 1418:22, 1419:5, 1424:22, 1426:15, 1426:23, 1427:1, 1427:20, 1427:23, 1428:3, 1428:5, 1428:7, 1428:8, 1428:12, 1428:13, 1428:18, 1428:23, 1429:5, 1430:5, 1430:10, 1430:14, 1430:14, 1430:22, 1431:7, 1431:12, 1432:2, 1432:4, 1432:11, 1433:7, 1433:10, 1433:15, 1433:23, 1434:9, 1438:19, 1438:23, 1439:2, 1439:15, 1440:20, 1442:16, 1443:7, 1443:14, 1444:1, 1444:7, 1445:1, 1445:5, 1446:2, 1446:9, 1446:14, 1446:19, 1447:16, 1447:18, 1447:19, 1447:23, 1448:2, 1448:5, 1448:9, 1448:10, 1448:12, 1448:13, 1448:21, 1448:23, 1450:9, 1451:1, 1451:2, 1451:7, 1451:10, 1451:20, 1451:23, 1451:24, 1454:16, 1455:15, 1455:16, 1455:17, 1455:19, 1455:23, 1456:3, 1456:4, 1456:8, 1456:9, 1456:20, 1457:1, 1457:3, 1457:20, 1458:9, 1458:13, 1458:14, 1458:20, 1458:23, 1459:6, 1459:7, 1459:9, 1459:10, 1459:11, 1459:13, 1459:23, 1459:24, 1460:8, 1460:15, 1460:17, 1460:19, 1461:11, 1462:4, 1462:18, 1462:22, 1462:23, 1463:8, 1463:16, 1463:18, 1463:19, 1464:9, 1464:12, 1464:19, 1465:5, 1466:8, 1466:18, 1466:23, 1467:2, 1467:6, 1467:7, 1467:9, 1468:12, 1468:13, 1468:14, 1469:4, 1470:4, 1470:6, 1470:23, 1471:5, 1471:10, 1471:15, 1477:10, 1477:11, 1478:10, 1478:18, 1478:21, 1478:23, 1479:1, 1479:2, 1479:10, 1479:11, 1479:12, 1479:13, 1480:21, 1481:4, 1481:6, 1481:11, 1482:1, 1482:7, 1482:13, 1482:19, 1483:2, 1483:5, 1483:18, 1483:19, 1484:15, 1486:14, 1487:6, 1487:7, 1487:9, 1487:10, 1487:14, 1487:17, 1488:1, 1488:4, 1488:6, 1488:8, 1488:9, 1488:15, 1488:16, 1488:17, 1488:23, 1488:24, 1489:15, 1489:19, 1489:22, 1490:5, 1491:2, 1491:6, 1491:9, 1492:8, 1492:15, 1492:24, 1493:12, 1493:24, 1498:5, 1499:2, 1499:19, 1501:8, 1501:12, 1501:13, 1501:16, 1501:24, 1502:1, 1502:3, 1502:4, 1503:8, 1503:9, 1503:10, 1504:7, 1504:16, 1504:19, 1505:8, 1505:14, 1506:21, 1508:6, 1508:8, 1508:16, 1509:1, 1510:14, 1510:24, 1511:15, 1511:21, 1512:3, 1512:4, 1512:8, 1513:11, 1513:23, 1515:8, 1515:15, 1515:21, 1516:2, 1516:6, 1517:10, 1517:18, 1517:21, 1517:24, 1521:10, 1524:2, 1525:24, 1526:20, 1527:8, 1530:6, 1531:17, 1533:19, 1534:11, 1536:3, 1536:9, 1536:18, 1536:24, 1537:6, 1537:9, 1537:11, 1537:17, 1537:19, 1537:20, 1538:2, 1538:5, 1538:7, 1538:8, 1538:9, 1538:16, 1539:1, 1539:19, 1540:3, 1540:5, 1540:24, 1541:1, 1541:6, 1541:15, 1542:17, 1543:6, 1545:24, ...7:2,
1547:4, 1547:5, 1547:8, 1547:9, 1547:19, 1547:23, 1547:24, 1548:2, 1548:21, 1553:19, 1553:24, 1560:19, 1561:10, 1561:14, 1561:19, 1562:6, 1562:11, 1562:19, 1565:18
**GOOGLE** [1] - 1373:6
**Google's** [41] - 1376:4, 1378:21, 1379:3, 1379:4, 1394:2, 1395:6, 1395:7, 1396:15, 1397:6, 1397:7, 1418:1, 1426:20, 1428:15, 1434:4, 1441:22, 1447:14, 1447:18, 1451:17, 1456:3, 1457:17, 1461:4, 1461:17, 1462:2, 1468:12, 1468:18, 1469:10, 1478:24, 1481:1, 1482:23, 1483:1, 1488:4, 1490:12, 1517:17, 1533:13, 1536:8, 1542:24, 1547:20, 1547:23, 1548:15, 1561:9
**Google.com** [1] - 1487:10
**govern** [1] - 1410:10
**graduate** [1] - 1435:14
**grainy** [2] - 1475:13, 1476:1
**granted** [1] - 1545:2
**Graphic** [1] - 1389:22
**graphics** [10] - 1422:13, 1435:12, 1483:20, 1541:23, 1541:24, 1542:1, 1542:5, 1542:11, 1542:13, 1543:13
**Graphics** [4] - 1454:22, 1502:14, 1502:20, 1502:22
**great** [6] - 1412:9, 1460:20, 1466:5, 1484:17, 1553:15, 1563:16
**Great** [1] - 1455:13
**greater** [2] - 1412:21, 1556:22
**grid** [2] - 1423:23, 1424:2
**grounds** [1] - 1565:3
**grow** [1] - 1538:14

**growing** [3] - 1481:19, 1482:15, 1482:24
**guess** [5] - 1377:3, 1481:4, 1544:12, 1550:19, 1550:24
**guessed** [3] - 1453:1, 1476:14, 1476:22
**guide** [1] - 1439:9
**half** [2] - 1544:3, 1559:8
**hand** [5] - 1410:18, 1437:24, 1440:6, 1561:5, 1567:15
**handled** [2] - 1408:10, 1408:13
**hands** [4] - 1451:1, 1455:24, 1492:16, 1551:5
**Hanke** [1] - 1455:13
**hard** [10] - 1394:18, 1453:6, 1456:22, 1479:7, 1490:15, 1499:12, 1529:8, 1534:19, 1559:8, 1563:15
**hardly** [1] - 1478:21
**hardware** [1] - 1422:12
**have.0** [1] - 1457:8
**Hawes** [9] - 1394:7, 1398:2, 1400:13, 1404:16, 1450:7, 1450:15, 1490:20, 1541:20, 1551:7
**HAWES** [39] - 1373:22, 1385:17, 1385:24, 1390:23, 1391:2, 1392:18, 1392:21, 1394:8, 1394:21, 1395:3, 1395:10, 1395:18, 1396:6, 1396:16, 1397:4, 1398:3, 1398:9, 1398:13, 1399:10, 1400:14, 1400:19, 1401:20, 1402:1, 1402:5, 1403:6, 1404:22, 1406:18, 1406:21, 1407:6, 1407:16, 1407:20, 1408:15, 1409:12, 1409:16, 1449:17, 1450:16, 1450:19, 1541:21, 1560:7
**Hawkins** [3] - 1567:7, 1567:19, 1567:20
**hear** [15] - 1396:23, 1454:17, 1455:13, 1456:12, 1460:24,

1478:21, 1489:21, 1491:23, 1527:11, 1527:16, 1527:17, 1528:24, 1544:15, 1551:22, 1559:22
**heard** [53] - 1393:20, 1410:13, 1411:23, 1413:17, 1451:15, 1453:9, 1453:13, 1454:21, 1456:20, 1457:4, 1460:6, 1460:18, 1461:4, 1461:5, 1462:5, 1473:12, 1477:16, 1482:17, 1482:18, 1484:8, 1484:9, 1485:2, 1491:17, 1493:15, 1498:3, 1502:4, 1502:6, 1502:20, 1503:4, 1507:17, 1508:13, 1516:1, 1518:9, 1518:24, 1520:6, 1520:19, 1521:17, 1523:12, 1524:6, 1527:12, 1527:13, 1528:20, 1537:18, 1538:15, 1540:18, 1540:19, 1540:21, 1543:14, 1543:16, 1544:14, 1545:13, 1547:8, 1548:18
**hearing** [1] - 1417:6
**heavily** [1] - 1470:15
**help** [7] - 1393:17, 1412:7, 1466:14, 1493:14, 1494:20, 1509:7, 1512:13
**helped** [1] - 1509:23
**helpful** [12] - 1388:23, 1397:18, 1415:24, 1472:21, 1472:24, 1473:1, 1473:2, 1491:11, 1508:24, 1509:17, 1510:3, 1565:22
**helps** [1] - 1395:22
**hereby** [1] - 1567:9
**hereunto** [1] - 1567:14
**hesitate** [1] - 1555:4
**higher** [8] - 1402:21, 1422:20, 1423:1, 1423:4, 1423:7, 1423:13, 1423:17, 1505:1
**highlight** [1] - 1474:2
**highly** [2] - 1378:7, 1379:10
**himself** [1] - 1454:18
**hindsight** [1] -

1436:10
**hire** [1] - 1455:12
**history** [5] - 1406:2, 1502:8, 1502:10, 1523:10, 1539:16
**Hold** [1] - 1559:21
**hold** [3] - 1380:4, 1388:10, 1548:5
**holder** [4] - 1440:12, 1440:15, 1440:24, 1441:6
**holding** [1] - 1555:16
**honest** [1] - 1474:23, 1555:7
**Honor** [97] - 1376:13, 1377:8, 1377:11, 1377:12, 1377:19, 1378:23, 1379:14, 1380:13, 1381:3, 1381:6, 1381:24, 1382:9, 1382:10, 1383:1, 1383:22, 1383:24, 1384:12, 1385:3, 1385:12, 1385:13, 1385:17, 1385:24, 1386:3, 1386:5, 1387:19, 1388:8, 1388:9, 1388:20, 1388:23, 1390:16, 1390:24, 1391:22, 1391:24, 1392:18, 1392:22, 1393:2, 1393:4, 1393:11, 1394:8, 1394:22, 1396:16, 1397:11, 1397:16, 1398:3, 1398:6, 1398:10, 1399:11, 1399:13, 1399:14, 1401:1, 1401:20, 1402:2, 1403:6, 1403:9, 1403:21, 1404:21, 1404:22, 1405:2, 1405:4, 1405:14, 1405:19, 1406:8, 1406:13, 1406:19, 1406:24, 1407:7, 1407:16, 1407:21, 1408:6, 1408:15, 1409:17, 1409:13, 1409:17, 1409:18, 1449:17, 1449:19, 1450:4, 1450:10, 1450:16, 1450:17, 1490:23, 1490:24, 1526:12, 1541:21, 1551:10, 1559:3, 1559:10, 1559:13, 1560:9, 1560:18, 1560:20,

1561:4, 1563:9, 1564:19, 1564:24, 1565:15, 1565:19
**Honor's** [4] - 1376:19, 1379:23, 1382:13, 1405:16
**HONORABLE** [1] - 1373:13
**hope** [5] - 1453:6, 1464:5, 1494:17, 1510:3, 1554:3
**hour** [4] - 1548:21, 1549:11, 1559:1, 1559:7
**hours** [3] - 1449:5, 1491:16, 1506:3
**housekeeping** [1] - 1405:19
**huge** [1] - 1487:8
**hundreds** [3] - 1483:18, 1491:16, 1506:3
**hung** [1] - 1549:2
**hypothetical** [25] - 1375:15, 1376:20, 1377:1, 1377:18, 1382:5, 1392:9, 1440:16, 1440:19, 1440:22, 1441:10, 1441:16, 1441:19, 1445:5, 1445:16, 1445:20, 1446:3, 1446:5, 1446:8, 1483:7, 1483:8, 1534:7, 1534:10, 1534:15, 1535:7, 1535:16
**hypothetically** [1] - 1446:13
**i.e** [3] - 1390:13, 1426:24, 1429:7
**icing** [1] - 1456:16
**idea** [4] - 1408:7, 1497:6, 1497:9, 1563:21
**ideas** [3] - 1503:18, 1503:19, 1503:20
**identical** [1] - 1528:4
**identified** [5] - 1401:8, 1405:22, 1406:2, 1406:4, 1437:3
**identify** [3] - 1400:2, 1400:8, 1401:12
**ignore** [4] - 1546:10, 1546:17, 1546:18, 1547:3
**ignored** [1] - 1515:3
**illustration** [1] - 1514:8
**illustrations** [1] -

1415:16
**image** [30] - 1421:22, 1421:24, 1422:3, 1422:12, 1422:17, 1422:18, 1422:22, 1422:23, 1423:12, 1423:13, 1423:16, 1423:17, 1435:13, 1451:4, 1467:23, 1498:22, 1499:18, 1499:23, 1500:11, 1506:6, 1507:1, 1507:4, 1509:1, 1509:4, 1512:21, 1513:2, 1513:4, 1516:7
**images** [10] - 1498:16, 1500:5, 1502:16, 1507:7, 1508:2, 1508:6, 1508:12, 1511:10, 1516:15, 1516:22
**imaging** [1] - 1504:7
**immediately** [3] - 1479:24, 1481:3, 1503:22
**impact** [1] - 1386:16
**impartial** [1] - 1412:10
**impartially** [1] - 1554:18
**impeached** [2] - 1414:23, 1415:6
**import** [1] - 1440:13
**important** [24] - 1396:1, 1396:22, 1397:16, 1414:6, 1414:21, 1452:22, 1455:4, 1456:24, 1461:3, 1461:5, 1475:8, 1478:4, 1481:21, 1482:7, 1493:2, 1507:14, 1509:4, 1512:13, 1524:13, 1527:5, 1536:9, 1537:18, 1541:14, 1542:9
**importantly** [3] - 1393:1, 1519:1, 1540:3
**imposed** [1] - 1432:17
**impress** [1] - 1454:14
**impression** [1] - 1556:23
**improper** [4] - 1379:8, 1389:3, 1390:10, 1392:15
**improvement** [1] - 1379:24
**improvements** [1] - 1443:14

**IN** [2] - 1373:1, 1567:14
**inaccurately** [1] - 1414:16
**inapplicable** [1] - 1563:4
**incentives** [1] - 1437:5
**inclined** [2] - 1383:9, 1409:4
**include** [4] - 1422:11, 1429:17, 1432:15, 1436:16
**included** [1] - 1550:6
**includes** [3] - 1399:22, 1427:21, 1532:11
**including** [9] - 1389:23, 1399:23, 1416:10, 1421:9, 1424:5, 1446:22, 1521:23, 1538:24, 1555:18
**inclusion** [2] - 1376:14, 1376:17
**inclusive** [1] - 1567:10
**incomparable** [1] - 1484:7
**INCORPORATED** [1] - 1373:6
**incorporates** [3] - 1425:17, 1426:8, 1501:19
**incorporating** [1] - 1437:11
**incorrectly** [1] - 1530:20
**increase** [1] - 1480:14
**increased** [1] - 1443:20
**increases** [2] - 1448:12, 1480:23
**incremental** [1] - 1444:15
**indeed** [1] - 1471:4
**independent** [13] - 1425:2, 1425:4, 1425:8, 1425:10, 1426:9, 1426:10, 1426:12, 1427:5, 1469:3, 1501:20, 1501:21, 1501:22, 1556:19
**independently** [2] - 1469:22, 1553:15
**indicate** [1] - 1416:17
**indicated** [1] - 1397:17
**indicates** [2] - 1382:16, 1396:3
**indication** [1] -

1410:22
**indicators** [1] - 1438:16
**individual** [1] - 1555:18
**industry** [2] - 1435:15, 1463:21
**inequitable** [1] - 1565:3
**infer** [1] - 1416:10
**inference** [1] - 1416:24
**inferences** [1] - 1412:13
**inferior** [1] - 1504:6
**influenced** [1] - 1556:20
**inform** [3] - 1408:4, 1408:6, 1408:14
**informal** [1] - 1375:3
**Information** [1] - 1377:19
**information** [26] - 1387:19, 1390:2, 1399:22, 1400:8, 1452:14, 1452:17, 1453:3, 1460:24, 1461:3, 1461:5, 1472:4, 1480:2, 1480:6, 1480:8, 1480:9, 1480:11, 1480:21, 1506:22, 1520:7, 1522:11, 1523:2, 1524:9, 1532:4, 1537:12, 1557:2, 1557:12
**informed** [2] - 1381:7, 1381:9
**infrastructure** [1] - 1487:8
**infringe** [36] - 1417:21, 1426:21, 1428:1, 1428:3, 1447:14, 1447:21, 1452:1, 1452:4, 1460:17, 1464:19, 1465:5, 1466:8, 1491:4, 1492:15, 1498:6, 1499:4, 1501:16, 1501:17, 1502:1, 1502:2, 1504:9, 1504:22, 1510:6, 1511:18, 1512:8, 1515:10, 1517:2, 1517:21, 1517:24, 1518:1, 1533:14, 1533:19, 1539:20, 1541:7, 1553:20, 1554:1
**infringed** [17] -

1418:10, 1418:13, 1424:23, 1426:11, 1426:12, 1426:15, 1426:23, 1439:2, 1441:6, 1461:1, 1470:3, 1483:10, 1483:13, 1494:2, 1501:21, 1501:23, 1547:12
**infringement** [38] - 1386:12, 1417:19, 1418:16, 1418:21, 1420:13, 1420:17, 1421:9, 1424:16, 1426:18, 1427:7, 1427:17, 1428:4, 1428:14, 1439:8, 1439:10, 1439:13, 1440:18, 1441:13, 1442:6, 1444:12, 1445:1, 1448:7, 1448:10, 1448:22, 1460:11, 1467:14, 1469:24, 1471:23, 1473:12, 1473:15, 1476:18, 1477:5, 1477:23, 1482:20, 1515:7, 1534:9, 1541:14, 1543:9
**infringements** [1] - 1427:9
**infringer** [11] - 1420:14, 1440:16, 1441:1, 1441:7, 1441:18, 1441:21, 1443:20, 1444:11, 1477:8, 1534:7, 1535:9
**infringes** [14] - 1417:15, 1426:4, 1428:16, 1448:11, 1460:15, 1460:23, 1461:6, 1470:24, 1471:5, 1471:11, 1471:12, 1517:19, 1561:10
**infringing** [6] - 1444:16, 1444:21, 1447:20, 1471:11, 1484:23, 1489:22
**innocent** [1] - 1414:19
**INNOVATIONAL** [1] - 1373:3
**inoperative** [1] - 1519:12
**insertion** [1] - 1381:8
**inside** [1] - 1478:11
**insofar** [1] - 1413:13
**instances** [1] - 1526:6
**instant** [1] - 1557:9

**instead** [9] - 1375:16, 1388:21, 1408:24, 1485:8, 1491:18, 1494:16, 1513:24, 1534:21, 1544:2
**instruct** [7] - 1410:14, 1410:24, 1426:13, 1428:21, 1434:15, 1439:1, 1557:3
**instructed** [9] - 1411:18, 1435:17, 1476:2, 1486:8, 1486:20, 1504:15, 1528:15, 1551:16, 1551:17
**instructing** [1] - 1439:6
**instruction** [20] - 1376:23, 1377:7, 1377:13, 1377:15, 1379:1, 1379:9, 1379:20, 1379:22, 1380:1, 1380:13, 1380:17, 1380:19, 1380:21, 1381:4, 1381:15, 1382:13, 1382:15, 1391:8, 1524:12, 1525:7
**instructions** [39] - 1375:6, 1375:9, 1375:21, 1382:7, 1382:22, 1387:12, 1387:17, 1388:6, 1388:13, 1388:15, 1396:24, 1402:15, 1402:19, 1405:11, 1406:11, 1410:1, 1410:6, 1410:10, 1410:15, 1410:21, 1411:4, 1412:7, 1430:1, 1439:8, 1449:2, 1449:4, 1482:22, 1485:21, 1488:20, 1489:6, 1499:6, 1521:6, 1534:1, 1546:20, 1549:17, 1551:3, 1554:7, 1554:11, 1556:3
**insuperable** [1] - 1550:5
**intellectual** [2] - 1482:8, 1490:6
**intend** [2] - 1402:20, 1559:15
**intended** [3] - 1411:5, 1428:3, 1433:8
**intends** [1] - 1401:3
**intentional** [1] - 1414:18

**interest** [2] - 1439:20, 1555:12
**interested** [3] - 1431:1, 1472:16, 1480:6
**interesting** [3] - 1463:22, 1468:24, 1548:24
**interface** [2] - 1460:20, 1460:21
**internal** [7] - 1468:12, 1478:19, 1481:10, 1482:23, 1545:23, 1546:13, 1547:4
**internet** [6] - 1516:11, 1516:13, 1550:8, 1557:8, 1557:10
**interpreted** [1] - 1424:12
**Intrinsic** [5] - 1389:22, 1390:21, 1454:22, 1502:20, 1502:22
**introduced** [5] - 1416:16, 1440:21, 1503:3, 1534:12, 1538:2
**introduction** [1] - 1384:6
**invalid** [22] - 1418:2, 1418:6, 1418:12, 1418:14, 1420:19, 1428:24, 1429:5, 1429:8, 1432:8, 1434:19, 1439:4, 1447:15, 1472:13, 1519:12, 1526:22, 1527:15, 1528:10, 1533:15, 1533:22, 1541:8, 1553:23, 1562:21
**invalidate** [1] - 1433:19
**invalidates** [2] - 1432:5, 1553:3
**invalidity** [10] - 1386:13, 1386:15, 1418:23, 1424:16, 1428:20, 1439:8, 1472:11, 1476:3, 1526:13, 1541:12
**invent** [6] - 1495:17, 1497:6, 1497:8, 1497:20, 1498:21, 1499:1
**invented** [2] - 1495:9, 1498:11
**invention** [84] - 1381:11, 1418:4, 1419:20, 1420:7, 1424:20, 1427:6,

1428:5, 1429:21, 1429:22, 1431:22, 1431:24, 1432:19, 1433:1, 1433:5, 1434:3, 1434:8, 1434:14, 1434:16, 1434:22, 1434:24, 1435:3, 1435:5, 1435:8, 1435:22, 1436:2, 1436:5, 1436:13, 1436:14, 1436:16, 1436:19, 1436:23, 1436:24, 1437:10, 1437:11, 1437:12, 1437:13, 1437:16, 1437:19, 1437:22, 1437:23, 1438:2, 1438:4, 1438:5, 1438:7, 1438:8, 1438:14, 1438:20, 1439:15, 1440:14, 1443:1, 1443:3, 1443:6, 1443:8, 1443:11, 1444:15, 1446:16, 1446:19, 1451:3, 1451:18, 1452:6, 1455:19, 1477:7, 1477:12, 1478:9, 1486:17, 1486:19, 1490:12, 1493:22, 1494:12, 1494:15, 1494:21, 1494:22, 1494:24, 1495:23, 1496:2, 1504:17, 1524:20, 1527:1, 1541:3, 1541:4, 1546:23, 1547:21, 1563:1

**inventions** [1] - 1436:8
**inventor** [5] - 1419:21, 1432:20, 1432:23, 1497:6, 1498:10
**inventor's** [1] - 1429:9
**inventors** [11] - 1437:21, 1438:3, 1494:6, 1495:22, 1495:23, 1501:4, 1517:6, 1522:15, 1531:1, 1548:7, 1552:6
**invest** [2] - 1546:8, 1546:15
**invested** [1] - 1482:14
**investing** [1] - 1482:24
**investment** [9] - 1481:19, 1481:22, 1482:8, 1482:10,

1482:12, 1482:15, 1483:17, 1546:7, 1547:1
**involve** [2] - 1417:9, 1474:21
**involved** [6] - 1415:19, 1419:23, 1426:16, 1445:20, 1455:8, 1460:22
**involves** [1] - 1425:1
**iPad** [1] - 1459:10
**iPhone** [1] - 1557:7
**ironclad** [1] - 1540:7
**irrelevant** [1] - 1404:11
**issue** [29] - 1378:13, 1379:21, 1384:13, 1389:1, 1389:3, 1390:13, 1391:9, 1391:11, 1391:19, 1391:22, 1393:1, 1400:16, 1400:23, 1400:24, 1402:3, 1402:6, 1403:24, 1405:20, 1408:10, 1433:21, 1493:10, 1493:11, 1514:24, 1515:24, 1518:7, 1521:3, 1533:10, 1543:20, 1549:14
**issued** [5] - 1429:1, 1429:3, 1518:10, 1518:12, 1551:13
**issues** [17] - 1375:7, 1386:16, 1395:17, 1399:15, 1400:11, 1406:15, 1412:1, 1412:8, 1417:14, 1418:20, 1420:22, 1421:8, 1421:9, 1439:12, 1452:23, 1453:21, 1537:19
**item** [1] - 1429:22
**items** [3] - 1380:8, 1429:17, 1514:1
**itself** [10] - 1389:7, 1395:19, 1396:10, 1425:13, 1443:11, 1448:23, 1481:6, 1493:4, 1529:21, 1529:22
**JACK** [1] - 1374:4
**January** [2] - 1503:13, 1504:1
**jerkiness** [2] - 1516:15, 1516:21
**job** [10] - 1418:9, 1421:7, 1470:13, 1470:14, 1492:12, 1518:13, 1541:23.

1553:13, 1553:14, 1553:16
**John** [2] - 1455:13, 1464:8
**joint** [2] - 1375:5, 1380:6
**jointly** [1] - 1468:21
**Jones** [14] - 1454:16, 1454:18, 1456:12, 1457:5, 1457:11, 1483:11, 1484:23, 1502:6, 1502:7, 1503:4, 1503:22, 1504:3, 1547:14
**Judge** [11] - 1373:14, 1460:6, 1462:22, 1476:2, 1477:16, 1486:8, 1486:20, 1488:20, 1501:10, 1546:19, 1551:16
**judge** [2] - 1436:9, 1450:23
**judged** [1] - 1413:12
**judges** [3] - 1410:19, 1416:19, 1555:11
**judgment** [6] - 1470:1, 1470:16, 1564:8, 1564:12, 1564:15, 1565:10
**Julian** [1] - 1464:7
**July** [5] - 1376:21, 1377:5, 1440:10, 1460:5, 1460:7
**June** [7] - 1440:20, 1534:4, 1534:11, 1534:15, 1535:1, 1535:17, 1535:21
**juror** [2] - 1556:17, 1556:23
**jurors** [6] - 1379:5, 1400:7, 1554:14, 1554:22, 1556:21, 1557:19
**Jury** [3] - 1450:12, 1560:22, 1564:5
**jury** [83] - 1375:6, 1375:9, 1375:21, 1382:21, 1383:18, 1384:2, 1386:9, 1386:14, 1387:2, 1387:3, 1387:12, 1387:16, 1387:22, 1388:6, 1388:13, 1388:14, 1390:6, 1390:7, 1391:6, 1391:18, 1396:8, 1396:23, 1396:24, 1397:5, 1398:5, 1398:21, 1399:3, 1400:9, 1401:5,

1401:16, 1401:21, 1402:14, 1402:23, 1405:6, 1405:11, 1406:11, 1408:2, 1408:4, 1408:14, 1408:18, 1408:20, 1409:1, 1409:6, 1409:8, 1409:15, 1409:19, 1409:22, 1410:1, 1410:6, 1410:12, 1410:18, 1411:9, 1416:1, 1417:9, 1449:12, 1449:14, 1450:2, 1450:14, 1460:14, 1472:22, 1474:23, 1489:2, 1490:17, 1494:11, 1517:9, 1554:7, 1554:8, 1555:3, 1555:21, 1557:18, 1558:18, 1559:6, 1560:14, 1560:16, 1560:24, 1561:2, 1562:3, 1563:8, 1563:11, 1563:22, 1563:24, 1564:17
**jury's** [1] - 1564:22
**justified** [1] - 1412:14
**Keep** [1] - 1438:20
**keep** [11] - 1409:23, 1414:11, 1436:5, 1457:12, 1457:14, 1472:14, 1496:20, 1500:9, 1522:22, 1536:21, 1545:9
**keeps** [1] - 1460:21
**kept** [2] - 1459:6, 1462:1
**Keyhole** [7] - 1390:1, 1455:1, 1455:4, 1455:21, 1483:17, 1503:2, 1503:9
**kind** [26] - 1400:8, 1454:9, 1469:3, 1475:24, 1478:14, 1479:7, 1483:16, 1484:3, 1484:6, 1484:14, 1484:20, 1485:9, 1486:3, 1494:10, 1495:11, 1496:1, 1499:11, 1505:23, 1537:2, 1537:5, 1537:24, 1538:18, 1544:4, 1548:24, 1549:3
**kinds** [2] - 1442:7, 1536:15
**King** [1] - 1373:11
**knowing** [1] - 1457:20

**knowingly** [1] - 1415:9
**knowledge** [12] - 1379:7, 1389:24, 1414:1, 1431:22, 1434:1, 1434:6, 1434:12, 1469:16, 1523:2, 1524:20, 1526:24, 1562:24
**known** [10] - 1429:18, 1429:23, 1436:13, 1436:18, 1436:20, 1442:5, 1493:5, 1495:1, 1495:3, 1549:6
**knows** [3] - 1391:6, 1505:11, 1505:18
**laches** [1] - 1565:2
**ladies** [1] - 1459:20
**language** [13] - 1424:18, 1481:21, 1491:15, 1493:15, 1493:18, 1493:20, 1494:4, 1494:7, 1494:11, 1496:4, 1496:12, 1499:5, 1499:22
**lapse** [1] - 1414:19
**large** [4] - 1386:21, 1387:1, 1392:14, 1477:17
**largely** [1] - 1379:21
**LARRY** [1] - 1373:22
**last** [7] - 1375:20, 1380:3, 1386:21, 1393:5, 1479:6, 1533:6, 1544:21
**late** [3] - 1380:3, 1522:11, 1528:10
**Lau** [32] - 1453:19, 1474:10, 1475:17, 1520:6, 1520:14, 1520:16, 1520:18, 1520:21, 1521:4, 1521:17, 1522:13, 1522:23, 1524:8, 1526:7, 1527:23, 1529:13, 1543:15, 1543:16, 1544:6, 1544:8, 1544:15, 1544:22, 1545:1, 1545:11, 1548:5, 1548:20, 1549:2, 1549:10, 1552:16, 1553:3
**Lau's** [1] - 1553:8
**law** [12] - 1384:18, 1410:14, 1410:17, 1410:24, 1411:4, 1434:15, 1452:4,

1528:8, 1551:17, 1554:15, 1554:19, 1555:20
**lawsuit** [2] - 1451:14, 1456:18
**lawyer** [6] - 1449:6, 1520:15, 1527:11, 1534:17, 1542:2, 1548:15
**lawyering** [1] - 1560:2
**lawyers** [8] - 1417:6, 1457:17, 1468:15, 1468:17, 1468:18, 1540:17, 1542:3, 1542:6
**lay** [1] - 1389:5
**lead** [3] - 1412:17, 1464:9, 1514:3
**learn** [1] - 1480:2
**learned** [3] - 1389:23, 1390:10, 1390:11
**least** [11] - 1389:20, 1428:18, 1428:19, 1447:14, 1448:11, 1497:2, 1519:1, 1521:18, 1522:15, 1533:14, 1543:23
**leaving** [1] - 1449:14
**Leclerc** [4] - 1521:4, 1522:24, 1523:13, 1523:15
**Leclerc's** [1] - 1552:18
**left** [5] - 1379:6, 1429:7, 1454:20, 1502:13, 1517:5
**legal** [1] - 1418:17
**legs** [4] - 1420:9, 1420:10, 1420:11
**length** [1] - 1445:12
**lengthy** [1] - 1410:6, 1558:13
**less** [19] - 1376:8, 1376:17, 1377:6, 1377:17, 1388:3, 1402:11, 1404:9, 1435:15, 1438:9, 1442:2, 1455:19, 1455:23, 1477:6, 1486:9, 1508:11, 1510:20, 1523:13, 1538:23, 1540:3
**level** [16] - 1421:23, 1422:1, 1435:1, 1435:16, 1467:24, 1468:2, 1500:11, 1500:12, 1507:4, 1507:24, 1508:2, 1511:8, 1511:11, 1511:13, 1513:3, 1516:12

**levels** [1] - 1468:3
**license** [20] - 1438:9, 1442:9, 1442:11, 1442:20, 1444:5, 1445:1, 1445:7, 1445:14, 1445:15, 1445:19, 1446:4, 1446:7, 1446:8, 1446:11, 1446:13, 1482:2, 1484:9, 1486:4, 1486:6, 1535:23
**licensed** [1] - 1539:8
**licensee** [3] - 1442:18, 1443:24, 1444:4
**licenses** [5] - 1446:12, 1484:6, 1535:23, 1536:2, 1536:8
**licensing** [7] - 1378:1, 1378:2, 1438:6, 1445:24, 1451:4, 1538:17, 1539:7
**licensor** [2] - 1443:24, 1547:7
**life** [1] - 1555:16
**light** [6] - 1405:15, 1412:15, 1429:14, 1437:8, 1564:8, 1564:22
**likely** [1] - 1447:24
**limitation** [1] - 1432:21
**limitations** [5] - 1382:17, 1382:23, 1420:5, 1428:9, 1428:11
**limited** [4] - 1413:21, 1424:6, 1550:8, 1558:15
**line** [9] - 1380:3, 1458:11, 1459:2, 1465:14, 1475:10, 1479:7, 1510:4, 1510:7
**lines** [4] - 1381:8, 1541:24, 1542:2, 1542:3
**link** [2] - 1392:10, 1469:8
**LinkedIn** [1] - 1557:11
**links** [1] - 1393:13
**list** [9] - 1419:24, 1421:3, 1453:3, 1507:6, 1508:21, 1514:1, 1520:15, 1534:17, 1535:14
**listed** [2] - 1380:9, 1405:24
**listened** [1] - 1516:18
**literally** [1] - 1406:21

**litigation** [2] - 1438:11, 1520:20
**live** [2] - 1413:11, 1522:1
**lived** [1] - 1480:5
**lives** [1] - 1537:14
**LLP** [2] - 1373:18, 1374:6
**Local** [1] - 1481:14
**locate** [1] - 1431:3
**location** [4] - 1421:13, 1421:21, 1495:6, 1528:2
**locations** [1] - 1521:23
**Lod** [1] - 1511:7
**Lodge** [1] - 1481:16
**look** [56] - 1383:16, 1393:3, 1393:4, 1400:7, 1425:7, 1425:21, 1452:18, 1454:3, 1459:6, 1459:16, 1463:6, 1466:23, 1469:20, 1469:22, 1470:21, 1474:9, 1475:9, 1477:24, 1478:1, 1478:2, 1478:6, 1485:1, 1489:5, 1489:10, 1489:13, 1490:18, 1491:12, 1496:3, 1499:3, 1499:8, 1510:17, 1511:19, 1519:5, 1519:6, 1519:24, 1522:6, 1523:23, 1532:2, 1532:4, 1535:3, 1537:8, 1537:16, 1538:1, 1539:10, 1539:15, 1541:5, 1541:16, 1542:1, 1542:11, 1551:3, 1553:2, 1553:14, 1553:16, 1553:17, 1553:21
**looked** [18] - 1459:17, 1460:4, 1473:7, 1506:2, 1506:3, 1518:8, 1520:1, 1520:3, 1528:2, 1530:12, 1535:17, 1535:22, 1537:8, 1538:5, 1539:6, 1550:20, 1551:13
**looking** [6] - 1453:24, 1454:5, 1463:8, 1515:5, 1515:11, 1528:3
**LUANN** [1] - 1374:7
**lump** [6] - 1484:16, 1484:23, 1487:24

1535:20, 1536:10, 1536:12, 1537:1, 1540:9
**lunch** [1] - 1490:8, 1558:24
**Luncheon** [1] - 1560:12
**Machinery** [1] - 1528:22
**Magic** [3] - 1520:11, 1521:23, 1522:7
**magic** [1] - 1522:3
**MAGIC** [1] - 1526:8
**mail** [8] - 1377:20, 1377:23, 1378:2, 1378:5, 1402:8, 1487:10, 1504:2, 1534:22
**mails** [3] - 1456:22, 1457:14, 1523:13
**main** [1] - 1393:10
**man** [1] - 1454:4
**manager** [3] - 1491:19, 1505:16, 1509:23
**Manager** [1] - 1505:14
**manufactured** [1] - 1442:14
**manufacturing** [1] - 1443:13
**Mapping** [2] - 1434:11, 1562:23
**mapping** [5] - 1431:8, 1495:3, 1532:7, 1532:12, 1532:23
**Maps** [2] - 1417:18, 1481:13
**marginal** [1] - 1407:14
**mark** [1] - 1383:7
**market** [2] - 1437:1, 1437:5
**marketing** [1] - 1437:17
**marketplace** [1] - 1447:12
**material** [3] - 1376:6, 1415:10, 1441:23
**materials** [4] - 1529:4, 1529:17, 1548:22, 1549:1
**mathematical** [1] - 1440:6
**mathematically** [1] - 1404:4
**matter** [7] - 1408:1, 1415:11, 1415:24, 1431:2, 1439:24, 1564:20, 1567:12
**matters** [1] - 1416:4

**maximum** [1] - 1468:2
**Mayer** [12] - 1377:24, 1378:3, 1389:12, 1457:4, 1457:11, 1458:2, 1495:7, 1497:6, 1503:13, 1503:24, 1523:12, 1534:22
**McClenden** [1] - 1454:17
**mean** [14] - 1378:17, 1384:14, 1396:18, 1414:13, 1458:23, 1487:17, 1500:16, 1506:20, 1509:17, 1510:6, 1535:16, 1541:13, 1547:3
**meaning** [3] - 1421:1, 1424:13, 1424:15
**meanings** [1] - 1472:20
**means** [29] - 1398:16, 1419:3, 1419:7, 1421:13, 1421:15, 1421:19, 1421:23, 1422:1, 1422:7, 1422:21, 1423:14, 1423:19, 1423:20, 1423:24, 1424:5, 1452:9, 1458:24, 1463:6, 1465:15, 1490:2, 1499:15, 1506:9, 1510:9, 1511:8, 1511:9, 1513:21, 1521:6, 1528:9, 1557:2
**meant** [3] - 1391:14, 1523:6, 1552:11
**measure** [1] - 1424:1
**measuring** [1] - 1444:17
**media** [1] - 1557:6
**meet** [6] - 1389:15, 1392:1, 1499:5, 1511:10, 1511:12, 1564:16
**meets** [3] - 1427:11, 1428:13, 1428:19
**member** [1] - 1431:6
**members** [10] - 1381:9, 1409:21, 1410:12, 1410:18, 1433:4, 1449:12, 1450:13, 1554:7, 1555:3, 1563:10
**memory** [5] - 1414:19, 1421:20, 1556:14, 1556:15, 1556:16
**mention** [4] - 1409:9, 1496:4, 1497:2,

1541:13
**mentioned** [5] - 1411:7, 1413:3, 1445:5, 1509:2, 1521:22
**Mercado** [2] - 1532:13, 1532:15
**Merce** [1] - 1464:8
**merely** [2] - 1436:17, 1555:9
**Merit** [1] - 1567:7
**mess** [1] - 1509:7
**message** [1] - 1557:21
**messages** [1] - 1557:9
**met** [9] - 1375:2, 1382:17, 1417:7, 1428:8, 1428:10, 1428:11, 1471:15, 1522:14, 1525:10
**metadata** [2] - 1507:3, 1508:9
**method** [17] - 1417:23, 1420:7, 1422:10, 1426:22, 1426:24, 1427:3, 1427:11, 1427:15, 1427:16, 1446:15, 1446:24, 1447:2, 1447:6, 1448:2, 1482:10, 1488:9, 1498:9
**method's** [1] - 1447:12
**methods** [7] - 1420:3, 1426:21, 1446:21, 1446:22, 1447:7, 1493:5, 1518:5
**metrics** [1] - 1511:7
**Michael** [3] - 1454:16, 1502:6, 1563:6
**MICHAEL** [2] - 1373:19, 1373:22
**middle** [2] - 1480:17, 1516:16
**midnight** [1] - 1380:3
**midpoint** [1] - 1539:22
**might** [11] - 1385:17, 1449:10, 1451:5, 1457:8, 1480:4, 1497:21, 1507:8, 1516:14, 1516:15, 1542:24
**million** [10] - 1401:16, 1401:21, 1402:6, 1402:21, 1536:7, 1538:10, 1538:18, 1538:20, 1540:6, 1540:10
**millions** [9] - 1451:6, 1451:7, 1458:18, 1458:19, 1483:18,

1537:10, 1547:16
**mind** [10] - 1414:11, 1419:7, 1436:5, 1438:21, 1443:19, 1457:13, 1457:15, 1472:14, 1545:9, 1555:5
**mindedness** [1] - 1563:17
**mine** [1] - 1395:3
**minimum** [1] - 1452:5
**minute** [2] - 1449:13, 1501:1
**minutes** [13] - 1387:13, 1388:3, 1405:15, 1406:17, 1410:7, 1449:1, 1460:23, 1494:13, 1533:4, 1541:10, 1564:1, 1564:4, 1564:17
**misinterpreted** [1] - 1525:13
**mislead** [1] - 1537:24
**misstatement** [2] - 1414:17, 1414:18
**mistake** [4] - 1414:12, 1474:19, 1474:23, 1512:2
**mistaken** [4] - 1530:23, 1531:3, 1552:4, 1553:8
**misunderstands** [1] - 1552:10
**mode** [1] - 1495:6
**model** [7] - 1378:3, 1415:18, 1423:23, 1423:24, 1480:8, 1490:7, 1547:24
**modes** [1] - 1443:1
**modify** [1] - 1384:5
**module** [6] - 1462:13, 1462:14, 1467:23, 1467:24, 1468:9
**modules** [3] - 1462:2, 1467:16, 1543:5
**moment** [5] - 1380:5, 1388:11, 1478:11, 1510:22, 1559:21
**Monday** [1] - 1456:5, 1461:16, 1478:13
**monetization** [4] - 1479:8, 1479:13, 1479:15, 1480:18
**monetizing** [2] - 1537:17, 1539:4
**money** [17] - 1404:8, 1418:14, 1439:5, 1451:5, 1455:8, 1455:10, 1456:9,

1479:10, 1480:23, 1481:3, 1481:9, 1537:13, 1537:22, 1538:11, 1538:12, 1539:9, 1540:22
**monitors** [1] - 1453:7
**months** [2] - 1479:11, 1528:6
**moot** [2] - 1564:22, 1565:9
**mootness** [1] - 1565:3
**morning** [13] - 1375:5, 1375:13, 1375:18, 1377:10, 1380:1, 1383:6, 1386:24, 1387:6, 1409:21, 1449:10, 1450:19, 1518:7, 1532:9
**morning's** [1] - 1401:2
**MORRIS** [1] - 1374:4
**Most** [1] - 1452:10
**most** [9] - 1461:3, 1461:5, 1475:18, 1480:13, 1491:13, 1493:1, 1503:16, 1522:20, 1548:17
**motion** [2] - 1403:2, 1404:14
**motions** [1] - 1564:13
**mouthful** [1] - 1448:24
**move** [5] - 1406:5, 1454:24, 1463:10, 1476:23, 1481:16
**moved** [4] - 1389:21, 1454:21, 1536:5, 1539:2
**moves** [1] - 1507:13
**moving** [2] - 1463:11, 1488:14
**MR** [94] - 1376:13, 1379:14, 1379:17, 1380:12, 1381:2, 1381:23, 1382:8, 1383:22, 1384:11, 1384:22, 1385:12, 1385:17, 1385:24, 1386:2, 1387:18, 1388:2, 1388:8, 1388:9, 1388:19, 1389:1, 1390:16, 1390:20, 1390:23, 1391:2, 1391:12, 1391:21, 1392:18, 1392:21, 1394:8, 1394:21, 1395:3, 1395:10, 1395:18, 1396:6, 1396:16, 1397:4, 1398:9, 1398:13, 1399:10, 1399:14,

1400:14, 1400:17, 1400:19, 1400:22, 1401:20, 1402:1, 1402:5, 1403:6, 1403:7, 1403:20, 1404:20, 1404:22, 1405:1, 1405:3, 1405:8, 1405:13, 1405:18, 1406:7, 1406:13, 1406:18, 1406:21, 1407:6, 1407:16, 1407:20, 1408:5, 1408:15, 1409:10, 1409:12, 1409:16, 1409:18, 1449:17, 1449:18, 1450:3, 1450:7, 1450:9, 1450:16, 1450:19, 1490:22, 1491:2, 1541:21, 1551:9, 1559:3, 1559:19, 1560:7, 1560:8, 1560:17, 1560:19, 1563:9, 1564:19, 1564:23, 1565:5, 1565:14, 1565:18
**MS** [17] - 1377:10, 1378:23, 1382:10, 1383:1, 1383:23, 1385:3, 1385:13, 1386:5, 1386:11, 1386:19, 1391:24, 1393:10, 1393:19, 1394:4, 1397:11, 1399:12, 1559:12
**multiple** [1] - 1521:22
**must** [60] - 1381:7, 1410:10, 1410:14, 1411:14, 1416:23, 1417:13, 1418:18, 1419:3, 1419:7, 1420:13, 1421:5, 1423:4, 1423:7, 1424:8, 1424:9, 1424:17, 1425:5, 1426:14, 1426:18, 1427:18, 1427:19, 1428:15, 1428:22, 1429:7, 1429:15, 1429:23, 1430:22, 1431:19, 1432:2, 1433:7, 1433:10, 1433:20, 1434:24, 1438:23, 1439:4, 1439:11, 1439:12, 1440:3, 1441:4, 1441:9, 1444:14, 1444:20, 1446:11, 1446:18, 1447:4, 1447:11,

1448:3, 1448:6, 1448:10, 1448:15, 1493:20, 1512:16, 1512:19, 1521:10, 1524:17, 1554:13, 1555:1, 1556:10, 1557:1
**MYERS** [1] - 1374:6
**MySpace** [1] - 1557:11
**names** [1] - 1467:16
**national** [1] - 1503:6
**natural** [1] - 1483:21
**nature** [3] - 1432:15, 1442:11, 1443:3
**Nawrocki** [17] - 1395:21, 1396:18, 1397:12, 1398:4, 1400:1, 1401:7, 1402:11, 1402:12, 1403:23, 1456:6, 1459:17, 1479:19, 1481:23, 1487:2, 1489:3, 1489:17, 1540:10
**Nawrocki's** [1] - 1392:4
**necessarily** [4] - 1384:18, 1414:13, 1479:23, 1481:3
**necessary** [9] - 1390:7, 1391:15, 1417:5, 1422:8, 1423:6, 1425:7, 1425:21, 1429:6, 1431:5
**necessitated** [1] - 1404:14
**need** [41] - 1375:10, 1375:13, 1375:17, 1375:22, 1383:15, 1387:7, 1387:21, 1405:9, 1405:11, 1408:4, 1408:13, 1414:17, 1418:14, 1420:15, 1432:1, 1436:3, 1437:1, 1437:20, 1440:5, 1445:2, 1456:14, 1465:2, 1470:1, 1470:23, 1471:17, 1478:4, 1478:5, 1483:3, 1488:21, 1489:24, 1507:8, 1509:14, 1510:8, 1511:6, 1511:9, 1511:11, 1533:3, 1533:9, 1533:12, 1560:15, 1565:13
**needed** [2] - 1435:15, 1466:16

**needs** [2] - 1388:18, 1446:7
**negatively** [1] - 1386:16
**negotiate** [1] - 1483:23
**negotiated** [2] - 1446:9, 1446:13
**negotiating** [2] - 1445:10, 1539:15
**negotiation** [27] - 1375:16, 1376:20, 1377:1, 1377:18, 1382:6, 1392:9, 1440:17, 1440:19, 1440:23, 1441:10, 1441:16, 1441:20, 1444:10, 1445:5, 1445:17, 1445:20, 1446:3, 1446:6, 1483:7, 1483:9, 1484:3, 1534:8, 1534:10, 1534:15, 1535:7, 1535:17, 1540:2
**negotiations** [5] - 1390:6, 1441:3, 1445:23, 1457:9, 1535:11
**nervous** [1] - 1484:3
**net** [2] - 1404:3, 1404:7
**network** [4] - 1480:12, 1481:8, 1522:3
**never** [20] - 1401:9, 1401:10, 1467:5, 1469:9, 1469:10, 1475:9, 1478:22, 1481:11, 1485:5, 1485:6, 1489:18, 1503:18, 1520:18, 1539:9, 1539:13, 1540:18, 1540:19, 1540:21, 1556:10
**New** [1] - 1567:2
**new** [5] - 1387:10, 1503:17, 1503:18, 1503:19, 1559:14
**next** [6] - 1389:10, 1389:21, 1389:24, 1466:14, 1512:7, 1518:3
**Next** [2] - 1389:18, 1390:1
**nexus** [1] - 1438:13
**nice** [12] - 1456:13, 1456:17, 1457:2, 1457:3, 1457:8, 1457:12, 1471:7, 1483:6, 1484:14,

1484:15, 1484:19, 1547:10
**nice-to-have** [1] - 1457:12
**NICHOLS** [1] - 1374:4
**night** [3] - 1375:20, 1380:3, 1386:21
**node** [5] - 1423:21, 1509:1, 1511:3, 1514:10, 1514:11
**nodes** [18] - 1506:18, 1507:7, 1507:13, 1508:17, 1508:19, 1508:21, 1509:10, 1509:14, 1510:20, 1510:21, 1511:10, 1511:12, 1513:7, 1514:9, 1514:17, 1515:3
**noises** [1] - 1506:22
**non** [7] - 1412:2, 1433:2, 1436:5, 1437:9, 1437:14, 1437:23, 1477:8
**non-commercial** [1] - 1433:2
**non-experts** [1] - 1412:2
**non-obvious** [2] - 1437:14, 1437:23
**non-obviousness** [1] - 1436:5
**nonetheless** [1] - 1383:12
**nonexclusive** [1] - 1442:12
**nonrestricted** [1] - 1442:12
**normally** [2] - 1443:22, 1529:11
**Notary** [1] - 1567:8
**note** [1] - 1503:24
**noted** [2] - 1380:11, 1380:22
**notes** [9] - 1408:7, 1489:8, 1556:13, 1556:15, 1556:17, 1556:18, 1556:20, 1567:11
**Notes** [1] - 1556:21
**nothing** [7] - 1393:12, 1397:22, 1401:6, 1405:1, 1405:3, 1449:18, 1485:18
**Nothing** [5] - 1450:3, 1560:17, 1560:19, 1565:14, 1565:18
**November** [1] - 1377:20
**number** [24] -

1385:18, 1385:19, 1401:4, 1401:8, 1401:12, 1401:16, 1402:21, 1402:22, 1412:21, 1437:2, 1477:17, 1479:12, 1489:20, 1525:22, 1525:23, 1526:4, 1526:22, 1527:20, 1530:5, 1531:14, 1531:15, 1532:22, 1544:19
**numbered** [2] - 1419:18, 1489:9
**numbers** [14] - 1392:23, 1392:24, 1394:16, 1395:11, 1396:7, 1396:21, 1458:10, 1458:17, 1458:18, 1459:7, 1459:14, 1459:18, 1471:24, 1496:20
**numerical** [1] - 1556:12
**o'clock** [2] - 1559:21, 1560:11
**O'MELVENY** [1] - 1374:6
**oath** [2] - 1413:8, 1474:19
**object** [9] - 1377:11, 1378:22, 1379:18, 1392:4, 1392:5, 1406:5, 1407:22, 1423:24, 1439:16
**objected** [3] - 1375:15, 1401:14, 1405:23
**objecting** [1] - 1380:16
**objection** [24] - 1375:17, 1376:11, 1376:14, 1379:12, 1379:22, 1380:2, 1380:19, 1380:21, 1380:24, 1381:17, 1381:21, 1382:6, 1382:24, 1383:21, 1384:9, 1385:2, 1385:10, 1385:15, 1386:3, 1391:12, 1399:2, 1406:7, 1416:17, 1416:22
**objectionable** [1] - 1389:8
**objections** [11] - 1375:8, 1375:10, 1375:12, 1378:12, 1382:4, 1382:5, 1382:11, 1382:20,

1387:20, 1388:7, 1388:11
**objective** [1] - 1437:7
**objects** [5] - 1377:15, 1378:5, 1378:24, 1386:7, 1424:1
**obligation** [1] - 1432:22
**obligations** [1] - 1432:17
**observers** [1] - 1432:18
**obtain** [1] - 1444:5
**obvious** [23] - 1384:18, 1433:16, 1433:24, 1434:5, 1434:10, 1434:20, 1434:24, 1435:23, 1436:1, 1436:6, 1436:20, 1436:23, 1437:14, 1437:23, 1438:4, 1438:8, 1438:20, 1526:23, 1527:7, 1531:7, 1532:19, 1553:23, 1562:22
**obviously** [5] - 1383:8, 1392:13, 1408:16, 1544:16, 1549:7
**obviousness** [17] - 1383:11, 1384:3, 1384:21, 1385:8, 1427:8, 1433:21, 1434:16, 1436:4, 1436:5, 1436:9, 1437:9, 1438:22, 1438:23, 1472:4, 1526:15, 1526:19
**occur** [1] - 1423:4
**occurred** [6] - 1432:16, 1437:4, 1440:20, 1451:14, 1460:11, 1534:11
**occurrence** [2] - 1519:14, 1519:17
**odd** [1] - 1549:3
**OF** [2] - 1373:2, 1567:5
**offer** [3] - 1440:13, 1451:2, 1451:5
**offered** [3] - 1377:24, 1429:19, 1486:15
**offering** [2] - 1451:3, 1547:9

1453:20, 1453:22, 1472:5, 1472:7, 1473:6, 1476:13, 1476:21, 1518:11, 1518:17, 1519:3, 1519:4, 1519:7, 1520:1, 1551:12, 1551:13, 1553:12
**office** [14] - 1453:17, 1457:21, 1458:1, 1458:4, 1458:6, 1458:8, 1544:14, 1544:17, 1544:24, 1545:7, 1548:10, 1548:12, 1550:19, 1550:24
**officer** [2] - 1558:21, 1558:22
**often** [1] - 1417:7
**old** [2] - 1443:1, 1456:23
**once** [13] - 1450:19, 1471:7, 1478:11, 1491:22, 1492:15, 1496:5, 1508:4, 1515:24, 1517:9, 1541:5, 1547:2, 1550:13, 1564:11
**One** [2] - 1375:22, 1504:23
**one** [118] - 1378:13, 1380:2, 1380:18, 1381:3, 1382:12, 1386:12, 1387:1, 1387:3, 1387:18, 1390:14, 1390:17, 1390:18, 1396:17, 1400:1, 1400:6, 1401:12, 1402:11, 1403:7, 1404:2, 1405:8, 1405:22, 1406:1, 1408:1, 1422:6, 1422:9, 1422:17, 1422:22, 1424:13, 1424:22, 1426:16, 1426:20, 1426:21, 1427:24, 1428:18, 1428:19, 1439:7, 1443:16, 1447:14, 1448:11, 1456:14, 1458:17, 1459:19, 1461:17, 1462:6, 1463:16, 1463:23, 1463:24, 1464:8, 1464:12, 1464:19, 1466:21, 1469:13, 1470:4, 1473:12, 1473:21, 1473:22, 1474:12, 1474:15, 1477:17,

1477:19, 1478:12,
1479:12, 1481:15,
1484:8, 1486:5,
1486:13, 1486:18,
1489:10, 1494:1,
1496:16, 1497:4,
1497:9, 1498:17,
1500:5, 1500:9,
1500:24, 1501:4,
1501:9, 1503:19,
1504:24, 1505:5,
1505:7, 1506:13,
1506:17, 1506:24,
1510:4, 1510:7,
1510:11, 1513:7,
1515:18, 1516:4,
1516:5, 1516:17,
1522:8, 1524:22,
1526:6, 1526:9,
1530:13, 1530:14,
1530:15, 1531:1,
1531:16, 1533:14,
1535:22, 1536:11,
1539:21, 1544:20,
1544:21, 1549:24,
1552:1, 1552:6,
1552:7, 1554:12,
1554:23, 1558:24,
1559:21, 1559:22
**ones** [4] - 1463:21,
1464:1, 1478:3,
1507:14
**opened** [1] - 1494:21
**opening** [12] -
1388:21, 1390:3,
1391:4, 1391:6,
1391:10, 1449:8,
1455:2, 1458:20,
1492:19, 1494:5,
1504:14, 1518:20
**opens** [1] - 1458:14
**operate** [1] - 1536:17
**operates** [1] - 1541:15
**operation** [1] - 1471:3
**opinion** [16] -
1392:10, 1397:13,
1397:15, 1401:8,
1401:9, 1401:10,
1416:4, 1416:5,
1416:9, 1416:14,
1416:18, 1443:15,
1536:6, 1540:14,
1554:17, 1555:5
**opportunity** [5] -
1375:8, 1411:1,
1500:22, 1502:13,
1558:14
**opposed** [2] -
1377:17, 1443:11
**opposite** [1] - 1474:5

**option** [1] - 1547:22
**options** [1] - 1402:17
**orally** [1] - 1558:1
**order** [12] - 1381:22,
1389:17, 1405:23,
1410:7, 1411:13,
1420:16, 1425:5,
1428:14, 1446:9,
1454:14, 1462:19,
1489:10
**orders** [1] - 1558:17
**ordinary** [18] -
1424:13, 1424:14,
1431:2, 1431:20,
1434:2, 1434:7,
1434:13, 1434:21,
1435:1, 1435:7,
1435:16, 1436:12,
1524:18, 1526:24,
1532:3, 1532:18,
1532:24, 1562:24
**organization** [1] -
1528:23
**organizations** [1] -
1555:19
**organizing** [1] -
1422:7
**original** [2] - 1468:18,
1519:11
**originally** [1] -
1402:22
**ostensibly** [1] -
1389:22
**otherwise** [5] -
1411:18, 1413:13,
1430:24, 1556:10,
1558:18
**ought** [8] - 1376:24,
1451:23, 1451:24,
1452:1, 1453:1,
1533:24, 1534:21,
1542:3
**outcome** [1] - 1490:10
**outset** [1] - 1413:3
**outside** [2] - 1427:3,
1459:23
**outstanding** [1] -
1387:20
**outweighs** [1] -
1543:12
**overall** [2] - 1379:22,
1380:19
**overarching** [4] -
1481:19, 1481:22,
1482:14, 1546:7
**overrule** [3] - 1378:11,
1381:20, 1391:16
**overruled** [4] -
1379:13, 1381:1,
1386:18, 1392:5

**own** [14] - 1395:1,
1397:7, 1397:21,
1425:19, 1454:22,
1470:16, 1476:7,
1479:2, 1503:17,
1511:4, 1518:4,
1518:5, 1548:2,
1555:5
**owned** [1] - 1443:4
**owner** [4] - 1419:21,
1419:22, 1446:2,
1455:23
**owns** [2] - 1419:22,
1487:17
**p.m** [1] - 1566:3
**Pacific** [1] - 1535:13
**Page** [3] - 1375:23,
1378:14, 1393:2
**page** [6] - 1376:2,
1478:11, 1479:4,
1501:12, 1545:15,
1546:4
**Pages** [1] - 1567:10
**paid** [10] - 1398:14,
1416:12, 1536:3,
1537:5, 1540:6,
1540:23, 1541:1,
1541:2, 1548:20,
1549:11
**paper** [36] - 1430:13,
1430:18, 1430:19,
1430:22, 1431:12,
1433:18, 1434:5,
1434:11, 1478:17,
1527:15, 1527:20,
1528:3, 1528:13,
1530:8, 1530:12,
1530:14, 1530:20,
1531:2, 1531:7,
1531:12, 1531:19,
1531:24, 1532:6,
1532:22, 1546:5,
1548:5, 1550:3,
1550:16, 1551:24,
1552:5, 1552:9,
1552:10, 1562:7,
1562:13, 1562:23
**papers** [7] - 1475:23,
1544:3, 1544:4,
1544:6, 1544:8,
1549:12, 1552:20
**paperwork** [3] -
1474:21, 1474:22,
1475:1
**paragraph** [3] -
1393:4, 1393:15,
1430:13
**parent** [3] - 1514:9,
1514:11, 1514:19
**parenthetical** [1] -

1383:19
**part** [12] - 1380:18,
1389:20, 1446:16,
1451:22, 1469:4,
1476:23, 1476:24,
1487:13, 1502:21,
1529:17, 1536:16,
1559:12
**partially** [1] - 1519:11
**participate** [1] -
1565:24
**participating** [1] -
1563:23
**particular** [8] -
1377:20, 1382:22,
1437:10, 1465:13,
1469:16, 1504:24,
1520:5, 1558:10
**particularly** [5] -
1472:21, 1472:24,
1514:7, 1524:13,
1536:8
**parties** [30] - 1375:4,
1375:20, 1378:10,
1380:7, 1382:14,
1390:8, 1394:23,
1413:24, 1415:22,
1430:3, 1435:6,
1439:24, 1441:5,
1442:6, 1445:13,
1446:1, 1450:24,
1534:4, 1534:14,
1534:24, 1535:3,
1535:4, 1535:20,
1537:4, 1539:17,
1540:1, 1540:5,
1554:17, 1563:17,
1564:10
**parties'** [4] - 1390:6,
1411:6, 1411:22,
1449:4
**partly** [1] - 1389:5
**partner** [1] - 1506:10
**partners** [3] - 1398:15,
1398:17, 1399:6
**partnership** [1] -
1394:22
**PARTRIDGE** [27] -
1373:21, 1376:13,
1379:14, 1379:17,
1380:12, 1381:2,
1381:23, 1382:8,
1383:22, 1384:11,
1384:22, 1385:12,
1386:2, 1387:18,
1388:8, 1405:1,
1405:8, 1405:13,
1406:7, 1450:3,
1450:7, 1559:3,
1559:19, 1560:17,

1563:9, 1564:23,
1565:14
**parts** [3] - 1420:4,
1467:20, 1510:1
**party** [9] - 1395:4,
1399:6, 1419:1,
1419:5, 1433:3,
1433:5, 1439:7,
1441:11, 1554:15
**party's** [1] - 1415:18
**pass** [2] - 1388:12,
1392:19
**passion** [3] - 1502:9,
1502:24
**past** [1] - 1545:17
**Patent** [41] - 1417:16,
1417:22, 1418:13,
1429:1, 1439:3,
1451:13, 1452:12,
1452:13, 1452:15,
1452:20, 1452:24,
1453:11, 1453:12,
1453:14, 1453:18,
1453:20, 1453:21,
1453:22, 1471:6,
1472:5, 1472:7,
1473:6, 1476:13,
1476:21, 1506:7,
1506:9, 1517:19,
1518:10, 1518:17,
1519:3, 1519:4,
1519:7, 1519:24,
1551:12, 1553:12,
1561:11, 1561:23,
1562:14, 1562:21
**patent** [176] - 1419:18,
1419:19, 1419:21,
1419:22, 1424:15,
1424:19, 1425:2,
1425:9, 1425:12,
1426:16, 1427:7,
1427:9, 1428:4,
1428:6, 1428:24,
1429:5, 1429:14,
1431:8, 1431:10,
1432:6, 1433:15,
1434:11, 1434:19,
1438:14, 1439:11,
1439:18, 1440:11,
1440:15, 1440:24,
1441:5, 1441:6,
1442:19, 1442:22,
1445:22, 1446:2,
1446:24, 1447:20,
1448:12, 1452:1,
1452:5, 1452:8,
1452:9, 1452:10,
1452:11, 1452:12,
1452:16, 1452:18,
1452:19, 1452:21,

1452:24, 1453:3,
1453:16, 1453:23,
1455:22, 1456:11,
1456:14, 1457:2,
1457:4, 1457:5,
1457:12, 1457:18,
1457:21, 1457:23,
1457:24, 1458:1,
1458:3, 1458:4,
1458:5, 1458:8,
1458:24, 1459:21,
1460:2, 1460:12,
1461:19, 1461:20,
1461:21, 1461:24,
1462:24, 1465:1,
1465:20, 1466:3,
1472:2, 1482:3,
1482:5, 1482:20,
1483:4, 1483:5,
1483:9, 1483:12,
1483:24, 1484:1,
1484:4, 1484:11,
1484:12, 1484:20,
1484:22, 1484:23,
1485:19, 1486:2,
1487:4, 1488:9,
1489:23, 1490:4,
1491:4, 1491:7,
1492:11, 1493:22,
1495:2, 1495:3,
1495:4, 1496:12,
1496:14, 1497:2,
1497:17, 1497:23,
1498:1, 1498:7,
1499:22, 1499:23,
1501:2, 1503:11,
1503:22, 1504:1,
1504:4, 1504:10,
1504:17, 1504:20,
1507:10, 1511:20,
1515:22, 1516:2,
1517:7, 1517:10,
1518:8, 1519:11,
1520:2, 1525:3,
1526:3, 1526:22,
1528:9, 1531:13,
1532:7, 1532:23,
1533:19, 1539:9,
1539:21, 1539:24,
1540:7, 1544:12,
1544:14, 1544:17,
1544:18, 1544:24,
1545:2, 1545:7,
1547:10, 1547:11,
1547:15, 1548:9,
1548:12, 1550:7,
1550:9, 1550:19,
1550:20, 1550:21,
1550:24, 1551:14,
1551:17, 1552:5,
1553:20, 1554:1,

1562:23
**patent-in-suit** [1] -
1445:22
**patented** [14] - 1427:6,
1429:24, 1442:17,
1442:24, 1443:3,
1443:11, 1444:15,
1444:17, 1444:19,
1446:15, 1446:23,
1448:1, 1448:17,
1482:10
**patentholder** [4] -
1443:21, 1444:11,
1534:6, 1535:8
**patents** [16] - 1429:1,
1429:3, 1429:20,
1439:18, 1445:18,
1445:19, 1450:22,
1452:10, 1457:19,
1458:8, 1472:13,
1484:7, 1518:10,
1518:12, 1536:2,
1551:18
**patience** [1] - 1409:22
**patient** [1] - 1492:4
**Pavel** [1] - 1457:4
**pay** [10] - 1410:9,
1424:17, 1443:21,
1444:6, 1451:19,
1451:23, 1482:6,
1493:20, 1534:22,
1551:14
**payment** [7] -
1440:11, 1440:15,
1444:10, 1455:22,
1484:16, 1534:6,
1535:20
**pegged** [1] - 1376:24
**People** [1] - 1522:21
**people** [13] - 1389:19,
1414:14, 1443:23,
1451:7, 1454:10,
1472:21, 1483:18,
1497:12, 1502:15,
1520:13, 1523:7,
1523:9, 1549:19
**per** [3] - 1398:15,
1401:15, 1486:18
**percent** [14] - 1396:5,
1396:14, 1397:2,
1398:15, 1398:17,
1398:18, 1403:11,
1403:15, 1477:19,
1487:3, 1539:21,
1539:23, 1552:24
**percentage** [2] -
1396:10, 1397:9
**perfectly** [1] - 1446:7
**perform** [5] - 1427:23,
1513:22, 1515:8,

1516:7, 1554:13
**performance** [3] -
1427:3, 1446:21,
1446:23
**performed** [12] -
1417:24, 1418:5,
1420:14, 1424:8,
1424:10, 1425:5,
1427:16, 1432:2,
1436:4, 1512:16,
1512:19, 1560:5
**performs** [6] -
1424:22, 1425:23,
1426:5, 1426:20,
1427:2, 1494:1
**perhaps** [1] - 1477:19
**period** [3] - 1376:10,
1538:22, 1564:12
**permission** [3] -
1451:11, 1451:12,
1482:5
**permit** [1] - 1554:15
**permits** [1] - 1439:19
**permitted** [4] -
1412:12, 1416:3,
1417:2, 1563:12
**person** [16] - 1416:1,
1431:20, 1432:21,
1434:2, 1434:6,
1434:12, 1434:21,
1435:6, 1436:11,
1505:11, 1505:13,
1505:23, 1524:18,
1526:24, 1532:18,
1562:24
**persons** [4] - 1431:1,
1437:20, 1555:14,
1555:18
**persuade** [1] - 1419:3
**Peter** [5] - 1469:1,
1469:3, 1469:15,
1469:17, 1505:13
**phone** [4] - 1459:11,
1557:7, 1557:15
**phrase** [2] - 1464:22,
1464:23
**pick** [2] - 1487:22,
1509:19
**picking** [2] - 1513:14
**picks** [1] - 1511:16
**pictorial** [3] - 1422:5,
1422:9, 1519:18
**picture** [2] - 1415:18,
1487:22
**pictures** [1] - 1487:20
**piece** [5] - 1404:2,
1404:7, 1492:13,
1492:14, 1527:9
**pieces** [3] - 1491:13,

**pipes** [1] - 1550:8
**place** [6] - 1440:17,
1444:12, 1488:11,
1514:1, 1534:8
**places** [1] - 1542:3
**plain** [2] - 1381:10,
1424:13
**plaintiff** [4] - 1401:3,
1405:2, 1406:4,
1409:16
**Plaintiff** [5] - 1373:4,
1373:24, 1450:4,
1560:18, 1565:15
**Plaintiff's** [3] -
1399:18, 1459:15,
1510:18
**plaintiff's** [7] - 1382:9,
1388:20, 1400:6,
1405:21, 1406:3,
1408:21, 1409:3
**plan** [3] - 1389:11,
1391:5, 1502:22
**plans** [1] - 1389:18
**platform** [5] - 1395:15,
1395:20, 1395:23,
1397:6, 1397:9
**platforms** [2] - 1394:3,
1394:5
**play** [2] - 1478:17,
1559:15
**pleasure** [1] - 1565:24
**plurality** [5] - 1421:14,
1421:16, 1422:1,
1422:19, 1422:24
**point** [17] - 1382:12,
1384:22, 1387:18,
1387:22, 1396:1,
1449:22, 1471:8,
1474:12, 1474:13,
1474:15, 1474:16,
1486:5, 1486:22,
1496:18, 1501:10,
1545:21, 1551:5
**pointed** [4] - 1393:16,
1452:14, 1474:3,
1532:10
**pointing** [3] - 1392:22,
1462:1, 1496:6
**points** [2] - 1466:22,
1488:19
**poll** [1] - 1563:7
**polygonal** [1] -
1423:23
**polygons** [1] - 1424:1
**POOL** [1] - 1373:3
**popular** [2] - 1503:5,
1537:21
**popularity** [1] -
1442:23
**portion** [2] - 1395:14,

1403:10, 1408:8,
1443:10, 1448:6,
1508:22, 1558:10
**portions** [1] - 1558:13
**portray** [1] - 1391:14
**position** [7] - 1423:19,
1451:17, 1466:1,
1466:12, 1466:13,
1466:16, 1565:10
**positions** [1] -
1382:15
**possession** [1] -
1381:12
**possible** [8] -
1413:13, 1413:23,
1498:21, 1498:23,
1507:7, 1509:5,
1516:13, 1557:23
**possibly** [1] - 1549:6
**post** [3] - 1406:1,
1435:14, 1564:13
**potential** [4] -
1384:13, 1403:1,
1413:18, 1478:6
**potentially** [3] -
1408:23, 1514:16,
1514:18
**practice** [2] - 1500:15,
1563:11
**practices** [1] -
1501:13
**praise** [1] - 1438:6
**preamble** [1] - 1424:3
**preceded** [2] -
1519:16, 1519:19
**precision** [5] -
1421:23, 1422:2,
1440:6, 1496:18,
1500:13
**predict** [1] - 1559:8
**predictable** [2] -
1436:17, 1437:3
**preference** [1] -
1559:9
**preferred** [1] -
1441:11
**prejudice** [2] -
1554:14, 1554:16
**prejudicial** [10] -
1378:7, 1379:10,
1386:8, 1386:10,
1392:15, 1400:6,
1404:9, 1407:15,
1408:19
**preliminary** [1] -
1430:1
**premise** [1] - 1457:10
**prepared** [4] - 1411:8,
1468:21, 1469:1,
1469:14

**preponderance** [12] - 1418:22, 1419:2, 1419:11, 1419:15, 1426:19, 1439:22, 1440:2, 1447:4, 1470:2, 1517:17, 1533:18, 1561:8
**present** [8] - 1413:7, 1413:15, 1413:22, 1431:15, 1431:20, 1516:6, 1524:18, 1532:15
**presentation** [2] - 1390:3, 1532:9
**presented** [10] - 1390:4, 1412:6, 1413:2, 1413:8, 1415:22, 1443:17, 1465:8, 1465:12, 1470:5, 1551:20
**presenting** [1] - 1532:11
**preserve** [2] - 1379:17, 1382:14
**preserved** [4] - 1375:14, 1375:17, 1381:17, 1382:4
**preserving** [2] - 1382:20, 1386:6
**pressure** [1] - 1437:1
**presumably** [1] - 1389:20
**presumed** [3] - 1429:2, 1518:11, 1551:18
**pretrial** [1] - 1405:23
**pretty** [4] - 1471:8, 1513:4, 1521:15, 1528:4
**prevail** [1] - 1439:7
**prevent** [1] - 1419:22
**previous** [1] - 1550:4
**previously** [6] - 1376:16, 1379:18, 1380:14, 1381:5, 1407:2, 1437:19
**price** [1] - 1455:20
**pricing** [1] - 1455:21
**print** [1] - 1386:24
**printed** [11] - 1430:7, 1430:19, 1431:5, 1431:8, 1436:2, 1528:14, 1528:15, 1529:20, 1530:8, 1531:16, 1562:7
**printouts** [1] - 1491:12
**prioritize** [1] - 1509:9
**prioritizes** [1] - 1507:12

**priority** [4] - 1430:2, 1430:4, 1479:22, 1519:22
**private** [1] - 1555:18
**Pro** [1] - 1538:7
**probable** [1] - 1419:4
**problem** [11] - 1384:16, 1407:14, 1436:20, 1437:2, 1457:23, 1496:10, 1496:17, 1496:18, 1496:23, 1497:22, 1543:18
**problems** [6] - 1377:3, 1457:18, 1457:19, 1474:6, 1518:21, 1554:1
**proceed** [2] - 1490:24, 1514:5
**proceeding** [1] - 1529:20
**process** [30] - 1389:15, 1443:13, 1453:5, 1453:11, 1457:16, 1462:9, 1465:18, 1481:24, 1482:1, 1492:9, 1500:10, 1502:15, 1507:9, 1508:4, 1508:14, 1509:13, 1510:24, 1511:1, 1513:12, 1513:16, 1513:17, 1514:13, 1514:16, 1517:14, 1529:2, 1531:10, 1532:6, 1533:23, 1535:13, 1559:13
**processing** [1] - 1435:13
**produce** [1] - 1419:7
**produced** [3] - 1411:21, 1443:5, 1529:8
**product** [58] - 1378:4, 1418:1, 1424:22, 1424:24, 1425:23, 1426:3, 1426:5, 1427:20, 1427:23, 1428:1, 1428:18, 1435:11, 1437:17, 1442:14, 1442:17, 1442:21, 1444:16, 1444:22, 1445:21, 1446:17, 1446:20, 1451:9, 1455:6, 1455:8, 1455:9, 1455:14, 1455:16, 1455:17, 1455:20, 1455:21, 1466:7, 1470:13, 1482:9,

1482:11, 1484:4, 1488:17, 1491:19, 1491:20, 1494:1, 1494:3, 1502:10, 1503:1, 1503:3, 1505:12, 1505:17, 1505:21, 1505:22, 1509:23, 1517:4, 1523:6, 1537:15, 1537:21, 1539:2, 1539:8, 1539:14, 1545:5, 1547:16
**Product** [1] - 1505:14
**product's** [1] - 1427:21
**productive** [1] - 1375:4
**products** [35] - 1379:20, 1379:21, 1393:22, 1399:8, 1417:17, 1417:21, 1426:20, 1428:13, 1428:16, 1437:10, 1442:18, 1444:16, 1445:18, 1445:20, 1447:8, 1447:14, 1447:16, 1447:20, 1447:23, 1448:1, 1448:3, 1448:5, 1448:7, 1448:9, 1448:13, 1448:16, 1448:21, 1462:18, 1470:7, 1508:16, 1517:18, 1533:13, 1537:10, 1539:11, 1561:10
**profession** [1] - 1560:5
**professionally** [1] - 1559:24
**profit** [5] - 1443:10, 1443:11, 1444:7, 1486:16, 1538:12
**profitability** [6] - 1378:21, 1379:3, 1379:5, 1379:6, 1442:21, 1447:19
**profitable** [2] - 1480:11, 1548:1
**profits** [4] - 1399:24, 1441:17, 1441:19, 1441:21
**program** [6] - 1393:20, 1394:10, 1394:15, 1394:22, 1394:23, 1397:7
**prohibited** [1] - 1400:9
**project** [5] - 1464:9, 1522:19, 1523:1,

1552:17, 1563:17
**projection** [5] - 1392:24, 1532:13, 1532:14, 1532:15, 1532:17
**projections** [2] - 1376:5, 1441:22
**promoting** [1] - 1442:18
**prompted** [1] - 1436:11
**promptly** [1] - 1557:23
**proof** [5] - 1418:19, 1419:12, 1419:16, 1447:11, 1533:18
**proper** [5] - 1378:8, 1379:9, 1399:7, 1448:4, 1546:22
**property** [2] - 1482:9, 1490:6
**proposal** [11] - 1376:1, 1378:16, 1378:17, 1378:18, 1378:24, 1380:5, 1380:6, 1380:7, 1380:18, 1383:9
**proposals** [5] - 1376:8, 1377:14, 1377:16, 1378:15, 1442:1
**propose** [3] - 1376:2, 1383:4, 1384:5
**proposed** [7] - 1375:5, 1375:19, 1377:12, 1383:8, 1383:15, 1401:5, 1401:10
**proposition** [1] - 1444:5
**protect** [1] - 1522:21
**proud** [2] - 1454:8, 1454:9
**prove** [19] - 1412:21, 1414:5, 1417:14, 1419:1, 1426:18, 1426:19, 1428:2, 1428:4, 1430:22, 1432:2, 1433:7, 1433:9, 1438:23, 1440:1, 1440:3, 1440:5, 1447:4, 1448:10, 1521:9
**proved** [2] - 1418:18, 1448:14
**proven** [20] - 1384:8, 1411:17, 1419:9, 1426:15, 1428:23, 1438:19, 1447:15, 1517:16, 1524:2, 1525:24, 1526:20, 1530:6, 1531:17,

1533:15, 1561:8, 1561:14, 1561:20, 1562:6, 1562:12, 1562:20
**proves** [1] - 1439:22
**provide** [3] - 1460:20, 1472:23, 1557:1
**provided** [7] - 1421:2, 1436:19, 1439:9, 1492:18, 1523:8, 1534:1, 1557:5
**provides** [3] - 1395:4, 1395:20, 1480:14
**providing** [2] - 1395:24, 1422:7
**proving** [4] - 1418:21, 1418:23, 1419:5, 1445:6
**prudent** [2] - 1443:23, 1444:4
**PTO** [6] - 1429:2, 1429:3, 1429:10, 1518:7, 1518:12, 1520:18
**PTX** [4] - 1406:3, 1407:4, 1408:2, 1459:5
**PTX-219** [2] - 1392:2, 1397:17
**public** [40] - 1381:7, 1381:9, 1381:11, 1383:20, 1430:16, 1430:20, 1431:6, 1432:4, 1432:8, 1432:13, 1432:14, 1432:15, 1432:16, 1433:2, 1433:3, 1433:4, 1433:6, 1433:12, 1433:24, 1493:5, 1518:4, 1518:6, 1521:5, 1521:7, 1521:8, 1521:12, 1521:21, 1522:12, 1523:1, 1523:3, 1523:6, 1526:2, 1526:9, 1526:14, 1528:16, 1552:21, 1554:16, 1561:22
**Public** [1] - 1567:9
**publically** [7] - 1432:10, 1432:12, 1432:20, 1433:10, 1521:10, 1522:5, 1561:16
**publication** [10] - 1430:19, 1431:9, 1436:3, 1527:12, 1528:14, 1528:15, 1530:8, 1531:17,

1549:19, 1562:8
**publications** [4] - 1429:20, 1430:7, 1431:5, 1528:21
**publicly** [3] - 1429:18, 1430:9, 1524:4
**publish** [1] - 1438:23
**published** [1] - 1429:24
**publishers** [2] - 1397:20, 1480:14
**publishes** [1] - 1480:10
**pull** [3] - 1397:17, 1404:2, 1489:9
**pulled** [2] - 1404:1, 1548:6
**punish** [1] - 1439:17
**purchased** [1] - 1503:9
**purportedly** [1] - 1390:5
**purpose** [9] - 1376:7, 1377:22, 1378:6, 1380:23, 1392:16, 1400:1, 1433:8, 1438:10, 1441:24
**purposes** [4] - 1384:14, 1386:6, 1429:10, 1442:2
**pursue** [1] - 1503:1
**put** [38] - 1381:12, 1386:21, 1397:20, 1401:4, 1401:15, 1401:19, 1402:8, 1402:20, 1403:8, 1452:17, 1458:3, 1478:17, 1481:18, 1487:11, 1492:1, 1499:12, 1500:18, 1501:3, 1511:18, 1511:24, 1515:23, 1517:8, 1523:6, 1525:11, 1527:24, 1530:19, 1532:17, 1534:3, 1534:17, 1538:22, 1540:10, 1544:18, 1548:15, 1552:2, 1552:21, 1563:16, 1563:21, 1565:9
**puts** [3] - 1456:15, 1507:14, 1542:13
**putting** [1] - 1492:16
**quadrant** [1] - 1423:20
**qualified** [2] - 1435:18, 1443:15
**qualifies** [6] - 1429:12, 1429:15, 1430:15, 1430:18,

1433:14, 1521:14
**qualify** [1] - 1430:21
**quality** [3] - 1467:23, 1468:1, 1510:20
**quarter** [1] - 1510:20
**questioned** [2] - 1451:19, 1544:5
**Questions** [1] - 1476:21
**questions** [14] - 1383:10, 1386:13, 1413:5, 1413:18, 1471:24, 1485:15, 1517:15, 1520:22, 1527:2, 1528:12, 1528:13, 1556:8, 1556:12, 1562:3
**quick** [4] - 1462:9, 1462:10, 1492:21, 1501:9
**quickly** [2] - 1509:5, 1516:13
**quite** [4] - 1399:9, 1448:24, 1454:23, 1558:15
**raise** [2] - 1391:23, 1403:1
**raised** [4] - 1375:13, 1382:3, 1402:4, 1521:2
**raises** [1] - 1407:13
**random** [1] - 1509:20
**rate** [19] - 1376:7, 1377:23, 1378:6, 1397:5, 1401:10, 1401:15, 1402:8, 1442:1, 1444:20, 1448:20, 1448:23, 1486:13, 1486:15, 1486:16, 1486:18, 1489:14, 1540:13, 1540:15, 1540:16
**rates** [1] - 1486:6
**Rather** [1] - 1519:20
**rather** [3] - 1474:4, 1519:16, 1519:20
**re** [1] - 1555:5
**RE** [1] - 1526:4
**re-examine** [1] - 1555:5
**RE44550** [6] - 1517:20, 1526:22, 1561:11, 1561:23, 1562:14, 1562:21
**reach** [10] - 1412:9, 1412:16, 1444:3, 1447:13, 1466:21, 1483:17, 1492:14, 1533:12, 1554:20, 1554:24

**reached** [6] - 1411:9, 1445:4, 1556:6, 1558:15, 1560:14, 1561:2
**reaching** [1] - 1402:17
**read** [25] - 1378:16, 1378:19, 1386:22, 1387:2, 1397:17, 1397:19, 1453:6, 1456:22, 1456:23, 1477:18, 1479:7, 1491:15, 1499:10, 1504:3, 1528:1, 1530:20, 1534:20, 1549:16, 1549:17, 1549:18, 1558:11, 1558:13, 1558:14, 1559:15, 1561:7
**readily** [1] - 1381:10
**ready** [5] - 1405:6, 1409:15, 1409:17, 1450:14, 1450:17
**real** [9] - 1455:8, 1460:16, 1463:14, 1475:5, 1538:11, 1538:12, 1555:10
**realized** [3] - 1405:19, 1466:9, 1547:14
**really** [28] - 1457:22, 1458:11, 1461:12, 1463:21, 1467:7, 1470:12, 1470:13, 1475:8, 1478:18, 1478:20, 1481:5, 1486:13, 1492:5, 1494:15, 1494:21, 1499:13, 1500:15, 1509:3, 1509:16, 1516:2, 1516:3, 1516:4, 1518:22, 1533:5, 1537:21, 1543:1, 1546:1
**reason** [13] - 1400:12, 1404:10, 1412:17, 1436:11, 1465:7, 1512:8, 1519:7, 1527:4, 1533:8, 1536:13, 1536:16, 1546:8
**reasonable** [35] - 1376:9, 1398:6, 1401:11, 1402:18, 1412:13, 1419:12, 1419:15, 1431:3, 1439:14, 1439:23, 1440:4, 1440:14, 1441:8, 1441:14, 1442:3, 1442:4, 1444:7, 1444:9, 1444:14, 1444:24,

1447:10, 1448:18, 1448:20, 1448:22, 1452:5, 1477:6, 1478:8, 1488:22, 1490:11, 1493:9, 1533:4, 1534:5, 1546:11, 1546:22
**reasonably** [3] - 1441:3, 1444:2, 1535:11
**reasons** [3] - 1467:17, 1504:22, 1519:12
**rebrands** [1] - 1455:16
**rebut** [1] - 1391:18
**rebuttal** [2] - 1449:8, 1549:13
**receipts** [3] - 1474:17, 1474:24
**receive** [1] - 1398:17
**received** [6] - 1402:16, 1411:20, 1415:1, 1452:15, 1488:18, 1529:20
**receives** [1] - 1394:12
**recess** [9] - 1387:13, 1410:5, 1417:7, 1449:16, 1449:23, 1556:2, 1558:24, 1560:11, 1560:12
**recessed** [1] - 1566:3
**recite** [2] - 1420:8, 1425:13
**recited** [1] - 1427:24
**recollection** [5] - 1415:20, 1415:22, 1522:14, 1556:19, 1556:22
**reconcile** [1] - 1469:19
**record** [7] - 1375:2, 1379:18, 1386:6, 1404:16, 1407:22, 1478:4, 1567:9
**recorded** [1] - 1413:4
**records** [1] - 1538:6
**recover** [4] - 1378:19, 1439:14, 1447:17, 1448:8
**red** [1] - 1380:3
**redacted** [2] - 1400:13, 1400:23
**redaction** [3] - 1399:20, 1400:15, 1400:20
**Reed** [17] - 1451:16, 1451:20, 1477:13, 1478:22, 1481:23, 1482:16, 1483:7, 1485:2, 1485:9, 1485:11, 1489:2,

1489:18, 1533:23, 1535:12, 1538:4, 1539:23, 1546:10
**Reed's** [1] - 1540:9
**reference** [12] - 1407:14, 1409:7, 1429:23, 1430:24, 1431:8, 1431:16, 1431:17, 1432:1, 1434:19, 1436:1, 1486:5, 1524:15
**referenced** [1] - 1399:24
**references** [15] - 1379:19, 1380:15, 1429:19, 1430:6, 1430:10, 1433:17, 1433:18, 1433:20, 1433:22, 1435:18, 1435:20, 1435:24, 1453:8, 1473:7, 1524:14
**referred** [2] - 1432:7, 1461:7
**referring** [2] - 1383:17, 1465:17
**refers** [8] - 1389:8, 1425:14, 1425:18, 1425:23, 1426:1, 1426:7, 1426:9, 1501:20
**reflect** [2] - 1444:20, 1542:5
**reflected** [1] - 1445:12
**reflecting** [2] - 1378:19, 1447:17
**reflects** [4] - 1486:13, 1486:17, 1486:18, 1542:1
**refuses** [1] - 1548:2
**regard** [5] - 1406:22, 1407:18, 1436:16, 1471:19, 1487:2
**regarding** [4] - 1377:14, 1379:4, 1379:9, 1556:4
**regardless** [3] - 1411:19, 1411:21, 1554:20
**Registered** [1] - 1567:7
**registration** [1] - 1549:2
**reissue** [4] - 1452:8, 1452:9, 1452:11, 1453:23
**reissued** [2] - 1520:2
**reject** [1] - 1415:12
**relate** [1] - 1438:21
**related** [19] - 1378:2,

1392:7, 1399:15,
1400:24, 1421:12,
1421:13, 1422:20,
1423:1, 1423:5,
1423:8, 1496:14,
1505:2, 1515:7,
1515:24, 1526:11,
1528:12, 1532:21,
1539:21, 1539:24
**relates** [7] - 1389:2,
1391:23, 1397:20,
1399:16, 1513:24,
1524:13, 1536:14
**relationship** [5] -
1442:15, 1445:24,
1446:1, 1469:16,
1512:14
**relative** [1] - 1446:5
**release** [2] - 1451:9,
1479:11
**released** [2] - 1479:1,
1503:10
**relevance** [2] -
1480:15
**relevant** [11] - 1378:7,
1403:18, 1408:8,
1412:8, 1414:1,
1424:14, 1427:8,
1432:14, 1438:12,
1480:19, 1538:22
**reliable** [1] - 1447:8
**relied** [2] - 1403:23,
1445:1
**rely** [10] - 1403:16,
1415:21, 1416:7,
1416:8, 1436:8,
1446:10, 1552:13,
1553:5, 1556:16,
1556:18
**remainder** [1] -
1425:11
**remaining** [3] -
1375:6, 1377:2,
1378:13
**Remember** [2] -
1472:3, 1555:10
**remember** [31] -
1414:15, 1451:19,
1453:10, 1456:3,
1457:17, 1458:22,
1461:16, 1462:17,
1464:6, 1467:20,
1474:1, 1474:3,
1479:9, 1481:22,
1483:5, 1484:9,
1485:4, 1485:12,
1487:4, 1508:7,
1540:4, 1542:24,
1543:3, 1547:10,
1548:8, 1549:10,

1549:15, 1549:22,
1550:2, 1550:9,
1552:8
**remembers** [1] -
1414:14
**remind** [2] - 1421:10,
1470:17
**remote** [2] - 1399:9,
1440:7
**remove** [1] - 1389:15
**removing** [1] -
1404:10
**render** [1] - 1531:7
**rendered** [1] - 1527:7
**rendering** [3] -
1418:6, 1510:19,
1510:21
**renders** [2] - 1527:15,
1532:19
**repeat** [11] - 1467:1,
1467:8, 1500:8,
1506:19, 1512:10,
1512:11, 1513:1,
1513:10, 1513:18,
1514:13, 1517:23
**repeated** [3] -
1375:18, 1379:19,
1380:14
**repeating** [5] -
1423:10, 1423:14,
1500:3, 1514:2,
1515:17
**repetitive** [2] -
1550:11, 1559:5
**reporter** [1] - 1558:12
**REPORTER** [1] -
1567:5
**Reporter** [2] - 1567:8
**reporters** [1] -
1565:21
**represent** [2] - 1500:1,
1506:16
**representation** [3] -
1422:6, 1422:9,
1519:18
**represented** [2] -
1500:6, 1512:24
**representing** [3] -
1422:4, 1511:2,
1514:4
**represents** [1] -
1423:24
**reprices** [1] - 1455:17
**reprioritizing** [1] -
1509:10
**request** [19] - 1405:14,
1421:21, 1472:9,
1499:24, 1505:1,
1505:4, 1506:14,
1506:19, 1508:7,

1508:14, 1509:1,
1511:17, 1512:18,
1513:8, 1513:14,
1514:10, 1514:12,
1558:10, 1563:7
**requested** [10] -
1381:7, 1421:20,
1423:8, 1508:7,
1508:17, 1508:19,
1508:20, 1508:21,
1512:23, 1515:4
**requesting** [8] -
1422:19, 1423:1,
1423:4, 1424:9,
1507:16, 1508:11,
1511:2, 1512:17
**requests** [1] - 1507:16
**require** [1] - 1419:12
**required** [8] - 1375:9,
1377:4, 1396:24,
1416:5, 1418:18,
1428:2, 1517:23,
1558:16
**requirement** [1] -
1427:22
**requirements** [10] -
1420:4, 1427:12,
1431:19, 1433:14,
1435:11, 1471:14,
1512:14, 1521:14,
1524:17, 1525:10
**requires** [5] - 1444:18,
1467:3, 1476:3,
1504:24, 1517:10
**research** [2] -
1435:10, 1557:13
**reserve** [2] - 1375:11,
1449:7
**resolution** [19] -
1376:12, 1384:13,
1386:16, 1421:22,
1422:18, 1422:20,
1422:23, 1423:1,
1423:4, 1423:7,
1423:13, 1423:16,
1423:17, 1466:21,
1467:21, 1468:1,
1505:1, 1513:3
**resolutions** [4] -
1422:1, 1422:18,
1422:22, 1487:21
**resolved** [1] - 1375:7
**resolves** [1] - 1400:22
**respect** [9] - 1379:15,
1380:13, 1381:1,
1385:8, 1385:21,
1385:22, 1399:7,
1408:3, 1442:13
**respond** [1] - 1557:23
**response** [5] -

1400:18, 1468:5,
1491:23, 1540:8,
1558:3
**responsible** [1] -
1396:14
**rest** [5] - 1380:21,
1424:19, 1493:21,
1510:16, 1510:17
**restricted** [1] -
1442:12
**restriction** [1] -
1432:22
**result** [4] - 1402:23,
1437:12, 1522:10,
1525:19
**resulted** [4] - 1441:9,
1441:16, 1444:10,
1445:16
**results** [2] - 1443:2,
1448:7
**resume** [2] - 1449:20,
1559:20
**retire** [2] - 1555:21,
1558:18
**retrieving** [2] - 1514:4,
1522:2
**reveal** [1] - 1556:8
**Revenue** [1] - 1393:19
**revenue** [25] -
1379:19, 1380:15,
1392:3, 1392:11,
1393:14, 1393:18,
1393:24, 1394:1,
1394:2, 1394:9,
1394:16, 1395:11,
1395:24, 1396:15,
1396:21, 1398:15,
1477:10, 1479:24,
1486:15, 1537:22,
1538:11, 1538:17,
1538:19, 1539:7
**revenues** [20] -
1376:4, 1392:7,
1392:13, 1392:23,
1396:21, 1397:21,
1399:24, 1400:3,
1400:10, 1441:22,
1447:24, 1448:4,
1448:6, 1448:13,
1448:16, 1448:18,
1448:21, 1448:23,
1539:22, 1539:24
**review** [5] - 1405:10,
1406:11, 1492:12,
1554:4, 1557:4
**reviewed** [2] -
1475:17, 1536:10
**reviewing** [1] -
1416:12
**revised** [2] - 1388:12,

1388:14
**rid** [2] - 1391:3,
1391:4
**rigorous** [1] - 1419:10
**risk** [3] - 1404:17,
1452:18, 1458:3
**risked** [1] - 1457:23
**risks** [1] - 1443:13
**RMR** [1] - 1567:20
**roadmap** [1] - 1492:21
**role** [4] - 1420:20,
1420:21, 1447:12,
1489:4
**rollcall** [1] - 1406:1
**ROM** [7] - 1527:24,
1528:5, 1529:21,
1545:4, 1548:6
**ROMs** [3] - 1529:2,
1529:7, 1529:24
**room** [9] - 1411:9,
1454:8, 1459:5,
1502:18, 1554:8,
1555:21, 1557:18,
1558:18, 1563:24
**ROONEY** [1] -
1373:23
**Rosh** [1] - 1464:8
**roughly** [1] - 1398:18
**Rous** [1] - 1528:21,
1529:9
**royalty** [57] - 1376:7,
1376:9, 1377:23,
1378:6, 1396:9,
1398:6, 1401:11,
1402:8, 1402:15,
1402:18, 1439:14,
1439:23, 1440:11,
1440:14, 1440:15,
1441:8, 1441:9,
1441:11, 1441:14,
1441:15, 1441:20,
1441:24, 1442:3,
1442:4, 1443:20,
1444:6, 1444:9,
1444:14, 1444:20,
1444:24, 1447:10,
1448:18, 1448:20,
1448:23, 1451:19,
1452:6, 1455:22,
1477:6, 1477:12,
1478:8, 1482:6,
1488:22, 1490:11,
1493:9, 1533:5,
1534:5, 1534:6,
1537:5, 1539:21,
1540:9, 1540:11,
1540:13, 1540:14,
1546:12, 1546:14,
1546:22
**Rule** [3] - 1375:9,

1403:1, 1404:14
**rule** [3] - 1375:22, 1394:19, 1403:4
**ruled** [2] - 1376:20, 1403:9
**rules** [3] - 1426:14, 1428:22, 1563:12
**ruling** [6] - 1399:11, 1403:12, 1405:16, 1406:21, 1407:21, 1407:23
**rulings** [2] - 1401:18, 1406:14
**run** [5] - 1467:21, 1468:2, 1474:6, 1496:21, 1564:14
**running** [1] - 1537:5
**runs** [2] - 1404:17, 1528:23

**sale** [1] - 1429:19
**sales** [2] - 1437:17, 1442:18
**sat** [1] - 1466:6
**satellite** [2] - 1487:18, 1487:19
**satellites** [1] - 1487:24
**satisfied** [3] - 1433:13, 1437:19, 1521:13
**satisfies** [1] - 1382:22
**satisfy** [1] - 1499:6
**saw** [13] - 1389:20, 1464:6, 1464:7, 1473:17, 1481:18, 1484:21, 1495:2, 1504:3, 1539:12, 1545:2, 1548:5, 1548:14
**scene** [1] - 1508:18
**scheme** [1] - 1403:10
**Schmidt** [1] - 1498:11
**Schmidt's** [1] - 1498:14
**Science** [1] - 1435:9
**scope** [5] - 1421:1, 1427:14, 1435:3, 1435:21, 1442:11
**SCOTT** [1] - 1373:21
**screen** [1] - 1528:2
**seal** [1] - 1567:15
**Search** [1] - 1481:14
**search** [1] - 1398:15
**seated** [5] - 1375:1, 1449:24, 1558:20, 1560:13, 1564:6
**SEC** [2] - 1399:18, 1399:21
**second** [13] - 1377:13, 1391:22, 1393:3, 1397:15, 1448:12,

1453:1, 1476:13, 1476:22, 1493:3, 1519:17, 1544:12, 1550:19, 1550:23
**secondary** [1] - 1437:7
**secrecy** [1] - 1432:23
**secret** [1] - 1433:2
**section** [3] - 1423:3, 1423:12, 1423:16
**sections** [20] - 1422:6, 1422:10, 1422:17, 1422:19, 1422:21, 1422:22, 1422:24, 1423:2, 1423:3, 1423:6, 1423:9, 1423:11, 1423:15, 1505:3, 1505:5, 1506:13, 1506:15
**security** [1] - 1558:21
**see** [41] - 1384:15, 1384:22, 1392:22, 1393:5, 1453:15, 1454:4, 1457:13, 1458:16, 1463:8, 1463:11, 1467:22, 1467:23, 1467:24, 1471:4, 1471:23, 1474:1, 1474:24, 1475:1, 1480:4, 1480:7, 1480:9, 1480:20, 1481:15, 1488:3, 1496:12, 1496:13, 1499:16, 1508:19, 1516:14, 1516:15, 1516:21, 1518:21, 1524:11, 1541:22, 1544:17, 1544:19, 1544:24, 1545:3, 1545:5, 1545:6, 1564:4
**seeing** [1] - 1508:2
**seek** [3] - 1451:11, 1451:12, 1555:12
**seeks** [4] - 1378:19, 1439:14, 1447:5, 1447:17
**seem** [1] - 1403:1
**select** [1] - 1554:8
**Select** [1] - 1556:1
**selection** [1] - 1519:15
**sell** [4] - 1440:13, 1547:16, 1547:18
**selling** [2] - 1442:17, 1455:6
**send** [2] - 1507:20, 1512:18
**senior** [1] - 1491:18
**Senior** [1] - 1505:14

**sense** [6] - 1412:17, 1452:3, 1479:3, 1535:2, 1550:17, 1563:22
**sent** [6] - 1375:4, 1375:20, 1383:5, 1503:24, 1504:1, 1534:22
**sentence** [7] - 1377:12, 1377:13, 1378:16, 1378:18, 1381:8, 1381:15, 1393:5
**sentences** [3] - 1376:3, 1376:15, 1419:19
**separate** [4] - 1383:10, 1420:12, 1421:16, 1469:3
**separately** [1] - 1427:18
**series** [3] - 1389:2, 1390:4, 1390:12
**serious** [2] - 1407:13, 1563:16
**server** [2] - 1487:9, 1487:10
**servers** [1] - 1488:12
**service** [5] - 1557:8, 1557:9, 1563:14, 1563:19, 1564:3
**session** [6] - 1401:4, 1458:12, 1458:13, 1458:15, 1459:7, 1537:6
**sessions** [7] - 1401:9, 1401:12, 1458:11, 1489:18, 1489:21, 1540:12, 1540:22
**set** [8] - 1377:18, 1402:11, 1402:12, 1406:17, 1419:24, 1468:21, 1523:17, 1567:14
**sets** [1] - 1425:4
**seven** [10] - 1385:5, 1385:19, 1460:8, 1460:17, 1482:18, 1486:3, 1488:17, 1488:24, 1489:18, 1489:23
**several** [7] - 1453:8, 1471:24, 1504:13, 1507:16, 1519:15, 1519:21, 1528:6
**SGI** [7] - 1389:8, 1389:14, 1389:23, 1454:13, 1454:14, 1454:17, 1454:20
**SGI's** [10] - 1389:12,

**shall** [1] - 1477:4
**share** [6] - 1395:10, 1395:12, 1395:19, 1395:24, 1396:5, 1398:15
**shared** [1] - 1502:8
**shed** [1] - 1437:8
**short** [1] - 1448:8
**Shorthand** [1] - 1567:8
**shorthand** [1] - 1465:17
**shortly** [1] - 1430:17
**show** [33] - 1388:22, 1389:12, 1391:10, 1395:5, 1398:21, 1398:22, 1398:23, 1400:9, 1433:10, 1448:2, 1448:6, 1468:15, 1470:9, 1474:18, 1474:23, 1476:5, 1492:13, 1494:4, 1494:7, 1494:11, 1506:8, 1509:20, 1510:16, 1512:4, 1521:10, 1527:23, 1530:2, 1534:18, 1539:17, 1544:1, 1549:20, 1550:22
**showed** [30] - 1405:11, 1454:13, 1461:13, 1462:3, 1467:10, 1467:15, 1469:17, 1469:18, 1471:2, 1472:2, 1473:23, 1475:10, 1479:21, 1494:14, 1506:23, 1506:24, 1510:4, 1510:13, 1514:22, 1524:22, 1525:18, 1530:14, 1532:7, 1535:19, 1540:11, 1543:4, 1543:24, 1544:2, 1544:5, 1551:20
**Showing** [1] - 1522:4
**showing** [5] - 1457:19, 1505:19, 1509:15, 1521:1, 1522:4
**shown** [11] - 1415:9, 1415:15, 1438:6, 1469:11, 1470:2, 1471:2, 1475:20, 1500:7, 1522:7, 1543:22, 1550:24
**showroom** [1] - 1454:14
**shows** [10] - 1389:12,

1395:22, 1397:7, 1443:8, 1473:14, 1473:19, 1473:20, 1531:5, 1541:15, 1551:24
**shrunk** [1] - 1386:22
**side** [10] - 1388:16, 1410:4, 1413:22, 1417:13, 1469:13, 1470:4, 1470:8, 1477:15, 1511:19
**side's** [1] - 1417:12
**sided** [1] - 1393:2
**sides** [3] - 1413:18, 1444:2, 1560:1
**SIGGRAPH** [6] - 1453:14, 1453:15, 1475:12, 1475:21, 1521:24, 1522:8
**Siggraph** [11] - 1526:8, 1528:5, 1528:23, 1529:5, 1529:10, 1529:13, 1529:15, 1543:17, 1544:7, 1545:4, 1550:16
**sign** [1] - 1411:12
**Signed** [1] - 1563:5
**significance** [1] - 1414:20
**significant** [1] - 1443:13
**significantly** [1] - 1407:15
**Silicon** [1] - 1502:13
**similar** [9] - 1390:4, 1443:2, 1445:11, 1445:15, 1445:19, 1446:1, 1506:23, 1530:10, 1555:16
**Simmons** [1] - 1397:10
**SIMMONS** [17] - 1374:7, 1377:10, 1378:23, 1382:10, 1383:1, 1383:23, 1385:3, 1385:13, 1386:5, 1386:11, 1386:19, 1391:24, 1393:10, 1393:19, 1394:4, 1397:11, 1399:12
**simple** [4] - 1414:12, 1473:14, 1473:16, 1474:1
**simplification** [2] - 1473:4, 1475:7
**simplifications** [2] - 1473:10, 1473:24
**simplify** [3] - 1472:15,

1474:5, 1549:15
**simplifying** [1] -
1472:16
**simply** [7] - 1414:19,
1436:6, 1441:10,
1467:4, 1467:11,
1528:10, 1559:16
**simulators** [4] -
1495:8, 1495:13,
1495:15, 1495:18
**single** [9] - 1396:19,
1412:20, 1412:24,
1431:15, 1434:18,
1436:1, 1475:10,
1481:11, 1536:11
**sit** [1] - 1515:12
**site** [1] - 1397:21
**sitting** [1] - 1454:6
**situation** [3] -
1380:15, 1486:1,
1547:13
**situations** [1] - 1445:6
**six** [2] - 1385:6,
1531:14
**sized** [1] - 1423:22
**skill** [18] - 1424:14,
1431:20, 1434:2,
1434:6, 1434:7,
1434:12, 1434:21,
1435:1, 1435:7,
1435:16, 1436:12,
1524:18, 1526:24,
1532:3, 1532:18,
1532:24, 1562:24
**skilled** [1] - 1431:2
**skip** [1] - 1509:13
**Skip** [1] - 1510:21
**Slide** [1] - 1391:23
**slide** [21] - 1389:2,
1389:7, 1389:10,
1389:17, 1389:18,
1389:21, 1389:24,
1390:1, 1390:15,
1392:1, 1392:6,
1392:23, 1406:23,
1407:1, 1468:21,
1540:11, 1542:7,
1544:18, 1546:24,
1549:13, 1549:23
**slides** [14] - 1387:21,
1388:22, 1389:2,
1390:4, 1391:3,
1391:4, 1391:5,
1391:6, 1405:15,
1469:17, 1469:18,
1469:20, 1469:21,
1481:17
**slow** [1] - 1516:14
**small** [1] - 1382:12
**smaller** [14] - 1422:19,

1422:21, 1422:24,
1423:2, 1423:3,
1423:5, 1423:9,
1423:11, 1423:15,
1500:5, 1505:2,
1505:4, 1506:15,
1538:20
**smart** [2] - 1509:13,
1557:7
**smarter** [1] - 1511:15
**smooth** [5] - 1463:10,
1483:21, 1516:7,
1516:10, 1516:11
**SNYDER** [22] - 1374:7,
1399:14, 1400:17,
1400:22, 1403:7,
1403:20, 1404:20,
1405:3, 1406:13,
1408:5, 1409:10,
1409:18, 1449:18,
1450:9, 1490:22,
1491:2, 1551:9,
1560:8, 1560:19,
1564:19, 1565:5,
1565:18
**Snyder** [6] - 1406:10,
1490:21, 1541:19,
1551:8, 1554:5,
1564:18
**software** [8] - 1395:5,
1417:24, 1422:14,
1464:9, 1470:19,
1487:11, 1487:12,
1502:23
**sold** [1] - 1442:14
**sole** [1] - 1416:19
**solely** [1] - 1555:8
**solution** [1] - 1436:20
**solutions** [1] - 1437:3
**solve** [3] - 1437:2,
1496:10, 1496:23
**solved** [4] - 1496:8,
1496:17, 1497:22,
1550:16
**someone** [8] - 1388:5,
1435:1, 1438:1,
1451:17, 1458:20,
1532:2, 1532:23,
1547:15
**sometimes** [3] -
1432:7, 1437:7,
1516:10
**somewhat** [2] -
1410:6, 1522:20
**sooner** [1] - 1509:11
**Sorry** [1] - 1409:23
**sorry** [7] - 1378:17,
1385:24, 1394:17,
1397:14, 1400:19,
1506:7, 1527:15

**sort** [1] - 1388:4
**sounds** [2] - 1505:23,
1538:18
**source** [70] - 1450:21,
1461:6, 1461:8,
1461:11, 1461:13,
1461:14, 1462:5,
1462:12, 1462:16,
1462:17, 1463:2,
1463:18, 1464:1,
1464:13, 1464:14,
1465:9, 1465:11,
1465:14, 1465:18,
1465:23, 1466:1,
1466:2, 1466:6,
1466:10, 1467:10,
1468:9, 1470:5,
1470:11, 1470:12,
1470:15, 1470:18,
1471:1, 1471:17,
1472:19, 1473:18,
1473:19, 1473:22,
1475:10, 1475:15,
1475:17, 1475:18,
1475:19, 1476:4,
1476:10, 1476:16,
1476:20, 1478:15,
1478:16, 1478:18,
1478:21, 1491:12,
1509:16, 1512:5,
1514:22, 1522:19,
1522:22, 1523:9,
1542:10, 1542:17,
1542:19, 1542:21,
1542:23, 1543:2,
1543:11, 1543:13,
1543:22, 1543:23,
1552:23
**sources** [2] - 1421:15,
1421:17
**space** [8] - 1421:12,
1422:20, 1423:1,
1423:5, 1423:8,
1423:19, 1496:22,
1505:2
**space-related** [6] -
1421:12, 1422:20,
1423:1, 1423:5,
1423:8, 1505:2
**spar** [1] - 1525:1
**spatial** [2] - 1421:23,
1422:2
**spatially** [1] - 1421:15
**speaking** [2] - 1529:6,
1548:16
**SPEARS** [1] - 1373:22
**special** [3] - 1416:1,
1483:19, 1493:6
**specialty** [1] - 1489:11
**specific** [7] - 1426:14,

1461:20, 1467:16,
1492:9, 1498:8,
1515:6, 1532:20
**specifically** [8] -
1391:9, 1393:6,
1424:11, 1515:5,
1515:11, 1519:14,
1529:10, 1536:14
**specification** [1] -
1519:20
**speculate** [3] -
1379:6, 1417:1,
1417:9
**speculative** [3] -
1407:12, 1440:8,
1447:10
**spend** [2] - 1493:1,
1493:8
**spends** [1] - 1537:11
**spent** [4] - 1493:9,
1537:13, 1537:14,
1538:21
**spirit** [1] - 1523:8
**split** [1] - 1398:18
**splits** [1] - 1394:10
**splitting** [1] - 1386:7
**spoken** [1] - 1453:19
**spreadsheet** [1] -
1459:1
**spreadsheets** [1] -
1458:17
**spun** [1] - 1503:1
**SRI** [10] - 1430:12,
1430:15, 1432:5,
1433:13, 1433:18,
1434:1, 1523:11,
1525:13, 1545:6,
1561:20
**SRI's** [10] - 1432:11,
1432:12, 1433:9,
1521:7, 1521:9,
1521:13, 1524:3,
1526:1, 1526:23,
1561:15
**stacks** [1] - 1491:11
**staff** [1] - 1565:22
**stages** [1] - 1409:24
**stand** [15] - 1408:24,
1413:7, 1413:15,
1456:7, 1465:11,
1466:6, 1485:7,
1485:9, 1485:20,
1494:7, 1495:8,
1527:14, 1527:23,
1544:15, 1555:19
**standard** [1] - 1419:10
**standards** [1] -
1419:16
**standing** [1] - 1555:15
**standpoint** [7] -

1379:24, 1382:9
**stands** [1] - 1499:2
**Stanford** [10] - 1442:9,
1444:23, 1445:2,
1484:8, 1484:9,
1484:12, 1484:21,
1485:4, 1485:18,
1485:22
**start** [15] - 1391:17,
1392:21, 1420:24,
1455:6, 1460:7,
1478:9, 1493:11,
1502:14, 1506:6,
1506:12, 1506:24,
1507:16, 1508:2,
1508:10, 1559:9
**started** [4] - 1454:2,
1465:12, 1532:14,
1538:8
**starting** [1] - 1440:10
**starts** [2] - 1409:2,
1507:2
**state** [1] - 1416:3
**State** [1] - 1567:1
**statement** [1] -
1410:20
**Statements** [1] -
1411:2
**STATES** [1] - 1373:1
**States** [14] - 1373:14,
1400:4, 1417:17,
1426:24, 1427:2,
1427:4, 1454:12,
1459:20, 1459:21,
1459:24, 1460:1,
1460:2, 1460:9
**stations** [1] - 1555:16
**statute** [3] - 1477:2,
1477:14, 1486:16
**stay** [1] - 1391:19
**stemming** [1] -
1382:13
**stenographic** [1] -
1567:11
**Step** [28] - 1471:3,
1473:20, 1473:21,
1501:13, 1504:23,
1512:9, 1512:10,
1512:11, 1512:15,
1512:18, 1512:19,
1512:24, 1513:17,
1513:22, 1513:24,
1514:6, 1515:7,
1515:9, 1515:10,
1517:22, 1517:23
**step** [54] - 1396:17,
1396:19, 1398:5,
1398:19, 1420:12,
1420:13, 1422:11,

1423:10, 1423:14, 1424:7, 1424:9, 1424:10, 1427:2, 1428:19, 1432:10, 1462:3, 1462:7, 1462:13, 1462:20, 1463:6, 1463:7, 1463:13, 1464:20, 1464:24, 1465:1, 1465:2, 1465:18, 1465:20, 1466:20, 1466:23, 1467:2, 1467:7, 1467:9, 1467:18, 1467:19, 1477:24, 1495:6, 1499:20, 1499:21, 1500:4, 1506:20, 1507:11, 1512:21, 1513:17, 1515:17, 1543:4, 1543:8, 1550:11

**Stephen** [5] - 1520:6, 1543:15, 1543:16, 1544:22, 1545:1

**steps** [25] - 1396:17, 1396:22, 1417:23, 1420:4, 1424:23, 1425:5, 1425:13, 1425:15, 1425:18, 1425:20, 1425:24, 1426:6, 1427:16, 1427:24, 1428:7, 1428:11, 1428:13, 1431:15, 1432:24, 1463:5, 1494:1, 1499:17, 1500:3, 1515:9, 1517:22

**Still** [1] - 1454:6

**still** [19] - 1389:17, 1434:19, 1452:19, 1455:4, 1457:23, 1458:1, 1458:4, 1467:20, 1493:4, 1494:14, 1502:24, 1507:21, 1527:5, 1527:7, 1545:13, 1545:21, 1550:14, 1550:20, 1550:21

**stipulations** [1] - 1411:23

**stood** [2] - 1461:17, 1461:18

**stopped** [1] - 1538:23

**stops** [1] - 1508:5

**store** [5] - 1499:24, 1506:16, 1513:9, 1513:15, 1514:12

**stored** [2] - 1500:6, 1512:24

**stores** [1] - 1537:12

**storing** [3] - 1421:18, 1421:19, 1514:4

**story** [4] - 1455:2, 1455:3, 1504:12, 1544:23

**strategic** [2] - 1479:17, 1479:21

**strategy** [22] - 1456:3, 1456:4, 1456:6, 1478:10, 1478:19, 1478:23, 1478:24, 1479:3, 1479:6, 1479:8, 1479:16, 1481:1, 1481:10, 1482:24, 1489:11, 1490:9, 1545:14, 1545:15, 1545:19, 1545:24, 1546:13

**Street** [1] - 1373:11

**StreetView** [1] - 1487:12

**stricken** [3] - 1407:11, 1407:23, 1408:2

**strictly** [1] - 1413:20

**strikes** [1] - 1515:12

**striking** [3] - 1407:17, 1408:21, 1409:3

**strong** [1] - 1533:17

**structure** [3] - 1423:21, 1445:14, 1445:15

**studied** [2] - 1509:24, 1510:10

**study** [2] - 1435:14, 1510:8

**stuff** [3] - 1468:3, 1472:1, 1545:6

**sub** [1] - 1424:8

**sub-dividing** [1] - 1424:8

**subdivide** [1] - 1550:10

**subject** [5] - 1415:24, 1431:2, 1533:6, 1533:8, 1564:20

**submit** [5] - 1400:23, 1518:23, 1518:24, 1519:8, 1559:16

**submitted** [2] - 1400:21, 1519:3

**subparagraph** [2] - 1519:16, 1519:19

**subparts** [2] - 1512:20, 1526:12

**subsection** [1] - 1504:24

**subsections** [3] - 1508:8, 1508:15, 1511:17

**substep** [1] - 1424:7

1424:9, 1512:16, 1512:17

**substeps** [4] - 1467:4, 1473:20, 1515:9, 1516:8

**succeeded** [1] - 1503:14

**success** [5] - 1437:15, 1442:22, 1446:17, 1459:23, 1490:3

**successful** [3] - 1403:2, 1437:12, 1488:16

**sudden** [3] - 1465:24, 1466:11, 1538:3

**sufficient** [4] - 1403:3, 1412:20, 1416:14, 1548:10

**sufficiently** [1] - 1504:5

**suggest** [11] - 1383:6, 1389:19, 1390:5, 1399:3, 1437:13, 1437:22, 1438:3, 1438:7, 1439:6, 1537:3, 1558:24

**suggested** [2] - 1377:2, 1436:21

**suggesting** [2] - 1391:17, 1396:13

**suggestion** [5] - 1376:17, 1389:4, 1389:16, 1390:10, 1401:15

**suit** [1] - 1445:22

**sum** [6] - 1484:16, 1535:20, 1536:10, 1536:12, 1537:1, 1540:9

**summarize** [1] - 1502:5

**summarized** [1] - 1535:18

**summary** [1] - 1417:12

**Superman** [1] - 1454:3

**support** [7] - 1381:14, 1401:6, 1403:3, 1404:3, 1404:13, 1404:16, 1546:14

**supported** [1] - 1416:13

**supporting** [1] - 1479:13

**supports** [1] - 1546:14

**supposed** [3] - 1482:12, 1509:21, 1522:21

**Supreme** [1] - 1381:18

**surface** [1] - 1424:1

**surprise** [1] - 1542:4

**surrounding** [1] - 1432:18

**sustain** [1] - 1399:1

**sustained** [1] - 1416:21

**swear** [1] - 1558:21

**sworn** [3] - 1413:4, 1554:22, 1558:22

**sympathy** [1] - 1554:16

**Symposium** [2] - 1521:24, 1522:7

**symposium** [1] - 1474:12

**Synovium** [1] - 1381:13

**System** [1] - 1527:10

**system** [46] - 1381:11, 1383:17, 1389:13, 1395:6, 1430:12, 1430:15, 1432:5, 1432:11, 1432:12, 1433:6, 1433:7, 1433:9, 1433:13, 1433:18, 1434:1, 1495:12, 1497:4, 1497:5, 1497:9, 1497:10, 1503:5, 1511:16, 1520:8, 1520:11, 1520:23, 1521:3, 1521:9, 1521:13, 1521:18, 1522:4, 1523:13, 1524:3, 1524:8, 1524:10, 1525:6, 1526:1, 1526:7, 1526:23, 1527:14, 1527:19, 1531:19, 1531:24, 1551:24, 1552:16, 1552:21, 1561:15

**systems** [2] - 1430:8, 1497:14

**T_Vision** [26] - 1430:13, 1430:18, 1430:19, 1430:21, 1431:12, 1433:17, 1434:5, 1434:11, 1472:2, 1527:10, 1527:20, 1528:3, 1528:12, 1530:7, 1530:11, 1531:6, 1531:12, 1531:19, 1531:24, 1532:22, 1548:5, 1549:12, 1551:24, 1562:7, 1562:13, 1562:23

**T_VisionVision** [1] - 1389:13

**table** [3] - 1420:7, 1482:4, 1484:3

**tabletop** [4] - 1420:8, 1420:9, 1420:10, 1420:11

**tad** [1] - 1498:6

**talks** [3] - 1392:2, 1495:4, 1497:4

**tangible** [1] - 1447:9

**target** [2] - 1467:23, 1468:1

**targeting** [3] - 1480:15, 1480:18

**taught** [2] - 1435:20, 1436:21

**Technical** [1] - 1521:23

**technical** [12] - 1415:24, 1416:2, 1416:4, 1446:22, 1473:7, 1473:8, 1484:7, 1485:13, 1485:23, 1496:8, 1496:10, 1496:16

**technically** [3] - 1484:10, 1485:6, 1485:14

**technique** [1] - 1493:6

**technological** [1] - 1411:24

**technologically** [1] - 1536:1

**technologies** [2] - 1446:23, 1447:7

**technology** [4] - 1424:14, 1448:17, 1473:6, 1536:19

**telephone** [1] - 1557:6

**ten** [10] - 1387:13, 1401:15, 1401:24, 1402:23, 1460:22, 1486:17, 1491:3, 1491:4, 1491:20, 1495:4

**tender** [1] - 1436:1

**tending** [1] - 1414:4

**term** [3] - 1442:19, 1479:9, 1519:15

**terminology** [2] - 1420:2, 1421:5

**terms** [6] - 1420:21, 1421:3, 1424:11, 1442:13, 1490:2, 1519:15

**TerraVision** [42] - 1383:17, 1430:12, 1430:15, 1432:5, 1432:11, 1432:12, 1433:9, 1433:13, 1433:18, 1434:1,

1453:9, 1472:1,
1475:11, 1475:19,
1520:8, 1520:9,
1521:3, 1521:7,
1521:9, 1521:13,
1521:18, 1522:24,
1523:5, 1523:11,
1524:3, 1524:8,
1525:5, 1525:13,
1525:19, 1526:1,
1526:23, 1527:19,
1543:16, 1543:19,
1543:20, 1544:22,
1545:1, 1545:5,
1552:16, 1561:15,
1561:21
**terrifying** [6] -
1483:13, 1483:15,
1484:22, 1485:1,
1486:2, 1547:13
**territory** [1] - 1442:13
**test** [3] - 1501:12,
1501:13, 1505:18
**testified** [22] -
1377:24, 1394:12,
1395:21, 1396:2,
1398:4, 1398:22,
1398:24, 1412:22,
1413:15, 1414:5,
1415:10, 1417:2,
1458:12, 1463:15,
1489:17, 1494:9,
1500:17, 1505:17,
1548:24, 1552:7,
1553:4
**testify** [5] - 1413:7,
1413:19, 1495:22,
1505:23, 1530:14
**testifying** [4] -
1416:13, 1474:19,
1511:23, 1530:18
**testimony** [57] -
1379:2, 1392:10,
1393:13, 1393:21,
1393:23, 1397:23,
1398:1, 1407:17,
1408:3, 1408:22,
1409:3, 1409:7,
1411:18, 1411:23,
1412:5, 1412:13,
1412:19, 1412:20,
1413:1, 1413:8,
1413:10, 1413:11,
1413:22, 1414:3,
1414:9, 1414:24,
1415:4, 1415:7,
1415:12, 1415:13,
1415:23, 1416:15,
1443:15, 1450:21,
1453:18, 1469:2,

1469:7, 1469:15,
1498:14, 1508:13,
1511:3, 1511:5,
1520:5, 1520:17,
1520:19, 1529:1,
1539:12, 1548:7,
1549:6, 1549:9,
1556:23, 1558:8,
1558:11, 1558:13,
1558:14, 1559:5
**testing** [1] - 1432:19
**text** [3] - 1474:2,
1474:4, 1557:9
**texturizing** [3] -
1496:9, 1496:12,
1496:15
**THE** [99] - 1373:1,
1373:2, 1373:13,
1375:1, 1377:9,
1378:9, 1379:12,
1379:16, 1380:4,
1380:20, 1381:16,
1382:1, 1382:19,
1383:3, 1384:1,
1384:19, 1385:1,
1385:4, 1385:14,
1385:20, 1386:10,
1386:18, 1386:20,
1387:24, 1388:4,
1388:10, 1388:24,
1390:14, 1390:17,
1391:1, 1391:16,
1392:17, 1392:20,
1393:8, 1393:17,
1394:1, 1394:7,
1394:17, 1395:2,
1395:9, 1395:16,
1396:4, 1396:13,
1397:1, 1397:10,
1398:1, 1398:7,
1398:11, 1399:1,
1400:12, 1401:23,
1402:3, 1402:24,
1403:14, 1404:12,
1404:23, 1405:5,
1405:9, 1405:17,
1406:9, 1406:16,
1406:20, 1407:4,
1407:8, 1407:19,
1407:24, 1408:12,
1409:4, 1409:14,
1409:21, 1449:15,
1449:20, 1449:24,
1450:5, 1450:11,
1450:13, 1450:18,
1490:20, 1491:1,
1541:19, 1551:7,
1554:5, 1558:20,
1558:23, 1559:11,
1559:18, 1559:20,
1560:10, 1

1560:21, 1560:23,
1561:2, 1561:5,
1563:10, 1564:6,
1565:1, 1565:7,
1565:17, 1565:20
**themselves** [3] -
1433:19, 1448:9,
1464:5
**theory** [1] - 1447:21
**therefore** [11] -
1377:21, 1390:9,
1420:23, 1426:4,
1431:9, 1447:4,
1467:8, 1498:6,
1499:3, 1536:5,
1556:6
**Therefore** [2] - 1378:4,
1379:8
**They've** [2] - 1504:12,
1518:15
**they've** [4] - 1509:13,
1518:17, 1520:13,
1521:2
**thinking** [1] - 1384:14
**thinks** [1] - 1505:9
**thinner** [1] - 1552:15
**third** [7] - 1394:23,
1395:4, 1399:6,
1433:3, 1433:4,
1481:15, 1488:7
**third-party** [1] -
1399:6
**thirds** [1] - 1462:24
**thirty** [1] - 1460:22
**three** [20] - 1375:6,
1377:3, 1383:16,
1384:8, 1435:9,
1470:6, 1481:17,
1501:14, 1501:17,
1502:2, 1502:17,
1518:9, 1522:15,
1525:17, 1525:22,
1526:17, 1531:13,
1539:21, 1545:17,
1549:24
**tie** [1] - 1447:11
**tied** [3] - 1446:15,
1447:16, 1448:8
**timeline** [1] - 1539:17
**timing** [1] - 1446:5
**TIMOTHY** [2] -
1373:13, 1373:23
**title** [1] - 1389:16
**Today** [1] - 1452:7
**today** [15] - 1382:3,
1450:24, 1451:13,
1451:16, 1453:24,
1455:24, 1457:14,
1466:13, 1466:16,
1466:22, 1484:10,

1498:3, 1502:7,
1515:12, 1565:13
**together** [3] - 1450:23,
1532:17, 1542:13
**ton** [1] - 1537:22
**took** [9] - 1388:9,
1390:11, 1448:24,
1459:18, 1462:8,
1464:10, 1502:19,
1506:2, 1510:7
**tools** [1] - 1492:17
**top** [2] - 1479:22,
1520:14
**topic** [1] - 1518:3
**total** [4] - 1396:15,
1396:20, 1400:10,
1538:21
**tough** [2] - 1456:23,
1477:3
**toughest** [1] - 1476:23
**track** [4] - 1388:5,
1496:20, 1506:11,
1536:21
**tracker** [1] - 1454:6
**Trademark** [5] -
1429:2, 1518:10,
1551:12, 1551:13,
1553:12
**training** [1] - 1416:1
**transaction** [1] -
1445:12
**transcript** [4] -
1375:24, 1474:13,
1474:14, 1567:11
**translation** [1] -
1519:21
**traverse** [1] - 1514:1
**traversed** [4] -
1508:17, 1508:18,
1509:2, 1513:6
**traversing** [3] -
1507:3, 1507:11,
1513:13
**treat** [2] - 1483:7,
1565:9
**treated** [2] - 1413:14,
1555:20
**tree** [8] - 1423:20,
1507:3, 1507:5,
1507:11, 1508:10,
1513:13, 1514:1
**trial** [39] - 1377:24,
1389:5, 1410:21,
1413:3, 1413:5,
1413:20, 1414:10,
1415:5, 1415:19,
1417:5, 1417:8,
1419:18, 1464:23,
1468:7, 1468:11,
1470:8, 1470:19,

1470:20, 1489:8,
1490:17, 1493:13,
1494:21, 1499:19,
1519:1, 1541:22,
1542:10, 1543:12,
1555:17, 1556:5,
1556:14, 1558:5,
1559:1, 1559:4,
1559:6, 1559:7,
1564:9, 1564:13,
1564:18, 1564:20
**Trial** [2] - 1373:3,
1459:15
**tried** [6] - 1437:21,
1493:13, 1505:21,
1510:2, 1517:9,
1560:1
**triple** [8] - 1452:21,
1452:24, 1453:4,
1453:10, 1453:22,
1472:5, 1476:22,
1544:12
**triple-checked** [1] -
1452:24
**true** [12] - 1467:4,
1467:5, 1467:12,
1474:5, 1505:15,
1523:21, 1527:18,
1540:24, 1543:20,
1544:16, 1548:7,
1567:10
**truly** [1] - 1457:3
**trust** [2] - 1553:12,
1563:21
**truth** [2] - 1414:14,
1555:12
**truthful** [2] - 1523:14,
1523:19
**try** [5] - 1403:8,
1436:24, 1492:12,
1505:18, 1538:16
**trying** [11] - 1406:23,
1444:2, 1472:10,
1481:24, 1490:1,
1491:5, 1492:17,
1493:4, 1509:3,
1518:4, 1518:5
**TUNNELL** [1] - 1374:4
**turn** [9] - 1393:2,
1451:6, 1478:10,
1481:12, 1512:7,
1518:3, 1527:9,
1533:3, 1546:4
**turning** [1] - 1375:19
**turns** [2] - 1508:23,
1540:2
**twenty** [1] - 1460:22,
1548:17
**twice** [1] - 1521:19
**Twitter** [1] - 1557:11

**two** [29] - 1375:10, 1375:21, 1376:3, 1377:2, 1384:7, 1386:7, 1388:16, 1388:20, 1399:15, 1425:1, 1430:13, 1445:23, 1449:5, 1462:24, 1464:7, 1464:8, 1466:21, 1467:20, 1469:19, 1495:21, 1504:22, 1506:14, 1511:19, 1511:22, 1512:22, 1525:23, 1532:17, 1539:22, 1539:23

**Two** [2] - 1377:4, 1552:6

**two-thirds** [1] - 1462:24

**type** [4] - 1386:21, 1386:22, 1387:1, 1456:16

**types** [4] - 1415:16, 1425:1, 1459:8, 1470:6

**typewritten** [1] - 1558:7

**typical** [4] - 1378:2, 1378:4, 1402:7, 1486:6

**U.S** [6] - 1517:19, 1522:9, 1561:11, 1561:23, 1562:14, 1562:21

**UIAP** [1] - 1480:8

**ultimate** [6] - 1444:19, 1461:9, 1470:18, 1476:9, 1476:15, 1542:16

**unanimous** [3] - 1411:10, 1411:15, 1556:6

**uncontradicted** [1] - 1489:17

**Under** [1] - 1413:6

**under** [8] - 1384:17, 1413:8, 1432:21, 1442:22, 1474:19, 1486:16, 1528:8, 1538:9

**underlying** [2] - 1397:14, 1398:20

**understood** [2] - 1466:7, 1481:7

**Understood** [1] - 1381:2

**unduly** [1] - 1556:20

**unfair** [1] - 1520:14

**unfortunate** [1] - 1523:10

**Unfortunately** [1] - 1410:5

**unhappy** [1] - 1378:10

**unimportant** [1] - 1414:22

**UNITED** [1] - 1373:1

**United** [14] - 1373:14, 1400:4, 1417:17, 1426:24, 1427:1, 1427:4, 1454:12, 1459:19, 1459:21, 1459:23, 1460:1, 1460:2, 1460:9

**University** [1] - 1445:2

**Unless** [1] - 1450:1

**unless** [5] - 1411:17, 1433:3, 1447:23, 1556:9, 1558:17

**unpatented** [2] - 1443:12, 1444:17

**unrelated** [1] - 1446:23

**unsolved** [1] - 1437:20

**unusual** [1] - 1522:21

**up** [32] - 1375:20, 1382:23, 1386:11, 1386:13, 1392:19, 1397:18, 1416:6, 1417:8, 1435:19, 1438:1, 1458:19, 1461:17, 1461:18, 1463:1, 1478:17, 1485:17, 1499:2, 1508:11, 1523:17, 1524:24, 1528:3, 1530:2, 1534:17, 1536:5, 1540:10, 1540:17, 1542:22, 1544:18, 1548:5, 1548:6, 1548:15, 1555:7

**US** [3] - 1526:3, 1526:22, 1528:7

**usage** [8] - 1481:20, 1482:15, 1482:16, 1482:17, 1483:1, 1486:18, 1546:9, 1546:16

**useful** [1] - 1388:22

**user** [2] - 1422:12, 1486:12

**users** [17] - 1479:23, 1479:24, 1480:1, 1480:3, 1480:13, 1481:2, 1481:6, 1481:20, 1482:15, 1482:16, 1482:17, 1482:24, 1483:1, 1509:5, 1546:6,

1546:8, 1548:1

**uses** [13] - 1424:4, 1460:8, 1482:19, 1482:20, 1486:3, 1488:17, 1488:24, 1492:24, 1493:12, 1513:12, 1536:20, 1536:22, 1539:23

**utility** [1] - 1442:24

**vacation** [1] - 1480:5

**vague** [1] - 1494:16

**valid** [16] - 1429:2, 1429:4, 1429:14, 1439:11, 1441:6, 1448:11, 1452:4, 1452:19, 1483:9, 1483:12, 1484:24, 1518:11, 1518:13, 1547:12, 1551:18

**validity** [2] - 1421:10, 1429:11

**value** [16] - 1378:20, 1394:11, 1395:19, 1443:8, 1444:15, 1444:18, 1444:20, 1446:18, 1446:20, 1447:1, 1447:18, 1447:22, 1487:4, 1546:1

**variability** [1] - 1472:20

**various** [7] - 1396:7, 1402:10, 1402:12, 1402:17, 1433:16, 1498:15, 1552:20

**vast** [1] - 1550:7

**verdict** [47] - 1383:4, 1383:5, 1383:11, 1385:15, 1387:6, 1387:10, 1388:5, 1388:12, 1388:13, 1405:10, 1406:12, 1410:2, 1411:7, 1411:10, 1411:12, 1411:14, 1412:3, 1412:10, 1470:22, 1471:9, 1471:23, 1490:19, 1492:14, 1517:13, 1524:1, 1525:22, 1530:5, 1531:14, 1532:21, 1533:7, 1551:3, 1554:9, 1554:10, 1554:20, 1555:22, 1556:6, 1556:7, 1557:14, 1558:16, 1560:3, 1561:3, 1561:6, 1561:7, 1563:13, 1564:8, 1564:22, 1565:11

**version** [3] - 1387:1, 1400:23, 1440:3

**versions** [3] - 1529:22, 1538:6, 1539:3

**versus** [2] - 1376:22, 1381:13

**video** [9] - 1455:14, 1464:6, 1464:7, 1475:13, 1476:1, 1520:9, 1522:4, 1539:13

**videos** [1] - 1450:22

**videotape** [1] - 1528:24

**view** [18] - 1377:7, 1401:11, 1402:15, 1410:22, 1421:19, 1421:20, 1422:5, 1422:8, 1433:24, 1434:5, 1434:10, 1452:3, 1483:4, 1488:11, 1507:6, 1507:9, 1562:22, 1564:11

**viewed** [1] - 1411:24

**visual** [1] - 1422:11

**visualization** [2] - 1502:11, 1523:3

**visualize** [2] - 1495:12, 1503:7

**visualizing** [1] - 1503:5

**Volume** [1] - 1373:3

**voluntarily** [1] - 1444:2

**wait** [3] - 1381:5, 1406:16, 1564:1

**waiting** [2] - 1409:23, 1516:22

**walk** [2] - 1487:22, 1542:23

**walked** [2] - 1461:13, 1471:16

**walking** [1] - 1543:2

**wants** [11] - 1454:2, 1531:5, 1536:15, 1536:18, 1537:24, 1546:10, 1546:11, 1549:14, 1549:16, 1551:11, 1553:5

**watched** [1] - 1549:3

**watching** [1] - 1494:10

**ways** [3] - 1486:7, 1498:12, 1498:15

**web** [1] - 1395:1

**website** [5] - 1394:24, 1395:2, 1395:6, 1395:7, 1557:10

**week** [5] - 1413:23, 1450:21, 1466:14, 1490:18, 1559:6

**weigh** [3] - 1470:14, 1543:9

**weighing** [1] - 1461:10

**weighs** [2] - 1461:12, 1467:14

**weight** [13] - 1376:9, 1376:17, 1377:6, 1377:17, 1413:12, 1414:2, 1416:18, 1416:20, 1438:9, 1442:2, 1486:9, 1556:22

**Welcome** [1] - 1450:13

**wheel** [1] - 1491:11

**WHEREOF** [1] - 1567:14

**whole** [7] - 1475:12, 1475:23, 1487:21, 1499:9, 1529:1, 1550:4, 1550:12

**wholly** [1] - 1519:11

**Wiek** [1] - 1519:10

**Williamson** [1] - 1506:10

**WILLIAMSON** [3] - 1374:8, 1405:18, 1559:12

**willing** [15] - 1441:7, 1443:21, 1443:22, 1444:6, 1445:12, 1458:2, 1482:2, 1482:3, 1482:6, 1485:17, 1485:20, 1540:2, 1547:6, 1564:13

**Wilmington** [4] - 1373:12, 1464:4, 1487:21, 1567:16

**win** [1] - 1417:14

**witness** [45] - 1406:1, 1407:18, 1408:23, 1412:20, 1412:24, 1413:5, 1413:6, 1413:7, 1413:8, 1413:11, 1413:14, 1413:15, 1414:3, 1414:5, 1414:7, 1414:10, 1414:12, 1414:13, 1414:16, 1414:22, 1415:2, 1415:6, 1415:7, 1415:9, 1415:13, 1416:3, 1416:10, 1416:11, 1416:22, 1417:1, 1464:13,

1464:17, 1464:18,
1466:6, 1478:24,
1481:11, 1485:7,
1485:9, 1489:19,
1491:21, 1520:6,
1540:18, 1548:14,
1548:16, 1548:20
**WITNESS** [1] -
1567:14
**witness'** [1] - 1415:12
**witness's** [4] -
1407:17, 1408:22,
1409:3, 1558:10
**witnesses** [16] -
1405:24, 1411:19,
1412:22, 1413:19,
1413:24, 1414:24,
1415:23, 1416:6,
1416:20, 1461:4,
1478:22, 1542:8,
1543:12, 1548:18,
1549:9, 1551:22
**word** [8] - 1391:13,
1424:4, 1496:12,
1525:2, 1525:3,
1525:4, 1547:18
**wording** [1] - 1416:24
**words** [17] - 1412:15,
1421:6, 1424:15,
1427:14, 1431:18,
1464:21, 1474:4,
1484:22, 1499:7,
1499:8, 1512:10,
1524:16, 1525:7,
1527:4, 1532:14,
1546:7, 1557:15
**workers** [1] - 1507:18
**works** [26] - 1404:1,
1464:14, 1468:8,
1475:20, 1491:20,
1491:22, 1492:2,
1500:20, 1501:5,
1505:9, 1505:22,
1506:4, 1509:22,
1510:12, 1512:3,
1512:4, 1513:23,
1514:23, 1515:15,
1516:2, 1516:3,
1517:11, 1529:11,
1547:24, 1552:11,
1552:19
**world** [5] - 1487:12,
1488:13, 1502:17,
1503:7, 1505:12
**worldwide** [1] -
1400:3
**worry** [1] - 1471:18
**worth** [2] - 1395:24,
1555:15
**wraps** [1] - 1450:23

**write** [4] - 1375:19,
1463:21, 1505:15,
1505:16
**writing** [1] - 1557:24
**written** [4] - 1381:22,
1415:1, 1491:14,
1557:21
**wrote** [5] - 1464:1,
1464:12, 1470:11,
1475:18, 1552:24
**year** [8] - 1451:8,
1455:7, 1460:4,
1522:8, 1528:6,
1528:7, 1544:3
**year-and-a-half** [1] -
1544:3
**years** [20] - 1376:23,
1377:21, 1392:8,
1435:10, 1475:24,
1491:3, 1491:4,
1491:20, 1495:4,
1505:17, 1520:20,
1534:23, 1537:14,
1538:10, 1548:17,
1548:19, 1550:2,
1550:15, 1553:24
**yesterday** [5] -
1375:3, 1400:20,
1451:15, 1451:16,
1544:16
**yourself** [3] - 1412:2,
1414:4, 1555:1
**YouTube** [1] - 1557:11
**zero** [7] - 1455:18,
1455:20, 1456:4,
1456:8, 1465:15,
1538:3, 1545:17
**zoom** [4] - 1483:20,
1488:10, 1495:6,
1502:16
**zooming** [1] - 1460:21